**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSHUA ATCHLEY, ELISSA ATCHLEY, JOHN
ARAGON, SR., BRIAN BEAUMONT,
DEMPSEY BENNETT, BRANDEAUX
CAMPBELL, ANGIE CAPRA, ANTHONY
CAPRA, SR., SHARON CAPRA, MARK CAPRA,
VICTORIA CAPRA, A.C., a minor, J.C., a minor,
S.C., a minor, DANIELLE CAPRA, EMILY
CAPRA, JACOB CAPRA, JOANNA CAPRA,
JOSEPH CAPRA, JULIA-ANNE CAPRA,
MICHAEL CAPRA, RACHEL LEE, SARAH
JOHNSON, SALLY CHAND, MICHAEL
CHAND, JR., CHRISTINA MAHON, RYAN
CHAND, BRENDA CHAND, KARA
CONNELLY, JEAN DAMMANN, MARK
DAMMANN, KEVIN CONNELLY, JIMMY
CONNOLLY, MELISSA DOHENY, KATHY
KUGLER, ROBERT KUGLER, AMY RITCHIE,
DREW EDWARDS, DONIELLE EDWARDS,
MICHAEL ADAM EMORY, MARIA de la luz
VILLA, BOBBY EMORY, TANYA EVRARD,
JACOB HARBIN, ELIJAH HARBIN, ESTHER
TATE, LEASA DOLLAR, EUGENE DELOZIER,
BILLY JOHNSON, BRIDGET JUNEAU,
STEPHANIE JUNEAU, WILLIAM KELSO,
JOHN KIRBY, CAREN KLECKER, GREGORY
KLECKER, LEROY LANCASTER, MICHAEL
LUKOW, ANGELA ROBINSON, RANDALL
THOMPSON, NATHAN MCCLURE, NIKITA
MCNEAL, J.M., a minor, JOSEPH MIXSON,
JOHN MIXSON, KARON MIXSON, ALICIA
MIXSON, RICHARD NEIBERGER, MARY
NEIBERGER, ERIC NEIBERGER, AMI
NEIBERGER, ROBERT NEIBERGER,
ANTHONY DONALD PELLECCHIA,
ANTHONY PELLECCHIA, KATHRYN ANN
JOHNSON, DANIEL PRICE, TERRI OVERTON,
CARL REIHER, SHAY HILL, FOR THE
ESTATE OF ALAN ROGERS, LUIS ROSA-
VALENTIN, LUIS ROSA-ALBERTY, M.R., a
minor, ALEX ROSA-VALENTIN, ILIANA
ROSA-VALENTIN, ELENA SHAW, EMILY
SHAW, C.S., a minor, L.S., a minor, KATHLEEN
STEPHENS, TRENT STEPHENS, DEREK

Case No.: _____


JURY TRIAL DEMANDED

STEPHENS, RHETT STEPHENS, SUMMER
STEPHENS, BRITTANI HOBSON, SUSAN
ARNOLD, DAVID ARNOLD, SAMANTHA
TUCKER, DAISY TUCKER, BRANDON
ARNOLD, RACHELLE IDOL, JAMES
VAUGHN, JEANNINE VAUGHN, CLIFFORD
VAUGHN, MICHELE WHITE, SHELBY
WHITE, S.W., a minor, ROBERT WINEGAR,
MELISSA WITTE, WILLIAM ZAPPA,

Plaintiffs,

v.

ASTRAZENECA UK LIMITED,
ASTRAZENECA PHARMACEUTICALS LP, GE
HEALTHCARE USA HOLDING LLC, GE
MEDICAL SYSTEMS INFORMATION
TECHNOLOGIES, INC., GE MEDICAL
SYSTEMS INFORMATION TECHNOLOGIES
GMBH, JOHNSON & JOHNSON, CILAG GMBH
INTERNATIONAL, ETHICON ENDO-
SURGERY, LLC, ETHICON, INC., JANSSEN
ORTHO LLC, JANSSEN PHARMACEUTICA
N.V., JOHNSON & JOHNSON (MIDDLE EAST)
INC., ORTHO BIOLOGICS LLC, PFIZER INC.,
PFIZER ENTERPRISES SARL, PFIZER
PHARMACEUTICALS LLC, PHARMACIA &
UPJOHN COMPANY LLC, WYETH
PHARMACEUTICALS INC., F. HOFFMANN-LA
ROCHE LTD., GENENTECH, INC.,
HOFFMANN-LA ROCHE INC.,

Defendants.

## COMPLAINT FOR VIOLATION OF THE ANTI-TERRORISM ACT AND STATE LAW

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

THE DEFENDANTS ........................................................................................... 9

    A.    The AstraZeneca Defendants ............................................................. 9

    B.    The GE Defendants ............................................................................ 9

    C.    The J&J Defendants ......................................................................... 10

    D.    The Pfizer Defendants ..................................................................... 11

    E.    The Roche Defendants ..................................................................... 11

JURISDICTION AND VENUE ......................................................................... 12

SOURCING ........................................................................................................ 13

FACTUAL ALLEGATIONS .............................................................................. 14

    I.     UNDER SADDAM HUSSEIN, THE IRAQI MINISTRY OF HEALTH
        BECAME A CORRUPT TOOL OF TERRORIST FINANCE ................................. 14

    II.    DEFENDANTS TRANSACTED BUSINESS WITH A POST-SADDAM
        HEALTH MINISTRY THAT WAS CONTROLLED BY SHIITE
        TERRORISTS LOYAL TO MUQTADA AL-SADR ................................. 18

        A.    Muqtada al-Sadr And The Formation Of Jaysh al-Mahdi ................... 18

        B.    Jaysh al-Mahdi's Control Of The Health Ministry ............................. 21

            1.    Dr. Adel Muhsin Abdullah al-Khazali (Inspector General of MOH) ............. 25

            2.    Hakim al-Zamili (Deputy Minister of Health) ................................. 27

            3.    Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, Dr. Hani Mousa
               Badr al-Uqabi, and Dr. Chasib Latif Ali al-Musawi al-Hajjami
               (Directors General at MOH) ........................................................ 32

            4.    Other Senior and Mid-Level Commanders ...................................... 34

    III.   DEFENDANTS ENGAGED IN CORRUPT TRANSACTIONS THAT
         PROVIDED FINANCING TO JAYSH AL-MAHDI ................................. 37

        A.    Jaysh al-Mahdi Raised Money Through Corrupt MOH Contracting
           Practices ........................................................................................ 37

B.  Defendants Made Corrupt Payments To Jaysh al-Mahdi ..................................... 40

  1.  "Free Goods" Payments ...................................................................... 41

  2.  "Commission" Payments ................................................................... 54

IV. DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS HELPED FUND JAYSH AL-MAHDI ATTACKS ON AMERICANS ........................................................................................................ 61

 A. Defendants' Corrupt Transactions Directly Funded Jaysh al-Mahdi Terrorist Attacks On Americans ........................................................................ 61

 B. Defendants Knew Or Recklessly Disregarded That Their Transactions With MOH Financed Terrorism ............................................................................. 68

V. EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE JAYSH AL-MAHDI .............................................. 75

 A. The AstraZeneca Defendants ................................................................................ 75

  1.  AstraZeneca Made Corrupt Payments to Jaysh al-Mahdi Members .............. 75

  2.  AstraZeneca's Corrupt Commercial Transactions Comport with Its Historical Sales Practices in International Markets ........................................ 80

  3.  AstraZeneca's Corrupt Transactions Had a Substantial Nexus to the United States ................................................................................................ 81

 B. The GE Defendants ................................................................................................ 84

  1.  GE Made Corrupt Payments to Jaysh al-Mahdi Members ............................ 84

  2.  GE's Corrupt Payments to Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets ........................................ 88

  3.  GE's Corrupt Transactions Had a Substantial Nexus to the United States ........................................................................................................ 91

 C. The J&J Defendants ................................................................................................ 96

  1.  J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Medical Devices in Iraq ................................... 97

  2.  J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Pharmaceuticals in Iraq ..................................... 99

3.      J&J's Corrupt Payments to Jaysh al-Mahdi Comport with Its Historical
        Sales Practices in International Markets ........................................................ 103

4.      J&J's Corrupt Transactions Had a Substantial Nexus to the United
        States ............................................................................................................ 107

D.      The Pfizer Defendants ......................................................................................... 110

1.      Pfizer Made Corrupt Payments to Jaysh al-Mahdi Members ....................... 110

2.      Pfizer's Corrupt Transactions with MOH Comport with Its Historical
        Sales Practices in International Markets ........................................................ 115

3.      Pfizer's Corrupt Transactions Had a Substantial Nexus with the United
        States ............................................................................................................ 117

E.      The Roche Defendants ......................................................................................... 122

1.      Roche Made Corrupt Payments to Jaysh al-Mahdi Members ....................... 122

2.      Roche's Corrupt Transactions with Jaysh al-Mahdi Members Comport
        with Its Historical Sales Practices in International Markets ......................... 125

3.      Roche's Corrupt Transactions with MOH Had a Substantial Nexus to
        the United States ........................................................................................... 127

VI.     JAYSH AL-MAHDI, WITH SUBSTANTIAL SUPPORT FROM
        LEBANESE HEZBOLLAH, USED DEFENDANTS' RESOURCES TO
        COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED
        AMERICANS ...................................................................................................... 130

A.      Beginning In 2003, Jaysh al-Mahdi Conducted A Campaign Of Terror
        Against Americans In Iraq ................................................................................... 130

B.      Jaysh al-Mahdi Was A Terrorist Enterprise ........................................................ 135

C.      Hezbollah Created, Armed, And Trained Jaysh al-Mahdi To Carry Out
        Terrorist Attacks Against Americans ................................................................... 137

1.      Hezbollah Has Orchestrated Campaigns of Terror Against Americans
        Across the Globe ........................................................................................... 138

2.      Hezbollah Co-Founded Jaysh al-Mahdi with Sadr To Carry Out a
        Campaign of Terror Against Americans in Iraq ............................................ 140

3.      Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in
        Iraq ................................................................................................................ 145

  4.  Hezbollah Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans in Iraq ............................................................................ 151

  5.  Hezbollah Provided Jaysh al-Mahdi with Weapons To Carry Out Terrorist Attacks Against Americans in Iraq ................................................. 157

VII. JAYSH AL-MAHDI KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY HEZBOLLAH.................................................................................................... 158

 A. The Atchley Family ................................................................................. 159

 B. John Aragon, Sr. ...................................................................................... 159

 C. Brian Beaumont ....................................................................................... 160

 D. Dempsey Bennett ..................................................................................... 160

 E. Brandeaux Campbell................................................................................ 161

 F. The Capra Family .................................................................................... 161

 G. The Chand Family.................................................................................... 163

 H. The Connelly Family ............................................................................... 165

 I. Jimmy Connolly....................................................................................... 166

 J. The Doheny Family ................................................................................. 167

 K. The Edwards Family ................................................................................ 168

 L. The Emory Family ................................................................................... 168

 M. Tanya Evrard............................................................................................ 169

 N. The Harbin Family ................................................................................... 170

 O. The Holden Family .................................................................................. 170

 P. Billy Johnson .......................................................................................... 171

 Q. The Juneau Family ................................................................................... 171

 R. William Kelso .......................................................................................... 172

 S. John Kirby................................................................................................ 172

T.    The Klecker Family ................................................................................... 173

U.    Leroy Lancaster ......................................................................................... 173

V.    Michael Lukow ........................................................................................... 174

W.    The Lynch Family....................................................................................... 174

X.    Nathan McClure .......................................................................................... 175

Y.    The McNeal Family .................................................................................... 175

Z.    The Mixson Family..................................................................................... 176

AA.   The Neiberger Family ................................................................................ 177

BB.   The Pellecchia Family................................................................................ 177

CC.   The Price Family ........................................................................................ 178

DD.   Carl Reiher ................................................................................................. 179

EE.   The Rogers Estate ...................................................................................... 179

FF.   The Rosa Family ........................................................................................ 180

GG.   The Shaw Family ....................................................................................... 181

HH.   The Stephens Family.................................................................................. 182

II.    The Tucker Family...................................................................................... 183

JJ.    The Vaughn Family .................................................................................... 183

KK.   The White Family ...................................................................................... 184

LL.   Robert Winegar .......................................................................................... 185

MM.   Melissa Witte ............................................................................................. 185

NN.   William Zappa ............................................................................................ 186

CLAIMS FOR RELIEF ................................................................................................ 186

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
        § 2333(d) (Aiding-and-Abetting Liability, Attack Predicate) .................. 186

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
        § 2333(d) (Aiding-and-Abetting Liability, RICO predicate)..................... 188

COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
§ 2333(a) (Primary Liability, Material Support Predicate)...................................... 190

COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
§ 2333(a) (Primary Liability, Terrorist Financing Predicate).................................. 192

COUNT FIVE:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (State
Law) .................................................................................................................. 193

JURY DEMAND ................................................................................................................ 194

PRAYER FOR RELIEF ...................................................................................................... 194

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Iraq between 2005 and 2009.  While these men and women worked to rebuild post-war Iraq, they were attacked by a terrorist group funded in part by Defendants' corrupt sales practices.  The terrorist-finance mechanism was straightforward:  the terrorists openly controlled the Iraqi ministry in charge of importing medical goods, and Defendants – all of which are large Western medical-supply companies – obtained lucrative contracts from that ministry by making corrupt payments to the terrorists who ran it.  Those payments aided and abetted terrorism in Iraq by directly financing an Iran-backed, Hezbollah-trained militia that killed or injured thousands of Americans.  The allegations below are based on 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government officials; English- and Arabic-language press reports; and Plaintiffs' own recollections.

2.      Defendants' transactions were part of a pattern and practice of corrupt business dealings in Iraq dating back to Saddam Hussein.  During Saddam's rule and ever since, Iraq has maintained a government-run healthcare system that in theory offers free medical care to all Iraqis.  That system of socialized medicine has long given the Iraqi Ministry of Health ("MOH" or "Ministry") and Kimadia (MOH's state-owned import subsidiary) significant leverage over medical-goods suppliers seeking to do business in Iraq.  It also has been a recipe for pervasive corruption in the medical-goods procurement process.  Under Saddam from 2000-2003, Kimadia officials used their leverage over foreign suppliers to extract sizable kickbacks on medical-goods contracts awarded under the U.N. Oil-for-Food Program.  Most Defendants (or their

predecessors or affiliates) made such corrupt payments to Saddam's regime.  In doing so, they supplied Saddam's regime with illicit funding in direct contravention of Oil-for-Food Program restrictions designed to prevent Saddam from raising money to finance terrorism abroad.

3.      By late 2004, after the collapse of Saddam's government, MOH fell under the control of a Shiite terrorist group known as Jaysh al-Mahdi (Arabic for "The Mahdi Army")[1] whose members swore fealty to anti-American cleric Muqtada al-Sadr.  The Jaysh al-Mahdi-controlled MOH functioned more as a terrorist apparatus than a health organization.  Public hospitals were converted into terrorist bases where Sunnis were abducted, tortured, and murdered.  MOH ambulances transported Jaysh al-Mahdi death squads around Baghdad.  Armed terrorists openly patrolled the halls of MOH headquarters in downtown Baghdad, which became too dangerous for Americans to enter and which one percipient witness described as a "Mahdi Army camp."  And the Deputy Minister of Health – who conducted Ministry business while surrounded by Jaysh al-Mahdi fighters and weapons – tortured and killed Sadr's enemies with the help of the Ministry's Facilities Protection Service (itself a notorious Jaysh al-Mahdi division).  At the same time, Jaysh al-Mahdi nearly destroyed the Iraqi healthcare system by systematically purging secular doctors, commandeering MOH facilities, and looting MOH's inventory for profit.  After late 2004, companies selling medical goods to MOH were dealing with a counterparty that was not a genuine medical institution; it was a de facto terrorist group.

4.      Despite Jaysh al-Mahdi's open control of MOH, Defendants continued their Saddam-era practice of making corrupt payments to officials inside the Ministry.  In or about late 2004, Jaysh al-Mahdi implemented a requirement that medical-goods suppliers seeking access to Iraq's lucrative healthcare market pay Jaysh al-Mahdi agents a *Khums*, which is an Islamic

---

[1] The "Mahdi" is a messianic-like figure in Islam.  Depending on the method of translation, English sources sometimes spell Jaysh al-Mahdi as "the Mehdi Army."

2

concept translating roughly to a 20% religious tax.  Companies seeking to win sales contracts from MOH after late 2004 had to pay that tax by providing Jaysh al-Mahdi agents with so-called "commissions" (an Iraqi euphemism for bribes) worth at least one-fifth the contract's value. During this time period, as explained in a contemporaneous memorandum by U.S. government investigators documenting an interview of an MOH source, "official corruption [was] tolerated at the MOH because it ha[d] become the ministry occupied by the Mahdi Army."

5.      One common way that Defendants made corrupt payments to Jaysh al-Mahdi agents involved the transfer of "free goods."  Under the "free goods" scheme, which was carried over from Oil-for-Food, medical-goods suppliers structured their transactions to provide MOH officials with additional batches of in-kind drugs and equipment, free of charge, on top of the quantities for which MOH had actually paid.  Suppliers included those extra goods in the same shipments as the purchased goods and packaged them in a manner conducive to street resale, which ensured that MOH officials could efficiently take the extra goods and monetize them on the black market.  Because of the way the contracts were structured, MOH officials did not have to account for such free goods in the national inventory.  Jaysh al-Mahdi agents working at MOH were thus able to divert the extra goods and re-sell them for cash at sizeable mark-ups.

6.      Another common way that Defendants made corrupt payments to Jaysh al-Mahdi agents was through commercially unreasonable clauses drafted into MOH contracts.  Under this scheme, also carried over from Oil-for-Food, suppliers bribed MOH officials by funneling cash payments through their corrupt local agents.  In theory, companies promised to provide MOH with after-sales support and other services ostensibly related to the product they sold, and they funded those ostensible services by giving money to their local agents.  In reality, such services

were illusory and functioned merely to create a slush fund the local agents could use to pass on "commissions" to corrupt MOH officials.

7.      Defendants used both techniques to finance Jaysh al-Mahdi throughout the period between 2004 and 2013, much as they had previously used them to finance Saddam's regime under Oil-for-Food.  Plaintiffs have obtained specific evidence of many of Defendants' corrupt payments in connection with their MOH contracts, including documents memorializing such payments; contract numbers corresponding to Defendants' corrupt transactions; and particular percentages of "free goods" that Defendants delivered to MOH officials.

8.      Defendants' corrupt transactions aided and abetted Jaysh al-Mahdi's terrorist operations against Americans in Iraq.  Control of MOH, and the illicit revenue that came with it, was essential to Jaysh al-Mahdi's terrorist machine:  in the words of one MOH insider, Kimadia was Sadr's "gold mine" that Jaysh al-Mahdi used to "finance their empire" in Iraq.  Cash bribes provided to Jaysh al-Mahdi agents within MOH flowed directly into Jaysh al-Mahdi's coffers and helped the militia buy weapons, training, and logistical support for its terrorist attacks. Similarly, Defendants' provision of "free goods" to MOH officials gave Jaysh al-Mahdi agents valuable cash equivalents they used to fund attacks.  Regional and local black markets provided ample opportunities to re-sell such drugs and devices; as the U.S. Embassy in Baghdad explained in a sensitive-but-unclassified 2006 report, Jaysh al-Mahdi relied on those black markets to "finance[ ] operations from diverted medicines."  Indeed, concerns about Jaysh al-Mahdi's use of MOH to finance terrorist attacks prompted Coalition forces to raid MOH headquarters in February 2007 and arrest the Deputy Minister of Health for "orchestrat[ing] several kickback schemes" to "funnel[ ] millions of U.S. dollars to militia elements."

9.      Defendants' corrupt transactions with MOH also aided and abetted terrorism by supplying Jaysh al-Mahdi with the means to pay its rank-and-file terrorist fighters.  Some U.S. government personnel in Iraq called Jaysh al-Mahdi "The Pill Army," because Sadr and his Jaysh al-Mahdi commanders were notorious for paying their terrorist fighters in diverted pharmaceuticals, rather than cash.  Those fighters – most of whom were poor, uneducated, young Shi'a men – accepted such payment because they could re-sell the free drugs on the street or could consume the pills themselves as a form of intoxication.  This payment-in-pills scheme, which helped Jaysh al-Mahdi retain its legion of impoverished terrorist fighters, depended on the large volumes of divertible drugs that Defendants delivered to the terrorist-run MOH.

10.      Defendants knew or recklessly disregarded that their corrupt transactions helped finance Jaysh al-Mahdi's terrorist attacks on Americans.  Defendants' agents negotiated and memorialized those transactions at in-person meetings inside the Ministry's headquarters building in Baghdad, where their physical surroundings made clear that they were dealing with terrorists.  Beginning in late 2004, the MOH headquarters building was decorated with hundreds of pictures of known terrorist Muqtada al-Sadr (often joined by his famous, martyred Grand Ayatollah father) alongside Shi'a terrorist slogans declaring "Death to America."  The entrance to the building also contained a large mural paying homage to the Sadr family next to the unmistakable, all-black terrorist flag of Jaysh al-Mahdi.  As *USA Today* reported in 2008, such Sadrist terrorist propaganda throughout the Ministry "remove[d] any doubts about who runs the place."  Companies whose agents memorialized their corrupt transactions in the shadow of jihadist propaganda paying homage to Jaysh al-Mahdi's world-famous terrorist leader assuredly knew (or at least consciously overlooked) whom their transactions were benefiting.

11.     Jaysh al-Mahdi's control of MOH also received extensive press coverage that Defendants knew about or recklessly disregarded.  Beginning in 2005, public reports repeatedly documented the link between Sadr's terrorist militia and the MOH procurement process:  major newspapers reported that MOH had fallen "under the control of the Shia cleric Moqtada al-Sadr"; that Sadrist MOH officials oversaw "the diversion of millions of dollars to a Shiite Muslim militia"; and that medical supplies were routinely "siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry of Health," which was "in the 'grip' of the Mahdi Army."  Those reported facts led to the highly publicized arrest and trial of the Deputy Minister of Health (himself a famously corrupt and violent Jaysh al-Mahdi commander), who was acquitted only after Jaysh al-Mahdi intimidated the witnesses into recanting.  All of this was major, international news that Defendants could not have overlooked in good faith.

12.     Defendants' contacts with the United States were essential to their financing of Jaysh al-Mahdi.  Each Defendant is part of a globally integrated company with a significant presence in the United States, and all but AstraZeneca and Roche maintain their worldwide headquarters in the United States.  In some cases, Defendants contracted with MOH through American companies, with those American companies negotiating with Kimadia and executing the corrupt transactions.  Because Kimadia insisted on doing business in U.S. dollars, Defendants also generally used the New York banking system to pay for letters of credit guaranteeing their corrupt transactions.  And, in all cases, Defendants' corrupt transactions relied at least in part on goods sourced from U.S. facilities that they touted as a key component of their global supply networks.  Indeed, many of Defendants' most valuable goods – and thus the goods most attractive to Jaysh al-Mahdi agents looking to profit on the black market – were manufactured by American affiliates in the United States.  Because the terrorists placed a premium on obtaining

(and re-selling) such American-made goods, they demanded that Defendants memorialize their goods' country of origin in the contracting documents. Defendants thus often had to certify their connection to the United States as a condition of obtaining the corrupt sales contracts at issue.

13.     The Jaysh al-Mahdi attacks that Defendants' corrupt payments aided and abetted were acts of "international terrorism." 18 U.S.C. § 2333(a). Sadr, working with Lebanese Hezbollah, founded Jaysh al-Mahdi in 2003 as an Islamic militia whose primary goal was to expel Americans from Iraq. In furtherance of that goal, Jaysh al-Mahdi waged a violent campaign that involved an array of asymmetrical terrorist tactics: Jaysh al-Mahdi fighters attacked civilians and service members indiscriminately; engaged in mass sectarian cleansing; targeted medics in attacks; conducted kidnappings, torture, and executions; and hid from U.S. troops in mosques, schools, ambulances, and hospitals. In reaction to such tactics, the Pentagon's press service referred to Sadr's militia as "the Jaysh al-Mahdi terrorist organization."

14.     In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more – likely making it responsible for more American casualties in Iraq than any other terrorist group. That prompted the U.S. military leadership to observe in 2007 that Jaysh al-Mahdi was "more of a hindrance to long-term security in Iraq than [Al-Qaeda in Iraq]," the Sunni terrorist group that became ISIS.

15.     Jaysh al-Mahdi's terrorist attacks against Americans in Iraq were "planned" and "authorized" by Hezbollah, 18 U.S.C. § 2333(d), the militant Lebanese terrorist group that the U.S. State Department has designated as a Foreign Terrorist Organization since 1997. In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Sadr found Jaysh al-Mahdi. Mugniyeh and other Hezbollah operatives subsequently recruited, trained, and equipped Jaysh al-Mahdi soldiers to carry out attacks against Americans in Iraq. At

the same time, both Hezbollah's Secretary-General and its Grand Ayatollah spiritual leader took

to the airwaves to call on Iraqi Shi'a to join Jaysh al-Mahdi in its attacks against Americans in

Iraq.  Hezbollah's training, weapons, and personnel – along with the moral and religious

authority provided by Hezbollah's incitement of Shiite religious violence – were essential to

Jaysh al-Mahdi's terrorist campaign.  As a prominent embedded war correspondent reported in

2007:  "The Mahdi Army is Iran's proxy in Iraq.  It is, in effect, the Iraqi branch of Hezbollah."

16.      Plaintiffs are U.S. citizens, and their family members, who served their country in

Iraq between 2005 and 2009 and who were killed or wounded in terrorist attacks for which Jaysh

al-Mahdi was responsible.  As alleged below, Plaintiffs are entitled to recover for their injuries

under the federal Anti-Terrorism Act ("ATA") and state law.  Defendants violated the ATA by

structuring their transactions with MOH to make payments to Jaysh al-Mahdi members who they

knew or recklessly disregarded would use such payments to help fund terrorist attacks on

Americans in Iraq.  Specifically, Defendants are liable under the ATA, 18 U.S.C. § 2333(d), for

aiding and abetting Jaysh al-Mahdi's campaign to commit terrorist attacks in Iraq that were

planned and authorized by Hezbollah, a designated Foreign Terrorist Organization.

Additionally, Defendants are liable under the ATA, 18 U.S.C. § 2333(a), as courts have

construed it, for providing material support to Jaysh al-Mahdi in violation of U.S. criminal law.

## THE DEFENDANTS

### A.    The AstraZeneca Defendants

17.    Defendant AstraZeneca UK Limited is a wholly owned subsidiary of AstraZeneca plc (collectively with its subsidiaries and affiliates, "AstraZeneca"), which is headquartered in the United Kingdom and whose American Depository Receipts trade on the New York Stock Exchange ("NYSE") under the ticker symbol AZN.  AstraZeneca UK Limited is incorporated in the United Kingdom, and its principal place of business is in London, England.

18.    Defendant AstraZeneca Pharmaceuticals LP is a wholly owned subsidiary of AstraZeneca plc.  It is incorporated in Delaware, and its principal place of business is in Wilmington, Delaware.

### B.    The GE Defendants

19.    Defendant GE Healthcare USA Holding LLC is a wholly owned subsidiary of General Electric Company (collectively with its subsidiaries and affiliates, "GE"), which is publicly traded on the NYSE under the ticker symbol GE.  GE Healthcare USA Holding LLC is incorporated in Delaware, and its principal place of business is in Arlington Heights, Illinois.

20.    Defendant GE Medical Systems Information Technologies, Inc. is a wholly owned subsidiary of General Electric Company.  GE Medical Systems Information Technologies, Inc. is incorporated in Wisconsin, and its principal place of business is in Milwaukee, Wisconsin.

21.    Defendant GE Medical Systems Information Technologies GmbH is a wholly owned, indirect subsidiary of General Electric Company.  GE Medical Systems Information Technologies GmbH is incorporated in Germany, and its principal place of business is in Freiburg, Germany.

C.      **The J&J Defendants**

22.     Defendant Johnson & Johnson (collectively with its subsidiaries, "J&J") is publicly traded on the NYSE under the ticker symbol JNJ.  Johnson & Johnson is incorporated in Delaware, and its principal place of business is in New Brunswick, New Jersey.

23.     Defendant Cilag GmbH International is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Switzerland, and its principal place of business is in Zug, Switzerland.

24.     Defendant Ethicon Endo-Surgery, LLC is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Delaware, and its principal place of business is in Guaynabo, Puerto Rico.

25.     Defendant Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in New Jersey, and its principal place of business is in Somerville, New Jersey.

26.     Defendant Janssen Ortho LLC is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Delaware, and its principal place of business is in Gurabo, Puerto Rico.

27.     Defendant Janssen Pharmaceutica N.V. is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Belgium, and its principal place of business is in Beerse, Belgium.

28.     Defendant Johnson & Johnson (Middle East) Inc. ("J&J Middle East") is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in New Jersey, and its principal place of business is in Dubai, United Arab Emirates.

29.     Defendant Ortho Biologics LLC is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Delaware, and its principal place of business is in Manatí, Puerto Rico.

D.      **The Pfizer Defendants**

30.     Defendant Pfizer Inc. (collectively with its subsidiaries, "Pfizer") is publicly

traded on the NYSE under the ticker symbol PFE.  Pfizer Inc. is incorporated in Delaware, and

its principal place of business is in New York, New York.

31.     Defendant Pfizer Enterprises SARL is a wholly owned subsidiary of Pfizer Inc.  It

is incorporated in Belgium, and its principal place of business is in Luxembourg, Belgium.

32.     Defendant Pfizer Pharmaceuticals LLC is a wholly owned subsidiary of Pfizer

Inc.  It is incorporated in Delaware, and its principal place of business is in Barceloneta, Puerto

Rico.

33.     Defendant Pharmacia & Upjohn Company LLC is a wholly owned subsidiary of

Pfizer Inc.  It is incorporated in Delaware, and its principal place of business is in Kalamazoo,

Michigan.

34.     Defendant Wyeth Pharmaceuticals Inc. is a wholly owned subsidiary of Pfizer

Inc.  It is incorporated in Delaware, and its principal place of business is in Collegeville,

Pennsylvania.  Pfizer acquired Wyeth Pharmaceuticals Inc. as part of a January 2009 merger in

which Pfizer Inc. purchased Wyeth and its subsidiaries (collectively, "Wyeth").

E.      **The Roche Defendants**

35.     Defendant F. Hoffmann-La Roche Ltd. is a wholly owned subsidiary of Roche

Holding Ltd. (collectively with its subsidiaries and affiliates, "Roche"), which is headquartered

in Switzerland and whose American Depository Receipts trade on OTCQX International Premier

under the ticker symbol RHHBY.  F. Hoffmann-La Roche Ltd. is incorporated in Switzerland,

and its principal place of business is in Basel, Switzerland.

36.     Defendant Genentech, Inc. ("Genentech") is a wholly owned subsidiary of Roche

Holding Ltd.  Genentech is incorporated in Delaware, and its principal place of business is in

South San Francisco, California.  Roche has owned a majority stake in Genentech since 1990, and it acquired Genentech in its entirety pursuant to a March 2009 merger agreement.

37.      Defendant Hoffmann-La Roche Inc. is a wholly owned subsidiary of Roche Holding Ltd.  Hoffmann-La Roche Inc. is incorporated in New Jersey, and its principal place of business is in Nutley, New Jersey.

## JURISDICTION AND VENUE

38.      This Court has subject-matter jurisdiction over Plaintiffs' federal-law claims under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.  It has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

39.      This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

40.      Venue is proper in this District under 18 U.S.C. § 2334(a), because Plaintiffs James Connolly and Robert Neiberger reside in the District.

**SOURCING**

41.     The factual allegations that follow are based on an extensive investigation

drawing on a broad array of public and non-public information, including evidence obtained

from 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public

and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published

by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi

government officials; English- and Arabic-language press reports; and Plaintiffs' own

recollections.  For allegations that quote or paraphrase directly from a publicly available

document, this Complaint typically cites the source in a footnote.  For other allegations, such as

those based on Confidential Witness interviews or non-public documents, the Complaint does

not expressly identify the basis of the allegation, in an effort to protect Plaintiffs' sources.

42.     Many of Plaintiffs' Confidential Witnesses harbor a well-founded fear for their

physical safety, based on their current or former ties to Iraq or other Shi'a-majority countries.

The last time witnesses came forward to testify against one of the Jaysh al-Mahdi terrorists who

effectively ran MOH, they received death threats against themselves and their families.  *See infra*

¶¶ 92-94.  Many of Plaintiffs' Confidential Witnesses have expressed serious concern that any

public allegations traceable to them could invite a similar result here.  For that reason, Plaintiffs

have withheld details tying specific allegations to particular Confidential Witnesses – as well as

details tying allegations to particular sensitive documents – so as not to provide terrorists with

the means to piece together their identities.

43.     Plaintiffs' Confidential Witnesses have offered an array of first-hand perspectives

on various aspects of the terrorist-financing scheme alleged below.  Those witnesses include

MOH employees with experience inside the Ministry across various time periods since 2003;

other Iraqi officials who personally interacted with corrupt MOH employees doubling as Jaysh

al-Mahdi terrorists; former U.S. officials stationed in Iraq with responsibility for various facets of U.S. policy involving MOH and corruption, both during reconstruction and afterwards; and a civilian security contractor deployed to protect U.S. government personnel, who gained extensive tactical experience around MOH and in Jaysh al-Mahdi-controlled neighborhoods. The following allegations are based in part on those witnesses' observations and recollections, corroborated by public and non-public documents and press reports.

## FACTUAL ALLEGATIONS

I.    **UNDER SADDAM HUSSEIN, THE IRAQI MINISTRY OF HEALTH BECAME A CORRUPT TOOL OF TERRORIST FINANCE**

44.    Defendants' transactions with MOH relied on a corrupt procurement process originally created under Saddam Hussein's regime.  That corrupt system laid the groundwork for how Defendants funded terrorist attacks through MOH after Saddam's overthrow.  The following nine paragraphs of this Complaint describe that background.

45.    Saddam, the head of the secularist Sunni Ba'ath Party, ascended to power in Iraq in 1979.  On August 2, 1990, Saddam's military invaded Kuwait, which sparked the first Gulf War and led the U.N. Security Council to impose trade sanctions on Iraq.  The U.N. later adopted Resolution 986, which relaxed those sanctions and authorized Iraq to sell oil on the condition that the proceeds be deposited in a U.N.-monitored bank account and be used only to purchase designated humanitarian goods.  This program was known as the "Oil-for-Food Program."

46.    By mid-2000, Saddam's regime had implemented a scheme to subvert the Oil-for-Food Program by extracting corrupt payments from so-called "humanitarian-goods suppliers" like Defendants.  The resulting scandal prompted congressional hearings in both the House and the Senate, resulted in a 623-page report by a U.N.-commissioned Independent Inquiry

Committee led by Paul Volcker ("*Volcker Report*"),[2] and was called by one Congressman "the biggest scandal in the history of the U.N. and one of the greatest financial scandals of modern times."[3]  All told, Saddam's regime obtained more than $1.5 billion in illicit income from so-called "humanitarian-goods suppliers" under the Oil-for-Food Program.[4]

47.     The Oil-for-Food scandal included transactions involving MOH, which – through Kimadia, its subsidiary import company that had a monopoly over all public medical-goods imports in Iraq – was responsible for importing drugs and devices using revenues that Iraq derived from its U.N.-approved oil sales under the Oil-for-Food Program.

48.     MOH generally, and Kimadia specifically, was widely understood to be one of the most corrupt agencies of Saddam's regime.  As one account summarized the 2004 observations of a U.S. military advisor with post-invasion responsibility for Kimadia operations, Kimadia "operated as a top-down 'controlled system of allocation' under Saddam Hussein, and was, by all counts, totally and utterly corrupt."[5]  An analysis of Kimadia prepared in mid-2003 for USAID likewise reported a widespread sentiment among Kimadia mid-level employees that "the system is very corrupt both above an[d] below their authority."[6]

49.     Kimadia employed a number of different measures to obtain corrupt payments from medical-goods suppliers under Oil-for-Food.  Most common was the use of post-sale, maintenance, and warranty fees, which later became known as "After Sales Service Fees" ("ASSFs") – a practice that spawned an international scandal and numerous Foreign Corrupt

---

[2] Paul A. Volcker *et al.*, *Manipulation Of The Oil-for-Food Programme By The Iraqi Regime* (Oct. 27, 2005) ("*Volcker Report*").

[3] 151 Cong. Rec. H4704 (daily ed. June 17, 2005) (statement of Rep. John Sullivan).

[4] *Volcker Report* at 4.

[5] Brandon Sprague & Adam Shemper, *Baghdad's Shame*, Salon (Aug. 28, 2003).

[6] Abt Associates, Inc., *Situational Analysis Report for Kimadia* 8, USAID Contract No. RAN-C-00-03-00010-00 (July 11, 2003).

Practices Act ("FCPA") enforcement actions.[7]  Saddam's regime imposed a 10% After Sales

Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[8]

Saddam's regime collected these payments from suppliers ostensibly to pay for post-sale

services, but in reality they simply gave his regime illicit cash flow free of U.N. oversight.

According to the Volcker Commission, Saddam sometimes collected ASSFs without

memorializing them in the actual sales contracts:  the "ten percent fee" was often paid "without

labeling it an 'after-sales-service' fee or without inserting an after-sales-service provision in the

applicable contract."[9]  Suppliers typically concealed such fees on their books by routing them

through third-party "consultants" or distributors who acted as their sales agents in Iraq.

50.     Saddam's Kimadia also devised a second, equally potent scheme to extract

corrupt payments from foreign suppliers.  This second scheme worked much like the first, except

that the bribes were paid in the form of goods rather than cash.  Under this "free goods" scheme,

suppliers provided free, in-kind drugs and equipment to Kimadia officials in quantities equal to

10% of the underlying contract.  For example, if Kimadia contracted with a medical-supply

company to buy one million units of Product A, the company would provide, free of charge, an

extra 100,000 units of Product A on top of the 1 million units that had been purchased.  The

company would include those "free goods" in the same shipments as the underlying contracted-

for goods and package them in a manner conducive to street resale – which ensured that Kimadia

---

[7] *See* Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505, ECF No. 1 (D.D.C. filed Aug. 23, 2007); Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862, ECF No. 1 (D.D.C. filed May 11, 2009) ("*Novo Nordisk FCPA* Compl."); Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448, ECF No. 1 (D.D.C. filed Mar. 17, 2010); Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258, ECF No. 1 (D.D.C. July 27, 2010) ("*GE FCPA* Compl."); Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648, ECF No. 1 (D.D.C. filed Sept. 29, 2010); Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686, ECF No. 1 (D.D.C. filed Apr. 8, 2011) ("*J&J FCPA* Compl."); Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, Case No. 11-cr-00099-RBW, ECF No. 1-1 (D.D.C. filed Apr. 8, 2011) ("*J&J DPA*"); Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733, ECF No. 4 (S.D. Tex. filed Nov. 26, 2013).

[8] *Volcker Report* at 276.

[9] *Id.* at 249.

officials could divert the extra goods to the black market.  Once diverted, the goods were resold

at a markup, with corrupt Kimadia employees and their Ba'athist patrons reaping the profits.

51.     The "free goods" scheme under Oil-for-Food was confirmed in a published

journal article written by a former U.S. Army officer and medical logistician assigned to MOH

under the Coalition Provisional Authority ("CPA").[10]  The article appeared in *Contract

Management*, a prominent procurement-logistics journal that is "the world's leading professional

resource for those in the field of contract management."[11]  The article explained that "10 percent

free goods was another way the corrupt regime exploited the [Oil-for-Food Program]":  the extra

"free goods," by design, did not "make it into the Iraqi inventory," but instead often "traveled

back across Iraqi borders to neighboring countries" for sale on black markets "at 100-1000

percent above the sale prices within the Iraqi health system."[12]

52.     The U.S. government alleged the use of free goods to bribe Iraqi officials under

Oil-for-Food.  For example, according to the Securities and Exchange Commission ("SEC"), a

GE subsidiary made substantial "in-kind kickback payments" on cardiology equipment to

Saddam's Kimadia.[13]  The GE subsidiary actually refused to pay the standard ASSFs in the form

of "cash payments to the Iraqi ministry," but it "acquiesced" to making effectively the same

payment using "in-kind" goods – which it included in the contract free of charge.[14]  As with the

---

[10] *See Pre-liberation Iraqi Procurement Processes*, 45 Contract Mgmt. 44 (July 2005) ("*Contract Management*").

[11] Nat'l Contract Mgmt. Ass'n, *Publications*, http://www.ncmahq.org/stay-informed/publications; Nat'l Contract Mgmt. Ass'n, *What Is NCMA?*, http://www.ncmahq.org/discover-our-profession/what-is-ncma.

[12] *Contract Management* at 48.

[13] *GE FCPA* Compl. ¶ 23.

[14] *Id.* ¶ 24.

cash payments, the free goods were funneled to MOH officials through a corrupt local sales

agent and mischaracterized on the seller's books and records as a legitimate agent commission.[15]

53.     Defendants made these corrupt payments to Saddam's regime even though the

public purpose of the international sanctions program (which Defendants' corrupt transactions

circumvented) was to choke off Saddam's ability to finance terrorist activities.[16]  In fact, it was

widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers

through the Oil-for-Food Program to finance international terrorist attacks.[17]

## II.     DEFENDANTS TRANSACTED BUSINESS WITH A POST-SADDAM HEALTH MINISTRY THAT WAS CONTROLLED BY SHIITE TERRORISTS LOYAL TO MUQTADA AL-SADR

### A.     Muqtada al-Sadr And The Formation Of Jaysh al-Mahdi

54.     On March 19, 2003, the United States invaded Iraq.  U.S. troops seized control of

Baghdad less than three weeks later, and on April 9, 2003, Saddam's government fell.  Shortly

thereafter, the CPA began overseeing the reconstruction of a democratic Iraqi government and

formulating a plan to transfer sovereignty to the Iraqi people.

55.     Formal armed hostilities between the United States and the Iraqi government

ended on May 1, 2003.  After that date, American troops deployed to Iraq performed a

peacekeeping and nation-building function, rather than a warfighting function.  American troops'

primary purpose was to create the political and security conditions conducive to Iraqi democracy.

---

[15] *See id.* ¶¶ 25-28.

[16] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[17] *See, e.g.*, Cynthia R. Fagen, *Iraq's Oil For Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), http://nypost.com/2004/10/17/iraqs-oil-for-terror-72m-to-palestinians/; *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (statement of Chairman Henry Hyde) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), http://commdocs.house.gov/committees/intlrel/hfa96930.000/hfa96930_0.HTM.

56.     As described in more detail below, in the years immediately following the U.S. invasion, Shi'a terrorists affiliated with Muqtada al-Sadr assumed control of MOH.  Sadr is an influential Iraqi Shiite cleric whose power is based in large part on his family lineage.  His cousin and father-in-law, Baqir al-Sadr, was a powerful cleric and founder of the Da'wa Party, which today remains a dominant political force in Iraq.  Baqir al-Sadr was executed by Saddam in 1980 and is known among Iraqi Shi'a as the "First Martyr."  Muqtada's father, Grand Ayatollah Sadiq al-Sadr, was an even more powerful cleric whom Saddam assassinated in 1999.  Sadiq al-Sadr is revered by many Iraqi Shi'a as the "Second Martyr."  In addition, Muqtada's cousin, Musa al-Sadr, founded Amal – the predecessor to Hezbollah in Lebanon.

57.     In the spring of 2003, after the collapse of Saddam's regime, Muqtada al-Sadr became the leader of masses of impoverished Iraqi Shi'a.  Sadr's followers took over Saddam City – the two-million-person slum in eastern Baghdad, which is the most densely populated area in Iraq – and renamed it "Sadr City" after Muqtada's father, Sadiq al-Sadr.  During this time period, Sadr's public sermons in the Shiite holy city of Najaf decried the U.S. invasion of Iraq, labeled U.S. troops as an illegal occupying force, and urged Iraqis to expel Americans from the country.  Sadr's rallies commonly ended with public "Death to America" chants.

58.     By the summer of 2003, Sadr had channeled his popularity into a nascent organization called the "Sadrist Trend" (members of the Sadrist Trend and related groups are known as "Sadrists").  The Sadrist Trend was modeled expressly on Lebanese Hezbollah.  Like Hezbollah, the Sadrist Trend had both a political wing, called the Office of Martyr Sadr, and a terrorist wing, called "Jaysh al-Mahdi" (Arabic for "the Mahdi Army") or "JAM" – the latter of which Hezbollah officials participated directly in founding.  *See infra* Part VI.  And, like Hezbollah, the Sadrists seized control of key tactical neighborhoods (such as Sadr City) and used

19

Jaysh al-Mahdi to attack foreign enemies – in the case of the Sadrists, U.S.-led Coalition forces.

The Office of Martyr Sadr and Jaysh al-Mahdi were closely interconnected, worked in tandem,

shared common sources of financing, and were run by the same people.  There was never any

meaningful firewall between those two intertwined components of the Sadrist Trend.

59.     By early 2004, Sadr's growing influence, along with the escalating violence

employed by his terrorist militia, threatened the U.S. strategy in Iraq.  That led the CPA, on

March 28, 2004, to order a 60-day closure of *al-Hawza*, the Sadrist newspaper that Sadr used to

proselytize anti-American and anti-Israeli violence.  Sadr reacted by intensifying his

denunciations of the U.S. government and urging his followers to " 'terrorize' their enemy."[18]

According to *The Endgame:  The Inside Story of the Struggle For Iraq, From George W. Bush to*

*Barack Obama* ("*Endgame*"), Michael Gordon and General Bernard Trainor's celebrated

account of the Iraq war,[19] Sadr's Friday sermon on April 2, 2004, was a "bitter invective against

the United States, denouncing the Americans and even praising the September 11 attacks."[20]

60.     From that point forward, Sadr and Jaysh al-Mahdi increased their attacks on

Americans in Iraq, resulting in mass casualties among U.S. citizens (both military and civilian)

working to stabilize and rebuild the country.  By late 2004, Sadr had effectively seized control of

large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah,

and the entire eastern half of Baghdad.  By early 2005, Sadr controlled 20 Jaysh al-Mahdi

brigades – all of which were trained by Hezbollah – operating out of his command-and-control

---

[18] Nimrod Raphaeli, *Understanding Muqtada al-Sadr*, Middle East Quarterly (Fall 2004), http://www.meforum.org/655/understanding-muqtada-al-sadr.

[19] Mr. Gordon was the chief military correspondent for the *New York Times*, and General Trainor was a former foreign correspondent and retired Marine Corps Lieutenant General.  The *New York Times* called *Endgame* full of "extraordinary research and sobriety" and "one well-documented fact after another."  Gideon Rose, *Exiting the Iraq War:  A Blow-by-Blow Chronicle*, N.Y. Times (Oct. 1, 2012).

[20] Michael R. Gordon & Gen. Bernard E. Trainor, *The Endgame:  The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama* 67 (Vintage Books 1st ed. 2012) ("*Endgame*").

safe haven in Sadr City, from which Jaysh al-Mahdi coordinated and launched Hezbollah-supported attacks against Coalition forces throughout Iraq.

61.     In service of its terrorist agenda, and relying on Hezbollah training, weapons, and personnel, Jaysh al-Mahdi mastered several types of attacks that proved especially deadly for U.S. troops and civilians, including the attacks that killed and injured Plaintiffs.  As one commentator explained, Jaysh al-Mahdi was "[a]nalogous to the Sunni terrorist organization, al Qaeda," "committed thousands of bombings," "detonated roadside explosives," and "fired mortar shells toward the Green Zone."[21]  In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more.  The death toll inflicted by Jaysh al-Mahdi became so severe that, by July 2007, U.S. military leadership concluded that "JAM is more of a hindrance to long-term security in Iraq than is [Al-Qaeda in Iraq]," the Sunni terrorist group that became ISIS.[22]

### B.     Jaysh al-Mahdi's Control Of The Health Ministry

62.     In 2004, the Sadrists executed a plan to take control of MOH, which was the first Ministry that the CPA returned to Iraqi control.  As described in more detail below, from 2004-2013, Jaysh al-Mahdi used its control over MOH to finance terrorist activities.

63.     The Sadrists' plan to take control of MOH was modeled on Hezbollah's experience in Lebanon.  Control of the Lebanese healthcare sector was (and remains) essential to Hezbollah's power.  As it had done for Hezbollah in Lebanon, control over the Iraqi healthcare system offered the Sadrists several advantages, including the ability to raise funds for terrorism through the medical-goods contracting process.

---

[21] Birgit Svensson, *The Mahdi Army:  Turbans, Kalashnikovs and Plans to 'Slaughter'*, Deutsche Welle (June 22, 2014), http://www.dw.com/en/the-mahdi-army-turbans-kalashnikovs-and-plans-to-slaughter/a-17728487.

[22] *See Endgame* at 422.

64.     The Sadrist takeover of MOH was part of the broader political trend in reconstruction-era Iraq.  As different factions vied for power in the wake of Saddam's collapse, competing political parties (and their associated anti-American militias) focused on seizing control of the instruments of government.  In a 2009 report, the U.S. Special Inspector General for Iraqi Reconstruction described this "undisguised power grab" that occurred throughout the Iraqi administrative state:

> Almost overnight, a majority of the ministries of Iraq's central government – once controlled by the Ba'ath Party, but largely staffed by technocrats – became aligned with, and then dominated by, competing political parties.  Sadrists seized the Health and Education ministries.  Employing the model of service delivery embraced by Hezbollah – the radical Islamic Shi'a group based in Lebanon – they openly deployed ministry resources to build support among the Shi'a underclass.[23]

65.     In early 2004, Sadrists began assuming important positions throughout the MOH bureaucracy.  Sunnis and secular technocrats alike were purged in what one percipient witness describes as a widespread "occupational cleansing."  Doctors who exhibited insufficient loyalty to the Sadrists were killed or forced to flee.  One MOH insider estimates that, at the height of Sadrist control, the Ministry employed roughly 70,000 members of Jaysh al-Mahdi.  As a result of this "occupational cleansing," the Sadrists achieved virtually total control over MOH.

66.     By late 2004, Jaysh al-Mahdi personnel were invoking their status as MOH employees when arrested by Coalition forces.  For example, an October 2, 2004 military arrest report (as published by *WikiLeaks*) documented Coalition forces' detention of two Iraqis in eastern Baghdad – one of whom "had a Mahdi Militia ID card" – who were "trying to hide Al Sadr posters" and who "both claimed to be Ministry of Health FPS workers."[24]

---

[23] U.S. Special Inspector General for Iraq Reconstruction, *Hard Lessons:  The Iraq Reconstruction Experience* 250 (2009).

[24] *WikiLeaks* (Oct. 2, 2004), https://wikileaks.org/irq/report/2004/10/IRQ20041002n766.html.

67.     The 2005 parliamentary elections ratified Sadr's power over MOH.  The Sadrists won 23 parliamentary seats in January and increased their total to 32 seats in December.  In early 2005, the ministries within Prime Minister Ibrahim al-Jaafari's cabinet were divvied up by political party so that each party leader effectively controlled the ministries assigned to his party.  As part of that process, the Sadrists officially assumed control of several ministries, including MOH.  In early 2006, Sadr switched his support to Nouri al-Maliki, who replaced Jaafari as Prime Minister.  In exchange, the Sadrists retained control of MOH, while obtaining control of several other ministries as well.  The Sadrists considered MOH to be their most important Ministry – it was the first one they demanded in cabinet negotiations – because of the enormous fundraising opportunity that came with control of Kimadia's corrupt procurement process.

68.     In early 2005, Sadr selected Abdul Muqtalib Ali Muhammad Salih al-Rabi'i as his first official Minister of Health.  Dr. Muqtalib was a member of Jaysh al-Mahdi who referred to himself as a "Mahdi soldier."

69.     In mid-2006, Dr. Ali al-Shemari, another Sadrist, replaced Dr. Muqtalib as the Minister of Health.  During his tenure, a 2006 U.S. State Department cable (as published by *WikiLeaks*) noted "[t]he almost complete infiltration of the Health Ministry by Sadrists."[25]

70.     The Sadrists' control over MOH extended to Kimadia.  In the process of taking control of the Ministry, Jaysh al-Mahdi installed Sadrists in senior- and mid-level positions throughout Kimadia, including in the Director General position.  As *USA Today* reported in 2008, "Al-Sadr's control over Kimadia, the state-run company that is responsible for importing and distributing drugs and supplies to Iraq's hospitals, also poses problems."[26]  Quoting the Iraq

---

[25] U.S. State Dep't Cable, *Ambassador's Meeting With Minister Of Oil Shahristani* (Nov. 26, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD4351_a.html.

[26] Charles Levinson, *Sadrists' Grip On Health Care Takes Toll*, USA Today (Mar. 27, 2008).

director for the International Medical Corps, the article reported that Kimadia's "monopoly" over medical imports gave it a "stranglehold on the whole medical sector, and that is a source of power through which Sadr can control the health sector and threaten the country."[27]

71.     MOH was a sprawling bureaucracy that employed thousands of Iraqis and had facilities all over the country.  Kimadia was one division within the MOH bureaucracy – it was technically a state-owned import company and monopoly – and was based out of the MOH headquarters building in Sadrist-controlled eastern Baghdad, near the Medical City complex.  In addition to Kimadia, the headquarters housed MOH's leadership and administrative departments. Other MOH facilities throughout Iraq housed the Ministry's regional and local administrative buildings, hospitals, and clinics.  Because of Iraq's system of socialized medicine, every public-sector doctor, pharmacist, nurse, and medical technician in Iraq was employed by MOH.

72.     The Sadrists openly advertised their control of MOH facilities, including the Ministry's Baghdad headquarters from which the contracting process was run.  By late 2004, hundreds of Sadrist posters displaying large pictures of Muqtada and Grand Ayatollah Sadiq al-Sadr (Muqtada's father, the Second Martyr) adorned the halls of MOH's headquarters in Baghdad.  These interior posters contained pictures of the Sadr family surrounded by Shi'a terrorist slogans conveying two basic messages in Arabic, translating roughly to "Death to America and Israel" and "we must destroy the occupiers."  The Ministry's front gates conveyed a similar message.  Beginning in 2005, the exterior wall just outside the MOH entrance contained a 20-foot mural of the Sadr family – so large it was visible from the air – alongside the unmistakable, all-black flag of Jaysh al-Mahdi.  Similar black flags also appeared throughout the inside of the headquarters building, as well as other MOH installations around Iraq.  In addition,

---

[27] *Id.*

the gates just outside the building (and adjacent to the mural) contained anti-American and anti-Israeli propaganda.  As *USA Today* reported, these posters and slogans throughout the MOH headquarters building "remove[d] any doubts about who runs the place."[28]

73.     From at least 2005-2007, the Ministry headquarters building also contained written messages soliciting donations for Sadr and Jaysh al-Mahdi.  As *CBS News* journalists observed in October 2006, the MOH headquarters building was full of "[y]ellow boxes covered in Arabic scrawl, calling on people to contribute to Moqtada al Sadr, the founder and leader of the Mahdi Army milit[i]a."[29]

74.     Jaysh al-Mahdi terrorists also set up a physical office inside the main Ministry building.  When Dr. Muqtalib became the first Sadrist Minister of Health in 2005, one office within the Minister's suite in the headquarters building became known as the "Jaysh al-Mahdi office."  It was strewn with AK-47s and other weaponry, making clear to anyone who passed by that the Minster was personally associated with Jaysh al-Mahdi.  The office was permanently staffed by senior clerics from Sadr's inner circle who exercised substantial control over MOH decisions, including contracting decisions.

75.     Although the Sadrists filled MOH from top to bottom, the following officials played especially prominent roles in transforming the Ministry into a tool of Jaysh al-Mahdi.

### 1.     Dr. Adel Muhsin Abdullah al-Khazali (Inspector General of MOH)

76.     Dr. Adel Muhsin Abdullah al-Khazali arrived at MOH in August 2003 and assumed the title of Inspector General of MOH.  He served as Inspector General of MOH until 2013.  During that tenure, he married the Director of Contract Audit for Kimadia, a Sadrist who was in charge of the medical-goods contracting process.  Within months of his arrival, Dr. Adel

---

[28] *Id.*

[29] Lara Logan, *Iraq, Up Close:  Bodies and Terror*, CBS News (Oct. 5, 2006).

began exerting control over the Kimadia contracting process.  Dr. Adel used his position to facilitate Jaysh al-Mahdi's corrupt activities inside MOH.

77.     As detailed in a sensitive-but-unclassified report by the U.S. Embassy Baghdad, which was finalized on December 24, 2006, Dr. Adel traveled with a "Mehdi Army body guard detachment" and helped demonstrate that MOH was "openly under the control of the Mehdi Army of Muktad al-Sadr."[30]  That bodyguard detachment consisted of roughly 130 Jaysh al-Mahdi fighters and functioned as an Adel-commanded Jaysh al-Mahdi unit.  As one U.S. official working on anti-corruption matters in Iraq noted in a contemporaneous email, "Adel controls Health.  Adel is also Mahdi Army and has been implicated in an[t]i-Sunni death squad activity."

78.     In 2006 and 2007, Judge Radhi Hamza al-Radhi, head of Iraq's Commission on Public Integrity ("CPI"), attempted to investigate Dr. Adel for corruption.  Judge Radhi's investigation uncovered evidence (as later recounted in *Condé Nast Portfolio*) that "the Mahdi Army . . . had fully commandeered the ministries of health, trade and transportation" and that MOH ambulances and hospitals were "integral to the militia's sectarian killing machine."[31]  In retaliation, Jaysh al-Mahdi began murdering Judge Radhi's investigators, who became too afraid to venture into Ministry buildings by late 2006.  All told, more than 28 members of CPI were assassinated in 2006 and 2007.  In mid-2007, fearful for his life, Judge Radhi fled Iraq.

79.     According to a contemporaneous memorandum prepared by U.S. anti-corruption officials documenting a July 27, 2006 interview with an MOH confidential source, "Adel is a close contact of Muqtada al[-]Sadr" and "has political power because of his allegiance to Muqtada al[-]Sadr."  The same memorandum documented Dr. Adel's regular attendance with his

---

[30] Office of Accountability & Transparency, U.S. Embassy Baghdad, *The Sixth Month Review Of Iraq's Performance & Capacity In Enforcing Its Anticorruption Laws* 24 (Dec. 24, 2006) ("*U.S. Embassy Baghdad Report*").  A near-final version of this report is available online at https://fas.org/irp/eprint/anticorruption.pdf.

[31] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Condé Nast Portfolio (Mar. 17, 2008) ("*Betrayal*").

Jaysh al-Mahdi bodyguards at Friday prayers in Najaf, "where Muqtada delivers his radical messages." The MOH source further "advised that official corruption is tolerated at the MOH because it has become the ministry occupied by the Mahdi Army, in effect." And an August 12, 2007 memorandum documenting another CPI interview similarly described Dr. Adel as "one of the major supporters and organizers of the Mahdi Militia."

80.     Dr. Adel also publicly embraced Jaysh al-Mahdi in an event that garnered international media coverage. After an August 12, 2006 raid by Coalition forces to detain Jaysh al-Mahdi bodyguards assigned to the Minister of Health, Dr. Adel stood next to other Jaysh al-Mahdi members, including Hakim al-Zamili and Dr. Chasib al-Hajjami, *see infra* Part II.B.2-3, in front of television cameras to oppose Coalition forces. This took place in a rally outside the MOH headquarters building, while Dr. Adel was protected by armed Jaysh al-Mahdi fighters.

81.     From 2004 until he was forced from his position in 2013, Dr. Adel used his position as Inspector General to raise funds for Jaysh al-Mahdi, including its closely related and allied "Special Group" offshoot, Asa'ib Ahl al-Haq or "AAH." *See infra* ¶ 327.

## 2.     Hakim al-Zamili (Deputy Minister of Health)

82.     Hakim al-Zamili was another senior MOH official who served as a high-ranking Jaysh al-Mahdi terrorist commander. Zamili joined MOH in 2003 as the Deputy Director General and in 2005 became the Deputy Minister of Health, serving until he was arrested in 2007. Zamili was a prominent Jaysh al-Mahdi commander who used his MOH position – in conjunction with Dr. Adel, with whom he worked closely – to conduct Jaysh al-Mahdi terrorist activities. As Dr. David Ghanim, an Iraqi native and Senior Research Fellow at the University of

Gothenburg, observed in his book on Iraq's democratic institutions, Zamili "played a leading role in transforming the ministry into a bastion of sectarian violence."[32]

83.     Zamili amassed power within MOH by seizing control of the Facilities Protection Service, a group of roughly 15,000 fighters nominally tasked with safeguarding the physical security of MOH assets.  Zamili staffed the Facilities Protection Service with elite Jaysh al-Mahdi fighters loyal to Sadr and used it as his personally commanded Jaysh al-Mahdi division.

84.     Under Zamili's direction, Jaysh al-Mahdi used MOH ambulances to ferry death squads around Baghdad, transport weapons, launch indirect fire attacks, and conduct vehicle-based attacks.  Sadrist terror cells often set up operations at hospitals and used the facilities to hold weapons and hostages.  They also used MOH facilities throughout the country as bases from which to directly launch attacks.  As one senior Iraqi politician observed, according to a U.S. State Department cable (as published by *WikiLeaks*), the "Ministry of Health, infiltrated by Sadrists," was more aptly described as the "Ministry of Weapons Transportation."[33]

85.     According to *CBS News*, a 2006 U.S. intelligence report corroborates those allegations.  As reported, U.S. intelligence concluded "Sadr's Mahdi Army . . . turned morgues and hospitals into places where death squads operate freely" and detailed how:

- "Hospitals have become command and control centers for the Mahdi Army militia.
- Sunni patients are being murdered; some are dragged from their beds.
- The militia is keeping hostages inside some hospitals, where they are tortured and executed.
- They're using ambulances to transport hostages and illegal weapons, and even to help their fighters escape from U.S. forces."[34]

---

[32] David Ghanim, *Iraq's Dysfunctional Democracy* 216 (Praeger 2011) ("*Dysfunctional Democracy*").

[33] U.S. State Dep't Cable, *Iraqi Moderate Front Organizers Concerned About Media Attention, Lack of Progress* (Dec. 12, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD4527_a.html.

[34] Melissa McNamara, *CBS:  Death Squads In Iraqi Hospitals*, CBS News (Oct. 4, 2006).

86.     This Jaysh al-Mahdi appropriation of MOH resources extended throughout Iraq. As recounted in *Endgame*, "[e]ven hospitals were used as killing grounds.  So many Sunni patients and relatives were abducted and killed at Baghdad's three major hospitals . . . that Sunnis were afraid to use the facilities, and would often drive their sick or injured relatives all the way to Fallujah or Ramadi."[35]  By the fall of 2006, Jaysh al-Mahdi's control over MOH facilities had grown so complete that wounded Iraqi troops and police occupied more than 80% of the hospital beds in U.S. military facilities.  As a U.S. Corps Commander explained, "[w]e cannot take them to civilian hospitals.  They'll be shot."[36]  An account in the *Washington Post* reflected the same sentiment, quoting one Sunni security guard whose cousin was allegedly murdered by Jaysh al-Mahdi in a hospital:  "We would prefer now to die instead of going to the hospitals . . . .  I will never go back to one.  Never.  The hospitals have become killing fields."[37]

87.     From 2005-2007, Zamili regularly led contingents of Jaysh al-Mahdi fighters up to the roof of the MOH headquarters building to launch attacks, using mortars, sniper rifles, and heavy machine guns.  On at least one occasion in 2006, Zamili himself was seen firing a DShK (a heavy-caliber machine gun popularly called a "Dushka") at nearby Sunni neighborhoods from the roof of the Ministry building.  On another occasion in 2006, a U.S. official was traveling to meet with Dr. Adel at MOH when the American convoy was attacked by Jaysh al-Mahdi snipers waiting on the roof of the MOH building; the convoy had to reverse course and retreat, and the official never made the meeting.  In light of these and other similar attacks, and Jaysh al-Mahdi's near-total control of the surrounding neighborhood, the area around MOH was considered one of the most dangerous parts of Baghdad for U.S. soldiers and civilians from 2005-2008.

---

[35] *Endgame* at 222.

[36] *Id.* at 223.

[37] Amit R. Paley, *Iraqi Hospitals Are War's New 'Killing Fields,'* Wash. Post (Aug. 30, 2006).

88.     From 2005-2007, Zamili's office and suite at MOH displayed Sadrist propaganda that paid homage to Muqtada and Sadiq al-Sadr.  He conducted Ministry business while being guarded by armed Jaysh al-Mahdi fighters.  His personal office was full of heavy weaponry, including rocket-propelled grenades and Kalashnikov machine guns.  Based on those weapons, and the contingent of armed terrorists in the building, one witness who spent significant time in MOH headquarters understood it as more of a "Mahdi Army camp" than a medical building.

89.     Numerous reports indicated that Zamili was responsible for the 2006 murder of Dr. Ali al-Mahdawi, the Sunni Director General of MOH for the Diyala province, after Mahdawi objected to Zamili's corrupt practices.[38]  Dr. Ali al-Shemari, the Minister of Health who later testified against Zamili, admitted to Mahdawi's family that he was "surrounded by killers" and that he wanted to fire Zamili, but that the "criminal armed militia do not want that."[39]

90.     Reports also indicated that Zamili was responsible for the 2007 murder of Ammar Saffar, his predecessor as Deputy Minister.  Saffar, as recounted by his son, was "on the verge of exposing explosive evidence that funds earmarked to improve Iraq's health sector were being diverted to sectarian militias" when Zamili kidnapped and killed him.[40]  Former Prime Minister Jaafari reportedly confirmed Zamili's culpability, telling Saffar's son that "prominent Sadrists" had admitted that "Zamili was in fact behind the kidnapping."[41]

91.     On February 8, 2007, Coalition special forces arrested Zamili inside MOH headquarters, along with his Jaysh al-Mahdi deputy in charge of the Facilities Protection Service.  They arrested Zamili based on accusations not only that he was a murderer, but also that he had

---

[38] *See*, *e.g.*, Kim Gamel, *Iraqi Official Tied To Militia Jailed*, Assoc. Press (Feb. 8, 2007).

[39] *Endgame* at 507.

[40] Ali Al-Saffar, *Iraq's Elected Criminals*, Foreign Policy (Mar. 4, 2010).

[41] *Id.*

participated in Jaysh al-Mahdi's terrorist fundraising via the diversion of medical goods and the use of inflated contracts for MOH equipment and services.

92.     Zamili's arrest signaled the beginning of the U.S. military's troop surge on the ground in Iraq.  The day of the arrest, a U.S. advisor to the Iraqi military explained to the *Los Angeles Times* that "[t]his is the first visible big fish."[42]  A few months later, General David Petraeus heralded Zamili's arrest as one of the surge's early successes, explaining that Zamili had "effectively hijacked the Ministry of Health."[43]  One U.S. Department of Justice ("DOJ") official opined to the *New York Times* during this period that Zamili's "case is as important, if not more important, than the Saddam Hussein case."[44]

93.     In the months before the trial, however, the witness list was leaked to the Sadrists. Jaysh al-Mahdi then engaged in multiple acts of witness intimidation.  On February 19, 2008, the trial was postponed because, as confirmed by a spokesman for the U.S. Judge Advocates' Corps, "[a]t least seven of the nine prosecution witnesses have received death threats."[45]

94.     Shortly thereafter, several key witnesses backed out of testifying, and others recanted on the stand.  On March 3, 2008, Zamili was acquitted for lack of evidence.  The presiding judge in Iraq, as paraphrased by *NPR*, concluded that "there was little doubt that Zamili, who has close ties to Shiite cleric Moqtada al-Sadr, played some role in the recent sectarian violence.  The court simply didn't have enough evidence to convict him."[46]  Roughly a week later, Zamili was released.  Stuart Bowen, the U.S. Special Inspector General for Iraqi Reconstruction, explained to Congress what had happened:

---

[42] Louise Roug, *Iraqi Health Official Is Arrested In Sweep*, L.A. Times (Feb. 9, 2007).

[43] William Branigin, *Petraeus:  Iraq Situation Is 'Exceedingly Challenging*,' Wash. Post (Apr. 26, 2007).

[44] Michael R. Gordon, *Iraqi Premier Wants Trial Of 2 Shiites In Killings*, N.Y. Times (Nov. 16, 2007).

[45] Byran Pearson, *Witnesses In Iraq Death Squad Trial Threatened*, Agence France Presse (Feb. 19, 2008).

[46] Dina Temple-Raston, *U.S. Urges New Trial For Iraqi Colonel*, National Public Radio Morning Edition (Mar. 13, 2008).

Mr. BOWEN.  Yes.  The most notable case came to court 1 week ago in Baghdad, involving the deputy minister of health.  There was significant evidence related to the sale of prescription drugs on the black market that had been ongoing within that ministry. The case was dismissed, because witnesses had been intimidated and did not show.[47]

95.     In 2010, Zamili was elected to the Iraqi Parliament.  In his campaign headquarters in Sadr City during the 2010 election season, Zamili maintained a pretense of denying the charges against him but did not conceal his support for terrorism.  The *New York Times*, after an interview, described Zamili as "unapologetic about the attacks that Shiite militias like Moqtada al-Sadr's Mahdi Army carried out in past years against the Americans."[48]  In Zamili's words, "resistance was our right because we were occupied.  We had a duty to protect the people from the U.S. forces and the attacks of terrorists [*i.e.*, Coalition forces and Sunnis]."[49]

### 3.     Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, Dr. Hani Mousa Badr al-Uqabi, and Dr. Chasib Latif Ali al-Musawi al-Hajjami (Directors General at MOH)

96.     In 2005, Jaysh al-Mahdi appointed several Directors General at MOH for the purpose of operationalizing its control over Ministry assets.  Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, and Dr. Hani Mousa Badr al-Uqabi were the Directors General for Rusafa (the eastern part of Baghdad whose MOH Directorate included Sadr City), Karkh (the Jaysh al-Mahdi-controlled neighborhood just to the west of the Tigris River), and Medical City (near MOH headquarters), respectively.  Each was a Jaysh al-Mahdi agent and participant in its terrorist operations.  As regional directors with oversight of MOH resources in their provinces, Dr. Ali Bustan, Dr. Jaleel, and Dr. Hani facilitated the use of MOH ambulances, trucks, hospitals, pharmacies, clinics, and supplies to support Jaysh al-Mahdi's terrorist activities.

---

[47] *Examining the Effectiveness of U.S. Efforts To Combat Waste, Fraud, Abuse, and Corruption In Iraq: Hearings Before the S. Comm. on Appropriations*, 110th Cong. 52 (2008) (statement of Stuart W. Bowen, Jr.), https://www.gpo.gov/fdsys/pkg/CHRG-110shrg43280/pdf/CHRG-110shrg43280.pdf.

[48] Marc Santora & Michael R. Gordon, *Murky Candidacy Stokes Iraq's Sectarian Fears*, N.Y. Times (Mar.3, 2010).

[49] *Id.*

97.     Dr. Ali Bustan's brother was the senior Jaysh al-Mahdi cleric and battalion commander for Sadr City who was, on information and belief, the leader of the notorious Fartusi Cell – a Jaysh al-Mahdi cell responsible for a substantial number of attacks against Coalition forces in Baghdad.  Dr. Jaleel, for his part, was caught in 2004 by U.S. troops inside a mosque with explosives of the type often used by Jaysh al-Mahdi against Coalition forces – but was then released on a technicality.  In a television interview years later, Dr. Jaleel boasted that he and his Sadrist allies once "fired their weapons against American soldiers," which he described as an act of "patriotism" that "had a great impact on his life."[50]

98.     Dr. Chasib Latif Ali al-Musawi al-Hajjami, the Director General for Operations at MOH, was another Sadrist and Jaysh al-Mahdi fighter who, in late 2005, attained his title after Dr. Adel forced out his predecessor.  From at least 2005-2008, Dr. Chasib regularly bragged about being a Jaysh al-Mahdi soldier; he stated on at least one occasion in 2006 that he had wielded a Kalashnikov machine gun for Jaysh al-Mahdi against U.S. forces.  In his years at MOH, Dr. Chasib also posted online photographs of himself armed and wearing Jaysh al-Mahdi garb, including several images of himself standing next to Muqtada al-Sadr.

99.     As the person overseeing MOH's day-to-day operations, Dr. Chasib had official responsibility for the use of Ministry facilities and equipment, such as ambulances.  He told MOH colleagues that his ambulances transported the corpses of Jaysh al-Mahdi's enemies.  On one occasion in or about 2007, he said that the MOH ambulances he oversaw were "still wet from the blood of the corpses" from a Jaysh al-Mahdi firefight the night before.

---

[50] TV Interview on Afaq Channel with Jaleel al-Shammari (Feb. 17, 2017) (translated from Arabic), https://www.youtube.com/watch?time_continue=329&v=beat6M8Ey-c (last accessed Sept. 12, 2017).

### 4. Other Senior and Mid-Level Commanders

100. Many other mid-level MOH employees also played key leadership roles in Jaysh al-Mahdi as Company-, Battalion-, and Brigade-level commanders throughout the group's terrorist operations. Those MOH employees included pharmacists, administrators, nurses, security personnel, and vehicle managers within the Ministry; such mid-level employees were responsible for coordinating various types of attacks on Coalition forces, including the use of improved explosive devices ("IEDs") and explosively formed penetrators ("EFPs"). Examples, drawn from contemporaneous military arrest reports (as published by *WikiLeaks*), include:

- **Imad Abu Sajjad, Brigade Commander for South Karkh (Baghdad).** On May 18, 2008, the Iraqi Army arrested "Imad Juwi Rahima aka Imad Abu Sajjad," who "work[ed] for the Ministry of Health" and was a "high level target" because of his status as "the South Karkh JAM Brigade Commander" who had "ordered IDF, EFP/IED, and SAF attacks" against Coalition forces.[51] In a 2006 Arabic-language article published by *Al-Jazeera*, Abu Sajjad was described as a "prominent leader in [the] Mahdi Army" who "was among the first to join when [Jaysh al-Mahdi] was formed," "command[ed] more than 1,500 fighters," and allegedly "provid[ed] protection for hospitals."[52] In a 2007 interview with the *New York Times*, Abu Sajjad stated that he and his fighters "had sworn loyalty to Moktada al-Sadr and promised to kill Americans or Sunnis when called upon to do so" and boasted that "Americans in Iraq . . . are really just prisoners" of Jaysh al-Mahdi.[53] An Arabic-language article published by *Al-Arabiya* further reported that Abu Sajjad was a deputy of Abu Dura, the Hezbollah-trained Jaysh al-Mahdi terrorist who played a key leadership role in its intelligence unit and who was nicknamed the "Shiite Zarqawi" for his brutal tactics.[54] On information and belief, as a senior Jaysh al-Mahdi terrorist in Iraq, Imad Abu Sajjad received specialized training from a Hezbollah agent deployed inside Iraq.

- **Sa'ad Abadi, Battalion Commander in Kadamiyah (Baghdad).** Sa'ad Abadi commanded a Jaysh al-Mahdi Battalion in Kadamiyah that included MOH employees and was linked to the Kadamiyah Teaching Hospital, which "JAM/SG cells" had "historically . . . used . . . as a cache site."[55] On information and belief,

---

[51] *WikiLeaks* (May 18, 2008), https://wikileaks.org/irq/report/2008/05/IRQ20080518n10702.html.

[52] Al-Jazeera (Nov. 20, 2006), https://goo.gl/PWSRx5 (link shortened; translated from Arabic).

[53] Damien Cave & Stephen Farrell, *At Street Level, Unmet Goals of Troop Buildup*, N.Y. Times (Sept. 9, 2007).

[54] *See* Al-Arabiya (Dec. 25, 2006), https://www.alarabiya.net/articles/2006/12/25/30226.html (translated from Arabic).

[55] *WikiLeaks* (June 11, 2009), https://wikileaks.org/irq/report/2009/06/IRQ20090611n12476.html.

Sa'ad Abadi and his cell received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Ali Hindi, Hajji Thair Cell in Kadamiyah (Baghdad).** On July 5, 2008, Coalition forces searched the home of Ali Hindi, who was a member of a Jaysh al-Mahdi Special Group known as the Hajji Thair cell in the Shuala section of the Kadamiyah District in Baghdad; Coalition forces discovered two MOH badges along with weapons, film, and a passport indicating travel through Syria,[56] which on information and belief is a significant indicator of terrorist training in Lebanon. On information and belief, Ali Hindi and his Special Group received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Abu Hajir, EFP Cell in Sadr City (Baghdad).** Abu Hajir was a member of a Jaysh al-Mahdi cell in Sadr City that included MOH employees. During a December 4, 2008 Coalition search "to capture Abu Hajir [in order] to disrupt [Jaysh al-Mahdi] operations in Sadr City," Coalition forces arrested seven suspected Jaysh al-Mahdi terrorists and recovered, among other things, an EFP, "Ministry of Health SCTY Force Badge," and U.S. currency.[57] On information and belief, Abu Hajir received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Husayn Saleem Zair, IED Cell near Sadr City (Baghdad).** During a September 15, 2008 search near Sadr City, Coalition forces arrested Husayn Saleem Zair, who was "suspected to be a [Jaysh al-Mahdi] Special Groups IED cell member."[58] When he was detained, Zair possessed an MOH Facilities Protection Service ID card and badge, "religious documents," a "sheet of paper from [the] Ministry of Health about workers," and "pills."[59] On information and belief, Husayn Saleem Zair and his Special Group received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

101.    These and other mid-level MOH employees translated Jaysh al-Mahdi's control of MOH into on-the-ground terrorist acts. Working at the direction of and in concert with senior terrorists (including the ones identified above), they used MOH assets to launch attacks, smuggle weapons, and gather intelligence. Contemporaneous U.S. military reports (as published by *WikiLeaks*) provide examples of Jaysh al-Mahdi using MOH resources to commit terrorist acts:

- **MOH Hospitals as Staging Areas.** On October 11, 2006, Coalition forces received reports that "Mahdi Army" personnel were in "Al Jwader Hospital" and

---

[56] *WikiLeaks* (July 5, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080705n11375.html.

[57] *WikiLeaks* (Dec. 4, 2008), https://wikileaks.org/irq/report/2008/12/IRQ20081204n11938.html.

[58] *WikiLeaks* (Sept. 15, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080915n11726.html.

[59] *WikiLeaks* (Sept. 15, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080915n11726.html.

"Al Sadr Hospital," among other places, and were "planning on attacking MNF if they enter Al Sadr City."[60]

- **MOH Vehicles as Attack Instruments.** On December 2, 2006, Coalition forces reported that 17 "JAM militants" were "planning to launch an attack on [Forward Operating Base] Rustamiyah . . . using Katyusha rockets and 120[mm] mortars," during which "militants [would] use five vehicles belonging to the Ministry of Health."[61] On December 12, 2006, Coalition forces reported that five ambulances had been "moved from Baghdad City to Al Sadr City and Al Shaab City," and that, "[f]rom the vehicles," Jaysh al-Mahdi would "fire mortars and then use the ambulances as [Vehicle-Borne IEDs]."[62]

- **MOH Headquarters as Attack Base.** On November 29, 2006, Coalition forces reported that Jaysh al-Mahdi fighters were "launching mortar rounds from [the] top of MOH."[63] On December 21, 2006, Coalition forces reported that "terrorists [were] on the roof of the Health Ministry [building] firing in the Al-Fadel area."[64]

- **MOH Facilities as Kidnapping Tool.** On August 13, 2006, Coalition forces arrested five suspected Jaysh al-Mahdi terrorists while acting on a tip that 15 "JAM [fighters] armed with PKC and AK-47 and wearing [Iraqi Army] uniforms kidnapped" six local nationals, "and took the kidnapped victims to MOH."[65]

- **MOH Vehicles as Smuggling Tool.** On December 15, 2006, Coalition forces reported that "[w]eapons have been transported" from Wasit Province (on the Iranian border) to Sadr City through the use of four "yellow trucks supported by ambulances."[66] Coalition forces determined that the weapons being transported "will be used to target" Americans in Baghdad.[67] On August 19, 2007, Coalition forces arrested three MOH employees "for questioning in association with the rocket cache found inside an ambulance," including an MOH Facilities Protection Service Night Shift Officer-in-Charge, MOH Deputy Security Manager for the Night Shift, and an MOH Vehicle Manager.[68]

102.    Sadrist control of MOH and Kimadia was at its apex from late 2004 through 2008. During that period, Jaysh al-Mahdi's cooptation of the Ministry was so complete that there was no meaningful distinction between the MOH bureaucracy and the Jaysh al-Mahdi

---

[60] *WikiLeaks* (Oct. 11, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061011n5285.html.

[61] *WikiLeaks* (Dec. 2, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061202n5876.html.

[62] *WikiLeaks* (Dec. 12, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061212n6135.html.

[63] *WikiLeaks* (Nov. 29, 2006), https://wikileaks.org/irq/report/2006/11/IRQ20061129n5782.html.

[64] *WikiLeaks* (Dec. 21, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061221n6232.html.

[65] *WikiLeaks* (Aug. 13, 2006), https://wikileaks.org/irq/report/2006/08/IRQ20060813n4950.html.

[66] *WikiLeaks* (Dec. 15, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061215n6306.html.

[67] *WikiLeaks* (Dec. 15, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061215n6306.html.

[68] *WikiLeaks* (Aug. 19, 2007), https://wikileaks.org/irq/report/2007/08/IRQ20070819n9397.html.

terrorist apparatus.  In 2008, after a different party won the right to appoint the Minister of

Health, the violence within the Ministry began to lessen to some degree.  But until 2013 (and

even afterward), Jaysh al-Mahdi's de facto control over the MOH contracting process –

exercised via mid- and upper-level managers entrenched throughout the MOH bureaucracy –

persisted and continued to fund terrorist attacks.  That was made possible by several of the key

Jaysh al-Mahdi agents described above.  For example, Dr. Adel continued in his position as

Inspector General until 2013, while Dr. Ali Bustan and Dr. Jaleel continued in their positions

until approximately 2015.  Dr. Chasib remains in a high-level position inside MOH to this day.

## III.   DEFENDANTS ENGAGED IN CORRUPT TRANSACTIONS THAT PROVIDED FINANCING TO JAYSH AL-MAHDI

### A.   Jaysh al-Mahdi Raised Money Through Corrupt MOH Contracting Practices

103.    Jaysh al-Mahdi financed its activities by extracting corrupt payments from foreign

suppliers like Defendants.  In a December 2004 official report, Health Minister Dr. Ala'din

Alwan – a secular bureaucrat whom the Sadrists forced out in early 2005, just after he had

publicly excoriated MOH's corrupt procurement practices and called for "drastic changes" –

acknowledged that "corruption is widespread" within MOH.[69]  According to Minister Alwan,

"[p]rocurement processes, bidding procedures, and project management are areas where

corruption is commonly encountered."[70]  Similarly, as Health Minister Dr. Ali al-Shemari noted

in the summer of 2006 (as described in a U.S. State Department cable as published by

*WikiLeaks*), he was aware that "Kimadia is corrupt."[71]

---

[69] Ala'din Alwan, *Health In Iraq:  The Current Situation, Our Vision for the Future and Areas of Work* 50, 75 (2d ed. Dec. 2004).

[70] *Id*. at 50.

[71] U.S. State Dep't Cable, *New Minister Of Health:  Let's Cooperate To Improve Healthcare & The Ministry* (June 12, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD1978_a.html.

104.     Dr. Adel used his position as corruption watchdog at MOH to facilitate Jaysh al-Mahdi's fundraising activities from foreign suppliers like Defendants.  As Inspector General, Dr. Adel blocked investigations into corrupt activities of Jaysh al-Mahdi officials at MOH.  He also controlled the MOH procurement process through his marriage to the Director of Contract Audit for Kimadia.  When others within the Iraqi government – either inside or outside MOH – would attempt to initiate legal investigations of MOH corruption, Dr. Adel scuttled the investigations.

105.     Jaysh al-Mahdi's fundraising schemes took advantage of MOH's lack of any modern logistics system.  Drugs and devices were counted in an ad-hoc manual way, logged on paper, and stored in warehouses in a haphazard manner.  There was no centralized system tracking the movement of goods and devices.  A 2004 investigation by 60 Iraqi pharmacists, as described in a report by the U.N.'s Office for the Coordination of Humanitarian Affairs, found that "medicine was stolen from warehouses, it was stolen from hospitals, it was even stolen on its way to patients."[72]  The Director General of Kimadia likewise admitted in 2004 that "huge volumes of paperwork make it easy to hide orders for stolen drugs and medical equipment."[73]

106.     In June 2007, retired New Hampshire Superior Court Judge Arthur Brennan, who then headed the Office of Accountability and Transparency ("OAT") at the U.S. Embassy in Baghdad, oversaw an investigation into Jaysh al-Mahdi's corruption at MOH.  As recounted by the New Hampshire Bar Association, OAT had "evidence of crimes committed by Dr. Adel Muhsin" – specifically, that "[m]illions of dollars in pharmaceuticals had been stolen or misappropriated."[74]  But Judge Brennan determined that OAT could not effectively investigate

---

[72] U.N. Office for the Coordination of Humanitarian Affairs, *Iraq:  Health Ministry Fights Corruption*, IRIN News (June 16, 2004), http://reliefweb.int/report/iraq/iraq-health-ministry-fights-corruption.

[73] *Id.*

[74] Beverly Rorick, *NH Judge's Anti-Corruption Mission In Iraq Ends In Disenchantment*, New Hampshire Bar Ass'n Bar News (Oct. 15, 2010), https://www.nhbar.org/publications/display-news-issue.asp?id=5761.

Dr. Adel further, as he "believed that Muhsin was a danger to his OAT advisors."[75]  Judge

Brennan testified before the Senate in 2008 about Dr. Adel (without identifying him by name):

"OAT had evidence that the man was corrupt and dangerous" and was involved in the "theft and

or misappropriation of up to one billion dollars in medical supplies intended for the use of the

Iraqi people.  The medical supplies were showing up on the black market in Iraq and Syria."[76]

107.    Jaysh al-Mahdi's re-selling of medical goods extended to neighboring countries

such as Iran and Syria.  As a U.S. anti-corruption official stated in a contemporaneous email,

Dr. Adel, as agent of Jaysh al-Mahdi, awarded contracts to those who paid "the highest kickback.

Once the bid is awarded – after collecting his kickback – he then obtains the actual drugs" and

"resells them to Syria and Jordan for a profit."  And, according to a memorandum documenting

an August 12, 2007 meeting with CPI officials, there were "numerous reports of Adel interfering

with contracts," steering "contracts to favored companies, and receiving kick backs."

108.    Dr. Adel himself scarcely bothered to hide Kimadia's corruption.  A U.S. State

Department cable (as published by *WikiLeaks*) recounted on July 10, 2009 that Dr. Adel publicly

"acknowledged corrupt practices by the Health Ministry's office, KIMADIA, responsible for

procurement of medicines and other medical items."[77]  Dr. Adel further admitted that, on his

watch, "a 'large proportion' of the purchase contracts issued by KIMADIA were tainted with

corruption."[78]  Another U.S. State Department cable (as published by *WikiLeaks*) the following

---

[75] *Id.*

[76] Statement of Arthur Brennan, *Waste Fraud & Corruption In Iraq*, S. Democratic Policy Comm. (May 12, 2008), 2008 WL 2010885 ("*Brennan Testimony*").

[77] U.S. State Dep't Cable, *Anti-Corruption Developments in Iraq* (July 10, 2009), https://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html.

[78] *Id.*

year observed that Dr. Adel had long "been the subject of credible corruption allegations," including "in connection with the Health Ministry's procurement of pharmaceuticals."[79]

109.    A 2013 report by the Iraqi Parliament was equally scathing.  After an extensive parliamentary investigation into Dr. Adel's practices, the Investigation Committee of the Parliament confirmed the "involvement of the General Inspector [Dr. Adel] within the Ministry of Health and his wife, with financial and administrative corruption."[80]  According to Hassan al-Jubouri, the chairman of the Investigation Committee, Dr. Adel and his wife had engaged in rampant "financial corruption through tak[ing] bribes from companies."[81]

110.    MOH's procurement corruption and its terrorist ties went hand-in-hand.  As documented in a contemporaneous memorandum memorializing a December 6, 2006 interview with a CPI investigator, Iraqi anti-corruption institutions failed to combat corruption at MOH because – even though there were "direct indications of equipment/medicine thefts" – outside investigators were "too scared of the militias within MOH to create waves."

**B.    Defendants Made Corrupt Payments To Jaysh al-Mahdi**

111.    Beginning in 2004, after the Sadrists infiltrated MOH, Defendants made corrupt payments to Jaysh al-Mahdi through MOH to exploit a post-Saddam Iraqi healthcare market that was generally perceived to be on the verge of rapid growth.  For example, one study found that, from 2006-2011, the Iraqi pharmaceutical market experienced a 17% compound annual growth rate – making it the fastest-growing market in Eastern Europe, the Middle East, and Africa.[82]

---

[79] U.S. State Dep't Cable, *Ministry Of Interior Bomb Detector Stirs Controversy & Charges Of Corruption* (Feb. 11, 2010), https://wikileaks.org/plusd/cables/10BAGHDAD366_a.html.

[80] Ahmed Hussein, *Investigations Prove Mohsin's Involvement In Corruption*, Iraqi News (May 13, 2013), http://www.iraqinews.com/baghdad-politics/investigations-prove-mohsin-s-involvement-in-corruption/.

[81] *Id.*

[82] *See* Management Partners, *Iraq Pharmaceuticals Market Opportunities*, Market Insights (May 2013).

112.    In an effort to grow their market share in Iraq, Defendants engaged in transactions structured to provide financial support to Jaysh al-Mahdi.  Defendants' corrupt payments to Jaysh al-Mahdi officials fell into two broad categories:  (1) "free goods;" and (2) "commissions."

### 1.    "Free Goods" Payments

113.    In 2004, shortly after the CPA ceded control of MOH to the Iraqis, Defendants revived the "free goods" scheme they had used under Oil-for-Food.  The scheme operated much the same way it had before, with two important differences.  First, the Ministry's procurement budget skyrocketed from $16 million per year under Saddam to an average of well more than $1 billion after 2004, when the Sadrists controlled MOH.  As a result, the market for Defendants' products in Iraq increased substantially, providing an additional motive for Defendants to engage in corrupt transactions with MOH.  Second, whereas Kimadia under Saddam had demanded "free goods" in quantities equal to 10% of the underlying contract, Defendants varied the percentages they paid the Sadrists – mostly upwards.  For example, AstraZeneca's general practice was to provide "free goods" to the Jaysh al-Mahdi-controlled Ministry in quantities ranging from 25% to 100% on sales of its blockbuster drugs.

114.    Prescription drugs and medical devices, while inexpensive for companies to manufacture and deliver, functioned as cash equivalents in Iraq:  they possessed high street value in Iraq and throughout the Middle East, given the chronic shortages at state-run clinics across the region; they were easy to conceal and smuggle across borders; and they could be effectively monetized on regional black markets or by Jaysh al-Mahdi doctors and pharmacists through their private clinics.  When Defendants delivered "free goods" in connection with MOH contracts, they provided Jaysh al-Mahdi with a valuable, transportable commodity that could be converted efficiently into cash.

115.    Delivering "free goods" to MOH offered Defendants other advantages.  Unlike cash payments made to corrupt officials, which are difficult to justify if discovered, Defendants could argue that providing free drugs or medical devices to Iraqi health officials reflected charitable goals.  The availability of this pretextual humanitarian justification has made the delivery of in-kind "free goods" a popular form of bribery in the Middle East.

116.    The structure of the Iraqi procurement process ensured that the provision of "free goods" functioned not to benefit the Iraqi people, but as corrupt payments to the terrorists who ran MOH.  From 2004-2013, the MOH procurement process generally began in December of each year, when Regional Directors General (such as Dr. Jaleel or Dr. Ali Bustan) supervised a process through which doctors, pharmacists, and local hospital administrators assessed their inventories and calculated the region's needs for the upcoming year.  They then submitted written requests to the MOH Needs Assessment Committee ordering the quantity of medical goods – specified to the number of individual units – required for the upcoming year.  The Needs Assessment Committee collected those various orders, tabulated the total, and used the total to fix a national quota for each drug and device.  Kimadia, in turn, used MOH's quota to set the quantities specified in the requests for proposal it issued the following year – so that the quantities purchased of each drug or device would match the corresponding quota set by MOH.  After Kimadia purchased drugs and devices in those quantities, it was responsible for importing and distributing the goods to satisfy the orders placed by individual healthcare providers.

117.    Kimadia procured its quota of each specific drug (or device) by issuing requests for proposal soliciting bids from suppliers for a specified quantity.  Companies responded with bids proposing a price for the quantity of requested goods, which matched the annual quota set by MOH.  On top of that fixed quantity, Kimadia's standard bid instructions regularly instructed

companies to specify the quantity of extra goods that they would provide for free.  This demand for "free goods" still appears on the face of Kimadia's standard instructions:  in a checklist specifying "general contract conditions," Kimadia states that each contract "is subjected to free goods to be shipped with the contract goods."  Given the Iraqi procurement process – in which the base quantity of "contract goods" specified in the bid already reflected all the orders submitted by Iraqi healthcare providers – the "free goods," by definition, did not correspond to any needs-based request by an authorized provider.  Because no provider actually requested the "free goods," Kimadia had no legitimate destination to which to send those goods once received in Iraqi warehouses.  Accordingly, the "free goods" were not accounted for in Iraqi inventory and operated instead as a slush fund for the Jaysh al-Mahdi agents running the Ministry.

118.   After a company won a tendering round, it was required to execute a formal sales contract with Kimadia.  Each contract was required to be executed, by hand, by an executive with signing authority for the supplying company.  The supplier had to physically bring a paper copy of the final, executed contract in person to MOH officials inside the Ministry headquarters building in Baghdad; MOH did not accept contracts that were delivered by mail or electronic means.  Iraqi health officials were suspicious of forged signatures, and they demanded paper copies – delivered in person – in part to visually inspect the executive's signature on the contract.  The signed sales contracts typically memorialized both the underlying quantity of "contract goods" for which Kimadia would make payment and the quantity of extra "free goods" on top.

119.   Although the precise layout of each Kimadia sales contract varied over time and by supplier, they generally followed the same core template.  The first few pages of the template included (among other things) the following information:

- Contracting Party / Seller:  The company that executed the contract with Kimadia and supplied the purchased goods (often called the "supplier").

43

- <u>Manufacturer</u>:  The company that manufactured the goods that the supplier was selling.  For drug contracts, this could refer either to the manufacturer of the active pharmaceutical ingredient or to the company that formulated and packaged the final drug.  *See infra* note 158.

- <u>Origin of the Goods</u>:  The country from which the supplier agreed to source the purchased drugs or devices; it typically referred to the place where the active pharmaceutical ingredient (the most important part of any drug) was made.  This "origin" term was material to Kimadia:  Iraqi health officials were suspicious of counterfeit drugs, and they insisted on contractual protections guaranteeing that drugs would be made in the proper country of origin.

- <u>National Code</u>:  The alphanumerical code assigned to the drug being sold (not applicable to devices).  Before any drug could be sold in Iraq, MOH had to place it on the national formulary and assign it a National Code.

- <u>Corresponding Bank</u>:  The supplier's correspondent bank account – including account number and SWIFT code – to which MOH wired payment.  As a general rule, transactions with Kimadia occurred in U.S. dollars, so most suppliers had to identify a correspondent account capable of receiving payment in U.S. dollars.

120.    Since 2004, the final section of the standard sales contract typically contained a series of additional contractual terms, often including the obligation to provide "free goods." Kimadia typically instructed suppliers not to label or distinguish these "free goods" from the rest of the goods destined for Iraqi inventory.  This section also often contained other commercially unreasonable contractual provisions, such as a requirement that the supplier re-supply "free of charge" any drugs that expired before Kimadia was able to sell them.

121.    After execution of the sales contract, a letter of credit was typically sent from Kimadia's bank – The Trade Bank of Iraq ("TBI") – to the supplier's bank.  Notice of the letter of credit was sent by SWIFT message, which included reference to the basic terms of the contract and often included – in Field 45A (denoting the Description of Goods and/or Services) – a specific reference to the "free goods" that would be delivered.  For example, one J&J letter of credit stated that "THIS L/C CONTAIN FREE GOODS 20PCT" – meaning that the J&J supplier company had agreed to make a 20% "free goods" payment.

122.    Letters of credit also confirmed the payment terms specified in the contract.  In Field 47A, letters of credit typically provided that some percentage of the contract amount was payable upon presentation of the appropriate shipping documents at the Iraqi border, with the remainder payable after acceptance of the goods at the Kimadia warehouse.  They also typically required the supplier to cover the banking charges associated with the transaction.  To effectuate that contractual term, letters of credit instructed the supplier's bank to credit TBI's New York-based correspondent banking account in U.S. dollars – so that the supplier, in essence, covered Kimadia's banking fees under the contract.

123.    On information and belief, Defendants covered Kimadia's transaction and banking fees by transferring funds into a TBI correspondent account at J.P. Morgan Chase Bank ("JPM NY") in New York.  This allegation is based on the following:

(a)    Plaintiffs have obtained two letters of credit governing two separate transactions in which the supplier defrayed Kimadia's transaction costs by wiring dollars into a JPM NY correspondent account based in New York.

(b)    TBI is an Iraqi-owned entity that the CPA incorporated on July 17, 2003, to facilitate the import and export of goods to and from Iraq.  Since its inception, according to TBI's chairman in a 2017 interview, TBI's focus has been on building an international "correspondent banks network" to "offer trade finance solutions to the public and private sectors."[83]

(c)    JPM NY led a consortium of banks that established and managed TBI at its founding in 2003, and in that capacity JPM NY directly ran TBI's operating platform and trained TBI's employees.  One of TBI's founding purposes was to issue letters of credit to finance Iraqi imports with the assistance of that JPM NY-led operating consortium.  For example, the U.S. Export-Import Bank approved export insurance in December 2003 for up to $250 million in TBI-issued letters of credit, which it stated would be "used to support trade financing from JPMorgan Chase Bank, as lead of the TBI's Operating Consortium."[84]

(d)    Correspondent accounts in New York were essential to TBI's mission of financing transactions for MOH and other ministries.  Rebuilding the

---

[83] Faisal al-Haimus, *Making Strides In Iraq & Beyond*, Banker Middle East (Feb. 22, 2017), 2017 WLNR 5615939.

[84] Press Release, Export-Import Bank of the United States, *$250 Million Ex-Im Bank Insurance Will Facilitate U.S. Exports to Iraq* (Dec. 28, 2003), http://www.exim.gov/news/250-million-ex-im-bank-insurance-will-facilitate-us-exports-iraq.

creditworthiness of Iraq's institutions was a crucial component of the U.S.-led reconstruction.  Correspondent accounts in New York – which was (and remains) the hub of the global credit system, especially for U.S. dollar-denominated transactions like Kimadia's – were key to TBI's viability.

124.    The availability of letters of credit, which relied on TBI's correspondent banking network in New York, was material to Defendants' willingness to sell to MOH.  In cross-border transactions, letters of credit serve a vital function:  they help alleviate the seller's credit risk by having a creditworthy financial institution guarantee payment upon the presentation of documents establishing delivery.  For that reason, the U.S. Department of Commerce has advised American businesses "dealing with Iraq" to "insist on confirmed, irrevocable [letters of credit] when initiating relationships with new importers and distributors."[85]  Although "Iraqi companies often resist the use of confirmed [letters of credit], because of the additional collateral required by Iraqi and international banks for confirmation," the Commerce Department has advised U.S. exporters to "require these necessary financial protections" before contracting with Iraqi purchasers.[86]  When it came to transactions with Kimadia, Defendants secured those protections by making payments into TBI's New York correspondent accounts.

125.    After TBI issued a letter of credit, suppliers shipped the goods into Iraq.  The shipments typically arrived on trucks that contained both the "contract goods" and the "free goods," without distinguishing between the two.  The goods arrived at a Kimadia warehouse loading area and had to be signed for by a Kimadia warehouse manager – whom the supplier (through its distributor) typically had to bribe, along with the relevant Deputy Director General of Kimadia.  *See infra* ¶¶ 155-156.  At that point – when Kimadia transferred the goods from the company's trucks to MOH warehouses – the "free goods" were often diverted.  Whereas MOH

---

[85] U.S. Department of Commerce, *Iraq – Doing Business in Iraq*, Ch. 7:  How Do I Get Paid (Methods of Payment), https://www.export.gov/article?id=Iraq-Methods-of-Payment (last accessed June 1, 2017).

[86] *Id.*

employees (who, after 2004, were typically agents of Jaysh al-Mahdi) generally loaded the

legitimate "contract goods" onto forklifts and logged them into warehouse storage, they

separated the illicit "free goods" and transferred them to trucks destined for the black market.

126.    The well-publicized 2007 account written by Ali A. Allawi, a former Iraqi

Minister, confirmed MOH officials' diversion of imported drugs and devices.  As Dr. Allawi

explained in *The Occupation of Iraq, Winning the War, Losing the Peace*:

> A deteriorating physical infrastructure, inadequate supplies and medicines, continuous
> power outages, all added to the sense of a health system under siege.  This was further
> compounded by the ***rampant corruption in the medicines' importing company,
> Kimadiya,*** a state-owned monopoly from the Saddam era.  ***Pharmaceuticals were
> routinely hoarded by company officials and then diverted to the black market or
> illegally exported***.
>
> ***The Health Ministry itself became a bastion of Islamist political parties***.  In spite of
> heroic efforts by individual doctors, administrators and ministerial officials, the
> deterioration in the health system continued unchecked.  The Health Ministry budget had
> exploded from a paltry $16 million in the last year of Saddam's rule to nearly a billion
> dollars in 2004, but ***this had to accommodate the*** massive losses to the health system's
> infrastructure and the ***theft or destruction of medicines and medical equipment.***[87]

127.    An April 2007 report on the Iraqi pharmaceutical sector for USAID reached a

similar conclusion.  According to the report, the Iraqi "system of control of the pharmaceutical

distribution chain has collapsed" and allowed "a significant trade in illicit imports" on the black

market.[88]  Although MOH expressed a purported desire to "tackle this practice," it

"acknowledges corruption within its own ranks, with [black market] drugs being supplied

directly from the Ministry."[89]  The report found that black-market "drugs are freely available in

the marketplace, either having been sold there illegally by Kimadia/MOH, sourced from illicit

---

[87] Dr. Ali A. Allawi, *The Occupation Of Iraq:  Winning The War, Losing The Peace* 378-79 (Yale Univ. Press 2007).

[88] The Louis Berger Group & The Services Group, *Pharmaceutical & Medical Products In Iraq* § 6.5.1.1, USAID Contract #267-00-04-00435-00 (Apr. 17, 2007).

[89] *Id.*

imports, or from goods looted from the Kimadia warehouses, as well as the hospital and clinic outlets."[90]  As Dr. Ghanim likewise observed, Jaysh al-Mahdi's "control over the health ministry provided them with an ample opportunity for profiteering and corruption.  Medical supplies intended for the Ministry of Health were looted and sold by the Mahdi Army."[91]

128.    Dr. Adel helped facilitate this medical-diversion scheme on Jaysh al-Mahdi's behalf.  As recounted in a 2008 email, a U.S. anti-corruption official who had worked in Iraq explained that "Dr. Adel made millions on the black market by diverting pharmaceutical supplies to Syria" while also "provid[ing] militia death squads with access to hospitals and ambulances for al Sadr's thugs to use in kidnapping, torturing and killing."

129.    Although corruption and diversion characterized the entire Kimadia supply chain, including the legitimately purchased "contract goods," the "free goods" delivered by Defendants were particularly easy for the Sadrists to monetize.  As observed by the former U.S. Army medical logistician writing in *Contract Management*, since the Saddam era the "free goods" delivered by corrupt foreign suppliers – which do not correspond to any legitimate order within the Iraqi healthcare system – have not gone "into the Iraqi inventory" but instead have been resold on the black market "at 100-1000 percent above" standard prices.[92]  Thus, when Jaysh al-Mahdi was looking to divert medical goods for a profit, the "free goods" offered them an especially easy source.  That is why, according to several witnesses, Jaysh al-Mahdi agents placed a premium on demanding "free goods" percentages on contracts for valuable drugs and devices.  In the words of one witness with substantial experience inside the Sadrist-controlled MOH, such "donated" goods were "very easy to disappear."

---

[90] *Id.* § 2.0.

[91] *Dysfunctional Democracy* at 217.

[92] *Contract Management* at 48.

130.     Companies further supported Jaysh al-Mahdi by selling MOH nearly-expired pharmaceuticals.  Corrupt MOH officials paid suppliers full price for nearly-expired or otherwise poor-quality drugs that, under ordinary commercial circumstances, were virtually worthless. Kimadia imported the drugs, waited for them to expire or otherwise fail MOH testing, and then – based on Iraqi regulations barring the sale of such drugs in public clinics – pulled them from inventory and disposed of them on the black market.[93]  This scheme gave Jaysh al-Mahdi agents at MOH another source of drugs that, like the "free goods," were especially easy to divert. Foreign suppliers, conversely, gained the benefit of selling virtually worthless drugs at full price – knowing that they were likely to be diverted and resold on the black market.  On information and belief, Defendants participated in this poor-quality-drugs scheme throughout the period when the Sadrists controlled the Ministry.  Indeed, that scheme resembled another mechanism foreign suppliers had used to deliver corrupt payments to Saddam's regime under Oil-for-Food.[94]

131.     Defendants delivered "free goods" to Jaysh al-Mahdi agents through three basic mechanisms.  First, and most commonly, Defendants used **FOC Clauses**, under which they agreed to a "free of charge" or "FOC" clause in the sales contract itself – which resembled the 10% "free goods" scheme practiced under Oil-for-Food.  Each Defendant employed FOC Clauses at least in part; indeed, Kimadia's standard practice was to demand "free goods" as an explicit term of the contract.  But Defendants' "free goods" payments were not always

---

[93] Reports (as published by *WikiLeaks*) corroborate the pervasiveness of this scheme.  For example, on November 11, 2008, Iraqi police, following an order "to arrest unlicensed pharmacies and street medicine dealers," arrested 29 "unlicensed pharmacies" in Nasiriyah "and confiscated a large amount of expired medicine."  *WikiLeaks* (Nov. 11, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081111n11855.html.

[94] *See* Iraq Survey Group, *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD*, Vol. I (Regime Finance and Procurement) 37 (Sept. 30, 2004) ("Another method of generating kickbacks from UN OFF import contracts . . . was based on deceiving the UN over the quality of the items being imported to Iraq.  For this illicit revenue scheme, Iraq arranged for a co-operative supplier to obtain a legitimate UN OFF contract specifying 'first quality' humanitarian goods.  Iraq would then be authorized under UN OFF to pay top quality prices for the items via the UN OFF-controlled accounts.  In reality, however, the co-operative supplier substituted cheap, poor-quality goods for the contract.  This generated very high profits for the co-operative supplier.  Saddam then arranged for the excess profits to be returned to Iraq via diplomatic channels, after the co-operative supplier took its 'fee.' ").

memorialized on the face of those contracts – depending on the individual contract and the course of negotiations, companies sometimes routed those payments through alternative means.

132.    The **Administrative Fee Clause** was the second strategy Defendants used to deliver "free goods" to Jaysh al-Mahdi agents inside MOH.  Under this strategy, Defendants and Kimadia agreed to commercially unreasonable contract provisions requiring the supplier to provide free product upon the satisfaction of some condition within Kimadia's control.  For example, Defendants occasionally agreed to a clause promising to replace every drug or device that Kimadia failed to sell within a specified time period (or drugs and devices that Kimadia claimed were deficient), and then, on top of that, pay an "administrative fee" to compensate Kimadia for the lack of sales.  Such provisions essentially gave MOH officials a blank check to demand additional "free goods" and cash from the supplier.  Defendants and their corrupt counterparts sometimes used an Administrative Fee Clause as a substitute for an FOC Clause, or even in addition to such a clause.  Pfizer, for example, accomplished the delivery of BeneFix "free goods" through both FOC Clauses and Administrative Fee Clauses.

133.    The **Off-the-Books Payoff** is the third strategy Defendants used to pay "free goods" bribes.  Under this strategy, Defendants used medical goods as cash equivalents to buy off MOH officials to resolve disputes – often triggered by the commercially unreasonable contract provisions that Kimadia insisted appear in every contract.  For example, Dr. Adel often accused companies of delivering spoiled or insufficient product and demanded an additional "donation" of "free goods" as compensation, which companies routinely agreed to provide. Instead of defending themselves against Dr. Adel's accusations, companies agreed to off-the-books settlements in which "free goods" were the currency of the settlement.  In these circumstances, companies made a separate shipment of the "free goods" to MOH that was not

tied to any particular tender or contract.  As Defendants knew or recklessly disregarded, such

shipments of extra goods were especially easy for Jaysh al-Mahdi to divert to the black market.

134.    Defendants did not intend for the "free goods" provided to Kimadia to serve any

legitimate charitable or medicinal purpose.  It was widely understood in Iraq that MOH operated

more like a terrorist organization than a legitimate health entity, and no rational company would

have viewed MOH as a suitable object for charity.  Nor did MOH actually operate as a charity:

it followed a detailed, widely known distribution process that depended on local needs as

calculated by the Needs Assessment Committee.  Given the way that system was structured,

which Defendants and their local agents knew or recklessly disregarded, the "free goods"

payments were structurally designed to disappear from inventory.  *See supra* ¶¶ 114-117.

135.    The flourishing black market for medical goods in Iraq supports the same

inference.  Despite an inflated procurement budget – which ballooned to nearly $1 billion in

2004 and only grew from there – Kimadia was notoriously unwilling and unable to actually

deliver imported drugs and devices to the people who needed them.  As was widely reported,

MOH's corruption and lack of inventory control meant that medical goods nominally intended

for the Iraqi people were routinely lost or stolen.[95]  For example, when Dr. Alwan became

Minister of Health in May 2004, only six of the 32 chronic-disease drugs nominally purchased

for public clinics were actually available to Iraqi patients.  The provision of "free goods" to

MOH made that problem worse.  MOH staff attributed such rampant medical-goods shortages to

two main causes:  "excessive utilization of free pharmaceuticals, and structural obstacles to

---

[95] *See, e.g.*, Corinne Reilly, *Iraq's Once-Envied Health Care System Lost To War, Corruption*, McClatchy (May 17, 2009) ("Health ministry workers routinely siphon drugs from hospital orders to make extra cash on the black market.  Bribery is rampant.  Millions of dollars meant for clinics and equipment have gone missing.  Millions more have been wasted on government contracts to buy expired medicines.  The health ministry's inspector general openly admits the problems.  Even so, the culprits are rarely punished.").

effective distribution, especially the corrupt vestiges of Kimadia."[96]  When Defendants provided "free goods" to MOH officials, therefore, they knew (or recklessly disregarded) that those goods were not serving any legitimate public-health objective; they were destined for the black market.

136.    Nor did the "free goods" payments operate as a legitimate discount.  Kimadia had an obvious reason for demanding "free goods," rather than a price discount:  discounted drugs and devices, while saving money in the MOH procurement budget, would have been harder for corrupt officials to monetize.  For example, if Kimadia issued a request for proposal to buy X units of a drug at $Y per unit, a true "discount" might result in an offer to sell X units at $0.5Y per unit – that is, a 50% price discount on the requested quantity.  While that would have been better for the Iraqi people and saved the government money, such a discount would have been harder for Jaysh al-Mahdi to monetize because the quantity purchased would have corresponded to actual purchase orders from Iraqi healthcare providers.  Under the "free goods" scheme, Defendants would instead sell X units at the full $Y per unit – and then include another Z units for free.  That allowed the Sadrists to keep and monetize the extra goods.  By structuring the transaction to provide "free goods" rather than a price discount, Defendants ensured that the transaction would redound to the benefit of the Jaysh al-Mahdi agents with whom they were negotiating.  At the same time, it allowed Defendants to prop up their relatively high official Iraq and Middle East-regional reference prices for drugs and medical devices.

137.    Under Oil-for-Food, Kimadia openly rejected discounts in favor of kickback payments.  As alleged by the SEC, one drug supplier "acquiesced to Kimadia's demands and authorized the payment of illegal ASSFs through a third-party agent."[97]  But before doing so, a

---

[96] James Dobbins *et al.*, *Occupying Iraq:  A History Of The Coalitional Provisional Authority* 130 (RAND Corp. 2009).

[97] *Novo Nordisk FCPA* Compl. ¶¶ 18-23.

company executive had "rejected the request to pay Kimadia a ten percent kickback" and instead

"suggested to the Kimadia import manager that [the company] reduce the price of its medicines

by ten percent."[98]  Kimadia, however, "angrily refused the offer" of a discount and insisted

instead on the 10% kickback on top – to which the company ultimately agreed.[99]  The same logic

guided Kimadia's contracting strategy in later years.  A true discount would not have benefited

corrupt MOH officials; Kimadia thus rejected discounts in favor of extra "free goods."

      138.    Pfizer has settled an FCPA case that further illustrates how providing "free

goods" to foreign officials functions as a bribe rather than as a legitimate discount.  On August 7,

2012, Pfizer H.C.P. Corporation ("Pfizer HCP") – a Pfizer Inc. subsidiary that operated in

several Central Asian markets – entered into a Deferred Prosecution Agreement with the DOJ

that resolved expansive FCPA allegations.[100]  In that agreement, Pfizer HCP admitted that it had

paid a variety of bribes and kickbacks in Russia and elsewhere.  Pfizer employees admittedly had

"provid[ed] incentives" to healthcare providers "that were calculated as 5% of the value of

certain Pfizer products."[101]  "On its face," that arrangement "appeared to be a mechanism" for

Pfizer employees "to provide the equivalent of indirect price discounts" to government hospitals.

"In practice, however, Pfizer Russia used [those payments] to make cash payments to individual

government healthcare professionals to corruptly reward past purchases . . . and to corruptly

induce future purchases and prescriptions."[102]  Defendants used a similar scheme here:  their

provision of "free goods" in connection with their Iraqi sales contracts functioned as corrupt

payments to MOH officials who were members of Jaysh al-Mahdi.

---

[98] *Id.*

[99] *Id.*

[100] Deferred Prosecution Agreement, *United States v. Pfizer H.C.P. Corp.*, No. 12-cr-00169, ECF No. 4 (D.D.C. filed Aug. 7, 2012) ("*Pfizer DPA*").

[101] *Pfizer DPA* Statement of Facts ¶¶ 36-37.

[102] *Id.*

2.      "Commission" Payments

139.     Defendants also made other corrupt payments to MOH officials at various stages of their sales transactions in Iraq.  Jaysh al-Mahdi extracted a so-called *Khums* on Kimadia contracts – an Islamic concept translating roughly to a 20% religious tax.  That policy required, as a general matter, companies doing business with Kimadia to pay bribes of at least 20% on every contract.  This was sometimes paid in the form of in-kind bribes (like the "free goods" described above) but was often paid in cash as well.  Such cash payments were typically called "commissions" – the Iraqi euphemism for bribes.  From 2004-2013, it was standard practice for companies dealing with MOH to pay "commissions" on every major sales contract.

140.     The 20% *Khums* accorded with Sadr's broader philosophy described in a 2009 U.S. State Department cable (as published by *WikiLeaks*):  that Iraqi Shi'a "are required to pay one-fifth the value of certain items they acquire as wealth" to the Sadrists as a tax.[103]  Muqtada and the Sadrists thus demanded that every Shi'a pay the *Khums* as a 20% "flat-rate income tax/tithe" derived from a "customary" Islamic "obligation to share the profits."[104]  Along those lines, in 2003 Sadr issued a *fatwa* authorizing looting of other people's property and allowing looters to "retain their stolen property as long as they made a contribution of 20 per cent of the value of the looted goods (*Khums*) to their local Sadrist office."[105]

141.     These tactics permitted Jaysh al-Mahdi to reap the benefits of a mafia-style web of corruption that plagued MOH (including Kimadia) from top to bottom.  Even when smaller

---

[103] U.S. State Dep't Cable, *Karbala Shrines Pursuing Independent Agenda* (Apr. 24, 2009) ("Several contacts reported that Imams Karbala'i and Safi – concerned that the Iraqi faithful might curtail their payment of khums (in Shi'a Islam, believers are required to pay one-fifth the value of certain items they acquire as wealth as an 'Islamic tax') if there was a perception that all of their money was going to be sent to Iran."), https://wikileaks.org/plusd/cables/09BAGHDAD1100_a.html.

[104] Sam Hardy, *Khums:  an un-Islamic tax for an Islamic antiquities market?*, Conflict Antiquities (Blog) (Aug. 17, 2014), https://conflictantiquities.wordpress.com/2014/08/17/syria-iraq-islamic-antiquities-trafficking-tax/.

[105] *Id.*

"commissions" were paid in cash to individual Sadrist officials, they went to benefit the Jaysh al-Mahdi machine:  such officials themselves had to kick back a percentage of their earnings to Sadr and Jaysh al-Mahdi as the price of keeping their lucrative positions in government.

142.    The Sadrists extracted their "commissions" from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle.  On information and belief, each Defendant paid significant "commissions" to MOH officials who were members of Jaysh al-Mahdi at some or all of those transaction stages.  The transaction stages, and the corruption that characterized them, are explained in the following 15 paragraphs.

143.    The first opportunity for corrupt payments came at the **formulary stage** of the transaction lifecycle.  Before a drug could be sold in Iraq, MOH had to approve the drug and place it on the national formulary (this requirement did not apply to devices).  Only after a drug appeared on the formulary could MOH assign it a National Code and make it eligible for future Kimadia contracts.  And, even after a drug made it onto the formulary, every new "indication" for the drug also had to be separately approved and then placed on the formulary.  This power over the formulary provided MOH officials with a significant point of leverage:  if MOH declined to approve a drug for sale (or a new indication for an approved drug) – or if it substantially delayed the approval process – it could exclude companies from future tendering rounds and materially threaten their revenues.  MOH officials' regular practice was to exploit their leverage over the formulary to extract corrupt payments from foreign suppliers.

144.    The **company registration stage** was another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers.  There were two key companies involved in any major transaction with Kimadia:  the supplier (the company that executed the contract and assumed responsibility for ensuring delivery of the goods) and the manufacturer (the company

that manufactured the goods being sold).  Before Kimadia would award a contract to a foreign supplier, both the supplier and the manufacturer had to register to do business in Iraq.  MOH also reserved the right to reject bids that did not describe the legal relationship between the two companies in a "clear and candid way," including disclosure of any subsidiary or affiliate relationship.  The supplier and manufacturer were required to provide proof that the manufacturer had authorized the supplier to sell products on the manufacturer's behalf in Iraq.

145.     This company registration process typically took place shortly before or after the completion of the bid process – but in all events no later than six months after the execution of a sales contract.  The registration process required an application to MOH and the retention of a local Scientific Bureau to represent the company's interests in Iraq.  Scientific Bureaus, by their nature and status under Iraqi law, must represent foreign suppliers' interests and act at those suppliers' direction and control.  Specifically, under MOH regulations, foreign medical-goods suppliers had to register a Scientific Bureau to represent them and act as their agent in dealings with MOH.  Scientific Bureaus could not enter agreements with or make payments to MOH unless so authorized by the suppliers they represented.  As part of their registrations, suppliers and manufacturers had to submit letters to MOH certifying that their chosen Scientific Bureau was authorized to transact business with MOH on their behalf.

146.     Scientific Bureaus also provided a conduit for corrupt payments to Jaysh al-Mahdi.  Although Scientific Bureaus have continuously served as a vehicle for corruption in Iraq since 2004, beginning in 2006 or 2007 Jaysh al-Mahdi-affiliated MOH officials – including (but not limited to) Directors General Dr. Ali Bustan and Dr. Hani – further enhanced their ability to raise money for Jaysh al-Mahdi through "commissions" by setting up Scientific Bureaus under their control and steering companies to retain those Bureaus to represent the companies in

transactions with Kimadia.  The Bureaus – acting as agents for the foreign suppliers – would charge an elevated agent fee that would itself, in effect, be a payment to Jaysh al-Mahdi.  On information and belief, Defendants hired certain Jaysh al-Mahdi-affiliated Scientific Bureaus to facilitate some of their corrupt transactions with MOH.

147.    According to Kimadia's registration regulations, multinational companies were "required to register any of their subsidiaries" to the extent they "decide to supply any of their products from the said subsidiary."  That required Defendants to submit paperwork to MOH describing their subsidiaries and affiliates involved in commercial transactions with MOH.  As with the formulary stage described above, MOH officials could hold up company registration paperwork – which MOH had to process as a condition of suppliers being permitted to sell in Iraq – as a way of encouraging suppliers to pay them additional "commissions."  MOH officials' regular practice was to extract such payments in connection with the registration process.

148.    The **drug or device registration stage** presented another opportunity for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers.  Even after a drug was placed on the formulary, a supplier could not sell its version of that drug until it separately registered with MOH.  For example, acetaminophen might appear on the MOH formulary, but Johnson & Johnson would not be able to sell Tylenol (its branded version of acetaminophen) unless it separately registered Tylenol with MOH.  A registration was effective for five years, after which the company was required to re-register the product.  MOH officials' regular practice was to extract corrupt payments as a condition for registering a company's drugs or devices.

149.    The product registration process required applicants to submit a wide array of information to MOH.  For example, suppliers seeking to register U.S.-manufactured goods had to provide a certificate confirming that the U.S. Food and Drug Administration ("FDA") had

approved the drug or device for sale in the United States.  FDA approval was important to MOH because it signified that the product was safe for use within Iraq (thus satisfying Iraqi safety regulations) and because FDA-approved drugs carried a high street value, which made U.S.-manufactured goods especially attractive for black-market sales.  Indeed, the Sadrists placed a premium on importing medical goods manufactured in the United States or Europe – as goods sourced from other countries were considered less valuable and more likely to be counterfeit.

150.     The **needs assessment stage** was another opportunity for Jaysh al-Mahdi to elicit corrupt payments from foreign suppliers.  Jaysh al-Mahdi agents within regional MOH directorates (such as Dr. Ali Bustan, Dr. Jaleel, or Dr. Hani, *see supra* Part II.B.3) regularly extracted corrupt payments as part of their Needs Assessment Committee calculations.  Regional MOH directorates had significant influence over the inventory-assessment calculations that informed how many units of each good Kimadia purchased each year; companies with a large market share in a certain class of good or drug thus regularly bribed MOH regional Directors General and their subordinates to influence Kimadia to make large purchases of their products.

151.     The **tendering stage** presented another occasion for Jaysh al-Mahdi to collect corrupt payments from foreign suppliers.  After a company had secured the necessary approvals to participate in a tendering round, the company had to then secure a sales contract from Kimadia before it could actually sell its drugs or devices.  The tendering process itself was laced with corruption.  As noted above, one important way that Kimadia extracted corrupt payments during the tendering process was by demanding that companies commit to provide "free goods" memorialized in the contracts themselves.  But that was not the only way.  Companies regularly made "commission" payments to Kimadia employees as well, along with MOH officials who sat on the committee overseeing the procurement process, to acquire inside information on the

evaluation process.  Several witnesses recall that companies bidding on contracts regularly paid

monthly "salaries" to Kimadia employees – essentially putting those employees on retainer – to

provide the companies with confidential information about the tendering process.

152.    The tendering process also required bidders to convey several important pieces of

information to MOH.  Beyond the quantity of "free goods," bids contained (among other things)

the following information:

- The names of the supplier and the manufacturer;
- Authorization letters verifying that both the supplier and the manufacturer had registered to do business in Iraq;
- A certification confirming that the goods were wholly produced or manufactured in the country of origin, which had to be stamped by an appropriate agency within that country.  Thus, if the goods being offered were manufactured in the United States, the supplier had to include a certificate – stamped by the U.S. Department of Commerce – that the goods being offered were indeed of U.S. origin; and
- An authorization letter from the manufacturer confirming that the supplier had authority to sell the manufacturer's products in Iraq and spelling out the legal relationship between the supplier and the manufacturer.  MOH required both the supplier and the manufacturer to verify the supplier's authority to sell the manufacturer's products in Iraq; if the supplier did not include an authorization letter from the manufacturer in the bid, MOH would contact the manufacturer directly to obtain such a letter confirming the supplier's authority.

153.    During the tendering process, or as a condition of the tender, companies also paid

for MOH officials (including Kimadia officials) to take free trips abroad – usually under the

pretense of inspecting company facilities or attending conferences, seminars, or training sessions.

These "free vacations" were often memorialized on the face of Kimadia's contracting

instructions:  suppliers were "responsible to submit training course[s] for the medical, technical

and Kimadia staff, inside and outside Iraq, F.O.C. [free of charge]."  In reality, both sides

understood these free trips – which often involved luxurious resorts and generous "per diems" –

as bribes intended to curry favor with MOH officials.  For example, to win a $1,451,259.40

medical-device contract, Defendant J&J Middle East agreed to provide a 10% "free goods" bribe

through the FOC strategy and, on top of that, to host "(4) doctors (4) nurses & (2) [K]imadia staff for (10) days in country of origin F.O.C." and, further, to "train the medical, technical, engineering and Kimadia staff, inside and outside Iraq, F.O.C." On information and belief, Defendants regularly provided such vacations to Sadrist MOH officials.

154.    Defendants' vacation bribes supported Jaysh al-Mahdi's terrorist activities in a number of ways. The sham "training" and "travel" expenses, which were paid as part of the free trips provided, functioned as a slush fund for cash payments to the Jaysh al-Mahdi agents who worked at MOH. In addition, the luxury vacations themselves benefited the terrorist enterprise by providing "rest and recuperation," popularly known as "R&R," for Jaysh al-Mahdi's terrorist leaders and financiers. The U.S. government recognizes "R&R in neighboring countries" as an important activity relevant to the functioning of a terrorist group.[106] On information and belief, Beirut was one destination for such free trips, and trips to Beirut (where Hezbollah's leadership resides) enabled Jaysh al-Mahdi agents to communicate securely with their Hezbollah sponsors.

155.    The **distribution stage** presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. The standard Kimadia sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery. Meeting these conditions required the sign-off of multiple MOH officials, including the Kimadia Deputy Director General of Imports, individual warehouse managers, and members of the Facilities Protection Service nominally providing "security" for the shipments. As detailed in the *Contract Management* article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process.[107]

---

[106] *See, e.g.*, https://www.state.gov/j/ct/rls/crt/2006/82738.htm (listing "R&R in neighboring countries" as one of the "activities" pursued by a notorious terrorist group (FARC), along with "extortion, kidnapping, weapons sourcing, [and] logistics") (last accessed Sep. 22, 2017).

[107] *See Contract Management* at 46-48.

156.     Like Saddam had done under Oil-for-Food, the Sadrists also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales "services," "warranties," "equipment donations," "contractual facilities," "maintenance," and "training."  Corrupt payments through sham services agreements was the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH.

157.     The **inventory stage** similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers.  Kimadia's standard sales contract imposed steep penalties on companies whose goods did "not comply with specifications" (*e.g.*, failed MOH testing) or went "missing."  That gave the Facilities Protection Service, whose members guarded MOH warehouses, significant leverage over medical-goods suppliers:  if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (*e.g.*, by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in the contract.  That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers.

IV.     **DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS HELPED FUND JAYSH AL-MAHDI ATTACKS ON AMERICANS**

   A.     **Defendants' Corrupt Transactions Directly Funded Jaysh al-Mahdi Terrorist Attacks On Americans**

158.     From at least 2004-2013, Defendants knowingly structured their transactions to facilitate Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from MOH – which Jaysh al-Mahdi used to support terrorist operations against Americans in Iraq.  Senior MOH officials involved in the procurement process (such as the officials identified above, *see supra* Part II.B) were avowed, well-known Jaysh al-Mahdi agents.  As the August 12, 2007

memorandum put it, Dr. Adel extracted corrupt payments from suppliers in his capacity as "one

of the major supporters and organizers of the Mahdi Militia."  According to the same document,

the "person who is in charge of all the medicine at MOH is also a [Mahdi] militia supporter."

Defendants' corrupt transactions overseen by such Jaysh al-Mahdi agents, with a counterparty

that the Sadrists had totally commandeered, delivered resources directly to Jaysh al-Mahdi.

159.    The Sadrist control over MOH was so complete that, by 2005, there was no longer

any meaningful distinction between the Ministry and Jaysh al-Mahdi.  By the fall of 2005,

American intelligence officials had expressed escalating concerns (as described in *Endgame*) that

Jaysh al-Mahdi members had "ensconced themselves in the ministries and were using them to

advance their military ends."[108]  The *Endgame* authors concluded that it was "bad enough that

the Mahdi Army was the dominant security force in Sadr City and other Shiite neighborhoods in

Baghdad.  Now it had captured the very instruments of the state."[109]  That was especially true of

MOH, which functioned as a Jaysh al-Mahdi apparatus that did much more to facilitate terrorism

than it did to provide medicine to the Iraqi people.  Because Jaysh al-Mahdi had effectively

captured MOH, corrupt payments via the latter directly benefited the former.

160.    Defendants' corrupt transactions with MOH supplied Jaysh al-Mahdi with

resources important to its terrorist operations.  The Sadrists' control over Kimadia's procurement

budget – and the corrupt payments from foreign suppliers that came with it – was a key source of

Jaysh al-Mahdi's power.  According to one witness who occupied a high-level position inside

MOH, Jaysh al-Mahdi's control over Kimadia was "how they financed their empire."  Indeed,

MOH was the Sadrists' top request during 2005-2008 cabinet negotiations precisely because

Kimadia offered the Sadrists the means to fund the Jaysh al-Mahdi organization.  As Dr. Ghanim

---

[108] *Endgame* at 220.

[109] *Id.*

(the University of Gothenburg Senior Research Fellow) observed, "control over Kimadia, the state-run company responsible for importing and distributing drugs and supplies to Iraqi hospitals, provided the Mahdi Army with a position of monopoly and a source of power."[110]

161.    Local government officials in Sadr City confirmed Jaysh al-Mahdi's use of government ministries, including MOH, to raise money.  As recounted in a June 2007 U.S. State Department cable (as published by *WikiLeaks*), "Sadr City council members" detailed the ways in which Jaysh al-Mahdi raised revenue through local "control of services" provided by the government.[111]  Jaysh al-Mahdi accomplished this, the council members explained, by ensuring that "a Sadrist" could "wield 'official' power" at key public institutions, which in turn permitted Jaysh al-Mahdi members to infiltrate the institution and "work around the fringes of that institution's jurisdiction with impunity."[112]  The cable further explained that MOH "offices provide an opportunity for JAM to channel medicine onto the black market."[113]

162.    The 2006 analysis prepared by the U.S. Embassy in Baghdad specifically documented the link between the MOH procurement process and Jaysh al-Mahdi attacks.  After noting that MOH was "openly under the control of the Mehdi Army of Muktad al-Sadr," the report discussed Jaysh al-Mahdi's fundraising through corrupt pharmaceutical transactions:

> **MOH has an atrocious reputation** in the public and the Iraqi press regularly complains bitterly **about the lack of pharmaceuticals which is blamed on corruption**.  There are repeated stories of patients having to purchase black market drugs that were originally destined for MOH.  Complaints of preventable deaths due to lack of medicines are commonplace.  **Military sources have reported that the Medhi Army finances operations from diverted medicines**.[114]

---

[110] *Dysfunctional Democracy* at 217.

[111] Amb. Ryan Crocker, U.S. State Dep't Cable, *Control Of Services Means Opportunity For Criminality* (June 20, 2007), https://wikileaks.org/plusd/cables/07BAGHDAD2040_a.html.

[112] *Id.*

[113] *Id.*

[114] *U.S. Embassy Baghdad Report* at 24-26 (emphasis added).

163.    A former official in the Office of the Treasury Attaché in Baghdad further documented that causal link in a 2010 article in *Military Review*, which is the "Professional Journal of the U.S. Army."  In the context of explaining a broader thesis about the relationship between corruption and organized crime, the article reported that corrupt officials "may attempt to obtain control over other resources either to convert them into money or distribute them to maintain influence.  The Mahdi Army, for example, used the Iraqi Ministry of Health to divert pharmaceuticals that were intended for the general public."[115]

164.    Evidence gathered in connection with the February 2007 Zamili arrest further corroborates the direct link between the Sadrists' corrupt fundraising scheme at MOH and Jaysh al-Mahdi's terrorist activities.  The day after the arrest, the Pentagon's press service issued a statement that Zamili had "reportedly orchestrated several kickback schemes by using inflated contracts for ministry equipment and services.  These kickbacks, which officials believe have funneled millions of U.S. dollars to militia elements, support sectarian attacks and violence."[116] The same day, a Pentagon spokesman confirmed to *The Toronto Star* that Zamili's "corruption is believed to have funneled millions of U.S. dollars into rogue JAM."[117]  Reporting on the raid two months later, the *Associated Press* similarly noted evidence that Zamili "orchestrated kickback schemes related to inflated contracts for equipment and services, with millions of dollars allegedly funneled to Mr. Sadr's Mahdi Army militia."[118]

---

[115] Brock Dahl, *The Quiet Enemy:  Defeating Corruption & Organized Crime*, Military Rev. 81-82 (Mar.-Apr. 2010).

[116] *Senior Official At Iraq Ministry of Health Detained; 13 Terrorists Killed*, DoD News, Am. Forces Press Serv. (Feb. 8, 2007), http://archive.defense.gov/news/newsarticle.aspx?id=2976.

[117] *Iraq's Deputy Health Minister Arrested*, Toronto Star (Feb. 8, 2007).

[118] Bassem Mroue & Qassim Abdul-Zahra, *Waste, Corruption Cost Iraq $8 Billion in Past 3 Years, Watchdog Says*, Assoc. Press (Apr. 5, 2007).

165.     The anti-corruption investigations spearheaded by the U.S. Office of
Accountability and Transparency ("OAT") and the Iraqi CPI uncovered similar evidence that
corrupt payments to MOH employees fueled Jaysh al-Mahdi terrorist attacks.  Those
investigations, according to Judge Brennan, involved evidence that Dr. Adel and Zamili had
engaged in "theft or misappropriation of up to one billion dollars in medical supplies" that were
"showing up on the black market in Iraq and Syria."  Based on those investigations, Judge
Brennan opined to Congress that "[i]t is likely that some of that money is financing outlaws and
insurgents such as the Mehdi Army."[119]  James Mattil, the Chief of Staff of OAT, testified
similarly that corruption at Iraqi ministries, including at MOH, helped fund attacks against
Americans in Iraq.  As he explained, "[c]orruption and its consequences are the fuel that sustains
the insurgency, providing the money, the people and the motivation to fight Americans in Iraq.
Stuart Bowen of SIGIR correctly calls it 'the second insurgency.' "[120]

166.     Judge Radhi, the head of the Iraqi CPI, similarly testified to Congress that, based
on data he gathered as of late 2007, corruption at MOH alone had reached an estimated $2
billion.[121]  As later reported, Judge Radhi considered his task in Iraq to be "put[ting] an end to
the corruption that was . . . a principal source of funding for the terrorist groups that the U.S.
military was trying to crush."  In the course of his investigation, Judge Radhi concluded that
Jaysh al-Mahdi had "fully commandeered the ministries of health, trade, and transportation.  Its
soldiers, with the tacit approval of ministry employees, stole food and medical supplies, among
other things, and resold them to fund the insurgency against the Americans."[122]

---

[119] *Brennan Testimony*, 2008 WL 2010885.

[120] Statement of James F. Mattil, *Waste, Fraud and Corruption in Iraq:  Hearing Before the S. Comm. on Democratic Policy* (May 12, 2008), 2008 WL 2010884.

[121] *See* Statement of Judge Radhi Hamza al-Radhi, *Waste, Fraud and Corruption in Iraq:  Hearing Before the S. Comm. on Appropriations* (Mar. 11, 2008), 2008 WL 652952.

[122] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Condé Nast Portfolio (Mar. 17, 2008).

167.     On April 11, 2008, *60 Minutes* ran an interview with Judge Radhi for a story entitled "Iraq:  State of Corruption."[123]  He stated that a "big problem" with Iraqi corruption was that "American and the Iraqi funds are now going to the militias.  And both Iraqis and the Americans are being killed with that."  MOH – and the bribes that Defendants paid the terrorists running it – exemplified that fact.  As summed up by the *60 Minutes* piece, the "bribery and outright theft" that plagued MOH (and other ministries) generated "ill-gotten gains" for terrorists that were "being used to kill American troops."[124]

168.     Dr. Phil Williams, while he was a Visiting Professor at the U.S. Army War College, further documented that causal connection between MOH's procurement process and Jaysh al-Mahdi's terrorist operations.  In 2009, Dr. Williams explained that Jaysh al-Mahdi's "infiltration" of MOH "not only led to sectarian killings of Sunni patients . . . but also made possible the diversion and sale of large amounts of pharmaceuticals.  Along with many other rackets, this was an important funding source for [Jaysh al-Mahdi]."[125]

169.     Some U.S. government personnel called Jaysh al-Mahdi the "The Pill Army," because Sadr and his lieutenants were notorious for paying Jaysh al-Mahdi's low-level terrorist fighters in pharmaceuticals, rather than cash.  Those fighters – most of whom were young, poor, uneducated Shiite males – accepted such payment because they could either re-sell the pills on the street or take the pills themselves (as an intoxicant, not as medicine).  This technique of payment-by-pharmaceuticals, in turn, depended on the large volumes of divertible pills that Defendants provided the terrorist officials who ran MOH.

---

[123] *See* Steve Kroft, *Iraq:  State of Corruption*, 60 Minutes (Apr. 11, 2008), http://www.cbsnews.com/news/iraq-state-of-corruption-11-04-2008/.

[124] *Id.*

[125] Phil Williams, *Criminals, Militias and Insurgents:  Organized Crime in Iraq* 208-09 (June 2009).

170.     Information from U.S. military raids on Jaysh al-Mahdi safe houses between

2005-2008 (as published by *WikiLeaks*) similarly indicated that Jaysh al-Mahdi diverted and

smuggled pharmaceuticals from MOH as a key part of its operations:

- On February 21, 2005, Coalition forces raided what was, on information and belief, a Jaysh al-Mahdi safe house near the Iranian border and seized a "large quantity of unknown pharmaceuticals" along with "7.62 ammo, several passports, ID's and documents."[126]

- On January 27, 2007, Coalition forces raided what was, on information and belief, a Jaysh al-Mahdi site southwest of Basra in which they recovered a large cache of rockets, mortars, explosives, and "syringes and suppositories."[127]

- On June 19, 2008, Coalition forces uncovered multiple weapons caches during raids on Jaysh al-Mahdi sites in eastern Baghdad near Sadr City; the caches included more than 100 AK-47s, an RPG launcher, and 20 boxes of prescription drugs, all of which appeared "to be serviceable, and were probably attained via local sources."[128]

171.     Jaysh al-Mahdi monetized more than just drugs and small medical devices.

Contemporaneous press accounts, beginning in 2004, revealed that large medical devices such as

X-ray machines and magnetic resonance imaging ("MRI") machines were also diverted from

MOH stockpiles and resold on local or regional black markets.[129]

172.     Although Defendants' corrupt payments to Jaysh al-Mahdi agents inside MOH

provided especially valuable assistance for Jaysh al-Mahdi terrorist attacks, the causal nexus was

not limited to such corrupt payments or other FCPA violations.  Whether or not Defendants

technically violated the FCPA, their transactions with a counterparty that was openly controlled

---

[126] *WikiLeaks* (Feb. 21, 2005), https://wikileaks.org/irq/report/2005/02/IRQ20050221n1542.html.

[127] *WikiLeaks* (Jan. 27, 2007), https://wikileaks.org/irq/report/2007/01/IRQ20070127n6694.html.

[128] *WikiLeaks* (June 19, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080619n11314.html.

[129] *See, e.g.*, Beth Potter, *Iraqi Health Ministry fights corruption*, UPI (June 15, 2004) ("[Iraqi] Health officials would pay to get the stolen medical equipment back, Talibi said.  He believes X-ray machines, ultrasound machines, maybe even a few MRI imaging machines donated to Iraq were probably sold for cents on the dollar to neighboring countries like Syria, Jordan, Turkey and Iran and are still relatively new."); Ala'din Alwan, *Health In Iraq* 56 (2d ed. 2004) (noting that MOH's "[e]xpensive multi-million dollar equipment was either stolen or damaged").

by terrorists – and which openly diverted Ministry resources to terrorist ends – supplied Jaysh al-Mahdi with medical goods that it used to fund terrorism against Americans.

**B.      Defendants Knew Or Recklessly Disregarded That Their Transactions With MOH Financed Terrorism**

173.     Defendants knew or recklessly disregarded that their corrupt transactions with MOH financed Jaysh al-Mahdi terrorist attacks.  At all relevant times since 2004, MOH insisted that each supplier execute contracts by hand and deliver them in person to MOH headquarters in Baghdad.  That required company agents (usually Scientific Bureaus) to enter a building whose physical premises explicitly paid homage to Sadr and his terrorist agenda.  Beginning in late 2004, Defendants' agents, on their way to deliver their contracts, necessarily walked past multiple posters adorned with Sadrist pictures and jihadist propaganda.  As *USA Today* reported, those posters "remove[d] any doubts about who runs the place."[130]  Other features of the Ministry building – including the Jaysh al-Mahdi fighters in the hallways, the yellow collection boxes calling for Sadrist donations, and the array of heavy weaponry (including rocket-propelled grenades) displayed in the offices of key officials – conveyed the same message.  In fact, MOH was unusual in that it was one of the few buildings in Iraq that, by late 2006, was considered too dangerous for Americans or other outside investigators to enter.  As the *Los Angeles Times* reported in early 2007, "U.S. officials no longer visit the run-down [health] ministry.  Even for Americans, who typically travel in cocoons of security, the threat level is too high."[131]

174.     Beginning in early 2005, Minister Muqtalib advertised that the office adjacent to his (staffed by clerics in Sadr's inner circle) was devoted to Jaysh al-Mahdi.  The presence of heavy weaponry inside his office, along with Dr. Muqtalib's open identification as a "Mahdi

---

[130] Charles Levinson, *Sadrists' Grip on Iraqis' Healthcare Takes Toll*, USA Today (Mar. 27, 2008).

[131] Louise Roug, *Iraqi Health Official Is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

soldier," further indicated his Jaysh al-Mahdi ties to those who interacted personally with him, including Defendants' local agents.  Those facts, combined with the ubiquitous anti-American propaganda inside MOH and the widespread reports of Jaysh al-Mahdi's violence against Americans, made clear to Defendants that the beneficiaries of their corrupt transactions were the anti-U.S. terrorists who ran the Ministry.

175.    By early 2005, according to several witnesses with on-the-ground experience with the Iraqi healthcare sector, it was widely understood in Iraq that Jaysh al-Mahdi had taken control of MOH's contracting process.  As Jeffrey Stacey, a professor of international relations at Tulane University, likewise observed in *The National Interest* in 2007, MOH was "[w]idely suspected of being turned into a Mahdi Army fief" that was "channeling . . . millions of dollars to the militia."[132]  Defendants were aware of that common understanding in part through their Scientific Bureaus.  Defendants each relied in part on Scientific Bureaus or other local agents to keep them abreast of Iraqi market conditions; these agents (which were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the Sadrists controlled MOH and used that control to raise money for terrorism.  As a general matter, those agents spoke fluent Arabic, had relationships with people throughout MOH and Kimadia, and were well-informed about Iraqi politics.  They could not have remained ignorant of the common understanding on the Iraqi street that the MOH contracting process was controlled by Jaysh al-Mahdi.

176.    From 2005-2008, accounts from prominent Western media sources also reported on the direct link between MOH and Jaysh al-Mahdi, including:[133]

- *New York Times*, April 2005:  "One political figure who may stand to gain from the new cabinet lineup is ***Moktada al-Sadr, the rebellious Shiite cleric who led two armed uprisings against the American occupation*** and the interim Iraqi government last year.

---

[132] Jeffrey Stacey, *Re-Occupy Iraq?*, Nat'l Interest (July-Aug. 2007).

[133] All emphases in this paragraph are added.

Three members of the cabinet – *the health minister*, the transportation minister and the civil society minister – *belong to Mr. Sadr's political movement* . . . ."[134]

- *Council on Foreign Relations*, May 2005:  "*Minister of health* Abdul Mutalib Mohammed Ali . . . is *linked to Muqtada al-Sadr*, the anti-U.S. Shiite cleric who heads the Imam Mehdi Army, *an armed militia that has intermittently waged an insurgency against U.S. forces* in Iraq."[135]

- *Christian Science Monitor*, September 2005:  "*Sadr movement officials run the Health Ministry*, extending influence from the hospitals to the ambulance service.  *Posters, stickers, and other memorabilia of Sadr are plastered on Ministry of Health* checkpoints, hospitals, and the walls of Baghdad's main ambulance center."[136]

- *Guardian*, May 2006:  "The [Health] ministry is *under the control of* the Shia cleric Moqtada *al-Sadr*, and a large mural of his dead ayatollah father decorates the entrance to the compound.  *Most of the security guards in the morgue and the ministry are affiliated to his militia, the Mahdi army*, one of the militias thought to be behind the sectarian killing going on in their neighbourhoods."[137]

- *Christian Science Monitor*, May 2006:  "The [health] ministry is *run by the militant Shiite movement led by cleric Moqtada al-Sadr* . . . . Security at the ministry and at the attached morgue is *controlled by the Mahdi Army,* the militia loyal to Mr. Sadr who have been accused by Sunni Arabs of running sectarian death squads. . . . *Those who control the Health Ministry don't try to hide where their ultimate loyalties lie*."[138]

- *Washington Post*, August 2006:  "[T]he primary group kidnapping Sunnis from hospitals is the Mahdi Army, a militia controlled by anti-American Shiite cleric Moqtada al-Sadr that has infiltrated the Iraqi security forces and several government ministries.  The minister of health, Ali al-Shimari, is a member of Sadr's political movement."[139]

- *Associated Press*, August 2006:  "Iraq's health minister, *who is aligned to a powerful Shiite militia*, claimed Sunday that *U.S. forces arrested seven of his personal guards* in a surprise pre-dawn raid on his office. . . . 'It is a provocation,' said al-Shemari, a Shiite *aligned to the anti-U.S. radical cleric, Muqtada al-Sadr, who heads Iraq's biggest Shiite militia, the Mahdi Army*."[140]

- *CBS News*, October 2006:  "[T]he morgue itself is believed to be controlled by the same Shiite militia blamed for many of the killings:  *the Mahdi Army*, founded and led by anti-American cleric Moqtada al-Sadr.  The *takeover began after the last election in December when Sadr's political faction was given control of the Ministry of Health*.

---

[134] Robert F. Worth, *The Struggle for Iraq:  Politics; Iraq's Assembly Accepts Cabinet Despite Tension*, N.Y. Times (Apr. 29, 2005).  At all times relevant to this Complaint, there was no actual or perceived firewall between the Sadrist political movement and Jaysh al-Mahdi.  *See supra* ¶ 58.

[135] Lionel Beehner, *IRAQ:  Cabinet Ministers*, Council on Foreign Relations Backgrounder (May 2, 2005).

[136] Jill Carroll, *Sadr Militia's New Muscle in South*, Christian Sci. Monitor (Sept. 21, 2005).

[137] Ghaith Abdul-Ahad, *Inside Iraq's Hidden War*, Guardian (May 19, 2006).

[138] Dan Murphy, *Sadr's Militia Tightens Grip On Healthcare*, Christian Sci. Monitor (May 25, 2006).

[139] Amit R. Paley, *Iraqi Hospitals Are War's New 'Killing Fields'*, Wash. Post (Aug. 30, 2006).

[140] Qais al-Bashir, *Iraq Minister Says 7 Bodyguards Arrested*, Wash. Post (Aug. 13, 2006).

The U.S. military has documented how ***Sadr's Mahdi Army has turned morgues and hospitals into places where death squads operate*** freely."[141]

- *USA Today*, November 2006:  "[Sadr's] political group, for example, controls the Health Ministry and has used it to harbor death squads, infiltrate hospitals and punish al-Sadr's enemies, says Ayad al-Samarrai, the deputy chairman of the Iraqi Islamic Party, a Sunni group. . . . Iraq's Health Ministry is a ***case study in how al-Sadr used his government role to consolidate his political and military support***.  Ministry-run hospitals have been used as a weapon against rival Sunnis, according to critics, such as Sunni lawmaker Mithal al-Alusi.  '***It's a jungle***,' al-Alusi says.  '***What (al-Sadr) has done with that ministry is criminal***.'"[142]

- *Newsweek*, December 2006:  "Two prime ministers since 2005 – Ibrahim Jaafari and the current Iraqi leader, Nuri al-Maliki – have depended on [Sadr's] swing votes for their majority.  But Sadr himself stayed out of government, and kept his distance.  That way he could pursue a dual strategy – ***rebuilding his militia even as he capitalized on his control of key ministries, like Health*** and Transportation, to provide services to the poor and jobs to his followers."[143]

- *Los Angeles Times*, February 2007:  "Iraqi and U.S. forces on Thursday launched a crackdown on the ***web of patronage that sustains radical anti-American cleric Muqtada Sadr***, detaining a high-level Iraqi official in connection with the killings of ***Health Ministry officials and the diversion of millions of dollars to a Shiite Muslim militia***. . . . The Health Ministry is controlled by Sadr, Iraqi and U.S. authorities say.  It's a house of horrors where health officials have disappeared on their way to meetings, never to be heard from again."[144]

- *New York Times*, February 2007:  "Iraqi and American troops arrested the second highest official in the Iraqi Health Ministry on Thursday, charging that he ***funneled millions of dollars to rogue Shiite militants*** who kidnapped and killed Iraqi civilians.  The United States military . . . accused the official of ***flooding the Health Ministry's payroll with militants***, embezzling American money meant to pay for Iraq's overworked medical system and using Health Ministry 'facilities and services for sectarian kidnapping and murder.'"[145]

- *American Forces Press Service*, February 2007:  "[S]pecial Iraqi army forces captured a senior official with alleged ties to the Jaysh al-Mahdi militia. . . . ***The suspect reportedly orchestrated several kickback schemes by using inflated contracts*** for ministry equipment and services.  These kickbacks, which officials believe have ***funneled millions of U.S. dollars to militia elements***, support sectarian attacks and violence

---

[141] Melissa McNamara, *CBS:  Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006).

[142] Rick Jervis, *Cleric al-Sadr May Hold Iraq's Future in His Hands*, USA Today (Nov. 13, 2006).

[143] Jeffrey Bartholet, *Moqtada al-Sadr and U.S.'s Fate in Iraq*, Newsweek (Dec. 3, 2006).

[144] Louise Roug, *Iraqi Health Official is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

[145] Damien Cave, *Iraq's No. 2 Health Official Is Held and Accused of Financing Shiite Militants*, N.Y. Times (Feb. 9, 2007).

targeting Iraqi civilians, U.S. officials said.  The suspect is believed to **support the Jaysh al-Mahdi militia** through large-scale employment of its members.”[146]

- *NBC News*, July 2007:  “Supplies and medicine in strife-torn Baghdad’s overcrowded hospitals have been **siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry of Health** . . . .  The draft report obtained by NBC said the Iraqi Ministry of Health, which oversees the country’s hospitals, is **in the ‘grip’ of the Mahdi Army**, the anti-American militia run by the Shiite cleric Muqtada al-Sadr.”[147]

- *USA Today*, March 2008:  “**A 6-foot picture hanging at the front gate of Iraq’s Health Ministry removes any doubts about who runs the place.**  The photo is of the father and uncle of radical Shiite cleric Muqtada al-Sadr, both of whom were religious leaders killed by Saddam Hussein’s regime.  Employees of the ministry, many of whom are loyalists to al-Sadr, pass their images every day as they go to work.  **Al-Sadr’s ironclad control over Iraq’s health system and other key ministries has come under renewed scrutiny** following recent clashes between his Mahdi Army militia and the Iraqi army.”[148]

- *60 Minutes*, April 2008:  “One of the biggest problems is corruption, which is robust even by Middle Eastern standards.  According to U.S. and Iraqi officials, **bribery and outright theft are flourishing in virtually every Iraqi ministry**, and some of those ill-gotten gains are being used to kill American troops. . . .  The situation got so bad, Radhi says his investigators could not even enter certain government buildings.  **Asked if his investigators were allowed [into the] Ministry of Health, Radhi said, ‘They entered the ministry and they conducted their investigations.  But they were threatened to be kidnapped**.’  So they stopped.”[149]

- *Business Monitor News*, November 2008:  “According to the International Medical Corps (IMC), **radical Shi’a cleric Muqtada al-Sadr controls much of the public health system**.  Al-Sadr’s power may be waning as peace returns to the country, as indicated by his announcement on August 8 that he will order most of his militia, save a number of elite fighting units, to disarm.  Yet, **the Shi’a cleric’s influence over** the State Company for Importation and Distribution of Drugs and Medical Appliances **(Kimadia), which has a virtual monopoly on pharmaceutical distribution**[,] **provides significant risk** to pharmaceutical output from Sunni- and Kurd- dominated Mosul if sectarian unrest were to reignite.”[150]

177.    The full text of a near-final draft of the 2006 *U.S. Embassy Baghdad Report* was made publicly available on the Internet no later than September 19, 2007, and it received recurring media coverage both before and after its release.  The draft accused MOH of

---

[146] *Senior Official at Iraq Ministry of Health Detained; 13 Terrorists Killed*, DoD News, Am. Forces Press Serv. (Feb. 8, 2007), http://archive.defense.gov/news/newsarticle.aspx?id=2976.

[147] Aram Roston & Lisa Myers, *‘Untouchable’ Corruption in Iraqi Ministries*, NBC News (July 30, 2007).

[148] Charles Levinson, *Sadrists’ Grip on Health Care Takes Toll*, USA Today (Mar. 26, 2008).

[149] Steve Kroft, *Iraq:  State of Corruption*, 60 Minutes (Apr. 11, 2008).

[150] Bus. Monitor News Indus. Alerts, *New Plant Suggests Re-Emergence of Pharmaceutical Industry*, 2008 WLNR 27850935 (Nov. 1, 2008).

"operating a pharmaceutical diversion scheme"; of being "openly under the control of the Mehdi Army"; of enabling the "Mehdi Army [to] finance[ ] operations from diverted medicines"; and of "shak[ing] down" clinics and doctors for free goods.[151] Media outlets describing the report included the *Washington Post* on June 25, 2007; *NBC News* on July 30, 2007; *The Nation* on August 30, 2007; *NPR* on September 1, 2007; and *60 Minutes* on April 11, 2008.[152]

178.    On information and belief, Defendants were aware of these reports documenting the link between MOH and Jaysh al-Mahdi. Each Defendant generally maintained a corporate security group responsible for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the drugs they sold, including in the Middle East. Pfizer, for example, maintained a Global Security group whose mandate included "[c]onduct[ing] due diligence . . . using both open and closed intelligence sources to verify the Company engages with legitimate business partners at all times."[153] As part of such efforts, Defendants' standard practice would have been to conduct basic open-source research on the Iraqi market and the mechanics of the MOH procurement process – even a modicum of which would have uncovered the press reports discussing MOH's terrorist ties set forth above.

179.    Defendants subscribed to intelligence-reporting services that discussed the relationship between MOH and Jaysh al-Mahdi. For example, Strategic Forecasting Inc., more popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world. On information and

---

[151] *U.S. Embassy Baghdad Report* at 23-25.

[152] *See* Walter Pincus, *Shhh . . . There Is Corruption in Iraq*, Wash. Post (June 25, 2007); Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC News (July 30, 2007); David Corn, *Secret Report: Corruption Is 'Norm' Within Iraqi Government*, Nation (Aug. 30, 2007); Debbie Elliott, *Report Reveals Corruption in Iraqi Government*, All Things Considered (Sept. 1, 2007); Steve Kroft, *Iraq: State of Corruption*, 60 Minutes (Apr. 11, 2008).

[153] Staff Reporter, *Ireland: Director Global Security – EMEA*, Eur. Union News, Plus Media Sols. Private Ltd. Pak. (Nov. 25, 2014) (publishing Pfizer job announcement).

belief, based on Stratfor's subscription lists (as published by *WikiLeaks*), senior U.S.-based

executives of Pfizer Inc.; GE Healthcare; Johnson & Johnson; AstraZeneca Pharmaceuticals LP;

and Genentech, Inc. likely had access to the service as of February 8-15, 2007, when Stratfor

included the following messages in its updates:

> IRAQ:  U.S. and Iraqi forces raided the Health Ministry in Baghdad on [sic] and
> arrested Deputy Health Minister Hakim Zamili, a senior member of the political
> bloc loyal to Shiite cleric Muqtada al-Sadr.  The U.S. military did not comment
> immediately on the reason for the arrest.[154]

> [O]ver the past week, the U.S. military continued its offensive against Shiite
> militia leaders in Baghdad.  Coalition forces arrested Shiite militia financier and
> Deputy Minister of Health Hakim al-Zamili at his office in the Ministry of Health
> in Rusafa on Feb. 8.  ***Al-Zamili is suspected of employing militia fighters and
> selling health services and equipment in return for millions of dollars that he
> later funneled to Shiite militias***.[155]

180.    After 2004, Defendants could not have conducted credible due diligence that

would have "cleared" their transactions with the Jaysh al-Mahdi-controlled MOH.  As the 2006

*U.S. Embassy Baghdad Report* noted, terrorist control of the Ministry precluded even "basic

efforts to stem th[e] perception" of widespread corruption at MOH.[156]  And, by 2006, U.S. and

Iraqi corruption investigators could "no longer go into the ministry because it is controlled by

militia."[157]  The lack of access to the Ministry hamstrung outside investigators from conducting

even basic diligence, given that investigators could not obtain exculpatory documents – and that

Dr. Adel's Inspector General's office at MOH was unresponsive to requests for information.

---

[154] Posting of Strategic Forecasting, Inc., noreply@stratfor.com, to nils@bildt.org & archive@stratfor.com, *Stratfor Intelligence Summary Strategic Forecasting* (Feb. 8, 2007), https://wikileaks.org/gifiles/docs/51/512219_fw-stratfor-intelligence-summary-.html.

[155] Press Release, Stratfor, *Iraq Update:  Feb. 14, 2007* (Feb. 15, 2007) (emphasis added), https://worldview.stratfor.com/article/iraq-update-feb-14-2007.

[156] *U.S. Embassy Baghdad Report* at 25.

[157] *Id.*

V.    **EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE JAYSH AL-MAHDI**

A.    **The AstraZeneca Defendants**

1.    **AstraZeneca Made Corrupt Payments to Jaysh al-Mahdi Members**

181.    The AstraZeneca *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is AstraZeneca UK Limited.  The AstraZeneca *manufacturer* Defendant – a company that manufactured drugs used to bribe Jaysh al-Mahdi agents – is AstraZeneca Pharmaceuticals LP.

182.    From 2004 through the present, Kimadia awarded AstraZeneca at least 47 contracts relating to various drugs.  During this time, AstraZeneca sold U.S.-manufactured drugs to MOH including, but not limited to:  Arimidex (API manufacturing[158] and drug formulation in Newark, Delaware); Meronem (API made in Newark, Delaware); and Seroquel (API made in Newark, Delaware).  On information and belief, AstraZeneca secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* ¶¶ 139-157.  Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 19 drug contracts to AstraZeneca.

183.    From 2004-2013, AstraZeneca delivered "free goods" to Jaysh al-Mahdi agents in connection with the sale of some of its most lucrative drugs.  Those deliveries were made in connection with contracts negotiated by AstraZeneca UK Limited and involved several AstraZeneca manufacturers, including Defendant AstraZeneca Pharmaceuticals LP.  Plaintiffs set forth below examples of those corrupt payments.  This list is far from exhaustive; Plaintiffs

---

[158] "API" refers to a drug's "active pharmaceutical ingredient."  AstraZeneca, like the other drug Defendants, ordinarily employed a two-part manufacturing process to create the drugs it sold.  First, it manufactured many of its most complicated and lucrative APIs at U.S. facilities.  Second, it used those same facilities, or affiliate facilities in Europe, to combine the U.S.-manufactured API with other compounds and materials into a deliverable drug, producing the final drug product through a process called "drug formulation."  API manufacturing is ordinarily the most commercially important part of the drug-creation process, as well as the most technically challenging.

believe discovery will uncover numerous additional instances of "free goods" payments that

AstraZeneca made at additional times with additional drugs.  Much of the information about

these transactions resides within AstraZeneca's exclusive control:  whereas AstraZeneca should

possess the sales contracts and other documents memorializing its "free goods" payments,

Kimadia generally does not publicly disclose historical contracting information prior to 2010.  In

addition, according to witnesses and a U.S. State Department cable (as published by *WikiLeaks*),

a fire at MOH in 2009 "destroyed numerous documents related to Kimadia contracts," which

prompted allegations that the fire was "deliberately set to destroy evidence of corruption."[159]

184.    Despite those constraints (which discovery should readily remedy), Plaintiffs have

amassed evidence of several specific corrupt transactions executed by AstraZeneca.  The chart

below depicts those AstraZeneca transactions on a drug-by-drug basis:

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Arimidex (15-AG0-014) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 2006 or earlier[160] | 40/2006/185 | 100% |
| Meronem injection (05-AG0-059) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 11-29-2004 | 40/2008/66 | 70% |
| Meronem powder (05-AG0-015) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 11-29-2004 | 40/2007/238 | 25% |
| Seroquel 200mg Tab (04-B00-079) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 5-16-2005 | 40/2008/3 | 100% |
| Zoladex (06-G00-008) | AstraZeneca UK Limited | AstraZeneca UK Limited | 2006 or earlier | 40/2006/704 | 25% |

[159] U.S. State Dep't Cable, *Anti-Corruption Developments in Iraq* (July 10, 2009), https://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html.

[160] For Arimidex (and certain other drugs below), Plaintiffs have not been able to determine the formulary date based on public information.  In such circumstances, Plaintiffs provide an estimate based on the first confirmed contract number.  Here, because Arimidex was sold pursuant to a contract negotiated during the 2006 tendering round (Contract No. 40/2006/185), and because MOH does not allow contracts for drugs missing from the formulary, Arimidex likely appeared on the formulary by 2006 at the latest (and likely earlier).

The column headers in the chart above have the following meanings:

- Drug (Nat'l Code):  The name of AstraZeneca's branded drug sold to Kimadia, with the unique National Code that MOH assigned to the underlying chemical compound when it placed the drug on the Iraqi formulary.
- Supplier:  The AstraZeneca company that executed the sales contract with Kimadia and that held itself out as the company with authority to sell the drug in Iraq.
- Manufacturer:  The AstraZeneca company that manufactured the drug (either the API or the drug formulation) that Kimadia purchased from the supplier.
- Formulary Date:  The date that MOH approved the drug's chemical compound for sale within Iraq and placed it on the formulary.
- Confirmed Contract:  The contract number of the earliest confirmed sale of the drug to Kimadia of which Plaintiffs are currently aware.  The second four digits of each code refer to the year of the tendering round pursuant to which Kimadia awarded the contract. It is likely that there are prior sales that Plaintiffs have not yet uncovered.
- FOC %:  The size of the "free goods" bribe – measured against the value of the underlying contract – that the supplier and manufacturer paid on the contract.  FOC, which often appears in MOH documents, stands for "free of charge."

185.     On information and belief, AstraZeneca UK Limited made corrupt payments in connection with each drug on an annual basis – in percentages similar to the ones listed on the chart – beginning the year after the drug was placed on the formulary and continuing through at least 2013.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" bribe that AstraZeneca paid in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year.  Based on that policy, if a company paid a "free goods" bribe of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq.  AstraZeneca made those corrupt payments through FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.

186.     AstraZeneca UK Limited made corrupt payments as agent for (among other affiliates) AstraZeneca Pharmaceuticals LP.  As a condition of selling drugs in Iraq that were

manufactured by AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited had to certify to MOH that AstraZeneca Pharmaceuticals LP had authorized the former to sell drugs manufactured by the latter.  AstraZeneca UK Limited also had to certify to MOH that it was selling drugs on behalf of AstraZeneca Pharmaceuticals LP and that the drugs being supplied had been manufactured by AstraZeneca Pharmaceuticals LP.

187.    AstraZeneca Pharmaceuticals LP also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing drugs that it knew or recklessly disregarded were being used by its affiliate to make corrupt payments to Jaysh al-Mahdi agents; (b) registering to do business as a manufacturer with the Jaysh al-Mahdi-controlled Health Ministry; and (c) submitting paperwork to MOH confirming AstraZeneca UK Limited's authority to negotiate and execute corrupt contracts on its behalf.

188.    AstraZeneca UK Limited also used U.S.-manufactured drugs to make several Off-the-Books Payoffs to Jaysh al-Mahdi agents, including payments of Seroquel and Meronem. These Off-the-Books Payoffs were not associated with any ordinary-course contract and were especially easy for Jaysh al-Mahdi to divert to the black market.  With respect to the Seroquel payment, AstraZeneca UK Limited supplied free Seroquel unconnected to any attendant order number or tendering round.  With respect to Meronem, a Kimadia document notes that AstraZeneca provided free Meronem to MOH in the quantity of "20% after compensating for the material of the order number 40/2002/20" – *i.e.*, a corrupt Oil-for-Food-era contract.

189.    AstraZeneca also agreed to Administrative Fee Clauses as an additional means of providing "free goods" and cash payments to Jaysh al-Mahdi.  For example, in Order No. 40/2010/143, in which AstraZeneca UK Limited contracted for the sale of Meronem 500mg, AstraZeneca did not include an FOC Clause but did include an Administrative Fee Clause.  That

clause required AstraZeneca to replace "100%" of any Meronem that Kimadia failed to sell before expiration and, when doing so, to pay a "15% administrative fee."[161]

190.     Arimidex illustrates how AstraZeneca's corrupt transactions worked.  Arimidex is a breast-cancer drug that gained FDA approval in 1996.  Before it came off patent in 2010, it was a major blockbuster drug for AstraZeneca, generating more than $1 billion in worldwide sales each year between 2005 and 2009.  AstraZeneca UK Limited registered Arimidex for sale with Kimadia on May 24, 2006 (it had likely been placed on the formulary at least several months prior).  AstraZeneca's practice was to pay 100% "free goods" bribes on Arimidex to the Jaysh al-Mahdi-controlled Ministry.  That meant that AstraZeneca UK Limited delivered free additional batches of Arimidex to Kimadia, which Jaysh al-Mahdi agents were able to divert, in quantities equal to the underlying quantity for which Kimadia had paid.

191.     AstraZeneca's corrupt payments to Jaysh al-Mahdi agents carried significant monetary value.  AstraZeneca's "free goods" percentages tended to rise for its most valuable drugs, and those drugs (for expensive-to-treat, chronic conditions) were among the easiest for Jaysh al-Mahdi to monetize on the black market.  The dollar value of those drugs was high.  For example, a single 2006-2007 Off-the-Books Payoff of Meronem, in which AstraZeneca gave MOH roughly 6,950 free packs of Meronem, was worth about $870,000 by itself (using 2010 tender prices).  Another 2006-2007 Off-the-Books Payoff of roughly 17,000 packs of Seroquel 100mg and 15,000 packs of Seroquel 200mg was worth about $1.8 million (using 2010 tender prices).  On information and belief, given the size of AstraZeneca's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, AstraZeneca's corrupt payments

---

[161] Translated from Arabic.

(including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 2. AstraZeneca's Corrupt Commercial Transactions Comport with Its Historical Sales Practices in International Markets

192. AstraZeneca has a history of engaging in corrupt international transactions. In 2016, the SEC instituted cease-and-desist proceedings against AstraZeneca plc, which it settled for more than $5.5 million.[162] In its institution order, the SEC alleged that AstraZeneca subsidiaries in China (from 2007-2010) and Russia (from 2005-2010) caused AstraZeneca to make "numerous improper payments in cash, gifts and other items," including "conference support" and "travel," to healthcare providers "as incentives to purchase or prescribe AZN pharmaceuticals."[163] AstraZeneca plc allowed such unlawful conduct to take place, the SEC alleged, by "failing to devise and maintain a sufficient system of internal accounting controls" and failing to "adequately enforce its corporate policy against making improper payments."[164]

193. AstraZeneca's history of making corrupt payments extends to Iraq specifically. The Volcker Commission determined that AstraZeneca AB (an AstraZeneca UK Limited affiliate) paid Kimadia at least $162,571 in kickbacks relating to three contracts collectively to sell roughly $1.7 million of drugs under Oil-for-Food from 2000-2003;[165] the Republic of Iraq later filed suit over those same allegations.[166]

---

[162] *See* Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934 at 1-2, 6, *In re AstraZeneca PLC*, Securities Exchange Act Release No. 78730, File No. 3-17517 (Aug. 30, 2016) ("*AZN SEC Order*").

[163] *Id.* ¶¶ 5, 13, 163.

[164] *Id.* ¶ 20.

[165] *Volcker Report*, Table 7, at 25.

[166] *See* First Am. Compl. ¶¶ 46-52, *Republic of Iraq v. ABB AG*, No. 08-cv-05951-GEL, ECF No. 112 (S.D.N.Y. filed July 31, 2009).

194.    For those corrupt Oil-for-Food transactions, on information and belief,

AstraZeneca relied on Omnitrade Pharma, a regional distributor based in Jordan that has

represented AstraZeneca continuously since 1999.  On information and belief, despite

Omnitrade's role in facilitating those corrupt transactions, AstraZeneca continued to use it as an

agent in post-Saddam Iraq – including, on information and belief, to assist with the corrupt

contracts that delivered funding to Jaysh al-Mahdi through Kimadia.

195.    AstraZeneca's more recent conduct further demonstrates its pattern and practice

of making corrupt payments in Iraq.  Notwithstanding AstraZeneca's 2016 settlement with the

SEC,[167] AstraZeneca UK Limited has continued to engage in corrupt transactions with Kimadia

officials in connection with the sale of U.S.-manufactured drugs over the past five years.  Among

other corrupt transactions, AstraZeneca UK Limited paid a 100% "free goods" bribe on

Arimidex in 2016 and a 25% "free goods" bribe on Zoladex in 2016.

### 3.    AstraZeneca's Corrupt Transactions Had a Substantial Nexus to the United States

196.    Although AstraZeneca is headquartered in the United Kingdom, it maintains a

significant presence in the United States.  AstraZeneca has operated "several key R&D,

manufacturing and commercial locations across the United States," including major centers in

Wilmington, Delaware (its U.S. headquarters); Newark, Delaware (a major manufacturing

facility); Gaithersburg, Maryland (a major biologics research & development center); and

Boston, Massachusetts (additional research & development facilities).[168]  The head of

AstraZeneca's U.S. operations is an Executive Vice President and a member of AstraZeneca's

Senior Executive Team, where his responsibilities include "driving growth and maximising [sic]

---

[167] *See AZN SEC Order* at 1, 6-7.

[168] AstraZeneca, *AstraZeneca in the United States*, https://www.astrazeneca-us.com/az-in-us.html#! (last accessed Sept. 19, 2017).

the contribution of the commercial operations in North America to AstraZeneca's global business."[169]  AstraZeneca describes its "U.S. operations" as "integral to our global business."[170]

197.     A U.S.-headquartered company (AstraZeneca Pharmaceuticals LP) was directly involved in the corrupt transactions for the sales of the drugs it manufactured.  Indeed, during the relevant time period, Arimidex (100% FOC bribes) was manufactured by AstraZeneca Pharmaceuticals LP at a manufacturing facility in Newark, Delaware.  The Newark facility was where Arimidex was "formulated and distributed globally"; AstraZeneca's director of corporate communications has described that facility as a "key strategic site in the firm's global supply chain";[171] and Arimidex's packaging listed Newark, Delaware, as its place of manufacture.  Consistent with Kimadia's general practice, AstraZeneca UK Limited certified to Kimadia that it was sourcing Arimidex from the United States.

198.     Seroquel (100% FOC bribes), which is AstraZeneca's branded anti-psychotic drug, was discovered and developed by AstraZeneca in the 1990s in its Fairfax, Delaware laboratory.  Since then, AstraZeneca Pharmaceuticals LP has manufactured Seroquel in its Newark, Delaware facility, and it has publicly stated that it manufactures Seroquel in the United States.  In a 2001 press release announcing an expansion of AstraZeneca's Newark facility, the company identified its expanded capacity to manufacture and distribute Seroquel as a key benefit of the Newark facility upgrades.[172]  AstraZeneca thus identified AstraZeneca Pharmaceuticals LP

---

[169] AstraZeneca, *What Science Can Do, AstraZeneca Annual Report and Form 20-F Information 2016*, at 88-89 (Mar. 7, 2017), https://www.sec.gov/Archives/edgar/data/901832/000095010317002275/dp73779_ex1501.htm.

[170] AstraZeneca, *AstraZeneca in the United States*, https://www.astrazeneca-us.com/az-in-us.html#! (last accessed Sept. 19, 2017).

[171] Cori Anne Natoli, *AstraZeneca's Bear Site to Get $100 Million Facelift*, News J. (Dec. 12, 2013), http://www.delawareonline.com/story/money/industries/healthcare/2013/12/12/astrazeneca-site-to-get-100-million-facelift/4005247/.

[172] *See* Press Release, AstraZeneca, *AstraZeneca to Expand Newark Manufacturing Facility* (Aug. 29, 2001), http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=21007.

as the Seroquel manufacturer in negotiations with Kimadia, and AstraZeneca UK Limited

certified to Kimadia that it was sourcing Seroquel from the United States.

199.    In 2000, AstraZeneca also gained FDA approval for its Newark, Delaware facility

to manufacture Meronem (70% and 25% FOC bribes) as well.  AstraZeneca Pharmaceuticals LP

thereafter manufactured Meronem's API at its Newark facility.  Indeed, a former AstraZeneca

employee described his job at the Newark site as "delivering [Meronem] finished product to

global markets."  That facility played a key role in facilitating the corrupt Meronem sales to the

Jaysh al-Mahdi-controlled MOH at issue in this case, and AstraZeneca UK Limited had to certify

that it was sourcing Meronem from the United States.

200.    AstraZeneca made similar certifications to Kimadia in connection with its corrupt

sales of Zoladex, another U.S.-manufactured drug.  For example, in Order No. 40/2010/543,

AstraZeneca UK Limited represented that the "USA" was Zoladex's "Country of Origin,"[173] and

it agreed to source the Zoladex being supplied to MOH from its U.S. facilities.

201.    At all relevant times, AstraZeneca also relied upon U.S. personnel to support

efforts to place new indications for existing AstraZeneca drugs on the formularies of health

authorities outside of the United States.  For example, an AstraZeneca employee in the United

States was a member of AstraZeneca's "Global Project Team" for Seroquel and, as such, helped

AstraZeneca "[r]eceive[] approval of Mania and Depression indications and [sustained release]

Formulation in [the] US and globally."

202.    On information and belief, as a condition of fulfilling its corrupt contracts with

Kimadia for the delivery of U.S.-manufactured drugs, AstraZeneca UK Limited had to procure

letters from the U.S. Commerce Department and the FDA confirming that the drugs were

---

[173] Translation from Arabic.

manufactured in the United States and had been approved for sale in the United States.  *See supra* ¶¶ 149, 152.

203.    On information and belief, AstraZeneca consummated the above transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 121-124.

**B.    The GE Defendants**

**1.    GE Made Corrupt Payments to Jaysh al-Mahdi Members**

204.    The GE business unit that oversaw transactions with MOH is known as GE Healthcare.  The global headquarters of GE Healthcare is located in Chicago, Illinois.  GE operates this worldwide business unit through GE subsidiaries, including Defendants GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc. ("GE Medical"), and GE Medical Systems Information Technologies GmbH.

205.    The GE *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is GE Medical Systems Information Technologies GmbH.  The GE *manufacturer* Defendants – companies that manufactured the medical devices used to bribe Jaysh al-Mahdi agents – are GE Healthcare USA Holding LLC and GE Medical.

206.    After the fall of Saddam in 2003, GE, like the pharmaceutical Defendants, pursued growth in the Middle East market in general and Iraq in particular.  As one prominent Emirati newspaper explained, GE's "standout country in the [Middle East] region is Iraq, where it has deployed a team to train personnel, design hospitals and sell its technology."[174]

207.    As part of that business strategy, GE made corrupt payments to Jaysh al-Mahdi agents in connection with MOH contracts.  On information and belief, the Jaysh al-Mahdi-

---

[174] Triska Hamid, *General Electric and Philips Are Among Those Aiming for Growth with US and European Budgets Squeezed*, National (Jan. 28, 2014), https://www.thenational.ae/business/1.317836.

controlled MOH awarded hundreds of millions of dollars in contracts to GE Healthcare.  For example, one 2009 report indicated that GE Healthcare had received at least 12 medical-device contracts from the Sadrist-controlled Ministry worth roughly $400 million[175] – a number that likely understates the overall value of the contracts that GE Healthcare obtained.  Moreover, from 2005-2011, GE Healthcare maintained functionally a 100% market share for all nuclear-medicine products in Iraq.  Several witnesses, based on personal experience with the corrupt Kimadia procurement process and with the local agents GE Healthcare used to negotiate with Kimadia, understood that GE could have secured that 100% market share only by bribing an array of Jaysh al-Mahdi officials throughout MOH during that timeframe.

208.    Reports in 2008 and 2009 indicated that GE Healthcare had previously engaged in corrupt transactions relating to large-scale medical-device contracts with the Sadrist-controlled MOH.  Examples include:

- On January 23, 2008, an Arabic-language media source reported that Zamili had stated during his prosecution that Dr. Adel "took a 6-million-dollar bribe from a foreign company in a restaurant"[176] on contracts that one Confidential Witness understood to concern GE Healthcare.

- On December 29, 2008, a U.S. State Department cable (as published by *WikiLeaks*) reported that the existing "allegations of corruption against the Health Ministry IG" included an investigation into Dr. Adel's "profits from a USD 10 million electrocardiogram machine contract," which on information and belief was supplied by GE Healthcare.[177]  Although the investigation uncovered credible evidence of bribery in connection with that contract, the Kimadia file "was mysteriously 'lost' before [Dr. Adel] could be prosecuted."[178]

---

[175] *See* Sabah al-Baghdadi, *Hidden Facts and Secrets of the Iraqi MOH Inspector General's Gangs Killing Iraqis*, Dunya al-Watan (May 21, 2009), https://pulpit.alwatanvoice.com/content/print/165460.html (translated from Arabic).

[176] Furat Naji, *Remember Hakim al-Zamili?  Learn What Is New About His Case*, Al Basrah Network (Jan. 23, 2008), http://articles.abolkhaseb.net/ar_articles_2008/0108/forat_230108.htm (translated from Arabic).

[177] U.S. State Dep't Cable, *Summing Up Iraq's Year of Anti-Corruption* (Dec. 29, 2008), https://wikileaks.org/plusd/cables/08BAGHDAD4058_a.html.  The Volcker Commission determined that GE paid kickbacks to secure an ECG contract during Oil-for-Food.  *See Volcker Report*, Table 7, at 106 (GE Healthcare subsidiary Marquette Hellige paid ECG-related bribes during Oil-for-Food).

[178] *Id.*

- On May 21, 2009, an Arabic-language media source similarly reported that, in connection with 12 contracts worth $400 million, Dr. Adel had received kickbacks from GE and so dubbed him the "Emperor of Corruption."[179]

209.    In or about March 2008, Dr. Adel stated on Iraqi radio that GE Healthcare was "corrupt," based on the medical-device sales it had made to MOH.  Dr. Adel's accusation demonstrates the depth and longevity of GE Healthcare's corruption in Iraq.  GE had paid large bribes on high-dollar contracts to MOH, but Dr. Adel's demands kept growing.  The public accusation of corruption came when Dr. Adel's demands finally grew higher than what GE Healthcare was willing to pay.  Perversely, as relayed in a contemporaneous email by a U.S. anti-corruption official stationed in Iraq, Dr. Adel publicly denounced GE not because he actually cared that GE was corrupt but because "GE wouldn't pay him a big enough bribe."

210.    GE also made documented "free goods" deliveries in connection with large medical-device contracts.  In 2010, for example, Kimadia awarded Contract No. 87/2010/216, valued at approximately $1.2 million, to GE Medical Systems Information Technologies GmbH, for the purchase of 200 ECG Machine MAC 1600, at the unit price of $6,096.58, with "20 FOC" – *i.e.*, a 10% free-goods bribe (20/200 FOC) worth roughly $120,000.[180]

211.    On information and belief, GE made 10% (or similar) free-goods payments in connection with an array of other medical-device contracts from 2004-2013.  This allegation is based on:  (a) documentary evidence memorializing the "free goods" payment in connection with Contract No. 87/2010/216; (b) GE's employment of local agents with demonstrated history of corrupt payments in Iraq, including "free goods" payments, *see infra* Part V.B.2; (c) GE's 100% market share in nuclear medicine in Iraq since 2005; and (d) Kimadia's general practice of

---

[179] Sabah al-Baghdadi, *Hidden Facts and Secrets of the Iraqi MOH Inspector General's Gangs Killing Iraqis*, Dunya al-Watan (May 21, 2009), https://pulpit.alwatanvoice.com/content/print/165460.html (translated from Arabic).

[180] On information and belief, the correct name for this device is the GE Mac 1600 Electrocardiograph.

extracting free-goods deliveries in connection with medical-device contracts across multiple years, usually through similar "free goods" percentages on a given medical device from year to year.  GE made those corrupt payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.

212.   On information and belief, GE secured many of its MOH contracts since 2004 by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* ¶¶ 139-157.

213.   GE Medical Systems Information Technologies GmbH made such payments to Jaysh al-Mahdi members as agent for GE Healthcare and GE Medical.  As a condition of selling goods in Iraq manufactured by either GE manufacturer, GE Medical Systems Information Technologies GmbH had to certify to MOH that the manufacturers had authorized it to sell their goods in Iraq.  GE Medical Systems Information Technologies GmbH also had to certify that it was selling devices on behalf of those manufacturers and that GE Healthcare USA Holding LLC and GE Medical had manufactured the devices being supplied.

214.   GE Healthcare USA Holding LLC and GE Medical also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing devices they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming GE Medical Systems Information Technologies GmbH's authority to negotiate and execute corrupt contracts on their behalf.

215.   GE's corrupt payments delivered substantial monetary value to Jaysh al-Mahdi. GE's contracts were for expensive, valuable "big iron" equipment that multiple witnesses recall as one of the most corrupt market segments in Iraq.  Jaysh al-Mahdi members monetized such equipment not only by moving it on the black market, but also by diverting it to their own private

clinics where Jaysh al-Mahdi agents (many of whom were doctors and clinicians) could charge patients for their use outside of Iraq's state-run public healthcare system.  On information and belief, given the size of GE's business in Iraq, the frequency of its contracts, and the particular devices that it sold, GE's total corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

      **2.**      **GE's Corrupt Payments to Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets**

216.     GE has a history of entering into corrupt "free goods" transactions in Iraq.  In 2010, GE resolved FCPA charges brought by the SEC by paying roughly $23 million, which was one of the larger Oil-for-Food settlements.[181]  The SEC alleged that two GE subsidiaries obtained at least four Oil-for-Food medical-goods contracts from Kimadia between 2000-2003 by agreeing to "pay illegal kickbacks in the form of computer equipment, medical supplies, and services."[182]  One GE subsidiary "declined to make cash payments to the Iraqi ministry" when asked to make the standard ASSF cash payment, but "acquiesced" to unlawful payments in the form of in-kind bribes "equal to ten percent of the contracts' value."[183]

217.     The GE subsidiaries paid for their illegal 10% free-goods bribes under Oil-for-Food by inflating a local agent's fee by an offsetting 10%, which the "agent used . . . to cover the cost of the equipment and services he kicked back to the Iraqi ministry."[184]  GE's corrupt local agents in Iraq during Oil-for-Food and afterwards included:

218.     **Alnabeel Scientific Bureau.**  During the Oil-for-Food Program and continuing through the Sadrist takeover of MOH, GE Healthcare engaged the Alnabeel Scientific Bureau

---

[181] *See* Press Release, GE, *GE Announces Settlement of Oil-for-Food Matter* (July 27, 2010), http://www.genewsroom.com/Press-Releases/GE-Announces-Settlement-of-Oil-for-Food-Matter-227527.

[182] *GE FCPA* Compl. ¶ 22; *see id*. ¶¶ 29-30.

[183] *Id.* ¶ 24.

[184] *Id.* ¶ 25.

and its General Manager ("GE Agent 1").[185]  GE Agent 1 stated to MOH officials in or around

Fall 2003 that s/he represented GE Healthcare in Iraq.

219.    GE Agent 1 was personally involved in paying a series of bribes in Iraq during

both the Saddam and the post-Saddam eras.  For example, according to one percipient witness,

GE Agent 1 offered bribes on behalf of GE Healthcare in 2003 to MOH decisionmakers to

secure payment from MOH relating to a contract for the sale of heart monitors, including an

offer to purchase a luxury European automobile for an MOH decisionmaker.  GE Agent 1 made

that offer on behalf of GE Healthcare in a meeting on or about December 2003 at the Four

Seasons in Amman, Jordan.

220.    On information and belief, from 2003 through at least on or about November

2006, Alnabeel acted as one of GE Healthcare's agents in Iraq and assisted with the sale of GE

Healthcare-manufactured products including, but not limited to, CT scanners, MRIs, X-Rays,

Ultrasounds, and other devices manufactured by GE Healthcare.

221.    **Al-Mazd Group.**  During the Oil-for-Food era, as well as after the Sadrist

takeover of MOH, GE Healthcare also engaged the Al-Mazd Group Medical & Engineering

Systems & Technologies ("Al-Mazd"), which is also known as "AGMEST."  Al-Mazd

represented GE Healthcare in transactions with MOH involving CTs, MRIs, and other large-

dollar medical devices.

222.    According to multiple witnesses, Al-Mazd had a reputation in Iraq during the

Oil-for-Food era, as well as the post-Saddam years, for making corrupt payments to MOH.  On

September 30, 2004, the Iraq Survey Group's report for the U.S. intelligence community

---

[185] Consistent with the DOJ's and the SEC's practice in comparable FCPA cases, Plaintiffs have anonymized
the names of local agents and distributors and other company employees implicated in the corruption scheme.

publicly identified "Al-Mazd" / "AGMEST" as a corrupt agent potentially involved in violations of sanctions applicable to Iraq under the Oil-for-Food Program.[186]

223.    After the end of Oil-for-Food, GE Healthcare continued to use Al-Mazd as one of its agents in Iraq, including after the Iraq Survey Group publicly identified Al-Mazd as a suspect agent.  On information and belief, Al-Mazd represented GE Healthcare in connection with its CT, MRI, Ultrasound, and other device contracts in Iraq during most of the period of time from 2003 through at least 2008.  Among other things, GE Healthcare relied on Al-Mazd's CEO ("GE Agent 2") to personally facilitate its medical-device sales in Iraq.  In doing so, GE Healthcare knew or recklessly disregarded that GE Agent 2 had a direct connection to Jaysh al-Mahdi, through a family member who was part of Sadr's personal inner circle in Najaf.

224.    There is evidence of Al-Mazd's corrupt payments to Iraqi officials continuing during the post-Saddam era when Jaysh al-Mahdi controlled MOH.  As found by a Canadian judge for the Ontario Superior Court, Al-Mazd charged at least one Canadian medical-device supplier a 34% agent fee for representing the supplier with Kimadia in connection with a commercial negotiation that took place in or about December 2006.[187]  A 34% agent fee, which Al-Mazd charged based on the full retail price of the supplier's goods, is commercially unreasonable and a red flag that Al-Mazd was engaged in corrupt activities with MOH throughout the contracting process.[188]  During the Canadian proceeding, the supplier's witness could not explain what legitimate benefit Al-Mazd had provided that would justify the 34%

---

[186] See Iraq Survey Group, *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD*, Vol. I (Regime Finance and Procurement, Annex I. Suspected WMD-Related Dual-Use Goods and Procurement Transactions) 262-63 (Sept. 30, 2004) (twice reporting that "the Al-Mazd Group for Medical and Engineering Systems and Technology (AGMEST) in Baghdad" had facilitated "[p]ossible [b]reaches of UN Sanctions" in Iraq).

[187] See *Ali v. O-Two Med. Techs. Inc.* (2015), 2015 ONSC 3932, ¶¶ 33-34, 37-38 (Can. Ont. Super. Ct.).

[188] See DOJ & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* at 22 (Nov. 14, 2012) ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

commission.[189]  On information and belief, Al-Mazd also represented GE Healthcare in Iraq during the same time period at issue in the Canadian proceeding.

225.   On its homepage, Al-Mazd boasts about its offerings as a "local after sales services (ASS) provider" that "represent[s] Suppliers & Manufacturers of State-Of-The-Art Medical Equipment And Supplies From U.S.A., Europe, Japan . . . and others."  Indeed, Al-Mazd maintains a webpage devoted in part to its "after sales services" offerings, even though such arrangements – and the very concept of After Sales Service Fees – were widely discredited in the aftermath of the Oil-for-Food scandal.  Al-Mazd also publicly touts the benefits that healthcare companies can derive from "charitable donations" of medical goods in Iraq.

226.   Al-Mazd's website also boasts of Al-Mazd's sponsorship of "Scientific & Medical activities" that were "officially requested" by MOH,[190] and that Al-Mazd provided "training courses for MOH staff, done extra to the contracted courses (FOC) [w]ithin [Al-Mazd's] specialty."[191]  As its website explains, Al-Mazd has provided FOC training courses to hundreds, if not thousands, of MOH officials, including courses relating to essentially every GE Healthcare major device offering by category.  While most of these training courses are not attributed to a specific company, Al-Mazd advertises at least one occasion when it provided a training course for GE Healthcare on a free-of-charge basis relating to GE's ultrasound sales to MOH.

### 3.    GE's Corrupt Transactions Had a Substantial Nexus to the United States

227.   GE's corrupt transactions with Kimadia required extensive involvement of U.S. personnel and facilities in the global GE Healthcare business unit.  At all relevant times, GE

---

[189] *Ali*, 2015 ONSC 3932, ¶¶ 33-34; *see also id.* ¶ 59 ("Mr. Sharma testified that this was a benefit to O-Two, but that he could not quantify the benefit.").

[190] AGMEST, Marketing, http://www.agmest.com/en/marketing.

[191] AGMEST, Sponsoring Some of the Scientific & Medical Activities and Conferences Officially Requested, http://www.agmest.com/en/marketing?q=node/114.

Healthcare – the integrated business unit of which GE Medical Systems Information Technologies GmbH was a part – maintained a substantial presence in Wisconsin, with corporate offices located in the Milwaukee County Research Park in Wauwatosa, Wisconsin, and nearly 6,000 employees in the State.[192]

228.    Wisconsin has, at all relevant times, served as the "home base and headquarters for key GE Healthcare product lines and imaging businesses, including computerized tomography, magnetic resonance, x-ray, and the unit's services and life care solutions businesses."[193]  As stated by a GE spokesman, Wisconsin is a "hub for global manufacturing and leadership."[194]  Wisconsin is GE Healthcare's global hub for nuclear medicine and what is known in healthcare circles as "big iron" – CT, MRI, and positron emission tomography ("PET") scanners.[195]

229.    GE Healthcare's Waukesha location has served as the global hub for GE Healthcare's business lines for X-rays, CTs, and MRIs (until at least 2011 with respect to X-rays and at all relevant times with respect to CTs and MRIs).  One 2014 press report indicated that at least half of the CT and PET scanners manufactured at GE Healthcare's Waukesha facility since 2005 were sold on the international market.[196]  GE Healthcare (Waukesha) manufactured one of GE's flagship CT scanner offerings, the GE Lightspeed CT Scanner, as well as a component of GE Healthcare CT machines, known as the Performix tube.  In a 2010 brochure issued by GE

---

[192] *See* Steve Jagler, *Jagler:  GE's Wold Sees the Future of Health Care Today*, Milwaukee J. Sentinel (Mar. 11, 2017).  On information and belief, GE's Wisconsin workforce was as large, if not larger, from 2003-2013.

[193] Thomas Content, *GE Healthcare to Move Global Headquarters from United Kingdom to Chicago*, Milwaukee J. Sentinel (Jan. 11, 2016).

[194] *Id.*

[195] *See* Guy Boulton, *GE Healthcare's Waukesha Business Units at the Forefront of 'Big Iron'*, Milwaukee J. Sentinel (Sept. 20, 2014).

[196] *See id.* ("About six years ago, revenue for the business that sells CT and PET scanners was more or less evenly split between the U.S. and international markets.  Now the business generates more than 75% of its revenue from international sales.").

Healthcare (Waukesha), GE touted its Waukesha-manufactured and/or -assembled Performix tubes as an essential component of GE Healthcare's value proposition in the CT market.[197]

230.    GE Healthcare's Madison, Wisconsin location also served as the global hub for GE Healthcare's respiratory offerings, including ventilation and breathing technologies.

231.    GE Healthcare relied heavily on cross-functional teams managed out of its U.S. headquarters to facilitate global sales and distribution.  For example, one GE Healthcare employee based in Wisconsin wrote that s/he acted to "[s]upport global cross-functional teams" for GE-manufactured products and that s/he worked with both GE suppliers and manufacturers to "resolve issues observed throughout the breadth of the supply chain."

232.    GE Healthcare's communications with the FDA confirm that its U.S.-based facilities played a key role in GE's medical-device sales in Iraq.  GE Healthcare periodically has issued recall notices to the FDA, and, on several occasions, those notices have represented that GE Healthcare USA Holding LLC or GE Medical sold the affected products in Iraq (among other countries).  Examples of those recall notices that include Iraq are:

---

[197] *See* GE Healthcare, *Performix*[TM] *Tubes:  The Value of Performance* at 2 (2010) ("Nothing builds reliability like experience.  We've manufactured more than 25,000 Performix tubes, and our reliability has been proven time and time again – in the design lab and in the exam room.  Performix tube development has come from more than 13 years of collaboration between GE Healthcare service engineering, manufacturing, and design engineering teams. Our tube manufacturing processes leverage our knowledge of GE Healthcare systems to eliminate potential failure points and ensure quality and dependability."), http://www3.gehealthcare.com.sg/~/media/Downloads/asean/ Services/Equipment%20Services/GEHealthcare-Brochure_Performix.pdf?Parent=%7B2E0FBFDD-B334-4829- 8DE0-BC40C6477BAC%7D.

| Date GE Initiated Recall | Recalling GE Entity | GE Device | Recall Number |
|---|---|---|---|
| March 6, 2006 | GE Healthcare, LLC[198] 3000 N Grandview Blvd, Waukesha, WI 53188 | Solid State X-Ray Imager | Z-0896-06 |
| March 6, 2006 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | Solid State X-Ray Imager | Z-0898-06 |
| June 24, 2008 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | Flouroscopic X-Ray System | Z-2356-2008 |
| February 27, 2009 | GE Medical Systems Information Technology 9900 Innovation Dr. Wauwatosa WI 53226 | Detector and alarm, arrhythmia | Z-1232-2009 |
| July 13, 2012 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | GEHC Voluson E6, E8 Expert, E10 Diagnostic Ultrasound System | Z-1833-2013 |
| March 9, 2015 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | Multiple GEHC MRI Systems | Z-1305-2015 |
| December 23, 2015 | GE Medical Systems, LLC 3000 N Grandview Blvd, Waukesha, WI 53188-1615 | GEMS Brivo XR285amx Mobile Digital Ready Radiographic System | Z-0769-2016 |
| November 3, 2016 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | GEHC Avance, Avance CS2, Amigo (Gas Machines / Anesthesia) | Z-0755-2017 |

233.    GE Healthcare has asserted that it derives substantial competitive advantages in

the international marketplace from its operations throughout Wisconsin, including, but not

---

[198] GE Healthcare, LLC, though listed in these FDA recall notices, does not appear to be the name of an actual corporate entity.  On information and belief, GE Healthcare, LLC is GE's shorthand for Defendant GE Healthcare USA Holding LLC.

limited to:  (i) a high-morale work force in a high quality-of-life location (Milwaukee's suburbs) that promotes employee productivity and retention; (ii) a highly educated work force, including more than 2,800 engineering degrees held by its Wisconsin employees; (iii) proximity to, and strategic partnerships with, the University of Wisconsin (Madison), through which GE Healthcare has developed pioneering radiology technologies for the global healthcare marketplace; (iv) "[t]he strength of the manufacturing sector in Wisconsin," which GE markets as "impressive";[199] and (v) Wisconsin's proximity to key international shipping hubs.

234.   GE Healthcare also followed an integrated global strategy in its imaging (CT, MRI, and PET) business.  In 2008, the President of GE Healthcare's Middle Eastern and African Growth Markets stated that GE Healthcare "look[ed] beyond traditional country and region borders to leverage synergies among international markets."[200]  That required U.S. facilities to be involved in the tender process, including the negotiation of pricing terms.  As one GE Healthcare sales manager located in Wisconsin wrote, from 2007-2010, s/he "[p]rovided gate keeper / deal approver for all discounts and contract terms that exceeded limits set for individual sales reps and regional managers."  Similarly, multiple high-level GE Healthcare compliance and auditor personnel were located in Wisconsin, with responsibility for reviewing contract terms and assuring (among other things) FCPA compliance.

235.   GE Healthcare has used its U.S. managers, personnel, and facilities to solicit prospective customers at MOH.  On at least one occasion in 2004, GE Healthcare paid for a senior Iraqi MOH official to travel to Wisconsin, had senior U.S.-based GE Healthcare staff

---

[199] GE Healthcare, *GE Healthcare – Growing the Economy in Madison, WI*, Fact Sheet No. 14-000161, at 2 (2012), http://www3.gehealthcare.com/~/media/documents/us-global/news%20center/gehc-press-release_ge-healthcare-growing-wisconsins-economy_2012.pdf?Parent=%7B37B9EC8D-1F42-44EB-83C9-454DD572C2BF%7D.

[200] *GE Healthcare Combines Eastern, African Market Regions; Appoints President*, HealthImaging.Com (Jan. 28, 2008).

provide that official a personal sales pitch, and gave the official a tour of a GE Healthcare facility in Waukesha.

236.    GE Healthcare's corrupt transactions with MOH (alleged above) involved sales of medical devices manufactured largely in the United States.  On information and belief, consistent with Kimadia's standard practice, GE certified to MOH during the registration and contract-negotiation process that its devices were made in the United States and that it was sourcing the devices sold to MOH from the United States.

237.    On information and belief, as a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured devices, GE had to procure letters from the U.S. Commerce Department and the FDA confirming that the devices were manufactured in the United States and had been approved for sale in the United States.  *See supra* ¶¶ 149, 152.

238.    On information and belief, GE also consummated the above transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 121-124.

**C.      The J&J Defendants**

239.    Defendant Johnson & Johnson is the publicly traded parent company that owns (directly or indirectly) the other J&J Defendants transacting business in Iraq after Jaysh al-Mahdi's takeover of MOH.  Johnson & Johnson oversaw and supervised the scheme by which J&J subsidiaries made corrupt payments to Jaysh al-Mahdi in Iraq.  *See infra* ¶¶ 267-268.  The J&J *supplier* Defendants – companies that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – are J&J Middle East (for devices) and Cilag GmbH International and Janssen Pharmaceutica N.V. (for drugs) (together, "Janssen-Cilag").  The J&J *manufacturer* Defendants – companies that manufactured goods used to bribe Jaysh al-Mahdi agents – are

Ethicon, Inc. and Ethicon Endo-Surgery, LLC (for devices) (together, "Ethicon"), and Janssen

Ortho LLC and Ortho Biologics LLC (for drugs).

> 1.     **J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Medical Devices in Iraq**

240.    J&J Middle East entered into corrupt transactions with the Jaysh al-Mahdi-

controlled MOH in connection with the sale of medical devices from 2004-2013.  Those corrupt

transactions involved contracts negotiated by J&J Middle East and included devices

manufactured in the United States by Ethicon.  Plaintiffs set forth below examples of those

device transactions.  These examples are not exhaustive and are based on the information that

Plaintiffs have been able to uncover without access to Defendants' files; Plaintiffs believe that

discovery will reveal additional examples of corrupt payments.  *See supra* ¶ 183.

| Contract Year | Supplier | Manufacturer | Confirmed Contract | Total Sale Price | FOC % |
|---|---|---|---|---|---|
| 2010 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2009/401/B | $8.28 million | 30% |
| 2010 | J&J Middle East | Ethicon, Inc. | 92/2010/477/2 | $647,000 | 1 box per suture type[201] |
| 2011 | J&J Middle East | Ethicon Endo-Surgery, LLC | 87/2011/83/O | $1.79 million | 6,200 units |
| 2011 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2009/400 | $1.45 million | 10% |
| 2012 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2011/83/N/1 | $649,000 | 30% |

The column headers in this chart have the following meaning:

- Contract Year:  The year that J&J Middle East executed the contract with Kimadia.

---

[201] A Kimadia award announcement relating to a 2010 tender (92/2010/477/2) memorializes the "free goods" bribe as "1 box of Sutures FOC" per "each type of suture ordered."

- Supplier:  The J&J company that executed the sales contract with Kimadia and that held itself out as the company with authority to sell the devices in Iraq.
- Manufacturer:  The J&J company that manufactured at least some of the devices that MOH purchased from the supplier.  Many of these device contracts governed the purchase of multiple types of medical devices (and therefore may involve multiple manufacturers):  for example, Contract No. 87/2009/400 memorialized the purchase of 31 different medical devices, some of which were manufactured in the United States by Defendant Ethicon Endo-Surgery, LLC, and some others of which were manufactured by Cordis Europa NV.
- Confirmed Contract:  The unique contract-number identifier that Kimadia assigned to the sales contract at issue.
- Total Sale Price:  The total amount that Kimadia paid for the devices being sold.
- FOC %:  The size of the "free goods" bribe – measured against the underlying quantity of goods being sold – that the supplier and manufacturer paid on the contract.

241.   These corrupt payments covered a variety of devices, including catheters, sutures, and arterial sheaths.  Unlike drug contracts – which tend to cover one drug per contract – device contracts often cover multiple types of devices.  On each of these examples, the FOC percentage listed in the chart applied generally to every device covered by the contract.  As with drugs, there was a thriving black market in the region for such goods:  Iraqis often had to purchase such goods at elevated prices from private pharmacies run by Jaysh al-Mahdi.

242.   On information and belief, from 2004-2013, J&J regularly made similar corrupt payments on comparable device sales.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing the corrupt payments above; (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given device from year to year; and (c) Ethicon-manufactured and -branded sutures and other medical devices were used heavily in Iraq in 2005 and earlier.  Ethicon was a dominant player in the Iraqi medical-device space under Saddam and afterwards, and Ethicon-branded devices appeared frequently in MOH inventory when the Sadrists began taking control in late 2004.

243.     J&J Middle East made those corrupt payments acting as agent for (among other affiliates) Ethicon Endo-Surgery, LLC and Ethicon, Inc.  As a condition of selling devices in Iraq manufactured by either J&J manufacturer Defendant, J&J Middle East had to certify to MOH that the manufacturer had authorized J&J Middle East to sell its devices.  J&J Middle East also had to certify it was selling goods on behalf of those manufacturers and that the devices being supplied had been manufactured by those manufacturers.

244.     Ethicon Endo-Surgery, LLC and Ethicon, Inc. also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing devices that they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming J&J Middle East's authority to negotiate and execute corrupt contracts on their behalf.

245.     J&J's corrupt transactions delivered significant monetary value to Jaysh al-Mahdi. Using just the four examples above (excluding contract 92/2010/477/2), the "free goods" delivered by J&J had a value of more than $3 million.  Assuming that J&J's corrupt payments in other years carried a similar value, it likely delivered more than $10 million worth of corrupt payments to Jaysh al-Mahdi agents between 2004-2013.

246.     On information and belief, J&J secured some or all of these and other device contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* ¶¶ 139-157.

### 2.     J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Pharmaceuticals in Iraq

247.     J&J also made corrupt payments in connection with pharmaceutical contracts with MOH.  From 2005 through the present, Kimadia awarded Janssen-Cilag at least 38 contracts

relating to more than a dozen different drugs. During this time, Janssen-Cilag sold U.S.-manufactured drugs to MOH including but not limited to: Eprex (API made in Manatí, Puerto Rico); Topamax (API made in Gurabo, Puerto Rico); Leustatin (API made in Manatí, Puerto Rico); and Remicade (API made in Malvern, Pennsylvania).[202] On information and belief, J&J secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%. *See supra* ¶¶ 139-157. Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex – from 2004-2008 – Kimadia awarded at least 13 drug contracts to J&J.

248.    From 2004-2013, J&J paid a wide variety of "free goods" bribes on drug contracts to the Jaysh al-Mahdi-controlled MOH. Examples, which Plaintiffs have uncovered without discovery of Defendants' files and which are merely illustrative, *see supra* ¶ 183, include:

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Eprex 2000 (08-C00-003) | Janssen-Cilag[203] | Ortho Biologics LLC | 04-15-2007 | 40/2005/303 | 20% |
| Eprex 4000 (08-C00-004) | Janssen-Cilag | Ortho Biologics LLC | 04-15-2007 | 40/2007/505 | 5% |
| Remicade (10-AC0-009) | Janssen-Cilag | Janssen Biotech, Inc.[204] | 02-28-2005 | TBD | 15% |
| Topamax (04-J00-044) | Janssen-Cilag | Janssen Ortho LLC | On or before 2006 | 40/2006/482 | Off-the-Books Payoff[205] |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 184).

[202] Merck controlled the license for Remicade in Iraq prior to April 2011, when control transferred to J&J. On information and belief, J&J began attempting to sell Remicade to Kimadia shortly thereafter, winning its first Remicade contract in or about December 2011.

[203] J&J appears to have transacted with MOH through both Cilag GmbH International and Janssen Pharmaceutica N.V., sometimes with respect to overlapping drugs. Plaintiffs therefore have noted the supplier entity as Janssen-Cilag, just as the SEC and the DOJ did in prior FCPA proceedings against J&J. *See, e.g., J&J FCPA* Compl. ¶ 55 (pleading supplier entity as "Janssen-Cilag," which referred to Janssen and Cilag collectively).

[204] For sales contracts executed before June 2011, the J&J supplier company was named Centocor Ortho Biotech Inc. In June 2011, Centocor Ortho Biotech Inc. was renamed Janssen Biotech, Inc.

[205] *See infra* ¶ 255 (describing Topamax payoff); *supra* ¶ 133 (describing Off-the-Books Payoff scheme).

249.    On information and belief, Janssen-Cilag made corrupt payments for each drug on an annual basis – similar to the percentages listed on the chart – beginning the year after the drug was placed on the formulary and continuing through the present.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" payment that Janssen-Cilag made in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year.  Based on that policy, if a company paid a "free goods" bribe of X% in one year, it likely also paid a similar percentage on sales of the same drug in other years beginning when the supplier first started selling that drug in Iraq.  Janssen-Cilag made those corrupt payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.

250.    Janssen-Cilag made those corrupt payments acting as agent for (among other affiliates) the J&J drug manufacturer Defendants.  As a condition of selling drugs in Iraq manufactured by the J&J drug manufacturer Defendants, Janssen-Cilag had to certify to MOH that those manufacturers had authorized it to sell their drugs.  Janssen-Cilag also had to certify that it was selling drugs on behalf of those manufacturers and that they had manufactured the drugs being supplied.

251.    The J&J drug manufacturer Defendants also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing drugs they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming Janssen-Cilag's authority to negotiate and execute corrupt contracts on their behalf.

252.    Eprex illustrates how J&J's corrupt transactions worked.  Eprex is an integrated medical system that uses both a medicine (J&J's international branded version of erythropoietin, a chemical compound that treats anemia) and a device (a syringe fitted with a sophisticated needle guard).  Since at least 2002, J&J has owned a license to manufacture and sell Eprex outside of the United States.  Eprex (together with its branded counterpart in the United States, Procrit) has generated billions of dollars in worldwide revenue for J&J, accounting for at least $1.9 billion in annual revenues each year from 2005-2010.

253.    While the Sadrists controlled the Iraqi Health Ministry, Janssen-Cilag routinely made large (between 5% and 20%, depending on the dosage) "free goods" payments of Eprex to win lucrative tenders from Kimadia.  Thus, for every 100 units of Eprex sold by J&J in Iraq, it often provided an extra 20, for free, that Jaysh al-Mahdi could divert to the black market to fund its terrorist activities.  In addition, Janssen-Cilag also used free Eprex as a cash equivalent to make Off-the-Books Payoffs on several occasions to resolve disputes concerning other drugs, which were memorialized in a Kimadia document as "compensation in the form of material."

254.    J&J's Eprex-related bribes to Jaysh al-Mahdi necessarily involved the provision of free medical devices in addition to free drugs.  J&J's "pre-filled syringes [of Eprex] are fitted with the PROTECS™ needle guard device to help prevent needle stick injuries after use."[206]  On information and belief, J&J included such devices in its Eprex packs to make it easier for J&J to sell Eprex.  J&J's provision of free medical devices as part of its free Eprex packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize Eprex on the black market.

255.    As another example, J&J provided free units of its blockbuster anti-epilepsy and anti-migraine drug Topamax to facilitate at least one Off-the-Books Payoff to corrupt MOH

---

[206] EPREX® PREFILLED SYRINGES Consumer Medicine Information at 3 (Mar. 2017), http://www.janssen.com/newzealand/sites/www_janssen_com_newzealand/files/prod_files/live/eprex.pdf (last accessed Sept. 21, 2017).

officials.  On at least one occasion, as a Kimadia document memorialized, the Sadrists approved

"compensation in the form of supplies" from Janssen-Cilag in response to an earlier request for

"monetary compensation."[207]  The free Topamax functioned as a cash equivalent to buy off

MOH officials in connection with an unrelated dispute, and the Topamax was provided outside

of the normal contracting process (and thus did not involve the typical use of a FOC Clause).

256.    J&J's corrupt transactions delivered substantial value to Jaysh al-Mahdi.  Eprex,

Topamax, and Remicade were three of J&J's most important drugs during the period in question

and, on information and belief, were a marketing priority for J&J in emerging markets.

Moreover, these drugs treat chronic conditions – anemia for Eprex, epilepsy for Topamax, and

rheumatoid arthritis for Remicade – and such drugs were among the easiest to monetize on the

black market.  The dollar value of those corrupt payments was high:  for example, J&J provided

more than one Off-the-Books Payoff in the form of free Eprex in 2006-2007, and, based on 2014

tender prices per pack, the value of those free goods was more than $10 million.  In total, given

the size of J&J's business in Iraq, the frequency of its contracts, and the particular drugs that it

sold, J&J's corrupt transactions (including "commissions" and "free goods") likely delivered at

least several million dollars per year in total value to Jaysh al-Mahdi.

### 3.     J&J's Corrupt Payments to Jaysh al-Mahdi Comport with Its Historical Sales Practices in International Markets

257.    J&J has admitted to bribing Iraqi officials during the Oil-for-Food scandal.

According to J&J, Kimadia demanded that humanitarian-goods suppliers "pay a kickback,

usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a

contract by the government."[208]  Janssen-Cilag admittedly paid at least $857,387 in such

---

[207] Translated from Arabic.

[208] *J&J DPA* ¶ 5.

kickbacks to corrupt Ba'athist officials to obtain 18 contracts for the sale of pharmaceuticals to Kimadia between December 2000 and March 2003.[209]

258.     J&J made those corrupt ASSF payments to Kimadia through J&J Agent 1, its Lebanon-based sales agent.[210]  On or about October 24, 2000, J&J Agent 1 wrote J&J and explained that "Kimadia is asking companies to pay them a 16 to 18% commission on each invoice.  This subject will be discussed during your visit to Baghdad."[211]  In response, in November 2000, Janssen-Cilag's Area Director with responsibility for J&J sales in Iraq instructed J&J Agent 1 to "sign[ ] a document stating that he would not pay commissions to Kimadia."[212]  As J&J later admitted, however, that response letter was a mirage.[213]  In reality, J&J Agent 1 proceeded to pay Kimadia its standard 10% kickbacks on Janssen-Cilag's behalf, and Janssen-Cilag reimbursed J&J Agent 1 by raising his agent fee.  Those corrupt payments were then misrepresented in J&J's books and records as sales "commissions."[214]

259.     On information and belief, from at least June 1998 through approximately February 2006, Janssen-Cilag made sales in Iraq through J&J Agent 1.  Although Janssen-Cilag's contract with J&J Agent 1 described him as a "consultant," J&J has admitted that he actually functioned as J&J's agent who acted on J&J's behalf in paying kickbacks to Kimadia under Oil-for-Food.[215]  On information and belief, J&J Agent 1 served as Janssen-Cilag's Iraqi

---

[209] *Id.* ¶ 102.

[210] *See id.* ¶ 104.

[211] *Id.* ¶ 105.

[212] *Id.* ¶ 106.

[213] *See id.* ¶¶ 105-106.

[214] *Id.* ¶ 118.

[215] *See id.* ¶¶ 27, 102-106.

sales agent until approximately February 2006, when the SEC uncovered J&J's kickbacks and prompted J&J to terminate his contract.[216]

260.    Under Oil-for-Food, Cilag also paid sizeable kickbacks on Eprex contracts. According to the *Volcker Report*, Cilag paid a total of $509,092 in kickbacks on six Oil-for-Food contracts worth roughly $5.6 million, and, on information and belief, Eprex accounted for a significant portion of the goods covered by those contracts.[217]  When asked by the Volcker Commission in 2005 for a response to the Commission's conclusion that Cilag had paid those kickbacks, Cilag denied the charges.[218]  Six years later, in pleading guilty to an FCPA violation, Cilag reversed course and admitted that the allegations were true.[219]

261.    J&J's admitted criminal bribery during Oil-for-Food did not prompt it to terminate its relationship with its key distributor.  On information and belief, Mersaco, a Lebanon-based distributor that held itself out as Janssen-Cilag's agent in the Middle East & North Africa ("MENA") region, was responsible for overseeing J&J Agent 1's day-to-day activities in Iraq on behalf of Janssen-Cilag during Oil-for-Food and afterwards.  On information and belief, Mersaco was involved in the preparation of the phony November 2000 letter discussed above that concealed J&J's bribes to Kimadia.

262.    Further, the Mersaco employee who exercised day-to-day responsibility for representing Janssen-Cilag in Iraq ("J&J Agent 2") handed out a business card in 2003 depicting him/herself as the "Regional Sales & Marketing Manager" for "Janssen-Cilag" and providing a J&J email address.  Moreover, according to one witness who met with J&J Agent 2 at an in-person meeting in Amman in 2003, J&J Agent 2 represented J&J in procuring tainted contracts

---

[216] *See J&J FCPA* Compl. ¶ 58.

[217] *See Volcker Report*, Table 7, at 44.

[218] *See id.* at 190 (Cilag Company Response).

[219] *See J&J DPA* ¶¶ 102-112.

under Oil-for-Food.  On information and belief, J&J Agent 2 thereafter remained a key player responsible for Janssen-Cilag's sales in Iraq – nominally working for Mersaco, but in reality taking direction from J&J managers and acting on J&J's behalf – when Jaysh al-Mahdi controlled MOH and during which time J&J paid numerous "free goods" bribes.

263.    Under Saddam, J&J sold medical devices in Iraq through J&J Agent 3.  J&J Agent 3 technically worked for Al-Misk Co. for Commercial Agencies ("Al-Misk"), but in reality s/he represented J&J and followed J&J's directions:  J&J Agent 3's business card had a description as a "Product Specialist" for "Johnson & Johnson Inc.," and J&J Agent 3 presented him/herself as J&J's agent for medical devices in several meetings at MOH in Baghdad.  J&J Agent 3 was also involved in facilitating the payment of bribes on J&J's behalf under Oil-for-Food.  On information and belief, J&J Agent 3 continued to represent J&J for medical-device sales made in Iraq after Oil-for-Food, when Jaysh al-Mahdi controlled MOH.

264.    On information and belief, Al-Misk appears to be the same as (or substantially related to) an Al-Misk entity that was one of the worst offenders out of the thousands of companies that paid kickbacks under Oil-for-Food.  The Volcker Commission determined that a Jordanian entity called "Misk For Int'l Marketing And Supply" paid $1,663,467 in ASSF bribes to MOH officials to secure 17 contracts from 2000-2003.[220]  Al-Misk did so regarding many categories of products corresponding to J&J goods sold in Iraq.[221]

265.    During Oil-for-Food and afterwards, Ethicon transacted business with MOH through a Jordanian distributor named Al-Wafi Group for Marketing & International Trade Co. ("Al-Wafi").  Al-Wafi has served as Ethicon's agent in Iraq during all or nearly all of the time period spanning from Oil-for-Food to the present.  Al-Wafi, like Al-Misk, was one of the most

---

[220] *Volcker Report*, Table 7, at 111.

[221] *See id.*

corrupt companies in the Oil-for-Food scandal.  The Volcker Commission determined that

Al-Wafi paid $1,780,051 in ASSF bribes during Oil-for-Food to secure 10 contracts from 2000-

2003.[222]  Also like Al-Misk, some of Al-Wafi's bribes were to secure contracts for "Surgical

Supplies," a category that included Ethicon products.[223]

266.    J&J's more recent conduct further demonstrates its longstanding pattern and

practice of making corrupt payments in Iraq.  In 2011, J&J settled Oil-for-Food FCPA

allegations and represented it had put in place a global compliance program to prevent future

corrupt payments in Iraq.  Despite those representations, J&J paid (among other bribes) a 20%

free-goods bribe on Remicade in 2015 and a 20% free-goods bribe on Eprex in 2014.

### 4.    J&J's Corrupt Transactions Had a Substantial Nexus to the United States

267.    J&J's operations in the Middle East were overseen in part by senior managers

residing in the United States.  Defendant Johnson & Johnson maintained global anti-bribery and

anti-corruption policies applicable throughout the J&J corporate hierarchy, which were

promulgated by its global headquarters in New Jersey.  One policy document was entitled

International Health Care Business Integrity Guide and was drafted by the U.S.-based

"Worldwide Office" of J&J's Office of Health Care Compliance & Privacy and the J&J Law

Department.  The November 2009 version of the document distinguished discounts from bribery:

in contrast to the policy's general prohibition of bribery, it provided that "discounts may be

granted when permitted by local laws and regulations and [when] in compliance with applicable

antitrust laws."  And, although the policy stated that J&J "generally may not provide free goods"

to healthcare providers, it authorized the delivery of "free goods" in certain circumstances:  "a

---

[222] *See id.* at 15.

[223] *See id.*

'free' product under a 'buy one, get one' arrangement is not considered to be free for purposes of the Guide, but instead is a form of discount."

268.    On January 14, 2011, Johnson & Johnson entered into a Deferred Prosecution Agreement with the DOJ in which it paid $70 million to resolve admitted allegations that J&J paid unlawful kickbacks in several countries, including Iraq.  Johnson & Johnson admitted it was "responsible for the acts of its officers, employees and agents, and wholly-owned subsidiaries and operating companies" in paying those kickbacks.[224]  Johnson & Johnson also represented that it had "conducted an extensive, global review of all of its operations to determine if there were problems elsewhere and has reported on any areas of concerns to the Department and the SEC."[225]  On information and belief, Johnson & Johnson's review of its Iraq-related subsidiaries' anti-corruption practices began around February 2006, when it received an SEC subpoena seeking information about its Oil-for-Food practices.[226]

269.    J&J made corrupt payments to Jaysh al-Mahdi members through American companies.  Its corrupt medical-device contracts were executed by J&J Middle East, a New Jersey company.  Many also required the direct involvement of U.S.-based Ethicon manufacturers.  From 2005 through the present, Ethicon manufactured most of its medical devices at plants located in Puerto Rico and Cornelia, Georgia.  J&J considered both plants to be significant to its global supply chain.  As of 2012, the Cornelia plant, which has operated since 1947, produced the majority of the world's supply of surgical sutures.

---

[224] *J&J DPA* § 2(b).

[225] *Id.* § 4(k)(ii).

[226] *See* Johnson & Johnson Form 10-Q at 24 (May 10, 2006).

270.    For sales of Ethicon sutures and arterial sheaths – as well as other surgical

devices, which were manufactured by Cordis Europa NV – J&J suppliers certified in the

contracting documents that J&J manufactured the goods in the United States.

271.    The U.S. nexus extended equally to J&J's pharmaceutical contracts.  Like the

other Defendants, J&J relied on a globally integrated manufacturing and distribution chain.  For

example, since 1988, J&J has manufactured the API for Eprex (20% FOC bribes) exclusively at

Ortho Biologics LLC's facility in Manatí, Puerto Rico – even though the manufacturer entity

appearing on some of J&J's Eprex contracts with Kimadia was Cilag AG (a J&J subsidiary

headquartered in Switzerland).  J&J filled and packed Eprex syringes – *i.e.*, it placed the

medicine manufactured in Puerto Rico into syringes, and then packed those syringes for sale – at

a Swiss facility run by Cilag.  However, the more difficult and hard-to-replicate part of the

process – the API manufacturing – occurred at the Ortho Biologics LLC plant, and, on

information and belief, Cilag had to certify to Kimadia in the contracting documents that Cilag

sourced Eprex's active ingredient from Puerto Rico.

272.    Senior J&J managers at its key production facilities in Puerto Rico, on both the

device side and the pharmaceuticals side, took part in cross-functional teams with colleagues

overseas.  For example, one J&J manager in Puerto Rico with decades of experience in both

device and drug manufacturing touted that s/he led "cross-functional," "cross-company," and

"international" "teams while at Johnson & Johnson" in support of J&J's manufacturing and sales

efforts concerning Eprex, Remicade, Leustatin, and other drugs.

273.    Topamax similarly illustrates J&J's use of its U.S. contacts to make corrupt

payments to Jaysh al-Mahdi.  J&J (through Janssen Ortho LLC) manufactures Topamax's API

primarily at its facility in Gurabo, Puerto Rico.  Janssen-Cilag used free batches of Topamax –

which it sourced from Puerto Rico – as a means of buying off corrupt Sadrist officials at MOH to resolve various disputes with MOH.

274.     On information and belief, as a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured goods, J&J had to procure letters from the U.S. Commerce Department and the FDA confirming that the goods were manufactured in the United States and had been approved for sale in the United States.  *See supra* ¶¶ 149, 152.

275.     On information and belief, J&J consummated the above transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 122-124.

###      D.      The Pfizer Defendants

####           1.      Pfizer Made Corrupt Payments to Jaysh al-Mahdi Members

276.     The Pfizer *supplier* Defendants – companies that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – are Defendants Pfizer Inc.; Wyeth Pharmaceuticals Inc. (a former Wyeth subsidiary responsible for certain legacy Wyeth drugs); and Pfizer Enterprises SARL.  The Pfizer *manufacturer* Defendants – companies that manufactured drugs used to bribe Jaysh al-Mahdi agents – are Pfizer Pharmaceuticals LLC and Pharmacia & Upjohn Company, LLC.

277.     Two of the Pfizer supplier Defendants registered to do business with MOH in mid-2006, after Jaysh al-Mahdi had cemented its control over the Ministry.  Wyeth Pharmaceutical Inc. registered with MOH on March 2, 2006, and Pfizer Inc. registered with MOH on September 28, 2006.  Defendant Pfizer Pharmaceuticals LLC registered (or

re-registered)[227] on August 20, 2009, and another Puerto Rico-based legacy-Wyeth manufacturer, Wyeth-Ayerst Lederle, Inc., registered (or re-registered) on October 30, 2008.  On each occasion, the registering company submitted registration documents in person to the MOH Technical Department.  On information and belief, obtaining these registrations involved corrupt payments to Jaysh al-Mahdi agents inside MOH.  *See supra* ¶¶ 144-147.

278.    From 2005 through the present, Kimadia awarded Pfizer at least 71 contracts relating to various Pfizer drugs.  During this time, Pfizer sold many U.S.-manufactured drugs to MOH including, but not limited to:  BeneFix (API made in Andover, Massachusetts); Depo-Provera (API made in Kalamazoo, Michigan); Neurontin (API made in Vega Baja, Puerto Rico); Campto (API made in Kalamazoo, Michigan); Prostin (API made in Kalamazoo, Michigan); and Solu-Medrol (API made in Kalamazoo, Michigan).  On information and belief, Pfizer secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* ¶¶ 139-157.  Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 17 drug contracts to Pfizer.

279.    From 2004-2013, Pfizer made corrupt payments to Jaysh al-Mahdi agents.  Plaintiffs set forth below examples of Pfizer's corrupt transactions (which discovery will supplement, *see supra* ¶ 183), on a drug-by-drug basis:

---

[227] MOH regulations provide that a registration is effective for five years, which requires companies to re-register with the Ministry every five years.  On information and belief, the registrations above were *re-registrations*, and the manufacturers were actually registered as early as 2003 and 2004.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| BeneFix 250 (08-H00-004) | Wyeth Pharmaceuticals Inc.[228] | Wyeth Farma, S.A.[229] | 5-29-2005 | 40/2006/287 | 10% |
| BeneFix 500 (08-H00-005) | Wyeth Pharmaceuticals Inc. | Wyeth Farma, S.A. | 5-29-2005 | 40/2006/683 | 10% |
| Campto (15-E00-002) | Pfizer Inc.[230] | Pfizer (Perth) Pty Limited | 7-25-2005 | TBD | 60% |
| Depo-Provera (06-F00-017) | Pfizer Enterprises SARL | Pharmacia & Upjohn Company, LLC | 2005 or earlier | 40/2005/402 | 20% |
| Neurontin (04-J00-053) | Pfizer Inc. | Pfizer Pharmaceuticals LLC | 2006 or earlier | 40/2006/428 | 50% |
| Solu-Medrol (15-AF0-020) | Pfizer Enterprises SARL | Pfizer Manufacturing Belgium N.V. | 2011 or earlier | 40/2011/446 | 10% |
| Xyntha (08-H00-008) | Wyeth Pharmaceuticals Inc. / Pfizer Enterprises SARL | Wyeth Farma, S.A. | 5-29-2005 | 40/2006/683 | 5% |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 184).

280.    On information and belief, the applicable Pfizer Defendants made corrupt payments in connection with their contracts for each drug on an annual basis – similar to the percentages listed on the chart – beginning the year after the drug was placed on the formulary

[228] On information and belief, Wyeth Pharmaceuticals Inc. acted as the supplier for BeneFix until after Pfizer's acquisition of Wyeth in 2009.  In 2010, Pfizer Gulf FZ-LLC, a Pfizer subsidiary based in Dubai, began acting as the supplier.  Similarly, on information and belief, Wyeth Pharmaceuticals Inc. acted as the supplier for Xyntha until 2010, when Pfizer Enterprises SARL took over the role.

[229] Pfizer identified Wyeth Farma, S.A. (a Spanish entity) as the manufacturer on at least some BeneFix contracts, possibly because Pfizer filled BeneFix into syringes and packaged the drugs for sale in Spain.  But Pfizer manufactured the API in the United States and certified to Kimadia that it was doing so.  Here (and for the other Defendants as well), where Plaintiffs have obtained reliable information from Kimadia's records depicting the manufacturer as listed on the contracts, Plaintiffs list that manufacturer in the chart.  But where Kimadia records do not reliably identify a manufacturing entity, Plaintiffs list the entity that appears to have manufactured the active pharmaceutical ingredient of the drug in question.

[230] For the drugs on this chart for which "Pfizer Inc." is listed as the supplier, the supplying company that appears in published MOH award tables is "Pfizer (USA)."  On information and belief, those entries appear to refer to Pfizer Inc., which registered as a corporate entity doing business with Kimadia on September 28, 2006, and which is a U.S.-based legacy-Pfizer company that acted as a supplier vis-à-vis MOH.

and continuing through the present.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" payment that Pfizer made in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year.  Based on that historical practice, if a company paid "free goods" of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq.  Pfizer made those corrupt payments by using FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.

281.    Pfizer also used U.S.-manufactured drugs to make Off-the-Books Payoffs to Jaysh al-Mahdi agents.  For example, a Kimadia document memorialized Wyeth Pharmaceuticals Inc.'s provision in 2006 or 2007 of 10,000 units of BeneFix 500 IU to Kimadia without any associated Contract or Order Number.  Because such Off-the-Books Payoffs were not associated with any ordinary-course contract, they were especially easy for Jaysh al-Mahdi to divert for sale on the black market to finance terrorist activities.

282.    The Pfizer supplier Defendants made corrupt payments acting as agent for (among other affiliates) the Pfizer manufacturer Defendants.  As a condition of selling Pfizer-manufactured goods in Iraq, the Pfizer supplier Defendants had to certify to MOH that the Pfizer manufacturers had authorized them to sell their goods in Iraq.  The Pfizer suppliers also had to certify they were selling devices on behalf of those manufacturers and that those devices were manufactured by each identified Pfizer manufacturer.

283.    The Pfizer manufacturer Defendants actively participated in the corrupt transactions with Jaysh al-Mahdi, including by:  (a) manufacturing drugs that they knew or recklessly disregarded were being used by their affiliates to bribe Jaysh al-Mahdi agents;

(b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and

(c) submitting paperwork to MOH confirming the Pfizer supplier Defendants' authority to

negotiate and execute corrupt contracts on their behalf.

284.    BeneFix illustrates how Pfizer's corrupt transactions worked.  BeneFix is an

integrated system containing both medicine and devices designed to treat hemophilia, and it

historically generated more than $600 million annually in worldwide revenues for Pfizer and

Wyeth.  BeneFix was placed on the Iraqi formulary on May 29, 2005, and Wyeth's corrupt

BeneFix transactions began around that time.  Wyeth's, and later Pfizer's, corrupt transactions

relating to its BeneFix contracts delivered substantial monetary value to Jaysh al-Mahdi agents.

Given BeneFix's sales price to MOH of more than $350 per pack, and that Pfizer generally sold

more than 10,000 units of BeneFix per year to MOH, Pfizer's "free goods" bribes on BeneFix

alone likely provided Jaysh al-Mahdi with millions of dollars in value.  For example, Pfizer's

2006-2007 Off-the-Books Payoff of 10,000 BeneFix packs was (based on the 2010 tender price

of $373 per pack) worth roughly $3.7 million.

285.    Pfizer's BeneFix-related bribes to Jaysh al-Mahdi involved the provision of free

medical devices in addition to free medicines.  With respect to the medicines aspect, BeneFix

consisted of recombinant coagulation Factor IX, a biotech drug.  With respect to the devices

aspect, the European Medicines Agency has determined that each BeneFix pack contained at

least six different medical devices or supplies in addition to the medicine itself.[231]  On

information and belief, Pfizer included such devices in its BeneFix packs to make it easier to sell

BeneFix.  Pfizer's provision of free medical devices as part of the free BeneFix packs thus

enhanced Jaysh al-Mahdi's ability to efficiently monetize BeneFix on the black market.

---

[231] European Medicines Agency, *BeneFix Annex I:  Summary of Product Characteristics* at 32, http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/ 000139/WC500020390.pdf.

286.    On information and belief, given the size of Pfizer's business in Iraq, the

frequency of its contracts, and the particular drugs that it sold, Pfizer's corrupt payments

(including "commissions" and "free goods") delivered several million dollars per year in total

value to Jaysh al-Mahdi.

### 2.    Pfizer's Corrupt Transactions with MOH Comport with Its Historical Sales Practices in International Markets

287.    The Pfizer Defendants have a history of making corrupt payments – including

through the delivery of "free goods" – to grow demand for their products.  In the August 2012

Deferred Prosecution Agreement identified above (*supra* ¶ 138), for example, Pfizer admitted

that it had paid in-kind kickbacks and had tried to conceal them as mere "discounts."  More

generally, Pfizer admitted that, "for the purpose of improperly influencing foreign officials in

connection with regulatory and formulary approvals, purchase decisions, prescription decisions,

and customs clearance," Pfizer entities had "made and authorized the making of payments of

cash and the provision of other things of value both directly and through third parties."[232]  For

example, Pfizer admitted to a "bonuses" scheme in Croatia "to corruptly influence the . . .

inclusion of pharmaceutical products in tenders or on formulary lists."[233]  This scheme involved

Pfizer's provision of "equipment, free pharmaceutical products, as well as cash payments."[234]

288.    Wyeth likewise has a history of corrupt international payments.  According to the

SEC, between 2005 and 2010, subsidiaries of Wyeth LLC paid improper bribes and kickbacks in

several international markets – including Saudi Arabia, Pakistan, Indonesia, and China.[235]  At

least some of those bribes took the form of in-kind payments much like the "free goods" at issue

---

[232] *Pfizer DPA* ¶ 16.

[233] *Id.* ¶ 26.

[234] *Id.* ¶ 27.

[235] Compl. ¶ 2, *SEC v. Wyeth LLC*, No. 12-cv-01304, ECF No. 1 (D.D.C. filed Aug. 7, 2012).

here:  in Wyeth's Indonesian operations, for example, employees paid kickbacks to doctors in the form of free "Wyeth nutritional products."[236]  The SEC also alleged that Wyeth subsidiaries in the above markets paid a litany of other bribes to foreign health officials, including the provision of "cash payments, . . . BlackBerrys, cell phones," "travel [bribes and payments for] office equipment and renovations."[237]  On information and belief, Pfizer Inc. became aware of those bribes close in time to its acquisition of Wyeth, LLC in October 2009.

289.    A 2013 presentation by a former Wyeth executive who served as Wyeth's Managing Director for the Middle East & North Africa region from 2004-2009 further suggests that Wyeth understood how "free goods" provided to Middle Eastern government customers were a form of corrupt payment.  In the presentation, the former Wyeth Managing Director acknowledged that "[m]ost [p]hysicians [in the Middle East] are somehow affiliated with the government" and that the practice of providing such doctors with "[e]xcessive bonus goods" was one of the "Prevailing Compliance Challenges" for doing business in the Middle East.

290.    Pfizer's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq.  Pfizer continued to make corrupt payments to Kimadia officials in connection with U.S.-drug contracts in the five years since Pfizer settled its FCPA allegations in 2012, at which point it purported to have a global compliance program that would prevent such behavior in the future.[238]  Among other such corrupt payments, Pfizer provided a "free goods" bribe on Xyntha in 2017 (27,666 units FOC); a 14% "free goods" bribe on BeneFix in 2016; a 60% "free goods" bribe on Campto in 2016; and a 10% "free goods" bribe on Solu-Medrol in 2014.

---

[236] *Id.* ¶ 16.

[237] *Id.* ¶¶ 16, 20.

[238] *Pfizer DPA* ¶ 4.

3.     **Pfizer's Corrupt Transactions Had a Substantial Nexus with the United States**

291.     Pfizer employs a centralized, top-down business model that consolidates significant control over global operations in its New York headquarters.  That model dates to an orchestrated plan of consolidation that Pfizer executed in the late 1990s.  As recounted in a Pfizer yearbook distributed to its employees on the company's 150th anniversary (with a cover letter from Pfizer's then-CEO), Pfizer decided in the 1990s that "unifying" domestic and international sales would serve "the best interests of the company."[239]  Thus, at the end of 1996, Pfizer "initiated a major reorganization . . . calculated to abolish whatever remained of the wall between domestic and international operations."[240]  Pfizer has since espoused the virtues of its top-down model by using phrases such as a "'One Pfizer' strategy,"[241] "obliterat[ing] vertical hierarchies,"[242] and "frequently crossing organizational and geographic boundaries"[243] to describe its global operations.

292.     At all relevant times, Pfizer's anti-corruption policies were designed and implemented by the Legal and Compliance Groups in New York.  Pfizer's senior executives also have inserted themselves into international corruption issues.  A former Pfizer CEO, who served from 2001-2006, claimed to have personally intervened with foreign heads of state to address alleged product-diversion issues.  He wrote, "I tell [heads of state] that if we start a program and

---

[239] Jeffrey L. Rodgengen, *The Legend of Pfizer* at 137, Ft. Lauderdale, FL: Write Stuff Syndicate, Inc. (1999).

[240] *Id.*

[241] Paul Thomas, *Pfizer Moving from Centralized to Holistic Supply Chain Security*, Pharm. Mfg. (Feb. 14, 2012).

[242] John Simons, *King of the Pill:  Pfizer Is the Biggest Drug Company Ever. Can It Become the Best?*, Fortune (Apr. 14, 2003).

[243] Pfizer Inc., *The Blue Book:  Summary of Pfizer Policies on Business Conduct* 23 (2003), http://www.pfizer.com/files/investors/corporate/blue_book_english_international_2017.pdf.

that program is failing because of diversion of product by corrupt officials for their own profit, I will shut the program down and I will tell the world specifically why I shut it down."[244]

293.     Global sales and portfolio management functions for Pfizer brands – including brands sold in the Middle East – were likewise directed by senior marketing personnel located in New York.  For example, an Executive Director at Wyeth Pharmaceuticals and later Pfizer from 2007-2011 explained that s/he had a "Global Strategy" role and was "[r]esponsible for all global brand management strategic activities" for BeneFix (10% FOC bribes) and Xyntha (5% FOC bribes).  Another Pfizer employee similarly wrote that, in Pfizer's Established Products Division, "Global Brand Directors" at Pfizer's New York headquarters were responsible for the "Anti-Fungal portfolio (Vfend, Ecalta/Eraxis and Diflucan) in the Global Established Products Division," and so directed "global strategies and tactics" as part of "cross functional teams including manufacturing, supply, portfolio management, medical, regulatory and regional colleagues."  Another Pfizer Inc. manager located in New York likewise wrote that, from New York, s/he "[a]ctively partnered with in-country Pfizer Marketing and Sales leaders realizing local business objectives" in an array of emerging markets, including the Middle East.  On information and belief, Pfizer had such cross-functional teams for the other drugs identified in this Complaint, indicating that U.S.-based personnel were involved in formulating Pfizer's sales strategies for the corrupt transactions that funded Jaysh al-Mahdi in Iraq.

294.     Pfizer Inc. also centralized control over its "corporate responsibility" divisions, which included programs for "donated products" in emerging markets.  For example, one New York-based Pfizer manager wrote that, from 1998-2009, s/he "[l]ed operations, contracting, communications, monitoring and evaluation and related policy development of Pfizer's

---

[244] Hank McKinnell, *A Call to Action:  Taking Back Healthcare for Future Generations* 167-68 (McGraw-Hill 2005).

international health programs," which involved "large cross-divisional regulatory (global compliance, dossier registration, API testing, packaging test) and program development teams" focused on moving donated product to needy countries.  The employee also worked out of New York "with manufacturing and supply chain divisions to ensure concurrent interactions testing, dossier development and regulatory submissions to emerging markets and developing countries."

295.    Pfizer operated an interconnected, global manufacturing and supply network that facilitated the worldwide distribution of Pfizer drugs.  The business unit responsible for distribution is known as Pfizer Global Supply (previously called Pfizer Global Manufacturing), whose nerve center was Pfizer's manufacturing facility in Kalamazoo, Michigan.  In 2011, Pfizer claimed that facility was the largest drug-manufacturing plant in the world.[245]  From 2003-2008, Pfizer invested roughly $600 million in the Kalamazoo facility to give it the ability to manufacture the API for drugs distributed all over the world.[246]  According to Pfizer's VP for Established Products in 2008, the Kalamazoo plant was critical to Pfizer's global operations not only due to its unique technical infrastructure, but also because "there's a long tradition of manufacturing here in Kalamazoo and here on the Kalamazoo site, so manufacturing these hard-to-make products is something we've learned over the years and become very good at."[247]

296.    As Pfizer's head of Global Tender & Contracting Lead for Established Products explained in 2015, Pfizer's approach to international tenders "requires liaison and close coordination with many different functions" throughout the Pfizer corporate hierarchy, including manufacturing (to confirm capacity and cost), finance, pricing, and marketing; "[t]o be able to

---

[245] *See* Pfizer in Kalamazoo County 2011, YouTube.com, https://www.youtube.com/watch?v=vrZNRkw-BGI (at 2:05).

[246] *See* CBS Radio Interview at Pfizer, YouTube.com, https://www.youtube.com/watch?v=zhYtEAeafMk (at 0:28).

[247] *Id.* (at 4:03).

manage this, [Pfizer] created [a] cross-functional process that involves people from a wide range of areas."[248]  Given Pfizer's centralized structure, the coordination of those various functions likely required the involvement of senior management in New York.  A Pfizer Inc. manager for Emerging Markets and Transition Sites wrote that, while based out of New York in 2007, s/he "[t]ravel[led] extensively in the Asia/Africa/Middle East and South America region with Senior Pfizer Leadership providing financial leadership and council [sic] and conducting operations reviews and operating plan strategy sessions."

297.    Iraqi records indicate that "Pfizer Inc." – the New York-based Pfizer parent company – acted as the supplier on several corrupt drug contracts executed with Kimadia.  *See supra* ¶ 279 & n.230.  Those records comport with how Pfizer structured its integrated supply network, with centralized oversight by the global headquarters in New York.

298.    Many of Pfizer's corrupt payments involved U.S.-based manufacturers or facilities.  For example, Pfizer relied on its Kalamazoo site to facilitate sales of Depo-Provera (20% FOC bribes) in Iraq.  Pfizer manufactured Depo-Provera at its Kalamazoo facility, and it used the Kalamazoo facility as part of its global distribution network to sell Depo-Provera in markets around the world.  Kalamazoo-based personnel were involved not only in manufacturing Depo-Provera's API, but also in arranging sales of Depo-Provera (among other drugs) in international markets.  MOH records thus identify the U.S.-based Pharmacia & Upjohn Company as Depo-Provera's manufacturer, and, consistent with Kimadia's standard practice, Pfizer certified to MOH that it was sourcing Depo-Provera from the United States.

299.    Pfizer also relied on its U.S. presence in facilitating Iraq sales of Neurontin, its anti-convulsant drug on which it paid 50% FOC bribes.  Pfizer developed Neurontin at its facility

---

[248] Suzanne Elvidge, *Making Tenders Work Globally:  The Pfizer Approach*, Eye for Pharma (Jan. 28, 2015).

in Ann Arbor, Michigan, and a Pfizer press release touted Neurontin as the "continuing fruits of Michigan's historic support of innovation."[249]  As for the physical manufacture of Neurontin's API, Pfizer used its facility in Vega Baja, Puerto Rico.  As with the other Defendants that relied heavily on Puerto Rico to manufacture drugs for global distribution, Pfizer sourced Neurontin from Puerto Rico facilities because of Puerto Rico's unique location, status as a U.S. territory, and valuable tax incentives.

300.    Pfizer (and Wyeth before it) likewise used U.S.-based personnel to oversee global marketing and brand-management activities for BeneFix (10% FOC bribes).  Wyeth developed BeneFix at its facility in Andover, Massachusetts, where it also manufactured BeneFix's API.  Wyeth used its U.S. facilities, primarily Andover, to oversee BeneFix's global distribution, including by creating a corporate roadmap in 2004 contemplating the "central planning of the entire supply chain."[250]  When Pfizer acquired Wyeth in 2009, it continued Wyeth's practice of manufacturing BeneFix in Andover.  Pfizer has called Andover "a crucial part of our global footprint for both clinical and commercial manufacturing."[251]  Today, Pfizer describes the Andover facility as a "vital cog in both Pfizer's WRD and Pfizer's Global Supply network."[252]

301.    Consistent with MOH's standard requirements, Pfizer guaranteed MOH that it manufactured BeneFix at its Andover facility.  For example, in 2010, Pfizer executed a contract with Kimadia for the sale of 18,002 packs of BeneFix.  The manufacturing entity was listed as

---

[249] Press Release, Pfizer Inc., *Pfizer Inc. Opens $250 Million Technical Development Facility, Latest Investment in Development of New Medicines at Growing Ann Arbor Research Campus* (June 24, 2002), http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=27494.

[250] Allen Jacques (Senior Director, Network Planning for Wyeth Biopharma), *Supply Chain Cycle Time Reduction*, Biopharm Int'l, Vol. 17 Issue 10 (Oct. 1, 2004), http://www.biopharminternational.com/supply-chain-cycle-time-reduction.

[251] Press Release, Pfizer Inc., *Pfizer Breaks Ground on New Biologics Clinical Manufacturing Facility in Andover, Massachusetts* (June 16, 2016), http://www.pfizer.com/news/press-release/press-release-detail/pfizer_breaks_ground_on_new_biologics_clinical_manufacturing_facility_in_andover_massachusetts.

[252] Pfizer Inc., *Andover, Massachusetts Site Statistics*, http://www.pfizer.com/science/research-development/centers/ma_andover (last accessed Sept. 22, 2017).

Wyeth Farma S.A., a Pfizer Inc. subsidiary headquartered in Spain (which performed the drug formulation but not the API manufacturing).  In Section 29 of that contract, the Pfizer supplier "guarantee[d] that raw materials used for manufacturing" – *i.e.*, BeneFix's API – "will be prepared in the country of origin (Andover, USA)."[253]  Pfizer made similar guarantees with respect to the other U.S.-manufactured drugs it sold to MOH.

302.    On information and belief, as a condition of fulfilling its corrupt contracts with Kimadia for U.S.-manufactured drugs and devices, the Pfizer suppliers had to procure letters from the U.S. Commerce Department and the FDA confirming that the drugs were manufactured in the United States and had been approved for sale in the United States.  *See supra* ¶¶ 149, 152.

303.    On information and belief, Pfizer also consummated the above transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 122-124.

E.    **The Roche Defendants**

1.    **Roche Made Corrupt Payments to Jaysh al-Mahdi Members**

304.    The Roche *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is F. Hoffmann-La Roche Ltd.  The Roche *manufacturer* Defendants – companies that manufactured drugs used to bribe Jaysh al-Mahdi agents – are Genentech, Inc. and Hoffmann-La Roche Inc.

305.    From 2005 through the present, Kimadia awarded Roche at least 44 contracts for the sale of Roche drugs and devices.  During this time, Roche sold U.S.-manufactured drugs and devices to MOH including, but not limited to:  Herceptin (API made in Vacaville, California); Pegasys (API made in Florence, South Carolina); Rituxan/MabThera (API made in Vacaville, California); Xeloda (API made in Nutley, New Jersey, and Florence, South Carolina); and

---

[253] Translated from Arabic.

Avastin (API made in Vacaville, California).  On information and belief, Roche secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commission" of at least 20%.  *See supra* ¶¶ 139-157.  Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 18 drug and/or device contracts to Roche.

306.    From 2004-2013, Roche delivered "free goods" to Jaysh al-Mahdi agents in connection with the sale of some of its most lucrative drugs and devices.  Those corrupt payments concerned contracts negotiated by F. Hoffmann-La Roche Ltd. and involved drugs sourced from several U.S.-based Roche facilities.  Examples, which Plaintiffs have uncovered without discovery of Defendants' files and are merely illustrative, *see supra* ¶ 183, include:

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Avastin 100mg (15-AF0-043) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. / Roche Diagnostics GmbH[254] | 6-11-2006 | TBD | 20% |
| Avastin 400mg (15-AF0-044) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. / Roche Diagnostics GmbH | 6-11-2006 | TBD | 20% |
| Herceptin 440mg (15-AF0-036) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. | 2007 or earlier | 40/2007/137 | 15% |
| MabThera (15-B00-036) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. | 2004 or earlier | 40/2004/899 | 10% |
| Pegasys (15-B00-055) | F. Hoffmann-La Roche Ltd. | Roche Carolina Inc. | 9-11-2005 | 40/2006/359 | 15% |
| Xeloda (15-AG0-038) | F. Hoffmann-La Roche Ltd. | Hoffmann-La Roche Inc. | 2006 or earlier | 40/2006/45 | 10% |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 184).

307.    On information and belief, Roche made those corrupt payments on an annual basis – in percentages similar to the ones listed on the chart – beginning the year after the drug was placed on the formulary and continuing through the present.  That allegation is based on the

---

[254] On information and belief, Genentech, Inc. manufactured the API for Avastin, while Roche Diagnostics GmbH performed the drug formulation.

facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" bribe that Roche paid in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year. Based on that policy, if a company paid "free goods" of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq.  Roche made those payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.

308.    F. Hoffmann-La Roche Ltd. made corrupt payments acting as agent for (among other affiliates) the Roche manufacturer Defendants.  As a condition of selling drugs in Iraq manufactured by those companies, F. Hoffmann-La Roche Ltd. had to certify to MOH that it was authorized to sell those manufacturers' drugs.  It also had to certify that it was selling drugs on behalf of those manufacturers and that they had actually manufactured the drugs being supplied.

309.    The Roche manufacturer Defendants actively participated in making corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing drugs that they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming F. Hoffmann-La Roche Ltd.'s authority to negotiate and execute corrupt contracts on their behalf.

310.    Herceptin illustrates how Roche's corrupt transactions worked.  Herceptin is a blockbuster breast-cancer drug that, between 2006 and 2010, generated at least $2.7 billion per year in worldwide revenue.  Beginning in 2007 or earlier, Roche generally paid "free goods" percentages of 15% on Herceptin contracts obtained from Kimadia.  Those payments delivered significant monetary value to MOH.  Herceptin is extremely expensive:  for a single patient in

2012, "Herceptin's price tag [was] $4,500 a month, or $54,000 a year."[255]  Accordingly, even a comparatively small "free goods" percentage of Herceptin was likely worth at least $100,000.

311.    Roche's corrupt payments relating to sales of its chronic-hepatitis drug Pegasys (15% FOC bribes) involved medical devices as well as drugs.  Such devices, on information and belief, included needles and/or Genentech's Pegasys ProClick™ Autoinjector, which is a "medical device[ ], namely, [an] injector filled with a pharmaceutical."[256]  On information and belief, Roche included such devices in its Pegasys packs to make it easier to sell.  Roche's provision of free medical devices as part of the free Pegasys packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize Pegasys on the black market.

312.    On information and belief, given the size of Roche's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, Roche's total corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 2.    Roche's Corrupt Transactions with Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets

313.    Roche participated in Oil-for-Food via Roche Agent 1, an employee of Omnitrade.  As the Volcker Commission found, F. Hoffmann-La Roche Ltd. paid at least $296,225 in kickbacks to procure 16 Oil-for-Food contracts from 2000-2003 worth more than $3.5 million.[257]  The Volcker Commission's findings reveal that Roche won the second-largest number of Oil-for-Food contracts (16) among the large Western pharmaceutical companies –

---

[255] Tracy Staton, *FDA Approves Roche's Pricey New Herceptin Partner, Perjeta*, Fierce Pharma (June 11, 2012).

[256] U.S. Patent & Trademark Office, *Trademark Electronic Search System (TESS)* (Genentech trademark for Pegasys ProClick™ Autoinjector), http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:v4jgoj.2.1.

[257] *See Volcker Report*, Table 7, at 63.

trailing only Janssen-Cilag (with 19).[258]  On information and belief, despite that documented evidence of corruption, Roche continued to use Roche Agent 1 (and Omnitrade) to transact with the Sadrist-controlled MOH from late 2004 and onwards.

314.    Roche Diagnostics GmbH, which is listed as a manufacturer on some of Roche's Avastin contracts, has a similar history of making corrupt payments in Iraq.  As the Volcker Commission found, Roche Diagnostics GmbH paid at least $184,618 in kickbacks to procure one Oil-for-Food contract worth roughly $2 million.[259]  Roche Diagnostics Manager 1 was formerly the head of Roche Diagnostics for Iran and the Levant Territory (on information and belief including Iraq, Syria, Lebanon, and Jordan), and had a business card with an identification as a "Managing Director" at Roche's "Regional Office."  In that capacity, Roche Diagnostics Manager 1 was responsible for Roche Diagnostics' kickbacks to corrupt MOH officials during Oil-for-Food.  One witness who personally met Roche Diagnostics Manager 1 in Amman in 2003 understood that Roche Diagnostics Manager 1 had paid bribes on behalf of Roche during Oil-for-Food.  Nevertheless, Roche Diagnostics Manager 1 was promoted, rather than fired, after Oil-for-Food, and continued to represent Roche vis-à-vis MOH during the years when Jaysh al-Mahdi controlled MOH.

315.    Roche's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq.  Among other corrupt payments during the past five years, Roche paid a 12% free-goods bribe on Herceptin in 2017; a 15% free-goods bribe on Pegasys in 2014; a 10% free-goods bribe on Rituxan/MabThera in 2014; a 20% free-goods bribe on Avastin in 2014; and a 10% free-goods bribe on Tarceva in 2014.

---

[258] *See id.* at 44, 63, 89.

[259] *See id.* at 140.

### 3. Roche's Corrupt Transactions with MOH Had a Substantial Nexus to the United States

316.    Roche, like the other Defendants, employed a globally integrated distribution model that relied heavily on its U.S. manufacturing capabilities to source and distribute product worldwide.  Genentech, Inc. played a pivotal role in those global distribution capabilities.  When Roche fully acquired Genentech, Inc. in 2009, it took steps to preserve the unique Genentech culture and brand, moving Roche's U.S. headquarters from Nutley, New Jersey, to Genentech's main offices in South San Francisco.  Genentech also maintained its corporate documents – including regulatory, marketing, and sales materials for Genentech drugs – at its headquarters in South San Francisco.

317.    The Nutley facility was shuttered in 2012.  Until its closure, the Nutley facility played a key role in Roche's global distribution capabilities, including with respect to sales of Xeloda, a lucrative chemotherapy drug on which Roche paid 10% "free goods" bribes to the Jaysh al-Mahdi-controlled Ministry.

318.    During the time that Roche's American headquarters were in New Jersey, Roche located key global compliance personnel there, with special responsibility for U.S.-manufactured drugs.  For example, one Compliance Specialist at the New Jersey office wrote that, from 2003-2005, s/he was involved in compliance efforts with respect to "inspections from global regulatory agencies" and "trained [a] global audience on compliant management system" for Roche's products.

319.    From 2005-2009, Roche's top-three selling drugs worldwide – cancer medicines Herceptin, Avastin, and Rituxan (branded in Iraq as MabThera) – were all developed in the United States and manufactured by Genentech in its Vacaville, California facility.  The Vacaville plant manufactured the API for those blockbuster drugs, which Roche then sent to other facilities

127

in Oregon or Switzerland for "packaging in vials or syringes."[260]  As Genentech's VP for

Manufacturing Operations stated, "We're always looking to develop solutions for unmet medical

needs – the tough stuff that no one else is doing.  That's why our pharmaceuticals are in such

demand.  Our Vacaville operations are a major part of this ongoing process."[261]  Roche built the

Vacaville facility specifically to meet the unique manufacturing challenges posed by

Genentech's complex biologic drugs like Herceptin.

320.     As a biotech drug, Herceptin (15% FOC bribes) required a complex research and

manufacturing process.  Since 1998, Genentech, Inc. has manufactured Herceptin's API

exclusively at its facility in Vacaville, California.  In 2000, Genentech, Inc. called its Vacaville

plant the "world's largest biotechnology manufacturing plant for the large-scale production of

pharmaceutical proteins."[262]  According to industry reports, the Vacaville facility played a

"major part" of Roche's global distribution chain, "producing more than half of Roche's global

output of biologic direct substance products."[263]  After the Vacaville facility manufactured the

active ingredient, the substances were frozen and then packaged into vials or syringes at Roche

facilities in Hillsboro, Oregon, or near Basel, Switzerland.

321.     In 1998, Roche and Genentech, Inc. (which was at all times majority-owned by

Roche) agreed to a licensing arrangement under which Roche attained the exclusive marketing

authority to sell Herceptin around the world.  Roche then attained the ability to sell Herceptin

directly upon completing its 2009 acquisition of Genentech, Inc.  Roche negotiated and executed

---

[260] *Genentech Details Big Vacaville Expansion*, North Bay Bus. J. (Nov. 4, 2013), http://www.northbay businessjournal.com/csp/mediapool/sites/NBBJ/IndustryNews/story.csp?cid=4184162&sid=778&fid=181.

[261] *Id.*

[262] Press Release, Genentech, *Genentech's Vacaville Facility Granted FDA Licensure* (Apr. 25, 2000), https://www.gene.com/media/press-releases/4611/2000-04-25/genentechs-vacaville-facility-granted-fd.

[263] *Genentech Details Big Vacaville Expansion*, North Bay Bus. J. (Nov. 4, 2013), http://www.northbay businessjournal.com/csp/mediapool/sites/NBBJ/IndustryNews/story.csp?cid=4184162&sid=778&fid=181.

its Herceptin sales contracts in Iraq through F. Hoffmann-La Roche Ltd., which obtained those contracts by paying 15% "free goods" bribes in the form of drugs sourced from the United States.  Consistent with Kimadia's standard practice, F. Hoffmann-La Roche Ltd. identified Genentech, Inc. as Herceptin's manufacturer in the contracting documents, and it assured Kimadia that it would source Herceptin from the United States.

322.    Throughout the relevant period, Roche also relied on its manufacturing facilities in Florence, South Carolina, as a key cog in its global distribution network.  Whereas the Vacaville facility focused on Roche's blockbuster biotech cancer drugs, the Florence facility (managed by Roche Carolina Inc.) focused on Roche's blockbuster chemical drugs and devices.  According to the European Medicines Agency, the Florence facility was the primary manufacturing site for six key Roche drugs or devices, including Pegasys.[264]

323.    Since 2002, Roche has manufactured Pegasys (15% FOC bribes) predominantly at its Florence facility.  Roche built that facility using tax credits and technical training programs funded by the City of Florence and the State of South Carolina.  Roche selected the Florence facility as a key site to manufacture Pegasys's API "because of a robust infrastructure already in place" at the facility.[265]

324.    On information and belief, as a condition of fulfilling its corrupt contracts with Kimadia for U.S.-manufactured drugs, F. Hoffmann-La Roche Ltd. had to procure letters from the U.S. Commerce Department and the FDA confirming that the drugs were manufactured in the United States and had been approved for sale in the United States.  *See supra* ¶¶ 149, 152.

---

[264] European Medicines Agency, Committee for Medicinal Products for Human Use, EMA/568026/2012, at 3 (Sept. 28, 2012).

[265] Kable Intelligence Ltd., *Roche Bulk Active Ingredient Manufacturing Facility, Florence, SC*, http://www.pharmaceutical-technology.com/projects/rochecarolina/ (last accessed July 18, 2017).

325.     On information and belief, Roche consummated its transactions with Kimadia through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 122-124.

## VI.     JAYSH AL-MAHDI, WITH SUBSTANTIAL SUPPORT FROM LEBANESE HEZBOLLAH, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS

### A.     Beginning In 2003, Jaysh al-Mahdi Conducted A Campaign Of Terror Against Americans In Iraq

326.     Muqtada al-Sadr founded Jaysh al-Mahdi in April 2003 with the assistance of Imad Mugniyeh, the chief terrorist mind of Hezbollah.  From the beginning, Jaysh al-Mahdi's publicly stated, primary goal was the expulsion of Americans from Iraq.  In July 2003, Sadr publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to fight the American and British occupiers."[266]  In a later sermon delivered by an aide on August 6, 2004, Sadr called America "the greatest of Satans" and proclaimed:  "America is our enemy and the enemy of the people, and we will not accept its partnership."[267]

327.     Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization.  As Dr. David E. Johnson, a former Army Colonel who studied Jaysh al-Mahdi's tactics, explained, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated."[268]  The most prominent Jaysh al-Mahdi "Special Group" was known as Asa'ib Ahl al-Haq or "AAH."

---

[266] Mahan Abedin, *Dossier:  The Sadrist Movement*, Middle East Intell. Bull. (July 2003), https://www.meforum.org/meib/articles/0307_iraqd.htm.

[267] Abdul Hussein al-Obeidi, *Rebel Shiite Cleric Blames 'Occupier' for Church Attacks, Kidnappings in Iraq*, Assoc. Press (Aug. 6, 2004).

[268] David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*"), https://www.rand.org/content/dam/rand/pubs/research_reports/RR100/RR160/ RAND_RR160.pdf.

328.    Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure.  As two counterterrorism scholars explained in June 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses."[269]  Formally separate Jaysh al-Mahdi cells also shared membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.[270]

329.    Jaysh al-Mahdi cells were also unified ideologically by radical Shi'a ideology, devotion to Sadr, and violent opposition to American presence in Iraq.  According to an unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen to MAS," because "[t]here is no one who can replace MAS."[271]  A March 2008 U.S. State Department cable (as published by *WikiLeaks*) similarly reported that Jaysh al-Mahdi's various elements "are different faces of the same group controlled by a single hand, who assigns each a role."[272]  And a U.S. military-intelligence officer told the *Washington Post* in May 2008 that Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."[273]

330.    Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging Jaysh al-Mahdi in a conventional military manner, especially in urban settings.  For example,

---

[269] Daveed Gartenstein-Ross & Bill Roggio, *Sadr's Special Groups*, The Weekly Standard (June 9, 2008), http://www.weeklystandard.com/sadrs-special-groups/article/16297.

[270] *See, e.g.*, *2008 Battle of Sadr City* at 25-26.

[271] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 010, at 1 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-010-Summary.pdf.

[272] U.S. State Dep't Cable, *PM Chief Of Staff Abdallah Tells Ambassador GOI Will Continue Basra Military Operations* (Mar. 31, 2008), https://wikileaks.org/plusd/cables/08BAGHDAD990_a.html.

[273] Amit R. Paley, *U.S. Deploys a Purpose-Driven Distinction*, Wash. Post (May 21, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/05/20/AR2008052001716.html.

when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared underground and hid among civilians while continuing to attack American forces.  Jaysh al-Mahdi's cellular structure also provided each Jaysh al-Mahdi cell with the tactical agility to adapt to rapidly changing conditions.  For example, individual Jaysh al-Mahdi cells were able to react to passing American convoys by setting up roadside bombs quickly without explicitly seeking permission to do so, safe in the knowledge that they had been given broad authorization to carry out such strikes against any Americans in Iraq.

331.    From 2003-2007, Jaysh al-Mahdi expanded from a fledgling group concentrated in Shi'a areas to a terrorist army with a significant presence throughout Iraq.  What began as a small group of 300 fighters in April 2003 had grown to a terrorist organization of between 6,000 and 10,000 fighters by June 2004 and boasted at least 60,000 fighters by January 2007.  Jaysh al-Mahdi operated throughout Iraq, with regional command centers in Kirkuk, Diyala, Baghdad, Wasit, Hillah, Karbala, Amarah, Basra, Diwaniyah, and Nasiriyah.  Jaysh al-Mahdi maintained an especially strong presence in the Al Rashid, Karkh, and Kadamiyah Districts of western Baghdad, all of eastern Baghdad (including the areas in and around Sadr City and Rustamiyah), Baqubah, Hillah, Najaf, Basra, and Wasit (though its power extended well beyond those areas).

332.    Jaysh al-Mahdi fighters used a variety of tactics and weaponry against Americans in Iraq.  Distinctive weapons and tactics used by Jaysh al-Mahdi included the following:

333.    **IEDs.**  Improvised explosive devices ("IEDs") are homemade bombs that are often used as booby traps by terrorist organizations.  Frequently, IEDs are set up as roadside bombs that terrorists can detonate when a vehicle passes by.  According to a 2013 *New York Times* report, at times IEDs have caused as many as 80% of Coalition casualties in Iraq.[274]  IEDs

---

[274] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.

were a signature weapon of Jaysh al-Mahdi. Baghdad, the location of Jaysh al-Mahdi's Sadr City headquarters, experienced more than 1,500 IED attacks between January 2007 and June 2008. In raids within Sadr City in 2008, Coalition forces discovered numerous weapons caches containing IEDs and bomb-making materials. One specific IED technique reportedly used by Jaysh al-Mahdi involved "daisy-chains" of multiple 122mm or 155mm artillery shells.

334. **EFPs.** Explosively formed penetrators ("EFPs") are an advanced type of IED with a specially shaped explosive charge designed to penetrate tank armor, which is impervious to more traditional weapons. According to a 2013 *New York Times* report, EFPs were the "single most lethal weapon American forces faced in Iraq."[275] According to one declassified CENTCOM study, there were at least 1,534 EFP detonations in Iraq between July 2005 and December 2011, resulting in at least 196 Americans killed in action and at least 861 Americans wounded in action.[276]

335. The manufacture of EFPs required advanced machinery and copper not widely available in Iraq, as well as advanced engineering know-how. In October 2008, Iraqi forces discovered an EFP factory inside Sadr City, demonstrating that Jaysh al-Mahdi had the technological capability to produce these deadly devices. Iraqi forces also discovered several caches of EFPs within Sadr City.

336. **Mortars.** A mortar is an artillery-like weapon that fires explosives at short ranges. Jaysh al-Mahdi frequently used mortars against Americans in Iraq. Between January 2007 and June 2008, there were more than 1,500 mortar attacks in Baghdad alone. In raids

---

[275] *Id.*

[276] *See* U.S. Army Central Command, "OIF EFP Detonations by Month," https://admin.govexec.com/media/gbc/docs/pdfs_edit/enclosure_tab_a_document_for_review_%28150813_oif_efp_pull_no_summary%29_%281%29.pdf.

within the Jaysh al-Mahdi stronghold of Sadr City in October 2008, Iraqi forces discovered numerous weapons caches containing mortars.

337.   **RPGs.**   Jaysh al-Mahdi used rocket-propelled grenades ("RPGs") against Coalition forces on numerous occasions.  In one such attack in May 2007, Jaysh al-Mahdi fighters killed 12 people and wounded another 75.  Iraqi forces discovered numerous weapons caches containing RPGs in raids within Sadr City in October 2008.

338.   **Rockets.**   Jaysh al-Mahdi fired a variety of rockets at Coalition targets on numerous occasions.  For example, Jaysh al-Mahdi operatives used Misagh-1 surface-to-air missiles to destroy at least one American helicopter.  In March 2008, Jaysh al-Mahdi operatives within Sadr City launched coordinated rocket attacks on the International Zone (also known as the "Green Zone") in southeast Baghdad, several miles away.  The rockets fired by Jaysh al-Mahdi included 107mm rockets, 122mm rockets, and man-portable air-defense systems.[277]  The purpose of those attacks was to terrorize the civilian residents of the Green Zone – including American political and civilian personnel.  These attacks prompted Coalition forces to enter Sadr City, where Jaysh al-Mahdi had set up ambushes and traps for them.[278]  Officials estimated that the ensuing violence – called the Battle of Sadr City – killed 925 people and injured 2,605.[279]

339.   **Complex Attacks.**   Jaysh al-Mahdi militants frequently carried out so-called "complex attacks" against American peacekeeping forces.  Complex attacks involve multiple teams of terrorists using different weapons and tactics in concert.  In March 2008 for example, a Jaysh al-Mahdi operative explained to journalists that, to attack a vehicle, one group of Jaysh al-

---

[277] *See 2008 Battle of Sadr City* at 38, 41, 57.

[278] *See id.* at 19-24, 59-60; *see also* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

[279] *See 2008 Battle of Sadr City* at 98.

Mahdi militants would attack it with a barrage of small arms fire to distract the soldiers while another group of Jaysh al-Mahdi militants planted an IED underneath the vehicle.[280]  In another attack type that several Plaintiffs personally witnessed, Jaysh al-Mahdi detonated EFPs and followed up by immediately attacking the disoriented victims with small-arms fire.

### B.      Jaysh al-Mahdi Was A Terrorist Enterprise

340.      Jaysh al-Mahdi was not a military force; rather, as the Pentagon's press service recognized, it acted as "the Jaysh al-Mahdi terrorist organization."[281]  General George Casey, who served as Commanding General of the Multi-National Force in Iraq from 2004-2007, described Jaysh al-Mahdi in a 2006 U.S. State Department cable (as published by *WikiLeaks*) as "[t]errorists and killers murdering innocent people."[282]  Members of both parties in Congress have also publicly recognized Jaysh al-Mahdi as a terrorist organization.[283]

341.      Jaysh al-Mahdi's campaign of terror against Americans differed from conventional military conflicts in important ways:

- Unlike a conventional military force, Jaysh al-Mahdi was supported and directed by an international terrorist organization, Hezbollah, whose aim was not to claim or defend territory but to inflict mass casualties on Americans in Iraq and around the world.  *See infra* Part VI.C.

- Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror did not take place during a declared war:  Coalition forces ousted Saddam Hussein in April 2003 and remained in Iraq only to help the country rebuild its government.

- Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror was not limited by geography or time.  Although this lawsuit focuses on violence within Iraq, Jaysh al-Mahdi fighters have fought with Hezbollah in Lebanon as

---

[280] *See* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

[281] American Forces Press Service, *Forces Arrest Terrorism Suspects in Iraq* (Nov. 13, 2009), http://archive.defense.gov/news/newsarticle.aspx?id=56680.

[282] U.S. State Dep't Cable, *MCNS Discusses Militia Death Squads, Recent Military Operations* (Mar. 25, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD981_a.html.

[283] *See* 152 Cong. Rec. H8581 (daily ed. Nov. 13, 2006) (statement of Rep. Ted Poe); 153 Cong. Rec. S1670 (daily ed. Feb. 7, 2007) (statement of Sen. Frank Lautenberg).

well.[284]  Similarly, although this lawsuit focuses on violence from 2005-2009, Jaysh al-Mahdi's campaign of terror against Americans in Iraq has continued indefinitely.  In July 2016, Sadr announced that his militias would once again target U.S. forces after the battle against ISIS is over.  As Sadr described his goal in a May 2015 speech:  "If America persists then it will cease to exist."[285]

342.    As a terrorist organization, Jaysh al-Mahdi routinely violated the laws of war.

Jaysh al-Mahdi fighters regularly used mosques, schools, hospitals, and government buildings

for cover.  For example, they attacked from mosques in their initial assault on American and

Coalition forces in April 2004 in Najaf, and again in Baghdad in 2007 and 2008 after the "surge"

of U.S. forces.  In August 2004, Sadr was accused of committing a war crime by using a holy

site, the Shrine of Imam Ali, as his combat headquarters.  Jaysh al-Mahdi also used children to

attack Coalition forces and attempted – for propaganda purposes – to provoke Americans to kill

Iraqi children.  Jaysh al-Mahdi further put out a bounty on the lives of U.S. medics, and Jaysh al-

Mahdi fighters specifically targeted medics during ambushes and other firefights.  Jaysh al-

Mahdi members have also massacred thousands of civilians in Iraq.

343.    Jaysh al-Mahdi also combined war crimes with street crimes, engaging in ethnic-

cleansing massacres of Sunnis at roadside checkpoints and in neighborhood sweeps; fighters also

stole victims' property, including cars and homes.  In May 2008, Iraqis in Baghdad accused

Jaysh al-Mahdi members of robbery, kidnapping for ransom, rape, and murder.

344.    Notwithstanding Jaysh al-Mahdi's frequent attacks against Americans in Iraq, the

Secretary of State did not officially designate Jaysh al-Mahdi as a Foreign Terrorist Organization

---

[284] For example, according to intelligence sources cited in a July 2006 U.S. State Department cable (as published by *WikiLeaks*), "a JAM campaign to recruit fighters for service in Lebanon has kicked into high gear. Recruitment of females is said to be a high priority, although it is not known in what capacity they would be employed.  Hazim Al-Araji, a JAM member with high-ranking relatives in Hezbollah, is reportedly in charge of the drive."  U.S. State Dep't Cable, *Iraqi Reaction to Israel-Lebanon Situation* (July 20, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD2591_a.html.

[285] Charlie Bayliss, *Top Muslim Cleric Tells His Followers To Attack Troops Who Are At War With Islamic State*, Daily Express (July 19, 2016), http://www.express.co.uk/news/world/690810/muslim-cleric-attack-us-troops-war-isis.

("FTO") under 8 U.S.C. § 1189.  That decision reflected a political concern among some U.S.

policymakers about the best way to influence Sadr, who wielded significant political clout as an

Iraqi kingmaker and enjoyed a cult-like following among millions of Iraqi Shi'a.  Sadr's power

over the Iraqi government led some U.S. policymakers to caution against overly antagonizing his

followers, which led the U.S. government to refrain from formally designating Jaysh al-Mahdi as

an FTO.  However, this strategic policy decision has not stopped terrorism scholars (as well as

members of the U.S. government) from recognizing the reality that Jaysh al-Mahdi acted and

functioned as a terrorist group.

### C.     Hezbollah Created, Armed, And Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans

345.    Jaysh al-Mahdi's campaign of terror against Americans and Sunni Iraqis could

not have occurred without the planning, authorization, and support of Hezbollah, a Lebanese-

based Shi'a terrorist organization that orchestrates terror attacks against Americans around the

world on behalf of Iran.  Richard Armitage, the Deputy Secretary of State under President

George W. Bush, has described Hezbollah as "the 'A-Team of Terrorists,' "[286] and former CIA

director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable

organization."[287]  Hezbollah's chief terrorist mastermind, Imad Mugniyeh, helped Sadr found

Jaysh al-Mahdi to inflict "mass casualties" on Americans in Iraq; Hezbollah has since provided

Jaysh al-Mahdi with training, weapons, personnel, and other logistical support.[288]

---

[286] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003), http://www.cbsnews.com/news/hezbollah-a-team-of-terrorists/.

[287] *Current and Future Worldwide Threats to the National Security of the United States:  Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George J. Tenet), http://www.gpo.gov/fdsys/pkg/CHRG-108shrg91721/pdf/CHRG-108shrg91721.pdf.

[288] Edward T. Pound, *Special Report:  The Iran Connection*, U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

1.    **Hezbollah Has Orchestrated Campaigns of Terror Against Americans Across the Globe**

346.    Hezbollah's geographic power base is in Lebanon, where it operates a parallel shadow government and provides some social services:  as of 2004, Hezbollah operated three hospitals, 12 health centers, 20 infirmaries, and 20 dental clinics within Lebanon.[289]  Hezbollah has used its control of government healthcare services to create patronage relationships with Lebanon's citizens.  As Hezbollah's 1985 manifesto explains, "our military apparatus is not separate from our overall social fabric.  Each of us is a fighting soldier."[290]  American Brigadier General Alexus Grynkewich has called this means of terrorist financing "welfare as warfare."[291]

347.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[292]  Hezbollah also frequently functions as a terrorist proxy for Iran, committing and orchestrating terrorist attacks abroad with Iran's support. Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[293]  In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me.  Our hostility to the Great Satan [America]

---

[289] *See* Shawn Teresa Flanigan & Mounah Abdel-Samad, *Hezbollah's Social Jihad:  Nonprofits as Resistance Organizations*, Middle East Policy Council (2009), http://www.mepc.org/hezbollahs-social-jihad-nonprofits-resistance-organizations.

[290] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[291] *See* Alexus Grynkewich, *Welfare as Warfare:  How Violent Non-State Groups Use Social Services to Attack the State*, 31 Stud. in Conflict & Terrorism 350 (2008).

[292] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015), http://www.timesofisrael.com/liveblog_entry/nasrallah-proud-that-pm-obama-discussed-hezbollah/; Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015), http://www.jpost.com/Arab-Israeli-Conflict/Nasrallah-praises-wave-of-terror-against-Israelis-432734.

[293] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America

will remain our reverberating and powerful slogan:  Death to America."[294]

348.    Hezbollah has coordinated terrorist attacks around the world primarily by acting

through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at

recruiting members from local populations in areas where they have networks on the ground."[295]

Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on

Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its

proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and

Khobar, Saudi Arabia (1996).

349.    Hezbollah raises money for its terrorist activities by engaging in criminal

activities around the world.  It is especially adept at raising money on the black market by selling

and smuggling pharmaceuticals.  According to Boaz Ganor of the International Institute for

Counterterrorism, "the most senior echelons of Hezbollah are involved in this criminal

activity."[296]

350.    Defendants themselves were aware of Hezbollah's pharmaceutical smuggling

operations.  In April 2009, representatives from Pfizer, J&J, and other pharmaceutical companies

attended a conference in Nigeria on the risks posed by international pharmaceutical smuggling

by terrorist groups.  According to a U.S. State Department cable from April 2009 (as published

by *WikiLeaks*), conference attendees were cautioned about "Lebanese networks that ship drugs

---

[294] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006), http://www.camera.org/index.asp?x_context= 7&x_issue=11&x_article=1158.

[295] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003), *available at* https://www.aclu.org/files/ fbimappingfoia/20111110/ACLURM001616.pdf.

[296] Boaz Ganor & Miri Halperin Wernli, *The Infiltration of Terrorist Organizations Into the Pharmaceutical Industry: Hezbollah as a Case Study*, 36 Stud. in Conflict & Terrorism 699, 703 (2013)

and counterfeit meds from Latin America and Asia into and through Nigeria" and warned that

"Hezbollah and Hamas are involved in smuggling drugs, counterfeit medicines and weapons into

and out of Nigeria."[297]  Two years later, in November 2011, Pfizer's Chief Security Officer

testified before Congress that "[p]harmaceutical counterfeiting is a low risk, high profit criminal

activity that has attracted drug traffickers, fire arms smugglers, and terrorists" and noted the

"indictment of 19 people who gave a portion of their profits from the sale of counterfeit Viagra

to Hezbollah."[298]

351.    In 1997, then-U.S. Secretary of State Madeleine Albright designated Hezbollah a

Foreign Terrorist Organization pursuant to 8 U.S.C. § 1189.  That designation has remained in

place ever since.

### 2.    Hezbollah Co-Founded Jaysh al-Mahdi with Sadr To Carry Out a Campaign of Terror Against Americans in Iraq

352.    In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad

Mugniyeh, to help Muqtada al-Sadr co-found Jaysh al-Mahdi.  Hezbollah's goal, according to an

October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq that would

inflict "mass casualties" on U.S. forces.[299]  A U.S. Special Operations task force report quoted by

the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership

believes that the struggle in Iraq is the new battleground in the fight against the U.S."[300]  As one

---

[297] U.S. State Dep't Cable, *Nigeria:  Counterfeit Meds Enforcement Training in Lagos* (Apr. 30, 2009), https://wikileaks.org/plusd/cables/09ABUJA746_a.html.

[298] *Stop Online Piracy Act:  Hearing Before the H. Comm. on the Judiciary*, 112th Cong. 61 (Nov. 16, 2011) (testimony of John P. Clark), https://judiciary.house.gov/_files/hearings/printers/112th/112-154_71240.PDF.

[299] Edward T. Pound, *Special Report:  The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[300] *Id.*

embedded war correspondent put it, Jaysh al-Mahdi was created to be "the Iraqi branch of Hezbollah."[301]

353.    Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq.  In addition to being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and sharing Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah and Iran.  Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-Sadr's uncle, Baqir al-Sadr.  Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor in Lebanon.  A 2004 U.S. military-intelligence report (as quoted in *U.S. News & World Report*) concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of Hezbollah, and that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf.[302]  Sadr himself visited Tehran and Beirut on numerous occasions.  And, in 2016, Nasrallah personally brokered talks between Sadr and the Iraqi government.[303]

354.    Hezbollah's role in Jaysh al-Mahdi's activities was similar to its role in other terror campaigns it sponsored:  Hezbollah recruited, trained, and armed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against American targets on Hezbollah's behalf.  Hezbollah Secretary-General Hassan Nasrallah was deeply involved in Jaysh al-Mahdi's campaign of terror, reportedly spending "several hours daily dealing with 'the situation in Iraq.' "[304]

---

[301] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J. (Aug. 14, 2007), http://www.michaeltotten.com/archives/001504.html.

[302] *See* Edward T. Pound, *Special Report:  The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[303] *See* Naharnet Newsdesk, *Report:  Nasrallah Meets al-Sadr to Reconcile Him with al-Maliki*, Naharnet (Apr. 15, 2016), http://www.naharnet.com/stories/en/207104.

[304] Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources:  Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008), http://www.nbcnews.com/id/25480176/ns/world_news-mideast_n_africa/t/shiite-sources-hezbollah-helping-iraqi-militia/#.WUwhPLaQyUk.

355.     Immediately after Jaysh al-Mahdi's founding in April 2003, Hezbollah dispatched Mugniyeh to recruit and train soldiers for Jaysh al-Mahdi.  Mugniyeh quickly recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping. These 300 fighters were some of the Jaysh al-Mahdi's first members.  That same month, according to the *Asia Times*, Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[ ] up [its] organizational and military apparatuses in Iraq."[305]  By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train terrorists for Jaysh al-Mahdi.  At the same time, these Hezbollah operatives were buying rocket-propelled grenades, antitank missiles, and other weapons for Jaysh al-Mahdi.

356.     Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years.  By January 2004, nearly 800 Hezbollah agents had been sent to Iraq to assist Jaysh al-Mahdi.  Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005.  An October 2006 U.S. intelligence summary (as published by *WikiLeaks*) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas.[306]  And, in January 2007, Hezbollah operative Ali Mussa Daqduq personally participated in a raid on the Provincial Joint Coordination Center in Karbala.  The attackers killed one U.S. soldier on site and kidnapped four others, later killing them as well.  Mugniyeh continued to personally supervise Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other

---

[305] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006), http://www.atimes.com/atimes/Middle_East/HG29Ak02.html.

[306] U.S. Dep't of Defense, *US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala* (Oct. 10, 2006), https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_Mahdi_Militia_-_Hezbollah_-_Harbala_(Oct_10,_2006).

Hezbollah operatives.  At the time Mugniyeh was killed in 2008, the U.S. government continued to view him as an ongoing threat to Americans in Iraq.

357.    Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah.  In a sermon in April 2004, Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming:  "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[307]  In an August 2007 interview, Sadr again reportedly acknowledged that Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[308]  Another Jaysh al-Mahdi member told an interviewer that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."[309]

358.    The close links between Hezbollah and Jaysh al-Mahdi were widely reported in the Western media.  The *Washington Times* reported on April 8, 2004, that Sadr was "being aided directly by Iran's Revolutionary Guard, which plays a large role in running that country, and by Hezbollah, an Iranian-created terrorist group based in Lebanon."[310]  In November 2006, the *New York Times* reported that "Hezbollah has trained members of the Mahdi Army."[311]  And Sadr's August 2007 interview, in which he admitted Jaysh al-Mahdi's "formal links with Hizbollah," was printed in the London-based *Independent*.[312]

---

[307] Wire, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas*, The Buffalo News (Apr. 2, 2004), http://buffalonews.com/2004/04/02/iraqi-cleric-calls-for-alliance-with-hezbollah-hamas/.

[308] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, The Independent (Aug. 20, 2007).

[309] *Id.*

[310] *Iran, Hezbollah Support al-Sadr*, Wash. Times (Apr. 7, 2004), http://www.washingtontimes.com/news/2004/apr/7/20040407-124311-9361r/.

[311] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/africa/28iht-militia.3702222.html?pagewanted=2&_r=0.

[312] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, The Independent (Aug. 20, 2007).

359.    In 2009, the U.S. Treasury Department formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi commander Abu Mahdi al-Muhandis as a Specially Designated Global Terrorist.  The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces."[313]  According to the press release, these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.[314]

360.    The U.S. Treasury Department again recognized the links between Hezbollah and Jaysh al-Mahdi in 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[315]  According to Treasury's findings, in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq.  In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."[316]  As of 2006, that unit was working with the Iranian Quds Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."[317]  As Treasury concluded, these Hezbollah-trained units were responsible for substantial violence against Americans in Iraq.

---

[313] U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009), https://www.treasury.gov/press-center/press-releases/Pages/tg195.aspx.

[314] *Id.*

[315] U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx.

[316] *Id.*

[317] *Id.*

### 3. Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq

361.    After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq.  It did so primarily through two channels.  First, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join Jaysh al-Mahdi and attack Americans in Iraq.  Second, Hezbollah encouraged senior members of Jaysh al-Mahdi, including Sadr himself, to carry out such attacks.  As a *Middle East Intelligence Bulletin* dispatch explained in March 2004, Hezbollah operatives in Iraq "have focused mainly on establishing lines of communication with Iraqi Shiite leaders and distributing anti-American propaganda, but the groundwork is clearly being laid for incitement of violence in the future."[318]

362.    Hezbollah's incitement was effective because many Jaysh al-Mahdi members looked to Hezbollah as a moral and religious authority on par with Sadr himself.  As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah appeared throughout Baghdad.  In August 2006, tens of thousands of Jaysh al-Mahdi operatives staged a massive, public, pro-Hezbollah rally in Sadr City.  Rally-goers burned American flags, chanted "Death to America," and displayed the portraits of Sadr and Nasrallah side-by-side in the streets of Baghdad.  Members of the rally wore white shrouds to symbolize their willingness to die for Hezbollah and asked for "victory to Hassan Nasrallah."[319]  Jaysh al-Mahdi members also asked "al-Sadr to consider them an extension of Hizbullah" and "expressed a genuine desire to

---

[318] Gary C. Gambill, *Dossier:  Hassan Nasrallah*, Middle East Intell. Bull. (Feb.-Mar. 2004), https://www.meforum.org/meib/articles/0402_ld.htm.

[319] Assoc. Press, *Shiites Hold pro-Hezbollah Rally in Baghdad*, NBC News (Aug. 4, 2006), http://www.nbcnews.com/id/14179529/ns/world_news-mideast_n_africa/t/shiites-hold-pro-hezbollah-rally-baghdad/.

participate with Hizbullah against" the Coalition government in Iraq.[320]  In a subsequent

demonstration in July 2007, Jaysh al-Mahdi members again carried signs featuring the pictures

of Sadr and Nasrallah side-by-side.  And, after Hezbollah terrorist mastermind Imad Mugniyeh

was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members

of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

363.    Grand Ayatollah Muhammad Hussein Fadlallah, whom the U.S. Treasury

Department has called "Hizballah's Spiritual Leader,"[321] occupied a similarly exalted position

among Iraqi Shi'a.  Fadlallah himself became a Specially Designated Terrorist in 1995[322] as a

result of his role as a "Leading Ideological Figure of Hizballah."[323]  Among other things, the

U.S. government concluded that "Sheikh Muhammad Hussein Fadlallah, Hizballah's chief

'spiritual leader,' reportedly issued the *fatwa* (religious ruling) authorizing the Marine Corps

barracks bombing" in Beirut in 1983,[324] which was the deadliest terrorist attack against America

before September 11th.  Although he was of Lebanese descent, Fadlallah was born in Najaf,

grew up in Najaf, studied in Najaf, reportedly spoke with an Iraqi accent, was a respected Shi'a

theologian, and was close with the Sadr family, including the First and Second Martyrs as well as

Muqtada himself.  When Fadlallah died in 2010, Muqtada al-Sadr called on his followers to

observe three days of mourning in honor of Hezbollah's spiritual leader.

---

[320] Middle East Media Research Inst., *Iraqi Shi'a View of the Lebanon Crisis*, Inquiry & Analysis Series No. 290 (Aug. 11, 2006), https://www.memri.org/reports/iraqi-shia-views-lebanon-crisis.

[321] U.S. Dep't of Treasury, *Treasury Designates Islamic Extremist, Two Companies Supporting Hizballah in Tri-Border Area* (June 10, 2004), https://www.treasury.gov/press-center/press-releases/Pages/js1720.aspx.

[322] *Id.*

[323] U.S. Dep't of Treasury, *Publication of the Hizballah International Financing Prevention Act of 2015 Related Sanctions Regulations; Counter Terrorism Designations Updates; Syria Designations Updates* (Apr. 15, 2016), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160415.aspx; *see also* Harvey W. Kushner, *Encyclopedia of Terrorism* 128 (Sage Publications 2003)

[324] Government's Written Proffer in Support of Its Request for Detention Pending Trial at 7, *United States v. D-2 Elfat El Aouar*, Crim. No. 06-20248, ECF No. 8 (E.D. Mich. filed May 22, 2006).

364.     Hezbollah's religious and moral authority was especially powerful because Jaysh al-Mahdi, like many other terrorist organizations, looked to religious authorities for validation. As Professor Bruce Hoffman has explained, " 'Shiites do not believe in the legitimate authority of secular governments.' "[325]  Instead, "religion serves as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine."[326]  Thus, for religious terrorist organizations such as Jaysh al-Mahdi, "violence first and foremost is a sacramental act or divine duty executed in direct response to some theological demand or imperative."[327]  As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of Jaysh al-Mahdi.

365.     Hezbollah's leaders leveraged their moral and religious authority over Jaysh al-Mahdi by publicly calling for "jihad" and issuing *fatwas* against Americans in Iraq.[328]  An April 2003 dispatch from the *Middle East Intelligence Bulletin* reported that "Hezbollah has recently begun a campaign to incite opposition to American forces in Iraq" by broadcasting propaganda to millions of Arab viewers (including Shi'a in Iraq) on its television station al-Manar.[329]  Such propaganda, which explicitly called for acts of "resistance" against Americans in Iraq, made up more than one-quarter of al-Manar's content.[330]

366.     In furtherance of this campaign, Secretary-General Nasrallah made repeated and direct overtures to Iraqi Shi'a to attack Americans:

---

[325] Bruce Hoffman, *"Holy Terror": The Implications of Terrorism Motivated by a Religious Imperative*, 18 Stud. in Conflict & Terrorism 271, 274 (1995) (quoting Marvin Zonis & Daniel Brumberg, *Behind Beirut Terrorism*, N.Y. Times (Oct. 8, 1984)).

[326] *Id.* at 272.

[327] *Id.*

[328] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[329] Avi Jorisch, *Al-Manar and the War in Iraq*, Middle East Intell. Bull. (Apr. 2003), http://www.washingtoninstitute.org/policy-analysis/view/al-manar-and-the-war-in-iraq.

[330] *Id.*

- In a March 2003 speech, Nasrallah publicly declared Hezbullah's support for attacks against Americans, promising that "people of this part of the world will receive [America] . . . **with guns, blood, weapons, and martyrdom operations**."[331]

- In an April 2003 speech, Nasrallah directly called on Iraqi Shi'a to attack Americans in Iraq, declaring that "**[t]he Iraqi people must resist this occupation**" and that "[w]e can bet that the Iraqi people will resist the American occupation and liberate themselves."[332]

- In an October 2006 interview that aired on al-Jazeera, Nasrallah stated: "We consider the resistance in Iraq . . . to be legitimate resistance, which is justified and appropriate . . . and **we support and endorse this resistance**."[333]

- In a January 2007 interview broadcast on al-Manar, Nasrallah declared: "We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect.  We believe that the solution in Iraq begins with adopting the option of armed resistance – **jihad against the occupation forces**."[334]

- In a December 2009 speech broadcast on al-Manar, Nasrallah promised "**all-out war**" against "the Great Satan" of America over a chorus of "Death to America" chants.[335]

367.   Nasrallah's call for "jihad" was particularly potent because of its religious significance.  As one federal court has explained, a "jihad" is a "religiously sanctioned resistance against perceived enemies of Islam."[336]  This religious sanctioning was thus highly significant to members of Jaysh al-Mahdi, a militantly Shi'a terrorist organization that frequently engaged in religious violence.

---

[331] Rola el-Husseini, *Hizbullah and Regional Non-State Actors*, *in* ISLAMIST POLITICS IN THE MIDDLE EAST: MOVEMENTS AND CHANGE 166, 175 (Samer S. Shehata ed., 2012) (all emphases in this paragraph added).

[332] Deborah Horan, *Hezbollah Chief to Iraqis:  Resist U.S.*, Chi. Trib. (Apr. 23, 2003), http://articles.chicago tribune.com/2003-04-23/news/0304230260_1_hezbollah-iraqi-shiites-iraqi-people.

[333] Excerpts from Interview with Hassan Nasrallah, Middle East Media Research Inst. TV Monitor Project (Oct. 31, 2006), https://www.memri.org/tv/hizbullah-secretary-general-hassan-nasrallah-when-we-were-young-i-cannot-forget-sight-american/transcript (last accessed Sept. 21, 2017).

[334] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[335] Excerpts from December 25, 2009 Speech by Hassan Nasrallah, Middle East Media Research Inst. (Dec. 29, 2009), https://www.memri.org/reports/hizbullah-secretary-general-hassan-nasrallah-al-manar-tv-us-beast-one-bite-our-nation-and (last accessed Sept. 21, 2017).

[336] *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016).

368.     Grand Ayatollah Fadlallah echoed similar themes in an August 2004 *fatwa* in which he instructed the Shi'a in Iraq that it was their religious duty to attack American military and civilian personnel in Iraq as a means of resisting the occupation.  "A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder."[337]  The Grand Ayatollah's *fatwa*, which received widespread coverage in the Iraqi and Western media, was a critical green light for Shiites in Lebanon and Iraq to attack Americans in Iraq.

369.     Until Fadlallah's death in 2010, he consistently incited his Shi'a followers in Iraq and Lebanon to attack Americans.  In at least six Friday sermons in the Imam Hassanayn Mosque in Beirut that took place between February and April 2003 – sermons that would have been widely shared in Iraq and would have undoubtedly been known to Muqtada and other leaders of Jaysh al-Mahdi – Fadlallah blessed the calls made by others such as Nasrallah for Iraqi Shiites to violently resist the U.S. occupation.

370.     Information gathered by Coalition forces during raids upon Jaysh al-Mahdi confirmed the power of Nasrallah's and Fadlallah's incitement against the United States.  For example, according to a U.S. military incident report (as published by *WikiLeaks*), an October 9, 2008 raid on a Jaysh al-Mahdi safe house in Basra yielded "religious Iranian video clips," "MAS [*i.e.*, Muqtada al-Sadr] literature," a "[n]otebook with JAM computer training dated 11 Jan 2007," and a "[p]icture of Mohammad Hussein Fadala [sic]" who was identified in the report as a "Deputy of Hassan Wasrala [sic] (Hezbollah)."[338]

371.     Hezbollah's public propaganda campaign to incite Jaysh al-Mahdi was similar to the methods used by other terrorist groups, such as al-Qaeda and ISIS, to communicate their authorization for terrorist attacks around the world.  For example, a July 2007 report by the

---

[337] *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000).

[338] *WikiLeaks* (Oct. 9, 2008), https://wikileaks.org/irq/report/2008/10/IRQ20081009n11927.html.

Council on Foreign Relations explained that, in lieu of executing terrorist attacks themselves, al-Qaeda "ha[d] become a sort of public relations branch, regularly releasing videotapes in which they encourage the faithful to continue their resistance against 'the Americans and their crusader allies.' "[339]  And in the wake of the May 2017 bombing of an Ariana Grande concert in Manchester, England, Professor Daniel Byman explained that "the bombing fits the tactics recommended in ISIS's propaganda campaign to encourage Muslims in the West to attack their home countries."[340]  By repeatedly issuing public calls for Iraqi Shi'a to engage in anti-American violence, Hezbollah's leaders were following the playbook that other terrorist organizations have used to communicate with their adherents around the globe.

372.    Hezbollah also wielded significant influence over Sadr himself, who had deep personal ties to Hezbollah's leaders.  *The Arab Weekly* reported that Sadr was "greatly inspired by Hassan Nasrallah" in part because "both men rose to lead their parties at a fairly young age."[341]  According to a March 2007 report by the Jamestown Foundation, a counterterrorism think tank, Sadr "has looked up to Hezbollah of Lebanon as a model of Shiite military success[,] [because] [h]e respects the leadership of the organization and admires [Hassan Nasrallah]."[342]  Accordingly, Sadr publicly declared his loyalty to Hezbollah, *see supra* ¶ 357; co-founded Jaysh al-Mahdi with the help of Hezbollah's chief terrorist mastermind, Imad Mugniyeh, *see supra* ¶ 352; expressly modelled his organization on Hezbollah, *see supra* ¶ 58; and travelled to Beirut (where Hezbollah is headquartered) several times from 2005-2009.  On information and belief,

---

[339] Eben Kaplan, *The Rise of al-Qaedaism*, Council on Foreign Relations (July 18, 2007), https://www.cfr.org/backgrounder/rise-al-qaedaism.

[340] Daniel Byman, *Uninspiring Terrorism*, Slate (May 23, 2017), http://www.slate.com/articles/news_and_politics/foreigners/2017/05/how_to_stop_groups_like_isis_from_inspiring_terrorist_attacks_like_manchester.html.

[341] Sami Moubayed, *Iran Invests in Iraq's Mahdi Army*, The Arab Weekly (May 22, 2016), http://www.thearabweekly.com/Iran/5187/Iran-invests-in-Iraq%E2%80%99s-Mahdi-Army.

[342] Babak Rahimi, *Moqtada al-Sadr's New Alliance with Tehran*, The Jamestown Found. (Mar. 1, 2007), https://jamestown.org/program/moqtada-al-sadrs-new-alliance-with-tehran/.

Hezbollah used its close relationship with Sadr to authorize and incite him to organize a terror

campaign that would inflict "mass casualties" against Americans in Iraq.

#### 4.    Hezbollah Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans in Iraq

373.    Hezbollah trained Jaysh al-Mahdi in the use of weapons and tactics that were

specifically designed to target Americans in Iraq – and that Jaysh al-Mahdi in fact used

successfully to perpetrate terrorist attacks against Americans in Iraq.  This training began at

Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of

Jaysh al-Mahdi's first 300 fighters in Lebanon.  It continued through at least 2008, when

Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's

Quds Force), Lebanon, and Iraq.  According to a captured Jaysh al-Mahdi operative, paraphrased

in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training

received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[343]

374.    From 2003-2008, Jaysh al-Mahdi recruits travelled to Hezbollah training camps in

Lebanon and Iran through meticulously planned routes.  Because of the logistical challenges

associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally

trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics

from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi

members in Iraq.[344]  U.S. officials have referred to this practice as "training the trainer."[345]

375.    Although Hezbollah training in Iran often occurred in conjunction with the

Iranian Quds Force, Hezbollah's role was crucial to Jaysh al-Mahdi for at least three reasons.

---

[343] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-002-Summary.pdf.

[344] Michael R. Gordon, *Hezbollah Trains Iraqis in Iran, Officials Say*, N.Y. Times (May 5, 2008), http://www.nytimes.com/2008/05/05/world/middleeast/05iran.html.

[345] *Id.*

*First*, Hezbollah operatives had considerably more experience with paramilitary tactics and explosives than their Quds Force counterparts.  *Second*, Hezbollah operatives typically spoke Arabic, the language spoken by most Jaysh al-Mahdi members, while members of the Quds Force did not.  *Third*, Hezbollah and Jaysh al-Mahdi shared a cultural affinity; captured Iraqi fighters have expressed their strong preference for training with Hezbollah over the Quds Force.

376.    Hezbollah's training was rigorous.  According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[346]  Trainees were awakened at 5:30 a.m. every day to pray and exercise.  Classes started at 8:00 a.m. and continued until dusk.  Each class lasted roughly 50 minutes, with 10-minute breaks in between classes.  Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations.  The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the *New York Times* in November 2006.[347]  The topics covered in these training programs included the following:

377.    **Basic Weapons Training.**  Many Jaysh al-Mahdi recruits had little to no combat experience or weapons training when they joined the organization, because the only qualification that prospective Jaysh al-Mahdi recruits were expected to have was the ability to read and write.  Accordingly, Hezbollah provided basic training intended to give new Jaysh al-Mahdi recruits a broad overview of paramilitary tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.

---

[346] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-005-Summary.pdf.

[347] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/africa/28iht-militia.3702222.html?pagewanted=2&_r=0.

378.  **IEDs.**  Hezbollah trained Jaysh al-Mahdi members in the creation and deployment of IEDs.  For instance, Hezbollah provided an IED Specialty Training Course to members of Jaysh al-Mahdi at its training camps designed to teach Jaysh al-Mahdi fighters how to create and deploy improvised explosives such as roadside bombs.

379.  **EFPs.**  Hezbollah also trained members of Jaysh al-Mahdi in the deployment of EFPs, a more complicated (and more lethal) explosive device designed to penetrate the armor of American tanks.  Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon.  Hezbollah also imparted to Jaysh al-Mahdi the complex expertise required to manufacture and use those EFPs.  According to a U.S. military-intelligence document paraphrased by *Time* in 2005, the EFPs used in Iraq were "based on a design from the Iranian-backed Lebanese militia Hizbollah."[348]  The *New York Times* similarly reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[349]  On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008, *see supra* ¶ 335, was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi.

380.  **Rockets.**  Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles.  During attacks on the Green Zone in Baghdad in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's training.

---

[348] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 15, 2005).

[349] John Ismay, *The Most Legal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/.

381.   **Mortars.**   Hezbollah trained Jaysh al-Mahdi fighters in the use of mortars, including by providing a Mortar Specialty Training Course to members of Jaysh al-Mahdi at its training camps in Iran.   The purpose of this training was to teach Jaysh al-Mahdi militants to hit distant targets with mortar strikes.   American military personnel have noted that Jaysh al-Mahdi's mortar strikes were particularly accurate.

382.   **RPGs.**   Hezbollah trained Jaysh al-Mahdi operatives in the use of RPGs, including assembly, firing procedures, target acquisition, and the use of various kinds of munitions.   Hezbollah's RPG training focused on attacks against vehicles and command structures such as the ones the United States used in Iraq.

383.   **Complex Attacks.**   Hezbollah training programs emphasized "complex attacks" and small-group tactics that combine different types of attacks by different members of a team. One unclassified (as redacted) U.S. military-intelligence report summarized these tactics as follows:

> For example, an engineer team may be responsible for emplacing and detonating IEDs on a convoy while a Support Weapons team is simultaneously responsible for launching mortars or rockets at the same vehicles.  A conventional weapons team would then be responsible for firing at the vehicles with small arms and assaulting the vehicles.  The Support Weapons team would be responsible for launching mortars at the vehicles again once the conventional weapons team pulled back.  Each team functions together but does not get involved in what the other team is doing.  A plan would be worked out ahead of time for this, and one individual in each team would be responsible for coordinating with the other team leaders during the attack.[350]

Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[351]

---

[350] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 001, at 3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-001-Summary.pdf.

[351] James Glanz *et al.*, *The War Logs: Secret Dispatches From the War in Iraq*, N.Y. Times, http://www.nytimes.com/interactive/world/iraq-war-logs.html#report/ABD1B1E9-D673-93B1-757861100C0728BC.

384.    Hezbollah's training enabled Jaysh al-Mahdi to execute sophisticated attacks against Americans that it otherwise would have been unable to carry out.

385.    Hezbollah trained, and coordinated with, Jaysh al-Mahdi terrorists who were responsible for Hezbollah-authorized terrorist attacks throughout Iraq.  On information and belief, that training and coordination extended to the following areas of operations:

- **Baghdad – Al Rashid District.**  Al Rashid includes a main approach to Baghdad International Airport ("BIAP") and Coalition forces' Victory Base Complex, and so was a focus of Jaysh al-Mahdi's attacks in western Baghdad.  On information and belief, Jaysh al-Mahdi coordinated attacks against Coalition forces in the Al Rashid District with Hezbollah.  According to a U.S. military incident report (as published by *WikiLeaks*), "JAM/Hizballah members operating" in Al Rashid coordinated through Haji Abu Ali and Mohammad Kalthomi, the latter of whom personally advised Nasrallah.  Such coordination also reportedly involved Jabbar Abdalnabi Alzarjawi, a "JAM leader" in Al Rashid who "facilitated . . . the movement of Hizballah members from Iran" into western Baghdad.[352]  On information and belief, Hezbollah-backed Jaysh al-Mahdi IED/EFP cells operating in Al Rashid were responsible for the EFP attacks that killed Christopher Neiberger, Ronald Tucker, and Kevin Witte.

- **Baghdad – Kadamiyah District.**  Kadamiyah was one of Jaysh al-Mahdi's strongholds in western Baghdad.  On information and belief, Hezbollah training and coordination aided Jaysh al-Mahdi's ability to target Americans in Kadamiyah.  For example, according to a U.S. military incident report (as published by *WikiLeaks*), Salah Aldeen Fayath, his brother Thya Aldeen Fayath, and his daughter, whom the U.S. government determined "was a member of Hezbollah," provided targeting support for Jaysh al-Mahdi operations against Coalition forces in Kadamiyah.[353]  On information and belief, Hezbollah-backed Jaysh al-Mahdi IED/EFP cells operating in or near Kadamiyah were responsible for the EFP attack that killed John Aragon, Jr.

- **Baghdad – Rusafa District.**  Rusafa is a Jaysh al-Mahdi stronghold in eastern Baghdad that includes the MOH headquarters building.  On information and belief, Hezbollah trained, locally supported, and coordinated with the Jaysh al-Mahdi IED/EFP cell operating in and near Rusafa.  For example, Jaysh al-Mahdi Special Groups trained by Hezbollah in Iran used Rusafa to launch rocket attacks on the International Zone.  On information and belief, Hezbollah-backed Jaysh al-Mahdi cells operating in Rusafa were responsible for the EFP and/or IED attacks in Rusafa that killed Deborah Klecker, Delmar White, and Alan Rogers.

---

[352] *WikiLeaks* (Nov. 22, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081122n11950.html.

[353] *WikiLeaks* (Oct. 19, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061019n5720.html.

- **Baghdad – Sadr City (Thawra District).**  Sadr City serves as Jaysh al-Mahdi's command-and-control center, safe haven, and principal power base in Iraq.  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi IED/EFP cells operating in and near Sadr City, with respect to both the attacks themselves and the subsequent Hezbollah and Jaysh al-Mahdi propaganda concerning such attacks.  For example, an August 12, 2008 U.S. military incident report (as published by *WikiLeaks*) confirmed that a "Hezbollah IED/EFP . . . cell" was active in and near Sadr City and was coordinating EFP attacks against Coalition forces with a "recon [Jaysh al-Mahdi] element working in the area."[354]  On information and belief, Hezbollah-backed Jaysh al-Mahdi cells operating in and near Sadr City were responsible for the attacks in or near Sadr City that injured Plaintiff Luis Rosa-Valentin and killed Brian Connelly.

- **Baghdad – New Baghdad District, Karadah District, and FOB Rustamiyah.**  New Baghdad, Karadah, and the area near Forward Operating Base ("FOB") Rustamiyah were focal points for Hezbollah-coordinated attacks by Jaysh al-Mahdi in eastern Baghdad.  For example, one U.S. military report (as published by *WikiLeaks*) concluded that, with respect to attacks in the vicinity of FOB Rustamiyah, it was "most likely" that "Hezbollah operatives [were] directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area."[355]  On information and belief, Jaysh al-Mahdi Hezbollah-trained cells operating in this area were responsible for the attacks that wounded the 2-16 Ranger Plaintiffs, *see infra* ¶ 391, as well as the attacks that killed Brian L. Holden, Richard Vaughn, Jeremiah McNeal, and Durrell Bennett.

- **Babil, Wasit, and Salman Pak (Central Iraq).**  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in central Iraq, including Babil, Wasit, and Salman Pak.  As published by *WikiLeaks*, Ahmad Sahib Ghali was a commander of Jaysh al-Mahdi's "assassination cell and IED cell" in Hillah.[356]  Ghali and his co-commanders were Jaysh al-Mahdi terrorists who were trained by Hezbollah to conduct attacks against Coalition forces in the vicinity of Hillah.  On information and belief, Jaysh al-Mahdi Hezbollah-trained terrorists operating in Wasit were responsible for the EFP attack that killed or injured Michael Doheny, Steven Evrard, Micah Shaw, and Billy Johnson, and a Jaysh al-Mahdi Hezbollah-trained cell operating in Salman Pak was responsible for the EFP attack that killed Blake Stephens.

- **Basra and Amarah (Southern Iraq).**  Basra and Amarah are Jaysh al-Mahdi strongholds in southern Iraq.  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Basra and Amarah, both of which were key areas of operation for Hezbollah and Jaysh al-Mahdi in southern Iraq.  For example, in July and August 2008, U.S. government reports (as published by *WikiLeaks*) confirmed that five terrorist squads, comprised of "a combination of Hezbollah and JAM who finished their

---

[354] *WikiLeaks* (Aug. 12, 2008), https://wikileaks.org/irq/report/2008/08/IRQ20080812n11209.html.

[355] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

[356] *WikiLeaks* (June 15, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080615n11261.html.

training in Iran" – each group containing 15-20 terrorists and led by the above Hezbollah and Jaysh al-Mahdi terrorists – were "heading to Basrah to attack [Coalition forces]" and "carry out terrorist activities" after "coming back from Iran," where they had been "trained" on how to "use [indirect fire] techniques" and "manufactur[e] IEDs."[357]  On information and belief, cells that reflected a "combination of Hezbollah and JAM" were responsible for the attacks that resulted in the death of William Juneau and the kidnapping, torture, and execution of Michael Chand.

- **Diyala (Northern Iraq).**  Diyala is a province in northern Iraq and was (and remains) a central area of emphasis for Hezbollah and Jaysh al-Mahdi because of the critical role its capital, Baqubah, plays with respect to the Shiite terrorists' desire to have a secure land corridor linking Iran to Syria.  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Diyala.  As published by *WikiLeaks*, on June 23, 2008, Coalition forces detained a Jaysh al-Mahdi commander in Baqubah, Rezul Sami Mohammed, who was "in possession of JAM and Hezbollah propaganda material."[358]  Similarly, on September 27, 2008, as published by *WikiLeaks*, Coalition forces conducted a raid to capture Hezbollah operative Mohammed Radam in order to "reduce Hezbollah influence" near Baqubah.[359]  On information and belief, a Jaysh al-Mahdi Hezbollah-trained cell operating in the vicinity of Baqubah was responsible for the EFP attack that killed Robbie Lynch.

### 5. Hezbollah Provided Jaysh al-Mahdi with Weapons To Carry Out Terrorist Attacks Against Americans in Iraq

386.    Hezbollah provided many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq.  A Jaysh al-Mahdi commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[360]

387.    Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks.  The *Long War Journal* reported in June 2007 that rockets that Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the

---

[357] *WikiLeaks* (July 16, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html; *WikiLeaks* (July 20, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080720n11400.html.

[358] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11209.html.

[359] *WikiLeaks* (Sept. 27, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080927n11997.html.

[360] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007), http://www.mcclatchydc.com/news/nation-world/world/article24465475.html.

summer of 2006."[361]  Later that year, on August 12, 2008, Coalition forces arrested nine

Hezbollah members who had been funneling weapons into Iraq.  Hezbollah's involvement in

these smuggling operations is not surprising, given that Hezbollah has acted as Iran's weapons

smuggler for years (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the

Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

388.     Hezbollah has also purchased weapons for Jaysh al-Mahdi outright.  For example,

according to a U.S. military-intelligence document (as quoted in *U.S. News & World Report* in

2004), "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other

weapons for Sadr's militia."[362]

389.     Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of

weapons on which Hezbollah trained Jaysh al-Mahdi:  small arms, IEDs, EFPs, rockets, mortars,

and RPGs.  These weapons were first smuggled into the Jaysh al-Mahdi command-and-control

safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces.  For

attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use

them; it supplied the weapons themselves.

## VII.    JAYSH AL-MAHDI KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY HEZBOLLAH

390.     Jaysh al-Mahdi's terrorist campaign against Americans in Iraq, which was

financed in part through Defendants' corrupt transactions with MOH, killed and injured

Plaintiffs and their family members.  Each of the acts of international terrorism described below

---

[361] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

[362] Edward T. Pound, *Special Report:  The Iran Connection*, U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115 (alteration in original).

was committed or proximately caused by Jaysh al-Mahdi and was planned, authorized, and/or carried out (in conjunction with Jaysh al-Mahdi) by Hezbollah.

### A.       The Atchley Family

391.       Plaintiff Staff Sergeant Joshua Atchley served in Iraq in the U.S. Army with the 1st Infantry Division, 2nd Battalion, 16th Infantry Regiment, 4th Brigade Combat Team (the "2-16 Rangers").  Beginning in early 2007, the 2-16 Rangers were responsible for fighting Jaysh al-Mahdi in an area a few miles southeast of Sadr City, based out of FOB Rustamiyah.  While there, the 2-16 Rangers had responsibility for securing several key neighborhoods in eastern Baghdad from Jaysh al-Mahdi, including Kamaliyah and Fedilayah.  Jaysh al-Mahdi was the principal enemy the 2-16 Rangers were tasked with fighting, and Jaysh al-Mahdi was responsible for the vast majority of the casualties the 2-16 Rangers sustained in Iraq in 2007 and 2008.

392.       SSG Atchley is a U.S. citizen and Oklahoma resident.

393.       On June 8, 2007, SSG Atchley was injured by an EFP planted and detonated by Jaysh al-Mahdi near FOB Rustamiyah.  That attack mutilated SSG Atchley's left eye, fractured his right arm, and caused other serious injuries that required a half-dozen surgeries.  As a result of that attack, SSG Atchley has experienced severe physical and emotional pain and suffering.

394.       Plaintiff Elissa Atchley is a U.S. citizen and Texas resident.  She is SSG Atchley's sister.  Ms. Atchley visited SSG Atchley in the hospital after the Jaysh al-Mahdi attack, and SSG Atchley later stayed with her and their father in the aftermath of the attack.  As a result of the June 8, 2007 attack, and SSG Atchley's injuries, Ms. Atchley has experienced severe emotional pain and suffering.

### B.       John Aragon, Sr.

395.       Sergeant John Aragon, Jr. served in Iraq as part of the 1st Squadron, 75th Cavalry Regiment, 2nd Brigade Combat Team, 101st Airborne Division of the U.S. Army.

396.    On June 12, 2008, SGT Aragon was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  He was 22 years old.

397.    SGT Aragon was a U.S. citizen when he was killed.

398.    Plaintiff John Aragon, Sr. is a U.S. citizen and California resident.  He is the father of SGT Aragon.

399.    As a result of the June 12, 2008 attack, and the death of SGT Aragon, Mr. Aragon, Sr. has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Aragon's society, companionship, and counsel.

### C.    Brian Beaumont

400.    Plaintiff Staff Sergeant Brian Beaumont served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Kansas resident.

401.    On July 17, 2007, SSG Beaumont was injured by an IED – consisting of three 155mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place near FOB Rustamiyah, close to Sadr City.  The attack severely wounded SSG Beaumont, who received a 100% disability rating from the Veterans Administration ("VA").  As a result of the attack, he has experienced extreme physical and emotional pain and suffering.

### D.    Dempsey Bennett

402.    Specialist Durrell Bennett served in Iraq as part of the 2-16 Rangers.

403.    On March 29, 2008, SPC Bennett was killed by an EFP planted and detonated by Jaysh al-Mahdi, near Fedilayah.

404.    SPC Bennett was a U.S. citizen when he was killed in Iraq.  He was 22 years old.

405.    Plaintiff Dempsey Bennett is a U.S. citizen and Washington resident.  He is the father of SPC Bennett.

406.     As a result of the March 29, 2008 attack, and SPC Bennett's death, Dempsey

Bennett has experienced severe mental anguish, emotional pain and suffering, and the loss of

SPC Bennett's society, companionship, and counsel.

### E.     Brandeaux Campbell

407.     Plaintiff Specialist Brandeaux Campbell served in Iraq as part of the 2-16

Rangers.  He is a U.S. citizen and Texas resident.

408.     On June 8, 2007, SPC Campbell was injured by an EFP planted and detonated by

Jaysh al-Mahdi, near FOB Rustamiyah.  The attack severely wounded SPC Campbell, giving

him a concussion, slicing open his forehead, mouth, and tongue, and lodging shrapnel in his

shoulder and leg.  Due to his injuries, SPC Campbell received a 70% disability rating from the

VA.

409.     As a result of the June 8, 2007 attack, SPC Campbell has experienced extreme

physical and emotional pain and suffering.

### F.     The Capra Family

410.     Technical Sergeant Anthony ("Tony") L. Capra, Jr. served in Iraq as part of

Detachment 63, 688th Armament Systems Squadron of the U.S. Air Force.

411.     On April 9, 2008, Tech. Sgt. Capra was killed by an IED in Golden Hills, Iraq,

planted and detonated by Ansar al-Sunna ("AAS"), a designated Foreign Terrorist Organization

operating in Iraq that allied and cooperated closely with Jaysh al-Mahdi in their shared goal of

using violence to expel Americans from Iraq.  According to public reports, AAS described its

"relationship" with Jaysh al-Mahdi "as intimate,"[363] and their cooperation included Jaysh al-

Mahdi's provision of services to AAS including munitions, training, personnel, and tactical

---

[363] Kathleen Ridolfo, *Iraq:  A Nation Finds Itself At A Crossroads*, Radio Free Europe (Sept. 16, 2005),
http://reliefweb.int/report/iraq/iraq-nation-finds-itself-crossroads.

contacts with Hezbollah and Iran.  On information and belief, Defendants' material support to Jaysh al-Mahdi enabled Jaysh al-Mahdi's cooperation with and support for its anti-Coalition partner AAS's IED attacks in Iraq, including the one that killed Tech. Sgt. Capra.

412.    Tech. Sgt. Capra was a U.S. citizen when he died in Iraq.  He was 31 years old.

413.    Plaintiff Angie Capra is a U.S. citizen and Virginia resident.  She is the widow of Tech. Sgt. Capra.

414.    Plaintiff Anthony ("Tony") Capra, Sr. is a U.S. citizen and Virginia resident.  He is the father of Tech. Sgt. Capra.

415.    Plaintiff Sharon Capra is a U.S. citizen and Virginia resident.  She is the mother of Tech. Sgt. Capra.

416.    Plaintiff Mark Capra is a U.S. citizen and Virginia resident.  He is the son of Tech. Sgt. Capra.

417.    Plaintiff Victoria Capra is a U.S. citizen and Virginia resident.  She is the daughter of Tech. Sgt. Capra.

418.    Plaintiff A.C., by and through her next friend Angie Capra, is a U.S. citizen and Virginia resident.  She is the minor daughter of Tech. Sgt. Capra.

419.    Plaintiff J.C., by and through his next friend Angie Capra, is a U.S. citizen and Virginia resident.  He is the minor son of Tech. Sgt. Capra.

420.    Plaintiff S.C., by and through his next friend Angie Capra, is a U.S. citizen and Virginia resident.  He is the minor son of Tech. Sgt. Capra.

421.    Plaintiff Danielle Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

422.     Plaintiff Emily Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

423.     Plaintiff Jacob Capra is a U.S. citizen and Virginia resident.  He is the brother of Tech. Sgt. Capra.

424.     Plaintiff Joanna Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

425.     Plaintiff Joseph Capra is a U.S. citizen and Virginia resident.  He is the brother of Tech. Sgt. Capra.

426.     Plaintiff Julia-Anne Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

427.     Plaintiff Michael Capra is a U.S. citizen and Virginia resident.  He is the brother of Tech. Sgt. Capra.

428.     Plaintiff Rachel Lee is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

429.     Plaintiff Sarah Johnson is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

430.     As a result of the April 9, 2008 attack, and the death of Tech. Sgt. Capra, each member of the Capra Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Tech. Sgt. Capra's society, companionship, and counsel.

### G.     The Chand Family

431.     Michael Chand, Sr. served in Iraq as a civilian contractor who provided security relating to road construction projects in southeast Iraq.

432.     On August 17, 2007, Mr. Chand's convoy was ambushed by roughly 300 Jaysh al-Mahdi fighters near the Jaysh al-Mahdi stronghold of Amarah, northwest of Basra, Iraq.  Mr.

Chand suffered a gunshot wound in the ambush and was kidnapped by Jaysh al-Mahdi.  He was held in captivity by Jaysh al-Mahdi for several years afterwards, and he was tortured in captivity. On or about March 13, 2010, his body was returned to the U.S. government.  The autopsy report revealed that Mr. Chand was killed by multiple gunshot wounds to the head and body, and it was consistent with the conclusion that he had been tortured.

433.    Initial reports of the August 17, 2007 attack suggested that Mr. Chand had been killed in the attack.  On August 24, 2007, the U.S. State Department officially informed Mr. Chand's wife that he was dead.  On October 31, 2007, the State Department reversed course and informed Mrs. Chand that, according to eyewitnesses, Mr. Chand was actually alive and being held in captivity.  However, efforts to secure his release over the next several years failed, and, on or about March 2010, the Chand family learned that Jaysh al-Mahdi had tortured and executed Mr. Chand while he was being held in captivity.

434.    Mr. Chand was a U.S. citizen when he was kidnapped and killed in Iraq.  At the time of his kidnapping, he was 52 years old.

435.    Plaintiff Sally Chand is a U.S. citizen and California resident.  She is the widow of Michael Chand, Sr.

436.    Plaintiff Michael Chand, Jr. is a U.S. citizen and California resident.  He is the son of Michael Chand, Sr.

437.    Plaintiff Christina Mahon is a U.S. citizen and California resident.  She is the daughter of Michael Chand, Sr.

438.    Plaintiff Ryan Chand is a U.S. citizen and California resident.  He is the son of Michael Chand, Sr.

439.     Plaintiff Brenda Chand is a U.S. citizen and California resident.  She is the daughter of Michael Chand, Sr.

440.     As a result of the August 17, 2007 attack, and the subsequent kidnapping and death of Michael Chand, Sr., each member of the Chand Family has experienced extreme mental anguish, emotional pain and suffering, and the loss of Michael Chand, Sr.'s society, companionship, and counsel.

### H.     The Connelly Family

441.     Corporal Brian Connelly served in Iraq as part of the 40th Engineer Battalion, 2nd Brigade Combat Team, 1st Armored Division of the U.S. Army.

442.     On February 26, 2009, CPL Connelly was killed by an EFP planted and detonated by Jaysh al-Mahdi in an area, north of Sadr City, in the Adhamiyah District in eastern Baghdad, Iraq.  He was 26 years old.

443.     CPL Connelly was a U.S. citizen when he was killed in Iraq.

444.     Plaintiff Kara Connelly is a U.S. citizen and New Jersey resident.  She is the widow of CPL Connelly.

445.     Plaintiff Jean Dammann is a U.S. citizen and Ohio resident.  She is the mother of CPL Connelly.

446.     Plaintiff Mark Dammann is a U.S. citizen and Ohio resident.  He is the father of CPL Connelly.

447.     Plaintiff Kevin Connelly is a U.S. citizen and New Jersey resident.  He is the brother of CPL Connelly.

448.     As a result of the February 26, 2009 attack, and the death of CPL Connelly, each member of the Connelly Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Connelly's society, companionship, and counsel.

I.     **Jimmy Connolly**

449.     Plaintiff Specialist Jimmy Connolly served in Iraq as the lead Combat Medic for

the 3rd Platoon, 58th Combat Engineer Company, 11th Armored Cavalry Regiment in the U.S.

Army.  SPC Connolly is a U.S. citizen and Washington, D.C. resident.

450.     SPC Connolly was deployed in Iraq from 2007 through 2009.  While deployed

near Bayji, Iraq, his unit was subject to regular improvised rocket attacks from the east.  On

information and belief, these rocket attacks were perpetrated by Jaysh al-Mahdi.  This belief is

based upon, among other things, SPC Connolly's personal observations of local indicators

consistent with Jaysh al-Mahdi death squads being active in the area, and statements made to

SPC Connolly by local Iraqi allies identifying the remains of burned out vehicles (including

human remains) as having resulted from Jaysh al-Mahdi death squads active in the area.

451.     In or about the spring of 2008, SPC Connolly's company was transferred to FOB

Hammer, which was east of Baghdad.  His company was moved to FOB Hammer because Jaysh

al-Mahdi had inflicted severe casualties on the prior company that had been stationed there.  His

company's mission at FOB Hammer was to fight Jaysh al-Mahdi.

452.     While at FOB Hammer, SPC Connolly was subjected to repeated attacks by Jaysh

al-Mahdi.  This included SPC Connolly being part of multiple convoys subjected to IEDs planted

and detonated by Jaysh al-Mahdi.

453.     Due to the intense, relentless terrorist attacks perpetrated by Jaysh al-Mahdi on

SPC Connolly and his company both while near Bayji and while in FOB Hammer, SPC

Connolly experienced severe emotional trauma and distress.

454.     Based on the injuries that SPC Connolly sustained as a result of those Jaysh al-

Mahdi attacks, he received a 70% disability rating from the VA and was diagnosed with Post-

Traumatic Stress Disorder.  As a result of Jaysh al-Mahdi's attacks in Iraq, he has experienced extreme physical and emotional pain and suffering.

### J.      The Doheny Family

455.    Michael Doheny worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who disposed of captured munitions in Iraq.

456.    On December 9, 2007, Mr. Doheny was killed by an EFP planted and detonated by Jaysh al-Mahdi in Iraq, in Az Zubaydiyah, in Wasit Province, which was a Jaysh al-Mahdi stronghold in central Iraq.  The EFP destroyed Mr. Doheny's vehicle, which was also occupied by Micah Shaw, Steven Evrard, and Plaintiff Billy Johnson.  Mr. Doheny was 30 years old.

457.    Mr. Doheny was a U.S. citizen when he was killed in Iraq.

458.    Plaintiff Melissa Doheny is a U.S. citizen and Nebraska resident.  She is the widow of Michael Doheny.

459.    Plaintiff Kathy Kugler is a U.S. citizen and Nebraska resident.  She is the mother of Michael Doheny.

460.    Plaintiff Robert Kugler is a U.S. citizen and Oregon resident.  He is the brother of Michael Doheny.

461.    Plaintiff Amy Ritchie is a U.S. citizen and Nebraska resident.  She is the sister of Michael Doheny.

462.    As a result of the December 9, 2007 attack, and the death of Michael Doheny, each member of the Doheny Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Michael Doheny's society, companionship, and counsel.

### K.    The Edwards Family

463.    Plaintiff Private First Class Drew Edwards served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Missouri resident.

464.    On June 25, 2007, PFC Edwards was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, Iraq.  The EFP attack injured PFC Edwards' neck and gave him a concussion.

465.    On July 17, 2007, PFC Edwards was injured by an IED – consisting of three 155mm artillery rounds fused together – planted and detonated by Jaysh al-Mahdi.  The IED blast resulted in the amputation of his left leg below the knee, shrapnel to his face and back, a .50 caliber gunshot wound through his right thigh caused by the resulting fire (post-blast), Traumatic Brain Injury, and degenerative disk(s) in his spine.  He was later diagnosed with Post-Traumatic Stress Disorder from the event.  As a result of his injuries, PFC Edwards received a 100% disability rating from the VA.

466.    As a result of the June 25, 2007 and July 17, 2007 Jaysh al-Mahdi attacks, PFC Edwards has experienced severe physical and emotional pain and suffering.

467.    Plaintiff Donielle Edwards is a U.S. citizen and Missouri resident.  She is the wife of PFC Edwards.  As a result of the June 25, 2007 and July 17, 2007 attacks, and PFC Edwards' injuries, Mrs. Edwards has experienced severe emotional pain and suffering.

### L.    The Emory Family

468.    Plaintiff Sergeant Michael Adam Emory served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

469.    On April 28, 2007, a Jaysh al-Mahdi sniper, shooting from the roof of a mosque in Kamaliyah, Iraq (eastern Baghdad near Sadr City), shot SGT Emory in the head using an AR-15 rifle.  That attack severely wounded SGT Emory and sent him into a coma.  As a result, he

suffered Traumatic Brain Injury and other physical injuries, and he received a 100% disability rating from the VA. To this day, he still has fragments of the Jaysh al-Mahdi-fired bullet lodged in his head. SGT Emory has experienced severe physical and emotional pain and suffering due to the attack.

470.    Plaintiff Maria de la luz Villa is a U.S. citizen and Texas resident. She is the ex-wife of SGT Emory. They were married when SGT Emory was shot, and Ms. Villa acted as SGT Emory's primary caregiver in the years following the attack. As a result of the April 28, 2007 attack, and SGT Emory's injuries, Ms. Villa has experienced severe emotional pain and suffering.

471.    Plaintiff Bobby Emory is a U.S. citizen and Florida resident. He is the father of SGT Emory. Bobby Emory helped care for SGT Emory after he was shot. As a result of the April 28, 2007 attack, and SGT Emory's injuries, Bobby Emory has experienced severe emotional pain and suffering.

**M.    Tanya Evrard**

472.    Steven Evrard worked as a civilian security specialist in Iraq. He was employed by a military contractor that provided security for civilian contractors who disposed of captured munitions in Iraq.

473.    On December 9, 2007, Mr. Evrard was killed by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah, in Wasit Province, which was a Jaysh al-Mahdi stronghold in central Iraq. The EFP destroyed Mr. Evrard's vehicle, which was also occupied by Michael Doheny, Micah Shaw, and Plaintiff Billy Johnson. Mr. Evrard was 36 years old.

474.    Mr. Evrard was a U.S. citizen when he was killed in Iraq.

475.    Plaintiff Tanya Evrard is a U.S. citizen and Texas resident. She is the widow of Steven Evrard.

476.     As a result of the December 9, 2007 attack, and Steven Evrard's death, Ms. Evrard has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Evrard's society, companionship, and counsel.

**N.     The Harbin Family**

477.     Plaintiff Private First Class Jacob Harbin served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Idaho resident.

478.     On September 22, 2007, PFC Harbin was injured by an EFP planted and detonated by Jaysh al-Mahdi, at a gas station across the street from FOB Rustamiyah.  The attack took place while PFC Harbin's unit was deployed to protect the gas station from Jaysh al-Mahdi. PFC Harbin sustained serious injuries in the attack, including being hit by shrapnel in his feet.

479.     As a result of the September 22, 2007 attack, PFC Harbin has experienced severe physical and emotional pain and suffering.

480.     Plaintiff Elijah Harbin is a U.S. citizen and Idaho resident.  He is the brother of PFC Harbin.  As a result of the September 22, 2007 attack, and PFC Harbin's injuries, Mr. Harbin has experienced extreme emotional pain and suffering.

481.     Plaintiff Esther Tate is a U.S. citizen and Idaho resident.  She is the sister of PFC Harbin.  As a result of the September 22, 2007 attack, and PFC Harbin's injuries, Ms. Tate has experienced extreme emotional pain and suffering.

**O.     The Holden Family**

482.     Private First Class Brian L. Holden served in Iraq in the U.S. Army, as part of the 2nd Battalion, 17th Field Artillery Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

483.     On April 9, 2007, PFC Holden was killed by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, Iraq.  He was 20 years old.

484.     PFC Holden was a U.S. citizen when he was killed in Iraq.

485.    Plaintiff Leasa Dollar is a U.S. citizen and North Carolina resident.  She is the mother of Brian Holden.

486.    Plaintiff Eugene DeLozier is a U.S. citizen and North Carolina resident.  He is the stepfather of Brian Holden.

487.    As a result of the April 9, 2007 attack and the death of PFC Holden, each member of the Holden Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Holden's society, companionship, and counsel.

**P.    Billy Johnson**

488.    Plaintiff Billy Johnson served as a civilian security specialist in Iraq.  He is a U.S. citizen and Tennessee resident.

489.    On December 9, 2007, Mr. Johnson was injured by an EFP planted and detonated by Jaysh al-Mahdi in Iraq, in Az Zubaydiyah, in Wasit Province, which was a Jaysh al-Mahdi stronghold in central Iraq.  The EFP attack destroyed Mr. Johnson's vehicle, which was also occupied by Michael Doheny, Micah Shaw, and Steven Evrard.  The attack severely wounded Mr. Johnson.

490.    As a result of the December 9, 2007 attack, Mr. Johnson has experienced extreme physical and emotional pain and suffering.

**Q.    The Juneau Family**

491.    William ("Bill") Juneau served in Iraq as a civilian security contractor working to train members of Iraq's police service.

492.    On November 26, 2007, Mr. Juneau was killed by an IED planted and detonated by Jaysh al-Mahdi, near Basra, Iraq.

493.    Mr. Juneau was a U.S. citizen when he was killed in Iraq.  He was 36 years old.

494.    Plaintiff Bridget Juneau is a U.S. citizen and Minnesota resident.  She is the twin sister of Bill Juneau.

495.    Plaintiff Stephanie Juneau is a U.S. citizen and Montana resident.  She is the sister of Bill Juneau.

496.    As the result of the November 26, 2007 attack, and the death of Bill Juneau, each member of the Juneau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Bill Juneau's society, companionship, and counsel.

**R.    William Kelso**

497.    Plaintiff William Kelso served in Iraq as a Combat Medic with the 3rd Infantry Division, 1st Battalion, 64th Armored Regiment of the U.S. Army.  He is a U.S. citizen and California resident.

498.    In early 2008, when CM Kelso's unit was deployed near Sadr City, CM Kelso was injured on several occasions by EFPs planted and detonated by Jaysh al-Mahdi.  His injuries from these attacks included, among other things, Traumatic Brain Injury.  Due to his injuries, CM Kelso received an 80% disability rating from the VA.

499.    As a result of the Jaysh al-Mahdi EFP attacks in eastern Baghdad, CM Kelso has experienced severe physical and emotional pain and suffering.

**S.    John Kirby**

500.    Plaintiff Staff Sergeant John Kirby served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

501.    On April 6, 2007, SSG Kirby was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, Iraq.  On May 29, 2007, a Jaysh al-Mahdi sniper shot SSG Kirby in the arm, which broke his humerus in three places and later required an implant.  Both attacks occurred near Sadr City, and both occurred while SSG Kirby was participating in the 2-

16 Rangers' mission to dismantle Jaysh al-Mahdi's fundraising infrastructure in the area.  Due to his injuries, SSG Kirby received a 60% disability rating from the VA.

502.    As a result of the April 6, 2007 and May 29, 2007 attacks, SSG Kirby has experienced severe physical and emotional pain and suffering.

### T.    The Klecker Family

503.    Deborah Klecker worked in Iraq for a civilian contractor providing mentoring and training to Iraqi police officers.

504.    On June 27, 2005, Ms. Klecker was killed by an IED planted and detonated by Jaysh al-Mahdi in eastern Baghdad, Iraq.  She was 51 years old.

505.    Ms. Klecker was a U.S. citizen when she was killed in Iraq.

506.    Plaintiff Caren Klecker is a U.S. citizen and Washington resident.  She is the sister of Deborah Klecker.

507.    Plaintiff Gregory Klecker is a U.S. citizen and Oregon resident.  He is the brother of Deborah Klecker.

508.    As a result of the June 27, 2005 attack, and the death of Deborah Klecker, each member of the Klecker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Deborah Klecker's society, companionship, and counsel.

### U.    Leroy Lancaster

509.    Plaintiff Private First Class Leroy Lancaster served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

510.    On June 8, 2007, PFC Lancaster was injured in a complex attack carried out by Jaysh al-Mahdi, on the outskirts of Fedaliyah, in eastern Baghdad, Iraq.  The attack began with an EFP attack on PFC Lancaster's Humvee, followed by Jaysh al-Mahdi rifle and small-arms fire.  The attack severely wounded PFC Lancaster:  he was hit with shrapnel in the legs, neck,

and face, and he sustained burns on his legs.  He also suffered ruptured ear drums.  Due to these injuries, PFC Lancaster received a 60% disability rating from the VA.

511.    As a result of the June 8, 2007 attack, PFC Lancaster has experienced extreme physical and emotional pain and suffering.

### V.    Michael Lukow

512.    Plaintiff Staff Sergeant Michael Lukow served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Utah resident.

513.    On January 30, 2008, SSG Lukow was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, along the outskirts of the New Baghdad District.  The attack severely wounded SSG Lukow and, among other things, required an amputation of his foot.  Due to his injuries, SSG Lukow received a 75% disability rating from the U.S. Army.

514.    As a result of the January 30, 2008 attack, SSG Lukow has experienced extreme physical and emotional pain and suffering.

### W.    The Lynch Family

515.    Lance Corporal Robert A. Lynch served in Iraq in the U.S. Marine Corps, as part of the 1st Battalion, 12th Marine Regiment, 3rd Marine Division, III Marine Expeditionary Force.

516.    On July 24, 2007, L. Cpl. Lynch was killed by an EFP planted and detonated by Jaysh al-Mahdi in Iraq, on the road between Baghdad and Baqubah.  He was 20 years old.

517.    L. Cpl. Lynch was a U.S. citizen when he was killed in Iraq.

518.    Plaintiff Angela Robinson is a U.S. citizen and Wisconsin resident.  She is the mother of L. Cpl. Lynch.

519.    Plaintiff Randall Thompson is a U.S. citizen and Kentucky resident.  He is the brother of L. Cpl. Lynch.

520.    As a result of the July 24, 2007 attack, and the death of L. Cpl. Lynch, each member of the Lynch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of L. Cpl. Lynch's society, companionship, and counsel.

## X.    Nathan McClure

521.    Plaintiff Sergeant Nathan McClure served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Kansas resident.

522.    On September 2, 2007, SGT McClure was injured in a complex attack carried out by Jaysh al-Mahdi, near FOB Rustamiyah in Iraq.  Jaysh al-Mahdi's complex attack involved the use of an array of multiple EFPs to attack SGT McClure's convoy, followed by small-arms fire. The attack severely wounded SGT McClure and, due to his wounds, he later received a 100% disability rating from the VA.  As a result of the September 2, 2007 attack, SGT McClure has experienced extreme physical and emotional pain and suffering.

## Y.    The McNeal Family

523.    Staff Sergeant Jeremiah E. McNeal served in Iraq as a combat engineer assigned to the 237th Engineer Company, 276th Engineer Battalion, 91st Troop Command, Virginia Army National Guard.

524.    On April 6, 2008, during the Battle of Sadr City, SSG McNeal was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in east Baghdad, Iraq.  He was 23 years old.

525.    SSG McNeal was a U.S. citizen when he was killed in Iraq.

526.    Plaintiff Nikita McNeal is a U.S. citizen and Virginia resident.  She is the widow of SSG McNeal.

527.    Plaintiff J.M., by and through his next friend Nikita McNeal, is a U.S. citizen and Virginia resident.  He is the minor son of SSG McNeal.

528.     As a result of the April 6, 2008 attack, and the death of SSG McNeal, each member of the McNeal Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McNeal's society, companionship, and counsel.

**Z.     The Mixson Family**

529.     Plaintiff Corporal Joseph Mixson served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Florida resident.

530.     On September 4, 2007, CPL Mixson was severely injured by an EFP planted and detonated by Jaysh al-Mahdi near FOB Rustamiyah, in Sadr City.  The attack severely wounded CPL Mixson and killed the other four 2-16 Rangers with him in the Humvee.  CPL Mixson sustained a skull fracture, suffered Traumatic Brain Injury, lost one of his elbows, and lost both of his legs above the knee.  Due to his injuries, CPL Mixson has received a 100% disability rating from the VA.  As a result of the attack, CPL Mixson has experienced extreme physical and emotional pain and suffering.

531.     Plaintiff John Mixson is a U.S. citizen and Florida resident.  He is the father of CPL Mixson.  Mr. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.  As a result of the September 4, 2007 attack, and CPL Mixson's injuries, Mr. Mixson has experienced extreme emotional pain and suffering.

532.     Plaintiff Karon Mixson is a U.S. citizen and Florida resident.  She is the mother of CPL Mixson.  Mrs. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.  As a result of the September 4, 2007 attack, and CPL Mixson's injuries, Mrs. Mixson has experienced extreme emotional pain and suffering.

533.     Plaintiff Alicia Mixson is a U.S. citizen and Florida resident.  She is the sister of CPL Mixson.  Ms. Mixson lived with and helped care for CPL Mixson in the aftermath of the

attack.  As a result of the September 4, 2007 attack, and CPL Mixson's injuries, Ms. Mixson has experienced extreme emotional pain and suffering.

### AA.    The Neiberger Family

534.    Specialist Christopher Neiberger served in Iraq in the U.S. Army as part of the 1st Battalion, 18th Infantry Regiment.  He served as a tank gunner.

535.    On August 6, 2007, SPC Neiberger was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad, Iraq.  He was 22 years old.

536.    SPC Neiberger was a U.S. citizen when he was killed in Iraq.

537.    Plaintiff Richard Neiberger is a U.S. citizen and Florida resident.  He is the father of Christopher Neiberger.

538.    Plaintiff Mary Neiberger is a U.S. citizen and Florida resident.  She is the mother of Christopher Neiberger.

539.    Plaintiff Eric Neiberger is a U.S. citizen and Florida resident.  He is the brother of Christopher Neiberger.

540.    Plaintiff Ami Neiberger is a U.S. citizen and Virginia resident.  She is the sister of Christopher Neiberger.

541.    Plaintiff Robert Neiberger is a U.S. citizen and Washington, D.C. resident.  He is the brother of Christopher Neiberger.

542.    As a result of the August 6, 2007 attack, and the death of SPC Neiberger, each member of the Neiberger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Neiberger's society, companionship, and counsel.

### BB.    The Pellecchia Family

543.    Plaintiff Corporal Anthony Donald Pellecchia served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

544.    On April 6, 2007, CPL Pellecchia was injured in a complex attack by Jaysh al-Mahdi near FOB Rustamiyah, where Jaysh al-Mahdi ambushed his platoon.  The complex attack involved both a roadside EFP and an ambulance that Jaysh al-Mahdi had rigged with explosives. The attack partially detached one of CPL Pellecchia's kneecaps, partially severed his patellar tendon, crushed one of his feet, set one of his legs on fire, inflicted shrapnel wounds to his abdomen, and caused him to suffer a blown eardrum.  The physical trauma CPL Pellecchia suffered caused permanent psoriasis in affected parts of his body.  Due to these wounds, CPL Pellecchia has received a 90% disability rating from the VA.  As a result of the attack, he has experienced severe physical and emotional pain and suffering.

545.    Plaintiff Anthony Pellecchia is a U.S. citizen and Texas resident.  He is the father of CPL Pellecchia, and he cared for CPL Pellecchia after his injuries.  As a result of the April 6, 2007 attack, and CPL Pellecchia's injuries, Mr. Pellecchia has experienced extreme emotional pain and suffering.

546.    Plaintiff Kathryn Ann Johnson is a U.S. citizen and Missouri resident.  She is the mother of CPL Pellecchia, and she cared for CPL Pellecchia after his injuries.  As a result of the April 6, 2007 attack, and CPL Pellecchia's injuries, Ms. Johnson has experienced extreme emotional pain and suffering.

**CC.    The Price Family**

547.    Plaintiff Specialist Daniel Price served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Illinois resident.

548.    On July 17, 2007, SPC Price was injured by an IED – consisting of three 155mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place near FOB Rustamiyah, close to Sadr City.  Due to his injuries, SPC Price received a 90%

disability rating from the VA.  As a result of the July 17, 2007 attack, SPC Price has experienced severe physical and emotional pain and suffering.

549.     Plaintiff Terri Overton is a U.S. citizen and Illinois resident.  She is the mother of SPC Price.  As a result of the July 17, 2007 attack, and SPC Price's injuries, Ms. Overton has experienced extreme emotional pain and suffering.

### DD.     Carl Reiher

550.     Plaintiff Private First Class Carl Reiher served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Arkansas resident.

551.     On March 29, 2008, PFC Reiher was injured by an EFP planted and detonated by Jaysh al-Mahdi, while traveling on Route Pluto near COP Cajimat in Kamaliyah, Iraq.  The attack severely wounded PFC Reiher and caused him to lose a hand.  Due to his injuries sustained, PFC Reiher received a 100% disability rating from the VA.  He has experienced severe physical and emotional pain and suffering as a result.

### EE.     The Rogers Estate

552.     Major Alan Rogers served in Iraq as part of the 1st Division National Police Transition Team of the U.S. Army, which trained and embedded with Iraqi military units.

553.     On January 27, 2008, MAJ Rogers was killed by an IED planted and detonated by Jaysh al-Mahdi, in the Rusafa District in eastern Baghdad, Iraq.  He was 40 years old.

554.     MAJ Rogers was a U.S. citizen when he was killed in Iraq.

555.     Plaintiff Shay Hill is the Executor of MAJ Rogers' estate.  A copy of the Georgia Probate Court order appointing him Executor, as well as an authenticated copy of MAJ Rogers' will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Mr. Hill brings this

action in his representative capacity as Executor, on behalf of MAJ Rogers' estate.  Mr. Hill is a

U.S. citizen and Florida resident.

556.     MAJ Rogers' estate is entitled to recover economic and non-economic damages

from Defendants, due to his death in the January 27, 2008 Jaysh al-Mahdi attack.

**FF.     The Rosa Family**

557.     Plaintiff Sergeant Luis Rosa-Valentin served in Iraq as part of the 66th Armored

Regiment, 3rd Brigade Combat Team, 4th Infantry Division of the U.S. Army.  He is a U.S.

citizen and Maryland resident.

558.     On April 21, 2008, SGT Rosa-Valentin was injured by an EFP planted and

detonated by Jaysh al-Mahdi in Sadr City.  The injuries that SGT Rosa-Valentin sustained from

the EFP caused him to lose both his legs and his left arm, and doctors gave him 5% survival odds

in the wake of the attack.  He also suffered blindness in one eye, lost his hearing, broke every

bone in his face, suffered Traumatic Brain Injury, and was diagnosed with Post-Traumatic Stress

Disorder.  Due to his injuries, SGT Rosa-Valentin received a 100% disability rating from the

VA.

559.     As a result of the April 21, 2008 attack, SGT Rosa-Valentin has experienced

extreme physical and emotional pain and suffering.

560.     Plaintiff Luis Rosa-Alberty is a U.S. citizen and Maryland resident.  He is the

father of SGT Rosa-Valentin.  As a result of the April 21, 2008 attack, and SGT Rosa-Valentin's

injuries, Mr. Rosa-Alberty has experienced extreme emotional pain and suffering.

561.     Plaintiff M.R., by and through her next friend Luis Rosa-Valentin, is a U.S.

citizen and Maryland resident.  She is the minor daughter of Luis Rosa-Valentin.  As a result of

the April 21, 2008 attack, and SGT Rosa-Valentin's injuries, M.R. has experienced extreme

emotional pain and suffering.

562.    Plaintiff Alex Rosa-Valentin is a U.S. citizen and Florida resident.  He is the brother of SGT Rosa-Valentin.  As a result of the April 21, 2008 attack, and SGT Rosa-Valentin's injuries, Mr. Rosa-Valentin has experienced extreme emotional pain and suffering.

563.    Plaintiff Iliana Rosa-Valentin is a U.S. citizen and Maryland resident.  She is the sister of SGT Rosa-Valentin.  As a result of the April 21, 2008 attack, and SGT Rosa-Valentin's injuries, Ms. Rosa-Valentin has experienced extreme emotional pain and suffering.

### GG.    The Shaw Family

564.    Micah Shaw served as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who searched for and disposed of captured munitions in Iraq.

565.    On December 9, 2007, Mr. Shaw was killed by an EFP planted and detonated by Jaysh al-Mahdi in Iraq, in Az Zubaydiyah, in Wasit Province, which was a Jaysh al-Mahdi stronghold in central Iraq.  The EFP attack destroyed Mr. Shaw's vehicle, which was also occupied by Michael Doheny, Steven Evrard, and Plaintiff Billy Johnson.  Mr. Shaw was 32 years old.

566.    Mr. Shaw was a U.S. citizen when he was killed in Iraq.

567.    Plaintiff Elena Shaw is a U.S. citizen and New Hampshire resident.  She is the widow of Micah Shaw.

568.    Plaintiff Emily Shaw is a U.S. citizen and New Hampshire resident.  She is the daughter of Micah Shaw.

569.    Plaintiff C.S., by and through his next friend Elena Shaw, is a U.S. citizen and New Hampshire resident.  He is the minor son of Micah Shaw.

570.    Plaintiff L.S., by and through her next friend Elena Shaw, is a U.S. citizen and New Hampshire resident.  She is the minor daughter of Micah Shaw.

571.    As a result of the December 9, 2007 attack, and the death of Micah Shaw, each member of the Shaw Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Micah Shaw's society, companionship, and counsel.

**HH.    The Stephens Family**

572.    Sergeant Blake Stephens served in Iraq with the 3rd Brigade Combat Team of the 3rd Infantry Division of the U.S. Army.

573.    On May 8, 2007, SGT Stephens was killed by an EFP planted and detonated by Jaysh al-Mahdi in Salman Pak, a town 18 miles south of Baghdad, Iraq.  He was 25 years old.

574.    SGT Stephens was a U.S. citizen when he was killed in Iraq.

575.    Plaintiff Kathleen Stephens is a U.S. citizen and Idaho resident.  She is the mother of Blake Stephens.

576.    Plaintiff Trent Stephens is a U.S. citizen and Idaho resident.  He is the father of Blake Stephens.

577.    Plaintiff Derek Stephens is a U.S. citizen and Idaho resident.  He is the brother of Blake Stephens.

578.    Plaintiff Rhett Stephens is a U.S. citizen and California resident.  He is the brother of Blake Stephens.

579.    Plaintiff Summer Stephens is a U.S. citizen and California resident.  She is the sister of Blake Stephens.

580.    Plaintiff Brittani Hobson is a U.S. citizen and Idaho resident.  She is the sister of Blake Stephens.

581.    As a result of the May 8, 2007 attack, and the death of SGT Stephens, each member of the Stephens Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stephens' society, companionship, and counsel.

II.      **The Tucker Family**

582.     Specialist Ronald J. Tucker served in Iraq in the U.S. Army as part of the 1st Battalion, 22nd Infantry Regiment, 1st Brigade Combat Team, 4th Infantry Division.

583.     On April 30, 2008, SPC Tucker was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad, Iraq.  The attack killed SPC Tucker while he was in a vehicle traveling back from helping to build a soccer field for Iraqi children.  He was 21 years old.

584.     SPC Tucker was a U.S. citizen when he was killed in Iraq.

585.     Plaintiff Susan Arnold is a U.S. citizen and Colorado resident.  She is the mother of Ronald Tucker.

586.     Plaintiff David Arnold is a U.S. citizen and Colorado resident.  He is the stepfather of Ronald Tucker.

587.     Plaintiff Samantha Tucker is a U.S. citizen and Ohio resident.  She is the sister of Ronald Tucker.

588.     Plaintiff Daisy Tucker is a U.S. citizen and Colorado resident.  She is the sister of Ronald Tucker.

589.     Plaintiff Brandon Arnold is a U.S. citizen and Colorado resident.  He is the brother of Ronald Tucker.

590.     As a result of the April 30, 2008 attack, and the death of SPC Tucker, each member of the Tucker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Tucker's society, companionship, and counsel.

JJ.      **The Vaughn Family**

591.     Sergeant Richard A. Vaughn served in Iraq in the U.S. Army as part of the 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division.

592.    On April 7, 2008, during the Battle of Sadr City, SGT Vaughn was killed in a complex attack – which involved the use of RPGs and EFPs – carried out by Jaysh al-Mahdi in Fedaliyah, which is in the New Baghdad District in eastern Baghdad, Iraq.

593.    SGT Vaughn was a U.S. citizen when he was killed in Iraq.

594.    Plaintiff Rachelle Idol is a U.S. citizen and North Carolina resident.  She is the widow of Richard Vaughn.

595.    Plaintiff James Vaughn is a U.S. citizen and Arizona resident.  He is the father of Richard Vaughn.

596.    Plaintiff Jeannine Vaughn is a U.S. citizen and Arizona resident.  She is the mother of Richard Vaughn.

597.    Plaintiff Clifford Vaughn is a U.S. citizen and Arizona resident.  He is the brother of Richard Vaughn.

598.    As a result of the April 7, 2008 attack, and the death of SGT Vaughn, each member of the Vaughn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Vaughn's society, companionship, and counsel.

**KK.    The White Family**

599.    Staff Sergeant Delmar White served in Iraq as part of the 2nd Battalion of the 138th Field Artillery in the Kentucky National Guard, based out of Carlisle, Kentucky.

600.    On September 2, 2007, SSG White was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Rusafa District in eastern Baghdad, Iraq.  He was 37 years old.

601.    SSG White was a U.S. citizen when he was killed in Iraq.

602.    Plaintiff Michele White is a U.S. citizen and Kentucky resident.  She is the widow of Delmar White.

603.    Plaintiff Shelby White is a U.S. citizen and Kentucky resident.  She is the daughter of Delmar White.

604.    Plaintiff S.W., by and through his next friend Michele White, is a U.S. citizen and Kentucky resident.  He is the minor son of Delmar White.

605.    As a result of the September 2, 2007 attack, and the death of SSG White, each member of the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG White's society, companionship, and counsel.

**LL.    Robert Winegar**

606.    Plaintiff Specialist Robert Winegar served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

607.    On March 29, 2008, during the Battle of Sadr City, SPC Winegar was injured by an EFP planted and detonated by Jaysh al-Mahdi near Fedilayah, Iraq.  The explosion and shrapnel severely wounded SPC Winegar, and, due to his injuries, he received a 90% disability rating from the VA.  As a result of the attack, SPC Winegar has experienced extreme physical and emotional pain and suffering.

**MM.   Melissa Witte**

608.    Staff Sergeant Kevin Witte served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.

609.    On October 20, 2006, SSG Witte was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad, Iraq.  He was 27 years old.

610.    SSG Witte was a U.S. citizen when he was killed in Iraq.

611.    Plaintiff Melissa Witte is a U.S. citizen and North Carolina resident.  She is the widow of SSG Witte.

612.     As a result of the October 20, 2006 attack, and the death of SSG Witte, Ms. Witte has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Witte's society, companionship, and counsel.

**NN.     William Zappa**

613.     Plaintiff First Sergeant William Zappa served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Texas resident.

614.     On April 28, 2007, 1SG Zappa was injured by the same Jaysh al-Mahdi sniper who shot SGT Emory in the Kamaliyah neighborhood in eastern Baghdad, Iraq.  The sniper shot 1SG Zappa in the side.  Due to his injuries, 1SG Zappa received a 50% disability rating by the VA.

615.     As a result of the April 28, 2007 attack, 1SG Zappa has experienced extreme physical and emotional pain and suffering.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT ONE**</u>**:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**(Aiding-and-Abetting Liability, Attack Predicate)**

616.     Plaintiffs incorporate their allegations above.

617.     The terrorist attacks that killed or injured Plaintiffs or members of their families were acts of international terrorism committed by Jaysh al-Mahdi.

618.     The terrorist attacks committed by Jaysh al-Mahdi, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States or would have violated those laws if they had been committed within the jurisdiction of the United States.  In particular, each attack constituted one or more of the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing

official duties, hostage taking, damaging U.S. government property, destroying national defense material, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing government facilities, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2155, 2332, 2332a, 2332b, and 2332f, respectively.

619.    Jaysh al-Mahdi's terrorist attacks appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

620.    Jaysh al-Mahdi's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

621.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by Jaysh al-Mahdi.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

622.    Defendants aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi by engaging in corrupt transactions with MOH that were structured to finance Jaysh al-Mahdi's terrorist activities, including by providing cash, drugs, medical devices, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi.

623.    The Jaysh al-Mahdi attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by Lebanese Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

624.     As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) (Aiding-and-Abetting Liability, RICO predicate)

625.     Plaintiffs incorporate their allegations above.

626.     From April 2003 until the present, as a terrorist organization, Jaysh al-Mahdi has been a group of associated individuals that functions as a continuing unit.  Jaysh al-Mahdi has engaged in, and its activities have affected, foreign commerce.

627.     From April 2003 until the present, Muqtada al-Sadr and other terrorists employed by or associated with Jaysh al-Mahdi have maintained and conducted Jaysh al-Mahdi as an enterprise by engaging in a campaign to expel Americans from Iraq through crime and anti-American violence (the "Jaysh al-Mahdi Campaign").

628.     Specifically, Muqtada al-Sadr and other terrorists employed by or associated with Jaysh al-Mahdi conducted and participated in the conduct of Jaysh al-Mahdi's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, kidnapping, and arson, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, destroying national defense material, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from a Foreign Terrorist Organization, in violation of state law and 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2155, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Muqtada al-Sadr and

other members of Jaysh al-Mahdi also maintained an interest in and control of Jaysh al-Mahdi (and conspired to do so) through this pattern of racketeering activity.

629.    The Jaysh al-Mahdi Campaign was an act of international terrorism.  It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c), the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b), and conspiring to do either of these acts, 18 U.S.C. § 1962(d), or would have violated these prohibitions had the Jaysh al-Mahdi Campaign been conducted within the jurisdiction of the United States.

630.    The Jaysh al-Mahdi Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

631.    The Jaysh al-Mahdi Campaign occurred primarily outside the territorial jurisdiction of the United States.

632.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Jaysh al-Mahdi Campaign.  Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Muqtada al-Sadr and other members of Jaysh al-Mahdi conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of Jaysh al-Mahdi.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Jaysh al-Mahdi Campaign; are the estate, survivors, and/or heirs of U.S. nationals who suffered such injuries; or both.

633.    Defendants aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi and the Jaysh al-Mahdi Campaign.  Defendants did so by engaging in corrupt transactions with MOH that were structured to finance the terrorist activities of Jaysh al-Mahdi and its members, including by providing cash, drugs, medical devices, training, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi.

634.    The Jaysh al-Mahdi Campaign was committed, planned, and/or authorized by Lebanese Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

635.    As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
### (Primary Liability, Material Support Predicate)

636.    Plaintiffs incorporate their allegations above.

637.    Defendants, by agreeing to structure their transactions with MOH to provide cash, drugs, medical devices, training, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi, provided material support to terrorists in violation of 18 U.S.C. § 2339A.

638.    Defendants knew or recklessly disregarded that their material support would be used by Jaysh al-Mahdi in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, destroying national defense material, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from a foreign terrorist organization.  Those acts by Jaysh al-Mahdi, in turn, violated the criminal laws of the United

States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2155, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Defendants also structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.

639.    Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for Jaysh al-Mahdi appears, as an objective matter under a reasonable-person standard, to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.  *See*, *e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material support statutes, even without any "subjective intent" to further terrorist attacks, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance'"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

640.    Defendants' provision of material support to Jaysh al-Mahdi occurred primarily outside the territorial jurisdiction of the United States.

641.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

642.     As a result of Defendants' violation of 18 U.S.C. § 2333(a) and 18 U.S.C.

§ 2333A, Plaintiffs are entitled to recover economic and non-economic damages, including

solatium damages.

## COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) (Primary Liability, Terrorist Financing Predicate)

643.     Plaintiffs incorporate their allegations above.

644.     Defendants, by agreeing to structure their transactions with MOH to provide cash,

drugs, and medical devices to members of Jaysh al-Mahdi, unlawfully and willfully provided

funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B), knowing or recklessly

disregarding that Jaysh al-Mahdi would use those funds in full or in part to carry out acts

intended to cause death or serious bodily injury to civilians and/or others not taking an active

part in the hostilities in a situation of armed conflict, and that the purpose of Jaysh al-Mahdi's

acts was to intimidate the Iraqi and United States populations and to compel the United States

and Iraqi governments to effect a withdrawal of American forces from Iraq.

645.     Defendants' provision of funds to Jaysh al-Mahdi involved acts dangerous to

human life that violated the criminal laws of the United States or would have violated those

prohibitions if they were committed within the jurisdiction of the United States, including 18

U.S.C. § 2339C(a)(1)(B).  Defendants' conduct therefore gives rise to primary liability under 18

U.S.C. § 2333(a).  Defendants' provision of funds to Jaysh al-Mahdi appears, as an objective

matter under a reasonable-person standard, to have been intended (a) to intimidate or coerce the

civilian populations of Iraq and the United States, (b) to influence the policy of the United States

and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United

States and Iraqi governments by mass destruction, assassination, and kidnapping.  *See*, *e.g.*,

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material

support statutes, even without any "subjective intent" to further terrorist attacks, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance' ''); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

646.    Defendants' provision of funds to Jaysh al-Mahdi occurred primarily outside the territorial jurisdiction of the United States.

647.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors or heirs of U.S. nationals who suffered such injuries; or both.

648.    As a result of Defendants' provision of funds to Jaysh al-Mahdi in violation of 18 U.S.C. § 2333(a) and 18 U.S.C. § 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## <u>COUNT FIVE</u>:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (State Law)

649.    Plaintiffs incorporate their allegations above.

650.    Defendants' corrupt transactions with MOH were the direct, actual, and proximate cause of severe emotional distress suffered by Plaintiffs.

651.    Defendants knew or should have known that their conduct would result in severe emotional distress to Plaintiffs.  Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the severe emotional distress inflicted on Plaintiffs.

652.    Defendants' conduct constituted extreme and outrageous conduct that is so extreme in degree as to go beyond all possible bounds of decency and be considered atrocious and utterly intolerable in a civilized community.

653.     Until 2017, Plaintiffs did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused their severe emotional distress.

654.     Defendants are liable to Plaintiffs for the intentional infliction of severe emotional distress under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

## JURY DEMAND

655.     In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

656.     Plaintiffs request that the Court:

    a.   Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, and applicable state law;

    b.   Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

    c.   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

    d.   Award Plaintiffs prejudgment interest; and

    e.   Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  October 17, 2017

Respectfully submitted,

*/s/ David C. Frederick*

| | |
|---|---|
| Ryan R. Sparacino (D.C. Bar No. 493700) | David C. Frederick (D.C. Bar No. 431864) |
| G. Derek Andreson (D.C. Bar No. 489994) | Joshua D. Branson (D.C. Bar No. 981623) |
| Sparacino & Andreson PLLC | Andrew E. Goldsmith (D.C. Bar No. 1007074) |
| 1920 L Street, NW, Suite 535 | Thomas G. Schultz (D.C. Bar No. 1028017) |
| Washington, D.C. 20036 | Nicholas O. Hunter (D.C. Bar No. 1022355) |
| Tel:  (202) 629-3530 | Kellogg, Hansen, Todd, |
| ryan.sparacino@sparacinopllc.com |   Figel & Frederick, P.L.L.C. |
| derek.andreson@sparacinopllc.com | 1615 M Street, N.W., Suite 400 |

Ryan R. Sparacino (D.C. Bar No. 493700)
G. Derek Andreson (D.C. Bar No. 489994)
Sparacino & Andreson PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
derek.andreson@sparacinopllc.com

David C. Frederick (D.C. Bar No. 431864)
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Thomas G. Schultz (D.C. Bar No. 1028017)
Nicholas O. Hunter (D.C. Bar No. 1022355)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
tschultz@kellogghansen.com
nhunter@kellogghansen.com

*Counsel for Plaintiffs*