## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOSHUA ATCHLEY *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:17-CV-02136 (RJL) |
| v. | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| ASTRAZENECA UK LIMITED *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DOMESTIC DEFENDANTS' MOTION TO DISMISS

Each of the Domestic Defendants in the above-captioned action,[1] by its respective undersigned counsel, respectfully moves to dismiss the complaint in this action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for the reasons set forth in the accompanying Memorandum in Support of Defendants' Rule 12(b)(1) and 12(b)(6) Motions to Dismiss.

Each of the Domestic Defendants also moves to dismiss Plaintiffs' state law claims for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for the reasons set forth in Part III of the Memorandum in Support of Defendants' Motions to Dismiss for Lack of Personal Jurisdiction accompanying the Foreign Defendants' Motion to Dismiss.

Domestic Defendants respectfully request oral argument on this motion. A proposed order has been attached hereto for the Court's consideration.

---

[1] The Domestic Defendants are AstraZeneca Pharmaceuticals, LP, GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., Johnson & Johnson, Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Johnson & Johnson (Middle East) Inc., Ortho Biologics LLC, Pfizer Inc., Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Wyeth Pharmaceuticals Inc., Genentech, Inc., and Hoffmann-La Roche Inc.

Dated:  February 5, 2018

Respectfully submitted,

/s/ Neil H. MacBride
Neil H. MacBride (D.C. Bar No. 439137)
Kenneth J. Wainstein (D.C. Bar No. 451058)
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
Tel: (202) 962-7030; Fax: (202) 962-7118
neil.macbride@davispolk.com

Paul S. Mishkin (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4292; Fax: (212) 701-5292
paul.mishkin@davispolk.com

*Counsel for Defendant AstraZeneca
Pharmaceuticals, LP*

/s/ John B. Bellinger
John B. Bellinger III (D.C. Bar No. 405059)
David J. Weiner (D.C. Bar No. 499806)
Robert A. DeRise (D.C. Bar No. 1005355)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson (D.C. Bar No.
994989)
ARNOLD & PORTER KAYE SCHOLER
LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-2325
Reeves.Anderson@arnoldporter.com

*Counsel for Defendants GE Healthcare USA
Holding LLC and GE Medical Systems
Information Technologies, Inc.*

/s/ John F. Baughman
John F. Baughman (D.C. Bar No. NY0254)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
jbaughman@paulweiss.com

Jeh C. Johnson (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
jjohnson@paulweiss.com

*Counsel for Defendants Johnson & Johnson,
Ethicon Endo-Surgery, LLC, Ethicon, Inc.,
Janssen Ortho LLC, Johnson & Johnson
(Middle East) Inc., and Ortho Biologics LLC*

/s/ Joseph G. Petrosinelli
Joseph G. Petrosinelli (D.C. Bar No. 434280)
Christopher N. Manning (D.C. Bar No.
464069)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
jpetrosinelli@wc.com

*Counsel for Defendants Pfizer Inc.,
Pfizer Pharmaceuticals LLC, Pharmacia
& Upjohn Company LLC, and Wyeth
Pharmaceuticals Inc.*

(signatures continue on next page)

/s/ Carl J. Nichols
Carl J. Nichols (D.C. Bar. No. 466889)
Patrick J. Carome (D.C. Bar. No. 385676)
David W. Bowker (D.C. Bar. No. 989309)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
carl.nichols@wilmer.com

*Counsel for Defendants Genentech, Inc. and
Hoffmann-La Roche Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSHUA ATCHLEY *et al.*,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　)
　　　　　　　　　　　　　　　　)　　Case No. 1:17-CV-02136 (RJL)
　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
ASTRAZENECA UK LIMITED *et al.*,　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 6

    A.  The U.S.-Led Invasion And Strategy For Victory In Iraq ........................................ 6

    B.  The U.S. Policy Of Funding And Rebuilding Iraq And The Ministry ........................ 7

    C.  The Sadrists And Jaysh Al-Mahdi .............................................................................. 14

    D.  The Armed Attacks At Issue ...................................................................................... 17

    E.  The Defendants' Supply Of Medicines And Medical Devices To The
        Ministry ...................................................................................................................... 19

STATUTORY FRAMEWORK AND PLAINTIFFS' CLAIMS ................................................ 21

    A.  The ATA's Civil Remedy Provision .......................................................................... 21

    B.  Plaintiffs' Causes Of Action ...................................................................................... 23

LEGAL STANDARD ........................................................................................................ 24

ARGUMENT ................................................................................................................... 25

I.  THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CLAIMS
    POSE NONJUSTICIABLE POLITICAL QUESTIONS ................................................... 26

    A.  Plaintiffs' Claims Ask The Court To Condemn U.S. Policy Governing
        The Funding And Rebuilding Of Iraq And Its Public Health System ........................ 27

    B.  Plaintiffs' Claims Also Ask The Court To Contradict U.S. Policies Regarding
        The Sadrists And Jaysh Al-Mahdi .............................................................................. 32

II.  THE ACT OF WAR EXCLUSION BARS ALL OF PLAINTIFFS' ATA CLAIMS ............ 33

    A.  Iraq Was In A State Of "Armed Conflict" During The Relevant
        Period ........................................................................................................................ 34

    B.  Jaysh Al-Mahdi Was A "Military Force" In The Armed Conflict ............................... 39

    C.  The Attacks At Issue Occurred "In The Course Of" Armed Conflict ........................ 41

III.  PLAINTIFFS' CLAIMS THAT DEFENDANTS ARE LIABLE FOR DIRECTLY
COMMITTING ACTS OF INTERNATIONAL TERRORISM FAIL ON
NUMEROUS GROUNDS ..................................................................................... 43

  A.  Plaintiffs Allege An Indirect And Highly Attenuated Causal Chain That Fails
To Satisfy The ATA's Proximate Cause Requirement ................................................ 44

  B.  Defendants' Alleged Actions Did Not Objectively "Appear To Be Intended"
To Intimidate A Civilian Population Or To Coerce Government Policy ................... 50

  C.  Plaintiffs Cannot Satisfy The Scienter Elements Of The Alleged Predicate
Crimes On Which Their Direct Liability ATA Claims Are Based............................ 52

  D.  The Medicine Exception To 18 U.S.C. § 2339A Requires Dismissal
Of The Material Support Claims Against The Pharmaceutical Defendants............... 56

  E.  Plaintiffs' Terrorism Financing Claim Should Be Dismissed With Respect To
The 89 Plaintiffs Suing Over Injuries Or Deaths Of U.S. Service Members ............. 59

IV.  PLAINTIFFS' CLAIMS FOR AIDING-AND-ABETTING LIABILITY UNDER
THE ATA FAIL FOR MANY REASONS ........................................................... 60

  A.  Plaintiffs Cannot Satisfy § 2333(d)'s Threshold Requirement That A
Designated FTO "Committed, Planned, Or Authorized" Each Alleged "Act Of
International Terrorism" ............................................................................................ 61

    1.  Plaintiffs' Fail To Adequately Plead That Hezbollah Planned Or
Authorized The Jaysh Al-Mahdi Attacks ....................................................... 61

    2.  Plaintiffs' Novel Attempt To Use RICO To Plead Around The ATA's
FTO Limit On Aiding-And-Abetting Liability Fails ...................................... 64

  B.  Both Aiding-And-Abetting Counts Also Fail Because The Allegations Do Not
Establish The Mens Rea Or Actus Reus Of A Substantial Assistance Claim ........... 67

    1.  Plaintiffs Fail To Plead Defendants "Knowingly" Assisted Acts Of
Terrorism Committed, Planned, Or Authorized By An FTO .......................... 67

    2.  Plaintiffs Fail To Plead Defendants "Substantial[ly] Assist[ed]" Jaysh
Al-Mahdi's Alleged Acts Of Terrorism.......................................................... 68

V.  PLAINTIFFS' STATE-LAW IIED CLAIMS SHOULD BE DISMISSED......................... 71

  A.  Plaintiffs' IIED Claims Are Time-Barred................................................................. 71

  B.  Plaintiffs Fail to State IIED Claims On The Merits .................................................. 73

CONCLUSION...................................................................................................... 75

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,
    62 F.3d 1454 (D.C. Cir. 1995) ...................................................................................71

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) .............................................................................50

*Aetna Cas. & Surety Co. v. Leahey Const. Co.*,
    219 F.3d 519 (6th Cir. 2000) .....................................................................................69

*Al-Aulaqi v. Panetta*,
    35 F. Supp. 3d 56, 67 (D.D.C. 2014) ..........................................................................6

*Alkasabi v. Wash. Mut. Bank*,
    31 F. Supp. 3d 101, 110 (D.D.C. 2014) ....................................................................72

*Almog v. Arab Bank, PLC*,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ......................................................................59

*Alseran v. Ministry of Defence*,
    2017 WL 06374962, [2017] EWHC 3289 (QB) ........................................................37

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................25, 53, 63, 65

*\*Baker v. Carr*,
    369 U.S. 186 (1962) ..........................................................................................26, 27

*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ..................................................................................26

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017) ..............................................................................................45

*Beck v. Prupis*,
    529 U.S. 494 (2000) ..................................................................................................65

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................25, 56

*Benak v. Alliance Cap. Mgmt. L.P.*,
    435 F.3d 396 (3d Cir. 2006) .....................................................................................53

*Biton* v. *Palestinian Interim Self-Gov't Auth.*,
    412 F. Supp. 2d 1 (D.D.C. 2005) ..............................................................................43

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ..............................................................53, 70

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
    291 F.3d 1000 (7th Cir. 2002) ..................................................................70

*Bradshaw v. Nicolay*,
    765 P.2d 630 (Colo. App. 1988) ................................................................74

*Brill v. Chevron Corp.*,
    No. 15-cv-04916, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017)...........................51

*Brink v. Cont'l Ins. Co.*,
    787 F.3d 1120 (D.C. Cir. 2015)..................................................................65

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*,
    572 F.3d 1271 (11th Cir. 2009) .................................................................38

*Cevenini v. Archbishop of Wash.*,
    707 A.2d 768 (D.C. 1998) ........................................................................72

*Chicago & S. Air Lines v. Waterman S. S. Corp.*,
    333 U.S. 103 (1948)................................................................................33

*Christensen v. Superior Court*,
    820 P.2d 181 (Cal. 1991) .........................................................................74

*\*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) ................................................................30, 33

*Dammarell v. Islamic Republic of Iran*,
    No. 01-cv-2224 (JDB), 2005 WL 756090 (D.D.C. Mar. 29, 2005) ..................73

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
    941 F.2d 1220 (D.C. Cir. 1991)..................................................................65

*Davis v. Fulton*,
    884 F. Supp. 1245 (E.D. Ark. 1995)............................................................74

*Deem v. Koch Agric. Inc.*,
    188 F.3d 512 (9th Cir. 1999) .....................................................................74

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010)....................................................................27

*Estate of Klieman v. Palestinian Auth.*,
    424 F. Supp. 2d 153 (D.D.C. 2006)............................................................43

*Fields v. Twitter, Inc.,
    __ F.3d __, 2018 WL 626800 (9th Cir. Jan. 31, 2018) .............................................45, 48

Florida Bankers Ass'n v. U.S. Dep't of Treasury,
    799 F.3d 1065 (D.C. Cir. 2015) ...................................................................................34

Fryman v. Masters,
    No. 2004-CA-000932-MR, 2005 WL 1993464
    (Ky. Ct. App. Aug. 19, 2005) ......................................................................................74

Gibson v. Brewer,
    952 S.W.2d 239 (Mo. 1997) ........................................................................................74

Gill v. Arab Bank, PLC,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) .........................................................................39

Goldberg v. UBS AG,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) .........................................................................70

*Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) ........................................................................68, 69, 70

Hamdan v. Rumsfeld,
    548 U.S. 557 (2006) ...............................................................................................34, 36

Hemi Grp., LLC v. City of New York,
    559 U.S. 1 (2010) .........................................................................................................45

Hettinga v. United States,
    677 F.3d 471 (D.C. Cir. 2012) .....................................................................................58

Hinds Cty. v. Wachovia Bank NA,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) .........................................................................58

Holder v. Humanitarian Law Project,
    561 U.S. 1 (2010) ...................................................................................................57, 67

Hollis v. Rosa Mexicano DC, LLC,
    582 F. Supp. 2d 22 (D.D.C. 2008) ..............................................................................73

Holmes v. Sec. Inv'r Prot. Corp.,
    503 U.S. 258 (1992) ...............................................................................................45, 48

Humanitarian Law Project v. Reno,
    205 F.3d 1130 (9th Cir. 2000) .....................................................................................57

In re Elevator Antitrust Litig.,
    502 F.3d 47 (2d Cir. 2007) ..........................................................................................58

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.,*
  113 F.3d 1484 (8th Cir. 1997) ................................................................70, 71

*In re Terrorist Attacks on Sept. 11, 2001,*
  714 F.3d 118 (2d Cir. 2013)................................................................46, 52

*Jograj v. Enter. Servs., LLC,*
  No. 1:16-CV-1846-RMC, 2017 WL 3841833 (D.D.C. Sept. 1, 2017)............................24

*Kaempe v. Myers,*
  367 F.3d 958 (D.C. Cir. 2004) ................................................................25

*\*Kaplan v. Cent. Bank of Islamic Republic of Iran,*
  961 F. Supp. 2d 185 (D.D.C. 2013) ........................................................ *passim*

*Kimzey v. Yelp! Inc.,* 836 F.3d 1263 (9th Cir. 2016) ................................................57

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994)................................................................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  134 S. Ct. 1377 (2014)................................................................48

*Lillard & Lillard, P.C. v. Blue Cross & Blue Shield Ass'n,*
  971 F. Supp. 2d 116 (D.D.C. 2013) ........................................................24, 25

*Linde v. Arab Bank, PLC,*
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................................73

*Mastafa v. Chevron Corp.,*
  770 F.3d 170 (2d Cir. 2014)................................................................51

*McGanty v. Straudenraus,*
  901 P.2d 841 (Or. 1995) ................................................................74

*McKee v. Arizona,*
  388 P.3d 14 (Ariz. App. 2016)................................................................74

*Mobarez v. Kerry,*
  187 F. Supp. 3d 85 (D.D.C. 2016) ................................................................30

*Mullin v. Washington Free Weekly, Inc.,*
  785 A.2d 296 (D.C. 2001) ................................................................72

*Munns v. Clinton,*
  822 F. Supp. 2d 1048 (E.D. Cal. 2011)................................................................38

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.,*
  791 F. Supp. 2d 33 (D.D.C. 2011)................................................................70

*Ofisi v. BNP Paribas, S.A.,
    __ F. Supp. 3d __, 2017 WL 4355922 (D.D.C. Sept. 29, 2017)............................47, 48, 69

*Owens v. BNP Paribas, SA,
    235 F. Supp. 3d 85, 97-99 (D.D.C. 2017).....................................................................46, 47

People's Mojahedin Org. of Iran v. U.S. Dep't of State,
    182 F.3d 17 (D.C. Cir. 1999) ........................................................................................30, 33

Phoenix Consulting Inc. v. Republic of Angola,
    216 F.3d 36 (D.C. Cir. 2000) ...............................................................................................25

Prosecutor v. Tadić,
    Case No. IT-94-1-I, Decision on Defence Motion for Interlocutory Appeal
    on Jurisdiction (Int'l Crim. Trib. for the former Yugoslavia Oct. 2, 1995).......................36

Rabideau v. City of Racine,
    627 N.W.2d 795 (Wis. 2001)...............................................................................................74

Redmon v. U.S. Capitol Police,
    80 F. Supp. 3d 79, 89 (D.D.C. 2015)...................................................................................66

Redondo Waste Sys., Inc. v. Lopez-Freytes,
    659 F.3d 136 (1st Cir. 2011)................................................................................................58

Reid v. Pierce,
    961 P.2d 195 (Wash. 1998)..................................................................................................74

Republic of Iraq v. Beaty,
    556 U.S. 848 (2009)..............................................................................................................30

Rothstein v. UBS AG,
    647 F. Supp. 2d 292 (S.D.N.Y. 2009)..................................................................................71

*Rothstein v. UBS AG,
    708 F.3d 82 (2d Cir. 2013)........................................................................................ passim

RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,
    682 F.3d 1043 (D.C. Cir. 2012) ...........................................................................................58

Russello v. United States,
    464 U.S. 16 (1983)................................................................................................................62

*Saldana v. Occidental Petroleum Corp.,
    774 F.3d 544 (9th Cir. 2014) ...............................................................................................29

Saunders v. Nemati,
    580 A.2d 660 (D.C. 1990) ...................................................................................................71

vii

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) ...................................................................65

*\*Shatsky v. Palestine Liberation Org.*,
No. 02-cv-2280, 2017 WL 2666111 (D.D.C. June 20, 2017).................................3, 44, 49

*Sheeran v. Blyth Shipholding S.A.*,
No. 14-cv-5482, 2015 WL 9048979 (D.N.J. Dec. 16, 2015)...........................................58

*Siegel v. SEC*,
592 F.3d 147 (D.C. Cir. 2010).......................................................................44

*Sokolow v. Palestine Liberation Org.*,
583 F. Supp. 2d 451 (S.D.N.Y. 2008)...................................................41, 42, 43

*\*Stansell v. BGP, Inc.*,
No. 8:09-cv-2501, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ...........................50, 52

*Stewart v. Nat'l Educ. Ass'n*,
471 F.3d 169 (D.C. Cir. 2006) ....................................................................6, 34

*Stutts v. De Dietrich Grp.*,
No. 03-CV-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ...............................42, 52

*Supervalu, Inc. v. Johnson*,
666 S.E.2d 335 (Va. 2008)...........................................................................74

*Twyman v. Twyman*,
855 S.W.2d 619 (Tex. 1993).........................................................................73

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011)......................................................................56, 57

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ...................................................................65

*United States v. Shah*,
474 F. Supp. 2d 492 (S.D.N.Y. 2007)..........................................................56, 57

*United States v. Warsame*,
537 F. Supp. 2d 1005 (D. Minn. 2008) ...........................................................56

*Waldon v. Covington*,
415 A.2d 1070 (D.C. 1980) ........................................................................73

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014)......................................................................50, 51

## STATUTES, RULES, AND REGULATIONS

8 U.S.C. § 1189 ............................................................................................................3, 17

18 U.S.C. § 1962 ...................................................................................................................65

*18 U.S.C. § 2331 ........................................................................................................ *passim*

*18 U.S.C. § 2333 ........................................................................................................ *passim*

*18 U.S.C. § 2336 ...........................................................................................3, 22, 23, 33, 34

18 U.S.C. § 2339A ....................................................................................................... *passim*

18 U.S.C. § 2339B ..........................................................................................................56, 67

18 U.S.C. § 2339C ....................................................................................................... *passim*

28 U.S.C. § 1367 ...................................................................................................................75

50 U.S.C. § 1543 ...................................................................................................................35

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* ........................................................... *passim*

Authorization for the Use of Military Force Against Iraq,
    Pub. L. No. 107-243, 116 Stat. 1498 (2002) .....................................................35

Clayton Act, 15 U.S.C. § 15(a) ...........................................................................................45

Emergency Supplemental Appropriations Act for Defense & Reconstruction of
    Iraq & Afghanistan,
    Pub. L. No. 108-106, 117 Stat. 1209 (Nov. 6, 2003) ....................................7, 28

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 ...........................................................21, 68

National Defense Authorization Act for Fiscal Year 2005,
    Pub. L. No. 108-375 §§ 1201(a)(1), 1204(a)(4), 118 Stat. 1811 (2004) ..............8

Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1964(c) (2011) .................... *passim*

Sherman Act, 26 Stat. 210 (1890) .......................................................................................45

Fed. R. Civ. P. 12(b)(1) ...........................................................................................2, 6, 24

Fed. R. Civ. P. 12(b)(2) ..........................................................................................................2

Fed. R. Civ. P. 12(b)(6) .................................................................................2, 6, 24, 34

## OTHER AUTHORITIES

162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) ........................................................60, 64

Chambers Dictionary (13th ed. 2014) ................................................................................61

H.R. Rep. No. 104–383 (1995) ..........................................................................................58

KH (Article 15(c) Qualification Directive) Iraq CG [2008] UKAIT 00023 .................37

Michael N. Schmitt, *Iraq (2003 Onwards)*, in *Int'l Law and the Classification of Conflicts* 357 (Elizabeth Wilmshurst ed., 2012) ......................................................37

Letter of Submittal from Deputy Secretary Strobe Talbott, Oct. 3, 2000, S. Treaty Doc. No. 106-49 ...................................................................................60

New Oxford Am. Dictionary (3d ed. 2010) ......................................................................61

Oxford English Dictionary ................................................................................................40

Suppl. Br. for U.S., *United States v. Hamidullin*, No. 15-4788, 2017 WL 4163478 (4th Cir. Sept. 11, 2017) ...............................37

## INTRODUCTION

From 2003-2010, more than 4,000 brave American service members lost their lives in Operation Iraqi Freedom, and more than 30,000 were wounded in action. Plaintiffs and their family members were among them. Defendants recognize and respect the extraordinary sacrifice and dedication of all who served in the Iraq War, and sympathize with those—including Gold Star families—who suffered injury or loss. Defendants condemn those who attacked U.S. forces in Iraq and understand the strong desire to hold the perpetrators responsible.

This lawsuit, however, attempts to do something else. Plaintiffs attempt to impose civil liability on pharmaceutical and medical equipment companies for injuries and losses sustained at the hands of Iraqi insurgent groups in the armed conflict in Iraq. This effort would stretch the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, well beyond its text, to impose liability not on terrorists and their knowing supporters, but on companies that answered the U.S. government's call to help with the reconstruction of the Iraqi health care system.

Pursuing a novel and expansive theory of liability under the ATA, Plaintiffs claim that Defendants' provision of life-saving medicine and medical equipment to the Iraqi Ministry of Health (the "Ministry") knowingly caused the attacks that injured Plaintiffs. This theory begins with sectarian politics in Iraq after the United States returned sovereignty to that country, when a Shi'a political faction under the leadership of Muqtada al-Sadr (the "Sadrists") was given responsibility for the Ministry. The Sadrists' militia, Jaysh al-Mahdi (Arabic for "the Mahdi Army"), allegedly infiltrated the Ministry and looted its resources. Plaintiffs allege the Sadrists' control of Ministry resources helped Jaysh al-Mahdi in the ongoing military conflict in Iraq.

Although Plaintiffs portray the Sadrist-led Ministry of Health as "not a genuine medical institution" and nothing more than a "de facto terrorist group," Compl. ¶ 3, the Ministry was in charge of Iraq's public healthcare system and responsible for delivering healthcare to the entire

population of Iraq.  In that mission, the Ministry had no greater benefactor than the U.S. government.  As part of its foreign policy commitment to rebuild Iraq, the United States supported and heavily funded the Ministry, encouraged companies (including Defendants) to do business with the Ministry, and urged companies (including some Defendants) to donate free medicine to the Ministry.  Nonetheless, Plaintiffs contend that Defendants' provision of medicines and medical equipment (such as baby incubators, ventilators, and EKG machines) to the Ministry yielded—through looting and black-market sales by Jaysh al-Mahdi—cash that Jaysh al-Mahdi then used to help fund attacks on Americans.  On this basis, Plaintiffs allege that Defendants knowingly supported terrorism.

A central theme of Plaintiffs' narrative is that Defendants' dealings with the Ministry allegedly were corrupt.  Defendants deny that unfounded allegation, but even assuming its truth (for purposes of Defendants' motions), it is irrelevant under the ATA.  Plaintiffs' theory is that "[w]hether or not" there was corruption, the ATA creates liability for any "transactions with a counterparty [*i.e.*, the Ministry] that was openly controlled by terrorists [*i.e.*, Jaysh al-Mahdi]." Compl. ¶ 172.  In other words, under Plaintiffs' view, anyone who did business with the Ministry while the Sadrists were in charge of it is responsible for terrorism.

Plaintiffs' theory fails, for many reasons.[1]  *First*, at the threshold, Plaintiffs' entire Complaint should be dismissed for lack of jurisdiction under the political question doctrine because a ruling in Plaintiffs' favor would necessarily condemn wartime policies of the political branches.  If Plaintiffs' theory were accepted, the inescapable conclusion would be that the Executive and Legislative Branches, by funding the Sadrist-led Ministry of Health on a massive

---

[1] Defendants have moved to dismiss under various subsections of Rule 12(b).  This memorandum addresses the arguments of all Defendants under Rules 12(b)(1) and 12(b)(6). Defendants' arguments under Rule 12(b)(2) are detailed in a separate memorandum.

scale, also had engaged in and funded terrorism against U.S. forces in Iraq.  A ruling in

Plaintiffs' favor would likewise contradict the Executive's wartime policy decisions to

encourage companies to do business with, and donate free goods to, the Ministry, and would

contradict the Executive's policies toward the Sadrists and Jaysh al-Mahdi, including what

Plaintiffs concede was the Executive's "strategic policy decision" not to designate Jaysh al-

Mahdi as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189.  Compl. ¶ 344.

*Second*, all of Plaintiffs' ATA claims are precluded by the statute's express bar against

civil actions for injuries arising from "acts of war," including acts in the course of an "armed

conflict between military forces of any origin."  18 U.S.C. §§ 2331(4), 2336(a).  Iraq was

indisputably in a state of armed conflict throughout the period relevant to the Complaint, and

Plaintiffs' injuries were allegedly the direct result of attacks by one military force (Jaysh al-

Mahdi) engaged in that conflict against other military forces (U.S. and Coalition).  The ATA

precludes any action for injury or loss arising from such an armed conflict.

*Third*, Plaintiffs' direct liability claims under the ATA—*i.e.*, that Defendants themselves

committed "acts of international terrorism"—are defective in numerous respects.  Plaintiffs'

theoretical chain of causation between Defendants' transactions with the Ministry and the

battlefield attacks on Americans is far too attenuated to meet the ATA's "rigorous proximate

cause requirement."  *Shatsky v. Palestine Liberation Org.*, No. 02-cv-2280, 2017 WL 2666111,

at *7 (D.D.C. June 20, 2017) (Leon, J.).  Plaintiffs' allegations also make clear that Defendants'

sale of medicine and medical equipment did not "appear to be intended" to "intimidate" or

"coerce" civilians or government policy, as required to constitute an "act of international

terrorism" under the ATA.  18 U.S.C. § 2331(1).  Plaintiffs also fail to plead necessary elements

of the criminal offenses they allege as the requisite predicates for their ATA claims—material

support for terrorism and financing of terrorism.  18 U.S.C. §§ 2339A, 2339C.  They have not

sufficiently alleged the scienter element of these crimes, *i.e.*, that Defendants *knew* their dealings

with the Ministry were funding terrorism.  Liability based on § 2339A also cannot be premised

on the sale or manufacture of pharmaceuticals because that provision expressly exempts the

provision of medicine.  *Id.* § 2339A(b)(1).  And liability for attacks on service members cannot

be based on § 2339C, because that statute is expressly limited to civilians and others not taking

an active part in hostilities.  *Id.* § 2339C(a)(1)(B).

*Fourth*, Plaintiffs' ATA aiding-and-abetting claims also fail.  When Congress amended

the ATA in 2016 to include such claims, it cabined aiding-and-abetting liability to circumstances

in which an act of international terrorism is "committed, planned, or authorized" by a designated

FTO.  18 U.S.C. § 2333(d)(2).  Jaysh al-Mahdi was not an FTO, and although Plaintiffs insinuate

that Hezbollah, which was an FTO, was broadly in league with the Sadrists, they have not

sufficiently alleged that Hezbollah committed, planned, or authorized the attacks that injured

Plaintiffs.  Trying to plead around that shortcoming, Plaintiffs advance a novel but defective

theory under which the "Jaysh al-Mahdi Campaign" was a multi-year criminal RICO violation

that supposedly constituted both a "pattern of racketeering" and an "act of international

terrorism," allegedly planned or authorized by Hezbollah and from which Plaintiffs' injuries all

arose.  That pleading trick fails as a matter of common sense and also as a matter of law: the

ATA requires Plaintiffs to link the FTO to each specific "act" of terrorism—*i.e.*, each attack—

from which their injuries arose, not to an amorphous "Jaysh al-Mahdi Campaign"; to permit

otherwise would eviscerate Congress's deliberate choice to require that the FTO have planned,

committed, or authorized the particular "act" in question.  Moreover, Plaintiffs' mere listing of

criminal acts generally attributed to a purported "Jaysh al-Mahdi Campaign" fails to satisfy

RICO's pleading requirements.  Plaintiffs also fail to plead that Defendants knew they were assisting the perpetrators of covered acts of terrorism (*i.e.*, acts committed, planned, or authorized by an FTO) or that any assistance they allegedly delivered was "substantial."

*Fifth*, Plaintiffs' state-law intentional infliction of emotional distress claims fail, both because they are brought outside the 3-year statute of limitations, and because Plaintiffs are unable to state a claim on the merits.

Thus, all claims against all Defendants should be dismissed.  Moreover, Plaintiffs have sued not only companies they allege sold and donated medicine and devices to the Ministry (the "Supplier Defendants"), but also companies alleged merely to have manufactured the products (the "Manufacturer Defendants").  Plaintiffs' attempt to impose liability on the Manufacturer Defendants is even more fraught with defects.  None of the latter Defendants is alleged to have transacted with, much less made corrupt payments to, the Ministry or Jaysh al-Mahdi.

Defendants sympathize with the Plaintiffs, recognize their sacrifices, and are grateful for their service.  U.S. courts, however, are not available to adjudicate civil claims for injuries caused by acts of war during the armed conflict in Iraq or to make political judgments about whether the United States was right to fund the Iraqi government, promote business with its ministries, and encourage political engagement by the Sadrists and other Iraqi sectarian factions. Even if there were jurisdiction to hear such cases, the ATA and state law simply do not provide a basis to sue Defendants for having provided medicine and medical equipment to the Iraqi Ministry of Health on the far-fetched theory that the United States, Defendants, and others who funded or did business with the Ministry were knowingly aiding and abetting attacks on U.S. service members.  Plaintiffs' lawsuit therefore should be dismissed.

## FACTUAL BACKGROUND

### A.     The U.S.-Led Invasion And Strategy For Victory In Iraq

The Iraq War began in late March 2003 with the invasion of Iraq by U.S. and Coalition

armed forces.  Compl. ¶ 54.[2]  Three weeks later, U.S.-led forces toppled Iraqi President Saddam

Hussein's regime, *id.*, bringing an end to the first phase of the war and marking the beginning of

a new phase: a military occupation followed by at least seven more years of armed conflict

between, on one side, U.S. and Coalition forces and the new Iraqi government, and, on the other

side, a wide array of armed insurgent groups, including Jaysh al-Mahdi, that also fought with

each other.  The armed conflict in Iraq lasted for the entire period of attacks alleged in the

Complaint.[3]  All told, and from 2003-2010, 4,424 U.S. service members were killed and another

---

[2] Defendants vigorously dispute many of the allegations in the Complaint, and especially the allegations that they knowingly supported terrorism or violence against U.S. soldiers or engaged in any other alleged wrongdoing.  But for purposes of their Rule 12(b)(6) motion, Defendants accept as true Plaintiffs' well-pleaded, non-conclusory factual allegations and rely on only the Complaint, materials it incorporates by reference (Exs. 2 - 16), and documents subject to judicial notice (Exs. 17 - 74).  *See Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice"); *see also Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) (court may take judicial notice of facts that are not subject to "reasonable dispute" because they "can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned," including "public records and government documents.")  Two items (Exs. 75 & 76) are submitted solely in support of Defendants' Rule 12(b)(1) motion.  *See Lillard & Lillard, P.C. v. Blue Cross & Blue Shield Ass'n*, 971 F. Supp. 2d 116, 118 (D.D.C. 2013) (Leon, J.) (court can consider extra-pleading materials in determining whether claims are justiciable).  The exhibits have been filed electronically, but Defendants will, of course, provide the Court (and Plaintiffs) with courtesy copies if the Court would find that helpful.

[3] *See*, *e.g.*, White House Off. of Press Sec'y, President Obama Has Ended the War in Iraq, 2011 WL 5014178, at *1 (Oct. 21, 2011) ("The long war in Iraq will come to an end by the end of [2011].");  Barbara Salazar Torreon, Cong. Research Serv., RS21405, U.S. Periods of War and Dates of Recent Conflicts 8-9 (Oct. 11, 2017) ("On December 15, 2011, U.S. Armed Forces in Baghdad marked the official end of the war in Iraq.") (Ex. 17).

31,957 were wounded in the course of Operation Iraqi Freedom.[4] Many military contractors were also killed or injured.

The United States faced numerous challenges in the years following the invasion. Iraq's public infrastructure and economy were in tatters due to failed economic policies, corruption, crime, neglect, international sanctions, and prior armed conflicts. And after U.S.-led forces ousted Saddam Hussein in April 2003, various Sunni and Shi'a militant groups waged an armed conflict to try to expel U.S.-led forces from Iraq and competed with each other for power. *See* Compl. ¶¶ 54-61, 95, 326. To address these challenges, the United States adopted and implemented a multi-pronged "strategy for victory in Iraq" that included: (1) defeating insurgent forces on the battlefield and restoring security; (2) rebuilding and supporting the Iraqi economy and government institutions; and (3) establishing democratic governance by bringing warring factions into the political process as part of a new parliamentary system.[5]

**B. The U.S. Policy Of Funding And Rebuilding Iraq And The Ministry**

The United States adopted and implemented a foreign policy of substantial aid and reconstruction in Iraq, involving a vast effort to rebuild, fund, and supply the Government of Iraq—including the Ministry of Health and the Iraqi health care system. In November 2003, Congress appropriated $20 billion to the Iraq Relief and Reconstruction Fund, including $793 million to fund and support the Ministry over a period of years.[6] President George W. Bush

---

[4] Dep't of Def., *Operation Iraqi Freedom (OIF) U.S. Casualty Status Fatalities* (last visited Jan. 18, 2018) (Ex. 18).

[5] *See* White House Off. of Press Sec'y, President Outlines Strategy for Victory in Iraq, 2005 WL 3197396 (Nov. 30, 2005).

[6] Emergency Supplemental Appropriations Act for Defense & Reconstruction of Iraq & Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (Nov. 6, 2003). *See also* U.S. Gov't Accountability Off., GAO-05-876, Rebuilding Iraq: Status of Funding and Reconstruction Efforts 32 (2005) (Ex. 19).

referred to the appropriation as "the greatest commitment of its kind since the Marshall Plan," and explained that it would serve U.S. national security interests by "help[ing] build [a] stable democratic societ[y] in Iraq."[7]  The United States spent hundreds of millions of dollars on Iraqi public health and other humanitarian needs throughout the period at issue in the Complaint, not only for the Ministry, but for countless other discrete purposes, such as $300 million for "urgent humanitarian relief" in Iraq (and Afghanistan) in fiscal year 2005.[8]

Restoring Iraq's nearly collapsed public health care system was particularly critical to the U.S. effort to rebuild and support the Iraqi government.  Following the first phase of the war, more than half of Iraq's medicine storage warehouses had been looted of pharmaceuticals, and the Iraqi health sector faced serious procurement challenges.[9]  Facing the prospect of a complete breakdown of the public health system and a humanitarian catastrophe, the U.S.-led Coalition Provisional Authority ("CPA"), led by Ambassador L. Paul Bremer, increased the budget for health care spending from $16 million in the last year of the Hussein regime to $950 million for 2004 alone.[10]  The U.S. Army deployed its Medical Department to assist in improving the infrastructure and procurement procedures of the Ministry and Kimadia—the state-owned

---

[7] White House Off. of Press Sec'y, Remarks by the President at Signing of H.R. 3289 – The Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2003 WL 22513828 (Nov. 6, 2003).  *See also* Statement by President George W. Bush upon Signing H.R. 3289, 2003 U.S.C.C.A.N. 1308, 1308 (2003).

[8] National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375 §§ 1201(a)(1), 1204(a)(4), 118 Stat. 1811 (2004).

[9] U.S. Gov't Accountability Off., GAO-05-876, Rebuilding Iraq: Status of Funding and Reconstruction Efforts 31 (2005) (Ex. 19).

[10] White House Off. of the Press Sec'y, Fact Sheet: The New Iraqi Healthcare System, 2003 WL 22941262, at *1 (Dec. 15, 2003); Michael R. Gordon & Gen. Bernard Trainor, The Endgame: The Inside Story of the Struggle for Iraq, From George W. Bush to Barack Obama 12-13 (2012) (cited at Compl. ¶ 59 n.19) (Ex. 2).

company managed by the Ministry that was responsible for importing and distributing all pharmaceuticals and medical equipment—and it did so at considerable personal risk to U.S. service members.[11]  So important was the U.S. policy of supporting the Ministry that President Bush met in person with Iraq's interim Health Minister in December 2003 to discuss public health priorities and the U.S. delivery of more than 25,000 tons of medicines and medical supplies to Iraqi hospitals.[12]  During a 50-day period in 2003, the U.S. government shipped more than 3,000 tons of pharmaceuticals and medical supplies to Iraq.[13]

After the return of sovereignty to Iraq in mid-2004, U.S. support for the Ministry and Kimadia remained a priority.  Under Iraq's public, single-payer health care system, the Ministry employed "every public-sector doctor, pharmacist, nurse, and medical technician in Iraq," and Kimadia had a "monopoly" over all medical imports into Iraq.  Compl. ¶¶ 70-71.  Accordingly, the United States—and others who imported medical goods into Iraq—had to work with the Ministry and Kimadia.  *Id.*[14]  Significant U.S. aid thus continued to flow to the Ministry and Kimadia for public health infrastructure, medicines, and medical supplies,[15] including from the $793 million and other discretionary funds the U.S. government had appropriated for the

---

[11] Fiscal 2005 Budget: Def. Health Programs, Hearing Before the Subcomm. on Total Force of H. Comm. on Armed Servs., 2004 WL 542571 (Mar. 18, 2004) (statement of Lieutenant General James B. Peake, Surgeon General of the Army).

[12] White House Off. of the Press Sec'y, Fact Sheet: The New Iraqi Healthcare System, 2003 WL 22941262, at *1 (Dec. 15, 2003).

[13] U.S. Dep't of Def., Dr. William Winkenwerder Holds Defense Department News Briefing on Efforts to Rebuild the Iraqi Health System, 2003 WL 21718495 (July 25, 2003).

[14] *See, e.g.*, Brandon Sprague & Adam Shemper, *Baghdad's Shame*, Salon (Aug. 28, 2003) (cited at Compl. ¶ 48 n.5) (describing presentation given to Kimadia employees in 2003 by a U.S. military advisor who had "personally overseen the delivery of 6,500 tons of medical supplies to local Kimadias and hospitals in 80 days") (Ex. 3).

[15] U.S. Gov't Accountability Off., GAO-05-876, Rebuilding Iraq: Status of Funding and Reconstruction Efforts 32-33 (2005) (Ex. 19).

Ministry, Kimadia, and the Iraqi public health sector.  In 2005 and 2006, for instance, the United

States Agency for International Development ("USAID") funded massive grants to distribute

"[e]ssential health care equipment" to the Ministry[16]; supported the Ministry's vaccination

efforts in every governorate of Iraq[17]; supplied vitamin supplements to hundreds of thousands of

Iraqi children[18]; and restored and supplied Iraqi public health clinics.[19]  USAID and the U.S.

Department of Defense also delivered hundreds of millions of dollars' worth of medical supplies

and equipment directly to the Ministry and Kimadia for distribution to Ministry-controlled

hospitals and clinics throughout Iraq in 2005 and 2006.[20]  Pursuant to the Strategic Framework

Agreement signed by the United States and Iraq in 2008, the United States committed to

"[s]upport and strengthen Iraq's efforts to build its health infrastructure," "strengthen health

systems and networks," and improve "Iraq's medicine procurement system."[21]  In 2009, the

United States remained "actively engaged" with the Ministry to help "meet the healthcare needs

of the Iraqi people."[22]

---

[16] U.S. Agency for Int'l Dev. ("USAID"), *Reconstruction Weekly Update* 7 (Mar. 31, 2005) (Ex. 20).

[17] USAID, *Reconstruction Weekly Update* 1, 6 (Sept. 1, 2005) (Ex. 21); USAID, *Reconstruction Weekly Update* 10 (July 7, 2005) (Ex. 22).

[18] USAID, *Reconstruction Weekly Update* 5 (Sept. 30, 2005) (Ex. 23).

[19] USAID, *Reconstruction Weekly Update* 5 (Jan. 20, 2006) (Ex. 24); *see also* USAID, *Fact Sheet: Accomplishments in Iraq* (Oct. 14, 2009) (summarizing USAID-sponsored Ministry projects) (Ex. 25).

[20] *See, e.g.*, U.S. Dep't of State, § 2207 Report on Iraq Relief and Reconstruction, App'x I (Apr. 6, 2005) (Ex. 26); U.S. Dep't of State, § 2207 Report on Iraq Relief and Reconstruction, Exec. Summ. (Apr. 2006) ("The U.S. has purchased over $117 million of medical equipment for use in clinics.  It will be transferred to the Iraqi Ministry of Health.") (Ex. 27).

[21] U.S.-Iraq Strategic Framework Agreement § VI (1), (3) (Nov. 17, 2008) (Ex. 28).

[22] U.S. Dep't of Def., Report to Congress: Measuring Stability and Security in Iraq 20 (July 23, 2009) (Ex. 29).

The United States also took wide-ranging steps to allow and encourage private companies from outside Iraq to do business with the Ministry and Kimadia.  In May 2003, the Bush Administration (1) de-designated Iraq as a state sponsor of terrorism, (2) suspended terrorism-related sanctions against the government, including government agencies like the Ministry, thus permitting U.S. entities and their affiliates to do business with them, and (3) included Kimadia in a General License issued by the Treasury Department's Office of Foreign Assets Control to ensure that Kimadia and others could utilize the U.S. banking system.[23]

The United States also expressly encouraged companies such as Defendants to sell and donate medicines and medical equipment to the Ministry and Kimadia, and to train them in the use of such medicines and equipment.  This effort to enlist private-sector assistance initially was led by the CPA Senior Health Advisor to the Ministry, James Haveman, whom President Bush had appointed to oversee the Ministry before its transition to Iraqi civilian rule.[24]  In July 2003, Haveman requested that regional representatives of multinational pharmaceutical companies commit to supply medicines to Iraq on a long-term basis, in order to ensure a continuous supply.[25]  Thereafter, he and a CPA procurement advisor traveled to Jordan in November 2003 to advise companies that were members of the Pharmaceutical Research and Manufacturers of America ("PhRMA")—whose members at the time included affiliates from each Defendant

---

[23] *See* Suspending the Iraq Sanctions Act, 68 Fed. Reg. 26,459 (May 7, 2003); Off. of Foreign Assets Control, Specially Designated Nationals and Blocked Persons, and Amended Iraqi General Licenses, 2004 WL 569364, at *4 (Mar. 23, 2003); Compl. ¶ 123.

[24] *See* The White House, James K. Haveman Jr. (Ex. 30).

[25] U.S. Dep't of State Cable, CPA Senior Health Advisor Haveman's Visit to Amman (Aug. 3, 2003) (sensitive but unclassified) (Ex. 75).  Plaintiffs' Complaint relies on a large number of U.S. State Department cables that were disclosed on the Internet by WikiLeaks (such as this cable) but that (unlike this cable) are marked as classified.  While Defendants have not relied upon any such classified cables in this memorandum, Plaintiffs' reliance on cables that have not been declassified would complicate adjudication of this case were it to go forward.

corporate family—that the Ministry would soon take control of pharmaceutical importation, and to explain Kimadia's bidding process, including the contracting, importation, and payment processes applicable to brand-name suppliers such as Defendants.[26]  Haveman also explained that CPA head Bremer would soon issue a letter to PhRMA member firms requesting that they donate $500 million worth of medicines to the Ministry, which Haveman said were still desperately needed as the United States worked to restore and supply Iraq's public health system.[27]  He also urged PhRMA companies to send a delegation to Baghdad and to advise the Ministry on medicines training for Iraqi physicians.[28]  The CPA promulgated tariffs for imports into Iraq, but exempted "medicines and medical equipment,"[29] and indeed, that exemption continued through at least 2012.[30]

After the return of sovereignty to Iraq in June 2004, the United States continued to encourage companies to supply medicines and medical equipment to the Ministry and Kimadia. The U.S. Commercial Service, an arm of the Department of Commerce, produced regular reports on "Doing Business in Iraq" that advised pharmaceutical and medical device companies on how to obtain licensure from the Ministry in order to participate in the Kimadia bidding process.[31]  In

---

[26] U.S. Dep't of State Cable, Good Vibes at Iraqi MOH Briefing for Big PhRMA (Nov. 20, 2003) (unclassified) (Ex. 76).

[27] *Id.*

[28] *Id.*

[29] Coal. Provisional Auth., Reconstruction Levy, Order No. 38 § 2 (Sept. 9, 2003) (Ex. 31).

[30] Int'l Trade Admin., Exporting U.S. Goods to Iraq (June 2012) (Ex. 32).

[31] *E.g.*, U.S. Commercial Serv., Doing Business in Iraq (2013) (cited at Compl. ¶ 124 n.85) (Ex. 4) (pp. 3-7 of excerpt); U.S. Commercial Serv., Doing Business in Iraq, at 34 (2012) (Ex. 33) (pp. 3-7 of excerpt).  *See also* U.S. Dep't of Commerce, Business Guide for Iraq, at 3-5 (2004) (describing healthcare as a "[s]pecific sector[] of interest" for USAID contracting, and explaining that some Iraqi government ministries were operating their own process for tendering

April 2007, USAID produced a report on "Pharmaceutical and Medical Products in Iraq" that included detailed information on how to become a recognized supplier, submit a tender, and enter the Iraqi pharmaceutical market as a non-Iraqi supplier.[32]  Beginning in 2006, USAID and the Department of Defense contracted with Defendants GE Medical Systems Information Technologies, Inc. and Johnson & Johnson to deliver medical equipment for use in Ministry facilities.[33]  In January 2009, USAID co-sponsored a Health Investment Seminar in Dubai along with a contingent from the Iraqi government, led by the Ministry of Health.[34]  The goal of this seminar was to match the various directorates of the Ministry with private medical suppliers to help Iraq modernize its health system, including its procurement system.  The U.S. Department of Commerce encouraged companies with expertise in the health care sector, including those that produced or sold medical equipment and pharmaceuticals, to attend this seminar.[35]

Throughout the period at issue, the United States maintained its support for the Ministry and Kimadia—and continued to encourage companies to transact with them—despite concerns about corruption within those agencies.  For instance, the 2007 USAID report that encouraged

---

contracts, including for "medical supplies") (Ex. 34); U.S. Commercial Serv., Doing Business in Iraq (2009) (advising firms selling products in Iraq work through PhRMA) (Ex. 35) (p. 6 of excerpt).

[32] USAID, Iraq Private Sector Growth and Employment Generation: Pharmaceutical and Medical Products in Iraq, at 49-53 (Apr. 17, 2007) (cited at Compl. ¶ 127 n.88) (Ex. 5); *see also* USAID, Investor Guide of Baghdad, at 40 (Nov. 2011) (identifying health sector as an "investment opportunity," and explaining "foreign investments that introduce state-of-art technology and modern medical appliances" would improve health care in Baghdad) (Ex. 36).

[33] *See, e.g.*, U.S. Special Inspector Gen. for Iraq Reconstr., Quarterly Report to the U.S. Congress, List of Contracting Actions and Grants (Oct. 30, 2012) (Ex. 37); U.S. Special Inspector Gen. for Iraq Reconstr., Quarterly Report to the U.S. Congress, List of Contracting Actions and Grants, at D49 (Oct. 30, 2006) (Ex. 38).

[34] U.S. Special Inspector Gen. for Iraq Reconstr., Quarterly Report to the U.S. Congress, at 70 (Jan. 30, 2009) (Ex. 39).

[35] U.S. Dep't of Commerce, International Trade Administration, Iraq: Events (last updated Aug. 25, 2015) (Ex. 40).

investment in Iraq's health sector, *see supra* note 32, noted that "[t]he [Ministry] . . . acknowledges corruption within its own ranks" but "intends to tackle" the illegal practice of resale from clinics and pharmacies to street traders.  Compl. ¶ 127 & n.89.  In sum, "[a]lthough many challenges remain[ed]," the United States continued to "actively engage[]" with the Ministry to "meet the healthcare needs of the Iraqi people," *see* 2009 Dep't of Defense Report, *supra* note 22—and to urge companies to do the same—because this effort was essential to stabilizing Iraq.

### C.   The Sadrists And Jaysh Al-Mahdi

Among the most destabilizing forces in Iraq were sectarian conflicts that erupted between and among Sunni and Shi'a factions after the Hussein government collapsed in 2003.  At that time, Muqtada al-Sadr formed one such faction as "the leader of masses of impoverished Iraqi Shi'a" who took over "Saddam City" in eastern Baghdad and renamed it "Sadr City."  Compl. ¶ 57.  Sadr and his followers, drawing on grassroots popularity inherited from his father, a renowned cleric assassinated by Saddam, started a movement called the "Sadrist Trend" and became known as "Sadrists."  *Id.* ¶¶ 56, 58.  The Sadrists formed a "political wing" led by Sadr, and a militant wing, "Jaysh al-Mahdi," (Arabic for the "Mahdi Army"), which Plaintiffs have also called "a terrorist wing."  *Id.*

The Sadrists quickly became a significant political force with millions of Iraqi Shi'a supporters.  *See* Compl. ¶ 344.  Sadr-backed candidates won 23 seats in the January 2005 parliamentary election, and increased their share to 32 seats that December.  *Id.* ¶ 67.  Members of parliament from Sadr's bloc joined the Iraqi government after both elections, and when cabinet ministries were "divvied up by political party," the Sadrists were given control of several, including the Ministry of Health, where they installed one of their own as the Minister of

Health.  *Id.*  The United States continued to support and work with the Ministry and encouraged

the Sadrists to play a constructive role in the Iraqi government.[36]  The Sadrist Minister of Health

resigned in April 2007 and was replaced with an independent minister.[37]

At the same time, Jaysh al-Mahdi and others were engaged in sectarian violence against

various Sunni-led factions[38] and were conducting an armed insurgency to try to expel U.S.-led

Coalition forces from Iraq.  Compl. ¶¶ 58-61, 411.  In this context, Plaintiffs acknowledge that

Jaysh al-Mahdi was a "militia" with "military ends," *see, e.g.*, *id.* ¶¶ 158-59, comprised of "a

well-armed, well-trained force of insurgents"[39]—"boast[ing] at least 60,000 fighters," *id.*

¶ 331—that used armed force to maintain control over particular Shi'a "stronghold" territories in

Iraq and to engage other Iraqis[40] and U.S. forces in combat, *see id.* ¶¶ 8, 13, 58-59, 60.

Described in the Complaint alternately as "terrorists" and "fighters," *compare id.* ¶ 74, *with id.*

¶ 87, Jaysh al-Mahdi militia members fought U.S. forces using "brigades," "regional command

centers," *id.* ¶¶ 60, 331, and military-style attacks, including assaults with heavy weapons on

---

[36] USAID, *Iraq Weekly Update* 6 (Mar. 31, 2006) ("USAID is supporting the Iraqi Ministry of Health (MoH) to strengthen essential health services, improve the capacity of health personnel, and respond to the specific health needs of vulnerable populations such as women and children.") (Ex. 41); *Iraq: The Crocker-Petraeus Report: Hearing on S. 110-490 Before the S. Comm. on Foreign Relations* 101, 110th Cong. (Sept. 11, 2007) (responses of Gen. David Petraeus to Questions Submitted for the Record by Senator Joseph Biden) (Ex. 42).

[37] *See* Kenneth Katzman, Cong. Research Serv., RL31339, Report for Congress, Iraq: Post-Saddam Governance and Security 17 (June 4, 2008) (Ex. 43).

[38] While Jaysh al-Mahdi targeted "foreign enemies," including the "U.S.-led Coalition forces," Compl. ¶ 58, it was simultaneously fighting Sunni insurgent groups, some of which were also fighting against the Coalition forces.  *See* President Outlines Strategy for Victory in Iraq, *supra* note 5; Damien Cave & Stephen Farrell, *At Street Level, Unmet Goals of Troop Buildup*, N.Y. Times (Sept. 9, 2007) (cited at Compl. ¶ 100 n.53) (Ex. 6).

[39] *See also* Nimrod Raphaeli, *Understanding Muqtada al-Sadr*, Middle East Quarterly 8 (Fall 2004) (cited at Compl. ¶ 59 n.18) (Ex. 7).

[40] 152 Cong. Rec. H8581 (daily ed. Nov. 13, 2006) (statement of Rep. Ted Poe) (cited at Compl ¶ 340 n.283) (Ex. 8).

U.S. military personnel, tanks, convoys, helicopters, and bases, *id.* ¶¶ 330, 334, 338.  Jaysh al-Mahdi conducted these attacks and defended its strongholds with military weapons such as rocket-propelled grenades, *id.* ¶¶ 337, 592; explosively formed penetrators, which are "specially shaped explosive charge[s] designed to penetrate tank armor," that "required advanced machinery and copper . . . as well as advanced engineering know-how," *id.* ¶¶ 334, 335; mortars, "an artillery-like weapon that fires explosives at short ranges," *id.* ¶ 336; surface-to-air missiles; and other rockets, *id.* ¶¶ 338, 450.

With armed groups such as Jaysh al-Mahdi engaged in military-style attacks against each other and against U.S., Coalition, and Iraqi armed forces, Iraq remained a war zone in a state of protracted and complicated armed conflict.  In addition to Plaintiffs' allegations of military-style attacks by Jaysh al-Mahdi, the source materials that Plaintiffs cite in their Complaint confirm the reality of war and armed conflict in post-Saddam Iraq.  For example:

- "What is clear, as the U.S. military announces heavy casualties and with roadside bombs at an all-time high, is that American soldiers are . . . suddenly caught in the midst of two distinct wars: a counter-insurgency and a rapidly escalating sectarian conflict."[41]

- Baghdad was "a war zone where entire sections of the City are off limits even to army personnel."[42]

- Army Gen. David H. Petraeus said the U.S. effort "clearly is going to require enormous commitment and commitment over time and told Americans to be prepared for 'more combat action and . . . more casualties' as troops move into new

---

[41] Lara Logan, *Iraq, Up Close: Bodies and Terror*, CBS News (Oct. 5, 2006) (cited at Compl. ¶ 73 n.29) (Ex. 9).

[42] Off. of Accountability & Transparency, U.S. Embassy in Baghdad, The Sixth Month Review of Iraq's Performance & Capacity In Enforcing Its Anticorruption Laws 9 (Dec. 24, 2006) (sensitive but unclassified) (cited at Compl. ¶ 77 n.30) (Ex. 10).

areas."[43]

- "A classified CIA report in November [2006] interpreted the conditions in Iraq as a 'civil war.'"[44]

- "[T]he additional troops had slowed, but far from stopped, Iraq's still-burning civil war."[45]

U.S. and Coalition forces fought for years to defeat Jaysh al-Mahdi on the battlefield, including with teams whose primary focus was fighting Jaysh al-Mahdi. *E.g.*, Compl. ¶ 391.[46] At the same time, the United States encouraged Sadrists to settle their differences through political participation in Iraq's new democracy.[47]  The State Department made what Plaintiffs allege was a "strategic policy decision" not to designate Jaysh al-Mahdi as an FTO, "reflect[ing] a political concern among some U.S. policymakers about the best way to influence Sadr" to engage with U.S.-backed entities and work peacefully through Iraqi government institutions. *Id.* ¶ 344.[48]  In an effort to give political reconciliation a chance, U.S. forces and other Iraqi groups repeatedly entered into cease-fire agreements with Sadr and Jaysh al-Mahdi commanders.[49]

---

[43] William Branigin, Petraeus:  Iraq Situation Is 'Exceedingly Challenging,' Wash. Post (Apr. 26, 2007) (cited at Compl. ¶ 92, n.43) (Ex. 11).

[44] Endgame, *supra* note 10, at 295 (cited at Compl. ¶ 59 n.19).

[45] *See At Street Level*, *supra* note 38 (cited at Compl. ¶ 100 n.53).

[46] David E. Johnson et al., The 2008 Battle of Sadr City: Reimagining Urban Combat at xiii-xiv (RAND Corp. 2013) (cited at Compl. ¶ 130 n.268) (Ex. 12).

[47] *See* Iraq: The Crocker-Petraeus Report, *supra* note 36, at 101.

[48] A federal statute, 8 U.S.C. § 1189(a)(1)(C), directs the State Department to designate as an FTO any foreign organization that it determines has engaged in terrorism that "threatens the security of United States nationals or the national security of the United States."  The United States designated several groups based in or active in Iraq as FTOs, including Ansar al-Islam and Al-Qa'ida in Iraq, *see* U.S. Dep of State, Country Reports on Terrorism 2008, at 288, 319-20 (April 2009) (Ex. 44), and, in 2009, some Shi'a groups such as Kata'ib Hizballah, U.S. Dep of State, Country Reports on Terrorism 2009, at 260-61 (Aug. 2010) (Ex. 45), but it did not designate Jaysh al-Mahdi or the Sadrists.

[49] Endgame, *supra* note 10, at 73 (cited at Compl. ¶ 59 n.19); *id.* at 424-25 (explaining a six-month cease fire Sadr declared in 2007); *id.* at 485; *id.* at 500.

### D.        The Armed Attacks At Issue

According to the Complaint, all of the Plaintiffs' injuries arose from armed attacks in Iraq

between 2005 and 2009 that killed or wounded 33 members of the U.S. armed forces and 7

contractors accompanying those forces.  Compl. ¶ 1.  The Complaint alleges that Jaysh al-Mahdi

committed all but one of these armed attacks, *see generally id.* ¶¶ 390-615; *see id.* ¶ 411

(attributing one attack to Ansar al-Sunna), and that Jaysh al-Mahdi's "publicly stated, primary

goal" in committing these attacks "was the expulsion of Americans from Iraq," *id.* ¶ 326.  These

attacks were carried out using military weapons or explosives and armed insurgency operations

characteristic of military forces.  *See id.* ¶¶ 332, 339, 396, 450, 456, 551, 592, 607.  Some of

them occurred during the "Battle of Sadr City," which pitted a large force of Jaysh al-Mahdi

combatants against the U.S. military and claimed 925 lives and injured 2,605, including three

Plaintiffs or Plaintiffs' family members.  *Id.* ¶¶ 338, 524, 592, 607.  Plaintiffs allege that Jaysh

al-Mahdi received general support (including training, funding, and weapons) and inspiration

from Hezbollah, an Iranian-backed FTO based in Lebanon.  *See id.* ¶¶ 345-89.

The 33 service member victims were all deployed to Iraq in combat roles as members of

the U.S. Army, Marine Corps, or Air Force, and/or were embedded with combat battalions in

Iraq.[50]  Many were engaged in military missions that specifically targeted Jaysh al-Mahdi.

Compl. ¶ 391.  Jaysh al-Mahdi "was the principal enemy" that 17 of the victims "were tasked

with fighting" as members of the U.S. Army, 1st Infantry Division, 2nd Battalion, 16th Infantry

Regiment, 4th Brigade Combat Team, known as the "2-16 Rangers."  *Id.* (2-16 Rangers "were

responsible for fighting Jaysh al-Mahdi in an area a few miles southeast of Sadr City" and had

---

[50] Compl. ¶¶ 391, 395, 400, 402, 407, 410, 441, 449, 463, 468, 477, 482, 497, 500, 509,
512, 515, 521, 523, 529, 534, 543, 547, 550, 552, 557, 572, 582, 591, 599, 606, 608, 613.

"responsibility for securing several key neighborhoods in eastern Baghdad from Jaysh al-Mahdi, including Kamaliyah and Fedilayah"); *see also id.* ¶¶ 400, 402, 407, 463, 468, 477, 500, 509, 512, 521, 529, 543, 547, 550, 606, 613 (identifying 17 victims who were 2-16 Rangers).

The seven other victims were military contractors embedded with combat units and otherwise tied to the military mission in Iraq.  The contractor victims provided security for areas used by U.S. military forces and for civilians who disposed of captured weapons, Compl. ¶¶ 431, 455, 472, 564, and they generally operated in zones of active fighting, *id.* ¶¶ 489, 492, 504.

Eighty-eight of the named Plaintiffs are relatives (or, in one instance, the estate) of the U.S. service members or contractors who were the direct victims of the armed attacks alleged in the Complaint, and all of the Plaintiffs allege emotional injuries arising from the injuries or deaths of their loved ones.[51]

### E.    The Defendants' Supply Of Medicines And Medical Devices To The Ministry

Defendants are among the world's leading manufacturers and suppliers of medicines and medical products, including oral and intravenous breast cancer medication, Compl. ¶¶ 184, 306, injections used to treat hemophilia, *id.* ¶ 284, MRIs, CT scanners, and ultrasound machines, *id.* ¶ 220, and catheters, sutures, and arterial sheaths, *id.* ¶ 241.  Defendants (or their supplier affiliates) have sold and donated these and other life-saving medications and medical supplies in countries throughout the world, including Iraq.

The Complaint characterizes nine of the Defendants as the "[S]upplier Defendants" and

---

[51] *Id.* ¶¶ 394, 399, 406, 413-30, 435-40, 444-48, 458-62, 467, 470-71, 475, 480-81, 485-86, 494-95, 506-07, 518-19, 526-27, 531-33, 537-41, 545-46, 549, 555, 560-63, 567-70, 575-80, 585-89, 594-97, 602-04, 611.

eleven of the Defendants as the "[M]anufacturer Defendants."[52]   Compl. ¶¶ 181, 205, 239, 276,

304.  Plaintiffs allege that the Supplier Defendants bid on and won contracts to supply medicines

and medical devices to the Ministry and Kimadia, in part by providing "kickbacks" to those

agencies.  *See, e.g.*, *id.* ¶¶ 184-85, 207-08, 240-41, 247-48, 279-81, 306-07.  Plaintiffs allege that

the Manufacturer Defendants manufactured the pharmaceuticals (and in some instances medical

equipment) that the Supplier Defendants sold or donated to the Ministry and Kimadia.  *Id.*

¶¶ 181, 205, 239, 276, 304.  The Manufacturer Defendants are not alleged to have entered into

contracts with, or provided kickbacks to, either agency.  *Compare, e.g.*, *id.* ¶¶ 183, 185 (Supplier

Defendants), *with id.* ¶ 187 (Manufacturer Defendants).

The Complaint alleges that the "kickbacks" by Supplier Defendants consisted of "free

goods," Compl. ¶¶ 183, 211, 240, 279, 306, or "commissions" in goods or cash, *id.* ¶ 139.  It also

alleges that the Ministry and Kimadia required Defendants and other suppliers to provide such

"free goods" and "commissions" in order to win contracts.  *See, e.g.*, *id.* ¶ 4.  The Complaint

states that "Kimadia's standard bid instructions regularly instructed companies to specify the

quantity of extra goods that they would provide for free."  *Id.* ¶ 117.  It was also allegedly the

"regular practice" of Ministry officials to require all non-Iraqi drug suppliers to pay

"commissions" at various stages in the drug registration process.  *Id.* ¶¶ 141-57.  Plaintiffs

---

[52] The Supplier Defendants are AstraZeneca UK Limited, GE Medical Systems
Information Technologies GmbH, Johnson & Johnson (Middle East), Cilag GmbH International,
Janssen Pharmaceutica NV, Pfizer Inc., Wyeth Pharmaceuticals Inc., Pfizer Enterprises SARL,
and F. Hoffmann-La Roche Ltd.  The Manufacturer Defendants are AstraZeneca
Pharmaceuticals LP, GE Healthcare USA Holding Inc., GE Medical Systems Information
Technologies, Inc., Ethicon, Inc., Ethicon Endo-Surgery LLC, Janssen Ortho LLC, Ortho
Biologics LLC, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Genentech,
Inc., and Hoffmann-La Roche Inc.  The Complaint describes one Defendant, Johnson & Johnson,
as neither a Supplier Defendant nor a Manufacturer Defendant, but alleges that it was the "parent
company" of certain affiliated Manufacturer and Supplier Defendants and that it "oversaw and
supervised" the alleged actions of its subsidiaries.  *Id.* ¶ 239.

further allege that some free goods went to Jaysh al-Mahdi because there was no "meaningful distinction between the Ministry and Jaysh al-Mahdi." *Id.* ¶ 159. Yet, Plaintiffs also allege that Jaysh al-Mahdi was able to obtain the goods from the Ministry only by "theft or misappropriation," and the "smuggl[ing]" of stolen goods, *see id.* ¶¶ 165, 170-71 & n.129.

## STATUTORY FRAMEWORK AND PLAINTIFFS' CLAIMS

### A.     The ATA's Civil Remedy Provision

Subject to a variety of limitations and exclusions, the ATA provides a private right of action to U.S. nationals who are victims of a criminal "act of international terrorism." 18 U.S.C. § 2333(a). For the first 24 years after its enactment, § 2333 provided for civil actions against only defendants who themselves committed such a criminal act ("direct" liability). In September 2016, Congress passed the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852, which amended the ATA to add a new provision, 18 U.S.C. § 2333(d), providing in limited circumstances for a civil remedy against defendants who themselves do not commit an act of international terrorism but who "aid[] and abet[]," "by knowingly providing substantial assistance," a person who commits "an act of international terrorism committed, planned, or authorized by" a designated FTO ("aiding and abetting" liability).

For both direct claims under § 2333(a) and aiding-and-abetting claims under § 2333(d), a plaintiff must plead and establish that his or her injury was "by reason of," *i.e.*, proximately caused by, an "act of international terrorism." The ATA's definitions section establishes, among other things, three cumulative requirements for an act to rise to the level of an "act of international terrorism." 18 U.S.C. § 2331(1). The act must: (1) be "violent" or "dangerous to human life;" (2) violate federal or state criminal law (or would do so if committed in the United States); and (3) "appear to be intended" to "intimidate or coerce a civilian population,"

"influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(A)-(B). The second of these requirements means that a plaintiff, in addition to pleading and establishing all of the other elements of an ATA civil claim, must also plead and establish that the misconduct of the defendant (on a direct liability claim) or of the primary actor (on an aiding-and-abetting liability claim) satisfies all of the elements of a federal or state criminal offense.

The Complaint's counts for *direct* liability under § 2333(a) (Counts 3 and 4) identify two criminal offenses that every Defendant allegedly committed: material support for terrorism under 18 U.S.C. § 2339A, and financing of terrorism under 18 U.S.C. § 2339C(a)(1)(B). Compl. ¶¶ 637, 644. Section 2339A makes it a crime to provide "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out" certain federal terrorism offenses; and § 2339C(a)(1)(B) criminalizes "directly or indirectly, unlawfully and willfully provid[ing] or collect[ing] funds" with the intent or knowledge that those funds will be used to carry out terrorist acts against civilians.

*Aiding-and-abetting* liability under § 2333(d) is available only with respect to an "act of international terrorism" that was "committed, planned, or authorized" by a designated FTO, and only if the plaintiff pleads and establishes that the defendant "aid[ed] and abet[ted], by knowingly providing substantial assistance, or . . . conspire[d] with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

The ATA imposes a number of exclusions and limitations on civil actions under § 2333. Most significant here, "[n]o action shall be maintained"—whether direct or secondary—"for injury or loss by reason of an act of war." 18 U.S.C. § 2336(a). The statute defines an "act of war" as

22

> any act occurring in the course of -- (A) declared war; (B) armed conflict, whether
> or not war has been declared, between two or more nations; or (C) armed conflict
> between military forces of any origin.

*Id.* § 2331(4).  In addition, the two criminal statutes on which Plaintiffs' direct liability claims

rest each have their own express limitations, which carry forward to limit those civil claims.

Section 2339A includes an express exception for the provision of "medicine" (even directly to

terrorists).  *Id.* § 2339A(b)(1).  And § 2339C(a)(1)(B) applies only to the financing of acts that

are "intended to cause death or serious bodily injury to a civilian, or to any other person not

taking an active part in the hostilities in a situation of armed conflict."  *Id.* § 2339C(a)(1)(B).

## B.    Plaintiffs' Causes Of Action

Each of the 108 Plaintiffs asserts the same five claims against all 21 Defendants.  Count

One is brought under the aiding-and-abetting liability provision of the ATA, 18 U.S.C.

§ 2333(d), and alleges that every Defendant aided and abetted every one of the 40-plus attacks

described in the Complaint.  Compl. ¶¶ 616-24.  Count Two is brought under the same

provision, and alleges that every Defendant aided and abetted a "Jaysh al-Mahdi Campaign" "to

expel Americans from Iraq through crime and anti-American violence."  *Id.* ¶¶ 625-35.  Plaintiffs

further identify general forms of support that Hezbollah allegedly provided to Jaysh al-Mahdi,

which they assert means that Hezbollah "planned or authorized" both the individual attacks from

which Plaintiffs' injuries arose, and the so-called "Jaysh al-Mahdi Campaign.  *See, e.g.*, *id.*

¶¶ 385-89, 623, 634; *see also infra* pp. 61-66.

Counts Three and Four are claims for direct liability under § 2333(a) and allege that

every Defendant itself committed criminal "acts of international terrorism"—by knowingly

providing material support to terrorists, in violation of 18 U.S.C. § 2339A, and willfully

financing terrorists, in violation of 18 U.S.C. § 2339C(a)(1)(B)—that caused all of the Plaintiffs'

injuries.  Compl. ¶¶ 636-48.  Finally, Count Five asserts against all Defendants state-law claims

for intentional infliction of emotional distress ("IIED").  *Id.* ¶¶ 649-54.

Plaintiffs do not allege that any Defendant knew about, carried out, was present for, or supplied any weapons or other items used to commit the attacks from which their injuries arose. Each of Plaintiffs' claims instead is premised on an extended chain of events that Plaintiffs contend linked the Defendants' business dealings with the Ministry of Health to Jaysh al-Mahdi and then to each of the attacks.  The Complaint alleges: (1) Manufacturer Defendants manufactured medical goods; (2) Supplier Defendants and/or their local Iraqi agents bid on, negotiated, and won Ministry contracts to supply the medical goods, Compl. ¶¶ 117-18; (3) in connection with those contracts, Supplier Defendants paid certain corrupt "commissions" or gave certain quantities of those medical goods free of charge to the Ministry, *id.* ¶¶ 182, 205, 239, 278, 304; (4) Jaysh al-Mahdi, which had infiltrated the Ministry, stole some of those medical goods or funds, *id.* ¶¶ 163-66; (5) Jaysh al-Mahdi sold the stolen medical goods on the black market, *id.* ¶¶ 114, 130, 171, 215, 253, 256, 281; (6) Jaysh al-Mahdi used the funds and black-market proceeds to purchase weapons and otherwise fund preparations to carry out attacks, *id.* ¶ 8; and (7) Jaysh al-Mahdi then allegedly carried out the attacks, *id.*  ¶¶ 326-39.

## LEGAL STANDARD

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, Plaintiffs bear the burden of establishing jurisdiction, and "[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "Dismissal on the basis that Plaintiffs' claims present non-justiciable political questions constitutes a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." *Jograj v. Enter. Servs.*, LLC, No. 1:16-CV-1846-RMC, 2017 WL 3841833, at *5 (D.D.C. Sept. 1, 2017).  Where Defendants challenge the factual basis of the Court's jurisdiction, the Court "must go beyond the pleadings and resolve any disputed issues of fact."  *Lillard & Lillard,* 971

24

F. Supp. 2d at 118 (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must plead sufficient facts to state a claim that is "'plausible on its face,'" and cannot rest on mere "possibility" or allegations that are "merely consistent with" Defendants' liability.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although well-pleaded allegations must be accepted as true, the Court need not accept "'a legal conclusion couched as a factual allegation.'"  *Id.*  Nor must it credit factual allegations contradicted by documents that the Complaint incorporates by reference or materials subject to judicial notice. *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

At the outset, Plaintiffs' action should be dismissed because it raises nonjusticiable political questions at the heart of U.S. foreign policy and national security decisions pertaining to the war in, and reconstruction of, Iraq.  *See* Part I.  But even if this case were justiciable, Plaintiffs' claims should be dismissed for numerous reasons.  Most comprehensively, the ATA's "act of war" exclusion requires dismissal of all Plaintiffs' ATA claims because each Plaintiff was injured in the course of "armed conflict" within the meaning of the statute.  *See* Part II.

In addition, Plaintiffs' ATA direct liability claims (Counts 3 and 4) fail, both because Plaintiffs cannot establish that Defendants' conduct proximately caused Plaintiffs injuries (*see* Part III.A) and because they have not alleged the elements necessary to show that any of the Defendants committed criminal "acts of international terrorism" (*see* Parts III.B, C).  Moreover, all of the material support claims against the Pharmaceutical Defendants should be dismissed for the additional reason that they are barred by the medicine exception to 18 U.S.C. § 2339A (*see*

Part III.D), and all of the terrorist financing claims arising from attacks on service members should be dismissed as to all Defendants because the criminal offense underlying that claim, 18 U.S.C. § 2339C, is limited to acts targeting "civilian[s]" or others not involved "in the hostilities [of the] armed conflict" (*see* Part III.E).

All of Plaintiffs' aiding-and-abetting claims (Counts 1 and 2), in turn, should be dismissed because Plaintiffs cannot show that any of the attacks at issue were "committed, planned, or authorized" by an FTO, because they have not alleged that Defendants had knowledge that an FTO committed, planned, or authorized such attacks, and because Defendants' transactions with the Ministry do not amount to "substantial assistance" for terrorism. *See* Part IV.  Finally, all of Plaintiffs' state law claims for intentional infliction of emotional distress (Count 5) should be dismissed both because they are untimely and because they fail to satisfy the elements of applicable state law.  *See* Part V.

## I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CLAIMS POSE NONJUSTICIABLE POLITICAL QUESTIONS

Plaintiffs' claims raise nonjusticiable political questions implicating foreign policy and national security decisions by the United States to rebuild, fund, and encourage private sector business with the Iraqi government, including the Ministry of Health and Kimadia.  Plaintiffs' action also implicates complex judgments by the Executive Branch to engage with the Sadrists as politically important stakeholders in the Iraqi government, rather than designate them or their military wing, Jaysh al-Mahdi, as terrorists.  Such "'political decisions . . . are by their nature committed to the political branches to the exclusion of the judiciary.'"  *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006).

The Supreme Court has identified at least six situations in which a "political question" is present, any one of which is sufficient to make a case nonjusticiable. *Baker v. Carr*, 369 U.S.

186, 217 (1962).[53]  Plaintiffs' lawsuit directly implicates several of these situations.  In

particular, judicial examination of Plaintiffs' claims would be impossible without questioning

"the wisdom of discretionary decisions made by the political branches in the realm of foreign

policy or national security" with respect to war and reconstruction in Iraq, matters that are

textually committed to the President and Congress (the first and fifth *Baker* factors).  *El-Shifa*

*Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc).  Adjudication

of Plaintiffs' claims would also risk condemnation of sensitive U.S. foreign policy and national

security decisions and the "embarrassment" of "multifarious pronouncements" by the different

branches (the fourth and sixth *Baker* factors).

### A.  Plaintiffs' Claims Ask The Court To Condemn U.S. Policy Governing The Funding And Rebuilding Of Iraq And Its Public Health System

During the period in which Plaintiffs allege Jaysh al-Mahdi controlled the Ministry, it

was the foreign policy of the United States to fund, support, and rebuild the Government of Iraq,

including the Ministry and Kimadia, through (1) direct aid and partnership and (2) promotion of

private sector business with those agencies.  Plaintiffs' claims ask this Court to condemn those

policies by equating support for those government agencies with support for terrorists.

The U.S. policy of direct support to the Ministry began soon after the regime change,

when the President and Congress concluded that the Ministry was a key strategic partner in the

effort to rebuild Iraq's public health system.  U.S. agencies partnered with the Ministry to train

---

[53] These situations are: "[1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  *Baker*, 369 U.S. at 217.

its personnel, provide it with medicines and supplies, and fund its operations.  *See supra* pp. 7-14

(describing U.S. aid to, and partnership with, the Ministry from 2003 through at least 2011).  In

December 2003, President Bush personally met with Iraq's Interim Health Minister to discuss

U.S. support for the Ministry.  *See supra* note 12.  In November 2003, Congress appropriated

$793 million for the Ministry and Kimadia and health-related projects in Iraq through 2006.

Indeed, U.S. financial support for the Ministry dwarfed the support that Plaintiffs allege was

provided by Defendants during the same period.  *Compare* Emergency Supplemental

Appropriations Act for Defense & Reconstruction of Iraq & Afghanistan, Pub. L. No. 108-106,

117 Stat. 1209 (Nov. 6, 2003), *with* Compl. ¶¶ 181-91, 204-15, 240-56, 276-86, 304-12.

The United States also sought to restore the Iraqi public health system by encouraging

private entities to do business with the Ministry.  Following the regime change, the United States

de-designated Iraq and its ministries as state sponsors of terrorism and waived, as to Iraq, the

FSIA's "terrorism exception" to immunity.  These decisions, which also applied to "any agency

or instrumentality of Iraq," including the Ministry,[54] signaled to private firms that it was legal—

indeed, integral to U.S. foreign policy—for them to do business with the Ministry.  *See supra* pp.

10-11.  The United States also actively *promoted* private sector business with the Ministry.

During the years Plaintiffs allege the Ministry was corrupt and controlled by terrorists, the

United States advised companies like Defendants on how to gain Kimadia approval of contracts

and engage in business dealings with the Ministry, and expressly encouraged companies to both

sell and donate to the Ministry millions of dollars' worth of medicines and medical supplies.  *See*

*supra* pp. 11-12.  In fact, the United States contracted directly with several Defendants to provide

---

[54] Waiver of § 1083 of the National Defense Authorization Act for Fiscal Year 2008, 73
Fed. Reg. 6,571 (Jan. 28, 2008).

medical equipment to Ministry-operated hospitals and clinics.  *See supra* p. 13.

Despite these U.S. policies, Plaintiffs ask the Court to find that the Ministry was "not a genuine medical institution," but was "effectively captured" by Jaysh al-Mahdi during the years the United States partnered with and funded the Ministry, Compl. ¶¶ 3, 159, and that it was obvious to all that Jaysh al-Mahdi in turn used Ministry resources to finance its "terrorist" attacks against U.S. forces, *id.* ¶ 172.  Doing so would be impossible without condemning the U.S. decision to provide vast operational and financial support to the Ministry.  Indeed, if the Court were to accept Plaintiffs' theory, it necessarily would follow that the United States itself had knowingly provided hundreds of millions of dollars to those same "terrorists" who allegedly controlled the Ministry—and, in doing so (according to Plaintiffs' theory), caused the deaths and injuries of scores of U.S. service members.  The political question doctrine bars such an indictment of U.S. foreign policy, precluding the adjudication of theories of liability "'that would apply with equal force to the foreign policy and national security determinations made by the political branches.'"  *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 550 (9th Cir. 2014).  Where the United States has funded a foreign entity accused of wrongdoing, holding a private defendant liable for providing support to the same entity "necessarily requires the judicial branch to question the political branches' decision."  *Id.* at 552 (dismissing on political question grounds claims against an oil company for killings by a Colombian army unit the company had partially funded because the United States had also funded the same unit).

Plaintiffs' claims also impermissibly impugn the Executive Branch's policy of promoting private sector business with the Ministry, inescapably accusing the United States of encouraging business dealings with known terrorists.  *See, e.g.*, Compl. ¶¶ 3-4.  The U.S. government, first through the CPA and then through the Departments of State and Commerce and USAID, urged

U.S. companies, including the Defendants, to enter into contracts with the Ministry and provide medicines and medical equipment "to meet the healthcare needs of the Iraqi people."[55]   The Executive's decisions to de-designate Iraq as a state sponsor of terrorism and to waive the FSIA's "terrorism exception"—thereby allowing business to resume with all Iraqi agencies— were made "in the national security interest of the United States" to "promote the reconstruction of, the consolidation of democracy in, and the relations of the United States with, Iraq."[56]   Such decisions are quintessentially nonjusticiable foreign policy determinations.  *See People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (the national security judgment embodied in FTO designations is a nonjusticiable political question); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 861-62 (2009) (recognizing President's authority to waive terrorism exception to sovereign immunity for Iraq and its agencies).

So, too, is the U.S. decision to encourage businesses to sell and donate medicines and medical equipment to the Ministry.  Accepting Plaintiffs' theory—that Defendants' transactions with the Ministry amounted to knowing support for "terrorism," *see, e.g.*, Compl. ¶¶ 103, 112, 116-17, 125, 134—would unavoidably entail "th[e] kind of second-guessing of the policy decisions of the political branches [that] is precisely what the political-question doctrine forbids."  *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 97-98 (D.D.C. 2016).  The Ninth Circuit's decision in *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007), makes this clear.  There, the plaintiffs sought damages from a U.S. company that had sold bulldozers to the Israel Defense Forces ("IDF"), which used the bulldozers to kill or harm the plaintiffs.  *Id.* at 977.  The court dismissed the case as nonjusticiable on political question grounds because the claims

---

[55] *See supra* notes 22, 25-26.

[56] 73 Fed. Reg. 6,571 (Jan. 28, 2008).

"unavoidably" cast doubt on U.S. policy encouraging private companies' sale of equipment to Israel:

> We cannot intrude into our government's decision to grant military assistance to Israel, *even indirectly[,]* by deciding this challenge to a defense contractor's sales. Plaintiffs' claims can succeed only if a court ultimately decides that Caterpillar should not have sold its bulldozers to the IDF. . . . A court could not find in favor of the plaintiffs *without implicitly questioning, and even condemning, United States foreign policy toward Israel*.

*Id.* at 983-84 (emphases added) (concluding that the suit implicated the first, fourth, fifth, and sixth *Baker* factors).  The same is true here, where Plaintiffs' claims could succeed only if the Court were to conclude—contrary to U.S. policy—that Defendants should not have engaged in "transactions with [the Ministry]."  Compl. ¶ 172.  Indeed, the case for dismissal is even stronger here, where U.S. policy also included hundreds of millions of dollars in direct U.S. funding and support for the Ministry and the Iraqi public health system.

It is no answer that Defendants' support allegedly was part of a "corrupt" scheme.  Even if Plaintiffs' allegations were true, the ATA draws no distinction between "corrupt" and "non-corrupt" support; rather, it focuses on whether the support is "material" or "substantial" and provided with the requisite knowledge or intent with respect to terrorism.  *See, e.g.*, 18 U.S.C. § 2339A(a); *id.* § 2333(d)(2).  Indeed, Plaintiffs admit their material-support theory is "not limited to . . . corrupt payments or other FCPA violations," Compl. ¶ 172, but rather extends to "contract goods" "legitimately purchased" by the Ministry, all of which they allege were subject to diversion in support of terrorism, *id.* ¶ 129.  According to Plaintiffs, Defendants are liable "[w]hether or not" they engaged in corruption, as *any* "transactions with" the Ministry would have funded terrorism and had a "causal nexus" to Jaysh al-Mahdi attacks.  *Id.* ¶ 172.  Plaintiffs' claims thus cannot be adjudicated without impugning U.S. foreign policy toward the Ministry.

**B.**   **Plaintiffs' Claims Also Ask The Court To Contradict U.S. Policies Regarding The Sadrists And Jaysh Al-Mahdi**

Plaintiffs' claims that the Sadrist-controlled Ministry was a front for Jaysh al-Mahdi, and that Jaysh al-Mahdi (a non-FTO) was a front for Hezbollah (an FTO), also call into question U.S. policies to work with the Sadrists, to encourage their political participation in the Iraqi government, and to decline to designate the Sadrists or Jaysh al-Mahdi as FTOs.

Although Plaintiffs characterize Jaysh al-Mahdi as terrorists, *see, e.g.*, Compl. ¶¶ 1, 340, 344, the State Department, even while designating other Iraqi militant groups and factions as FTOs, *see supra* note 49, chose *not* to designate the Sadrists or Jaysh al-Mahdi. Plaintiffs allege this was "a "*strategic policy decision*" that "reflected a *political concern* among some U.S. policymakers about the best way to influence" Sadr, "who wielded significant political clout," and the Jaysh al-Mahdi militia. Compl. ¶ 344 (emphasis added). That decision also reflected the policy of the U.S. military with respect to the Sadrists. Jaysh al-Mahdi was plainly a military force that fought American troops, *see infra* Part II, yet in an effort to bring an end to sectarian violence and make space for political reconciliation with the Sadrists, the U.S. military entered numerous cease-fire agreements with Jaysh al-Mahdi.[57]

The U.S. military, as well as diplomatic and intelligence agencies, determined that these decisions were effective. The State Department's 2007 terrorism report stated that the "improved security environment" in Iraq was partly the result of "the declared ceasefire by Muqtada al-Sadr's Jaysh al-Mahdi militia" that August,[58] and its 2008 report explained that the

---

[57] *See, e.g.*, U.S. Nat'l Counterterrorism Ctr., 2007 Report on Terrorism 13 (Apr. 30, 2008) (attributing decreased attacks to "the Mahdi Army's self-imposed cease-fire") (Ex. 46); *see also* David E. Johnson et al., The 2008 Battle of Sadr City: Reimagining Urban Combat, at xx (RAND Corp. 2013) (cited at Compl. ¶ 130 n.268) (Ex. 12).

[58] U.S. Dep't of State, Country Reports on Terrorism 2007, at 108 (April 2008) (Ex. 47).

Iraqi government "attributed security gains to . . . decisions by some elements affiliated with Muqtada al-Sadr's Jaysh al-Mahdi Army to forego armed action in favor of political activity."[59] Yet Plaintiffs' lawsuit, premised on treating Jaysh al-Mahdi as a terrorist organization, necessarily would require this Court, were it to find in Plaintiffs' favor, to contradict the Executive Branch's decisions not to designate the Sadrists and Jaysh al-Mahdi as FTOs and instead to encourage them to work peacefully through Iraqi institutions.

The political question doctrine insulates precisely such judgments. *See People's Mojahedin Org. of Iran*, 182 F.3d at 23. Strategic national security and foreign policy considerations "are delicate, complex, and involve large elements of prophecy," and therefore are committed solely to "the domain of political power." *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). That is especially true in zones of armed conflict. Plaintiffs urge "judicial intrusion [and] inquiry." *Id.* Accepting their allegations would risk "international embarrassment" by "undermin[ing] foreign policy decisions in the sensitive context" of the Iraq war and reconstruction, *Corrie*, 503 F.3d at 984, and would present the destabilizing specter of "multifarious pronouncements by various departments on one question," *Baker*, 369 U.S. at 217.

## II.   THE ACT OF WAR EXCLUSION BARS ALL OF PLAINTIFFS' ATA CLAIMS

The ATA provides that "[n]o action shall be maintained under § 2333 of this title for injury or loss by reason of an act of war." 18 U.S.C. § 2336(a). It defines an "act of war" as

> any act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

---

[59] U.S. Dep't of State, Country Reports on Terrorism 2008, at 116 (April 2009) (Ex. 44); *see also* David H. Petraeus, Testimony Before H. Comm. on Armed Servs., 2008 WL 948386 (April 9, 2008) (explaining that al-Sadr's ceasefire had contributed to a decline in violence); Dennis C. Blair, Dir. of Nat'l Intelligence, Testimony Before the H. Select Intel. Comm., 2009 WL 459077 (Feb. 25, 2009) (testifying that "most of [al-Sadr's] militia would set aside their weapons to become a cultural organization and a counterweight to Western influence").

*Id.* § 2331(4).  By the plain terms of the statute, the relevant acts need not occur during a "declared" war or one waged between nations.  Rather, Congress made clear that the exclusion covers acts occurring "in the course of" an "armed conflict" between "military forces *of any origin*."  *Id.* § 2331(4)(C) (emphasis added).  Even a group officially designated as a terrorist organization—which Jaysh al-Mahdi was not—can be a "military force of any origin" under this provision.  *See Kaplan v. Cent. Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185, 204 (D.D.C. 2013) (Lamberth, J.) (holding that Hezbollah rocket attacks against Israeli civilians were "in the course of . . . armed conflict").  This is consistent with the reality of the post-9/11 era, in which the U.S. military has fought in armed conflicts against a variety of non-state terrorist and insurgent groups.  Indeed, the Supreme Court has confirmed that "the United States' war with al-Qaeda" was an "armed conflict."  *Hamdan v. Rumsfeld*, 548 U.S. 557, 628-31 (2006).

There can be no serious dispute that Plaintiffs' battlefield injuries occurred in the course of the armed conflict in Iraq that took place from March 2003 through at least August 2010.[60]

## A.     Iraq Was In A State Of "Armed Conflict" During The Relevant Period

There is no question that an "armed conflict" within the meaning of the ATA raged in Iraq during the relevant period.  The Iraq War (as it was universally known) commenced in March 2003, and continued after the fall of Saddam in April 2003 until at least August 2010, when President Obama formally declared an end to the American "combat mission" in Iraq,

---

[60] Courts have taken different views on whether this statutory bar is jurisdictional, *see Kaplan*, 961 F. Supp. 2d at 199-200 (summarizing the "confusion"), but the better reading is that it is, because where the exclusion applies, "[n]o action shall be maintained."  18 U.S.C. § 2336(a); *cf. Florida Bankers Ass'n v. U.S. Dep't of Treasury*, 799 F.3d 1065, 1067 & n.1 (D.C. Cir. 2015) (provision that "no suit" to enjoin collection of a tax "shall be maintained" is jurisdictional).  But even if the Court were to consider the exclusion non-jurisdictional, dismissal would still be appropriate under Rule 12(b)(6) based on "the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which [the Court] may take judicial notice."  *Stewart*, 471 F.3d at 173.

withdrawing the last combat troops in December 2011.  Every branch of the U.S. government

recognized the situation in Iraq to be a "war" or "armed conflict," including during the 2005-

2009 time period in which the victims in this case were injured or killed.

Congress authorized the Iraq War in an Authorization for Use of Military Force Against

Iraq, Pub. L. No. 107-243, 116 Stat. 1498 (2002), and that domestic legal authority continued to

be a basis for U.S. military operations long after Saddam's fall.[61]  Throughout the entire period

covered by the Complaint, Presidents Bush and Obama complied with their obligation under the

War Powers Resolution to report regularly to Congress while U.S. "armed forces continue to be

engaged in . . . hostilities." 50 U.S.C. § 1543(c).[62]  When the Department of Defense issued its

statutorily required reports to Congress on Iraq in 2005 through 2009, it repeatedly confirmed

that the country was in a state of armed conflict.[63]  And when the Secretary of State annually

---

[61] *See, e.g., Declaration and Principles: Future U.S. Commitments to Iraq, Joint Hearing Before the Subcomm. on the Middle East and South Asia and the Subcomm. on Int'l Orgs., Human Rights, and Oversight of the H. Comm. on Foreign Affairs*, 110th Cong., 2d Sess. 22-23, 38 (2008) (testimony of David Satterfield, Senior Advisor, Coordinator for Iraq, U.S. State Dep't) (identifying the AUMF as authority for U.S. "use [of] force on a continuous basis" in Iraq) (Ex. 48).

[62] *See* H. R. Doc. No. 108-175, at 1 (2004) (Ex. 49); H. R. Doc. No. 108-231, at 2 (2004) (Ex. 50); H. R. Doc. No. 109-30, at 2 (2005) (Ex. 51); H. R. Doc. No. 109-73, at 2 (2005) (Ex. 52); H. R. Doc. No. 109-114, at 2 (2006) (Ex. 53); H. R. Doc. No. 110-5, at 2 (2007) (Ex. 54); H. R. Doc. No. 110-38, at 2 (2007) (Ex. 55); H. R. Doc. No. 110-81, at 2 (2007) (Ex. 56); H. R. Doc. No. 110-122, at 2 (2008) (Ex. 57); H. R. Doc. No. 111-61, at 2 (2009) (Ex. 58); H. R. Doc. No. 111-79, at 2 (2009) (Ex. 59); H. R. Doc. No. 111-122, at 2 (2010) (Ex. 60).

[63] U.S Dep't of Def., Report to Congress: Measuring Stability and Security in Iraq iv (Nov. 4, 2009) (explaining that "U.S. forces continue to focus on combat operations" and that "U.S. combat and support capabilities continue to play an important role") (Ex. 61); U.S Dep't of Def., Report to Congress: Measuring Stability and Security in Iraq 14 (Mar. 2, 2007) ("conflict" involved numerous armed groups, with "most attacks continu[ing] to be directed against Coalition forces") (Ex. 62); U.S Dep't of Def., Report to Congress: Measuring Stability and Security in Iraq 23 (Oct. 13, 2005) (about "80% of all attacks are directed against Coalition Forces") (Ex. 63).

(from 2004 to 2007) wrote to the U.N. Security Council to secure endorsement of Coalition operations through the end of 2008, Secretaries Powell and Rice explained that Coalition forces would abide by "the law of armed conflict"—a statement that could only mean the United States viewed Iraq as continuing to be in a state of armed conflict.[64]

As these government actions and the reality on the ground make clear, the armed conflict in Iraq continued long after Saddam was toppled, the occupation ended, and a new Iraqi government formed in June 2004. At that stage the armed conflict transitioned from an "armed conflict . . . between two or more nations," 18 U.S.C. § 2331(4)(B), to an "armed conflict between military forces of any origin," *id.* § 2331(4)(C). The latter statutory category matches the international law classification of a "non-international armed conflict." *Hamdan*, 548 U.S. at 631 (quoting Int'l Comm. of Red Cross, Commentary on the Additional Protocols to the Geneva Conventions). Such a non-international armed conflict exists whenever there is "protracted armed violence between governmental authorities and armed groups."[65] The United States stated

---

[64] S.C. Res. 1790, Annex II, Letter dated Dec. 10, 2007 from U.S. Secretary of State to President of Security Council, U.N. Doc. S/RES/1790 (Dec. 18, 2007) (Ex. 64); S.C. Res. 1723, Annex II, Letter dated Nov. 17, 2006 from U.S. Secretary of State to President of Security Council, U.N. Doc. S/RES/1723 (Nov. 28, 2006) (Ex. 65); S.C. Res. 1637, Annex II, Letter dated Oct. 29, 2005 from U.S. Secretary of State to President of Security Council, U.N. Doc. S/RES/1637 (Nov. 11, 2005) (Ex. 66); S.C. Res. 1546, Annex, Text of letters from Prime Minister of Interim Government of Iraq and U.S. Secretary of State to President of Security Council, U.N. Doc. S/RES/1546 (June 8, 2004) (Ex. 67).

[65] Op. of Off. of Legal Counsel, U.S. Dep't of Justice, *Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi* at 25 (July 16, 2010) (quoting *Prosecutor v. Tadić*, Case No. IT-94-1-I, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction, ¶ 70 (Int'l Crim. Trib. for the former Yugoslavia Oct. 2, 1995)) (Ex. 68); *see also* Int'l Comm. of the Red Cross (ICRC), Opinion Paper, How is the Term "Armed Conflict" Defined in International Humanitarian Law (March 2008), at 3 (a non-international armed conflict exists when "one or more non-governmental armed groups" with the "capacity to sustain military operations" are involved in "hostilities . . . of a collective character or when the government is obliged to use military force against the insurgents, instead of mere police forces") (Ex. 69).

in a recent Fourth Circuit brief that "when the United States passed control to an interim Iraqi government in 2004, 'the ongoing hostilities became a *non-international armed conflict.*'"[66] And the International Committee of the Red Cross, the international body charged with monitoring compliance with the Geneva Conventions, likewise concluded in 2004 that "hostilities in Iraq between armed fighters on one hand opposing the Multinational Force (MNF-I) and/or the newly established authorities on the other, amount to a non-international armed conflict."[67]

Presidents Bush and Obama annually characterized the situation in Iraq as a "war" in their State of the Union Addresses.  *See* George W. Bush, *State of the Union Address*, 2007 WL 159710 (Jan. 23, 2007) ("Every one of us wishes this war were over and won."); George W. Bush, *State of the Union Address*, 2008 WL 218919 (Jan. 28, 2008) ("[C]oalition and Iraqi forces have killed or captured hundreds of militia fighters . . . defeating these militia fighters is critical to the future of [Iraq]."); Barack Obama, *Remarks to Joint Session of Congress*, 2009 WL

---

[66] Suppl. Br. for U.S., *United States v. Hamidullin*, No. 15-4788, 2017 WL 4163478, at *6-7 (4th Cir. Sept. 11, 2017) (quoting David Wallace et al., *Trying to Make Sense of the Senseless: Classifying the Syrian War Under the Law of Armed Conflict*, 25 Mich. St. Int'l L. Rev. 555, 584-85 (2017) (emphasis added).

[67] Int'l Comm. of the Red Cross, Iraq Post 28 June 2004: Protecting Persons Deprived of Freedom Remains a Priority (Aug. 5, 2004) (Ex. 70).  Leading experts on armed conflict, including Professor Michael Schmitt, a former Army Judge Advocate General lawyer who is Stockton Professor at the Naval War College, have reached the same conclusion regarding the armed conflict in Iraq.  *See, e.g.*, Michael N. Schmitt, *Iraq (2003 Onwards)*, in *Int'l Law and the Classification of Conflicts* 357 (Elizabeth Wilmshurst ed., 2012) ("Since 2003, the conflict in Iraq . . . has evolved linearly from international armed conflict, through a period of belligerent occupation, to non-international armed conflict.") (Ex. 77).  The U.S. Coalition partner, the United Kingdom, is in accord.  *See* KH (Article 15(c) Qualification Directive) Iraq CG [2008] UKAIT 00023, ¶ 17 (stating the U.K. Government's view that as of 2008 "Iraq was in a situation of internal armed conflict") (Ex. 78); *see also Alseran v. Ministry of Defence*, 2017 WL 06374962, [2017] EWHC 3289 (QB) ("After the occupation of Iraq ended … on 28 June 2004, the situation was one of 'non-international armed conflict' in which there was fighting, not between states, but between multi-national armed forces … and organised armed groups.").

459901 (Feb. 24, 2009) ("I will soon announce a way forward in Iraq that leaves Iraq to its people and responsibly ends this war."); Barack Obama, *State of the Union Address*, 2010 WL 301960 (Jan. 27, 2010) ("This war is ending, and all of our troops are coming home.").  And when President Obama announced the timetable for withdrawing U.S. troops from Iraq on August 31, 2010—after the last attack alleged in the Complaint—he recognized that the longstanding armed conflict had transformed from a "war to disarm a state" to a "fight against an insurgency."[68]  President Obama stated then that "our troops fought" that insurgency "block by block," and that finally, in 2010, "the American combat mission in Iraq has ended."[69]

U.S. courts similarly recognized the existence of an armed conflict in Iraq during the relevant period.  *See, e.g.*, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009) (dismissing claims brought by the wife of an Army sergeant injured in Iraq in May 2004 because the political question doctrine barred "reexamination of many sensitive judgments and decisions entrusted to the military in a time of war"); *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1062 (E.D. Cal. 2011) (dismissing claims by survivors of U.S. civilian security personnel kidnapped in Iraq in 2008, because courts cannot second guess "the manner in which the Government responds to the kidnapping of American citizens in a foreign war zone").

Finally, the existence of an "armed conflict" is indisputable given Plaintiffs' own

---

[68] White House Off. of Press Sec'y, Remarks by the President in Address to the Nation on the End of Combat Operations in Iraq, 2010 WL 3415151 (Aug. 31, 2010).

[69] *Id.*; *see also* U.S. Periods of War and Dates of Recent Conflicts, *supra* note 3, at 8-9 ("On August 31, 2010, President Obama announced that the American combat mission in Iraq had ended. … On December 15, 2011, U.S. Armed Forces in Baghdad marked the official end of the war in Iraq .… [T]op U.S. military leaders observed the official end of U.S. Forces Iraq's mission after nearly nine years of conflict that claimed the lives of nearly 4,500 U.S. troops."); *accord* U.S. Dep't of Veterans Affairs, Dates and Names of Conflicts (including among "Recent Conflicts" the "War in Iraq:  Operation Iraqi Freedom (OIF; March 2003—November 2011) [and] Operation New Dawn (OND; September 2010—December 2011)" (last updated Aug. 24, 2015) (Ex. 71).

allegations.  Plaintiffs describe "an insurgency against U.S. forces," Compl. ¶ 176, that was

covered by the "laws of war," *id.* ¶ 342—which apply only in armed conflict.[70]  Plaintiffs further

describe hostilities that plainly amount to armed conflict, including armed attacks on military

forces, *id.* ¶¶ 58, 60, 100-01; "thousands of bombings" and other attacks on military targets using

military weapons, *id.* ¶¶ 61, 84, 87, 100-01; prolonged military battles, *id.* ¶¶ 330, 338; and

hundreds of soldiers killed or wounded "in action," *id.* ¶ 334.  This war, which claimed the lives

of 4,424 U.S. service members and wounded nearly 32,000 more,[71] was undeniably an "armed

conflict" within the meaning of the ATA's act of war exclusion.

### B.      Jaysh Al-Mahdi Was A "Military Force" In The Armed Conflict

Courts have recognized that the statutory phrase "military forces *of any origin*," 18

U.S.C. § 2331(4)(C) (emphasis added), "must include non-national forces," because other parts

of the definition of "act of war" "already cover[] all armed conflict between nations," *Kaplan*,

961 F. Supp. 2d at 201; *see also, e.g.*, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 512

(E.D.N.Y. 2012) (same).  Indeed, the phrase "military force of any origin" can include even

designated FTOs, and thus easily encompasses a group like Jaysh al-Mahdi that was *not* so

designated.  *See Kaplan*, 961 F. Supp. 2d at 204 (concluding Hezbollah acted "as a 'military

force'" while "engaged in sustained combat with a national military").

Plaintiffs' own allegations establish, despite a conclusory protest to the contrary, *see*

Compl. ¶ 340, that Jaysh al-Mahdi qualifies as a "military force[] of any origin."  Plaintiffs

allege that Jaysh al-Mahdi—literally "the Mahdi Army" ("Jaysh" being Arabic for "Army"), *id.*

¶ 3—formed to "fight the American and British occupiers," with its "primary goal" the

---

[70] U.S. Dep't of Def., Off. of Gen. Counsel, Law of War Manual, at 73 (June 2015) (Ex. 72).

[71] *See OIF U.S. Casualty Status Fatalities, supra* note 4.

"expulsion" of U.S. forces from Iraq, *id.* ¶ 326.  Having described a "conventional military force" as one that "aim[s]" to "claim or defend territory," *id.* ¶ 341, Plaintiffs thus concede that Jaysh al-Mahdi had exactly that aim.  Indeed, they further recognize that Jaysh al-Mahdi "seized control of large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah, and the entire eastern half of Baghdad," *id.* ¶ 60, as well as "key tactical neighborhoods," *id.* ¶ 58.  Claiming a "duty to protect the people from the U.S. forces," *id.* ¶ 95, Jaysh al-Mahdi "attack[ed] foreign enemies" from those strongholds, in particular, the "U.S.-led Coalition forces," *id.* ¶ 58.  By 2004, Jaysh al-Mahdi had "increased [its] attacks on Americans," and by early 2005 it was regularly launching "attacks against Coalition forces throughout Iraq." *Id.* ¶ 60; *see also id.* ¶ 101 (Jaysh al-Mahdi "waged an insurgency against U.S. forces in Iraq"). Plaintiffs repeatedly describe Jaysh al-Mahdi as a "militia," *see, e.g.*, *id.* ¶¶ 8, 11, 13, 59, 66, 85, 158, 164, 176, which, by definition, is a type of "military force."[72]  *See also id.* ¶ 331 (describing Jaysh al-Mahdi's expansion into a "terrorist *army* with a significant presence throughout Iraq" (emphasis added)).  The Department of Defense agreed, describing "the nature of the conflict" in Iraq as involving "Shi'a sectarian militias," including Jaysh al-Mahdi.[73]

As the Complaint further alleges, by 2007, Jaysh al-Mahdi had amassed more than "60,000 fighters," "operat[ing] throughout Iraq, with regional command centers," Compl. ¶ 331, and multiple "brigades," *id.* ¶ 60.  It employed the command structure of a traditional army, including "Company-, Battalion-, and Brigade-level commanders," *id.* ¶ 100, and functioned as

---

[72] *See Militia*, Oxford English Dictionary (last visited Feb. 2, 2018) (defining "militia" as "[a] military force that engages in rebel or terrorist activities in opposition to a regular army"); *Militia*, Cambridge Dictionary (last visited Feb. 2, 2018) (defining "militia" as "a military force whose members are trained soldiers but who often have other jobs").

[73] U.S. Dep't of Def., Report to Congress: Measuring Stability and Security in Iraq 16 (Mar. 2, 2007) (Ex. 62).

"a well-armed, well-trained force of insurgents,"[74] with "military headquarters" and regular "combat operations."[75] Jaysh al-Mahdi commanders even entered into cease-fires with U.S. forces "to preserve the militia after it took heavy losses."[76]

The Complaint also alleges that Jaysh al-Mahdi engaged in military-style combat against U.S. forces, using military weapons such as mortars, surface-to-air missiles, rocket-propelled grenades, and explosively formed penetrators designed to penetrate tank armor. Compl. ¶¶ 333-38. Jaysh al-Mahdi "mastered several types of attacks that proved especially deadly for U.S. troops," "likely kill[ing] more than 500 Americans and wound[ing] thousands more." *Id.* ¶ 61. These attacks spanned years and targeted U.S. military tanks, convoys, helicopters, and bases. *See, e.g.*, *id.* ¶¶ 87, 333-38, 385.

In short, Jaysh al-Mahdi "engaged in sustained combat with a national military force," often "initiating[] attack[s] on members of that military force," "provoking" counterattacks "by that military," and "agreeing to . . . cease-fire[s]." *Kaplan*, 961 F. Supp. 2d at 204. It was therefore acting as a "military force" in the ongoing "armed conflict" in Iraq.

## C.     The Attacks At Issue Occurred "In The Course Of" Armed Conflict

Finally, the attacks that are alleged to have injured Plaintiffs occurred "in the course of" this armed conflict. Courts have recognized attacks as occurring in the course of armed conflict when they take place in a "combat or militarized zone,"[77] are "targeted at military or

---

[74] Nimrod Raphaeli, *Understanding Muqtada al-Sadr*, Middle East Quarterly 8 (Fall 2004) (cited at Compl. ¶ 59 n.18) (Ex. 7).

[75] *See, e.g.*, Endgame, *supra* note 10, at 67 (cited at Compl. ¶ 59 n.19).

[76] *See id.* at 73. *See also id.* at 424-25.

[77] *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451, 459 (S.D.N.Y. 2008) (declining to apply act of war exclusion where civilians targeted outside a military zone, but suggesting act of war exclusion may apply where "the situs of the attacks [are] in any combat or

governmental personnel or interests,"[78] involve "friendly fire" accidents following a cease-fire,[79] or involve military weapons in the context of a discrete conflict.[80]  It is evident from the face of the Complaint that Plaintiffs' injuries—alleged to have resulted from Jaysh al-Mahdi's direct targeting of U.S. Armed Forces—occurred in the course of the armed conflict in Iraq.

Every victim is alleged to have been killed or injured in or near areas that Plaintiffs describe as zones of active hostilities—Sadr City, other parts of Baghdad, or Basra.  *See generally* Compl. ¶¶ 391-615; *see also id*. ¶ 385.  And far from "non-combatant civilians" "going about their everyday lives," *Sokolow*, 583 F. Supp. 2d at 459, each victim was an active-duty U.S. service member or a military contractor accompanying U.S. forces as part of the U.S. war effort.  Compl. ¶¶ 390-615.  Most were active members of the U.S. Army or Marine Corps deployed to Iraq in combat roles (and/or were embedded with combat battalions), many serving in units whose combat mission was to fight "insurgents" like Jaysh al-Mahdi.[81]  In fact, 17 of the victims were members of the Army unit "2-16 Rangers," which was principally "*tasked with fighting . . . Jaysh al-Mahdi*."  *Id*. ¶ 391 (emphasis added); *see also id*. ¶ 451 (alleging that the mission of Specialist Jimmy Connolly's company also was to "fight Jaysh al-Mahdi").

Others likewise served in combat units, Compl. ¶¶ 395, 482, 515, 557, 572, 582, 608, or

---

militarized zone").

[78] *Id.*

[79] *Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 WL 1867060, at *1, 4 (E.D.N.Y. June 30, 2006) (applying "act of war" exclusion to injuries suffered by U.S. service members and contractors exposed to "friendly fire" when Coalition forces detonated Saddam's chemical weapons stockpile; court rejected the view that the injuries "just happen[ed] to occur during wartime," and concluded they occurred "in the course of" armed conflict).

[80] *Kaplan*, 961 F. Supp. 2d at 203.

[81] Compl. ¶¶ 391, 395, 400, 402, 407, 410, 441, 449, 463, 468, 477, 482, 497, 500, 509, 512, 515, 521, 523, 529, 534, 543, 547, 550, 552, 557, 572, 582, 591, 599, 606, 608, 613.

as combat medics or engineers embedded with combat forces, *id.* ¶¶ 449, 497, 523.  The seven

contractors were also embedded with combat units, stationed in combat zones, and/or

participating in the war effort in Iraq.  They provided security for areas used by U.S. military

forces and for the disposal of captured weapons, *id.* ¶¶ 431, 455, 472, 564, and generally

operated in zones of active fighting, *id.* ¶¶ 488-89, 491-92, 503-04.

The difficult line-drawing question courts have faced under the act of war exclusion is

whether—unlike here—wartime attacks targeting *civilians outside of combat zones* can be said to

occur "in the course of" an armed conflict.  *Compare Sokolow*, 583 F. Supp. 2d at 459 (attack on,

*e.g.*, university cafeteria in Jerusalem not an "act of war"),[82] *with Kaplan*, 961 F. Supp. 2d at

203-04 ("act of war" exclusion applies to Hezbollah rocket attacks on civilians).  But the attacks

in this case—targeting U.S. military forces in an active war zone—are far from that line, and

constitute paradigmatic acts "in the course of" armed conflict.

## III.   PLAINTIFFS' CLAIMS THAT DEFENDANTS ARE LIABLE FOR DIRECTLY COMMITTING ACTS OF INTERNATIONAL TERRORISM FAIL ON NUMEROUS GROUNDS

Plaintiffs' direct liability claims allege that Defendants *themselves* committed acts of

international terrorism (specifically, material support for terrorism and financing of terrorism) by

selling and donating medicine and medical equipment to the Iraqi Ministry of Health.  Section

2333(a), on which these counts are based, requires Plaintiffs to plead and prove that they were

injured "by reason of" an "act of international terrorism" committed by Defendants.  Under

settled case law and the ATA's definition of "international terrorism," 18 U.S.C. § 2331(1), this

---

[82] *See also Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 166-67 (D.D.C. 2006) (attack on civilian public buses not an act of war); *Biton* v. *Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 10-11 (D.D.C. 2005) (attack on school buses carrying students and teachers not an act of war).  *Compare Gill*, 983 F. Supp. 2d at 514 (explaining that the limiting interpretation of "in the course of" adopted by these courts presents "a number of problems").

means, among other things, that Defendants' conduct must (1) have proximately caused

Plaintiffs' injuries, (2) objectively appear to have been intended to achieve certain specified

terroristic purposes, and (3) have violated a federal or state criminal law. *See supra* 21-22.

Plaintiffs' implausible theory fails at every step due to the highly attenuated causal chain that

strains to link Defendants' commercial transactions to Jaysh al-Mahdi's attacks; Plaintiffs' own

allegations of Defendants' non-terroristic motives for their dealings with the Ministry; the

absence of any reasonable inference that Defendants must have known that a U.S. government-

supported foreign Ministry was a "de facto terrorist group"; and application of two separate

express statutory limitations in the predicate offenses Plaintiffs invoke.

### A.       Plaintiffs Allege An Indirect And Highly Attenuated Causal Chain That Fails To Satisfy The ATA's Proximate Cause Requirement

Defendants supplied life-saving medicine and medical equipment to the Iraqi Ministry of

Health—a government agency with legitimate health care responsibilities and operations

nationwide. Only after completing such transactions did Jaysh al-Mahdi agents within the

Ministry allegedly "misappropriat[e]" some of the goods, Compl. ¶ 106, sell them on the black

market, and then use the proceeds to fund attacks like those that tragically injured Plaintiffs.

Taking Plaintiffs' well-pleaded allegations as true (only for purposes of this motion), at most

those allegations present an indirect and attenuated causal chain that does not satisfy the ATA's

"traditionally rigorous proximate cause requirement." *Shatsky v. Palestine Liberation Org.*, No.

02-cv-2280, 2017 WL 2666111, at *7 (D.D.C. June 20, 2017) (Leon, J.).

The touchstone for proximate cause is directness. *See Siegel v. SEC*, 592 F.3d 147, 159

(D.C. Cir. 2010) ("'[P]roximate causation' . . . is normally understood to require a direct relation

between conduct alleged and injury asserted."); *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d

Cir. 2013) (The "'central question'" for proximate causation "'is whether the alleged violation

led directly to the plaintiff's injuries.'").  The Supreme Court has repeatedly explained that a

plaintiff can satisfy the statutory "by reason of" standard only if he can show "some *direct*

*relation* between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Inv'r*

*Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasis added); *see also id.* at 269.  As the Ninth

Circuit recently held, the ATA is no exception: Section 2333(a)'s "'by reason of' requirement"

demands, at a minimum, a showing of "some direct relationship" between the plaintiff's injuries

and the defendant's alleged acts.  *Fields v. Twitter, Inc.*, __ F.3d __, 2018 WL 626800, at *4 (9th

Cir. Jan. 31, 2018) (affirming dismissal of ATA claim for failure to adequately plead proximate

cause).[83]  Put simply, the ATA adheres to the general rule that "foreseeability alone is not

sufficient to establish proximate cause" under a federal statute.  *Bank of Am. Corp. v. City of*

*Miami*, 137 S. Ct. 1296, 1305 (2017); *see also Fields*, 2018 WL 626800, at *6-7.  Thus, a

defendant may be liable only where a plaintiff's injury "is reasonably foreseeable or anticipated

as a natural consequence of the [defendant's] actions," *and* where those actions are a "*substantial*

*factor* in the sequence of responsible causation."  *Rothstein*, 708 F.3d at 91; *Shatsky*, 2017 WL

2666111, at *7 (emphasis added).

    Because of this "direct relationship requirement," courts reject claims that "stretch[] the

causal chain" connecting a defendant's conduct to plaintiff's injury "well beyond the first step."

*See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10-11 (2010).  Thus, where an ATA

defendant is alleged to have provided resources to a foreign intermediary with legitimate

---

[83] Congress borrowed the ATA's "by reason of" language from the Sherman Act, 26 Stat. 210 (1890), the Clayton Act, 15 U.S.C. § 15(a) (2017), and RICO, 18 U.S.C. § 1964(c) (2011). Because "Congress 'used the same words' when it enacted the ATA . . . 'we can only assume it intended them to have the same meaning.'"  *Shatsky*, 2017 WL 2666111, at *7 (quoting *Holmes*, 503 U.S. at 268); *see also Fields*, 2018 WL 626800, at *4 (same), *5 (explaining that the "reasons that compelled the *Holmes* Court to adopt the Clayton Act's 'some direct relation' requirement in the RICO context" apply equally "in the context of the ATA").

operations (such as an agency of a foreign sovereign), which *in turn* allegedly provided those resources to a terrorist organization, the allegations are "insufficient for proximate causation purposes." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013); *see also, e.g.*, *Rothstein*, 708 F.3d at 97; *Owens v. BNP Paribas, SA*, 235 F. Supp. 3d 85, 97-99 (D.D.C. 2017). Courts have enforced this line even where (unlike this case) the alleged intermediary is a state sponsor of terrorism, and the defendant allegedly provided it access to large sums of money (rather than medical goods). These decisions reason that such governments are "not simply a funnel to provide money to terrorists," but also "use[] the funds" for "legitimate purposes." *Owens*, 235 F. Supp. 3d at 97.

Cases involving state sponsors of terrorism are instructive in comparison to this case, which involves the provision of medicine and medical equipment to a health ministry. In *Rothstein*, terror victims argued that UBS was liable under the ATA because its banking services "provided Iran with hundreds of millions of dollars," alleging that UBS "knew full well that the cash dollars it was providing . . . would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations." 708 F.3d at 93, 97 (emphasis omitted). The Second Circuit affirmed the dismissal of the ATA claim because those allegations were too attenuated to show that UBS's actions had "led directly to" the plaintiffs' injuries. *Id.* at 92. In particular, Plaintiffs had not alleged that UBS participated in the terrorist attacks or transferred money directly to Hezbollah or Hamas, or that "Iran, with its billions of dollars in reserve, would not have funded the attacks" without UBS's services. *Rothstein*, 708 F.3d at 97. And while Iran's status as a state sponsor of terrorism "made it more likely that the moneys" UBS provided to Iran "would be used for terrorism," the court concluded that "the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

A recent decision in this District applied *Rothstein* to dismiss ATA claims because a bank's

processing of funds for Sudan—a state sponsor of terror, but still a government with legitimate

operations to fund—was "not the same as processing funds for" al Qaeda. *Ofisi v. BNP Paribas,

S.A.*, __ F. Supp. 3d __, 2017 WL 4355922, at *7-9 (D.D.C. Sept. 29, 2017), *vacated in part on

other grounds*, 2018 WL 385408 (D.D.C. Jan. 11, 2018).

As in *Rothstein* and *Ofisi*, Plaintiffs here claim that a government entity was in league

with terrorists, and that doing business with the government eventually benefitted the terrorists.

But by Plaintiffs' own account, Defendants transacted with only the Ministry and its import arm,

Kimadia, not with terrorists. *See, e.g.*, Compl. ¶¶ 182, 240, 278, 305. Plaintiffs allege that

members of Jaysh al-Mahdi had "infiltrate[d]" and "effectively captured" the Ministry, *id.*

¶¶ 159, 161, but "the fact remains that [the Ministry] is a government [agency]"—one that the

United States openly and vigorously supported—"and as such it ha[d] many legitimate . . .

operations[] and programs." *Rothstein*, 708 F.3d at 97; *accord Ofisi*, 2017 WL 4355922, at *9.

Defendants are thus "removed from the acts that caused the [P]laintiffs' injuries, separated by a

[government entity] . . . that may well have used [Defendants' medicines and medical

equipment] for any number of legitimate purposes." *Owens*, 235 F. Supp. 3d at 97.

Indeed, many intervening acts and actors separate Defendants' alleged conduct from the

attacks that injured Plaintiffs. According to Plaintiffs' theory: (1) the Supplier Defendants

(and/or their local Iraqi agents) received Ministry of Health contracts allegedly through

corruption, *see, e.g.*, Compl. ¶ 4; (2) pursuant to those contracts, the Suppliers sold

pharmaceuticals and medical devices, and allegedly gave certain quantities of those medicines

and supplies free of charge, to the Ministry, *id.* ¶ 5; (3) Jaysh al-Mahdi agents within the

Ministry allegedly "stole" or "funneled" those goods to the Jaysh al-Mahdi militia, *id.* ¶¶ 105,

163-66; (4) Jaysh al-Mahdi members allegedly sold Defendants' breast cancer drugs, hemophilia medication, MRI machines, and catheters, among other things, *id.* ¶¶ 220, 241, 284, 306, on the black market, *id.* ¶ 8; (5) Jaysh al-Mahdi leaders allegedly used the proceeds of those sales to purchase weapons and otherwise fund attacks, *id.*; and (6) Jaysh al-Mahdi agents then committed the alleged acts of terrorism, *id.* ¶ 390.  Even accepting Plaintiffs' conclusory allegations that the Suppliers also paid Ministry officials *cash* bribes (*but see infra* pp. 57-58) would do little to shorten this lengthy chain, still leaving Plaintiffs' allegations far short of the necessary "direct relation between the injury asserted and the injurious conduct alleged."  *Holmes*, 503 U.S. at 268.

This highly attenuated causal chain highlights the lack of any limiting principle.  If accepted, Plaintiffs' theory of causation would mean that any entity that did business with or provided medical aid, even indirectly, to the Ministry of Health during the relevant period—including the U.S. government, the United Nations, and the World Health Organization—also proximately caused the Jaysh al-Mahdi attacks.  *See, e.g.*, Compl. ¶ 129 (alleging that even "legitimately purchased" goods were diverted); *id.* ¶ 172 (explaining that "the causal nexus" alleged is "not limited to . . . corrupt payments or other FCPA violations").  Yet the very purpose of the proximate-cause requirement is to "bar[] suits for alleged harm that is 'too remote' from the defendant's [allegedly] unlawful conduct."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014).  And here—*even setting aside* the Ministry's critical, interrupting role in the causal chain—"[a]t most, the [Complaint] establishes that [Defendants'] alleged provision of material support to [Jaysh al-Mahdi] facilitated the organization's growth and ability to plan and execute terrorist acts[; it] does not articulate any connection between [Defendants'] provision of this aid and [Plaintiffs'] injuries."  *Fields*, 2018 WL 626800, at *8.

Additional deficiencies underscore Plaintiffs' failure to satisfy the ATA's direct-relation

requirement.  Plaintiffs do not allege, of course, that Defendants participated in the attacks that injured Plaintiffs.  *See, e.g.*, *Ofisi*, 2017 WL 4355922, at *9.  Nor is it plausible, under Plaintiffs' own allegations, that Defendants' alleged sales and donations constituted a "substantial factor" in causing the attacks.  *Shatsky*, 2017 WL 2666111, at *7.  After all, Defendants' claimed contributions pale in comparison to the Ministry's massive procurement budget, which was allegedly "looted" thoroughly by Jaysh al-Mahdi.  *See* Compl. ¶¶ 3, 113, 135, 191, 215, 256, 286, 312.  *Compare Rothstein*, 708 F.3d at 97 (even if defendant bank "had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would . . . have funded the attacks").  During the relevant period, Jaysh al-Mahdi allegedly also "fully commandeered" at least three other Iraqi government agencies, diverting their substantial resources to its agenda.  Compl. ¶ 166; *see also id.* ¶¶ 64, 67.  And while Plaintiffs' theory is that Defendants' sales "helped the militia buy weapons," *id.* ¶ 8, they allege that Iran and its proxies purchased and "provided many of the weapons" used by Jaysh al-Mahdi.  *See Id*. ¶¶ 386-88.[84]

Plaintiffs' allegations about the Manufacturer Defendants present an even more indirect causal chain.  Aside from "registering to do business as [] manufacturer[s]" and "submitting paperwork" confirming that the Suppliers were authorized to sell their products, *see, e.g.*, Compl. ¶¶ 152, 187, the Manufacturers are not alleged to have had any direct connection to the Ministry, much less to Jaysh al-Mahdi.  Instead, Plaintiffs allege, without any factual support, that the Suppliers acted as the Manufacturers' "agent(s)." *Id.*  ¶¶ 186, 213, 243, 250, 282, 308.  Such bare allegations of agency state a legal conclusion entitled to no weight on a motion to dismiss.  *See,*

---

[84] *See also* U.S. Dep't of Treasury, Treasury Designates Individual, Entity Posing Threat to Stability in Iraq (July 2, 2009) (cited at Compl. ¶ 359 n.313) (Ex. 13) (explaining how Iran organized and directed supplies of weapons and ammunition to Jaysh al-Mahdi to target Coalition forces).

*e.g.*, *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 111-12 (D.D.C. 2010) (dismissing claims based on an agency theory where plaintiffs offered only conclusory allegations that the principal had the right to control the agent). All that remains, then, are Plaintiffs' allegations that the Manufacturers manufactured medicines or medical devices that *someone else* in turn allegedly sold to the Ministry and "used to bribe" Kimadia officials. *See, e.g.*, Compl. ¶¶ 181, 239, 276, 304. The conduct of manufacturing—a routine commercial activity several steps removed from any alleged wrongdoing—even more clearly fails the proximate cause test and cannot give rise to liability under the statute. *See In re Terrorist Attacks*, 714 F.3d at 124 (the provision of "routine banking services to organizations and individuals said to be affiliated with al Qaeda" cannot be said to have "proximately caused" plaintiffs' injuries).

### B.      Defendants' Alleged Actions Did Not Objectively "Appear To Be Intended" To Intimidate A Civilian Population Or To Coerce Government Policy

The Complaint also fails to establish that Defendants themselves committed an "act of international terrorism," as required for direct liability under the ATA. Defendants cannot have committed "an act of international terrorism" unless (among other things) their *own* actions objectively "appear to be intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B); *see also Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014). The notion that Defendants— reputable corporations from five separate corporate families—each intended to achieve such extreme terrorist objectives by selling medical goods to a sovereign country's health ministry, even corruptly, is implausible on its face. Nowhere does the Complaint plead the facts necessary to "lead an objective observer to conclude Defendants intended to achieve" the coercion or intimidation objectives enumerated in the ATA. *Stansell v. BGP, Inc.*, No. 8:09-cv-2501, 2011

WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011); *see also Weiss*, 768 F.3d at 207 n.6 (statute creates "an objective standard to recognize the apparent intentions of actions").

An objective observer would recognize that Defendants' contracts with the Ministry and Kimadia—and any allegedly corrupt donations or payments made to secure those contracts—were intended to increase sales of the companies' medicines and medical equipment, not to intimidate civilians or coerce governments through acts of terrorism. Indeed, the Second Circuit considered a similar claim that corrupt oil-for-food dealings facilitated Iraqi human rights violations, and found it implausible to think that a major, multinational corporation "intend[ed]" its allegedly corrupt transactions to "assist[]" Saddam's "torture and abuse of Iraqi persons." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 194 (2d Cir. 2014); *see also Brill v. Chevron Corp.*, No. 15-cv-04916, 2017 WL 76894, at *1, *4 (N.D. Cal. Jan. 9, 2017) (dismissing ATA claim because allegedly corrupt oil-for-food transactions, which allegedly helped Saddam finance terrorism, did not appear to be intended to intimidate or coerce).

The Complaint itself describes Defendants as having commercial motives. Plaintiffs allege that the "post-Saddam Iraqi healthcare market . . . was generally perceived to be on the verge of rapid growth" and that "Defendants engaged in transactions structured to provide financial support to Jaysh al-Mahdi" "[i]n an effort to grow their market share in Iraq." Compl. ¶¶ 111-12. They state that the growing Iraqi market was a "motive for Defendants to engage in corrupt transactions" with the Ministry. *Id.* ¶ 113; *see also id.* ¶¶ 206-07 (corrupt payments were allegedly part of Defendants' "business strategy" for "the Middle East market in general and Iraq in particular"). These allegations contradict Plaintiffs' conclusory assertions of appearance of terroristic intent: they demonstrate that Defendants' apparent motive (again, accepting the allegations as true) was to do more business in Iraq, not to intimidate civilians or coerce

governments.  *See Stansell*, 2011 WL 1296881, at *9 (rejecting "conclusory" allegation that payments to terrorists "appear to be intended to achieve" terroristic objectives, because it was "contradict[ed]" by the allegation that defendants made the payments "'in exchange for the [terrorists'] agreement to allow [Defendants] to conduct [their] oil exploration activities'").[85]

This defect is all the more glaring with respect to the Manufacturer Defendants.  No objective observer would conclude that manufacturing medical goods to be resold by distributors to customers around the world exhibits a purpose to intimidate civilians or coerce governments. *See, e.g.*, *Stutts*, 2006 WL 1867060, at *2 ("engaging in commercial banking activity" with suppliers of chemicals to Iraq was not "designed to coerce civilians or government entities as required under § 2331").

### C.    Plaintiffs Cannot Satisfy The Scienter Elements Of The Alleged Predicate Crimes On Which Their Direct Liability ATA Claims Are Based

Plaintiffs also fail to plausibly allege the scienter required to violate the federal criminal statutes underlying their direct liability claims.  The two predicate offenses that Plaintiffs attempt to plead—material support and financing of terrorism—require that the defendant "know[]" or "intend[]" that its support is to be used for terrorist attacks.  *See* 18 U.S.C. §§ 2339A, 2339C.

---

[85] The Complaint further contradicts its claim that Defendants objectively appear to have had terroristic aims by alleging that Defendants made similar payments to officials in countries ranging from China and Indonesia to Greece, Poland, and Romania.  *See* Compl. ¶¶ 195 & n.167, 268 & n.224, 287-88.  Jaysh al-Mahdi had no presence in those countries, and Defendants are not alleged to have had any terroristic intent in making those payments.  Even in Iraq, Plaintiffs allege that Defendants paid "kickbacks" to the Ministry long *before* Jaysh al-Mahdi existed or U.S. forces entered Iraq, *see id.* ¶¶ 4, 7, 44-53, 113, 193, 216-22, 257-65, 313-14, and provided "free" goods for years *after* the Sadrists lost their claimed control of the Ministry, *see id.* ¶¶ 102, 195, 266, 290, 315.  For all of these reasons, an objective observer would not conclude that Defendants' alleged business practices reflected any intent to advance Jaysh al-Mahdi's alleged terrorist goals.

Knowledge requires at least a showing of "*criminal* recklessness,"[86] which permits liability "only when a person disregards a risk of harm *of which he is aware*." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 693-94 (7th Cir. 2008) (en banc) (emphasis added).

Plaintiffs do not suggest that Defendants intended to provide material support or to finance terrorism. They assert, however, that Defendants "knew or recklessly disregarded" that their transactions with the Ministry financed terrorism. Compl. ¶ 173. This claim purports to be based not on specific allegations of what Defendants actually knew, but rather on news articles that, according to the Complaint, "reported on the direct link between [the Ministry] and Jaysh al-Mahdi." *Id.* ¶ 176. Plaintiffs' theory is that information in the public domain should have alerted Defendants that transactions with the Ministry were supplying Jaysh al-Mahdi, and that Jaysh al-Mahdi was using the resulting funds to attack Americans. *See id.* ¶¶ 176-80.

Although the Complaint includes allegations that such news reports existed, those allegations are insufficient if they do not "'state a claim to relief that is plausible on its face,'" by "allow[ing] the court to draw the reasonable inference [from the facts alleged] that the defendant is liable." *Iqbal*, 556 U.S. at 678. In deciding whether it is plausible to infer knowledge or criminal recklessness based on what was allegedly "widely understood" and "reported," Compl. ¶¶ 175-76, the full body of publicly available information is relevant. The Court is not limited to Plaintiffs' selection of press reports, but may take judicial notice of other materials that "indicate what was in the public realm at the time." *Benak v. Alliance Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (taking judicial notice of newspaper articles "not [for] the[ir] contents" but to

---

[86] Defendants do not concede that criminal recklessness suffices to establish knowledge under §§ 2339A and 2339C, but the Court need not address that issue because Plaintiffs' well-pleaded allegations, taken as true for this motion, do not establish that Defendants criminally disregarded a risk of which they were aware.

evaluate whether a party should be charged with notice).

Although Plaintiffs selectively highlight reports that allege a close link between the Ministry and Jaysh al-Mahdi, *see* Compl. ¶¶ 175-80, their own allegations and sources reveal that the contemporaneous public record was far more confused and changed over time.  It was members of the Sadrist *political wing*—not Jaysh al-Mahdi—that the Iraqi parliament appointed to run the Ministry.  *See id.* ¶¶ 58, 62-72.  And although the Sadrists were no doubt problematic, Defendants could not have known that the entire Ministry was "not a genuine medical institution . . . [but] a de facto terrorist group." *Id.* ¶ 3.  It was customary in Iraq to build parliamentary coalitions by dividing ministries among political parties and for those parties to use the ministries to help their constituents.  *See id.* ¶¶ 64, 67.  According to one article Plaintiffs quote, Sadr "capitalized" on his control over the Ministry "to provide services to the poor and jobs to his followers."  *Id.* ¶ 176 (tenth bullet) (quoting *Newsweek*).  Reports that Jaysh al-Mahdi engaged in "theft or misappropriation" and "smuggled" goods out of the Ministry, *see id.*  ¶¶ 165-66, 170-71 & n.129, undercut the assertion that there was no "meaningful distinction" between the Ministry and the militia.  And even assuming Defendants were aware that Jaysh al-Mahdi agents held powerful positions in the Ministry, it does not follow that this fact should have prevented them from doing business with the Ministry.  The United States declined to designate either the Sadrists or Jaysh al-Mahdi as terrorist organizations, *see id.* ¶ 344, and General Petraeus testified to Congress that "mainstream Jaysh al-Mahdi" had "the right . . . to participate in the political process."[87]

Throughout the relevant period, there was one clear, constant signal: the open support and funding of the Ministry by the United States and reputable international organizations.  *See*

---

[87] Iraq: The Crocker-Petraeus Report, *supra* note 36, at 101.

*supra* pp. 7-14.   Throughout this period, the United States made massive investments in the

Ministry.   *See supra* pp. 7-10.   In 2007, the World Health Organization announced completion of

a multi-million-dollar drug control and research center built in partnership with the Ministry.[88]

And the United States facilitated the sale of medicine and medical equipment to this alleged

terrorist entity, even providing guidance to businesses on how to participate in Kimadia's

procurement process.[89]   This support and facilitation continued even as the United States

recognized corruption problems within the Ministry and worked with Iraqi authorities to root it

out, and even while U.S.-led forces continued to engage in armed conflict with Jaysh al-Mahdi.

*See supra* pp. 13-14.   Based on the full record available to Defendants at the time, it is

implausible to infer that Defendants knew, or criminally disregarded, that U.S.-encouraged

transactions with a U.S.-supported Ministry were part of an elaborate scheme to target U.S.

soldiers.

Plaintiffs' sole attempt to rely on something other than the public record fails for similar

reasons.   Plaintiffs allege that local agents of the Supplier (but not Manufacturer) Defendants

visited Ministry headquarters, where they would have "walked past multiple posters adorned

with Sadrist pictures" and seen weapons.   Compl. ¶ 173.   These allegations do not support a

---

[88] *E.g.*, World Health Org., *Assuring quality medicines for the people of Iraq* (May 8, 2007) (Ex. 73).

[89] *See, e.g.*, USAID, Iraq Private Sector Growth and Employment Generation: Pharmaceutical and Medical Products in Iraq, at 49-53 (Apr. 17, 2007) (cited at Compl. ¶ 127 n.88) (Ex. 5); U.S. Commercial Serv., Doing Business in Iraq (2013) (cited at Compl. ¶ 124 n.85) (Ex. 4) (pp. 3-7 of excerpt); U.S. Commercial Serv., Doing Business in Iraq, at 34 (2012) (Ex. 33) (pp. 3-7 of excerpt).   *See also* U.S. Commercial Serv., Doing Business in Iraq, at 12 (2009) (advising firms selling products in Iraq work through PhRMA) (Ex. 35) (p. 6 of excerpt); USAID, Investor Guide of Baghdad, at 40 (Nov. 2011) (Ex. 36) (identifying the health sector as an "investment opportunity"); U.S. Dep't of Commerce, Business Guide for Iraq at 3-5 (2004) (Ex. 34) (describing healthcare as a "[s]pecific sector of interest" for USAID contracting).

plausible inference that Defendants knew their transactions with a U.S.-supported Ministry *were supporting terrorism against Americans*.  Sadrist pictures and slogans would hardly have been remarkable at a Ministry officially assigned to the Sadrist party as part of the "political process" General Petraeus referenced.  Nor would weapons have seemed out of place at a ministry whose officials and headquarters were widely reported targets of Sunni insurgents in Iraq's ongoing sectarian war.[90]  Considered in light of all of the publicly available information about the Ministry, including continued U.S. support for it, these allegations do not "nudge[]" Plaintiffs' claims of knowledge "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

### D.  The Medicine Exception To 18 U.S.C. § 2339A Requires Dismissal Of The Material Support Claim Against The Pharmaceutical Defendants

Plaintiffs' material support claim (Count 3) fails as to the Pharmaceutical Defendants—*i.e.*, those who manufactured or supplied medicine[91]—for yet another reason: the ATA's definition of "material support" excludes "medicine," which is the only form of support these Defendants are plausibly alleged to have provided.  *See* 18 U.S.C. § 2339A(b)(1).

The exception, as every court to consider it has confirmed, categorically permits the supply of "medical substances and preparations."  *United States v. Farhane*, 634 F.3d 127, 143 (2d Cir. 2011) (considering the issue under § 2339B, which incorporates § 2339A's definition of "material support," *see* 18 U.S.C. § 2339B(g)(4)).  It applies even where, in contrast to Plaintiffs' indirect support allegations, a party provides medicine directly to a terrorist group.  *Id.*; *see also*

---

[90] *See, e.g.*, Kirk Semple, *Sectarian Attack Is Worst in Baghdad Since Invasion*, N.Y. Times (Nov. 24, 2006) (Ex. 74) (describing attacks on Ministry of Health employees, including a siege by Sunni insurgents of Ministry headquarters, which was repelled by "Ministry Security guards with assault rifles . . . until Iraqi and American troops responded two hours later").

[91] These Defendants include the AstraZeneca Defendants, Pfizer Defendants, Roche U.S. Defendants, and Roche Ltd, as well as several J&J Defendants (Cilag GmbH International, Janssen Pharmaceutica NV, Janssen Ortho LLC, and Ortho Biologics LLC).

*United States v. Warsame*, 537 F. Supp. 2d 1005, 1019 n.12 (D. Minn. 2008); *United States v. Shah*, 474 F. Supp. 2d 492, 495-96 (S.D.N.Y. 2007), *aff'd sub nom. Farhane*, 634 F.3d 127.

This decision to exempt the provision of medicine from the ATA reflects Congress's "careful balancing of interests in creating limited exceptions to the ban on material support." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010) (citing § 2339A(b)(1)); *see also* H.R. Rep. No. 104–383, at 178 n.3 (1995). Congress expressly "decide[d] that the humanitarian value of providing medicine to [terrorist] organizations outweighs the risk that the medicine would be sold to finance terrorist activities." *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 n.4 (9th Cir. 2000).

No doubt recognizing that the medicine exception bars any claim of material support that is rooted in the provision of medicine to the Ministry (including the provision of free pharmaceuticals), Plaintiffs make conclusory and generic allegations that the Pharmaceutical Defendants also "provide[d] cash" and other "services." *See* Compl. ¶ 637.[92] But particularly where Congress has carefully crafted an exclusion from liability, courts are vigilant against "artful skirting" of that immunity through "threadbare allegations" or conclusory accusations. *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266, 1268 (9th Cir. 2016).

In contrast to their specific allegations regarding the Pharmaceutical Defendants' alleged provision of free medicines, *see, e.g.*, Compl. ¶¶ 183-85, 248-49, 279-81, 306-07 (alleging, *inter*

---

[92] Plaintiffs also assert that, in addition to medicines, the Pfizer and Roche Defendants provided "medical devices" for administering their hemophilia and chronic-hepatitis medications. *See* Compl. ¶ 285 & n.231 (asserting that each "pack" of Pfizer's hemophilia drug contained, *inter alia*, "one pre-filled syringe of solvent … for injection," "one sterile vial adapter reconstitution device," and "one sterile infusion set"); *id.* ¶ 311 (alleging that Roche's chronic-hepatitis medicine was sold with "needles" or in a pre-filled "injector"). But such basic applicators or sterilization implements, which are essential to the "appropriate use or application" of life-saving intravenous drugs and therefore included as part of those medications, plainly fall within § 2339A's medicine exception. *See Farhane*, 634 F.3d at 142 & n.12.

*alia*, specific medications, national drug codes, contract numbers, and percentages of free goods), Plaintiffs proffer no factual content supporting their claim that, "as a general matter, companies doing business with Kimadia [had] to pay bribes of at least 20%"—sometimes in the form of "cash payments" called "commissions"—"on every contract," *id.* ¶ 139.  Nor do Plaintiffs provide a factual basis for their conclusory assertion that "each Defendant paid significant 'commissions' to [Ministry] officials who were members of Jaysh al-Mahdi at some or all . . . transaction stages." *Id.* ¶ 142; *see also id.* ¶¶ 182, 247, 278, 305.  And what specific allegations Plaintiffs *do* provide show that some companies "*refused to pay*" cash commissions allegedly demanded by the Ministry. *Id.* ¶¶ 52, 216.  This Court need not "accept [the] inferences drawn by [Plaintiffs]" when they "are not supported by the facts set out in the complaint." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).[93]

Moreover, Plaintiffs' allegations are impermissibly generic.  "To state a claim against each Defendant, . . . Plaintiffs must 'make allegations that plausibly suggest that *each Defendant*'" acted unlawfully. *Hinds Cty. v. Wachovia Bank NA*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (emphasis added) (citation omitted).  Instead, Plaintiffs' allegations of bribes and services speak only in "general terms without any specification of any *particular activities* by any *particular defendant*." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (emphasis added) (rejecting such vague allegations as inconsistent with *Twombly*); *accord Redondo Waste Sys., Inc. v. Lopez-Freytes*, 659 F.3d 136, 140 (1st Cir. 2011).  "[T]his type of

---

[93] Plaintiffs' claims that the Pharmaceutical Defendants provided "free trips abroad" and other "services," Compl. ¶ 637, suffer from the same defect: they are conclusory and unsupported by concrete factual allegations, *see id.* ¶¶ 153 (offering only one example unrelated to any Pharmaceutical Defendant), 154, 637.  Those assertions are accordingly "'not entitled to be assumed true.'" *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1052 (D.C. Cir. 2012).

'group pleading' does not satisfy Rule 8." *Sheeran v. Blyth Shipholding S.A.*, No. 14-cv-5482, 2015 WL 9048979, *3 (D.N.J. Dec. 16, 2015).

These deficiencies are particularly stark with respect to the Manufacturer Defendants. Aside from a single, bare allegation purporting to encompass *all* Defendants, Compl. ¶ 142, the Manufacturers are not alleged to have made *any* payments to the Ministry, corrupt or otherwise, *see id.* ¶¶ 181, 239, 276, 304 (alleging that only the Suppliers "negotiated with Kimadia and made corrupt payments"). Rather, they are accused of having acted unlawfully merely by manufacturing pharmaceutical drugs for worldwide distribution. *Id.* ¶¶ 187, 251, 283, 309. Even if such routine commercial activity could implicate the ATA, *but see supra* p. 50—it would fall firmly within the medicine exception.

### E.     Plaintiffs' Terrorism Financing Claim Should Be Dismissed With Respect To The 89 Plaintiffs Suing Over Injuries Or Deaths Of U.S. Service Members

Plaintiffs cannot premise liability under the ATA on a violation of 18 U.S.C. § 2339C for injuries suffered by U.S. service members. Section 2339C criminalizes the provision or collection of funds with the intent or knowledge that the funds are to be used to carry out certain acts of terrorism. But the acts of terrorism covered by § 2339C expressly do *not* include attacks on military personnel or others involved in hostilities in an armed conflict. Rather, the provision applies only to terrorist acts "intended to cause death or serious bodily injury *to a civilian*, or to any other person *not taking an active part* in the hostilities in a situation of armed conflict . . . " 18 U.S.C. § 2339C(a)(1)(B) (emphasis added).[94] Congress enacted § 2339C to implement the International Convention for the Suppression of the Financing of Terrorism. *See Almog v. Arab*

---

[94] Section 2339C(a)(1)(A) further covers acts of terrorism that violate certain specified treaties. None of these treaty violations is applicable here, and Plaintiffs limit their claim to the financing of terrorist acts under subsection (a)(1)(B). *See* Compl. ¶ 644.

*Bank, PLC*, 471 F. Supp. 2d 257, 277 (E.D.N.Y. 2007).  As the Executive Branch explained in

submitting the treaty to the Senate to be ratified, this definition of terrorism was drafted to

encompass only attacks on civilians and "*off-duty* military personnel," such as the peacetime

attack on a military housing complex in Saudi Arabia in 1996.  Letter of Submittal from Deputy

Secretary Strobe Talbott, Oct. 3, 2000, S. Treaty Doc. No. 106-49 at VII.

The U.S. service members here are by definition not "civilians."[95]  And far from being

injured while off duty outside a war zone, the Complaint makes clear that they were attacked

while taking an active part in the hostilities of the Iraq War.  *See, e.g.*, Compl. ¶¶ 391, 393, 449-

52, 521-22; *supra* Part II.  Count Four should be dismissed as to those Plaintiffs.

## IV.   PLAINTIFFS' CLAIMS FOR AIDING-AND-ABETTING LIABILITY UNDER THE ATA FAIL FOR MANY REASONS

Plaintiffs' aiding-and-abetting claims under 18 U.S.C. § 2333(d) are equally expansive

and unmoored from the ATA's text and purpose.  In amending the ATA in 2016, Congress

rejected a broad construction of aiding-and-abetting liability for all acts of international

terrorism, instead confining such liability to encompass only those acts "committed, planned, or

authorized" by an FTO, and only where the defendant "knowingly provid[ed] substantial

assistance" to the perpetrator of such an act with knowledge of the FTO's involvement.  18

U.S.C. § 2333(d)(2); *see supra* p. 22.  As the Chair of the House Judiciary Committee explained

at the time, "[s]econdary liability should only attach to persons who have actual knowledge that

they are directly providing substantial assistance to a designated foreign terrorist organization in

connection with the commission of an act of international terrorism."  162 Cong. Rec. H5240

---

[95] To the extent the civilian contractors took an active part in hostilities or otherwise performed combat-related functions in armed conflict, the same argument would apply.

(daily ed. Sept. 9, 2016) (statement of Rep. Goodlatte).  Plaintiffs have failed in multiple ways to satisfy the elements of § 2333(d).

A.      **Plaintiffs Cannot Satisfy § 2333(d)'s Threshold Requirement That A Designated FTO "Committed, Planned, Or Authorized" Each Alleged "Act Of International Terrorism"**

1.      **Plaintiffs Fail To Adequately Plead That Hezbollah Planned Or Authorized The Jaysh Al-Mahdi Attacks**

Jaysh al-Mahdi, the group Plaintiffs allege committed the attacks that injured them, was not designated an FTO by the Secretary of State.  Compl. ¶ 344.  Plaintiffs therefore strain to tie Jaysh al-Mahdi to a different organization, Hezbollah, which was a designated FTO, by claiming that Hezbollah "planned" or "authorized" the attacks that Jaysh al-Mahdi "committed."[96]  *Id.* ¶¶ 15, 390.  But that effort fails, because whatever the connections between the two organizations, Plaintiffs' allegations do not include any actions by Hezbollah that constituted planning or authorizing Jaysh al-Mahdi activities, let alone the specific attacks from which Plaintiffs' injuries allegedly arose.

The relationship of control and the decision-making authority that "planning" and "authorization" connote is not alleged by the Complaint.  To "plan" something is to "design" it or "decide on and arrange [it] in advance."  New Oxford Am. Dictionary (3d ed. 2010).[97]  To

---

[96] The Capra Family Plaintiffs allege an attack committed not by Jaysh al-Mahdi but by Ansar al-Sunna ("AAS").  Compl. ¶¶ 410-30.  That attack is properly alleged to have been "committed" by an FTO.  But this claim still fails because (among many other reasons) Plaintiffs do not allege that Defendants aided and abetted AAS, "the person who committed" the act.  18 U.S.C. § 2333(d)(2).  Aside from the brief allegation (Compl. ¶ 411) that Sgt. Capra was killed by AAS, the Complaint does not contain any reference at all to that group.

[97] *See also, e.g.*, The Chambers Dictionary (13th ed. 2014) ("to design" or "devise" "a scheme drawn up beforehand").

"authorize" something is to "give official permission" or "approval" for it. *Id.*[98]  Plaintiffs have not pleaded that Hezbollah decided on and arranged in advance the Jaysh al-Mahdi attacks, or that Hezbollah gave official permission or approval for the Jaysh al-Mahdi attacks.

Plaintiffs allege instead that Hezbollah provided general forms of support and inspiration to Jaysh al-Mahdi, *e.g.*, that Hezbollah recruited, trained, and provided weapons and logistical support to Jaysh al-Mahdi militants, Compl. ¶¶ 15, 345, 354-55, 358-60, 373-89, and conducted a propaganda campaign to "incite[]" its membership, *id.* ¶¶ 15, 361-72.  Such activities do not constitute planning or authorizing any conduct by Jaysh al-Mahdi, much less planning or authorizing the commission by Jaysh al-Mahdi of each particular act of international terrorism. To the contrary, the first type of conduct falls within the meaning of a different term used in the ATA: "provid[ing] material support or resources," which Congress defined to include providing "training," "weapons," "expert advice," "personnel," and any "service," 18 U.S.C. § 2339A(a), (b)(1).  Congress could have borrowed the language of § 2339A if it had wanted to impose liability for attacks by a group that receives "material support or resources" from an FTO, but Congress enacted a narrower provision that must be given effect.  *See Russello v. United States*, 464 U.S. 16, 23 (1983).  And the second type of conduct, generally promoting an organization, falls outside even the definition of material support.

Congress's intent that the terms "planned" and "authorized" in the ATA be given their ordinary meaning is further confirmed by its decision not to adopt the more expansive terminology from another law that, like JASTA's amendment of the ATA, focused on the terrorist attacks of 9/11.  When Congress authorized the President to use force in response to the

---

[98] *See also, e.g.*, The Chambers Dictionary (13th ed. 2014) ("to give authority to"); Black's Law Dictionary (10th ed. 2014) ("authorize" defined as 1) "to give legal authority; to empower;" and 2) "to formally approve, to sanction").

9/11 attacks, it specified that such authority applied against anyone who "planned, authorized, committed, *or aided*" those attacks.  Authorization for Use of Military Force, Pub. L. No. 107–40, § 2, 115 Stat. 224, 224 (2001) (emphasis added).  It is noteworthy that Congress's amendment of the ATA borrowed the "planned, committed, authorized" formulation verbatim—but *omitted* the term "aided."

Moreover, even if Plaintiffs had adequately alleged that Hezbollah planned or authorized some Jaysh al-Mahdi actions, the Complaint does not allege facts to establish that Hezbollah planned or authorized the specific attacks from which Plaintiffs' injuries arose.  For example, the "act of international terrorism" from which Plaintiff Johnson's injuries arose is the "EFP planted and detonated by Jaysh al-Mahdi . . . in Az Zubaydiyah."  Compl. ¶ 489.  To state a claim of aiding-and-abetting liability against Defendants for that attack, Plaintiffs must plead, among other things, that the designated FTO, Hezbollah, planned or authorized that particular "act of international terrorism."  But Plaintiffs do not even attempt to meet this requirement, for that attack or any other.  Instead, they offer a "[t]hreadbare recital[] of the elements" of the claim without the required factual allegations.  *Iqbal*, 556 U.S. at 678; *see* Compl. ¶ 390 ("Each of the acts of international terrorism . . . was planned, authorized, and/or carried out by Hezbollah.").  When Plaintiffs actually do plead facts about the individual attacks, *see id.* ¶¶ 391-615, specific factual allegations about Hezbollah's role are conspicuously absent.[99]

---

[99] Aside from vague allegations about "Hezbollah-backed" or "Hezbollah-trained" Jaysh al-Mahdi cells, Compl. ¶ 385, the Complaint alleges "on information and belief" that, for two particular attacks, "cells that reflected a 'combination of Hezbollah and [Jaysh al-Mahdi]' were responsible," *id.* (penultimate bullet).  Yet when the Complaint elsewhere describes in detail how Jaysh al-Mahdi allegedly carried out those same two attacks, it omits any mention of Hezbollah, *see id.* ¶¶ 432-33, 492, just as it does for each of the other attacks.

2.      **Plaintiffs' Novel Attempt To Use RICO To Plead Around The ATA's FTO Limit On Aiding-And-Abetting Liability Fails**

Having failed to adequately allege that an FTO "committed, planned, or authorized" any of the attacks at issue, as the ATA requires for aiding-and-abetting liability, Plaintiffs offer a novel and unfounded RICO theory.  According to this Rube Goldberg-esque theory, Plaintiffs' injuries arose not from any individual "act of international terrorism" but from a long series of racketeering acts conducted over many years that together constitute what Plaintiffs call the "Jaysh al-Mahdi Campaign," which in turn allegedly violated three provisions of RICO and which, Plaintiffs allege, was itself a distinct "act of international terrorism" that (a) caused plaintiffs' injuries, (b) was "committed, planned, or authorized" by Hezbollah (an FTO), and (c) was aided and abetted by Defendants.  Such pleading artifice fails for a host of reasons.

*First*, it does not meet the ATA's basic requirement for aiding-and-abetting liability that each Plaintiff's "injury aris[e] from an act of international terrorism committed, planned, or authorized" by an FTO.  18 U.S.C. § 2333(d)(2).  Plaintiffs contend that their RICO theory satisfies this requirement because the years-long "Campaign" allegedly was planned and authorized by Hezbollah, Compl. ¶¶ 629, 634, but this disregards the plain language of the ATA.  As the statute makes clear, it is the "act" of terrorism that gives rise to injury—*i.e.*, the terrorist attack itself—that must be "committed, planned, or authorized" by the FTO.  Plaintiffs have not alleged—and cannot allege—facts sufficient to meet that requirement.  And it is not enough to allege that an FTO "committed, planned, or authorized" something else, such as a RICO "pattern of racketeering" or an amorphous "Campaign."

*Second*, Plaintiffs' RICO theory conflicts with Congress's deliberate imposition of the FTO requirement to limit the class of terrorist attacks that could give rise to aiding-and-abetting liability.  As discussed above, Congress tightly cabined ATA aiding-and-abetting liability to

ensure that it would "only attach" to persons "directly providing substantial assistance to a designated foreign terrorist organization in connection with the commission of an act of international terrorism." Cong. Rec. at H5240 (daily ed.) (statement of Rep. Goodlatte). Plaintiffs' open-ended RICO theory based on an alleged affiliation between an FTO and a "Campaign"—but *not* between an FTO and any of the terrorist attacks at issue here—is flatly inconsistent with the intent of Congress to strictly limit aiding-and-abetting liability.

*Third*, Plaintiffs' threadbare allegations fail to satisfy RICO's demanding pleading requirements under all three provisions they invoke (18 U.S.C. § 1962(b), (c), and (d)). *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir. 1986) (Section 1962(b) "makes it unlawful to [1] acquire [2] an interest in or control of [3] an enterprise [4] through a pattern [5] of racketeering activity"); *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015) (Section 1962(c) makes it unlawful to "(1) conduct (2) . . . an enterprise (3) through a pattern (4) of racketeering activity"); *Beck v. Prupis*, 529 U.S. 494, 500 (2000) ("Section 1962(d) makes it unlawful for a person 'to conspire [with one or more persons] to violate [subsection] (a), (b), or (c) . . . .'"). Plaintiffs merely allege a laundry list of unspecified criminal acts, at unspecified times, carried out by Sadr or "other terrorists." Compl. ¶ 628. This does not come close to alleging "sufficient factual matter" to state a RICO violation. *Iqbal*, 556 U.S. at 678.[100]   Plaintiffs' theory also fails because they do not allege that substantial assistance went to any particular RICO perpetrator (*i.e.*, the "person who committed [the supposed] act of international terrorism," 18 U.S.C. § 2333(d)(2)), as opposed to a particular RICO enterprise, *see*

---

[100] Nor do Plaintiffs adequately allege that they were injured by reason of the alleged RICO violations. *See, e.g.*, *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991) (a plaintiff is injured by reason of a § 1962(b) violation only when his injuries "ar[ose] from the acquisition or maintenance of an interest in or control of an enterprise"); *Beck*, 529 U.S. at 505 (under § 1962(d), a plaintiff is injured only by reason of a substantive RICO violation done in furtherance of the conspiracy).

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1113 (D.C. Cir. 2009) (per curiam)

("[T]he RICO [perpetrator] must be distinct from the RICO enterprise.").

 *Finally*, Plaintiffs' RICO theory is contradicted by their own sources.  Plaintiffs claim

that Hezbollah helped found Jaysh al-Mahdi, *see* Compl. ¶¶ 326, 345, but materials cited in the

Complaint state that Hezbollah did not "establish contacts" with Jaysh al-Mahdi until after it was

founded.[101]  Plaintiffs' sources also make clear that Sadr established Jaysh al-Mahdi, appointed

top commanders, and took control of Sadr City without any involvement by Hezbollah.[102]

Hezbollah obviously could not have "committed, planned, or authorized" activities with which it

had no involvement.  Allegations contradicted by Plaintiffs' own sources cannot be accepted as

true.  *See Redmon v. U.S. Capitol Police*, 80 F. Supp. 3d 79, 89 (D.D.C. 2015).  Plaintiffs also

rely on materials that attest that Hezbollah's support for Iraqi insurgent groups such as Jaysh al-

Mahdi remained "at most, limited and furtive," and consisted of "political relations" rather than

"direct involvement or military support."[103]  The loose relationship between Hezbollah and Jaysh

al-Mahdi that Plaintiffs' allegations and sources portray is not one in which a founding superior

planned or authorized a subordinate's "Campaign."

---

 [101] *Compare* Compl. ¶ 326 (Sadr founded Jaysh al-Mahdi in April 2003), *with* Edward T. Pound, *The Iran Connection*, U.S. News & World Report 46 (Nov. 22, 2004) (cited Compl. at ¶ 345 n.288) (Ex. 14) (Hezbollah established contacts with Jaysh al-Mahdi in late August 2003).

 [102] *Compare* Mahan Abedin, *Dossier: The Sadrist Movement*, Middle East Intell. Bull. (July 2003) (cited Compl. ¶ 326 n.266) (Ex. 15) (stating that these things were accomplished by July 2003), *with* Pound, *supra* note 101, at 46 (cited Compl. at ¶ 345 n.288) (stating that Hezbollah established contacts with Jaysh al-Mahdi in late August 2003).

 [103] Rola el-Husseini, *Hizbullah and Regional Non-State Actors*, in Islamist Politics in the Middle East 166, 176, 178 (Samer S. Shehata ed., 2012) (cited at Compl. ¶ 336 n.331) (Ex. 16).

**B.      Both Aiding-And-Abetting Counts Also Fail Because The Allegations Do Not Establish The Mens Rea Or Actus Reus Of A Substantial Assistance Claim**

**1.      Plaintiffs Fail To Plead That Defendants "Knowingly" Assisted Acts Of Terrorism Committed, Planned, Or Authorized By An FTO**

In addition to limiting aiding-and-abetting liability to "act[s] of international terrorism committed, planned, or authorized by" an FTO, the ATA confines such liability to persons "who aid[] and abet[], by *knowingly* providing substantial assistance, or who conspire[] with the person who committed *such* an act of international terrorism."  18 U.S.C. § 2333(d)(2) (emphasis added).  "Such" an act of international terrorism is the kind referenced earlier in the provision: one that is committed, planned, or authorized by an FTO.  Read together, then, § 2333(d)(2) prohibits "knowingly providing substantial assistance" to a "person who committed [an act of international terrorism committed, planned or authorized by an FTO]."  The "knowing" requirement naturally applies to each element of the claim, including that the allegedly assisted act of terrorism involved the requisite FTO participation.

The FTO requirement serves to ensure that a defendant had sufficient notice of a designated terrorist's involvement before providing substantial assistance.  The importance of such notice pervades § 2333(d)(2).  Under that provision, secondary liability does not attach if the FTO is so designated only after it "committed, planned, or authorized" the terrorist act.  18 U.S.C. § 2333(d)(2).  The act is still terrorism, but the alleged aider-and-abettor cannot be liable because the defendant was not put on notice that an FTO was involved until after the defendant provided substantial assistance.  *See id.*  That scienter under § 2333(d)(2) includes knowledge of a designated FTO's involvement is also confirmed by JASTA's purpose and legislative history.  *See supra* p. 60 (statement of Chair of the House Judiciary Committee explaining that JASTA's aiding-and-abetting provision is limited to designated FTOs, because secondary liability "should only attach to persons who have *actual knowledge* that they are directly providing substantial

67

assistance to a designated foreign terrorist organization" (emphasis added)).  It made sense for Congress to limit aiding-and-abetting liability in this manner because it is the Secretary of State's official designation that provides the notice that an organization is "'so tainted by [its] criminal conduct that any contribution to such an organization facilitates such conduct.'"  *Humanitarian Law Project*, 561 U.S. at 7 (quoting note following 18 U.S.C. § 2339B).  Congress recognized that if a defendant does not *know* that an FTO is involved, then a defendant's actions—selling medicine to a U.S.-supported health ministry, for example—do not warrant treble damages as an aider-and-abettor of terrorism.

Plaintiffs' claims fail this knowledge requirement.  Plaintiffs strain (unsuccessfully) to link Jaysh al-Mahdi to Hezbollah, and they do so without any allegation that Defendants knew of any such link.  *See* Compl. ¶¶ 326-89.  The only allegation about Defendants' knowledge of Hezbollah is a tangential assertion that Defendants "were aware of Hezbollah's pharmaceutical smuggling operations*. . . . into and out of Nigeria*," *id.* ¶ 350 (emphasis added)—a far cry from alleging that Defendants knew they were substantially assisting acts of international terrorism committed, planned, or authorized by Hezbollah.  And even if knowledge of an FTO's involvement were not required, Plaintiffs' claims still would fail to satisfy § 2333(d)'s knowledge element.  For reasons explained above, *see supra* Part III.C, Plaintiffs do not and cannot plausibly allege that Defendants *knew* the U.S.-supported Ministry was a terrorist front helping Jaysh al-Mahdi attack U.S. soldiers.  They cannot therefore show that Defendants "knowingly provid[ed] substantial assistance" to Jaysh al-Mahdi's alleged commission of any "act of international terrorism."  18 U.S.C. § 2333(d)(2).

### 2.      Plaintiffs Fail To Plead Defendants "Substantial[ly] Assist[ed]" Jaysh Al-Mahdi's Alleged Acts Of Terrorism

Plaintiffs' aiding-and-abetting claims also fail because the Complaint falls well short of

pleading that Defendants "provid[ed] *substantial* assistance" to the person who committed the

"act of international terrorism" from which Plaintiffs' injuries arose.  18 U.S.C. § 2333(d)(2)

(emphasis added).  Congress directed courts to apply the multi-factor framework set forth in

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), to determine whether a defendant

substantially assisted the tortfeasor in committing the principal act of international terrorism.  *See*

JASTA § 2(a)(5), 130 Stat. 852.  Significantly, the *Halberstam* "factors are the same as those

used in determining the existence of legal causation."  Restatement (Second) of Torts § 876 cmt.

d (1979).[104]  Because any link between Defendants' contracts with the Ministry and Jaysh al-

Mahdi's attacks on service members is highly attenuated, *see supra* Part III.A, it is no surprise

that the *Halberstam* factors point decisively against liability.

The first and second factors, the nature of the act encouraged and the amount and kind of

assistance given, "dictate[ ] what aid might matter, *i.e.*, be substantial."  *Halberstam*, 705 F.2d at

484.  Defendants did not supply Jaysh al-Mahdi with bombs or bullets, which would no doubt

"matter" where the acts allegedly encouraged are terrorist attacks; rather, they sold the Ministry

of Health intravenous breast cancer medication, Compl. ¶¶ 184 (Arimidex), 306 (Herceptin),

ultrasound machines, *id.* ¶ 220, catheters, *id.* ¶ 241, and other medical products.  Unlike the aid

provided in *Halberstam* and the cases it cites, Defendants' alleged transactions are many steps

removed from the Jaysh al-Mahdi attacks they allegedly assisted.  *Supra* Part III.A; *see Ofisi*,

2017 WL 4355922, at *15 (dismissing common-law aiding-and-abetting claim for financing

terrorism because plaintiffs failed to "plead a link between the aid rendered and the principal

---

[104] *See also Aetna Cas. & Surety Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) ("Establishing [substantial assistance] . . . requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort.").

violation (or violations) alleged").  And whatever value Jaysh al-Mahdi could have extracted

from Defendants' medicine and medical equipment was insubstantial in comparison with the full

budget of the Ministry that Jaysh al-Mahdi was allegedly looting, the resources of other

ministries that Jaysh al-Mahdi allegedly controlled, and the support that Jaysh al-Mahdi

allegedly received from Iran.  *See supra* p. 28.  Put simply, Plaintiffs have not pleaded that

Defendants' sale of medical goods to the Ministry, even if done corruptly, was a "substantial

factor in causing" bombings with Iranian-supplied weapons, or similar assaults on the U.S.

military.  *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 53-54

(D.D.C. 2011).

The third and fourth *Halberstam* factors—whether the defendant was present at the time

of the principal violation and the defendant's relationship to the principal wrongdoer, 705 F.2d at

478, 484—further demonstrate that Plaintiffs have failed to allege "substantial assistance."

Plaintiffs do not allege that any Defendant was present at the time of any alleged terrorist attack

or racketeering activity, or that any Defendant had a special relationship (such as a position of

authority) vis-à-vis any Jaysh al-Mahdi agent.  *See id.* at 484 ("the defendant's relation to the

tortfeasor" is significant when it involves a "position of authority" (emphasis omitted)).  Indeed,

allegations of any relationship between Defendants and Jaysh al-Mahdi are attenuated at best,

because Defendants allegedly engaged in "corrupt transactions with MOH," the Ministry the

United States supported—not with Jaysh al-Mahdi.  Compl. ¶ 9; *see also supra* pp. 19-21.

*Halberstam*'s fifth factor involves a showing that the defendant "was one in spirit with

the [principal wrongdoer]."  705 F.2d at 484; *see In re Temporomandibular Joint (TMJ) Implants

Prods. Liab. Litig. ("TMJ")*, 113 F.3d 1484, 1496 (8th Cir. 1997) (defendants' actions must have

been "done for the purpose of assisting the [principal violation]").  Courts that have analyzed

aiding-and-abetting liability under the ATA have emphasized that it is not enough that the

defendant "knew of [the principal wrongdoer's] illegal activities"; he must also have "*desired to*

*help those activities succeed*." *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief &*

*Dev.*, 291 F.3d 1000, 1023 (7th Cir. 2002) (emphasis added), *overruled on other grounds by*

*Boim*, 549 F.3d 685; *see Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425 (E.D.N.Y. 2009)

("'substantial assistance'" requires a showing of the defendant's "desire to help [the unlawful]

activity succeed"); *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 295 (S.D.N.Y. 2009) (noting that

courts "have dismissed aiding and abetting claims under the [ATA] precisely for failure to allege

knowledge *and intent*," and dismissing such claim where there was no plausible allegation that

defendant bank "intended" that "its funds [provided to Iran] would be used to sponsor terrorist

acts").[105]  Here, Plaintiffs allege that Defendants engaged in corrupt dealings to "win sales

contracts" from the Ministry.  Compl. ¶ 4; *see also supra* at 19-21.  They do not, and could not

plausibly, allege that Defendants' sales were driven by a desire to facilitate a campaign of

terrorism by Jaysh al-Mahdi against U.S. service members.[106]

## V.  PLAINTIFFS' STATE-LAW IIED CLAIMS SHOULD BE DISMISSED

### A.  Plaintiffs' IIED Claims Are Time-Barred

The statute of limitations for IIED claims brought in the District of Columbia is three

---

[105] These cases assumed that aiding-and-abetting liability was available under § 2333(a) before JASTA amended the ATA to add § 2333(d).  Later case law concluded, and JASTA subsequently confirmed, that there is no general aiding-and-abetting liability under the ATA, except under the limited circumstances authorized by § 2333(d).  *See Rothstein*, 708 F.3d at 97-98; *Boim*, 549 F.3d at 689-90.

[106] The sixth and final *Halberstam* factor, the duration of the aid allegedly provided, does not play a significant role in this case.  *See In re TMJ Implants*, 113 F.3d at 1496 (despite contacts "extending over four decades," this factor does not alter the analysis where assistance was otherwise not substantial).

years.  *Saunders v. Nemati*, 580 A.2d 660, 665 (D.C. 1990).[107]  Plaintiffs filed this lawsuit

between eight and thirteen years after the attacks they allege injured them.  *See* Compl. ¶¶ 391-

615 (alleging attacks from 2005-2009).  Their IIED claims are therefore untimely.

Recognizing this infirmity, Plaintiffs invoke the "discovery rule," which applies only

where "the relationship between the fact of injury and the alleged tortious conduct [is] obscure."

*Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001).  In such cases, the

limitations period begins to run upon "inquiry notice" of the cause of action, *i.e.*, "that notice

which a plaintiff would have possessed after due investigation."  *Cevenini v. Archbishop of

Wash.*, 707 A.2d 768, 771 (D.C. 1998).  Plaintiffs summarily claim that they "could not have

known with the exercise of reasonable diligence of Defendants' wrongdoing" "[u]ntil 2017."

Compl. ¶ 653.  But they do not support this bare assertion, point to any steps they took to

identify wrongdoing, or explain what changed in 2017.

This failure is all the more glaring given Plaintiffs' claim that *everyone* knew of the

alleged wrongdoing.  According to Plaintiffs, by at least 2008 it was "widely understood" and

reported by "Western media sources" that Jaysh al-Mahdi exercised control over the Ministry,

and was financing terrorist activities through inflated contracts, purported kickbacks, and

diverted products.  *E.g.* Compl. ¶¶ 126, 166-67, 175-76.  Defendants disagree that these reports

suffice to establish knowledge of Jaysh al-Mahdi's alleged activities, *see supra* p. 53-54, but

Plaintiffs' counsel cannot advance such a theory and simultaneously argue that these claims were

not discoverable until 2017.  Bare invocation of the discovery rule cannot save these untimely

claims.  *See Alkasabi v. Wash. Mut. Bank*, 31 F. Supp. 3d 101, 110 (D.D.C. 2014) (Leon, J.).

---

[107] D.C. choice of law rules "treat statutes of limitations as procedural," so the D.C. statute of limitations governs, irrespective of what substantive law would apply to the IIED claims.  *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).

### B.      Plaintiffs Fail to State IIED Claims On The Merits

Plaintiffs' IIED claims fail on the merits in any event.  The tort of IIED is defined as "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another."  Restatement (Second) of Torts § 46 (1965).[108]  All Plaintiffs have failed to plead IIED's intent and causation elements, and 54 of them have failed to satisfy additional applicable state law requirements.

1. *Causation*.  To state an IIED claim, "[t]he defendant's actions must proximately cause the plaintiff emotional distress."  *Hollis v. Rosa Mexicano DC, LLC*, 582 F. Supp. 2d 22, 26 (D.D.C. 2008).  Plaintiffs have failed to plead that Defendants caused the Jaysh al-Mahdi attacks that allegedly injured them, *see supra* at Part III.A, which necessarily dooms Plaintiffs' IIED claims.  Indeed, courts have found proximate cause lacking in an IIED claim even where an ATA claim survives.  *See Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 590-91 (E.D.N.Y. 2005).

2. *Intent*.  IIED requires the defendant to "desire[] to inflict severe emotional distress," "know[] that such distress is certain, or substantially certain, to result from his conduct," or act "in deliberate disregard of a high degree of probability that the emotional distress will follow."  Restatement (Second) of Torts § 46 cmt. i.  The Complaint does not properly allege that Defendants intended, knew, or deliberately disregarded that their allegedly corrupt transactions financed terrorism, *see supra* pp. 50-52, let alone that Defendants disregarded a "high

---

[108] Under D.C. choice of law rules, the law of each Plaintiff's domicile at the time of the alleged injury governs.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224 (JDB), 2005 WL 756090, at *18-23 (D.D.C. Mar. 29, 2005).  The Complaint does not identify Plaintiffs' domiciles at the relevant time, so Defendants assume they are the same as their current residences.  Each of these 27 jurisdictions has adopted the Restatement (Second) of Torts for guidance on the essential elements of an IIED claim.  *See Twyman v. Twyman*, 855 S.W.2d 619, 622 & n.2 (Tex. 1993) (collecting cases).

probability" that such funding would result in attacks against U.S. forces, and so cause emotional distress to service members and their families.  Plaintiffs' conclusory allegations, *see* Compl. ¶ 651, are insufficient, *see Waldon v. Covington*, 415 A.2d 1070, 1077-78 (D.C. 1980).  And for the 27 Plaintiffs residing in Arkansas, Missouri, Oregon, Virginia, and Wisconsin,[109] an even stricter intent standard applies.  They must plead that Defendants' actions were "directed at the plaintiff *individually*," or that Defendants' purpose was to "cause [Plaintiff's] emotional distress."  *See Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997); *McGanty v. Straudenraus*, 901 P.2d 841, 849 (Or. 1995); *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 344 (Va. 2008); *Rabideau v. City of Racine*, 627 N.W.2d 795, 803 (Wis. 2001); *see also Davis v. Fulton*, 884 F. Supp. 1245, 1264 (E.D. Ark. 1995) ("A tort of outrage occurs only when a person engages in a course of outrageous conduct with the intent to inflict extreme emotional distress upon another.").  These Plaintiffs do not attempt to meet this element.

3.  *Presence*.  The states of Arizona, California, Colorado, Idaho, Kentucky, and Washington each limit IIED claims to plaintiffs who were present at the scene of the defendant's allegedly "extreme and outrageous conduct."  *See, e.g.*, *McKee v. Arizona*, 388 P.3d 14, 20-21 (Ariz. App. 2016); *Christensen v. Superior Court*, 820 P.2d 181, 202-03 (Cal. 1991); *Bradshaw v. Nicolay*, 765 P.2d 630, 632 (Colo. App. 1988); *Deem v. Koch Agric. Inc.*, 188 F.3d 512, 512-13 (9th Cir. 1999) (table) (applying Idaho law); *Fryman v. Masters*, No. 2004-CA-000932-MR,

---

[109] Plaintiff Carl Reiher resides in Arkansas.  Compl. ¶ 550.  Plaintiffs Drew Edwards, Donielle Edwards, and Kathryn Ann Johnson reside in Missouri.  *Id.* ¶¶ 463, 467, 546.  Plaintiffs Robert Kugler and Gregory Klecker reside in Oregon.  *Id.* ¶¶ 460, 507.  Plaintiffs Angie Capra, Anthony Capra, Sr., Sharon Capra, Mark Capra, Victoria Capra, A.C., J.C., S.C., Danielle Capra, Emily Capra, Jacob Capra, Joanna Capra, Joseph Capra, Julia-Anne Capra, Michael Capra, Rachel Lee, Sarah Johnson, Nikita McNeal, J.M., and Ami Neiberger reside in Virginia.  *Id.* ¶¶ 413-29, 526-27, 540.  Plaintiff Angela Robinson resides in Wisconsin.  *Id.* ¶ 518.

2005 WL 1993464, at *2 (Ky. Ct. App. Aug. 19, 2005); *Reid v. Pierce*, 961 P.2d 195, 203

(Wash. 1998).  The 27 Plaintiffs who reside in those states[110] do not (and presumably cannot)

allege that they were present when Defendants allegedly entered into corrupt transactions with

the Ministry.[111]

## **CONCLUSION**

Plaintiffs should be honored, respected, and supported for the sacrifices they and their

family members made in service to the United States.  But the Complaint's expansive theories

under the ATA and state law do not support holding Defendants liable for the wartime attacks

that caused Plaintiffs' injuries.  The Complaint should be dismissed entirely, with prejudice.

---

[110] Plaintiffs James Vaughn, Jeannine Vaughn, and Clifford Vaughn reside in Arizona. Compl. ¶¶ 595-97.  Plaintiffs John Aragon, Sr., Sally Chand, Michael Chand, Jr., Christina Mahon, Ryan Chand, Brenda Chand, Rhett Stephens, and Summer Stephens reside in California. *Id.* ¶¶ 398, 435-39, 497, 578-79.  Plaintiffs Susan Arnold, David Arnold, Daisy Tucker, and Brandon Arnold reside in Colorado.  *Id.* ¶¶ 585-86, 588-89.  Plaintiffs Elijah Harbin, Esther Tate, Kathleen Stephens, Trent Stephens, Derek Stephens, and Brittani Hobson reside in Idaho.  *Id.* ¶¶ 477, 480-81, 575-77, 580.  Plaintiffs Randall Thompson, Michele White, Shelby White, and S.W. reside in Kentucky.  *Id.* ¶¶ 519, 602-04.  Plaintiffs Dempsey Bennett and Caren Klecker reside in Washington.  *Id.* ¶¶ 405, 506.

[111] The Court can and should dismiss Plaintiffs' IIED claims with prejudice for failure to state a claim.  Nevertheless, should the Court dismiss the ATA claims but retain supplemental jurisdiction over the IIED claims, *see* 28 U.S.C. § 1367, Defendants reserve their right to assert other applicable defenses, including *forum non conveniens*.

Dated:  February 5, 2018

Respectfully submitted,

/s/ Neil H. MacBride
Neil H. MacBride (D.C. Bar No. 439137)
Kenneth J. Wainstein (D.C. Bar No. 451058)
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
Tel: (202) 962-7030; Fax: (202) 962-7118
neil.macbride@davispolk.com

Paul S. Mishkin (*admitted pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4292; Fax: (212) 701-5292
paul.mishkin@davispolk.com

*Counsel for Defendants AstraZeneca Pharmaceuticals, LP and AstraZeneca UK Limited*

/s/ John B. Bellinger
John B. Bellinger III (D.C. Bar No. 405059)
David J. Weiner (D.C. Bar No. 499806)
Robert A. DeRise (D.C. Bar No. 1005355)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson (D.C. Bar No. 994989)
ARNOLD & PORTER KAYE SCHOLER LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-2325
Reeves.Anderson@arnoldporter.com

*Counsel for Defendants GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., and GE Medical Systems Information Technologies GmbH*

(signatures continue on next page)

76

/s/ John F. Baughman
John F. Baughman (D.C. Bar No. NY0254)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
jbaughman@paulweiss.com

Jeh C. Johnson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
jjohnson@paulweiss.com

*Counsel for Defendants Johnson & Johnson,
Cilag GmbH International, Ethicon Endo-
Surgery, LLC, Ethicon, Inc., Janssen Ortho
LLC, Janssen Pharmaceutica NV, Johnson &
Johnson (Middle East) Inc., and Ortho
Biologics LLC*

/s/ John E. Hall
John E. Hall (D.C. Bar No. 415364)
Beth S. Brinkmann (D.C. Bar No. 477771)
David M. Zionts (D.C. Bar No. 995170)
COVINGTON & BURLING LLP
850 Tenth Street N.W.
One City Center
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5104
jhall@cov.com

*Counsel for Defendant F. Hoffmann-La
Roche Ltd*

/s/ Joseph G. Petrosinelli
Joseph G. Petrosinelli (D.C. Bar No. 434280)
Christopher N. Manning (D.C. Bar No.
464069)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
jpetrosinelli@wc.com

*Counsel for Defendants Pfizer Inc.,
Pfizer Pharmaceuticals LLC, Pfizer
Enterprises SARL, Pharmacia
& Upjohn Company LLC, and Wyeth
Pharmaceuticals Inc.*

/s/ Carl J. Nichols
Carl J. Nichols (D.C. Bar. No. 466889)
Patrick J. Carome (D.C. Bar. No. 385676)
David W. Bowker (D.C. Bar. No. 989309)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
carl.nichols@wilmer.com

*Counsel for Defendants Genentech, Inc. and
Hoffmann-La Roche Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this Fifth day of February 2018, I electronically transmitted a copy of the foregoing MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS on behalf of all Served Defendants to the Clerk's Office using the CM/ECF system, and service was effected electronically to all counsel of record.

s/ Carl J. Nichols
CARL J. NICHOLS