**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSHUA ATCHLEY *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 17-cv-02136-RJL |
| ASTRAZENECA UK LIMITED *et al.*, | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**RULE 12(b)(1) AND 12(b)(6) MOTIONS TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

   A.    Legal Background .................................................................................................. 4

   B.    Factual Background ............................................................................................... 5

        1.    Jaysh al-Mahdi and Corruption at the Iraqi Ministry of Health .............................. 6

        2.    Defendants' Payments to Jaysh al-Mahdi ............................................................. 12

        3.    Jaysh al-Mahdi's Hezbollah-Sponsored Campaign of Terrorism Against Americans in Iraq .............................................................. 13

   C.    Plaintiffs' Claims ................................................................................................ 15

ARGUMENT ...................................................................................................................... 16

   I.    DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE IT DEPENDS ON EXTRA-PLEADING MATERIALS THE COURT SHOULD DISREGARD ......... 16

   II.    THE POLITICAL QUESTION DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS ........................................................................................... 19

      A.    The Amended Complaint Raises Justiciable Legal Questions About A Federal Statute And Traditional Tort Law .......................................................... 19

      B.    Defendants Have Identified No U.S. Government Policy Towards The Ministry That Renders Plaintiffs' Claims Nonjusticiable ................................................. 22

        1.    Plaintiffs' claims do not require this Court to pass judgment on U.S. policy toward the Ministry ........................................................................................ 22

        2.    Defendants' corrupt conduct undermined U.S. foreign policy ......................... 24

        3.    The U.S. government did not make a foreign policy judgment that Defendants should transact with Kimadia ........................................................................ 26

      C.    Plaintiffs' Claims Do Not Contradict Any U.S. Foreign Policy Judgment About Jaysh al-Mahdi ................................................................................................ 30

   III.    THE ACT-OF-WAR DEFENSE DOES NOT BAR PLAINTIFFS' CLAIMS ......... 32

      A.    Jaysh al-Mahdi Was Not A "Military Force" ........................................................ 33

       1.     Jaysh al-Mahdi consistently violated the laws of war ........................................ 33

       2.     Jaysh al-Mahdi was not associated with any government .................................. 36

       3.     Defendants' arguments for treating Jaysh al-Mahdi as a "military force" are unpersuasive ....................................................................................................... 38

  B.    Jaysh al-Mahdi's Attacks On Plaintiffs Did Not Occur "In the Course of" An Armed Conflict ................................................................................................... 39

  C.    The United States Was Not Engaged In An "Armed Conflict" In Iraq ............... 41

IV.    PLAINTIFFS PROPERLY PLEAD AIDING-AND-ABETTING CLAIMS (COUNTS ONE AND TWO) ..................................................................................... 43

  A.    Plaintiffs Adequately Allege That Defendants Knowingly And Substantially Assisted Jaysh al-Mahdi's Acts Of International Terrorism ................................. 43

       1.     Factors 1 and 2:  nature of the act assisted and amount of the aid ................... 44

           a.     Defendants' assistance was substantial in kind and amount ..................... 44

           b.     Defendants' arguments lack merit ............................................................ 46

           c.     The Manufacturers are also liable ............................................................ 48

       2.     Factor 5:  Defendants' state of mind ................................................................. 50

           a.     Defendants knew they were funding terrorism ......................................... 50

           b.     There is no specific-intent requirement ................................................... 53

       3.     Factors 3, 4, and 6:  presence, relationship, and duration ................................. 54

  B.    Plaintiffs Adequately Allege That Hezbollah "Committed, Planned, Or Authorized" The Relevant Acts Of International Terrorism ................................. 55

       1.     Hezbollah "planned" the terrorist attacks that injured Plaintiffs ....................... 56

       2.     Hezbollah "authorized" the terrorist attacks that injured Plaintiffs ................. 61

       3.     Hezbollah "planned and authorized" Jaysh al-Mahdi's illegal terrorist enterprise 64

       4.     Defendants' knowledge argument regarding Hezbollah lacks merit ................ 68

V.    PLAINTIFFS PROPERLY PLEAD DIRECT-LIABILITY CLAIMS (COUNTS THREE AND FOUR) ............................................................................................... 71

A.  Defendants' Conduct Manifested An Appearance Of Terroristic Intent .............. 71

B.  Plaintiffs Satisfy The Scienter Elements Of The Predicate Criminal Statutes ..... 73

C.  Defendants' Statutory Arguments Under 18 U.S.C. §§ 2339A and 2339C Fail .. 74

D.  Plaintiffs Properly Plead Proximate Cause ........................................................... 79

    1.  Defendants proximately caused Plaintiffs' injuries by directly financing the terrorist group that caused their injuries ............................................................ 79

    2.  Defendants' proximate-cause arguments are unpersuasive ............................... 82

VI.  PLAINTIFFS PROPERLY PLEAD VIOLATIONS OF STATE LAW (COUNTS FIVE THROUGH EIGHT) ........................................................................................ 86

A.  Fact Issues Preclude Defendants' Statute-Of-Limitations Argument ................... 86

B.  Defendants' State-Specific Dismissal Theories Are Flawed ................................ 87

C.  Defendants' General Tort-Law Arguments Lack Merit ....................................... 88

    1.  Intentional infliction of emotional distress (Count Five) ................................. 88

    2.  Assault and battery (Count Six) ....................................................................... 89

    3.  Wrongful death and survival (Counts Seven and Eight) .................................. 90

CONCLUSION ................................................................................................................... 90

## TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abecassis v. Wyatt*,
   785 F. Supp. 2d 614 (S.D. Tex. 2011), *recon. on other grounds*,
   7 F. Supp. 3d 668 (S.D. Tex. 2014) ....................................................................*passim*

*Abecassis v. Wyatt*,
   7 F. Supp. 3d 668 (S.D. Tex. 2014)......................................................... 3, 72, 73, 84

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
   957 F. Supp. 1308 (S.D.N.Y. 1997) ...................................................................... 45

*ACA Int'l v. FCC*,
   885 F.3d 687 (D.C. Cir. 2018)................................................................................ 70

*Advocate Health Care Network v. Stapleton*,
   137 S. Ct. 1652 (2017) ........................................................................................... 66

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
   219 F.3d 519 (6th Cir. 2000) ............................................................................ 48, 50

*Ahmad v. Christian Friends of Israeli Communities*,
   2014 WL 1796322 (S.D.N.Y. May 5, 2014) .......................................................... 31

*Almog v. Arab Bank, PLC*,
   471 F. Supp. 2d 257 (E.D.N.Y. 2007) .............................................................. 20, 21

*Bank of Am. Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017) ........................................................................................... 84

*Banneker Ventures, LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015)......................................................... 16, 18, 57, 74

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................................... 19, 20, 21, 23

*Baker v. Farrand*,
   26 A.3d 806 (Me. 2011) ......................................................................................... 65

*Baker v. Gurfein*,
   744 F. Supp. 2d 311 (D.D.C. 2010)....................................................................... 90

*Ben-Rafael v. Islamic Rep. of Iran*,
    540 F. Supp. 2d 39 (D.D.C. 2008) ...................................................................... 89

*Benak v. Alliance Capital Mgmt. L.P.*,
    435 F.3d 396 (3d Cir. 2006) ............................................................................... 74

*Bennett v. Islamic Rep. of Iran*,
    507 F. Supp. 2d 117 (D.D.C. 2007) .................................................................... 88

*Biton v. Palestinian Interim Self-Gov't Auth.*,
    412 F. Supp. 2d 1 (D.D.C. 2005) ........................................................ 20, 21, 22, 41

*Bluth v. Islamic Rep. of Iran*,
    203 F. Supp. 3d 1 (D.D.C. 2016) .................................................................. 62, 89

*Bodoff v. Islamic Rep. of Iran*,
    424 F. Supp. 2d 74 (D.D.C. 2006) ..................................................................... 90

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ....................................................................... *passim*

*Brill v. Chevron Corp.*,
    2017 WL 76894 (N.D. Cal. Jan. 9, 2017) ........................................................... 73

*Bryant v. Yosemite Falls Café, Inc.*,
    2018 WL 372704 (E.D. Cal. Jan. 11, 2018) ........................................................ 27

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ............................................................... *passim*

*Camp v. Dema*,
    948 F.2d 455 (8th Cir. 1991) ............................................................................. 50

*Cause of Action Inst. v. Tillerson*,
    285 F. Supp. 3d 201 (D.D.C. 2018) .................................................................... 27

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig., In re*,
    190 F. Supp. 3d 1100 (S.D. Fla. 2016) ............................................................... 45

*Chiquita Brands Int'l, Inc., In re*,
    284 F. Supp. 3d 1284 (S.D. Fla. 2018) ............................................... 52, 72, 80, 85

*Christensen v. Superior Court*,
    820 P.2d 181 (Cal. 1991) ................................................................................... 89

*City of Chicago v. Purdue Pharma L.P.*,
　211 F. Supp. 3d 1058 (N.D. Ill. 2016)................................................. 49

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
　536 U.S. 424 (2002) ............................................................................ 59

*CNE Direct, Inc. v. Blackberry Corp.*,
　821 F.3d 146 (1st Cir. 2016) .............................................................. 49

*C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*,
　508 F.2d 1354 (7th Cir. 1975) ............................................................ 77

*Cooper v. Tokyo Elec. Power Co.*,
　166 F. Supp. 3d 1103 (S.D. Cal. 2015), *aff'd*, 860 F.3d 1193 (9th Cir. 2017).................... 24, 25

*Corrie v. Caterpillar, Inc.*,
　503 F.3d 974 (9th Cir. 2007) ...................................................... 21, 23, 24

*Dammarell v. Islamic Rep. of Iran*,
　2005 WL 756090 (D.D.C. Mar. 29, 2005) ......................................... 87

*Davis v. Fulton Cty.*,
　884 F. Supp. 1245 (E.D. Ark. 1995) ................................................. 89

*Doe v. Exxon Mobil Corp.*,
　473 F.3d 345 (D.C. Cir. 2007)..................................................... 20, 23, 30

*Doe v. Exxon Mobil Corp.*,
　654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7
　(D.C. Cir. 2013)................................................................................ 54

*Domestic Airline Travel Antitrust Litig., In re*,
　221 F. Supp. 3d 46 (D.D.C. 2016).............................................. 17, 18

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
　246 F. Supp. 3d 52 (D.D.C. 2017).................................................... 90

*Elahi v. Islamic Rep. of Iran*,
　124 F. Supp. 2d 97 (D.D.C. 2000)..................................................... 62

*Elevator Antitrust Litig., In re*,
　502 F.3d 47 (2d Cir. 2007) ................................................................ 76

*Elite Int'l. Enter., Inc. v. Patton Wallcoverings, Inc.*,
　2014 WL 1652197 (E.D. Mich. Apr. 24, 2014) ............................... 49

*Estate of Klieman v. Palestinian Auth.*,
    424 F. Supp. 2d 153 (D.D.C. 2006) ............................................................ 20, 40, 41

*Feld Entm't, Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
    873 F. Supp. 2d 288 (D.D.C. 2012) ...................................................................... 67

*Feldman v. FDIC*,
    879 F.3d 347 (D.C. Cir. 2018) ............................................................................. 16

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ................................................................................ 85

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) .............................................................................. 86

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury*,
    799 F.3d 1065 (D.C. Cir. 2015) ............................................................................ 33

*Franzone v. City of New York*,
    2015 WL 2139121 (E.D.N.Y. May 4, 2015) .......................................................... 67

*FTC v. Wash. Data Res.*,
    856 F. Supp. 2d 1247(M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013) ....................... 17

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ......................................................... *passim*

*Gill v. Islamic Rep. of Iran*,
    249 F. Supp. 3d 88 (D.D.C. 2017) ........................................................................ 89

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
    422 F. Supp. 2d 96 (D.D.C. 2006) ................................................................... 20, 73

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................................ 4, 72, 74

*Gourdine v. Karl Storz Endoscopy-America, Inc.*,
    223 F. Supp. 3d 475 (D.S.C. 2016) ...................................................................... 49

*Graham v. SEC*,
    222 F.3d 994 (D.C. Cir. 2000) .............................................................................. 54

*Great Lakes Comnet, Inc. v. FCC*,
    823 F.3d 998 (D.C. Cir. 2016) .............................................................................. 60

*Gross v. German Found. Indus. Initiative,*
 456 F.3d 363 (3d Cir. 2006) ...................................................................... 21, 29, 30

*Halberstam v. Welch,*
 705 F.2d 472 (D.C. Cir. 1983)..........................................................................*passim*

*Hale v. United States,*
 2015 WL 7760161 (D.D.C. Dec. 2, 2015) ............................................................. 18

*Hamdan v. Rumsfeld,*
 548 U.S. 557 (2006) ............................................................................................... 36

*Hemi Grp., LLC v. City of New York,*
 559 U.S. 1 (2010) ................................................................................................... 84

*Herbert v. Nat'l Acad. of Scis.,*
 974 F.2d 192 (D.C. Cir. 1992)............................................................................... 18

*Hourani v. Mirtchev,*
 796 F.3d 1 (D.C. Cir. 2015).............................................................................. 20, 23

*Hull v. Eaton Corp.,*
 825 F.2d 448 (D.C. Cir. 1987)............................................................................... 49

*Hurd v. District of Columbia,*
 864 F.3d 671 (D.C. Cir. 2017)........................................................................... 17, 18

*Hunt v. Rodriguez,*
 2009 WL 173070 (E.D. Cal. Jan. 26, 2009) ......................................................... 18

*Inland Empire Pub. Lands Council v. Glickman,*
 88 F.3d 697 (9th Cir. 1996) .................................................................................. 67

*Jakobovits v. PHL Variable Ins. Co.,*
 2018 WL 2291311 (E.D.N.Y. May 18, 2018)....................................................... 87

*Japan Whaling Ass'n. v. Am. Cetacean Soc'y,*
 478 U.S. 221 (1986) ............................................................................................... 20

*Jerome Stevens Pharm., Inc. v. FDA,*
 402 F.3d 1249 (D.C. Cir. 2005)............................................................................. 16

*Jesner v. Arab Bank, PLC,*
 138 S. Ct. 1386 (2018) ........................................................................................... 22

*Jones v. Lattimer,*
  29 F. Supp. 3d 5 (D.D.C. 2014).............................................................................. 88

*Kaplan v. Cent. Bank of Islamic Rep. of Iran,*
  961 F. Supp. 2d 185 (D.D.C. 2013)........................................................... 34, 37, 41

*Knox v. Palestine Liberation Org.,*
  306 F. Supp. 2d 424 (S.D.N.Y. 2004) ..................................................................... 21

*Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs. Inc.,*
  853 F.3d 173 (5th Cir. 2017) .......................................................................... 23, 30

*Lane v. Halliburton,*
  529 F.3d 548 (5th Cir. 2008) ................................................................................. 20

*Lee v. Madigan,*
  358 U.S. 228 (1959) ............................................................................................... 43

*Lee v. Wolfson,*
  265 F. Supp. 2d 14 (D.D.C. 2003)........................................................................ 86

*Lev v. Arab Bank, PLC,*
  2010 WL 623636 (E.D.N.Y. Jan. 29, 2010) .......................................................... 30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  134 S. Ct. 1377 (2014) ..................................................................................... 80, 84

*Linde v. Arab Bank, PLC,*
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................... 17, 45, 72

*Linde v. Arab Bank, PLC,*
  882 F.3d 314 (2d Cir. 2018) ............................................................................ 47, 51

*Lopez v. Council on American-Islamic Relations Action Network, Inc.,*
  826 F.3d 492 (D.C. Cir. 2016)............................................................................... 49

*Marzorati v. Med Start-Georgetown Med. Ctr, Inc.,*
  265 F. Supp. 3d 24 (D.D.C. 2017).......................................................................... 87

*Mastafa v. Chevron Corp.,*
  770 F.3d 170 (2d Cir. 2014) .................................................................................. 73

*McLaughlin v. Anderson,*
  962 F.2d 187 (2d Cir. 1992) .................................................................................. 67

*McMahon v. Presidential Airways, Inc.*,
 460 F. Supp. 2d 1315 (M.D. Fla. 2006), *aff'd* 502 F.3d 1331 (11th Cir. 2007) ....................... 23

*Meyer v. Holley*,
 537 U.S. 280 (2003) ...................................................................................... 48

*Mohamed v. Select Portfolio Servicing, Inc.*,
 215 F. Supp. 3d 85 (D.D.C. 2016) .................................................................. 87

*Morris v. Khadr*,
 415 F. Supp. 2d 1323 (D. Utah 2006) ................................................ 37, 38, 39

*Morris v. McCarthy*,
 825 F.3d 658 (D.C. Cir. 2016) ....................................................................... 85

*Murphy v. DirecTV, Inc.*,
 724 F.3d 1218 (9th Cir. 2013) ....................................................................... 49

*Murray v. Amalgamated Transit Union*,
 206 F. Supp. 3d 202 (D.D.C. 2016) ............................................................... 29

*Nat'l Ass'n. of Mfrs. v. Taylor*,
 582 F.3d 1 (D.C. Cir. 2009) ........................................................................... 66

*Nat'l Council of Resistance of Iran v. Dep't of State*,
 373 F.3d 152 (D.C. Cir. 2004) ....................................................................... 60

*Nixon v. United States*,
 506 U.S. 224 (1993) ...................................................................................... 20

*Ofisi v. BNP Paribas, S.A.*,
 2018 WL 396234 (D.D.C. Jan. 11, 2018) ....................................................... 54

*Owens v. Rep. of Sudan*,
 531 F.3d 884 (D.C. Cir. 2008) .................................................................. 80, 85

*Owens v. BNP Paribas S.A.*,
 235 F. Supp. 3d 85 (D.D.C. 2017) ............................................................ 83, 84

*Owens v. Rep. of Sudan*,
 864 F.3d 751 (D.C. Cir. 2017) ............................................................ 79, 80, 85

*Paroline v. United States*,
 134 S. Ct. 1710 (2014) .............................................................................. 79, 81

*Pennie v. Twitter, Inc.*,
    281 F. Supp. 3d 874 (N.D. Cal. 2017) ................................................................. 63

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    652 F. Supp. 2d 495 (S.D.N.Y. 2009) ................................................................. 50

*People v. Corpening*,
    386 P.3d 379 (Cal. 2016) ................................................................................... 65

*Perrodin v. Rooker*,
    908 S.W.2d 85 (Ark. 1995) ............................................................................... 89

*Peterson v. Islamic Rep. of Iran*,
    515 F. Supp. 2d 25 (D.D.C. 2007), *abrogated on other grounds*,
    *Mohammadi v. Islamic Rep. of Iran*, 782 F.3d 9 (D.C. Cir. 2015) .............. 88, 89, 90

*Pontrelli v. MonaVie, Inc.*,
    2014 WL 4105417 (D.N.J. Aug. 19, 2014) ....................................................... 48, 49

*Rael v. Cadena*, 604 P.2d 822 (N.M. 1979) ........................................................... 54

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ........................................................................... 31

*Richards v. Mileski*,
    662 F.2d 65 (D.C. Cir. 1981) ............................................................................. 86

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ............................................................................. 80, 84

*Russello v. United States*,
    464 U.S. 16 (1983) ............................................................................................. 59

*Saldana v. Occidental Petroleum Corp.*,
    774 F.3d 544 (9th Cir. 2014) ................................................................... 21, 25, 26

*Sea Shepherd Conservation Soc'y v. IRS*,
    89 F. Supp. 3d 81 (D.D.C. 2015) ......................................................................... 5

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013) ........................................................................................... 33

*Shatsky v. Palestine Liberation Org.*,
    2017 WL 2666111 (D.D.C. June 20, 2017) ....................................................... 80

*Sheeran v. Blyth Shipholding S.A.,*
   2015 WL 9048979 (D.N.J. Dec. 16, 2015) ........................................................ 76

*Smith v. District of Columbia,*
   413 F.3d 86 (D.C. Cir. 2005) ................................................................... 79, 85

*Sokolow v. Palestine Liberation Org.,*
   583 F. Supp. 2d 451 (S.D.N.Y. 2008) ............................................................ 41

*Stansell v. BGP, Inc.,*
   2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ................................................ 73

*Stansell v. Rep. of Cuba,*
   217 F. Supp. 3d 320 (D.D.C. 2016) ............................................................... 88

*Stansell v. Revolutionary Armed Forces of Colombia,*
   771 F.3d 713 (11th Cir. 2014) ...................................................................... 61

*Strauss v. Credit Lyonnais, S.A.,*
   2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) .............................................. 52, 85

*Strauss v. Credit Lyonnais, S.A.,*
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) ........................................................... 83

*Stutts v. De Dietrich Grp.,*
   2006 WL 1867060 (E.D.N.Y. June 30, 2006) ................................................ 73

*Techniarts Eng. v. United States,*
   51 F.3d 301 (D.C. Cir. 1995) ........................................................................ 63

*Terrorist Attacks on Sept. 11, 2001, In re,*
   714 F.3d 118 (2d Cir. 2013) ......................................................................... 84

*Texas Mun. Power Agency v. EPA,*
   89 F.3d 858 (D.C. Cir. 1996) ........................................................................ 66

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
   200 F.3d 843 (D.C. Cir. 2000) ...................................................................... 49

*Twenty First Century L.P.I. v. LaBianca,*
   19 F. Supp. 2d 35 (E.D.N.Y. 1998) .............................................................. 45

*Ungar v. Palestine Liberation Org.,*
   402 F.3d 274 (1st Cir. 2005) .................................................................. 20, 21

*United States v. Akinyoyenu,*
　199 F. Supp. 3d 106 (D.D.C. 2016) .................................................................. 612

*United States v. AT&T Inc.,*
　2018 WL 2930849 (D.D.C. June 12, 2018) ................................................... 16, 18

*United States v. Dewalt,*
　92 F.3d 1209 (D.C. Cir. 1996) ........................................................................ 69

*United States v. Elshinawy,*
　2017 WL 876484 (D. Md. Mar. 6, 2017) ......................................................... 78

*United States v. Farhane,*
　634 F.3d 127 (2d Cir. 2011) ............................................................................ 77

*United States v. Fiorillo,*
　186 F.3d 1136 (9th Cir. 1999) ......................................................................... 69

*United States v. Forbes,*
　515 F.2d 676 (D.C. Cir. 1975) ........................................................................ 60

*United States v. Haipe,*
　769 F.3d 1189 (D.C. Cir. 2014) ...................................................................... 73

*United States v. Hamidullin,*
　888 F.3d 62 (4th Cir. 2018) ............................................................................ 36

*United States v. Hausa,*
　258 F. Supp. 3d 265 (E.D.N.Y. 2017) ............................................................ 78

*United States v. Jennings,*
　496 F.3d 344 (4th Cir. 2007) .......................................................................... 69

*United States v. Johnson,*
　970 F.2d 907 (D.C. Cir. 1992) ........................................................................ 59

*United States v. Jones,*
　471 F.3d 535 (4th Cir. 2006) .......................................................................... 69

*United States v. Parnell,*
　581 F.2d 1374 (10th Cir. 1978) ...................................................................... 59

*United States v. Pregler,*
　925 F.2d 268 (8th Cir. 1991) .......................................................................... 65

*United States v. Prosperi,*
  573 F. Supp. 2d 436 (D. Mass. 2008)............................................................ 42, 43

*United States v. Right to Use & Occupy 3.38 Acres of Land, More or Less, in Alexandria,*
  484 F.2d 1140 (4th Cir. 1973) ..................................................................... 63

*United States v. Staten,*
  581 F.2d 878 (D.C. Cir. 1978)..................................................................... 67

*United States v. TDC Mgmt. Corp.,*
  24 F.3d 292 (D.C. Cir. 1994)....................................................................... 54

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978) .................................................................................... 72

*United States v. Yunis,*
  924 F.2d 1086 (D.C. Cir. 1991)................................................................... 34

*United States ex rel. Head v. Kane Co.,*
  798 F. Supp. 2d 186 (D.D.C. 2011).............................................................. 76

*United States ex rel. Heath v. AT&T, Inc.,*
  791 F.3d 112 (D.C. Cir. 2015)..................................................................... 76

*United States ex rel. Landis v. Tailwind Sports Corp.,*
  51 F. Supp. 3d 9 (D.D.C. 2014)................................................................... 87

*Weiss v. Arab Bank, PLC,*
  2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)................................... 35, 38, 39

*Weiss v. Nat'l Westminster Bank PLC,*
  453 F. Supp. 2d 609 (E.D.N.Y. 2006)................................................ 4, 72, 81

*Weiss v. Nat'l Westminster Bank PLC,*
  768 F.3d 202 (2d Cir. 2014) ........................................................................ 72

*Weiss v. Nat'l Westminster Bank PLC,*
  278 F. Supp. 3d 636 (E.D.N.Y. 2017)...................................... 50, 82, 83

*Woods v. Barnett Bank of Ft. Lauderdale,*
  765 F.2d 1004 (11th Cir. 1985) ................................................................... 51

*Wultz v. Islamic Rep. of Iran,*
  755 F. Supp. 2d 1 (D.D.C. 2010) ....................................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ................................................................. 19, 21

## Statutes, Rules, Codes, and Regulations

Foreign Corrupt Practices Act of 1977 ("FCPA"),
   15 U.S.C. § 78dd-1, *et seq.*

   § 78dd-1(a) ........................................................................................ 5

   § 78m(b)(2)(A) ................................................................................... 5

18 U.S.C. § 371 ...................................................................................... 60

18 U.S.C. § 844(n) ................................................................................. 60

18 U.S.C. § 956(a)(1) ............................................................................ 60

18 U.S.C. § 1203(a) ............................................................................... 60

18 U.S.C. § 1962(b) ............................................................................... 64

   § 1962(c) ................................................................................... 64, 68

   § 1962(d) ......................................................................................... 64

18 U.S.C. § 2331(1) ........................................................................ *passim*

   § 2331(1)(A) .................................................................................. 64

   § 2331(1)(B) .................................................................................. 71

   § 2331(4) .................................................................................. 33, 42

   § 2331(4)(A) .................................................................................. 34

   § 2331(4)(B) ........................................................................ 33, 37, 40

   § 2331(4)(C) ............................................................................ *passim*

18 U.S.C. § 2332a(a) .............................................................................. 60

18 U.S.C. § 2332b(a)(2) .......................................................................... 60

18 U.S.C. § 2332f ................................................................................... 78

§ 2332f(a)(1) ................................................................................................ 79

§ 2332f(a)(2) ................................................................................................ 60

§ 2332f(d)(1) ................................................................................................ 78

18 U.S.C. § 2333 .......................................................................................... 20

    § 2333(a) ................................................................................................ *passim*

    § 2333(d) ................................................................................ 21, 30, 54, 60

    § 2333(d)(2) ........................................................................................... *passim*

18 U.S.C. § 2336

    § 2336(a) ................................................................................................ 2, 33

    § 2336(b) ................................................................................................ 22

    § 2336(c) ................................................................................................ 22

18 U.S.C. § 2337 .......................................................................................... 22

18 U.S.C. § 2338 .......................................................................................... 21

18 U.S.C. § 2339A ............................................................... 31, 72, 74, 75

    § 2339A(a) ........................................................................................... 60, 75

    § 2339A(b)(1) .......................................................................... 60, 75, 77, 78

18 U.S.C. § 2339B(a)(1) .............................................................................. 70

18 U.S.C. § 2339C ...................................................................................... *passim*

    § 2339C(a)(1) ........................................................................................ 79

    § 2339C(a)(1)(A) .............................................................................. 78, 79

    § 2339C(a)(1)(B) .............................................................................. 78, 79

    § 2339C(e)(7)(I) .................................................................................... 78

18 U.S.C. § 2339D ...................................................................................... 39

28 U.S.C. § 1605(a)(7) (2006) ................................................................ 80

Emergency Suppl. Appropriations Act for Defense & for the Reconstruction of Iraq
   & Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (2003) .................................... 29

Justice Against Sponsors of Terrorism Act ("JASTA"),
   Pub. L. No. 114-222, 130 Stat. 852 (2016)

      § 2(a)(3) ...................................................................................... 61

      § 2(a)(4) ................................................................................. 4, 55

      § 2(a)(5) .............................................................................. 43, 70

      § 2(a)(6) ..................................................................... 5, 48, 55, 81

      § 2(a)(7) .............................................................................. 55, 71

      § 2(b) ................................................................................. *passim*

Violent Crime and Enforcement Act of 1994,
   Pub. L. No. 103-322, 108 Stat. 1796 (1994) ................................................ 60

Lieber Code of Apr. 24, 1863 .................................................................. 37

Waiver of Section 1083 of the National Defense Authorization Act for Fiscal Year 2008,
   73 Fed. Reg. 6,571 (Jan. 28, 2008) .......................................................... 27

Fed. R. Civ. P. 8 .............................................................................. 76

Fed. R. Civ. P. 9(b) ........................................................................... 76

Fed. R. Civ. P. 12(b)(1) ............................................................... 16, 18, 27

Fed. R. Civ. P. 15(a) .......................................................................... 91

Fed. R. Evid. 201(b) ........................................................................... 17

Fed. R. Evid. 404(b) ........................................................................... 59

## Other Authorities, Legislative, and Agency Materials

H.R. Rep. No. 102-1040 (1992) ................................................................. 37

H.R. Conf. Rep. No. 104-518 (1996) ........................................................... 77

S. Rep. No. 102-342 (1992) .................................................................................. 4, 37, 81

160 Cong. Rec. S6657-01 (daily ed. Dec. 11, 2014) ................................................ 67

162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) ................................................ 66, 67

2 Wigmore on Evidence § 304 ................................................................................ 59

Restatement (Second) of Conflict of Laws § 175 (1971) ......................................... 90

Restatement (Second) of Torts § 46 (1965) ............................................................. 89

Restatement (Second) of Torts § 876(b) (1979) ....................................................... 90

Restatement (Third) of Agency § 1.01 (2006) .............................................. 48, 49, 61

Dep't of Def., *Law of War Manual* (Dec. 2016) .......................................... 35, 37, 39, 43

Sen. Patrick Leahy, *Questions for the Record, Rod J. Rosenstein* (2017),
   https://goo.gl/nbeAqA ......................................................................................... 5

U.S. Dep't of Justice & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*
   (Nov. 14, 2012), https://www.justice.gov/criminal-fraud/fcpa-guidance ................. 5

U.S. Dep't of State, Foreign Terrorist Organizations,
   https://goo.gl/UNGzLJ ........................................................................................ 38

Webster's Third New Int'l. Dict. Unabridged (3d ed. 2002) ............................... *passim*

Webster's New World College Dictionary (4th ed. 2010) ........................................ 40

Anne Stenersen, *Thirty Years after its Foundation – Where is al-Qaida Going?*,
   Perspectives on Terrorism (Dec. 2017), https://goo.gl/pLbwY4 .............................. 39

CPT Mack Borgen, *The Determination of Domicile*,
   65 Mil. L. Rev. 133 (1974) .................................................................................. 88

## INTRODUCTION

Plaintiffs in this lawsuit are American service members and civilians, and their families, who were attacked in Iraq between 2005 and 2009 by a Hezbollah-sponsored terrorist group called "Jaysh al-Mahdi."  Defendants are large medical-supply companies that knowingly financed those attacks.  The reason was straightforward:  Jaysh al-Mahdi openly controlled the Iraqi Ministry of Health ("Ministry"), and Defendants obtained lucrative contracts from the Ministry by making corrupt payments to the terrorists who ran it.  Those payments, in turn, supplied Jaysh al-Mahdi with funding for things like buying weapons and paying recruits.  By 2006, due in no small part to its control of the Ministry, Jaysh al-Mahdi had become the deadliest terrorist group in Iraq.  It murdered and wounded thousands of Americans, including Plaintiffs.

Defendants financed Jaysh al-Mahdi both in cash and in "free goods."  With the latter, Defendants structured their transactions with the Ministry to deliver batches of extra, off-book medical goods they knew Jaysh al-Mahdi would use for terrorist ends.  Those goods functioned in Iraq as cash equivalents – easily monetized on the black market or used as currency to pay terrorist salaries – and Defendants knew they helped fund Jaysh al-Mahdi's terrorist operations. Indeed, Defendants consummated their corrupt transactions at in-person meetings surrounded by fighters, weapons, and jihadist propaganda making clear who their terrorist counterparty really was.  Public news reports likewise documented Jaysh al-Mahdi's use of the Ministry to raise funds for terrorism.  Yet Defendants wanted to make money off the Ministry, so they proceeded with their corrupt transactions anyway.  For that, they are liable to Plaintiffs under the federal Anti-Terrorism Act ("ATA") and various state laws.

Defendants' motion to dismiss reads like a jury argument.  Nearly 50 pages are devoted not to Plaintiffs' allegations, but to an elaborate factual narrative – cobbled together from 1,021 pages of Internet research – about U.S. foreign policy in Iraq.  In Defendants' telling, the U.S.

government *wanted* them to violate federal law and funnel corrupt payments to the reprehensible anti-American terrorists who ran the Ministry.  Of course, they have no real evidence for that farfetched claim.  Instead, they cite a hodgepodge of unsubstantiated secondary sources indicating that the U.S. government broadly wanted to rebuild Iraq's health infrastructure after the U.S. invasion.  Such materials, most of which are barely relevant and inadmissible in any event, would be worth little at summary judgment.  On a motion to dismiss, Defendants' need to rely on such materials demonstrates why Plaintiffs' claims should proceed.

That core flaw – which runs throughout Defendants' motion to dismiss – sinks their lead argument under the political question doctrine.  Plaintiffs' claims do not require the resolution of any political question; they simply ask the Court to apply a federal statutory cause of action to private companies.  By enacting the ATA, the political branches have already determined that courts should adjudicate such claims.  This Court can do so here without opining on the broader policy questions that Defendants strain to raise.  But if the Court reaches those questions, the answer is simple:  Defendants undermined U.S. foreign policy by making illegal, corrupt payments to terrorists who were killing Americans.  And as the Amended Complaint (ECF No. 67, "AC") also makes clear, Plaintiffs' claims are unaffected by the U.S. government's decision not to designate Jaysh al-Mahdi as a Foreign Terrorist Organization ("FTO").

Defendants' "act of war" defense is even weaker.  18 U.S.C. § 2336(a).  That defense is intended to distinguish lawful wartime attacks by opposing "military forces," *id*. § 2331(4)(C), from criminal "act[s] of international terrorism," *id*. § 2333(a).  Jaysh al-Mahdi's heinous attacks on Plaintiffs were the latter.  Terrorist groups differ from "military forces" in that they pay no heed to the laws of war, and Jaysh al-Mahdi acted in total disregard of those laws here.  It slaughtered thousands of innocent civilians; its fighters wore no uniforms; it used ambulances,

hospitals, and children to launch attacks; and it tortured and mutilated the bodies of Americans it captured, including Plaintiffs' family members.  Defendants' act-of-war argument sanitizes those shameful acts.  Defendants go so far as to assert that the global war on terror is now one giant "armed conflict," such that even the most abhorrent terrorists are protected "military forces" in that conflict whenever they use military jargon and weapons (as most terrorists do).  That argument defies the ATA's text and purpose, and the Court should reject it.

Defendants' arguments about the elements of Plaintiffs' claims, which begin more than halfway through their 90-page brief, are also unfounded.  Congress enacted the ATA to stanch the flow of resources to terrorist groups, and it recently amended the statute to make it easier to sue those who finance such groups.  Defendants are liable under the ATA – both for aiding-and-abetting Jaysh al-Mahdi and for violating U.S. criminal law – because they knowingly (or recklessly) financed Jaysh al-Mahdi's operations.  Indeed, two federal judges have upheld strikingly similar ATA claims based on kickbacks companies paid to secure contracts from Saddam Hussein's regime, which Saddam then used to fund terrorism abroad.  *See Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) ("*Abecassis I*"), *recon. on other grounds*, *Abecassis v. Wyatt*, 7 F. Supp. 3d 668 (S.D. Tex. 2014) ("*Abecassis II*").  Given the direct nexus between the Ministry and Jaysh al-Mahdi terrorism, Plaintiffs' claims are even stronger.

Plaintiffs' carefully researched allegations on all these issues are more than enough to warrant discovery.  But at virtually every turn, Defendants respond by asking the Court to pick through a mass of secondary sources so that it can recast those allegations and give Defendants the benefit of complex, disputed inferences about everything from Iraq's healthcare system to Hezbollah's role in Jaysh al-Mahdi's operations.  Defendants should save their lengthy (and badly mistaken) factual arguments for a jury.  The motion to dismiss should be denied.

# BACKGROUND

## A.    Legal Background

Congress enacted the ATA in 1992 to "open[] the courthouse door to victims of international terrorism."  S. Rep. No. 102-342, at 45 (1992).  The ATA reflected Congress's dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists.  *Id*. at 22.  Congress thus originally designed the statute's civil remedy to impose "liability at any point along the causal chain of terrorism."  *Id*.; *see* 18 U.S.C. § 2333(a).

In the ensuing years, courts applied the ATA to further Congress's purpose of "cut[ting] the terrorists' lifeline" by separating terrorists from "their financial angels."  *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc).  Courts held frequently that the ATA imposed liability for knowingly providing general funding to terrorist groups, without requiring plaintiffs to trace the specific attacks that injured them to any one monetary contribution.[1]  Courts divided on the legal theory for imposing such liability:  some held that terrorist funders were directly liable for themselves committing an "act of international terrorism," 18 U.S.C. § 2333(a), *see, e.g.*, *Boim*, 549 F.3d at 689-90, whereas others held them secondarily liable as aiders-and-abettors, *see, e.g.*, *Abecassis I*, 785 F. Supp. 2d at 645-49.

Congress resolved that disagreement in the Justice Against Sponsors of Terrorism Act ("JASTA"), which preserves direct liability under the ATA while also codifying "causes of action for aiding and abetting and conspiracy liability."  *See* Pub. L. No. 114-222, 130 Stat. 852 (2016), § 2(a)(4).  In creating secondary liability, Congress found that companies that "contribute

---

[1] *See, e.g.*, *Abecassis I*, 785 F. Supp. 2d at 647; *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 41-57 (D.D.C. 2010); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106 (D.D.C. 2003).

material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities." *Id*. § 2(a)(6).  Congress thus explained that JASTA's "purpose" was to "provide civil litigants with the broadest possible basis . . . to seek relief against" entities that contribute resources "directly or indirectly" to "foreign organizations or persons that engage in terrorist activities against the United States." *Id*. § 2(b).

The Foreign Corrupt Practices Act ("FCPA") also bars companies from corruptly paying "foreign official[s]" to obtain business, 15 U.S.C. § 78dd-1(a), or violating the statute's accounting provisions, *id*. § 78m(b)(2)(A).  FCPA violations, particularly by repeat offenders like Defendants, have a "corrosive effect" on "our corporate culture."  Tr. of Status Conf. at 9:24-10:1, *SEC v. Int'l Bus. Machs. Corp.*, No. 11-cv-563 (D.D.C. Dec. 20, 2012), ECF No. 10 (Leon, J.).  Such violations "impede[] [U.S.] efforts to . . . combat international crime and terrorism."[2]  Indeed, the FCPA "play[s] a key role in counterterrorism policy, as it helps stop the flow of money to terrorist organizations and those who would fund them."[3]

## B.    Factual Background

The following facts derive from the Amended Complaint, which reflects an extensive investigation and is sourced from (among other things) more than 12 Confidential Witnesses; an array of public and non-public reports, contracts, and emails; English- and Arabic-language press reports; and U.S. diplomatic and military cables as published by *WikiLeaks*.  AC ¶¶ 41-43.[4]

---

[2] U.S. Dep't of Justice & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 104 n.5 (Nov. 14, 2012), https://www.justice.gov/criminal-fraud/fcpa-guidance.

[3] Sen. Patrick Leahy, *Questions for the Record, Rod J. Rosenstein* at 24 (2017), https://goo.gl/nbeAqA.

[4] Civil complaints frequently cite *WikiLeaks* materials.  *See, e.g.*, *Sea Shepherd Conservation Soc'y v. IRS*, 89 F. Supp. 3d 81, 87 (D.D.C. 2015) ("plaintiff points to two classified cables, authored by [U.S.] government officials and published [by] . . . Wikileaks").

1.      **Jaysh al-Mahdi and Corruption at the Iraqi Ministry of Health**

**a.**      For nearly two decades, the Iraqi Ministry of Health has been one of the most corrupt institutions in the world.  AC ¶¶ 48-51, 105-11, 138.  Iraq maintains a government-run healthcare system that provides the Ministry with leverage to extract corrupt payments from medical-goods suppliers seeking to do business in Iraq.  *Id*. ¶¶ 2, 72.  The Ministry first gained notoriety under the U.N. Oil-For-Food Program, which authorized Western companies to sell humanitarian goods to Saddam Hussein's regime, subject to strict financial controls.  *Id*. ¶¶ 44-53.  The Saddam-era Ministry, and its import subsidiary Kimadia, devised several schemes to circumvent the Oil-For-Food Program and extract kickbacks from foreign medical-goods suppliers doing business with the Ministry.  *Id*.  Those corrupt payments – which virtually every Defendant[5] or an affiliate made – supplied Saddam's regime with funding it used to finance international terrorism.  *Id*. ¶ 53.  Saddam's exploitation of the Oil-For-Food Program spawned numerous FCPA enforcement actions, including against several Defendants.  *Id*. ¶ 49.

In April 2003, the United States invaded Iraq and removed Saddam from power.  *Id*. ¶ 54.  Roughly eighteen months later, the Ministry began to fall under the control of the Shiite terrorist group Jaysh al-Mahdi (Arabic for the "Mahdi Army," sometimes spelled in English as the "Mehdi Army").  *Id*. ¶¶ 63-76.  Jaysh al-Mahdi was headed by notorious anti-American cleric Muqtada al-Sadr and modeled on Hezbollah, the Lebanese terrorist group that helped him found it.  *Id*. ¶¶ 56-59.  Jaysh al-Mahdi acted as the terrorist wing of Sadr's political party, the "Sadrist

---

Although Defendants say (at 11 n.29) they do not rely on any classified cables from *WikiLeaks*, they do openly cite (at 17) a book purporting to quote from a "[a] classified CIA report."

[5] There are 21 Defendants from five corporate families.  Two are subsidiaries of AstraZeneca plc (together, "AstraZeneca"), AC ¶¶ 17-18; three are subsidiaries of General Electric Company (together, "GE"), *id*. ¶¶ 19-21; eight are Johnson & Johnson and subsidiaries (together, "J&J"), *id*. ¶¶ 22-29; five are Pfizer Inc. and subsidiaries (together, "Pfizer"), *id*. ¶¶ 30-34; and three are subsidiaries of Roche Holding Ltd. (together, "Roche"), *id*. ¶¶ 35-37.

Trend," and Sadr's followers were called "Sadrists." *Id.* ¶ 59.  Jaysh al-Mahdi's founding

purpose was to exterminate the American presence in Iraq. *Id.* ¶ 333.  To that end, Sadr

regularly presided over "Death to America" chants, praised the September 11 attacks, and called

for a "jihad" against the "occupiers." *Id.* ¶¶ 58-60.  Jaysh al-Mahdi eventually became the

deadliest terrorist group in Iraq, responsible for more casualties than even al-Qaeda. *Id.* ¶ 62.

From 2005 to 2008, the Ministry was at the very center of Jaysh al-Mahdi's national

terrorist apparatus. *Id.* ¶¶ 63-104.[6]  Beginning in late 2004, Jaysh al-Mahdi engaged in an

"occupational cleansing" in which it purged the Ministry of Sunnis and secular technocrats while

staffing the key positions (from the Minister on down) with Jaysh al-Mahdi members. *Id.* ¶¶ 63-

70.  With operatives in place throughout the ranks – many of whom Plaintiffs have identified by

name – Jaysh al-Mahdi transformed the Ministry from a medical institution into an instrument of

terrorism. *Id.* ¶¶ 78-103.  It used the Ministry headquarters building in downtown Baghdad as a

base from which to launch attacks. *Id.*  It converted hospitals into command-and-control centers.

*Id.*  It relied on ambulances to transport death squads around Baghdad. *Id.* ¶ 86.  And it used the

Ministry security staff to house an entire Jaysh al-Mahdi division commanded by the Deputy

Health Minister. *Id.* ¶ 85.  As the U.S. Embassy in Baghdad summarized in 2006, the Ministry

and its infrastructure were "openly under the control of the Mehdi Army." *Id.* ¶ 79.

Jaysh al-Mahdi's control of the Ministry was no secret.  Beginning in late 2004, Jaysh al-

Mahdi's terrorist propaganda festooned Ministry facilities throughout Iraq, including its Baghdad

headquarters. *Id.* ¶ 73.  Large pictures of Muqtada al-Sadr adorned the walls; jihadist slogans

---

[6] This case focuses on Jaysh al-Mahdi's activities from 2005 to 2008, when it turned the
Ministry into a terrorist apparatus over which it had near-total control.  AC ¶¶ 63-104.  Although
Jaysh al-Mahdi retained influence in later years – including through the present – its absolute
control over the Ministry's infrastructure has somewhat lessened. *Id.* ¶ 104.

like "Death to America" were ubiquitous; and Jaysh al-Mahdi's all-black flag decorated the
entrances. *Id.* Armed Jaysh al-Mahdi fighters walked the halls. *Id.* ¶ 180. The Deputy Health
Minister (a Jaysh al-Mahdi commander) stocked his Ministry office with weaponry like rocket-
propelled grenades ("RPGs"), and he regularly led Jaysh al-Mahdi fighters up to the roof to
launch attacks. *Id.* ¶¶ 89-90. According to one witness, the Ministry headquarters building
looked more like a "Mahdi Army camp" than a medical building. *Id.* ¶ 90. Jaysh al-Mahdi's
control of the Ministry was so obvious – and the armed fighters so prevalent – that it became one
of the few buildings in Baghdad that U.S. officials could not safely enter. *Id.* ¶ 180.

Major Western newspapers at the time also reported on Jaysh al-Mahdi's takeover of the
Ministry. They described (among other things) how the Ministry had fallen "under the control of
the Shia cleric Moqtada al-Sadr" and was providing "millions of dollars" to Sadr's "Shiite
Muslim militia." *Id.* ¶ 183. A *CBS News* report detailed how the "Mahdi Army" had turned
Ministry "morgues and hospitals into places where death squads operate freely." *Id.* ¶ 87. And
one *USA Today* reporter, after witnessing the Jaysh al-Mahdi propaganda and jihadist messages
all over the Ministry headquarters, left with no "doubt[] about who runs the place." *Id.* ¶ 180.

    **b.**    Jaysh al-Mahdi also used the Ministry (as Saddam had) for terrorist finance. AC
¶¶ 105-12, 165-79. Jaysh al-Mahdi prioritized control of the Ministry – which the Sadrists
officially took over in the April 2005 elections, *id.* ¶ 68 – in large part because Kimadia offered it
a proven stream of corrupt revenue (and because Hezbollah had benefited greatly from similar
control of the Lebanese health system), *id.* ¶¶ 64, 173. Thus, in late 2004, Jaysh al-Mahdi
revived the corrupt schemes that Saddam had used to such great effect under Oil-For-Food. *Id.*
¶¶ 116-64. Those schemes went hand-in-hand with Jaysh al-Mahdi's terrorist control of the
Ministry. *Id.* ¶ 112. As one U.S. government investigator observed in a contemporaneous

memorandum, "official corruption [was] tolerated at the [Ministry] because it ha[d] become the ministry occupied by the Mahdi Army." *Id.* ¶ 81.

Jaysh al-Mahdi extracted corrupt payments in two primary ways. First, medical-goods suppliers structured their transactions with Kimadia to provide Jaysh al-Mahdi members with extra batches of in-kind drugs and medical devices, free of charge, on top of the quantities for which Kimadia had paid. *Id.* ¶¶ 116-41. Suppliers included those "free goods" in the same shipments as the "purchased goods" and packaged them in a manner conducive to street resale, which ensured that Jaysh al-Mahdi could monetize them on the black market. *Id.* ¶¶ 5, 50-51, 119-20. Because of the way the contracts were structured, Ministry officials did not have to account for the extra goods in inventory. *Id.* ¶¶ 117-20. For that reason, as one Ministry insider stated, the "free goods" were "very easy to disappear" for illicit purposes. *Id.* ¶ 132.

Defendants liked using "free goods" payments (which they also used to finance terrorism under Oil-For-Food) because it allowed them to pay in-kind bribes using medical goods that cost them little to manufacture. *Id.* ¶ 117. It also allowed them to claim, if caught, that they were merely donating "life-saving medicine and medical equipment" to the Iraqi people. *Compare* Mem. at 1, *with* AC ¶ 118. Defendants knew their "free goods" were corrupt payments to Jaysh al-Mahdi members rather than humanitarian donations. AC ¶¶ 119-20, 137-39. In Iraq, medical goods functioned as cash equivalents – regularly sold and bartered (like gold, or diamonds) on black markets – and Kimadia's procurement process ensured that "free goods" donations did not go to any legitimate public health facility. *Id.* Defendants knew that their "free goods" deliveries only worsened the deterioration of Iraq's public-health system. *Id.* ¶ 138.

Second, medical-goods suppliers also paid Jaysh al-Mahdi cash bribes (known as "commissions" in Iraq) to obtain contracts from Kimadia. *Id.* ¶¶ 142-64. As they had done

under Oil-For-Food, Defendants paid commissions through several mechanisms – including so-called "performance bonds" (*id*. ¶¶ 161-62) or other unreasonable "services" clauses (*id*. ¶ 158) – and funneled the money to Jaysh al-Mahdi through their corrupt local sales agents, *id*. ¶¶ 148-49. According to several witnesses, it was essentially impossible to obtain a commercial contract from Kimadia between 2005 and 2008 without paying "commissions" to Jaysh al-Mahdi members at several stages of the transaction. *Id*. ¶¶ 142-45; *e.g.*, *id*. ¶¶ 197, 213, 258.

**c.**     Jaysh al-Mahdi used Defendants' corrupt payments to finance terrorist attacks on Americans. *Id.* ¶¶ 165-79. As documented by U.S. anti-corruption personnel, Ministry employees, and other Iraqi government officials, Jaysh al-Mahdi was notorious for using its control over the Ministry to fund terrorist operations. *Id*. ¶¶ 108-12, 165-75. Corrupt payments – which provided off-book, fungible resources for which Ministry employees did not need to officially account – were especially easy to appropriate for terrorist ends. *Id*. ¶ 179. That was true of not only Defendants' "commissions," but also their "free goods" deliveries. Jaysh al-Mahdi "finance[d] operations from diverted medicines" that it sold on the black market, and it regularly paid its rank-and-file terrorist fighters directly in pharmaceuticals rather than cash. *Id*. ¶¶ 169, 176. Jaysh al-Mahdi was so dependent on its supply of cash-equivalent pharmaceuticals from the Ministry that it was often known in Iraq as "The Pill Army." *Id*. ¶¶ 9, 176.

In February 2007, those facts led the U.S. government to coordinate the prosecution of Deputy Health Minister Hakim al-Zamili for helping Jaysh al-Mahdi "effectively hijack[] the Ministry of Health." *Id*. ¶ 94. The prosecution was based on evidence that Zamili had "orchestrated kickback schemes related to inflated contracts for equipment and services, with millions of dollars allegedly funneled to Mr. Sadr's Mahdi Army." *Id*. ¶ 171. An Iraqi court eventually acquitted Zamili after Jaysh al-Mahdi coerced the witnesses into recanting. *Id*. ¶ 96.

**d.**     The United States did not encourage companies to transact with the Jaysh al-Mahdi-controlled Ministry, and it especially opposed use of the corrupt Kimadia contracting process.  *Id.* ¶¶ 76, 113.[7]  The U.S. government warned of the Ministry's "atrocious reputation" for "corruption" while "under the control of the Mehdi Army"; helped prosecute the Deputy Health Minister as a terrorist; and supported efforts to combat corruption at the Ministry.  *Id.* ¶¶ 76, 80-81, 94, 108, 169.  The United States viewed Kimadia in particular as a "serious problem within the [Ministry]" and expressed reservations about the Ministry's "Sadrist affiliation."  Def. Ex. 14 at 5.[8]  In fact, the U.S. government sought to abolish Kimadia altogether for being "totally and utterly corrupt."  AC ¶ 48.  But those efforts ran aground because the Sadr-controlled Ministry would "not work with Americans."  *Id.* ¶ 76.

The U.S. government thus looked for other constructive ways to support the Iraqi health sector without enabling the Jaysh al-Mahdi terrorists who ran the Ministry.  *Id.* ¶ 113.  For example, it focused on rebuilding Iraq's infrastructure by supporting the construction and supply of new hospitals.  *Id.*  On occasion, it also procured medical goods by contracting directly with suppliers to avoid dealing with corrupt Kimadia officials.  *See, e.g.*, Def. Ex. 46 (Table D-1).  The government subjected such programs to safeguards designed to prevent Jaysh al-Mahdi from diverting U.S. resources.  AC ¶ 113.  At the same time, it warned companies about the importance of complying with the FCPA.[9]  Indeed, U.S. officials called public corruption "the

---

[7] Defendants assert inaccurately that "Kimadia had a 'monopoly' over all medical imports." Mem. at 8 (quoting AC ¶ 72).  In fact, Kimadia monopolized *public* medical-goods imports," AC ¶ 47 (emphasis added), but did not control non-profit or private imports, *see id.* ¶ 113.

[8] "Def. Ex. __" refers to Defendants' exhibits.  *See* ECF No. 72-2.  "Pl. Ex. __" refers to Plaintiffs' exhibits, which are complete versions of certain of Defendants' excerpted exhibits and which put Defendants' citations in context.  "Mem." refers to ECF No. 72-1.  Unless otherwise specified, all internal quotations, brackets, and emphases are omitted from all citations herein.

[9] *See, e.g.*, U.S. Com. Serv., *Doing Business in Iraq* 72-78 (2012) (Pl. Ex. 2; full version of Def. Ex. 40) (citing FCPA and warning companies about "corruption" in Iraq).

second insurgency" and warned that corrupt payments to Iraqi officials were "provid[ing] the money, the people and the motivation to fight Americans in Iraq."  AC ¶ 172.

### 2. Defendants' Payments to Jaysh al-Mahdi

At least from 2004 until 2013, Defendants made corrupt payments to obtain lucrative medical-goods contracts from the Ministry.  AC ¶ 7.  For each Defendant, Plaintiffs allege an array of drugs or devices that it sold (or manufactured for sale) to the Ministry; identify a minimum number of tainted contracts it obtained; specify particular contract numbers and "free goods" percentages it paid; and describe the corrupt third-party agents and Scientific Bureaus (the local Iraqi agents that interfaced with the Ministry on Defendants' behalf) it used to funnel payments to Jaysh al-Mahdi.  *Id.* ¶¶ 188-209 (AstraZeneca), 210-44 (GE), 245-80 (J&J), 281-309 (Pfizer), 310-32 (Roche).  Each Defendant (or a predecessor or affiliate) has violated the FCPA in comparable ways before, *id.*, and virtually all of them made similar corrupt payments to Ministry officials under Oil-For-Food, *id.* ¶¶ 199-201, 222-23, 262-63, 319-20.  To effectuate the corrupt transactions Plaintiffs allege here, Defendants used the same crooked local agents they had used under Oil-For-Food.  *Id.* ¶¶ 201, 223-30, 264-70, 319-20.

At least two corporate entities, both of which generally appeared in the sales contracts, were involved in each corrupt transaction.  *Id.* ¶¶ 121-22.  First, a Supplier[10] acted as the contracting entity that executed the corrupt transaction with Kimadia.  *Id.* ¶ 122.  Second, a

---

[10] The Suppliers are AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Pharmaceutica N.V., Johnson & Johnson (Middle East) Inc., Pfizer Inc., Pfizer Enterprises SARL, Wyeth Pharmaceuticals Inc., and F. Hoffmann-La Roche Ltd.  *Id.* ¶¶ 188, 211, 245, 281, 310.  The Manufacturers are AstraZeneca Pharmaceuticals LP, GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Ortho Biologics LLC, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company, LLC, Genentech, Inc., and Hoffmann-La Roche Inc.  *Id.*  Johnson & Johnson is a parent company that supervised its subsidiaries' corrupt payments to Jaysh al-Mahdi.  *Id.* ¶¶ 245, 273-74.

Manufacturer (the Supplier's affiliate) made the goods being sold. *Id*. The Suppliers acted as agents for the Manufacturers: Ministry regulations required the Suppliers to confirm they were acting on the Manufacturers' behalf subject to the Manufacturers' control, and the Manufacturers had to authorize their sales. *Id*. ¶¶ 156-57. The Manufacturers also participated directly in the corrupt transactions, *id*. ¶¶ 194, 220, 250, 256, 315, and worked in concert with their Suppliers to grow their sales to the Ministry, *id*. ¶¶ 12, 114, 203-07, 233-41, 272-78, 296-306, 322-30.

Defendants knew (or recklessly disregarded) that their corrupt payments funded Jaysh al-Mahdi terrorist attacks. *Id.* ¶¶ 10-11, 180-87. Defendants consummated those payments at in-person meetings inside the Ministry headquarters, surrounded by Jaysh al-Mahdi propaganda and fighters. *Id*. ¶¶ 121, 180-81. They each relied on a local Scientific Bureau that was fluent in Iraqi politics and aware that Jaysh al-Mahdi raised money through the Ministry. *Id*. ¶ 182. And each had a corporate-security department that exposed it to public and non-public reporting of Jaysh al-Mahdi's terrorist financing schemes at the Ministry. *Id*. ¶¶ 183-86.

### 3.   Jaysh al-Mahdi's Hezbollah-Sponsored Campaign of Terrorism Against Americans in Iraq

Defendants' transactions funded a terrorist campaign that killed and injured large numbers of Americans in Iraq, including Plaintiffs. Sadr founded Jaysh al-Mahdi in 2003 in conjunction with Hezbollah's chief terrorist operative. AC ¶ 333. Due to Hezbollah's involvement, Jaysh al-Mahdi quickly mastered an array of terrorist tactics. *Id*. ¶¶ 338-46. Most lethal were explosively formed penetrators ("EFPs"), an advanced explosive device designed to penetrate American tank armor. *Id*. ¶¶ 341-42. Jaysh al-Mahdi used EFPs and other weaponry – including mortars, rockets, and RPGs – to kill or wound thousands of Americans. *Id*. ¶¶ 14, 339-46. The U.S. military considered "Jaysh al-Mahdi" to be a "terrorist organization" and explained that, by 2006, it represented a more severe security threat than al-Qaeda in Iraq. *Id*. ¶¶ 347-48.

Jaysh al-Mahdi engaged in despicable, illegal attacks on Americans (including Plaintiffs) working to rebuild Iraq's civic institutions. *Id.* ¶¶ 349-52. Jaysh al-Mahdi fighters launched attacks out of mosques, schools, ambulances, and hospitals; coopted children and Iraqi police officers for attacks; and wore civilian clothes (rather than uniforms) to prevent the U.S. military from engaging them. *Id.* ¶¶ 351-54. They tortured, murdered, and mutilated the bodies of the Americans they captured, including Plaintiffs' civilian family members. *Id.* ¶¶ 461, 796, 808. They intentionally slaughtered thousands of innocent Iraqi civilians. *Id.* ¶ 351. They stole from, raped, and murdered people who crossed them. *Id.* ¶ 353. And they funded it all through a mafia-like criminal organization – in which their control of the Ministry played a key role – that hijacked and exploited public resources for terrorist ends. *Id.* ¶¶ 143-44, 166, 168.

Hezbollah, which has been a designated FTO since 1997, was instrumental to Jaysh al-Mahdi's terrorist campaign. *Id.* ¶¶ 364-407. Hezbollah co-founded Jaysh al-Mahdi as its terrorist proxy in Iraq; recruited Iraqi Shiites to join Jaysh al-Mahdi; came up with Jaysh al-Mahdi's heinous tactics; instructed Jaysh al-Mahdi how to employ those tactics; and helped supply the weapons that implemented them. *Id.* ¶¶ 364-76, 389-407. Its involvement was focused on the particular types of attacks that injured Plaintiffs – which were too sophisticated for Jaysh al-Mahdi to execute on its own – and the particular Iraqi geographies where those attacks took place. *Id.* ¶¶ 389-403. At all times, Hezbollah kept senior operatives stationed in Iraq to supervise Jaysh al-Mahdi's "jihad" against the United States. *Id.* ¶¶ 366-70.

Hezbollah also used its religious authority over Iraqi Shiites to legitimize the Jaysh al-Mahdi terrorist campaign. *Id.* ¶¶ 377-88. Senior Hezbollah spiritual leaders called publicly for terrorist violence against Americans in Iraq and went to great lengths to justify it religiously. *Id.* ¶¶ 378-85. Hezbollah exerted similar influence over Sadr personally, with whom it was in close

contact.  *Id*. ¶ 387.  Hezbollah's messages – including Islamic *fatwas* and formal calls for "jihad"
– had their intended effect.  *Id*. ¶¶ 377-88.  Jaysh al-Mahdi's members (from its top leaders down
to rank-and-file fighters) publicly swore fealty to Hezbollah, declared their willingness to die for
Hezbollah's leaders, marched under Hezbollah's banners and flags, and regularly participated in
rallies where they chanted "we are Hezbollah."  *Id*. ¶¶ 371-73.  As one prominent journalist put
it, Jaysh al-Mahdi was essentially the "Iraqi branch of Hezbollah."  *Id*. ¶ 364.

The United States declined to designate Jaysh al-Mahdi as an FTO so that it could
preserve its ability to engage diplomatically with the Sadrists when necessary.  *Id*. ¶ 355.
Plaintiffs disclaim any challenge to that decision, which does not undermine the claims asserted
here.  *Id*. ¶¶ 355-56; *see infra* Part II.C.

## C.    Plaintiffs' Claims

Plaintiffs are U.S. citizens who were killed or injured between 2005 and 2009 by Jaysh
al-Mahdi's terrorist activities in Iraq.  AC ¶¶ 1, 16.  They are American service members who
deployed to Iraq to stabilize the country and keep the peace, American civilians working on
reconstruction projects, and the estates and family members of both.  *Id*. ¶¶ 408-1153.  Some
were killed in an attack for which Jaysh al-Mahdi was responsible, others were physically
wounded in such an attack, and others suffered injury due to an attack on a family member.  *Id*.

Every Plaintiff brings two aiding-and-abetting (*id*. ¶¶ 1154-80) and two direct-liability
(*id*. ¶¶ 1181-94) claims under the ATA against all Defendants.  Every Plaintiff except those
representing an estate also brings a state-law claim for intentional infliction of emotional distress.
*Id*. ¶¶ 1195-1201.  Plaintiffs whom Jaysh al-Mahdi physically wounded bring state-law assault-
and-battery claims.  *Id*. ¶¶ 1202-07.  And Plaintiffs representing an estate bring state-law
wrongful-death and survival claims.  *Id*. ¶¶ 1208-27.  Plaintiffs bring these claims against nine
Suppliers, 11 Manufacturers, and one parent company.  *Id*. ¶¶ 17-37; *see supra* note 10.

**ARGUMENT**

**I.     DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE IT DEPENDS ON EXTRA-PLEADING MATERIALS THE COURT SHOULD DISREGARD**

In deciding Defendants' motion to dismiss, the Court should "take[] the allegations of the complaint as true" and "draw all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).  That applies to both the merits and jurisdictional arguments:  although Rule 12(b)(1) permits consideration of "materials outside the pleadings" in assessing subject-matter jurisdiction, the Court "must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Similarly, in addressing Defendants' arguments under Rule 12(b)(1) "at [the] threshold stage, prior to any discovery," the Court should "accord [Plaintiffs] the benefit of all reasonable inferences." *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018).  To survive the motion to dismiss, Plaintiffs need only allege facts that, favorably construed, state a "plausible claim for relief." *Banneker*, 798 F.3d at 1129.

As explained below, the Amended Complaint satisfies that test.  But rather than engage with Plaintiffs' allegations as pleaded, Defendants devote large parts of their brief to their own competing factual narrative divorced from – and often at odds with – Plaintiffs' well-pleaded facts. *See, e.g.*, Mem. at 1-3, 5-21, 26-35, 37-48.  Moreover, Defendants try to support that narrative (at 5 n.1) not with affidavits or other admissible evidence, but with 1,021 pages of Internet research (and a few book chapters) excerpted from a patchwork of 93 different secondary sources.  Defendants make no attempt to provide a "sponsoring witness[]" for any of their document excerpts. *United States v. AT&T Inc.*, 2018 WL 2930849, at *19 (D.D.C. June 12, 2018) (Leon, J).  Rather, they ask the Court (at 5 n.1) to accept on faith that everything in their excerpts is true, so that it can draw contested factual inferences in their favor.

That is not a proper exercise on a motion to dismiss.  A "bulky 'document dump'" is generally a "disfavored (and risky) practice that almost always results in grief for the lawyers or the judge or for anyone else left to swim in a great reservoir of undifferentiated and unfamiliar paper."  *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1253 n.3 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013).  That is especially true here, where neither side has taken discovery. Defendants' reliance on their jumble of research excerpts is a virtual admission that Plaintiffs' claims, as pleaded, should proceed.  *See Hurd v. District of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017) (rejecting extra-pleading "documents supportive of [defendant's] view of potentially disputed issues"); *Wultz*, 755 F. Supp. 2d at 40 (excluding "matters outside the pleadings" on an ATA motion to dismiss raising the political question doctrine and other grounds).[11]

To be sure, the Court should deny Defendants' motion even if it permits their document dump.  But neither of Defendants' justifications (at 5 n.1) for submitting their extra-pleading materials is persuasive.  *First*, those materials are not properly subject to judicial notice.  A "federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Hurd*, 864 F.3d at 686 (quoting Fed. R. Evid. 201(b)).  Many of Defendants' sources – such as undated, obsolete webpages (Def. Exs. 34, 43-44, 49-50), a newspaper article quoting one of the very terrorists whom Defendants bribed (Def. Ex. 88), and a book chapter by a Hezbollah-sympathizing academic (Def. Ex. 89) – self-evidently fail that test.  And in most

---

[11] *See also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) (rejecting as improper on a "motion to dismiss" an invitation to use "judicial notice" to "make factual determinations" on disputed issues); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 509 (E.D.N.Y. 2012) ("At the Rule 12 stage the court has virtually no factual record, and the exercise of judicial notice in a case like [this ATA] one is not acceptable."); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 575 n.2 (E.D.N.Y. 2005) (similar).

cases, Defendants seek judicial notice merely because their excerpt is from a document that some government agency supposedly authored (but for which they offer no sponsoring witness).  That is not a proper basis for assuming the truth of contested facts on a motion to dismiss.[12]

*Second*, Defendants misuse (at 5 n.1) the incorporation-by-reference doctrine.  When a plaintiff cites only part of a document to support a discrete allegation, courts should not "treat the entire document as incorporated into the complaint."  *Banneker*, 798 F.3d at 1133.  By submitting Exhibits 3-19 – mostly for points unrelated to Plaintiffs' citations – Defendants wrongly assume that Plaintiffs' citation to a source requires the Court to "adopt every word" of the source "as true."  *Id.*  The Court should reject that attempt to smuggle contested facts into a motion to dismiss.  *See id*.; *Domestic Airline*, 221 F. Supp. 3d at 70 (declining to incorporate entirety of documents "merely cited as the source of certain factual allegations").

Those principles apply to the Rule 12(b)(1) arguments as well.  When a fact-heavy jurisdictional argument implicates the merits, courts should not "rul[e] on a Rule 12(b)(1) motion . . . before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992).  Here, Defendants make fact-intensive arguments about Iraq – many of which overlap with the merits of Plaintiffs' claims – based on untested secondary sources.  Using such materials to find jurisdictional facts at this stage would "short-circuit the factual development and adjudicative process to which [Plaintiffs are] entitled."  *Hale v. United States*, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).[13]

---

[12] *See Domestic Airline*, 221 F. Supp. 3d at 71-72 (declining to use "government" records to "counter the factual allegations underlying Plaintiffs' claim"); *Hunt v. Rodriguez*, 2009 WL 173070, at *3 (E.D. Cal. Jan. 26, 2009) ("judicial notice is not a vehicle" for accepting "the facts in every governmental record"); *see also Hurd*, 864 F.3d at 686-87.

[13] That is particularly true because Defendants make no attempt to proffer "sponsoring witnesses" for their documents.  *AT&T*, 2018 WL 2930849, at *19.  Defendants thus provide no basis for the Court to determine whether any given excerpt was authored by a percipient

## II.    THE POLITICAL QUESTION DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants' lead argument (at 26-35) under the political question doctrine asserts that Plaintiffs' claims impinge on the political branches' foreign-policy prerogatives.  That argument is legally and factually flawed.  Most fundamentally, it ignores that the political branches (through the ATA) have expressly authorized private lawsuits like this one.  It also rests on an incorrect factual premise.  Simply put, the U.S. government did not encourage companies to make corrupt payments to the Jaysh al-Mahdi terrorists who controlled the Ministry.  For that reason, Plaintiffs' claims do not contradict any U.S. foreign policy determination.

### A.    The Amended Complaint Raises Justiciable Legal Questions About A Federal Statute And Traditional Tort Law

The federal judiciary "has a responsibility to decide cases properly before it, even those it would gladly avoid."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012).  The political question doctrine represents a "narrow exception to that rule," *id.* at 195, under which there are six factors that tend to identify a nonjusticiable political question.[14]  In applying those factors, courts generally hold that the political question doctrine "bars [their] jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable

---

government witness on the ground in Iraq, or instead by some low-level bureaucrat in Washington.  Lacking such context, Defendants' excerpts can readily "be misunderstood or selectively cited" and so are entitled to no weight at this stage.  *Id.*

[14] Those factors are:  "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  *Baker v. Carr*, 369 U.S. 186, 217 (1962); *see* Mem. at 25-26 n.65.

standards for resolving it.'"  *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  Unless such an issue is "inextricable from the case at bar, there should be no dismissal." *Baker*, 369 U.S. at 217.

Defendants cite no case (and Plaintiffs are aware of none) dismissing any ATA lawsuit under the political question doctrine.  This case should not be the first, because Plaintiffs' ATA claims simply ask the Court to interpret and apply a federal statute to Defendants' private conduct.  *See* AC ¶¶ 1154-94 (citing 18 U.S.C. § 2333).  Interpreting a statute is a "recurring and accepted task for the federal courts," even when it has "significant political overtones." *Japan Whaling Ass'n. v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Here, the existence of a federal statute expressly authorizing Plaintiffs' claims is decisive.  Whatever the merits of Defendants' efforts (at 26-35) to tie the facts of this case to U.S. foreign policy, "Congress explicitly committed these issues to the federal courts under the ATA." *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6 (D.D.C. 2005).  The Court can thus apply the statutory criteria Congress established in the ATA "without 'expressing lack of the respect due coordinate branches of government.'" *Id.* (quoting *Baker*, 369 U.S. at 217).[15]

Courts routinely hold that similar lawsuits under the ATA are justiciable.[16]  They do so because ATA lawsuits are "tort suit[s] brought under a legislative scheme that Congress enacted

---

[15] The same holds true for Plaintiffs' state-law claims.  *See* AC ¶¶ 1195-227.  Those claims turn on traditional tort-law principles this Court is well-equipped to apply.  *See Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 354 (D.C. Cir. 2007) ("tort suit[s]" are "constitutionally committed to the judiciary"); *Lane v. Halliburton*, 529 F.3d 548, 560 (5th Cir. 2008) (in an "ordinary tort suit, the textual commitment factor actually weighs in favor of resolution by the judiciary").

[16] *See Gill*, 893 F. Supp. 2d at 520 (rejecting political-question argument because "ATA suits are expressly authorized by Congress"); *see also Wultz*, 755 F. Supp. 2d at 25-27; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 295 n.45 (E.D.N.Y. 2007); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96, 99-100 (D.D.C. 2006); *Biton*, 412 F. Supp. 2d at 5-6; *Ungar v.*

for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism." *Ungar*, 402 F.3d at 280.  Courts also often adjudicate ATA cases despite asserted implications for U.S. foreign policy.  For example, courts have sustained claims against:  the Palestine Liberation Organization for supporting attacks in the Gaza Strip, *see Biton*, 412 F. Supp. 2d at 5-6; a Chinese state-owned bank for funding a bombing in Tel Aviv, *see Wultz*, 755 F. Supp. 2d at 19, 25-27; and a Jordanian bank for maintaining accounts for Hamas, *Almog*, 471 F. Supp. 2d at 295 n.45.  Those cases all had "political overtones," and some even touched on issues as sensitive as the "Israeli-Palestinian conflict."  *Ungar*, 402 F.3d at 281.  But the ATA's statutory scheme made all of them justiciable, and it has the same effect here.

Congress's judgment that federal courts should entertain meritorious ATA lawsuits confirms that no *Baker* factor (*supra* note 14) is present in this case.  With respect to the first two factors, Congress has textually committed ATA suits to federal courts, *see* 18 U.S.C. § 2338, and the statute itself arms courts with "judicially discoverable and manageable standards," *Baker*, 369 U.S. at 217.  This Court need only apply the criteria Congress has supplied to determine whether Defendants' support for Jaysh al-Mahdi met the statutory definition of "international terrorism," 18 U.S.C. § 2333(a), or whether they "aid[ed] and abet[ted]" such terrorism, *id.* § 2333(d).  That is a quintessentially proper role for a court.  *See Zivotofsky*, 566 U.S. at 196 ("enforc[ing] a specific statutory right" is a "familiar judicial exercise"); *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 388 (3d Cir. 2006) (similar).[17]

_____

*Palestine Liberation Org.*, 402 F.3d 274, 280-82 (1st Cir. 2005); *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 448 (S.D.N.Y. 2004).

[17] Notably, the two cases on which Defendants most heavily rely (at 29-31) did not concern a statutory private right of action, but instead addressed claims under the Alien Tort Statute.  *See Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 545 (9th Cir. 2014) (per curiam); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007).  As the Supreme Court recently held, the

As for the final four *Baker* factors, the "initial policy determination involved here has already been made by the U.S. Congress":  that Americans "injured by terrorist acts" should be able to sue under the ATA.  *Biton*, 412 F. Supp. 2d at 6.  Allowing this case to proceed therefore does not second-guess the political branches; it effectuates the judgment they expressed in a federal statute.  *See id.*  In fact, the ATA itself contains several *statutory* protections to prevent intrusions into foreign-policy decision-making, including one immunizing government officials from suit.  *See* 18 U.S.C. § 2337; *see also id.* § 2336(b)-(c) (authorizing stay on "national security" grounds).  But Defendants ask (at 28) the Court to ignore that statute and instead conduct its own free-floating inquiry into whether "[a]pplying Plaintiffs' logic" might raise questions about "U.S. policy" decisions supposedly reflected in Defendants' extra-pleading materials.  That argument – asking a court to hold, based solely on a litigant's online research, that U.S. foreign policy bars a claim expressly authorized by Congress – would flout the very separation-of-powers principles Defendants claim to promote.  A far better way to respect the political branches is to follow and apply the statute Congress wrote.

### B.   Defendants Have Identified No U.S. Government Policy Towards The Ministry That Renders Plaintiffs' Claims Nonjusticiable

#### 1.   Plaintiffs' claims do not require this Court to pass judgment on U.S. policy toward the Ministry

Although the ATA alone is dispositive, Plaintiffs' claims also do not require the Court to opine on U.S. foreign policy.  To resolve those claims, the Court need only determine whether *Defendants'* conduct – transactions executed by *private* companies – violated the ATA.  Nothing about that task requires the Court to pass judgment on U.S. policy in Iraq.  This case is thus like

---

Alien Tort Statute – unlike the ATA – does not even authorize lawsuits against private companies.  *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403-05 (2018).

most lawsuits involving "private defendants": though it may indirectly relate to Executive

Branch decisions, it remains justiciable because it does not challenge those decisions. *McMahon*

*v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1319-20 (M.D. Fla. 2006) (dismissal

warranted in "exceedingly small" number of such cases), *aff'd* 502 F.3d 1331 (11th Cir. 2007).[18]

      Defendants nonetheless try (at 29) to inject political questions into this case by arguing

that, if they funded terrorists through the Ministry, it "necessarily follow[s]" that the United

States did too. That is incorrect, *see infra* Part II.B.2-3, but in any event poses no political

question that is "inextricable from the case at bar," *Baker*, 369 U.S. at 217. Plaintiffs' claims

concern historical *facts* about Defendants' corrupt transactions with the Ministry and about

whether those transactions financed Jaysh al-Mahdi. AC ¶¶ 114-87. The Court can answer those

factual questions without opining about U.S. policy. At best, Defendants have shown (at 31-32)

that Plaintiffs' legal theory "implicates" U.S. policy in the sense that it might logically

"extend[]" to things Defendants say the U.S. government did. But any such implications – which

appear nowhere in the Amended Complaint[19] – are "extricable from the resolution of plaintiffs'

claims" and so provide no basis for dismissal. *Wultz*, 755 F. Supp. 2d at 26.

      The Ninth Circuit's *Corrie* decision (*supra* note 17), on which Defendants rely heavily

(at 31, 35), provides a useful contrast. There, the plaintiffs sued Caterpillar for selling bulldozers

to the Israeli Defense Forces ("IDF") in violation of "international law." *Corrie,* 503 F.3d at

---

[18] *See Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs. Inc.*, 853 F.3d 173, 181
(5th Cir. 2017) (private defendants face "double burden": first to show that claims "require
reexamination of a decision by the Government," then to show decision "is insulated from
judicial review"); *Hourani*, 796 F.3d at 8-9 (rejecting political-question argument by "private
parties" facing "private civil liability"); *Exxon*, 473 F.3d at 355 (district court did not clearly err
in holding justiciable "claims by a private party against a private United States corporation").

[19] Defendants argue (at 29 & n.75, 33 n.78) that one article Plaintiffs cite criticizes the U.S.
government, but Plaintiffs do not rely on that part of the article, AC ¶¶ 80, 173, which poses no
political question that is "inextricable from the case at bar," *Baker*, 369 U.S. at 217.

977-79.  But the U.S. "government paid for every bulldozer that Caterpillar transferred to the IDF," and it had specifically "approved and financed all contracts between Israel and Caterpillar."  *Id*. at 978.  "The decisive factor" making those claims nonjusticiable was "that Caterpillar's sales to Israel were paid for by the United States" as military aid to Israel.  *Id*. at 982.  In that way, "the United States [was] a direct actor" in the allegedly unlawful conduct.  *Id*. at 983 n.8.  This case is very different:  Defendants' transactions were funded by a terrorist-run Ministry and involved corrupt sales that no U.S. official ever approved, let alone paid for.  *See Cooper v. Tokyo Elec. Power Co.*, 166 F. Supp. 3d 1103, 1123 (S.D. Cal. 2015) (distinguishing *Corrie* as involving sales the U.S. "approved and paid for"), *aff'd*, 860 F.3d 1193 (9th Cir. 2017).

### 2.     Defendants' corrupt conduct undermined U.S. foreign policy

Defendants' argument also fails because their conduct undermined U.S. foreign policy.  AC ¶¶ 76, 113, 172.  Plaintiffs claim that Defendants violated the ATA mainly by making corrupt payments to Ministry officials:  Plaintiffs identify those payments in detail, *id*. ¶¶ 188-332; describe how Defendants structured their transactions to benefit Jaysh al-Mahdi members in the Ministry, *id*. ¶¶ 105-11, 132-39; and explain that corrupt contracting practices went hand-in-hand with Jaysh al-Mahdi's terrorist control over the Ministry, *id*. ¶¶ 112-13, 165-79.  Any suggestion that the U.S. government endorsed such practices – which violated both Iraqi and U.S. law, including the FCPA – is absurd on its face.  Indeed, Defendants' sources state that the United States publicly called Iraqi corruption a "second insurgency" that created a "compelling need for . . . reforms."[20]  Holding Defendants liable for contributing to that corruption comports with the foreign-policy judgments reflected in their own materials.  AC ¶¶ 105-13, 165-78.

---

[20] SIGIR, *Quarterly Report to the United States Congress* 8 (Oct. 30, 2008) (Pl. Ex. 3; full version of Def. Ex. 33); *see also, e.g.*, USAID, *Iraq Private Sector Growth & Employment Generation:  Pharmaceutical & Medical Products in Iraq* §§ 6.5.1.1, 7.5 (Apr. 17, 2007) (Pl. Ex. 4; full version of Def. Ex. 5) ("*2007 USAID Report*") (observing that "the system of control of

Recognizing that problem, Defendants do not contend (nor do they cite any source contending) that the U.S. government supported corrupt transactions with the Ministry. Rather, they try to divert attention (at 31-32) from their corruption by zeroing in on a single paragraph where Plaintiffs allege that the "causal nexus" to terrorism was "not limited" to "FCPA violations." AC ¶ 179. Even if Defendants' criticisms of that paragraph were correct, *but see infra* Part II.B.3, the solution would be to disregard that one allegation rather than to dismiss Plaintiffs' claims wholesale.[21] After all, the same paragraph alleges that "Defendants' corrupt payments to Jaysh al-Mahdi members inside [the Ministry] provided especially valuable assistance for Jaysh al-Mahdi," AC ¶ 179, and Plaintiffs' allegations focus on the unique nexus between corrupt payments and terrorism, *id.* ¶¶ 188-332. All else aside, Defendants' off-book, corrupt payments were far easier for Jaysh al-Mahdi to monetize than ordinary commercial transactions would have been. *Id.* ¶¶ 132, 142-45, 179; *see Abecassis I*, 785 F. Supp. 2d at 649 (explaining similar concept under Oil-For-Food). Plaintiffs' claims based on such payments do not contradict any foreign-policy judgment. *See Wultz*, 755 F. Supp. 2d at 26.

Defendants' reliance (at 30) on *Saldana* is misplaced. There, the Ninth Circuit affirmed the dismissal of Alien Tort Statute claims against a company that funded (without corruption) a Colombian Army Brigade. 774 F.3d at 545. The court held those claims nonjusticiable because the "United States provided much greater funding to the [same] Brigade at the same time and for the same purpose." *Id.* at 552. Given that the challenged conduct mirrored U.S. government aid

---

the pharmaceutical distribution chain has collapsed"; also identifying "bribery, corruption, [and] protection rackets" as key "[t]hreats" to Iraqi healthcare).

   [21] *See Cooper*, 166 F. Supp. 3d at 1124 (remedy for "Court's justiciability concerns" was to "omit[] [the offending] allegations" and to narrow the "theory of the case"); *Wultz*, 755 F. Supp. 2d at 26 ("Because the Court will not consider them, there is no concern that [the two allegations defendants criticize] will raise a political question to be decided by the Court.").

in virtually every respect, the court found "no principled way to sever [defendant's] funding from that of the United States." *Id.* Here, Defendants' conduct is easy to "sever":  whereas the United States tried (unsuccessfully) to stamp out corruption at the Ministry, Defendants exacerbated it by bribing the Jaysh al-Mahdi members who controlled their contracts, AC ¶¶ 105-64.  As that demonstrates, Defendants did not make their corrupt payments "at the same time and for the same purpose as the United States." *Saldana*, 774 F.3d at 554.

### 3.   The U.S. government did not make a foreign policy judgment that Defendants should transact with Kimadia

Corruption aside, Defendants also have failed to identify any U.S. foreign-policy judgment supporting their commercial sales to the terrorist-controlled Ministry.  AC ¶ 179.  The U.S. government opposed Jaysh al-Mahdi's takeover of the Ministry, *id.* ¶¶ 63-104:  a 2006 analysis prepared by the U.S. Embassy in Baghdad warned that the Ministry was "openly under the control of the Mehdi Army of Muktad al-Sadr," *id.* ¶ 79; multiple State Department officials testified that Jaysh al-Mahdi was illegally raising money through corruption at the Ministry, *id.* ¶¶ 108, 172; and Coalition forces arrested the Deputy Health Minister (a Jaysh al-Mahdi commander) in February 2007 because he had, as General Petraeus put it, "effectively hijacked the Ministry of Health," *id.* ¶¶ 93-94.  None of Defendants' sources refutes those allegations.  In fact, Defendants offer no evidence at all – let alone any authoritative statement from the U.S. government – denying that Jaysh al-Mahdi commandeered the Ministry during the relevant timeframe.  Lacking such evidence, Defendants' assertion that the U.S. government blessed their sales to a Ministry that had been "effectively hijacked" by terrorists is implausible.[22]

_____

[22] Nor do Plaintiffs' claims contradict the President's "de-designat[ion of] Iraq as a state sponsor of terrorism."  Mem. at 30 (citing Waiver of Section 1083 of the National Defense Authorization Act for Fiscal Year 2008, 73 Fed. Reg. 6,571 (Jan. 28, 2008)).  That decision, which was not specific to the Ministry or Kimadia, broadly exempted the Iraqi government from

Defendants nonetheless insist (at 29) that the "United States expressly encouraged companies to sell and to donate to the Ministry millions of dollars' worth of medicines and medical supplies." That is factually untrue, *see* AC ¶¶ 76, 113, and Defendants offer no evidence to back up their assertion. The two main sources Defendants cite (at 11-12 nn.29-32) are unauthenticated *WikiLeaks* cables offering only unverified double hearsay about what was said at a pair of meetings 15 years ago. *See* Def. Exs. 90-91; *infra* note 31. Such materials do not provide a reliable basis for finding jurisdictional facts at this stage.[23] Moreover, both cables were written roughly a year before Jaysh al-Mahdi effected its takeover of the Ministry and so shed no light on whether the U.S. government supported the transactions at issue here. AC ¶ 104. As for the rest of Defendants' sources, they mostly concern infrastructure or public-health projects that had little to do with Defendants' commercial sales;[24] describe direct U.S. government (or U.N.-funded) contracts with suppliers that bypassed the terrorist-run procurement process Defendants used;[25] or contain broad information about (or links to) basic

---

lawsuits under the Foreign Sovereign Immunities Act ("FSIA"). *See* 73 Fed. Reg. at 6,571. It did not encourage companies to transact with any Iraqi ministry in a way that funded terrorism.

[23] *See Cause of Action Inst. v. Tillerson*, 285 F. Supp. 3d 201, 208 n.6 (D.D.C. 2018) (noting that "admissibility – and a focus on reliability – should guide [courts] in assessing whether to rely on evidence outside of the pleadings" on a Rule 12(b)(1) motion); *Bryant v. Yosemite Falls Café, Inc.*, 2018 WL 372704, at *3 (E.D. Cal. Jan. 11, 2018) (refusing to consider a defendant's "inadmissible hearsay" on a Rule 12(b)(1) motion).

[24] *See* Def. Ex. 22 at 33 (U.S. "largely focused on improving the physical infrastructure"); *see also* Def. Ex. 24 at 6, Def. Ex. 27 at 5, Def. Ex. 28 at 3-6, Def. Ex. 30 at 93-96, Def. Ex. 31 at § VI, Def. Ex. 32 at 9-12, Def. Ex. 36 at 5-7, Def. Ex. 37 at 110-11, Def. Ex. 58 at 91-94; U.S. State Dep't, *Quarterly Update to Congress: 2207 Report* I-92–I-94 (Apr. 2006) (Pl. Ex. 5; full version of Def. Ex. 29); *id.* at I-45 ("supporting" fight against "corrupt government officials").

[25] *See* SIGIR, *The Year of Transition Enters the Iraqi Fourth Quarter* 77 (Oct. 30, 2006) (Pl. Ex. 6; full version of Def. Ex. 46) (noting Army Corps of Engineers' "direct role in management oversight"); Def. Ex. 29 at 3-4 ("direct contracts"); Def. Ex. 30 at 98 (using "U.S. government-controlled warehouse" in light of "corruption" concerns with Kimadia); *see also* Def. Ex. 23 at 7, Def. Ex. 25 at 10, Def. Ex. 26 at 5, Def. Ex. 41 at 2, Def. Ex. 45 at 12, Def. Ex. 46 at 12.

Iraqi government procedures, *see* Def. Exs. 4, 40-44.  None shows that the U.S. government encouraged Defendants to funnel resources to the terrorists who ran the Ministry.

The *2007 USAID Report* that Defendants cite repeatedly (at 13-14, 29) reinforces the point.  Defendants attach a 13-page excerpt (Def. Ex. 5) of that 61-page report (Pl. Ex. 4) and characterize it (Mem. at 14) as "encourag[ing] companies to transact" with "the Ministry and Kimadia."  That argument well illustrates the perils of relying on Defendants' document snippets to find facts on a motion to dismiss.  In reality, the full report stated that the Ministry's "regulatory enforcement regime has failed"; that its "pharmaceutical distribution chain has collapsed"; that the "process through which non-domestic suppliers bid for tender . . . is open to abuse"; and that the "[Ministry of Health], and in particular, its[] operating subsidiary known as *Kimadia should be thoroughly restructured [and] its functions [should] be restricted*."  Pl. Ex. 4 §§ 1.5, 6.5.1.1, 7.2, 8.2.6 (emphasis added).  Nowhere did USAID encourage foreign suppliers to sell into Kimadia's broken procurement system.  On the contrary:  the report concluded (at §§ 1.8, 8.1) that a "pre-requisite" for foreign investment in the Ministry was the "creation of appropriate privatisation and restructuring mechanisms" to curtail corruption.

Defendants' assertions (at 26-27) about the "U.S. Government's financial support to the Ministry" are similarly flawed.  Many of their sources describe U.S. efforts to supply the Ministry in 2003 or early 2004 – in the aftermath of the invasion – when the United States or its handpicked Iraqi successors still ran the Ministry.  AC ¶ 54.[26]  Such efforts say nothing about U.S. foreign policy toward the Ministry after Jaysh al-Mahdi later captured it.  AC ¶¶ 63-104.

---

[26] *See* Mem. at 8 & nn.9-12; Def. Exs. 3, 38, 90-91.  Defendants also attach tangential exhibits discussing the Ministry in 2009 or later – when Jaysh al-Mahdi's control had begun to wane, AC ¶ 104, and when Defendants' sources state that "reforms in MOH procurement and contracting were still needed," Def. Ex. 92 at 3; *see* Def. Ex. 4 (2013 document), Def. Ex. 33 at 85 (discussing 2009-2013 Strategic Plan), Def. Exs. 35, 48-50 (2009 documents).

Moreover, Defendants repeatedly conflate U.S. spending on the *Iraqi health sector* with funding for the *Ministry* itself.[27]  The United States undoubtedly spent money on the former.  But it is one thing for the U.S. government to directly fund infrastructure projects subject to oversight and anti-corruption safeguards; it is quite another for Defendants to structure their sales contracts to facilitate Jaysh al-Mahdi's ability to monetize their goods on the black market.  AC ¶¶ 113, 117, 132.[28]  Defendants cannot credibly claim that the latter served U.S. foreign policy interests.

Finally, Defendants' materials (even if read in their favor) do not support dismissal because they contain no "authoritative expression of Executive interest" in Plaintiffs' claims. *Gross*, 456 F.3d at 384.  Many are weekly USAID "update" newsletters (author and reliability unknown) that Defendants downloaded from a non-U.S.-government website;[29] several are now-defunct webpages of unknown provenance that Defendants dredged up through the "Internet Archive Wayback Machine";[30] and a few are *WikiLeaks* cables reciting multiple layers of hearsay.[31]  Three others even say on their face that they "do not necessarily reflect the views of

---

[27] *Compare, e.g.*, Emergency Suppl. Appropriations Act for Defense & for the Reconstruction of Iraq & Afghanistan, 2004, Pub. L. No. 108-106, 117 Stat. 1209 (2003) (allocating "$793,000,000 for health care"), *with* Mem. at 7 & n.5 (mischaracterizing that appropriation as going entirely to "fund and support the Ministry").

[28] Almost none of Defendants' sources suggests that the United States used Kimadia for distribution.  *See* Def. Ex. 14 at 5 ("Kimadia is a serious problem").  The one exception – which should not be assumed true – does not suggest that U.S.-funded goods were actually diverted. *See* Def. Ex. 28 at 57 (noting plans for "installation and training of specified equipment with the vendors, Kimadia and the designated hospitals"); *see also* Def. Ex. 22 at 34 (noting "revised distribution plan" given Ministry's "limited capacity" to "distribute large shipments"); AC ¶ 113.

[29] Def. Exs. 23-27, 51, 57; *see also* Def. Ex. 36 (anonymous USAID "fact sheet").

[30] Def. Exs. 34, 43-44.  The Internet Archive Wayback Machine is a free tool for retrieving archived versions of webpages that no longer exist.  *See* http://web.archive.org/.

[31] Def. Exs. 14, 90-92.  Hearsay is not a reliable basis for finding jurisdictional facts in Defendants' favor.  *See supra* note 23.  By contrast, because Plaintiffs seek merely to proceed to discovery (rather than asking the Court to find facts), they are permitted to rely on hearsay to support their allegations at this stage.  *See, e.g.*, *Murray v. Amalgamated Transit Union*, 206 F.

[USAID] or the United States Government,"[32] while two more contain disclaimers denying any "endorsement . . . by the U.S. Department of Commerce" of the information Defendants cite, Def. Exs. 43, 44. Such materials are not "authoritative" expressions of U.S. policy that deprive the Court of jurisdiction. *Gross*, 456 F.3d at 384; *see Lev v. Arab Bank, PLC*, 2010 WL 623636, at *4 (E.D.N.Y. Jan. 29, 2010) (rejecting political-question-doctrine argument that "rest[ed] on selectively-chosen and mischaracterized comments by a few government officials").[33]

### C.    Plaintiffs' Claims Do Not Contradict Any U.S. Foreign Policy Judgment About Jaysh al-Mahdi

Defendants' effort (at 33-35) to invent a conflict between Plaintiffs' claims and U.S. policy toward Jaysh al-Mahdi is even less persuasive. To resolve Plaintiffs' claims, the Court need only determine whether the Jaysh al-Mahdi conduct that injured Plaintiffs (or Defendants' conduct in funding Jaysh al-Mahdi) met the *statutory* definition of "international terrorism." 18 U.S.C. §§ 2331(1), 2333(a), 2333(d). The Court can answer that statutory question without wading into the broader policy issues about the Sadrists that Defendants raise. AC ¶ 355.

Defendants assert (at 34) that Plaintiffs' claims "contradict[]" the Executive Branch's decision not to designate Jaysh al-Mahdi as an FTO. But Plaintiffs do not allege that the Executive Branch should have designated Jaysh al-Mahdi as an FTO; they expressly disclaim any such allegation. AC ¶ 355; *see Kuwait Pearls*, 853 F.3d at 183-84 (claims against military

---

Supp. 3d 202, 207 (D.D.C. 2016) (plaintiffs are "not limited to evidence that meets the standards of admissibility" in opposing a jurisdictional motion to dismiss).

[32] Def. Exs. 5 at 2, 32 at 3; *see also* USAID, *The USAID-TIJARA Provincial Economic Growth Program: Investor Guide of Baghdad* at 3 of PDF (Nov. 2011) (Pl. Ex. 7; full version of Def. Ex. 47) (disclaimer cover page).

[33] Even the official-looking reports discuss the health sector only briefly as part of a broader, high-level survey of U.S. reconstruction. *See* Pl. Exs. 3, 5 (examples of full reports); *see also* Def. Exs. 28-30, 33, 35, 37, 48, 58. Such surveys offer no specific judgment about whether Defendants should have sold to the Ministry. *See Exxon*, 473 F.3d at 354 (no political question where Executive failed to express an "unqualified opinion that [the] suit must be dismissed").

contractor were justiciable where plaintiff "ha[d] represented to the court it will not be

challenging or questioning the Government's conduct").  The ATA's plain text, meanwhile,

contemplates terrorist attacks by non-FTOs.  *See* 18 U.S.C. § 2333(d)(2) (referring to acts

"committed, *planned, or authorized*" by FTO) (emphasis added); *id.* §§ 2339A, 2339C (criminal

liability for funding non-FTO terrorists); *see also Ahmad v. Christian Friends of Israeli

Communities*, 2014 WL 1796322, at *3 (S.D.N.Y. May 5, 2014) ("In order to trigger liability

under the ATA, the recipient of a defendant's support need not be a designated foreign terrorist

organization.").  The Court can thus find for Plaintiffs without second-guessing – or even saying

anything about – the wisdom of Jaysh al-Mahdi's non-designation.

The Executive Branch declined to designate Jaysh al-Mahdi as an FTO to preserve its

own diplomatic ability to engage with the Sadrists when necessary.  AC ¶ 355.  At the same

time, Jaysh al-Mahdi engaged in conduct that the U.S. government strongly opposed and that

met the ATA's definition of "international terrorism."  *Id.* ¶¶ 333-54.  The two are not mutually

exclusive.  *Id.* ¶ 355.  And as the D.C. Circuit has held, whether a group's conduct meets the

statutory definition of "terrorist activity" – even in the context of a direct challenge to an FTO

designation – raises a "justiciable legal challenge."  *Ralls Corp. v. Comm. on Foreign Inv. in

U.S.,* 758 F.3d 296, 313 (D.C. Cir. 2014).  That holding forecloses Defendants' position here.

Nor do Plaintiffs' claims require the Court to "second-guess[] the Executive's judgment

about how to engage" with the Sadrists.  Mem. at 34.  Because Plaintiffs need only prove a

violation of the ATA, any broader questions about U.S. strategy for dealing with the Sadrists are

peripheral at best.  *See supra* Part II.A.  At any rate, Plaintiffs also allege that Defendants'

conduct undermined U.S. strategy for dealing with the Sadrists.  AC ¶ 356.  Although occasional

political dialogue was part of the approach, U.S. policy focused first and foremost on degrading

Jaysh al-Mahdi's terrorist capabilities – which required choking off its supply of money.  *Id.*
Defendants' conduct frustrated those efforts.  *Id.* ¶¶ 165-78, 356.

During the period when Defendants say (at 33-35) the United States was focused on
"work[ing] with the Sadrists," the U.S. military actually referred to Jaysh al-Mahdi as a "terrorist
organization" and "terrorists," AC ¶ 347; sustained heavy losses in a bloody campaign to prevent
Jaysh al-Mahdi from terrorizing civilians in the Green Zone, *id.* ¶ 345; and warned that Jaysh al-
Mahdi had "replaced al-Qaeda in Iraq as the most dangerous accelerant of potentially self-
sustaining sectarian violence in Iraq," *id.* ¶ 348 & n.294.  Defendants' narrative about political
reconciliation ignores those allegations.  It also elides Jaysh al-Mahdi's founding purpose:  to
drive the United States out of Iraq by inflicting mass casualties on American soldiers and
civilians alike.  *Id.* ¶¶ 56-62, 333-46, 408.  This Court can hold Defendants accountable for
funding those efforts without impugning any U.S. foreign policy decision.[34]

## III.    THE ACT-OF-WAR DEFENSE DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants next argue (at 35-48) that the ATA bars Plaintiffs' claims because Jaysh al-
Mahdi was a "military force[]" engaged in lawful "[a]ct[s] of war" against the United States.  18
U.S.C. §§ 2331(4)(C), 2336(a).  At the outset, the "act of war exception" raises questions "best
addressed on a motion for summary judgment or at trial."  *Gill*, 893 F. Supp. 2d at 510.  The
Amended Complaint alleges an array of facts raising a plausible inference that Jaysh al-Mahdi

---

[34] General Petraeus's reference (Mem. at 60) to "the right of mainstream JAM to participate
in the political process," Def. Ex. 52 at 109, does not support Defendants' position.  Whatever
the proper treatment of so-called "mainstream JAM" (whose meaning is unclear from
Defendants' source), the terrorists who hijacked the Ministry were "extremist JAM members"
whom the United States opposed.  *Id.*; *see* AC ¶¶ 76-104.  Defendants' reliance (at 33) on
alleged "ceasefire agreements" is similarly misplaced because such "agreements" rarely held,
AC ¶¶ 333-45, and because Defendants' conduct made such agreements less likely by decreasing
the Sadrists' motivation to engage in political dialogue, *id.* ¶ 356.

was a criminal terrorist group rather than a military force committing acts of war.  AC ¶¶ 55,

347-56, 409-10.  Defendants' attempt (at 37-42) to rebut those allegations – through a mishmash

of factual assertions, legal treatises, and international-law principles, *see* Def. Exs. 62-86, 93-95

– is premature at this stage.  *See Gill*, 893 F. Supp. 2d at 510 (deferring until summary judgment

consideration of "legal and factual questions" raised by act-of-war defense).[35]

      But if this Court is inclined to resolve Defendants' arguments now, it should reject them.

An "act of war" is an act occurring "in the course of" (1) a "declared war," (2) an "armed

conflict, whether or not war has been declared, between two or more nations," or (3) an "armed

conflict between military forces of any origin."  18 U.S.C. § 2331(4).  Defendants do not argue

that this case implicates the first two prongs, and their attempt to squeeze Jaysh al-Mahdi's

conduct into the third prong conflicts with the ATA's text and purpose.

### A.    Jaysh al-Mahdi Was Not A "Military Force"

#### 1.    Jaysh al-Mahdi consistently violated the laws of war

      The ATA's act-of-war defense does not extend to non-state actors like Jaysh al-Mahdi

that act in total disregard of the laws of war.  That defense, as is evident from its first two prongs,

is aimed primarily at national armies.  *See* 18 U.S.C. § 2331(4)(A)-(B).  In cases that do not

involve such armies, Congress used the term "military forces," *id*. § 2331(4)(C), to cabin the act-

of-war defense to other legitimate armed groups that substantially comply with the laws of war.

The adjective "military" ordinarily pertains "to the *methods and customs of war* or of organized

---

[35] Defendants are incorrect (at 35 n.83) that the act-of-war bar is jurisdictional.  *See Gill*, 893
F. Supp. 2d at 508 ("affirmative defense").  Had Congress intended the bar to be jurisdictional, it
would have said so expressly.  *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 155 (2013)
(adopting "bright line" rule turning on whether "Congress has clearly stated that the rule is
jurisdictional").  *Florida Bankers Association v. United States Department of the Treasury*, 799
F.3d 1065 (D.C. Cir. 2015) (cited in Mem. at 35 n.83), is inapt because it recited pre-*Auburn
Medical* law that "carrie[d] no practical significance for [that] case."  799 F.3d at 1067 n.1.

fighting men," as in military "discipline." Webster's Third New Int'l. Dict. Unabridged 1433

(3d ed. 2002) ("*Webster's Third*") (emphasis added).  Consistent with that plain meaning, the

D.C. Circuit has upheld a jury instruction (concerning an "obedience to military orders" defense)

that groups "must conduct their operations in accordance with the laws and customs of war to

qualify as military organizations."  *United States v. Yunis*, 924 F.2d 1086, 1098 (D.C. Cir. 1991).

That definition – which "track[s] language found in . . . the Geneva Convention and . . . the

Hague Convention," *id*. – applies to the ATA.  Indeed, as one of the cases Defendants cite (at 42)

concluded, "military forces" under the ATA are limited to groups that "act in substantial

conformity with the laws of war."  *Gill*, 893 F. Supp. 2d at 517.[36]

That principle alone demonstrates that Jaysh al-Mahdi was not a "military force."  Jaysh

al-Mahdi systematically disregarded the laws of war:  it attacked civilians indiscriminately; hid

from U.S. troops in mosques, schools, ambulances, and hospitals; used children to perpetrate

attacks; and engaged in mass sectarian cleansing. AC ¶¶ 13, 350-53.  It worked closely with

Hezbollah, a designated FTO that has orchestrated terrorist attacks against Americans around the

globe.  *Id*. ¶¶ 357-76.  Jaysh al-Mahdi also kidnapped the relatives of several Plaintiffs and then

tortured them, executed them in captivity, and mutilated the bodies.  *Id*. ¶¶ 795-836.  All the

while, its fighters ignored the Geneva Conventions by refusing to carry arms openly or to

distinguish themselves from civilians.  *Id*. ¶ 352.  Those are the criminal acts of a terrorist group,

---

[36] *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013), to the extent it held otherwise, is inapposite because it turned on unique facts absent here.  *See infra* p. 37.  Regardless, *Kaplan* represents a minority viewpoint and expressly departed from the weight of authority on the issue.  *See id*. at 201-02 & nn.9-11 (citing and declining to follow multiple cases limiting the act-of-war bar based on "laws of war").  The Court should follow the majority view rather than *Kaplan*'s outlier one.  If anything, *Kaplan*'s conclusion that *a designated FTO* (there, Hezbollah) was a "military force" just illustrates the illogic of Defendants' position.

not the acts of a "military force."  *See, e.g.*, *Gill*, 893 F. Supp. 2d at 517 (group that "violate[s] the laws of war to any substantial degree" is not "a 'military' force" under the ATA).

The ATA's structure confirms that Congress did not intend to immunize support for such groups.  The ATA distinguishes between unlawful acts of "international terrorism" on the one hand, 18 U.S.C. § 2331(1), and lawful acts of war by "military forces" on the other, *id.* § 2331(4)(C).  Acts of "terrorism" are violations of U.S. criminal law designed to "intimidate or coerce a civilian population" or influence "the policy of a government."  *Id.* § 2331(1).  The goal of a "military force" in a "war," by contrast, is to "vindicate [a government's] rights (principally, its inherent right of self-defense) under international law."  Dep't of Def., Law of War Manual §§ 1.5, 1.5.1 (Dec. 2016) ("*Law of War Manual*").  Congress did not intend significant overlap between the two.  *See Weiss v. Arab Bank, PLC*, 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007).  To the contrary, extending the term "military force" to criminal terrorist groups would "pervert the very purpose of the ATA, which was enacted to deter terrorist activity."  *Id.*

As between "terrorist" and "military," Jaysh al-Mahdi fits only the former category.  Not only did it ignore the laws of war, but its aims were overtly terroristic:  Sadr praised the September 11 attacks as a "miracle from God," encouraged his followers to "terrorize their enemy," and called for a "jihad" against America.  AC ¶¶ 60, 180, 333.  That "jihad" involved widespread criminality, including assassinations of doctors and anti-corruption investigators, looting of public resources, and street crimes.  *Id.* ¶¶ 66, 80, 91, 353.  For those reasons, the U.S. military referred to Jaysh al-Mahdi as a "terrorist organization," and one commander observed it was essentially just a "mob with a lot of weapons."  *Id.* ¶ 347.  Congress did not intend to shelter such a group – or its despicable, illegal attacks on Plaintiffs and their families – under the act-of-war defense.  *See Gill*, 893 F. Supp. 2d at 516-17; *Weiss*, 2007 WL 4565060, at *5-6.

Defendants assert (at 44) that a group that violates the laws of war, though "forfeit[ing] certain legal protections," remains a "'military force' participating in an armed conflict."  But the cases they cite (at 44-45) address only whether an *armed conflict* exists and say nothing about whether such groups are "military forces."[37]  Both must be present for an act-of-war defense; an "armed conflict" is not enough.  *See* 18 U.S.C. § 2331(4)(C).  And as Defendants' cases make clear, Jaysh al-Mahdi – even if participating in an armed conflict – was made up of "[u]nlawful combatants" with no "combatant immunity" under U.S. and international law.  *Hamidullin*, 888 F.3d at 66.  Defendants cite nothing suggesting that Congress intended the ATA to shelter *unlawful* enemy combatants who have forfeited their immunity from suit in U.S. courts.

## 2.  Jaysh al-Mahdi was not associated with any government

Jaysh al-Mahdi also was not a "military force" because it did not belong to any government.  The plain meaning of "military" connotes an association with a government,[38] and the Department of Defense describes "the resort to military force" as the "prerogative of the State."  *Law of War Manual* § 1.11.1.1.  Congress shared the same understanding in enacting the ATA:  it intended to limit the act-of-war defense to "injuries that result from *military action by recognized governments* as opposed to terrorists."  S. Rep. No. 102-342, at 46 (emphasis added); *see* H.R. Rep. No. 102-1040, at 7 (1992) (same).  Jaysh al-Mahdi was nothing of the sort and had

---

[37] *See*, *e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 592-93 (2006); *United States v. Hamidullin*, 888 F.3d 62, 66 (4th Cir. 2018).  The secondary sources Defendants cite (at 44 n.103) are similarly inapposite.  Both concern "armed forces" under international law, Def. Ex. 84 at 13-14, Def. Ex. 85 at 20-22, rather than "military forces" under the ATA.  Moreover, those sources state that unlawful combatants are treated as part of an "armed force" under international law so that such combatants do not benefit from "the more protective legal regime afforded to the civilian population."  Def. Ex. 85 at 24.  That distinction – which *lessens* protections for unlawful combatants – undercuts the suggestion that such combatants merit immunity under the ATA.

[38] *See*, *e.g.*, *Webster's Third* at 1433 ("military" as an adjective describes things "performed or made by armed forces"); *id*. at 119 (defining "armed forces" as "the combined military, naval, and air forces of a nation or a group of nations").

no claim to act on behalf of the Iraqi government.  *See* AC ¶ 348; Def. Ex. 76 at 25 ("the Iraqi government has made repeated calls for [Jaysh al-Mahdi's] disbandment").

True, the act-of-war bar extends beyond conflicts "between two or more nations" to those "between military forces of any origin."  18 U.S.C. § 2331(4)(B), (C).  But the latter clause does not sweep in groups like Jaysh al-Mahdi; it encompasses militaries not belonging to a specific "nation."  That may include militaries associated with non-recognized governments (like Taiwan) or supra-national entities (like NATO), or potentially a military participant in a true "civil war," S. Rep. No. 102-342, at 46 – where each side has a claim to be the legitimate government (and complies with the laws of war) but only one enjoys international recognition.[39] None of those applications helps Defendants here.  Jaysh al-Mahdi had no claim to be the lawful government of Iraq; it instead used terrorism and a mafia-like criminal enterprise to undermine the very government with which the Sadrists were nominally aligned.  AC ¶¶ 80, 144, 347-50. That forecloses Jaysh al-Mahdi from being a "military force" under the ATA.  *See Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006) (non-national group that "systematically uses violent and destructive acts . . . to coerce the United States" is not a "military force").

Those facts also distinguish this case from *Kaplan* (cited in Mem. at 42, 45).  There, Hezbollah's attacks on Israel occurred during a "military conflict that was temporally limited, discrete, waged between Israel and Lebanon over the course of 34 days during the summer of 2006, and provoked by a discrete event."  *Kaplan*, 961 F. Supp. 2d at 203.  For purposes of that discrete conflict – commonly called the "Israel-Lebanon war" – Hezbollah acted as "part of the

---

[39] *See* Lieber Code art. 150 ("Civil war is war between two or more portions of a country or state, each contending for the mastery of the whole, and each claiming to be the legitimate government."); Def. Ex. 54 at § 1.3.6 ("Iraq is far more complex than the term 'civil war' implies"; "defin[ing] the several and diverse sources of violence as civil war [is] not helpful").

Lebanese government." *Id*. at 204.  Based on "the context of this case, and this particular conflict," the court held that Hezbollah acted as a "military force." *Id*.  This case is dissimilar: Jaysh al-Mahdi here did not act as a proxy for the Iraqi government, and its terrorist campaign against the United States – an ally of the Iraqi government – was neither "temporally limited" nor "discrete." *Id*. at 203; *see* AC ¶ 348 (distinguishing the Israel-Lebanon war).  *Kaplan*'s narrow holding, whatever its merits, does not support treating such a group as a "military force."

### 3.  Defendants' arguments for treating Jaysh al-Mahdi as a "military force" are unpersuasive

Rather than reconcile Jaysh al-Mahdi's conduct with the ATA's text and purpose, Defendants' main argument (at 42-45) is that Jaysh al-Mahdi must have been a "military force" because it adopted military jargon and tactics.  But those facts, which apply to virtually every terrorist group,[40] have no bearing on whether Jaysh al-Mahdi was a "military force" under the ATA.  *See Weiss*, 2007 WL 4565060, at *6 ("[t]o describe, in common parlance . . . that the terrorists engage in military or paramilitary-type activities does not mean [they are] a 'military force'").[41]  Terrorists do not morph into a "military" just by calling themselves one, or by receiving military-style training.  *See, e.g.*, 18 U.S.C. § 2339D (criminalizing "knowingly receiv[ing] military-type training from or on behalf of any" FTO); *Morris*, 415 F. Supp. 2d at

---

[40] *See* U.S. Dep't of State, Foreign Terrorist Organizations, https://goo.gl/UNGzLJ (FTOs include, *e.g.*, "National Liberation Army," "Real Irish Republican Army," "Revolutionary Armed Forces of Colombia (FARC)," "Jaish-e-Mohammed," and the "Army of Islam").  Even "[t]he word 'al-Qaida' means 'the base' . . . referring to a military base for Arab fighters inside Afghanistan."  Anne Stenersen, *Thirty Years after its Foundation – Where is al-Qaida Going?*, Perspectives on Terrorism (Dec. 2017), https://goo.gl/pLbwY4.

[41] Defendants' invocation (at 43) of Jaysh al-Mahdi's command structure also fails.  The point of requiring armed forces to maintain a command structure is to "help[] ensure that the armed group has sufficient discipline and organization to conduct its operations in accordance with the law of war."  *Law of War Manual* § 4.6.3.  Here, Jaysh al-Mahdi used its structure to facilitate its members' wanton disregard of that law.  AC ¶¶ 334-37, 351-52.

1333 ("'military' training" can be "employ[ed] . . . in a terroristic fashion to achieve terroristic ends."). Were it otherwise, the more sophisticated a terrorist group's weapons and training – and the more Americans it were able to kill as a result – the more likely it would qualify for act-of-war immunity under the ATA. Defendants' cite no case endorsing such a perverse result.

Defendants' arguments betray their lack of any limiting principle. As their own materials confirm, U.S. and allied troops play a vital role in the global fight against terrorism. *See, e.g.*, Def. Ex. 62 at 2, Def. Ex. 65 at 1-2, Def. Ex. 81 at 27-28. It is thus no surprise that terrorists like Jaysh al-Mahdi often employ military-style attacks on Western military targets. *See Morris*, 415 F. Supp. 2d at 1331; *Weiss*, 2007 WL 4565060, at *2, *5 (rejecting act-of-war bar for attacks on soldiers). Treating such attacks as coming from a "military force" just because Jaysh al-Mahdi was well-organized and able to injure a large number of U.S. troops – something also true of al-Qaeda, ISIS, and Hezbollah – would gut the ATA as a counterterrorism tool. Indeed, Defendants do not hide (at 36) their view that, in the so-called "post-9/11 reality," even "al Qaeda and ISIS" are now military forces in a global "armed conflict[]" against the United States. Defendants' concession that their theory would immunize *even funding for ISIS* is reason enough to reject it.[42]

### B.    Jaysh al-Mahdi's Attacks On Plaintiffs Did Not Occur "In the Course of" An Armed Conflict

Even if Jaysh al-Mahdi were a "military force," and even assuming that Iraq was in a state of "armed conflict," *but see infra* Part III.C, the attacks that injured Plaintiffs did not occur

---

[42] The same is true of Plaintiffs' description of Jaysh al-Mahdi as a "militia," AC ¶ 347, which Defendants try (at 43 n.98) to define as a "military force." Jaysh al-Mahdi was not a lawful "militia" under Iraqi law, AC ¶ 347, and colloquially describing it as one does not transform it into a "military force" under the ATA. A "militia" in everyday parlance is a broad term that can refer to virtually any "group[] of citizens that are organized as to resemble an army." Webster's New World College Dict. 914 (4th ed. 2010). Had Congress wanted the act-of-war defense to protect all such "militias," it would have used that term in the statute.

"in the course" of that conflict, 18 U.S.C. §§ 2331(4), 4(C).  The phrase "in the course of" is a

"gatekeeper phrase that is intended to exclude as a matter of law a subset of conduct" otherwise

within the "general . . . provision in question."  *Klieman*, 424 F. Supp. 2d at 164.  Thus, although

it may be correct that "violations of the law of war necessarily occur in war," Mem. at 46, the

ATA's use of "in the course of" operates to exclude unlawful acts connected to an "armed

conflict" that remain outside the category of conduct Congress intended to protect.  "As a matter

of law, an act that violates established norms of warfare and armed conflict under international

law is not an act occurring in the course of armed conflict."  *Klieman*, 424 F. Supp. 2d at 166.

That principle alone forecloses Defendants' act-of-war defense.  The Amended

Complaint describes, for every Plaintiff or family member attacked in Iraq, how Jaysh al-Mahdi

violated the laws of war in committing the attack.  AC ¶¶ 408-1153.  For example, Jaysh al-

Mahdi kidnapped, tortured and executed Michael Chand.  *Id.* ¶¶ 461, 463, 464.  It committed

similar atrocities against the civilians targeted in the Crescent Security kidnapping.  *E.g.*, *id.*

¶¶ 796-820.  Several other attacks involved ambulances or mosques.  *Id.* ¶¶ 509, 551, 609, 1030,

1087.  Jaysh al-Mahdi regularly attacked Plaintiffs without wearing uniforms, with weapons that

indiscriminately placed civilians at risk, or both.  *E.g.*, *id*. ¶¶ 522, 709, 712, 780, 792, 881, 889.

It targeted William Kelso for being a medic.  *Id*. ¶ 549.  And it killed Master Sergeant Sean

Thomas in a rocket attack directed at civilians in the Green Zone.  *Id.* ¶¶ 709, 711.

Many Plaintiffs were civilians not lawfully subject to attack at all.  *E.g.*, *id.* ¶¶ 460, 488,

514, 535, 538, 555, 635, 741, 757, 826, 862, 909.  As for Plaintiffs in uniform, Jaysh al-Mahdi

wounded Specialists Connolly and Winegar while they were working on civilian capacity-

building operations.  *Id*. ¶¶ 484, 685.  It killed Specialist Tucker while he was returning "from

helping to build a soccer field for Iraqi children."  *Id*. ¶ 656.  It murdered Corporal O'Brien while

he secured a "weapons cache" in a "civilian location." *Id*. ¶ 773.  And several other Plaintiffs were attacked while securing a gas station to "prevent Jaysh al-Mahdi from extorting the local population." *Id*. ¶¶ 521, 777, 1017, 1075.  Such attacks did not occur "in the course of" any armed conflict.  *See Klieman* 424 F. Supp. 2d at 166; *Biton*, 412 F. Supp. 2d at 8-9.

Defendants assert (at 45-48) that attacks necessarily occur "in the course" of an armed conflict when they occur in "combat zones" – a term Defendants apparently believe swept in the entire country of Iraq (including the civilian U.S. Embassy in the Green Zone).  But they cite no case adopting such a rule.[43]  Even if such a rule existed, Plaintiffs were performing peacekeeping and reconstruction functions when they were attacked.  AC ¶¶ 55, 349-50.  They were, for example, building soccer fields, disposing of munitions, training Iraqi police, securing gas stations, building schools or sewage systems, or working in the Green Zone.  *Id.* ¶¶ 409-10, 488, 521, 555, 656, 708.  None was plausibly in a "combat zone."

## C.    The United States Was Not Engaged In An "Armed Conflict" In Iraq

Although each point above is independently dispositive, Defendants also fail to establish that Iraq was in a state of "armed conflict."  18 U.S.C. § 2331(4)(C).  Defendants concede (at 38-39) that the "international armed conflict" in Iraq ended by 2004, when Iraq regained sovereignty.  As Defendants' sources further observe, not all "organized armed violence" counts as "non-international armed conflict"; the term excludes matters for "law enforcement" such as government efforts to combat "terrorists . . . or other organized criminals."  Def. Ex. 85 at 24.

---

[43] Defendants cite (at 45) *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008), but that case supports Plaintiffs because it held that the act-of-war bar did *not* apply to attacks with weaponry "capab[le] of indiscriminately killing and maiming untold numbers in heavily populated civilian areas," *id*. at 459.  Jaysh al-Mahdi committed such attacks here.  AC ¶ 351.  The other two cases they cite (at 45-47) involved discrete conflicts triggered by discrete events; neither held that the act-of-war bar applies to all violence committed in a broadly defined "combat zone."  *Cf. Biton*, 412 F. Supp. 2d at 3, 10; *Kaplan*, 961 F. Supp. 2d at 203.

The United States' fight against Jaysh al-Mahdi was a law enforcement matter against terrorists rather than an "armed conflict." After the cessation of "[f]ormal armed hostilities" on May 1, 2003, American troops in Iraq shifted to a peacekeeping and nation-building role. AC ¶ 55. Civilian reconstruction and nation-building became predominant lines of effort, and Jaysh al-Mahdi staged attacks on Americans to undermine those efforts and compel the United States (including its civilian leadership) to leave Iraq. *Id.* ¶¶ 349-50, 409-10. Consistent with Jaysh al-Mahdi's status as a criminal organization, Coalition forces arrested Jaysh al-Mahdi commander Hakim al-Zamili for trial in a criminal court, rather than attacking him militarily. *Id.* ¶¶ 93-94. Such facts are the hallmarks of law enforcement, rather than "armed conflict."

Defendants' arguments to the contrary are unpersuasive. They cite (at 38-41) a variety of statements that the United States was at "war," but their own sources acknowledge that, as late as 2012, "[t]he United States has not made any formal pronouncement" that Iraq was "in a state of internal armed conflict." Def. Ex. 93 at 368-69. Moreover, the congressional reports Defendants cite (at 38 n.87) refer to hostilities in Iraq as part of the "Global War on *Terrorism*" or the "War on *Terror*," *e.g.*, Def. Exs. 62, 65 at 1 (emphases added), and one of Defendants' sources describes Jaysh al-Mahdi attacks as unlawful acts of "terrorism" rather than legitimate combat. *See* Pl. Ex. 8 (full version of Def. Ex. 59) at 37-96; *see also id.* at 63, 70, 75, 82, 84. That confirms the flaw in Defendants' position: if they were right (at 36-37) that the "post-9/11 war on terrorism is one giant "non-international armed conflict," nothing would be left of the ATA.

Defendants also cite (at 41) *United States v. Prosperi*, 573 F. Supp. 2d 436 (D. Mass. 2008), but that case held that the "Iraq conflict" *ended on May 1, 2003* when President Bush declared that "[m]ajor combat operations in Iraq have ended." *Id.* at 454-55. The other sources they cite (at 41-42) discuss the law of "armed conflict" in other contexts, but none supports an

act-of-war defense under the ATA.  *See Prosperi*, 573 F. Supp. 2d at 444 ("Congress in drafting

laws may decide that the Nation may be 'at war' for one purpose, and 'at peace' for another.'")

(quoting *Lee v. Madigan*, 358 U.S. 228, 231 (1959)).  Nor does it matter that the U.S. military

"abide[d] by 'the law of armed conflict.'"  Mem. at 38.  U.S. policy requires compliance with the

laws of war "even in situations that do not constitute 'war' or 'armed conflict.'"  *Law of War*

*Manual* § 3.1.1; *see* Def. Ex. 81 at 27 n.36.  At most, such arguments raise issues for discovery.

## IV.  PLAINTIFFS PROPERLY PLEAD AIDING-AND-ABETTING CLAIMS (COUNTS ONE AND TWO)

Counts One and Two allege that Defendants aided and abetted Jaysh al-Mahdi's terrorist

acts in Iraq.  AC ¶¶ 1154-80.  Congress instructed courts to apply *Halberstam v. Welch*, 705 F.2d

472 (D.C. Cir. 1983), as "the proper legal framework for how [aiding-and-abetting] liability

should function" under the ATA.  JASTA § 2(a)(5).  *Halberstam* identifies three elements of

aiding-and-abetting liability:  (1) the principal violator must "perform a wrongful act," (2) "the

defendant must be generally aware of his role" in the "overall illegal or tortious activity," and (3)

"the defendant must knowingly and substantially assist the principal violation."  705 F.2d at 487-

88.  Defendants do not dispute that Jaysh al-Mahdi's activities satisfied the first element, and

Plaintiffs properly allege the other two.  *Infra* Part IV.A.  Plaintiffs also allege that Hezbollah

"committed, planned, or authorized" Jaysh al-Mahdi's terrorist acts.  *Infra* Part IV.B.

### A.  Plaintiffs Adequately Allege That Defendants Knowingly And Substantially Assisted Jaysh al-Mahdi's Acts Of International Terrorism

Defendants aided and abetted Jaysh al-Mahdi by providing resources it used to fund

terrorist attacks on Americans in Iraq.  AC ¶¶ 105-79.  *Halberstam* itself demonstrates that

Defendants' assistance was "substantial."  There, the principal tort was a "long-running burglary

enterprise" in which a man stole valuables from homes and, on one occasion, murdered a

resident.  705 F.2d at 488.  The D.C. Circuit affirmed that the burglar's live-in companion was

liable for aiding and abetting both the enterprise as a whole and the murder committed in the

course of it. *Id*. at 475-76.  Her assistance was limited to clerical tasks, like keeping the books

and processing payments from buyers, that helped convert "stolen goods into 'legitimate'

wealth." *Id*. at 488; *see id*. at 474-76 (describing her role).  She neither assisted nor knew about

the murder. *See id*. at 475-76, 488.  But her financial acts were substantial assistance "in the

context of the enterprise [she] aided." *Id*. at 488.  And because "violence and killing" was a

"foreseeable risk" of the broader enterprise, she was liable for the murder even though she did

not even "kn[o]w specifically that [her companion] was committing burglaries." *Id*.

Defendants' contribution to Jaysh al-Mahdi's terrorist enterprise was more substantial

than the woman's in *Halberstam*.  AC ¶¶ 165-79.  The D.C. Circuit determined that the woman's

assistance to the burglary enterprise was "substantial" using six factors:  (1) the nature of the act

assisted; (2) the amount and kind of assistance; (3) presence at the time of the tort; (4) the

defendant's relation to the tortfeasor; (5) the defendant's state of mind; and (6) the duration of

the assistance. *See Halberstam*, 705 F.2d at 483-84.  Those factors support liability here.

### 1.     Factors 1 and 2:  nature of the act assisted and amount of the aid

#### a.     Defendants' assistance was substantial in kind and amount

*Halberstam*'s first factor explains that "the *nature of the act* involved dictates what aid

might matter, *i.e.*, be substantial." *Id*. at 484.  The acts here are Jaysh al-Mahdi's terrorist attacks

on Plaintiffs (as to Count One) and its terrorist enterprise as a whole (Count Two).  Financing of

the type Defendants provided matters greatly to such activities. *See Boim*, 549 F.3d at 690-91

(explaining importance of "cut[ting] the terrorists' lifeline" by separating them from "their

financial angels").  That is why courts regularly hold that providing general funding to a terrorist

group aids and abets the group's attacks.[44]  And courts more broadly hold that financial

assistance – especially when involving unlawful kickbacks – aids and abets the enterprise being

funded.[45]  Plaintiffs' allegations warrant the same conclusion.  Just as the burglary enterprise in

*Halberstam* benefited from laundering "stolen goods into 'legitimate' wealth," 705 F.2d at 488,

so did Jaysh al-Mahdi's terrorist enterprise benefit from corrupt payments (in both cash and

medical goods) extracted through Kimadia, AC ¶¶ 165-79.

   *Halberstam*'s second factor concerns the "*amount [and kind] of assistance given* to the

wrongdoer." 705 F.2d at 484 (brackets in original).  Here, Defendants each gave Jaysh al-Mahdi

at least several million dollars per year in cash and medical goods.  AC ¶¶ 198, 221, 251, 261,

291, 318.  That assistance was greater than in *Halberstam*, where the assistance was not

"overwhelming as to any given burglary." 705 F.2d at 488.  It also far exceeds the collective

$1.7 million over nine years another court held sufficient for aiding-and-abetting Colombian

terrorism.  *See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig.*, 190

F. Supp. 3d 1100, 1104 (S.D. Fla. 2016) ("*Chiquita I*").  Much as in that case, Defendants'

funding here helped Jaysh al-Mahdi "continue and intensify its terror campaign." *Id.* at 1119.

   *Abecassis I* is especially instructive.  There, the court held that plaintiffs had stated an

aiding-and-abetting claim under the ATA based on the defendants' corrupt payments to

---

   [44] *See Abecassis I*, 785 F. Supp. 2d at 645-49 (Oil-For-Food "kickbacks" aided and abetted terrorist attacks in Israel because Saddam "diverted" them "to make reward payments to families of suicide bombers"); *Wultz*, 755 F. Supp. 2d at 57 (bank's processing of transactions for terror group aided and abetted Tel Aviv bombing); *Linde*, 384 F. Supp. 2d at 584 (bank's provision of financial services to terror group was "within the mainstream of aiding and abetting liability").

   [45] *See, e.g.*, *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997) ("Participation in the financing of a[n] [unlawful] scheme, particularly where . . . the financing was not routine, constitutes substantial assistance."); *Twenty First Century L.P.I. v. LaBianca*, 19 F. Supp. 2d 35, 42 (E.D.N.Y. 1998) (finding defendant liable for aiding and abetting breach of fiduciary duty by "pa[ying] kickbacks to [plaintiff's] employees").

Saddam's regime under Oil-For-Food, which supplied Saddam with fungible resources he could use to "support terrorist activity in Israel."  785 F. Supp. 2d at 646-49.  One company allegedly made $5.5 million in corrupt payments, which formed part of a $6 billion slush fund Saddam had created by "manipulating the Oil for Food program."  *Id*. at 622-23.  Although the company's payments were less than 0.1% of that broader fund, the "kickbacks" gave Saddam at least some "unrestricted money" he could make "available for terrorist activities" against Israel.  *Id*. at 647.  The court held that liability in such circumstances accorded with "Congress's clear intent to resist terrorism by cutting off the sources of funding to terrorist groups."  *Id*. at 645.

The same is true here.  Although Defendants were not Jaysh al-Mahdi's sole source of funds, their corrupt payments supplied Jaysh al-Mahdi with an important stream of revenue.  AC ¶¶ 165-79.  That is more than enough for liability.  *See Abecassis I*, 785 F. Supp. 2d at 647-49.  In fact, given the reprehensible nature of Jaysh al-Mahdi's conduct, *Halberstam* would support liability even if Defendants played only a "relatively trivial role" in financing it.  705 F.2d at 484 n.13 ("a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act").  Because Defendants played a more-than-trivial role in funding one of the most "blameworth[y] . . . act[s]" imaginable, *id*. – heinous attacks on Americans rebuilding Iraq – Plaintiffs' aiding-and-abetting claims should proceed.

### b.      Defendants' arguments lack merit

Defendants' effort (at 77-80) to downplay their assistance is unpersuasive.  Defendants may not have "supplied Jaysh al-Mahdi with bombs or bullets," Mem. at 77, but they did supply the resources with which to acquire such weapons, AC ¶¶ 8, 165-79.  That included cash "commissions," *id*. ¶¶ 142-64, which is one type of aid the ATA is plainly intended to curtail, *see Abecassis I*, 785 F. Supp. 2d at 645 (aiding-and-abetting should be applied to "cut[] off the sources of funding to terrorist groups").  Defendants' corrupt payments also took the form of free

pharmaceuticals and medical devices, which they knew Jaysh al-Mahdi would convert into cash or use to pay rank-and-file terrorist fighters.  AC ¶¶ 167-73, 175-79.  In context, those "free goods" functioned as cash equivalents (to be used as terrorist finance) rather than legitimate medical goods (to be used in public health facilities).  *Id*. ¶¶ 117-20, 129-33, 137-40, 176.

Defendants' contrary arguments merely confirm the potency of their scheme.  One reason Defendants relied so heavily on "free goods" payments was so they could cloak those payments in specious humanitarian justifications, *id*. ¶ 118 – the same ones Defendants repeatedly invoke here.  *E.g.*, Mem. at 1 ("life-saving medicine and medical equipment").  But Defendants did not intend their "free goods" to serve any humanitarian function; that is why they structured them as off-book donations and packaged them to facilitate black-market diversion.  AC ¶¶ 120, 137-38.  Given Jaysh al-Mahdi's control of the Ministry, such in-kind payments were functionally the same as cash donations to terrorists.  *Id*. ¶¶ 117, 169-72.  Defendants' attempt to disguise those payments as legitimate commercial activity only adds to their culpability.  *See Halberstam*, 705 F.2d at 488 ("laundering" burglary proceeds was "important" part of substantial assistance).

Defendants' effort (at 77-78) to minimize the causal link between their assistance and the terrorist attacks is similarly flawed.  As explained below, Plaintiffs allege that Defendants' sales practices proximately caused the attacks that injured them.  *See infra* Part V.D.  Regardless, Plaintiffs' aiding-and-abetting claims do not require Defendants themselves (as opposed to the terrorists they funded) to have proximately caused the attacks.  *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018) (defendant's conduct need not be "a proximate cause of plaintiffs' injuries," because JASTA requires only that a defendant have "aided and abetted acts of terrorism by others, [whose] acts caused plaintiffs' injuries").  Congress intended JASTA to reach companies that provide "resources, *directly or indirectly*, to persons or organizations that

pose a significant risk of committing acts of terrorism," JASTA § 2(a)(6) (emphasis added), and there is no question that Plaintiffs' allegations raise an inference of such support, AC ¶¶ 165-79. Defendants' factual criticisms of Plaintiffs' causal theory thus provide no reason to dismiss the aiding-and-abetting claims. *See Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) ("Substantial assistance . . . does not mean *necessary* assistance.").

### c.  The Manufacturers are also liable

Plaintiffs' substantial-assistance allegations apply equally to the Manufacturers.  AC ¶¶ 193-94, 219-20, 249-50, 255-56, 287-88, 314-15.  To begin with, the Manufacturers are "vicariously liable" for the misconduct of their agent Suppliers. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003).  Agency requires that an agent act "on the principal's behalf and subject to the principal's control."  Restatement (Third) of Agency § 1.01 (2006).  Here, Iraqi law required the Manufacturers to provide written authorization designating the Suppliers as their "sole and exclusive represent[atives]" in Iraq, AC ¶¶ 156-57, and the Manufacturers had the right to control the terms of the transactions the Suppliers negotiated on their behalf, *id.* ¶¶ 156-57, 193, 219, 249, 255, 287, 314.  When the Suppliers executed sales contracts with Kimadia, they did so on terms that were subject to the Manufacturers' approval. *Id.*  That alone raises a plausible inference of agency. *See Pontrelli v. MonaVie, Inc.*, 2014 WL 4105417, at *4 (D.N.J. Aug. 19, 2014) (consumers adequately pleaded "Distributors" were agents of manufacturer that manifested "consent and authorization to have the Distributors act on their behalf").

Defendants assert (at 55) that Plaintiffs' allegations of control are deficient, but they ignore that a principal need not have the "right to control the full range of the agent's activities." Restatement (Third) of Agency § 1.01 cmt. c.  Here, the Manufacturers had the right to control what mattered:  they had authority to decide whether to sell to the Jaysh al-Mahdi-controlled Ministry and whether (and in what way) to use their products as in-kind bribes. AC ¶¶ 156-57.

48

The Manufacturers' failure to exercise that control to prevent the Suppliers' misconduct does not eliminate the agency relationship. *See* Restatement (Third) of Agency § 1.01 cmt. c ("[a] principal's failure to exercise the right of control does not eliminate it").[46]

Defendants' analogy (at 55) to an arms-length "manufacturer-supplier relationship" is inapt. Some suppliers are not agents because they act as independent wholesalers, buying from manufacturers and re-selling at a mark-up while bearing the inventory risks.[47] The Suppliers here, however, were "sales agent[s]": acting as a "middleman" between the Ministry and their affiliated Manufacturers while serving to "facilitate[] the purchase" rather than taking goods into their own inventory. *Elite Int'l. Enter., Inc. v. Patton Wallcoverings, Inc.*, 2014 WL 1652197, at *5 (E.D. Mich. Apr. 24, 2014). Those types of distributors *are* agents. *See id.*; *Pontrelli*, 2014 WL 4105417, at *4-5. That is particularly true because each Supplier acted in concert with its affiliated Manufacturer(s) as an integrated business unit. AC ¶¶ 203-04, 207-08 (AstraZeneca), 233-34, 237-38, 240 (GE), 273-77 (J&J), 296-301, 304 (Pfizer), 322-24 (Roche). Such close affiliates are nothing like the third-party wholesalers to which Defendants analogize them. *See City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1070 (N.D. Ill. 2016) (finding plausible inference that J&J distribution subsidiary had "agency relationship" with "Johnson & Johnson"); *Gourdine v. Karl Storz Endoscopy-America, Inc.*, 223 F. Supp. 3d 475, 496-97

---

[46] *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843 (D.C. Cir. 2000), which Defendants cite (at 55), is off-point because it addressed when a state-owned corporation is a "government instrumentality" under "the rule of sovereign immunity." 200 F.3d at 847-48. Whatever the rule in that context, a principal's vicarious liability under ordinary agency principles depends on the *right* to control, rather than its exercise. *See Lopez v. Council on American-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 499 (D.C. Cir. 2016) ("Actual control . . . is not the test; it is the right to control which is determinative.").

[47] The cases Defendants cite (at 55) involved such suppliers. *See CNE Direct, Inc. v. Blackberry Corp.*, 821 F.3d 146, 151-52 (1st Cir. 2016); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232-33 (9th Cir. 2013); *Hull v. Eaton Corp.*, 825 F.2d 448, 457-58 (D.C. Cir. 1987).

(D.S.C. 2016) (medical-goods distributor was agent of affiliated manufacturer where they "work[ed] together" as part of "one business enterprise" that was "divided into numerous parts").

In any event, the Manufacturers directly participated in the aiding-and-abetting by registering with the Ministry (which independently required bribes), confirming the Suppliers' authority to execute the corrupt transactions, and manufacturing the goods they knew would be used to fund terrorism.  AC ¶¶ 194, 220, 250, 256, 288, 315.  That is enough for liability, with or without an agency relationship.  *See, e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 510-11 (S.D.N.Y. 2009) (even "clerical and ministerial" conduct can support aiding-and-abetting liability when it "substantially contribute[s]" to principal tort).  By enabling their business units' corrupt payments, the Manufacturers did not engage in "routine commercial activity," Mem. at 80; they knowingly contributed to terrorist finance.  *See Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 641 (E.D.N.Y. 2017) (companies "cannot 'routinely' provide [commercial] services, if they provide those services with knowledge of their assistance in funding terrorist activities").

## 2.      Factor 5:  Defendants' state of mind

### a.      Defendants knew they were funding terrorism

*Halberstam*'s fifth factor instructs that "the *state of mind* of the defendant may also be relevant."  705 F.2d at 484.  The only requirement is that the defendant "be generally aware of his role as part of an overall illegal or tortious activity."  *Id*. at 477.  To meet that standard, an aider-and-abettor need not "have a full understanding" nor "know all of the details of the primary party's scheme."  *Aetna*, 219 F.3d at 535-36.  The "exact level" of knowledge required "remains flexible."  *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991).

The Amended Complaint sufficiently pleads Defendants' knowledge.  That is true in part due to the corrupt structure of Defendants' transactions:  they made unlawful payments (in either

cash or in-kind product) structurally designed to funnel off-book resources to Jaysh al-Mahdi members inside the Ministry.  AC ¶¶ 117-20, 132-39, 142-45, 165.  The "very object of sidestepping" ordinary FCPA restrictions on those transactions "was to provide money for [Jaysh al-Mahdi members] to achieve ends other than providing for the welfare of Iraqi civilians."  *Abecassis I*, 785 F. Supp. 2d at 647.  Such allegations alone "support an inference that the defendants knew that money paid in kickbacks would be used to support terrorist activity."  *Id*.  Indeed, courts often view "atypical business transactions" as evidence of an aider-and-abettor's culpability.  *Camp*, 948 F.2d at 459; *see Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1012 (11th Cir. 1985) ("[K]nowing assistance can be inferred from atypical business actions.").  Plaintiffs' allegations support the same conclusion here.  AC ¶¶ 137-38, 165-87.

Additional allegations aver that Defendants knew Jaysh al-Mahdi would use their corrupt payments to support terrorist attacks on Americans in Iraq.  *Id*. ¶¶ 180-87.  Defendants negotiated those payments at in-person meetings at the Ministry headquarters surrounded by the trappings of Jaysh al-Mahdi's terrorist agenda, *id*. ¶¶ 10, 121, 180:  propaganda posters paying homage to known terrorist Muqtada al-Sadr, Jaysh al-Mahdi's unmistakable black flag, terrorist fighters and weapons, and "Death to America" slogans, *id*. ¶¶ 10, 73-74, 89-90, 180-81.  Defendants could not have entered that building without being at least "'generally aware'" they were "playing a 'role' in [Jaysh al-Mahdi's] violent or life-endangering activities."  *Linde*, 882 F.3d at 329-30 (quoting *Halberstam*, 705 F.2d at 477).  Indeed, *USA Today* reported that Jaysh al-Mahdi's overt control of the Ministry left no "doubt[] about who runs the place."  AC ¶ 180.

Defendants respond (at 60-61) as if they are arguing to a jury, asserting (without evidence) that anti-American jihadist propaganda and slogans "would not have been remarkable at [the] Ministry."  In fact, Jaysh al-Mahdi's control over the Ministry building was quite

remarkable – so much so that it was one of the few government buildings in Baghdad that Americans were too afraid to enter.  AC ¶¶ 76, 180.  And although Defendants say (at 61) they thought the heavy weaponry was needed to defend the Ministry against "Sunni insurgents," their only "evidence" for that is a *New York Times* article sourced primarily from Hakim al-Zamili, one of the criminal terrorists whom they bribed and whom the U.S. government later worked to prosecute.[48]  A jury, of course, could disbelieve Zamili and conclude that Defendants knew the truth:  that Jaysh al-Mahdi had turned the Ministry into a terrorist base.  AC ¶¶ 3, 73-75, 89-90.

Press coverage documenting Jaysh al-Mahdi's control of the Ministry further shows Defendants' knowledge.  *Id.* ¶¶ 11, 183-85.  Publicly available articles reported (among other things) that the Ministry was "under the control of the Shia cleric Moqtada al-Sadr" and "his militia, the Mahdi Army"; that Ministry officials effected "the diversion of millions of dollars to [their] Shiite Muslim militia"; and that the Ministry's procurement system was "in the 'grip' of the Mahdi Army."  *Id.* ¶¶ 11, 183.  A publicly disclosed report from the U.S. Embassy likewise warned that the Ministry was "openly under the control of the Mehdi Army" and was allowing it to "finance[] operations from diverted medicines."  *Id.* ¶ 184.  Courts regularly sustain allegations of knowledge under the ATA based on public sources much less compelling.[49]

Defendants again respond (at 58-61) with jury arguments, asserting that they thought the Ministry was run by the "Sadrist political wing" rather than "Jaysh al-Mahdi."  But there was no

---

[48] *Compare* Def. Ex. 88 at 5 (quoting Zamili to describe attacks on Ministry), *with* AC ¶¶ 84-97 (alleging Zamili's role in terrorist enterprise inside the Ministry).

[49] *See Abecassis I*, 785 F. Supp. 2d at 647 (sustaining knowledge allegations based on "news stories" indicating "that [Saddam] was making reward payments to the families of Palestinian 'martyrs'"); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1318-20 (S.D. Fla. 2018) ("*Chiquita II*") (finding triable issue on knowledge given "widely reported news" about terror group); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *15 (E.D.N.Y. Oct. 5, 2006) (sustaining knowledge allegations where "press discussions" should have "induced the bank to investigate" link to terrorism).

meaningful distinction between the two, AC ¶ 59, and even if there were, Defendants overlook the many public sources attributing control of the Ministry to Jaysh al-Mahdi specifically.[50]  As for the argument (at 60) that the Sadrists used the Ministry merely to "help their constituents," it conflicts with the widespread reports that Jaysh al-Mahdi used Ministry assets to transport death squads, launch attacks, detain and torture its enemies, and raise money for terrorist operations. AC ¶¶ 86-92, 183-84.  Defendants simply ignore those allegations and – based on one sentence fragment in one of the more-than-20 articles Plaintiffs cite – contend (at 60) that Sadr really just wanted to "provide services to the poor."  At best, such assertions present an issue for trial.

Finally, Defendants' reliance (at 60-61) on purported U.S. policy toward the Ministry is misplaced for the reasons stated above.  *See supra* Parts I, II.B.2-3.  During the relevant period, the three most high-profile indications of U.S. policy toward the Ministry were:  (1) the Iraq Study Group's conclusion that the Sadr-controlled Ministry "will not work with Americans," AC ¶ 76; (2) the U.S. Embassy's conclusion that the Ministry "has an atrocious reputation" and was "openly under the control of the Mehdi Army," *id*. ¶ 169; and (3) Zamili's criminal arrest and prosecution, *id*. ¶¶ 93-96.  Defendants cannot credibly claim they thought their corrupt payments to such criminals were consistent with U.S. policy.

### b.      There is no specific-intent requirement

Defendants' assertion (at 78-79) that *Halberstam*'s fifth factor imposes a specific-intent requirement lacks merit.  *Halberstam* could scarcely be clearer:  an aider-and-abettor need only be "generally aware of his role" in the principal violation.  705 F.2d at 487-88.[51]  Under

---

[50] *See, e.g.*, AC ¶ 183 (second bullet:  linking Minister to "Mehdi Army"); *id*. (fourth bullet: "[m]ost of the security guards in the morgue and the ministry are affiliated to [Sadr's] militia, the Mahdi army"); *id*. (eleventh bullet:  "diversion of millions of dollars to a Shiite Muslim militia").

[51] Although Defendants quote (at 78) another part of *Halberstam* discussing a defendant who was "one in spirit" with the principal violator, that was merely one example of a state-court

Defendants' interpretation, *Halberstam* would have reversed the judgment of liability rather than affirming it, because the defendant did not even know about (much less intend) the murder.  *See* 705 F.2d at 475-76, 488.  But *Halberstam* affirmed the judgment, and the D.C. Circuit since has confirmed that an "aider and abettor" need not "share the same purpose as the principal."  *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-36 (D.C. Cir. 2011), *vacated on other grounds,* 527 F. App'x 7 (D.C. Cir. 2013); *see Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *4 n.8 (D.D.C. Jan. 11, 2018) (similar).  Accordingly, whatever the merits of the out-of-circuit cases Defendants cite (at 78-79), their argument is foreclosed by controlling precedent.

Defendants' argument also conflicts with congressional intent.  Defendants concede (at 58-59) that direct liability under the ATA requires only knowledge or recklessness.  *See also infra* Part V.B.  JASTA's use of the word "knowingly," 18 U.S.C. § 2333(d), incorporates a standard at least as lenient.[52]  Congress intended JASTA to *expand* liability already imposed by the ATA, *see* JASTA § 2(a)(4), (b), and Defendants offer no plausible reason Congress would have used the word "knowingly" in JASTA to impose a scienter standard that is more defendant-friendly than the one required for direct liability under the ATA.

### 3.   Factors 3, 4, and 6:  presence, relationship, and duration

The remaining *Halberstam* factors either are neutral or cut in Plaintiffs' favor.  The third factor asks whether a defendant was "*present at the time* of" the tort.  705 F.2d at 488.

---

case that found liability – not a suggestion that being "one in spirit" is necessary in all cases. *Halberstam*, 705 F.2d at 484 (citing *Rael v. Cadena*, 604 P.2d 822 (N.M. 1979)).

[52] Although the Court need not decide the issue here, recklessness also suffices for aiding-and-abetting liability under JASTA.  *See* JASTA § 2(a)(6)-(7) (discussing defendants that "recklessly" provide resources to terrorist groups); *see also Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000) (recklessness supports aiding-and-abetting liability under the securities laws); *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 297 (D.C. Cir. 1994) (interpreting term "knowingly" in another statute to impose liability for recklessness).

Defendants, as in most ATA cases, assisted Jaysh al-Mahdi by supplying financing – not by showing up at the scene of the terrorist attacks.  As in *Halberstam* itself, Defendants' physical absence during the attacks is no bar to liability.  *See id.* at 482 ("the aiding-abetting action may also be more distant in time and location and still be substantial enough to create liability").

As for the fourth factor, Defendants' "*relation to the tortious actor*," *id*. at 488, Defendants cooperated with Jaysh al-Mahdi in structuring their transactions to finance terrorism, AC ¶¶ 105-87.  Defendants' relationship to the Ministry – as foreign medical-goods suppliers willing and able to make corrupt payments – made them ideal candidates for such fundraising efforts.  *Id.* ¶¶ 105-12, 167.  The lack of some "special relationship . . . vis-à-vis any Jaysh al-Mahdi fighter," Mem. at 78, is therefore unimportant.  *See Halberstam*, 705 F.2d at 488 ("we accord [the relationship factor] a low priority in our calculus").

Finally, the sixth factor – "the *duration of the assistance*" – confirms that Defendants' assistance was substantial.  *Id*. at 488.  Defendants supplied Jaysh al-Mahdi with corrupt sources of financing throughout (at least) the nine-year period from 2004 to 2013.  AC ¶ 7.  Much of that conduct has continued in recent years, *id*. ¶¶ 202, 271, 295, 321, and most Defendants engaged in similar misconduct from 2000-2003 under Oil-for-Food, *id*. ¶¶ 2, 44-53.  The longevity of Defendants' financing scheme well exceeds the "five years" at issue in *Halberstam*.  705 F.2d at 474.  This factor thus supports liability even more "strongly" here than it did there.  *Id*. at 488.

### B.       Plaintiffs Adequately Allege That Hezbollah "Committed, Planned, Or Authorized" The Relevant Acts Of International Terrorism

JASTA imposes aiding-and-abetting liability for injuries arising from an "act of international terrorism committed, planned, or authorized" by an FTO.  18 U.S.C. § 2333(d)(2).  Plaintiffs allege that Hezbollah, an FTO since 1997, "planned," "authorized," and sometimes helped "commit[]" the terrorist attacks that injured Plaintiffs.  AC ¶¶ 357-408.  Defendants

concede (at 67-68) that Plaintiffs adequately allege Hezbollah helped "commit" five attacks against six different families:  three kidnapping operations (one of which targeted three Plaintiff families), one IED attack in Basra, and one 2007 rocket attack on the Green Zone.[53]  That latter concession applies equally to the 2008 Hezbollah-directed rocket attacks on the Green Zone that precipitated the Battle of Sadr City.  *Id.* ¶¶ 397, 712-13.  Including Plaintiffs' Battle of Sadr City injuries,[54] which those rocket attacks proximately caused, *id.* ¶¶ 345, 397, Defendants' view of JASTA's FTO element would allow 51 Plaintiffs' claims (out of 312 total) to proceed.

But Defendants' narrow interpretation would nullify the words "planned" and "authorized" in the statute, and the Court should reject it.  Under the proper standard, Hezbollah "planned" and "authorized" *all* of the Jaysh al-Mahdi attacks that killed and injured Plaintiffs.

### 1.      Hezbollah "planned" the terrorist attacks that injured Plaintiffs

Hezbollah "planned" the Jaysh al-Mahdi attacks that injured Plaintiffs.  To "plan" something means to "arrange the parts of:  [to] design."  *Webster's Third* at 1730.  Here, Hezbollah helped arrange and design each Jaysh al-Mahdi terrorist attack at issue.  It did so by co-founding Jaysh al-Mahdi as its terrorist proxy to undermine U.S. interests in Iraq, AC ¶¶ 56, 364; recruiting, training, and equipping Jaysh al-Mahdi fighters, *id.* ¶¶ 366-68, 390-92, 404-07; instructing those fighters how to execute attacks against Americans specifically, *id.* ¶¶ 389-401;

---

[53] The "five attacks" Defendants reference (at 67) are:  (1) the August 17, 2007 kidnapping of Michael Chand, AC ¶ 461; (2) the March 27, 2007 rocket attack that killed Sean Thomas, *id.* ¶ 709; (3) the November 16, 2006 kidnapping of Joshua Munns, Paul Johnson-Reuben, and Jonathon Coté, *id.* ¶¶ 795-825; (4) the January 5, 2007 kidnapping of Ronnie Withrow, *id.* ¶ 827; and (5) the November 26, 2007 IED attack that killed Bill Juneau, *id.* ¶ 539.

[54] AC ¶¶ 428-33, 584-90, 619-21, 655-66, 667-75, 684-88, 1038-42, 1141-43, 1144-49.  As for the Capra Family, *id.* ¶¶ 437-59, Plaintiffs allege that Tech. Sgt. Capra died in an attack committed by Ansar al-Sunna ("AAI"), a designated FTO, *id.* ¶ 438.  Defendants say (at 67 n.126) they did not aid and abet that group, but they ignore the allegations that the Capra Family was injured "by reason of" Jaysh al-Mahdi's terrorist campaign, 18 U.S.C. § 2333(a), because Jaysh al-Mahdi supported and proximately caused the AAI attack, AC ¶ 439.

dispatching senior Hezbollah operatives to Iraq to oversee and support those attacks, *id*. ¶¶ 367-70; and devising the specific tactics – such as the heavy use of EFPs and 107mm rockets – that Jaysh al-Mahdi used against Americans in Iraq, *id*. ¶¶ 393-402.

In furtherance of that plan, Hezbollah provided Jaysh al-Mahdi with tactical direction designed to facilitate the very types of attacks that injured Plaintiffs.  *Id*. ¶¶ 366-70, 395-99, 403.[55]  Hezbollah itself made the "strategic decision" to ratchet up support for Jaysh al-Mahdi's attacks in 2005 as part of its strategy (and that of its sponsor, Iran) to foster "managed instability" in Iraq.  AC ¶ 370.  Hezbollah further came up with the idea (which it then implemented) for Jaysh al-Mahdi to use its signature weapons:  EFPs, 107mm rockets, mortars, and RPGs.  *Id*. ¶¶ 395-99.  Hezbollah even memorialized many of those decisions in a document that five U.S. Senators later called a "planning guide."  *Id*. ¶¶ 399, 402.  At a minimum, those activities – conducted with specific intent to facilitate terrorism against Americans in Iraq – raise an inference that Hezbollah planned the attacks that injured Plaintiffs.

Indeed, each Plaintiff (or a family member) was attacked using particular tactics – and in a particular geography – specifically attributable to Hezbollah.  *Id*. ¶¶ 393-401 (describing Hezbollah's role in facilitating small-arms, IED, EFP, rocket, mortar, and RPG attacks, as well as complex attacks and kidnapping operations); *id*. ¶ 403 (describing Hezbollah's role in the particular geographies where Plaintiffs were injured).  Without Hezbollah's experience, training, and resources, Jaysh al-Mahdi would have been unable to perpetrate the types of attacks on

---

[55] Defendants belittle (at 69-70) Plaintiffs' allegations as "cosmetic word swaps," but Plaintiffs' factual allegations that Hezbollah *directed* Jaysh al-Mahdi's terrorist attacks are presumed true and read in their favor.  *See* AC ¶¶ 366-70 (describing Hezbollah day-to-day oversight role in Iraq).  Defendants' efforts (at 69-70 nn.129-30) to pick apart Plaintiffs' sources for not using the word "directed" raise premature fact disputes.  *See Banneker*, 798 F.3d at 1129.

Americans that led to this lawsuit. *Id.* ¶¶ 389-407. Hezbollah's role in purposefully enabling those attacks constitutes "planning," no matter what definition the Court adopts.[56]

Plaintiff Billy Johnson, whose claims Defendants single out (at 67-68) for criticism, well illustrates that point. AC ¶¶ 535-37. On December 9, 2007, Jaysh al-Mahdi detonated an EFP in Wasit Province that injured Mr. Johnson. *Id.* ¶ 536. EFPs were "expressly designed to penetrate" American armor like what Mr. Johnson's convoy used, and they were "exclusively associated with Hizballah." *Id.* ¶ 395. They were also virtually unheard of in Iraq until Hezbollah, which was the "world's foremost expert on EFPs," "introduced" them to Iraq in 2004 by teaching Jaysh al-Mahdi how to use them against American convoys like Mr. Johnson's. *Id.* Hezbollah instructed Jaysh al-Mahdi to use EFPs – through a multipronged plan to foster EFP attacks against Americans throughout Iraq, *id.* ¶ 396 – because of their unique ability to pierce American armor. *Id.* ¶¶ 364, 370-71, 395-96. Without Hezbollah, Jaysh al-Mahdi would not even have had EFPs, much less known how to use them effectively. *Id.* ¶¶ 389-96. And Hezbollah's sponsorship of EFP attacks against Americans extended specifically to the Wasit Province Jaysh al-Mahdi cell that attacked Mr. Johnson. *Id.* ¶¶ 402, 536.

Despite all those allegations, Defendants insist (at 68) there are "no specific factual allegations of how Hezbollah committed, planned, or authorized" the attack on Mr. Johnson. It is unclear what Defendants think is missing, but if they are demanding allegations that Hezbollah directed Jaysh al-Mahdi individually to attack *Mr. Johnson on December 9*, their argument fails.

---

[56] Defendants assert (at 68) that "to plan" something means "to design" it or "decide on and arrange [it] in advance." Hezbollah designed and arranged Jaysh al-Mahdi's terrorist attacks by recruiting its members, coming up with the tactics (like EFP and indirect fire) most effective against U.S. forces, and training Jaysh al-Mahdi to execute the attacks. AC ¶¶ 364-70, 389-402.

*First*, Defendants' argument conflicts with JASTA's text.  A person can "plan"
something by helping to arrange it at a high level; control over the details is not required.  *See
supra* p. 56.  In ordinary parlance, for example, a "series of similar transactions" are often said to
form "part of one basic and overriding plan."  *United States v. Parnell*, 581 F.2d 1374, 1382
(10th Cir. 1978).  Consistent with that principle, evidence of prior bad acts can be admissible to
prove a "plan" under Fed. R. Evid. 404(b) when those acts are "'caused by a general plan of
which they are the individual manifestations.'"  *United States v. Johnson*, 970 F.2d 907, 913-14
(D.C. Cir. 1992) (quoting 2 Wigmore on Evidence § 304, at 249).  Similarly, the International
Criminal Tribunal for Yugoslavia has held that a defendant "planned" a whole series of
individual war crimes by helping to devise a "general plan" to "kill military aged men"
throughout "the Lasva Valley" – even though he did not control the target or location of any one
murder.  Judgement ¶¶ 975-76, *Prosecutor v. Kordic & Cerkez*, ICTY Case No. IT-95-14/2-A
(Dec. 17, 2004).  Here, Hezbollah likewise "planned" Jaysh al-Mahdi's attacks on Americans in
Iraq without always dictating their individual times and locations.

Defendants respond (at 69) that Hezbollah's activities could not have been "planning"
because they instead amounted to "material support" under a separate criminal statute.  *See* 18
U.S.C. § 2339A(a), (b)(1).  But "[l]anguage in one statute usually sheds little light upon the
meaning of different language in another statute."  *Russello v. United States*, 464 U.S. 16, 25
(1983); *see City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36
(2002) (comparison between provisions "grows weaker with each difference").  Congress
enacted the "material support" law as part of the Violent Crime and Enforcement Act of 1994,
*see* Pub. L. No. 103-322, 108 Stat. 1796 (1994), whereas it enacted JASTA more than two
decades later as an amendment to a separate civil statute.  The two are textually dissimilar, and

there is no indication Congress meant to define the FTO's role in the latter by reference to the former.  Thus, although Hezbollah's training activities undoubtedly provided "material support" to Jaysh al-Mahdi under U.S. criminal law, they *also* amounted to "planning" under JASTA.

*Second*, Defendants' argument would render "planned" redundant with "committed."  *See Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) ("[W]hen construing a statute courts give effect, if possible, to every clause and word.").  Defendants assert (at 68) that Hezbollah was required to exercise "control and decision-making authority" with respect to "the specific Jaysh al-Mahdi attacks that injured Plaintiffs."  But if Hezbollah had to exert control over whether Jaysh al-Mahdi attacked a given target on a given day, the Jaysh al-Mahdi fighter who did so would be Hezbollah's agent.[57]  In such circumstances, the attack by Jaysh al-Mahdi (the agent) legally would be "committed" by Hezbollah (the principal) as well.  *See United States v. Forbes*, 515 F.2d 676, 684 (D.C. Cir. 1975).  And even absent an agency relationship, if Hezbollah members participated in the details of an individual attack, they would be co-conspirators "committing" the terrorist act as well, through either the general criminal conspiracy statute, 18 U.S.C. § 371, or the conspiracy provision of the terrorism-related criminal offense, *e.g.*, 18 U.S.C. §§ 844(n), 956(a)(1), 1203(a), 2332(b), 2332a(a), 2332b(a)(2), 2332f(a)(2).  Accordingly, if the word "planned" in § 2333(d) is to be different from "committed," it must reach beyond attacks that an FTO specifically directs and controls, or joins in individually.

*Third*, Defendants' argument conflicts with JASTA's purpose of "provid[ing] civil litigants with the broadest possible basis" to sue entities that "provide[] material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities."  JASTA

---

[57] *See* Restatement (Third) of Agency § 1.01 (defining agency relationship in terms of "control"); *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 158 (D.C. Cir. 2004) (Roberts, J.) (applying ordinary "agency" principles to FTOs and their proxies).

§ 2(b).  Defendants' interpretation of "planned" would gut JASTA by immunizing a wide array

of FTO-sponsored attacks.  Modern terrorism often involves FTOs farming out operations to

remote, semi-autonomous non-FTO proxies with discretion to choose the targets, locations, and

times of individual attacks,[58] and Hezbollah has relied on such proxies to plan some of the most

heinous attacks in history.  AC ¶¶ 358-61.  Congress intended to deter funding for such attacks,

but Defendants would immunize all of them because none is "planned" in the cramped, FTO-

must-select-each-individual-target sense in which they use the term.  The inconsistency between

Defendants' position and "the realities of terrorism" is reason enough to reject it.  *Stansell v.*

*Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 732 (11th Cir. 2014).

## 2.    Hezbollah "authorized" the terrorist attacks that injured Plaintiffs

Hezbollah also "authorized" the Jaysh al-Mahdi terrorist attacks that injured Plaintiffs.

18 U.S.C. § 2333(d)(2).  "[C]ourts have recognized that the term 'authorized' is broad."  *United*

*States v. Akinyoyenu*, 199 F. Supp. 3d 106, 115 (D.D.C. 2016).  To "authorize" something means

"to endorse, empower, justify, or permit" it through "some recognized or proper authority ([such]

as custom, evidence, personal right, or regulating power)."  *Webster's Third* at 146.  Hezbollah's

activities satisfy both elements of that definition.  AC ¶¶ 377-88.

Hezbollah exerted authority over Jaysh al-Mahdi in a number of ways.  It exerted

*religious* authority by virtue of its exalted status among Iraqi Shi'a, particularly through its

Secretary-General Hassan Nasrallah and Grand Ayatollah Hussein Fadlallah, whom the U.S.

government found was Hezbollah's "Spiritual Leader" and "Leading Ideological Figure."  *Id.*

---

[58] *See* U.S. State Dep't, *Country Reports on Terrorism 2007* at 8 (Apr. 2008) (Pl. Ex. 9; full version of Def. Ex. 60) (noting a "transition from expeditionary to guerrilla terrorism," where FTOs operate through "intermediaries" and the "subversion of [local] populations" to cause attacks by proxies that have "communications, training, and financial" links to the FTO); *see also* JASTA § 2(a)(3) (finding that FTOs can "act[] through affiliated groups or individuals").

¶¶ 377-80.  It exerted *personal* authority through its influence over Sadr himself, who was close

with Hezbollah's leadership.  *Id*. ¶ 387.  And it exerted *operational* authority through its role in

recruiting, training, and indoctrinating Jaysh al-Mahdi's fighters.  *Id*. ¶¶ 364-76, 389-403.

Jaysh al-Mahdi itself ratified those sources of authority.  At public rallies, Jaysh al-Mahdi

members declared themselves "an extension of Hizbullah," professed their "willingness to die

for Hezbollah," carried banners featuring Hezbollah leadership side-by-side with Sadr, and

chanted "We are Hezbollah."  *Id*. ¶¶ 372-73, 378.  Sadr himself swore fealty to Hezbollah by

describing Jaysh al-Mahdi as Hezbollah's "striking arm in Iraq," pledging support for what he

called "our victorious party, Hezbollah," and noting Jaysh al-Mahdi's "formal links with

Hizbollah."  *Id*. ¶¶ 333, 371-73.  At the operational level, Jaysh al-Mahdi fighters relied on

Hezbollah's training to learn how to murder Americans in Iraq.  *Id*. ¶¶ 375-76, 389-403.  Even

organizationally, Jaysh al-Mahdi's very structure – including its terrorist apparatus and control

over public health services in Iraq – was modeled on Hezbollah.  *Id*. ¶ 59.

Hezbollah used that authority over Jaysh al-Mahdi to incite the attacks that injured

Plaintiffs.  *Id*. ¶¶ 377-88.  Hezbollah exhorted Jaysh al-Mahdi to resist the so-called "occupiers";

implemented a propaganda campaign to rally additional recruits to Jaysh al-Mahdi's terrorist

cause; and publicly called on Iraqi Shiites to wage a "jihad" against Americans.  *Id*. ¶¶ 377-83.

Moreover, Grand Ayatollah Fadlallah issued a 2004 *fatwa* instructing Iraqi Shi'a that they had a

*religious duty* to attack Americans in Iraq.  *Id*. ¶¶ 384-85.  Such religious instructions were

"authorization" under any definition.[59]  They also were far more potent than legal authorization:

---

[59] *See Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000) ("A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder"); *Bluth v. Islamic Rep. of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016) ("jihad" is a "religiously sanctioned resistance against perceived enemies of Islam").

in the context of an Islamic jihad against a perceived occupier, Hezbollah's religious imprimatur offered vital, necessary permission for Jaysh al-Mahdi's abhorrent acts of violence.  AC ¶ 380.[60]

Defendants are wrong (at 68) to downplay such activities as mere "inspiration" for Jaysh al-Mahdi's attacks.  Unlike, for instance, a terrorist group that posts Internet propaganda that inspires a lone-wolf shooter somewhere across the world, Hezbollah had direct, continuous lines of communication and institutional linkages with Jaysh al-Mahdi.  AC ¶¶ 364-76, 389-92.  Also unlike an FTO "inspiring" faraway strangers, Hezbollah tailored its messages of authorization to Jaysh al-Mahdi and Iraqi Shi'a in particular – messages that precipitated reciprocal displays of fealty from Jaysh al-Mahdi fighters and Sadr himself.  *Id.* ¶¶ 371-73.  Hezbollah also focused its acts of authorization on a specific class of target (Americans) in a specific geographic area (Iraq).  *Id.* ¶¶ 377-88; *cf. Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 888 (N.D. Cal. 2017) (no allegations that Hamas "authorized" lone-wolf attack on Texas police officer where plaintiffs "d[id] not allege that Hamas had or expressed any intent to facilitate attacks on police officers in the United States").  Such acts went well beyond mere "inspiration."

Defendants' only other answer (at 68-69) is to criticize Plaintiffs' allegations as insufficiently "specific" – again suggesting that Hezbollah needed to exert authority over the details of each individual attack.  But a person can "authorize" an act categorically, without deciding when and where it takes place.[61]  Here, Hezbollah categorically "authorized" Jaysh al-

---

[60] Defendants' suggestion (at 68 & n.128) that an FTO must exert "official" or "legal" authority is a poor fit for terrorist organizations, which are illegal and so do not exercise "authority" like a legitimate entity would.  In the context of an Islamic terrorist group like Jaysh al-Mahdi, *religious* authority – the type Hezbollah exercised – matters most.  AC ¶¶ 380-81, 383.

[61] *Cf. Techniarts Eng. v. United States*, 51 F.3d 301, 305 (D.C. Cir. 1995) (finding a personal-services contract to be "specifically authorized by statute" because it fell within the category of contract Congress had authorized, not because Congress had approved the individual contract); *United States v. Right to Use & Occupy 3.38 Acres of Land, More or Less, in Alexandria*, 484 F.2d 1140, 1142 (4th Cir. 1973) (a "statutory "authorization" to acquire land

Mahdi's attacks on Americans in Iraq without always dictating day-to-day details like timing or

target selection.  Moreover, if Defendants were correct (at 70) that Hezbollah could "authorize"

an attack only by exercising formal "control or authority" over all of its details, it would turn the

terrorist implementing the attack into Hezbollah's agent and thus eliminate any distinction

between "authorized" and "committed" in the statute.  *See supra* p. 60.  And Defendants' narrow

view of "authorized," as with "planned," would vitiate JASTA as a tool for combatting modern

terrorist financing.  *See supra* p. 61.  All of those flaws remain fatal to Defendants' argument.

### 3. Hezbollah "planned and authorized" Jaysh al-Mahdi's illegal terrorist enterprise

**a.**    Count Two alleges that Defendants also aided and abetted a different "act of

international terrorism," 18 U.S.C. § 2333(a):  the "Jaysh al-Mahdi-Hezbollah Campaign," which

was Jaysh al-Mahdi's terrorist campaign to coerce the United States into withdrawing from Iraq.

AC ¶¶ 1164-74.  Sadr and his associates waged that Campaign through an illegal enterprise

(Jaysh al-Mahdi) that engaged in a pattern of racketeering activity, including the attacks on

Plaintiffs.  *Id*. ¶¶ 1164-66.  The Jaysh al-Mahdi-Hezbollah Campaign was an "act of international

terrorism" under the ATA, *id*. ¶ 1175:  it was undisputedly "violent [and] dangerous to human

life," it sought to "influence the policy of a government by intimidation or coercion," and it

"occur[red] primarily outside" the United States' "territorial jurisdiction."  18 U.S.C. § 2331(1).

It also violated the "criminal laws of the United States," *id*. § 2331(1)(A), because Sadr and his

associates conducted Jaysh al-Mahdi's affairs in violation of the Racketeer Influenced and

Corrupt Organizations ("RICO") statute.  *Id*. § 1962(b)-(d); *see* AC ¶¶ 1166, 1175.

---

"need not refer to the specific transaction if the project comes within the class of expenditures
that Congress intended to authorize").

The Court should sustain Count Two even if it concludes that Hezbollah did not "plan" or "authorize" the individual attacks that injured Plaintiffs.  No matter how the Court views the individual attacks, Hezbollah "planned" and "authorized" Jaysh al-Mahdi's broader terrorist campaign by co-founding Jaysh al-Mahdi, exercising its religious and moral authority to build up Jaysh al-Mahdi's organization and to incite attacks, and developing the tactics and training that Jaysh al-Mahdi deployed against Americans.  *Id.* ¶¶ 364-407.  Virtually all of Defendants' criticisms (at 66-70) of those allegations evaporate if the Campaign – rather than each individual attack – is the relevant "act of international terrorism."  Further, Defendants aided and abetted the Campaign for the reasons stated above, *supra* Part IV.A, and Plaintiffs undeniably were injured "by reason of" that Campaign, 18 U.S.C. § 2333(a).  Count Two thus provides an independent basis for denying Defendants' motion.

**b.**     Defendants' challenges to Count Two fail.  Their main argument (at 71) is that the Jaysh al-Mahdi-Hezbollah Campaign is not an "act of international terrorism" because operating a RICO enterprise is not an "act" "in ordinary parlance."  But Defendants offer no support for the assertion that the commission of a federal crime is not an "act."  Ordinarily, a "statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective."  *People v. Corpening*, 386 P.3d 379, 382 (Cal. 2016).[62]  That is nowhere more evident than in *Halberstam* itself, where the "act assisted" was not the individual murder but the "long-running burglary enterprise."  705 F.2d at 488.  Just as the woman in *Halberstam* was liable for assisting the "act" of a "five-year-long burglary campaign against private homes," *id.*, so are Defendants liable for assisting Jaysh

---

[62] *See also United States v. Pregler*, 925 F.2d 268, 269 (8th Cir. 1991) ("[a] [three-year] conspiracy is an ongoing act"); *Baker v. Farrand*, 26 A.3d 806, 816 (Me. 2011) ("act" can refer to "a series of related acts or omissions that proximately cause a harm").

al-Mahdi's multiyear campaign against the United States in Iraq, AC ¶¶ 1175-78.  Given

Defendants' concession (at 72) that Congress instructed courts to apply *Halberstam* under

JASTA, Defendants cannot explain why Congress would have wanted to bar liability for

assisting a multiyear "campaign" or "enterprise" like the one in *Halberstam*.  705 F.2d at 488.[63]

     Defendants fare no better in attacking Count Two for extending liability beyond "persons

who 'directly provid[e] substantial assistance to a designated foreign terrorist organization.'"

Mem. at 71 (quoting 162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) (statement of Rep.

Goodlatte)).  By its plain terms, liability under JASTA does not require a defendant to directly

assist an FTO; JASTA applies when a defendant assists "the person who committed" a terrorist

act that an FTO "committed, *planned, or authorized*."  18 U.S.C. § 2333(d)(2) (emphasis added).

Because the Jaysh al-Mahdi-Hezbollah Campaign is an "act of international terrorism" that

Hezbollah "planned" and "authorized," Count Two fits comfortably within the text of the statute.

     The single floor statement on which Defendants base (at 71) their contrary position is

entitled to no weight.  "[F]loor statements by individual lawmakers" are "among the least

illuminating forms of legislative history," *Advocate Health Care Network v. Stapleton*, 137 S. Ct.

1652, 1661 (2017), especially when they conflict with the statutory text and come from someone

(like Representative Goodlatte) who did not even sponsor the bill at issue.[64]  Whatever

---

[63] *Halberstam* also answers Defendants' concern (at 71, 72 n.132) about the "link between a defendant's conduct and the attack that injured a plaintiff."  For Defendants to be liable based on their assistance to the Jaysh al-Mahdi-Hezbollah Campaign, the attacks that injured Plaintiffs must be a "natural and foreseeable consequence" of the "enterprise[]" they assisted.  *Halberstam*, 705 F.2d at 488.  Defendants cannot dispute that test is met here.  AC ¶ 354.

[64] *See Nat'l Ass'n. of Mfrs. v. Taylor*, 582 F.3d 1, 12-13 (D.C. Cir. 2009) ("[F]loor statements' from members of Congress, even from a bill's sponsors, cannot amend the clear and unambiguous language of a statute."); *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 875 (D.C. Cir. 1996) (calling for "extreme caution" in using "floor" statements, which are often merely one member's "attempt[] to reassure his own constituency or even to create legislative history");

Representative Goodlatte may have *wished* JASTA said, the bill Congress enacted does not "strictly confine aiding-and-abetting liability," Mem. at 71; it affords plaintiffs "the broadest possible basis" to sue companies "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities," JASTA § 2(b). Plaintiffs' use of RICO as a predicate crime for an "act of international terrorism" accords with that intent.[65]

Defendants likewise err in asserting (at 72) that Plaintiffs failed to plead a RICO violation. Plaintiffs identify Sadr and many Jaysh al-Mahdi associates by name, AC ¶¶ 78-102, and allege that Defendants aided several RICO perpetrators in particular, *id.* ¶ 1165. Nothing more is required at this stage. *See McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (RICO claims that do not sound in fraud are "evaluated . . . against the more lenient pleading standards of Federal Rule of Civil Procedure 8(a)").[66] To be liable for aiding and abetting the Jaysh al-Mahdi-Hezbollah Campaign, Defendants need not have known the identities of the principals so long as they were "generally aware of [their] role [in] an overall illegal or tortious activity." *Halberstam*, 705 F.2d at 487-88; *see United States v. Staten*, 581 F.2d 878, 887 (D.C. Cir. 1978) (affirming aiding-and-abetting conviction even though the "principal in the operation"

---

*Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 702 (9th Cir. 1996) (discounting "floor statements of an individual member of Congress who did not sponsor the bill").

[65] The floor statement Defendants cite also conflicts with other floor statements evincing a broader conception of JASTA's reach. *See* 162 Cong. Rec. H5239-03 (statement of Rep. Smith) (JASTA imposes "secondary liability" for "aiding and abetting or conspiring with terrorist perpetrators"); 160 Cong. Rec. S6657-01 (daily ed. Dec. 11, 2014) (JASTA intended to impose liability on "aiders and abettors of terrorism").

[66] The cases Defendants cite (at 72) are inapposite. In *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288 (D.D.C. 2012), the court dismissed claims based on "a single act" that failed "RICO's pattern element" but *upheld* claims against other defendants who "committed hundreds of [unspecified] racketeering acts." *Id.* at 317. In *Franzone v. City of New York*, 2015 WL 2139121 (E.D.N.Y. May 4, 2015), the court applied a heightened pleading standard to RICO claims "sounding in fraud" – not the case here. *Id.* at *5.

being assisted was not specifically "identified").  Accordingly, the assertion that Plaintiffs must

allege with particularity each individual RICO perpetrator whom Defendants aided lacks merit.

Defendants' final argument (at 73-74) merely debates the facts.  Plaintiffs allege that

Hezbollah co-founded Jaysh al-Mahdi in April 2003 (thus "planning" and "authorizing" the

enterprise), AC ¶¶ 56 & n.18, 364,[67] which should be accepted as true at this stage.  In any event,

the precise timing of Hezbollah's first contact with Jaysh al-Mahdi matters little because RICO

proscribes "conduct[ing the] affairs" of an enterprise through a pattern of racketeering activity,

not just creating such an enterprise.  18 U.S.C. § 1962(c).  Thus, even if Hezbollah did not

contact Jaysh al-Mahdi until shortly after its formation, Hezbollah still "planned" and

"authorized" the RICO violation as it continued in later years.  AC ¶¶ 364-407.

### 4. Defendants' knowledge argument regarding Hezbollah lacks merit

In a last-ditch attempt to escape aiding-and-abetting liability, Defendants argue (at 74-76)

that the Amended Complaint fails to allege they *knew* of Hezbollah's role in Jaysh al-Mahdi's

terrorist attacks.  But the statute requires no such allegation.  The pertinent section reads:

> In an action under subsection (a) for an injury arising from an act of international
> terrorism *committed, planned, or authorized by an organization that had been
> designated as [an FTO]* under section 219 of the Immigration and Nationality Act
> (8 U.S.C. § 1189), as of the date on which such act of international terrorism was
> committed, planned, or authorized, liability may be asserted as to any person who
> aids and abets, by *knowingly providing substantial assistance*, or who conspires
> with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2) (emphases added).  The word "knowingly," properly construed, requires

only that an aider-and-abettor know (or recklessly disregard) that it is assisting terrorism.  *See*

---

[67] *See also* Def. Ex. 89 at 175 (noting one journalist's conclusion that "Hizbullah began
building . . . military apparatuses in Iraq immediately after the U.S. invasion").

*Halberstam*, 705 F.2d at 477.  Defendants, however, maintain (at 74) that the word "knowingly" applies to "each element," including the FTO's role in the act of international terrorism.

That argument misreads the statute.  *First*, an adverb like "knowingly" naturally modifies only the verb it precedes (here, "providing") rather than the entirety of the sentence in which it appears.  *See United States v. Dewalt*, 92 F.3d 1209, 1214 (D.C. Cir. 1996) ("the more obvious reading is that the adverb 'knowingly' modifies only the verbs, not the adjectival phrase"); *United States v. Jones*, 471 F.3d 535, 539 (4th Cir. 2006) (extending "knowingly" to the "infinite hereafters of statutory sentences would cause grammarians to recoil").  That principle applies here with particular force.  Defendants seek to extend the word "knowingly" not just beyond the verb it modifies ("providing"), but also through the direct object ("substantial assistance") and the indirect object ("the person who committed such an act") all the way up to an adjectival phrase ("committed, planned, or authorized by") modifying "act" several clauses earlier.  Congress did not plausibly intend a meaning that strays so far from ordinary rules of grammar.[68]

*Second*, Congress used the word "knowingly" not to describe the FTO element, but to incorporate *Halberstam*'s scienter requirement that "a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct."  705 F.2d at 478; *see* JASTA § 2(a)(5) (instructing courts to apply *Halberstam*).  In *Halberstam*, the woman was unaware that her companion was even "committing burglaries," let alone murder.  705 F.2d at 488.  But she remained liable for the murder because she "had a general awareness of her role in a continuing criminal enterprise."  *Id*.  Just as the woman in *Halberstam* was liable despite not knowing the

---

[68] *See United States v. Jennings*, 496 F.3d 344, 354 (4th Cir. 2007) ("it is doubly implausible here to extend the adverb's reach . . . through prepositional, relative, and conjunctive phrases and clauses"); *United States v. Fiorillo*, 186 F.3d 1136, 1156 & n.32 (9th Cir. 1999) (even if "knowingly" modifies words "far *beyond* it," it cannot modify "words that *precede[ ]* it").

details of what the burglar was doing, here too Defendants are liable for "knowingly" funding an illegal terrorist enterprise even if they were unaware of Hezbollah's involvement.

*Third*, had Congress intended Defendants' reading, it would have said so clearly.  It could have limited liability, for example, to injuries "arising from an act of international terrorism *that the defendant knows is* committed, planned, or authorized" by an FTO.  Or it could have borrowed the scienter standard from the criminal material-support statute requiring a defendant to "have knowledge that the organization is a designated terrorist organization."  18 U.S.C. § 2339B(a)(1).  The absence of such language in JASTA cuts against Defendants' interpretation.

Rather than proffer textual evidence to the contrary, Defendants again base their position (at 74-75) on a single floor statement that deserves no weight.  *See supra* p. 66.  Contrary to that floor statement, JASTA's text gives no indication that Congress was concerned about terrorist financiers having "sufficient notice" of an FTO's involvement.  Instead, Congress's concern was for *victims* of terrorism and with affording them "full access to the court system."  JASTA § 2(a)(7), (b).  Those "findings" codified in the statute – which, unlike a floor statement, Congress actually voted for – shed "substantial light" on JASTA's purpose and refute Defendants' position.  *ACA Int'l v. FCC*, 885 F.3d 687, 698 (D.C. Cir. 2018).

*Finally*, even if Defendants were correct about the statute, the Amended Complaint adequately alleges that they knew of Hezbollah's role in Jaysh al-Mahdi's terrorist acts.  AC ¶ 374.  Not only did Sadr and Jaysh al-Mahdi repeatedly proclaim their allegiance to Hezbollah at public events, *id*. ¶¶ 364-73 – of which Defendants' local agents were surely aware, *id*. ¶ 182 – but "widespread [media] coverage" of Hezbollah's role in Jaysh al-Mahdi's terrorist campaign placed Defendants directly on notice of those facts, *id*. ¶ 374.  Those news reports stated that Jaysh al-Mahdi was "being aided directly . . . by Hezbollah," that "Hezbollah was recruiting and

training members of Sadr's militia," and that Hezbollah made a "strategic decision" to ratchet up "support to Sadr to increase pressure on the U.S." *Id.* Defendants' request (at 75-76) that the Court construe those articles in their favor just raises fact questions for a jury.[69]

## V.  PLAINTIFFS PROPERLY PLEAD DIRECT-LIABILITY CLAIMS (COUNTS THREE AND FOUR)

A defendant that funds terrorism also violates the ATA when its own conduct constitutes an "act of international terrorism."  18 U.S.C. § 2333(a).  Direct liability works through a "chain of explicit statutory incorporations," under which a defendant that violates a predicate criminal statute (for example, by providing material support to terrorists) commits an act of "international terrorism" under the ATA.  *Boim*, 549 F.3d at 690.  Counts Three and Four state direct-liability claims based on violations of 18 U.S.C. §§ 2339A and 2339C.  AC ¶¶ 1181-94.  Under this theory, Defendants' conduct in violation of those statutes (rather than Jaysh al-Mahdi's) is the "act of international terrorism" that injured Plaintiffs and gives rise to ATA liability.

### A.  Defendants' Conduct Manifested An Appearance Of Terroristic Intent

Defendants' corrupt payments to Jaysh al-Mahdi were "act[s] of international terrorism" under the ATA because they involved dangerous acts, violated U.S. criminal law, occurred primarily outside U.S. territory, and "appear[ed] to be intended" to achieve all three of the aims set out in the statute:  "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1); *see* AC ¶¶ 1184, 1191.

---

[69] For example, the lead article Defendants cite (at 75 & n.136), though noting General Abizaid's belief that Hezbollah-Jaysh al-Mahdi "linkages" are "hard to pin down with precision," also noted his conclusion that "[t]hese linkages exist" and corroborated Plaintiffs' allegations based on other sources, including a "Mahdi commander."  Def. Ex. 16 at 5-6.

The requirement that Defendants' conduct "appear to be intended" to achieve a terrorist aim, 18 U.S.C. § 2331(1)(B), "is not a state-of-mind requirement; it is a matter of external appearance," *Boim*, 549 F.3d at 694; *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (liability hinges on "an objective standard" pegged to "the apparent intentions of actions"); *Wultz* 755 F. Supp. 2d at 49 ("actual subjective intent is not what the ATA" requires). The requirement is met when the "foreseeable consequences" of a defendant's conduct promote one of the three statutory aims. *Boim*, 549 F.3d at 694. Courts thus routinely hold that providing material support to terrorists, without any other allegations of intent, raises a plausible inference that the defendant committed an "act of international terrorism."[70]

This is not a novel concept in the law. The Supreme Court recognized 40 years ago that "a person who acts (or omits to act) intends a result of his act (or omission) . . . when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978). The ATA's focus on the appearance of a defendant's intent is similar; whatever Defendants subjectively desired, the law presumes that they intended the natural consequences of their actions. *See Boim*, 549 F.3d at 693-94. Here, those consequences included Jaysh al-Mahdi attacks that sought to (and did) achieve the three terrorist aims set out in the ATA. A jury thus could find that Defendants appeared to have intended those aims as well – even if Defendants did not subjectively desire them. *See, e.g.*, *Wultz*, 755 F. Supp. 2d at 48-49; *Abecassis II*, 7 F. Supp. 3d at 675-76.

---

[70] *See Abecassis II*, 7 F. Supp. 3d at 675-76 (reaching that conclusion for Oil-For-Food kickbacks to Saddam's regime); *Boim*, 549 F.3d at 694; *Wultz*, 755 F. Supp. 2d at 48-49; *Linde*, 384 F. Supp. 2d at 580-81; *Goldberg*, 660 F. Supp. 2d at 426-427; *Weiss*, 453 F. Supp. 2d at 613; *Burnett*, 274 F. Supp. 2d at 106-07; *Chiquita II*, 284 F. Supp. 3d at 1319.

Defendants' response (at 56) that they merely "intended to increase sales" to the Ministry misses the point.  The Bank of China, the defendant in *Wultz* and "an internationally respected financial institution with branches in this country," 755 F. Supp. 2d at 48, similarly argued that it wanted to make money rather than further terrorism.  But the court denied its motion to dismiss because "the law requires only that a defendant's acts '*appear* to be intended' to achieve one of the three enumerated items."  *Id*. at 49.  Here, too, even if Defendants *also* had the "apparent motive . . . to do more business in Iraq," Mem. at 57, that does not negate their apparent intent to support Jaysh al-Mahdi's terrorist aims.  *See United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (affirming sentencing enhancement based on 18 U.S.C. § 2331(1) because "money-raising goals obviously do not preclude a finding of intent to influence government policy").  At most, Defendants' argument that they appeared to be motivated solely by greed, rather than terrorism, just raises fact questions "for the jury."  *Gilmore*, 422 F. Supp. 2d at 102.[71]

### B.  Plaintiffs Satisfy The Scienter Elements Of The Predicate Criminal Statutes

Plaintiffs also adequately allege the state of mind required by both 18 U.S.C. § 2339A (material support) and 18 U.S.C. § 2339C (terrorist finance).  Both offenses require only that Defendants knew or recklessly disregarded that their support of Jaysh al-Mahdi would be used

---

[71] Defendants' cases (at 56-58) are not to the contrary.  Defendants rely primarily on *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014), but that case involved an international-law standard requiring allegations of a defendant's actual "purpose," *id*. at 192, not the objective appearance required here.  The plaintiffs in *Brill v. Chevron Corp.*, 2017 WL 76894, at *4 (N.D. Cal. Jan. 9, 2017), made "no allegations whatsoever" to satisfy the "appear to be intended" requirement, contending it "should not be treated as an independent element."  In *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *1-2, *9 (M.D. Fla. Mar. 31, 2011), the defendant paid *ransom* money that objective observers could view as different from Defendants' payments to gain entry to the Iraqi market.  Finally, in *Stutts v. De Dietrich Group*, 2006 WL 1867060 (E.D.N.Y. June 30, 2006), the plaintiffs failed to allege that the defendants "knew about any connection between the letters of credit they issued and Saddam Hussein's . . . chemical weapons."  *Id*. at *2 n.5.  Here, in contrast, Defendants knew or recklessly disregarded that their drugs and devices would support Jaysh al-Mahdi's terrorism.  *See supra* Part IV.A.2.

for terrorist purposes.  *See Boim*, 549 F.3d at 693 ("To give a small child a loaded gun would be

a case of *criminal* recklessness and therefore satisfy the state of mind requirement for liability

under section 2333 and the statutes that it incorporates by reference."); *Gill*, 893 F. Supp. 2d at

506 (mental state for §§ 2339A and 2339C is satisfied if "the defendant was reckless with regard

to the substantial probability of injuries that would likely be suffered by Americans").

Plaintiffs' allegations meet that standard for the reasons explained above.  *See supra* Part

IV.A.2; AC ¶¶ 180-87.  Defendants knew (or recklessly disregarded) that their corrupt payments

to Jaysh al-Mahdi supported terrorist attacks on Americans – both through direct knowledge, AC

¶¶ 180-82, and media reports, *id*. ¶¶ 183-87.  That is sufficient.  *See Goldberg*, 660 F. Supp. 2d

at 433 (sustaining ATA claim based on § 2339C alleging knowledge based on "public sources of

information"); *see also supra* note 49.  Defendants' request (at 59) – that the Court review "the

full body of publicly available information," weigh all the inferences, and determine for itself

what Defendants' knew – is improper at this stage.  *See Banneker*, 798 F.3d at 1129 (dismissal

unwarranted when "there are two alternative explanations . . . both of which are plausible").[72]

## C.    Defendants' Statutory Arguments Under 18 U.S.C. §§ 2339A and 2339C Fail

**1.    Section 2339A:**  Count Three alleges Defendants violated § 2339A by providing

"material support or resources" to Jaysh al-Mahdi.  18 U.S.C. § 2339A(a).  Defendants – except

for GE and Johnson & Johnson (Middle East) Inc., AC ¶¶ 210-21, 246-51 – argue (at 61-64) that

the statute does not apply to them because Congress excluded "medicine" from "material

support."  18 U.S.C. § 2339A(b)(1).  That argument fails for several reasons.

---

[72] *Benak v. Alliance Capital Management L.P.*, 435 F.3d 396 (3d Cir. 2006) (cited in Mem.
at 59), does not suggest otherwise.  That case turned on the "storm warnings" doctrine applicable
to the statute of limitations for federal securities-law claims, which involves an "objective"
standard that is satisfied when a sufficient quantum of information becomes public.  *Id*. at 400.
Here, in contrast, Defendants ask the Court to weigh assertedly competing reports to apply the
ATA's scienter standard, which raises a quintessential question of fact.

a.     *Cash bribes, free trips, and other benefits*.  The "medicine" exception, no matter

how this Court construes it, does not exculpate Defendants because each supported Jaysh al-

Mahdi members through cash bribes, vacations, and other unreasonable contract benefits.  AC

¶¶ 142-64; *see id*. ¶¶ 189, 192 (AstraZeneca), 217-18 (GE), 248, 252, 254 (J&J), 283, 285

(Pfizer), 311, 313 (Roche).  The Amended Complaint alleges that most Defendants made similar

cash payments under Oil-For-Food and identifies specific corrupt contracts executed by the

others.  *Id*. ¶¶ 49 & n.7, 161-62.  It further details the seven transaction stages at which

Defendants had to pay "commissions," *id*. ¶¶ 146-64, and explains that Jaysh al-Mahdi typically

required such "commissions" to account for at least 20% of the contract value, *id*. ¶¶ 142-45,

197, 258.  It also identifies Defendants' corrupt local agents and describes how Defendants used

them to deliver benefits to Jaysh al-Mahdi.  *Id*. ¶¶ 49, 200-01, 223-32, 262-70, 319-20.

Those allegations are more than sufficient.  Defendants assert (at 63) that Plaintiffs' cash

allegations lack "factual content" compared to the hyper-specific "free goods" allegations, but

they ignore the allegations that they paid "commissions" on the very same transactions in which

they delivered those "free goods."  AC ¶¶ 191-92, 216-17, 246-48, 253-54, 284-85, 312-13.  The

Amended Complaint describes the mechanics of those cash payments in depth, *id*. ¶¶ 146-64,

and it identifies specific contract numbers and percentages in which Defendants paid cash bribes

through "performance bonds," *id*. ¶¶ 161-62.[73]  Those cash bribes are especially plausible

because nearly every Defendant (or a predecessor or affiliate) funded terrorism through similar

---

[73] Defendants' cursory attempt to explain away the performance bonds, at the end of one
footnote (at 63 n.121), just raises a fact question.  Given how the bonds actually functioned in
practice, they provided a delivery mechanism for corrupt payments – and also accorded with the
practice of using such bonds for bribery under Oil-For-Food.  AC ¶¶ 161-62.

payments under Oil-For-Food.  *Id.* ¶¶ 44-53.  Plaintiffs' allegations on these issues provide more than the "short and plain statement" Rule 8 requires.  *Wultz*, 755 F. Supp. 2d at 38-39.

Plaintiffs' allegations would pass muster even under Rule 9(b)'s heightened standard, which does not apply here.  *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015).  In *Heath*, which addressed the False Claims Act, the D.C. Circuit held that Rule 9(b) does not require "'representative samples' of the [alleged false] claims that specify the time, place, and content of the bills." *Id*. at 125.  Instead, it requires only "sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *Id*.  Plaintiffs' extensive description of the cash-bribe scheme achieves both ends.  *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 202-04 (D.D.C. 2011) (sustaining allegations about a "complex fraud scheme" without details of "specific invoices, statements or records" or "where and when the . . . submission occurred").[74]

**b.**     ***Medical devices***.  Defendants sometimes supplied Jaysh al-Mahdi with medical devices along with pharmaceuticals.  *See* AC ¶¶ 259 (Janssen-Cilag's Eprex), 290 & n.237 (Pfizer's BeneFix), 317 (Roche's Pegasys).  The ATA's text (the word "medicine") and legislative history confirm that such devices are "property" within the definition of material support, rather than "medicine" excluded from it.  18 U.S.C. § 2339A(b)(1); *see* H.R. Conf. Rep. No. 104-518, at 114 (1996) ("limit[ing]" the exclusion "to the medicine itself" rather than "the

---

[74] Nor does the Amended Complaint implicate the concerns (Mem. at 64) that drive courts to dismiss complaints for improper group pleading.  Kimadia demanded corrupt payments from all counterparties, including each Defendant.  AC ¶¶ 142-64.  Defendants thus have ample "notice of the claims against each of them," and there is no doubt as to "the theory of liability for each Defendant." *Sheeran v. Blyth Shipholding S.A.*, 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015) (cited at 64).  Plaintiffs also rely on multiple witnesses and scores of documents; they allege far more than "a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir. 2007) (cited at 64).

vast array of medical supplies"); *United States v. Farhane*, 634 F.3d 127, 143 (2d Cir. 2011)

("[T]he medicine exception identified in § 2339A(b)(1) shields only those who provide

*substances* qualifying as medicine to terrorist organizations.").  Defendants' inclusion of medical

devices alongside their drugs thus renders the "medicine" exemption inapplicable.

      c.      ***"Free goods" were currency, not medicine***.  Even considering just Defendants'

drugs in isolation, the free drugs delivered to Kimadia functioned as cash equivalents rather than

medical donations.  AC ¶¶ 117, 119-20, 137-39.  Because Defendants provided those goods

knowing they would be bartered on the black market, they did not function as "medicine" in the

context of Defendants' transactions.  *See Webster's Third* at 1402 ("medicine" means "a

substance or preparation used in treating disease").  Rather, the cash-equivalent drugs functioned

as a type of "currency," which is included within the definition of material support.  18 U.S.C.

§ 2339A(b)(1); *cf. C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354, 1363

(7th Cir. 1975) ("currency" in Securities Exchange Act encompasses "cash substitute[s]").

Terrorist groups – including Jaysh al-Mahdi and Hezbollah – often raise funds through black-

market drug smuggling, AC ¶¶ 169-71, 361-62, and Congress did not plausibly intend to allow

companies to support those efforts by providing terrorists with cash-equivalent pharmaceuticals.

      2.      **Section 2339C:**  Count Four alleges that Defendants' provision of cash, drugs,

and medical devices – which Defendants do not dispute are "funds" under § 2339C, *see* AC

¶¶ 1189-90 – violated both prongs of that statute because Defendants knew they would be used

"in full or in part" to violate the International Convention for the Suppression of Terrorist

Bombings, 18 U.S.C. § 2332f (incorporated by 18 U.S.C. § 2339C(a)(1)(A), (e)(7)(I)), and to

injure civilians or others not taking an active part in hostilities, *id*. § 2339C(a)(1)(B).

Defendants raise only two narrow arguments in response.  First, they contend (at 65) that Jaysh al-Mahdi's bombings are not covered by § 2332f because Jaysh al-Mahdi was an "armed force[]" during an armed conflict, as those terms are understood under the law of war."  18 U.S.C. § 2332f(d)(1).  But Jaysh al-Mahdi was not an "armed force" in an "armed conflict" under that statute, just as it was not a "military force" under the ATA's act-of-war provision.  *See supra* Part III; *United States v. Hausa*, 258 F. Supp. 3d 265, 276 (E.D.N.Y. 2017) (construing the § 2332f(d)(1) exemption as "coterminous with the principle of combatant immunity").

Second, Defendants seek (at 65-66) to pick off individual Plaintiffs' claims by arguing that certain attacks were not bombings under § 2332f, or that many Plaintiffs were outside the scope of § 2339C(a)(1)(B).  But Defendants' attempt to limit Count Four to particular Plaintiffs ignores that the statute prohibits financing that will be used "in full or in part" to violate a treaty or to attack noncombatants.  18 U.S.C. § 2339C(a)(1).  Defendants do not deny that many of the attacks supported by their funds *did* fall under § 2339C(a)(1)(A) or (B).[75]  That the funding may have supported other attacks too merely shows it was used "in part" for a prohibited purpose; all of the financing was still provided in violation of the statute.  *Cf. United States v. Elshinawy*, 2017 WL 876484, at *15 (D. Md. Mar. 6, 2017) (actual use of funds for terrorism not required). Because Defendants' unlawful financing of Jaysh al-Mahdi proximately caused injuries to all Plaintiffs, *see infra* Part V.D, all can pursue claims based on § 2339C – even if financing one given attack in isolation would not have violated the statute.

---

[75] Defendants try to exclude (at 65 n.123) kidnappings from § 2339C(a)(1)(A) (and § 2332f(a)(1), which it incorporates) because they did not involve bombings, *see* AC ¶¶ 461, 796, 810, 820, 827, but those attacks targeted civilians and thus fall within § 2339C(a)(1)(B). Defendants' argument (at 65 n.125) ignores the statute's disjunctive text.  *See* 18 U.S.C. § 2339C(a)(1)(B) ("a civilian [] *or* to any other person not taking an active part in the hostilities") (emphasis added).

### D.        Plaintiffs Properly Plead Proximate Cause

#### 1.        Defendants proximately caused Plaintiffs' injuries by directly financing the terrorist group that caused their injuries

Plaintiffs' direct-liability claims (unlike the aiding-and-abetting claims) require that Defendants have proximately caused their injuries.  To plead "proximate cause," Plaintiffs must allege "some reasonable connection" between their injuries and Defendants' conduct.  *Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) ("*Owens III*").  Such a connection "contains two similar but distinct elements":  that (1) Defendants' conduct was a "substantial factor in the sequence of events" that led to Plaintiffs' injuries, and (2) the injuries were "reasonably foreseeable or anticipated as a natural consequence."  *Id*.  Those elements foreclose liability only when the "'causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'"  *Id*. (quoting *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014)).  Whether the requisite link exists in any given case "is ordinarily a question for the jury."  *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005).

Plaintiffs' causation allegations are legally sufficient.  The D.C. Circuit recently explained that providing material support to a terrorist group proximately causes the group's foreseeable attacks when the support "foster[s] the[] growth" of that group.  *Owens III*, 864 F.3d at 794.  Thus, in *Owens III*, the court upheld a finding that Sudan proximately caused al-Qaeda's U.S. Embassy bombings by providing al-Qaeda with general "tax exceptions and customs privileges" and by facilitating its "access to the formal banking system."  *Id*. at 794-95.[76]  The

---

[76] *Owens III* addressed whether the plaintiffs had established proximate cause "for jurisdictional purposes" under the FSIA's terrorism exception.  *Id.* at 778.  Although a plaintiff faces a "lighter burden" in showing jurisdictional causation than in "proving a winning case on the merits," *id*., that reflects merely the lesser quantum of evidence needed to establish jurisdictional facts, *id*. at 784-85 (noting plaintiffs' "modest burden of production").  The *legal* standard for causation remains the same in both circumstances.  *See id*. at 794 ("proximate cause remains the jurisdictional standard").  *Owens III* relied on traditional proximate-cause principles

plaintiffs were not required to "chart a direct and unbroken factual line between [the defendant's] actions and the terrorist act[s]" that injured them.  *Owens v. Rep. of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008) ("*Owens I*"); *see also Owens III*, 864 F.3d at 799 (affirming causation despite no evidence that Sudan "directly advanced the 1998 embassy bombings" in question).  Rather, they needed only to show that the defendant's "financial support" strengthened the capacity of al-Qaeda's "broader organization" to commit the type of attacks that injured them.  *Id*. at 794-95.

The D.C. Circuit's proximate-cause standard, which is controlling here,[77] accords with the ATA's purpose.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) ("Proximate-cause analysis is controlled by the nature of the statutory cause of action.").  The ATA's founding goal was to "interrupt, or at least imperil, the flow of money" "at any point along the causal chain of terrorism," S. Rep. No. 102-342, at 22, and Congress recently reaffirmed its intent to curtail the flow of "resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism," JASTA § 2(a)(6).  By making "financiers of terrorism" liable for attacks foreseeably committed by the groups they fund, the *Owens* standard fulfills that objective of "cut[ting] the terrorists' lifeline."  *Boim*, 549 F.3d at 691; *see id*. at 697-98.  Courts thus routinely sustain proximate-cause allegations when a defendant gives general financing to the terrorist group responsible for the attack at issue.[78]

---

and cited an ATA case as the basis for its two-factor test.  *See id*. at 794 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).  Moreover, the statutory text *Owens III* considered – applying when an injury is "'caused by'" terrorism, *id.* at 763 (quoting 28 U.S.C. § 1605(a)(7) (2006)) – closely resembles the ATA's "by reason of" language, 18 U.S.C. § 2333(a).

[77] *Shatsky v. Palestine Liberation Org.*, 2017 WL 2666111 (D.D.C. June 20, 2017) (Leon, J.), confirms that Plaintiffs need only show "proximate cause, as that term is typically defined." *Id*. at *7.  Although *Shatsky* found no causation under that standard, it did so at summary judgment based on evidentiary deficiencies that are inapplicable at this stage.

[78] *See e.g.*, *Chiquita II*, 284 F. Supp. 3d at 1317-18 (triable issue on proximate cause where defendant's "financial contributions" materially "enhance[d] the [terrorists'] terror capabilities"); *Wultz*, 755 F. Supp. 2d at 48 (bank's alleged "provision of financial services, including receipt

Plaintiffs' allegations are sufficient under the governing standard because Defendants' sales practices foreseeably financed Jaysh al-Mahdi's terrorist attacks. AC ¶¶ 165-87. Defendants sold to the Ministry during a period when terrorists controlled everything from its headquarters (which they used as a base), to its ambulances (which they weaponized), to its hospitals (which they used as command-and-control centers), to its procurement process (which they used to raise money). *Id*. ¶¶ 63-112. Yet despite the obvious nexus between the Ministry and terrorism, Defendants knowingly structured their transactions to funnel illegal payments – in both cash and in-kind cash-equivalents – to the Jaysh al-Mahdi members who ran the Ministry. *Id*. ¶¶ 105-64. Those payments provided crucial funding for Jaysh al-Mahdi's terrorist activities. *Id*. ¶¶ 165-79. Indeed, Sadr and Jaysh al-Mahdi sought control of the Ministry precisely because corrupt payments from foreign suppliers offered them a potent source of terrorist finance. *Id*. ¶ 167. The connection between such payments and Jaysh al-Mahdi terrorism was not some "mere fortuity," *Paroline*, 134 S. Ct. at 1719; it was the entire point of the arrangement.

*Abecassis I* confirms that those allegations are sufficient. *See* 785 F. Supp. 2d at 649. There, the court held that the plaintiffs had adequately pleaded a causal link between "Palestinian terrorist attacks" in Israel and the defendants' "kickbacks" to Saddam's regime under Oil-for-Food. *Id*. Although the court perceived "only an attenuated connection between the plaintiffs' injuries and each of the defendants," it sustained the allegations of "proximate cause" under the ATA because it was "foreseeable that [Saddam] would use the kickbacks" to finance terrorism. *Id*. The key, for the court, was the corrupt structure of the transactions. Although companies

and transfer of funds, proximately caused plaintiffs' alleged injuries"); *Weiss*, 453 F. Supp. 2d at 631 (sustaining proximate-cause allegations that "defendant provided material assistance or funding to the terrorist organization responsible for perpetrating the attacks"); *Burnett*, 274 F. Supp. 2d at 106 (same because "[a]ny terrorist attack . . . might have been the natural and probable consequence of . . . providing financial support to" a terrorist group).

"were permitted and even encouraged to do business with Iraq" under Saddam, they were "restricted to doing so within the bounds of the [Oil-For-Food Program]" that limited their sales to specified "humanitarian uses." *Id*. By paying unlawful "kickbacks," the defendants "bypassed" those restrictions and funneled "money to [Saddam] for unlimited discretionary use." *Id*. A natural and proximate consequence of providing such "off-book money" was that Saddam "would use at least some of it to support terrorist attacks" in Israel. *Id*.

Plaintiffs' causation allegations are even stronger. Here, as in *Abecassis I*, Defendants structured their transactions with an Iraqi ministry to "bypass[] the strict rules" (there, the Oil-For-Food Program; here, the FCPA) designed to ensure their integrity. *Id*. Here, as in *Abecassis I*, the "purpose of [the] kickbacks" was to funnel money to a corrupt counterparty (there, Saddam's regime; here, Jaysh al-Mahdi) "for unlimited discretionary use." *Id*. And in both cases "it was foreseeable" that such "off-book money" would flow to "support terrorist attacks." *Id*.; *see* AC ¶¶ 165-87. The only difference is that, whereas the *Abecassis I* kickbacks were transmitted by Saddam to separate terrorist groups abroad, *see* 785 F. Supp. 2d at 619-23, the terrorist group here directly controlled the Ministry with which Defendants were transacting, AC ¶¶ 63-104. If the former is enough for proximate cause, the latter is an easy case.[79]

## 2.   Defendants' proximate-cause arguments are unpersuasive

Defendants' causation arguments (at 48-53) rest on the premise that Plaintiffs allege only "commercial transactions that provided resources to a foreign intermediary with legitimate operations, . . . which *in turn* allegedly provided those resources to agents of a militant group."

---

[79] That conclusion applies to the Manufacturers for the reasons stated above. *See supra* Part IV.A.1.c. The Manufacturers' conduct – which they knew (or disregarded) supported Jaysh al-Mahdi, AC ¶¶ 183-87 – formed an integral part of the unlawful scheme and so was not "routine commercial activity." *Compare* Mem. at 54, *with Weiss*, 278 F. Supp. 3d at 641-42 (activity not "routine" if company "knows that the groups" benefiting "are engaged in terrorist activities").

Although Defendants' contracts were nominally with the Ministry, they secured those contracts by making corrupt payments *directly* to Jaysh al-Mahdi members. AC ¶¶ 105-164. Indeed, Defendants structured their transactions so that Jaysh al-Mahdi – rather than the Ministry in its lawful capacity – could use their payments for extra-legal purposes. *Id.* ¶¶ 117-20, 132-40, 142-44, 165. Jaysh al-Mahdi's diversion of those payments was thus baked into the transactions' very design. *See Abecassis I*, 785 F. Supp. 2d at 649 (same for "off-book" kickbacks under Oil-For-Food, even though companies were "encouraged to do business with Iraq").

Defendants also presume incorrectly (at 50) that the Ministry was a true "intermediary" separate from the "militant group" that controlled it. In fact, the Ministry was more of a Jaysh al-Mahdi front than a medical institution. AC ¶¶ 3, 63-104, 137-38. Courts regularly sustain proximate-cause allegations against companies that finance terrorism by funneling resources through comparable "front organizations." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013) (triable issue over proximate cause existed where defendants sent money not to Hamas itself but to third-party "organizations controlled by Hamas").[80] Were it otherwise – and companies could evade the ATA by "launder[ing]" terrorist donations through "intermediate organizations" – the "statute would be a dead letter." *Boim*, 549 F.3d at 702. The Ministry's presence as Defendants' nominal counterparty therefore does not defeat causation.

Defendants' cases (at 50-51) "involving state sponsors of terrorism" are not to the contrary. Those cases hold that giving funds to a country like Iran, standing alone, does not proximately cause all attacks "by a terrorist organization associated with that state." *Rothstein*,

---

[80] *See Weiss,* 278 F. Supp. 3d at 643 (sustaining proximate-cause allegations "that Defendant provided funds to Hamas front-groups and Hamas carried out the attacks during the same period of time within which the money was transferred"); *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 97 (D.D.C. 2017) ("*Owens II*") (noting that ATA proximate-cause allegations typically succeed when a company provides financing "for a terrorist organization or a terrorist front").

708 F.3d at 96.   But each involved a genuinely "sovereign state" acting as a "truly independent

intermediary" between the alleged financing and the terrorist group at issue.  *Owens II*, 235 F.

Supp. 3d at 97 (citing *Rothstein*).   Here, as just explained, the Ministry was not a true

"intermediary" at all, much less an "independent" one.  AC ¶¶ 3, 63-112, 165-79.  Moreover,

Defendants' state-sponsor cases hinged on a lack of well-pleaded allegations suggesting that the

moneys sent to the sovereign state were actually passed along to any terrorist group.[81]   The

Amended Complaint supplies that missing link by alleging in detail how Jaysh al-Mahdi used the

Ministry to extract terrorist financing from foreign suppliers like Defendants.  AC ¶¶ 105-12,

165-79; *see Abecassis II*, 7 F. Supp. 3d at 675 (holding proximate-cause allegations about Oil-

For-Food "kickbacks" sufficient under *Rothstein*).

Further, although Defendants are correct that courts often reject causation theories that go

"'well beyond the first step,'" Mem. at 50 (quoting *Hemi Grp., LLC v. City of New York*, 559

U.S. 1, 10-11 (2010)), determining what "falls within that 'first step' depends in part on the

'nature of the statutory cause of action.'"  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296,

1306 (2017) (quoting *Lexmark*, 134 S. Ct. at 1390).   The core inquiry is "whether the harm

alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark*, 134 S.

Ct. at 1390.   Plaintiffs' allegations are sufficient under that framework because Congress

intended the ATA to combat general terrorist financing.  *See supra* pp. 4-5.   Terrorist attacks by

the same group Defendants funded thus fall within the "first step" under the statute Congress

---

[81] *See Rothstein*, 708 F.3d at 97 (discerning "no nonconclusory allegation . . . plausibly
show[ing] that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas"); *In
re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) (no "factual allegations
that the money allegedly donated by . . . defendants to the purported charities actually was
transferred to al Qaeda and aided in the September 11, 2001 attacks"); *Owens II*, 235 F. Supp. 3d
at 97 (noting lack of "concrete connection to indicate that Iran did or was likely to use the money
defendants processed to fund terrorist acts").

enacted.  *See Owens I*, 531 F.3d at 895 (proximate cause does not require "direct and unbroken

factual line" to terrorist attack); *Boim*, 549 F.3d at 700-02 (noting that Defendants' preferred

"causal requirement" would "eviscerat[e]" "[d]onor liability" under the ATA).[82]

　　　　Finally, Defendants fail in their attempt (at 52) to defeat causation through so-called

"intervening acts."  The "acts" they identify – such as Jaysh al-Mahdi's diversion of their "free

goods" – were just the natural consequences of their conduct and so do not sever the causal

chain.  *See Morris v. McCarthy*, 825 F.3d 658, 672 (D.C. Cir. 2016) ("superseding cause" can

"break the causal chain" only when "of independent origin" and "not foreseeable").  The "free

goods" functioned as cash equivalents, and Jaysh al-Mahdi's monetization of those goods was no

more an "intervening act" than a terrorist group's conversion of U.S.-dollar cash donations into

its local currency.  At best, Defendants' exercise (at 52) of listing artificially separate "acts" in

the causal chain raises arguments "for the jury."  *Smith*, 413 F.3d at 102.[83]

---

[82] *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), which Defendants cite (at 49-50, 53), does not warrant a different conclusion.  That case turned on the plaintiffs' failure to "articulate any connection" whatsoever between Twitter's conduct (offering generally available social media services) and the ISIS attack at issue.  *Fields*, 881 F.3d at 750.  That defect is not present here.  AC ¶¶ 165-79.  Nor does this case implicate the Ninth Circuit's concern about the unique nature of "[c]ommunication services and equipment" like Twitter causing "ripples of harm to flow far beyond [Twitter's] misconduct."  *Fields*, 881 F.3d at 749.  But to the extent *Fields* suggests a need to tie a defendant's assistance directly to an *individual* attack, it is inconsistent with *Owens III*, *see* 864 F.3d at 794-98, and the weight of authority rejecting such a requirement, *see Boim*, 549 F.3d at 698-700; *see also, e.g.*, *Gill*, 893 F. Supp. 2d at 507 ("The money used need not be shown to have been used to purchase the bullet that struck the plaintiff."); *Strauss*, 2006 WL 2862704, at *18 ("Because money is fungible, it is not generally possible to say that a particular dollar caused a particular act or paid for a particular gun.").

[83] Defendants' observation (at 53-54) that Jaysh al-Mahdi also received support from other sources is beside the point.  Plaintiffs allege that corrupt payments by medical-goods suppliers provided an important (if not exclusive) stream of revenue for Jaysh al-Mahdi, AC ¶¶ 167, 175-76, and the ATA requires nothing more, *see Chiquita II*, 284 F. Supp. 3d at 1317 (triable proximate-cause issue existed where defendant's contributions to terrorist group were "but a small fraction of [the group's] overall revenues"); *Strauss*, 2006 WL 2862704, at *18 n.16 (alternate sources of financing for same terrorist group did not defeat causation because there "may be more than one proximate cause of an injury"); *Boim*, 549 F.3d at 698-700 (similar).

## VI.   PLAINTIFFS PROPERLY PLEAD VIOLATIONS OF STATE LAW (COUNTS FIVE THROUGH EIGHT)

Based on the same conduct described above, Plaintiffs also bring claims for intentional infliction of emotional distress, assault and battery, wrongful death, and survival.  AC ¶¶ 1195-1227; *see Burnett*, 274 F. Supp. 2d at 107 ("Given the adequacy of plaintiffs' [ATA allegations], plaintiffs have also stated common law claims for wrongful death, survival, and intentional infliction of emotional distress.").  Defendants' arguments (at 80-90) against those claims fail.

### A.   Fact Issues Preclude Defendants' Statute-Of-Limitations Argument

Plaintiffs' state-law claims are timely as pleaded.  The limitations clock for those claims did not start until Plaintiffs knew or reasonably should have known that Defendants' wrongdoing caused their injuries.  *See, e.g.*, *Lee v. Wolfson*, 265 F. Supp. 2d 14, 17-18 (D.D.C. 2003).  Here, given the obscurity of Defendants' corrupt contracting practices, Plaintiffs could not reasonably have discovered their claims until 2017, when counsel's investigation unearthed them.[84]  At most, that date poses a fact question for the jury.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208-09 (D.C. Cir. 1996) ("As [the D.C. Circuit has] repeatedly held, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint."); *Richards v. Mileski*, 662 F.2d 65, 70 (D.C. Cir. 1981) (clock tolled for over 20 years as to defendants whose individual wrongdoing was unknown).  Indeed, the factual dispute here is quite evident:  Defendants themselves "disagree" that the public record fully revealed "Jaysh al-Mahdi's activities," let alone their own corrupt role.  Mem. at 82.

---

[84] Many of Plaintiffs' allegations come from information counsel gathered from Confidential Witnesses and non-public documents during an extensive investigation.  *See* AC ¶¶ 1, 41-43. Plaintiffs could not have discovered those facts previously.  *Id.* ¶¶ 1200, 1206, 1217, 1226.

Defendants are incorrect (at 81-82) to suggest an inconsistency in the allegations that *Defendants* knew of Jaysh al-Mahdi's activities while *Plaintiffs* reasonably lacked knowledge of Defendants' wrongdoing.[85]  Whatever the public record about the Ministry, Defendants' practices – which are the centerpiece of this case – were not publicly known.  AC ¶¶ 188-332.  Moreover, Defendants are sophisticated companies with corporate security departments and savvy local agents in Iraq.  *See, e.g.*, *id.* ¶¶ 182, 185.  Plaintiffs are not similarly situated.

### B.    Defendants' State-Specific Dismissal Theories Are Flawed

Most of Defendants' state-law arguments (at 82-90) fail at the threshold because they depend on state-specific principles that Defendants have not shown apply.  Those arguments rest on two unsupported assumptions that Defendants bury (at 82 n.145) in a footnote:  (1) that the "common law claims are governed by the law of the domicile of each plaintiff (or decedent) or by D.C."; and (2) that Plaintiffs' domiciles "are the same as [Plaintiffs'] current residences."

This Court should not rely on those unproven assumptions at this stage.[86]  The Court has not yet made a choice-of-law determination for any claims, and the "constructive blending" of interests required for such a determination under D.C. law "is a fact-specific inquiry" best made on a more-developed record.  *Dammarell v. Islamic Rep. of Iran*, 2005 WL 756090, at *19-20 (D.D.C. Mar. 29, 2005).  For example, even assuming that the law of each Plaintiff's domicile

---

[85] Nor are they right (at 82) that the discovery-rule allegations are too conclusory.  Statute of limitations is an affirmative defense, and Plaintiffs had no duty to plead facts to negate it.  *See United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 38 (D.D.C. 2014); *Marzorati v. Med Start-Georgetown Med. Ctr, Inc.*, 265 F. Supp. 3d 24, 26 (D.D.C. 2017).

[86] Defendants intimate (at 82 n.145) that they are entitled to make these assumptions because the Amended Complaint does not specify which state's law applies to each claim.  But Plaintiffs are under no obligation to plead enough facts to conduct a choice-of-law analysis; "a complaint need not pin plaintiff's claim for relief to a precise legal theory."  *Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 99 (D.D.C. 2016); *see also, e.g.*, *Jakobovits v. PHL Variable Ins. Co.*, 2018 WL 2291311, at *8 (E.D.N.Y. May 18, 2018) (denying motion to dismiss for lack of "facts necessary to determine which state's substantive law applies").

controls, domicile is not necessarily the same as residence.[87]  That illustrates why courts often decline to conduct a choice-of-law analysis on the pleadings.  *See, e.g.*, *Jones v. Lattimer*, 29 F. Supp. 3d 5, 10 n.3 (D.D.C. 2014) (citing cases).  This Court should follow a similar course.

### C.      Defendants' General Tort-Law Arguments Lack Merit

#### 1.      Intentional infliction of emotional distress (Count Five)

Plaintiffs adequately allege all the elements of intentional infliction of emotional distress.  AC ¶¶ 1195-1201.  Defendants' arguments to the contrary (at 82-85) are unpersuasive.

**a.      *Extreme and outrageous conduct***.  Defendants knowingly funded terrorists who used their resources to attack Americans.  AC ¶¶ 105-79.  As courts have recognized, that constitutes extreme and outrageous conduct.  *See, e.g.*, *Stansell v. Rep. of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016); *Burnett*, 274 F. Supp. 2d at 107-08.

**b.      *Causation***.  Causation exists in support-of-terrorism cases when the attack is "precipitated by the defendants' financial support and sponsorship."  *Bennett v. Islamic Rep. of Iran*, 507 F. Supp. 2d 117, 129 (D.D.C. 2007).  Plaintiffs allege that Defendants' corrupt transactions were critical to Jaysh al-Mahdi's terrorist operations, AC ¶¶ 165-79, which raises a plausible inference of factual and legal causation at this stage.  *See also supra* Part V.D.

**c.      *Intent***.  To satisfy this element, Plaintiffs need only allege that Defendants supported terrorism with at least "reckless disregard of the probability of causing" emotional distress.  *Peterson v. Islamic Rep. of Iran*, 515 F. Supp. 2d 25, 42 (D.D.C. 2007), *abrogated on other grounds, Mohammadi v. Islamic Rep. of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015).  The Amended Complaint does so for the reasons stated above.  *See supra* Part IV.A.2.

---

[87] That is especially true for the many Plaintiffs who were service members.  *See, e.g.*, CPT Mack Borgen, *The Determination of Domicile*, 65 Mil. L. Rev. 133, 146-49 (1974).

    **d.**    ***State-specific arguments***.  If the Court reaches the state-specific arguments, it

should reject them because Defendants often describe the rules incorrectly.   For example,

contrary to Defendants' assertion (at 84-85), Arkansas does not require a defendant to target a

plaintiff individually.[88]  Defendants also invoke (at 85) a "presence" requirement, but the

Restatement (Second) of Torts § 46 (1965) contains no such requirement for direct victims, *see*

*Peterson*, 515 F. Supp. 2d at 42, and a court in this District held that six of the 11 states they cite

do *not* require presence, *see id*. at 42-44.[89]  At any rate, the District of Columbia – whose law

Defendants admit (at 82 n.145) might apply – imposes neither requirement Defendants raise.[90]

    **2.**    **Assault and battery (Count Six)**

    Plaintiffs who were physically wounded allege that Defendants gave "substantial

assistance or encouragement" to Jaysh al-Mahdi's assault and battery of Plaintiffs.  Restatement

(Second) of Torts § 876(b) (1979); *see* AC ¶¶ 1202-07.  As explained above, Defendants aided

and abetted Jaysh al-Mahdi's terrorist attacks, which undisputedly harmed Plaintiffs.  *See supra*

Part IV.A.  That is sufficient to impose secondary liability on Defendants.  *See Gill v. Islamic*

*Rep. of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017) (defendant "vicariously liable for assault

---

    [88] *See Perrodin v. Rooker*, 908 S.W.2d 85, 87-88 (Ark. 1995) (intent element satisfied if the wrongdoer "should have known that emotional distress was the likely result of his conduct"). *Davis v. Fulton County*, 884 F. Supp. 1245 (E.D. Ark. 1995) (cited in Mem. at 85 n.148) is not to the contrary because it suggested the intent element could have been met had the injury been a "substantially certain or highly probable consequence" of defendant's conduct.  *Id*. at 1264.

    [89] *Peterson* first found that California law has no presence requirement, interpreting the same case Defendants cite.  *Id*. at 42 (citing *Christensen v. Superior Court*, 820 P.2d 181 (Cal. 1991)); *see* Mem. at 85 n.149.  Then, finding no authoritative interpretation from 23 other states or the District of Columbia – including Connecticut, Kansas, and Kentucky from Defendants' list – *Peterson* held that they too do not require presence.  *Peterson*, 515 F. Supp. 2d at 44.

    [90] *See Ben-Rafael v. Islamic Rep. of Iran*, 540 F. Supp. 2d 39, 57 (D.D.C. 2008) ("the District of Columbia does not require physical injury or presence"); *Bluth*, 203 F. Supp. 3d at 21 ("acts of terrorism are per se extreme and outrageous conduct" under D.C. law, with or without direct targeting).

and battery" for supporting "terrorist activities" by another).  Defendants' only answer (at 86) is

to assert incorrectly that there is no aiding-and-abetting liability under D.C. law.[91]

### 3.     Wrongful death and survival (Counts Seven and Eight)

Plaintiffs' wrongful-death and survival claims are on behalf of the deceased Plaintiffs and

their estates, and they incorporate the common-law torts discussed above.  AC ¶¶ 1208-27.

Plaintiffs adequately plead these claims for reasons already stated.  *See, e.g.*, *Bodoff v. Islamic*

*Rep. of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006).  Because Plaintiffs allege intentional torts,

Defendants' discussion (at 88-89) of "negligence" is beside the point.  *See Burnett*, 274 F. Supp.

2d at 107-08 (sustaining wrongful-death and survival claims while dismissing "negligence"

claims); *Peterson*, 515 F. Supp. 2d at 39-40 (sustaining similar wrongful-death claims).[92]

## CONCLUSION

The Court should deny the motion to dismiss.  In the alternative, it should grant Plaintiffs

an opportunity to seek leave to amend.  *See* Fed. R. Civ. P. 15(a).

---

[91] "[T]his court is bound to recognize an actionable tort of aiding and abetting under the
D.C. Circuit's decision in *Halberstam*."  *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
246 F. Supp. 3d 52, 87-88 (D.D.C. 2017) (citing *Halberstam*, 705 F.2d 472); *see also Baker v.
Gurfein*, 744 F. Supp. 2d 311, 317 n.3 (D.D.C. 2010).

[92] Finally, Defendants' other state-specific arguments (at 86) assume that each estate's
claims are governed by the state where the estate is probated.  But they cite no authority for that
proposition, *see* Mem. at 86 n.153, which is far from clear on this record, *see* Restatement
(Second) of Conflict of Laws § 175 (1971) (using place of injury unless another state has a
"more significant relationship").  As with Defendants' other state-specific arguments, the Court
should wait to conduct a choice-of-law determination on a more-developed record.  *See supra*
Part VI.B.  Further, Defendants admit (at 89 n.156) that five states have not decided whether
their wrongful death and survival statutes apply extraterritorially.  The Court should decline
Defendants' premature invitation to guess how those states would rule on that issue.

Dated:  June 25, 2018

Respectfully submitted,

*/s/ David C. Frederick*

Ryan R. Sparacino (D.C. Bar No. 493700)
G. Derek Andreson (D.C. Bar No. 489994)
Sparacino & Andreson PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
derek.andreson@sparacinopllc.com

David C. Frederick (D.C. Bar No. 431864)
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Thomas G. Schultz (D.C. Bar No. 1028017)
Nicholas O. Hunter (D.C. Bar No. 1022355)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
tschultz@kellogghansen.com
nhunter@kellogghansen.com

*Counsel for Plaintiffs*