# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA ATCHLEY, BENNY ATCHLEY, CONNIE ATCHLEY, ELISSA ATCHLEY, KATELYN WEATHERFORD, JOHN ARAGON, SR., BRIAN BEAUMONT, DEMPSEY BENNETT, DORIS BENNETT, DARNELL BENNETT, BRANDEAUX CAMPBELL, ANGIE CAPRA, ANTHONY CAPRA, SR., SHARON CAPRA, MARK CAPRA, VICTORIA CAPRA, A.C., a minor, JARED CAPRA, S.C., a minor, DANIELLE CAPRA, EMILY CAPRA, JACOB CAPRA, JOANNA CAPRA, JOSEPH CAPRA, JULIA-ANNE CAPRA, MICHAEL CAPRA, RACHEL LEE, SARAH JOHNSON, SALLY CHAND, individually, and for the estate of MICHAEL CHAND, SR., MICHAEL CHAND, JR., CHRISTINA MAHON, RYAN CHAND, BRENDA CHAND, KARA CONNELLY, JEAN DAMMANN, MARK DAMMANN, KEVIN CONNELLY, JIMMY CONNELLY, MELISSA DOHENY, KATHY KUGLER, ROBERT KUGLER, AMY RITCHIE, DREW EDWARDS, DONIELLE EDWARDS, ALAN EDWARDS, BRENDA EDWARDS, DANE EDWARDS, LOGAN EDWARDS, SAMANTHA EDWARDS, IAN EDWARDS, HANNAH EDWARDS, AUSTIN EMORY, BRANDON EMORY, individually, and for the estate of MICHAEL ADAM EMORY, L.E., a minor, MARIA de la luz VILLA, BOBBY EMORY, CAROLYN BALDWIN, for the estate of KATHY LOUISE BURNS, TANYA EVRARD, JACOB HARBIN, DANNY HARBIN, LINDA HARBIN, ELIJAH HARBIN, ESTHER TATE, LEASA DOLLAR, EUGENE DELOZIER, BILLY JOHNSON, BRIDGET JUNEAU, individually, and for the estate of WILLIAM JUNEAU, STEPHANIE JUNEAU, WILLIAM KELSO, JOHN KIRBY, REBEKAH KIRBY, CAREN KLECKER, GREGORY KLECKER, individually, and for the estate of DEBORAH KLECKER, LEROY LANCASTER, MICHAEL LUKOW, BRUCE LUKOW, RIKKI LUKOW, KRISTEN KELLEY, ANDREW LUKOW, JOSEPH LUKOW, | Case No.: 17-cv-02136-RJL<br><br>JURY TRIAL DEMANDED |

ANGELA ROBINSON, RANDALL THOMPSON, NATHAN MCCLURE, NIKITA MCNEAL, J.M., a minor, JOSEPH MIXSON, JOHN MIXSON, KARON MIXSON, ALICIA MIXSON, RICHARD NEIBERGER, MARY NEIBERGER, ERIC NEIBERGER, individually, and for the estate of CHRISTOPHER NEIBERGER, AMI NEIBERGER, ROBERT NEIBERGER, ANTHONY DONALD PELLECCHIA, ANTHONY PELLECCHIA, KATHRYN ANN JOHNSON, DANIEL PRICE, TERRI OVERTON, STEVEN PRICE, CARL REIHER, SHAY HILL, for the estate of ALAN ROGERS, LUIS ROSA-VALENTIN, LUIS ROSA-ALBERTY, M.R., a minor, ALEX ROSA-VALENTIN, ILIANA ROSA-VALENTIN, ELENA SHAW, EMILY SHAW, CASEY SHAW, L.S., a minor, ERIN DRUCTOR, individually, and for the estate of BLAKE STEPHENS, KATHLEEN STEPHENS, TRENT STEPHENS, DEREK STEPHENS, RHETT STEPHENS, SUMMER STEPHENS, BRITTANI HOBSON, SUSAN ARNOLD, individually, and for the estate of RONALD TUCKER, DAVID ARNOLD, SAMANTHA TUCKER, DAISY TUCKER, BRANDON ARNOLD, RACHELLE IDOL, JAMES VAUGHN, JENNINE VAUGHN, CLIFFORD VAUGHN, MICHELE WHITE, individually, and for the estate of DELMAR WHITE, SHELBY WHITE, S.W., a minor, ROBERT WHITE, ROBERT WINEGAR, PATRICIA CLAVENNA, ELYSE WINEGAR, MARY JAGELLO, ROBERT LLOYD WINEGAR, MELISSA WITTE, WILLIAM WITTE, individually, and for the estate of KEVIN WITTE, WILLIAM ZAPPA, HAEKYUNG ZAPPA, PATSY BELL, RICHARD LANDECK, VICTORIA LANDECK, JENNIFER LANDECK, CARRIE THOMPSON, individually, and for the estate of SEAN THOMAS, A.T., a minor, DANIEL THOMAS, SR., DIANA THOMAS, DANIEL THOMAS, JR., DAVID THOMAS, KELLY GILLIS, MELINDA FLICK, MICHELLE WEST, MADISON WEST, NISTASHA PEREZ, MICHAEL MURPHY-SWEET, ELIZABETH MURPHY-SWEET, ANONA GONELLI, ROBERT J. KUHLMEIER,

THERESA A. KUHLMEIER, THERESA A.
KUHLMEIER, EDWARD KUHLMEIER,
THOMAS KUHLMEIER, JOHN KUHLMEIER,
DAVID KUHLMEIER, ROBERT W.
KUHLMEIER, TANJA KUHLMEIER,
individually, and for the estate of DANIEL
KUHLMEIER, K.K., a minor, DONNA FARLEY,
NOEL J. FARLEY, BARBARA FARLEY, BRETT
FARLEY, individually, and for the estate of
STEVEN FARLEY, JESSICA FARLEY,
CAMERON FARLEY, CHRIS FARLEY, VICKIE
MCHONE, NOEL S. FARLEY, DAVID FARLEY,
CARLA PROFFITT, DAWN WILLIAMSON,
LESLIE HARDCASTLE, individually, and for the
estate of JOSHUA REEVES, J.R., a minor, JAMES
REEVES, W. JEAN REEVES, JARED REEVES,
SHERRI HOILMAN, JONI LITTLE, MARIA
LANE, MARK MUNNS, MARTHA STEWART,
CRISTA MUNNS, BREE REUBEN, CASEY
REUBEN, BEN REUBEN, PATRICK REUBEN,
QUINTEN REUBEN, LINDA REUBEN,
FRANCIS COTÉ, NANCY COTÉ, SAMANTHA
DUNFORD, MAXIMILLIAN SHROYER,
CHRISTOPHER COTÉ, individually, and for the
estate of JONATHON COTÉ, BARBARA
ALEXANDER, individually, and for the estate of
RONALD WITHROW, JOHNNY ALEXANDER,
SHAWN RYAN, SANDRA RYAN, A.R., a minor,
BARB THIEDE, JASON RYAN, BILLY RYAN,
ANGIE RYAN, TERESA BECKLEY, GRANT
VON LETKEMANN II, KELLY VON
LETKEMANN, SCOTT SCURRAH, MASINA
TULIAU, JENNIFER LINK, JESSICA REW,
SARA LILLY, RYAN HICKMAN, E.H., a minor,
SHARON JOHNSTON, JUDY COLLADO,
individually, and for the estate of JAY COLLADO,
KAIYA COLLADO, MARICEL MURRAY, W.
ANN MEULI, J.M., a minor, BRYAN S.
SHELTON, individually, and for the estate of
RANDOL SHELTON, DARLENE SHELTON,
BRYAN T. SHELTON, AMANDA SHELTON,
TAMMY KINNEY, TAMMIE DENBOER,
DEREK GAJDOS, SHARONDA PARLIN,
CYNTHIA PARLIN, MARIA VIDAL, JIMMY
RUNDELL, ROBIN DAVIDSON, individually,
and for the estate of STEVEN PACKER,

CHRISTOPHER PACKER, DANIELLE
PACKER, JASON DAVIDSON, ZACHARY
DAVIDSON, KATHERINE CROW, K.E.C., a
minor, K.A.C., a minor, CANDACE HUDSON,
DAVID BUSH, JONATHAN CONTRERAS, SR.,
CARLOS CONTRERAS, CESAR CONTRERAS,
HERNAN CONTRERAS, NOEL CONTRERAS,
DANNYEL CONTRERAS, NORMA
CONTRERAS, THERESA INOUYE, JERRY
INOUYE, JULIE PAYNE, individually, and for the
estate of CAMERON PAYNE, K.P., a minor, A-
L.P., a minor, DENISE JACKSON, AUNDRA
CRAIG, JOYCE CRAIG, T.M.C., a minor,
JONATHAN CRAIG, MICHAEL COOK, ANDRE
BROWN, VALENCIA COOK, DEBRA COOK-
RUSSELL, NASHIMA CRAIG, ARIFAH
HARDY, MATTHEW CRAIG, TONY
BOTELLO, TAUSOLO AIETI, POLOKA AIETI,
IMO AIETI, LISI AIETI, CHRISTOPHER
BOUTEN, ERIN BOUTEN, JORDAN
BRACKETT, BRANDON BYBEE, MARK
CASHMAN, BRIAN CASEY, BRITTANY
HOGAN, SHELLEY CASEY, RICHARD
CASEY, JOHNNY CASTILLO, MICHAEL
DUNN, ANDREW FUKUZAWA, FRANCISCO
GIETZ, ABELINO GOMEZ, PATRICK
HANLEY, EDWARD HANLEY, KATHERINE
HANLEY, CECELIA HANLEY, BENJAMIN
JOHNSON, TAMALA JOHNSON, GREG
JOHNSON, BRANDON JOHNSON, BROOKE
PLUMB, C. RICHARD LOONEY, MARTHA
LOONEY, BARRY MCDONALD, MATTHEW
MERGELE, JARETH PAYNE, LUCAS
SASSMAN, MELISSA SASSMAN, JEREMY
SMITH, DONALD SPENCER, JARED
STEVENS, DERRICK STINNETT, BRANDI
STINNETT, LAURIE MANYLIGHTNINGS, for
the estate of LELAND THOMPSON, PATRICK
TUTWILER, CRYSTAL TUTWILER, RYAN
WILSON, JAMI WILSON, JOSHUA WOLD,
CELESTE YANTIS, PRESLEY ALEXANDER,
E.W., a minor, HERBERT GILL, JAMES
GMACHOWSKI, JOSHUA GRZYWA, NEYSA
GRZYWA, KURTISS LAMB, LISA LAMB, JOSE
LOPEZ, J.L., a minor, DAVID MCINTOSH,
DONALD MCINTOSH, TYLER NORAGER,

SHALEE NORAGER, M.N., a minor, JASON
ROBINSON, FRANCES ROBINSON, E.R., a
minor, WILLIAM WEATHERLY, MICHAEL
WEATHERLY, JARROD LAGRONE,
CHRISTOPHER HALSKI, VIRGINIA BILLITER,
ERIC BILLITER, ADRIANNE KIDD, DANIEL
DUDEK, MARGARET DUDEK, SARAH
DUDEK, ANDREW DUDEK, KATIE
WOODARD, CHELSEA ADAIR, individually,
and for the estate of JAMES ADAIR, A.A., a
minor, MATTHEW ADAMSON, R.A., a minor,
KARAR ALABSAWI, ROSEMARIE ALFONSO,
individually, and for the estate of CARLO
ALFONSO, K.B., a minor, KOUSAY AL-TAIE,
individually, and for the estate of AHMED AL-
TAIE, NAWAL AL-TAIE, HATHAL TAIE, JAKE
ALTMAN, NADJA ALTMAN, J.A., a minor,
MAIRA ALVAREZ, individually, and for the
estate of CONRAD ALVAREZ, K.A., a minor,
A.A., a minor, C.A., a minor, CHERYL ANAYA,
CARMELO ANAYA JR., TRISTA MOFFETT,
individually, and for the estate of MICHAEL
ANAYA, CATHY ANDINO, individually, and for
the estate of EDWIN ANDINO, II, VERONICA
PENA ANDRADE, VERONICA D. ANDRADE,
ROBERTO ANDRADE, SR., individually, and for
the estate of ROBERTO ANDRADE, JR.,
MATTHEW ANDREAS, NICHOLAS ANNA,
MONICA ARIZOLA, ROBERTO AARON
ARIZOLA, ROBERTO ARIZOLA, SR., CECILIA
ARIZOLA, RICARDO ARIZOLA, DANNY
ARIZOLA, TREY BAILEY, MCKENZIE
BAILEY, SAMANTHA BALSLEY, individually,
and for the estate of MICHAEL BALSLEY, L.R-
W., a minor, AFONSO BANDHOLD, HENRY
BANDHOLD, JR., MARIANA BANDHOLD,
LAUREL BARATTIERI, individually, and for the
estate of GUY BARATTIERI, PATRICIA
WHEATLEY, CODY BARHAM, TODD
BARNUM, DUSTIN BAUER, T.H., a minor, S.B.,
a minor, K.B., a minor, KARI CAROSELLA,
individually, and for the estate of JUSTIN BAUER,
JEREMY BAUER, JACOB BAUER, CONNIE
HADDOCK, GREGORY BAUER, DAVID
BAXTER, JR., NICOLE BAXTER, DAVID
BAXTER, SR., BRIAN BEEM, ELIZABETH

BEEM, KELLY BEEM, KAITLYN BEEM,
CASSANDRA BEEM, JOSEPH BEEM,
MATTHEW BENSON, DANIEL BENSON,
CAROL BENSON, B.B., a minor, C.B., a minor,
MELISSA BENSON, BRENTYN BISHOP, JOHN
BLICKENSTAFF, PAM JONES, TRISTA
CARTER, ADRIANNE BLICKENSTAFF, A.B., a
minor, C.B, a minor, M.B., a minor, MISTY
BLICKENSTAFF, JARED BLICKENSTAFF,
DENISE VENNIX, JEREMY BLOHM,
individually, and for the estates of ALAN BLOHM
and CHRISTOPHER BLOHM, KIANA BLOHM,
PAULA BOBB-MILES, individually, and for the
estate of BRANDON BOBB, JOHNNY MILES,
SR., RACQUEL MILES, JOHNNY MILES, JR.,
EVAN BOGART, LANI BOGART, DOUGLAS
BOGART, CANA HICKMAN, CHRISTOPHER
BOGART, JOHN BOTTS, DARA BOTTS,
ELIZABETH CUNNINGHAM, STEVE BOTTS,
JENNIFER BOTTS, MARIO BOWEN,
MICHELLE KLEMENSBERG, ANDREW
BRADLEY, CONSTANCE BRIAN, individually,
and for the estate of BRIAN BRIAN, AMBER
HENSLEY, MICHAEL BRIGGS, TAKARRA
BRIGGS, M.D.R. II, a minor, M.J.B., a minor,
M.J.B., a minor, JOSHUA BROOKS, DANIEL
BROOKS, ELIZABETH MASTERSON,
individually, and for the estate of JOSHUA
BROWN, TAYLOR BROWN, individually, and
for the estate of SCOTT BROWN, ALAN BURKS,
individually, and for the estate of PETER BURKS,
JACKIE HLASTAN, GEORGIA BURKS,
ALISON MCRUIZ, SARAH PHILLIPS,
ZACHARY BURKS, LARRY CABRAL, JR.,
JASMYN RAUDA, individually, and for the estate
of ROLAND CALDERON, BENJAMIN
CARRINGTON, TERRY CARTER, LINDA
CARTER, SHAUN CHANDLER, JULEONNA
CHANDLER, ELIZABETH CHISM, individually,
and for the estate of JOHNATHAN CHISM,
DANNY CHISM, VANESSA CHISM, JULIE
CHISM, ANN CHRISTOPHER, individually, and
for the estate of KWESI CHRISTOPHER,
THOMAS COE II, HEATHER COE, V.T.C., a
minor, ALEJANDRO CONTRERASBAEZ,
JESSICA CONTRERASBAEZ, PETER

PASILLAS, J.C., a minor, A.C., a minor, JOSHUA
COPE, PHILIP COPE, ERICA OWENS, JACOB
COPE, LINDA COPE, JONATHAN COPE, L.C., a
minor, KATHY CRABTREE, individually, and for
the estate of DANIEL CRABTREE, M.C., a minor,
DEBRA WIGBELS, JUDY CRABTREE,
JOSHUA CRAVEN, HOLLY CRAVEN,
MEAGHUN CROOKSTON, LEESHA
CROOKSTON, individually, and for the estate of
DUNCAN CROOKSTON, JOHN DAGGETT,
COLLEEN CZAPLICKI, KENDALL
RASMUSSON, LOUIS DAHLMAN, LUCAS
DAHLMAN, AMBER DAHLMAN, KAY
STOCKDALE, AYLA DAVIS, E.D., a minor,
GUY DAVIS, TERESITA DAVIS,
CHRISTOPHER DAVIS, MARIA CALLE,
individually, and for the estate of GEORGE
DELGADO, CYNTHIA DELGADO, ANTHONY
DEMATTIA, PHILIP DERISE, LORAMAY
DIAMOND, individually, and for the estate of
SEAN DIAMOND, SALLY WILEY, JAMES
WILEY, JASON DIAMOND, TAYLOR
DIAMOND, MADISON DIAMOND, A.D., a
minor, SEAN R. DIAMOND, KENDRICK
DIXON, KADAIVION DIXON, DANIEL
DIXON, individually, and for the estates of
ROBERT DIXON and ILENE DIXON, DAVID
DIXON, GRETCHEN LANG, L.R., a minor, M.R.,
a minor, SHAWN DONNERY, TONYA
DRESSLER, individually, and for the estate of
SHAWN DRESSLER, ARDITH DRESSLER,
MELISSA DRESSLER, TANYA DRESSLER,
DANIEL DRESSLER, JAMES DRESSLER,
KENNETH DREVNICK, individually, and for the
estate of DANIEL DREVNICK, DENNIS DUNN,
SHARON SMITH, individually, and for the estate
of TERRENCE DUNN, TIMOTHY DUVALL,
JR., TAMMY EAKES, JOHN EAKES, JOSHUA
ECKHOFF, JULIA EDDS, individually, and for
the estate of JONATHAN EDDS, BARRY EDDS,
JOEL EDDS, ANGELINE JACKSON,
individually, and for the estate of CODY
EGGLESTON, KAYTRINA JACKSON, SHILYN
JACKSON, TIMOTHY ELLEDGE, individually,
and for the estate of MICHAEL ELLEDGE,
EDWARD ELLIOTT, individually, and for the

estate of DANIEL ELLIOTT, LEROY ESCO JR.,
TARYN ESCO, L.E., a minor, A.P., a minor,
KEYONDRA PERRIN, STEPHANIE ZOBAY,
individually, and for the estate of STEPHEN
EVERHART, RUSSELL C. FALTER, JOHN
SACKETT, MARJORIE FALTER, DAVID
LUCAS, MICHAEL LUCAS, LINDA FALTER,
RUSSELL J. FALTER, individually, and for the
estate of SHAWN FALTER, TIMOTHY LUCAS,
MARSHA NOVAK, ANDREW LUCAS,
ANTHONY FARINA, KATHLEEN PIRTLE,
CARROL ALDERETE, individually, and for the
estate of CLAY FARR, ANTHONY ALDERETE,
MATTHEW FIESER, JACKIE FARRAR-
FINKEN, CAROLINE FINKEN, EMILIE
FINKEN, JOAN HENSCHEID, MARK FINKEN,
JEAN PRUITT, RICHARD FINKEN, DAVID
FINKEN, ALAN FINKEN, PETER FINKEN,
JAMES FLEMING, III, MARK FLETCHER,
NORMAN FORBES IV, LONNIE FORD,
individually, and for the estate of JOSHUA FORD,
LINDA MATTISON-FORD, JESSICA MATSON,
HELEN FRASER, RICHARD FRASER,
individually, and for the estate of DAVID
FRASER, RICHARD LEE, CHARLOTTE
FREEMAN, individually, and for the estate of
BRIAN FREEMAN, I.F., a minor, G.F., a minor,
FRED FRIGO, NOALA FRITZ, individually, and
for the estates of JACOB FRITZ and LYLE
FRITZ, ETHAN FRITZ, DANIEL FRITZ, SCOTT
FRITZ, KRISTEN BLEDSOE-FRITZ, NANCY
FUENTES, individually, and for the estate of
DANIEL FUENTES, ARMANDO FUENTES,
TATYANA FUENTES, JULIO FUENTES,
EMMA MCGARRY, D.F., a minor, SAMANTHA
GAGE, individually, and for the estate of JOSEPH
GAGE, M.G., a minor, LUIS GARZA, BREANNA
GASPER, individually, and for the estate of
FRANK GASPER, JAMIE BARNES, RANDALL
GEIGER, individually, and for the estate of
WAYNE GEIGER, KIMBERLEY GEIGER,
JESSECA TSOSIE, ANTHONY GERBER,
LINDA GIBSON, individually, and for the estate
of BRENNAN GIBSON, JOHN GIBSON,
STEPHANIE WEBSTER, SEAN ELLIOTT,
TRAVIS GIBSON, TYLER GINAVAN,

CHRISTOPHER GOLEMBE, KATHRYN HEAD,
MIGUEL GONZALEZ, JOEL GORBUTT,
KEVIN GRAVES, individually, and for the estate
of JOSEPH GRAVES, COURTNAY GRAY,
individually, and for the estate of BRENTON
GRAY, CAYDEN GRAY, JOHN GREER,
STEPHANIE SANDER, CHRISTOPHER GREER,
JOSEPH GREER, CARL GREER, CHARLES
GREGSTON, ASHLEY HOUPPERT, individually,
and for the estate of JAMES GUDRIDGE,
ROBERT HAAF, MONICA HAAF, J.A.H., a
minor, MARY HAAF, JAMES HAAF, ASHLEY
SIMS, MICHAEL HABSIEGER, BRENDA
HABSIEGER, individually, and for the estate of
ANDREW HABSIEGER, AMBER HABSIEGER,
for the estate of JACOB HABSIEGER, DEREK
HADFIELD, ASHLEY HADFIELD, ROBERT
HADFIELD II, KRISTI HADFIELD, JENNIFER
ROTON, KELLI HAKE, individually, and for the
estate of CHRISTOPHER HAKE, G.H., a minor,
DENICE YORK, RUSSEL YORK, JENNIFER
YORK, JASON YORK, PETER HAKE, JILL
HAKE, KERI HAKE, ZACHARY HAKE,
SKYLAR HAKE, JESSICA WILLIAMS,
individually, and for the estate of JAMES HALE,
J.H., a minor, J.H., a minor, J.H., a minor, JERRAL
HANCOCK, STACIE TSCHERNY, J.H., a minor,
A.H., a minor, SAVANNAH TSCHERNY,
JEFFREY HARPER, SEAN HARRINGTON,
PAUL HARRIS, ANNE HARRIS, DAVID WADE
HARTLEY, individually, and for the estate of
JEFFERY HARTLEY, DAVID WAYNE
HARTLEY, KAYLIE HARTLEY, NANNETTE
BYRNE-HAUPT, LYNN FOREHAND,
individually, and for the estate of RYAN HAUPT,
LANCE HAUPT, RHONDA HAUPT, TIFANY
THOMPSON, SABRINA CUMBE,
CHRISTOPHER HEIDLING, STANLEY
HEIDLING, TERRA RHOADS, JESSICA
HEINLEIN, individually, and for the estate of
CHARLES HEINLEIN, JR., CHARLES
HEINLEIN, SR., LANITA HERLEM, individually,
and for the estate of BRYANT HERLEM,
ERNESTO HERNANDEZ III, LAURA
HERNANDEZ, ERNESTO HERNANDEZ IV,
N.H., a minor, ERNESTO HERNANDEZ II, ENDI

HERRERA, JONATHAN HESLOP, DAVID
EUGENE HICKMAN, individually, and for the
estate of DAVID EMANUEL HICKMAN,
VERONICA HICKMAN, DEVON HICKMAN,
RUSSEL HICKS SR., individually, and for the
estate of COREY HICKS, RUSSEL HICKS JR.,
JAMES HOCHSTETLER, LEANNE
HOCHSTETLER, J.H., a minor, KYLE
MARSHALL, GREGORY HOGANCAMP,
JOSHUA HOLLADAY, SHIRLEY ATKINSON,
CRYSTAL HASTINGS, ROBIN HONEYCUTT,
JANICE KWILOS-EDMUNDS, ROBERT HUNT,
A.H., a minor, M.H., a minor, BOONCHOB
PRUDHOME, MAX HURST, individually, and for
the estate of DAVID HURST, LILLIAN HURST,
CHRISTOPHER HURST, MARK HURST, ERIC
HURST, DWAYNE HURST, DEVIN HURST,
SIERRA HURST, TARA HUTCHINSON, LINDA
GRESS, DOMINICK IWASINSKI, TRACY
TAYLOR, individually, and for the estate of
KENNETH IWASINSKI, AMANDA TAYLOR,
MARGARITA ARISTIZABAL, individually, and
for the estate of ALFRED JAIRALA, J.J., a minor,
SEBASTIAN NIUMAN, JERRALD JENSEN,
OLNEY JOHNSON, BRANDON JOSEY,
CHRISTOPHER JOYNER, ANNE JOYNER,
NECOLE SMITH, CORY KENFIELD, EVAN
KIRBY, STEVEN KIRBY, MARCIA KIRBY,
ANDREW KIRCHOFF, RANDALL
KLINGENSMITH, JEANETTE KNAPP,
individually, and for the estate of DAVID KNAPP,
LAWRENCE KRUGER, individually, and for the
estate of ERIC KRUGER, DOUGLAS KRUGER,
KRISTY KRUGER, E.K., a minor, C.K., a minor,
DAVID KUBE, individually, and for the estate of
CHRISTOPHER KUBE, JONATHAN KUBE,
JESSICA KUBE, JENNIFER KUBE, JASON
KUBE, DONNA KUGLICS, individually, and for
the estate of MATTHEW KUGLICS, LES
KUGLICS, DANIEL KULICKA, DAN LAIRD,
ANGELA LAIRD, JORDAN LAIRD, HUNTER
LAIRD, C.L., a minor, MATTHEW LAMMERS,
ALICIA LAMMERS, STACY PATE, BARBARA
LAMMERS, GARY LAMMERS, CHRISTOPHER
LANDRY, ROADY LANDTISER, TYLER
LATHAM, SUZZETTEE LAWSON, individually,

and for the estate of ISAAC LAWSON, C.L., a
minor, DARREN LESLIE, CHRISTOPHER LEVI,
BEAU LEVINE, individually, and for the estate of
HUNTER LEVINE, JESSICA LEVINE, OLIVIA
LEVINE, DONNA LEWIS, individually, and for
the estate of JASON LEWIS, G.L., a minor, J.L., a
minor, J.L., a minor, JEAN MARIANO,
ANTHONY LILL, individually, and for the estate
of ERIC LILL, KORTNE JONES, SKYE OTERO,
M.L., a minor, CODY LILL, SHELLEY SMITH,
individually, and for the estate of KYLE LITTLE,
WILLIAM LITTLE, BRENDA LITTLE, KIRA
SIKES, WILLIAM LITTLE, JR., KYLE LLOYD,
RIGOBERTO LOPEZ-GARCIA, DANIEL
LUCKETT, KONRAD LUDWIG, ADAM
MAGERS, JOHN MAINE, DAVID
MANGANELLA, LUIGI MARCIANTE,
individually, and for the estate of LUIGI
MARCIANTE JR., MARIA MARCIANTE, ENZA
BALESTRIERI, STEPHANIE MARCIANTE,
L.M., a minor, DONNIE MARION, individually,
and for the estate of ADAM MARION, PAMELA
MARION, EDWARD MARISCAL, GINA
MARSHALL-RICKFORD, individually, and for
the estate of BRADLEY MARSHALL, TANNER
MARSHALL, WESLEY MARSHALL,
GERRALD MARSHALL, FRANCIS
MARSHALL, KIMBERLY MAYO, REBECCA
OLIVER, individually, and for the estate of
VIRGIL MARTINEZ, DANIEL OLIVER,
KIMBERLEE AUSTIN-OLIVER, DEBORAH
NOBLE, individually, and for the estate of
CHARLES MATHENY, IV, CHARLES
MATHENY, III, DAVID NOBLE, MICHELLE
BENAVIDEZ, individually, and for the estate of
KENNITH MAYNE, DANIEL BENAVIDEZ, SR.,
DANIEL BENAVIDEZ, JR., CHRISTINA
BIEDERMAN, JENNIFER MORMAN, LORI
MCCOY, individually, and for the estate of
GREGORY MCCOY, LOGAN MCCOY, T.M., a
minor, TABITHA MCCOY, individually, and for
the estate of STEVE MCCOY, L.M., a minor,
R.M., a minor, KATHERINE MCRILL-FELLINI,
individually, and for the estate of ROBERT
MCRILL, BRIAN COKE, RONALD MCRILL,
DANIEL MENKE, individually, and for the estate

of JONATHAN MENKE, PAULA MENKE, NICHOLE LOHRIG, MATTHEW MENKE, TIM MERRILL, individually, and for the estate of JASON MERRILL, SUE MERRILL, ALYSSA MERRILL, AMBER PIRANEO, ASHLEA LEWIS, CHRISTOPHER MILLER, JOSEPH MILLER, KIMBERLY MILLER, DANA SVENSON, SHANNON MILLICAN, individually, and for the estate of JOHNATHON MILLICAN, PAUL MILLICAN, MICHAEL MILLS, M.M., a minor, M.M., a minor, MICHAEL MOCK, individually, and for the estate of WILLSUN MOCK, MANUEL MOLINA, JOSUE MOLINA, individually, and for the estate of JOSHUA MOLINA, MARIA MOLINA, SAMUEL MONTALBANO, ANDREW MOORES, GLENN MORRIS, individually, and for the estate of DANIEL MORRIS, LUKE MURPHY, WILETTE MURPHY, RANDOLPH NANTZ, II, WAYNE NEWBY, individually, and for the estate of NICHOLAS NEWBY, THERESA HART, NATHAN NEWBY, FLOR FUENTES, individually, and for the estate of DANIEL NEWSOME, TYLER OGDEN, SHERYL CHEN, JERRIN OGDEN, JOSE OLGUIN, individually, and for the estate of RANDELL OLGUIN, JENNIE MORIN, ANITA BAKER, JANET RIOS, PATRICK O'NEILL, JARED OSBURN, TIMOTHY O'SULLIVAN, MICHAEL OWEN, LAURIE MILLER, R.O., a minor, GILBERT PAIZ, JR., EDDIE JO PALINSKY, individually, and for the estate of JERRY PALINSKY, JR., JERRY PALINSKY II, ADINA PALINSKY, JERRY PALINSKY, SR., KATHLEEN HOKE, JOEL PALINSKY, KARALEEN HERB, CHEYENNE FLAGG, WILLIAM PARKER, DIXIE FLAGG, individually, and for the estate of RICHARD PARKER, MEGHAN PARKER-CROCKETT, MICHAEL PASCO, NICHOLAS PAUPORE, MARIA PAUPORE, CODY PAUPORE, MAILEY PAUPORE, COLIN PEARCY, LAIRD PEARCY, ANNE PEARCY, JODY STRIKER, KARYN MCDONALD, ANDREW PEARCY, PATRICK PEARCY, MERLESE PICKETT, individually, and for the estate of EMANUEL PICKETT, HARRY

CROMITY, MARLEN PICKETT, KEMELY
PICKETT, VIVIAN PICKETT, KYSHIA
SUTTON, BRENNA CORBIN, LOWELL KEITH
THOMPSON, LISA THOMPSON, individually,
and for the estate of JOSHUA PLOCICA, PEGGY
PORTWINE, individually, and for the estate of
BRIAN PORTWINE, HOLLY BURSON,
individually, and for the estate of JEROME
POTTER, MARIAH COWARD, individually, and
for the estate of AARON PRESTON, DMITRI
QUIST, DOUGLAS RAGONE, D.R., a minor,
DAVID RAGONE, BARBARA RAGONE,
DANIEL RAGONE, DENISE SMITH, JUDAS
RECENDEZ, JASON REGESTER, CARMEN
BILLEDEAUX, LOIS RICHARD, JOSEPH
RICHARD JR., NATHAN RICHARDS, STEVEN
RICHARDS, JOHN STEARNS, individually, and
for the estates of MICHELLE RING and SHIRLEY
STEARNS, MARC STEARNS, ERIK ROBERTS,
E.C.R., a minor, ROBIN ROBERTS, JAMES
ROBERTS, CARA ROBERTS, COLIN
ROBERTS, MANUEL ROMAN, MARCO
ROMAN, MARIA MURPHY, ESTRELLA
VILLANUEVA, MANUEL ROMAN, SR.,
THALIA ROMAN, ARACELLYS ROMAN,
JAMILEX ROMAN, JULIE ROSENBERG,
individually, and for the estate of MARK
ROSENBERG, JASON RZEPA, CASSANDRA
RZEPA, C.R., a minor, K.R., a minor, BRIAN
SAARISTO, BARBARA LIIMATAINEN,
CHERYL SAARISTO, BRIAN SAARISTO, JR.,
LEAH SAARISTO, NANETTE SAENZ,
individually, and for the estate of CARLOS
SAENZ, FRANCES CASTRO, BRIAN SCHAR,
JOSHUA SCHICHTL, MARK SCHICHTL,
KAYLA NELSON, KRISTIE NELSON, JIM
SCHUMANN, individually, and for the estate of
JASON SCHUMANN, BENJAMIN
SCHUMANN, RACHEL GILLETTE, individually,
and for the estate of STEPHEN SCOTT,
SHANNON SHUMATE, LAUREN SHUMATE,
L.S., a minor, L.S., a minor, JOHN SKLANEY, III,
JUDY HUENINK, individually, and for the estate
of BENJAMIN SLAVEN, SEAN SLAVEN,
CHASTITY LAFLIN, NICOLE LANDON, MISTI
FISHER, RONALD SLOAN, CHRISTOPHER

SMITH, JAMES SMITH, PATRICIA SMITH, MICHAEL SMITH, individually, and for the estate of TIMOTHY SMITH, JARED SOWINSKI, AUSTIN SOWINSKI, DIANE SOWINSKI, individually, and for the estate of NICHOLAS SOWINSKI, RAYMOND SPENCER, SR., individually, and for the estate of RAYMOND SPENCER, JR., SYLVIA SPENCER, BRADLEY STARCEVICH, individually, and for the estate of LUCAS STARCEVICH, GLENDA STARCEVICH, TRENTON STARCEVICH, ANGEL MAYES, individually, and for the estate of ANTONIO STIGGINS, DONALD MAYES, SHAUN STILTNER, WILLIAM STOUT, CALLIE MCGEE, TAMARA STOUT, STEPHANIE BENEFIELD, AUDREY BARBER, individually, and for the estate of BRANDON STOUT, TRACY ANDERSON, JEFFREY ANDERSON, ELIZABETH ISLAS, ANDREW ANDERSON, ADAM STOUT, TRAVIS STRONG, TAYLOR HESTON, ANTHONY DURKACS, DEBORAH BEAVERS, individually, and for the estate of JOHN SULLIVAN, DAVID IVERSON, individually, and for the estate of NICOLE SUVEGES, ALLEN SWINTON, TEMIKA SWINTON, T.R.S., a minor, T.M.S., a minor, TYREASHA BRYANT, LINDA PRITCHETT, JOHN TAKAI, MAE TAKAI, JONAMAE TAKAI, NIANA TAKAI, K.T., a minor, I.T., a minor, BRIAN TAYLOR, MICHELLE TAYLOR, individually, and for the estate of DAVID TAYLOR, JR., J.D.J.T., a minor, PHYLLIS TAYLOR, JOHN TAYLOR, EDWARD TERRY, SR., EDWARD TERRY, JR., GLENNDON TERRY, MARK THOMSEN, ARDELL THOMSEN, RALPH THOMSEN, COREY SCHLENKER, individually, and for the estate of WILLIAM THORNE, JOEY ROBINSON, MARVIN THORNSBERRY, CYNTHIA THORNSBERRY, L.T., a minor, M.T., a minor, N.T., a minor, A.B., a minor, TIMOTHY TIFFNER, individually, and for the estate of BENJAMIN TIFFNER, JUDITH TIFFNER, JOSHUA TIFFNER, SETH TIFFNER, SARAH CROSBY, PHILIP TRIMBLE, JANET SCHOONOVER, ANDREW TRIMBLE,

RICHARD TRIMBLE, LADONNA
LANGSTRAAT, JOHN TRIMBLE, CHARLOTTE
TEETSEL, KAYELEEN LULOFF, JOHN
TULLY, individually, and for the estate of
MICHAEL TULLY, MARILYN TULLY,
HEATHER FARKAS, SLADE TULLY, JOHN
TULLY, II, NANCY UMBRELL, individually, and
for the estate of COLBY UMBRELL, MARK
UMBRELL, individually, and for the estate of
COLBY UMBRELL, JOHN VACHO,
individually, and for the estate of CAROL
VACHO, ASHLEY LESLIE, MARY JANE
VANDEGRIFT, individually, and for the estates of
MATTHEW VANDEGRIFT and JOHN
VANDEGRIFT, ANDRES VAZQUEZ,
BARBARA PALACIO-VAZQUEZ, A.V., a minor,
M.G.V., a minor, J.B.V., a minor, MARISEL
VAZQUEZ, MARIA VAZQUEZ, individually, and
for the estate of OMAR VAZQUEZ, TRAVIS
VENDELA, MARIANNE VENDELA, JOSE
VERA, CAROL POLLEY, KEITH VEVERKA,
DOUGLAS VEVERKA, RONALD VEVERKA,
SANDRA SOLIDAY, LISA RAMACI,
individually, and for the estate of STEVEN
VINCENT, ISABELL VINCENT, individually,
and for the estate of CHARLES VINCENT,
CHRISTOPHER VIOLETTE, MICHELLE
WAGER, BRYAN WAGNER, MARGARET
WAKEMAN, DAVID WAKEMAN, individually,
and for the estate of DUSTIN WAKEMAN,
WILLIAM WAKEMAN, JUSTIN WALDECK,
BILLY WALLACE, STEFANIE WALLACE,
AUSTIN WALLACE, DEVON WALLACE, C.W.,
a minor, JEREMY WALLACE, LINDSAY
YOUNG, individually, and for the estate of BRETT
WALTON, SYDNEY WALTON, PATRICK
WARD, JARRETT WARD, KYLE WELCH,
JOSHUA WELLS, LYDIA LANTRIP, BILLIE
WELLS, JR., DAVID LANTRIP, JR., J.W., a
minor, MARK WHETZEL, JENNIFER
WHETZEL, DIANNA WHETZEL, JENNIFER
WHITE, individually, and for the estate of LUCAS
WHITE, WESLEY WILLIAMSON, JAMES
WILSON, VICTOR WISE, II, BEVERLY
WOLFER, individually, and for the estate of
STUART WOLFER, DAVID WOODARD, D.W.,

a minor, GINA WRIGHT, JOHN ROBERT
YOUNG, SHARON DEBRABANDER, DENNIS
DEBRABANDER, NICOLE DEBRABANDER,
JOELLA PRATT, RICKY ZHORNE, JR.,
BENJAMIN ZIBUTIS,

     Plaintiffs,

   v.

ASTRAZENECA UK LIMITED,
ASTRAZENECA PHARMACEUTICALS LP, GE
HEALTHCARE USA HOLDING LLC, GE
MEDICAL SYSTEMS INFORMATION
TECHNOLOGIES, INC., GE MEDICAL
SYSTEMS INFORMATION TECHNOLOGIES
GMBH, JOHNSON & JOHNSON, CILAG GMBH
INTERNATIONAL, ETHICON ENDO-
SURGERY, LLC, ETHICON, INC., JANSSEN
ORTHO LLC, JANSSEN PHARMACEUTICA
N.V., JOHNSON & JOHNSON (MIDDLE EAST)
INC., ORTHO BIOLOGICS LLC, PFIZER INC.,
PFIZER ENTERPRISES SARL, PFIZER
PHARMACEUTICALS LLC, PHARMACIA &
UPJOHN COMPANY LLC, WYETH
PHARMACEUTICALS INC., F. HOFFMANN-LA
ROCHE LTD., GENENTECH, INC.,
HOFFMANN-LA ROCHE INC.,

     Defendants.

## THIRD AMENDED COMPLAINT FOR VIOLATION OF THE
## ANTI-TERRORISM ACT AND STATE LAW

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

THE DEFENDANTS................................................................................................... 9

    A.      The AstraZeneca Defendants .................................................................. 9

    B.      The GE Defendants ................................................................................. 9

    C.      The J&J Defendants .............................................................................. 10

    D.      The Pfizer Defendants.......................................................................... 11

    E.      The Roche Defendants .......................................................................... 11

JURISDICTION AND VENUE ............................................................................... 12

SOURCING ............................................................................................................. 13

FACTUAL ALLEGATIONS ................................................................................... 14

    I.      UNDER SADDAM HUSSEIN, THE IRAQI MINISTRY OF HEALTH
           BECAME A CORRUPT TOOL OF TERRORIST FINANCE.................................. 14

    II.     DEFENDANTS TRANSACTED BUSINESS WITH A POST-SADDAM
           HEALTH MINISTRY THAT WAS CONTROLLED BY SHIITE
           TERRORISTS LOYAL TO MUQTADA AL-SADR ................................................. 18

        A.      Muqtada al-Sadr, Hezbollah, And The Formation Of Jaysh al-Mahdi ................ 18

        B.      Jaysh al-Mahdi's Control Of The Health Ministry .............................. 22

              1.      Dr. Adel Muhsin Abdullah al-Khazali (Inspector General of MOH)............. 27

              2.      Hakim al-Zamili (Deputy Minister of Health)................................. 29

              3.      Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, Dr. Hani Mousa
                    Badr al-Uqabi, and Dr. Chasib Latif Ali al-Musawi al-Hajjami
                    (Directors General at MOH) .......................................................... 34

              4.      Other Senior and Mid-Level Commanders.................................... 35

    III.    DEFENDANTS ENGAGED IN CORRUPT TRANSACTIONS THAT
           PROVIDED FINANCING TO JAYSH AL-MAHDI ................................................. 39

        A.      Jaysh al-Mahdi Raised Money Through Corrupt MOH Contracting
             Practices ............................................................................................... 39

B.   Defendants Made Corrupt Payments To Jaysh al-Mahdi ...................................... 43

    1.   "Free Goods" Payments ............................................................................. 43

    2.   "Commission" Payments ........................................................................... 57

IV.   DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR
TRANSACTIONS HELPED FUND JAYSH AL-MAHDI ATTACKS ON
AMERICANS ........................................................................................................... 67

A.   Defendants' Corrupt Transactions Directly Funded Jaysh al-Mahdi
Terrorist Attacks On Americans ........................................................................ 67

B.   Defendants Knew Or Recklessly Disregarded That Their Transactions
With MOH Financed Terrorism .......................................................................... 74

V.   EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS
THAT IT KNEW OR RECKLESSLY DISREGARDED WERE
STRUCTURED TO FINANCE JAYSH AL-MAHDI ............................................... 81

A.   The AstraZeneca Defendants .............................................................................. 81

    1.   AstraZeneca Made Corrupt Payments to Jaysh al-Mahdi Members ............. 81

    2.   AstraZeneca's Corrupt Commercial Transactions Comport with Its
Historical Sales Practices in International Markets ....................................... 87

    3.   AstraZeneca's Corrupt Transactions Had a Substantial Nexus to the
United States .............................................................................................. 88

B.   The GE Defendants ............................................................................................ 91

    1.   GE Made Corrupt Payments to Jaysh al-Mahdi Members ............................ 91

    2.   GE's Corrupt Payments to Jaysh al-Mahdi Members Comport with Its
Historical Sales Practices in International Markets ....................................... 95

    3.   GE's Corrupt Transactions Had a Substantial Nexus to the United
States ......................................................................................................... 99

C.   The J&J Defendants .......................................................................................... 104

    1.   J&J Made Corrupt Payments to Jaysh al-Mahdi Members in
Connection with the Sale of Medical Devices in Iraq ................................. 104

    2.   J&J Made Corrupt Payments to Jaysh al-Mahdi Members in
Connection with the Sale of Pharmaceuticals in Iraq ................................. 107

3.   J&J's Corrupt Payments to Jaysh al-Mahdi Comport with Its Historical Sales Practices in International Markets ...................................................... 111

4.   J&J's Corrupt Transactions Had a Substantial Nexus to the United States ................................................................................................................ 115

D.   The Pfizer Defendants ......................................................................................... 118

1.   Pfizer Made Corrupt Payments to Jaysh al-Mahdi Members ....................... 118

2.   Pfizer's Corrupt Transactions with MOH Comport with Its Historical Sales Practices in International Markets ...................................................... 123

3.   Pfizer's Corrupt Transactions Had a Substantial Nexus with the United States ................................................................................................................ 125

E.   The Roche Defendants ......................................................................................... 131

1.   Roche Made Corrupt Payments to Jaysh al-Mahdi Members ...................... 131

2.   Roche's Corrupt Transactions with Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets ....................... 135

3.   Roche's Corrupt Transactions with MOH Had a Substantial Nexus to the United States ............................................................................................ 136

VI.   JAYSH AL-MAHDI, WITH SUBSTANTIAL SUPPORT FROM HEZBOLLAH, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS .......... 140

A.   Beginning In 2003, Jaysh al-Mahdi Conducted A Campaign Of Terror Against Americans In Iraq ................................................................................... 140

B.   Jaysh al-Mahdi Was A Terrorist Enterprise ....................................................... 146

C.   Hezbollah Created, Armed, And Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans ................................................................... 151

1.   Hezbollah Has Orchestrated Campaigns of Terror Against Americans Across the Globe ............................................................................................ 152

2.   Hezbollah Co-Founded Jaysh al-Mahdi with Sadr To Carry Out a Campaign of Terror Against Americans in Iraq ........................................... 154

3.   Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq ................................................................................................................ 161

4.   Hezbollah Planned Jaysh al-Mahdi's Terrorist Attacks Against Americans in Iraq .......................................................................................... 167

5.      Hezbollah Provided Jaysh al-Mahdi with Weapons To Carry Out Terrorist Attacks Against Americans in Iraq ................................................. 177

VII.    JAYSH AL-MAHDI KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY HEZBOLLAH ................................................................. 178

The Atchley Family ................................................................................ 178

John Aragon, Sr. ................................................................................... 180

Brian Beaumont ..................................................................................... 181

The Bennett Family ................................................................................ 181

Brandeaux Campbell .............................................................................. 182

The Capra Family ................................................................................... 183

The Chand Family and Estate ................................................................ 185

The Connelly Family .............................................................................. 188

Jimmy Connolly ..................................................................................... 189

The Doheny Family and Estate .............................................................. 190

The Edwards Family ............................................................................... 191

The Emory Family and Estate ................................................................ 193

Tanya Evrard .......................................................................................... 194

The Harbin Family .................................................................................. 195

The Holden Family ................................................................................. 196

Billy Johnson ......................................................................................... 197

The Juneau Family and Estate ............................................................... 197

William Kelso ......................................................................................... 198

The John Kirby Family ........................................................................... 199

The Klecker Family and Estate .............................................................. 200

Leroy Lancaster ..................................................................................... 201

The Lukow Family ........................................................................................................ 201

The Lynch Family ........................................................................................................ 202

Nathan McClure .......................................................................................................... 203

The McNeal Family ..................................................................................................... 204

The Mixson Family ...................................................................................................... 205

The Neiberger Family and Estate ................................................................................ 206

The Pellecchia Family ................................................................................................. 207

The Price Family .......................................................................................................... 208

Carl Reiher .................................................................................................................. 209

The Rogers Estate ........................................................................................................ 209

The Rosa Family .......................................................................................................... 210

The Shaw Family ......................................................................................................... 211

The Stephens Family and Estate .................................................................................. 212

The Tucker Family and Estate ..................................................................................... 213

The Vaughn Family ..................................................................................................... 215

The Delmar White Family and Estate .......................................................................... 216

The Winegar Family .................................................................................................... 217

The Witte Family and Estate ....................................................................................... 218

The Zappa Family ........................................................................................................ 219

The Landeck Family .................................................................................................... 220

The Thomas Family and Estate .................................................................................... 220

The West Family .......................................................................................................... 223

The Murphy-Sweet Family .......................................................................................... 224

The Kuhlmeier Family and Estate ............................................................................... 225

The Farley Family and Estate ...................................................................................... 227

Dawn Williamson ............................................................................................. 228

The Reeves Family and Estate ........................................................................ 229

Maria Lane ...................................................................................................... 231

The Munns Family ........................................................................................... 232

The Johnson-Reuben Family ........................................................................... 234

The Coté Family and Estate ............................................................................ 235

The Alexander Family and Withrow Estate ..................................................... 236

The Ryan Family .............................................................................................. 238

The Von Letkemann Family ............................................................................. 240

Scott Scurrah ................................................................................................... 240

Masina Tuliau .................................................................................................. 241

The Richard Hickman Family .......................................................................... 242

The Collado Family and Estate ....................................................................... 243

The Murray Family .......................................................................................... 244

The Shelton Family and Estate ....................................................................... 245

Tammy Kinney .................................................................................................. 246

The Gajdos Family ........................................................................................... 246

TheParlin Family ............................................................................................. 247

Maria Vidal ...................................................................................................... 248

Jimmy Rundell .................................................................................................. 249

The Packer Family and Estate ........................................................................ 249

The Crow Family .............................................................................................. 251

The Contreras Family ...................................................................................... 252

The Inouye Family ............................................................................................ 253

The Cameron Payne Family and Estate .......................................................... 254

The Craig Family ......................................................................................... 255

Tony Botello ............................................................................................... 256

The Aieti Family ......................................................................................... 257

The Bouten Family ...................................................................................... 258

Jordan Brackett ........................................................................................... 258

Brandon Bybee ............................................................................................ 259

Mark Cashman ............................................................................................. 260

The Casey Family ....................................................................................... 260

Johnny Castillo ............................................................................................ 261

Michael Dunn .............................................................................................. 261

Andrew Fukuzawa ....................................................................................... 262

Francisco Gietz ........................................................................................... 263

Abelino Gomez ............................................................................................ 263

The Hanley Family ...................................................................................... 264

The Benjamin Johnson Family .................................................................... 265

The Looney Family ...................................................................................... 266

Barry McDonald .......................................................................................... 266

Matthew Mergele ........................................................................................ 267

Jareth Payne ................................................................................................ 267

The Sassman Family .................................................................................... 268

Jeremy Smith ............................................................................................... 269

Donald Spencer ........................................................................................... 269

Jared Stevens ............................................................................................... 270

The Stinnett Family ..................................................................................... 270

The Thompson Estate ................................................................................... 271

The Tutwiler Family ................................................................................................ 272

The Ryan Wilson Family ......................................................................................... 272

The Wold Family ..................................................................................................... 273

Herbert B. Gill ........................................................................................................ 274

James Gmachowski .................................................................................................. 275

The Grzywa Family ................................................................................................. 275

The Lamb Family ..................................................................................................... 276

The Lopez Family ..................................................................................................... 277

The McIntosh Family ............................................................................................... 278

The Norager Family ................................................................................................. 278

The Robinson Family ............................................................................................... 279

Jarrod Lagrone ......................................................................................................... 280

Christopher Halski .................................................................................................... 281

The Billiter Family ................................................................................................... 281

The Dudek Family .................................................................................................... 282

The Adair Family and Estate .................................................................................... 284

The Adamson Family ............................................................................................... 284

Karar Adel Alabsawi ............................................................................................... 285

The Alfonso Family and Estate ................................................................................ 286

The Al-Taie Family and Estate ................................................................................. 287

The Altman Family ................................................................................................... 288

The Alvarez Family and Estate ................................................................................ 288

The Anaya Family and Estate ................................................................................... 290

The Andino Family and Estate ................................................................................. 291

The Andrade Family and Estate ............................................................................... 291

Matthew Andreas ............................................................................................... 292

Nicholas Anna.................................................................................................... 293

The Arizola Family ............................................................................................ 294

The Bailey Family .............................................................................................. 295

The Balsley Family and Estate .......................................................................... 295

The Bandhold Family ......................................................................................... 296

The Barattieri Family and Estate ....................................................................... 297

Cody Barham ..................................................................................................... 298

Todd A. Barnum ................................................................................................ 299

The Dustin Bauer Family ................................................................................... 300

The Justin Bauer Family and Estate.................................................................. 300

The Baxter Family .............................................................................................. 302

The Beem Family ............................................................................................... 303

The Benson Family ............................................................................................ 304

Brentyn Bishop .................................................................................................. 305

The Blickenstaff Family ..................................................................................... 305

The Blohm Family and Estate............................................................................ 307

The Bobb Family and Estate.............................................................................. 308

The Bogart Family ............................................................................................. 309

The Botts Family................................................................................................. 310

Mario Bowen ...................................................................................................... 311

Michelle Klemensberg ........................................................................................ 311

Andrew Bradley .................................................................................................. 312

The Brian Family and Estate.............................................................................. 313

The Briggs Family .............................................................................................. 314

The Brooks Family ................................................................................................ 315

The Joshua Brown Family and Estate ..................................................................... 315

The Scott Brown Family and Estate ....................................................................... 316

The Burks Family and Estate .................................................................................. 317

Larry D. Cabral, Jr. ................................................................................................ 318

The Calderon-Ascencio Family and Estate ............................................................. 319

Benjamin D. Carrington .......................................................................................... 320

The Carter Family ................................................................................................... 320

The Chandler Family ............................................................................................... 321

The Chism Family and Estate .................................................................................. 322

The Christopher Family and Estate ......................................................................... 324

The Coe Family ....................................................................................................... 325

The Contrerasbaez Family ....................................................................................... 326

The Cope Family ..................................................................................................... 327

The Crabtree Family and Estate .............................................................................. 328

The Craven Family ................................................................................................... 329

The Crookston Family and Estate ............................................................................ 330

The Daggett Family ................................................................................................. 331

The Dahlman Family ............................................................................................... 332

The Davis Family ..................................................................................................... 333

The Delgado Family and Estate .............................................................................. 334

Anthony DeMattia ................................................................................................... 335

Philip Alan Derise ................................................................................................... 335

The Diamond Family and Estate .............................................................................. 336

The Kendrick Dixon Family .................................................................................... 337

The Robert Dixon Family and Estate ..................................................................... 338

Shawn Donnery .................................................................................................... 339

The Dressler Family and Estate ............................................................................ 340

The Drevnick Family and Estate ........................................................................... 341

The Terrence Dunn Family and Estate .................................................................. 342

Timothy W. DuVall, Jr. ......................................................................................... 343

The Eakes Family .................................................................................................. 343

Joshua Eckhoff ..................................................................................................... 344

The Edds Family and Estate .................................................................................. 345

The Eggleston Family and Estate .......................................................................... 346

The Elledge Family and Estate .............................................................................. 347

The Elliott Family and Estate ................................................................................ 347

The Esco Family .................................................................................................... 348

The Everhart Family and Estate ............................................................................ 349

The Falter Family and Estate ................................................................................. 350

The Farina Family ................................................................................................. 352

The Farr Family and Estate .................................................................................... 352

Matthew Fieser ...................................................................................................... 353

The Finken Family ................................................................................................. 354

James E. Fleming, III ............................................................................................. 356

Mark Fletcher ........................................................................................................ 357

Norman Forbes IV ................................................................................................. 357

The Ford Family and Estate ................................................................................... 358

The Fraser Family and Estate ................................................................................ 359

The Freeman Family and Estate ............................................................................ 359

Fred Frigo...................................................................................................... 360

The Jacob Fritz Family and Estate................................................................... 361

The Scott Fritz Family..................................................................................... 362

The Fuentes Family and Estate........................................................................ 363

The Gage Family and Estate............................................................................ 364

Luis Garza..................................................................................................... 365

The Gasper Family and Estate......................................................................... 366

The Geiger Family and Estate.......................................................................... 367

Anthony M. Gerber......................................................................................... 368

The Gibson Family and Estate.......................................................................... 369

Tyler Ginavan ................................................................................................ 370

The Golembe Family........................................................................................ 370

Miguel Angel Gonzalez.................................................................................... 371

Joel K. Gorbutt............................................................................................... 372

The Graves Family and Estate......................................................................... 372

The Gray Family and Estate............................................................................ 373

The Greer Family ........................................................................................... 374

Charles Gregston............................................................................................ 375

The Gudridge Family and Estate...................................................................... 376

The Haaf Family ............................................................................................ 377

The Habsieger Family and Estate..................................................................... 378

The Hadfield Family ....................................................................................... 379

The Hake Family and Estate............................................................................ 380

The Hale Family and Estate............................................................................ 382

The Hancock Family....................................................................................... 383

Jeffrey Harper ................................................................................................................ 384

Sean Harrington .............................................................................................................. 384

The Harris Family ........................................................................................................... 385

The Hartley Family and Estate ....................................................................................... 386

The Haupt Family and Estate .......................................................................................... 387

The Heidling Family ....................................................................................................... 388

The Heinlein Family and Estate ...................................................................................... 389

The Herlem Family and Estate ........................................................................................ 390

The Hernandez Family .................................................................................................... 391

Endi C. Herrera ............................................................................................................... 392

Jonathan Heslop .............................................................................................................. 392

The David Hickman Family and Estate .......................................................................... 393

The Hicks Family and Estate .......................................................................................... 394

The Hochstetler Family ................................................................................................... 395

Gregory E. Hogancamp ................................................................................................... 396

The Holladay Family ....................................................................................................... 396

The Honeycutt Family ..................................................................................................... 397

The Hunt Family .............................................................................................................. 398

The David Hurst Family and Estate ................................................................................ 399

The Eric Hurst Family ..................................................................................................... 400

The Hutchinson Family .................................................................................................... 401

The Iwasinski Family and Estate .................................................................................... 402

The Jairala Family and Estate ......................................................................................... 403

Jerrald J. Jensen .............................................................................................................. 404

Olney E. Johnson ............................................................................................................. 404

Brandon T. Josey ................................................................................................. 405

The Joyner Family ............................................................................................... 406

Cory Kenfield........................................................................................................ 407

The Evan Kirby Family ....................................................................................... 408

Andrew S. Kirchoff.............................................................................................. 408

Randall L. Klingensmith ...................................................................................... 409

The Knapp Family and Estate.............................................................................. 409

The Kruger Family and Estate ............................................................................. 410

The Kube Family and Estate................................................................................ 411

The Kuglics Family and Estate ........................................................................... 413

Daniel R. Kulicka................................................................................................. 414

The Laird Family ................................................................................................. 414

The Lammers Family ........................................................................................... 415

Christopher R. Landry ......................................................................................... 416

Roady Landtiser ................................................................................................... 417

Tyler Latham........................................................................................................ 417

The Lawson Family and Estate............................................................................ 418

Darren Leslie........................................................................................................ 419

Christopher Levi .................................................................................................. 420

The LeVine Family and Estate ............................................................................ 420

The Lewis Family and Estate .............................................................................. 421

The Lill Family and Estate .................................................................................. 423

The Kyle Little Family and Estate ...................................................................... 424

The William Little Family ................................................................................... 425

Kyle Lloyd ........................................................................................................... 426

Rigoberto Lopez-Garcia...........................................................................................................426

Daniel S. Luckett ...................................................................................................................427

Konrad Ludwig .......................................................................................................................427

Adam Magers...........................................................................................................................428

John Maine ...............................................................................................................................429

David Manganella ...................................................................................................................430

The Marciante Family and Estate ........................................................................................430

The Marion Family and Estate .............................................................................................432

Edward Mariscal .....................................................................................................................433

The Marshall Family and Estate ..........................................................................................433

The Martinez Family and Estate ..........................................................................................434

The Matheny Family and Estate ..........................................................................................435

The Mayne Family and Estate ..............................................................................................436

The Gregory McCoy Family and Estate .............................................................................437

The Steve McCoy Family and Estate...................................................................................438

The McRill Family and Estate ..............................................................................................439

The Menke Family and Estate ..............................................................................................440

The Merrill Family and Estate ..............................................................................................441

Christopher Miller...................................................................................................................443

Joseph Miller............................................................................................................................443

The Patrick Miller Family......................................................................................................444

The Millican Family and Estate ...........................................................................................444

The Mills Family......................................................................................................................445

The Mock Family and Estate ................................................................................................446

The Molina Family ..................................................................................................................447

Samuel Montalbano ................................................................................................ 448

Andrew S. Moores ................................................................................................. 448

The Morris Family and Estate ............................................................................... 449

The Murphy Family ............................................................................................... 450

Randolph Nantz, II ................................................................................................. 451

The Newby Family and Estate ............................................................................... 451

The Newsome Family and Estate ........................................................................... 452

The Olguin Family and Estate ............................................................................... 453

The Ogden Family .................................................................................................. 454

Patrick O'Neill ....................................................................................................... 455

Jared Osburn .......................................................................................................... 455

Timothy J. O'Sullivan ........................................................................................... 456

The Owen Family ................................................................................................... 457

Gilbert Paul Paiz, Jr. .............................................................................................. 458

The Palinsky Family and Estate ............................................................................ 459

The Parker Family and Estate ............................................................................... 460

Michael Jung Pasco ............................................................................................... 461

The Paupore Family ............................................................................................... 462

The Pearcy Family ................................................................................................. 463

The Pickett Family and Estate ............................................................................... 464

The Plocica Family and Estate .............................................................................. 466

The Portwine Family and Estate ........................................................................... 467

The Potter Family and Estate ................................................................................ 468

The Preston Family and Estate .............................................................................. 469

Dmitri Quist ........................................................................................................... 469

The Ragone Family ............................................................................................ 470

Judas E. Recendez ............................................................................................ 471

Jason Regester ................................................................................................. 472

The Richard Family .......................................................................................... 473

The Richards Family ........................................................................................ 474

The Ring Family and Estate ............................................................................. 474

The Roberts Family .......................................................................................... 475

The Roman Family ........................................................................................... 476

The Rosenberg Family and Estate ................................................................... 478

The Rzepa Family ............................................................................................ 479

The Saaristo Family ......................................................................................... 479

The Saenz Family and Estate .......................................................................... 480

Brian R. Schar ................................................................................................. 481

The Schichtl Family ......................................................................................... 482

The Schumann Family and Estate ................................................................... 483

The Scott Family and Estate ............................................................................ 484

The Shumate Family ........................................................................................ 485

John P. Sklaney, III .......................................................................................... 486

The Slaven Family and Estate ......................................................................... 486

Ronald E. Sloan ............................................................................................... 488

Christopher G. Smith ....................................................................................... 488

James L. Smith ................................................................................................ 489

The Timothy Smith Family and Estate ........................................................... 489

The Sowinski Family and Estate ..................................................................... 490

The Raymond Spencer, Jr. Family and Estate ................................................ 491

The Starcevich Family and Estate ................................................................................. 492

The Stiggins Family and Estate ................................................................................... 493

Shaun C. Stiltner ........................................................................................................ 494

The Stout Family and Estate ....................................................................................... 495

The Strong Family ....................................................................................................... 496

The Sullivan Family and Estate ................................................................................... 497

The Suveges Family and Estate ................................................................................... 498

The Swinton Family ..................................................................................................... 499

The Takai Family ......................................................................................................... 500

Brian G. Taylor ............................................................................................................ 501

The David G. Taylor, Jr. Family and Estate ................................................................. 501

The Terry Family .......................................................................................................... 502

The Thomsen Family .................................................................................................... 503

The Thorne Family and Estate ..................................................................................... 504

The Thornsberry Family ............................................................................................... 505

The Tiffner Family and Estate ...................................................................................... 506

The Trimble Family ...................................................................................................... 507

The Tully Family and Estate ........................................................................................ 509

The Umbrell Family and Estate .................................................................................... 510

The Vacho Family ......................................................................................................... 511

The Vandegrift Family and Estate ................................................................................ 512

The Andres Vazquez Family ......................................................................................... 513

The Omar Vazquez Family and Estate .......................................................................... 514

The Vendela Family ...................................................................................................... 515

Jose L. Vera ................................................................................................................. 515

The Veverka Family ................................................................................................ 516

The Vincent Family and Estate ............................................................................... 517

Christopher Violette ................................................................................................ 518

Michelle Wager ....................................................................................................... 519

Bryan Wagner .......................................................................................................... 519

The Wakeman Family and Estate ........................................................................... 520

Justin Waldeck ........................................................................................................ 521

The Billy Wallace Family ....................................................................................... 522

Jeremy Wallace ....................................................................................................... 523

The Walton Family and Estate ............................................................................... 523

The Ward Family ..................................................................................................... 524

Kyle L. Welch .......................................................................................................... 525

The Wells Family ..................................................................................................... 526

The Whetzel Family ................................................................................................ 527

The Lucas White Family and Estate ...................................................................... 527

Wesley Williamson .................................................................................................. 528

James T. Wilson ....................................................................................................... 529

Victor R. Wise, II .................................................................................................... 530

The Wolfer Family and Estate ................................................................................ 530

The Woodard Family ............................................................................................... 531

Gina Wright ............................................................................................................. 532

The John Roy Young Family ................................................................................... 533

Ricky D. Zhorne, Jr. ................................................................................................ 534

Benjamin A. Zibutis ................................................................................................ 535

CLAIMS FOR RELIEF ........................................................................................... 536

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
       § 2333(d) (All Plaintiffs: Aiding-and-Abetting Liability, Attack Predicate) ........... 536

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
       § 2333(d) (All Plaintiffs:  Aiding-and-Abetting Liability, RICO predicate)............ 537

COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
       § 2333(a) (All Plaintiffs:  Primary Liability, Material-Support Predicate) ............. 542

COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
       § 2333(a) (All Plaintiffs:  Primary Liability, Terrorist-Financing Predicate).......... 543

COUNT FIVE:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (All
       Non-Estate Plaintiffs: State Law) ........................................................................... 545

COUNT SIX:  ASSAULT AND BATTERY (All Physically Wounded Plaintiffs In
       The First Amended Complaint:  State Law)............................................................. 545

COUNT SEVEN:  WRONGFUL DEATH (All Estate Plaintiffs:  State Law).................... 546

COUNT EIGHT:  SURVIVAL ACTION (All Estate Plaintiffs:  State Law)..................... 549

JURY DEMAND ...................................................................................................................... 550

PRAYER FOR RELIEF ........................................................................................................... 550

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act on behalf of

American service members and civilians, and their families, who were killed or wounded while

serving their country in Iraq between 2005 and 2011.  While these men and women worked to

rebuild post-war Iraq, they were attacked by a terrorist group funded in part by Defendants'

corrupt sales practices.  The terrorist-finance mechanism was straightforward:  the terrorists

openly controlled the Iraqi ministry in charge of importing medical goods, and Defendants – all

of which are large Western medical-supply companies – obtained lucrative contracts from that

ministry by making corrupt payments to the terrorists who ran it.  Those payments aided and

abetted terrorism in Iraq by directly financing an Iran-backed, Hezbollah-trained militia that

killed or injured thousands of Americans.  The allegations below are based on more than 12

Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-

public reports, contracts, and emails; U.S. diplomatic and military cables (as published by

*WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government

officials; English- and Arabic-language press reports; and Plaintiffs' own recollections.

2.      Defendants' transactions were part of a pattern and practice of corrupt business

dealings in Iraq dating back to Saddam Hussein.  During Saddam's rule and ever since, Iraq has

maintained a government-run healthcare system that in theory offers free medical care to all

Iraqis.  That system of socialized medicine has long given the Iraqi Ministry of Health ("MOH"

or "Ministry") and Kimadia (MOH's state-owned import subsidiary) significant leverage over

medical-goods suppliers seeking to do business in Iraq.  It also has been a recipe for pervasive

corruption in the medical-goods procurement process.  Under Saddam from 2000-2003, Kimadia

officials used their leverage over foreign suppliers to extract sizable kickbacks on medical-goods

contracts awarded under the U.N. Oil-for-Food Program.  Most Defendants (or their

predecessors or affiliates) made such corrupt payments to Saddam's regime.  In doing so, they

supplied Saddam's regime with illicit funding in direct contravention of Oil-for-Food Program

restrictions designed to prevent Saddam from raising money to finance terrorism abroad.

3.      By late 2004, after the collapse of Saddam's government, MOH fell under the

control of a Shiite terrorist group known as Jaysh al-Mahdi (Arabic for "The Mahdi Army")[1]

whose members swore fealty to anti-American cleric Muqtada al-Sadr.  The Jaysh al-Mahdi-

controlled MOH functioned more as a terrorist apparatus than a health organization.  Public

hospitals were converted into terrorist bases where Sunnis were abducted, tortured, and

murdered.  MOH ambulances transported Jaysh al-Mahdi death squads around Baghdad.  Armed

terrorists openly patrolled the halls of MOH headquarters in downtown Baghdad, which became

too dangerous for Americans to enter and which one percipient witness described as a "Mahdi

Army camp."  And the Deputy Minister of Health – who conducted Ministry business while

surrounded by Jaysh al-Mahdi fighters and weapons – tortured and killed Sadr's enemies with

the help of the Ministry's Facilities Protection Service (itself a notorious Jaysh al-Mahdi

division).  At the same time, Jaysh al-Mahdi nearly destroyed the Iraqi healthcare system by

systematically purging secular doctors, commandeering MOH facilities, and looting MOH's

inventory for profit.  After late 2004, companies selling medical goods to MOH were dealing

with a counterparty that was not a genuine medical institution; it was a de facto terrorist group.

4.      Despite Jaysh al-Mahdi's open control of MOH, Defendants continued their

Saddam-era practice of making corrupt payments to officials inside the Ministry.  In or about late

2004, Jaysh al-Mahdi implemented a requirement that medical-goods suppliers seeking access to

Iraq's lucrative healthcare market pay Jaysh al-Mahdi agents a *Khums*, which is an Islamic

---

[1] The "Mahdi" is a messianic-like figure in Islam.  Depending on the method of translation, English sources
sometimes spell Jaysh al-Mahdi as "the Mehdi Army."

concept translating roughly to a 20% religious tax.  Companies seeking to win sales contracts

from MOH after late 2004 had to pay that tax by providing Jaysh al-Mahdi agents with so-called

"commissions" (an Iraqi euphemism for bribes) worth at least one-fifth the contract's value.

During this time period, as explained in a contemporaneous memorandum by U.S. government

investigators documenting an interview of an MOH source, "official corruption [was] tolerated at

the MOH because it ha[d] become the ministry occupied by the Mahdi Army."

5.      One common way that Defendants made corrupt payments to Jaysh al-Mahdi

agents involved the transfer of "free goods."  Under the "free goods" scheme, which was carried

over from Oil-for-Food, medical-goods suppliers structured their transactions to provide MOH

officials with additional batches of in-kind drugs and equipment, free of charge, on top of the

quantities for which MOH had actually paid.  Suppliers included those extra goods in the same

shipments as the purchased goods and packaged them in a manner conducive to street resale,

which ensured that MOH officials could efficiently take the extra goods and monetize them on

the black market.  Because of the way the contracts were structured, MOH officials did not have

to account for such free goods in the national inventory.  Jaysh al-Mahdi agents working at MOH

were thus able to divert the extra goods and re-sell them for cash at sizeable mark-ups.

6.      Another common way that Defendants made corrupt payments to Jaysh al-Mahdi

agents was through commercially unreasonable clauses drafted into MOH contracts.  Under this

scheme, also carried over from Oil-for-Food, suppliers bribed MOH officials by funneling cash

payments through their corrupt local agents.  In theory, companies promised to provide MOH

with after-sales support and other services ostensibly related to the product they sold, and they

funded those ostensible services by giving money to their local agents.  In reality, such services

were illusory and functioned merely to create a slush fund the local agents could use to pass on "commissions" to corrupt MOH officials.

7.      Defendants used both techniques to finance Jaysh al-Mahdi throughout the period between 2004 and 2013, much as they had previously used them to finance Saddam's regime under Oil-for-Food.  Plaintiffs have obtained specific evidence of many of Defendants' corrupt payments in connection with their MOH contracts, including documents memorializing such payments; contract numbers corresponding to Defendants' corrupt transactions; and particular percentages of "free goods" that Defendants delivered to MOH officials.

8.      Defendants' corrupt transactions aided and abetted Jaysh al-Mahdi's terrorist operations against Americans in Iraq.  Control of MOH, and the illicit revenue that came with it, was essential to Jaysh al-Mahdi's terrorist machine:  in the words of one MOH insider, Kimadia was Sadr's "gold mine" that Jaysh al-Mahdi used to "finance their empire" in Iraq.  Cash bribes provided to Jaysh al-Mahdi agents within MOH flowed directly into Jaysh al-Mahdi's coffers and helped the militia buy weapons, training, and logistical support for its terrorist attacks.  Similarly, Defendants' provision of "free goods" to MOH officials gave Jaysh al-Mahdi agents valuable cash equivalents they used to fund attacks.  Regional and local black markets provided ample opportunities to re-sell such drugs and devices; as the U.S. Embassy in Baghdad explained in a sensitive-but-unclassified 2006 report, Jaysh al-Mahdi relied on those black markets to "finance[ ] operations from diverted medicines."  Indeed, concerns about Jaysh al-Mahdi's use of MOH to finance terrorist attacks prompted Coalition forces to raid MOH headquarters in February 2007 and arrest the Deputy Minister of Health for "orchestrat[ing] several kickback schemes" to "funnel[ ] millions of U.S. dollars to militia elements."

9.      Defendants' corrupt transactions with MOH also aided and abetted terrorism by supplying Jaysh al-Mahdi with the means to pay its rank-and-file terrorist fighters.  Some U.S. government personnel in Iraq called Jaysh al-Mahdi "The Pill Army," because Sadr and his Jaysh al-Mahdi commanders were notorious for paying their terrorist fighters in diverted pharmaceuticals, rather than cash.  Those fighters – most of whom were poor, uneducated, young Shi'a men – accepted such payment because they could re-sell the free drugs on the street or could consume the pills themselves as a form of intoxication.  This payment-in-pills scheme, which helped Jaysh al-Mahdi retain its legion of impoverished terrorist fighters, depended on the large volumes of divertible drugs that Defendants delivered to the terrorist-run MOH.

10.     Defendants knew or recklessly disregarded that their corrupt transactions helped finance Jaysh al-Mahdi's terrorist attacks on Americans.  Defendants' agents negotiated and memorialized those transactions at in-person meetings inside the Ministry's headquarters building in Baghdad, where their physical surroundings made clear that they were dealing with terrorists.  Beginning in late 2004, the MOH headquarters building was decorated with hundreds of pictures of known terrorist Muqtada al-Sadr (often joined by his famous, martyred Grand Ayatollah father) alongside Shi'a terrorist slogans declaring "Death to America."  The entrance to the building also contained a large mural paying homage to the Sadr family next to the unmistakable, all-black terrorist flag of Jaysh al-Mahdi.  As *USA Today* reported in 2008, such Sadrist terrorist propaganda throughout the Ministry "remove[d] any doubts about who runs the place."  Companies whose agents memorialized their corrupt transactions in the shadow of jihadist propaganda paying homage to Jaysh al-Mahdi's world-famous terrorist leader assuredly knew (or at least consciously overlooked) whom their transactions were benefiting.

11.     Jaysh al-Mahdi's control of MOH also received extensive press coverage that Defendants knew about or recklessly disregarded.  Beginning in 2005, public reports repeatedly documented the link between Sadr's terrorist militia and the MOH procurement process:  major newspapers reported that MOH had fallen "under the control of the Shia cleric Moqtada al-Sadr"; that Sadrist MOH officials oversaw "the diversion of millions of dollars to a Shiite Muslim militia"; and that medical supplies were routinely "siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry of Health," which was "in the 'grip' of the Mahdi Army."  Those reported facts led to the highly publicized arrest and trial of the Deputy Minister of Health (himself a famously corrupt and violent Jaysh al-Mahdi commander), who was acquitted only after Jaysh al-Mahdi intimidated the witnesses into recanting.  All of this was major, international news that Defendants could not have overlooked in good faith.

12.     Defendants' contacts with the United States were essential to their financing of Jaysh al-Mahdi.  Each Defendant is part of a globally integrated company with a significant presence in the United States, and all but AstraZeneca and Roche maintain their worldwide headquarters in the United States.  In some cases, Defendants contracted with MOH through American companies, with those American companies negotiating with Kimadia and executing the corrupt transactions.  Because Kimadia insisted on doing business in U.S. dollars, Defendants also generally used the New York banking system to pay for letters of credit guaranteeing their corrupt transactions.  And, in all cases, Defendants' corrupt transactions relied at least in part on goods sourced from U.S. facilities that they touted as a key component of their global supply networks.  Indeed, many of Defendants' most valuable goods – and thus the goods most attractive to Jaysh al-Mahdi agents looking to profit on the black market – were manufactured by American affiliates in the United States.  Because the terrorists placed a premium on obtaining

(and re-selling) such American-made goods, they demanded that Defendants memorialize their goods' country of origin in the contracting documents.  Defendants thus often had to certify their connection to the United States as a condition of obtaining the corrupt sales contracts at issue.

13.     The Jaysh al-Mahdi attacks that Defendants' corrupt payments aided and abetted were acts of "international terrorism."  18 U.S.C. § 2333(a).  Sadr, working with Hezbollah, founded Jaysh al-Mahdi in 2003 as an Islamic militia whose primary goal was to expel Americans from Iraq.  In furtherance of that goal, Jaysh al-Mahdi waged a violent campaign that involved an array of asymmetrical terrorist tactics:  Jaysh al-Mahdi fighters attacked civilians and service members indiscriminately; engaged in mass sectarian cleansing; targeted medics in attacks; conducted kidnappings, torture, and executions; and hid from U.S. troops in mosques, schools, ambulances, and hospitals.  In reaction to such tactics, the Pentagon's press service referred to Sadr's militia as "the Jaysh al-Mahdi terrorist organization."

14.     In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more – likely making it responsible for more American casualties in Iraq than any other terrorist group.  That prompted the U.S. military leadership to observe in 2007 that Jaysh al-Mahdi was "more of a hindrance to long-term security in Iraq than [Al-Qaeda in Iraq]," the Sunni terrorist group that became ISIS.

15.     Jaysh al-Mahdi's terrorist attacks against Americans in Iraq were "planned" and "authorized" by Hezbollah, 18 U.S.C. § 2333(d), the militant Lebanese terrorist group that the U.S. State Department has designated as a Foreign Terrorist Organization since 1997.  In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Sadr found Jaysh al-Mahdi.  Mugniyeh and other Hezbollah operatives subsequently recruited, trained, and equipped Jaysh al-Mahdi terrorists to carry out attacks against Americans in Iraq.

At the same time, both Hezbollah's Secretary-General and its Grand Ayatollah spiritual leader publicly called on Iraqi Shi'a to join Jaysh al-Mahdi in its attacks against Americans in Iraq. Hezbollah's training, weapons, and personnel – along with the moral and religious authority provided by Hezbollah's incitement of Shiite religious violence in Iraq – were essential to Jaysh al-Mahdi's terrorist campaign.  As thousands of Jaysh al-Mahdi terrorists declared during a 2006 rally in Sadr City, while marching under the Hezbollah flag:  "We are Hezbollah."

16.     Plaintiffs are U.S. citizens, and their family members, who served their country in Iraq between 2005 and 2009 and who were killed or wounded in terrorist attacks for which Jaysh al-Mahdi was responsible.  As alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act ("ATA") and state law.  Defendants violated the ATA by structuring their transactions with MOH to make payments to Jaysh al-Mahdi members who they knew or recklessly disregarded would use such payments to help fund terrorist attacks on Americans in Iraq.  Specifically, Defendants are liable under the ATA, 18 U.S.C. § 2333(d), for aiding and abetting Jaysh al-Mahdi's campaign to commit terrorist attacks in Iraq that were planned and authorized by Hezbollah, a designated Foreign Terrorist Organization. Additionally, Defendants are liable under the ATA, 18 U.S.C. § 2333(a), as courts have construed it, for supporting Jaysh al-Mahdi in violation of U.S. criminal law.

## THE DEFENDANTS

### A.    The AstraZeneca Defendants

17.    Defendant AstraZeneca UK Limited is a wholly owned subsidiary of AstraZeneca plc (collectively with its subsidiaries and affiliates, "AstraZeneca"), which is headquartered in the United Kingdom and whose American Depository Receipts trade on the New York Stock Exchange ("NYSE") under the ticker symbol AZN.  AstraZeneca UK Limited is incorporated in the United Kingdom, and its principal place of business is in London, England.

18.    Defendant AstraZeneca Pharmaceuticals LP is a wholly owned subsidiary of AstraZeneca plc.  It is incorporated in Delaware, and its principal place of business is in Wilmington, Delaware.

### B.    The GE Defendants

19.    Defendant GE Healthcare USA Holding LLC is a wholly owned subsidiary of General Electric Company (collectively with its subsidiaries and affiliates, "GE"), which is publicly traded on the NYSE under the ticker symbol GE.  GE Healthcare USA Holding LLC is incorporated in Delaware, and its principal place of business is in Arlington Heights, Illinois.

20.    Defendant GE Medical Systems Information Technologies, Inc. is a wholly owned subsidiary of General Electric Company.  GE Medical Systems Information Technologies, Inc. is incorporated in Wisconsin, and its principal place of business is in Milwaukee, Wisconsin.

21.    Defendant GE Medical Systems Information Technologies GmbH is a wholly owned, indirect subsidiary of General Electric Company.  GE Medical Systems Information Technologies GmbH is incorporated in Germany, and its principal place of business is in Freiburg, Germany.

C.      **The J&J Defendants**

22.     Defendant Johnson & Johnson (collectively with its subsidiaries, "J&J") is publicly traded on the NYSE under the ticker symbol JNJ.  Johnson & Johnson is incorporated in Delaware, and its principal place of business is in New Brunswick, New Jersey.

23.     Defendant Cilag GmbH International ("Cilag") is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Switzerland, and its principal place of business is in Zug, Switzerland.

24.     Defendant Ethicon Endo-Surgery, LLC is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Delaware, and its principal place of business is in Guaynabo, Puerto Rico.

25.     Defendant Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in New Jersey, and its principal place of business is in Somerville, New Jersey.

26.     Defendant Janssen Ortho LLC is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Delaware, and its principal place of business is in Gurabo, Puerto Rico.

27.     Defendant Janssen Pharmaceutica N.V. is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Belgium, and its principal place of business is in Beerse, Belgium.

28.     Defendant Johnson & Johnson (Middle East) Inc. ("J&J Middle East") is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in New Jersey, and its principal place of business is in Dubai, United Arab Emirates.

29.     Defendant Ortho Biologics LLC is a wholly owned subsidiary of Johnson & Johnson.  It is incorporated in Delaware, and its principal place of business is in Manatí, Puerto Rico.

D.      **The Pfizer Defendants**

30.      Defendant Pfizer Inc. (collectively with its subsidiaries, "Pfizer") is publicly

traded on the NYSE under the ticker symbol PFE.  Pfizer Inc. is incorporated in Delaware, and

its principal place of business is in New York, New York.

31.      Defendant Pfizer Enterprises SARL is a wholly owned subsidiary of Pfizer Inc.  It

is incorporated in Belgium, and its principal place of business is in Luxembourg.

32.      Defendant Pfizer Pharmaceuticals LLC is a wholly owned subsidiary of Pfizer

Inc.  It is incorporated in Delaware, and its principal place of business is in Barceloneta, Puerto

Rico.

33.      Defendant Pharmacia & Upjohn Company LLC is a wholly owned subsidiary of

Pfizer Inc.  It is incorporated in Delaware, and its principal place of business is in Kalamazoo,

Michigan.

34.      Defendant Wyeth Pharmaceuticals Inc. is a wholly owned subsidiary of Pfizer

Inc.  It is incorporated in Delaware, and its principal place of business is in Collegeville,

Pennsylvania.  Pfizer acquired Wyeth Pharmaceuticals Inc. as part of a January 2009 merger in

which Pfizer Inc. purchased Wyeth and its subsidiaries (collectively, "Wyeth").

E.      **The Roche Defendants**

35.      Defendant F. Hoffmann-La Roche Ltd. is a wholly owned subsidiary of Roche

Holding Ltd. (collectively with its subsidiaries and affiliates, "Roche"), which is headquartered

in Switzerland and whose American Depository Receipts trade on OTCQX International Premier

under the ticker symbol RHHBY.  F. Hoffmann-La Roche Ltd. is incorporated in Switzerland,

and its principal place of business is in Basel, Switzerland.

36.      Defendant Genentech, Inc. ("Genentech") is a wholly owned subsidiary of Roche

Holding Ltd.  Genentech is incorporated in Delaware, and its principal place of business is in

South San Francisco, California.  Roche has owned a majority stake in Genentech since 1990, and it acquired Genentech in its entirety pursuant to a March 2009 merger agreement.

37.    Defendant Hoffmann-La Roche Inc. is a wholly owned subsidiary of Roche Holding Ltd.  Hoffmann-La Roche Inc. is incorporated in New Jersey, and its principal place of business is in Nutley, New Jersey.

## JURISDICTION AND VENUE

38.    This Court has subject-matter jurisdiction over Plaintiffs' federal-law claims under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.  It has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

39.    This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

40.    Venue is proper in this District under 18 U.S.C. § 2334(a), because Plaintiffs James Connolly, Robert Neiberger, and Stephanie Zobay reside in the District.

## SOURCING

41.     The factual allegations that follow are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from more than 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government officials; English- and Arabic-language press reports; and Plaintiffs' own recollections.  For allegations that quote or paraphrase directly from a publicly available document, this Complaint typically cites the source in a footnote.  For other allegations, such as those based on Confidential Witness interviews or non-public documents, the Complaint does not expressly identify the basis of the allegation, in an effort to protect Plaintiffs' sources.

42.     Many of Plaintiffs' Confidential Witnesses harbor a well-founded fear for their physical safety, based on their current or former ties to Iraq or other Shi'a-majority countries. The last time witnesses came forward to testify against one of the Jaysh al-Mahdi terrorists who effectively ran MOH, they received death threats against themselves and their families.  *See infra* ¶¶ 94-96.  Many of Plaintiffs' Confidential Witnesses have expressed serious concern that any public allegations traceable to them could invite a similar result here.  For that reason, Plaintiffs have withheld details tying specific allegations to particular Confidential Witnesses – as well as details tying allegations to particular sensitive documents – so as not to provide terrorists with the means to piece together their identities.

43.     Plaintiffs' Confidential Witnesses have offered an array of first-hand perspectives on various aspects of the terrorist-financing scheme alleged below.  Those witnesses include MOH employees with experience inside the Ministry across various time periods since 2003; other Iraqi officials who personally interacted with corrupt MOH employees doubling as Jaysh

13

al-Mahdi terrorists; former U.S. officials stationed in Iraq with responsibility for various facets of U.S. policy involving MOH and corruption, both during reconstruction and afterwards; and a civilian security contractor deployed to protect U.S. government personnel, who gained extensive tactical experience around MOH and in Jaysh al-Mahdi-controlled neighborhoods. The following allegations are based in part on those witnesses' observations and recollections, corroborated by public and non-public documents and press reports.

## **FACTUAL ALLEGATIONS**

**I.    UNDER SADDAM HUSSEIN, THE IRAQI MINISTRY OF HEALTH BECAME A CORRUPT TOOL OF TERRORIST FINANCE**

44.    Defendants' transactions with MOH relied on a corrupt procurement process originally created under Saddam Hussein's regime.  That corrupt system laid the groundwork for how Defendants funded terrorist attacks through MOH after Saddam's overthrow.  The following nine paragraphs of this Complaint describe that background.

45.    Saddam, the head of the secularist Sunni Ba'ath Party, ascended to power in Iraq in 1979.  On August 2, 1990, Saddam's military invaded Kuwait, which sparked the first Gulf War and led the U.N. Security Council to impose trade sanctions on Iraq.  The U.N. later adopted Resolution 986, which relaxed those sanctions and authorized Iraq to sell oil on the condition that the proceeds be deposited in a U.N.-monitored bank account and be used only to purchase designated humanitarian goods.  This program was known as the "Oil-for-Food Program."

46.    By mid-2000, Saddam's regime had implemented a scheme to subvert the Oil-for-Food Program by extracting corrupt payments from so-called "humanitarian-goods suppliers" like Defendants.  The resulting scandal prompted congressional hearings in both the House and the Senate, resulted in a 623-page report by a U.N.-commissioned Independent Inquiry

Committee led by Paul Volcker ("*Volcker Report*"),[2] and was called by one Congressman "the biggest scandal in the history of the U.N. and one of the greatest financial scandals of modern times."[3]  All told, Saddam's regime obtained more than $1.5 billion in illicit income from so-called "humanitarian-goods suppliers" under the Oil-for-Food Program.[4]

47.     The Oil-for-Food scandal included transactions involving MOH, which – through Kimadia, its subsidiary import company that had a monopoly over all public medical-goods imports in Iraq – was responsible for importing drugs and devices using revenues that Iraq derived from its U.N.-approved oil sales under the Oil-for-Food Program.

48.     MOH generally, and Kimadia specifically, was widely understood to be one of the most corrupt agencies of Saddam's regime.  As one account summarized the 2004 observations of a U.S. military advisor with post-invasion responsibility for Kimadia operations, Kimadia "operated as a top-down 'controlled system of allocation' under Saddam Hussein, and was, by all counts, totally and utterly corrupt."[5]  An analysis of Kimadia prepared in mid-2003 for USAID likewise reported a widespread sentiment among Kimadia mid-level employees that "the system is very corrupt both above an[d] below their authority."[6]  For that reason, the U.S. government in 2003 and 2004 attempted to abolish Kimadia and replace it with a transparent, free-market procurement system, but encountered Iraqi opposition and was unable to cure Kimadia's entrenched corruption before handing sovereignty back to the Iraqis.

---

[2] Paul A. Volcker *et al.*, *Manipulation of the Oil-for-Food Programme by the Iraqi Regime* (Oct. 27, 2005) ("*Volcker Report*").

[3] 151 Cong. Rec. H4704 (daily ed. June 17, 2005) (statement of Rep. John Sullivan).

[4] *Volcker Report* at 4.

[5] Brandon Sprague & Adam Shemper, *Baghdad's Shame*, Salon (Aug. 28, 2003).

[6] Abt Associates, Inc., *Situational Analysis Report for Kimadia* 8, USAID Contract No. RAN-C-00-03-00010-00 (July 11, 2003).

49.     Kimadia employed a number of different measures to obtain corrupt payments from medical-goods suppliers under Oil-for-Food.  Most common was the use of post-sale, maintenance, and warranty fees, which later became known as "After Sales Service Fees" ("ASSFs") – a practice that spawned an international scandal and numerous Foreign Corrupt Practices Act ("FCPA") enforcement actions.[7]  Saddam's regime imposed a 10% After Sales Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[8] Saddam's regime collected these payments from suppliers ostensibly to pay for post-sale services, but in reality they simply gave his regime illicit cash flow free of U.N. oversight. According to the Volcker Commission, Saddam sometimes collected ASSFs without memorializing them in the actual sales contracts:  the "ten percent fee" was often paid "without labeling it an 'after-sales-service' fee or without inserting an after-sales-service provision in the applicable contract."[9]  Suppliers typically concealed such fees on their books by routing them through third-party "consultants" or distributors who acted as their sales agents in Iraq.

50.     Saddam's Kimadia also devised a second, equally potent scheme to extract corrupt payments from foreign suppliers.  This second scheme worked much like the first, except that the bribes were paid in the form of goods rather than cash.  Under this "free goods" scheme, suppliers provided free, in-kind drugs and equipment to Kimadia officials in quantities equal to

---

[7] *See* Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505 (D.D.C. filed Aug. 23, 2007), ECF No. 1; Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862 (D.D.C. filed May 11, 2009), ECF No. 1 ("*Novo Nordisk FCPA* Compl."); Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448 (D.D.C. filed Mar. 17, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258 (D.D.C. July 27, 2010), ECF No. 1 ("*GE FCPA* Compl."); Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648 (D.D.C. filed Sept. 29, 2010), ECF No. 1; Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686 (D.D.C. filed Apr. 8, 2011), ECF No. 1  ("*J&J FCPA* Compl."); Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, Case No. 11-cr-00099-RBW (D.D.C. filed Apr. 8, 2011), ECF No. 1-1 ("*J&J DPA*"); Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733 (S.D. Tex. filed Nov. 26, 2013), ECF No. 4.

[8] *Volcker Report* at 276.

[9] *Id.* at 249.

10% of the underlying contract.  For example, if Kimadia contracted with a medical-supply company to buy one million units of Product A, the company would provide, free of charge, an extra 100,000 units of Product A on top of the 1 million units that had been purchased.  The company would include those "free goods" in the same shipments as the underlying contracted-for goods and package them in a manner conducive to street resale – which ensured that Kimadia officials could divert the extra goods to the black market.  Once diverted, the goods were resold at a markup, with corrupt Kimadia employees and their Ba'athist patrons reaping the profits.

51.     The "free goods" scheme under Oil-for-Food was confirmed in a published journal article written by a former U.S. Army officer and medical logistician assigned to MOH under the Coalition Provisional Authority ("CPA").[10]  The article appeared in *Contract Management*, a prominent procurement-logistics journal that is "the world's leading professional resource for those in the field of contract management."[11]  The article explained that "10 percent free goods was another way the corrupt regime exploited the [Oil-for-Food Program]":  the extra "free goods," by design, did not "make it into the Iraqi inventory," but instead often "traveled back across Iraqi borders to neighboring countries" for sale on black markets "at 100-1000 percent above the sale prices within the Iraqi health system."[12]

52.     The U.S. government alleged the use of free goods to bribe Iraqi officials under Oil-for-Food.  For example, according to the Securities and Exchange Commission ("SEC"), a GE subsidiary made substantial "in-kind kickback payments" on cardiology equipment to

---

[10] *See Pre-liberation Iraqi Procurement Processes*, 45 Contract Mgmt. 44 (July 2005) ("*Contract Management*").

[11] Nat'l Contract Mgmt. Ass'n, *Publications*, http://www.ncmahq.org/stay-informed/publications; Nat'l Contract Mgmt. Ass'n, *What Is NCMA?*, http://www.ncmahq.org/discover-our-profession/what-is-ncma.

[12] *Contract Management* at 48.

Saddam's Kimadia.[13]  The GE subsidiary actually refused to pay the standard ASSFs in the form of "cash payments to the Iraqi ministry," but it "acquiesced" to making effectively the same payment using "in-kind" goods – which it included in the contract free of charge.[14]  As with the cash payments, the free goods were funneled to MOH officials through a corrupt local sales agent and mischaracterized on the seller's books and records as a legitimate agent commission.[15]

53.     Defendants made these corrupt payments to Saddam's regime even though the public purpose of the international sanctions program (which Defendants' corrupt transactions circumvented) was to choke off Saddam's ability to finance terrorist activities.[16]  In fact, it was widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers through the Oil-for-Food Program to finance international terrorist attacks.[17]

## II.     DEFENDANTS TRANSACTED BUSINESS WITH A POST-SADDAM HEALTH MINISTRY THAT WAS CONTROLLED BY SHIITE TERRORISTS LOYAL TO MUQTADA AL-SADR

### A.     Muqtada al-Sadr, Hezbollah, And The Formation Of Jaysh al-Mahdi

54.     On March 19, 2003, the United States invaded Iraq.  U.S. troops seized control of Baghdad less than three weeks later, and on April 9, 2003, Saddam's government fell.  Shortly

---

[13] *GE FCPA* Compl. ¶ 23.

[14] *Id.* ¶ 24.

[15] *See id.* ¶¶ 25-28.

[16] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[17] *See*, *e.g.*, Cynthia R. Fagen, *Iraq's Oil for Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), http://nypost.com/2004/10/17/iraqs-oil-for-terror-72m-to-palestinians/; Statement of Chairman Henry Hyde, *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), http://commdocs.house.gov/committees/intlrel/hfa96930.000/hfa96930_0.HTM.

thereafter, the CPA began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

55.     Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003.  After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function.  American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy.

56.     The U.S. invasion of Iraq was watched closely by Iran and its terrorist proxy, Hezbollah.  Even before the invasion began, as early as September 2002, Iran and Hezbollah plotted to undermine the anticipated U.S. presence in Iraq.  Immediately after Saddam's government fell in April 2003, Hezbollah dispatched its chief terrorist mastermind, Imad Mugniyeh, to Iraq.  Mugniyeh's assignment was to make contact with Muqtada al-Sadr, an influential Shiite cleric, and to work with Sadr to build a terrorist organization modeled after Hezbollah and capable of carrying out sophisticated attacks on Americans in Iraq.  Mugniyeh made contact with Sadr shortly thereafter, and the two immediately began work creating the terrorist organization that would become known as Jaysh al-Mahdi.  An Israeli intelligence report confirmed that, by October 2003, Hezbollah was already planning to "set up a resistance movement that would cause mass casualties" among American forces in Iraq.[18]

57.     Sadr's power in Iraq is based in large part on his family lineage.  His cousin and father-in-law, Baqir al-Sadr, was a powerful cleric and founder of the Da'wa Party, which today remains a dominant political force in Iraq.  Baqir al-Sadr was executed by Saddam in 1980 and is

---

[18] Edward T. Pound, *Special Report:  The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.  Mr. Pound's article also cites a July 2003 U.S. intelligence report that concluded that Hezbollah agents were then "attempting to establish contact with Sadr and his Mahdi Army."  On information and belief, based on information that has become available since July 2003, Hezbollah (through Mugniyeh) established contact with Sadr no later than April 2003.

known among Iraqi Shi'a as the "First Martyr."  Muqtada's father, Grand Ayatollah Sadiq al-Sadr, was an even more powerful cleric whom Saddam assassinated in 1999.  Sadiq al-Sadr is revered by many Iraqi Shi'a as the "Second Martyr."  In addition, Muqtada's cousin, Musa al-Sadr, founded Amal – the predecessor to Hezbollah in Lebanon.

58.     Drawing on this influence, Muqtada al-Sadr became the leader of masses of impoverished Iraqi Shi'a after Saddam's fall in April 2003.  Sadr's followers took over Saddam City – the two-million-person slum in eastern Baghdad, which is the most densely populated area in Iraq – and renamed it "Sadr City" after Muqtada's father, Sadiq al-Sadr.  During this time period, Sadr's public sermons in the Shiite holy city of Najaf decried the U.S. invasion of Iraq, labeled U.S. troops as an illegal occupying force, and urged Iraqis to expel Americans from the country.  Sadr's rallies commonly ended with public "Death to America" chants.

59.     By the summer of 2003, Sadr had channeled his popularity into a nascent organization called the "Sadrist Trend" (members of the Sadrist Trend and related groups are known as "Sadrists").  The Sadrist Trend was modeled expressly on Hezbollah.  Like Hezbollah, the Sadrist Trend had both a political wing, called the Office of Martyr Sadr, and a terrorist wing, called "Jaysh al-Mahdi" (Arabic for "the Mahdi Army") or "JAM."  And, like Hezbollah, the Sadrists seized control of important neighborhoods (such as Sadr City) and used Jaysh al-Mahdi to attack foreign enemies – in the case of the Sadrists, U.S.-led Coalition forces.  The Office of Martyr Sadr and Jaysh al-Mahdi were closely interconnected, worked in tandem, shared common sources of financing, and were run by the same people.  There was never any meaningful firewall between those two intertwined components of the Sadrist Trend.

60.     By early 2004, Sadr's growing influence, along with the escalating violence employed by his terrorist militia, threatened the U.S. strategy in Iraq.  That led the CPA, on

March 28, 2004, to order a 60-day closure of *al-Hawza*, the Sadrist newspaper that Sadr used to

proselytize anti-American and anti-Israeli violence.  Sadr reacted by intensifying his

denunciations of the U.S. government and urging his followers to " 'terrorize' their enemy."[19]

According to *The Endgame:  The Inside Story of the Struggle For Iraq, From George W. Bush to*

*Barack Obama* ("*Endgame*"), Michael Gordon and General Bernard Trainor's celebrated

account of the Iraq war,[20] Sadr's Friday sermon on April 2, 2004, was a "bitter invective against

the United States, denouncing the Americans and even praising the September 11 attacks."[21]

61.     From that point forward, Sadr and Jaysh al-Mahdi increased their attacks on

Americans in Iraq, resulting in mass casualties among U.S. citizens (both military and civilian)

working to stabilize and rebuild the country.  By late 2004, Sadr had effectively seized control of

large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah,

and the entire eastern half of Baghdad.  By early 2005, Sadr controlled 20 Jaysh al-Mahdi

brigades – all of which were trained by Hezbollah – operating out of his command-and-control

safe haven in Sadr City, from which Jaysh al-Mahdi coordinated and launched Hezbollah-

supported attacks against Coalition forces throughout Iraq.

62.     In service of its terrorist agenda, and relying on Hezbollah training, weapons, and

personnel, Jaysh al-Mahdi mastered several types of attacks that proved especially deadly for

U.S. troops and civilians, including the attacks that killed and injured Plaintiffs.  As one

commentator explained, Jaysh al-Mahdi was "[a]nalogous to the Sunni terrorist organization, al

---

[19] Nimrod Raphaeli, *Understanding Muqtada al-Sadr*, Middle East Quarterly (Fall 2004), http://www.meforum.org/655/understanding-muqtada-al-sadr.

[20] Mr. Gordon was the chief military correspondent for the *New York Times*, and General Trainor was a former foreign correspondent and retired Marine Corps Lieutenant General.  The *New York Times* called *Endgame* full of "extraordinary research and sobriety" and "one well-documented fact after another."  Gideon Rose, *Exiting the Iraq War:  A Blow-by-Blow Chronicle*, N.Y. Times (Oct. 1, 2012).

[21] Michael R. Gordon & Gen. Bernard E. Trainor, *The Endgame:  The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama* 67 (Vintage Books 1st ed. 2012) ("*Endgame*").

Qaeda," "committed thousands of bombings," "detonated roadside explosives," and "fired mortar shells toward the Green Zone."[22]  In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more.  The death toll inflicted by Jaysh al-Mahdi became so severe that, by July 2007, General David Petraeus concluded that "JAM is more of a hindrance to long-term security in Iraq than is [Al-Qaeda in Iraq]," the Sunni terrorist group that became ISIS.[23]

### B.    Jaysh al-Mahdi's Control Of The Health Ministry

63.    In 2004, the Sadrists executed a plan to take control of MOH, which was the first Ministry that the CPA returned to Iraqi control.  As described in more detail below, from 2004-2013, Jaysh al-Mahdi used its control over MOH to finance terrorist activities.

64.    The Sadrists' plan to take control of MOH was modeled on Hezbollah's experience in Lebanon.  Control of the Lebanese healthcare sector was (and remains) essential to Hezbollah's power.  As it had done for Hezbollah in Lebanon, control over the Iraqi healthcare system offered the Sadrists several advantages, including the ability to raise funds for terrorism through the medical-goods contracting process.

65.    The Sadrist takeover of MOH was part of the broader political trend in reconstruction-era Iraq.  As different factions vied for power in the wake of Saddam's collapse, competing political parties (and their associated anti-American militias) focused on seizing control of the instruments of government.  In a 2009 report, the U.S. Special Inspector General for Iraqi Reconstruction described this "undisguised power grab" that occurred throughout the Iraqi administrative state:

---

[22] Birgit Svensson, *The Mahdi Army:  Turbans, Kalashnikovs and Plans to 'Slaughter'*, Deutsche Welle (June 22, 2014), http://www.dw.com/en/the-mahdi-army-turbans-kalashnikovs-and-plans-to-slaughter/a-17728487.

[23] *See Endgame* at 422.

Almost overnight, a majority of the ministries of Iraq's central government – once controlled by the Ba'ath Party, but largely staffed by technocrats – became aligned with, and then dominated by, competing political parties.  Sadrists seized the Health and Education ministries.  Employing the model of service delivery embraced by Hezbollah – the radical Islamic Shi'a group based in Lebanon – they openly deployed ministry resources to build support among the Shi'a underclass.[24]

66.     In early 2004, Sadrists began assuming important positions throughout the MOH bureaucracy.  Sunnis and secular technocrats alike were purged in what one percipient witness describes as a widespread "occupational cleansing."  Doctors who exhibited insufficient loyalty to the Sadrists were killed or forced to flee.  One MOH insider estimates that, at the height of Sadrist control, the Ministry employed roughly 70,000 members of Jaysh al-Mahdi.  As a result of this "occupational cleansing," the Sadrists achieved virtually total control over MOH.

67.     By late 2004, Jaysh al-Mahdi personnel were invoking their status as MOH employees when arrested by Coalition forces.  For example, an October 2, 2004 military arrest report (as published by *WikiLeaks*) documented the detention of two Iraqis in eastern Baghdad – one of whom "had a Mahdi Militia ID card" – who were "trying to hide Al Sadr posters" and who "both claimed to be Ministry of Health [Facilities Protection Service] workers."[25]

68.     The 2005 parliamentary elections ratified Sadr's power over MOH.  The Sadrists won 23 parliamentary seats in January and increased their total to 32 seats in December.  In early 2005, the ministries within Prime Minister Ibrahim al-Jaafari's cabinet were divvied up by political party so that each party leader effectively controlled the ministries assigned to his party.  As part of that process, the Sadrists officially assumed control of several ministries, including MOH.  In early 2006, Sadr switched his support to Nouri al-Maliki, who replaced Jaafari as

---

[24] U.S. Special Inspector Gen. for Iraq Reconstruction, *Hard Lessons:  The Iraq Reconstruction Experience* 250 (2009).

[25] *WikiLeaks* (Oct. 2, 2004), https://wikileaks.org/irq/report/2004/10/IRQ20041002n766.html.

Prime Minister.  In exchange, the Sadrists retained control of MOH, while obtaining control of several other ministries as well.  The Sadrists considered MOH to be their most important Ministry – it was the first one they demanded in cabinet negotiations – because of the enormous fundraising opportunity that came with control of Kimadia's corrupt procurement process.

69.     In early 2005, Sadr selected Abdul Mutalib Ali Muhammad Salih al-Rabi'i as his first official Minister of Health.  Dr. Mutalib was a member of Jaysh al-Mahdi who referred to himself as a "Mahdi soldier."

70.     In mid-2006, Dr. Ali al-Shemari, another Sadrist, replaced Dr. Mutalib as the Minister of Health.  During his tenure, a 2006 U.S. State Department cable (as published by *WikiLeaks*) noted "[t]he almost complete infiltration of the Health Ministry by Sadrists."[26] During this time period, Jaysh al-Mahdi controlled nearly every facet of MOH.  As one percipient Iraqi witness explained, "the entire Iraqi Ministry of Health w[as] under the control of [the] Mahdi Army," which "made the Iraqi Ministry of Health, along with all Iraqi hospitals and health clinics, bases for their operations."[27]

71.     The Sadrists' control over MOH extended to Kimadia.  In the process of taking control of the Ministry, Jaysh al-Mahdi installed Sadrists in senior- and mid-level positions throughout Kimadia, including in the Director General position.  As *USA Today* reported in 2008, "Al-Sadr's control over Kimadia, the state-run company that is responsible for importing and distributing drugs and supplies to Iraq's hospitals, also poses problems."[28]  Quoting the Iraq director for the International Medical Corps, the article reported that Kimadia's "monopoly" over

---

[26] U.S. State Dep't Cable, *Ambassador's Meeting with Minister of Oil Shahristani* (Nov. 26, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD4351_a.html.

[27] Omer Salih Mahdi, *Diary of an Iraqi ER Doctor Turned Journalist: Where Western Media Could Not Travel*, Huffington Post (updated May 25, 2011), https://www.huffingtonpost.com/omer-salih-mahdi/diary-of-an-iraqi-er-doct_b_83259.html.

[28] Charles Levinson, *Sadrists' Grip on Health Care Takes Toll*, USA Today (Mar. 27, 2008).

medical imports gave it a "stranglehold on the whole medical sector, and that is a source of power through which Sadr can control the health sector and threaten the country."[29]

72.     MOH was a sprawling bureaucracy that employed thousands of Iraqis and had facilities all over the country.  Kimadia was one division within the MOH bureaucracy – it was technically a state-owned import company and monopoly – and was based out of the MOH headquarters building in Sadrist-controlled eastern Baghdad, near the Medical City complex.  In addition to Kimadia, the headquarters housed MOH's leadership and administrative departments. Other MOH facilities throughout Iraq housed the Ministry's regional and local administrative buildings, hospitals, and clinics.  Because of Iraq's system of socialized medicine, every public-sector doctor, pharmacist, nurse, and medical technician in Iraq was employed by MOH.

73.     The Sadrists openly advertised their control of MOH facilities, including the Ministry's Baghdad headquarters from which the contracting process was run.  By late 2004, hundreds of Sadrist posters displaying large pictures of Muqtada and Grand Ayatollah Sadiq al-Sadr (Muqtada's father, the Second Martyr) adorned the halls of MOH's headquarters in Baghdad.  These interior posters contained pictures of the Sadr family surrounded by Shi'a terrorist slogans conveying two basic messages in Arabic, translating roughly to "Death to America and Israel" and "we must destroy the occupiers."  The Ministry's front gates conveyed a similar message.  Beginning in 2005, the exterior wall just outside the MOH entrance contained a 20-foot mural of the Sadr family – so large it was visible from the air – alongside the unmistakable, all-black flag of Jaysh al-Mahdi.  Similar black flags also appeared throughout the inside of the headquarters building, as well as other MOH installations around Iraq.  In addition, the gates just outside the building (and adjacent to the mural) contained anti-American and anti-

---

[29] *Id.*

25

Israeli propaganda.  As *USA Today* reported, these posters and slogans throughout the MOH headquarters building "remove[d] any doubts about who runs the place."[30]

74.     From at least 2005-2007, the Ministry headquarters building also contained written messages soliciting donations for Sadr and Jaysh al-Mahdi.  As *CBS News* journalists observed in October 2006, the MOH headquarters building was full of "[y]ellow boxes covered in Arabic scrawl, calling on people to contribute to Moqtada al Sadr, the founder and leader of the Mahdi Army milit[i]a."[31]

75.     Jaysh al-Mahdi terrorists also set up a physical office inside the main Ministry building.  When Dr. Mutalib became the first Sadrist Minister of Health in 2005, one office within the Minister's suite in the headquarters building became known as the "Jaysh al-Mahdi office."  It was strewn with AK-47s and other weaponry, making clear to anyone who passed by that the Minster was personally associated with Jaysh al-Mahdi.  The office was permanently staffed by senior clerics from Sadr's inner circle who exercised substantial control over MOH decisions, including contracting decisions.

76.     The U.S. government did not support the Jaysh al-Mahdi-controlled Ministry of Health, nor did it encourage companies to transact with MOH between 2005 and 2008 in a way that would benefit the terrorists running it.  The Jaysh al-Mahdi-run Ministry largely refused to cooperate with the U.S. government; levied death threats against U.S. health officials who tried to reform it; froze out U.S. anti-corruption personnel; and became so dangerous that U.S. government teams could no longer enter its Baghdad headquarters.  As the Iraq Study Group

---

[30] *Id.*

[31] Lara Logan, *Iraq, Up Close:  Bodies and Terror*, CBS News (Oct. 5, 2006).

Report concluded in 2006, "Sadr objects to the U.S. presence in Iraq, and therefore the ministries he controls – Health, Agriculture, and Transportation – will not work with Americans."[32]

77.     Although the Sadrists filled MOH from top to bottom, the following officials played especially prominent roles in transforming the Ministry into a tool of Jaysh al-Mahdi.

### 1.     Dr. Adel Muhsin Abdullah al-Khazali (Inspector General of MOH)

78.     Dr. Adel Muhsin Abdullah al-Khazali arrived at MOH in August 2003 and assumed the title of Inspector General of MOH.  He served as Inspector General of MOH until 2013.  During that tenure, he married the Director of Contract Audit for Kimadia, a Sadrist who was in charge of the medical-goods contracting process.  Within months of his arrival, Dr. Adel began exerting control over the Kimadia contracting process.  Dr. Adel used his position to facilitate Jaysh al-Mahdi's corrupt activities inside MOH.

79.     As detailed in a sensitive-but-unclassified report by the U.S. Embassy Baghdad, which was finalized on December 24, 2006, Dr. Adel traveled with a "Mehdi Army body guard detachment" and helped demonstrate that MOH was "openly under the control of the Mehdi Army of Muktad al-Sadr."[33]  That bodyguard detachment consisted of roughly 130 Jaysh al-Mahdi fighters and functioned as an Adel-commanded Jaysh al-Mahdi unit.  As one U.S. official working on anti-corruption matters in Iraq noted in a contemporaneous email, "Adel controls Health.  Adel is also Mahdi Army and has been implicated in an[t]i-Sunni death squad activity."

80.     In 2006 and 2007, Judge Radhi Hamza al-Radhi, head of Iraq's Commission on Public Integrity ("CPI"), attempted to investigate Dr. Adel for corruption.  Judge Radhi's

---

[32] James A. Baker, III *et al*, *The Iraq Study Group Report* 26 (2006), http://history-world.org/061206_iraq_study_group_report.pdf.

[33] Off. of Accountability & Transparency, U.S. Embassy Baghdad, *The Sixth Month Review of Iraq's Performance & Capacity in Enforcing Its Anticorruption Laws* 24 (Dec. 24, 2006) ("*U.S. Embassy Baghdad Report*").  A near-final version of this report is available online at https://fas.org/irp/eprint/anticorruption.pdf.

investigation uncovered evidence (as later recounted in *Condé Nast Portfolio*) that "the Mahdi Army . . . had fully commandeered the ministries of health, trade and transportation" and that MOH ambulances and hospitals were "integral to the militia's sectarian killing machine."[34]  In retaliation, Jaysh al-Mahdi began murdering Judge Radhi's investigators, who became too afraid to venture into Ministry buildings by late 2006.  All told, more than 28 members of CPI were assassinated in 2006 and 2007.  In mid-2007, fearful for his life, Judge Radhi fled Iraq.

81.      According to a contemporaneous memorandum prepared by U.S. anti-corruption officials documenting a July 27, 2006 interview with an MOH confidential source, "Adel is a close contact of Muqtada al[-]Sadr" and "has political power because of his allegiance to Muqtada al[-]Sadr."  The same memorandum documented Dr. Adel's regular attendance with his Jaysh al-Mahdi bodyguards at Friday prayers in Najaf, "where Muqtada delivers his radical messages."  The MOH source further "advised that official corruption is tolerated at the MOH because it has become the ministry occupied by the Mahdi Army, in effect."  And an August 12, 2007 memorandum documenting another CPI interview similarly described Dr. Adel as "one of the major supporters and organizers of the Mahdi Militia."

82.      Dr. Adel also publicly embraced Jaysh al-Mahdi in an event that garnered international media coverage.  After an August 12, 2006 raid by Coalition forces to detain Jaysh al-Mahdi bodyguards assigned to the Minister of Health, Dr. Adel stood next to other Jaysh al-Mahdi members, including Hakim al-Zamili and Dr. Chasib al-Hajjami, *see infra* Part II.B.2-3, in front of television cameras to oppose Coalition forces.  This took place in a rally outside the MOH headquarters building, while Dr. Adel was protected by armed Jaysh al-Mahdi fighters.

---

[34] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Condé Nast Portfolio (Mar. 17, 2008) ("*Betrayal*").

83.     From 2004 until he was forced from his position in 2013, Dr. Adel used his position as Inspector General to raise funds for Jaysh al-Mahdi, including its closely related and allied "Special Group" offshoot, Asa'ib Ahl al-Haq or "AAH."  *See infra* ¶ 334.

## 2.      Hakim al-Zamili (Deputy Minister of Health)

84.     Hakim al-Zamili was another senior MOH official who served as a high-ranking Jaysh al-Mahdi terrorist commander.  Zamili joined MOH in 2003 as the Deputy Director General and in 2005 became the Deputy Minister of Health, serving until he was arrested in 2007.  Zamili was a prominent Jaysh al-Mahdi commander who used his MOH position – in conjunction with Dr. Adel, with whom he worked closely – to conduct Jaysh al-Mahdi terrorist activities.  As Dr. David Ghanim, an Iraqi native and Senior Research Fellow at the University of Gothenburg, observed in his book on Iraq's democratic institutions, Zamili "played a leading role in transforming the ministry into a bastion of sectarian violence."[35]

85.     Zamili amassed power within MOH by seizing control of the Facilities Protection Service, a group of roughly 15,000 fighters nominally tasked with safeguarding the physical security of MOH assets.  Zamili staffed the Facilities Protection Service with elite Jaysh al-Mahdi fighters loyal to Sadr and used it as his personally commanded Jaysh al-Mahdi division.

86.     Under Zamili's direction, Jaysh al-Mahdi used MOH ambulances to ferry death squads around Baghdad, transport weapons, launch indirect fire attacks, and conduct vehicle-based attacks.  Sadrist terror cells often set up operations at hospitals and used the facilities to hold weapons and hostages.  They also used MOH facilities throughout the country as bases from which to directly launch attacks.  As one senior Iraqi politician observed, according to a

---

[35] David Ghanim, *Iraq's Dysfunctional Democracy* 216 (Praeger 2011) ("*Dysfunctional Democracy*").

U.S. State Department cable (as published by *WikiLeaks*), the "Ministry of Health, infiltrated by

Sadrists," was more aptly described as the "Ministry of Weapons Transportation."[36]

87.     According to *CBS News*, a 2006 U.S. intelligence report corroborates those

allegations.  As reported, U.S. intelligence concluded "Sadr's Mahdi Army . . . turned morgues

and hospitals into places where death squads operate freely" and detailed how:

- "Hospitals have become command and control centers for the Mahdi Army militia.
- Sunni patients are being murdered; some are dragged from their beds.
- The militia is keeping hostages inside some hospitals, where they are tortured and executed.
- They're using ambulances to transport hostages and illegal weapons, and even to help their fighters escape from U.S. forces."[37]

88.     This Jaysh al-Mahdi appropriation of MOH resources extended throughout Iraq.

As recounted in *Endgame*, "[e]ven hospitals were used as killing grounds.  So many Sunni

patients and relatives were abducted and killed at Baghdad's three major hospitals . . . that

Sunnis were afraid to use the facilities, and would often drive their sick or injured relatives all

the way to Fallujah or Ramadi."[38]  By the fall of 2006, Jaysh al-Mahdi's control over MOH

facilities had grown so complete that wounded Iraqi troops and police occupied more than 80%

of the hospital beds in U.S. military facilities.  As a U.S. Corps Commander explained, "[w]e

cannot take them to civilian hospitals.  They'll be shot."[39]  An account in the *Washington Post*

reflected the same sentiment, quoting one Sunni security guard whose cousin was allegedly

---

[36] U.S. State Dep't Cable, *Iraqi Moderate Front Organizers Concerned About Media Attention, Lack of Progress* (Dec. 12, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD4527_a.html.

[37] Melissa McNamara, *CBS:  Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006).

[38] *Endgame* at 222.

[39] *Id.* at 223.

murdered by Jaysh al-Mahdi in a hospital:  "We would prefer now to die instead of going to the hospitals . . . .  I will never go back to one.  Never.  The hospitals have become killing fields."[40]

89.     From 2005-2007, Zamili regularly led contingents of Jaysh al-Mahdi fighters up to the roof of the MOH headquarters building to launch attacks, using mortars, sniper rifles, and heavy machine guns.  On at least one occasion in 2006, Zamili himself was seen firing a DShK (a heavy-caliber machine gun popularly called a "Dushka") at nearby Sunni neighborhoods from the roof of the Ministry building.  On another occasion in 2006, a U.S. official was traveling to meet with Dr. Adel at MOH when the American convoy was attacked just outside MOH's front gates by an IED planted by Jaysh al-Mahdi fighters doubling as Facilities Protection Service members.  In light of these and other similar attacks, and Jaysh al-Mahdi's near-total control of the surrounding neighborhood, the area around MOH was considered one of the most dangerous parts of Baghdad for U.S. soldiers and civilians from 2005-2008.

90.     From 2005-2007, Zamili's office and suite at MOH displayed Sadrist propaganda that paid homage to Muqtada and Sadiq al-Sadr.  He conducted Ministry business while being guarded by armed Jaysh al-Mahdi fighters.  His personal office was full of heavy weaponry, including rocket-propelled grenades and Kalashnikov machine guns.  Based on those weapons, and the contingent of armed terrorists in the building, one witness who spent significant time in MOH headquarters understood it as more of a "Mahdi Army camp" than a medical building.

91.     Numerous reports indicated that Zamili was responsible for the 2006 murder of Dr. Ali al-Mahdawi, the Sunni Director General of MOH for the Diyala province, after Mahdawi objected to Zamili's corrupt practices.[41]  Dr. Ali al-Shemari, the Minister of Health who later

---

[40] Amit R. Paley, *Iraqi Hospitals Are War's New 'Killing Fields,'* Wash. Post (Aug. 30, 2006).

[41] *See*, *e.g.*, Kim Gamel, *Iraqi Official Tied to Militia Jailed*, Assoc. Press (Feb. 8, 2007).

testified against Zamili, admitted to Mahdawi's family that he was "surrounded by killers" and that he wanted to fire Zamili, but that the "criminal armed militia do not want that."[42]

92.     Reports also indicated that Zamili was responsible for the 2007 murder of Ammar Saffar, his predecessor as Deputy Minister.  Saffar, as recounted by his son, was "on the verge of exposing explosive evidence that funds earmarked to improve Iraq's health sector were being diverted to sectarian militias" when Zamili kidnapped and killed him.[43]  Former Prime Minister Jaafari reportedly confirmed Zamili's culpability, telling Saffar's son that "prominent Sadrists" had admitted that "Zamili was in fact behind the kidnapping."[44]

93.     On February 8, 2007, Coalition special forces arrested Zamili inside MOH headquarters, along with his Jaysh al-Mahdi deputy in charge of the Facilities Protection Service. They arrested Zamili based on accusations not only that he was a murderer, but also that he had participated in Jaysh al-Mahdi's terrorist fundraising via the diversion of medical goods and the use of inflated contracts for MOH equipment and services.

94.     Zamili's arrest signaled the beginning of the U.S. military's troop surge on the ground in Iraq.  The day of the arrest, a U.S. advisor to the Iraqi military explained to the *Los Angeles Times* that "[t]his is the first visible big fish."[45]  A few months later, General David Petraeus heralded Zamili's arrest as one of the surge's early successes, explaining that Zamili had "effectively hijacked the Ministry of Health."[46]  One U.S. Department of Justice ("DOJ")

---

[42] *Endgame* at 507.

[43] Ali Al-Saffar, *Iraq's Elected Criminals*, Foreign Policy (Mar. 4, 2010).

[44] *Id.*

[45] Louise Roug, *Iraqi Health Official Is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

[46] William Branigin, *Petraeus:  Iraq Situation Is 'Exceedingly Challenging*,' Wash. Post (Apr. 26, 2007).

official opined to the *New York Times* during this period that Zamili's "case is as important, if not more important, than the Saddam Hussein case."[47]

95.     In the months before the trial, however, the witness list was leaked to the Sadrists. Jaysh al-Mahdi then engaged in multiple acts of witness intimidation.  On February 19, 2008, the trial was postponed because, as confirmed by a spokesman for the U.S. Judge Advocates' Corps, "[a]t least seven of the nine prosecution witnesses have received death threats."[48]

96.     Shortly thereafter, several key witnesses backed out of testifying, and others recanted on the stand.  On March 3, 2008, Zamili was acquitted for lack of evidence.  The presiding judge in Iraq, as paraphrased by *NPR*, concluded that "there was little doubt that Zamili, who has close ties to Shiite cleric Moqtada al-Sadr, played some role in the recent sectarian violence.  The court simply didn't have enough evidence to convict him."[49]  Roughly a week later, Zamili was released.  Stuart Bowen, the U.S. Special Inspector General for Iraqi Reconstruction, explained to Congress what had happened:

> Mr. BOWEN.  Yes.  The most notable case came to court 1 week ago in Baghdad, involving the deputy minister of health.  There was significant evidence related to the sale of prescription drugs on the black market that had been ongoing within that ministry. The case was dismissed, because witnesses had been intimidated and did not show.[50]

97.     In 2010, Zamili was elected to the Iraqi Parliament.  In his campaign headquarters in Sadr City during the 2010 election season, Zamili maintained a pretense of denying the charges against him but did not conceal his support for terrorism.  The *New York Times*, after an

---

[47] Michael R. Gordon, *Iraqi Premier Wants Trial of 2 Shiites in Killings*, N.Y. Times (Nov. 16, 2007).

[48] Byran Pearson, *Witnesses in Iraq Death Squad Trial Threatened*, Agence France Presse (Feb. 19, 2008).

[49] Dina Temple-Raston, *U.S. Urges New Trial for Iraqi Colonel*, National Public Radio Morning Edition (Mar. 13, 2008).

[50] Statement of Stuart W. Bowen, Jr., *Examining the Effectiveness of U.S. Efforts to Combat Waste, Fraud, Abuse, and Corruption in Iraq:  Hearings Before the S. Comm. on Appropriations*, 110th Cong. 52 (2008), https://www.gpo.gov/fdsys/pkg/CHRG-110shrg43280/pdf/CHRG-110shrg43280.pdf.

interview, described Zamili as "unapologetic about the attacks that Shiite militias like Moqtada al-Sadr's Mahdi Army carried out in past years against the Americans."[51]  In Zamili's words, "resistance was our right because we were occupied.  We had a duty to protect the people from the U.S. forces and the attacks of terrorists [*i.e.*, Coalition forces and Sunnis]."[52]

### 3.   Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, Dr. Hani Mousa Badr al-Uqabi, and Dr. Chasib Latif Ali al-Musawi al-Hajjami (Directors General at MOH)

98.     In 2005, Jaysh al-Mahdi appointed several Directors General at MOH for the purpose of operationalizing its control over Ministry assets.  Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, and Dr. Hani Mousa Badr al-Uqabi were the Directors General for Rusafa (the eastern part of Baghdad whose MOH Directorate included Sadr City), Karkh (the Jaysh al-Mahdi-controlled neighborhood just to the west of the Tigris River), and Medical City (near MOH headquarters), respectively.  Each was a Jaysh al-Mahdi agent and participant in its terrorist operations.  As regional directors with oversight of MOH resources in their areas of operation, Drs. Ali Bustan, Jaleel, and Hani facilitated the use of MOH ambulances, trucks, hospitals, pharmacies, clinics, and supplies to support Jaysh al-Mahdi's terrorist activities.

99.     Dr. Ali Bustan's brother was the senior Jaysh al-Mahdi cleric and battalion commander for Sadr City who was, on information and belief, the leader of the notorious Fartusi Cell – a Jaysh al-Mahdi cell responsible for a substantial number of attacks against Coalition forces in Baghdad.  Dr. Jaleel, for his part, was caught in 2004 by U.S. troops inside a mosque with explosives of the type often used by Jaysh al-Mahdi against Coalition forces – but was then released on a technicality.  In a television interview years later, Dr. Jaleel boasted that he and his

---

[51] Marc Santora & Michael R. Gordon, *Murky Candidacy Stokes Iraq's Sectarian Fears*, N.Y. Times (Mar.3, 2010).

[52] *Id*.

Sadrist allies once "fired their weapons against American soldiers," which he described as an act of "patriotism" that "had a great impact on his life."[53]

100.    Dr. Chasib Latif Ali al-Musawi al-Hajjami, the Director General for Operations at MOH, was another Sadrist and Jaysh al-Mahdi fighter who, in late 2005, attained his title after Dr. Adel forced out his predecessor.  From at least 2005-2008, Dr. Chasib regularly bragged about being a Jaysh al-Mahdi soldier; he stated on at least one occasion in 2006 that he had wielded a Kalashnikov machine gun for Jaysh al-Mahdi against U.S. forces.  In his years at MOH, Dr. Chasib also posted online photographs of himself armed and wearing Jaysh al-Mahdi garb, including several images of himself standing next to Muqtada al-Sadr.

101.    As the person overseeing MOH's day-to-day operations, Dr. Chasib had official responsibility for the use of Ministry facilities and equipment, such as ambulances.  He told MOH colleagues that his ambulances transported the corpses of Jaysh al-Mahdi's enemies.  On one occasion in or about 2007, he said that the MOH ambulances he oversaw were "still wet from the blood of the corpses" from a Jaysh al-Mahdi attack the night before.

### 4.    Other Senior and Mid-Level Commanders

102.    Many other mid-level MOH employees also played key leadership roles in Jaysh al-Mahdi as Company-, Battalion-, and Brigade-level commanders throughout the group's terrorist operations.  Those MOH employees included pharmacists, administrators, nurses, security personnel, and vehicle managers within the Ministry; such mid-level employees were responsible for coordinating various types of attacks on Coalition forces, including the use of

---

[53] TV Interview on Afaq Channel with Jaleel al-Shammari (Feb. 17, 2017) (translated from Arabic), https://www.youtube.com/watch?time_continue=329&v=beat6M8Ey-c (last accessed Sept. 12, 2017).

improved explosive devices ("IEDs") and explosively formed penetrators ("EFPs").  Examples,

drawn from contemporaneous military arrest reports (as published by *WikiLeaks*), include:

- **Imad Abu Sajjad, Brigade Commander for South Karkh (Baghdad).**  On May 18, 2008, the Iraqi Army arrested "Imad Juwi Rahima aka Imad Abu Sajjad," who "work[ed] for the Ministry of Health" and was a "high level target" because of his status as "the South Karkh JAM Brigade Commander" who had "ordered IDF, EFP/IED, and SAF attacks" against Coalition forces.[54]  In a 2006 Arabic-language article published by *Al-Jazeera*, Abu Sajjad was described as a "prominent leader in [the] Mahdi Army" who "was among the first to join when [Jaysh al-Mahdi] was formed," "command[ed] more than 1,500 fighters," and allegedly "provid[ed] protection for hospitals."[55]  In a 2007 interview with the *New York Times*, Abu Sajjad stated that he and his fighters "had sworn loyalty to Moktada al-Sadr and promised to kill Americans or Sunnis when called upon to do so" and boasted that "Americans in Iraq . . . are really just prisoners" of Jaysh al-Mahdi.[56]  An Arabic-language article published by *Al-Arabiya* further reported that Abu Sajjad was a deputy of Abu Dura, the Hezbollah-trained Jaysh al-Mahdi terrorist who played a key leadership role in its intelligence unit and who was nicknamed the "Shiite Zarqawi" for his brutal tactics.[57]  On information and belief, as a senior Jaysh al-Mahdi terrorist in Iraq, Imad Abu Sajjad received specialized training from a Hezbollah agent deployed inside Iraq.

- **Sa'ad Abadi, Battalion Commander in Kadamiyah (Baghdad).**  Sa'ad Abadi commanded a Jaysh al-Mahdi Battalion in Kadamiyah that included MOH employees and was linked to the Kadamiyah Teaching Hospital, which "JAM/SG cells" had "historically . . . used . . . as a cache site."[58]  On information and belief, Sa'ad Abadi and his cell received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Ali Hindi, Hajji Thair Cell in Kadamiyah (Baghdad).**  On July 5, 2008, Coalition forces searched the home of Ali Hindi, who was a member of a Jaysh al-Mahdi cell known as the Hajji Thair cell in the Shuala section of the Kadamiyah District in Baghdad; Coalition forces discovered two MOH badges along with weapons, film, and a passport indicating travel through Syria,[59] which on information and belief is a significant indicator of terrorist training in Lebanon.  On information and belief, Ali Hindi and his Special Group received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Abu Hajir, EFP Cell in Sadr City (Baghdad).**  Abu Hajir was a member of a Jaysh al-Mahdi cell in Sadr City that included MOH employees.  During a December 4, 2008

---

[54] *WikiLeaks* (May 18, 2008), https://wikileaks.org/irq/report/2008/05/IRQ20080518n10702.html.

[55] Al-Jazeera (Nov. 20, 2006), https://goo.gl/PWSRx5 (link shortened; translated from Arabic).

[56] Damien Cave & Stephen Farrell, *At Street Level, Unmet Goals of Troop Buildup*, N.Y. Times (Sept. 9, 2007).

[57] *See* Al-Arabiya (Dec. 25, 2006), https://www.alarabiya.net/articles/2006/12/25/30226.html (translated from Arabic).

[58] *WikiLeaks* (June 11, 2009), https://wikileaks.org/irq/report/2009/06/IRQ20090611n12476.html.

[59] *WikiLeaks* (July 5, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080705n11375.html.

Coalition search "to capture Abu Hajir [in order] to disrupt [Jaysh al-Mahdi] operations in Sadr City," Coalition forces arrested seven suspected Jaysh al-Mahdi terrorists and recovered, among other things, an EFP, "Ministry of Health SCTY Force Badge," and U.S. currency.[60]  On information and belief, Abu Hajir received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Husayn Saleem Zair, IED Cell near Sadr City (Baghdad).**  During a September 15, 2008 search near Sadr City, Coalition forces arrested Husayn Saleem Zair, who was "suspected to be a [Jaysh al-Mahdi] Special Groups IED cell member."[61]  When he was detained, Zair possessed an MOH Facilities Protection Service ID card and badge, "religious documents," a "sheet of paper from [the] Ministry of Health about workers," and "pills."[62]  On information and belief, Husayn Saleem Zair and his Special Group received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

103.    These and other mid-level MOH employees translated Jaysh al-Mahdi's control of MOH into on-the-ground terrorist acts.  Working at the direction of and in concert with senior terrorists (including the ones identified above), they used MOH assets to launch attacks, smuggle weapons, and gather intelligence.  Contemporaneous U.S. military reports (as published by *WikiLeaks*) provide examples of Jaysh al-Mahdi using MOH resources to commit terrorist acts:

- **MOH Hospitals as Staging Areas.**  On October 11, 2006, Coalition forces received reports that "Mahdi Army" personnel were in "Al Jwader Hospital" and "Al Sadr Hospital," among other places, and were "planning on attacking MNF if they enter Al Sadr City."[63]

- **MOH Vehicles as Attack Instruments.**  On December 2, 2006, Coalition forces reported that 17 "JAM militants" were "planning to launch an attack on [Forward Operating Base] Rustamiyah . . . using Katyusha rockets and 120[mm] mortars," during which "militants [would] use five vehicles belonging to the Ministry of Health."[64]  On December 12, 2006, Coalition forces reported that five ambulances had been "moved from Baghdad City to Al Sadr City and Al Shaab City," and that, "[f]rom the vehicles," Jaysh al-Mahdi would "fire mortars and then use the ambulances as [Vehicle-Borne IEDs]."[65]

---

[60] *WikiLeaks* (Dec. 4, 2008), https://wikileaks.org/irq/report/2008/12/IRQ20081204n11938.html.

[61] *WikiLeaks* (Sept. 15, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080915n11726.html.

[62] *WikiLeaks* (Sept. 15, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080915n11726.html.

[63] *WikiLeaks* (Oct. 11, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061011n5285.html.

[64] *WikiLeaks* (Dec. 2, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061202n5876.html.

[65] *WikiLeaks* (Dec. 12, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061212n6135.html.

- **MOH Headquarters as Attack Base.**  On November 29, 2006, Coalition forces reported that Jaysh al-Mahdi fighters were "launching mortar rounds from [the] top of MOH."[66] On December 21, 2006, Coalition forces reported that "terrorists [were] on the roof of the Health Ministry [building] firing in the Al-Fadel area."[67]

- **MOH Facilities as Kidnapping Tool.**  On August 13, 2006, Coalition forces arrested five suspected Jaysh al-Mahdi terrorists while acting on a tip that 15 "JAM [fighters] armed with PKC and AK-47 and wearing [Iraqi Army] uniforms kidnapped" six local nationals, "and took the kidnapped victims to MOH."[68]

- **MOH Vehicles as Smuggling Tool.**  On December 15, 2006, Coalition forces reported that "[w]eapons have been transported" from Wasit Province (on the Iranian border) to Sadr City through the use of four "yellow trucks supported by ambulances."[69]  Coalition forces determined that the weapons being transported "will be used to target" Americans in Baghdad.[70]  On August 19, 2007, Coalition forces arrested three MOH employees "for questioning in association with the rocket cache found inside an ambulance," including an MOH Facilities Protection Service Night Shift Officer-in-Charge, MOH Deputy Security Manager for the Night Shift, and an MOH Vehicle Manager.[71]

104.    Sadrist control of MOH and Kimadia was at its apex from late 2004 through 2008.  During that period, Jaysh al-Mahdi's cooptation of the Ministry was so complete that there was no meaningful distinction between the MOH bureaucracy and the Jaysh al-Mahdi terrorist apparatus.  In 2008, after a different party won the right to appoint the Minister of Health, the violence within the Ministry began to lessen to some degree.  But until 2013 (and even afterward), Jaysh al-Mahdi's de facto control over the MOH contracting process – exercised via mid- and upper-level managers entrenched throughout the MOH bureaucracy – persisted and continued to fund terrorist attacks.  That was made possible by several of the key Jaysh al-Mahdi agents described above.  For example, Dr. Adel continued in his position as

---

[66] *WikiLeaks* (Nov. 29, 2006), https://wikileaks.org/irq/report/2006/11/IRQ20061129n5782.html.

[67] *WikiLeaks* (Dec. 21, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061221n6232.html.

[68] *WikiLeaks* (Aug. 13, 2006), https://wikileaks.org/irq/report/2006/08/IRQ20060813n4950.html.

[69] *WikiLeaks* (Dec. 15, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061215n6306.html.

[70] *WikiLeaks* (Dec. 15, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061215n6306.html.

[71] *WikiLeaks* (Aug. 19, 2007), https://wikileaks.org/irq/report/2007/08/IRQ20070819n9397.html.

Inspector General until 2013, while Dr. Ali Bustan and Dr. Jaleel continued in their positions until approximately 2015.  Dr. Chasib remains in a high-level position inside MOH to this day.

## III.   DEFENDANTS ENGAGED IN CORRUPT TRANSACTIONS THAT PROVIDED FINANCING TO JAYSH AL-MAHDI

### A.   Jaysh al-Mahdi Raised Money Through Corrupt MOH Contracting Practices

105.   Jaysh al-Mahdi financed its activities by extracting corrupt payments from foreign suppliers like Defendants.  In a December 2004 official report, Health Minister Dr. Ala'din Alwan – a secular bureaucrat whom the Sadrists forced out in early 2005, just after he had publicly excoriated MOH's corrupt procurement practices and called for "drastic changes" – acknowledged that "corruption is widespread" within MOH.[72]  According to Minister Alwan, "[p]rocurement processes, bidding procedures, and project management are areas where corruption is commonly encountered."[73]  Similarly, as Health Minister Dr. Ali al-Shemari noted in the summer of 2006 (as described in a U.S. State Department cable as published by *WikiLeaks*), he was aware that "Kimadia is corrupt."[74]

106.   Dr. Adel used his position as corruption watchdog at MOH to facilitate Jaysh al-Mahdi's fundraising activities from foreign suppliers like Defendants.  As Inspector General, Dr. Adel blocked investigations into corrupt activities of Jaysh al-Mahdi officials at MOH.  He also controlled the MOH procurement process through his marriage to the Director of Contract Audit for Kimadia.  When others within the Iraqi government – either inside or outside MOH – would attempt to initiate legal investigations of MOH corruption, Dr. Adel scuttled the investigations.

---

[72] Ala'din Alwan, *Health in Iraq:  The Current Situation, Our Vision for the Future and Areas of Work* 50, 75 (2d ed. Dec. 2004).

[73] *Id*. at 50.

[74] U.S. State Dep't Cable, *New Minister of Health:  Let's Cooperate to Improve Healthcare & the Ministry* (June 12, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD1978_a.html.

107.    Jaysh al-Mahdi's fundraising schemes took advantage of MOH's lack of any modern logistics system.  Drugs and devices were counted in an ad-hoc manual way, logged on paper, and stored in warehouses in a haphazard manner.  There was no centralized system tracking the movement of goods and devices.  A 2004 investigation by 60 Iraqi pharmacists, as described in a report by the U.N.'s Office for the Coordination of Humanitarian Affairs, found that "medicine was stolen from warehouses, it was stolen from hospitals, it was even stolen on its way to patients."[75]  The Director General of Kimadia likewise admitted in 2004 that "huge volumes of paperwork make it easy to hide orders for stolen drugs and medical equipment."[76]

108.    In June 2007, retired New Hampshire Superior Court Judge Arthur Brennan, who then headed the Office of Accountability and Transparency ("OAT") at the U.S. Embassy in Baghdad, oversaw an investigation into Jaysh al-Mahdi's corruption.  As recounted by the New Hampshire Bar Association, OAT had "evidence of crimes committed by Dr. Adel Muhsin" – specifically, that "[m]illions of dollars in pharmaceuticals had been stolen or misappropriated."[77] But Judge Brennan determined that OAT could not effectively investigate Dr. Adel further, as he "believed that Muhsin was a danger to his OAT advisors."[78]  Judge Brennan testified before the Senate in 2008 about Dr. Adel (without identifying him by name):  "OAT had evidence that the man was corrupt and dangerous" and was involved in the "theft and or misappropriation of up to one billion dollars in medical supplies" – meaning that Dr. Adel and Jaysh al-Mahdi were exploiting their control over procurement at MOH and Kimadia by monetizing medical goods

---

[75] U.N. Off. for the Coordination of Humanitarian Aff., *Iraq:  Health Ministry Fights Corruption*, IRIN News (June 16, 2004), http://reliefweb.int/report/iraq/iraq-health-ministry-fights-corruption.

[76] *Id.*

[77] Beverly Rorick, *NH Judge's Anti-Corruption Mission in Iraq Ends in Disenchantment*, New Hampshire Bar Ass'n Bar News (Oct. 15, 2010), https://www.nhbar.org/publications/display-news-issue.asp?id=5761.

[78] *Id.*

nominally intended for public facilities.  Rather than being distributed for legitimate medicinal

purposes, "[t]he medical supplies were showing up on the black market in Iraq and Syria."[79]

109.    Jaysh al-Mahdi's re-selling of medical goods extended to neighboring countries

such as Iran and Syria.  As a U.S. anti-corruption official stated in a contemporaneous email,

Dr. Adel, as agent of Jaysh al-Mahdi, awarded contracts to those who paid "the highest kickback.

Once the bid is awarded – after collecting his kickback – he then obtains the actual drugs" and

"resells them to Syria and Jordan for a profit."  And, according to a memorandum documenting

an August 12, 2007 meeting with CPI officials, there were "numerous reports of Adel interfering

with contracts," steering "contracts to favored companies, and receiving kick backs."

110.    Dr. Adel himself scarcely bothered to hide Kimadia's corruption.  A U.S. State

Department cable (as published by *WikiLeaks*) recounted on July 10, 2009 that Dr. Adel publicly

"acknowledged corrupt practices by the Health Ministry's office, KIMADIA, responsible for

procurement of medicines and other medical items."[80]  Dr. Adel further admitted that, on his

watch, "a 'large proportion' of the purchase contracts issued by KIMADIA were tainted with

corruption."[81]  Another U.S. State Department cable (as published by *WikiLeaks*) the following

year observed that Dr. Adel had long "been the subject of credible corruption allegations,"

including "in connection with the Health Ministry's procurement of pharmaceuticals."[82]

111.    A 2013 report by the Iraqi Parliament was equally scathing.  After an extensive

parliamentary investigation into Dr. Adel's practices, the Investigation Committee of the

---

[79] Statement of Arthur Brennan, *Waste Fraud & Corruption in Iraq*, S. Democratic Policy Comm. (May 12, 2008), 2008 WL 2010885 ("*Brennan Testimony*").

[80] U.S. State Dep't Cable, *Anti-Corruption Developments in Iraq* (July 10, 2009), https://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html.

[81] *Id.*

[82] U.S. State Dep't Cable, *Ministry of Interior Bomb Detector Stirs Controversy & Charges of Corruption* (Feb. 11, 2010), https://wikileaks.org/plusd/cables/10BAGHDAD366_a.html.

Parliament confirmed the "involvement of the General Inspector [Dr. Adel] within the Ministry of Health and his wife, with financial and administrative corruption."[83]  According to Hassan al-Jubouri, the chairman of the Investigation Committee, Dr. Adel and his wife had engaged in rampant "financial corruption through tak[ing] bribes from companies."[84]

112.    MOH's procurement corruption and its terrorist ties went hand-in-hand.  As documented in a contemporaneous memorandum memorializing a December 6, 2006 interview with a CPI investigator, Iraqi anti-corruption institutions failed to combat corruption at MOH because – even though there were "direct indications of equipment/medicine thefts" – outside investigators were "too scared of the militias within MOH to create waves."

113.    The U.S. government's aid programs interfacing with MOH – including those run by the State Department, USAID, and the Army Corps of Engineers – generally circumvented MOH's corrupt procurement apparatus by focusing on infrastructure projects, capacity-building efforts such as hospital and clinic construction, and direct procurement of supplies not subject to Kimadia's corrupt import process.  Most of these programs were created either during reconstruction (when the CPA ran MOH) or shortly thereafter, before the Sadrists took over the Ministry.  U.S. government programs also implemented safeguards designed to prevent the diversion or misappropriation of U.S.-funded health projects, and were subject to audits and other anti-corruption safeguards – safeguards that Defendants' corrupt transactions lacked.  Through these mechanisms, the U.S. government attempted to support the cause of rebuilding the Iraqi healthcare system without strengthening Jaysh al-Mahdi through the corrupt MOH

---

[83] Ahmed Hussein, *Investigations Prove Mohsin's Involvement in Corruption*, Iraqi News (May 13, 2013), http://www.iraqinews.com/baghdad-politics/investigations-prove-mohsin-s-involvement-in-corruption/.

[84] *Id.*

contracting process.  At no point did the U.S. government encourage companies to accede to

MOH's demands for corrupt payments in the Kimadia-run medical-supply procurement process.

### B.      Defendants Made Corrupt Payments To Jaysh al-Mahdi

114.     Beginning in 2004, after the Sadrists infiltrated MOH, Defendants made corrupt

payments to Jaysh al-Mahdi through MOH to exploit a post-Saddam Iraqi healthcare market that

was generally perceived to be on the verge of rapid growth.  For example, one study found that,

from 2006-2011, the Iraqi pharmaceutical market experienced a 17% compound annual growth

rate – making it the fastest-growing market in Eastern Europe, the Middle East, and Africa.[85]

115.     In an effort to grow their market share in Iraq, Defendants engaged in transactions

structured to provide financial support to Jaysh al-Mahdi.  Defendants' corrupt payments to

Jaysh al-Mahdi officials fell into two broad categories:  (1) "free goods;" and (2) "commissions."

### 1.      "Free Goods" Payments

116.     In 2004, shortly after the CPA ceded control of MOH to the Iraqis, Defendants

revived the "free goods" scheme they had used under Oil-for-Food.  The scheme operated much

the same way it had before, with two important differences.  First, the Ministry's procurement

budget skyrocketed from $16 million per year under Saddam to an average of well more than $1

billion after 2004, when the Sadrists controlled MOH.  As a result, the market for Defendants'

products in Iraq increased substantially, providing an additional motive for Defendants to engage

in corrupt transactions with MOH.  Second, whereas Kimadia under Saddam had demanded

"free goods" in quantities equal to 10% of the underlying contract, Defendants varied the

percentages they paid the Sadrists – mostly upwards.  For example, AstraZeneca's general

---

[85] *See* Management Partners, *Iraq Pharmaceuticals Market Opportunities*, Market Insights (May 2013).

practice was to provide "free goods" to the Jaysh al-Mahdi-controlled Ministry in quantities ranging from 25% to 100% on sales of its blockbuster drugs.

117.    Defendants knew that prescription drugs and medical devices, while inexpensive to manufacture and deliver, functioned as cash equivalents in Iraq:  they possessed high street value throughout the Middle East, given the chronic shortages at state-run clinics across the region; they were easy to conceal and smuggle across borders; and they could be effectively monetized on regional black markets or by Jaysh al-Mahdi doctors and pharmacists through their private clinics.  In Iraq between 2004 and at least 2008, medical goods supplied through the Kimadia procurement process functioned more as commodities – they were tradeable, carried a "street" value, and were easily convertible into cash – than they did as medicine to be provided to the public.  That was particularly true with respect to the rare, expensive drugs of the sort sold by Defendants.  When Defendants delivered "free goods" through their Kimadia contracts, therefore, they knowingly provided Jaysh al-Mahdi with a valuable, transportable commodity that could be converted into cash or other goods (such as weapons).

118.    Delivering "free goods" to MOH offered Defendants other advantages.  Unlike cash payments made to corrupt officials, which are difficult to justify if discovered, Defendants could argue that providing free drugs or medical devices to Iraqi health officials reflected charitable goals.  The availability of this pretextual humanitarian justification has made the delivery of in-kind "free goods" a popular form of bribery in the Middle East.

119.    The structure of the Iraqi procurement process ensured that the provision of "free goods" functioned not to benefit the Iraqi people, but as corrupt payments to the terrorists who ran MOH.  From 2004-2013, the MOH procurement process generally began in December of each year, when Regional Directors General (such as Dr. Jaleel or Dr. Ali Bustan) supervised a

process through which doctors, pharmacists, and local hospital administrators assessed their inventories and calculated the region's needs for the upcoming year.  They then submitted written requests to the MOH Needs Assessment Committee ordering the quantity of medical goods – specified to the number of individual units – required for the upcoming year.  The Needs Assessment Committee collected those various orders, tabulated the total, and used the total to fix a national quota for each drug and device.  Kimadia, in turn, used MOH's quota to set the quantities specified in the requests for proposal it issued the following year – so that the quantities purchased of each drug or device would match the corresponding quota set by MOH.  After Kimadia purchased drugs and devices in those quantities, it was responsible for importing and distributing the goods to satisfy the orders placed by individual healthcare providers.

120.    Kimadia procured its quota of each specific drug (or device) by issuing requests for proposal soliciting bids from suppliers for a specified quantity.  Companies responded with bids proposing a price for the quantity of requested goods, which matched the annual quota set by MOH.  On top of that fixed quantity, Kimadia's standard bid instructions regularly instructed companies to specify the quantity of extra goods that they would provide for free.  This demand for "free goods" still appears on the face of Kimadia's standard instructions:  in a checklist specifying "general contract conditions," Kimadia states that each contract "is subjected to free goods to be shipped with the contract goods."  Given the Iraqi procurement process – in which the base quantity of "contract goods" specified in the bid already reflected all the orders submitted by Iraqi healthcare providers – the "free goods," by definition, did not correspond to any needs-based request by an authorized provider.  Because no provider actually requested the "free goods," Kimadia had no legitimate destination to which to send those goods once received

in Iraqi warehouses.  Accordingly, the "free goods" were not accounted for in Iraqi inventory and operated instead as a slush fund for the Jaysh al-Mahdi agents running the Ministry.

121.    After a company won a tendering round, it was required to execute a formal sales contract with Kimadia.  Each contract was required to be executed, by hand, by an executive with signing authority for the supplying company.  The supplier had to physically bring a paper copy of the final, executed contract in person to MOH officials inside the Ministry headquarters building in Baghdad; MOH did not accept contracts that were delivered by mail or electronic means.  Iraqi health officials were suspicious of forged signatures, and they demanded paper copies – delivered in person – in part to visually inspect the executive's signature on the contract. The signed sales contracts often memorialized both the underlying quantity of "contract goods" for which Kimadia would make payment and the quantity of extra "free goods" on top.

122.    Although the precise layout of each Kimadia sales contract varied over time and by supplier, they generally followed the same core template.  The first few pages of the template included (among other things) the following information:

- Contracting Party / Seller:  The company that executed the contract with Kimadia and supplied the purchased goods (often called the "supplier").

- Manufacturer:  The company that manufactured the goods that the supplier was selling. For drug contracts, this could refer either to the manufacturer of the active pharmaceutical ingredient or to the company that formulated and packaged the final drug. *See infra* note 164.  In the latter case, the sales contract itself might not identify the company that manufactured the active pharmaceutical ingredient.

- Origin of the Goods:  The country from which the supplier agreed to source the purchased drugs or devices.  Generally speaking, this term tracked the domicile of whatever entity was identified in the contract as the "manufacturer."  Thus, in some instances the "origin" term described the place where the active pharmaceutical ingredient (the most important component of any drug) was made.  In other instances, it described the place where the drug was formulated and packaged.  The source of the drugs was material to Kimadia:  MOH officials were suspicious of counterfeit drugs, and they insisted on contractual protections guaranteeing that drugs would be made in the proper country of origin.  MOH officials also prioritized obtaining U.S.-manufactured drugs, which tended to be most valuable on the black market.  *See infra* ¶ 153.

46

- <u>National Code</u>:  The alphanumerical code assigned to the drug being sold (not applicable to devices).  Before any drug could be sold in Iraq, MOH had to place it on the national formulary and assign it a National Code.
- <u>Corresponding Bank</u>:  The supplier's correspondent bank account – including account number and SWIFT code – to which MOH wired payment.  As a general rule, transactions with Kimadia occurred in U.S. dollars, so most suppliers had to identify a correspondent account capable of receiving payment in U.S. dollars.

123.    Since 2004, the final section of the standard sales contract typically contained a series of additional contractual terms, often including the obligation to provide "free goods." Kimadia typically instructed suppliers not to label or distinguish these "free goods" from the rest of the goods destined for Iraqi inventory.  This section also often contained other commercially unreasonable contractual provisions, such as a requirement that the supplier re-supply "free of charge" any drugs that expired before Kimadia was able to sell them.

124.    In the sales contract, the supplier typically agreed it would make the sale pursuant to an irrevocable letter of credit.  After execution of the sales contract, the letter of credit was typically sent from Kimadia's bank – The Trade Bank of Iraq ("TBI") – to the supplier's bank. Notice of the letter of credit was sent by SWIFT message, which included reference to the basic terms of the contract and often included – in Field 45A (denoting the Description of Goods and/or Services) – a specific reference to the "free goods" that would be delivered.  For example, one J&J letter of credit stated that "THIS L/C CONTAIN FREE GOODS 20PCT" – meaning that the J&J supplier company had agreed to make a 20% "free goods" payment.

125.    Letters of credit also confirmed the payment terms specified in the contract.  In Field 47A, letters of credit typically provided that some percentage of the contract amount was payable upon presentation of the appropriate shipping documents at the Iraqi border, with the remainder payable after acceptance of the goods at the Kimadia warehouse.  They also typically required the supplier to cover the banking charges associated with the transaction.  To effectuate

that contractual term, letters of credit instructed the supplier's bank to credit TBI's New York-based correspondent banking account in U.S. dollars – so that the supplier, in essence, covered Kimadia's banking fees under the contract.

126.   On information and belief, the supplier Defendants covered Kimadia's transaction and banking fees on each corrupt MOH sales contract by transferring funds into a TBI correspondent account at J.P. Morgan Chase Bank ("JPM NY") in New York.  This allegation is based on the following:

(a)   Plaintiffs have obtained two letters of credit governing two separate transactions in which Defendant Cilag defrayed Kimadia's transaction costs by wiring dollars into a JPM NY correspondent account based in New York.

(b)   TBI is an Iraqi-owned entity that the CPA incorporated on July 17, 2003, to facilitate the import and export of goods to and from Iraq.  Since its inception, according to TBI's chairman in a 2017 interview, TBI's focus has been on building an international "correspondent banks network" to "offer trade finance solutions to the public and private sectors."[86]

(c)   JPM NY led a consortium of banks that established and managed TBI at its founding in 2003, and in that capacity JPM NY directly ran TBI's operating platform and trained TBI's employees.  One of TBI's founding purposes was to issue letters of credit to finance Iraqi imports with the assistance of that JPM NY-led operating consortium.  For example, the U.S. Export-Import Bank approved export insurance in December 2003 for up to $250 million in TBI-issued letters of credit, which it stated would be "used to support trade financing from JPMorgan Chase Bank, as lead of the TBI's Operating Consortium."[87]

(d)   Correspondent accounts in New York were essential to TBI's mission of financing transactions for MOH and other ministries.  Rebuilding the creditworthiness of Iraq's institutions was a crucial component of the U.S.-led reconstruction.  Correspondent accounts in New York – which was (and remains) the hub of the global credit system, especially for U.S. dollar-denominated transactions like Kimadia's – were key to TBI's viability, which led TBI and the Iraqi ministries that relied on TBI to use New York-based accounts.

---

[86] Faisal al-Haimus, *Making Strides in Iraq & Beyond*, Banker Middle East (Feb. 22, 2017), 2017 WLNR 5615939.

[87] Press Release, Export-Import Bank of the United States, *$250 Million Ex-Im Bank Insurance Will Facilitate U.S. Exports to Iraq* (Dec. 28, 2003), http://www.exim.gov/news/250-million-ex-im-bank-insurance-will-facilitate-us-exports-iraq.

127.     The availability of letters of credit, which relied on TBI's correspondent banking network in New York, was material to Defendants' corrupt transactions with MOH.  In cross-border transactions, letters of credit serve a vital function:  they help alleviate the seller's credit risk by having a creditworthy financial institution guarantee payment upon the presentation of documents establishing delivery.  For that reason, the U.S. Department of Commerce has advised American businesses "dealing with Iraq" to "insist on confirmed, irrevocable [letters of credit] when initiating relationships with new importers and distributors."[88]  Although "Iraqi companies often resist the use of confirmed [letters of credit], because of the additional collateral required by Iraqi and international banks for confirmation," the Department of Commerce has advised U.S. exporters to "require these necessary financial protections" before contracting with Iraqi purchasers.[89]  When it came to transactions with Kimadia, the supplier Defendants secured those protections by making payments into TBI's New York correspondent accounts.

128.     After TBI issued a letter of credit, suppliers shipped the goods into Iraq.  The shipments typically arrived on trucks that contained both the "contract goods" and the "free goods," without distinguishing between the two.  The goods arrived at a Kimadia warehouse loading area and had to be signed for by a Kimadia warehouse manager – whom the supplier (through its distributor) typically had to bribe, along with the relevant Deputy Director General of Kimadia.  *See infra* ¶ 163.  At that point – when Kimadia transferred the goods from the company's trucks to MOH warehouses – the "free goods" were often diverted.  Whereas MOH employees (who, after 2004, were typically agents of Jaysh al-Mahdi) generally loaded the

---

[88] U.S. Dep't of Com., *Iraq – Doing Business in Iraq*, Ch. 7:  How Do I Get Paid (Methods of Payment), https://www.export.gov/article?id=Iraq-Methods-of-Payment (last accessed June 1, 2017).

[89] *Id.*

legitimate "contract goods" onto forklifts and logged them into warehouse storage, they separated the illicit "free goods" and transferred them to trucks destined for the black market.

129.    The well-publicized 2007 account written by Ali A. Allawi, a former Iraqi Minister, confirmed MOH officials' diversion of imported drugs and devices.  As Dr. Allawi explained in *The Occupation of Iraq, Winning the War, Losing the Peace*:

> A deteriorating physical infrastructure, inadequate supplies and medicines, continuous power outages, all added to the sense of a health system under siege.  This was further compounded by the ***rampant corruption in the medicines' importing company, Kimadiya,*** a state-owned monopoly from the Saddam era.  ***Pharmaceuticals were routinely hoarded by company officials and then diverted to the black market or illegally exported***.
>
> ***The Health Ministry itself became a bastion of Islamist political parties***.  In spite of heroic efforts by individual doctors, administrators and ministerial officials, the deterioration in the health system continued unchecked.  The Health Ministry budget had exploded from a paltry $16 million in the last year of Saddam's rule to nearly a billion dollars in 2004, but ***this had to accommodate the*** massive losses to the health system's infrastructure and the ***theft or destruction of medicines and medical equipment.***[90]

130.    An April 2007 report on the Iraqi pharmaceutical sector for USAID reached a similar conclusion.  According to the report, the Iraqi "system of control of the pharmaceutical distribution chain has collapsed" and allowed "a significant trade in illicit imports" on the black market.[91]  Although MOH expressed a purported desire to "tackle this practice," it "acknowledges corruption within its own ranks, with [black market] drugs being supplied directly from the Ministry."[92]  The report found that black-market "drugs are freely available in the marketplace, either having been sold there illegally by Kimadia/MOH, sourced from illicit imports, or from goods looted from the Kimadia warehouses, as well as the hospital and clinic

---

[90] Dr. Ali A. Allawi, *The Occupation of Iraq:  Winning the War, Losing the Peace* 378-79 (Yale Univ. Press 2007).

[91] USAID, *Pharmaceutical & Medical Products in Iraq* § 6.5.1.1, Contract No. 267-C-00-04-00435-00 (Apr. 17, 2007) ("*2007 USAID Report*").

[92] *Id.*

outlets."[93]  As Dr. Ghanim likewise observed, Jaysh al-Mahdi's "control over the health ministry provided them with an ample opportunity for profiteering and corruption.  Medical supplies intended for the Ministry of Health were looted and sold by the Mahdi Army."[94]

131.    Dr. Adel helped facilitate this medical-diversion scheme on Jaysh al-Mahdi's behalf.  As recounted in a 2008 email, a U.S. anti-corruption official who had worked in Iraq explained that "Dr. Adel made millions on the black market by diverting pharmaceutical supplies to Syria" while also "provid[ing] militia death squads with access to hospitals and ambulances for al Sadr's thugs to use in kidnapping, torturing and killing."

132.    Although corruption and diversion characterized the entire Kimadia supply chain, including the legitimately purchased "contract goods," the "free goods" delivered by Defendants were particularly easy for the Sadrists to monetize.  As observed by the former U.S. Army medical logistician writing in *Contract Management*, since the Saddam era the "free goods" delivered by corrupt foreign suppliers – which do not correspond to any legitimate order within the Iraqi healthcare system – have not gone "into the Iraqi inventory" but instead have been resold on the black market "at 100-1000 percent above" standard prices.[95]  Thus, when Jaysh al-Mahdi was looking to divert medical goods for a profit, the "free goods" offered them an especially easy source.  That is why, according to several witnesses, Jaysh al-Mahdi agents placed a premium on demanding "free goods" percentages on contracts for valuable drugs and devices.  In the words of one witness with substantial experience inside the Sadrist-controlled MOH, such "donated" goods were "very easy to disappear."

---

[93] *Id.* § 2.0.

[94] *Dysfunctional Democracy* at 217.

[95] *Contract Management* at 48.

133.    Companies further supported Jaysh al-Mahdi by selling MOH nearly-expired pharmaceuticals.  Corrupt MOH officials paid suppliers full price for nearly-expired or otherwise poor-quality drugs that, under ordinary commercial circumstances, were virtually worthless.  Kimadia imported the drugs, waited for them to expire or otherwise fail MOH testing, and then – based on Iraqi regulations barring the sale of such drugs in public clinics – pulled them from inventory and disposed of them on the black market.[96]  This scheme gave Jaysh al-Mahdi agents at MOH another source of drugs that, like the "free goods," were especially easy to divert.  Foreign suppliers, conversely, gained the benefit of selling virtually worthless drugs at full price – knowing that they were likely to be diverted and resold on the black market.  On information and belief, Defendants participated in this poor-quality-drugs scheme throughout the period when the Sadrists controlled the Ministry.  Indeed, that scheme resembled another mechanism foreign suppliers had used to deliver corrupt payments to Saddam's regime under Oil-for-Food.[97]

134.    Defendants delivered "free goods" to Jaysh al-Mahdi agents through three basic mechanisms.  First, and most commonly, Defendants used **FOC Clauses**, under which they agreed to a "free of charge" or "FOC" clause in the sales contract itself – which resembled the 10% "free goods" scheme practiced under Oil-for-Food.  Each Defendant employed FOC Clauses at least in part; indeed, Kimadia's standard practice was to demand "free goods" as an

---

[96] Reports (as published by *WikiLeaks*) corroborate the pervasiveness of this scheme.  For example, on November 11, 2008, Iraqi police, following an order "to arrest unlicensed pharmacies and street medicine dealers," arrested 29 "unlicensed pharmacies" in Nasiriyah "and confiscated a large amount of expired medicine."  *WikiLeaks* (Nov. 11, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081111n11855.html.

[97] *See* Iraq Survey Group, *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD*, Vol. I (Regime Finance and Procurement) 37 (Sept. 30, 2004) ("Another method of generating kickbacks from UN OFF import contracts . . . was based on deceiving the UN over the quality of the items being imported to Iraq.  For this illicit revenue scheme, Iraq arranged for a co-operative supplier to obtain a legitimate UN OFF contract specifying 'first quality' humanitarian goods.  Iraq would then be authorized under UN OFF to pay top quality prices for the items via the UN OFF-controlled accounts.  In reality, however, the co-operative supplier substituted cheap, poor-quality goods for the contract.  This generated very high profits for the co-operative supplier.  Saddam then arranged for the excess profits to be returned to Iraq via diplomatic channels, after the co-operative supplier took its 'fee.' ").

explicit term of the contract.  Sometimes these clauses appeared as standalone clauses; other times they were framed as providing free goods for the nominal purpose of "analysis" by Kimadia.  But Defendants' "free goods" payments were not always memorialized on the face of those contracts – depending on the individual contract and the course of negotiations, companies sometimes routed those payments through alternative means.

135.     The **Administrative Fee Clause** was the second strategy Defendants used to deliver "free goods" to Jaysh al-Mahdi agents inside MOH.  Under this strategy, Defendants and Kimadia agreed to commercially unreasonable contract provisions requiring the supplier to provide free product upon the satisfaction of some condition within Kimadia's control.  For example, Defendants occasionally agreed to a clause promising to replace every drug or device that Kimadia failed to sell within a specified time period (or drugs and devices that Kimadia claimed were deficient), and then, on top of that, pay an "administrative fee" to compensate Kimadia for the lack of sales.  Such provisions essentially gave MOH officials a blank check to demand additional "free goods" and cash from the supplier.  This was particularly true because Defendants' sales contracts generally contained Iraqi choice-of-forum clauses requiring disputes to be litigated in notoriously corrupt and unreliable Iraqi courts – another commercially unreasonable term that facilitated the corrupt payments (such as Administrative Fee Clause payments) otherwise occurring under the contracts.  Defendants and their corrupt counterparts sometimes used an Administrative Fee Clause as a substitute for an FOC Clause, or even in addition to such a clause.  Pfizer, for example, accomplished the delivery of BeneFix "free goods" through both FOC Clauses and Administrative Fee Clauses.

136.     The **Off-the-Books Payoff** is the third strategy Defendants used to pay "free goods" bribes.  Under this strategy, Defendants used medical goods as cash equivalents to buy

off MOH officials to resolve disputes – often triggered by the commercially unreasonable contract provisions that Kimadia insisted appear in every contract.  For example, Dr. Adel often accused companies of delivering spoiled or insufficient product and demanded an additional "donation" of "free goods" as compensation, which companies routinely agreed to provide. Instead of defending themselves against Dr. Adel's accusations, companies agreed to off-the-books settlements in which "free goods" were the currency of the settlement.  In these circumstances, companies made a separate shipment of the "free goods" to MOH that was not tied to any particular tender or contract.  As Defendants knew or recklessly disregarded, such shipments of extra goods were especially easy for Jaysh al-Mahdi to divert to the black market.

137.    Defendants did not intend for the "free goods" provided to Kimadia to serve any legitimate charitable or medicinal purpose.  It was widely understood in Iraq that MOH operated more like a terrorist organization than a legitimate health entity, and no rational company would have viewed MOH as a suitable object for charity.  Nor did MOH actually operate as a charity: it followed a detailed, widely known distribution process that depended on local needs as calculated by the Needs Assessment Committee.  Given the way that system was structured, which Defendants and their local agents knew or recklessly disregarded, the "free goods" payments were structurally designed to disappear from inventory.  *See supra* ¶¶ 117-120.

138.    The flourishing black market for medical goods in Iraq supports the same inference.  Despite an inflated procurement budget – which ballooned to nearly $1 billion in 2004 and only grew from there – Kimadia was notoriously unwilling and unable to actually deliver imported drugs and devices to the people who needed them.  As was widely reported, MOH's corruption and lack of inventory control meant that medical goods nominally intended

for the Iraqi people were routinely diverted.[98]  For example, when Dr. Alwan became Minister of Health in May 2004, only six of the 32 chronic-disease drugs nominally purchased for public clinics were actually available to Iraqi patients.  The provision of "free goods" to MOH made that problem worse.  MOH staff attributed such rampant medical-goods shortages to two main causes:  "excessive utilization of free pharmaceuticals, and structural obstacles to effective distribution, especially the corrupt vestiges of Kimadia."[99]  When Defendants provided "free goods" to MOH officials, therefore, they knew (or recklessly disregarded) that those goods were not serving any legitimate public-health objective; they were destined for the black market.

139.    Nor did the "free goods" payments operate as a legitimate discount.  Kimadia had an obvious reason for demanding "free goods," rather than a price discount:  discounted drugs and devices, while saving money in the MOH procurement budget, would have been harder for corrupt officials to monetize.  For example, if Kimadia issued a request for proposal to buy X units of a drug at $Y per unit, a true "discount" might result in an offer to sell X units at $0.5Y per unit – that is, a 50% price discount on the requested quantity.  While that would have been better for the Iraqi people and saved the government money, such a discount would have been harder for Jaysh al-Mahdi to monetize because the quantity purchased would have corresponded to actual purchase orders from Iraqi healthcare providers.  Under the "free goods" scheme, Defendants would instead sell X units at the full $Y per unit – and then include another Z units for free.  That allowed the Sadrists to keep and monetize the extra goods.  By structuring the

---

[98] *See, e.g.*, Corinne Reilly, *Iraq's Once-Envied Health Care System Lost to War, Corruption*, McClatchy (May 17, 2009) ("Health ministry workers routinely siphon drugs from hospital orders to make extra cash on the black market.  Bribery is rampant.  Millions of dollars meant for clinics and equipment have gone missing.  Millions more have been wasted on government contracts to buy expired medicines.  The health ministry's inspector general openly admits the problems.  Even so, the culprits are rarely punished.").

[99] James Dobbins *et al.*, *Occupying Iraq:  A History of the Coalitional Provisional Authority* 130 (RAND Corp. 2009).

transaction to provide "free goods" rather than a price discount, Defendants ensured that the transaction would redound to the benefit of the Jaysh al-Mahdi agents with whom they were negotiating.  At the same time, it allowed Defendants to prop up their relatively high official Iraq and Middle East-regional reference prices for drugs and medical devices.

140.    Under Oil-for-Food, Kimadia openly rejected discounts in favor of kickback payments.  As alleged by the SEC, one drug supplier "acquiesced to Kimadia's demands and authorized the payment of illegal ASSFs through a third-party agent."[100]  But before doing so, a company executive had "rejected the request to pay Kimadia a ten percent kickback" and instead "suggested to the Kimadia import manager that [the company] reduce the price of its medicines by ten percent."[101]  Kimadia, however, "angrily refused the offer" of a discount and insisted instead on the 10% kickback on top – to which the company ultimately agreed.[102]  The same logic guided Kimadia's contracting strategy in later years.  A true discount would not have benefited corrupt MOH officials; Kimadia thus rejected discounts in favor of extra "free goods."

141.    Pfizer has settled an FCPA case that further illustrates how providing "free goods" to foreign officials functions as a bribe rather than as a legitimate discount.  On August 7, 2012, Pfizer H.C.P. Corporation ("Pfizer HCP") – a Pfizer Inc. subsidiary that operated in several Central Asian markets – entered into a Deferred Prosecution Agreement with the DOJ that resolved expansive FCPA allegations.[103]  In that agreement, Pfizer HCP admitted that it had paid a variety of bribes and kickbacks in Russia and elsewhere.  Pfizer employees admittedly had "provid[ed] incentives" to healthcare providers "that were calculated as 5% of the value of

---

[100] *Novo Nordisk FCPA* Compl. ¶¶ 18-23.

[101] *Id.*

[102] *Id.*

[103] Deferred Prosecution Agreement, *United States v. Pfizer H.C.P. Corp.*, No. 12-cr-00169 (D.D.C. filed Aug. 7, 2012), ECF No. 4  ("*Pfizer DPA*").

certain Pfizer products."[104]  "On its face," that arrangement "appeared to be a mechanism" for Pfizer employees "to provide the equivalent of indirect price discounts" to government hospitals. "In practice, however, Pfizer Russia used [those payments] to make cash payments to individual government healthcare professionals to corruptly reward past purchases . . . and to corruptly induce future purchases and prescriptions."[105]  Defendants used a similar scheme here:  their provision of "free goods" in connection with their Iraqi sales contracts functioned as corrupt payments to MOH officials who were members of Jaysh al-Mahdi.

### 2. "Commission" Payments

142.   Defendants also made other corrupt payments to MOH officials at various stages of their sales transactions in Iraq.  Jaysh al-Mahdi extracted a so-called *Khums* on Kimadia contracts – an Islamic concept translating roughly to a 20% religious tax.  That policy required, as a general matter, companies doing business with Kimadia to pay bribes of at least 20% on every contract.  This was sometimes paid in the form of in-kind bribes (like the "free goods" described above) but was often paid in cash as well.  Such cash payments were typically called "commissions" – the Iraqi euphemism for bribes.  From 2004-2013, it was standard practice for companies dealing with MOH to pay "commissions" on every major sales contract.

143.   The 20% *Khums* accorded with Sadr's broader philosophy described in a 2009 U.S. State Department cable (as published by *WikiLeaks*):  that Iraqi Shi'a "are required to pay one-fifth the value of certain items they acquire as wealth" to the Sadrists as a tax.[106]  Muqtada

---

[104] *Pfizer DPA* Statement of Facts ¶¶ 36-37.

[105] *Id*.

[106] U.S. State Dep't Cable, *Karbala Shrines Pursuing Independent Agenda* (Apr. 24, 2009) ("Several contacts reported that Imams Karbala'i and Safi – concerned that the Iraqi faithful might curtail their payment of khums (in Shi'a Islam, believers are required to pay one-fifth the value of certain items they acquire as wealth as an 'Islamic tax') if there was a perception that all of their money was going to be sent to Iran."), https://wikileaks.org/plusd/cables/09BAGHDAD1100_a.html.

and the Sadrists thus demanded that every Shi'a pay the *Khums* as a 20% "flat-rate income tax/tithe" derived from a "customary" Islamic "obligation to share the profits."[107] Along those lines, in 2003 Sadr issued a *fatwa* authorizing looting of other people's property and allowing looters to "retain their stolen property as long as they made a contribution of 20 per cent of the value of the looted goods (*Khums*) to their local Sadrist office."[108]

144. These tactics permitted Jaysh al-Mahdi to reap the benefits of a mafia-style web of corruption that plagued MOH (including Kimadia) from top to bottom. Even when smaller "commissions" were paid in cash to individual Sadrist officials, they went to benefit the Jaysh al-Mahdi machine: such officials themselves had to kick back a percentage of their earnings to Sadr and Jaysh al-Mahdi as the price of keeping their lucrative positions in government. To that end, Jaysh al-Mahdi terrorists were embedded in leadership positions throughout every significant MOH and Kimadia department and committee, which ensured that Jaysh al-Mahdi and Sadr could institutionally profit from the "corruption economy" at MOH.

145. The Sadrists extracted their "commissions" from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle. On information and belief, each Defendant paid significant "commissions" to MOH officials who were members of Jaysh al-Mahdi at some or all of those transaction stages. On information and belief, companies occasionally paid these "commissions" at early transaction stages even for contracts that they did not end up successfully obtaining. The transaction stages, and the corruption that characterized them, are explained in the following 19 paragraphs.

---

[107] Sam Hardy, *Khums: An un-Islamic Tax for an Islamic Antiquities Market?*, Conflict Antiquities (Blog) (Aug. 17, 2014), https://conflictantiquities.wordpress.com/2014/08/17/syria-iraq-islamic-antiquities-trafficking-tax/.

[108] *Id.*

146.     The first opportunity for corrupt payments came at the **formulary stage** of the transaction lifecycle.  Before a drug could be sold in Iraq, MOH had to approve the drug and place it on the national formulary (this requirement did not apply to devices).  Only after a drug appeared on the formulary could MOH assign it a National Code and make it eligible for future Kimadia contracts.  And, even after a drug made it onto the formulary, every new "indication" for the drug also had to be separately approved and then placed on the formulary.  This power over the formulary provided MOH officials with a significant point of leverage:  if MOH declined to approve a drug for sale (or a new indication for an approved drug) – or if it substantially delayed the approval process – it could exclude companies from future tendering rounds and materially threaten their revenues.  MOH officials' regular practice was to exploit their leverage over the formulary to extract corrupt payments from foreign suppliers.

147.     The **company registration stage** was another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers.  There were two key companies involved in any major transaction with Kimadia:  the supplier (the company that executed the contract and assumed responsibility for ensuring delivery of the goods) and the manufacturer (the company that manufactured the goods being sold).  Before Kimadia would award a contract to a foreign supplier, both the supplier and the manufacturer had to register with the MOH Technical Department to do business in Iraq.  MOH also reserved the right to reject bids that did not describe the legal relationship between the two companies in a "clear and candid way," including disclosure of any subsidiary or affiliate relationship.

148.     This company registration process typically took place shortly before or after the completion of the bid process – but in all events no later than six months after the execution of a sales contract.  The registration process required an application to MOH and the retention of a

local Scientific Bureau to represent the company's interests in Iraq. Scientific Bureaus, by their nature and status under Iraqi law, must represent foreign suppliers' interests and act at those suppliers' direction and control. Specifically, under MOH regulations, foreign medical-goods suppliers had to register a Scientific Bureau to represent them and act as their agent in dealings with MOH. Scientific Bureaus could not enter agreements with or make payments to MOH unless so authorized by the suppliers they represented. As part of their registrations, suppliers and manufacturers had to submit letters to MOH certifying that their chosen Scientific Bureau was authorized to transact business with MOH on their behalf.

149.    Scientific Bureaus also provided a conduit for corrupt payments to Jaysh al-Mahdi. Although Scientific Bureaus have continuously served as a vehicle for corruption in Iraq since 2004, beginning in 2006 or 2007 Jaysh al-Mahdi-affiliated MOH officials – including (but not limited to) Directors General Dr. Ali Bustan and Dr. Hani – further enhanced their ability to raise money for Jaysh al-Mahdi through "commissions" by setting up Scientific Bureaus under their control and steering companies to retain those Bureaus to represent the companies in transactions with Kimadia. The Bureaus – acting as agents for the foreign suppliers – would charge an elevated agent fee that would itself, in effect, be a payment to Jaysh al-Mahdi. On information and belief, Defendants hired certain Jaysh al-Mahdi-affiliated Scientific Bureaus to facilitate some of their corrupt transactions with MOH.

150.    According to Kimadia's registration regulations, multinational companies were "required to register any of their subsidiaries" to the extent they "decide to supply any of their products from the said subsidiary." That required Defendants to submit paperwork to MOH describing their subsidiaries and affiliates involved in commercial transactions with MOH. As with the formulary stage described above, MOH officials could hold up company registration

paperwork – which MOH had to process as a condition of suppliers being permitted to sell in Iraq – as a way of encouraging suppliers to pay them additional "commissions."  MOH officials' regular practice was to extract such payments in connection with the registration process.

151.    The **drug or device registration stage** presented another opportunity for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers.  Even after a drug was placed on the formulary, a supplier could not sell its version of that drug until it separately registered with MOH.  For example, acetaminophen might appear on the MOH formulary, but Johnson & Johnson would not be able to sell Tylenol (its branded version of acetaminophen) unless it separately registered Tylenol with MOH.  A registration was effective for five years, after which the company was required to re-register the product.  MOH officials' regular practice was to extract corrupt payments as a condition for registering a company's drugs or devices.

152.    The product registration process required applicants to submit a wide array of information to MOH.  For example, suppliers seeking to register U.S.-manufactured goods had to provide a certificate confirming that the U.S. Food and Drug Administration ("FDA") had approved the drug or device for sale in the United States, and such suppliers had to certify that they were sourcing the drug or device from the United States.  Suppliers also had to write the country of origin – in the case of U.S.-manufactured goods, "USA" – on the inner and outer packages of the drugs or devices shipped to Kimadia.

153.    In addition, even for drugs manufactured outside of the United States, Kimadia required suppliers to provide FDA approvals where applicable.  FDA approval was important to MOH because of the reputational legitimacy the FDA conferred:  FDA approval signified that the product was safe for use (thus satisfying Iraqi safety regulations), and FDA-approved drugs carried a high street value, which made FDA-approved goods especially attractive for black-

market diversion.  Indeed, the Sadrists placed a premium on importing medical goods manufactured in the United States and Europe – as goods sourced from other countries were considered less valuable; worth less on the black market; and more likely to be counterfeit. Moreover, FDA approval was the gold standard for imported drugs and medical devices, and Kimadia prioritized obtaining documentation of FDA approval over and above approvals from regulatory bodies in other countries (including in Europe).

154.     The **needs assessment stage** was another opportunity for Jaysh al-Mahdi to elicit corrupt payments from foreign suppliers.  Jaysh al-Mahdi agents within regional MOH directorates (such as Dr. Ali Bustan, Dr. Jaleel, or Dr. Hani, *see supra* Part II.B.3) regularly extracted corrupt payments as part of their Needs Assessment Committee calculations.  Regional MOH directorates had significant influence over the inventory-assessment calculations that informed how many units of each good Kimadia purchased each year; companies with a large market share in a certain class of good or drug thus regularly bribed MOH regional Directors General and their subordinates to influence Kimadia to make large purchases of their products.

155.     The **tendering stage** presented another occasion for Jaysh al-Mahdi to collect corrupt payments from foreign suppliers.  After a company had secured the necessary approvals to participate in a tendering round, the company had to then secure a sales contract from Kimadia before it could actually sell its drugs or devices.  The tendering process itself was laced with corruption.  As noted above, one important way that Kimadia extracted corrupt payments during the tendering process was by demanding that companies commit to provide "free goods" memorialized in the contracts themselves.  But that was not the only way.  Companies regularly made "commission" payments to Kimadia employees as well, as well as to MOH officials who sat on the committee overseeing the procurement process, to acquire inside information on the

evaluation process.  Several witnesses recall that companies bidding on contracts regularly paid monthly "salaries" to Kimadia employees – essentially putting those employees on retainer – to provide the companies with confidential information about the tendering process.

156.    The tendering process also required bidders to convey several important pieces of information to MOH.  Beyond the quantity of "free goods," bids contained (among other things) the following information:

- The names of the supplier and the manufacturer;
- Authorization letters verifying that both the supplier and the manufacturer had registered to do business in Iraq;
- A certification confirming that the goods were wholly produced or manufactured in the country of origin, which had to be stamped by an appropriate agency within that country. Thus, if the goods being offered were manufactured in the United States, the supplier had to include a certificate – stamped by the U.S. Department of Commerce – that the goods being offered were indeed of U.S. origin; and
- An authorization letter from the manufacturer confirming that the supplier had authority to sell the manufacturer's products in Iraq and spelling out the legal relationship between the supplier and the manufacturer.  MOH required both the supplier and the manufacturer to verify the supplier's authority to sell the manufacturer's products in Iraq; if the supplier did not include an authorization letter from the manufacturer in the bid, MOH would contact the manufacturer directly to obtain such a letter.

157.    Suppliers who sold medical goods to MOH did so as agents for the foreign manufacturers whose products they sold.[109]  Iraqi regulations – as well as the paperwork submitted during the tender process – made that relationship clear.  As part of the tender process, a supplier was required to demonstrate "sole and exclusive rights to represent th[e] manufacturer in the territory of Iraq for all of its products," and each supplier had to procure a "letter from the manufacturing company authori[z]ing [the supplier] to represent them."[110]  Manufacturers thus

---

[109] This was true for the manufacturers that were affiliated with the suppliers and that were actually making the active pharmaceutical ingredient ("API"); it did not appear to apply in circumstances in which Defendants entered into a relationship with a contract manufacturing partner that was technically listed as the "manufacturer" on certain contracts.  *See, e.g., infra* ¶ 276 (describing J&J's relationship with partner Vetter), note 164 (explaining API).

[110] *2007 USAID Report* § 6.3.2.1.2.

had the right to control the suppliers' conduct vis-à-vis MOH:  manufacturers could refuse to authorize specific suppliers to sell in Iraq; could decline to produce documentation confirming that the suppliers acted on their behalf in negotiating with MOH; or could refuse to fulfill contracts that contained corrupt payments.  Any one of those steps, which were in the manufacturer Defendants' power to control, would have precluded the corrupt payments at issue. None of those things happened, however, because the manufacturer Defendants were (like the supplier Defendants) eager to profit from sales in Iraq, and thus were willing to delegate to their supplier affiliate-agents the responsibility for Iraqi sales of their products.

158.    Like Saddam had done under Oil-for-Food, the Sadrists also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales "services," "performance bonds," "warranties," "equipment donations," "contractual facilities," "maintenance," and "training."  Corrupt payments through sham services agreements were the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH.

159.    During the tender process, or as a condition of the tender, companies also paid for MOH officials (including Kimadia officials) to take free trips abroad – usually under the pretense of inspecting company facilities or attending conferences, seminars, or training sessions.  These "free vacations" were often memorialized on the face of Kimadia's contracting instructions: suppliers were "responsible to submit training course[s] for the medical, technical and Kimadia staff, inside and outside Iraq, F.O.C. [free of charge]."  In reality, both sides understood these free trips – which often involved luxurious resorts and generous "per diems" – as bribes intended to curry favor with MOH officials.  For example, to win a $1,451,259.40 medical-device contract, Defendant J&J Middle East agreed to provide a 10% "free goods" bribe through the

FOC strategy and, on top of that, to host "(4) doctors (4) nurses & (2) [K]imadia staff for (10) days in country of origin F.O.C." and, further, to "train the medical, technical, engineering and Kimadia staff, inside and outside Iraq, F.O.C."  On information and belief, Defendants regularly provided such vacations to Sadrist MOH officials.

160.    Defendants' vacation bribes supported Jaysh al-Mahdi's terrorist activities in a number of ways.  The sham "training" and "travel" expenses, which were paid as part of the free trips provided, functioned as a slush fund for cash payments to the Jaysh al-Mahdi agents who worked at MOH.  In addition, the luxury vacations themselves benefited the terrorist enterprise by providing "rest and recuperation," popularly known as "R&R," for Jaysh al-Mahdi's terrorist leaders and financiers.  The U.S. government recognizes "R&R in neighboring countries" as an important activity relevant to the functioning of a terrorist group.[111]  On information and belief, Beirut was one destination for such free trips, and trips to Beirut (where Hezbollah's leadership resides) enabled Jaysh al-Mahdi agents to communicate securely with their Hezbollah sponsors.

161.    Performance-bond clauses provided another mechanism for the delivery of corrupt payments during the tender process.  A "performance bond" required the supplier to deliver up-front to Kimadia a guarantee, issued by a bank and backed by collateral, valued at a percentage of the value of the contract.  These clauses were nominally to protect Kimadia from default by the supplier, but in reality they functioned as a conduit for additional corrupt payments.  Not only did the performance bonds serve no legitimate business function given the presence of letters of credit (which already provided Kimadia with protection against default), but the sales contracts allowed Kimadia officials to seize the bond amount on demand, with

---

[111] *See, e.g.*, U.S. State Dep't, *Country Reports on Terrorism 2006, Ch. 6 – Terrorist Organizations*  (listing "R&R in neighboring countries" as one of the "activities" pursued by a notorious terrorist group (FARC), along with "extortion, kidnapping, weapons sourcing, [and] logistics"), https://www.state.gov/j/ct/rls/crt/2006/82738.htm (last accessed Sep. 22, 2017).

virtually no accountability.  For those reasons, foreign suppliers used "performance bonds" as a technique to funnel corrupt payments to Ba'athist officials under the Oil-for-Food Program.[112] The same remained true when Jaysh al-Mahdi controlled the Ministry.

162.    Defendants regularly agreed to provide "performance bonds" in their sales contracts with the Jaysh al-Mahdi-run MOH, which functioned as another means through which Jaysh al-Mahdi could collect their required *Khums* in cash.  These performance-bond clauses duplicated the letters of credit (for which the suppliers were separately paying); often involved the use of corrupt Iraqi banks; and were typically subject to few (if any) enforceable restrictions on when Kimadia officials could seize the bonds.  Examples of performance-bond clauses executed by Defendants appeared in Order Nos. 40/2008/66, 40/2008/3, 40/2006/704, 40/2010/143, 40/2010/543, and 40/2006/185 (AstraZeneca, 5% bond); Order No. 40/2005/303 (Cilag, 10% bond); Order No. 40/2007/505 (Cilag, 5% bond); Order No. 40/2011/446 (Pfizer, 5% bond); and Order No. 40/2006/359 (Roche, 5% bond).

163.    The **distribution stage** presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers.  The standard Kimadia sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery.  Meeting these conditions required the sign-off of multiple MOH officials, including a Kimadia Deputy Director General, individual warehouse managers, and members of the Facilities Protection Service nominally providing "security" for the shipments.  As detailed in the *Contract*

---

[112] *See, e.g.*, Volcker Report at 277 ("Often this upward revision was accomplished by increasing the unit price, but in many instances an explicit after-sales-service fee equal to the levied amount was inserted in the contract.  In other instances, the fee was disguised as a performance bond or a maintenance or training expense."); Compl. ¶ 25, *SEC v. York Int'l Corp.*, No. 07-cv-01750 (D.D.C. filed Oct. 1, 2007), ECF No. 1  ("In a November 7, 2000 memorandum to the Regional Sales Manager, who was based in YACR's Dubai branch, the Agent asserted that the Agent could facilitate the 'requested 10%' by characterizing the payment as a 'performance bond.'").

*Management* article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process.[113]

164.    The **inventory stage** similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers.  Kimadia's standard sales contract imposed steep penalties on companies whose goods did "not comply with specifications" (*e.g.*, failed MOH testing) or went "missing."  That gave the Facilities Protection Service, whose members guarded MOH warehouses, significant leverage over medical-goods suppliers:  if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (*e.g.*, by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in the contract.  That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers.

IV.   **DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS HELPED FUND JAYSH AL-MAHDI ATTACKS ON AMERICANS**

A.    **Defendants' Corrupt Transactions Directly Funded Jaysh al-Mahdi Terrorist Attacks On Americans**

165.    From at least 2004-2013, Defendants knowingly structured their transactions to facilitate Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from MOH – which Jaysh al-Mahdi used to support terrorist operations against Americans in Iraq.  Senior MOH officials involved in the procurement process (such as the officials identified above, *see supra* Part II.B) were avowed, well-known Jaysh al-Mahdi agents.  As the August 12, 2007 memorandum put it, Dr. Adel extracted corrupt payments from suppliers in his capacity as "one of the major supporters and organizers of the Mahdi Militia."  According to the same document, the "person who is in charge of all the medicine at MOH is also a [Mahdi] militia supporter."

---

[113] *See Contract Management* at 46-48.

Defendants' corrupt transactions overseen by such Jaysh al-Mahdi agents, with a counterparty that the Sadrists had totally commandeered, delivered resources directly to Jaysh al-Mahdi.

166.    The Sadrist control over MOH was so complete that, by 2005, there was no longer any meaningful distinction between the Ministry and Jaysh al-Mahdi.  By the fall of 2005, American intelligence officials had expressed escalating concerns (as described in *Endgame*) that Jaysh al-Mahdi members had "ensconced themselves in the ministries and were using them to advance their military ends."[114]  The *Endgame* authors concluded that it was "bad enough that the Mahdi Army was the dominant security force in Sadr City and other Shiite neighborhoods in Baghdad.  Now it had captured the very instruments of the state."[115]  That was especially true of MOH, which functioned as a Jaysh al-Mahdi apparatus that did much more to facilitate terrorism than it did to provide medicine to the Iraqi people.  Because Jaysh al-Mahdi had effectively captured MOH, corrupt payments via the latter directly benefited the former.

167.    Defendants' corrupt transactions with MOH supplied Jaysh al-Mahdi with resources critical to its terrorist operations.  The Sadrists' control over Kimadia's procurement budget – and the corrupt payments from foreign suppliers that came with it – was a key source of Jaysh al-Mahdi's power.  According to one witness who occupied a high-level position inside MOH, Jaysh al-Mahdi's control over Kimadia was "how they financed their empire."  Indeed, MOH was the Sadrists' top request during 2005-2008 cabinet negotiations precisely because Kimadia offered the Sadrists the means to fund the Jaysh al-Mahdi organization.  Jaysh al-Mahdi's appropriation of MOH facilities as direct tools of terrorism (*see supra* Part II.B) further strengthened the potency of Defendants' corrupt transactions as a means of financing attacks.  As

---

[114] *Endgame* at 220.

[115] *Id.*

Dr. Ghanim (the University of Gothenburg Senior Research Fellow) observed, "control over Kimadia, the state-run company responsible for importing and distributing drugs and supplies to Iraqi hospitals, provided the Mahdi Army with a position of monopoly and a source of power."[116]

168.    Local government officials in Sadr City confirmed Jaysh al-Mahdi's use of government ministries, including MOH, to raise money.  As recounted in a June 2007 U.S. State Department cable (as published by *WikiLeaks*), "Sadr City council members" detailed the ways in which Jaysh al-Mahdi raised revenue through local "control of services" provided by the government.[117]  Jaysh al-Mahdi accomplished this, the council members explained, by ensuring that "a Sadrist" could "wield 'official' power" at key public institutions, which in turn permitted Jaysh al-Mahdi members to infiltrate the institution and "work around the fringes of that institution's jurisdiction with impunity."[118]  The cable further explained that MOH "offices provide an opportunity for JAM to channel medicine onto the black market."[119]

169.    The 2006 analysis prepared by the U.S. Embassy in Baghdad specifically documented the link between the MOH procurement process and Jaysh al-Mahdi attacks.  After noting that MOH was "openly under the control of the Mehdi Army of Muktad al-Sadr," the report discussed Jaysh al-Mahdi's fundraising through corrupt pharmaceutical transactions:

> **MOH has an atrocious reputation** in the public and the Iraqi press regularly complains bitterly **about the lack of pharmaceuticals which is blamed on corruption**.  There are repeated stories of patients having to purchase black market drugs that were originally destined for MOH.  Complaints of preventable deaths due to lack of medicines are

---

[116] *Dysfunctional Democracy* at 217.

[117] Amb. Ryan Crocker, U.S. State Dep't Cable, *Control of Services Means Opportunity for Criminality* (June 20, 2007), https://wikileaks.org/plusd/cables/07BAGHDAD2040_a.html.

[118] *Id.*

[119] *Id.*

commonplace.  ***Military sources have reported that the Medhi Army finances operations from diverted medicines***.[120]

170.   A former official in the Office of the Treasury Attaché in Baghdad further documented that causal link in a 2010 article in *Military Review*, which is the "Professional Journal of the U.S. Army."  In the context of explaining a broader thesis about the relationship between corruption and organized crime, the article reported that corrupt officials "may attempt to obtain control over other resources either to convert them into money or distribute them to maintain influence.  The Mahdi Army, for example, used the Iraqi Ministry of Health to divert pharmaceuticals that were intended for the general public."[121]

171.   Evidence gathered in connection with the February 2007 Zamili arrest further corroborates the direct link between the Sadrists' corrupt fundraising scheme at MOH and Jaysh al-Mahdi's terrorist activities.  The day after the arrest, the Pentagon's press service issued a statement that Zamili had "reportedly orchestrated several kickback schemes by using inflated contracts for ministry equipment and services.  These kickbacks, which officials believe have funneled millions of U.S. dollars to militia elements, support sectarian attacks and violence."[122]  The same day, a Pentagon spokesman confirmed to *The Toronto Star* that Zamili's "corruption is believed to have funneled millions of U.S. dollars into rogue JAM."[123]  Reporting on the raid two months later, the *Associated Press* similarly noted evidence that Zamili "orchestrated kickback

---

[120] *U.S. Embassy Baghdad Report* at 24-26 (emphasis added).

[121] Brock Dahl, *The Quiet Enemy:  Defeating Corruption & Organized Crime*, Military Rev. 81-82 (Mar.-Apr. 2010).

[122] U.S. Dep't of Def., *Senior Official at Iraq Ministry of Health Detained; 13 Terrorists Killed*, Am. Forces Press Serv. (Feb. 8, 2007), http://archive.defense.gov/news/newsarticle.aspx?id=2976.

[123] *Iraq's Deputy Health Minister Arrested*, Toronto Star (Feb. 8, 2007).

schemes related to inflated contracts for equipment and services, with millions of dollars

allegedly funneled to Mr. Sadr's Mahdi Army militia."[124]

172.    The anti-corruption investigations spearheaded by the U.S. Office of

Accountability and Transparency ("OAT") and the Iraqi CPI uncovered similar evidence that

corrupt payments to MOH employees fueled Jaysh al-Mahdi terrorist attacks.  Those

investigations, according to Judge Brennan, involved evidence that Dr. Adel and Zamili had

engaged in "theft or misappropriation of up to one billion dollars in medical supplies" that were

"showing up on the black market in Iraq and Syria."  Based on those investigations, Judge

Brennan opined to Congress that "[i]t is likely that some of that money is financing outlaws and

insurgents such as the Mehdi Army."[125]  James Mattil, the Chief of Staff of OAT, testified

similarly that corruption at Iraqi ministries, including at MOH, helped fund attacks against

Americans in Iraq.  As he explained, "[c]orruption and its consequences are the fuel that sustains

the insurgency, providing the money, the people and the motivation to fight Americans in Iraq.

Stuart Bowen of SIGIR correctly calls it 'the second insurgency.' "[126]

173.    Judge Radhi, the head of the Iraqi CPI, similarly testified to Congress that, based

on data he gathered as of late 2007, corruption at MOH alone had reached an estimated $2

billion.[127]  As later reported, Judge Radhi considered his task in Iraq to be "put[ting] an end to

the corruption that was . . . a principal source of funding for the terrorist groups that the U.S.

military was trying to crush."  In the course of his investigation, Judge Radhi concluded that

---

[124] Bassem Mroue & Qassim Abdul-Zahra, *Waste, Corruption Cost Iraq $8 Billion in Past 3 Years, Watchdog Says*, Assoc. Press (Apr. 5, 2007).

[125] *Brennan Testimony*, 2008 WL 2010885.

[126] Statement of James F. Mattil, *Waste, Fraud and Corruption in Iraq:  Hearing Before the S. Comm. on Democratic Policy* (May 12, 2008), 2008 WL 2010884.

[127] *See* Statement of Judge Radhi Hamza al-Radhi, *Waste, Fraud and Corruption in Iraq:  Hearing Before the S. Comm. on Appropriations* (Mar. 11, 2008), 2008 WL 652952.

Jaysh al-Mahdi had "fully commandeered the ministries of health, trade, and transportation.  Its soldiers, with the tacit approval of ministry employees, stole food and medical supplies, among other things, and resold them to fund the insurgency against the Americans."[128]

174.    On April 11, 2008, *60 Minutes* ran an interview with Judge Radhi for a story entitled "Iraq:  State of Corruption."[129]  He stated that a "big problem" with Iraqi corruption was that "American and the Iraqi funds are now going to the militias.  And both Iraqis and the Americans are being killed with that."  MOH – and the bribes that Defendants paid the terrorists running it – exemplified that fact.  As summed up by the *60 Minutes* piece, the "bribery and outright theft" that plagued MOH (and other ministries) generated "ill-gotten gains" for terrorists that were "being used to kill American troops."[130]

175.    Dr. Phil Williams, while he was a Visiting Professor at the U.S. Army War College, further documented that causal connection between MOH's procurement process and Jaysh al-Mahdi's terrorist operations.  In 2009, Dr. Williams explained that Jaysh al-Mahdi's "infiltration" of MOH "not only led to sectarian killings of Sunni patients . . . but also made possible the diversion and sale of large amounts of pharmaceuticals.  Along with many other rackets, this was an important funding source for [Jaysh al-Mahdi]."[131]

176.    Some U.S. government personnel called Jaysh al-Mahdi the "The Pill Army," because Sadr and his lieutenants were notorious for paying Jaysh al-Mahdi's low-level terrorist fighters in pharmaceuticals, rather than cash.  Those fighters – most of whom were young, poor, uneducated Shiite males – accepted such payment because they could either re-sell the pills on

---

[128] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Condé Nast Portfolio (Mar. 17, 2008).

[129] *See* Steve Kroft, *Iraq:  State of Corruption*, 60 Minutes (Apr. 11, 2008), http://www.cbsnews.com/news/iraq-state-of-corruption-11-04-2008/.

[130] *Id.*

[131] Phil Williams, *Criminals, Militias and Insurgents:  Organized Crime in Iraq* 208-09 (June 2009).

the street or take the pills themselves (as an intoxicant, not as medicine).  This technique of

payment-by-pharmaceuticals, in turn, depended on the large volumes of divertible pills that

Defendants provided the terrorist officials who ran MOH.

177.    Information from U.S. military raids on Jaysh al-Mahdi safe houses between

2005-2008 (as published by *WikiLeaks*) similarly indicated that Jaysh al-Mahdi diverted MOH

pharmaceuticals as a key part of its operations:

- On February 21, 2005, Coalition forces raided what was, on information and belief, a Jaysh al-Mahdi safe house near the Iranian border and seized a "large quantity of unknown pharmaceuticals" along with "7.62 ammo, several passports, ID's and documents."[132]

- On January 27, 2007, Coalition forces raided what was, on information and belief, a Jaysh al-Mahdi site southwest of Basra in which they recovered a large cache of rockets, mortars, explosives, and "syringes and suppositories."[133]

- On June 19, 2008, Coalition forces uncovered multiple weapons caches during raids on Jaysh al-Mahdi sites in eastern Baghdad near Sadr City; the caches included more than 100 AK-47s, an RPG launcher, and 20 boxes of prescription drugs, all of which appeared "to be serviceable, and were probably attained via local sources."[134]

178.    Jaysh al-Mahdi monetized more than just drugs and small medical devices.

Contemporaneous press accounts, beginning in 2004, revealed that large medical devices such as

X-ray machines and magnetic resonance imaging ("MRI") machines were also diverted from

MOH stockpiles and resold on local or regional black markets.[135]

179.    Although Defendants' corrupt payments to Jaysh al-Mahdi agents inside MOH

provided especially valuable assistance for Jaysh al-Mahdi terrorist attacks, the causal nexus was

---

[132] *WikiLeaks* (Feb. 21, 2005), https://wikileaks.org/irq/report/2005/02/IRQ20050221n1542.html.

[133] *WikiLeaks* (Jan. 27, 2007), https://wikileaks.org/irq/report/2007/01/IRQ20070127n6694.html.

[134] *WikiLeaks* (June 19, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080619n11314.html.

[135] *See, e.g.*, Beth Potter, *Iraqi Health Ministry Fights Corruption*, UPI (June 15, 2004) ("[Iraqi] Health officials would pay to get the stolen medical equipment back, Talibi said.  He believes X-ray machines, ultrasound machines, maybe even a few MRI imaging machines donated to Iraq were probably sold for cents on the dollar to neighboring countries like Syria, Jordan, Turkey and Iran and are still relatively new."); Ala'din Alwan, *Health in Iraq* 56 (2d ed. 2004) (noting that MOH's "[e]xpensive multi-million dollar equipment was either stolen or damaged").

not limited to such corrupt payments or other FCPA violations.  Whether or not Defendants technically violated the FCPA, their transactions with a counterparty that was openly controlled by terrorists – and which openly diverted Ministry resources to terrorist ends – supplied Jaysh al-Mahdi with medical goods and cash that it used to fund terrorism against Americans.

### B.    Defendants Knew Or Recklessly Disregarded That Their Transactions With MOH Financed Terrorism

180.    Defendants knew or recklessly disregarded that their corrupt transactions with MOH financed Jaysh al-Mahdi terrorist attacks.  At all relevant times since 2004, MOH insisted that each supplier execute contracts by hand and deliver them in person to MOH headquarters in Baghdad.  That required company agents (usually Scientific Bureaus) to enter a building whose physical premises explicitly paid homage to Sadr and his terrorist agenda.  Beginning in late 2004, Defendants' agents, on their way to deliver their contracts, necessarily walked past multiple posters adorned with Sadrist pictures and jihadist propaganda.  As *USA Today* reported, those posters "remove[d] any doubts about who runs the place."[136]  Other features of the Ministry building – including the Jaysh al-Mahdi fighters in the hallways, the yellow collection boxes calling for Sadrist donations, and the array of heavy weaponry (including rocket-propelled grenades) displayed in the offices of key officials – conveyed the same message.  In fact, MOH was unusual in that it was one of the few buildings in Iraq that, by late 2006, was considered too dangerous for Americans or other outside investigators to enter.  As the *Los Angeles Times* reported in early 2007, "U.S. officials no longer visit the run-down [health] ministry.  Even for Americans, who typically travel in cocoons of security, the threat level is too high."[137]

---

[136] Charles Levinson, *Sadrists' Grip on Iraqis' Healthcare Takes Toll*, USA Today (Mar. 27, 2008).

[137] Louise Roug, *Iraqi Health Official Is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

181.    Beginning in early 2005, Minister Mutalib advertised that the office adjacent to his (staffed by clerics in Sadr's inner circle) was devoted to Jaysh al-Mahdi.  The presence of heavy weaponry inside his office, along with Dr. Mutalib's open identification as a "Mahdi soldier," further indicated his Jaysh al-Mahdi ties to those who interacted personally with him, including Defendants' local agents.  Those facts, combined with the ubiquitous anti-American propaganda inside MOH and the widespread reports of Jaysh al-Mahdi's violence against Americans, made clear to Defendants that the beneficiaries of their corrupt transactions were the anti-U.S. terrorists who ran the Ministry.  And the heavy weaponry and violent messaging inside the building further indicated to Defendants what was already widely understood in Iraq:  that Jaysh al-Mahdi terrorists – not benign Sadrist bureaucrats – actually ran MOH.

182.    By early 2005, according to several witnesses with on-the-ground experience with the Iraqi healthcare sector, it was widely understood in Iraq that Jaysh al-Mahdi had taken control of MOH's contracting process.  As Jeffrey Stacey, a professor of international relations at Tulane University, likewise observed in *The National Interest* in 2007, MOH was "[w]idely suspected of being turned into a Mahdi Army fief" that was "channeling . . . millions of dollars to the militia."[138]  Defendants were aware of that common understanding in part through their Scientific Bureaus.  Defendants each relied in part on Scientific Bureaus or other local agents to keep them abreast of Iraqi market conditions; these agents (which were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the Sadrists controlled MOH and used that control to raise money for terrorism.  As a general matter, those agents spoke fluent Arabic, had relationships with people throughout MOH and Kimadia, and were well-informed

---

[138] Jeffrey Stacey, *Re-Occupy Iraq?*, Nat'l Interest (July-Aug. 2007).

about Iraqi politics.  They could not have remained ignorant of the common understanding on the Iraqi street that the MOH contracting process was controlled by Jaysh al-Mahdi.

183.    From 2005-2008, accounts from prominent Western media sources also reported on the direct link between MOH and Jaysh al-Mahdi, including:[139]

- *New York Times*, April 2005:  "One political figure who may stand to gain from the new cabinet lineup is ***Moktada al-Sadr, the rebellious Shiite cleric who led two armed uprisings against the American occupation*** and the interim Iraqi government last year. Three members of the cabinet – ***the health minister***, the transportation minister and the civil society minister – ***belong to Mr. Sadr's political movement*** . . . ."[140]

- *Council on Foreign Relations*, May 2005:  "***Minister of health*** Abdul Mutalib Mohammed Ali . . . is ***linked to Muqtada al-Sadr***, the anti-U.S. Shiite cleric who heads the Imam Mehdi Army, ***an armed militia that has intermittently waged an insurgency against U.S. forces*** in Iraq."[141]

- *Christian Science Monitor*, September 2005:  "***Sadr movement officials run the Health Ministry***, extending influence from the hospitals to the ambulance service.  ***Posters, stickers, and other memorabilia of Sadr are plastered on Ministry of Health*** checkpoints, hospitals, and the walls of Baghdad's main ambulance center."[142]

- *Guardian*, May 2006:  "The [Health] ministry is ***under the control of*** the Shia cleric Moqtada ***al-Sadr***, and a large mural of his dead ayatollah father decorates the entrance to the compound.  ***Most of the security guards in the morgue and the ministry are affiliated to his militia, the Mahdi army***, one of the militias thought to be behind the sectarian killing going on in their neighbourhoods."[143]

- *Christian Science Monitor*, May 2006:  "The [health] ministry is ***run by the militant Shiite movement led by cleric Moqtada al-Sadr*** . . . . Security at the ministry and at the attached morgue is ***controlled by the Mahdi Army,*** the militia loyal to Mr. Sadr who have been accused by Sunni Arabs of running sectarian death squads. . . . ***Those who control the Health Ministry don't try to hide where their ultimate loyalties lie***."[144]

- *Washington Post*, August 2006:  "[T]he primary group kidnapping Sunnis from hospitals is the Mahdi Army, a militia controlled by anti-American Shiite cleric Moqtada al-Sadr

---

[139] All emphases in this paragraph are added.

[140] Robert F. Worth, *The Struggle for Iraq:  Politics; Iraq's Assembly Accepts Cabinet Despite Tension*, N.Y. Times (Apr. 29, 2005).  At all times relevant to this Complaint, there was no actual or perceived firewall between the Sadrist political movement and Jaysh al-Mahdi.  *See supra* ¶ 59.

[141] Lionel Beehner, *IRAQ:  Cabinet Ministers*, Council on Foreign Rel. Backgrounder (May 2, 2005).

[142] Jill Carroll, *Sadr Militia's New Muscle in South*, Christian Sci. Monitor (Sept. 21, 2005).

[143] Ghaith Abdul-Ahad, *Inside Iraq's Hidden War*, Guardian (May 19, 2006).

[144] Dan Murphy, *Sadr's Militia Tightens Grip on Healthcare*, Christian Sci. Monitor (May 25, 2006).

that has infiltrated the Iraqi security forces and several government ministries.  The minister of health, Ali al-Shimari, is a member of Sadr's political movement."[145]

- *Associated Press*, August 2006:  "Iraq's health minister, ***who is aligned to a powerful Shiite militia***, claimed Sunday that ***U.S. forces arrested seven of his personal guards*** in a surprise pre-dawn raid on his office. . . . 'It is a provocation,' said al-Shemari, a Shiite ***aligned to the anti-U.S. radical cleric, Muqtada al-Sadr, who heads Iraq's biggest Shiite militia, the Mahdi Army***."[146]

- *CBS News*, October 2006:  "[T]he morgue itself is believed to be controlled by the same Shiite militia blamed for many of the killings:  ***the Mahdi Army***, founded and led by anti-American cleric Moqtada al-Sadr.  The ***takeover began after the last election in December when Sadr's political faction was given control of the Ministry of Health***.  The U.S. military has documented how ***Sadr's Mahdi Army has turned morgues and hospitals into places where death squads operate*** freely."[147]

- *USA Today*, November 2006:  "[Sadr's] political group, for example, controls the Health Ministry and has used it to harbor death squads, infiltrate hospitals and punish al-Sadr's enemies, says Ayad al-Samarrai, the deputy chairman of the Iraqi Islamic Party, a Sunni group. . . . Iraq's Health Ministry is a ***case study in how al-Sadr used his government role to consolidate his political and military support***.  Ministry-run hospitals have been used as a weapon against rival Sunnis, according to critics, such as Sunni lawmaker Mithal al-Alusi.  '***It's a jungle***,' al-Alusi says.  '***What (al-Sadr) has done with that ministry is criminal***.' "[148]

- *Newsweek*, December 2006:  "Two prime ministers since 2005 – Ibrahim Jaafari and the current Iraqi leader, Nuri al-Maliki – have depended on [Sadr's] swing votes for their majority.  But Sadr himself stayed out of government, and kept his distance.  That way he could pursue a dual strategy – ***rebuilding his militia even as he capitalized on his control of key ministries, like Health*** and Transportation, to provide services to the poor and jobs to his followers."[149]

- *Los Angeles Times*, February 2007:  "Iraqi and U.S. forces on Thursday launched a crackdown on the ***web of patronage that sustains radical anti-American cleric Muqtada Sadr***, detaining a high-level Iraqi official in connection with the killings of ***Health Ministry officials and the diversion of millions of dollars to a Shiite Muslim militia***. . . . The Health Ministry is controlled by Sadr, Iraqi and U.S. authorities say.  It's a house of horrors where health officials have disappeared on their way to meetings, never to be heard from again."[150]

- *New York Times*, February 2007:  "Iraqi and American troops arrested the second highest official in the Iraqi Health Ministry on Thursday, charging that he ***funneled millions of dollars to rogue Shiite militants*** who kidnapped and killed Iraqi civilians.  The United

---

[145] Amit R. Paley, *Iraqi Hospitals are War's New 'Killing Fields'*, Wash. Post (Aug. 30, 2006).

[146] Qais al-Bashir, *Iraq Minister Says 7 Bodyguards Arrested*, Wash. Post (Aug. 13, 2006).

[147] Melissa McNamara, *CBS:  Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006).

[148] Rick Jervis, *Cleric al-Sadr May Hold Iraq's Future in His Hands*, USA Today (Nov. 13, 2006).

[149] Jeffrey Bartholet, *Moqtada al-Sadr and U.S.'s Fate in Iraq*, Newsweek (Dec. 3, 2006).

[150] Louise Roug, *Iraqi Health Official is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

States military . . . accused the official of ***flooding the Health Ministry's payroll with militants***, embezzling American money meant to pay for Iraq's overworked medical system and using Health Ministry 'facilities and services for sectarian kidnapping and murder.'"[151]

- *American Forces Press Service*, February 2007:  "[S]pecial Iraqi army forces captured a senior official with alleged ties to the Jaysh al-Mahdi militia. . . . ***The suspect reportedly orchestrated several kickback schemes by using inflated contracts*** for ministry equipment and services.  These kickbacks, which officials believe have ***funneled millions of U.S. dollars to militia elements***, support sectarian attacks and violence targeting Iraqi civilians, U.S. officials said.  The suspect is believed to ***support the Jaysh al-Mahdi militia*** through large-scale employment of its members."[152]

- *NBC News*, July 2007:  "Supplies and medicine in strife-torn Baghdad's overcrowded hospitals have been ***siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry of Health*** . . . .  The draft report obtained by NBC said the Iraqi Ministry of Health, which oversees the country's hospitals, is ***in the 'grip' of the Mahdi Army***, the anti-American militia run by the Shiite cleric Muqtada al-Sadr."[153]

- *USA Today*, March 2008:  "***A 6-foot picture hanging at the front gate of Iraq's Health Ministry removes any doubts about who runs the place.***  The photo is of the father and uncle of radical Shiite cleric Muqtada al-Sadr, both of whom were religious leaders killed by Saddam Hussein's regime.  Employees of the ministry, many of whom are loyalists to al-Sadr, pass their images every day as they go to work.  ***Al-Sadr's ironclad control over Iraq's health system and other key ministries has come under renewed scrutiny*** following recent clashes between his Mahdi Army militia and the Iraqi army."[154]

- *60 Minutes*, April 2008:  "One of the biggest problems is corruption, which is robust even by Middle Eastern standards.  According to U.S. and Iraqi officials, ***bribery and outright theft are flourishing in virtually every Iraqi ministry***, and some of those ill-gotten gains are being used to kill American troops. . . .  The situation got so bad, Radhi says his investigators could not even enter certain government buildings.  ***Asked if his investigators were allowed [into the] Ministry of Health, Radhi said, 'They entered the ministry and they conducted their investigations.  But they were threatened to be kidnapped*.'**  So they stopped."[155]

- *Business Monitor News*, November 2008:  "According to the International Medical Corps (IMC), ***radical Shi'a cleric Muqtada al-Sadr controls much of the public health system***.  Al-Sadr's power may be waning as peace returns to the country, as indicated by his announcement on August 8 that he will order most of his militia, save a number of elite fighting units, to disarm.  Yet, ***the Shi'a cleric's influence over*** the State Company for

---

[151] Damien Cave, *Iraq's No. 2 Health Official Is Held and Accused of Financing Shiite Militants*, N.Y. Times (Feb. 9, 2007).

[152] U.S. Dep't of Def., *Senior Official at Iraq Ministry of Health Detained; 13 Terrorists Killed*, Am. Forces Press Serv. (Feb. 8, 2007), http://archive.defense.gov/news/newsarticle.aspx?id=2976.

[153] Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC News (July 30, 2007).

[154] Charles Levinson, *Sadrists' Grip on Health Care Takes Toll*, USA Today (Mar. 26, 2008).

[155] Steve Kroft, *Iraq:  State of Corruption*, 60 Minutes (Apr. 11, 2008).

Importation and Distribution of Drugs and Medical Appliances *(Kimadia), which has a virtual monopoly on pharmaceutical distribution*[,] *provides significant risk* to pharmaceutical output from Sunni- and Kurd- dominated Mosul if sectarian unrest were to reignite."[156]

184.    The full text of a near-final draft of the 2006 *U.S. Embassy Baghdad Report* was made publicly available on the Internet no later than September 19, 2007, and it received recurring media coverage both before and after its release.  The draft accused MOH of "operating a pharmaceutical diversion scheme"; of being "openly under the control of the Mehdi Army"; of enabling the "Mehdi Army [to] finance[] operations from diverted medicines"; and of "shak[ing] down" clinics and doctors for free goods.[157]  Media outlets describing the report included the *Washington Post* on June 25, 2007; *NBC News* on July 30, 2007; *The Nation* on August 30, 2007; *NPR* on September 1, 2007; and *60 Minutes* on April 11, 2008.[158]

185.    On information and belief, Defendants were aware of these reports documenting the link between MOH and Jaysh al-Mahdi.  Each Defendant generally maintained a corporate security group responsible for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the drugs they sold, including in the Middle East.  Pfizer, for example, maintained a Global Security group whose mandate included "[c]onduct[ing] due diligence . . . using both open and closed intelligence sources to verify the Company engages with legitimate business partners at all times."[159]  As part of such efforts,

---

[156] Bus. Monitor News Indus. Alerts, *New Plant Suggests Re-Emergence of Pharmaceutical Industry*, 2008 WLNR 27850935 (Nov. 1, 2008).

[157] *U.S. Embassy Baghdad Report* at 23-25.

[158] *See* Walter Pincus, *Shhh . . . There Is Corruption in Iraq*, Wash. Post (June 25, 2007); Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC News (July 30, 2007); David Corn, *Secret Report: Corruption Is 'Norm' Within Iraqi Government*, Nation (Aug. 30, 2007); Debbie Elliott, *Report Reveals Corruption in Iraqi Government*, All Things Considered (Sept. 1, 2007); Steve Kroft, *Iraq:  State of Corruption*, 60 Minutes (Apr. 11, 2008).

[159] Staff Reporter, *Ireland:  Director Global Security – EMEA*, Eur. Union News, Plus Media Sols. Private Ltd. Pak. (Nov. 25, 2014) (publishing Pfizer job announcement).

Defendants' standard practice would have been to conduct basic open-source research on the Iraqi market and the mechanics of the MOH procurement process – even a modicum of which would have uncovered the press reports discussing MOH's terrorist ties set forth above.

186.    Defendants subscribed to intelligence-reporting services that discussed the relationship between MOH and Jaysh al-Mahdi.  For example, Strategic Forecasting Inc., more popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world.  On information and belief, based on Stratfor's subscription lists (as published by *WikiLeaks*), senior U.S.-based executives of Pfizer Inc.; GE Healthcare; Johnson & Johnson; AstraZeneca Pharmaceuticals LP; and Genentech, Inc. likely had access to the service as of February 8-15, 2007, when Stratfor included the following messages in its updates:

> IRAQ:  U.S. and Iraqi forces raided the Health Ministry in Baghdad on [sic] and arrested Deputy Health Minister Hakim Zamili, a senior member of the political bloc loyal to Shiite cleric Muqtada al-Sadr.  The U.S. military did not comment immediately on the reason for the arrest.[160]

> [O]ver the past week, the U.S. military continued its offensive against Shiite militia leaders in Baghdad.  Coalition forces arrested Shiite militia financier and Deputy Minister of Health Hakim al-Zamili at his office in the Ministry of Health in Rusafa on Feb. 8.  ***Al-Zamili is suspected of employing militia fighters and selling health services and equipment in return for millions of dollars that he later funneled to Shiite militias***.[161]

187.    After 2004, Defendants could not have conducted credible due diligence that would have "cleared" their transactions with the Jaysh al-Mahdi-controlled MOH.  As the 2006 *U.S. Embassy Baghdad Report* noted, terrorist control of the Ministry precluded even "basic

---

[160] Posting of Strategic Forecasting, Inc., noreply@stratfor.com, to nils@bildt.org & archive@stratfor.com, *Stratfor Intelligence Summary Strategic Forecasting* (Feb. 8, 2007), https://wikileaks.org/gifiles/docs/51/512219_fw-stratfor-intelligence-summary-.html.

[161] Press Release, Stratfor, *Iraq Update:  Feb. 14, 2007* (Feb. 15, 2007) (emphasis added), https://worldview.stratfor.com/article/iraq-update-feb-14-2007.

efforts to stem th[e] perception" of widespread corruption at MOH.[162]  And, by 2006, U.S. and Iraqi corruption investigators could "no longer go into the ministry because it is controlled by militia."[163]  The lack of access to the Ministry hamstrung outside investigators from conducting even basic diligence, given that investigators could not obtain exculpatory documents – and that Dr. Adel's Inspector General's office at MOH was unresponsive to requests for information.

## V.   EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE JAYSH AL-MAHDI

### A.   The AstraZeneca Defendants

#### 1.   AstraZeneca Made Corrupt Payments to Jaysh al-Mahdi Members

188.   The AstraZeneca *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is AstraZeneca UK Limited.  The AstraZeneca *manufacturer* Defendant – a company that manufactured drugs used to bribe Jaysh al-Mahdi agents – is AstraZeneca Pharmaceuticals LP.

189.   From 2004 through the present, Kimadia awarded AstraZeneca at least 47 contracts relating to various drugs.  During this time, AstraZeneca sold U.S.-manufactured drugs to MOH including, but not limited to:  Arimidex (API manufacturing[164] and drug formulation in Newark, Delaware); Meronem (API made in Newark, Delaware); and Seroquel (API made in Newark, Delaware).  On information and belief, AstraZeneca secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* Part

---

[162] *U.S. Embassy Baghdad Report* at 25.

[163] *Id.*

[164] "API" refers to a drug's "active pharmaceutical ingredient."  AstraZeneca, like the other drug Defendants, ordinarily employed a two-part manufacturing process to create the drugs it sold.  First, it manufactured many of its most complicated and lucrative APIs at U.S. facilities.  Second, it used those same facilities, or affiliate facilities in Europe, to combine the U.S.-manufactured API with other compounds and materials into a deliverable drug, producing the final drug product through a process called "drug formulation."  API manufacturing is ordinarily the most commercially important part of the drug-creation process, as well as the most technically challenging.

III.B.2.  Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 19 drug contracts to AstraZeneca.

190.    From 2004-2013, AstraZeneca delivered "free goods" to Jaysh al-Mahdi agents in connection with the sale of some of its most lucrative drugs.  Those deliveries were made in connection with contracts negotiated by AstraZeneca UK Limited and involved several AstraZeneca manufacturers, including Defendant AstraZeneca Pharmaceuticals LP.  Plaintiffs set forth below examples of those corrupt payments.  This list is far from exhaustive; Plaintiffs believe discovery will uncover numerous additional instances of "free goods" payments that AstraZeneca made at additional times with additional drugs.  Much of the information about these transactions resides within AstraZeneca's exclusive control:  whereas AstraZeneca should possess the sales contracts and other documents memorializing its "free goods" payments, Kimadia generally does not publicly disclose historical contracting information prior to 2010.  In addition, according to witnesses and a U.S. State Department cable (as published by *WikiLeaks*), a fire at MOH in 2009 "destroyed numerous documents related to Kimadia contracts," which prompted allegations that the fire was "deliberately set to destroy evidence of corruption."[165]

191.    Despite those constraints (which discovery should readily remedy), Plaintiffs have amassed evidence of several specific corrupt transactions executed by AstraZeneca.  The chart below depicts those AstraZeneca transactions on a drug-by-drug basis:

---

[165] U.S. State Dep't Cable, *Anti-Corruption Developments in Iraq* (July 10, 2009), https://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Arimidex (15-AG0-014) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 2006 or earlier[166] | 40/2006/185 | 100% |
| Meronem injection (05-AG0-059) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 11-29-2004 | 40/2008/66 | 70% |
| Meronem powder (05-AG0-015) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 11-29-2004 | 40/2007/238 | 25% |
| Seroquel 200mg Tab (04-B00-079) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 5-16-2005 | 40/2008/3 | 100% |
| Zoladex (06-G00-008) | AstraZeneca UK Limited | AstraZeneca UK Limited | 2006 or earlier | 40/2006/704 | 25% |

The column headers in the chart above have the following meanings:

- Drug (Nat'l Code):  The name of AstraZeneca's branded drug sold to Kimadia, with the unique National Code that MOH assigned to the underlying chemical compound when it placed the drug on the Iraqi formulary.

- Supplier:  The AstraZeneca company that executed the sales contract with Kimadia and that held itself out as the company with authority to sell the drug in Iraq.

- Manufacturer:  The AstraZeneca company that manufactured the drug (either the API or the formulation) that Kimadia purchased from the supplier.  This entity is often, but not always, the entity identified as the manufacturer in the sales contract.  *See infra* note 235.

- Formulary Date:  The date that MOH approved the drug's chemical compound for sale within Iraq and placed it on the formulary.

- Confirmed Contract:  The contract number of the earliest confirmed sale of the drug to Kimadia of which Plaintiffs are currently aware.  The second four digits of each code refer to the year of the tendering round pursuant to which Kimadia awarded the contract. It is likely that there are prior (and later) sales that Plaintiffs have not yet uncovered.

- FOC %:  The size of the "free goods" bribe – measured against the value of the underlying sales – that the supplier and manufacturer paid in connection with their sales of the drug.  FOC, which often appears in MOH documents, stands for "free of charge."

---

[166] For Arimidex (and certain other drugs below), Plaintiffs have not been able to determine the formulary date based on public information.  In such circumstances, Plaintiffs provide an estimate based on the first confirmed contract number.  Here, because Arimidex was sold pursuant to a contract negotiated during the 2006 tendering round (Contract No. 40/2006/185), and because MOH does not allow contracts for drugs missing from the formulary, Arimidex likely appeared on the formulary by 2006 at the latest (and likely earlier).

192.     On information and belief, AstraZeneca UK Limited made corrupt payments in connection with each drug on an annual basis – in percentages similar to the ones listed on the chart – beginning the year after the drug was placed on the formulary and continuing through at least 2013.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" bribe that AstraZeneca paid in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year.  Based on that policy, if a company paid a "free goods" bribe of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq.  AstraZeneca made those corrupt payments through FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.  AstraZeneca UK Limited also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

193.     AstraZeneca UK Limited made corrupt payments as agent for (among other affiliates) AstraZeneca Pharmaceuticals LP.  As a condition of selling drugs in Iraq that were manufactured by AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited had to certify to MOH that AstraZeneca Pharmaceuticals LP had authorized the former to sell drugs manufactured by the latter.  AstraZeneca UK Limited also had to certify to MOH that it was selling drugs on behalf of AstraZeneca Pharmaceuticals LP and that the drugs being supplied had been manufactured by AstraZeneca Pharmaceuticals LP.  Based on these facts, and the Iraqi regulations governing the tender process, AstraZeneca Pharmaceuticals LP exercised control over AstraZeneca UK Limited with respect to the corrupt transactions executed by the latter.  *See supra* ¶ 157.

194.     AstraZeneca Pharmaceuticals LP also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing drugs that it knew or recklessly disregarded were being used by its affiliate to make corrupt payments to Jaysh al-Mahdi agents; (b) registering to do business as a manufacturer with the Jaysh al-Mahdi-controlled Health Ministry; and (c) submitting paperwork to MOH confirming AstraZeneca UK Limited's authority to negotiate and execute corrupt contracts on its behalf.

195.     AstraZeneca UK Limited also used U.S.-manufactured drugs to make several Off-the-Books Payoffs to Jaysh al-Mahdi agents, including payments of Seroquel and Meronem. These Off-the-Books Payoffs were not associated with any ordinary-course contract and were especially easy for Jaysh al-Mahdi to divert to the black market.  With respect to the Seroquel payment, AstraZeneca UK Limited supplied free Seroquel unconnected to any attendant order number or tendering round.  With respect to Meronem, a Kimadia document notes that AstraZeneca provided free Meronem to MOH in the quantity of "20% after compensating for the material of the order number 40/2002/20" – *i.e.*, a corrupt Oil-for-Food-era contract.

196.     AstraZeneca also agreed to Administrative Fee Clauses as an additional means of providing "free goods" and cash payments to Jaysh al-Mahdi.  For example, in Order No. 40/2010/143, in which AstraZeneca UK Limited contracted for the sale of Meronem 500mg, AstraZeneca did not include an FOC Clause but did include an Administrative Fee Clause.  That clause required AstraZeneca to replace "100%" of any Meronem that Kimadia failed to sell before expiration and, when doing so, to pay a "15% administrative fee."[167]

197.     Arimidex illustrates how AstraZeneca's corrupt transactions worked.  Arimidex is a breast-cancer drug that gained FDA approval in 1996.  Before it came off patent in 2010, it was

---

[167] Translated from Arabic.

a major blockbuster drug for AstraZeneca, generating more than $1 billion in worldwide sales each year between 2005 and 2009.  AstraZeneca UK Limited registered Arimidex for sale with Kimadia on May 24, 2006 (it had likely been placed on the formulary at least several months prior).  AstraZeneca's practice was to pay 100% "free goods" bribes on Arimidex to the Jaysh al-Mahdi-controlled Ministry.  That meant that AstraZeneca UK Limited delivered free additional batches of Arimidex to Kimadia, which Jaysh al-Mahdi agents were able to divert, in quantities equal to the underlying quantity for which Kimadia had paid.  AstraZeneca secured at least three contracts for the sale of Arimidex alone during the period from 2004 through 2008, when it was virtually impossible to obtain sales contracts without making corrupt payments.  AstraZeneca executed one such contract on February 5, 2007.

198.    AstraZeneca's corrupt payments to Jaysh al-Mahdi agents carried significant monetary value.  AstraZeneca's "free goods" percentages tended to rise for its most valuable drugs, and those drugs (for expensive-to-treat, chronic conditions) were among the easiest for Jaysh al-Mahdi to monetize on the black market.  The dollar value of those drugs was high.  For example, a single 2006-2007 Off-the-Books Payoff of Meronem, in which AstraZeneca gave MOH roughly 6,950 free packs of Meronem, was worth about $870,000 by itself (using 2010 tender prices).  Another 2006-2007 Off-the-Books Payoff of roughly 17,000 packs of Seroquel 100mg and 15,000 packs of Seroquel 200mg was worth about $1.6 million (using 2008 contract prices).  On information and belief, given the size of AstraZeneca's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, AstraZeneca's corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 2. AstraZeneca's Corrupt Commercial Transactions Comport with Its Historical Sales Practices in International Markets

199.    AstraZeneca has a history of engaging in corrupt international transactions.  In 2016, the SEC instituted cease-and-desist proceedings against AstraZeneca plc, which it settled for more than $5.5 million.[168]  In its institution order, the SEC alleged that AstraZeneca subsidiaries in China (from 2007-2010) and Russia (from 2005-2010) caused AstraZeneca to make "numerous improper payments in cash, gifts and other items," including "conference support" and "travel," to healthcare providers "as incentives to purchase or prescribe AZN pharmaceuticals."[169]  AstraZeneca plc allowed such unlawful conduct to take place, the SEC alleged, by "failing to devise and maintain a sufficient system of internal accounting controls" and failing to "adequately enforce its corporate policy against making improper payments."[170]

200.    AstraZeneca's history of making corrupt payments extends to Iraq specifically. The Volcker Commission determined that AstraZeneca AB (an AstraZeneca UK Limited affiliate) paid Kimadia at least $162,571 in kickbacks relating to three contracts collectively to sell roughly $1.7 million of drugs under Oil-for-Food from 2000-2003;[171] the Republic of Iraq later filed suit over those same allegations.[172]

201.    For those corrupt Oil-for-Food transactions, on information and belief, AstraZeneca relied on Omnitrade Pharma, a regional distributor based in Jordan that has represented AstraZeneca continuously since 1999.  On information and belief, despite

---

[168] *See* Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934 at 1-2, 6, *In re AstraZeneca PLC*, Securities Exchange Act Release No. 78730, File No. 3-17517 (Aug. 30, 2016) ("*AZN SEC Order*").

[169] *Id.* ¶¶ 5, 13, 163.

[170] *Id.* ¶ 20.

[171] *Volcker Report*, Table 7, at 25.

[172] *See* First Am. Compl. ¶¶ 46-52, *Republic of Iraq v. ABB AG*, No. 08-cv-05951-GEL (S.D.N.Y. filed July 31, 2009), ECF No. 112.

87

Omnitrade's role in facilitating those corrupt transactions, AstraZeneca continued to use it as an agent in post-Saddam Iraq – including, on information and belief, to assist with the corrupt contracts that delivered funding to Jaysh al-Mahdi through Kimadia.

202.    AstraZeneca's more recent conduct further demonstrates its pattern and practice of making corrupt payments in Iraq.  Notwithstanding AstraZeneca's 2016 settlement with the SEC,[173] AstraZeneca UK Limited has continued to engage in corrupt transactions with Kimadia officials in connection with the sale of U.S.-manufactured drugs over the past five years.  Among other corrupt transactions, AstraZeneca UK Limited paid a 100% "free goods" bribe on Arimidex in 2016 and a 25% "free goods" bribe on Zoladex in 2016.

### 3.    AstraZeneca's Corrupt Transactions Had a Substantial Nexus to the United States

203.    Although AstraZeneca is headquartered in the United Kingdom, it maintains a significant presence in the United States.  AstraZeneca has operated "several key R&D, manufacturing and commercial locations across the United States," including major centers in Wilmington, Delaware (its U.S. headquarters); Newark, Delaware (a major manufacturing facility); Gaithersburg, Maryland (a major biologics research & development center); and Boston, Massachusetts (additional research & development facilities).[174]  The head of AstraZeneca's U.S. operations is an Executive Vice President and a member of AstraZeneca's Senior Executive Team, where his responsibilities include "driving growth and maximising [sic]

---

[173] *See AZN SEC Order* at 1, 6-7.

[174] AstraZeneca, *AstraZeneca in the United States*, https://www.astrazeneca-us.com/az-in-us.html#! (last accessed Sept. 19, 2017).

the contribution of the commercial operations in North America to AstraZeneca's global business."[175]  AstraZeneca describes its "U.S. operations" as "integral to our global business."[176]

204.    A U.S.-headquartered company (AstraZeneca Pharmaceuticals LP) was directly involved in the corrupt transactions for the sales of the drugs it manufactured.  Indeed, during the relevant time period, Arimidex (100% FOC bribes) was manufactured by AstraZeneca Pharmaceuticals LP at a manufacturing facility in Newark, Delaware.  The Newark facility was where Arimidex was "formulated and distributed globally"; AstraZeneca's director of corporate communications has described that facility as a "key strategic site in the firm's global supply chain";[177] and Arimidex's packaging listed Newark, Delaware, as its place of manufacture. Consistent with Kimadia's general practice, AstraZeneca UK Limited certified to Kimadia that it was sourcing Arimidex from the United States.  On one occasion, in connection with Order No. 40/2006/185, the draft of the sales contract originally listed "UK" as the country of origin for Arimidex, but "UK" was then specifically crossed out and "US" was written in its stead.

205.    Seroquel (100% FOC bribes), which is AstraZeneca's branded anti-psychotic drug, was discovered and developed by AstraZeneca in the 1990s in its Fairfax, Delaware laboratory.  Since then, AstraZeneca Pharmaceuticals LP has manufactured Seroquel in its Newark, Delaware facility, and it has publicly stated that it manufactures Seroquel in the United States.  In a 2001 press release announcing an expansion of AstraZeneca's Newark facility, the company identified its expanded capacity to manufacture and distribute Seroquel as a key benefit

---

[175] AstraZeneca, *What Science Can Do, AstraZeneca Annual Report and Form 20-F Information 2016*, at 88-89 (Mar. 7, 2017), https://www.sec.gov/Archives/edgar/data/901832/000095010317002275/dp73779_ex1501.htm.

[176] AstraZeneca, *AstraZeneca in the United States*, https://www.astrazeneca-us.com/az-in-us.html#! (last accessed Sept. 19, 2017).

[177] Cori Anne Natoli, *AstraZeneca's Bear Site to Get $100 Million Facelift*, News J. (Dec. 12, 2013), http://www.delawareonline.com/story/money/industries/healthcare/2013/12/12/astrazeneca-site-to-get-100-million-facelift/4005247/.

of the Newark facility upgrades.[178]  AstraZeneca thus identified AstraZeneca Pharmaceuticals LP

as the Seroquel manufacturer in certain contract negotiations with Kimadia, and AstraZeneca UK

Limited certified to Kimadia in one or more sales contracts that it was sourcing Seroquel from

the United States (based on the API's manufacture in the United States), notwithstanding one

other sales contract (Order No. 40/2008/3) in which AstraZeneca identified the United Kingdom

as the origin of goods (based on the drug's formulation in the United Kingdom).

206.    In 2000, AstraZeneca gained FDA approval for its Newark, Delaware facility to

manufacture Meronem (70% and 25% FOC bribes) as well.  AstraZeneca Pharmaceuticals LP

thereafter manufactured Meronem's API at its Newark facility.  Indeed, a former AstraZeneca

employee described his job at the Newark site as "delivering [Meronem] finished product to

global markets."  That U.S.-based facility, by supplying the API for the Meronem sold in Iraq,

played a key role in facilitating the corrupt Meronem sales to the Jaysh al-Mahdi-controlled

MOH at issue in this case, notwithstanding that AstraZeneca on occasion identified

manufacturing partners such as ACS Dobfar S.p.A. in its sales contracts with Kimadia.

207.    At all relevant times, AstraZeneca also relied upon U.S. personnel to support

efforts to place new indications for existing AstraZeneca drugs on the formularies of health

authorities outside of the United States.  For example, an AstraZeneca employee in the United

States was a member of AstraZeneca's "Global Project Team" for Seroquel and, as such, helped

AstraZeneca "[r]eceive[ ] approval of Mania and Depression indications and [sustained release]

Formulation in [the] US and globally."

208.    As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of

U.S.-manufactured drugs, AstraZeneca UK Limited agreed to procure letters from the U.S.

---

[178] *See* Press Release, AstraZeneca, *AstraZeneca to Expand Newark Manufacturing Facility* (Aug. 29, 2001),
http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=21007.

Department of Commerce confirming that the drugs were manufactured in the United States. *See supra* ¶ 156. It further procured evidence of FDA approval for all of its drugs sold to Kimadia, including those purportedly sourced from outside the United States. *See supra* ¶¶ 152-53.

209. On information and belief, AstraZeneca UK Limited consummated the above transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts. *See supra* ¶¶ 124-127.

**B.      The GE Defendants**

**1.      GE Made Corrupt Payments to Jaysh al-Mahdi Members**

210. The GE business unit that oversaw transactions with MOH is known as GE Healthcare. The global headquarters of GE Healthcare is located in Chicago, Illinois. GE operates this worldwide business unit through GE subsidiaries, including Defendants GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc. ("GE Medical"), and GE Medical Systems Information Technologies GmbH.

211. The GE *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is GE Medical Systems Information Technologies GmbH. The GE *manufacturer* Defendants – companies that manufactured the medical devices used to bribe Jaysh al-Mahdi agents – are GE Healthcare USA Holding LLC and GE Medical.

212. After the fall of Saddam in 2003, GE, like the pharmaceutical Defendants, pursued growth in the Middle East market in general and Iraq in particular. As one prominent Emirati newspaper explained, GE's "standout country in the [Middle East] region is Iraq, where it has deployed a team to train personnel, design hospitals and sell its technology."[179]

---

[179] Triska Hamid, *General Electric and Philips are Among Those Aiming for Growth with US and European Budgets Squeezed*, Nat'l (Jan. 28, 2014), https://www.thenational.ae/business/1.317836.

213.    As part of that business strategy, GE made corrupt payments to Jaysh al-Mahdi agents in connection with MOH contracts.  On information and belief, the Jaysh al-Mahdi-controlled MOH awarded hundreds of millions of dollars in contracts to GE Healthcare.  For example, one 2009 report indicated that GE Healthcare had received at least 12 medical-device contracts from the Sadrist-controlled Ministry worth roughly $400 million[180] – a number that likely understates the overall value of the contracts that GE Healthcare obtained.  Moreover, from 2005-2011, GE Healthcare maintained functionally a 100% market share for all nuclear-medicine products in Iraq.  Several witnesses, based on personal experience with the corrupt Kimadia procurement process and with the local agents GE Healthcare used to negotiate with Kimadia, understood that GE could have secured that 100% market share only by bribing an array of Jaysh al-Mahdi officials throughout MOH during that timeframe.

214.    Reports in 2008 and 2009 indicated that GE Healthcare had previously engaged in corrupt transactions relating to large-scale medical-device contracts with the Sadrist-controlled MOH.  Examples include:

- On January 23, 2008, an Arabic-language media source reported that Zamili had stated during his prosecution that Dr. Adel "took a 6-million-dollar bribe from a foreign company in a restaurant"[181] on contracts that one Confidential Witness understood to concern GE Healthcare.

- On December 29, 2008, a U.S. State Department cable (as published by *WikiLeaks*) reported that the existing "allegations of corruption against the Health Ministry IG" included an investigation into Dr. Adel's "profits from a USD 10 million electrocardiogram machine contract," which on information and belief was supplied by GE Healthcare.[182]  Although the investigation uncovered credible evidence of bribery in

---

[180] *See* Sabah al-Baghdadi, *Hidden Facts and Secrets of the Iraqi MOH Inspector General's Gangs Killing Iraqis*, Dunya al-Watan (May 21, 2009), https://pulpit.alwatanvoice.com/content/print/165460.html (translated from Arabic).

[181] Furat Naji, *Remember Hakim al-Zamili?  Learn What Is New About His Case*, Al Basrah Network (Jan. 23, 2008), http://articles.abolkhaseb.net/ar_articles_2008/0108/forat_230108.htm (translated from Arabic).

[182] U.S. State Dep't Cable, *Summing Up Iraq's Year of Anti-Corruption* (Dec. 29, 2008), https://wikileaks.org/plusd/cables/08BAGHDAD4058_a.html.  The Volcker Commission determined that GE paid kickbacks to secure an ECG contract during Oil-for-Food.  *See Volcker Report*, Table 7, at 106 (GE Healthcare subsidiary Marquette Hellige paid ECG-related bribes during Oil-for-Food).

connection with that contract, the Kimadia file "was mysteriously 'lost' before [Dr. Adel] could be prosecuted."[183]

- On May 21, 2009, an Arabic-language media source similarly reported that, in connection with 12 contracts worth $400 million, Dr. Adel had received kickbacks from GE and so dubbed him the "Emperor of Corruption."[184]

215.    In or about March 2008, Dr. Adel stated on Iraqi radio that GE Healthcare was "corrupt," based on the medical-device sales it had made to MOH.  Dr. Adel's accusation demonstrates the depth and longevity of GE Healthcare's corruption in Iraq.  GE had paid large bribes on high-dollar contracts to MOH, but Dr. Adel's demands kept growing.  The public accusation of corruption came when Dr. Adel's demands finally grew higher than what GE Healthcare was willing to pay.  Perversely, as relayed in a contemporaneous email by a U.S. anti-corruption official stationed in Iraq, Dr. Adel publicly denounced GE not because he actually cared that GE was corrupt but because "GE wouldn't pay him a big enough bribe."

216.    GE also made documented "free goods" deliveries in connection with large medical-device contracts.  In 2010, for example, Kimadia awarded Contract No. 87/2010/216, valued at approximately $1.2 million, to GE Medical Systems Information Technologies GmbH, for the purchase of 200 ECG Machine MAC 1600, at the unit price of $6,096.58, with "20 FOC" – *i.e.*, a 10% free-goods bribe (20/200 FOC) worth roughly $120,000.[185]

217.    On information and belief, GE made 10% (or similar) free-goods payments in connection with an array of other medical-device contracts from 2004-2013.  This allegation is based on:  (a) documentary evidence memorializing the "free goods" payment in connection with Contract No. 87/2010/216; (b) GE's employment of local agents with demonstrated history of

---

[183] *Id.*

[184] Sabah al-Baghdadi, *Hidden Facts and Secrets of the Iraqi MOH Inspector General's Gangs Killing Iraqis*, Dunya al-Watan (May 21, 2009), https://pulpit.alwatanvoice.com/content/print/165460.html (translated from Arabic).

[185] On information and belief, the correct name for this device is the GE Mac 1600 Electrocardiograph.

corrupt payments in Iraq, including "free goods" payments, *see infra* Part V.B.2; (c) GE's 100% market share in nuclear medicine in Iraq from 2005 through at least 2011; and (d) Kimadia's general practice of extracting free-goods deliveries in connection with medical-device contracts across multiple years, usually through similar "free goods" percentages on a given medical device from year to year.  GE made those corrupt payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.  GE Medical Systems Information Technologies GmbH also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

218.    On information and belief, GE secured many of its MOH contracts since 2004 by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* Part III.B.2.

219.    GE Medical Systems Information Technologies GmbH made such payments to Jaysh al-Mahdi members as agent for GE Healthcare and GE Medical.  As a condition of selling goods in Iraq manufactured by either GE manufacturer Defendant, GE Medical Systems Information Technologies GmbH had to certify to MOH that the manufacturers had authorized it to sell their goods in Iraq.  GE Medical Systems Information Technologies GmbH also had to certify that it was selling devices on behalf of those manufacturers and that GE Healthcare USA Holding LLC and GE Medical had manufactured the devices being supplied.  Based on these facts, and the Iraqi regulations governing the tender process, the GE manufacturer Defendants exercised control over GE Medical Systems Information Technologies GmbH with respect to the corrupt transactions executed by the latter.  *See supra* ¶ 157.

220.    GE Healthcare USA Holding LLC and GE Medical also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing devices they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents;

(b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and

(c) submitting paperwork to MOH confirming GE Medical Systems Information Technologies GmbH's authority to negotiate and execute corrupt contracts on their behalf.

221.    GE's corrupt payments delivered substantial monetary value to Jaysh al-Mahdi. GE's contracts were for expensive, valuable "big iron" equipment that multiple witnesses recall as one of the most corrupt market segments in Iraq.  Jaysh al-Mahdi members monetized such equipment not only by moving it on the black market, but also by diverting it to their own private clinics where Jaysh al-Mahdi agents (many of whom were doctors and clinicians) could charge patients for their use outside of Iraq's state-run public healthcare system.  On information and belief, given the size of GE's business in Iraq, the frequency of its contracts, and the particular devices that it sold, GE's total corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

## 2.    GE's Corrupt Payments to Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets

222.    GE has a history of entering into corrupt "free goods" transactions in Iraq.  In 2010, GE resolved FCPA charges brought by the SEC by paying roughly $23 million, which was one of the larger Oil-for-Food settlements.[186]  The SEC alleged that two GE subsidiaries obtained at least four Oil-for-Food medical-goods contracts from Kimadia between 2000-2003 by agreeing to "pay illegal kickbacks in the form of computer equipment, medical supplies, and services."[187]  One GE subsidiary "declined to make cash payments to the Iraqi ministry" when

---

[186] *See* Press Release, GE, *GE Announces Settlement of Oil-for-Food Matter* (July 27, 2010), http://www.genewsroom.com/Press-Releases/GE-Announces-Settlement-of-Oil-for-Food-Matter-227527.

[187] *GE FCPA* Compl. ¶ 22; *see id*. ¶¶ 29-30.

asked to make the standard ASSF cash payment, but "acquiesced" to unlawful payments in the form of in-kind bribes "equal to ten percent of the contracts' value."[188]

223.     The GE subsidiaries paid for their illegal 10% free-goods bribes under Oil-for-Food by inflating a local agent's fee by an offsetting 10%, which the "agent used . . . to cover the cost of the equipment and services he kicked back to the Iraqi ministry."[189]  GE's corrupt local agents in Iraq during Oil-for-Food and afterwards included:

224.     **Alnabeel Scientific Bureau.**  During the Oil-for-Food Program and continuing through the Sadrist takeover of MOH, GE Healthcare engaged the Alnabeel Scientific Bureau and its General Manager ("GE Agent 1").[190]  GE Agent 1 stated to MOH officials in or around Fall 2003 that s/he represented GE Healthcare in Iraq.

225.     GE Agent 1 was personally involved in paying a series of bribes in Iraq during both the Saddam and the post-Saddam eras.  For example, according to one percipient witness, GE Agent 1 offered bribes on behalf of GE Healthcare in 2003 to MOH decisionmakers to secure payment from MOH relating to a contract for the sale of heart monitors, including an offer to purchase a luxury European automobile for an MOH decisionmaker.  GE Agent 1 made that offer on behalf of GE Healthcare in a meeting on or about December 2003 at the Four Seasons in Amman, Jordan.

226.     On information and belief, from 2003 through at least on or about November 2006, Alnabeel acted as one of GE Healthcare's agents in Iraq and assisted with the sale of GE

---

[188] *Id.* ¶ 24.

[189] *Id.* ¶ 25.

[190] Consistent with the DOJ's and the SEC's practice in comparable FCPA cases, Plaintiffs have anonymized the names of local agents and distributors and other company employees implicated in the corruption scheme.

Healthcare-manufactured products including, but not limited to, CT scanners, MRIs, X-Rays, Ultrasounds, and other devices manufactured by GE Healthcare.

227.     **Al-Mazd Group.**  During the Oil-for-Food era, as well as after the Sadrist takeover of MOH, GE Healthcare also engaged the Al-Mazd Group Medical & Engineering Systems & Technologies ("Al-Mazd"), which is also known as "AGMEST."  Al-Mazd represented GE Healthcare in transactions with MOH involving CTs, MRIs, and other large-dollar medical devices.

228.     According to multiple witnesses, Al-Mazd had a reputation in Iraq during the Oil-for-Food era, as well as the post-Saddam years, for making corrupt payments to MOH.  On September 30, 2004, the Iraq Survey Group's report for the U.S. intelligence community publicly identified "Al-Mazd" / "AGMEST" as a corrupt agent potentially involved in violations of sanctions applicable to Iraq under the Oil-for-Food Program.[191]

229.     After the end of Oil-for-Food, GE Healthcare continued to use Al-Mazd as one of its agents in Iraq, including after the Iraq Survey Group publicly identified Al-Mazd as a suspect agent.  On information and belief, Al-Mazd represented GE Healthcare in connection with its CT, MRI, Ultrasound, and other device contracts in Iraq during most of the period of time from 2003 through at least 2008.  Among other things, GE Healthcare relied on Al-Mazd's CEO ("GE Agent 2") to personally facilitate its medical-device sales in Iraq.  In doing so, GE Healthcare knew or recklessly disregarded that GE Agent 2 had a direct connection to Jaysh al-Mahdi, through a family member who was part of Sadr's personal inner circle in Najaf.

---

[191] *See* Iraq Survey Group, *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD*, Vol. I (Regime Finance and Procurement, Annex I. Suspected WMD-Related Dual-Use Goods and Procurement Transactions) 262-63 (Sept. 30, 2004) (twice reporting that "the Al-Mazd Group for Medical and Engineering Systems and Technology (AGMEST) in Baghdad" had facilitated "[p]ossible [b]reaches of UN Sanctions" in Iraq).

230.    There is evidence of Al-Mazd's corrupt payments to Iraqi officials continuing during the post-Saddam era when Jaysh al-Mahdi controlled MOH.  As found by a Canadian judge for the Ontario Superior Court, Al-Mazd charged at least one Canadian medical-device supplier a 34% agent fee for representing the supplier with Kimadia in connection with a commercial negotiation that took place in or about December 2006.[192]  A 34% agent fee, which Al-Mazd charged based on the full retail price of the supplier's goods, is commercially unreasonable and a red flag that Al-Mazd was engaged in corrupt activities with MOH throughout the contracting process.[193]  During the Canadian proceeding, the supplier's witness could not explain what legitimate benefit Al-Mazd had provided that would justify the 34% commission.[194]  On information and belief, Al-Mazd also represented GE Healthcare in Iraq during the same time period at issue in the Canadian proceeding.

231.    On its homepage, Al-Mazd boasts about its offerings as a "local after sales services (ASS) provider" that "represent[s] Suppliers & Manufacturers of State-Of-The-Art Medical Equipment And Supplies From U.S.A., Europe, Japan . . . and others."  Indeed, Al-Mazd maintains a webpage devoted in part to its "after sales services" offerings, even though such arrangements – and the very concept of After Sales Service Fees – were widely discredited in the aftermath of the Oil-for-Food scandal.  Al-Mazd also publicly touts the benefits that healthcare companies can derive from "charitable donations" of medical goods in Iraq.

---

[192] *See Ali v. O-Two Med. Techs. Inc.* (2015), 2015 ONSC 3932, ¶¶ 33-34, 37-38 (Can. Ont. Super. Ct.).

[193] *See* DOJ & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* at 22 (Nov. 14, 2012) ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

[194] *Ali*, 2015 ONSC 3932, ¶¶ 33-34; *see also id.* ¶ 59 ("Mr. Sharma testified that this was a benefit to O-Two, but that he could not quantify the benefit.").

232.    Al-Mazd's website also boasts of Al-Mazd's sponsorship of "Scientific & Medical activities" that were "officially requested" by MOH,[195] and that Al-Mazd provided "training courses for MOH staff, done extra to the contracted courses (FOC) [w]ithin [Al-Mazd's] specialty."[196]   As its website explains, Al-Mazd has provided FOC training courses to hundreds, if not thousands, of MOH officials, including courses relating to essentially every GE Healthcare major device offering by category.   While most of these training courses are not attributed to a specific company, Al-Mazd advertises at least one occasion when it provided a training course for GE Healthcare on a free-of-charge basis relating to GE's ultrasound sales to MOH.

### 3.    GE's Corrupt Transactions Had a Substantial Nexus to the United States

233.    GE's corrupt transactions with Kimadia required extensive involvement of U.S. personnel and facilities in the global GE Healthcare business unit.  At all relevant times, GE Healthcare – the integrated business unit of which GE Medical Systems Information Technologies GmbH was a part – maintained a substantial presence in Wisconsin, with corporate offices located in the Milwaukee County Research Park in Wauwatosa, Wisconsin, and nearly 6,000 employees in the State.[197]

234.    Wisconsin has, at all relevant times, served as the "home base and headquarters for key GE Healthcare product lines and imaging businesses, including computerized tomography, magnetic resonance, x-ray, and the unit's services and life care solutions businesses."[198]  As stated by a GE spokesman, Wisconsin is a "hub for global manufacturing and

---

[195] AGMEST, Marketing, http://www.agmest.com/en/marketing.

[196] AGMEST, Sponsoring Some of the Scientific & Medical Activities and Conferences Officially Requested, http://www.agmest.com/en/marketing?q=node/114.

[197] *See* Steve Jagler, *Jagler:  GE's Wold Sees the Future of Health Care Today*, Milwaukee J. Sentinel (Mar. 11, 2017).  On information and belief, GE's Wisconsin workforce was as large, if not larger, from 2003-2013.

[198] Thomas Content, *GE Healthcare to Move Global Headquarters from United Kingdom to Chicago*, Milwaukee J. Sentinel (Jan. 11, 2016).

leadership."[199]  Wisconsin is GE Healthcare's global hub for nuclear medicine and what is known in healthcare circles as "big iron" – CT, MRI, and positron emission tomography ("PET") scanners.[200]

235.     GE Healthcare's Waukesha location has served as the global hub for GE Healthcare's business lines for X-rays, CTs, and MRIs (until at least 2011 with respect to X-rays and at all relevant times with respect to CTs and MRIs).  One 2014 press report indicated that at least half of the CT and PET scanners manufactured at GE Healthcare's Waukesha facility since 2005 were sold on the international market.[201]  GE Healthcare (Waukesha) manufactured one of GE's flagship CT scanner offerings, the GE Lightspeed CT Scanner, as well as a component of GE Healthcare CT machines, known as the Performix tube.  In a 2010 brochure issued by GE Healthcare (Waukesha), GE touted its Waukesha-manufactured and/or -assembled Performix tubes as an essential component of GE Healthcare's value proposition in the CT market.[202]

236.     GE Healthcare's Madison, Wisconsin location also served as the global hub for GE Healthcare's respiratory offerings, including ventilation and breathing technologies.

237.     GE Healthcare relied heavily on cross-functional teams managed out of its U.S. headquarters to facilitate global sales and distribution.  For example, one GE Healthcare

---

[199] *Id.*

[200] *See* Guy Boulton, *GE Healthcare's Waukesha Business Units at the Forefront of 'Big Iron'*, Milwaukee J. Sentinel (Sept. 20, 2014).

[201] *See id.* ("About six years ago, revenue for the business that sells CT and PET scanners was more or less evenly split between the U.S. and international markets.  Now the business generates more than 75% of its revenue from international sales.").

[202] *See* GE Healthcare, *Performix^{TM} Tubes:  The Value of Performance* at 2 (2010) ("Nothing builds reliability like experience.  We've manufactured more than 25,000 Performix tubes, and our reliability has been proven time and time again – in the design lab and in the exam room.  Performix tube development has come from more than 13 years of collaboration between GE Healthcare service engineering, manufacturing, and design engineering teams. Our tube manufacturing processes leverage our knowledge of GE Healthcare systems to eliminate potential failure points and ensure quality and dependability."), http://www3.gehealthcare.com.sg/~/media/Downloads/asean/ Services/Equipment%20Services/GEHealthcare-Brochure_Performix.pdf?Parent=%7B2E0FBFDD-B334-4829-8DE0-BC40C6477BAC%7D.

employee based in Wisconsin wrote that s/he acted to "[s]upport global cross-functional teams" for GE-manufactured products and that s/he worked with both GE suppliers and manufacturers to "resolve issues observed throughout the breadth of the supply chain."

238.   GE Healthcare's communications with the FDA confirm that its U.S.-based facilities played a key role in GE's medical-device sales in Iraq.  GE Healthcare periodically has issued recall notices to the FDA, and, on several occasions, those notices have represented that GE Healthcare USA Holding LLC or GE Medical sold the affected products in Iraq (among other countries).  Examples of those recall notices that include Iraq are:

| Date GE Initiated Recall | Recalling GE Entity | GE Device | Recall Number |
|---|---|---|---|
| March 6, 2006 | GE Healthcare, LLC[203]<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Solid State X-Ray Imager | Z-0896-06 |
| March 6, 2006 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Solid State X-Ray Imager | Z-0898-06 |
| June 24, 2008 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Flouroscopic X-Ray System | Z-2356-2008 |
| February 27, 2009 | GE Medical Systems Information Technology<br>9900 Innovation Dr. Wauwatosa WI 53226 | Detector and alarm, arrhythmia | Z-1232-2009 |
| July 13, 2012 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | GEHC Voluson E6, E8 Expert, E10 Diagnostic Ultrasound System | Z-1833-2013 |

---

[203] GE Healthcare, LLC, though listed in these FDA recall notices, does not appear to be the name of an actual corporate entity.  On information and belief, GE Healthcare, LLC is GE's shorthand for Defendant GE Healthcare USA Holding LLC.

| Date GE Initiated Recall | Recalling GE Entity | GE Device | Recall Number |
|---|---|---|---|
| March 9, 2015 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | Multiple GEHC MRI Systems | Z-1305-2015 |
| December 23, 2015 | GE Medical Systems, LLC 3000 N Grandview Blvd, Waukesha, WI 53188-1615 | GEMS Brivo XR285amx Mobile Digital Ready Radiographic System | Z-0769-2016 |
| November 3, 2016 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | GEHC Avance, Avance CS2, Amingo (Gas Machines / Anesthesia) | Z-0755-2017 |

239.    GE Healthcare has asserted that it derives substantial competitive advantages in the international marketplace from its operations throughout Wisconsin, including, but not limited to:  (i) a high-morale work force in a high quality-of-life location (Milwaukee's suburbs) that promotes employee productivity and retention; (ii) a highly educated work force, including more than 2,800 engineering degrees held by its Wisconsin employees; (iii) proximity to, and strategic partnerships with, the University of Wisconsin (Madison), through which GE Healthcare has developed pioneering radiology technologies for the global healthcare marketplace; (iv) "[t]he strength of the manufacturing sector in Wisconsin," which GE markets as "impressive";[204] and (v) Wisconsin's proximity to key international shipping hubs.

240.    GE Healthcare also followed an integrated global strategy in its imaging (CT, MRI, and PET) business.  In 2008, the President of GE Healthcare's Middle Eastern and African Growth Markets stated that GE Healthcare "look[ed] beyond traditional country and region

---

[204] Press Release, GE Healthcare, *GE Healthcare – Growing the Economy in Madison, WI*, Fact Sheet No. 14-000161, at 2 (2012), http://www3.gehealthcare.com/~/media/documents/us-global/news%20center/gehc-press-release_ge-healthcare-growing-wisconsins-economy_2012.pdf?Parent=%7B37B9EC8D-1F42-44EB-83C9-454DD572C2BF%7D.

borders to leverage synergies among international markets."[205]  That required U.S. facilities to be involved in the tender process, including the negotiation of pricing terms.  As one GE Healthcare sales manager located in Wisconsin wrote, from 2007-2010, s/he "[p]rovided gate keeper / deal approver for all discounts and contract terms that exceeded limits set for individual sales reps and regional managers."  Similarly, multiple high-level GE Healthcare compliance and auditor personnel were located in Wisconsin, with responsibility for reviewing contract terms and assuring (among other things) FCPA compliance.

241.    GE Healthcare has used its U.S. managers, personnel, and facilities to solicit prospective customers at MOH.  On at least one occasion in 2004, GE Healthcare paid for a senior Iraqi MOH official to travel to Wisconsin, had senior U.S.-based GE Healthcare staff provide that official a personal sales pitch, and gave the official a tour of a GE Healthcare facility in Waukesha.

242.    GE Healthcare's corrupt transactions with MOH (alleged above) involved sales of medical devices manufactured largely in the United States.  On information and belief, consistent with Kimadia's standard practice, GE certified to MOH during the registration and contract-negotiation process that its devices were made in the United States and that it was sourcing the devices sold to MOH from the United States.

243.    On information and belief, as a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured devices, GE Medical Systems Information Technologies GmbH agreed to procure letters from the U.S. Department of Commerce confirming that the devices were manufactured in the United States.  *See supra* ¶ 156.  On information and belief, it further procured evidence of FDA approval for all of its devices sold to

---

[205] *GE Healthcare Combines Eastern, African Market Regions; Appoints President*, HealthImaging.Com (Jan. 28, 2008).

Kimadia, including those purportedly sourced from outside the United States.  *See supra* ¶¶ 152-153.

244.     On information and belief, GE Medical Systems Information Technologies GmbH consummated its transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 124-127.

### C.     The J&J Defendants

245.     Defendant Johnson & Johnson is the publicly traded parent company that owns (directly or indirectly) the other J&J Defendants transacting business in Iraq after Jaysh al-Mahdi's takeover of MOH.  Johnson & Johnson oversaw and supervised the scheme by which J&J subsidiaries made corrupt payments to Jaysh al-Mahdi in Iraq.  *See infra* ¶¶ 273-74.  The J&J *supplier* Defendants – companies that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – are J&J Middle East (for devices) and Cilag GmbH International and Janssen Pharmaceutica N.V. (for drugs) (together, "Janssen-Cilag").  The J&J *manufacturer* Defendants – companies that manufactured goods used to bribe Jaysh al-Mahdi agents – are Ethicon, Inc. and Ethicon Endo-Surgery, LLC (for devices) (together, "Ethicon"), and Janssen Ortho LLC and Ortho Biologics LLC (for drugs).

### 1.     J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Medical Devices in Iraq

246.     J&J Middle East entered into corrupt transactions with the Jaysh al-Mahdi-controlled MOH in connection with the sale of medical devices from 2004-2013.  Those corrupt transactions involved contracts negotiated by J&J Middle East and included devices manufactured in the United States by Ethicon.  Plaintiffs set forth below examples of those device transactions.  These examples are not exhaustive and are based on the information that

Plaintiffs have been able to uncover without access to Defendants' files; Plaintiffs believe that

discovery will reveal additional examples of corrupt payments.  *See supra* ¶ 190.

| Contract Year | Supplier | Manufacturer | Confirmed Contract | Total Sale Price | FOC % |
|---|---|---|---|---|---|
| 2010 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2009/401/B | $8.28 million | 30% |
| 2010 | J&J Middle East | Ethicon, Inc. | 92/2010/477/2 | $647,000 | 1 box per suture type[206] |
| 2011 | J&J Middle East | Ethicon Endo-Surgery, LLC | 87/2011/83/O | $1.79 million | 6,200 units |
| 2011 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2009/400 | $1.45 million | 10% |
| 2012 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2011/83/N/1 | $649,000 | 30% |

The column headers in this chart have the following meaning:

- Contract Year:  The year that J&J Middle East executed the contract with Kimadia.

- Supplier:  The J&J company that executed the sales contract with Kimadia and that held itself out as the company with authority to sell the devices in Iraq.

- Manufacturer:  The J&J company that manufactured at least some of the devices that MOH purchased from the supplier.  Many of these device contracts governed the purchase of multiple types of medical devices (and therefore may involve multiple manufacturers):  for example, Contract No. 87/2009/400 memorialized the purchase of 31 different medical devices, some of which were manufactured in the United States by Defendant Ethicon Endo-Surgery, LLC, and others of which were manufactured by Cordis Europa NV.

- Confirmed Contract:  The unique contract-number identifier that Kimadia assigned to the sales contract at issue.

- Total Sale Price:  The total amount that Kimadia paid for the devices being sold.

- FOC %:  The size of the "free goods" bribe – measured against the underlying quantity of goods being sold – that the supplier and manufacturer paid on the devices at issue.

---

[206] A Kimadia award announcement relating to a 2010 tender (92/2010/477/2) memorializes the "free goods" bribe as "1 box of Sutures FOC" per "each type of suture ordered."

247.    These corrupt payments covered a variety of devices, including catheters, sutures, and arterial sheaths.  Unlike drug contracts – which tend to cover one drug per contract – device contracts often cover multiple types of devices.  On each of these examples, the FOC percentage listed in the chart applied generally to every device covered by the contract.  As with drugs, there was a thriving black market in the region for such goods:  Iraqis often had to purchase such goods at elevated prices from private pharmacies run by Jaysh al-Mahdi.

248.    On information and belief, from 2004-2013, J&J regularly made similar corrupt payments on comparable device sales.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing the corrupt payments above; (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given device from year to year; and (c) Ethicon-manufactured and -branded sutures and other medical devices were used heavily in Iraq in 2005 and earlier.  Ethicon was a dominant player in the Iraqi medical-device space under Saddam and afterwards, and Ethicon-branded devices appeared frequently in MOH inventory when the Sadrists began taking control in late 2004.  J&J Middle East also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

249.    J&J Middle East made those corrupt payments acting as agent for (among other affiliates) Ethicon Endo-Surgery, LLC and Ethicon, Inc.  As a condition of selling devices in Iraq manufactured by either J&J manufacturer Defendant, J&J Middle East had to certify to MOH that the manufacturer had authorized J&J Middle East to sell its devices.  J&J Middle East also had to certify it was selling goods on behalf of those manufacturers and that the devices supplied had been manufactured by those manufacturers.  Based on these facts, and the Iraqi regulations governing the tender process, the J&J device manufacturer Defendants exercised control over J&J Middle East with respect to the corrupt transactions executed by the latter.  *See supra* ¶ 157.

250.    Ethicon Endo-Surgery, LLC and Ethicon, Inc. also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing devices that they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming J&J Middle East's authority to negotiate and execute corrupt contracts on their behalf.

251.    J&J's corrupt transactions (including "commissions" and "free goods") delivered significant monetary value to Jaysh al-Mahdi.  Using just the four examples above (excluding contract 92/2010/477/2), the "free goods" delivered by J&J had a value of more than $3 million. Assuming that J&J's corrupt payments in other years carried a similar value, it likely delivered more than $10 million worth of corrupt payments to Jaysh al-Mahdi agents between 2004-2013.

### 2.    J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Pharmaceuticals in Iraq

252.    J&J also made corrupt payments in connection with pharmaceutical contracts with MOH.  From 2005 through the present, Kimadia awarded Janssen-Cilag at least 38 contracts relating to more than a dozen different drugs.  During this time, Janssen-Cilag sold U.S.-manufactured drugs to MOH including but not limited to:  Eprex (API made in Manatí, Puerto Rico); Topamax (API made in Gurabo, Puerto Rico); Leustatin (API made in Manatí, Puerto Rico); and Remicade (API made in Malvern, Pennsylvania).[207]  On information and belief, J&J secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%.  *See supra* Part III.B.2.  Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex – from 2004-2008 – Kimadia awarded at least 13 drug contracts to J&J.

---

[207] Merck controlled the license for Remicade in Iraq prior to April 2011, when control transferred to J&J.  On information and belief, J&J began attempting to sell Remicade to Kimadia shortly thereafter, winning its first Remicade contract in or about December 2011.

253.     From 2004-2013, J&J paid a wide variety of "free goods" bribes on drug contracts

to the Jaysh al-Mahdi-controlled MOH.  Examples, which Plaintiffs have uncovered without

discovery of Defendants' files and which are merely illustrative, *see supra* ¶ 190, include:

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Eprex 2000 (08-C00-003) | Janssen-Cilag[208] | Ortho Biologics LLC | 04-15-2007 | 40/2005/303 | 20% |
| Eprex 4000 (08-C00-004) | Janssen-Cilag | Ortho Biologics LLC | 04-15-2007 | 40/2007/505 | 5% |
| Remicade (10-AC0-009) | Janssen-Cilag | Janssen Biotech, Inc.[209] | 02-28-2005 | TBD | 15% |
| Topamax (04-J00-044) | Janssen-Cilag | Janssen Ortho LLC | On or before 2006 | 40/2006/482 | Off-the-Books Payoff[210] |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 191).

254.     On information and belief, Janssen-Cilag made corrupt payments for each drug on

an annual basis – similar to the percentages listed on the chart – beginning the year after the drug

was placed on the formulary and continuing through the present.  That allegation is based on the

facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free

goods" payment that Janssen-Cilag made in the listed percentage for each drug; and (b) Kimadia

maintained a general policy of extracting similar "free goods" percentages on a given drug from

year to year.  Based on that policy, if a company paid a "free goods" bribe of X% in one year, it

likely also paid a similar percentage on sales of the same drug in other years beginning when the

---

[208] J&J appears to have transacted with MOH through both Cilag GmbH International and Janssen Pharmaceutica N.V., sometimes with respect to overlapping drugs.  Plaintiffs therefore have noted the supplier entity as Janssen-Cilag, just as the SEC and the DOJ did in prior FCPA proceedings against J&J.  *See, e.g., J&J FCPA* Compl. ¶ 55 (pleading supplier entity as "Janssen-Cilag," which referred to Janssen and Cilag collectively). This notation means that, on information and belief, both Cilag GmbH International and Janssen Pharmaceutica N.V. executed corrupt sales contracts for the drugs at issue.

[209] For sales contracts executed before June 2011, the J&J supplier company was named Centocor Ortho Biotech Inc.  In June 2011, Centocor Ortho Biotech Inc. was renamed Janssen Biotech, Inc.

[210] *See infra* ¶ 261 (describing Topamax payoff); *supra* ¶ 136 (describing Off-the-Books Payoff scheme).

supplier first started selling that drug in Iraq.  Janssen-Cilag made those corrupt payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.  Janssen-Cilag also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

255.    Janssen-Cilag made those corrupt payments acting as agent for (among other affiliates) the J&J drug manufacturer Defendants.  As a condition of selling drugs in Iraq manufactured by the J&J drug manufacturer Defendants, Janssen-Cilag had to certify to MOH that those manufacturers had authorized it to sell their drugs.  Janssen-Cilag also had to certify that it was selling drugs on behalf of those manufacturers and that they had manufactured the drugs being supplied.  Based on these facts, and the Iraqi regulations governing the tender process, the J&J drug manufacturer Defendants exercised control over Janssen-Cilag with respect to the corrupt transactions executed by the latter.  *See supra* ¶ 157.

256.    The J&J drug manufacturer Defendants also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing drugs they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming Janssen-Cilag's authority to negotiate and execute corrupt contracts on their behalf.

257.    Eprex illustrates how J&J's corrupt transactions worked.  Eprex is an integrated medical system that uses both a medicine (J&J's international branded version of erythropoietin, a chemical compound that treats anemia) and a device (a syringe fitted with a sophisticated needle guard).  Since at least 2002, J&J has owned a license to manufacture and sell Eprex outside of the United States.  Eprex (together with its branded counterpart in the United States,

Procrit) has generated billions of dollars in worldwide revenue for J&J, accounting for at least $1.9 billion in annual revenues each year from 2005-2010.

258.    While the Sadrists controlled the Iraqi Health Ministry, Janssen-Cilag routinely made large (between 5% and 20%, depending on the dosage) "free goods" payments of Eprex to win lucrative tenders from Kimadia.  Thus, for every 100 units of Eprex sold by J&J in Iraq, it often provided an extra 20, for free, that Jaysh al-Mahdi could divert to the black market to fund its terrorist activities.  In addition, Janssen-Cilag also used free Eprex as a cash equivalent to make Off-the-Books Payoffs on several occasions to resolve disputes concerning other drugs, which were memorialized in a Kimadia document as "compensation in the form of material."  In addition to its Off-the-Books Payoffs of Eprex in 2006-2007, Janssen-Cilag also secured at least two contracts for the sale of Eprex – which were collectively worth more than $5 million – during the period from 2004 through 2008, when high-dollar contracts were virtually impossible to obtain without corrupt payments to Jaysh al-Mahdi agents.

259.    J&J's Eprex-related bribes to Jaysh al-Mahdi necessarily involved the provision of free medical devices in addition to free drugs.  J&J's "pre-filled syringes [of Eprex] are fitted with the PROTECS™ needle guard device to help prevent needle stick injuries after use."[211]  On information and belief, J&J included such devices in its Eprex packs to make it easier for J&J to sell Eprex.  J&J's provision of free medical devices as part of its free Eprex packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize Eprex on the black market.

260.    As another example, J&J provided free units of its blockbuster anti-epilepsy and anti-migraine drug Topamax to facilitate at least one Off-the-Books Payoff to corrupt MOH officials.  On at least one occasion, as a Kimadia document memorialized, the Sadrists approved

---

[211] EPREX® PREFILLED SYRINGES Consumer Medicine Information at 3 (Mar. 2017), http://www.janssen. com/newzealand/sites/www_janssen_com_newzealand/files/prod_files/live/eprex.pdf (last accessed Sept. 21, 2017).

"compensation in the form of supplies" from Janssen-Cilag in response to an earlier request for "monetary compensation."[212]  The free Topamax functioned as a cash equivalent to buy off MOH officials in connection with an unrelated dispute, and the Topamax was provided outside of the normal contracting process (and thus did not involve the typical use of a FOC Clause).

261.    J&J's corrupt transactions delivered substantial value to Jaysh al-Mahdi.  Eprex and Topamax were two of J&J's most important drugs during the period in question and, on information and belief, were a marketing priority for J&J in emerging markets.  Moreover, these drugs treat chronic conditions – anemia for Eprex and epilepsy for Topamax – and such drugs were among the easiest to monetize on the black market.  The dollar value of those corrupt payments was high:  for example, J&J provided more than one Off-the-Books Payoff in the form of free Eprex in 2006-2007, and, based on 2007 tender prices per pack, the value of those free goods was at least several million dollars.  In total, given the size of J&J's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, J&J's corrupt transactions (including "commissions" and "free goods") likely delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 3. J&J's Corrupt Payments to Jaysh al-Mahdi Comport with Its Historical Sales Practices in International Markets

262.    J&J has admitted to bribing Iraqi officials during the Oil-for-Food scandal.  According to J&J, Kimadia demanded that humanitarian-goods suppliers "pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government."[213]  Janssen-Cilag admittedly paid at least $857,387 in such kickbacks to corrupt Ba'athist officials to obtain 18 contracts for the sale of pharmaceuticals to

---

[212] Translated from Arabic.

[213] *J&J DPA* ¶ 5.

Kimadia between December 2000 and March 2003.[214]  As J&J's corporate representative

recently testified in another case:  "we paid kickbacks to Iraqi foreign officials."[215]

263.    J&J made those corrupt ASSF payments to Kimadia through J&J Agent 1, its

Lebanon-based sales agent.[216]  On or about October 24, 2000, J&J Agent 1 wrote J&J and

explained that "Kimadia is asking companies to pay them a 16 to 18% commission on each

invoice.  This subject will be discussed during your visit to Baghdad."[217]  In response, in

November 2000, Janssen-Cilag's Area Director with responsibility for J&J sales in Iraq

instructed J&J Agent 1 to "sign[ ] a document stating that he would not pay commissions to

Kimadia."[218]  As J&J later admitted, however, that response letter was a mirage.[219]  In reality,

J&J Agent 1 proceeded to pay Kimadia its standard 10% kickbacks on Janssen-Cilag's behalf,

and Janssen-Cilag reimbursed J&J Agent 1 by raising his agent fee.  Those corrupt payments

were then misrepresented in J&J's books and records as sales "commissions."[220]

264.    On information and belief, from at least June 1998 through approximately

February 2006, Janssen-Cilag made sales in Iraq through J&J Agent 1.  Although Janssen-

Cilag's contract with J&J Agent 1 described him as a "consultant," J&J has admitted that he

actually functioned as J&J's agent who acted on J&J's behalf in paying kickbacks to Kimadia

under Oil-for-Food.[221]  On information and belief, J&J Agent 1 served as Janssen-Cilag's Iraqi

---

[214] *Id.* ¶ 102.

[215] Test. of Christina Egan (Fed. R. Civ. P. 30(b)(6) designee for J&J), Trial Tr., Vol. 15 at 69:15-69:16, *In Re: Depuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, No. 3:13-cv-01071-K (N.D. Tex. Jan. 29, 2016), ECF No. 314.

[216] *See id.* ¶ 104.

[217] *Id.* ¶ 105.

[218] *Id.* ¶ 106.

[219] *See id.* ¶¶ 105-106.

[220] *Id.* ¶ 118.

[221] *See id.* ¶¶ 27, 102-106.

sales agent until approximately February 2006, when the SEC uncovered J&J's kickbacks and prompted J&J to terminate his contract.[222]

265.     Under Oil-for-Food, Cilag also paid sizeable kickbacks on Eprex contracts. According to the *Volcker Report*, Cilag paid a total of $509,092 in kickbacks on six Oil-for-Food contracts worth roughly $5.6 million, and, on information and belief, Eprex accounted for a significant portion of the goods covered by those contracts.[223]  When asked by the Volcker Commission in 2005 for a response to the Commission's conclusion that Cilag had paid those kickbacks, Cilag denied the charges.[224]  Six years later, in pleading guilty to an FCPA violation, Cilag reversed course and admitted that the allegations were true.[225]

266.     J&J's admitted criminal bribery during Oil-for-Food did not prompt it to terminate its relationship with its key distributor.  On information and belief, Mersaco, a Lebanon-based distributor that held itself out as Janssen-Cilag's agent in the Middle East & North Africa ("MENA") region, was responsible for overseeing J&J Agent 1's day-to-day activities in Iraq on behalf of Janssen-Cilag during Oil-for-Food and afterwards.  On information and belief, Mersaco was involved in the preparation of the phony November 2000 letter discussed above that concealed J&J's bribes to Kimadia.

267.     Further, the Mersaco employee who exercised day-to-day responsibility for representing Janssen-Cilag in Iraq ("J&J Agent 2") handed out a business card in 2003 depicting him/herself as the "Regional Sales & Marketing Manager" for "Janssen-Cilag" and providing a J&J email address.  Moreover, according to one witness who met with J&J Agent 2 at an in-

---

[222] *See J&J FCPA* Compl. ¶ 58.

[223] *See Volcker Report*, Table 7, at 44.

[224] *See id*. at 190 (Cilag Company Response).

[225] *See J&J DPA* ¶¶ 102-112.

person meeting in Amman in 2003, J&J Agent 2 represented J&J in procuring tainted contracts under Oil-for-Food.  On information and belief, J&J Agent 2 thereafter remained a key player responsible for Janssen-Cilag's sales in Iraq – nominally working for Mersaco, but in reality taking direction from J&J managers and acting on J&J's behalf – when Jaysh al-Mahdi controlled MOH and during which time J&J paid numerous "free goods" bribes.

268.    Under Saddam, J&J sold medical devices in Iraq through J&J Agent 3.  J&J Agent 3 technically worked for Al-Misk Co. for Commercial Agencies ("Al-Misk"), but in reality s/he represented J&J and followed J&J's directions:  J&J Agent 3's business card had a description as a "Product Specialist" for "Johnson & Johnson Inc.," and J&J Agent 3 presented him/herself as J&J's agent for medical devices in several meetings at MOH in Baghdad.  J&J Agent 3 was also involved in facilitating the payment of bribes on J&J's behalf under Oil-for-Food.  On information and belief, J&J Agent 3 continued to represent J&J for medical-device sales made in Iraq after Oil-for-Food, when Jaysh al-Mahdi controlled MOH.

269.    On information and belief, Al-Misk appears to be the same as (or substantially related to) an Al-Misk entity that was one of the worst offenders out of the thousands of companies that paid kickbacks under Oil-for-Food.  The Volcker Commission determined that a Jordanian entity called "Misk For Int'l Marketing And Supply" paid $1,663,467 in ASSF bribes to MOH officials to secure 17 contracts from 2000-2003.[226]  Al-Misk did so regarding many categories of products corresponding to J&J goods sold in Iraq.[227]

270.    During Oil-for-Food and afterwards, Ethicon transacted business with MOH through a Jordanian distributor named Al-Wafi Group for Marketing & International Trade Co.

---

[226] *Volcker Report*, Table 7, at 111.

[227] *See id.*

("Al-Wafi").  Al-Wafi has served as Ethicon's agent in Iraq during all or nearly all of the time

period spanning from Oil-for-Food to the present.  Al-Wafi, like Al-Misk, was one of the most

corrupt companies in the Oil-for-Food scandal.  The Volcker Commission determined that

Al-Wafi paid $1,780,051 in ASSF bribes during Oil-for-Food to secure 10 contracts from 2000-

2003.[228]  Also like Al-Misk, some of Al-Wafi's bribes were to secure contracts for "Surgical

Supplies," a category that included Ethicon products.[229]

271.    J&J's more recent conduct further demonstrates its longstanding pattern and

practice of making corrupt payments in Iraq.  In 2011, J&J settled Oil-for-Food FCPA

allegations and represented it had put in place a global compliance program to prevent future

corrupt payments in Iraq.  Despite those representations, J&J paid (among other bribes) a 20%

free-goods bribe on Remicade in 2015 and a 20% free-goods bribe on Eprex in 2014.

**4.    J&J's Corrupt Transactions Had a Substantial Nexus to the United States**

272.    J&J's operations in the Middle East were overseen in part by senior managers

residing in the United States.  Defendant Johnson & Johnson maintained global anti-bribery and

anti-corruption policies applicable throughout the J&J corporate hierarchy, which were

promulgated by its global headquarters in New Jersey.  One policy document was entitled

International Health Care Business Integrity Guide and was drafted by the U.S.-based

"Worldwide Office" of J&J's Office of Health Care Compliance & Privacy and the J&J Law

Department.  The November 2009 version of the document distinguished discounts from bribery:

in contrast to the policy's general prohibition of bribery, it provided that "discounts may be

granted when permitted by local laws and regulations and [when] in compliance with applicable

---

[228] *See id.* at 15.

[229] *See id.*

antitrust laws."  And, although the policy stated that J&J "generally may not provide free goods" to healthcare providers, it authorized the delivery of "free goods" in certain circumstances:  "a 'free' product under a 'buy one, get one' arrangement is not considered to be free for purposes of the Guide, but instead is a form of discount."

273.    On January 14, 2011, Johnson & Johnson entered into a Deferred Prosecution Agreement with the DOJ in which it paid $70 million to resolve admitted allegations that J&J paid unlawful kickbacks in several countries, including Iraq.  Johnson & Johnson admitted it was "responsible for the acts of its officers, employees and agents, and wholly-owned subsidiaries and operating companies" in paying those kickbacks.[230]  Johnson & Johnson also represented that it had "conducted an extensive, global review of all of its operations to determine if there were problems elsewhere and has reported on any areas of concerns to the Department and the SEC."[231]  On information and belief, Johnson & Johnson's review of its Iraq-related subsidiaries' anti-corruption practices began around February 2006, when it received an SEC subpoena seeking information about its Oil-for-Food practices.[232]

274.    J&J made corrupt payments to Jaysh al-Mahdi members through American companies.  Its corrupt medical-device contracts were executed by J&J Middle East, a New Jersey company.  Many also required the direct involvement of U.S.-based Ethicon manufacturers.  From 2005 through the present, Ethicon manufactured most of its medical devices at plants located in Puerto Rico and Cornelia, Georgia.  J&J considered both plants to be significant to its global supply chain.  As of 2012, the Cornelia plant, which has operated since 1947, produced the majority of the world's supply of surgical sutures.

---

[230] *J&J DPA* § 2(b).

[231] *Id.* § 4(k)(ii).

[232] *See* Johnson & Johnson Form 10-Q at 24 (May 10, 2006).

275.    For sales of Ethicon sutures and arterial sheaths – as well as other surgical devices, which were manufactured by Cordis Europa NV – J&J suppliers certified in the contracting documents that J&J manufactured the goods in the United States.

276.    The U.S. nexus extended equally to J&J's pharmaceutical contracts.  Like the other Defendants, J&J relied on a globally integrated manufacturing and distribution chain.  For example, since 1988, J&J has manufactured the API for Eprex (20% FOC bribes) exclusively at Ortho Biologics LLC's facility in Manatí, Puerto Rico – even though the manufacturer entities appearing on some of J&J's Eprex contracts with Kimadia were Cilag AG (a J&J subsidiary headquartered in Switzerland) or Vetter Pharma-Fertigung GmbH & Co. KG (a German contract manufacturing partner used by J&J for the aseptic filling and packaging of compounds into medical devices).  J&J filled and packed Eprex syringes – *i.e.*, it placed the medicine manufactured in Puerto Rico into syringes, and then packed those syringes for sale – at a Swiss facility run by Cilag.  However, the more difficult and hard-to-replicate part of the process – the API manufacturing – occurred at the Ortho Biologics LLC plant in Puerto Rico.

277.    Senior J&J managers at its key production facilities in Puerto Rico, on both the device side and the pharmaceuticals side, took part in cross-functional teams with colleagues overseas.  For example, one J&J manager in Puerto Rico with decades of experience in both device and drug manufacturing touted that s/he led "cross-functional," "cross-company," and "international" "teams while at Johnson & Johnson" in support of J&J's manufacturing and sales efforts concerning Eprex, Remicade, Leustatin, and other drugs.

278.    Topamax similarly illustrates J&J's use of its U.S. contacts to make corrupt payments to Jaysh al-Mahdi.  J&J (through Janssen Ortho LLC) manufactures Topamax's API primarily at its facility in Gurabo, Puerto Rico.  Janssen-Cilag used free batches of Topamax –

for which, on information and belief, it made the API in Puerto Rico – as a means of buying off corrupt Sadrist officials at MOH to resolve various disputes with MOH.

279.     As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured goods, the J&J supplier Defendants agreed to procure letters from the U.S. Department of Commerce confirming the goods were manufactured in the United States.  *See supra* ¶ 156.  They further procured evidence of FDA approval for all of their goods sold to Kimadia, including those purportedly sourced from outside the United States.  *See supra* ¶¶ 152-153.

280.     On information and belief, the J&J supplier Defendants consummated their transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 124-127.

> **D.**     **The Pfizer Defendants**

> **1.**     **Pfizer Made Corrupt Payments to Jaysh al-Mahdi Members**

281.     The Pfizer *supplier* Defendants – companies that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – are Defendants Pfizer Inc.; Wyeth Pharmaceuticals Inc. (a former Wyeth subsidiary responsible for certain legacy Wyeth drugs); and Pfizer Enterprises SARL.  The Pfizer *manufacturer* Defendants – companies that manufactured drugs used to bribe Jaysh al-Mahdi agents – are Pfizer Pharmaceuticals LLC and Pharmacia & Upjohn Company, LLC.

282.     Two of the Pfizer supplier Defendants registered to do business with MOH in mid-2006, after Jaysh al-Mahdi had cemented its control over the Ministry.  Wyeth Pharmaceutical Inc. registered with MOH on March 2, 2006, and Pfizer Inc. registered with MOH on September 28, 2006.  Defendant Pfizer Pharmaceuticals LLC registered (or

re-registered)[233] on August 20, 2009, and another Puerto Rico-based legacy-Wyeth

manufacturer, Wyeth-Ayerst Lederle, Inc., registered (or re-registered) on October 30, 2008.  On

each occasion, the registering company submitted registration documents in person to the MOH

Technical Department.  On information and belief, obtaining these registrations involved corrupt

payments to Jaysh al-Mahdi agents inside MOH, including those who controlled the Technical

Department.  *See supra* ¶¶ 147-151.

283.    From 2005 through the present, Kimadia awarded Pfizer at least 71 contracts

relating to various Pfizer drugs.  During this time, Pfizer sold many U.S.-manufactured drugs to

MOH including, but not limited to:  BeneFix (API made in Andover, Massachusetts); Depo-

Provera (API made in Kalamazoo, Michigan); Neurontin (API made in Vega Baja, Puerto Rico);

Campto (API made in Kalamazoo, Michigan); Prostin (API made in Kalamazoo, Michigan); and

Solu-Medrol (API made in Kalamazoo, Michigan).  On information and belief, Pfizer secured

some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least

20%.  *See supra* Part III.B.2.  Moreover, during the period when Jaysh al-Mahdi's control of

MOH was at its apex from 2004-2008, Kimadia awarded at least 17 drug contracts to Pfizer.

284.    From 2004-2013, Pfizer made corrupt payments to Jaysh al-Mahdi agents.

Plaintiffs set forth below examples of Pfizer's corrupt transactions (which discovery will

supplement, *see supra* ¶ 190), on a drug-by-drug basis:

---

[233] MOH regulations provide that a registration is effective for five years, which requires companies to re-register with the Ministry every five years.  On information and belief, the registrations above were *re-registrations*, and the manufacturers were actually registered as early as 2003 and 2004.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| BeneFix 250 (08-H00-004) | Wyeth Pharmaceuticals Inc.[234] | Wyeth Farma, S.A.[235] | 5-29-2005 | 40/2006/287 | 10% |
| BeneFix 500 (08-H00-005) | Wyeth Pharmaceuticals Inc. | Wyeth Farma, S.A. | 5-29-2005 | 40/2006/683 | 10% |
| Campto (15-E00-002) | Pfizer Inc.[236] | Pfizer (Perth) Pty Limited | 7-25-2005 | TBD | 60% |
| Depo-Provera (06-F00-017) | Pfizer Enterprises SARL | Pharmacia & Upjohn Company, LLC | 2007 or earlier | 40/2007/503 | 20% |
| Neurontin (04-J00-053) | Pfizer Inc. | Pfizer Pharmaceuticals LLC | 2006 or earlier | 40/2006/428 | 50% |
| Solu-Medrol (15-AF0-019) (15-AF0-020) | Pfizer Enterprises SARL | Pfizer Manufacturing Belgium N.V. | 2005 or earlier | 40/2005/402 | 10% |
| Xyntha (08-H00-008) | Wyeth Pharmaceuticals Inc. / Pfizer Enterprises SARL | Wyeth Farma, S.A. | 5-29-2005 | 40/2006/683 | 5% |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 191).

285.    On information and belief, the applicable Pfizer Defendants made corrupt payments in connection with their contracts for each drug on an annual basis – similar to the percentages listed on the chart – beginning the year after the drug was placed on the formulary

---

[234] On information and belief, Wyeth Pharmaceuticals Inc. acted as the supplier for BeneFix until after Pfizer's acquisition of Wyeth in 2009.  In 2010, Pfizer Gulf FZ-LLC, a Pfizer subsidiary based in Dubai, began acting as the supplier.  Similarly, on information and belief, Wyeth Pharmaceuticals Inc. acted as the supplier for Xyntha until 2010, when Pfizer Enterprises SARL took over the role.

[235] Pfizer identified Wyeth Farma, S.A. (a Spanish entity) as the manufacturer on at least some BeneFix contracts, possibly because Pfizer filled BeneFix into syringes and packaged the drugs for sale in Spain.  But Pfizer manufactured the API in the United States and certified to Kimadia that it was doing so.  Here (and for the other Defendants as well), where Plaintiffs have obtained reliable information from Kimadia's records depicting the manufacturer as listed on the contracts, Plaintiffs list that manufacturer in the chart.  But where Kimadia records do not reliably identify a manufacturing entity, Plaintiffs list the entity that appears to have manufactured the active pharmaceutical ingredient of the drug in question.  *See also supra* ¶ 191.

[236] For the drugs on this chart for which "Pfizer Inc." is listed as the supplier, the supplying company that appears in published MOH award tables is "Pfizer (USA)."  On information and belief, those entries appear to refer to Pfizer Inc., which registered as a corporate entity doing business with Kimadia on September 28, 2006, and which is a U.S.-based legacy-Pfizer company that acted as a supplier vis-à-vis MOH.

and continuing through the present.  That allegation is based on the facts that:  (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" payment that Pfizer made in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year.  Based on that historical practice, if a company paid "free goods" of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq.  Pfizer made those corrupt payments by using FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof.  The Pfizer supplier Defendants also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

286.    Pfizer also used U.S.-manufactured drugs to make Off-the-Books Payoffs to Jaysh al-Mahdi agents.  For example, a Kimadia document memorialized Wyeth Pharmaceuticals Inc.'s provision in 2006 or 2007 of 10,000 units of BeneFix 500 IU to Kimadia without any associated Contract or Order Number.  Because such Off-the-Books Payoffs were not associated with any ordinary-course contract, they were especially easy for Jaysh al-Mahdi to divert for sale on the black market to finance terrorist activities.

287.    The Pfizer supplier Defendants made corrupt payments acting as agent for (among other affiliates) the Pfizer manufacturer Defendants.  As a condition of selling Pfizer-manufactured goods in Iraq, the Pfizer supplier Defendants had to certify to MOH that the Pfizer manufacturers had authorized them to sell their goods in Iraq.  The Pfizer suppliers also had to certify they were selling devices on behalf of those manufacturers and that those devices were manufactured by each identified Pfizer manufacturer.  Based on these facts, and the Iraqi regulations governing the tender process, the Pfizer manufacturer Defendants exercised control

over the Pfizer supplier Defendants with respect to the corrupt transactions executed by the latter. *See supra* ¶ 157.

288. The Pfizer manufacturer Defendants actively participated in the corrupt transactions with Jaysh al-Mahdi, including by: (a) manufacturing drugs that they knew or recklessly disregarded were being used by their affiliates to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming the Pfizer supplier Defendants' authority to negotiate and execute corrupt contracts on their behalf.

289. BeneFix illustrates how Pfizer's corrupt transactions worked. BeneFix is an integrated system containing both medicine and devices designed to treat hemophilia, and it historically generated more than $600 million annually in worldwide revenues for Pfizer and Wyeth. BeneFix was placed on the Iraqi formulary on May 29, 2005, and Wyeth's corrupt BeneFix transactions began around that time. Wyeth's, and later Pfizer's, corrupt transactions relating to its BeneFix contracts delivered substantial monetary value to Jaysh al-Mahdi agents. Given BeneFix's sales price to MOH of more than $350 per pack, and that Pfizer generally sold more than 10,000 units of BeneFix per year to MOH, Pfizer's "free goods" bribes on BeneFix alone likely provided Jaysh al-Mahdi with millions of dollars in value. For example, Pfizer's 2006-2007 Off-the-Books Payoff of 10,000 BeneFix packs was (based on the 2010 tender price of $373 per pack) worth roughly $3.7 million. In addition to the 2006-2007 Off-the-Books Payoff of BeneFix, Pfizer also secured at least four contracts for the sale of BeneFix during the period from 2004 through 2008, when high-dollar contracts were virtually impossible to obtain without corrupt payments to Jaysh al-Mahdi agents.

290.    Pfizer's BeneFix-related bribes to Jaysh al-Mahdi involved the provision of free medical devices in addition to free medicines.  With respect to the medicines aspect, BeneFix consisted of recombinant coagulation Factor IX, a biotech drug.  With respect to the devices aspect, the European Medicines Agency has determined that each BeneFix pack contained at least six different medical devices or supplies in addition to the medicine itself.[237]  On information and belief, Pfizer included such devices in its BeneFix packs to make it easier to sell BeneFix.  Pfizer's provision of free medical devices as part of the free BeneFix packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize BeneFix on the black market.

291.    On information and belief, given the size of Pfizer's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, Pfizer's corrupt payments (including "commissions" and "free goods") delivered several million dollars per year in total value to Jaysh al-Mahdi.

## 2.    Pfizer's Corrupt Transactions with MOH Comport with Its Historical Sales Practices in International Markets

292.    The Pfizer Defendants have a history of making corrupt payments – including through the delivery of "free goods" – to grow demand for their products.  In the August 2012 Deferred Prosecution Agreement identified above (*supra* ¶ 141), for example, Pfizer admitted that it had paid in-kind kickbacks and had tried to conceal them as mere "discounts."  More generally, Pfizer admitted that, "for the purpose of improperly influencing foreign officials in connection with regulatory and formulary approvals, purchase decisions, prescription decisions, and customs clearance," Pfizer entities had "made and authorized the making of payments of

---

[237] European Medicines Agency, *BeneFix Annex I:  Summary of Product Characteristics* at 32, http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000139/WC500020390.pdf.

cash and the provision of other things of value both directly and through third parties."[238]  For example, Pfizer admitted to a "bonuses" scheme in Croatia "to corruptly influence the . . . inclusion of pharmaceutical products in tenders or on formulary lists."[239]  This scheme involved Pfizer's provision of "equipment, free pharmaceutical products, as well as cash payments."[240]

293.    Wyeth likewise has a history of corrupt international payments.  According to the SEC, between 2005 and 2010, subsidiaries of Wyeth LLC paid improper bribes and kickbacks in several international markets – including Saudi Arabia, Pakistan, Indonesia, and China.[241]  At least some of those bribes took the form of in-kind payments much like the "free goods" at issue here:  in Wyeth's Indonesian operations, for example, employees paid kickbacks to doctors in the form of free "Wyeth nutritional products."[242]  The SEC also alleged that Wyeth subsidiaries in the above markets paid a litany of other bribes to foreign health officials, including the provision of "cash payments, . . . BlackBerrys, cell phones," "travel [bribes and payments for] office equipment and renovations."[243]  On information and belief, Pfizer Inc. became aware of those bribes close in time to its acquisition of Wyeth, LLC in October 2009.

294.    A 2013 presentation by a former Wyeth executive who served as Wyeth's Managing Director for the Middle East & North Africa region from 2004-2009 further suggests that Wyeth understood how "free goods" provided to Middle Eastern government customers were a form of corrupt payment.  In the presentation, the former Wyeth Managing Director acknowledged that "[m]ost [p]hysicians [in the Middle East] are somehow affiliated with the

---

[238] *Pfizer DPA* ¶ 16.

[239] *Id.* ¶ 26.

[240] *Id.* ¶ 27.

[241] Compl. ¶ 2, *SEC v. Wyeth LLC*, No. 12-cv-01304 (D.D.C. filed Aug. 7, 2012), ECF No. 1.

[242] *Id.* ¶ 16.

[243] *Id.* ¶¶ 16, 20.

government" and that the practice of providing such doctors with "[e]xcessive bonus goods" was one of the "Prevailing Compliance Challenges" for doing business in the Middle East.

295.     Pfizer's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq.  Pfizer continued to make corrupt payments to Kimadia officials in connection with U.S.-drug contracts in the five years since Pfizer settled its FCPA allegations in 2012, at which point it purported to have a global compliance program that would prevent such behavior in the future.[244]  Among other such corrupt payments, Pfizer provided a "free goods" bribe on Xyntha in 2017 (27,666 units FOC); a 14% "free goods" bribe on BeneFix in 2016; a 60% "free goods" bribe on Campto in 2016; and a 10% "free goods" bribe on Solu-Medrol in 2014.

### 3.    Pfizer's Corrupt Transactions Had a Substantial Nexus with the United States

296.     Pfizer employs a centralized, top-down business model that consolidates significant control over global operations in its New York headquarters.  That model dates to an orchestrated plan of consolidation that Pfizer executed in the late 1990s.  As recounted in a Pfizer yearbook distributed to its employees on the company's 150th anniversary (with a cover letter from Pfizer's then-CEO), Pfizer decided in the 1990s that "unifying" domestic and international sales would serve "the best interests of the company."[245]  Thus, at the end of 1996, Pfizer "initiated a major reorganization . . . calculated to abolish whatever remained of the wall between domestic and international operations."[246]  Pfizer has since espoused the virtues of its

---

[244] *Pfizer DPA* ¶ 4.

[245] Jeffrey L. Rodgengen, *The Legend of Pfizer* at 137, Ft. Lauderdale, FL: Write Stuff Syndicate, Inc. (1999).

[246] *Id.*

top-down model by using phrases such as a "'One Pfizer' strategy,"[247] "obliterat[ing] vertical hierarchies,"[248] and "frequently crossing organizational and geographic boundaries"[249] to describe its global operations.

297.     At all relevant times, Pfizer's anti-corruption policies were designed and implemented by the Legal and Compliance Groups in New York.  Pfizer's senior executives also have inserted themselves into international corruption issues.  A former Pfizer CEO, who served from 2001-2006, claimed to have personally intervened with foreign heads of state to address alleged product-diversion issues.  He wrote, "I tell [heads of state] that if we start a program and that program is failing because of diversion of product by corrupt officials for their own profit, I will shut the program down and I will tell the world specifically why I shut it down."[250]

298.     Global sales and portfolio management functions for Pfizer brands – including brands sold in the Middle East – were likewise directed by senior marketing personnel located in New York.  For example, an Executive Director at Wyeth Pharmaceuticals and later Pfizer from 2007-2011 explained that s/he had a "Global Strategy" role and was "[r]esponsible for all global brand management strategic activities" for BeneFix (10% FOC bribes) and Xyntha (5% FOC bribes).  Another Pfizer employee similarly wrote that, in Pfizer's Established Products Division, "Global Brand Directors" at Pfizer's New York headquarters were responsible for the "Anti-Fungal portfolio (Vfend, Ecalta/Eraxis and Diflucan) in the Global Established Products Division," and so directed "global strategies and tactics" as part of "cross functional teams

---

[247] Paul Thomas, *Pfizer Moving from Centralized to Holistic Supply Chain Security*, Pharm. Mfg. (Feb. 14, 2012).

[248] John Simons, *King of the Pill:  Pfizer Is the Biggest Drug Company Ever. Can It Become the Best?*, Fortune (Apr. 14, 2003).

[249] Pfizer Inc., *The Blue Book:  Summary of Pfizer Policies on Business Conduct* 23 (2003), http://www.pfizer.com/files/investors/corporate/blue_book_english_international_2017.pdf.

[250] Hank McKinnell, *A Call to Action:  Taking Back Healthcare for Future Generations* 167-68 (McGraw-Hill 2005).

including manufacturing, supply, portfolio management, medical, regulatory and regional colleagues." Another Pfizer Inc. manager located in New York likewise wrote that, from New York, s/he "[a]ctively partnered with in-country Pfizer Marketing and Sales leaders realizing local business objectives" in an array of emerging markets, including the Middle East. On information and belief, Pfizer had such cross-functional teams for the other drugs identified in this Complaint, indicating that U.S.-based personnel were involved in formulating Pfizer's sales strategies for the corrupt transactions that funded Jaysh al-Mahdi in Iraq.

299.     Pfizer Inc. also centralized control over its "corporate responsibility" divisions, which included programs for "donated products" in emerging markets. For example, one New York-based Pfizer manager wrote that, from 1998-2009, s/he "[l]ed operations, contracting, communications, monitoring and evaluation and related policy development of Pfizer's international health programs," which involved "large cross-divisional regulatory (global compliance, dossier registration, API testing, packaging test) and program development teams" focused on moving donated product to needy countries. The employee also worked out of New York "with manufacturing and supply chain divisions to ensure concurrent interactions testing, dossier development and regulatory submissions to emerging markets and developing countries."

300.     Pfizer operated an interconnected, global manufacturing and supply network that facilitated the worldwide distribution of Pfizer drugs. The business unit responsible for distribution is known as Pfizer Global Supply (previously called Pfizer Global Manufacturing), whose nerve center was Pfizer's manufacturing facility in Kalamazoo, Michigan. In 2011, Pfizer claimed that facility was the largest drug-manufacturing plant in the world.[251] From 2003-2008, Pfizer invested roughly $600 million in the Kalamazoo facility to give it the ability to

---

[251] *See* Pfizer in Kalamazoo County 2011, YouTube.com, https://www.youtube.com/watch?v=vrZNRkw-BGI (at 2:05).

manufacture the API for drugs distributed all over the world.[252]  According to Pfizer's VP for Established Products in 2008, the Kalamazoo plant was critical to Pfizer's global operations not only due to its unique technical infrastructure, but also because "there's a long tradition of manufacturing here in Kalamazoo and here on the Kalamazoo site, so manufacturing these hard-to-make products is something we've learned over the years and become very good at."[253]

301.    As Pfizer's head of Global Tender & Contracting Lead for Established Products explained in 2015, Pfizer's approach to international tenders "requires liaison and close coordination with many different functions" throughout the Pfizer corporate hierarchy, including manufacturing (to confirm capacity and cost), finance, pricing, and marketing; "[t]o be able to manage this, [Pfizer] created [a] cross-functional process that involves people from a wide range of areas."[254]  Given Pfizer's centralized structure, the coordination of those various functions likely required the involvement of senior management in New York.  A Pfizer Inc. manager for Emerging Markets and Transition Sites wrote that, while based out of New York in 2007, s/he "[t]ravel[led] extensively in the Asia/Africa/Middle East and South America region with Senior Pfizer Leadership providing financial leadership and council [sic] and conducting operations reviews and operating plan strategy sessions."

302.    Iraqi records indicate that "Pfizer Inc." – the New York-based Pfizer parent company – acted as the supplier on several corrupt drug contracts executed with Kimadia.  *See supra* ¶ 285 & n.236.  Those records comport with how Pfizer structured its integrated supply network, with centralized oversight by the global headquarters in New York.

---

[252] *See* CBS Radio Interview at Pfizer, YouTube.com, https://www.youtube.com/watch?v=zhYtEAeafMk (at 0:28).

[253] *Id.* (at 4:03).

[254] Suzanne Elvidge, *Making Tenders Work Globally:  The Pfizer Approach*, Eye for Pharma (Jan. 28, 2015).

303.    Pfizer was represented in Iraq by a Jordanian sales agent and his/her entity, Mass Marketing & Distribution Co. ("Pfizer Agent 1").  Over email, Pfizer Agent 1 represented himself/herself to Kimadia decisionmakers as acting on behalf of the Pfizer U.S. entities.  For example, in one late 2003 email relating to two pharmaceutical contracts, Pfizer Agent 1 represented that s/he was acting on behalf of "Pfizer – USA."  On information and belief, Pfizer Agent 1 and/or other agents acting on behalf of Pfizer, including Pfizer's scientific bureaus, also represented to Kimadia representatives that they were acting on behalf of "Pfizer USA."  This belief is based on, among other things, the above late 2003 email as well as the frequent references to "Pfizer USA" throughout Kimadia documents prepared by different Kimadia officials, at different times from the 2000s through the present, and in connection with different Pfizer contracts for numerous different Pfizer drugs.

304.    Many of Pfizer's corrupt payments involved U.S.-based manufacturers or facilities.  For example, Pfizer relied on its Kalamazoo site to facilitate sales of Depo-Provera (20% FOC bribes) in Iraq.  Pfizer manufactured Depo-Provera at its Kalamazoo facility, and it used the Kalamazoo facility as part of its global distribution network to sell Depo-Provera in markets around the world.  Kalamazoo-based personnel were involved not only in manufacturing Depo-Provera's API, but also in arranging sales of Depo-Provera (among other drugs) in international markets.  MOH records thus identify the U.S.-based Pharmacia & Upjohn Company as Depo-Provera's manufacturer, and, consistent with Kimadia's standard practice, Pfizer certified to MOH that it was sourcing Depo-Provera from the United States.

305.    Pfizer also relied on its U.S. presence in facilitating Iraq sales of Neurontin, its anticonvulsant drug on which it paid 50% FOC bribes.  Pfizer developed Neurontin at its facility in Ann Arbor, Michigan, and a Pfizer press release touted Neurontin as the "continuing fruits of

Michigan's historic support of innovation."[255]  As for the physical manufacture of Neurontin's API, Pfizer used its facility in Vega Baja, Puerto Rico.  As with the other Defendants that relied heavily on Puerto Rico to manufacture drugs for global distribution, Pfizer sourced Neurontin from Puerto Rico facilities because of Puerto Rico's unique location, status as a U.S. territory, and valuable tax incentives.

306.    Pfizer (and Wyeth before it) likewise used U.S.-based personnel to oversee global marketing and brand-management activities for BeneFix (10% FOC bribes).  Wyeth developed BeneFix at its facility in Andover, Massachusetts, where it also manufactured BeneFix's API. From 2004 through at least 2008, Wyeth exclusively manufactured the API for BeneFix in Andover.  Wyeth used its U.S. facilities, primarily Andover, to oversee BeneFix's global distribution, including by creating a 2004 corporate roadmap contemplating the "central planning of the entire supply chain."[256]  When Pfizer acquired Wyeth in 2009, it continued Wyeth's practice of manufacturing BeneFix in Andover.  Pfizer has called Andover "a crucial part of our global footprint for both clinical and commercial manufacturing."[257]  Today, Pfizer describes the Andover facility as a "vital cog in both Pfizer's WRD and Pfizer's Global Supply network."[258]

307.    Consistent with MOH's standard requirements, Pfizer guaranteed MOH that it manufactured BeneFix at its Andover facility.  For example, in 2010, Pfizer executed a contract

---

[255] Press Release, Pfizer Inc., *Pfizer Inc. Opens $250 Million Technical Development Facility, Latest Investment in Development of New Medicines at Growing Ann Arbor Research Campus* (June 24, 2002), http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=27494.

[256] Allen Jacques (Senior Director, Network Planning for Wyeth Biopharma), *Supply Chain Cycle Time Reduction*, Biopharm Int'l, Vol. 17 Issue 10 (Oct. 1, 2004), http://www.biopharminternational.com/supply-chain-cycle-time-reduction.

[257] Press Release, Pfizer Inc., *Pfizer Breaks Ground on New Biologics Clinical Manufacturing Facility in Andover, Massachusetts* (June 16, 2016), http://www.pfizer.com/news/press-release/press-release-detail/pfizer_breaks_ground_on_new_biologics_clinical_manufacturing_facility_in_andover_massachusetts.

[258] Pfizer Inc., *Andover, Massachusetts Site Statistics*, http://www.pfizer.com/science/research-development/centers/ma_andover (last accessed Sept. 22, 2017).

with Kimadia for the sale of 18,002 packs of BeneFix.  The manufacturing entity was listed as Wyeth Farma S.A., a Pfizer Inc. subsidiary headquartered in Spain (which performed the drug formulation but not the API manufacturing).  In Section 29 of that contract, the Pfizer supplier "guarantee[d] that raw materials used for manufacturing" – *i.e.*, BeneFix's API – "will be prepared in the country of origin (Andover, USA)."[259]  Pfizer made similar guarantees with respect to the other U.S.-manufactured drugs it sold to MOH.

308.    As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured drugs, the Pfizer supplier Defendants agreed to procure letters from the U.S. Department of Commerce confirming the drugs were manufactured in the United States.  *See supra* ¶ 156.  They further procured evidence of FDA approval for all of their drugs sold to Kimadia, including those purportedly sourced from outside the United States.  *See supra* ¶¶ 152-153.

309.    On information and belief, the Pfizer supplier Defendants consummated their transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.  *See supra* ¶¶ 124-127.

   **E.    The Roche Defendants**

      **1.    Roche Made Corrupt Payments to Jaysh al-Mahdi Members**

310.    The Roche *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is F. Hoffmann-La Roche Ltd.  The Roche *manufacturer* Defendants – companies that manufactured drugs used to bribe Jaysh al-Mahdi agents – are Genentech, Inc. and Hoffmann-La Roche Inc.

---

[259] Translated from Arabic.

311.    From 2005 through the present, Kimadia awarded Roche at least 44 contracts for the sale of Roche drugs and devices.  During this time, Roche sold U.S.-manufactured drugs and devices to MOH including, but not limited to:  Herceptin (API made in Vacaville, California); Pegasys (API made in Florence, South Carolina); Rituxan/MabThera (API made in Vacaville, California); Xeloda (API made in Nutley, New Jersey, and Florence, South Carolina); and Avastin (API made in Vacaville, California).  On information and belief, Roche secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commission" of at least 20%.  *See supra* Part III.B.2.  Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 18 drug and/or device contracts to Roche.

312.    From 2004-2013, Roche delivered "free goods" to Jaysh al-Mahdi agents in connection with the sale of some of its most lucrative drugs and devices.  Those corrupt payments concerned contracts negotiated by F. Hoffmann-La Roche Ltd. and involved drugs sourced from several U.S.-based Roche facilities.  Examples, which Plaintiffs have uncovered without discovery of Defendants' files and are merely illustrative, *see supra* ¶ 190, include:

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Avastin 100mg (15-AF0-043) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. / Roche Diagnostics GmbH[260] | 6-11-2006 | TBD | 20% |
| Avastin 400mg (15-AF0-044) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. / Roche Diagnostics GmbH | 6-11-2006 | TBD | 20% |
| Herceptin 440mg (15-AF0-036) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. | 2007 or earlier | 40/2007/137 | 15% |
| MabThera (15-B00-036) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. | 2004 or earlier | 40/2004/899 | 10% |
| Pegasys (15-B00-055) | F. Hoffmann-La Roche Ltd. | Roche Carolina Inc. | 9-11-2005 | 40/2006/359 | 15% |

[260] On information and belief, Genentech, Inc. manufactured the API for Avastin, while Roche Diagnostics GmbH performed the drug formulation.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Xeloda (15-AG0-038) | F. Hoffmann-La Roche Ltd. | Hoffmann-La Roche Inc. | 2006 or earlier | 40/2006/45 | 10% |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 191).

313. On information and belief, Roche made those corrupt payments on an annual basis – in percentages similar to the ones listed on the chart – beginning the year after the drug was placed on the formulary and continuing through the present. That allegation is based on the facts that: (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" bribe that Roche paid in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year. Based on that policy, if a company paid "free goods" of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier started selling that drug in Iraq. Roche made those payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof. F. Hoffmann-La Roche Ltd. also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

314. F. Hoffmann-La Roche Ltd. made corrupt payments acting as agent for (among other affiliates) the Roche manufacturer Defendants. As a condition of selling drugs in Iraq manufactured by those companies, F. Hoffmann-La Roche Ltd. had to certify to MOH that it was authorized to sell those manufacturers' drugs. It also had to certify that it was selling drugs on behalf of those manufacturers and that they had actually manufactured the drugs being supplied. Based on these facts, and the Iraqi regulations governing the tender process, the Roche manufacturer Defendants exercised control over F. Hoffmann-La Roche Ltd. with respect to the corrupt transactions executed by the latter. *See supra* ¶ 157.

133

315.     The Roche manufacturer Defendants actively participated in making corrupt payments to Jaysh al-Mahdi agents, including by:  (a) manufacturing drugs that they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming F. Hoffmann-La Roche Ltd.'s authority to negotiate and execute corrupt contracts on their behalf.

316.     Herceptin illustrates how Roche's corrupt transactions worked.  Herceptin is a blockbuster breast-cancer drug that, between 2006 and 2010, generated at least $2.7 billion per year in worldwide revenue.  Beginning in 2007 or earlier, Roche generally paid "free goods" percentages of 15% on Herceptin contracts obtained from Kimadia.  Those payments delivered significant monetary value to MOH.  Herceptin is extremely expensive:  for a single patient in 2012, "Herceptin's price tag [was] $4,500 a month, or $54,000 a year."[261]  Accordingly, even a comparatively small "free goods" percentage of Herceptin was likely worth at least $100,000.

317.     Roche's corrupt payments relating to sales of its chronic-hepatitis drug Pegasys (15% FOC bribes) involved medical devices as well as drugs.  Such devices, on information and belief, included needles and/or Genentech's Pegasys ProClick™ Autoinjector, which is a "medical device[ ], namely, [an] injector filled with a pharmaceutical."[262]  On information and belief, Roche included such devices in its Pegasys packs to make it easier to sell.  Roche's provision of free medical devices as part of the free Pegasys packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize Pegasys on the black market.

---

[261] Tracy Staton, *FDA Approves Roche's Pricey New Herceptin Partner, Perjeta*, Fierce Pharma (June 11, 2012).

[262] U.S. Pat. & Trademark Off., *Trademark Electronic Search System (TESS)* (Genentech trademark for Pegasys ProClick™ Autoinjector), http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:v4jgoj.2.1.

318.     On information and belief, given the size of Roche's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, Roche's total corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 2.     Roche's Corrupt Transactions with Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets

319.     Roche participated in Oil-for-Food via Roche Agent 1, an employee of Omnitrade.  As the Volcker Commission found, F. Hoffmann-La Roche Ltd. paid at least $296,225 in kickbacks to procure 16 Oil-for-Food contracts from 2000-2003 worth more than $3.5 million.[263]  The Volcker Commission's findings reveal that Roche won the second-largest number of Oil-for-Food contracts (16) among the large Western pharmaceutical companies – trailing only Janssen-Cilag (with 19).[264]  On information and belief, despite that documented evidence of corruption, Roche continued to use Roche Agent 1 (and Omnitrade) to transact with the Sadrist-controlled MOH from late 2004 and onwards, including for the negotiation and execution of contracts for the sale of MabThera on or about December 2005 and Pegasys on or about March 2007.

320.     Roche Diagnostics GmbH, which is listed as a manufacturer on some of Roche's Avastin contracts, has a similar history of making corrupt payments in Iraq.  As the Volcker Commission found, Roche Diagnostics GmbH paid at least $184,618 in kickbacks to procure one Oil-for-Food contract worth roughly $2 million.[265]  Roche Diagnostics Manager 1 was formerly the head of Roche Diagnostics for Iran and the Levant Territory (on information and belief

---

[263] See *Volcker Report*, Table 7, at 63.

[264] See *id.* at 44, 63, 89.

[265] See *id.* at 140.

including Iraq, Syria, Lebanon, and Jordan), and had a business card with an identification as a "Managing Director" at Roche's "Regional Office."  In that capacity, Roche Diagnostics Manager 1 was responsible for Roche Diagnostics' kickbacks to corrupt MOH officials during Oil-for-Food.  One witness who personally met Roche Diagnostics Manager 1 in Amman in 2003 understood that Roche Diagnostics Manager 1 had paid bribes on behalf of Roche during Oil-for-Food.  Nevertheless, Roche Diagnostics Manager 1 was promoted, rather than fired, after Oil-for-Food, and continued to represent Roche vis-à-vis MOH during the years when Jaysh al-Mahdi controlled MOH.

321.    Roche's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq.  Among other corrupt payments during the past five years, Roche paid a 12% free-goods bribe on Herceptin in 2017; a 15% free-goods bribe on Pegasys in 2014; a 10% free-goods bribe on Rituxan/MabThera in 2014; a 20% free-goods bribe on Avastin in 2014; and a 10% free-goods bribe on Tarceva in 2014.

> **3.    Roche's Corrupt Transactions with MOH Had a Substantial Nexus to the United States**

322.    Roche, like the other Defendants, employed a globally integrated distribution model that relied heavily on its U.S. manufacturing capabilities to source and distribute product worldwide.  Genentech, Inc. played a pivotal role in those global distribution capabilities.  When Roche fully acquired Genentech, Inc. in 2009, it took steps to preserve the unique Genentech culture and brand, moving Roche's U.S. headquarters from Nutley, New Jersey, to Genentech's main offices in South San Francisco.  Genentech also maintained its corporate documents – including regulatory, marketing, and sales materials for Genentech drugs – at its headquarters in South San Francisco.

323.    The Nutley facility was shuttered in 2012.  Until its closure, the Nutley facility played a key role in Roche's global distribution capabilities, including with respect to sales of Xeloda, a lucrative chemotherapy drug on which Roche paid 10% "free goods" bribes to the Jaysh al-Mahdi-controlled Ministry.

324.    During the time that Roche's American headquarters were in New Jersey, Roche located key global compliance personnel there, with special responsibility for U.S.-manufactured drugs.  For example, one Compliance Specialist at the New Jersey office wrote that, from 2003-2005, s/he was involved in compliance efforts with respect to "inspections from global regulatory agencies" and "trained [a] global audience on compliant management system" for Roche's products.

325.    From 2005-2009, Roche's top-three selling drugs worldwide – cancer medicines Herceptin, Avastin, and Rituxan (branded in Iraq as MabThera) – were all developed in the United States and manufactured by Genentech in its Vacaville, California facility.  From 2004 through at least 2008, the Vacaville plant served as the exclusive global manufacturer of the API for those blockbuster drugs, which Roche then sent to other facilities in Oregon or Switzerland for "packaging in vials or syringes."[266]  As Genentech's VP for Manufacturing Operations stated, "We're always looking to develop solutions for unmet medical needs – the tough stuff that no one else is doing.  That's why our pharmaceuticals are in such demand.  Our Vacaville operations are a major part of this ongoing process."[267]  Roche built the Vacaville facility specifically to meet the unique manufacturing challenges posed by Genentech's complex biologic drugs like Herceptin.

---

[266] *Genentech Details Big Vacaville Expansion*, North Bay Bus. J. (Nov. 4, 2013), http://www.northbay businessjournal.com/csp/mediapool/sites/NBBJ/IndustryNews/story.csp?cid=4184162&sid=778&fid=181.
[267] *Id.*

326.     On information and belief, Roche was dependent upon Genentech's Vacaville facility for the manufacturing of the API for MabThera (10% free goods) sales to MOH. MabThera is a sophisticated biotech drug the API for which was manufactured exclusively in Genentech's bioreactors in Vacaville for distribution worldwide, and F. Hoffmann-La Roche Ltd. could not have sold MabThera to Iraq without the API manufacturing activity that took place in the United States.  Although one contract for MabThera listed F. Hoffmann-La Roche Ltd. as the manufacturer and identified Switzerland as the country of origin, that meant only that the drug was formulated in Switzerland – the API was still sourced from the United States.

327.     Another biotech drug, Herceptin (15% FOC bribes), required a complex research and manufacturing process.  Since 1998, Genentech, Inc. has manufactured Herceptin's API exclusively at its facility in Vacaville, California.  In 2000, Genentech, Inc. called its Vacaville plant the "world's largest biotechnology manufacturing plant for the large-scale production of pharmaceutical proteins."[268]  According to industry reports, the Vacaville facility played a "major part" of Roche's global distribution chain, "producing more than half of Roche's global output of biologic direct substance products."[269]  After the Vacaville facility manufactured the active ingredient, the substances were frozen and then packaged into vials or syringes at Roche facilities in Hillsboro, Oregon, or near Basel, Switzerland.

328.     In 1998, Roche and Genentech, Inc. (which was at all times majority-owned by Roche) agreed to a licensing arrangement under which Roche attained the exclusive marketing authority to sell Herceptin around the world.  Roche then attained the ability to sell Herceptin directly upon completing its 2009 acquisition of Genentech, Inc.  Roche negotiated and executed

---

[268] Press Release, Genentech, *Genentech's Vacaville Facility Granted FDA Licensure* (Apr. 25, 2000), https://www.gene.com/media/press-releases/4611/2000-04-25/genentechs-vacaville-facility-granted-fd.

[269] *Genentech Details Big Vacaville Expansion*, North Bay Bus. J. (Nov. 4, 2013), http://www.northbaybusinessjournal.com/csp/mediapool/sites/NBBJ/IndustryNews/story.csp?cid=4184162&sid=778&fid=181.

its Herceptin sales contracts in Iraq through F. Hoffmann-La Roche Ltd., which obtained those contracts by paying 15% "free goods" bribes in the form of drugs sourced from the United States. Consistent with Kimadia's standard practice, F. Hoffmann-La Roche Ltd. identified Genentech, Inc. as Herceptin's manufacturer in the contracting documents, and it assured Kimadia that it would source Herceptin from the United States.

329.    Throughout the relevant period, Roche also relied on its manufacturing facilities in Florence, South Carolina, as a key cog in its global distribution network. Whereas the Vacaville facility focused on Roche's blockbuster biotech cancer drugs, the Florence facility (managed by Roche Carolina Inc.) focused on Roche's blockbuster chemical drugs and devices. According to the European Medicines Agency, the Florence facility was the primary manufacturing site for six key Roche drugs or devices, including Pegasys.[270]

330.    Since 2002, Roche has manufactured Pegasys (15% FOC bribes) predominantly at its Florence facility. Roche built that facility using tax credits and technical training programs funded by the City of Florence and the State of South Carolina. Roche selected the Florence facility as a key site to manufacture Pegasys' API "because of a robust infrastructure already in place" at the facility.[271]

331.    As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured drugs, F. Hoffmann-La Roche Ltd. agreed to procure letters from the U.S. Department of Commerce confirming that the drugs were manufactured in the United States. *See supra* ¶ 156. It further procured evidence of FDA approval for all of its drugs sold to

---

[270] European Medicines Agency, Committee for Medicinal Products for Human Use, EMA/568026/2012, at 3 (Sept. 28, 2012).

[271] Kable Intelligence Ltd., *Roche Bulk Active Ingredient Manufacturing Facility, Florence, SC*, http://www.pharmaceutical-technology.com/projects/rochecarolina/ (last accessed July 18, 2017).

Kimadia, including those allegedly sourced from outside the United States.  *See supra* ¶¶ 152-

153.

333.     On information and belief, F. Hoffmann-La Roche Ltd. consummated its

transactions with Kimadia through the New York banking system, by covering Kimadia's

collateral costs in the form of payments wired into New York correspondent accounts.  *See supra*

¶¶ 124-127.

## VI.   JAYSH AL-MAHDI, WITH SUBSTANTIAL SUPPORT FROM HEZBOLLAH, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS

### A.   Beginning In 2003, Jaysh al-Mahdi Conducted A Campaign Of Terror Against Americans In Iraq

333.     Muqtada al-Sadr founded Jaysh al-Mahdi in April 2003 with the assistance of

Imad Mugniyeh, the chief terrorist mind of Hezbollah.  From the beginning, Jaysh al-Mahdi's

publicly stated, primary goal was the expulsion of Americans from Iraq.  In July 2003, Sadr

publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to

fight" the so-called "American and British occupiers."[272]  In a later sermon delivered by an aide

on August 6, 2004, Sadr called America "the greatest of Satans" and proclaimed:  "America is

our enemy and the enemy of the people, and we will not accept its partnership."[273]  And during

Sadr's Friday sermons on March 26, 2004, among other things:

- Sadr praised "[t]he date of September 11th," which he explained "is the date of the collapse of the Two Towers, and therefore is a miracle from God, who never disappoints his servants but allows infidels time before striking them."

- Sadr pledged his fealty to Hezbollah, which he couched in Shi'a Islamic terms such that he was communicating to his followers that support for Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah."

---

[272] Mahan Abedin, *Dossier: The Sadrist Movement*, Middle East Intell. Bull. (July 2003), https://www.meforum.org/meib/articles/0307_iraqd.htm.

[273] Abdul Hussein al-Obeidi, *Rebel Shiite Cleric Blames 'Occupier' for Church Attacks, Kidnappings in Iraq*, Assoc. Press (Aug. 6, 2004).

- Sadr called for violent resistance to, and "jihad" against, the American "occupiers" and "invaders" of Iraq, invoking multiple passages from the Koran to provide a purported religious justification for attacking Americans in Iraq.

334.    Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization.  As Dr. David E. Johnson, a former Army Colonel who has studied Jaysh al-Mahdi's tactics, explained, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated."[274]  The most prominent Jaysh al-Mahdi "Special Group" was known as Asa'ib Ahl al-Haq or "AAH."

335.    Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure.  As two counterterrorism scholars explained in June 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses."[275]  Formally separate Jaysh al-Mahdi cells also shared membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.[276]

336.    Jaysh al-Mahdi cells were also unified ideologically by radical Shi'a ideology, devotion to Sadr, and violent opposition to American presence in Iraq.  According to an unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen

---

[274] David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*"), https://www.rand.org/content/dam/rand/pubs/research_reports/RR100/RR160/RAND_RR160.pdf.

[275] Daveed Gartenstein-Ross & Bill Roggio, *Sadr's Special Groups*, The Weekly Standard (June 9, 2008), http://www.weeklystandard.com/sadrs-special-groups/article/16297.

[276] *See, e.g.*, *2008 Battle of Sadr City* at 25-26.

to MAS," because "[t]here is no one who can replace MAS."[277]  A March 2008 U.S. State

Department cable (as published by *WikiLeaks*) similarly reported that Jaysh al-Mahdi's various

elements "are different faces of the same group controlled by a single hand, who assigns each a

role."[278]  And a U.S. military-intelligence officer told the *Washington Post* in May 2008 that

Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."[279]

337.    Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging

Jaysh al-Mahdi in a conventional military manner, especially in urban settings.  For example,

when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared

underground and hid among civilians while continuing to attack American forces.  Jaysh al-

Mahdi's cellular structure also provided each Jaysh al-Mahdi cell with the tactical agility to

adapt to rapidly changing conditions.  For example, individual Jaysh al-Mahdi cells were able to

react to passing American convoys by setting up roadside bombs quickly without explicitly

seeking permission to do so, safe in the knowledge that they had been given broad authorization

to carry out such strikes against any Americans in Iraq.

338.    From 2003-2007, Jaysh al-Mahdi expanded from a fledgling group concentrated

in Shi'a areas to a terrorist organization with a significant presence throughout Iraq.  What began

as a small group of 300 fighters in April 2003 grew to a terrorist organization of between 6,000

and 10,000 fighters by June 2004 and boasted at least 60,000 fighters by January 2007.  Jaysh al-

Mahdi operated throughout Iraq, with regional command centers in Kirkuk, Diyala, Baghdad,

---

[277] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 010, at 1 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-010-Summary.pdf.

[278] U.S. State Dep't Cable, *PM Chief of Staff Abdallah Tells Ambassador GOI Will Continue Basra Military Operations* (Mar. 31, 2008), https://wikileaks.org/plusd/cables/08BAGHDAD990_a.html.

[279] Amit R. Paley, *U.S. Deploys a Purpose-Driven Distinction*, Wash. Post (May 21, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/05/20/AR2008052001716.html.

Wasit, Hillah, Karbala, Amarah, Basra, Diwaniyah, and Nasiriyah.  Jaysh al-Mahdi maintained

an especially strong presence in the Al Rashid, Karkh, and Kadamiyah Districts of western

Baghdad, all of eastern Baghdad (including the areas in and around Sadr City and Rustamiyah),

Baqubah, Hillah, Najaf, Basra, and Wasit (though its power extended well beyond those areas).

339.    Jaysh al-Mahdi fighters used a variety of tactics and weaponry against Americans

in Iraq.  Distinctive weapons and tactics used by Jaysh al-Mahdi included the following:

340.    **IEDs.**  Improvised explosive devices ("IEDs") are homemade bombs that are

often used as booby traps by terrorist organizations.  Frequently, IEDs are set up as roadside

bombs that terrorists can detonate when a vehicle passes by.  According to a 2013 *New York*

*Times* report, at times IEDs have caused as many as 80% of Coalition casualties in Iraq.[280]  IEDs

were a signature weapon of Jaysh al-Mahdi.  Baghdad, the location of Jaysh al-Mahdi's Sadr

City headquarters, experienced more than 1,500 IED attacks between January 2007 and June

2008.  In raids within Sadr City in 2008, Coalition forces discovered numerous weapons caches

containing IEDs and bomb-making materials.  One specific IED technique reportedly used by

Jaysh al-Mahdi involved "daisy-chains" of multiple 122mm or 155mm artillery shells.

341.    **EFPs.**  Explosively formed penetrators ("EFPs") are an advanced type of IED

with a specially shaped explosive charge designed to penetrate tank armor, which is impervious

to more traditional weapons.  According to a 2013 *New York Times* report, EFPs were the "single

most lethal weapon American forces faced in Iraq."[281]  According to one declassified

CENTCOM study, there were at least 1,534 EFP detonations in Iraq between July 2005 and

---

[280] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.

[281] *Id.*

December 2011, resulting in at least 196 Americans killed in action and at least 861 Americans wounded in action.[282]  Jaysh al-Mahdi typically used EFPs by placing them on public roadways.

342.    The manufacture of EFPs required advanced machinery and copper not widely available in Iraq, as well as advanced engineering know-how.  Hezbollah introduced EFPs to Iraq in 2004 and was the conduit through which Jaysh al-Mahdi acquired the technology to manufacture EFPs.  In 2007 and 2008, Iraqi and Coalition forces discovered EFP factories inside Jaysh al-Mahdi strongholds, including Sadr City, demonstrating that Jaysh al-Mahdi had acquired from Hezbollah the technological capability to produce these deadly devices.

343.    **Mortars.**  A mortar is an artillery-like weapon that fires explosives at short ranges.  Jaysh al-Mahdi frequently used mortars against Americans in Iraq.  Between January 2007 and June 2008, there were more than 1,500 mortar attacks in Baghdad alone.  In raids within the Jaysh al-Mahdi stronghold of Sadr City in October 2008, Iraqi forces discovered numerous weapons caches containing mortars.

344.    **RPGs.**  Jaysh al-Mahdi used rocket-propelled grenades ("RPGs") against Coalition forces on numerous occasions.  In one such attack in May 2007, Jaysh al-Mahdi fighters killed 12 people and wounded another 75.  Iraqi forces discovered numerous weapons caches containing RPGs in raids within Sadr City in October 2008.

345.    **Rockets.**  Jaysh al-Mahdi fired a variety of rockets at Coalition targets on numerous occasions.  For example, Jaysh al-Mahdi operatives used Misagh-1 surface-to-air missiles to destroy at least one American helicopter.  In March 2008, Jaysh al-Mahdi operatives within Sadr City launched coordinated rocket attacks on the International Zone (commonly known as the "Green Zone") in southeast Baghdad, several miles away.  The rockets fired by

---

[282] *See* U.S. Army Central Command, "OIF EFP Detonations by Month," https://admin.govexec.com/media/gbc/docs/pdfs_edit/enclosure_tab_a_document_for_review_%28150813_oif_efp_pull_no_summary%29_%281%29.pdf.

Jaysh al-Mahdi included 107mm rockets, 122mm rockets, and man-portable air-defense systems.[283]  The purpose of those attacks was to terrorize the civilian residents of the Green Zone – including American political and civilian personnel.  The rocket attacks were a key part of the broader Jaysh al-Mahdi terror campaign, as Jaysh al-Mahdi agents boasted about America's alleged inability to protect civilians in the Green Zone.  These attacks prompted Coalition forces to enter Sadr City to deny Jaysh al-Mahdi the ability to fire freely on the civilian Green Zone.  When Coalition forces entered Sadr City – as a direct response to Jaysh al-Mahdi's terrorist attacks on civilians in the Green Zone that were planned and authorized by Hezbollah – they encountered ambushes and traps that Jaysh al-Mahdi had set for them.[284]  Officials estimated that the ensuing violence – all directly caused by Jaysh al-Mahdi's attacks on the Green Zone and often collectively called the "Battle of Sadr City" – killed 925 people and injured 2,605 others.[285]

346.    **Complex Attacks.**  Jaysh al-Mahdi militants frequently carried out so-called "complex attacks" against American peacekeeping forces.  Complex attacks involve multiple teams of terrorists using different weapons and tactics in concert.  In March 2008 for example, a Jaysh al-Mahdi operative explained to journalists that, to attack a vehicle, one group of Jaysh al-Mahdi militants would attack it with a barrage of small-arms fire to distract the soldiers while another group of Jaysh al-Mahdi militants planted an IED underneath the vehicle.[286]  In another attack type that several Plaintiffs personally witnessed, Jaysh al-Mahdi detonated EFPs and followed up by immediately attacking the disoriented victims with small-arms fire.

---

[283] *See 2008 Battle of Sadr City* at 38, 41, 57.

[284] *See id.* at 19-24, 59-60; *see also* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

[285] *See 2008 Battle of Sadr City* at 98.

[286] *See* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

### B.      Jaysh al-Mahdi Was A Terrorist Enterprise

347.      Jaysh al-Mahdi was not a military force; rather, as the Pentagon's press service recognized, it acted as "the Jaysh al-Mahdi terrorist organization."[287]  General George Casey, who served as Commanding General of the Multi-National Force in Iraq from 2004-2007, described Jaysh al-Mahdi in a 2006 U.S. State Department cable (as published by *WikiLeaks*) as "[t]errorists and killers murdering innocent people."[288]  Members of both parties in Congress have also publicly recognized Jaysh al-Mahdi as a terrorist organization.[289]  Although Jaysh al-Mahdi is sometimes also called a "militia" in the colloquial sense – a term Plaintiffs sometimes use in this Complaint – it was not a legal "militia" under Iraqi law.  Indeed, as one Iraqi military officer put it:  "Mahdi Army!  They're not an army! . . . They're a bunch of looters."[290]  A U.S. commander concurred that Jaysh al-Mahdi's unlawful violent tactics made it a "mob with a lot of weapons" rather than a legitimate military force.[291]

348.      Jaysh al-Mahdi's campaign of terror against Americans differed from conventional military conflicts in important ways:

- Unlike a conventional military force, Jaysh al-Mahdi was supported and directed by an international terrorist organization, Hezbollah, whose aim was to inflict mass casualties on Americans in Iraq and around the world.  *See infra* Part VI.C.

- Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror did not take place during a declared war:  Coalition forces ousted Saddam Hussein in April 2003 and remained in Iraq only to help the country rebuild its government.

- Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror was not limited by geography or time.  Although this lawsuit focuses on violence within Iraq,

---

[287] U.S. Dep't of Def., *Forces Arrest Terrorism Suspects in Iraq*, Am. Forces Press Serv. (Nov. 13, 2009), http://archive.defense.gov/news/newsarticle.aspx?id=56680.

[288] U.S. State Dep't Cable, *MCNS Discusses Militia Death Squads, Recent Military Operations* (Mar. 25, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD981_a.html.

[289] *See* 152 Cong. Rec. H8581 (daily ed. Nov. 13, 2006) (statement of Rep. Ted Poe); 153 Cong. Rec. S1670 (daily ed. Feb. 7, 2007) (statement of Sen. Frank Lautenberg).

[290] Karl Vick & Sewell Chan, *Violence in Sadr City Embitters Both Sides*, Wash. Post (Apr. 6, 2004).

[291] *Id.*

Jaysh al-Mahdi fighters have fought with Hezbollah in Lebanon as well.[292]  Similarly, although this lawsuit focuses on violence from 2005-2009, Jaysh al-Mahdi's campaign of terror against Americans in Iraq has continued indefinitely.  In July 2016, Sadr announced that his militias would once again target U.S. forces after the battle against ISIS is over.  As Sadr described his goal in a May 2015 speech:  "If America persists then it will cease to exist."[293]

- Unlike in conventional military conflicts, Jaysh al-Mahdi did not simply engage in combat against a single defined enemy or enemies, but rather engaged in calculated sectarian violence designed to sow instability and undermine the legitimacy of the democratic government (and thus undermine U.S. objectives in Iraq).  As the Department of Defense observed in 2006, Jaysh al-Mahdi "replaced al-Qaeda in Iraq as the most dangerous accelerant of potentially self-sustaining sectarian violence in Iraq."[294]

- Unlike in the 2006 Israel-Lebanon conflict (even assuming that should be classified as a military conflict), Jaysh al-Mahdi engaged in violence against the very government whose ministries it controlled.  Jaysh al-Mahdi never declared "war" on the Iraqi government, and the Sadrists never formally seceded from the Iraqi government; rather, they engaged in a terrorist campaign in part against the U.S.-supported Iraqi government in an effort to cement their own power and coerce policy changes.

349.    Following the return of sovereignty to the Iraqi government in July 2004,

Coalition forces – including the U.S. military units of which many Plaintiffs were a part –

functioned primarily not as combat forces but as stabilization forces aiding the Iraqi government

in rebuilding the country's civil institutions.  As then-U.S. Secretary Colin Powell explained in

connection with U.N. Resolution 1546, which authorized the creation of the Multi-National

Force in Iraq ("MNF-I"), the "goal" of the military presence in Iraq was "to help the Iraqi people

to complete the political transition" and "permit the United Nations and the international

---

[292] For example, according to intelligence sources cited in a July 2006 U.S. State Department cable (as published by *WikiLeaks*), "a JAM campaign to recruit fighters for service in Lebanon has kicked into high gear. Recruitment of females is said to be a high priority, although it is not known in what capacity they would be employed.  Hazim Al-Araji, a JAM member with high-ranking relatives in Hezbollah, is reportedly in charge of the drive."  U.S. State Dep't Cable, *Iraqi Reaction to Israel-Lebanon Situation* (July 20, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD2591_a.html.

[293] Charlie Bayliss, *Top Muslim Cleric Tells His Followers to Attack Troops Who are at War with Islamic State*, Daily Express (July 19, 2016), http://www.express.co.uk/news/world/690810/muslim-cleric-attack-us-troops-war-isis.

[294] Dep't of Def., *Measuring Stability & Security in Iraq* 19 (Nov. 30, 2006).

community to work to facilitate Iraq's reconstruction."[295]  This mission required U.S. troops to "participate in the provision of humanitarian assistance, civil affairs support, and relief and reconstruction assistance."[296]  Governance, economics, capacity building, and rule of law became major lines of effort for the U.S. military's stability operations, and U.S. troops cooperated with civilians and local officials in their day-to-day efforts to facilitate Iraqi reconstruction.  The U.S. military also worked regularly in hybrid teams involving civilian members of the U.S. government, including from the State Department.

350.    Jaysh al-Mahdi sought to undermine U.S. reconstruction efforts by terrorizing the population, killing Sunni civilians, and commandeering the instruments of local government. The U.S. military thus had to fight Jaysh al-Mahdi in an effort to prevent it from derailing the United States' broader project of civilian reconstruction in Iraq.

351.    As a terrorist organization, Jaysh al-Mahdi routinely committed acts that would violate the law of war, sometimes referred to as international humanitarian law, if Jaysh al-Mahdi were subject to that law.  For example, they attacked from mosques in their initial assault on American and Coalition forces in April 2004 in Najaf, and again in Baghdad in 2007 and 2008 after the "surge" of U.S. forces.  In August 2004, Sadr was accused of violating the law of war by using a holy site, the Shrine of Imam Ali, as a headquarters from which to launch attacks. Jaysh al-Mahdi also used weapons in a manner that could kill indiscriminately and thus violate the law of war.  For example, Jaysh al-Mahdi used EFPs that included passive infrared sensors that would be triggered by any nearby movement (including by civilians).  On many occasions, those EFPs killed and injured civilians.  Jaysh al-Mahdi also used children to attack Coalition

---

[295] Letter from Colin L. Powell, U.S. Sec'y, to Lauro L. Baja, Jr., President of the U.N. Sec. Council (June 7, 2004), http://www.un.org/News/dh/iraq/draft-iraq-res-7jun04.pdf.

[296] *Id.*

forces and attempted to provoke Americans into killing Iraqi children.  Jaysh al-Mahdi further

put bounties on U.S. medics, and Jaysh al-Mahdi fighters specifically targeted medics during

ambushes and other firefights.  Jaysh al-Mahdi also massacred thousands of civilians in Iraq.

352.    Jaysh al-Mahdi did not follow the required practices of a military force.  Although

its members commonly dressed in all-black garb for propaganda purposes (particularly during

public demonstrations, and in and around MOH), they rarely wore uniforms while staging

attacks on Americans.  Their civilian garb allowed them to camouflage their presence and blend

in with civilians to avoid counter-attacks from U.S. forces.  They also infiltrated the Iraqi Police

and wore police uniforms to disguise their presence while committing attacks.  Jaysh al-Mahdi

members routinely attacked Americans in Iraq (both civilian and military) without wearing a

fixed distinctive sign recognizable at a distance and without carrying their arms openly.

Moreover, on direct orders from Muqtada al-Sadr, Jaysh al-Mahdi terrorists did not distinguish

between uniformed American military personnel and American civilians – Jaysh al-Mahdi

considered both illegitimate and so attacked both indiscriminately.

353.    Jaysh al-Mahdi combined violations of the law of war with street crimes,

engaging in ethnic-cleansing massacres of Sunnis at roadside checkpoints and in neighborhood

sweeps; fighters also stole victims' property, including cars and homes.  In May 2008, Iraqis in

Baghdad accused Jaysh al-Mahdi members of robbery, kidnapping for ransom, rape, and murder.

354.    At all times relevant to this Complaint, Defendants knew that Jaysh al-Mahdi was

a violent, anti-American terrorist organization that was massacring both American soldiers and

American and Iraqi civilians.  They knew this not only because it was common knowledge on

the Iraqi street – a common understanding of which Defendants' local Iraqi agents were aware – but also because it was widely reported both by the U.S. government and in the Western press.[297]

355.    Notwithstanding Jaysh al-Mahdi's frequent attacks against Americans in Iraq, the Secretary of State did not officially designate Jaysh al-Mahdi as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189.  That decision reflected a concern among some U.S. policymakers about the best way to influence Sadr, who wielded significant political clout as an Iraqi kingmaker and enjoyed a cult-like following among millions of Iraqi Shi'a.  Sadr's power over certain elements of the Iraqi government led some U.S. policymakers to caution against overly antagonizing his followers, which led the U.S. government to refrain from formally designating Jaysh al-Mahdi as an FTO.  This was primarily a strategic diplomatic decision geared at preserving flexibility for members of the U.S. government to engage with the Sadrists if and when doing so would serve the national interest (something an FTO designation could have inhibited).  It was not intended to signal the U.S. government's approval of the Sadrists' activities, nor was it intended to allow private companies to deliver support to Jaysh al-Mahdi.  Indeed, the diplomatic decision to refrain from designating Jaysh al-Mahdi as an FTO (which allowed U.S. officials to engage with the Sadrists when necessary) is not inconsistent with the reality that Jaysh al-Mahdi acted and functioned as a terrorist group.  Plaintiffs' claims hinge on the latter point; they expressly disclaim any challenge to the former.

---

[297] *See, e.g.*, Dep't of Def., *Measuring Stability & Security in Iraq* 19 (Nov. 30, 2006) (Jaysh al-Mahdi "replaced al-Qaeda in Iraq as the most dangerous accelerant of potentially self-sustaining sectarian violence in Iraq"); *id.* at 20 ("Attacks on the Sunni population by JAM . . . contribute to Sunni concerns about persecution."); Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006) (noting that hospital "patients are being murdered" by Jaysh al-Mahdi, which was "keeping hostages inside some hospitals"); Karl Vick & Sewell Chan, *Violence in Sadr City Embitters Both Sides*, Wash. Post (Apr. 6, 2004) (describing confrontations between Jaysh al-Mahdi and U.S. forces; U.S. commander calling Jaysh al-Mahdi a "mob with a lot of weapons").

356.     The U.S. strategy of preserving the option of diplomatically engaging with the

Sadrists depended on simultaneously degrading Jaysh al-Mahdi's infrastructure and undermining

its ability to mount terrorist attacks.  That strategy partially succeeded by mid-2008 after

Coalition forces had dealt Jaysh al-Mahdi heavy losses in Basra and in the Battle of Sadr City,

which pressured Muqtada al-Sadr into turning toward the political process.  But Defendants'

conduct – by supplying Jaysh al-Mahdi with corrupt resources it could use to attack Americans –

undermined that strategy by bolstering Jaysh al-Mahdi's capacity to mount terrorist attacks and

correspondingly reducing the Sadrists' incentives to engage in legitimate political activity.

### C.      Hezbollah Created, Armed, And Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans

357.     Jaysh al-Mahdi's campaign of terror against Americans and Sunni Iraqis could

not have occurred without the planning and authorization provided by Hezbollah, a Lebanese-

based Shi'a terrorist organization that orchestrates terror attacks against Americans around the

world on behalf of Iran.  Richard Armitage, the Deputy Secretary of State under President

George W. Bush, has described Hezbollah as "the 'A-Team of Terrorists,' "[298] and former CIA

director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable

organization."[299]  Hezbollah's chief terrorist mastermind, Imad Mugniyeh, helped Sadr found

Jaysh al-Mahdi to inflict "mass casualties" on Americans in Iraq and recruited many of its first

---

[298] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003), http://www.cbsnews.com/news/hezbollah-a-team-of-terrorists/.

[299] Statement of Hon. George J. Tenet, *Current and Future Worldwide Threats to the National Security of the United States:  Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003), http://www.gpo.gov/fdsys/pkg/CHRG-108shrg91721/pdf/CHRG-108shrg91721.pdf.

members; Hezbollah has since orchestrated Jaysh al-Mahdi's campaign of terror against Americans in Iraq.[300]

> 1. **Hezbollah Has Orchestrated Campaigns of Terror Against Americans Across the Globe**

358.    Hezbollah's geographic power base is in Lebanon, where it operates a parallel shadow government and provides some social services: as of 2004, Hezbollah operated three hospitals, 12 health centers, 20 infirmaries, and 20 dental clinics within Lebanon.[301]  Hezbollah has used its control of government healthcare services to create patronage relationships with Lebanon's citizens.  As Hezbollah's 1985 manifesto explains, "our military apparatus is not separate from our overall social fabric.  Each of us is a fighting soldier."[302]  American Brigadier General Alexus Grynkewich has called this means of terrorist financing "welfare as warfare."[303]

359.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[304]  Hezbollah also frequently functions as a terrorist proxy for Iran, committing and orchestrating terrorist attacks abroad with Iran's support. Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that

---

[300] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[301] *See* Shawn Teresa Flanigan & Mounah Abdel-Samad, *Hezbollah's Social Jihad: Nonprofits as Resistance Organizations*, Middle East Policy Council (2009), http://www.mepc.org/hezbollahs-social-jihad-nonprofits-resistance-organizations.

[302] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East: A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[303] *See* Alexus Grynkewich, *Welfare as Warfare: How Violent Non-State Groups Use Social Services to Attack the State*, 31 Stud. in Conflict & Terrorism 350 (2008).

[304] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015), http://www.timesofisrael.com/liveblog_entry/nasrallah-proud-that-pm-obama-discussed-hezbollah/; Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015), http://www.jpost.com/Arab-Israeli-Conflict/Nasrallah-praises-wave-of-terror-against-Israelis-432734.

"Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[305]  In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[306]

360.   Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[307] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

361.   Hezbollah raises money for its terrorist activities by engaging in criminal activities around the world.  It is especially adept at raising money on the black market by selling and smuggling pharmaceuticals.  According to Boaz Ganor of the International Institute for Counterterrorism, "the most senior echelons of Hezbollah are involved in this criminal activity."[308]

---

[305] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[306] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006), http://www.camera.org/index.asp?x_context= 7&x_issue=11&x_article=1158.

[307] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003), https://www.aclu.org/files/ fbimappingfoia/20111110/ACLURM001616.pdf.

[308] Boaz Ganor & Miri Halperin Wernli, *The Infiltration of Terrorist Organizations Into the Pharmaceutical Industry: Hezbollah as a Case Study*, 36 Stud. in Conflict & Terrorism 699, 703 (2013).

362.     Defendants themselves were aware of Hezbollah's pharmaceutical smuggling operations.  In April 2009, representatives from Pfizer, J&J, and other pharmaceutical companies attended a conference in Nigeria on the risks posed by international pharmaceutical smuggling by terrorist groups.  According to an April 2009 U.S. State Department cable (as published by *WikiLeaks*), attendees were cautioned about "Lebanese networks that ship drugs and counterfeit meds from Latin America and Asia into and through Nigeria" and warned that "Hezbollah and Hamas are involved in smuggling drugs, counterfeit medicines and weapons into and out of Nigeria."[309]  Two years later, in November 2011, Pfizer's Chief Security Officer testified before Congress that "[p]harmaceutical counterfeiting is a low risk, high profit criminal activity that has attracted drug traffickers, fire arms smugglers, and terrorists" and noted the "indictment of 19 people who gave a portion of their profits from the sale of counterfeit Viagra to Hezbollah."[310]

363.     In 1997, then-U.S. Secretary of State Madeleine Albright designated Hezbollah an FTO pursuant to 8 U.S.C. § 1189.  That designation has remained in place ever since.

## 2.      Hezbollah Co-Founded Jaysh al-Mahdi with Sadr To Carry Out a Campaign of Terror Against Americans in Iraq

364.     In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Muqtada al-Sadr found Jaysh al-Mahdi.  Hezbollah's goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass casualties" on Americans.[311]  A U.S. Special Operations task force report quoted by the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that

---

[309] U.S. State Dep't Cable, *Nigeria:  Counterfeit Meds Enforcement Training in Lagos* (Apr. 30, 2009), https://wikileaks.org/plusd/cables/09ABUJA746_a.html.

[310] Testimony of John P. Clark, *Stop Online Piracy Act:  Hearing Before the H. Comm. on the Judiciary*, 112th Cong. 61 (Nov. 16, 2011), https://judiciary.house.gov/_files/hearings/printers/112th/112-154_71240.PDF.

[311] Edward T. Pound, *Special Report:  The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

the struggle in Iraq is the new battleground in the fight against the U.S."[312]  As one embedded

war correspondent put it, Jaysh al-Mahdi was created to be "the Iraqi branch of Hezbollah."[313]

365.   Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq.  In addition

to being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and

sharing Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah

and Iran.  Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-

Sadr's uncle, Baqir al-Sadr.  Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor

in Lebanon.  A 2004 U.S. military-intelligence report (as quoted in *U.S. News & World Report*)

concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of Hezbollah, and

that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf.[314]  Sadr himself

visited Tehran and Beirut on numerous occasions.  And, in 2016, Nasrallah personally brokered

talks between Sadr and the Iraqi government.[315]

366.   Hezbollah's role in Jaysh al-Mahdi's activities was similar to its role in other

terror campaigns it sponsored:  Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi

terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf.  Hezbollah

Secretary-General Hassan Nasrallah was deeply involved in Jaysh al-Mahdi's campaign of

terror, reportedly spending "several hours daily dealing with 'the situation in Iraq.'"[316]

---

[312] *Id.*

[313] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J. (Aug. 14, 2007), http://www.michaeltotten.com/archives/001504.html.

[314] *See* Edward T. Pound, *Special Report:  The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[315] *See* Naharnet Newsdesk, *Report:  Nasrallah Meets al-Sadr to Reconcile Him with al-Maliki*, Naharnet (Apr. 15, 2016), http://www.naharnet.com/stories/en/207104.

[316] Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources:  Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008), http://www.nbcnews.com/id/25480176/ns/world_news-mideast_n_africa/t/shiite-sources-hezbollah-helping-iraqi-militia/#.WUwhPLaQyUk.

367.     Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to recruit and train soldiers for Jaysh al-Mahdi.  Mugniyeh soon recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping.  These 300 fighters were some of Jaysh al-Mahdi's first members.  That same month, according to the *Asia Times*, Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[ ] up [its] organizational and military apparatuses in Iraq."[317]  By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi terrorists.  At the same time, these Hezbollah operatives were acquiring rocket-propelled grenades, antitank missiles, and other weapons for Jaysh al-Mahdi.

368.     Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years.  By January 2004, nearly 800 Hezbollah agents had been sent to Iraq, where they were deployed to direct Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Sadr City, Najaf, Safwan, and Basra.  Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005.  An October 2006 U.S. intelligence summary (as published by *WikiLeaks*) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas.[318]  Mugniyeh continued to personally supervise Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by

---

[317] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006), http://www.atimes.com/atimes/Middle_East/HG29Ak02.html.

[318] U.S. Dep't of Def., *US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala* (Oct. 10, 2006), https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_Mahdi_Militia_-_Hezbollah_-_Harbala_(Oct_10,_2006).

other Hezbollah operatives.  At the time Mugniyeh was killed in 2008, the U.S. government

continued to view him as an ongoing threat to Americans in Iraq.

369.    In addition to its terrorist mastermind Imad Mugniyeh, Hezbollah deployed a

litany of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against

Americans in Iraq, including, but not limited to, the following Hezbollah terrorists:

- **Ali Mussa Daqduq (Senior Hezbollah Field Commander).**  Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Quds Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.

- **Muhammad Kawtharani (Nasrallah's Personal Liaison to Sadr).**  Hezbollah also deployed a senior cleric, Muhammad Kawtharani, to serve as a liaison to Jaysh al-Mahdi. In 2013, the U.S. Treasury Department identified Kawtharani as a member of "Hizballah's leadership" who "act[ed] for, or on behalf of Hizballah," and was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities."[319] Kawtharani, as personal liaison to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

- **Yusuf Hashem (Iraq Operations – Country-wide).**  Hezbollah also tasked another senior Hezbollah terrorist commander, Yusuf Hashem, to coordinate Hezbollah's Jaysh al-Mahdi operations in Iraq.

- **Ali Falih Hadi (Iraq Operations – Basra and Amarah).**  According to a Coalition threat report (as published by *WikiLeaks*), Ali Falih Hadi was a member of Hezbollah who was based in Amarah in Basra Province and was "responsible for supplying" weapons to members of a joint Jaysh al-Mahdi/Hezbollah cell operating in Basra.[320]

- **Hezbollah Bombmakers.**  On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide in-country direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against Americans in Iraq.

370.    At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in

Iraq beginning in the winter of 2005.  This escalation was the result of Hezbollah's own

"strategic decision" to ratchet up pressure on the United States by boosting Hezbollah's "support

---

[319] Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Hizballah Leadership* (Aug. 22, 2013), https://www.treasury.gov/press-center/press-releases/Pages/jl2147.aspx.

[320] *WikiLeaks* (Jul. 16, 2008) (While the report identifies "Ali Falih Hadey," on information and belief "Hadey" has the same meaning as "Hadi."), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html.

[for] Sadr" and fostering "managed instability" in Iraq.[321]  According to the *New York Times*, a senior American intelligence official assessed that, as part of this "strategic decision" to escalate the terrorist campaign against Americans in Iraq, Iran served as "a link to Lebanese Hezbollah" and "helped facilitate Hezbollah training inside of Iraq, but more importantly Jaish al-Mahdi members going to Lebanon" for training.[322]

371.   Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah.  During his Friday sermons on March 26, 2004 – in which he praised the attacks of September 11th and called for violence against Americans in Iraq – Sadr swore fealty to Hezbollah in Shi'a Islamic terms, pledging support to "our victorious party, Hezbollah."  Weeks later, in a sermon in April 2004, Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming:  "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[323]  In an August 2007 interview, Sadr again reportedly acknowledged that Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[324]  Another Jaysh al-Mahdi member told an interviewer that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."[325]

372.   In the years after 2003, Jaysh al-Mahdi fighters regularly participated in anti-American marches in which they marched under Hezbollah flags and banners.  Tens of

---

[321] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/middleeast/28military.html.

[322] *Id.*

[323] Wire, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas*, Buffalo News (Apr. 2, 2004), http://buffalonews.com/2004/04/02/iraqi-cleric-calls-for-alliance-with-hezbollah-hamas/.

[324] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

[325] *Id.*

thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006 alone, including on July 21, 2006 and August 4, 2006.

373.    On August 4, 2006, more than 10,000 members of Jaysh al-Mahdi attended a joint Jaysh al-Mahdi/Hezbollah march in Sadr City, which further demonstrated Hezbollah's control over Jaysh al-Mahdi operations.  As recounted in a field report in *Al-Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[326]  The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[327]  The close, symbiotic connection between Jaysh al-Mahdi and Hezbollah was summed up by Jaysh al-Mahdi members' repeated declaration at the rally:  "we are Hezbollah."

374.    Defendants were aware of the close and extensive links between Hezbollah and Jaysh al-Mahdi as early as 2004, based on the widespread coverage those links received in the Western and international media, including but not limited to:

- In April 2004, the *Washington Times* reported that Sadr was "being aided directly by Iran's Revolutionary Guard, which plays a large role in running that country, and by Hezbollah, an Iranian-created terrorist group based in Lebanon."[328]

- In November 2004, *U.S. News & World Report* reported that, according to intelligence reports, "Iran used Hezbollah to train and provide funds to Sadr's Mahdi Army"; that "Hezbollah had established 'a team of 30 to 40 operatives' in Najaf 'in support of Moqtada Sadr's Shia paramilitary group'"; that "Hezbollah was recruiting and training members of Sadr's militia"; and that "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."[329]

---

[326] *Iraq's Shia March for Hezbollah*, Al-Jazeera (Aug. 4, 2006), www.aljazeera.com/archive/2006/08/200849131615702691.html.

[327] *Id.*

[328] *Iran, Hezbollah Support al-Sadr*, Wash. Times (Apr. 7, 2004), http://www.washingtontimes.com/news/2004/apr/7/20040407-124311-9361r/.

[329] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004) (citation omitted), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

- In July 2006, the *Asia Times* reported that Hezbollah had "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[] up [its] organizational and military apparatuses in Iraq."[330]

- In November 2006, the *New York Times* reported that "Hezbollah had been training members of the Mahdi Army," that Hezbollah had trained more than a thousand terrorists in Hezbollah camps in Lebanon alone, and that a senior U.S. intelligence official assessed that "Lebanese Hezbollah" made a "strategic decision" in late winter 2005 or early spring 2006 "to provide more support to Sadr to increase pressure on the U.S."[331]

- In August 2007, the London-based *Independent* printed Sadr's August 2007 interview, in which he admitted Jaysh al-Mahdi's "formal links with Hizbollah."[332]

375.    In 2009, the U.S. Treasury Department formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi commander Abu Mahdi al-Muhandis as a Specially Designated Global Terrorist.  The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces."[333]  According to the press release, these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.[334]

376.    The U.S. Treasury Department again recognized the links between Hezbollah and Jaysh al-Mahdi in 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[335]  According to Treasury's findings, in

---

[330] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006), http://www.atimes.com/atimes/Middle_East/HG29Ak02.html.

[331] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/middleeast/28military.html.

[332] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

[333] Press Release, U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009), https://www.treasury.gov/press-center/press-releases/Pages/tg195.aspx.

[334] *Id.*

[335] Press Release, U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx.

2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq. In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."[336]  As of 2006, that unit was working with the Iranian Quds Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."[337]

### 3.    Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq

377.    After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq. It did so primarily through two channels. First, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join Jaysh al-Mahdi and attack Americans in Iraq. Second, Hezbollah encouraged senior members of Jaysh al-Mahdi, including Sadr himself, to carry out such attacks. As a *Middle East Intelligence Bulletin* dispatch explained in March 2004, Hezbollah operatives in Iraq "have focused mainly on establishing lines of communication with Iraqi Shiite leaders and distributing anti-American propaganda, but the groundwork is clearly being laid for incitement of violence in the future."[338]

378.    Hezbollah's message of authorization was effective because many Jaysh al-Mahdi members looked to Hezbollah as a moral and religious authority on par with Sadr himself. As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah

---

[336] *Id.*

[337] *Id.*

[338] Gary C. Gambill, *Dossier:  Hassan Nasrallah*, Middle East Intell. Bull. (Feb.-Mar. 2004), https://www.meforum.org/meib/articles/0402_ld.htm.

appeared throughout Baghdad.  In August 2006, tens of thousands of Jaysh al-Mahdi operatives staged a massive, public, pro-Hezbollah rally in Sadr City.  Rally-goers burned American flags, chanted "Death to America," and displayed the portraits of Sadr and Nasrallah side-by-side in the streets of Baghdad.  Members of the rally wore white shrouds to symbolize their willingness to die for Hezbollah and asked for "victory to Hassan Nasrallah."[339]  Jaysh al-Mahdi members also asked "al-Sadr to consider them an extension of Hizbullah" and "expressed a genuine desire to participate with Hizbullah against" the Coalition government in Iraq.[340]  In a subsequent demonstration in July 2007, Jaysh al-Mahdi members again carried signs featuring the pictures of Sadr and Nasrallah side-by-side.  And, after Hezbollah terrorist mastermind Imad Mugniyeh was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

379.    Grand Ayatollah Muhammad Hussein Fadlallah, whom the U.S. Treasury Department has called "Hizballah's Spiritual Leader,"[341] occupied a similarly exalted position among Iraqi Shi'a.  Fadlallah himself became a Specially Designated Terrorist in 1995[342] as a result of his role as a "Leading Ideological Figure of Hizballah."[343]  Among other things, the U.S. government concluded that "Sheikh Muhammad Hussein Fadlallah, Hizballah's chief 'spiritual leader,' reportedly issued the *fatwa* (religious ruling) authorizing the Marine Corps

---

[339] *Shiites Hold pro-Hezbollah Rally in Baghdad*, NBC News (Aug. 4, 2006), http://www.nbcnews.com/id/14179529/ns/world_news-mideast_n_africa/t/shiites-hold-pro-hezbollah-rally-baghdad/.

[340] Middle East Media Research Inst., *Iraqi Shi'a View of the Lebanon Crisis*, Inquiry & Analysis Series No. 290 (Aug. 11, 2006), https://www.memri.org/reports/iraqi-shia-views-lebanon-crisis.

[341] Press Release, U.S. Dep't of Treasury, *Treasury Designates Islamic Extremist, Two Companies Supporting Hizballah in Tri-Border Area* (June 10, 2004), https://www.treasury.gov/press-center/press-releases/Pages/js1720.aspx.

[342] *Id.*

[343] U.S. Dep't of Treasury, *Publication of the Hizballah International Financing Prevention Act of 2015 Related Sanctions Regulations; Counter Terrorism Designations Updates; Syria Designations Updates* (Apr. 15, 2016), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160415.aspx; *see also* Harvey W. Kushner, *Encyclopedia of Terrorism* 128 (Sage Publications 2003)

barracks bombing" in Beirut in 1983,[344] which was the deadliest terrorist attack against America before September 11th.  Although he was of Lebanese descent, Fadlallah was born in Najaf, grew up in Najaf, studied in Najaf, reportedly spoke with an Iraqi accent, was a respected Shi'a theologian, and was close with the Sadr family, including the First and Second Martyrs as well as Muqtada himself.  When Fadlallah died in 2010, Muqtada al-Sadr called on his followers to observe three days of mourning in honor of Hezbollah's spiritual leader.

380.    Hezbollah's religious and moral authority was especially powerful because Jaysh al-Mahdi, like many other terrorist organizations, looked to religious authorities for validation. As Professor Bruce Hoffman has explained, " 'Shiites do not believe in the legitimate authority of secular governments.' "[345]  Instead, "religion serves as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine."[346]  Thus, for religious terrorist organizations such as Jaysh al-Mahdi, "violence first and foremost is a sacramental act or divine duty executed in direct response to some theological demand or imperative."[347]  As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of Jaysh al-Mahdi.

381.    Hezbollah's leaders leveraged their moral and religious authority over Jaysh al-Mahdi by publicly calling for "jihad" and issuing *fatwas* against Americans in Iraq.[348]  An April 2003 dispatch from the *Middle East Intelligence Bulletin* reported that "Hezbollah has recently

---

[344] Government's Written Proffer in Support of Its Request for Detention Pending Trial at 7, *United States v. D-2 Elfat El Aouar*, Crim. No. 06-20248 (E.D. Mich. filed May 22, 2006), ECF No. 8.

[345] Bruce Hoffman, *"Holy Terror": The Implications of Terrorism Motivated by a Religious Imperative*, 18 Stud. in Conflict & Terrorism 271, 274 (1995) (quoting Marvin Zonis & Daniel Brumberg, *Behind Beirut Terrorism*, N.Y. Times (Oct. 8, 1984)).

[346] *Id.* at 272.

[347] *Id.*

[348] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

begun a campaign to incite opposition to American forces in Iraq" by broadcasting propaganda to millions of Arab viewers (including Shi'a in Iraq) on its television station al-Manar.[349]  Such propaganda, which explicitly called for acts of "resistance" against Americans in Iraq, made up more than one-quarter of al-Manar's content.[350]

382.    In furtherance of this campaign, Secretary-General Nasrallah made repeated and direct communications to Iraqi Jaysh al-Mahdi members to attack Americans:

- In a March 2003 speech, Nasrallah publicly declared Hezbollah's support for attacks against Americans, promising that "peoples of this part of the world will receive [America] . . . *with guns, blood, weapons, and martyrdom operations*."[351]

- In an April 2003 speech, Nasrallah directly called on Iraqi Shi'a to attack Americans in Iraq, declaring that "*[t]he Iraqi people must resist this occupation*" and that "[w]e can bet that the Iraqi people will resist the American occupation and liberate themselves."[352]

- In an October 2006 interview that aired on Al-Jazeera, Nasrallah stated:  "We consider the resistance in Iraq . . . to be legitimate resistance, which is justified and appropriate . . . and *we support and endorse this resistance*."[353]

- In a January 2007 interview broadcast on al-Manar, Nasrallah declared:  "We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect.  We believe that the solution in Iraq begins with adopting the option of armed resistance – *jihad against the occupation forces*."[354]

- In a December 2009 speech broadcast on al-Manar, Nasrallah promised "*all-out war*" against "the Great Satan" of America over a chorus of "Death to America" chants.[355]

---

[349] Avi Jorisch, *Al-Manar and the War in Iraq*, Middle East Intell. Bull. (Apr. 2003), http://www. washingtoninstitute.org/policy-analysis/view/al-manar-and-the-war-in-iraq.

[350] *Id.*

[351] Nicholas Noe, *Voice of Hezbollah: The Statements of Sayyed Hassan Nasrallah* 285 (2007).

[352] Deborah Horan, *Hezbollah Chief to Iraqis:  Resist U.S.*, Chi. Trib. (Apr. 23, 2003), http://articles.chicago tribune.com/2003-04-23/news/0304230260_1_hezbollah-iraqi-shiites-iraqi-people.

[353] Excerpts from Interview with Hassan Nasrallah, Middle East Media Research Inst. TV Monitor Project (Oct. 31, 2006), https://www.memri.org/tv/hizbullah-secretary-general-hassan-nasrallah-when-we-were-young-i-cannot-forget-sight-american/transcript (last accessed Sept. 21, 2017).

[354] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[355] Excerpts from December 25, 2009 Speech by Hassan Nasrallah, Middle East Media Research Inst. (Dec. 29, 2009), https://www.memri.org/reports/hizbullah-secretary-general-hassan-nasrallah-al-manar-tv-us-beast-one-bite-our-nation-and (last accessed Sept. 21, 2017).

383.     Nasrallah's call for "jihad" was particularly potent because of its religious significance.  As one federal court has explained, a "jihad" is a "religiously sanctioned resistance against perceived enemies of Islam."[356]  This religious sanctioning was thus highly significant to members of Jaysh al-Mahdi, a militantly Shi'a terrorist organization that frequently engaged in religious violence.

384.     Grand Ayatollah Fadlallah echoed similar themes in an August 2004 *fatwa* in which he instructed the Shi'a in Iraq that it was their religious duty to attack American military and civilian personnel in Iraq as a means of resisting the occupation.  "A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder."[357]  The Grand Ayatollah's *fatwa*, which received widespread coverage in the Iraqi and Western media, was a critical green light for Jaysh al-Mahdi terrorists in Iraq to attack Americans in Iraq.

385.     Until Fadlallah's death in 2010, he consistently incited his Shi'a followers in Iraq and Lebanon to attack Americans.  In at least six Friday sermons in the Imam Hassanayn Mosque in Beirut that took place between February and April 2003 – sermons that would have been widely shared in Iraq and would have undoubtedly been known to Sadr and other leaders of Jaysh al-Mahdi – Fadlallah blessed the calls made by others such as Nasrallah for Iraqi Shiites to violently resist the U.S. occupation.

386.     Information gathered by Coalition forces during raids upon Jaysh al-Mahdi confirmed the power of Nasrallah's and Fadlallah's messages of authorization.  For example, according to a U.S. military incident report (as published by *WikiLeaks*), an October 9, 2008 raid on a Jaysh al-Mahdi safe house in Basra yielded "religious Iranian video clips," "MAS [*i.e.*,

---

[356] *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016).

[357] *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000).

Muqtada al-Sadr] literature," a "[n]otebook with JAM computer training dated 11 Jan 2007," and a "[p]icture of Mohammad Hussein Fadala [sic]" who was identified in the report as a "Deputy of Hassan Wasrala [sic] (Hezbollah)."[358]

387.   Hezbollah also wielded significant influence over Sadr himself, who had deep personal ties to Hezbollah's leaders.  *The Arab Weekly* reported that Sadr was "greatly inspired by Hassan Nasrallah" in part because "both men rose to lead their parties at a fairly young age."[359]  According to a March 2007 report by the Jamestown Foundation, a counterterrorism think tank, Sadr "has looked up to Hezbollah of Lebanon as a model of Shiite military success[,] [because] [h]e respects the leadership of the organization and admires [Hassan Nasrallah]."[360] Accordingly, Sadr publicly declared his loyalty to Hezbollah, *see supra* ¶ 371; co-founded Jaysh al-Mahdi with the help of Hezbollah's chief terrorist mastermind, Imad Mugniyeh, *see supra* ¶ 364; expressly modelled his organization on Hezbollah, *see supra* ¶ 59; and travelled to Beirut (where Hezbollah is headquartered) several times from 2005-2009.  On information and belief, Hezbollah used its close relationship with Sadr to authorize and incite him to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.

388.   Hezbollah's leaders have directly connected Hezbollah's authorization of terror attacks against Americans in Iraq to Hezbollah's terrorist objective of forcing the U.S. to abandon Iraq.  For example, in a speech on October 25, 2011, Nasrallah stated that "resistance groups" Hezbollah had backed (that is, Jaysh al-Mahdi) pressured the U.S. to reduce its presence in Iraq.  In the same speech, Nasrallah boasted that the Hezbollah-Jaysh al-Mahdi campaign of

---

[358] *WikiLeaks* (Oct. 9, 2008), https://wikileaks.org/irq/report/2008/10/IRQ20081009n11927.html.

[359] Sami Moubayed, *Iran Invests in Iraq's Mahdi Army*, Arab Weekly (May 22, 2016), http://www.thearabweekly.com/Iran/5187/Iran-invests-in-Iraq%E2%80%99s-Mahdi-Army.

[360] Babak Rahimi, *Moqtada al-Sadr's New Alliance with Tehran*, Jamestown Found. (Mar. 1, 2007), https://jamestown.org/program/moqtada-al-sadrs-new-alliance-with-tehran/.

terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

### 4. Hezbollah Planned Jaysh al-Mahdi's Terrorist Attacks Against Americans in Iraq

389.    Hezbollah trained Jaysh al-Mahdi in the use of weapons and tactics that were specifically designed to target Americans in Iraq – and that Jaysh al-Mahdi in fact used successfully to perpetrate terrorist attacks against Americans in Iraq.  This training began at Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of Jaysh al-Mahdi's first 300 fighters in Lebanon.  It continued through at least 2008, when Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's Quds Force), Lebanon, and Iraq.  According to a captured Jaysh al-Mahdi operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[361]

390.    From 2003-2008, Jaysh al-Mahdi recruits travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes.  Because of the logistical challenges associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi members in Iraq.[362]  U.S. officials have referred to this practice as "training the trainer."[363]

---

[361] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-002-Summary.pdf.

[362] Michael R. Gordon, *Hezbollah Trains Iraqis in Iran, Officials Say*, N.Y. Times (May 5, 2008), http://www.nytimes.com/2008/05/05/world/middleeast/05iran.html.

[363] *Id.*

Hezbollah also trained members of Jaysh al-Mahdi inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

391.    Although Hezbollah training in Iran often occurred in conjunction with the Iranian Quds Force, Hezbollah's role was crucial to Jaysh al-Mahdi for at least three reasons. First, Hezbollah operatives had considerably more experience with terrorist tactics and explosives than their Quds Force counterparts.  Second, Hezbollah operatives typically spoke Arabic, the language spoken by most Jaysh al-Mahdi members, while members of the Quds Force did not.  Third, Hezbollah and Jaysh al-Mahdi shared a cultural affinity; captured Iraqi fighters have expressed their strong preference for training with Hezbollah over the Quds Force.

392.    Hezbollah's training was rigorous.  According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[364]  Trainees were awakened at 5:30 a.m. every day to pray and exercise.  Classes started at 8:00 a.m. and continued until dusk.  Each class lasted roughly 50 minutes, with 10-minute breaks in between classes.  Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations.  The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the *New York Times* in November 2006.[365]  The topics covered in these training programs included the following:

---

[364] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-005-Summary.pdf.

[365] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/africa/28iht-militia.3702222.html?pagewanted=2&_r=0.

393.   **Basic Weapons Training.**  Many Jaysh al-Mahdi recruits had little to no combat experience or weapons training when they joined the organization, because the only qualification that prospective Jaysh al-Mahdi recruits were expected to have was the ability to read and write. Accordingly, Hezbollah provided basic training intended to give new Jaysh al-Mahdi recruits a broad overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.

394.   **IEDs.**  Hezbollah trained Jaysh al-Mahdi members in the creation and deployment of IEDs.  For instance, Hezbollah provided an IED Specialty Training Course to members of Jaysh al-Mahdi at its training camps designed to teach Jaysh al-Mahdi fighters how to create and deploy improvised explosives such as roadside bombs.

395.   **EFPs.**  In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP.[366]   Hezbollah trained members of Jaysh al-Mahdi in the deployment of EFPs, which were expressly designed to penetrate the American armor. Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon.  Indeed, at that point, Hezbollah was the world's foremost expert on EFPs.  Hezbollah also imparted to Jaysh al-Mahdi the complex expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon, Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers.  The *New York Times* reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[367]   On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October

---

[366] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

[367] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/.

2008, *see supra* ¶ 343, was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi.  As a declassified British intelligence report concluded, EFPs used in Iraq during this time period were "exclusively associated with Hizballah."[368]

396.    Hezbollah planned the Jaysh al-Mahdi EFP terrorist attack campaign (as with the other Jaysh al-Mahdi attacks outlined in this Complaint) in Iraq through the extensive training and coordination set forth above.  Hezbollah's planning of Jaysh al-Mahdi's EFP attacks against Americans included:  (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi was permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Jaysh al-Mahdi with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-Mahdi members in camps in Lebanon, Sadr City, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans.

397.    **Rockets.**  Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles.  In particular, Hezbollah directed Jaysh al-Mahdi members to launch indirect-fire rocket attacks on the Green Zone from Sadr City, and it instructed them on how to do so.  Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City.  During these attacks

---

[368] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction.  By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel.  Indeed, the *Long War Journal* reported that the rockets Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[369]

398.    **Mortars.**  Hezbollah trained Jaysh al-Mahdi fighters in the use of mortars, including by providing a Mortar Specialty Training Course to members of Jaysh al-Mahdi at its training camps in Iran.  The purpose of this training was to teach Jaysh al-Mahdi militants to hit distant targets with mortar strikes.  American military personnel have noted that Jaysh al-Mahdi's mortar strikes were particularly accurate.

399.    **RPGs and Anti-Tank Missiles.**  Hezbollah trained Jaysh al-Mahdi operatives in the use of RPGs and advanced anti-tank missiles, including assembly, firing procedures, target acquisition, and the use of various kinds of munitions.  Hezbollah's RPG and anti-tank missile training focused on attacks against armored vehicles and command structures such as the ones the United States used in Iraq.  For example, a Hezbollah "planning guide" that U.S. forces recovered from Daqduq provided tactical instructions to Jaysh al-Mahdi terrorists for the use of RPGs against Americans, including commands concerning volume of fire and specific vehicles in the convoy to target in order to inflict maximum casualties.

400.    **Complex Attacks.**  Hezbollah training programs emphasized "complex attacks" and small-group tactics that combine different types of attacks by different members of a team.  One unclassified (as redacted) U.S. military-intelligence report summarized these tactics:

---

[369] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

For example, an engineer team may be responsible for emplacing and detonating IEDs on a convoy while a Support Weapons team is simultaneously responsible for launching mortars or rockets at the same vehicles. A conventional weapons team would then be responsible for firing at the vehicles with small arms and assaulting the vehicles. The Support Weapons team would be responsible for launching mortars at the vehicles again once the conventional weapons team pulled back. Each team functions together but does not get involved in what the other team is doing. A plan would be worked out ahead of time for this, and one individual in each team would be responsible for coordinating with the other team leaders during the attack.[370]

Hezbollah also instructed Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[371]

401. **Kidnappings**. Hezbollah is well-known for its kidnapping operations. In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers. Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[372] Jaysh al-Mahdi put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where Jaysh al-Mahdi terrorists kidnapped four U.S. soldiers and killed another. And a 2011 letter from five U.S. Senators documented that Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Jaysh al-Mahdi on "how to conduct intelligence and kidnapping operations."

402. The extent of Hezbollah's involvement in Jaysh al-Mahdi's attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide"

---

[370] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 001, at 3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-001-Summary.pdf.

[371] *The War Logs:  Secret Dispatches From the War in Iraq, Alleged Jaysh Al-Mahdi Plans to Kidnap U.S. Soldiers in Baghdad, Iraq*, N.Y. Times (Dec. 22, 2006), http://www.nytimes.com/interactive/world/iraq-war-logs.html#report/ABD1B1E9-D673-93B1-757861100C0728BC.

[372] *Id.*

memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hezbollah's instruction as reflected in this "planning guide" enabled Jaysh al-Mahdi to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

403.   Hezbollah trained, and coordinated with, Jaysh al-Mahdi terrorists who were responsible for Hezbollah-authorized terrorist attacks throughout Iraq. On information and belief, that training and coordination extended to the following areas (among others):

- **Baghdad – Al Rashid District.** Al Rashid includes a main approach to Baghdad International Airport ("BIAP") and Victory Base Complex, a consolidated facility containing a range of Coalition military and civilian personnel that surrounded Baghdad International Airport ("BIAP") and so was a focus of Jaysh al-Mahdi's attacks in western Baghdad. On information and belief, Jaysh al-Mahdi coordinated attacks against Coalition forces in the Al Rashid District with Hezbollah. According to a U.S. military incident report (as published by *WikiLeaks*), "JAM/Hizballah members operating" in Al Rashid coordinated through Haji Abu Ali and Mohammad Kawtharani, the latter of whom personally advised Nasrallah. Such coordination also reportedly involved Jabbar Abdalnabi Alzarjawi, a "JAM leader" in Al Rashid who "facilitated . . . the movement of Hizballah members from Iran" into western Baghdad.[373] On information and belief, Hezbollah-backed Jaysh al-Mahdi cells operating in Al Rashid were responsible for the attacks that killed, among others, Christopher Neiberger, Ronald Tucker, Kevin Witte, Samuel Parlin, James Adair, Joshua Brown, Steven Davis, George Delgado, Robert Dixon, Daniel Fuentes, Wayne Geiger, James Gudridge, Andrew Habsieger, Christopher Hake, Bryant Herlem, Kenneth Iwasinski, Gregory McCoy, Steve McCoy, Nicholas Newby, William O'Brien, Michelle Ring, Lucas Starcevich, and Dustin Wakeman, and injured Shawn Ryan and Grant Von Letkemann II, and Hezbollah-backed Jaysh al-Mahdi cells operating in Al Rashid were responsible for the attacks that injured, among others, Matthew Andreas, Joshua Brooks, Benjamin Carrington, Shaun Chandler, Derek Hadfield, Ernesto Hernandez III, Jonathan Heslop, Matthew Lammers, Gilbert Paiz, Jr., Douglas Ragone, Joshua Schichtl, Christopher Smith, Shaun Stiltner, John Takai, and Victor Wise, II.

- **Baghdad – Kadamiyah District.** Kadamiyah was one of Jaysh al-Mahdi's strongholds in western Baghdad. On information and belief, Hezbollah training and coordination enabled Jaysh al-Mahdi's to target Americans in Kadamiyah. According to a U.S. military incident report (as published by *WikiLeaks*), Salah Aldeen Fayath, his brother, and his daughter, whom the U.S. government determined "was a member of Hezbollah,"

---

[373] *WikiLeaks* (Nov. 22, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081122n11950.html.

provided targeting support for Jaysh al-Mahdi operations against Coalition forces in Kadamiyah.[374]  On information and belief, Hezbollah-backed Jaysh al-Mahdi IED/EFP cells operating in or near Kadamiyah were responsible for the EFP attacks that killed, among others, Conrad Alvarez, John Aragon, Jr., Anthony Kalladeen, Brandon Bobb, Scott Brown, Michael Elledge, James Hale, and Virgil Martinez, and Hezbollah-backed Jaysh al-Mahdi cells operating in Kadamiyah were responsible for the attacks that injured, among others, David Baxter, Jr., Larry Cabral, Jr., Tara Hutchinson, Daniel Luckett, Patrick O'Neill, Nathan Richards, Brian Schar, Travis Strong, and Joshua Wells.

- **Baghdad – Rusafa District.**  Rusafa is a Jaysh al-Mahdi stronghold in eastern Baghdad that includes the MOH headquarters building.  On information and belief, Hezbollah trained, locally supported, and coordinated with the Jaysh al-Mahdi IED/EFP cell operating in and near Rusafa.  For example, Jaysh al-Mahdi cells trained by Hezbollah in Iran used Rusafa to launch rocket attacks on the Green Zone.  On information and belief, Hezbollah-backed Jaysh al-Mahdi cells operating in Rusafa were responsible for the attacks in Rusafa that killed, among others, Deborah Klecker, Delmar White, Alan Rogers, and Nicholas Sowinski, and Hezbollah-backed Jaysh al-Mahdi cells operating in Rusafa were responsible for the attacks that injured, among others, Todd Barnum, Brian Beem, Jerrald Jensen, Christopher Joyner, Dan Laird, and Ricky Zhorne, Jr.

- **Baghdad – Sadr City (Thawra District).**  Sadr City serves as Jaysh al-Mahdi's command-and-control center, safe haven, and principal power base in Iraq.  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi IED/EFP cells operating in and near Sadr City, with respect to both the attacks themselves and the subsequent Hezbollah and Jaysh al-Mahdi propaganda concerning such attacks.  For example, an August 12, 2008 U.S. military incident report (as published by *WikiLeaks*) confirmed that a "Hezbollah IED/EFP . . . cell" was active in and near Sadr City and was coordinating EFP attacks against Coalition forces with a "recon [Jaysh al-Mahdi] element working in the area."[375]  On information and belief, Hezbollah-backed Jaysh al-Mahdi cells operating in and near Sadr City were responsible for the attacks in or near Sadr City against, among others, Plaintiffs Luis Rosa-Valentin, Daniel Dudek, Brian Connelly, Steven Farley, Sean Thomas, Stephen Scott, Stuart Wolfer, Carlo Alfonso, John Daggett, George Delgado, Lance Eakes, Corey Hicks, Hunter LeVine, Adam Marion, Joshua Molina, Randell Olguin, Timothy Smith, Nicole Suveges, Nicholas Anna, Cody Barham, Dustin Bauer, John Botts, Andrew Bradley, Michael Briggs, Alejandro Contrerasbaez, John Daggett, Shawn Donnery, Timothy DuVall, Jr., Joshua Eckhoff, Leroy Esco Jr., Anthony Farina, Luis Garza, Anthony Gerber, Charles Gregston, Robert Haaf, Jerral Hancock, Endi Herrera, Brandon Josey, Cory Kenfield, Andrew Kirchoff, Daniel Kulicka, Christopher Landry, Darren Leslie, Konrad Ludwig, Adam Magers, David Manganella, Edward Mariscal, Samuel Montalbano, Jared Osburn, Michael Pasco, Jason Register, Erik Roberts, Ronald Sloan, Mark Thomsen, Andres Vazquez, Christopher Violette, Michelle Wager, Jeremy Wallace, Kyle Welch, James Wilson, Benjamin Zibutis, and the Blue Spader and 2-30 Wild Boar plaintiffs.

---

[374] *WikiLeaks* (Oct. 19, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061019n5720.html.

[375] *WikiLeaks* (Aug. 12, 2008), https://wikileaks.org/irq/report/2008/08/IRQ20080812n11209.html.

- **Baghdad – New Baghdad District, Karadah District, and FOB Rustamiyah.**  New Baghdad, Karadah, and the area near Forward Operating Base ("FOB") Rustamiyah were focal points for Hezbollah-coordinated attacks by Jaysh al-Mahdi in eastern Baghdad. For example, one U.S. military report (as published by *WikiLeaks*) concluded that, with respect to attacks near FOB Rustamiyah, it was "most likely" that "Hezbollah operatives [were] directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area."[376]  Similarly, according to an arrest report (as published by *WikiLeaks*), Abu Aloze served as "JAM leadership" in the area, was responsible for coordinating attacks against Americans in the New Baghdad and Karadah Districts (including against FOBs in the area), and was specifically trained by Hezbollah in Lebanon.[377]  On information and belief, Jaysh al-Mahdi Hezbollah-trained cells operating in this area, were responsible for the attacks that killed and wounded the 2-16 Ranger Plaintiffs, *see infra* ¶¶ 409-10, as well as the attacks that killed Brian L. Holden, Richard Vaughn, Jeremiah McNeal, Phillip A. Murphy-Sweet, Daniel J. Kuhlmeier, Andres J. Contreras, Brian Botello, Tulsa Tuliau, Roberto Andrade, Jr., Roberto Arizola, Jr., Michael Balsley, Justin Bauer, Brian Brian, Duncan Crookston, Jonathan Edds, Paul Finken, David Fraser, Joseph Gage, Blake Harris, David Hurst, Eric Kruger, Christopher Kube, Isaac Lawson, Jason Lewis, Eric Lill, Charles Matheny, IV, Kenneth Mayne, Robert McRill, Jonathan Menke, Jason Merrill, Patrick Miller, Willsun Mock, Daniel Newsome, Emanuel Pickett, Joshua Plocica, Jerome Potter, Joseph Richard III, Brandon Stout, John Sullivan, Ahmed al-Taie, David Taylor, Jr., and Brett Walton, and such cells were responsible for the attacks that injured, among others, Matthew Adamson, Karar Alabsawi, Jake Altman, Matthew Benson, Brentyn Bishop, John Blickenstaff, Evan Bogart, Thomas Coe II, Joshua Cope, Norman Forbes IV, Scott Fritz, Christopher Golembe, Christopher Heidling, Gregory Hogancamp, Christopher Levi, Christopher Miller, Luke Murphy, John Sklaney, III, Brian Taylor, Edward Terry, Sr., Jose Vera, Wesley Williamson, and David Woodard.

- **Babil, Wasit, and Salman Pak (Central Iraq).**  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in central Iraq, including Babil, Wasit, and Salman Pak.  As published by *WikiLeaks*, Ahmad Sahib Ghali was a commander of Jaysh al-Mahdi's "assassination cell and IED cell" in Hillah.[378]  Ghali and his co-commanders were Jaysh al-Mahdi terrorists who were trained by Hezbollah to conduct attacks against Coalition forces near Hillah.  On information and belief, Jaysh al-Mahdi Hezbollah-trained terrorists operating in these areas were responsible for the EFP attacks that killed or injured Michael Doheny, Steven Evrard, Micah Shaw, Billy Johnson, Kevin Landeck, Laurent West, Jesse Ault, William Juneau, Kwesi Christopher, Daniel Crabtree, Terrence Dunn, James Hochstetler, Robert Hunt, Carlos Saenz, Jason Schumann, Benjamin Slaven, Antonio Stiggins, Nathan Vacho, Omar Vazquez, and David Veverka, and a Jaysh al-Mahdi Hezbollah-trained cell operating in Salman Pak was responsible for the EFP attack that killed Blake Stephens and Kyle Little.

---

[376] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

[377] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11207.html.

[378] *WikiLeaks* (June 15, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080615n11261.html.

- **Basra and Amarah (Southern Iraq).**  Basra and Amarah are Jaysh al-Mahdi strongholds in southern Iraq.  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Basra and Amarah.  For example, in July and August 2008, U.S. government reports (as published by *WikiLeaks*) confirmed that five terrorist squads, comprised of "a combination of Hezbollah and JAM who finished their training in Iran" were "heading to Basrah to attack [Coalition forces]" and "carry out terrorist activities" after "coming back from Iran," where they had been "trained" on how to "use [indirect fire] techniques" and "manufactur[e] IEDs."[379]  On information and belief, cells that reflected a "combination of Hezbollah and JAM" were responsible for the attacks that resulted in the deaths of Rick Hickman, Sean Diamond, Daniel Drevnick, Daniel Elliott, Matthew Vandegrift, and Christopher Young, injuries to Terry Carter, Tyler Ginavan, Sean Harrington, Robin Honeycutt, and Timothy O'Sullivan, and the kidnapping, torture, and execution of Michael Chand, Joshua Munns, Paul Johnson-Reuben, Jonathon Coté, Ronnie Withrow, John Young, and Steven Vincent.

- **Diyala (Northern Iraq).**  Diyala is a province in northern Iraq and was (and remains) a central area of emphasis for Hezbollah and Jaysh al-Mahdi because of the critical role its capital, Baqubah, plays with respect to the Shiite terrorists' desire to have a secure land corridor linking Iran to Syria.  On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Diyala.  As published by *WikiLeaks*, on June 23, 2008, Coalition forces detained a Jaysh al-Mahdi commander in Baqubah, Rezul Sami Mohammed, who was "in possession of JAM and Hezbollah propaganda material."[380]  Similarly, on September 27, 2008, as published by *WikiLeaks*, Coalition forces conducted a raid to capture Hezbollah operative Mohammed Radam in order to "reduce Hezbollah influence" near Baqubah.[381]  On information and belief, a Jaysh al-Mahdi Hezbollah-trained cell operating in the vicinity of Baqubah was responsible for the EFP attacks that killed Robbie Lynch, Cody Eggleston, Nathan Frigo, Daniel Morris, and Ryan Haupt.

- **Kirkuk (Northern Iraq).**  Kirkuk is a province in northern Iraq that played (and continues to play) a key role in radical Shiite terrorists' transportation, logistics, and communications networks.  Consequently, Hezbollah and Jaysh al-Mahdi have had a longstanding presence in Kirkuk.  On information and belief, Hezbollah trained, supported, and coordinated with Jaysh al-Mahdi cells operating in and near Kirkuk.  As published by *WikiLeaks*, a March 9, 2006 Department of State cable reported that a senior Kurdish official, when addressing the security challenges in Kirkuk province with U.S. counterparts, specifically identified the threat posed in Kirkuk province by Muqtada al-Sadr, whom the Kurdish official noted "was in league with Iran, Syria and Hezbollah."[382]  On information and belief, a Jaysh al-Mahdi Hezbollah-trained cell operating in the

---

[379] *WikiLeaks* (July 16, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html; *WikiLeaks* (July 20, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080720n11400.html.

[380] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11209.html.

[381] *WikiLeaks* (Sept. 27, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080927n11997.html.

[382] U.S. State Dep't Cable, *Kurdistan Regional Government PUK Prime Minister Pushes for Kirkuk Against Spread of Political Islam and Iranian Influence* (Mar. 9, 2006), https://wikileaks.org/plusd/cables/06KIRKUK58_a.html.

vicinity of Kirkuk was responsible for the EFP attacks that killed Matthew Kuglics, and injured Nicholas Paupore and Brian Saaristo.

### 5. Hezbollah Provided Jaysh al-Mahdi with Weapons To Carry Out Terrorist Attacks Against Americans in Iraq

404.    Hezbollah supplied many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq – though Jaysh al-Mahdi still required money and resources (derived in significant part from its control of MOH) to acquire those weapons and transport them to the appropriate cells in Iraq.  A Jaysh al-Mahdi commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[383]

405.    Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks.  The *Long War Journal* reported in June 2007 that rockets that Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[384]  Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq.  Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

406.    Hezbollah has also purchased weapons for Jaysh al-Mahdi outright.  For example, according to a U.S. military-intelligence document (as quoted in *U.S. News & World Report* in

---

[383] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007), http://www.mcclatchydc.com/news/nation-world/world/article24465475.html.

[384] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

2004), "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."[385]

407.    Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of weapons on which Hezbollah trained Jaysh al-Mahdi:  small arms, IEDs, EFPs, rockets, mortars, and RPGs.  These weapons were first smuggled into the Jaysh al-Mahdi command-and-control safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces.  For attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use them; it supplied the weapons themselves.

## VII.    JAYSH AL-MAHDI KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY HEZBOLLAH

408.    Jaysh al-Mahdi's terrorist campaign against Americans in Iraq, which was financed in part through Defendants' corrupt transactions with MOH, killed and injured Plaintiffs and their family members.  Each of the acts of international terrorism described below was committed or proximately caused by Jaysh al-Mahdi and was planned, authorized, and/or carried out (in conjunction with Jaysh al-Mahdi) by Hezbollah.

### The Atchley Family

409.    Plaintiff Staff Sergeant Joshua Atchley served in Iraq in the U.S. Army as part of the 1st Infantry Division, 2nd Battalion, 16th Infantry Regiment, 4th Brigade Combat Team (the "2-16 Rangers").  Upon their deployment to Iraq in early 2007, the 2-16 Rangers had a dual-pronged mission:  to build civil capacity for the fledgling Iraqi democratic government and to provide security for the Iraqi people.  To that end, the 2-16 Rangers worked with civilian

---

[385] Edward T. Pound, *Special Report:  The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115 (alteration in original).

contractors to rebuild municipal infrastructure, and they provided security so that those contractors could complete their projects in safety.  For example, the 2-16 Rangers installed a new sewage system in Kamaliyah; rebuilt the electric power grid; overhauled local trash-collection practices; worked on road repair; and oversaw school reconstruction.  These projects required the 2-16 Rangers to interact on a daily basis with local civilian leaders, and the 2-16 Rangers also regularly partnered with local civilian police to provide security.

410.    Jaysh al-Mahdi was the principal impediment to the 2-16 Rangers' mission of rebuilding civil capacity in their area of responsibility, which included the neighborhoods of Kamaliyah, Fedilayah, Mashtal, Mua'lmeen, Amin, and Baghdad al Jadeeda – all of which are east of Sadr City.  As part of its broader agenda to undermine the legitimacy of the Coalition-led reconstruction efforts, Jaysh al-Mahdi terrorized the local population in these areas and staged attacks designed to destroy the civil-capacity projects on which the 2-16 Rangers were working.  For that reason, the 2-16 Rangers assumed responsibility for fighting Jaysh al-Mahdi in their areas of responsibility, based out of FOB Rustamiyah.  While stationed there, the 2-16 Rangers worked to secure several key neighborhoods in eastern Baghdad from Jaysh al-Mahdi, including Kamaliyah and Fedilayah, in service of their broader mission of building civil capacity and supporting Iraqi democracy.  Jaysh al-Mahdi was the principal enemy the 2-16 Rangers were tasked with fighting to protect this broader mission, and Jaysh al-Mahdi was responsible for the vast majority of the casualties the 2-16 Rangers sustained in Iraq in 2007 and 2008.

411.    SSG Atchley is a U.S. citizen and Oklahoma resident.

412.    On June 8, 2007, SSG Atchley was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack on SSG Atchley's vehicle, followed by Jaysh al-Mahdi rifle and small-arms fire.  The EFP –

which was planted and detonated by Jaysh al-Mahdi – mutilated SSG Atchley's left eye, fractured his right arm, and caused other serious injuries that required a half-dozen surgeries.  As a result of that attack, SSG Atchley has experienced extreme physical and emotional pain and suffering.

413.  The attack that injured SSG Atchley would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

414.  Plaintiff Benny Atchley is a U.S. citizen and Oregon resident.  He is the father of SSG Atchley.

415.  Plaintiff Connie Marie Atchley is a U.S. citizen and Oregon resident.  She is the mother of SSG Atchley.

416.  Plaintiff Elissa Atchley is a U.S. citizen and Texas resident.  She is the sister of SSG Atchley.

417.  Plaintiff Katelyn Weatherford is a U.S. citizen and Oregon resident.  She is the sister of SSG Atchley.

418.  As a result of the June 8, 2007 attack, and SSG Atchley's injuries, the Atchley Family has experienced extreme emotional pain and suffering.

**John Aragon, Sr.**

419.  Sergeant John Aragon, Jr. served in Iraq in the U.S. Army as part of the 1st Squadron, 75th Cavalry Regiment, 2nd Brigade Combat Team, 101st Airborne Division.

420.  On June 12, 2008, SGT Aragon was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad.  He was 22 years old.

421.  SGT Aragon was a U.S. citizen when he was killed.

422.    SGT Aragon's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

423.    Plaintiff John Aragon, Sr. is a U.S. citizen and California resident.  He is the father of SGT Aragon.

424.    As a result of the June 12, 2008 attack, and SGT Aragon's death, John Aragon, Sr. has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Aragon's society, companionship, and counsel.

### Brian Beaumont

425.    Plaintiff Staff Sergeant Brian Beaumont served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Kansas resident.

426.    On July 17, 2007, SSG Beaumont was injured by an IED – consisting of 130mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place on Outer Berm Road in a palm tree grove close to Sadr City.  The IED attack severely wounded SSG Beaumont.  Due to his injuries, SSG Beaumont received a 100% disability rating from the Veterans Administration ("VA").  As a result of the attack, SSG Beaumont has experienced extreme physical and emotional pain and suffering.

427.    The attack that injured SSG Beaumont would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Bennett Family

428.    Specialist Durrell Bennett served in Iraq as part of the 2-16 Rangers.

429.     On March 29, 2008, during the Battle of Sadr City, SPC Bennett was killed by an EFP planted and detonated by Jaysh al-Mahdi between the New Baghdad District Advisory Council and Combat Outpost ("COP") Cajimat.  He was 22 years old.

430.     SPC Bennett was a U.S. citizen when he was killed in Iraq.

431.     SPC Bennett's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

432.     Plaintiff Dempsey Bennett is a U.S. citizen and Washington resident.  He is the father of SPC Bennett.

433.     Plaintiff Doris Bennett is a U.S. citizen and Washington resident.  She is the mother of SPC Bennett.

434.     Plaintiff Darnell Bennett is a U.S. citizen and Washington resident.  He is the brother of SPC Bennett.

435.     As a result of the March 29, 2008 attack, and SPC Bennett's death, the Bennett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bennett's society, companionship, and counsel.

**Brandeaux Campbell**

436.     Plaintiff Specialist Brandeaux Campbell served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

437.     On June 8, 2007, SPC Campbell was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack on SPC Campbell's vehicle, followed by Jaysh al-Mahdi small-caliber rifle fire.  The EFP, which was planted and detonated by Jaysh al-Mahdi, severely wounded SPC Campbell, giving him a

concussion, slicing open his forehead, mouth, and tongue, and lodging shrapnel in both his shoulder and leg.  Due to his injuries, SPC Campbell received a 70% disability rating from the VA.  As a result of the attack, SPC Campbell has experienced extreme physical and emotional pain and suffering.

438.    The attack that injured SPC Campbell would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### **The Capra Family**

439.    Technical Sergeant Anthony ("Tony") L. Capra, Jr. served in Iraq in the U.S. Air Force as part of Detachment 63, 688th Armament Systems Squadron.

440.    On April 9, 2008, Tech. Sgt. Capra was killed by an IED planted and detonated by Ansar al-Islam ("AAI"), also known as Ansar al-Sunna, in Golden Hills. He was 31 years old. AAI is a terrorist group operating in Iraq that allied and cooperated closely with Jaysh al-Mahdi in their shared goal of using violence to expel Americans from Iraq.  In 2004, then-U.S. Secretary of State Colin Powell designated AAI as an FTO pursuant to 8 U.S.C. § 1189.  That designation has remained in place ever since.

441.    According to public reports, AAI described its "relationship" with Jaysh al-Mahdi "as intimate,"[386] and their cooperation included Jaysh al-Mahdi's provision of services to AAI including providing munitions, training, personnel, and tactical contacts with Hezbollah and Iran.  On information and belief, Defendants' support of Jaysh al-Mahdi enabled Jaysh al-

---

[386] Kathleen Ridolfo, *Iraq:  A Nation Finds Itself at a Crossroads*, Radio Free Europe (Sept. 16, 2005), http://reliefweb.int/report/iraq/iraq-nation-finds-itself-crossroads.

Mahdi's cooperation with and support for its anti-Coalition partner AAI's IED attacks in Iraq, including the one that killed Tech. Sgt. Capra.

442.    Tech. Sgt. Capra was a U.S. citizen when he was killed in Iraq.

443.    Tech. Sgt. Capra's murder would have violated the law of war if AAI were subject to it because, among other reasons, the AAI member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

444.    Plaintiff Angie Capra is a U.S. citizen and Virginia resident.  She is the widow of Tech. Sgt. Capra.

445.    Plaintiff Anthony ("Tony") Capra, Sr. is a U.S. citizen and Virginia resident.  He is the father of Tech. Sgt. Capra.

446.    Plaintiff Sharon Capra is a U.S. citizen and Virginia resident.  She is the mother of Tech. Sgt. Capra.

447.    Plaintiff Mark Capra is a U.S. citizen and Virginia resident.  He is the son of Tech. Sgt. Capra.

448.    Plaintiff Victoria Capra is a U.S. citizen and Virginia resident.  She is the daughter of Tech. Sgt. Capra.

449.    Plaintiff A.C., by and through her next friend Angie Capra, is a U.S. citizen and Virginia resident.  She is the minor daughter of Tech. Sgt. Capra.

450.    Plaintiff Jared Capra is a U.S. citizen and Virginia resident.  He is the son of Tech. Sgt. Capra.

451.    Plaintiff S.C., by and through his next friend Angie Capra, is a U.S. citizen and Virginia resident.  He is the minor son of Tech. Sgt. Capra.

452.    Plaintiff Danielle Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

453.    Plaintiff Emily Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

454.    Plaintiff Jacob Capra is a U.S. citizen and Virginia resident.  He is the brother of Tech. Sgt. Capra.

455.    Plaintiff Joanna Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

456.    Plaintiff Joseph Capra is a U.S. citizen and Virginia resident.  He is the brother of Tech. Sgt. Capra.

457.    Plaintiff Julia-Anne Capra is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

458.    Plaintiff Michael Capra is a U.S. citizen and Virginia resident.  He is the brother of Tech. Sgt. Capra.

459.    Plaintiff Rachel Lee is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

460.    Plaintiff Sarah Johnson is a U.S. citizen and Virginia resident.  She is the sister of Tech. Sgt. Capra.

461.    As a result of the April 9, 2008 attack, and Tech. Sgt. Capra's death, the Capra Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Tech. Sgt. Capra's society, companionship, and counsel.

## **The Chand Family and Estate**

462.    Michael Chand, Sr. worked in southeast Iraq as a civilian contractor who provided security relating to road construction projects.

463.    On August 17, 2007, Mr. Chand's convoy was ambushed by roughly 300 Jaysh al-Mahdi fighters near the Jaysh al-Mahdi stronghold of Amarah, northwest of Basra.  On information and belief, this group also included members of Hezbollah.  *See supra* ¶ 403.  Mr. Chand suffered a gunshot wound in the ambush and was kidnapped by Jaysh al-Mahdi.  He was held in captivity by Jaysh al-Mahdi for several years afterwards, and he was tortured in captivity.  He was 52 years old at the time of his kidnapping.  On or about March 13, 2010, his body was returned to the U.S. government.  The autopsy report revealed that Mr. Chand was killed by multiple gunshot wounds to the head and body, and it was consistent with the conclusion that he had been tortured.

464.    Initial reports of the August 17, 2007 attack suggested that Mr. Chand had been killed in the attack.  On August 24, 2007, the U.S. State Department officially informed Mr. Chand's wife that he was dead.  On October 31, 2007, the State Department reversed course and informed his wife, Mrs. Sally Chand, that, according to eyewitnesses, Mr. Chand was actually alive and being held in captivity.  However, efforts to secure his release over the next several years failed, and, on or about March 13, 2010, the Chand family learned that Jaysh al-Mahdi had tortured and executed Mr. Chand while he was being held in captivity.

465.    Mr. Chand was a U.S. citizen when he was kidnapped and killed in Iraq.

466.    Mr. Chand's kidnapping and murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, Mr. Chand was a civilian not taking part in hostilities, was tortured during his captivity, was executed without trial, and was attacked by groups who neither wore uniforms nor otherwise identified themselves as enemy combatants.

467.     Plaintiff Sally Chand is a U.S. citizen and California resident.  She is the widow of Michael Chand, Sr.

468.     Sally Chand is also the Personal Representative of Michael Chand's estate.  A copy of the California Superior Court order appointing her as special administrator, as well as an authenticated copy of Michael Chand's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Mrs. Chand brings claims both in her personal capacity and in her representative capacity as the Personal Representative, on behalf of Michael Chand's estate.

469.     Plaintiff Michael Chand, Jr. is a U.S. citizen and California resident.  He is the son of Michael Chand, Sr.

470.     Plaintiff Christina Mahon is a U.S. citizen and California resident.  She is the daughter of Michael Chand, Sr.

471.     Plaintiff Ryan Chand is a U.S. citizen and California resident.  He is the son of Michael Chand, Sr.

472.     Plaintiff Brenda Chand is a U.S. citizen and California resident.  She is the daughter of Michael Chand, Sr.

473.     As a result of the August 17, 2007 attack, and the subsequent kidnapping and execution of Michael Chand, Sr., the Chand Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Michael Chand, Sr.'s society, companionship, and counsel.

474.     Michael Chand, Sr.'s estate is entitled to recover economic and non-economic damages from Defendants, due to his kidnapping, detainment, torture, and murder by Jaysh al-Mahdi.

**The Connelly Family**

475.     Corporal Brian Connelly served in Iraq in the U.S. Army as part of the 40th Engineer Battalion, 2nd Brigade Combat Team, 1st Armored Division.

476.     On February 26, 2009, CPL Connelly was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Adhamiyah District in eastern Baghdad, an area north of Sadr City.  He was 26 years old.

477.     CPL Connelly was a U.S. citizen when he was killed in Iraq.

478.     CPL Connelly's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

479.     Plaintiff Kara Connelly is a U.S. citizen and New Jersey resident.  She is the widow of CPL Connelly.

480.     Plaintiff Jean Dammann is a U.S. citizen and Ohio resident.  She is the mother of CPL Connelly.

481.     Plaintiff Mark Dammann is a U.S. citizen and Ohio resident.  He is the father of CPL Connelly.

482.     Plaintiff Kevin Connelly is a U.S. citizen and New Jersey resident.  He is the brother of CPL Connelly.

483.     As a result of the February 26, 2009 attack, and CPL Connelly's death, the Connelly Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Connelly's society, companionship, and counsel.

**Jimmy Connolly**

484.    Plaintiff Specialist Jimmy Connolly served in Iraq in the U.S. Army as the lead Combat Medic for the 3rd Platoon, 58th Combat Engineer Company, 11th Armored Cavalry Regiment.  SPC Connolly is a U.S. citizen and Washington, D.C. resident.

485.    SPC Connolly was deployed in Iraq from 2007 through 2009.  While deployed near Bayji, his unit was subject to regular improvised rocket attacks from the east.  On information and belief, these rocket attacks were perpetrated by Jaysh al-Mahdi.  This belief is based upon, among other things, SPC Connolly's personal observations of local indicators consistent with Jaysh al-Mahdi death squads being active in the area, and statements made to SPC Connolly by local Iraqi allies identifying the remains of burned out vehicles (including human remains) as having resulted from Jaysh al-Mahdi death squads active in the area.

486.    In or about the spring of 2008, SPC Connolly's company was transferred to FOB Hammer, which was east of Baghdad.  His company was moved to FOB Hammer because Jaysh al-Mahdi had inflicted severe casualties on the prior company that had been stationed there.  His company's mission at FOB Hammer was to fight Jaysh al-Mahdi to prevent Jaysh al-Mahdi from undermining the military's civil-capacity-building objectives and de-railing the U.S. government's broader efforts to strengthen Iraqi democracy.

487.    While at FOB Hammer, SPC Connolly was subjected to repeated attacks by Jaysh al-Mahdi.  This included SPC Connolly being part of multiple convoys subjected to IEDs planted and detonated by Jaysh al-Mahdi.  SPC Connolly was also subjected to attacks while he and his unit were resting and refitting at FOB Hammer.

488.    Due to the intense, relentless terrorist attacks perpetrated by Jaysh al-Mahdi on SPC Connolly and his company both while near Bayji and while in FOB Hammer, SPC Connolly experienced extreme emotional trauma and distress.  He was diagnosed with Post-

Traumatic Stress Disorder ("PTSD").  Due to his injuries, SPC Connolly received a 70%

disability rating from the VA.  As a result of the attacks, SPC Connolly has experienced extreme

physical and emotional pain and suffering.

489.     The attacks that injured SPC Connolly would have violated the law of war if

Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s)

who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy

combatants.

### The Doheny Family and Estate

490.     Michael Doheny worked as a civilian security specialist in Iraq.  He was

employed by a military contractor that provided security for civilian contractors who disposed of

captured munitions.

491.     On December 9, 2007, Mr. Doheny was killed by an EFP planted and detonated

by Jaysh al-Mahdi in Az Zubaydiyah, the Jaysh al-Mahdi stronghold in Wasit Province.  The

EFP attack destroyed Mr. Doheny's vehicle, which was also occupied by Micah Shaw, Steven

Evrard, and Plaintiff Billy Johnson.  Mr. Doheny was 30 years old.

492.     Mr. Doheny was a U.S. citizen when he was killed in Iraq.

493.     Mr. Doheny's murder would have violated the law of war if Jaysh al-Mahdi were

subject to it because, among other reasons, Mr. Doheny was a civilian not taking part in

hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore

uniforms nor otherwise identified themselves as enemy combatants.

494.     Plaintiff Melissa Doheny is a U.S. citizen and Nebraska resident.  She is the

widow of Michael Doheny.  She brings claims in both her personal capacity and her

representative capacity on behalf of Mr. Doheny's estate.

495.    Plaintiff Kathy Kugler is a U.S. citizen and Nebraska resident.  She is the mother of Michael Doheny.

496.    Plaintiff Robert Kugler is a U.S. citizen and Oregon resident.  He is the brother of Michael Doheny.

497.    Plaintiff Amy Ritchie is a U.S. citizen and Nebraska resident.  She is the sister of Michael Doheny.

498.    As a result of the December 9, 2007 attack, and Michael Doheny's death, the Doheny Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Michael Doheny's society, companionship, and counsel.

499.    Mr. Doheny's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Edwards Family**

500.    Plaintiff Private First Class Drew Edwards served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Missouri resident.

501.    On June 25, 2007, PFC Edwards was injured by an EFP planted and detonated by Jaysh al-Mahdi in the northeastern Mua'lmeen neighborhood.  The EFP attack injured PFC Edwards' neck and gave him a concussion.

502.    On July 17, 2007, PFC Edwards was injured by an IED – consisting of three 155mm artillery rounds fused together – planted and detonated by Jaysh al-Mahdi.  The IED blast resulted in the amputation of his left leg below the knee, shrapnel to his face and back, a .50 caliber gunshot wound through his right thigh caused by the resulting fire (post-blast), traumatic brain injury, and degenerative disk(s) in his spine.  PFC Edwards was diagnosed with PTSD due to the attacks.  Due to his injuries, PFC Edwards received a 100% disability rating from the VA.

As a result of the June 25, 2007 and July 17, 2007 attacks, PFC Edwards has experienced extreme physical and emotional pain and suffering.

503.    The attacks that injured PFC Edwards would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the EFP and IED attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

504.    Plaintiff Donielle Edwards is a U.S. citizen and Missouri resident.  She is the wife of PFC Edwards.

505.    Plaintiff Alan T. Edwards is a U.S. citizen and Kansas resident.  He is the father of PFC Edwards.

506.    Plaintiff Brenda Edwards is a U.S. citizen and Kansas resident.  She is the mother of PFC Edwards.

507.    Plaintiff Dane Edwards is a U.S. citizen and Nebraska resident.  He is the brother of PFC Edwards.

508.    Plaintiff Logan M. Edwards is a U.S. citizen and Kansas resident.  He is the brother of PFC Edwards.

509.    Plaintiff Samantha R. Edwards is a U.S. citizen and California resident.  She is the sister of PFC Edwards.

510.    Plaintiff Ian Edwards is a U.S. citizen and Kansas resident.  He is the brother of PFC Edwards.

511.    Plaintiff Hannah Edwards is a U.S. citizen and Kansas resident.  She is the sister of PFC Edwards.

512.     As a result of the June 25, 2007 and July 17, 2007 attacks, and PFC Edwards' injuries, the Edwards Family has experienced extreme emotional pain and suffering.

**The Emory Family and Estate**

513.     Sergeant Michael Adam Emory served in Iraq as part of the 2-16 Rangers.  He was a U.S. citizen and Texas resident.  He died on November 23, 2019.

514.     On April 28, 2007, a Jaysh al-Mahdi sniper, shooting from the roof of a mosque in the Kamaliyah neighborhood of eastern Baghdad, shot SGT Emory in the head using an AR-15 rifle.  That attack severely wounded SGT Emory and sent him into a coma.  As a result of the bullet wound, he suffered traumatic brain injury and other neurological disorders.  Due to his injuries, SGT Emory received a 100% disability rating from the VA.  SGT Emory retained fragments of the Jaysh al-Mahdi-fired bullet lodged in his head.  As a result of the attack, SGT Emory experienced extreme physical and emotional pain and suffering.

515.     The attack that injured SGT Emory would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot SGT Emory did so from a mosque, and because he neither wore a uniform nor otherwise identified himself as an enemy combatant.

516.     Plaintiff Austin Emory is a U.S. citizen and Georgia resident.  He is the son of SGT Emory.

517.     Plaintiff Brandon Emory is a U.S. citizen and Georgia resident.  He is the son of SGT Emory.  Brandon Emory brings claims in both his personal capacity and his representative capacity on behalf of SGT Emory's estate.

518.     Plaintiff L.E., by and through her next friend Maria de la luz Villa, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Emory.

519.    Plaintiff Maria de la luz Villa is a U.S. citizen and Texas resident.  She is the ex-wife of SGT Emory.  They were married when SGT Emory was shot, and Ms. Villa acted as SGT Emory's primary caregiver in the years following the attack.

520.    Plaintiff Bobby Emory is a U.S. citizen and Florida resident.  He is the father of SGT Emory.  Mr. Emory helped care for SGT Emory after he was shot.

521.    Kathy Louise Burns was a U.S. citizen and Georgia resident.  She was the mother of SGT Emory.  She died on November 27, 2019.

521.1.   Plaintiff Carolyn Baldwin is a U.S. citizen and Georgia resident.  She is the sister of Kathy Louise Burns.  She brings this action in her representative capacity on behalf of Ms. Burns's estate.

522.    As a result of the April 28, 2007 attack, and SGT Emory's injuries, the Emory Family has experienced extreme emotional pain and suffering.

**Tanya Evrard**

523.    Steven Evrard worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who disposed of captured munitions.

524.    On December 9, 2007, Mr. Evrard was killed by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah – the Jaysh al-Mahdi stronghold in Wasit Province.  The EFP attack destroyed Mr. Evrard's vehicle, which was also occupied by Michael Doheny, Micah Shaw, and Plaintiff Billy Johnson.  Mr. Evrard was 36 years old.

525.    Mr. Evrard was a U.S. citizen when he was killed in Iraq.

526.    Mr. Evrard's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Evrard was a civilian not taking part in

hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

527.    Plaintiff Tanya Evrard is a U.S. citizen and Texas resident.  She is the widow of Steven Evrard.

528.    As a result of the December 9, 2007 attack, and Steven Evrard's death, Tanya Evrard has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven. Evrard's society, companionship, and counsel.

### The Harbin Family

529.    Plaintiff Private First Class Jacob Harbin served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Idaho resident.

530.    On September 22, 2007, PFC Harbin was injured by an EFP planted and detonated by Jaysh al-Mahdi.  The attack took place outside a gas station, across the street from FOB Rustamiyah, from which PFC Harbin's unit had been deployed to provide security to prevent Jaysh al-Mahdi from extorting the local population.  After activation, the EFP was set to detonate using a passive infrared trigger system.  PFC Harbin sustained serious injuries in the attack, including being hit by shrapnel in his feet.  Due to his injuries, PFC Harbin received a 70% disability rating from the VA.  As a result of the attack, PFC Harbin has experienced extreme physical and emotional pain and suffering.

531.    The attack that injured PFC Harbin would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

532.    Plaintiff Danny Harbin is a U.S. citizen and Idaho resident.  He is the father of PFC Harbin.

533.    Plaintiff Linda Harbin is a U.S. citizen and Idaho resident.  She is the mother of PFC Harbin.

534.    Plaintiff Elijah Harbin is a U.S. citizen and Idaho resident.  He is the brother of PFC Harbin.

535.    Plaintiff Esther Tate is a U.S. citizen and Idaho resident.  She is the sister of PFC Harbin.

536.    As a result of the September 22, 2007 attack, and PFC Harbin's injuries, the Harbin Family has experienced extreme emotional pain and suffering.

### **The Holden Family**

537.    Private First Class Brian L. Holden served in Iraq in the U.S. Army as part of the 2nd Battalion, 17th Field Artillery Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

538.    On April 9, 2007, PFC Holden was killed by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad.  He was 20 years old.

539.    PFC Holden was a U.S. citizen when he was killed in Iraq.

540.    PFC Holden's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

541.    Plaintiff Leasa Dollar is a U.S. citizen and North Carolina resident.  She is the mother of PFC Holden.

542.    Plaintiff Eugene DeLozier is a U.S. citizen and North Carolina resident.  He is the stepfather of PFC Holden.

543.     As a result of the April 9, 2007 attack and PFC Holden's death, the Holden
Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC
Holden's society, companionship, and counsel.

**Billy Johnson**

544.     Plaintiff Billy Johnson worked as a civilian security specialist in Iraq.  He was
employed by a military contractor that provided security for civilian contractors who disposed of
captured munitions.  Mr. Johnson is a U.S. citizen and Tennessee resident.

545.     On December 9, 2007, Mr. Johnson was injured by an EFP planted and detonated
by Jaysh al-Mahdi in Az Zubaydiyah – the Jaysh al-Mahdi stronghold in Wasit Province.  The
EFP attack destroyed Mr. Johnson's vehicle, which was also occupied by Michael Doheny,
Micah Shaw, and Steven Evrard.  The attack severely wounded Mr. Johnson.  As a result of the
attack, Mr. Johnson has experienced extreme physical and emotional pain and suffering.

546.     The attack that injured Mr. Johnson would have violated the law of war if Jaysh
al-Mahdi were subject to it because, among other reasons, Mr. Johnson was a civilian not taking
part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither
wore uniforms nor otherwise identified themselves as enemy combatants.

**The Juneau Family and Estate**

547.     William ("Bill") Juneau worked in Iraq as a civilian security contractor working
to train members of Iraq's police service.

548.     On November 26, 2007, Mr. Juneau was killed in Wasit Province near Aziziyah,
Iraq by an IED planted and detonated by Jaysh al-Mahdi.  He was 36 years old.

549.     Mr. Juneau was a U.S. citizen when he was killed in Iraq.

550.     Mr. Juneau's murder would have violated the law of war if Jaysh al-Mahdi were
subject to it because, among other reasons, Mr. Juneau was a civilian not taking part in

hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

551.    Plaintiff Bridget Juneau is a U.S. citizen and Minnesota resident.  She is the twin sister of Bill Juneau.

552.    Bridget Juneau is also the Personal Representative of Bill. Juneau's estate.  A copy of the Minnesota District Court order appointing her as Personal Representative, as well as an authenticated copy of Bill Juneau's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Bridget Juneau brings claims in both her personal capacity and her representative capacity as the Personal Representative, on behalf of Bill Juneau's estate.

553.    Plaintiff Stephanie Juneau is a U.S. citizen and Montana resident.  She is the sister of Bill Juneau.

554.    As the result of the November 26, 2007 attack, and Bill Juneau's death, the Juneau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Bill Juneau's society, companionship, and counsel.

555.    Bill Juneau's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the November 26, 2007 Jaysh al-Mahdi attack.

**William Kelso**

556.    Plaintiff William Kelso served in Iraq in the U.S. Army as a Combat Medic with the 3rd Infantry Division, 1st Battalion, 64th Armored Regiment.  He is a U.S. citizen and California resident.

557.    In early 2008, when CM Kelso's unit was deployed near Sadr City, CM Kelso was injured on several occasions by EFPs planted and detonated by Jaysh al-Mahdi in eastern Baghdad.  His injuries from these attacks included, among other things, traumatic brain injury.

Due to his injuries, CM Kelso received an 80% disability rating from the VA.  As a result of the attacks, CM Kelso has experienced extreme physical and emotional pain and suffering.

558.     One or more of the attacks that injured CM Kelso would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Jaysh al-Mahdi specifically targeted him as a medic, and the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The John Kirby Family

559.     Plaintiff Staff Sergeant John Kirby served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

560.     On April 6, 2007, SSG Kirby was injured in a complex attack carried out by Jaysh al-Mahdi in the Mua'lmeen neighborhood.  The complex attack involved both a roadside EFP and an ambulance that Jaysh al-Mahdi had rigged with explosives.  On May 29, 2007, near Route Predator at the edge of the Fedilayah neighborhood, a Jaysh al-Mahdi sniper shot SSG Kirby in the arm, which broke his humerus in three places and later required an implant.  Both attacks occurred east of Sadr City.  Due to his injuries, SSG Kirby received a 60% disability rating from the VA.  As a result of the April 6, 2007 and May 29, 2007 attacks, SSG Kirby has experienced extreme physical and emotional pain and suffering.

561.     The April 6, 2007 and May 29, 2007 attacks that injured SSG Kirby would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Jaysh al-Mahdi used an ambulance as a weapon, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP and shot SSG Kirby neither wore uniforms nor otherwise identified themselves as enemy combatants.

562.     Plaintiff Rebekah Kirby is a U.S. citizen and Texas resident.  She is the wife of SSG Kirby.

563.     As a result of the April 6, 2007 and May 29, 2007 attacks and SSG Kirby's injuries, Rebekah Kirby has experienced extreme emotional pain and suffering.

**The Klecker Family and Estate**

564.     Deborah Klecker worked in Iraq for a civilian contractor providing mentoring and training to Iraqi police officers.

565.     On June 27, 2005, Ms. Klecker was killed by an IED planted and detonated by Jaysh al-Mahdi in eastern Baghdad.  She was 51 years old.

566.     Ms. Klecker was a U.S. citizen when she was killed in Iraq.

567.     Ms. Klecker's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Ms. Klecker was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

568.     Plaintiff Caren Klecker is a U.S. citizen and Washington resident.  She is the sister of Deborah Klecker.

569.     Plaintiff Gregory Klecker is a U.S. citizen and Oregon resident.  He is the brother of Deborah Klecker.

570.     Gregory Klecker is also the Personal Representative of Ms. Klecker's estate.  A copy of the Oregon Circuit Court order appointing him as Personal Representative, as well as an authenticated copy of Ms. Klecker's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for her estate is now open in the District of Columbia.  Gregory Klecker brings claims in both his personal capacity and his representative capacity on behalf of Deborah Klecker's estate.

571.     As a result of the June 27, 2005 attack, and Deborah Klecker's death, the Klecker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Deborah Klecker's society, companionship, and counsel.

572.     Deborah Klecker's estate is entitled to recover economic and non-economic damages from Defendants, due to her murder by Jaysh al-Mahdi.

**Leroy Lancaster**

573.     Plaintiff Private First Class Leroy Lancaster served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

574.     On June 8, 2007, PFC Lancaster was injured in a complex attack carried out by Jaysh al-Mahdi in the Mua'lmeen neighborhood.  The attack began with an EFP attack on PFC Lancaster's vehicle, followed by Jaysh al-Mahdi rifle and small-arms fire.  The attack severely wounded PFC Lancaster:  he was hit with shrapnel in the legs, neck, and face, and he sustained burns on his legs.  He also suffered ruptured ear drums.  Due to his injuries, PFC Lancaster received a 60% disability rating from the VA.  As a result of the attack, PFC Lancaster has experienced extreme physical and emotional pain and suffering.

575.     The attack that injured PFC Lancaster would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Lukow Family**

576.     Plaintiff Staff Sergeant Michael Lukow served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Utah resident.

577.     On January 30, 2008, SSG Lukow was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, along the outskirts of the Baghdad al Jadeeda

neighborhood as his vehicle was nearing Route Predator.  The attack severely wounded SSG Lukow and, among other things, required an amputation of his foot.  Due to his injuries, SSG Lukow received a 70% disability rating from the U.S. Army.  As a result of the attack, SSG Lukow has experienced extreme physical and emotional pain and suffering.

578.    The attack that injured SSG Lukow would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

579.    Plaintiff Bruce Lukow is a U.S. citizen and Colorado resident.  He is the father of SSG Lukow.

580.    Plaintiff Rikki Lukow is a U.S. citizen and Colorado resident.  She is the mother of SSG Lukow.

581.    Plaintiff Kristen Kelley is a U.S. citizen and Colorado resident.  She is the sister of SSG Lukow.

582.    Plaintiff Andrew Lukow is a U.S. citizen and Wisconsin resident.  He is the brother of SSG Lukow.

583.    Plaintiff Joseph Paul Lukow is a U.S. citizen and Colorado resident.  He is the brother of SSG Lukow.

584.    As a result of the January 30, 2008 attack, and SSG Lukow's injuries, the Lukow Family has experienced extreme emotional pain and suffering.

**The Lynch Family**

585.    Lance Corporal Robert A. Lynch served in Iraq in the U.S. Marine Corps as part of the 1st Battalion, 12th Marine Regiment, 3rd Marine Division, III Marine Expeditionary Force.

586.     On July 24, 2007, L. Cpl. Lynch was killed by an EFP planted and detonated by Jaysh al-Mahdi on the road between Baghdad and Baqubah.  He was 20 years old.

587.     L. Cpl. Lynch was a U.S. citizen when he was killed in Iraq.

588.     L. Cpl. Lynch's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

589.     Plaintiff Angela Robinson is a U.S. citizen and Wisconsin resident.  She is the mother of L. Cpl. Lynch.

590.     Plaintiff Randall Thompson is a U.S. citizen and Kentucky resident.  He is the brother of L. Cpl. Lynch.

591.     As a result of the July 24, 2007 attack, and L. Cpl. Lynch's death, the Lynch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of L. Cpl. Lynch's society, companionship, and counsel.

### Nathan McClure

592.     Plaintiff Sergeant Nathan McClure served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Kansas resident.

593.     On September 2, 2007, SGT McClure was injured in a complex attack carried out by Jaysh al-Mahdi near FOB Rustamiyah on Route Pluto.  The attack began with the use of an array of multiple EFPs to attack SGT McClure's convoy, followed by Jaysh al-Mahdi small-arms fire.  The attack severely wounded SGT McClure, including lacerations of his abdomen and thigh, burns, and a fractured arm.  Due to his injuries, SGT McClure received a 100% disability rating from the VA.  As a result of the attack, SGT McClure has experienced extreme physical and emotional pain and suffering.

594.     The attack that injured SGT McClure would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The McNeal Family

595.     Staff Sergeant Jeremiah E. McNeal served in Iraq as a combat engineer assigned to the 237th Engineer Company, 276th Engineer Battalion, 91st Troop Command in the Virginia Army National Guard.

596.     On April 6, 2008, during the Battle of Sadr City, SSG McNeal was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in east Baghdad.  He was 23 years old.

597.     SSG McNeal was a U.S. citizen when he was killed in Iraq.

598.     SSG McNeal's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

599.     Plaintiff Nikita McNeal is a U.S. citizen and Virginia resident.  She is the widow of SSG McNeal.

600.     Plaintiff J.M., by and through his next friend Nikita McNeal, is a U.S. citizen and Virginia resident.  He is the minor son of SSG McNeal.

601.     As a result of the April 6, 2008 attack, and SSG McNeal's death, the McNeal Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McNeal's society, companionship, and counsel.

**The Mixson Family**

602.     Plaintiff Corporal Joseph Mixson served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Florida resident.

603.     On September 4, 2007, CPL Mixson was severely injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Predator near Sadr City.  The EFP attack on CPL Mixson's vehicle severely wounded CPL Mixson, while three of the other 2-16 Rangers were killed outright and the fourth died of wounds four months later.  CPL Mixson sustained a skull fracture, suffered traumatic brain injury, lost one of his elbows, and lost both of his legs above the knee.  Due to his injuries, CPL Mixson received a 100% disability rating from the VA.  As a result of the attack, CPL Mixson has experienced extreme physical and emotional pain and suffering.

604.     The attack that injured CPL Mixson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

605.     Plaintiff John Mixson is a U.S. citizen and Florida resident.  He is the father of CPL Mixson.  Mr. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.

606.     Plaintiff Karon Mixson is a U.S. citizen and Florida resident.  She is the mother of CPL Mixson.  Mrs. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.

607.     Plaintiff Alicia Mixson is a U.S. citizen and Florida resident.  She is the sister of CPL Mixson.  Ms. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.

608.    As a result of the September 4, 2007 attack, and CPL Mixson's injuries, the Mixson Family has experienced extreme emotional pain and suffering.

### The Neiberger Family and Estate

609.    Specialist Christopher Neiberger served in Iraq in the U.S. Army as part of the 1st Battalion, 18th Infantry Regiment.  He served as a tank gunner.

610.    On August 6, 2007, SPC Neiberger was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad.  He was 22 years old.

611.    SPC Neiberger was a U.S. citizen when he was killed in Iraq.

612.    SPC Neiberger's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

613.    Plaintiff Richard Neiberger is a U.S. citizen and Florida resident.  He is the father of SPC Neiberger.

614.    Plaintiff Mary Neiberger is a U.S. citizen and Florida resident.  She is the mother of SPC Neiberger.

615.    Plaintiff Eric Neiberger is a U.S. citizen and Florida resident.  He is the brother of SPC Neiberger.

616.    Eric Neiberger is also the Personal Representative of SPC Neiberger's estate.  A copy of the Florida Circuit Court order appointing him as Personal Representative has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for SPC Neiberger's estate is now open in the District of Columbia.  Eric Neiberger brings claims in both his personal capacity and his representative capacity on behalf of SPC Neiberger's estate.

617.    Plaintiff Ami Neiberger is a U.S. citizen and Virginia resident.  She is the sister of SPC Neiberger.

618.    Plaintiff Robert Neiberger is a U.S. citizen and Washington, D.C. resident.  He is the brother of SPC Neiberger.

619.    As a result of the August 6, 2007 attack, and SPC Neiberger's death, the Neiberger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Neiberger's society, companionship, and counsel.

620.    SPC Neiberger's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Pellecchia Family**

621.    Plaintiff Corporal Anthony Donald Pellecchia served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

622.    On April 6, 2007, CPL Pellecchia was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood, in which Jaysh al-Mahdi ambushed his platoon.  The complex attack involved both a roadside EFP and an ambulance that Jaysh al-Mahdi had rigged with explosives.  The attack partially detached one of CPL Pellecchia's kneecaps, partially severed his patellar tendon, crushed one of his feet, set one of his legs on fire, inflicted shrapnel wounds to his abdomen, and caused him to suffer a ruptured eardrum.  The physical trauma CPL Pellecchia suffered caused permanent psoriasis in affected parts of his body.  Due to his injuries, CPL Pellecchia received a 90% disability rating from the VA.  As a result of the attack, CPL Pellecchia has experienced extreme physical and emotional pain and suffering.

623.    The attack that injured CPL Pellecchia would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Jaysh al-Mahdi used an

ambulance as a weapon, and because the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

624.    Plaintiff Anthony Pellecchia is a U.S. citizen and Texas resident.  He is the father of CPL Pellecchia, and he cared for CPL Pellecchia after his injuries.

625.    Plaintiff Kathryn Ann Johnson is a U.S. citizen and Missouri resident.  She is the mother of CPL Pellecchia, and she cared for CPL Pellecchia after his injuries.

626.    As a result of the April 6, 2007 attack, and CPL Pellecchia's injuries, the Pellecchia Family has experienced extreme emotional pain and suffering.

**The Price Family**

627.    Plaintiff Specialist Daniel Price served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Illinois resident.

628.    On July 17, 2007, SPC Price was injured by an IED – consisting of three artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi on Outer Berm Road in a palm tree grove close to Sadr City.  Due to his injuries, SPC Price received a 90% unemployability rating from the VA.  As a result of the attack, SPC Price has experienced extreme physical and emotional pain and suffering.

629.    The attack that injured SPC Price would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

630.    Plaintiff Terri Overton is a U.S. citizen and Illinois resident.  She is the mother of SPC Price.

631.    Plaintiff Steven Price is a U.S. citizen and Tennessee resident.  He is the brother of SPC Price.

632.     As a result of the July 17, 2007 attack, and SPC Price's injuries, the Price Family has experienced extreme emotional pain and suffering.

**Carl Reiher**

633.     Plaintiff Private First Class Carl Reiher served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Arkansas resident.

634.     On March 29, 2008, during the Battle of Sadr City, PFC Reiher was injured in a complex attack carried out by Jaysh al-Mahdi, between the New Baghdad District Advisory Council and COP Cajimat.  The complex attack involved both an EFP planted and detonated by Jaysh al-Mahdi and small-arms fire.  The attack severely wounded PFC Reiher and caused him to lose a hand.  Due to his injuries, PFC Reiher received a 100% disability rating from the VA. As a result of the attack, PFC Reiher has experienced extreme physical and emotional pain and suffering.

635.     The attack that injured PFC Reiher would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Rogers Estate**

636.     Major Alan Rogers served in Iraq in the U.S. Army as part of the 1st Division National Police Transition Team, which trained and embedded with Iraqi military units.

637.     On January 27, 2008, MAJ Rogers was killed by an IED planted and detonated by Jaysh al-Mahdi in the Rusafa District in eastern Baghdad.  He was 40 years old.

638.     MAJ Rogers was a U.S. citizen when he was killed in Iraq.

639.     MAJ Rogers' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and

detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

640.    Plaintiff Shay Hill is a U.S. citizen and Florida resident.  Mr. Hill is the Executor of MAJ Rogers' estate.  A copy of the Georgia Probate Court order appointing him Executor, as well as an authenticated copy of MAJ Rogers' will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Shay Hill brings this action in his representative capacity as Executor, on behalf of MAJ Rogers' estate.

641.    MAJ Rogers' estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the January 27, 2008 Jaysh al-Mahdi attack.

**The Rosa Family**

642.    Plaintiff Sergeant Luis Rosa-Valentin served in Iraq in the U.S. Army as part of the 66th Armored Regiment, 3rd Brigade Combat Team, 4th Infantry Division.  He is a U.S. citizen and Maryland resident.

643.    On April 21, 2008, SGT Rosa-Valentin was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Amin neighborhood of the New Baghdad District.  SGT Rosa-Valentin's injuries caused him to lose both his legs and his left arm, and doctors gave him 5% survival odds in the wake of the attack.  He also suffered blindness in one eye, lost his hearing, broke every bone in his face, suffered traumatic brain injury, and was diagnosed with PTSD.  Due to his injuries, SGT Rosa-Valentin received a 100% disability rating from the VA.  As a result of the attack, SGT Rosa-Valentin has experienced extreme physical and emotional pain and suffering.

644.    The attack that injured SGT Rosa-Valentin would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s)

who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

645.    Plaintiff Luis Rosa-Alberty is a U.S. citizen and Maryland resident.  He is the father of SGT Rosa-Valentin.

646.    Plaintiff M.R., by and through her next friend Luis Rosa-Valentin, is a U.S. citizen and Maryland resident.  She is the minor daughter of SGT Rosa-Valentin.

647.    Plaintiff Alex Rosa-Valentin is a U.S. citizen and Florida resident.  He is the brother of SGT Rosa-Valentin.

648.    Plaintiff Iliana Rosa-Valentin is a U.S. citizen and Maryland resident.  She is the sister of SGT Rosa-Valentin.

649.    As a result of the April 21, 2008 attack, and SGT Rosa-Valentin's injuries, the Rosa Family has experienced extreme emotional pain and suffering.

### The Shaw Family

650.    Micah Shaw worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who searched for and disposed of captured munitions.

651.    On December 9, 2007, Mr. Shaw was killed by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah – the Jaysh al-Mahdi stronghold in Wasit Province.  The EFP attack destroyed Mr. Shaw's vehicle, which was also occupied by Michael Doheny, Steven Evrard, and Plaintiff Billy Johnson.  Mr. Shaw was 32 years old.

652.    Mr. Shaw was a U.S. citizen when he was killed in Iraq.

653.    Mr. Shaw's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Shaw was a civilian not taking part in hostilities,

and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

654.    Plaintiff Elena Shaw is a U.S. citizen and New Hampshire resident.  She is the widow of Micah Shaw.

655.    Plaintiff Emily Shaw is a U.S. citizen and Pennsylvania resident.  She is the daughter of Micah Shaw.

656.    Plaintiff Casey Shaw is a U.S. citizen and New Hampshire resident.  He is the son of Micah Shaw.

657.    Plaintiff L.S., by and through her next friend Elena Shaw, is a U.S. citizen and New Hampshire resident.  She is the minor daughter of Micah Shaw.

658.    As a result of the December 9, 2007 attack, and Micah Shaw's death, the Shaw Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Micah Shaw's society, companionship, and counsel.

### The Stephens Family and Estate

659.    Sergeant Blake Stephens served in Iraq in the U.S. Army as part of the 3rd Brigade Combat Team of the 3rd Infantry Division.

660.    On May 8, 2007, SGT Stephens was killed by an EFP planted and detonated by Jaysh al-Mahdi near Salman Pak, a town 18 miles south of Baghdad.  He was 25 years old.

661.    SGT Stephens was a U.S. citizen when he was killed in Iraq.

662.    SGT Stephens' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

663.    Plaintiff Erin Lee Dructor is a U.S. citizen and California resident.  She is the widow of SGT Stephens.  Erin Lee Dructor brings claims in both her personal capacity and her representative capacity on behalf of SGT Stephens's estate.

664.    Plaintiff Kathleen Stephens is a U.S. citizen and Idaho resident.  She is the mother of SGT Stephens.

665.    Plaintiff Trent Stephens is a U.S. citizen and Idaho resident.  He is the father of SGT Stephens.

666.    Plaintiff Derek Stephens is a U.S. citizen and Idaho resident.  He is the brother of SGT Stephens.

667.    Plaintiff Rhett Stephens is a U.S. citizen and California resident.  He is the brother of SGT Stephens.

668.    Plaintiff Summer Stephens is a U.S. citizen and California resident.  She is the sister of SGT Stephens.

669.    Plaintiff Brittani Hobson is a U.S. citizen and Idaho resident.  She is the sister of SGT Stephens.

670.    As a result of the May 8, 2007 attack, and SGT Stephens' death, the Stephens Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stephens' society, companionship, and counsel.

671.    SGT Stephens's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Tucker Family and Estate**

672.    Specialist Ronald J. Tucker served in Iraq in the U.S. Army as part of the 1st Battalion, 22nd Infantry Regiment, 1st Brigade Combat Team, 4th Infantry Division.

673.     On April 30, 2008, during the Battle of Sadr City, SPC Tucker was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad.  The EFP attack killed SPC Tucker while he was in a vehicle traveling back from helping to build a soccer field for Iraqi children.  He was 21 years old.

674.     SPC Tucker was a U.S. citizen when he was killed in Iraq.

675.     SPC Tucker's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, he was traveling with a civilian convoy at the time of the EFP attack, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

676.     Plaintiff Susan Arnold is a U.S. citizen and Colorado resident.  She is the mother of SPC Tucker.

677.     Susan Arnold is also the Personal Representative of SPC Tucker's estate.  A copy of the Colorado District Court order appointing her as Personal Representative has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for SPC Tucker's estate is now open in the District of Columbia.  Susan Arnold brings claims in both her personal capacity and her representative capacity as the Personal Representative, on behalf of SPC Tucker's estate.

678.     Plaintiff David Arnold is a U.S. citizen and Colorado resident.  He is the stepfather of SPC Tucker.

679.     Plaintiff Samantha Tucker is a U.S. citizen and Ohio resident.  She is the sister of SPC Tucker.

680.     Plaintiff Daisy Tucker is a U.S. citizen and Colorado resident.  She is the sister of SPC Tucker.

681.     Plaintiff Brandon Arnold is a U.S. citizen and Colorado resident.  He is the brother of SPC Tucker.

682.     As a result of the April 30, 2008 attack, and SPC Tucker's death, the Tucker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Tucker's society, companionship, and counsel.

683.     SPC Tucker's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the April 30, 2008 Jaysh al-Mahdi attack.

**The Vaughn Family**

684.     Sergeant Richard A. Vaughn served in Iraq in the U.S. Army as part of the 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division.

685.     On April 7, 2008, during the Battle of Sadr City, SGT Vaughn was killed in a complex attack carried out by Jaysh al-Mahdi in Fedilayah, which is in the New Baghdad District in eastern Baghdad.  The complex attack involved the use of both RPGs and EFPs planted and detonated by Jaysh al-Mahdi.

686.     SGT Vaughn was a U.S. citizen when he was killed in Iraq.

687.     SGT Vaughn's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs and fired the RPGs neither wore uniforms nor otherwise identified themselves as enemy combatants.

688.     Plaintiff Rachelle Idol is a U.S. citizen and North Carolina resident.  She is the widow of SGT Vaughn.

689.     Plaintiff James Vaughn is a U.S. citizen and Arizona resident.  He is the father of SGT Vaughn.

690.    Plaintiff Jennine Vaughn is a U.S. citizen and Arizona resident.  She is the mother of SGT Vaughn.

691.    Plaintiff Clifford Vaughn is a U.S. citizen and Arizona resident.  He is the brother of SGT Vaughn.

692.    As a result of the April 7, 2008 attack, and SGT Vaughn's death, the Vaughn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Vaughn's society, companionship, and counsel.

**The Delmar White Family and Estate**

693.    Staff Sergeant Delmar White served in Iraq as part of the 2nd Battalion of the 138th Field Artillery in the Kentucky National Guard.

694.    On September 2, 2007, SSG White was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Rusafa District in eastern Baghdad.  He was 37 years old.

695.    SSG White was a U.S. citizen when he was killed in Iraq.

696.    SSG White's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

697.    Plaintiff Michele White is a U.S. citizen and Kentucky resident.  She is the widow of SSG White.

698.    Michele White is also the Personal Representative of SSG White's estate.  A copy of the Kentucky District Court order appointing her as Personal Representative has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for SSG White's estate is now open in the District of Columbia.  Michele White brings claims in both her personal capacity and her representative capacity on behalf of SSG White's estate.

699.     Plaintiff Shelby White is a U.S. citizen and Kentucky resident.  She is the daughter of SSG White.

700.     Plaintiff S.W., by and through his next friend Michele White, is a U.S. citizen and Kentucky resident.  He is the minor son of SSG White.

701.     Plaintiff Robert White is a U.S. citizen and Ohio resident.  He is the brother of Delmar White.

702.     As a result of the September 2, 2007 attack, and SSG White's death, the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG White's society, companionship, and counsel.

703.     SSG White's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Winegar Family

704.     Plaintiff Specialist Robert Winegar served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

705.     On March 29, 2008, during the Battle of Sadr City, SPC Winegar was injured in a complex attack carried out by Jaysh al-Mahdi, between the New Baghdad District Advisory Council and COP Cajimat.  The complex attack involved both an EFP planted and detonated by Jaysh al-Mahdi and small-arms fire.  At the time, SPC Winegar was returning to the COP after providing security for capacity-building operations.  The EFP attack severely wounded SPC Winegar.  Due to his injuries, SPC Winegar received a 90% disability rating from the VA.  As a result of the attack, SPC Winegar has experienced extreme physical and emotional pain and suffering.

706.     The attack that injured SPC Winegar would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

707.     Plaintiff Patricia A. Clavenna is a U.S. citizen and Michigan resident.  She is the mother of SPC Winegar.

708.     Plaintiff Elyse M. Winegar is a U.S. citizen and Michigan resident.  She is the sister of SPC Winegar.

709.     Plaintiff Mary K. Jagello is a U.S. citizen and Michigan resident.  She is the sister of SPC Winegar.

710.     Plaintiff Robert L. Winegar is a U.S. citizen and Michigan resident.  He is the father of SPC Winegar.

711.     As a result of the March 29, 2008 attack, and SPC Winegar's injuries, the Winegar Family has experienced extreme emotional pain and suffering.

### **The Witte Family and Estate**

712.     Staff Sergeant Kevin Witte served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.

713.     On October 20, 2006, SSG Witte was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad.  He was 27 years old.

714.     SSG Witte was a U.S. citizen when he was killed in Iraq.

715.     SSG Witte's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

716.     Plaintiff Melissa Witte is a U.S. citizen and North Carolina resident.  She is the widow of SSG Witte.

218

717.    Plaintiff William J. Witte is a U.S. citizen and Oregon resident.  He is the brother of SSG Witte.  William Jake Witte brings claims in both his personal capacity and his representative capacity on behalf SSG Witte's estate.

718.    As a result of the October 20, 2006 attack, and SSG Witte's death, the Witte Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Witte's society, companionship, and counsel.

719.    SSG Witte's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Zappa Family**

720.    Plaintiff First Sergeant William Zappa served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Texas resident.

721.    On April 28, 2007, 1SG Zappa was injured by the same Jaysh al-Mahdi sniper who shot SGT Emory in the Kamaliyah neighborhood in eastern Baghdad.  The sniper shot 1SG Zappa in the side.  Due to his injuries, 1SG Zappa received a 50% disability rating by the VA. As a result of the attack, 1SG Zappa has experienced extreme physical and emotional pain and suffering.

722.    The attack that injured 1SG Zappa would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot 1SG Zappa neither wore a uniform nor otherwise identified himself as an enemy combatant.

723.    Plaintiff Haekyung Zappa is a U.S. citizen and Texas resident.  She is the wife of 1SG Zappa.

724.    Plaintiff Patsy Bell is a U.S. citizen and Louisiana resident.  She is the mother of 1SG Zappa.

725.    As a result of the April 28, 2007 attack, and 1SG Zappa's injuries, the Zappa Family has experienced extreme emotional pain and suffering.

**The Landeck Family**

726.    Captain Kevin C. Landeck served in Iraq in the U.S. Army as part of the 2nd Battalion, 15th Field Artillery Regiment, 2nd Brigade Combat Team, 10th Mountain Division.

727.    On February 2, 2007, CPT Landeck was killed by an EFP planted and detonated by Jaysh al-Mahdi in its stronghold in the city center of Mahmudiyah.

728.    CPT Landeck was a U.S. citizen when he was killed in Iraq.

729.    CPT Landeck's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

730.    Plaintiff Richard Landeck is a U.S. citizen and Illinois resident.  He is the father of CPT Landeck.

731.    Plaintiff Victoria Landeck is a U.S. citizen and Illinois resident.  She is the mother of CPT Landeck.

732.    Plaintiff Jennifer Landeck is a U.S. citizen and Illinois resident.  She is the sister of CPT Landeck.

733.    As a result of the February 2, 2007 attack, and CPT Landeck's death, the Landeck Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Landeck's society, companionship, and counsel.

**The Thomas Family and Estate**

734.    Master Sergeant Sean M. Thomas served in the Green Zone in Baghdad in the 28th Division Support Command of the Pennsylvania Army National Guard.

735.    On March 27, 2007, MSG Thomas was killed by a 107mm rocket that was transported, stored, and launched by Jaysh al-Mahdi against the U.S. Embassy Diplomatic Compound in the Green Zone.  The attack took place during a period when Jaysh al-Mahdi was specifically targeting the Green Zone with 107mm rockets.

736.    MSG Thomas was a U.S. citizen when he was killed in Iraq.

737.    MSG Thomas' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the attack placed civilians at risk, and because the Jaysh al-Mahdi member(s) who launched the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

738.    Indirect fire ("IDF") attacks against the Green Zone, including the U.S. Embassy, were a signature attack of Jaysh al-Mahdi, and were a particular lever that Muqtada al-Sadr deployed with Hezbollah's assistance.  On information and belief, Hezbollah specifically directed Jaysh al-Mahdi agents to launch indirect fire attacks against U.S. facilities in Baghdad – including the U.S. Embassy in the Green Zone – to terrorize American civilian leadership and intimidate America into changing its policy in Iraq.

739.    Hezbollah operatives participated in Jaysh al-Mahdi's 107mm rocket attacks against Americans in Baghdad, including, on information and belief, with respect to the attack that killed MSG Thomas.  A State Department cable (as published by *WikiLeaks*) memorialized the consensus amongst U.S. and Iraqi personnel in Baghdad that Iran – and therefore on information and belief its proxy Hezbollah – played a specific operational role with respect to "IDF Attacks on the Green Zone."[387]  And a U.S. Army assessment (as published by *WikiLeaks*) concluded that indirect fire attacks against Americans in Baghdad were "most likely" the result

---

[387] U.S. State Dep't Cable, *July 15 Ministerial Committee on National Security* (Jul. 23, 2007) https://wikileaks.org/plusd/cables/07BAGHDAD2437_a.html.

of "Hezbollah operatives … directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against CF/ISF in [the] Baghdad area, utilizing historic TAI [i.e., Target Areas of Interest]."[388]

740.    Plaintiff Carrie Thompson is a U.S. citizen and Pennsylvania resident.  She is the widow of MSG Thomas.

741.    Carrie Thompson is also the Personal Representative of MSG Thomas' estate.  A copy of the Grant of Letters Testamentary to Carrie Thompson from the Pennsylvania Register of Wills, as well as an authenticated copy of MSG Thomas' will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Carrie Thompson brings claims in both her personal capacity and her representative capacity as the Personal Representative, on behalf of MSG Thomas' estate.

742.    Plaintiff A.T., by and through her next friend Carrie Thompson, is a U.S. citizen and Pennsylvania resident.  She is the minor daughter of MSG Thomas.

743.    Plaintiff Daniel Thomas, Sr. is a U.S. citizen and Pennsylvania resident.  He is the father of MSG Thomas.

744.    Plaintiff Diana Thomas is a U.S. citizen and Pennsylvania resident.  She is the mother of MSG Thomas.

745.    Plaintiff Daniel Thomas, Jr. is a U.S. citizen and Pennsylvania resident.  He is the brother of MSG Thomas.

746.    Plaintiff David Thomas is a U.S. citizen and Pennsylvania resident.  He is the brother of MSG Thomas.

---

[388] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

747.     Plaintiff Kelly Gillis is a U.S. citizen and Pennsylvania resident.  She is the sister of MSG Thomas.

748.     Plaintiff Melinda Flick is a U.S. citizen and Pennsylvania resident.  She is the sister of MSG Thomas.

749.     As a result of the March 27, 2007 attack, and MSG Thomas' death, the Thomas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Thomas' society, companionship, and counsel.

750.     MSG Thomas' estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the March 27, 2007 Jaysh al-Mahdi attack.

**The West Family**

751.     Staff Sergeant Laurent J. West served in Iraq in the U.S. Army as part of the 3rd Squadron, 73rd Cavalry Regiment, 1st Brigade Combat Team, 82nd Airborne Division.

752.     On March 11, 2008, SSG West was killed by a roadside bomb planted and detonated by Jaysh al-Mahdi in Babil Province, the Jaysh al-Mahdi stronghold in south central Iraq.

753.     SSG West was a U.S. citizen when he was killed in Iraq.

754.     SSG West's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the roadside bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

755.     Plaintiff Michelle West is a U.S. citizen and New Mexico resident.  She is the widow of SSG West.

756.     Plaintiff Madison Paige West is a U.S. citizen and Maryland resident.  She is the daughter of SSG West.

757.    Plaintiff Nistasha Perez is a U.S. citizen and Colorado resident.  She is the stepdaughter of SSG West.

758.    As a result of the March 11, 2008 attack, and SSG West's death, the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG West's society, companionship, and counsel.

### The Murphy-Sweet Family

759.    Commander Phillip A. Murphy-Sweet served in Iraq in the U.S. Navy, and was assigned to the Joint Contracting Command, Multi-National Force–Iraq.

760.    On April 7, 2007, Cmdr. Murphy-Sweet was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, near Sadr City.

761.    Cmdr. Murphy-Sweet was a U.S. citizen when he was killed in Iraq.

762.    Cmdr. Murphy-Sweet's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the convoy that Jaysh al-Mahdi attacked was a civilian convoy, and because the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

763.    Plaintiff Michael Murphy-Sweet is a U.S. citizen and Idaho resident.  He is the brother of Cmdr. Murphy-Sweet.

764.    Plaintiff Elizabeth Murphy-Sweet is a U.S. citizen and Idaho resident.  She is the sister of Cmdr. Murphy-Sweet.

765.    Plaintiff Anona Gonelli is a U.S. citizen and Idaho resident.  She is the sister of Cmdr. Murphy-Sweet.

766.    As a result of the April 7, 2007 attack, and Cmdr. Murphy-Sweet's death, the Murphy-Sweet Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cmdr. Murphy-Sweet's society, companionship, and counsel.

**The Kuhlmeier Family and Estate**

767.     Special Agent Daniel J. Kuhlmeier worked in Iraq for the U.S. Air Force, and was assigned to the Air Force Office of Special Investigations Detachment 204 (Offutt AFB, Nebraska), supporting the 55th Wing and Headquarters, U.S. Strategic Command.  He was a civilian employee of the U.S. Air Force who was posthumously awarded the Outstanding Civilian Career Service Award.

768.     On February 20, 2006, while he was part of a convoy en route to a meeting, Special Agent Kuhlmeier was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, near Sadr City.

769.     Special Agent Kuhlmeier was a U.S. citizen when he was killed in Iraq.

770.     Special Agent Kuhlmeier's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Special Agent Kuhlmeier was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

771.     Plaintiff Robert J. Kuhlmeier is a U.S. citizen and Pennsylvania resident.  He is the father of Special Agent Kuhlmeier.

772.     Plaintiff Theresa A. Kuhlmeier is a U.S. citizen and Pennsylvania resident.  She is the mother of Special Agent Kuhlmeier.

773.     Plaintiff Theresa A. Kuhlmeier is a U.S. citizen and Pennsylvania resident.  She is the sister of Special Agent Kuhlmeier.

774.     Plaintiff Edward Kuhlmeier is a U.S. citizen and Pennsylvania resident.  He is the brother of Special Agent Kuhlmeier.

775.     Plaintiff Thomas Kuhlmeier is a U.S. citizen and Pennsylvania resident.  He is the brother of Special Agent Kuhlmeier.

776.     Plaintiff John Kuhlmeier is a U.S. citizen and Pennsylvania resident.  He is the brother of Special Agent Kuhlmeier.

777.     Plaintiff David Kuhlmeier is a U.S. citizen and Pennsylvania resident.  He is the brother of Special Agent Kuhlmeier.

778.     Plaintiff Robert W. Kuhlmeier is a U.S. citizen and Pennsylvania resident.  He is the brother of Special Agent Kuhlmeier.

779.     Plaintiff Tanja Kuhlmeier is a U.S. citizen and Virginia resident.  She is the widow of Special Agent Kuhlmeier.

780.     Tanja Kuhlmeier is also the Personal Representative of Special Agent Kuhlmeier's estate.   A copy of the Nebraska County Court order appointing her as Personal Representative, as well as an authenticated copy of Special Agent Kuhlmeier's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  She brings claims in both her personal capacity and her representative capacity on behalf of Special Agent Kuhlmeier's estate.

781.     Plaintiff K.K., by and through her next friend Tanja Kuhlmeier, is a U.S. citizen and Virginia resident.  She is the minor daughter of Special Agent Kuhlmeier.

782.     As a result of the February 20, 2006 attack, and Special Agent Kuhlmeier's death, the Kuhlmeier Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Special Agent Kuhlmeier's society, companionship, and counsel.

783.     Special Agent Kuhlmeier's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Farley Family and Estate**

784.   Steven L. Farley worked in Iraq under the auspices of the U.S. Department of State as a member of a Provincial Reconstruction Team ("PRT") in eastern Baghdad in 2008.

785.   On June 24, 2008, a Jaysh al-Mahdi cell – whose members had, on information and belief, received training from Hezbollah in Iran – executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not following Sadr.  The bomb killed eleven people, including Mr. Farley and three other Americans.

786.   Mr. Farley was a U.S. citizen when he was killed in Iraq.

787.   Mr. Farley's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, he and others killed in the attack were civilians not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

788.   Plaintiff Donna Farley is a U.S. citizen and Oklahoma resident.  She is the widow of Steven Farley.

789.   Plaintiff Noel J. Farley is a U.S. citizen and Oklahoma resident.  He is the father of Steven Farley.

790.   Plaintiff Barbara Farley is a U.S. citizen and Oklahoma resident.  She is the mother of Steven Farley.

791.   Plaintiff Brett Farley is a U.S. citizen and Oklahoma resident.  He is the son of Steven Farley.  He brings claims in both his personal capacity and his representative capacity on behalf of Steven Farley's estate.

792.     Plaintiff Jessica Farley is a U.S. citizen and Oklahoma resident.  She is the daughter-in-law of Steven Farley; had an especially close relationship with her father-in-law; and thought of him as the equivalent of a biological father.

793.     Plaintiff Cameron Farley is a U.S. citizen and Oklahoma resident.  He is the son of Steven Farley.

794.     Plaintiff Chris Farley is a U.S. citizen and Oklahoma resident.  He is the son of Steven Farley.

795.     Plaintiff Vickie McHone is a U.S. citizen and Oklahoma resident.  She is the sister of Steven Farley.

796.     Plaintiff Noel S. Farley is a U.S. citizen and Oklahoma resident.  He is the brother of Steven Farley.

797.     Plaintiff David Farley is a U.S. citizen and Oklahoma resident.  He is the brother of Steven Farley.

798.     Plaintiff Carla Proffitt was a U.S. citizen and Oklahoma resident.  She was the sister of Steven Farley.  She died on August 29, 2018.

799.     As a result of the June 24, 2008 attack, and Steven Farley's death, the Farley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Farley's society, companionship, and counsel.

800.     Steven Farley's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Dawn Williamson**

801.     Corporal William D. O'Brien served in Iraq in the U.S. Army as part of the 1st Battalion, 28th Infantry Regiment, 4th Brigade Combat Team, 1st Infantry Division.

802.     On March 15, 2008, CPL O'Brien was killed by a Jaysh al-Mahdi sniper in Al Rashid District.  CPL O'Brien was murdered while working as part of a team attempting to secure a cache of Jaysh al-Mahdi EFPs sourced to a local Jaysh al-Mahdi EFP manufacturing site, which EFP manufacturing site and associated caches, on information and belief, Hezbollah and Jaysh al-Mahdi created and maintained relying upon the technical designs, training, and other similar support from Hezbollah.  Jaysh al-Mahdi placed its EFP cache storage in a densely populated civilian area in Al Rashid District.

803.     CPL O'Brien was a U.S. citizen when he was killed in Iraq.

804.     CPL O'Brien's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, CPL O'Brien was shot by a Jaysh al-Mahdi member while working to safely secure a Jaysh al-Mahdi weapons cache that was placed in an unmarked civilian location, and because the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

805.     Plaintiff Dawn Williamson is a U.S. citizen and Texas resident.  She is the mother of CPL O'Brien.

806.     As a result of the March 15, 2008 attack, and CPL O'Brien's death, Dawn Williamson has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL O'Brien's society, companionship, and counsel.

**The Reeves Family and Estate**

807.     Corporal Joshua H. Reeves served in Iraq as part of the 2-16 Rangers.

808.     On September 22, 2007, CPL Reeves was killed by an EFP planted and detonated by Jaysh al-Mahdi outside of FOB Rustamiyah.  After activation, the EFP was set to detonate using a passive infrared trigger system.  When his vehicle was hit by the EFP that killed him,

CPL Reeves was returning to FOB Rustamiyah from a gas station across the street, where he had been providing security to prevent Jaysh al-Mahdi from extorting the local population.

809.    CPL Reeves initially survived the EFP detonation, losing consciousness from the pain and shock of the injuries he suffered.  Although CPL Reeves initially survived the attack, he died from his injuries later that day.  CPL Reeves died one day after his first child was born.

810.    CPL Reeves was a U.S. citizen when he was killed in Iraq.

811.    CPL Reeves' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

812.    Plaintiff Leslie Kay Hardcastle is a U.S. citizen and Tennessee resident.  She is the widow of CPL Reeves.  Ms. Hardcastle brings claims in both her personal capacity and her representative capacity on behalf of CPL Reeves's estate.

813.    Plaintiff J.R., by and through his next friend Leslie Hardcastle, is a U.S. citizen and Tennessee resident.  He is the minor son of CPL Reeves.

814.    Plaintiff James Reeves is a U.S. citizen and Georgia resident.  He is the father of CPL Reeves.

815.    Plaintiff W. Jean Reeves is a U.S. citizen and Georgia resident.  She is the mother of CPL Reeves.

816.    Plaintiff Jared Reeves is a U.S. citizen and Georgia resident.  He is the brother of CPL Reeves.

817.    Plaintiff Sherri C. Hoilman is a U.S. citizen and Florida resident.  She is the sister of CPL Reeves.

818.    Plaintiff Joni Little is a U.S. citizen and Georgia resident.  She is the sister of CPL Reeves.

819.    As a result of the September 22, 2007 attack, and CPL Reeves' death, the Reeves Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Reeves' society, companionship, and counsel.

820.    CPL Reeves's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Maria Lane**

821.    Specialist David J. Lane served in Iraq as part of the 2-16 Rangers.

822.    On September 4, 2007, SPC Lane was killed by an EFP planted and detonated by Jaysh al-Mahdi on Route Predator on the northwestern side of the Mashtal neighborhood.  After activation, the EFP was set to detonate using a passive infrared trigger system.  The attack also killed two other 2-16 Rangers outright and seriously wounded another.

823.    SPC Lane was a U.S. citizen when he was killed in Iraq.

824.    SPC Lane's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

825.    Plaintiff Maria Lane is a U.S. citizen and Kansas resident.  She is the mother of SPC Lane.

826.    As a result of the September 4, 2007 attack, and SPC Lane's death, Maria Lane has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Lane's society, companionship, and counsel.

### **The Munns Family**

827.     Joshua Munns served in southern Iraq as a civilian security contractor for Crescent Security.

828.     On November 16, 2006, Mr. Munns and four other Crescent Security contractors (including Paul Johnson-Reuben and Jonathon Coté) were kidnapped and later killed by Jaysh al-Mahdi near Basra.  Plaintiffs refer to the ambush itself, and the subsequent kidnapping, detention, torture, and murder, as the "Crescent Security Attack."

829.     The Crescent Security Attack would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Crescent Security contractors were civilians not taking part in hostilities, were tortured during their captivity, and were executed without trial, and because the Jaysh al-Mahdi member(s) who carried out the Crescent Security Attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

830.     A Hezbollah-trained Jaysh al-Mahdi leader named Abu Zainab coordinated attacks targeting American and British personnel in the Basra Province area, and Abu Zainab was specifically involved in planning, conducting, and carrying out Jaysh al-Mahdi hostage-taking operations in Basra.  For example, the Crescent Security hostages were held with another American, Ronnie Withrow, who was kidnapped in a complex ambush in Basra on January 5, 2007 that was attributed to terrorists loyal to Abu Zainab.

831.     On information and belief, senior Hezbollah operative Ali Mussa Daqduq planned and authorized some or all of the Crescent Security Attack.  This belief is based upon, among other things, representations made by the U.S. government to the family members of the Crescent Security hostages, as well as a 2011 letter in which five U.S. senators noted that Daqduq had "coordinated the kidnapping and execution of U.S. citizens and British nationals in Iraq" in conjunction with Jaysh al-Mahdi.

832.     In or about January 2007, the terrorists holding hostage Mr. Munns, Paul Johnson-Reuben, Jonathon Coté and the other Crescent Security contractors released a video that showed each man in a state of obvious distress.  The video made plain the terroristic nature of the Crescent Security Attack.  Among other things, the terrorists holding Mr. Coté hostage compelled him to state on camera: "I can't be released until the prisoners in the American jails and British jails are released."  The video was broadcast on an Iranian state-run Arabic-language cable news outlet called al-Alam.

833.     On information and belief, Mr. Munns was held hostage by terrorists affiliated with Jaysh al-Mahdi from on or about November 16, 2006, when he was kidnapped, to on or about 2008.  Jaysh al-Mahdi members committed the Crescent Security Attack on November 16, 2006 and the subsequent hostage holding and execution of Mr. Munns.  Throughout this time period, Mr. Munns, and the Munns Family members, suffered as a result of the kidnapping, notwithstanding the weekly briefings they received from the State Department.

834.     In or about 2008, the Jaysh al-Mahdi terrorists holding hostage Mr. Munns and the other Crescent Security contractors cut off one finger from each hostage – including Mr. Munns – and transported the fingers to an intermediary, who ultimately provided them to the FBI, which determined that one of the fingers belonged to Mr. Munns.

835.     On information and belief, on or after when the terrorists severed Mr. Munns' finger, the terrorists proceeded to beat Mr. Munns to death.  They subsequently mutilated his remains.

836.     On or about March 2008, four bodies were discovered near Basra.  On March 27, 2008, the FBI publicly announced that it had confirmed that Mr. Munns' remains were among the recovered, and in April 2008 his body was returned to his family for cremation.

837.    Mr. Munns was a U.S. citizen when he was kidnapped in Iraq and killed in Iraq or Iran.

838.    Plaintiff Mark Munns is a U.S. citizen and California resident.  He is the father of Joshua Munns.

839.    Plaintiff Martha Elaine Jackie Stewart is a U.S. citizen and California resident. She is the mother of Joshua Munns.

840.    Plaintiff Crista Munns is a U.S. citizen and California resident.  She is the stepmother of Joshua Munns.

841.    As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Joshua Munns, and the post-murder mutilation of Joshua Munns' remains in or about 2008, the Munns Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Joshua Munn's society, companionship, and counsel.

**The Johnson-Reuben Family**

842.    Paul Johnson-Reuben worked in Iraq as a civilian security contractor employed by Crescent Security.

843.    Mr. Johnson-Reuben was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack.  *See supra* ¶¶ 828-834.  Jaysh al-Mahdi member(s) mutilated Mr. Johnson-Reuben's remains after executing him.  Mr. Johnson-Reuben's body was ultimately returned to his family in April 2008.

844.    Mr. Johnson-Reuben was a U.S. citizen when he was kidnapped and killed in Iraq and/or Iran.

845.    Plaintiff Bree Reuben is a U.S. citizen and Minnesota resident.  She is the daughter of Paul Johnson-Reuben.

234

846.    Plaintiff Casey Nicole Reuben is a U.S. citizen and Minnesota resident.  She is the daughter of Paul Johnson-Reuben.

847.    Plaintiff Ben Reuben is a U.S. citizen and Minnesota resident.  He is the father of Paul Johnson-Reuben.

848.    Plaintiff Patrick Reuben is a U.S. citizen and Wisconsin resident.  He is the twin brother of Paul Johnson-Reuben.

849.    Plaintiff Quinten Reuben is a U.S. citizen and Minnesota resident.  He is the brother of Paul Johnson-Reuben.

850.    Plaintiff Linda Reuben is a U.S. citizen and Minnesota resident.  She is the stepmother of Paul Johnson-Reuben.

851.    As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Paul Johnson-Reuben, and the post-murder mutilation of Paul Johnson-Reuben's remains on or about 2008, the Johnson-Reuben Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Paul Johnson-Reuben's society, companionship, and counsel.

### The Coté Family and Estate

852.    Jonathon M. Coté worked in Iraq as a civilian security contractor employed by Crescent Security.

853.    Mr. Coté was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack.  *See supra* ¶¶ 828-834.  Jaysh al-Mahdi mutilated Mr. Coté's remains after executing him.  On April 23, 2008, the FBI announced that it had identified the remains of Mr. Coté – which were recovered four days prior – and made arrangements to return Mr. Coté's remains to his family.

854.    Mr. Coté was a U.S. citizen when he was kidnapped and killed in Iraq and/or Iran.

855.    Plaintiff Francis L. Coté is a U.S. citizen and New York resident.  He is the father of Jonathon Coté.

856.    Plaintiff Nancy Coté is a U.S. citizen and New York resident.  She is the stepmother of Jonathon Coté.

857.    Plaintiff Samantha Dunford is a U.S. citizen and New York resident.  She is the stepsister of Jonathon Coté.

858.    Plaintiff Maximillian Shroyer is a U.S. citizen and Ohio resident.  He is the stepbrother of Jonathon Coté.

859.    Plaintiff Christopher Coté is a U.S. citizen and New York resident.  He is the brother of Jonathon Coté.  He brings claims in both his personal capacity and his representative capacity on behalf of Jonathon Coté's estate.

860.    As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Jonathon Coté, and the post-murder mutilation of Jonathon Coté's remains on or about 2008, the Coté Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Jonathon Coté's society, companionship, and counsel.

861.    Mr. Coté's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Alexander Family and Withrow Estate**

862.    Ronald J. ("Ronnie") Withrow served as a civilian information technology contractor and computer specialist, who was hired by JPI Worldwide to help rebuild Iraq and provide IT-related services in support of such efforts.

863.    On information and belief, Mr. Withrow was kidnapped, held hostage, tortured, and ultimately murdered by the same Hezbollah-led Jaysh al-Mahdi cell responsible for the

Crescent Security Attack.  *See supra* ¶¶ 828-834.  Specifically, on January 5, 2007, Mr. Withrow was kidnapped in Basra as part of an elaborate operation that, on information and belief, was planned, coordinated and carried out by a joint Hezbollah/Jaysh al-Mahdi team.

864.     On information and belief, a senior Jaysh al-Mahdi operative named Abu Zainab, and his two sons, helped supervise the kidnapping of Mr. Withrow, and did so in order to take American hostages for purposes of furthering Jaysh al-Mahdi's terrorist agenda.  On information and belief, as a senior Jaysh al-Mahdi operative tasked with kidnapping operations, Abu Zainab received personal instruction, and direct operational support, from Hezbollah with respect to kidnapping tactics and strategy.

865.     On information and belief, senior Hezbollah operative Daqduq planned, committed, and/or authorized some or all the kidnapping, detention, and summary execution of Mr. Withrow.  This belief is based upon, among other things, representations made by the U.S. government to the family members of the Crescent Security hostages.

866.     On or about 2008, the terrorists holding Mr. Withrow, as well as the Crescent Security hostages, cut off one finger from each hostage, including Mr. Withrow, and transported the fingers to an intermediary, who ultimately provided them to the FBI, which determined that one of the fingers belonged to Mr. Withrow.  On or after when the terrorists severed Mr. Withrow's finger, the terrorists proceeded to beat him to death.

867.     On or about March 24, 2008, the FBI announced that it had confirmed the recovery of Mr. Withrow's remains and made arrangements to return his remains to his family.

868.     Mr. Withrow's kidnapping and execution would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Withrow was a civilian not taking part in hostilities, was tortured during captivity, and was executed without trial, and

because the Jaysh al-Mahdi and Hezbollah member(s) who carried out the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

869.    Mr. Withrow was a U.S. citizen when he was kidnapped and killed in Iraq and/or Iran.

870.    Plaintiff Barbara E. Alexander is a U.S. citizen and Texas resident.  She is the mother of Ronnie Withrow.  Ms. Alexander brings claims in both her personal capacity and her representative capacity on behalf of Mr. Withrow's estate.

871.    Plaintiff Johnny Wayman Alexander is a U.S. citizen and Texas resident.  He is the stepfather of Ronnie Withrow.

872.    As a result of the ambush and kidnapping of Ronnie Withrow on January 5, 2007, and the subsequent captivity, torture, mutilation, and murder of Ronnie Withrow, and the post-murder mutilation of Ronnie Withrow's remains on or about 2008, the Alexander Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ronnie Withrow's society, companionship, and counsel.

873.    Mr. Withrow's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Ryan Family

874.    Plaintiff Staff Sergeant Shawn Ryan served in Iraq in the U.S. Air Force as part of the 82nd Security Forces Squadron.  He is a U.S. citizen and Texas resident.

875.    On February 1, 2007, SSgt Ryan was seriously injured from shrapnel by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District, a Jaysh al-Mahdi stronghold in western Baghdad.  The EFP attack came inches away from killing SSgt Ryan, and the shrapnel injuries that SSgt Ryan sustained from the EFP left him permanently disabled.  Due to his

injuries, SSgt received a 100% disability rating from the VA.  As a result of the attack, SSgt Ryan has experienced extreme physical and emotional pain and suffering.

876.    The attack that injured SSgt Ryan would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

877.    Plaintiff Sandra Ryan is a U.S. citizen and Texas resident.  She is the wife of SSgt Ryan.

878.    Plaintiff A.R., by and through her next friend SSgt Ryan, is a U.S. citizen and Texas resident.  He is the minor son of SSgt Ryan.

879.    Plaintiff Barb Thiede is a U.S. citizen and Illinois resident.  She is the mother of SSgt Ryan.

880.    Plaintiff Jason Ryan is a U.S. citizen and Illinois resident.  He is the brother of SSgt Ryan.

881.    Plaintiff Billy Ryan is a U.S. citizen and Illinois resident.  He is the brother of SSgt Ryan.

882.    Plaintiff Angie Ryan is a U.S. citizen and Illinois resident.  She is the sister of SSgt Ryan.

883.    Plaintiff Teresa Beckley is a U.S. citizen and Illinois resident.  She is the sister of SSgt Ryan.

884.    As a result of the February 1, 2007 attack, and SSgt Ryan's injuries, the Ryan Family has experienced extreme emotional pain and suffering.

**The Von Letkemann Family**

885.    Plaintiff Sergeant First Class Grant Von Letkemann II served in Iraq as a reservist who was deployed with the 396th Military Police Detachment of the U.S. Army.  He is a U.S. citizen and Colorado resident.

886.    On April 4, 2008, while he was on base, SFC Von Letkemann was seriously injured from the blast and explosion from a Jaysh al-Mahdi 107mm rocket attack on Victory Base Complex.  Due to his injuries, SFC Von Letkemann received a 70% disability rating from the VA.  As a result of the April 4, 2008 attack, SFC Von Letkemann has experienced extreme physical and emotional pain and suffering.

887.    The attack that injured SFC Von Letkemann would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the attack placed civilians at risk.

888.    Plaintiff Kelly Von Letkemann is a U.S. citizen and Colorado resident.  She is the wife of SFC Von Letkemann.

889.    As a result of the April 4, 2008 attack, and SFC Von Letkemann's injuries, Kelly Von Letkemann has experienced extreme emotional pain and suffering.

**Scott Scurrah**

890.    Plaintiff Sergeant Scott Scurrah served in Iraq as a Team Leader of a Tactical Human Intelligence Team attached to the U.S. Army's 1-125 Strike Battalion, Task Force Thunder.  He is a U.S. citizen and South Carolina resident.

891.    SGT Scurrah served in Babil Province, Iraq from on or about March 2006 through on or about July 2007.  While deployed to Iraq and pursuing high value intelligence relating to Jaysh al-Mahdi, SGT Scurrah was repeatedly subjected to terrorist attacks by Jaysh al-Mahdi

including routine indirect fire attacks by Jaysh al-Mahdi.  SGT Scurrah was also subjected to attacks while he and his unit were resting and refitting at FOB Hammer.  He was diagnosed with PTSD.  Due to his injuries, SGT Scurrah received a 60% disability rating from the VA.  As a result of the Jaysh al-Mahdi attacks on him in Iraq, SGT Scurrah has experienced extreme physical and emotional pain and suffering.

892.    The attacks that injured SGT Scurrah would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the attacks placed civilians at risk.

**Masina Tuliau**

893.    Master Sergeant Tulsa T. Tuliau served in Iraq in the U.S. Army as part of the 3rd Battalion, 314th Field Artillery Regiment, 2nd Brigade, 78th Division.

894.    On September 26, 2005, MSG Tuliau was killed by an EFP that was planted and detonated by Jaysh al-Mahdi near FOB Rustamiyah in the New Baghdad District.

895.    MSG Tuliau was a U.S. citizen when he was killed in Iraq.

896.    MSG Tuliau's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

897.    Plaintiff Masina Tuliau is a U.S. citizen and Washington resident.  She is the mother of MSG Tuliau.

898.    As a result of the September 26, 2005 attack, and MSG Tuliau's death, Masina Tuliau has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Tuliau's society, companionship, and counsel.

## **The Richard Hickman Family**

899.     Richard Thomas "Rick" Hickman served in Iraq as a civilian contractor, employed by DynCorp International, working to train Iraqi Police units in Basra.

900.     On January 18, 2006, Richard Hickman was killed by an EFP planted and detonated by Jaysh al-Mahdi in Basra.  On information and belief, Jaysh al-Mahdi members who received training from Hezbollah facilitated and/or conducted the terrorist attack that killed Richard Hickman.

901.     Richard Hickman was a U.S. citizen when he was killed in Iraq.

902.     Richard Hickman's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Richard Hickman was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

903.     Plaintiff Jennifer Link is a U.S. citizen and Florida resident.  She is the daughter of Richard Hickman.

904.     Plaintiff Jessica Rew is a U.S. citizen and Missouri resident.  She is the daughter of Richard Hickman.

905.     Plaintiff Sara Lilly is a U.S. citizen and Kansas resident.  She is the daughter of Richard Hickman.

906.     Plaintiff Ryan Hickman is a U.S. citizen and Missouri resident.  He is the son of Richard Hickman.

907.     Plaintiff E.H., by and through his next friend April Hudgens, is a U.S. citizen and Georgia resident.  He is the minor son of Richard Hickman.

908.     Plaintiff Sharon Johnston is a U.S. citizen and Florida resident.  She is the sister of Richard Hickman.

909. As a result of the January 18, 2006 attack, and Richard Hickman's death, the Hickman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Richard Hickman's society, companionship, and counsel.

**The Collado Family and Estate**

910. Staff Sergeant Jay T. Collado served in Iraq in the U.S. Marine Corps and was assigned to Marine Light Attack Helicopter Squadron-267, Marine Aircraft Group-39, 3rd Marine Aircraft Wing, I Marine Expeditionary Force, Camp Pendleton, California, attached to the Army's 4th Infantry Division.

911. On February 20, 2006, S. Sgt. Collado was killed by an EFP planted and detonated by Jaysh al-Mahdi in Karbala Province, a Jaysh al-Mahdi stronghold at the time. On information and belief, Jaysh al-Mahdi members who received training from Hezbollah committed the terrorist attack that killed S. Sgt. Collado.

912. S. Sgt. Collado was a U.S. citizen when he was killed in Iraq.

913. S. Sgt. Collado's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

914. Plaintiff Judy Collado is a U.S. citizen and California resident. She is the widow of S. Sgt. Collado. Judy Collado brings claims in both her personal capacity and her representative capacity on behalf of S. Sgt. Collado's estate.

915. Plaintiff Kaiya Collado is a U.S. citizen and California resident. She is the daughter of S. Sgt. Collado.

916.     As a result of the February 20, 2006 attack, and S. Sgt. Collado's death, the Collado Family has experienced severe mental anguish, emotional pain and suffering, and the loss of S. Sgt. Collado's society, companionship, and counsel.

917.     S. Sgt. Collado's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Murray Family**

918.     Sergeant Joel L. Murray served in Iraq as part of the 2-16 Rangers.

919.     On September 4, 2007, SGT Murray was killed by an EFP planted and detonated by Jaysh al-Mahdi on Route Predator on the northwestern side of the Mashtal neighborhood. After activation, the EFP was set to detonate using a passive infrared trigger system.  The attack also killed two other 2-16 Rangers outright, caused another to die of wounds four months later, and seriously wounded another.

920.     SGT Murray was a U.S. citizen when he was killed in Iraq.

921.     SGT Murray's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

922.     Plaintiff Maricel Murray is a U.S. citizen and Kansas resident.  She is the widow of SGT Murray.

923.     Plaintiff W. Ann Meuli is a U.S. citizen and Kansas resident.  She is the mother of SGT Murray.

924.     Plaintiff J.M., by and through his next friend Maricel Murray, is a U.S. citizen and Kansas resident.  He is the minor son of SGT Murray.

925.    As a result of the September 4, 2007 attack, and SGT Murray's death, the Murray Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Murray's society, companionship, and counsel.

### The Shelton Family and Estate

926.    Private Randol "Randy" Shelton served in Iraq as part of the 2-16 Rangers.

927.    On September 4, 2007, PVT Shelton was killed by an EFP planted and detonated by Jaysh al-Mahdi on Route Predator on the northwestern side of the Mashtal neighborhood. After activation, the EFP was set to detonate using a passive infrared trigger system.  The attack also killed two other 2-16 Rangers outright, caused another to die of wounds four months later, and seriously wounded another.

928.    PVT Shelton was a U.S. citizen when he was killed in Iraq.

929.    PVT Shelton's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

930.    Plaintiff Bryan S. Shelton is a U.S. citizen and Illinois resident.  He is the father of PVT Shelton.  Bryan S. Shelton brings claims in both his personal capacity and his representative capacity on behalf of PVT Shelton's estate.

931.    Plaintiff Darlene A. Shelton is a U.S. citizen and Illinois resident.  She is the mother of PVT Shelton.

932.    Plaintiff Bryan T. Shelton is a U.S. citizen and Illinois resident.  He is the brother of PVT Shelton.

933.    Plaintiff Amanda A. Shelton is a U.S. citizen and Illinois resident.  She is the sister of PVT Shelton.

934.     As a result of the September 4, 2007 attack, and PVT Shelton's death, the Shelton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PVT Shelton's society, companionship, and counsel.

935.     PVT Shelton's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Tammy Kinney**

936.     Private First Class James J. Harrelson served in Iraq as part of the 2-16 Rangers.

937.     On July 17, 2007, PFC Harrelson was killed by an IED – consisting of 130mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place on Outer Berm Road in a palm tree grove close to Sadr City.

938.     PFC Harrelson was a U.S. citizen when he was killed in Iraq.

939.     PFC Harrelson's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

940.     Plaintiff Tammy Kinney is a U.S. citizen and Alabama resident.  She is the mother of PFC Harrelson.

941.     As a result of the July 17, 2007 attack, and PFC Harrelson's death, Tammy Kinney has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Harrelson's society, companionship, and counsel.

**The Gajdos Family**

942.     Private First Class Shawn Gajdos served in Iraq as part of the 2-16 Rangers.

943.     On June 6, 2007, PFC Gajdos was riding in a Humvee on Route Pluto, just south of the Amin neighborhood in eastern Baghdad, when his platoon was ambushed in a complex

attack by Jaysh al-Mahdi.  The attack involved an EFP and small-caliber rifle fire.  During the attack, PFC Gajdos was killed by the EFP planted and detonated by Jaysh al-Mahdi.  He was 25 years old.

944.    PFC Gajdos was a U.S. citizen when he was killed in Iraq.

945.    PFC Gajdos's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

946.    Plaintiff Tammie DenBoer is a U.S. citizen and Michigan resident.  She is the sister of PFC Gajdos.

947.    Plaintiff Derek Gajdos is a U.S. citizen and Michigan resident.  He is the brother of PFC Gajdos.

948.    As a result of the June 6, 2007 attack, and PFC Gajdos's death, the Gajdos Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Gajdos's society, companionship, and counsel.

**The Parlin Family**

949.    Samuel E. Parlin, Jr. served in Iraq as a civilian contractor employed by DynCorp International, working for the Civilian Police Advisory Training Team ("CPATT"), which was responsible for the Coalition efforts to train and equip the Iraqi Police.

950.    On January 16, 2006, Mr. Parlin was killed by a roadside bomb planted and detonated by Jaysh al-Mahdi in the Al-Rashid District of western Baghdad on the road connecting Baghdad International Airport to the center of Baghdad (Airport Road).

951.    Mr. Parlin was a U.S. citizen when he was killed in Iraq.

952.    Mr. Parlin's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Parlin was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

953.    Plaintiff Sharonda Parlin is a U.S. citizen and Georgia resident.  She is the daughter of Mr. Parlin.

953.1.  Plaintiff Cynthia Parlin is a U.S. citizen and Georgia resident.  She is the widow of Mr. Parlin.

954.    As a result of the January 16, 2006 attack, and Samuel Parlin's death, the Parlin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Samuel Parlin's society, companionship, and counsel.

**Maria Vidal**

955.    Specialist Anthony N. Kalladeen served in Iraq as part of the 1st Battalion, 69th Infantry Regiment, 256th Brigade Combat Team, New York Army National Guard.

956.    On August 7, 2005, SPC Kalladeen was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad.  Although SPC Kalladeen initially survived the attack, he died of his injuries the following day, on August 8, 2005.

957.    SPC Kalladeen was a U.S. citizen when he was killed in Iraq.

958.    SPC Kalladeen's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

959.    Plaintiff Maria Vidal is a U.S. citizen and Pennsylvania resident.  She is the mother of SPC Kalladeen.

960.    As a result of the August 7, 2005 attack, and SPC Kalladeen's death the day after, Maria Vidal has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Kalladeen's society, companionship, and counsel.

**Jimmy Rundell**

961.    Specialist Gregory B. Rundell served in Iraq in the U.S. Army as part of 1st Battalion, 27th Infantry Regiment, 2nd Brigade Combat Team, 25th Infantry Division.

962.    On March 26, 2008, SPC Rundell was killed by a Jaysh al-Mahdi sniper near Camp Taji in Baghdad.  The attack occurred within days of the Iraqi government's assault on Jaysh al-Mahdi in Basra and the resulting spread of the fighting to Baghdad and, on information and belief, was part of the broader Jaysh al-Mahdi terrorist offensive against Americans in Baghdad and Basra.

963.    SPC Rundell was a U.S. citizen when he was killed in Iraq.

964.    SPC Rundell's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

965.    Plaintiff Jimmy Rundell is a U.S. citizen and Minnesota resident.  He is the father of SPC Rundell.

966.    As a result of the March 26, 2008 attack, and SPC Rundell's death, Jimmy Rundell has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rundell's society, companionship, and counsel.

**The Packer Family and Estate**

967.    Sergeant Steven M. Packer served in Iraq in the U.S. Army as part of A Company, 2nd Battalion, 14th Infantry Regiment, 2nd Brigade Combat Team, 10th Mountain Division.

968.    On May 17, 2007, SGT Packer was killed by an EFP planted and detonated by Jaysh al-Mahdi in an area near Yusufiyah in central Iraq in which Jaysh al-Mahdi was known to operate.

969.    SGT Packer was a U.S. citizen when he was killed in Iraq.

970.    SGT Packer's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

971.    Plaintiff Robin Davidson is a U.S. citizen and California resident.  She is the mother of SGT Packer.

972.    Robin Davidson is also the Personal Representative of SGT Packer's estate.  A copy of the California Superior Court order appointing her as Personal Representative has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for SGT Packer's estate is now open in the District of Columbia.  Robin Davidson brings claims in both her personal capacity and her representative capacity on behalf of SGT Packer's estate.

973.    Plaintiff Christopher Packer is a U.S. citizen and California resident.  He is the brother of SGT Packer.

974.    Plaintiff Danielle Packer is a U.S. citizen and California resident.  She is the sister of SGT Packer.

975.    Plaintiff Jason Davidson is a U.S. citizen and California resident.  He is the brother of SGT Packer.

976.    Plaintiff Zachary Davidson is a U.S. citizen and California resident.  He is the brother of SGT Packer.

977.     As a result of the May 17, 2007 attack, and SGT Packer's death, the Packer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Packer's society, companionship, and counsel.

978.     SGT Packer's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Crow Family**

979.     Sergeant William W. Crow, Jr. served in Iraq as part of the 2-16 Rangers.

980.     On June 28, 2007, SGT Crow was killed by an EFP planted and detonated by Jaysh al-Mahdi on Route Pluto near FOB Rustamiyah.

981.     SGT Crow was a U.S. citizen when he was killed in Iraq.

982.     SGT Crow's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

983.     Plaintiff Katherine Crow is a U.S. citizen and Texas resident.  She is the widow of SGT Crow.

984.     Plaintiff K.E.C., by and through her next friend Katherine Crow, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Crow.

985.     Plaintiff K.A.C., by and through her next friend Katherine Crow, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Crow.

986.     Plaintiff Candace Cathryn Crow Hudson is a U.S. citizen and Florida resident. She is the sister of SGT Crow.

987.     Plaintiff David Bush is a U.S. citizen and Texas resident.  He is the stepson of SGT Crow.

988.     As a result of the June 28, 2007 attack, and SGT Crow's death, the Crow Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Crow's society, companionship, and counsel.

**The Contreras Family**

989.     Sergeant Andres J. Contreras served in Iraq in the U.S. Army as part of the 519th Military Police Battalion, 1st Combat Support Brigade.

990.     On July 15, 2006, SGT Contreras was killed by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad on the border between the Karadah and New Baghdad Districts.

991.     SGT Contreras was a U.S. citizen when he was killed in Iraq.

992.     SGT Contreras' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

993.     Plaintiff Jonathan Contreras, Sr. is a U.S. citizen and California resident.  He is the father of SGT Contreras.

994.     Plaintiff Carlos Contreras is a U.S. citizen and California resident.  He is the brother of SGT Contreras.

995.     Plaintiff Cesar Contreras is a U.S. citizen and California resident.  He is the brother of SGT Contreras.

996.     Plaintiff Hernan Contreras is a U.S. citizen and California resident.  He is the brother of SGT Contreras.

997.     Plaintiff Noel Contreras is a U.S. citizen and California resident.  He is the brother of SGT Contreras.

998. Plaintiff Dannyel Contreras is a U.S. citizen and California resident. He is the brother of SGT Contreras.

999. Plaintiff Norma Contreras is a U.S. citizen and California resident. She is the mother of SGT Contreras.

1000. As a result of the July 15, 2006 attack, and SGT Contreras' death, the Contreras Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Contreras' society, companionship, and counsel.

### The Inouye Family

1001. Sergeant Deyson K. Cariaga served in Iraq in the Hawaiian National Guard and was assigned to the 229th Military Intelligence Company, 29th Separate Infantry Brigade.

1002. On July 8, 2005, SGT Cariaga was killed by an EFP planted and detonated by Jaysh al-Mahdi in Balad, a Shiite enclave in northern Iraq.

1003. SGT Cariaga was a U.S. citizen when he was killed in Iraq.

1004. SGT Cariaga's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1005. Plaintiff Theresa Inouye is a U.S. citizen and Hawaii resident. She is the mother of SGT Cariaga.

1006. Plaintiff Jerry Inouye is a U.S. citizen and Hawaii resident. He is the stepfather of SGT Cariaga.

1007. As a result of the July 8, 2005 attack, and SGT Cariaga's death, the Inouye Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Cariaga's society, companionship, and counsel.

**The Cameron Payne Family and Estate**

1008.   Specialist Cameron K. Payne served in Iraq as part of the 2-16 Rangers.

1009.   On June 11, 2007, SPC Payne was killed by an EFP planted and detonated by Jaysh al-Mahdi in the southern portion of the Fedilayah neighborhood.

1010.   SPC Payne was a U.S. citizen when he was killed in Iraq.

1011.   SPC Payne's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1012.   Plaintiff Julie Payne is a U.S. citizen and California resident.  She is the widow of SPC Payne.  Julie Payne brings claims in both her personal capacity and her representative capacity on behalf of SPC Payne's estate.

1013.   Plaintiff K.P., by and through her next friend Julie Payne, is a U.S. citizen and California resident.  She is the minor daughter of SPC Payne.

1014.   Plaintiff A-L.P., by and through her next friend Julie Payne, is a U.S. citizen and California resident.  She is the minor daughter of SPC Payne.

1015.   Plaintiff Denise Jackson is a U.S. citizen and California resident.  She is the mother of SPC Payne.

1016.   As a result of the June 11, 2007 attack, and SPC Payne's death, the Payne Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Payne's society, companionship, and counsel.

1017.   SPC Payne's estate is entitled to economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Craig Family**

1018.   Specialist Andre Craig, Jr. served in Iraq as part of the 2-16 Rangers.

1019.   On June 25, 2007, SPC Craig was killed by an EFP planted and detonated by Jaysh al-Mahdi southern portion of the Fedilayah neighborhood.

1020.   SPC Craig was a U.S. citizen when he was killed in Iraq.

1021.   SPC Craig's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1022.   Plaintiff Aundra Craig is a U.S. citizen and Connecticut resident.  He is the father of SPC Craig.

1023.   Plaintiff Joyce Craig is a U.S. citizen and Connecticut resident.  She is the mother of SPC Craig.

1024.   Plaintiff T.M.C., by and through her next friend Arifah Hardy, is a U.S. citizen and Connecticut resident.  She is the minor daughter of SPC Craig.

1025.   Plaintiff Jonathan Craig is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1026.   Plaintiff Michael Cook is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1027.   Plaintiff Andre Brown is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1028.   Plaintiff Valencia Cook is a U.S. citizen and Connecticut resident.  She is the sister of SPC Craig.

1029.   Plaintiff Debra L. Cook-Russell is a U.S. citizen and Connecticut resident.  She is the sister of SPC Craig.

1030.   Plaintiff Nashima S.W. Craig is a U.S. citizen and Connecticut resident.  She is the sister of SPC Craig.

1031.   Plaintiff Arifah Hardy is a U.S. citizen and Connecticut resident.  She was the fiancée of SPC Craig.

1032.   Plaintiff Matthew Craig is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1033.   As a result of the June 25, 2007 attack, and SPC Craig's death, the Craig Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Craig's society, companionship, and counsel.

**Tony Botello**

1034.   Specialist Brian A. Botello served in Iraq in the U.S. Army as part of 3rd Squadron, 61st Cavalry Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

1035.   On April 29, 2007, SPC Botello was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District.

1036.   SPC Botello was a U.S. citizen when he was killed in Iraq.

1037.   SPC Botello's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1038.   Plaintiff Tony Botello is a U.S. citizen and Texas resident.  He is the father of SPC Botello.

1039.   As a result of the April 29, 2007 attack, and SPC Botello's death, Tony Botello has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Botello's society, companionship, and counsel.

**The Aieti Family**

1040.   Plaintiff Specialist Tausolo Aieti served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and a Nevada resident.

1041.   On July 17, 2007, SPC Aieti was injured by an IED – consisting of 130mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place on Outer Berm Road in a palm tree grove close to Sadr City.  The attack severely wounded Aieti, who injured his leg and suffered traumatic brain injury. Due to his injuries, SPC Aieti received a 90% disability rating from the VA.  As a result of the July 17, 2007 attack and his injuries, Aieti has experienced extreme physical and emotional pain and suffering.

1042.   The attack that injured SPC Aieti would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1043.   Plaintiff Poloka Aieti is a U.S. citizen and Utah resident.  He is the brother of SPC Aieti.

1044.   Plaintiff Imo Aieti is a U.S. citizen and Texas resident.  He is the brother of SPC Aieti.

1045.   Plaintiff Lisi Aieti is a U.S. citizen and Utah resident.  She is the sister of SPC Aieti.

1046.   As a result of the July 17, 2007 attack, and SPC Aieti's injuries, the Aieti Family has experienced extreme emotional pain and suffering.

**The Bouten Family**

1047.   Plaintiff Sergeant Christopher Bouten served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Kentucky resident.

1048.   On July 17, 2007, SGT Bouten was injured by a mortar round fired by Jaysh al-Mahdi on the COP that served as the base for the Bravo Company of the 2-16 Rangers in the Kamaliyah neighborhood in eastern Baghdad.  He was hit by shrapnel on his neck, back, and leg, and was subsequently medically retired.  Due to his injuries, SGT Bouten received a 90% disability rating from the VA.  As a result of the July 17, 2007 attack, Bouten has experienced physical and emotional pain and suffering.

1049.   The attack that injured SGT Bouten would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the mortar attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1050.   Plaintiff Erin Bouten is a U.S. citizen and Kentucky resident.  She is the wife of SGT Bouten.

1051.   As a result of the July 17, 2007 attack and SGT Bouten's injuries, Erin Bouten has experienced extreme emotional pain and suffering.

**Jordan Brackett**

1052.   Plaintiff Private Second Class Jordan P. Brackett served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Kansas resident.

1053.   On June 6, 2007, PV2 Brackett was riding in a Humvee on Route Pluto, just south of the Amin neighborhood in eastern Baghdad, when his platoon was ambushed in a complex attack by Jaysh al-Mahdi.  The attack involved an EFP and small-caliber rifle fire.  During the attack, PV2 Brackett was severely wounded by the EFP, which also killed PFC Gajdos, and his

258

injuries included a concussion and damage to his eye.  On October 8, 2007, PV2 Brackett was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Pluto, near FOB Loyalty. He suffered shrapnel wounds to his legs and arm as a result of the EFP attack.  Due to his injuries, PV2 Brackett received an 80% disability rating from the VA.

1054.   As the result of the attacks on June 6, 2007 and October 8, 2007, and the injuries he suffered therein, PV2 Brackett has experienced extreme physical and emotional pain and suffering.

1055.   The attacks that injured PV2 Brackett would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Brandon Bybee**

1056.   Plaintiff Sergeant First Class Brandon H. Bybee served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Iowa resident.

1057.   On August 17, 2007, SFC Bybee was injured by an EFP planted and detonated by Jaysh al-Mahdi near COP Cajimat.  As a result of the EFP attack, SFC Bybee suffered second degree burns to his face and lacerations to his leg.  As a result of the attack and his injuries, SFC Bybee has experienced extreme physical and emotional pain and suffering.

1058.   The attack that injured SFC Bybee would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Mark Cashman**

1059.   Plaintiff Sergeant First Class Mark A. Cashman served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Washington resident.

1060.   On May 29, 2007, SFC Cashman was injured in a Jaysh al-Mahdi attack near Route Predator at the edge of the Fedilayah neighborhood.  Jaysh al-Mahdi fired small-caliber rifles at Cashman's unit and SFC Cashman sustained leg injuries caused by the resulting bullet fragments.  Another soldier was shot in the arm by a Jaysh al-Mahdi sniper during the same attack.  As a result of the May 29, 2007 attack, and the injuries he sustained therein, SFC Cashman has experienced extreme physical and emotional pain and suffering.

1061.   The attack that injured SFC Cashman would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who attacked him neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Casey Family**

1062.   Plaintiff Second Lieutenant Brian J. Casey served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Montana resident.

1063.   On August 14, 2007, 2LT Casey was leading a platoon securing a gas station near Route Predator, providing security to prevent Jaysh al-Mahdi from extorting the local population, when he was shot by a Jaysh al-Mahdi sniper.  The sniper round collapsed 2LT Casey's lung and fractured his ribs.  Due to his injuries, 2LT Casey received a 20% disability rating from the VA.  As a result of the August 14, 2007 attack, and the injuries he sustained therein, 2LT Casey has experienced extreme physical and emotional pain and suffering.

1064.   The attack that injured 2LT Casey would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

1065.   Plaintiff Brittany Hogan is a U.S. citizen and Montana resident.  She was the wife of 2LT Casey at the time of his injury.

1066.   Plaintiff Shelley Ann Casey is a U.S. citizen and North Carolina resident.  She is the mother of 2LT Casey.

1067.   Plaintiff Richard Casey is a U.S. citizen and North Carolina resident.  He is the father of 2LT Casey.

1068.   As a result of the August 14, 2007 attack and 2LT Casey's injuries, the Casey Family has experienced extreme emotional pain and suffering.

**Johnny Castillo**

1069.   Plaintiff Sergeant Johnny Castillo served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and New York resident.

1070.   On June 25, 2007, SGT Castillo was injured by an EFP planted and detonated in the southern portion of the Fedilayah neighborhood.  The EFP injured his neck and caused nerve damage.  As a result of the June 25, 2007 attack and his injuries, SGT Castillo has experienced extreme physical and emotional pain and suffering.

1071.   The attack that injured SGT Castillo would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Michael Dunn**

1072.   Plaintiff Private First Class Michael A. Dunn served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Michigan resident.

1073.   On April 28, 2007, PFC Dunn was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Mua'lmeen neighborhood of eastern Baghdad.  He suffered a ruptured ear

drum and shrapnel wounds to the right cheek just below and lateral to the nose.  On June 28,
2007 PFC Dunn was again injured by an EFP, which was planted and detonated by Jaysh al-
Mahdi, and also killed another 2-16 Ranger.  The explosion resulted in the amputation of PFC
Dunn's right arm below the elbow, and shrapnel wounds in both his legs, among other injuries.
Due to his injuries, PFC Dunn received a 100% disability rating from the VA.  The attacks
resulted in PFC Dunn's medical retirement from the Army.  As a result of the April 28, 2007 and
June 28, 2007 attacks, and the injuries he suffered therein, PFC Dunn has experienced extreme
physical and emotional pain and suffering.

1074.   The attacks that injured PFC Dunn would have violated the law of war if Jaysh al-
Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who
planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as
enemy combatants.

### Andrew Fukuzawa

1075.   Plaintiff Private First Class Andrew Fukuzawa served in Iraq as part of the 2-16
Rangers.  He is a U.S. citizen and California resident.

1076.   On April 6, 2007, PFC Fukuzawa was riding in a Humvee in the Mua'lmeen
neighborhood when his platoon was ambushed in a complex attack carried out by Jaysh al-
Mahdi.  The complex attack involved both a roadside EFP and an ambulance that Jaysh al-Mahdi
had rigged with explosives.  As a result of the attack, PFC Fukuzawa suffered a shrapnel injury
to his arm, was medically retired from the Army based on the incident, and has experienced
extreme physical and emotional pain and suffering.  Due to his injuries, PFC Fukuzawa received
a 30% disability rating from the VA.

1077.   The attack that injured PFC Fukuzawa would have violated the law of war if
Jaysh al-Mahdi were subject to it because, among other reasons, Jaysh al-Mahdi used an

ambulance as a weapon, and because the Jaysh al-Mahdi member(s) who staged the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Francisco Gietz**

1078.   Plaintiff Staff Sergeant Francisco R. Gietz served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1079.   On July 4, 2007, SSG Gietz was injured while on dismounted patrol while returning to FOB Rustamiyah roughly two blocks west of the New Baghdad District Advisory Council, by RPG and mortar fire from Jaysh al-Mahdi.  As a result of the attack, SSG Gietz suffered damage to his eye and traumatic brain injury.  Two days later, SSG Gietz was further injured by an IED planted and detonated by Jaysh al-Mahdi, while he was dismounted and walking back to FOB Rustamiyah.  Due to his injuries, SSG Gietz received a 100% disability rating from the VA.  As a result of the July 4, 2007 and July 6, 2007 attacks, and the injuries he sustained therein, SSG Gietz has experienced extreme physical and emotional pain and suffering.

1080.   The attacks that injured SSG Gietz would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Abelino Gomez**

1081.   Plaintiff Private First Class Abelino S. Gomez served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and California resident.

1082.   On August 11, 2007, PFC Gomez was struck by a mortar round launched by Jaysh al-Mahdi at FOB Rustamiyah, while he was resting and refitting inside the FOB.  PFC Gomez sustained shrapnel injuries including lacerations to his hip and abdomen.  Due to his injuries, PFC Gomez received a 90% disability rating from the VA.  As a result of the August 11,

2007 attack and his injuries, PFC Gomez has experienced extreme physical and emotional pain and suffering.

1083.   The attack that injured PFC Gomez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the mortar round neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Hanley Family

1084.   Plaintiff Specialist Patrick Keith Hanley served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Virginia resident.

1085.   On March 29, 2008, during the Battle of Sadr City, SPC Hanley was injured by an EFP planted and detonated by Jaysh al-Mahdi between the New Baghdad District Advisory Council and COP Cajimat.  The EFP detonated during a complex attack by Jaysh al-Mahdi that included small-arms fire.  The EFP caused him to lose his left arm and one third of his skull.  Due to his injuries, SPC Hanley received a 100% disability rating from the VA.  As a result of the March 29, 2008 attack, and the injuries he suffered therein, SPC Hanley has experienced extreme physical and emotional pain and suffering.

1086.   The attack that injured Hanley would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1087.   Plaintiff Edward Hanley is a U.S. citizen and Virginia resident.  He is the father of SPC Hanley.

1088.   Plaintiff Katherine Hanley is a U.S. citizen and Virginia resident.  She is the mother of SPC Hanley.

1089.   Plaintiff Cecelia Hanley is a U.S. citizen and Georgia resident.  She is the sister of SPC Hanley.

1090.   As a result of the March 29, 2008 attack, and SPC Hanley's injuries, the Hanley Family has experienced extreme emotional pain and suffering.

**The Benjamin Johnson Family**

1091.   Plaintiff Private First Class Benjamin Johnson served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1092.   On June 8, 2007, PFC Johnson was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack on PFC Johnson's Humvee, followed by Jaysh al-Mahdi rifle and small-arms fire.  PFC Johnson was severely wounded in the attack, and his injuries included damage to his right hand that ultimately required amputation.  Due to his injuries, PFC Johnson received a 100% disability rating from the VA.  As a result of the June 8, 2007 attack and his injuries, PFC Johnson has experienced extreme physical and emotional pain and suffering.

1093.   The attack that injured PFC Johnson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1094.   Plaintiff Tamala Johnson is a U.S. citizen and Missouri resident.  She is the mother of PFC Johnson.

1095.   Plaintiff Greg Johnson is a U.S. citizen and Missouri resident.  He is the father of PFC Johnson.

1096.   Plaintiff Brandon W. Johnson is a U.S. citizen and Missouri resident.  He is the brother of PFC Johnson.

1097.   Plaintiff Brooke L. Plumb is a U.S. citizen and Missouri resident.  She is the sister of PFC Johnson.

1098.   As a result of the June 8, 2007 attack, and PFC Johnson's injuries, the Johnson Family has experienced extreme emotional pain and suffering.

**The Looney Family**

1099.   Private First Class Andrew R. Looney served in Iraq as part of the 2-16 Rangers. He was a U.S. citizen when he served in Iraq.

1100.   On August 17, 2007, PFC Looney was injured by an EFP planted and detonated by Jaysh al-Mahdi near COP Cajimat.  As a result of the EFP attack, Looney suffered a partial right foot amputation, shrapnel in his leg, and burns and laceration to his hand.  PFC Looney is now deceased.

1101.   The attack that injured PFC Looney would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1102.   Plaintiff C. Richard Looney is a U.S. citizen and Oklahoma resident.  He is the father of PFC Looney.

1103.   Plaintiff Martha Looney is a U.S. citizen and Oklahoma resident.  She is the mother of PFC Looney.

1104.   As a result of the August 17, 2007 attack and PFC Looney's injuries, the Looney Family has experienced extreme emotional pain and suffering.

**Barry McDonald**

1105.   Plaintiff Specialist Barry C. McDonald served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and North Carolina resident.

1106.   On October 8, 2007, SPC McDonald was injured by an EFP that had been planted and detonated by Jaysh al-Mahdi on Route Pluto near FOB Loyalty.  His injuries from the attack included lacerations to his face.  As a result of the October 8, 2007 attack and his injuries, McDonald has experienced extreme physical and emotional pain and suffering.

1107.   The attack that injured SPC McDonald would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Matthew Mergele

1108.   Plaintiff Specialist Matthew L. Mergele served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Tennessee resident.

1109.   On or about July 6, 2007, SPC Mergele was injured while returning to FOB Rustamiyah two blocks west of the New Baghdad District Advisory Council.  He was injured by an IED planted and detonated by Jaysh al-Mahdi.  As a result of the attack and his injuries, SPC Mergele has experienced extreme physical and emotional pain and suffering.

1110.   The attack that injured SPC Mergele would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi members who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Jareth Payne

1111.   Plaintiff Specialist Jareth Sheldon Payne served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1112.   On August 7, 2007, SPC Payne was shot in the right hand by a Jaysh al-Mahdi sniper while on COP Cajimat.  He suffered permanent nerve damage to his hand caused by his

gunshot wound.  Due to his injuries, SPC Payne received a 100% disability rating from the VA.

As a result of the August 7, 2007 attack, and the injuries he suffered therein, SPC Payne has

experienced extreme physical and emotional pain and suffering.

1113.   The attack that injured SPC Payne would have violated the law of war if Jaysh al-

Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot

him neither wore a uniform nor otherwise identified himself as an enemy combatant.

### **The Sassman Family**

1114.   Plaintiff Specialist Lucas Sassman served in Iraq as part of the 2-16 Rangers.  He

is a U.S. citizen and Maine resident.

1115.   On June 8, 2007, SPC Sassman was injured in a complex attack carried out by

Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack

on SPC Sassman's Humvee, followed by rifle and small-arms fire.  In addition to injuries caused

by the EFP explosion, SPC Sassman suffered a gunshot wound to the right temple, inflicted by a

Jaysh al-Mahdi sniper.  The attack caused traumatic brain injury and required the removal of a

portion of the skull and other surgeries; it also caused short-term memory loss, constant

migraines, vertigo and balance issues, and facial deformity.  Due to his injuries, SPC Sassman

received a 100% disability rating from the VA.  As a result of the June 8, 2007 attack, and the

injuries he suffered therein, SPC Sassman has experienced extreme physical and emotional pain

and suffering.

1116.   The attack that injured SPC Sassman would have violated the law of war if Jaysh

al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

executed the attack neither wore uniforms nor otherwise identified themselves as enemy

combatants.

1117.   Plaintiff Melissa Sassman is a U.S. citizen and Maine resident.  She is the wife of SPC Sassman.

1118.   As a result of the June 8, 2007 attack and SPC Sassman's injuries, Melissa Sassman has experienced extreme emotional pain and suffering.

**Jeremy Smith**

1119.   Plaintiff Staff Sergeant Jeremy D. Smith served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and North Carolina resident.

1120.   On May 5, 2007, SSG Smith was injured by a mortar round fired by Jaysh al-Mahdi.  He was resting and refitting at COP Bushmaster in Kamaliyah when three mortar rounds were fired at the U.S. installation.  One of the mortars impacted near SSG Smith, peppering him with shrapnel in his right arm and right leg.  Though at first no major injury was visible, a piece of shrapnel had damaged a ligament in SSG Smith's right ankle.  The injury impacted SSG Smith's ability to perform his job functions, and required surgeries in 2011 and 2018.  As a result of the May 5, 2007 attack and his injuries, Smith has experienced extreme physical and emotional pain and suffering.

1121.   The attack that injured SSG Smith would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who executed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Donald Spencer**

1122.   Plaintiff Staff Sergeant Donald H. Spencer served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Georgia resident.

1123.   On July 10, 2007, SSG Spencer was shot in the neck by a Jaysh al-Mahdi sniper while providing security at the Route Predator gas station.  Due to his injuries, SSG Spencer

received a 50% disability rating from the VA.  As a result of the July 10, 2007 attack and his injuries, SSG Spencer has experienced extreme physical and emotional pain and suffering.

1124.   The attack that injured SSG Spencer would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

### Jared Stevens

1125.   Plaintiff Sergeant First Class Jared S. Stevens served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Maryland resident.

1126.   On April 28, 2007, SFC Stevens was injured by a Jaysh al-Mahdi sniper in the Kamaliyah neighborhood of eastern Baghdad.  The sniper shot SFC Stevens in the lip, lacerating it and requiring immediate evacuation to FOB Rustamiyah.  As a result of the April 28, 2007 attack, SFC Stevens has experienced extreme physical and emotional pain and suffering.

1127.   The attack that injured SFC Stevens would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

### The Stinnett Family

1128.   Plaintiff Sergeant Derrick Stinnett served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1129.   On June 2, 2007, SGT Stinnett was riding in a U.S. Army Humvee in the Mua'lmeen neighborhood en route to FOB Rustamiyah when he was injured by an EFP planted and detonated by Jaysh al-Mahdi.  SGT Stinnett's injuries from the EFP explosion included second degree burns, injuries to his ribs and back, and a shrapnel wound to his neck.  The attack resulted in his medical retirement from the Army.  Due to his injuries, SGT Stinnett received an 80% disability rating from the VA, later changed to 100%.  As a result of the June 2, 2007 attack

and his injuries, SGT Stinnett has experienced extreme physical and emotional pain and suffering.

1130.   The attack that injured SGT Stinnett would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1131.   Plaintiff Brandi Stinnett is a U.S. citizen and Texas resident.  She is the wife of SGT Stinnett.

1132.   As a result of the June 2, 2007 attack and SGT Stinnett's injuries, Brandi Stinnett has experienced extreme emotional pain and suffering.

**The Thompson Estate**

1133.   Private First Class Leland R. Thompson served in Iraq as part of the 2-16 Rangers.  He was a U.S. citizen and Minnesota resident.  He died on November 14, 2018.

1134.   On May 15, 2007, PFC Thompson was injured by an IED that was planted and detonated by Jaysh al-Mahdi in the Mua'lmeen neighborhood near COP Cajimat.  His injuries included a laceration to his face.

1135.   On June 10, 2007, PFC Thompson was injured by an RPG fired by a Jaysh al-Mahdi operative at PFC Thompson's vehicle, at the end of a firefight in the Fedilayah neighborhood, from a Jaysh al-Mahdi-controlled mosque.  The attack caused severe injuries to his legs and groin.  As a result of the May 15, 2007 and June 10, 2007 attacks, and the injuries he sustained therein, PFC Thompson experienced extreme physical and emotional pain and suffering.

1136.   The attacks that injured PFC Thompson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s)

who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they launched the June 10, 2007 attack from a mosque.

1136.1.   Plaintiff Laurie Manylightnings is a U.S. citizen and Minnesota resident.  She is the mother of PFC Thompson.  She brings this action in her representative capacity on behalf of PFC Thompson's estate.

### The Tutwiler Family

1137.   Plaintiff Private First Class Patrick Tutwiler served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Tennessee resident.

1138.   On June 30, 2007, PFC Tutwiler was injured in an attack by Jaysh al-Mahdi in eastern Baghdad near Route Pluto.  During the attack, a Jaysh al-Mahdi sniper shot PFC Tutwiler through the face and neck.  Due to his injuries, PFC Tutwiler received a 100% disability rating from the VA.  As a result of the June 30, 2007 attack and his injuries, Tutwiler has experienced extreme physical and emotional pain and suffering.

1139.   The attack that injured PFC Tutwiler would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi sniper who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

1140.   Plaintiff Crystal Tutwiler is a U.S. citizen and Tennessee resident.  She is the wife of PFC Tutwiler.  As a result of the June 30, 2007 attack and PFC Tutwiler's injuries, Crystal Tutwiler has experienced extreme emotional pain and suffering.

### The Ryan Wilson Family

1141.   Plaintiff Private First Class Ryan Wilson served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Florida resident.

1142.   On June 8, 2007, PFC Wilson was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack

on PFC Wilson's Humvee, followed by small-caliber rifle fire.  PFC Wilson was injured by the EFP, including shrapnel wounds to his right arm.  Due to his injuries, PFC Wilson received a 90% disability rating from the VA.  As a result of the June 8, 2007 attack, and the injuries he sustained therein, PFC Wilson has experienced extreme physical and emotional pain and suffering.

1143.   The attack that injured PFC Wilson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1144.   Plaintiff Jami Lin Wilson is a U.S. citizen and Florida resident.  She is the wife of PFC Wilson.  As a result of the June 8, 2007 attack, and PFC Wilson's injuries, Jami Lin Wilson has experienced extreme emotional pain and suffering.

### **The Wold Family**

1145.   Plaintiff Sergeant Joshua P.G. Wold served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Oregon resident.

1146.   On September 2, 2007, SGT Wold was injured in a complex attack carried out by Jaysh al-Mahdi on Route Pluto west of FOB Rustamiyah.  Jaysh al-Mahdi's complex attack involved the use of an array of multiple EFPs to attack SGT Wold's convoy, followed by small-arms fire.  SGT Wold was severely wounded in the attack, and his injuries required partial amputation of his right foot.  SGT Wold received a 40% disability rating from the VA due to his amputation.  As a result of the September 2, 2007 attack, and the injuries he sustained therein, SGT Wold has experienced extreme physical and emotional pain and suffering.

1147.   The attack that injured SGT Wold would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

1148.   Plaintiff Celeste Yantis is a U.S. citizen and Washington resident.  She is the ex-wife of SGT Wold.

1149.   Plaintiff Presley Alexander is a U.S. citizen and Washington resident.  She is the stepdaughter of SGT Wold.

1150.   Plaintiff E.W., by and through her next friend Joshua Wold, is a U.S. citizen and Washington resident.  She is the minor daughter of SGT Wold.

1151.   As a result of the September 2, 2007 attack, and SGT Wold's injuries, the Wold Family has experienced extreme emotional pain and suffering.

### Herbert B. Gill

1152.   Plaintiff Command Sergeant Major Herbert B. Gill served in Iraq in the U.S. Army as part of 1st Battalion, 26th Infantry Regiment, 2nd Brigade Combat Team, 101st Airborne Division (the "Blue Spaders").  He is a U.S. citizen and Alaska resident.

1153.   In or about 2006 and 2007, CSM Gill was seriously injured by multiple EFPs that were planted and detonated by Jaysh al-Mahdi in separate areas of Baghdad that were under Jaysh al-Mahdi control.  Furthermore, CSM Gill was injured in a complex attack from small arms fire, specifically, he received shrapnel to the left hand from an AK-47 round fired by a Jaysh al-Mahdi member.  As a result of those attacks, and the injuries he suffered therein, CSM Gill has experienced extreme physical and emotional pain and suffering.

1154.   The attacks that injured CSM Gill would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

**James Gmachowski**

1155.   Plaintiff Staff Sergeant James Gmachowski served in Iraq as part of the Blue Spaders.  He is a U.S. citizen and California resident.

1156.   On October 22, 2006, SSG Gmachowski was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, near Sadr City.  The EFP severely wounded SSG Gmachowski and lodged a golf-ball-sized piece of copper in his back, which required invasive surgery to remove.  The wound took roughly five months to heal and was accompanied by traumatic brain injury and a PTSD diagnosis.  Due to his injuries, SSG Gmachowski received a 100% disability rating from the VA.  As a result of the October 22, 2006 attack, and the injuries he sustained therein, SSG Gmachowski has experienced extreme physical and emotional pain and suffering.

1157.   The attack that injured SSG Gmachowski would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Grzywa Family**

1158.   Plaintiff Master Sergeant Joshua Grzywa served in Iraq with the Blue Spaders. He is a U.S. citizen and Arizona resident.

1159.   On September 4, 2006, MSG Grzywa was injured by a mortar attack carried out by Jaysh al-Mahdi while he was resting and refitting in FOB Rustamiyah in eastern Baghdad. The attack occurred roughly five minutes after MSG Grzywa had returned to his base after completing a patrol.  MSG Grzywa was severely wounded in the attack:  a back injury he sustained caused him shooting pain into his extremities; partial loss of feeling in his legs; bulging disks in the lumbar spine; and an onset of disk degeneration – all of which required multiple

back surgeries and procedures.  His injuries forced him to medically retire from the U.S. Army.

Due to his injuries, MSG Grzywa received an 80% disability rating from the VA.  As a result of

the September 4, 2006 attack, and the injuries he sustained therein, MSG Grzywa has

experienced extreme physical and emotional pain and suffering.

1160.   The attack that injured MSG Grzywa would have violated the law of war if Jaysh

al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

launched the attack neither wore uniforms nor otherwise identified themselves as enemy

combatants.

1161.   Plaintiff Neysa Grzywa is a U.S. citizen and Arizona resident.  She is the wife of

MSG Grzywa.

1162.   As a result of the September 4, 2006 attack, and MSG Grzywa's injuries, Neysa

Grzywa has experienced extreme emotional pain and suffering.

### **The Lamb Family**

1163.   Plaintiff Sergeant Kurtiss Lamb served in Iraq as part of the Blue Spaders.  He is

a U.S. citizen and Tennessee resident.

1164.   On November 13, 2006, SGT Lamb was injured by an EFP planted and detonated

by Jaysh al-Mahdi in the Al Wahda District of Baghdad.  The EFP severely wounded SGT Lamb

and caused partial paralysis to his arm, bulging disks in his lumbar spine, and Traumatic Brain

Injury.  Due to his injuries, SGT Lamb received a 100% disability rating from the VA.  As a

result of the November 13, 2006 attack, and the injuries he sustained therein, SGT Lamb has

experienced extreme physical and emotional pain and suffering.

1165.   The attack that injured SGT Lamb would have violated the law of war if Jaysh al-

Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1166.   Plaintiff Lisa M. Lamb is a U.S. citizen and Tennessee resident.  She is the wife of SGT Lamb.  As a result of the November 13, 2006 attack, and SGT Lamb's injuries, Lisa M. Lamb has experienced extreme emotional pain and suffering.

**The Lopez Family**

1167.   Plaintiff Specialist Jose Lopez served in Iraq as part of the Blue Spaders.  He is a U.S. citizen and Connecticut resident.

1168.   On November 21, 2006, SPC Lopez was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Taji neighborhood of Baghdad.  The attack severely wounded SPC Lopez and caused him to sustain injuries to his right foot and lower right leg.  Due to his injuries, SPC Lopez received a 90% disability rating from the VA.  As a result of the November 21, 2006 attack, and the injuries he sustained therein, SPC Lopez has experienced extreme physical and emotional pain and suffering.

1169.   The attack that injured SPC Lopez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1170.   Plaintiff J.L., by and through his next friend SPC Lopez, is a U.S. citizen and Connecticut resident.  He is the minor son of SPC Lopez.

1171.   As a result of the November 21, 2006 attack, and SPC Lopez's injuries, J.L. has experienced extreme emotional pain and suffering.

**The McIntosh Family**

1172.   Plaintiff Private First Class David McIntosh served in Iraq as part of the Blue Spaders.  He is a U.S. citizen and Tennessee resident.

1173.   On October 22, 2006, PFC McIntosh was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, near Sadr City.  The EFP severely wounded PFC McIntosh and fractured his lower left leg, left him with permanent muscle damage in his left leg, and caused him to suffer hearing loss and permanent scars.  He was diagnosed with PTSD.  Due to his injuries, PFC McIntosh received a 100% disability rating from the VA.  As a result of the October 22, 2006 attack, and the injuries he sustained therein, PFC McIntosh has experienced extreme physical and emotional pain and suffering.

1174.   The attack that injured PFC McIntosh would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1175.   Plaintiff Donald McIntosh is a U.S. citizen and Tennessee resident.  He is the father of PFC McIntosh.

1176.   As a result of the October 22, 2006 attack, and PFC McIntosh's injuries, Donald McIntosh has experienced extreme emotional pain and suffering.

**The Norager Family**

1177.   Plaintiff Private First Class Tyler Norager served in Iraq as part of the Blue Spaders.  He is a U.S. citizen and Utah resident.

1178.   On October 22, 2006, PFC Norager was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, near Sadr City.  The EFP severely wounded PFC Norager and caused him to suffer shrapnel wounds to the face, the right side of his body, and the top of

his spine.  His injuries have caused him long-term, permanent back pain.  Due to his injuries, PFC Norager received a 100% disability rating from the VA.  As a result of the October 22, 2006 attack, and the injuries he sustained therein, PFC Norager has experienced extreme physical and emotional pain and suffering.

1179.   The attack that injured PFC Norager would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1180.   Plaintiff Shalee Norager is a U.S. citizen and Utah resident.  She is the wife of PFC Norager.

1181.   Plaintiff M.N., by and through her next friend Tyler Norager, is a U.S. citizen and Utah resident.  She is the minor daughter of PFC Norager.

1182.   As a result of the October 22, 2006 attack, and PFC Norager's injuries, the Norager Family has experienced extreme emotional pain and suffering.

**The Robinson Family**

1183.   Plaintiff Staff Sergeant Jason Robinson served in Iraq in the U.S. Army as part of the 2nd Battalion, 30th Infantry Regiment, 4th Brigade, 10th Mountain Division (the "2-30 Wild Boars").  He is a U.S. citizen and Virginia resident.

1184.   On April 3, 2008, SSG Robinson was injured by an EFP planted and detonated by Jaysh al-Mahdi, in eastern Baghdad, near Sadr City.  SSG Robinson sustained shrapnel wounds to his face, neck, and shoulder; the blast also dislocated two lumbar disks and ruptured both of his eardrums.  Due to his injuries, SSG Robinson received a 90% disability rating from the VA. As a result of the April 3, 2008 attack, and the injuries he sustained therein, SSG Robinson has experienced extreme physical and emotional pain and suffering.

1185.   The attack that injured SSG Robinson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1186.   Plaintiff Frances Robinson is a U.S. citizen and Virginia resident.  She is the wife of SSG Robinson.

1187.   Plaintiff E.R., by and through her next friend Frances Robinson, is a U.S. citizen and Virginia resident.  She is the minor daughter of SSG Robinson.

1188.   Plaintiff William Justin Weatherly is a U.S. citizen and Virginia resident.  He is the stepson of SSG Robinson.

1189.   Plaintiff Michael Weatherly is a U.S. citizen and Texas resident.  He is the stepson of SSG Robinson.

1190.   As a result of the April 3, 2008 attack, and SSG Robinson's injuries, the Robinson Family has experienced extreme emotional pain and suffering.

**<u>Jarrod Lagrone</u>**

1191.   Plaintiff Sergeant Jarrod Lagrone served in Iraq as part of the 2-30 Wild Boars. He is a U.S. citizen and Texas resident.

1192.   From November 2007 to February 2009, SGT Lagrone served in several areas of Iraq that functioned as Jaysh al-Mahdi strongholds, including Sadr City.  During that time period, SGT Lagrone was injured by multiple Jaysh al-Mahdi attacks, including those involving EFPs, 107mm rockets, and mortars.  These attacks caused SGT Lagrone to suffer permanent hearing loss, traumatic brain injury, and PTSD.  Due to his injuries, SGT Lagrone received a 70% disability rating from the VA.  As a result of the Jaysh al-Mahdi attacks, and the injuries he

sustained therein, SGT Lagrone has experienced extreme physical and emotional pain and suffering.

1193.   The attacks that injured SGT Lagrone would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Christopher Halski

1194.   Plaintiff Specialist Christopher Halski served in Iraq as part of the 2-30 Wild Boars.  He is a U.S. citizen and Nebraska resident.

1195.   SPC Halski served in Iraq between December 2007 and March 2009 and sustained three injuries resulting from attacks committed by Jaysh al-Mahdi, all on the border of Sadr City.  One attack involved an EFP, and one involved a rocket.  The EFP attack occurred while SPC Halski was providing security for personnel constructing a wall in Sadr City during the Battle of Sadr City.  As a result of the attacks, SPC Halski suffered permanent hearing loss and sustained an injury to his leg.  Due to his injuries, SPC Halski received a 60% disability rating from the VA.  As a result of the Jaysh al-Mahdi's attacks, SPC Halski has experienced extreme physical and emotional pain and suffering.

1196.   The attacks that injured SPC Halski would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Billiter Family

1197.   Staff Sergeant Jesse A. Ault served in Iraq in the as part of the 429th Brigade Support Battalion, Virginia Army National Guard.

1198.   On April 9, 2008, SSG Ault was killed by an EFP planted and detonated by Jaysh al-Mahdi northeast of Hillah, in central Iraq.  SSG Ault's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1199.   SSG Ault was a U.S. citizen when he was killed in Iraq.

1200.   Plaintiff Virginia Billiter is a U.S. citizen and West Virginia resident.  She is the mother of SSG Ault.

1201.   Plaintiff Eric Billiter is a U.S. citizen and West Virginia resident.  He is the stepfather of SSG Ault.

1202.   Plaintiff Adrianne Kidd is a U.S. citizen and North Carolina resident.  She is the stepsister of SSG Ault.

1203.   As a result of the April 9, 2008 attack, and SSG Ault's death, the Billiter Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Ault's society, companionship, and counsel.

**The Dudek Family**

1204.   Plaintiff Colonel Daniel Dudek served in Iraq in the U.S. Army.  He is a U.S. citizen and Washington resident.

1205.   In April 2007, COL Dudek was deployed to Iraq while serving in his third year as a Brigade Fire Officer for the 4th Brigade, 2nd Infantry Division, a then-active Stryker Brigade Combat Team, specifically to Taji in support of the U.S. government's efforts under the Baghdad Security Plan to interdict Jaysh al-Mahdi terrorist operations that threatened the Green Zone and risked destabilizing Iraq.

282

1206.   On July 19, 2007, COL Dudek was seriously injured by an EFP planted and detonated by Jaysh al-Mahdi on the north side of Husseinyah, a Jaysh al-Mahdi stronghold north of Baghdad.  The EFP attack resulted in the death of one Soldier and left COL Dudek with limited paralysis in his hips and legs, and complete paralysis in both of his ankles and feet.  He also has a Lumbar 3/4 cauda equina with no glute muscles and no ability to move the muscles in his calf/ankles/feet and has reduced feeling in his legs down to his ankles.  He also has a deep shrapnel hole in his back and pieces of fragmentation all throughout his left arm, hips, and buttocks area.

1207.   The attack on COL Dudek would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1208.   Plaintiff Margaret Eileen Tivnan Dudek is a U.S. citizen and North Carolina resident.  She is the mother of COL Dudek.

1209.   Plaintiff Sarah Dudek is a U.S. citizen and North Carolina resident.  She is the sister of COL Dudek.

1210.   Plaintiff Andrew Dudek is a U.S. citizen and North Carolina resident.  He is the brother of COL Dudek.

1211.   Plaintiff Katie Woodard is a U.S. citizen and North Carolina resident.  She is the sister of COL Dudek.

1212.   As a result of the July 19, 2007 attack, and COL Dudek's injuries, the Dudek Family has experienced extreme emotional pain and suffering.

**The Adair Family and Estate**

1213.   Specialist James L. Adair served in Iraq in the U.S. Army as part of the 1st Battalion, 28th Infantry Regiment, 4th Infantry Brigade Combat Team, 1st Infantry Division.

1214.   On June 29, 2007, SPC Adair was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 26 years old.

1215.   SPC Adair was a U.S. citizen when he was killed in Iraq.

1216.   SPC Adair's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1217.   Plaintiff Chelsea Adair is a U.S. citizen and Texas resident.  She is the widow of SPC Adair.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Adair's estate.

1218.   Plaintiff A.A., by and through her next friend Chelsea Adair, is a U.S. citizen and Texas resident.  She is the minor daughter of SPC Adair.

1219.   As a result of the June 29, 2007 attack, and SPC Adair's death, the Adair Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Adair's society, companionship, and counsel.

1220.   SPC Adair's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Adamson Family**

1221.   Plaintiff Specialist Matthew Adamson served with the Oklahoma National Guard in Iraq as part of the 1st Battalion, 158th Field Artillery Battalion.  He is a U.S. citizen and Oklahoma resident.

1222.   On June 5, 2006, SPC Adamson was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  The EFP struck his vehicle and caused SPC Adamson to suffer a head injury.  Due to the attack, he now suffers from frequent and severe headaches, memory loss, modified Traumatic Brain Injury, and PTSD.  As a result of the June 5, 2006 attack, SPC Adamson has experienced extreme physical and emotional pain and suffering.

1223.   The attack that injured SPC Adamson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1224.   Plaintiff R.A., by and through his next friend SPC Adamson, is a U.S. citizen and Oklahoma resident.  He is the son of Mr. Adamson.

1225.   As a result of the June 5, 2006 attack, and the injuries SPC Adamson suffered, Plaintiff R.A. has experienced extreme emotional pain and suffering.

### Karar Adel Alabsawi

1226.   Plaintiff Specialist Karar A. Alabsawi served in the U.S. Army in Iraq as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.  He is a U.S. citizen and Pennsylvania resident.

1227.   On October 22, 2006, SPC Alabsawi was injured when Jaysh al-Mahdi planted and detonated an EFP near his vehicle in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  The explosion resulted in the amputation of his left leg, severe injury to his left hand and arm, and shrapnel and burns throughout his body.  As a result of the October 22, 2006 attack, SPC Alabsawi has experienced extreme physical and emotional pain and suffering.

1228.   The attack that injured SPC Alabsawi would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

**The Alfonso Family and Estate**

1229.   Specialist Carlo E. Alfonso served in the U.S. Army in Iraq as part of 40th Engineer Battalion, 2nd Brigade Combat Team, 1st Armored Division.

1230.   On August 26, 2008, SPC Alfonso was killed by an EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  SPC Alfonso was 23 years old.

1231.   SPC Alfonso was a U.S. citizen when he was killed in Iraq.

1232.   SPC Alfonso's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1233.   Plaintiff Rosemarie Alfonso is a U.S. citizen and Washington resident.  She is the widow of SPC Alfonso.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Alfonso's estate.

1234.   Plaintiff K.B., by and through his next friend Rosemarie Alfonso, is a U.S. citizen and Washington resident.  He is the minor stepson of SPC Alfonso.

1235.   As a result of the August 26, 2008 attack, and SPC Alfonso's death, the Alfonso Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Alfonso's society, companionship, and counsel.

1236.   SPC Alfonso's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Al-Taie Family and Estate

1237.   Staff Sergeant Ahmed K. Al-Taie served in the U.S. Army in Iraq as part of the Provincial Reconstruction Team, Divisional Training Center, Special Troops Battalion, 4th Infantry Division.

1238.   SSG Al-Taie was abducted on or around October 23, 2006, in the Karadah District of Baghdad, Iraq, by Jaysh al-Mahdi and AAH.[389]  His remains were positively identified on February 25, 2012.

1239.   SSG Al-Taie was a U.S. citizen when he was killed in Iraq.

1240.   SSG Al-Taie's abduction and murder would have violated the law of war if Jaysh al-Mahdi and AAH were subject to it because, among other reasons, the terrorists who conducted the attack neither wore uniforms nor otherwise identified themselves as enemy combatants; because they engaged in kidnapping; and because they tortured and executed him in captivity.

1241.   Plaintiff Kousay Al-Taie is a U.S. citizen and Michigan resident.  He is the father of SSG Al-Taie.  He brings claims in both his personal capacity and his representative capacity on behalf of SSG Al-Taie's estate.

1242.   Plaintiff Nawal Al-Taie is a U.S. citizen and Michigan resident.  She is the mother of SSG Al-Taie.

1243.   Plaintiff Hathal K. Taie is a U.S. citizen and Michigan resident.  He is the brother of SSG Al-Taie.

1244.   As a result of the abduction and death of SSG Al-Taie, the Al-Taie Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Al-Taie's society, companionship, and counsel.

---

[389] References to "Jaysh al-Mahdi" throughout this Part VII include AAH and other cells and "Special Groups" as described above.  *See supra* ¶¶ 83, 334.

1245.   SSG Al-Taie's estate is entitled to recover economic and non-economic damages from Defendants, due to his death while being held hostage by Jaysh al-Mahdi.

**The Altman Family**

1246.   Plaintiff Specialist Jake Altman served in the U.S. Army in Iraq as part of Company B, 9th Engineer Battalion, 2nd Brigade Combat Team, 1st Infantry Division.  He is a U.S. citizen and North Carolina resident.

1247.   On May 14, 2007, SPC Altman was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Karadah District in Baghdad, Iraq.  SPC Altman was attacked while traveling in a one-person reconnaissance vehicle.  In this attack, SPC Altman sustained injuries that resulted in a severed right hand and PTSD.  Due to his injuries, SPC Altman received a 100% disability rating from the VA.  As a result of the May 14, 2007 attack, SPC Altman has experienced extreme physical and emotional pain and suffering.

1248.   The attack that injured SPC Altman would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1249.   Plaintiff Nadja Altman is a U.S. citizen and North Carolina resident.  She is the wife of SPC Altman.

1250.   Plaintiff J.A., by and through his next friend Nadja Altman, is a U.S. citizen and North Carolina resident.  He is the minor son of SPC Altman.

1251.   As a result of the May 14, 2007 attack, and the injuries SPC Altman suffered, the Altman Family has experienced extreme emotional pain and suffering.

**The Alvarez Family and Estate**

1252.   Sergeant Conrad Alvarez served in the U.S. Army in Iraq as part of 1st Battalion, 502nd Infantry Regiment, 2nd Brigade Combat Team, 101st Airborne Division.

1253.   On February 19, 2008, SGT Alvarez was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  He died of injuries from the attack the next day.  SGT Alvarez was 22 years old.

1254.   SGT Alvarez was a U.S. citizen when he was killed in Iraq.

1255.   SGT Alvarez's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1256.   Plaintiff Maira Alvarez is a U.S. citizen and Texas resident.  She is the widow of SGT Alvarez.  She brings claims in both her personal capacity and her representative capacity on behalf of SGT Alvarez's estate.

1257.   Plaintiff K.A., by and through his next friend Maira Alvarez, is a U.S. citizen and Texas resident.  He is the minor son of SGT Alvarez.

1258.   Plaintiff A.A., by and through her next friend Angela Alvarez, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Alvarez.

1259.   Plaintiff C.A., by and through her next friend Angela Alvarez, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Alvarez.

1260.   As a result of the February 19, 2008 attack, and SGT Alvarez's death, the Alvarez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Alvarez's society, companionship, and counsel.

1261.   SGT Alvarez's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Anaya Family and Estate**

1262.   Corporal Michael J. Anaya served in the U.S. Army in Iraq as part of the 2nd Battalion, 27th Infantry Regiment, 3rd Infantry Brigade Combat Team, 25th Infantry Division.

1263.   On April 12, 2009, CPL Anaya was killed by an EFP planted and detonated by Jaysh al-Mahdi in Bayji, Iraq.  CPL Anaya was murdered when traveling in his vehicle on Alternative Supply Route ("ASR") Hershey.  CPL Anaya was 23 years old.

1264.   CPL Anaya was a U.S. citizen when he was killed in Iraq.

1265.   CPL Anaya's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1266.   Plaintiff Cheryl Anaya is a U.S. citizen and Florida resident.  She is the mother of CPL Anaya.

1267.   Plaintiff Carmelo Anaya Jr. is a U.S. citizen and Florida resident.  He is the brother of CPL Anaya.

1268.   Plaintiff Trista Moffett is a U.S. citizen and Florida resident.  She is the sister of CPL Anaya.  Trista Moffett brings claims in both her personal capacity and her representative capacity on behalf of CPL Anaya's estate.

1269.   As a result of the April 12, 2009 attack, and CPL Anaya's death, the Anaya Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Anaya's society, companionship, and counsel.

1270.   CPL Anaya's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Andino Family and Estate

1271.   Private First Class Edwin A. Andino, II served in the U.S. Army in Iraq as part of the 1st Battalion, 26th Infantry Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

1272.   On September 3, 2006, PFC Andino was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Karadah District in eastern Baghdad, Iraq.  He was 23 years old.

1273.   PFC Andino was a U.S. citizen when he was killed in Iraq.

1274.   PFC Andino's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1275.   Plaintiff Cathy Andino is a U.S. citizen and Virginia resident.  She is the mother of PFC Andino.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Andino's estate.

1276.   As a result of the September 3, 2006 attack, and PFC Andino's death, Cathy Andino has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Andino's society, companionship, and counsel.

1277.   PFC Andino's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Andrade Family and Estate

1278.   Staff Sergeant Roberto Andrade, Jr. served in the U.S. Army in Iraq as part of the 1st Battalion, 66th Armor, 1st Brigade Combat Team, 4th Infantry Division.

1279.   On January 18, 2009, SSG Andrade was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 26 years old.

1280.   SSG Andrade was a U.S. citizen when he was killed in Iraq.

1281.   SSG Andrade's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1282.   Plaintiff Veronica Pena Andrade is a U.S. citizen and Arizona resident.  She is the stepmother of SSG Andrade.

1283.   Plaintiff Veronica D. Andrade is a U.S. citizen and Arizona resident.  She is the sister of SSG Andrade.

1284.   Plaintiff Roberto Andrade, Sr. is a U.S. citizen and Arizona resident.  He is the father of SSG Andrade.  He brings claims in both his personal capacity and his representative capacity on behalf of SSG Andrade's estate.

1285.   As a result of the January 18, 2009 attack, and SSG Andrade's death, the Andrade Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Andrade's society, companionship, and counsel.

1286.   SSG Andrade's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Matthew Andreas**

1287.   Plaintiff Staff Sergeant Matthew L. Andreas served in the U.S. Army in Iraq as a culinary specialist with the 1st Battalion, 18th Infantry Regiment, 2nd Brigade, 1st Infantry Division.  He is a U.S. citizen and California resident.

1288.   On March 19, 2007, SSG Andreas was in the dining facility at FOB Falcon, in the Al Rashid District in Baghdad, Iraq, when an explosion occurred, which caved in the roof of the facility.  The weapon used to attack and injure SSG Andreas was an RPG launched by Jaysh al-Mahdi.  SSG Andreas sustained head and other injuries due to the concussive blast of the

explosion and subsequent shrapnel and debris impacting his neck and left shoulder, lacerations to his left arm, shoulder, back, and neck, tinnitus, and PTSD.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the March 19, 2007 attack, SSG Andreas has experienced extreme physical and emotional pain and suffering.

1289.   The attack that injured SSG Andreas would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Nicholas Anna**

1290.   Plaintiff Specialist Nicholas Anna served in the U.S. Army in Iraq as part of B Company, 2nd Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Maine resident.

1291.   SPC Anna served in Sadr City, Iraq, including during the Battle of Sadr City. During his service from August 2007 through November 2008, SPC Anna survived over a dozen IED, EFP, and complex attacks by Jaysh al-Mahdi.  On January 18, 2008, SPC Anna survived an EFP attack by Jaysh al-Mahdi in the Adhamiyah District of Baghdad, Iraq.  Standing between the EFP and another vehicle was a young local girl, who was killed by the explosion.  SPC Anna was stunned by the concussive blast.

1292.   SPC Anna was diagnosed with PTSD from his exposure to these Jaysh al-Mahdi attacks.  Due to his injuries, SPC Anna received a 40% disability rating from the VA.  As a result of the January 2008 attack, SPC Anna has experienced extreme physical and emotional pain and suffering.

1293.   The attacks that injured SPC Anna would have been war crimes if Jaysh al-Mahdi were subject to the laws of war because, among other reasons, the Jaysh al-Mahdi member(s) who committed the EFP and IED attacks neither wore uniforms nor otherwise identified

themselves as enemy combatants, nor did they discriminate between combatants and non-combatants, resulting in the murder of a young child.

### The Arizola Family

1294.   Sergeant Roberto Arizola, Jr. served in the U.S. Army in Iraq as part of the 297th Military Intelligence Battalion, 513th Military Intelligence Brigade.

1295.   On June 8, 2005, SGT Arizola was killed by an IED planted and detonated by Jaysh al-Mahdi on Omar bin al-Khattab Street (Route Pluto), which separates the Karadah and New Baghdad Districts in eastern Baghdad, Iraq.  The explosion set fire to the vehicle in which SGT Arizola was riding, killing him and injuring three others.  He was 31 years old.

1296.   SGT Arizola was a U.S. citizen when he was killed in Iraq.

1297.   SGT Arizola's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the IED attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1298.   Plaintiff Monica Arizola is a U.S. citizen and Texas resident.  She is the widow of SGT Arizola.

1299.   Plaintiff Roberto Aaron Arizola is a U.S. citizen and Texas resident.  He is the son of SGT Arizola.

1300.   Plaintiff Roberto Arizola, Sr. is a U.S. citizen and Texas resident.  He is the father of SGT Arizola.

1301.   Plaintiff Cecilia Arizola is a U.S. citizen and Texas resident.  She is the mother of SGT Arizola.

1302.   Plaintiff Ricardo Arizola is a U.S. citizen and Texas resident.  He is the brother of SGT Arizola.

1303.   Plaintiff Danny Arizola is a U.S. citizen and Texas resident.  He is the brother of SGT Arizola.

1304.   As a result of the June 8, 2005 attack, and SGT Arizola's death, the Arizola Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Arizola's society, companionship, and counsel.

### The Bailey Family

1305.   Plaintiff First Lieutenant Trey N. Bailey served in the U.S. Army in Iraq as part of Fox Company, 145th Brigade Support Battalion.  1LT Bailey is a U.S. citizen and Oregon resident.

1306.   On April 29, 2011, 1LT Bailey was injured when an IED, which was planted and detonated by Jaysh al-Mahdi, struck his vehicle on Route Tampa in Baghdad, Iraq.  Due to the attack, he sustained injuries to his cervical and thoracic spine, Traumatic Brain Injury, and PTSD.  He received a 90% disability rating from the VA.  As a result of the April 29, 2011 attack, 1LT Bailey has experienced extreme physical and emotional pain and suffering.

1307.   The attack that injured 1LT Bailey would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1308.   Plaintiff McKenzie Bailey is a U.S. citizen and Oregon resident.  She is the wife of 1LT Bailey.  As a result of the April 29, 2011 attack, and the injuries 1LT Bailey suffered, McKenzie Bailey has experienced extreme emotional pain and suffering.

### The Balsley Family and Estate

1309.   Private First Class Michael C. Balsley served in the U.S. Army in Iraq as part of the 3rd Squadron, 61st Cavalry Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

1310.   On January 25, 2007, PFC Balsley was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  PFC Balsley was 23 years old.

1311.   PFC Balsley was a U.S. citizen when he was killed in Iraq.

1312.   PFC Balsley's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

1313.   Plaintiff Samantha Balsley is a U.S. citizen and Virginia resident.  She is the widow of PFC Balsley.  Samantha Balsley brings claims in her personal capacity and in her representative capacity on behalf of PFC Balsley's estate.

1314.   Plaintiff L.R-W., by and through his next friend Samantha Balsley, is a U.S. citizen and Virginia resident.  He is the minor son of PFC Michael Balsley.

1315.   As a result of the January 25, 2007 attack, and PFC Balsley's death, the Balsley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Balsley's society, companionship, and counsel.

1316.   PFC Balsley's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Bandhold Family**

1317.   Corporal Scott Bandhold served in the U.S. Army in Iraq as part of the 1st Battalion, 67th Armored Regiment, 2nd Brigade Combat Team, 4th Infantry Division.

1318.   On April 12, 2006, CPL Bandhold was killed by an EFP planted and detonated by Jaysh al-Mahdi on a roadway between Karbala and Musayyib, Iraq.  He was 37 years old.

1319.   CPL Bandhold was a U.S. citizen when he was killed in Iraq.

1320.   CPL Bandhold's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1321.   Plaintiff Afonso Bandhold is a U.S. citizen and Portugal resident.  He is the son of CPL Bandhold.

1322.   Plaintiff Henry J. Bandhold, Jr. is a U.S. citizen and New York resident.  He is the brother of CPL Bandhold.

1323.   Plaintiff Mariana Bandhold is a U.S. citizen and California resident.  She is the daughter of CPL Bandhold.

1324.   As a result of the April 12, 2006 attack, and CPL Bandhold's death, the Bandhold Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Bandhold's society, companionship, and counsel.

**The Barattieri Family and Estate**

1325.   Major Guyton "Guy" R. Barattieri graduated from West Point and served in Iraq during multiple deployments, first as a Special Forces officer, and later as a civilian security contractor.  As a civilian in Iraq, MAJ Barattieri, among other things, provided personal security for Fox News reporters as part of his effort in support of a free and independent press in Iraq.

1326.   On October 4, 2006, while working as a civilian contractor for Falcon Security, MAJ Barattieri was killed during a complex attack by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq.  The complex attack included use of an EFP planted and detonated by Jaysh al-Mahdi.  MAJ Barattieri survived the initial attack but died of his wounds shortly thereafter.

1327.   MAJ Barattieri was a U.S. citizen and when he was killed in Iraq.

1328.   MAJ Barattieri's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they targeted civilians.

1329.   Plaintiff Laurel Barattieri is a U.S. citizen and Washington resident.  She is the widow of MAJ Barattieri.  She brings claims in both her personal capacity and her representative capacity on behalf of MAJ Barattieri's estate.

1330.   Plaintiff Patricia Wheatley is a U.S. citizen and Ohio resident.  She is the mother of MAJ Barattieri.

1331.   As a result of the October 4, 2006 attack, and MAJ Barattieri's death, the Barattieri Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Barattieri's society, companionship, and counsel.

1332.   MAJ Barattieri's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Cody Barham**

1333.   Plaintiff Sergeant Cody Barham served in the U.S. Army in Iraq as part of B Company, 3rd Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Wyoming resident.

1334.   In March 2008, SGT Barham survived an RPG attack by Jaysh al-Mahdi in Sadr City.  The RPG hit the roof on which SGT Barham was standing, exploding and knocking him one story down in the building, where he struck his face on another unit member's weapon as he landed.  In the attack, SGT Barham sustained back injuries, Traumatic Brain Injury, and a concussion.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of

the March 2008 attack, SGT Barham has experienced extreme physical and emotional pain and suffering.

1335.   The attack that injured SGT Barham would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the RPG attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Todd A. Barnum

1336.   Plaintiff Sergeant Todd A. Barnum served in Iraq as a line medic attached to B Company, 1st Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Texas resident.

1337.   On January 4, 2008, SGT Barnum was injured by an EFP planted and detonated by Jaysh al-Mahdi near the border between the Rusafa and Adhamiyah Districts in eastern Baghdad, Iraq.  The explosion knocked SGT Barnum unconscious and caused chest pains, a concussion, and injuries from smoke inhalation.

1338.   While at COP Urr in March or April 2008, during the Battle of Sadr City, SGT Barnum was injured in a firefight with Jaysh al Mahdi.  The concussive blast that SGT Barnum sustained during the fight caused severe headaches.  The Jaysh al-Mahdi attacks that injured SSG Barnum resulted in Traumatic Brain Injury, cognitive dysfunction, sleep issues, and hearing loss. Due to his injuries, SGT Barnum received a 100% disability rating from the VA.

1339.   As a result of the January 4, 2008 and March or April 2008 attacks, SGT Barnum has experienced severe physical and emotional pain and suffering.

1340.   The attacks that injured SGT Barnum would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Dustin Bauer Family**

1341.   Plaintiff Sergeant Dustin R. Bauer served in the U.S. Army in Iraq as part of B Company, 1st Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Texas resident.

1342.   During his tour in Iraq from approximately August 2007 through October 2008, SGT Bauer was injured by numerous EFP, IED, RPG, and mortar attacks by Jaysh al-Mahdi in or near Sadr City, including a mortar attack on August 14, 2007.  Due to those attacks, SGT Bauer suffered a Traumatic Brain Injury and fused vertebrae in his back; he was then medically retired from the military and received a 50% disability rating from the VA.  As a result of those attacks, SGT Bauer has experienced extreme physical and emotional pain and suffering.

1343.   Those attacks would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

1344.   Plaintiff T.H., by and through her next friend SGT Bauer, is a U.S. citizen and a Texas resident.  She is the minor stepdaughter of SGT Bauer.

1345.   Plaintiff S.B., by and through her next friend SGT Bauer, is a U.S. citizen and a Texas resident.  She is the minor daughter of SGT Bauer.

1346.   Plaintiff K.B., by and through her next friend SGT Bauer, is a U.S. citizen and a Texas resident.  She is the minor daughter of SGT Bauer.

1347.   As a result of the Jaysh al-Mahdi attacks, and the injuries SGT Bauer suffered, the Bauer Family has experienced extreme emotional pain and suffering.

**The Justin Bauer Family and Estate**

1348.   Staff Sergeant Justin L. Bauer served in the U.S. Army in Iraq as part of the 2nd Battalion, 505th Parachute Infantry Regiment, 3rd Brigade Combat Team, 82nd Airborne Division.

1349.   On January 10, 2009, SSG Bauer was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  SSG Bauer was 24 years old.

1350.   SSG Bauer was a U.S. citizen when he was killed in Iraq.

1351.   SSG Bauer's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1352.   Plaintiff Kari Carosella is a U.S. citizen and Colorado resident.  She is the widow of SSG Bauer.  Kari Carosella brings claims in both her personal capacity and her representative capacity on behalf of SSG Bauer's estate.

1353.   Plaintiff Jeremy Bauer is a U.S. citizen and Colorado resident.  He is the brother of SSG Bauer.

1354.   Plaintiff Jacob Bauer is a U.S. citizen and Colorado resident.  He is the brother of SSG Bauer.

1355.   Plaintiff Connie Haddock is a U.S. citizen and Colorado resident.  She is the mother of SSG Bauer.

1356.   Plaintiff Gregory Bauer is a U.S. citizen and New Mexico resident.  He is the father of SSG Bauer.

1357.   As a result of the January 10, 2009 attack, and SSG Bauer's death, the Bauer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Bauer's society, companionship, and counsel.

1358.   SSG Bauer's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Baxter Family**

1359.   Plaintiff Specialist David R. Baxter, Jr. served in the U.S. Army in Iraq as part of Headquarters Company, 1-502 Infantry Regiment, 2nd Brigade Combat Team, 101st Airborne Division.  He is a U.S. citizen and Oregon resident.

1360.   On March 19, 2008, SPC Baxter survived a complex attack by Jaysh al-Mahdi on Route Tampa, just outside the Kadamiyah District in western Baghdad, Iraq.  SPC Baxter was providing security to civilian contractors when they were attacked by rockets and machine-gun fire from Jaysh al-Mahdi.  SPC Baxter's vehicle was hit by a light armor-piercing round.  SPC Baxter sustained a back injury, Traumatic Brain Injury, and shrapnel wounds.  Due to his injuries, he received an 80% disability rating from the VA.  As a result of the March 19, 2008 attack, SPC Baxter has experienced extreme physical and emotional pain and suffering.

1361.   The attack that injured SPC Baxter would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the complex attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1362.   Plaintiff Nicole M. Baxter is a U.S. citizen and Oregon resident.  She is the wife of SPC David Baxter.

1363.   Plaintiff David R. Baxter, Sr. is a U.S. citizen and California resident.  He is the father of SPC David Baxter.

1364.   As a result of the March 19, 2008 attack, and the injuries SPC Baxter suffered, the Baxter Family has experienced extreme emotional pain and suffering.

**The Beem Family**

1365.   Plaintiff Staff Sergeant Brian Beem served in the U.S. Army in Iraq as part of the 172nd Stryker Brigade Combat Team.  He is a U.S. citizen and Colorado resident.

1366.   On October 11, 2006, SSG Beem was injured by an IED that was planted and detonated by Jaysh al-Mahdi in the Rusafa District in eastern Baghdad, Iraq.  SSG Beem was injured while riding in his Stryker vehicle, and he sustained injuries that resulted in the amputation of his leg.  As a result of the October 11, 2006 attack, SSG Beem has experienced extreme physical and emotional pain and suffering.

1367.   The attack that injured SSG Beem would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1368.   Plaintiff Elizabeth Beem is a U.S. citizen and Colorado resident.  She is the spouse of SSG Beem.

1369.   Plaintiff Kelly Beem is a U.S. citizen and Colorado resident.  She is the daughter of SSG Beem.

1370.   Plaintiff Kaitlyn Beem is a U.S. citizen and Colorado resident.  She is the daughter of SSG Beem.

1371.   Plaintiff Cassandra Beem is a U.S. citizen and Colorado resident.  She is the daughter of SSG Beem.

1372.   Plaintiff Joseph Beem is a U.S. citizen and New York resident.  He is the father of SSG Beem.

1373.   As a result of the October 11, 2006 attack, and the injuries SSG Beem suffered, the Beem Family has experienced extreme emotional pain and suffering.

**The Benson Family**

1374.   Plaintiff Staff Sergeant Matthew A. Benson served in the U.S. Army in Iraq as part of Company A, 1st Battalion, 8th Cavalry Regiment, 2nd Brigade Combat Team, 1st Cavalry Division.  He is a U.S. citizen and Arizona resident.

1375.   On June 17, 2007, SSG Benson survived an EFP explosion that was planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  SSG Benson sustained a skull fracture, copper shrapnel embedded in his body, burns and bruising on his back, as well as lacerations to his hands, face, and head.  He now suffers from severe headaches and PTSD.  As a result of the June 17, 2007 attack, SSG Benson has experienced extreme physical and emotional pain and suffering.

1376.   The attack that injured SSG Benson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1377.   Plaintiff Daniel P. Benson is a U.S. citizen and Kansas resident.  He is the father of SSG Benson.

1378.   Plaintiff Carol Benson is a U.S. citizen and Kansas resident.  She is the mother of SSG Benson.

1379.   Plaintiff B.B., by and through his next friend SSG Benson, is a U.S. citizen and Arizona resident.  He is the minor son of SSG Benson.

1380.   Plaintiff C.B., by and through his next friend SSG Benson, is a U.S. citizen and Arizona resident.  He is the minor son of SSG Benson.

1381.   Plaintiff Melissa Benson is a U.S. citizen and Arizona resident.  She is the wife of SSG Benson.

1382.    As a result of the June 17, 2007 attack, and the injuries SSG Benson suffered, the Benson Family has experienced extreme emotional pain and suffering.

**Brentyn Bishop**

1383.    Plaintiff Staff Sergeant Brentyn M. Bishop served in the U.S. Army in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1384.    On June 25, 2007, SSG Bishop was injured by an EFP planted and detonated by Jaysh al-Mahdi in the southern portion of the Fedilayah neighborhood of the New Baghdad District in eastern Baghdad, Iraq.  The attack severely wounded SSG Bishop, who was injured with shrapnel and suffered Traumatic Brain Injury, memory loss, tinnitus, and headaches.  As a result of the June 25, 2007 attack, SSG Bishop has experienced extreme physical and emotional pain and suffering.

1385.    The attack that injured SSG Bishop would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Blickenstaff Family**

1386.    Plaintiff Specialist John Blickenstaff served in Iraq as part of the 38th Military Police Company, 38th Infantry Division, Indiana Army National Guard.  He is a U.S. citizen and Indiana resident.

1387.    On August 4, 2008, SPC Blickenstaff survived an EFP attack planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  His injuries from this attack included loss of hearing in both ears, shrapnel in his body, scarring, leg wounds requiring a muscle graft to his right leg, amputation of a toe on his right foot, missing tissue from his upper left thigh, and PTSD.  Due to his injuries, SPC Blickenstaff received a 100% disability

rating from the VA.  As a result of the attack, SPC Blickenstaff has experienced extreme physical and emotional pain and suffering.

1388.   The attack that injured SPC Blickenstaff would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1389.   Plaintiff Pam Jones is a U.S. citizen and Indiana resident.  She is the mother of SPC Blickenstaff.

1390.   Plaintiff Trista Carter is a U.S. citizen and Indiana resident.  She is the sister of SPC Blickenstaff.

1391.   Plaintiff Adrianne Blickenstaff is a U.S. citizen and Tennessee resident.  She is the sister of SPC Blickenstaff.

1392.   Plaintiff A.B., by and through his next friend SPC Blickenstaff, is a U.S. citizen and Indiana resident.  He is the minor son of SPC Blickenstaff.

1393.   Plaintiff C.B., by and through her next friend SPC Blickenstaff, is a U.S. citizen and Indiana resident.  She is the minor daughter of SPC Blickenstaff.

1394.   Plaintiff M.B., by and through her next friend SPC Blickenstaff, is a U.S. citizen and Indiana resident.  She is the minor daughter of SPC Blickenstaff.

1395.   Plaintiff Misty Blickenstaff is a U.S. citizen and Indiana resident.  She is the spouse of SPC Blickenstaff.

1396.   Plaintiff Jared Blickenstaff is a U.S. citizen and Indiana resident.  He is the brother of SPC Blickenstaff.

1397.   As a result of the August 4, 2008 attack, and the injuries SPC Blickenstaff suffered, the Blickenstaff Family has experienced extreme emotional pain and suffering.

### The Blohm Family and Estate

1398.   Private First Class Alan R. Blohm served in the U.S. Army in Iraq as part of the 425th Brigade Special Troops Battalion, 4th Airborne Brigade Combat Team, 25th Infantry Division.

1399.   On December 31, 2006, PFC Blohm was killed by an EFP that was planted and detonated by Jaysh al-Mahdi west of Musayyib, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  PFC Blohm was 21 years old.

1400.   PFC Blohm was a U.S. citizen when he was killed in Iraq.

1401.   PFC Blohm's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

1402.   Christopher Blohm was a U.S. citizen at the time of the death of PFC Blohm.  He was the father of PFC Blohm.  He died on May 4, 2017.

1403.   Plaintiff Denise Vennix is a U.S. citizen and Michigan resident.  She is the mother of PFC Blohm.

1404.   Plaintiff Jeremy Blohm is a U.S. citizen and Michigan resident.  He is the brother of PFC Blohm.  He brings claims in both his personal capacity and his representative capacity on behalf of Christopher Blohm's estate and PFC Blohm's estate.

1405.   Plaintiff Kiana Blohm is a U.S. citizen and Michigan resident.  She is the sister of PFC Blohm.

1406.   As a result of the December 31, 2006 attack, and PFC Blohm's death, the Blohm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Blohm's society, companionship, and counsel.

1407.   PFC Blohm's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

1408.   Christopher Blohm's estate is entitled to recover economic and non-economic damages from Defendants, due to PFC Blohm's murder by Jaysh al-Mahdi.

**The Bobb Family and Estate**

1409.   Private First Class Brandon K. Bobb served in the U.S. Army in Iraq as part of the 401st Military Police Company, 92nd Military Police Battalion, 89th Military Police Brigade.

1410.   On July 17, 2007, PFC Bobb was killed by an EFP planted and detonated by Jaysh al-Mahdi near the Khatib neighborhood of Baghdad, Iraq.  He was 20 years old.

1411.   PFC Bobb was a U.S. citizen when he was killed in Iraq.

1412.   PFC Bobb's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1413.   Plaintiff Paula C. Bobb-Miles is U.S. citizen and Texas resident.  She is the mother of PFC Bobb.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Bobb's estate.

1414.   Plaintiff Johnny J. Miles, Sr. is a U.S. citizen and Texas resident.  He is the stepfather of PFC Bobb.

1415.   Plaintiff Racquel A. Bobb Miles is a U.S. citizen and Texas resident.  She is the sister of PFC Bobb.

1416.   Plaintiff Johnny J. Miles, Jr. is a U.S. citizen and Texas resident.  He is the brother of PFC Bobb.

1417.   As a result of the July 17, 2007 attack, and PFC Bobb's death, the Bobb Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Bobb's society, companionship, and counsel.

1418.   PFC Bobb's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Bogart Family

1419.   Plaintiff Specialist Evan D. Bogart served in Iraq in the U.S. Army as part of Headquarters Company, 4th Brigade, 10th Mountain Division.  He is a U.S. citizen and Arizona resident.

1420.   On April 21, 2008, during the Battle of Sadr City, SPC Bogart was injured when an EFP was planted and detonated near his vehicle by Jaysh al-Mahdi on Route Predators, close to FOB Loyalty, in the New Baghdad District in eastern Baghdad, Iraq.  SPC Bogart sustained burns and blast injuries to his face, as well as a shrapnel injury to his left shoulder, PTSD, and tinnitus.  Due to his injuries, he received an 80% disability rating from the VA.  As a result of the April 21, 2008 attack, SPC Bogart has experienced extreme physical and emotional pain and suffering.

1421.   The attack that injured SPC Bogart would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1422.   Plaintiff Lani D. Bogart is a U.S. citizen and Arizona resident.  She is the mother of SPC Bogart.

1423.   Plaintiff Douglas R. Bogart is a U.S. citizen and Arizona resident.  He is the father of SPC Bogart.

1424.   Plaintiff Cana S. Hickman is a U.S. citizen and Texas resident.  She is the sister of SPC Bogart.

1425.   Plaintiff Christopher Bogart is a U.S. citizen and Arizona resident.  He is the brother of SPC Bogart.

1426.   As a result of the April 21, 2008 attack, and the injuries SPC Bogart suffered, the Bogart Family has experienced extreme emotional pain and suffering.

**The Botts Family**

1427.   Plaintiff Sergeant John Botts served in the U.S. Army in Iraq as part of the 258th Military Police Company.  He is a U.S. citizen and Texas resident.

1428.   On September 7, 2006, SGT Botts survived an EFP attack by Jaysh al-Mahdi in Sadr City.  As a result of the attack, SGT Botts lost his left leg above the knee, sustained fractures his right tibia and right leg, damaged his hip and lower back, and now suffers from PTSD.  Due to his injuries, SGT Botts received a 100% disability rating from the VA.  As a result of the September 7, 2006 attack, SGT Botts has experienced extreme physical and emotional pain and suffering.

1429.   The attack that injured SGT Botts would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1430.   Plaintiff Dara Botts is a U.S. citizen and Tennessee resident.  She is the mother of SGT Botts.

1431.   Plaintiff Elizabeth Cunningham is a U.S. citizen and Tennessee resident.  She is the sister of SGT Botts.

1432.   Plaintiff Steve Botts is a U.S. citizen and Tennessee resident.  He is the father of SGT Botts.

1433.   Plaintiff Jennifer Botts is a U.S. citizen and Texas resident.  She is the wife of SGT Botts.

1434.   As a result of the September 7, 2006 attack, and the injuries SGT Botts suffered, the Botts Family has experienced extreme emotional pain and suffering.

### Mario Bowen

1435.   Plaintiff Sergeant First Class Mario Bowen served in the U.S. Army in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Georgia resident.

1436.   On August 23, 2007, SFC Bowen was injured by an EFP planted and detonated by Jaysh al-Mahdi south of FOB Rustamiyah, near Route Pluto in the New Baghdad District in eastern Baghdad, Iraq.  The attack severely wounded SFC Bowen, rendering him unconscious and causing a Traumatic Brain Injury, memory loss, speech issues, and headaches.  As a result of the August 23, 2007 attack, SFC Bowen has experienced extreme physical and emotional pain and suffering.

1437.   The attack that injured SFC Bowen would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Michelle Klemensberg

1438.   Sergeant Larry R. Bowman served in the U.S. Army in Iraq as part of the 513th Transportation Company, 57th Transportation Battalion, 593rd Corps Support Group.

1439.   On April 13, 2007, SGT Bowman was killed by an EFP planted and detonated by Jaysh al-Mahdi near his vehicle on Main Supply Route ("MSR") Tampa south of Baghdad, Iraq. SGT Bowman was 29 years old.

1440.   SGT Bowman was a U.S. citizen when he was killed in Iraq.

1441.   SGT Bowman's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1442.   Plaintiff Michelle Klemensberg is a U.S. citizen and California resident.  She is the widow of SGT Bowman.

1443.   As a result of the April 13, 2007 attack, and SGT Bowman's death, Michelle Klemensberg has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Bowman's society, companionship, and counsel.

**Andrew Bradley**

1444.   Plaintiff Corporal Andrew Bradley served in Iraq in the U.S. Army as an infantryman for Company B, 18th Infantry Regiment, 1st Battalion, 2nd Brigade Combat Team, 1st Infantry Division.  He is a U.S. citizen and Texas resident.

1445.   On January 10, 2009, CPL Bradley survived an explosion from an EFP that was planted and detonated near his vehicle by Jaysh al-Mahdi in Sadr City.  In this attack, CPL Bradley lost part of his right leg and sustained burns on his left foot.  He now suffers from the amputation of his right leg below the knee, nerve damage to his left foot, and chronic pain as a result of the EFP attack by Jaysh al-Mahdi.  Due to his injuries, he has received a 50% disability rating from the VA.  As a result of the January 10, 2009 attack, CPL Bradley has experienced extreme physical and emotional pain and suffering.

1446.   The attack that injured CPL Bradley would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Brian Family and Estate**

1447.   Brian M. Brian, Sr. served in Iraq as a civilian contractor conducting an international police liaison mission for DynCorp International.

1448.   On October 22, 2006, Mr. Brian was killed by an IED planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 58 years old.

1449.   Mr. Brian was a U.S. citizen when he was killed in Iraq.

1450.   Mr. Brian's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they targeted civilians.

1451.   Plaintiff Constance Brian is a U.S. citizen and Arkansas resident.  She is the widow of Mr. Brian.  She brings claims in both her personal capacity and representative capacity on behalf of Mr. Brian's estate.

1452.   Plaintiff Amber Hensley is a U.S. citizen and North Dakota resident.  She is the daughter of Mr. Brian.

1453.   As a result of the October 22, 2006 attack, and Mr. Brian's death, the Brian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brian's society, companionship, and counsel.

1454.   Mr. Brian's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Briggs Family**

1455.   Plaintiff Sergeant Michael J. Briggs served in the U.S. Army in Iraq as part of D Company, 64th Regiment, 4th Armored Brigade, 3rd Infantry Division attached to the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Georgia resident.

1456.   On or about May 4, 2008, during the Battle of Sadr City, SGT Briggs was injured when his vehicle was struck by two RPG rounds fired by Jaysh al-Mahdi in Sadr City.  SGT Briggs sustained a severe concussion, which left him with a Traumatic Brain Injury, migraines, hearing loss, a slipped disk in his neck, and nerve damage to his arms.  Due to his injuries, he received a 70% disability rating from the VA.  As a result of the May 4, 2008 attack, SGT Briggs has experienced extreme physical and emotional pain and suffering.

1457.   The attack that injured SGT Briggs would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who fired the RPG neither wore uniforms nor otherwise identified themselves as enemy combatants.

1458.   Plaintiff Takarra L. Briggs is a U.S. citizen and Georgia resident.  She is the wife of SGT Briggs.

1459.   Plaintiff M.D.R. II, by and through his next friend Takarra Lyn Briggs, is a U.S. citizen and Georgia resident.  He is the minor stepson of SGT Briggs.

1460.   Plaintiff M.J.B., by and through her next friend Takarra Lyn Briggs, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT Briggs.

1461.   Plaintiff M.J.B., by and through her next friend Takarra Lyn Briggs, is a U.S. citizen and Georgia resident.  He is the minor son of SGT Briggs.

1462.   As a result of the May 4, 2008 attack, and the injuries SGT Briggs suffered, the Briggs Family has experienced extreme emotional pain and suffering.

**The Brooks Family**

1463.   Plaintiff Senior Airman Joshua D. Brooks served with the U.S. Air Force in Iraq as part of the 90th Security Support Squadron.  He is a U.S. citizen and Tennessee resident.

1464.   On May 14, 2007, SrA Brooks survived an EFP explosion that was planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  In this attack, SrA Brooks sustained a shattered left fibula, tissue loss in his left leg, and nerve and tendon damage to his left foot and ankle.  As a result of the May 14, 2007 attack, SrA Brooks has experienced extreme physical and emotional pain and suffering.

1465.   The attack that injured SrA Brooks would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1466.   Plaintiff Daniel T. Brooks is a U.S. citizen and Kentucky resident.  He is the brother of SrA Joshua Brooks.  As a result of the May 14, 2007 attack, and the injuries SrA Brooks suffered, Daniel T. Brooks has experienced extreme emotional pain and suffering.

**The Joshua Brown Family and Estate**

1467.   Specialist Joshua D. Brown served in the U.S. Army in Iraq as part of the Company A, 1st Battalion, 18th Infantry Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

1468.   On June 2, 2007, SPC Brown was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He succumbed to his injuries and died the following day.  SPC Brown was 26 years old.

1469.   SPC Brown was a U.S. citizen when he was killed in Iraq.

1470.   SPC Brown's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1471.   Plaintiff Elizabeth Masterson is a U.S. citizen and Michigan resident.  She is the widow of SPC Brown.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Brown's estate.

1472.   As a result of the June 2, 2007 attack, and SPC Brown's death, Elizabeth Masterson has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Brown's society, companionship, and counsel.

1473.   SPC Brown's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Scott Brown Family and Estate

1474.   Sergeant First Class Scott J. Brown served in Iraq in the U.S. Army as part of the 1st Battalion, 325th Airborne Infantry Regiment, 2nd Brigade Combat Team, 82nd Airborne Division.

1475.   On May 18, 2007, SFC Brown was killed by injuries sustained in a Jaysh al-Mahdi complex attack, which included an EFP and small-arms fire, in the Kadamiyah District in western Baghdad, Iraq.

1476.   SFC Brown was a U.S. citizen when he was killed in Iraq.

1477.   SFC Brown's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

1478.   Plaintiff Taylor Brown is a U.S. citizen and Wisconsin resident.  He is the son of SFC Brown.  Taylor Brown brings claims in both his personal capacity and his representative capacity on behalf of SFC Brown's estate.

1479.   As a result of the May 18, 2007 attack, and SFC Brown's death, Taylor Brown has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Brown's society, companionship, and counsel.

1480.   SFC Brown's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Burks Family and Estate**

1481.   Second Lieutenant Peter H. Burks served in the U.S. Army in Iraq as part of the 4th Squadron, 2nd Stryker Cavalry Regiment.

1482.   On November 14, 2007, 2LT Burks was killed by an EFP that was planted and detonated by Jaysh al-Mahdi in the Karkh District in Baghdad, Iraq.  He was 26 years old.

1483.   2LT Burks was a U.S. citizen when he was killed in Iraq.

1484.   2LT Burks's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1485.   Plaintiff Alan Burks is a U.S. citizen and Texas resident.  He is the father of 2LT Burks.  Alan Burks brings claims in both his personal capacity and his representative capacity on behalf of 2LT Burks' estate.

1486.   Plaintiff Jackie M. Hlastan is a U.S. citizen and Texas resident.  She is the mother of 2LT Burks.

1487.   Plaintiff Georgia Burks is a U.S. citizen and Texas resident.  She is the sister of 2LT Burks.

1488.   Plaintiff Alison Burks McRuiz is a U.S. citizen and Texas resident.  She is the sister of 2LT Burks.

1489.   Plaintiff Sarah Phillips is a U.S. citizen and Texas resident.  She is the sister of 2LT Burks.

1490.   Plaintiff Zachary Burks is a U.S. citizen and Texas resident.  He is the brother of 2LT Burks.

1491.   As a result of the November 14, 2007 attack, and 2LT Burks's death, the Burks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Burks's society, companionship, and counsel.

1492.   2LT Burks's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Larry D. Cabral, Jr.**

1493.   Plaintiff Larry D. Cabral, Jr. served in the U.S. Army in Iraq as a signal systems specialist for the 1st Brigade, Military Transition Team, 6th Iraqi Army Division.  He is a U.S. citizen and Texas resident.

1494.   On November 14, 2006, Mr. Cabral was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Phone Card in the Kadamiyah District in western Baghdad, Iraq. His injuries from the attack included nerve damage in both arms, shrapnel to his side, compressed cervical vertebrae, and a Traumatic Brain Injury.  He also suffers from PTSD, anxiety, and other psychological issues.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the November 14, 2006 attack, Mr. Cabral has experienced extreme physical and emotional pain and suffering.

318

1495.   The attack that injured Mr. Cabral would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Calderon-Ascencio Family and Estate

1496.   Specialist Roland E. Calderon-Ascencio served in the U.S. Army in Iraq as part of the 1st Battalion, 67th Armored Regiment, 2nd Brigade Combat Team, 4th Infantry Division.

1497.   On April 12, 2006, SPC Calderon-Ascencio was killed by an EFP planted and detonated by Jaysh al-Mahdi near Musayyib, Iraq.  He was 21 years old.

1498.   SPC Calderon-Ascencio was a U.S. citizen when he was killed in Iraq.

1499.   SPC Calderon-Ascencio's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1500.   Plaintiff Jasmyn Rauda is a U.S. citizen and Florida resident.  She is the sister of SPC Calderon-Ascencio.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Calderon-Ascencio's estate.

1501.   As a result of the April 12, 2006 attack, and SPC Calderon-Ascencio's death, Jasmyn Rauda has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Calderon-Ascencio's society, companionship, and counsel.

1502.   SPC Calderon-Ascencio's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Benjamin D. Carrington**

1503.   Plaintiff Sergeant Benjamin D. Carrington served in the U.S. Army in Iraq as part of the 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division. He is a U.S. citizen and Texas resident.

1504.   On March 23, 2008, SGT Carrington was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  The EFP struck SGT Carrington's vehicle and forced him to witness the attack scene and its aftermath, including a fellow soldier who was engulfed in flames.  SGT Carrington was diagnosed with PTSD and has sought counseling, as well as received medication to treat his condition.  As a result of the March 23, 2008 attack, SGT Carrington has experienced extreme emotional pain and suffering.

1505.   The attack that injured SGT Carrington would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Carter Family**

1506.   Plaintiff Staff Sergeant Terry R. Carter served in the U.S. Army in Iraq as an air defense command, control, communications, computers, and intelligence operator for the 1st Cavalry Division.  He is a U.S. citizen and Mississippi resident.

1507.   On June 21, 2007, SSG Carter survived an explosion outside the Basra Palace in Basra, Iraq from a mortar that was transported, stored, and launched by a cell that included members of both Jaysh al-Mahdi and Hezbollah.  The incoming mortars landed behind SSG Carter, throwing him into a concrete bunker.  In this attack, SSG Carter sustained injuries to his head, neck, spine, and hip.  SSG Carter now suffers from back and hip pain, as well as PTSD as a result of the mortar attacks by Jaysh al-Mahdi and Hezbollah.  Due to his injuries, he has

received a 100% disability rating from the VA.  As a result of the June 21, 2007 attack, SSG Carter has experienced extreme physical and emotional pain and suffering.

1508.   The attack that injured SSG Carter would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who committed the mortar strike neither wore uniforms nor otherwise identified themselves as enemy combatants.

1509.   Plaintiff Linda Sue Carter is a U.S. citizen and Mississippi resident.  She is the wife of SSG Carter.  As a result of the June 21, 2007 attack, and the injuries SSG Carter suffered, Linda Carter has experienced extreme emotional pain and suffering.

### The Chandler Family

1510.   Plaintiff Master Sergeant Shaun S. Chandler served in the U.S. Army in Iraq as part of the 450th Civil Affairs Battalion.  He is a U.S. citizen and Virginia resident.

1511.   On September 26, 2007, MSG Chandler survived an explosion from an EFP planted and detonated by Jaysh al-Mahdi on Route Raiders in the Al Rashid District in Baghdad, Iraq.  The explosion hit the vehicle in which MSG Chandler was riding.  In the attack, MSG Chandler sustained shrapnel injuries, including a severe injury to his left arm and right leg, and a Traumatic Brain Injury.  Due to his injuries, he received an 80% disability rating from the VA. As a result of the September 26, 2007 attack, MSG Chandler has experienced extreme physical and emotional pain and suffering.

1512.   The attack that injured MSG Chandler would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1513.   Plaintiff Juleonna Chandler is a U.S. citizen and Virginia resident.  She is the wife of MSG Chandler.  As a result of the September 26, 2007 attack, and the injuries MSG Chandler suffered, Juleonna Chandler has experienced extreme emotional pain and suffering.

**The Chism Family and Estate**

1514.   Specialist Johnathan B. Chism served in the U.S. Army in Iraq as part of the 2nd Battalion, 377th Parachute Field Artillery Regiment, 4th Brigade Combat team, 25th Infantry Division.

1515.   On the night of January 20, 2007, Iran and Hezbollah launched a coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad, Iraq.  The attack on the PJCC ("Karbala Attack") was largely conceived of, designed, and directed by Hezbollah, under the oversight of Ali Mussa Daqduq, and it was carried out on the ground by AAH.  *See supra* ¶¶ 83, 334.

1516.   Just after nightfall, a five-car convoy of black GMC Suburban Sport-Utility Vehicles ("SUVs") – the type frequently used by the U.S. government in Iraq – made its way through three checkpoints on the access road approaching the PJCC.  The vehicles contained approximately a dozen of AAH operatives dressed in U.S. military-style fatigues, carrying American-type weapons.  After exiting their vehicles, the AAH terrorists threw grenades and opened fire on the PJCC compound with automatic rifles.

1517.   At the same time that AAH terrorists were attacking the PJCC's main building, other AAH operatives detonated explosives throughout the PJCC and abducted four U.S. soldiers before fleeing the compound.  Realizing the likelihood of escaping with their captives was low, the AAH operatives soon murdered the four Americans they had just kidnapped and abandoned their bodies near the town of Mahawil.  Three of the four U.S. soldiers died at the scene.

1518.   The terror attack on the PJCC was commanded on-the-ground by Azhar al-Dulaymi.  He was trained by Hezbollah operatives, including Daqduq, near the city of Qom, Iran, where he and his Special Group operatives trained in military-style executions and precision kidnappings.

1519.   Although al-Dulaymi commanded the Karbala Attack, Daqduq masterminded it. Daqduq and Hezbollah's role in conceiving, designing, and overseeing the attack (all done at Iran's behest) was instrumental to AAH's ability to execute it.  In 2012, the U.S. Treasury found that Daqduq specifically participated in and oversaw the Karbala Attack.[390]

1520.   SPC Chism was one of the Americans abducted in the Karbala Attack who was murdered shortly thereafter.  He was 22 years old.

1521.   SPC Chism was a U.S. citizen when he was abducted and killed in Iraq.

1522.   SPC Chism's abduction and murder would have violated the law of war if AAH and Hezbollah were subject to it because, among other reasons, the terrorists who committed it disguised themselves as American soldiers; because they engaged in kidnapping; and because they executed hostages in captivity.

1523.   Plaintiff Elizabeth Chism is a U.S. citizen and Louisiana resident.  She is the mother of SPC Chism.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Chism's estate.

1524.   Plaintiff Danny Chism is a U.S. citizen and Louisiana resident.  He is the father of SPC Chism.

---

[390] Press Release, U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx.

1525.   Plaintiff Vanessa Chism is a U.S. citizen and Louisiana resident.  She is the stepmother of SPC Chism.  She played a significant role in Johnathan's life, and cared for him whenever SPC Chism stayed with his father.  They remained close up until his death.

1526.   Plaintiff Julie Chism is a U.S. citizen and Louisiana resident.  She is the sister of SPC Chism.

1527.   As a result of the January 20, 2007 attack, and SPC Chism's death, the Chism Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Chism's society, companionship, and counsel.

1528.   SPC Chism's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder in the Karbala Attack.

**The Christopher Family and Estate**

1529.   Kwesi Christopher served in Iraq as a civilian contractor.

1530.   On March 31, 2007, Mr. Christopher was killed by an EFP planted and detonated by Jaysh al-Mahdi near Diwaniyah in central Iraq.  He was 25 years old.

1531.   Mr. Christopher was a U.S. citizen when he was killed in Iraq.

1532.   Mr. Christopher's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they targeted a civilian.

1533.   Plaintiff Ann Christopher is a U.S. citizen and Florida resident.  She is the mother of Mr. Christopher.  Ann Christopher brings this action in both her personal capacity and her representative capacity on behalf of Mr. Christopher's estate.

1534.   As a result of the March 31, 2007 attack, and Mr. Christopher's death, Ann Christopher has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Christopher's society, companionship, and counsel.

1535.   Mr. Christopher's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Coe Family**

1536.   Plaintiff Private First Class Thomas M. Coe II served in the U.S. Army in Iraq as a peacekeeping serviceman and Signal Support Systems Specialist with the 4th Brigade, 10th Mountain Division.  He is a U.S. citizen and Texas resident.

1537.   On the morning of April 28, 2008, during the Battle of Sadr City, PFC Coe was walking back from the chow hall inside FOB Loyalty in the New Baghdad District in eastern Baghdad, Iraq, carrying food for some of the other men, when several 107mm rockets launched by Jaysh al-Mahdi struck inside the FOB, causing severe damage to supply trucks and buildings, as well as injuring and killing numerous people.  The first rocket hit the ground but did not detonate; a second rocket landed, exploded, and detonated the first rocket with it.  The third rocket hit a building in the center of FOB Loyalty.  When the rockets hit, PFC Coe took cover, then tried to proceed to his Tactical Operations Command, at which time he was struck in the head by falling and blasted debris from the third rocket explosion.  He was then struck and run over by a pick-up truck during the chaos of the rocket explosions and the aftermath.  The truck hit PFC Coe's left foot, ran up his entire body, and pinned his shoulder, with the driver's side front wheel against his face.  He sustained significant and permanent injuries to his body, including to his shoulder, foot, and ankle that required several surgeries.  PFC Coe also has suffered from, and continues to suffer from, severe PTSD, severe anxiety, and depression.  Due

to his injuries, PFC Coe received a 100% disability rating from the VA.  As a result of the April 28, 2008 attack, PFC Coe has experienced extreme physical and emotional pain and suffering.

1538.   The attack that injured PFC Coe would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

1539.   Plaintiff Heather N. Coe is a U.S. citizen and Texas resident.  She is the wife of PFC Coe.

1540.   Plaintiff V.T.C., by and through his next friend PFC Coe, is a U.S. citizen and Texas resident.  He is the minor son of PFC Coe.

1541.   As a result of the April 28, 2008 attack, and the injuries PFC Coe suffered, the Coe Family has experienced extreme emotional pain and suffering.

**The Contrerasbaez Family**

1542.   Plaintiff Staff Sergeant Alejandro Contrerasbaez served in the U.S. Army in Iraq as part of B Company, 3rd Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and California resident.

1543.   On March 28, 2008, during the Battle of Sadr City, SSG Contrerasbaez survived an EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  The explosion hit the vehicle in which SSG Contrerasbaez was riding, disabling the vehicle and causing him to lose consciousness.  The vehicle was disabled and incurred RPG fire from Jaysh al-Mahdi during a period of eight hours until they were rescued.  In this attack, SSG Contrerasbaez sustained a fractured skull, fractured jaw, hearing damage, neck and back injuries, and a Traumatic Brain Injury.  Due to his injuries, SSG Contrerasbaez received a 90% disability rating from the VA.

As a result of the March 28, 2008 attack, SSG Contrerasbaez has experienced extreme physical and emotional pain and suffering.

1544.   The attack that injured SSG Contrerasbaez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1545.   Plaintiff Jessica A. Contrerasbaez is a U.S. citizen and California resident.  She is the wife of SSG Contrerasbaez.

1546.   Plaintiff Peter J. Pasillas is a U.S. citizen and California resident.  He is the stepson of SSG Contrerasbaez.

1547.   Plaintiff J.C., by and through his next friend SSG Contrerasbaez, is a U.S. citizen and California resident.  He is the minor son of SSG Contrerasbaez.

1548.   Plaintiff A.C., by and through her next friend SSG Contrerasbaez, is a U.S. citizen and California resident.  She is the minor daughter of SSG Contrerasbaez.

1549.   As a result of the March 28, 2008 attack, and the injuries SSG Contrerasbaez suffered, the Contrerasbaez Family has experienced extreme emotional pain and suffering.

**The Cope Family**

1550.   Plaintiff Sergeant Joshua Cope served in the U.S. Army in Iraq as part of the 1st Battalion, 26th Infantry Regiment.  He is a U.S. citizen and Florida resident.

1551.   On November 13, 2006, SGT Cope survived an EFP attack by Jaysh al-Mahdi in the Karadah District of Baghdad, Iraq.  In this attack, he sustained injuries that resulted in the loss of both legs and the use of his right hand, as well as PTSD.  Due to his injuries, SGT Cope received a 100% disability rating from the VA.  As a result of the November 13, 2006 attack, SGT Cope has experienced extreme physical and emotional pain and suffering.

1552.   The attack that injured SGT Cope would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1553.   Plaintiff Philip Cope is a U.S. citizen and Florida resident.  He is the father of SGT Cope.

1554.   Plaintiff Erica Cope Owens is a U.S. citizen and Florida resident.  She is the former spouse of SGT Cope.

1555.   Plaintiff Jacob Cope is a U.S. citizen and Texas resident.  He is the brother of SGT Cope.

1556.   Plaintiff Linda Cope is a U.S. citizen and Florida resident.  She is the mother of SGT Cope.

1557.   Plaintiff Jonathan Cope is a U.S. citizen and Florida resident.  He is the brother of SGT Cope.

1558.   Plaintiff L.C., by and through her next friend Erica Cope Owens, is a U.S. citizen and Florida resident.  She is the minor daughter of SGT Cope.

1559.   As a result of the November 13, 2006 attack, and the injuries SGT Cope suffered, the Cope Family has experienced extreme emotional pain and suffering.

### **The Crabtree Family and Estate**

1560.   Sergeant First Class Daniel Crabtree served in Iraq with the Ohio National Guard as part of 2nd Battalion, 19th Special Forces Group.

1561.   On June 8, 2006, SFC Crabtree was killed by an EFP planted and detonated by Jaysh al-Mahdi near Aziziyah, Iraq, in Wasit Province.  He was 31 years old.

1562.   SFC Crabtree was a U.S. citizen when he was killed in Iraq.

1563.   SFC Crabtree's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1564.   Plaintiff Kathy Crabtree is a U.S. citizen and Ohio resident.  She is the widow of SFC Crabtree.  She brings claims in both her personal capacity and her representative capacity on behalf of SFC Crabtree's estate.

1565.   Plaintiff M.C., by and through her next friend Kathy Crabtree, is a U.S. citizen and Ohio resident.  She is the minor daughter of SFC Crabtree.

1566.   Plaintiff Debra Wigbels is a U.S. citizen and Georgia resident.  She is the sister of SFC Crabtree.

1567.   Plaintiff Judy A. Crabtree is a U.S. citizen and Georgia resident.  She is the mother of SFC Crabtree.

1568.   As a result of the June 8, 2006 attack, and SFC Crabtree's death, the Crabtree Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Crabtree's society, companionship, and counsel.

1569.   SFC Crabtree's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Craven Family**

1570.   Plaintiff Specialist Joshua Craven served in the U.S. Army in Iraq.  He is a U.S. citizen and North Carolina resident.

1571.   On August 4, 2010, SPC Craven was injured by an EFP planted and detonated by Jaysh al-Mahdi in Najaf, Iraq.  SPC Craven suffered severe injuries due to the attack, including the loss of his left leg above the knee, and a right limb salvage with paralysis.  Due to his

injuries, he has received a 100% disability rating from the VA.  As a result of the August 4, 2010 attack, SPC Craven experienced extreme physical and emotional pain and suffering.

1572.   The attack that injured SPC Craven would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1573.   Plaintiff Holly Craven is a U.S. citizen and North Carolina resident.  She is the wife of SPC Craven.  As a result of the August 4, 2010 attack, and the injuries SPC Craven suffered, Holly Craven has experienced extreme emotional pain and suffering.

### The Crookston Family and Estate

1574.   Corporal Duncan C. Crookston served in the U.S. Army in Iraq as part of the 2-16 Rangers.

1575.   On September 4, 2007, CPL Crookston suffered critical injuries from an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  Although CPL Crookston initially survived the attack, he was severely burned and died of his injuries on January 25, 2008.  CPL Crookston was 19 years old.

1576.   CPL Crookston was a U.S. citizen when he was killed in Iraq.

1577.   CPL Crookston's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1578.   Plaintiff Meaghun Crookston is a U.S. citizen and California resident.  She is the widow of CPL Crookston.

1579.   Plaintiff Leesha Crookston is a U.S. citizen and Colorado resident.  She is the mother of CPL Crookston.  She brings claims in both her personal capacity and her representative capacity on behalf of CPL Crookston's estate.

1580.   As a result of the September 4, 2007 attack, and CPL Crookston's death, the Crookston Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Crookston's society, companionship, and counsel.

1581.   CPL Crookston's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Daggett Family**

1582.   Sergeant John K. Daggett served with the U.A. Army in Iraq as part of the 1st Battalion, 14th Infantry Regiment, 2nd Brigade Combat Team, 25th Infantry Division.

1583.   On May 1, 2008, during the Battle of Sadr City, SGT Daggett was injured by an RPG fired at his vehicle by Jaysh al-Mahdi.  The attack occurred while SGT Daggett was providing security for personnel constructing a wall in Sadr City.  SGT Daggett underwent surgery at Camp Taji in Baghdad, Iraq.  He was transported to Landstuhl, Germany, where he spent several days.  SGT Daggett was then to be flown from Germany to a military hospital in the Washington, D.C. area but, due to a mid-flight medical emergency caused by his injuries, SGT Daggett was rerouted to Halifax, Nova Scotia to tend to his injuries.  SGT Daggett's family, including his father and mother, traveled to Halifax, where they spent several days beside his hospital bed.  SGT Daggett died on May 15, 2008 in Halifax.  SGT Daggett was 21 years old.

1584.   SGT Daggett was a U.S. citizen when he was killed.

1585.   SGT Daggett's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who fired the RPG neither wore uniforms nor otherwise identified themselves as enemy combatants.

1586.   Plaintiff John Daggett is a U.S. citizen and Arizona resident.  He is the father of SGT Daggett.

1587.   Plaintiff Colleen Czaplicki is a U.S. citizen and Arizona resident.  She is the mother of SGT Daggett.

1588.   Plaintiff Kendall Rasmusson is a U.S. citizen and Arizona resident.  She is the sister of SGT Daggett.

1589.   As a result of the May 1, 2008 attack, and SGT Daggett's death 14 days later, the Daggett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Daggett's society, companionship, and counsel.

**The Dahlman Family**

1590.   Plaintiff Specialist Louis Dahlman served in the U.S. Army in Iraq as part of the 3rd Squadron, 89th Cavalry Regiment, 4th Brigade Combat Team, 10th Mountain Infantry Division.  He is a U.S. citizen and Texas resident.

1591.   On May 19, 2007, SPC Dahlman survived an EFP attack by Jaysh al-Mahdi in Diwaniyah, Iraq.  SPC Dahlman was injured while escorting supplies from southern Iraq to northern Iraq on MSR Tampa from Tallil to Scania.  The explosion blew off his jaw.  As a result of the May 19, 2007 attack, SPC Dahlman has experienced extreme physical and emotional pain and suffering.

1592.   The attack that injured SPC Dahlman would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1593.   Plaintiff Lucas Dahlman is a U.S. citizen and Iowa resident.  He is the brother of SPC Dahlman.

1594.   Plaintiff Amber Dahlman is a U.S. citizen and Iowa resident.  She is the sister of SPC Dahlman.

1595.   Plaintiff Kay Stockdale is a U.S. citizen and Iowa resident.  She is the mother of SPC Dahlman.

1596.   As a result of the May 19, 2007 attack, and the injuries SPC Dahlman suffered, the Dahlman Family has experienced extreme emotional pain and suffering.

**The Davis Family**

1597.   Specialist Steven A. Davis served in the U.S. Army in Iraq as part of the 2nd Battalion, 12th Infantry regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

1598.   On July 4, 2007, SPC Davis was killed in the Al Rashid District in Baghdad, Iraq. SPC Davis was killed by a shape charge grenade thrown by Jaysh al-Mahdi.  He was 23 years old.

1599.   SPC Davis was a U.S. citizen when he was killed in Iraq.

1600.   SPC Davis's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who threw the grenade neither wore uniforms nor otherwise identified themselves as enemy combatants.

1601.   Plaintiff Ayla M. Davis is a U.S. citizen and North Carolina resident.  She is the widow of SPC Davis.

1602.   Plaintiff E.D., by and through her next friend Ayla M. Davis, is a U.S. citizen and North Carolina resident.  She is the minor daughter of SPC Davis.

1603.   Plaintiff Guy L. Davis is a U.S. citizen and North Carolina resident.  He is the father of SPC Davis.

1604.   Plaintiff Teresita R. Davis is a U.S. citizen and North Carolina resident.  She is the mother of SPC Davis.

1605.   Plaintiff Christopher J. Davis is a U.S. citizen and Virginia resident.  He is the brother of SPC Davis.

1606.   As the result of the July 4, 2007 attack, and SPC Davis's death, the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Davis's society, companionship, and counsel.

### The Delgado Family and Estate

1607.   Private First Class George Delgado served in the U.S. Army in Iraq as part of the 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.

1608.   On March 23, 2008, during the Battle of Sadr City, PFC Delgado was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 21 years old.

1609.   PFC Delgado was a U.S. citizen when he was killed in Iraq.

1610.   PFC Delgado's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1611.   Plaintiff Maria Calle is a U.S. citizen and California resident.  She is the mother of PFC Delgado.  Maria Calle brings claims in both her personal capacity and her representative capacity on behalf of PFC Delgado's estate.

1612.   Plaintiff Cynthia Delgado is a U.S. citizen and California resident.  She is the sister of PFC Delgado.

1613.   As a result of the March 23, 2008 attack, and PFC Delgado's death, the Delgado Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Delgado's society, companionship, and counsel.

1614.   PFC Delgado's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Anthony DeMattia**

1615.   Plaintiff Sergeant Anthony DeMattia served in the U.S. Army in Iraq as part of A Company, 2nd Battalion, 14th Light Infantry Brigade, 10th Mountain Division.  He is a U.S. citizen and New York resident.

1616.   On October 3, 2006, SGT DeMattia was injured by an IED planted and detonated by Jaysh al-Mahdi on Route Earnhardt, approximately 500 meters from FOB Gator in Baghdad, Iraq.  The explosion caused severe vertigo and a concussion.  After recovering, he sustained injuries at approximately the same location on November 6, 2006 from a mortar launched by Jaysh al-Mahdi.  The attacks caused Traumatic Brain Injury, neck and back injuries, PTSD, and ulcers.  Due to his injuries, SGT DeMattia received a 90% disability rating from the VA.  As a result of the October 3, 2006 and November 6, 2006 attacks, SGT DeMattia has experienced extreme physical and emotional pain and suffering.

1617.   The attacks that injured SGT DeMattia would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED and launched the mortar round neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Philip Alan Derise**

1618.   Plaintiff Staff Sergeant Philip A. Derise served with the U.S. military in Iraq as part of E Company, 1st Battalion, 67th Armored Regiment, 4th Infantry Division.  He is a U.S. citizen and Washington resident.

1619.   On or about July 12, 2006, SSG Derise was injured by an EFP planted and detonated by Jaysh al-Mahdi near Karbala, Iraq.  The attack caused him to suffer a loss of

hearing and eyesight, a concussion, a Traumatic Brain Injury, and PTSD.  As a result of the attack, SSG Derise has experienced extreme physical and emotional pain and suffering.

1620.   The attack that injured SSG Derise would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Diamond Family and Estate

1621.   Staff Sergeant Sean Diamond served in the U.S. Army in Iraq as part of the 610th Engineer Support Company, 14th Engineer Battalion, 555th Engineer Brigade.

1622.   On February 15, 2009, SSG Diamond was killed by an EFP planted and detonated by a cell that included members of both Jaysh al-Mahdi and Hezbollah, in As Salam, in between Nasiriyah and Amarah in Basra Province in southern Iraq.

1623.   SSG Diamond was a U.S. citizen when he was killed in Iraq.

1624.   SSG Diamond's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1625.   Plaintiff Loramay "Lora" Diamond is a U.S. citizen and Washington resident. She is the widow of SSG Diamond.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Diamond's estate.

1626.   Plaintiff Sally Diamond Wiley is a U.S. citizen and Nevada resident.  She is the mother of SSG Diamond.

1627.   Plaintiff James Michael Wiley is a U.S. citizen and Nevada resident.  He is the stepfather of SSG Diamond.

1628.   Plaintiff Jason Diamond is a U.S. citizen and California resident.  He is the brother of SSG Diamond.

1629.   Plaintiff Taylor Diamond is a U.S. citizen and Washington resident.  She is the daughter of SSG Diamond.

1630.   Plaintiff Madison J. Diamond is a U.S. citizen and California resident.  She is the daughter of SSG Diamond.

1631.   Plaintiff A.D., by and through her next friend Lora Diamond, is a U.S. citizen and Washington resident.  She is the minor daughter of SSG Diamond.

1632.   Plaintiff Sean R. Diamond is a U.S. citizen and Washington resident.  He is the son of SSG Diamond.

1633.   As a result of the February 15, 2009 attack, and SSG Diamond's death, the Diamond Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Diamond's society, companionship, and counsel.

1634.   SSG Diamond's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

### The Kendrick Dixon Family

1635.   Plaintiff Staff Sergeant Kendrick L. Dixon served in the U.S. Army in Iraq as part of the 703rd Brigade Support Battalion, 4th Brigade Combat Team, 3rd Infantry Division.  He is a U.S. citizen and Georgia resident.

1636.   On December 9, 2007, SSG Dixon was injured by an IED planted and detonated near his vehicle by Jaysh al-Mahdi on Route Tampa south of Baghdad in Mahaweel, Iraq.  As a result of the attack, he suffered a Traumatic Brain Injury and now suffers from PTSD, depression, anxiety, and night-terror attacks.  Due to his injuries, he received a 100% disability

rating from the VA.  As a result of the December 9, 2007 attack, PFC Dixon has experienced extreme physical and emotional pain and suffering.

1637.   The attack that injured SSG Dixon would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1638.   Plaintiff KaDaivion L. Dixon is a U.S. citizen and Georgia resident.  He is the son of SSG Dixon.  As a result of the December 9, 2007 attack, and SSG Dixon's injuries, KaDaivion L. Dixon has experienced extreme emotional pain and suffering.

**The Robert Dixon Family and Estate**

1639.   Specialist Robert J. Dixon served in the U.S. Army in Iraq as part of the 1st Squadron, 4th Cavalry Regiment, 4th Brigade Combat Team, 1st Infantry Division.

1640.   On May 6, 2007, SPC Dixon was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 27 years old.

1641.   SPC Dixon was a U.S. citizen when he was killed in Iraq.

1642.   SPC Dixon's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1643.   Ilene Dixon was a U.S. citizen at the time of SPC Dixon's murder.  She was the mother of SPC Dixon.  She died on November 18, 2014.

1644.   Plaintiff Daniel Allen Dixon is a U.S. citizen and Michigan resident.  He is the father of Robert J. Dixon.  Daniel Allen Dixon brings claims in his personal capacity and his representative capacities on behalf of SPC Dixon's estate and Ilene Dixon's estate.

1645.   Plaintiff David Dixon is a U.S. citizen and Michigan resident.  He is the brother of SPC Dixon.

1646.   Plaintiff Gretchen Lang is a U.S. citizen and Michigan resident.  She is the sister of SPC Dixon.

1647.   Plaintiff L.R., by and through his next friend Jessica Hubbard, is a U.S. citizen and Michigan resident.  He is the minor son of SPC Dixon.

1648.   Plaintiff M.R., by and through his next friend Jessica Hubbard, is a U.S. citizen and Michigan resident.  He is the minor son of SPC Dixon.

1649.   As a result of the May 6, 2007 attack, and SPC Dixon's death, the Dixon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Dixon's society, companionship, and counsel.

1650.   SPC Dixon's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

1651.   Ilene Dixon's estate is entitled to recover non-economic damages from Defendants, due to SPC Dixon's murder by Jaysh al-Mahdi.

**Shawn Donnery**

1652.   Plaintiff Corporal Shawn Donnery served in the U.S. Army in Iraq as part of B Company, 1st Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Florida resident.

1653.   In May or June 2008, CPL Donnery was injured by an EFP planted and detonated by Jaysh al-Mahdi in or near Sadr City.  That attack, along with another Jaysh al-Mahdi EFP attack in or near Sadr City during his tour between September 2007 and October 2008, resulted in  Traumatic Brain Injury and degenerative disk disease.  Due to his injuries, CPL Donnery received an 80% disability rating from the VA.  As a result of the attacks, CPL Donnery has experienced extreme physical and emotional pain and suffering.

1654.   The attacks that injured CPL Donnery would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Dressler Family and Estate

1655.   Sergeant Shawn E. Dressler served in the U.S. Army in Iraq as part of Company A, 1st Battalion, 18th Infantry Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

1656.   On June 2, 2007, SGT Dressler was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi near the intersection of the Al Kharjia, Al Taie, and Jihad neighborhoods in Baghdad, Iraq.  He was 22 years old.

1657.   SGT Dressler was a U.S. citizen when he was killed in Iraq.

1658.   SGT Dressler's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1659.   Plaintiff Tonya K. Dressler is a U.S. citizen and Arizona resident.  She is the mother of SGT Dressler.  She brings claims in both her personal capacity and her representative capacity on behalf of SGT Dressler's estate.

1660.   Plaintiff Ardith Cecil Dressler is a U.S. citizen and Arizona resident.  He is the father of SGT Dressler.

1661.   Plaintiff Melissa Dressler is a U.S. citizen and Arizona resident.  She is the sister of SGT Dressler.

1662.   Plaintiff Tanya S. Dressler is a U.S. citizen and Arkansas resident.  She is the sister of SGT Dressler.

1663.   Plaintiff Daniel Dressler is a U.S. citizen and Virginia resident.  He is the brother of SGT Dressler.

1664.   Plaintiff James Dressler is a U.S. citizen and Virginia resident.  He is the brother of SGT Dressler.

1665.   As a result of the June 2, 2007 attack, and SGT Dressler's death, the Dressler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dressler's society, companionship, and counsel.

1666.   SGT Dressler's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Drevnick Family and Estate**

1667.   Specialist Daniel P. Drevnick served in Iraq as part of the 34th Military Police Company, 34th Infantry Division, Minnesota Army National Guard.

1668.   On July 16, 2009, SPC Drevnick was killed by a mortar attack in Basra, Iraq that was planned and executed by a cell that included members of both Jaysh al-Mahdi and Hezbollah.  SPC Drevnick was 22 years old.

1669.   SPC Drevnick was a U.S. citizen when he was killed in Iraq.

1670.   SPC Drevnick's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1671.   Plaintiff Kenneth J. Drevnick is a U.S. citizen and Wisconsin resident.  He is the father of SPC Drevnick.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Drevnick's estate.

1672.   As a result of the July 16, 2009 attack, and SPC Drevnick's death, Kenneth J. Drevnick has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Drevnick's society, companionship, and counsel.

1673.   SPC Drevnick's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

### The Terrence Dunn Family and Estate

1674.   Staff Sergeant Terrence D. Dunn served in the U.S. Army in Iraq as part of the 210th Brigade Support Battalion, 2nd Brigade Combat Team, 10th Mountain Division.

1675.   On February 2, 2007, SSG Dunn was killed by an EFP planted and detonated by Jaysh al-Mahdi in central Iraq near Mahmudiyah.  He was 38 years old.

1676.   SSG Dunn was a U.S. citizen when he was killed in Iraq.

1677.   SSG Dunn's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1678.   Plaintiff Dennis Dunn is a U.S. citizen and New Mexico resident.  He is the brother of SSG Dunn.

1679.   Plaintiff Sharon Smith is a U.S. citizen and Texas resident.  She is the sister of SSG Dunn.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Dunn's estate.

1680.   As a result of the February 2, 2007 attack, and SSG Dunn's death, the Dunn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Dunn's society, companionship, and counsel.

1681.    SSG Dunn's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Timothy W. DuVall, Jr.**

1682.    Plaintiff Specialist Timothy W. DuVall, Jr. served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Louisiana resident.

1683.    On January 18, 2008, SPC DuVall was injured by an EFP planted and detonated by Jaysh al-Mahdi on the outskirts of Sadr City.  The EFP struck and killed two Iraqi children outside his vehicle, struck his vehicle and caused him to strike his head with significant force. SPC DuVall was diagnosed with a concussion, tinnitus, chronic headaches, and PTSD due to the attack.  Due to his injuries, SPC DuVall received a 90% disability rating from the VA.  As a result of the January 18, 2008 attack, SPC DuVall has experienced extreme physical and emotional pain and suffering.

1684.    The attack that injured SPC DuVall would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, nor did their methods of attack distinguish combatants from non-combatants.

**The Eakes Family**

1685.    Sergeant Lance O. Eakes served in Iraq as part of the 1132nd Military Police Company, North Carolina Army National Guard.

1686.    On April 18, 2008, during the Battle of Sadr City, SGT Eakes was killed by an IED planted and detonated near his vehicle by Jaysh al-Mahdi near Husseiniya, Iraq.  He was 25 years old.

1687.    SGT Eakes was a U.S. citizen when he was killed in Iraq.

1688.   SGT Eakes's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1689.   Plaintiff Tammy Eakes is a U.S. citizen and North Carolina resident.  She is the mother of SGT Eakes.

1690.   Plaintiff John Eakes is a U.S. citizen and North Carolina resident.  He is the father of SGT Eakes.

1691.   As a result of the April 18, 2008 attack, and SGT Eakes's death, the Eakes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Eakes's society, companionship, and counsel.

**Joshua Eckhoff**

1692.   Plaintiff Staff Sergeant Joshua Eckhoff served in Iraq in the 1138th Sapper Company with the Missouri National Guard, attached to the 10th Mountain Division.  He is a U.S. citizen and Missouri resident.

1693.   On February 6, 2008, SSG Eckhoff's vehicle was struck by multiple EFPs planted and detonated by Jaysh al-Mahdi on Route Vernon in Sadr City.  One of the EFPs directly struck and severely injured SSG Eckhoff's head, collapsing the right hemisphere of his brain.  Due to his injuries, SSG Eckhoff received a 100% disability rating from the VA.  As a result of the February 6, 2008 attack, SSG Eckhoff has experienced extreme physical and emotional pain and suffering.

1694.   The attack that injured SSG Eckhoff would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Edds Family and Estate

1695.   First Lieutenant Jonathan W. Edds served in the U.S. Army in Iraq as part of the 2nd Battalion, 69th Armor Regiment, 3rd Brigade Combat Team, 3rd Infantry Division.

1696.   On August 17, 2007, 1LT Edds was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  Although 1LT Edds initially survived the attack, he died later that day of the wounds he sustained.  He was 24 years old.

1697.   1LT Edds was a U.S. citizen when he was killed in Iraq.

1698.   1LT Edds's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1699.   Plaintiff Julia Edds is a U.S. citizen and Michigan resident.  She is the mother of 1LT Edds.  She brings claims in both her personal capacity and her representative capacity on behalf of 1LT Edds's estate.

1700.   Plaintiff Barry Edds is a U.S. citizen and Michigan resident.  He is the father of 1LT Edds.

1701.   Plaintiff Joel Edds is a U.S. citizen and California resident.  He is the brother of 1LT Edds.

1702.   As a result of the August 17, 2007 attack, and 1LT Edds's death, the Edds Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Edds's society, companionship, and counsel.

1703.   1LT Edds's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Eggleston Family and Estate**

1704.   Private First Class Cody J. Eggleston served in the U.S. Army in Iraq as part of C Company, 1st Battalion, 5th Infantry Regiment, 1st Brigade Combat Team, 25th Infantry Division.

1705.   On October 16, 2008, PFC Eggleston was injured by mortars launched by Jaysh al-Mahdi in Baqubah, Iraq.  He died of wounds sustained in this attack on October 24, 2008. PFC Eggleston was 21 years old.

1706.   PFC Eggleston was a U.S. citizen when he was killed in Iraq.

1707.   PFC Eggleston's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the mortars neither wore uniforms nor otherwise identified themselves as enemy combatants.

1708.   Plaintiff Angeline Jackson is a U.S. citizen and Oregon resident.  She is the mother of PFC Eggleston.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Eggleston's estate.

1709.   Plaintiff Kaytrina Jackson is a U.S. citizen and Oregon resident.  She is the sister of PFC Eggleston.

1710.   Plaintiff Shilyn Jackson is a U.S. citizen and Oregon resident.  She is the sister of PFC Eggleston.

1711.   As a result of the October 16, 2008 attack, and PFC Eggleston's death, the Eggleston Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Eggleston's society, companionship, and counsel.

1712.   PFC Eggleston's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Elledge Family and Estate**

1713.   Staff Sergeant Michael D. Elledge served in the U.S. Army in Iraq as part of the 1st Battalion, 68th Armor Regiment, 3rd Brigade Combat Team, 4th Infantry Division.

1714.   On March 17, 2008, SSG Elledge was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  SSG Elledge was 41 years old.

1715.   SSG Elledge was a U.S. citizen when he was killed in Iraq.

1716.   SSG Elledge's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1717.   Plaintiff Timothy W. Elledge is a U.S. citizen and Michigan resident.  He is the brother of SSG Elledge.  He brings claims in both his personal capacity and his representative capacity on behalf of SSG Elledge's estate.

1718.   As a result of the March 17, 2008 attack, and SSG Elledge's death, Timothy W. Elledge has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Elledge's society, companionship, and counsel.

1719.   SSG Elledge's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Elliott Family and Estate**

1720.   Specialist Daniel L. Elliott served in Iraq as part of the 290th Military Police Brigade, 200th Military Police Command, U.S. Army Reserve.

1721.   On July 15, 2011, SPC Elliott was killed in Basra, Iraq by an EFP planted and detonated by a cell that included members of both Jaysh al-Mahdi and Hezbollah.  He was 21 years old.

1722.   SPC Elliott was a U.S. citizen when he was killed in Iraq.

1723.   SPC Elliott's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1724.   Plaintiff Edward Elliott is a U.S. citizen and North Carolina resident.  He is the father of SPC Elliott.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Elliott's estate.

1725.   As a result of the July 15, 2011 attack, and SPC Elliott's death, Plaintiff Edward Elliott has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Elliott's society, companionship, and counsel.

1726.   SPC Elliott's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

**The Esco Family**

1727.   Plaintiff Specialist Leroy Esco, Jr. served in the U.S. Army in Iraq as part of A Company, 1st Battalion, 30th Infantry Regiment, 3rd Infantry Division.  He is a U.S. citizen and Arkansas resident.

1728.   On March 28, 2008, during the Battle of Sadr City, SPC Esco was injured by an EFP that was planted and detonated near his vehicle by Jaysh al-Mahdi in Sadr City.  The blast tore apart his right foot.  Due to his injuries, he received a 100% disability rating from the VA.

As a result of the March 28, 2008 attack, SPC Esco has experienced extreme physical and emotional pain and suffering.

1729.   The attack that injured SPC Esco would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1730.   Plaintiff Taryn Esco is a U.S. citizen and Arkansas resident.  She is the wife of SPC Esco.

1731.   Plaintiff L.E., by and through his next friend Taryn Esco, is a U.S. citizen and Arkansas resident.  He is the minor son of SPC Esco.

1732.   Plaintiff A.P., by and through her next friend Taryn Esco, is a U.S. citizen and Arkansas resident.  She is the minor stepdaughter of SPC Esco.

1733.   Plaintiff Keyondra Perrin is a U.S. citizen and Arkansas resident.  She is the stepdaughter of SPC Esco.

1734.   As a result of the March 28, 2008 attack, and SPC Esco's injuries, the Esco Family has experienced extreme emotional pain and suffering.

**The Everhart Family and Estate**

1735.   Dr. Stephen S. Everhart served on the faculty of The American University in Cairo, including as the Associate Dean of the School of Business.

1736.   On June 23, 2011, Dr. Everhart was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Karadah District on the road between the University of Baghdad and the Green Zone in Baghdad, Iraq.  Dr. Everhart was killed while riding in a convoy headed to the U.S. Embassy after he had conducted a seminar designed to elevate an Iraqi business school to international standards.  Dr. Everhart was 53 years old.

1737.   Dr. Everhart was a U.S. citizen when he was killed in Iraq.

1738.   Dr. Everhart's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Dr. Everhart was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1739.   Plaintiff Dr. Stephanie Zobay is a U.S. citizen and Washington, D.C. resident. She is the widow of Dr. Everhart.  She brings claims in both her personal capacity and her representative capacity on behalf of Dr. Everhart's estate.

1740.   As a result of the June 23, 2011 attack, and Dr. Everhart's death, Dr. Zobay has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

1741.   Dr. Everhart's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Falter Family and Estate**

1742.   Private First Class Shawn P. Falter served in the U.S. Army in Iraq as part of the 2nd Battalion, 377th Parachute Field Artillery Regiment, 4th Brigade Combat Team, 25th Infantry Division.

1743.   On January 20, 2007, PFC Falter was killed by Jaysh al-Mahdi during the Karbala Attack in Iraq.  *See supra* ¶¶ 1515-19.  PFC Falter was 25 years old.

1744.   PFC Falter was a U.S. citizen when he was killed in Iraq.

1745.   PFC Falter's abduction and murder would have violated the law of war if AAH and Hezbollah were subject to it because, among other reasons, the terrorists who committed the attack disguised themselves as American soldiers; because they engaged in kidnapping; and because they executed hostages in captivity.

1746.   Plaintiff Russell C. Falter is a U.S. citizen and New York resident.  He is the brother of PFC Falter.

1747.   Plaintiff John Erwin Sackett is a U.S. citizen and North Carolina resident.  He is the brother of PFC Falter.

1748.   Plaintiff Marjorie Falter is a U.S. citizen and New York resident.  She is the sister of PFC Falter.

1749.   Plaintiff David Lucas is a U.S. citizen and New York resident.  He is the stepbrother of PFC Falter.

1750.   Plaintiff Michael Lucas is a U.S. citizen and New York resident.  He is the stepbrother of PFC Falter.

1751.   Plaintiff Linda Falter is a U.S. citizen and New York resident.  She is the stepmother of PFC Falter.

1752.   Plaintiff Russell J. Falter is a U.S. citizen and New York resident.  He is the father of PFC Falter.  He brings claims in both his personal capacity and his representative capacity on behalf of PFC Falter's estate.

1753.   Plaintiff Timothy Lucas is a U.S. citizen and New York resident.  He is the stepbrother of PFC Falter.

1754.   Plaintiff Marsha Lucas Novak is a U.S. citizen and California resident.  She is the stepsister of PFC Falter.

1755.   Plaintiff Andrew Lucas is a U.S. citizen and North Carolina resident.  He is the stepbrother of PFC Falter.

1756.   As a result of the January 20, 2007 attack, and PFC Falter's death, the Falter Family has experienced severe mental anguish, emotional pain and suffering, and the loss PFC Falter's society, companionship, and counsel.

1757.   PFC Falter's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the Karbala Attack.

**The Farina Family**

1758.   Plaintiff Staff Sergeant Anthony Farina served in the U.S. Army in Iraq as part of C Company, 3rd Brigade, 4th Infantry Division.  He is a U.S. citizen and Indiana resident.

1759.   On April 27, 2008, during the Battle of Sadr City, SSG Farina was injured by an RPG fired by Jaysh al-Mahdi while he was providing security for personnel constructing a wall in Sadr City.  SSG Farina suffered shrapnel wounds to his neck and was knocked unconscious. Due to his injuries, SSG Farina received a 100% disability rating from the VA.  As a result of the April 27, 2008 attack, SSG Farina has experienced extreme physical and emotional pain and suffering.

1760.   The attack that injured SSG Farina would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1761.   Plaintiff Kathleen Pirtle is a U.S. citizen and Indiana resident.  She is the mother of SSG Farina.  As a result of the April 27, 2008 attack, and SSG Farina's injuries, Kathleen Pirtle has experienced extreme emotional pain and suffering.

**The Farr Family and Estate**

1762.   Specialist Clay P. Farr served in the U.S. Army in Iraq as part of the 1st Squadron, 71st Cavalry, 1st Brigade Combat Team, 10th Mountain Division.

1763.   On February 26, 2006, SPC Farr was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Mansour District in Baghdad, Iraq.  He was 21 years old.

1764.   SPC Farr was a U.S. citizen when he was killed in Iraq.

1765.   SPC Farr's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1766.   Plaintiff Carrol Alderete is a U.S. citizen and California resident.  She is the mother of SPC Farr.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Farr's estate.

1767.   Plaintiff Anthony Alderete is a U.S. citizen and California resident.  He is the stepfather of SPC Farr.

1768.   As a result of the February 26, 2006 attack, and SPC Farr's death, the Farr Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Farr's society, companionship, and counsel.

1769.   SPC Farr's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Matthew Fieser**

1770.   Plaintiff Sergeant Matthew Fieser served in the U.S. Army in Iraq as part of A Company, 4th Battalion, 64th Regiment, 4th Brigade Combat Team, 3rd Infantry Division.  He is a U.S. citizen and Washington resident.

1771.   On March 23, 2008, during the Battle of Sadr City, SGT Fieser survived an EFP that was planted and detonated by Jaysh al-Mahdi near the border of the Malef and Turath neighborhoods in Baghdad, Iraq.  The explosion hit the lead vehicle in SGT Fieser's convoy, resulting in the deaths of several soldiers.  The blast caused the lead vehicle of the convoy to

burn uncontrollably.  SGT McCoy, the truck commander of the lead vehicle, exited the vehicle engulfed in flames.

1772.   SGT Fieser's vehicle approached the burning lead vehicle, and he dismounted. While engulfed in flames, SGT McCoy ran screaming toward SGT Fieser.  Although severely burned all over his body, SGT McCoy remained conscious following the attack.

1773.   After a period of time, SGT Fieser helped move SGT McCoy onto a support to prepare him for transport.  SGT Fieser traveled alongside SGT McCoy, speaking to him as he was taken to the hospital.  Throughout this period, SGT McCoy continued to scream with pain and cough up a foamy substance.  After arriving at the hospital, SGT Fieser learned that the other occupants of the vehicle had been severely burned, could not be extricated from the vehicle, and did not survive.  Due to the March 23, 2008 attack, SGT Fieser now suffers from PTSD and nightmares.  As a result of the attack, he has experienced extreme emotional pain and suffering.

1774.   The attack that injured SGT Fieser would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Finken Family**

1775.   Lieutenant Colonel Paul Finken served in the U.S. Army in Iraq as part of 1st Battalion, 506th Infantry Regiment, 4th Brigade Combat Team, 101st Airborne Division.

1776.   On November 2, 2006, LTC Finken was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 40 years old.

1777.   LTC Finken was a U.S. citizen when he was killed in Iraq.

1778.   LTC Finken's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1779.   Plaintiff Jackie L. Farrar-Finken is a U.S. citizen and Virginia resident.  She is the widow of LTC Finken.

1780.   Plaintiff Caroline M. Finken is a U.S. citizen and Virginia resident.  She is the daughter of LTC Finken.

1781.   Plaintiff Emilie C. Finken is a U.S. citizen and Virginia resident.  She is the daughter of LTC Finken.

1782.   Plaintiff Joan Henscheid is a U.S. citizen and Iowa resident.  She is the sister of LTC Finken.

1783.   Plaintiff Mark Finken is a U.S. citizen and Iowa resident.  He is the brother of LTC Finken.

1784.   Plaintiff Jean Pruitt is a U.S. citizen and Iowa resident.  She is the sister of LTC Finken.  She brings claims in both her personal capacity and her representative capacity on behalf of Mark Finken as his Attorney-in-fact.

1785.   Plaintiff Richard Finken is a U.S. citizen and Iowa resident.  He is the brother of LTC Finken.

1786.   Plaintiff David Finken is a U.S. citizen and Nebraska resident.  He is the brother of LTC Finken.  He brings claims in both his personal capacity and his representative capacity on behalf of Richard Finken as his Attorney-in-fact.

1787.   Plaintiff Alan Finken is a U.S. citizen and Colorado resident.  He is the brother of LTC Finken.

1788.   Plaintiff Peter Finken is a U.S. citizen and Connecticut resident.  He is the brother of LTC Finken.

1789.   As a result of the November 2, 2006 attack, and LTC Finken's death, the Finken Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Paul Finken's society, companionship, and counsel.

**James E. Fleming, III**

1790.   Plaintiff Sergeant James E. Fleming, III served in the U.S. Army in Iraq as part of 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Missouri resident.

1791.   On February 20, 2008, SGT Fleming was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in Shab-Ur, Baghdad, Iraq.  SGT Fleming suffered burns from shrapnel to his neck and shoulder, as well as a concussion.

1792.   On April 7, 2008, during the Battle of Sadr City, SGT Fleming survived an RPG attack by Jaysh al-Mahdi in Sadr City.  A grenade landed near SGT Fleming during this attack, killing two other members of his unit.  SGT Fleming sustained a concussion during this attack.

1793.   Due to the attacks on SGT Fleming, he now suffers from headaches and PTSD. SGT Fleming received an 80% disability rating from the VA.  As a result of the February 20, 2008 and April 7, 2008 attacks, SGT Fleming has experienced extreme physical and emotional pain and suffering.

1794.   The attacks that injured SGT Fleming would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who conducted them neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Mark Fletcher**

1795.   Plaintiff Staff Sergeant Mark L. Fletcher served in the U.S. Army in Iraq with A Company, 161st Infantry Regiment.  He is a U.S. citizen and Washington resident.

1796.   On April 1, 2009, SSG Fletcher was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi while traveling along Route Vernon near the border between the Kadamiyah and Mansour Districts in Baghdad, Iraq.  He suffered significant injuries including shrapnel tears to both legs, burn injuries, nerve damage to both his legs, a concussion, tinnitus, PTSD, depression, and anxiety.  Due to his injuries, he received a 90% disability rating from the VA.  As a result of the April 1, 2009 attack, SSG Fletcher has experienced extreme physical and emotional pain and suffering.

1797.   The attack that injured SSG Fletcher would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Norman Forbes IV**

1798.   Plaintiff Sergeant Norman Forbes IV served in the U.S. Army in Iraq as part of the 2-30 Wild Boars.  He is a U.S. citizen and Texas resident.

1799.   On March 17, 2008, SGT Forbes was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi on Route Predators in the New Baghdad District in eastern Baghdad, Iraq.  SGT Forbes sustained injuries resulting in a shattered left arm and left hand, broken left femur, and the destruction of his thigh muscle.  As a result of the March 17, 2008 attack, SGT Forbes has experienced extreme physical and emotional pain and suffering.

1800.   The attack that injured SGT Forbes would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### **The Ford Family and Estate**

1801.   Sergeant Joshua Andrew Ford served in Iraq as part of the 189th Transportation Company, 485th Corps Support Battalion, Nebraska Army National Guard.

1802.   On July 31, 2006, SGT Ford was killed by an IED planted and detonated near his vehicle by Jaysh al-Mahdi near Numaniyah, Iraq, in Wasit Province.  He was 20 years old.

1803.   SGT Ford was a U.S. citizen when he was killed in Iraq.

1804.   SGT Ford's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1805.   Plaintiff Lonnie Ford is a U.S. citizen and Nebraska resident.  He is the father of SGT Ford.  He brings claims in both his personal capacity and his representative capacity on behalf of SGT Ford's estate.

1806.   Plaintiff Linda Mattison-Ford is a U.S. citizen and Nebraska resident.  She is the stepmother of SGT Ford.

1807.   Plaintiff Jessica Matson is a U.S. citizen and Nebraska resident.  She is the sister of SGT Ford.

1808.   As a result of the July 31, 2006 attack, and SGT Ford's death, the Ford Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ford's society, companionship, and counsel.

1809.   SGT Ford's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Fraser Family and Estate**

1810.   First Lieutenant David M. Fraser served in the U.S. Army in Iraq as part of the 3rd Battalion, 67th Armor Regiment, 4th Brigade, 4th Infantry Division.

1811.   On November 26, 2006, 1LT Fraser was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 25 years old.

1812.   1LT Fraser was a U.S. citizen when he was killed in Iraq.

1813.   1LT Fraser's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1814.   Plaintiff Helen Fraser is a U.S. citizen and Texas resident.  She is the mother of 1LT Fraser.

1815.   Plaintiff Richard Fraser is a U.S. citizen and Texas resident.  He is the father of 1LT Fraser.  He brings claims in both his personal capacity and his representative capacity on behalf of 1LT Fraser's estate.

1816.   As a result of the November 26, 2006 attack, and 1LT Fraser's death, the Fraser Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Fraser's society, companionship, and counsel.

1817.   1LT Fraser's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Freeman Family and Estate**

1818.   Captain Brian S. Freeman served in the U.S. Army in Iraq as part of A Company, 412th Civil Affairs Battalion.

1819. On January 20, 2007, CPT Freeman was one of the four Americans killed during the Karbala Attack. *See supra* ¶¶ 1515-19. CPT Freeman was 31 years old.

1820. CPT Freeman was a U.S. citizen when he was killed in Iraq.

1821. CPT Freeman's abduction and murder would have violated the law of war if AAH and Hezbollah were subject to it because, among other things, the terrorists who committed the Karbala Attack disguised themselves as American soldiers and executed hostages in captivity.

1822. Plaintiff Richard Lee is a U.S. citizen and California resident. He is the stepbrother of CPT Freeman.

1823. Plaintiff Charlotte Freeman is a U.S. citizen and California resident. She is the widow of CPT Freeman. She brings claims in both her personal capacity and her representative capacity on behalf of CPT Freeman's estate.

1824. Plaintiff I.F., by and through her next friend Charlotte Freeman, is a U.S. citizen and California resident. She is the minor daughter of CPT Freeman.

1825. Plaintiff G.F., by and through his next friend Charlotte Freeman, is a U.S. citizen and California resident. He is the minor son of CPT Freeman.

1826. As a result of the January 20, 2007 attack, and CPT Freeman's death, the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Freeman's society, companionship, and counsel.

1827. CPT Freeman's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the Karbala Attack.

**Fred Frigo**

1828. Specialist Nathan J. Frigo served in the U.S. Army in Iraq as part of the 1st Battalion, 68th Armor Regiment, 3rd Heavy Brigade Combat Team, 4th Infantry Division.

1829.   On October 17, 2006, SPC Frigo was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in Baqubah, Iraq.  On information and belief, Hezbollah terrorist Daqduq personally participated in the attack that killed SPC Frigo.  He was 23 years old.

1830.   SPC Frigo was a U.S. citizen when he was killed in Iraq.

1831.   SPC Frigo's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1832.   Plaintiff Fred Frigo is a U.S. citizen and Indiana resident.  He is the father of SPC Frigo.  As a result of the October 17, 2006 attack, and SPC Frigo's death, Fred Frigo has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Frigo's society, companionship, and counsel.

**The Jacob Fritz Family and Estate**

1833.   First Lieutenant Jacob Fritz served in the U.S. Army in Iraq as part of the 2nd Battalion, 377th Parachute Field Artillery Regiment, 4th Brigade Combat Team, 25th Infantry Division.

1834.   On January 20, 2007, 1LT Fritz was one of the Americans killed during the Karbala Attack.  *See supra* ¶¶ 1515-19.  1LT Fritz was 25 years old.

1835.   1LT Fritz was a U.S. citizen when he was killed in Iraq.

1836.   1LT Fritz's abduction and murder would have violated the law of war if AAH and Hezbollah were subject to it because, among other things, the terrorists who committed the Karbala Attack disguised themselves as American soldiers and executed hostages in captivity.

1837.   Lyle Fritz was a U.S. citizen at the time of 1LT Fritz's murder.  He was the father of 1LT Fritz.  Lyle Fritz died on June 11, 2011.

1838.   Plaintiff Noala Fritz is a U.S. citizen and Nebraska resident.  She is the mother of 1LT Fritz.  Noala Fritz brings claims in both her personal capacity and her representative capacities on behalf of 1LT Fritz's estate and Lyle Fritz's estate.

1839.   Plaintiff Ethan Fritz is a U.S. citizen and Nebraska resident.  He is the brother of 1LT Fritz.

1840.   Plaintiff Daniel Fritz is a U.S. citizen and Nebraska resident.  He is the brother of 1LT Fritz.

1841.   As a result of the January 20, 2007 attack, and 1LT Fritz's death, the Fritz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Fritz's society, companionship, and counsel.

1842.   1LT Fritz's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the Karbala Attack.

1843.   Lyle Fritz's estate is entitled to recover non-economic damages from Defendants, due to 1LT Fritz's death in the Karbala Attack.

### The Scott Fritz Family

1844.   Plaintiff Specialist Scott Fritz served in the U.S. Army in Iraq as part of the 46th Military Police Company, 759th Military Police Battalion, 89th Military Police Brigade, 2nd Infantry Division.  He is a U.S. citizen and Michigan resident.

1845.   On July 27, 2007, SPC Fritz was injured by a mortar attack by Jaysh al-Mahdi on FOB Rustamiyah, located on the border between the Karadah and New Baghdad Districts of Baghdad, Iraq.  The attack involved a 60mm mortar that landed at the entrance of a bunker SPC Fritz had entered.  The explosion caused SPC Fritz to sustain injuries from shrapnel, the loss of hearing in his right ear, and a concussion.  Due to his injuries, SPC Fritz received a 70%

disability rating from the VA.  As a result of the July 27, 2007 attack, SPC Fritz has experienced extreme physical and emotional pain and suffering.

1846.   The attack that injured SPC Fritz would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1847.   Plaintiff Kristen Bledsoe-Fritz is a U.S. citizen and Michigan resident.  She is the wife of SPC Fritz.  As a result of the July 27, 2007 attack, and SPC Fritz's injuries, Kristen Bledsoe-Fritz has experienced extreme emotional pain and suffering.

**The Fuentes Family and Estate**

1848.   Private First Class Daniel A. Fuentes served in the U.S. Army in Iraq as part of the 1st Battalion, 28th Infantry Regiment, 4th Infantry Brigade Combat Team, 1st Infantry Division.

1849.   On April 6, 2007, PFC Fuentes was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 19 years old.

1850.   PFC Fuentes was a U.S. citizen when he was killed in Iraq.

1851.   PFC Fuentes' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1852.   Plaintiff Nancy Fuentes is a U.S. citizen and New York resident.  She is the mother of PFC Fuentes.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Fuentes' estate.

1853.   Plaintiff Armando Fuentes is a U.S. citizen and New York resident.  He is the father of PFC Fuentes.

1854.    Plaintiff Tatyana Fuentes is a U.S. citizen and New York resident.  She is the sister of PFC Fuentes.

1855.    Plaintiff Julio Fuentes is a U.S. citizen and New York resident.  He is the brother of PFC Fuentes.

1856.    Plaintiff Emma McGarry is a U.S. citizen and New York resident.  She was the fiancée of PFC Fuentes at the time of his death, and is the mother of Plaintiff D.F.

1857.    Plaintiff D.F., by and through his next friend Emma McGarry, is a U.S. citizen and New York resident.  He is the minor son of PFC Fuentes.

1858.    As a result of the April 6, 2007 attack, and PFC Fuentes' death, the Fuentes Family has experienced severe mental anguish, emotional pain and suffering, and the loss PFC Fuentes' society, companionship, and counsel.

1859.    PFC Fuentes' estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Gage Family and Estate**

1860.    Staff Sergeant Joseph A. Gage served in the U.S. Army in Iraq as part of the 1st Battalion, 506th Infantry Regiment, 4th Brigade Combat Team, 101st Airborne Division.

1861.    On November 2, 2006, SSG Gage was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 28 years old.

1862.    SSG Gage was a U.S. citizen when he was killed in Iraq.

1863.    SSG Gage's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1864.   Plaintiff Samantha Gage is a U.S. citizen and Michigan resident.  She is the widow of SSG Gage.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Gage's estate.

1865.   Plaintiff M.G., by and through his next friend Samantha Gage, is a U.S. citizen and Michigan resident.  He is the minor son of SSG Gage.

1866.   As a result of the November 2, 2006 attack, and SSG Gage's death, the Gage Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Gage's society, companionship, and counsel.

1867.   SSG Gage's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### Luis Garza

1868.   Plaintiff Specialist Luis Garza served in the U.S. Army in Iraq as part of the 2-30 Wild Boars.  He is a U.S. citizen and Florida resident.

1869.   On or about April 29, 2008, during the Battle of Sadr City, SPC Garza was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi near Sadr City.  The explosion severely damaged the vehicle and caused facial injuries to SPC Garza from shrapnel.

1870.   On or about May 9, 2008, during the Battle of Sadr City, SPC Garza was injured by another EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  This attack dazed him, and he was peppered with shrapnel in his face.  As a result of both attacks, SPC Garza suffers from PTSD, and had to have part of his kidney removed.

1871.   Due to his injuries, SPC Garza received a 90% disability rating from the VA.  As a result of the Jaysh al-Mahdi attacks, SPC Garza has experienced extreme physical and emotional pain and suffering.

1872.   The attacks that injured SPC Garza would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Gasper Family and Estate**

1873.   Staff Sergeant Frank J. Gasper served in the U.S. Army in Iraq as part of D Company, 3rd Battalion, 10th Special Forces Group.

1874.   On May 25, 2008, SSG Gasper was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in Najaf, Iraq.  He was 25 years old.

1875.   SSG Gasper was a U.S. citizen when he was killed in Iraq.

1876.   SSG Gasper's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1877.   Plaintiff Breanna Gasper is a U.S. citizen and Georgia resident.  She is the widow of SSG Gasper.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Gasper's estate.

1878.   Plaintiff Jamie Barnes is a U.S. citizen and California resident.  She is the sister of SSG Gasper.

1879.   As a result of the May 25, 2008 attack, and SSG Gasper's death, the Gasper Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Gasper's society, companionship, and counsel.

1880.   SSG Gasper's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Geiger Family and Estate

1881.   Corporal Wayne M. Geiger served in the U.S. Army in Iraq as part of H Company, 3rd Squadron, 2nd Stryker Cavalry Regiment.

1882.   On October 18, 2007, CPL Geiger was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 23 years old.

1883.   CPL Geiger was a U.S. citizen when he was killed in Iraq.

1884.   CPL Geiger's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1885.   Plaintiff Randall Geiger is a U.S. citizen and California resident.  He is the father of CPL Geiger.  He brings claims in both his personal capacity and his representative capacity on behalf of CPL Geiger's estate.

1886.   Plaintiff Kimberley Geiger is a U.S. citizen and California resident.  She is the mother of CPL Geiger.

1887.   Plaintiff Jesseca Tsosie is a U.S. citizen and California resident.  She is the sister of CPL Geiger.

1888.   As a result of the October 18, 2007 attack, and CPL Geiger's death, the Geiger Family has experienced severe mental anguish, emotional pain and suffering, and the loss CPL Geiger's society, companionship, and counsel.

1889.   CPL Geiger's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Anthony M. Gerber**

1890.   Plaintiff Sergeant Anthony M. Gerber served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Washington resident.

1891.   SGT Gerber was the target of numerous Jaysh al-Mahdi attacks during the Battle of Sadr City, and was involved in several counter-offensives against Jaysh al-Mahdi terrorists. He was the target of regular ambushes by Jaysh al-Mahdi that relied on the use of women and children as human shields, as well as RPG and sniper attacks.  SGT Gerber was also part of the fight surrounding the construction of the wall on Route Gold; the fighting involving Chris Kyle depicted in the film *American Sniper*; and the fighting to interdict Jaysh al-Mahdi attempts to resupply Sadr City and counter Jaysh al-Mahdi attacks on the flanks of Sadr City.

1892.   On March 27, 2008, during the Battle of Sadr City, SGT Gerber survived an EFP attack by Jaysh al-Mahdi.  During this attack, he witnessed an EFP destroy the vehicle immediately in front of him, killing Corporal Joshua Molina.  SGT Gerber was hit by the concussion from the blast, damaging his hearing.

1893.   In the course of fighting against Jaysh al-Mahdi terrorists in late 2007 and early 2008, including during the Battle of Sadr City, SGT Gerber suffered multiple concussions, developed PTSD, chronic back pain, and tinnitus.  Due to his injuries, SGT Gerber received a 50% disability rating from the VA.  As a result of multiple Jaysh al-Mahdi attacks, SGT Gerber has experienced extreme physical and emotional pain and suffering.

1894.   The attacks that injured SGT Gerber would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who attacked him neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they used children as human shields.

### The Gibson Family and Estate

1895.   Sergeant Brennan C. Gibson served in the U.S. Army in Iraq as part of the 3rd Battalion, 509th Infantry (Airborne), 4th Brigade Combat Team, 25th Infantry Division.

1896.   On December 10, 2006, SGT Gibson was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  SGT Gibson was 26 years old.

1897.   SGT Gibson was a U.S. citizen when he was killed in Iraq.

1898.   SGT Gibson's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other things, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

1899.   Plaintiff Linda Gibson is a U.S. citizen and Oregon resident.  She is the mother of SGT Gibson.  She brings claims in both her personal capacity and her representative capacity on behalf of SGT Gibson's estate.

1900.   Plaintiff John Gibson is a U.S. citizen and Oregon resident.  He is the stepfather of SGT Gibson.

1901.   Plaintiff Stephanie Gibson Webster is a U.S. citizen and Oregon resident.  She is the sister of SGT Gibson.

1902.   Plaintiff Sean Elliott is a U.S. citizen and Oregon resident.  He is the brother of SGT Gibson.

1903.   Plaintiff Travis Gibson is a U.S. citizen and Oregon resident.  He is the brother of SGT Gibson.

1904.   As a result of the December 10, 2006 attack, and SGT Gibson's death, the Gibson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gibson's society, companionship, and counsel.

1905.   SGT Gibson's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Tyler Ginavan**

1906.   Plaintiff Senior Airman Tyler Ginavan served with the U.S. Air Force in Iraq, as part of the 822nd Security Forces.  He is a U.S. citizen and Kansas resident.

1907.   On October 29, 2007, SrA Ginavan was injured by an EFP planted and detonated near his vehicle by a cell that included members of both Jaysh al-Mahdi and Hezbollah in Al Zubair, near Camp Bucca, south of Basra, Iraq.  Copper from the EFP lodged in his face, neck, knee, and calf.  Copper from the EFP remains fused to his jawline.  SrA Ginavan has been diagnosed with PTSD.  As a result of the October 29, 2007 attack, SrA Ginavan has experienced extreme physical and emotional pain and suffering.

1908.   The attack that injured SrA Ginavan would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other things, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Golembe Family**

1909.   Plaintiff Private Christopher Golembe served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and West Virginia resident.

1910.   On September 29, 2007, PVT Golembe was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi near the border between the New Baghdad and Karadah Districts in Baghdad, Iraq.  He sustained a concussion as a result of the attack and has

suffered survivor's guilt, PTSD, and memory loss since the attack.  Due to his injuries, he received an 80% disability rating from the VA.  As a result of the September 29, 2007 attack, PVT Golembe has experienced extreme physical and emotional pain and suffering.

1911.  The attack that injured PVT Golembe would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1912.  Plaintiff Kathryn Head is a U.S. citizen and Virginia resident.  She is the mother of PVT Golembe.  As a result of the September 29, 2007 attack, and PVT Golembe's injuries, Kathryn Head has experienced extreme emotional pain and suffering.

### Miguel Angel Gonzalez

1913.  Plaintiff Sergeant Miguel A. Gonzalez served in the U.S. Army in Iraq as part of the 3rd Brigade, 3rd Infantry Division.  He is a U.S. citizen and California resident.

1914.  On March 1, 2009, SGT Gonzalez was injured in a mortar attack by Jaysh al-Mahdi in Mada'in Qada, just southeast of Baghdad, Iraq.  SGT Gonzalez sustained a spinal fracture and a Traumatic Brain Injury.  Due to his injuries, SGT Gonzalez received a 70% disability rating from the VA.  As a result of the March 1, 2009 attack, SGT Gonzalez has experienced extreme physical and emotional pain and suffering.

1915.  The attack that injured SGT Gonzalez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the mortars neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Joel K. Gorbutt

1916.   Plaintiff Staff Sergeant Joel K. Gorbutt served in Iraq as part of the 259th Engineer Company, Arizona Army National Guard.  He is a U.S. citizen and Arizona resident.

1917.   On June 13, 2007, SSG Gorbutt was injured by an IED planted and detonated near his vehicle by Jaysh al-Mahdi on Route Tampa, just outside of the Kadamiyah District in western Baghdad, Iraq.  As a result of the attack, SSG Gorbutt sustained a concussion, suffered a Traumatic Brain Injury, and developed tinnitus.  Due to his injuries, SSG Gorbutt received an 80% disability rating from the VA.  As a result of the June 13, 2007 attack, SSG Gorbutt has experienced extreme physical and emotional pain and suffering.

1918.   The attack that injured SSG Gorbutt would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Graves Family and Estate

1919.   Specialist Joseph A. Graves served in the U.S. Army in Iraq as part of the 110th Military Police Company, 720th Military Police Battalion, 89th Military Police Brigade.

1920.   On July 25, 2006, SPC Graves was killed in a complex attack by Jaysh al-Mahdi while he was traveling on ASR Dover in Baghdad, Iraq.  He was 21 years old.

1921.   SPC Graves was a U.S. citizen when he was killed in Iraq.

1922.   SPC Graves' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1923.   Plaintiff Kevin Graves is a U.S. citizen and a California resident.  He is the father of SPC Graves.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Graves's estate.

1924.   As a result of the July 25, 2006 attack, and SPC Graves's death, Kevin Graves has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Graves's society, companionship, and counsel.

1925.   SPC Graves's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Gray Family and Estate

1926.   Brenton T. Gray worked as a civilian security specialist in Iraq.

1927.   On August 18, 2006, Mr. Gray was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in northern Baghdad, Iraq.  He was 34 years old.

1928.   Mr. Gray was a U.S. citizen when he was killed in Iraq.

1929.   Mr. Gray's murder would have violated the laws of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Gray was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1930.   Plaintiff Courtnay S. Gray is a U.S. citizen and Utah resident.  She is the widow of Mr. Gray.  She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Gray's estate.

1931.   Plaintiff Cayden Gray is a U.S. citizen and Utah resident.  He is the son of Mr. Gray.

1932.   As a result of the August 18, 2006 attack, and Mr. Gray's death, the Gray Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Gray's society, companionship, and counsel.

1933.   Mr. Gray's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Greer Family**

1934.   Plaintiff John D. Greer served as a civilian security specialist in Iraq.  He is a U.S. citizen and Texas resident.

1935.   On May 2, 2006, Mr. Greer was injured by multiple EFPs planted and detonated near his vehicle by Jaysh al-Mahdi in the Adhamiyah District of Baghdad, Iraq.  Mr. Greer lost his right hand from above the wrist and sustained third-degree burns on his upper chest.  He also suffered a Traumatic Brain Injury and trauma to his back that necessitated a spinal fusion; he also has been diagnosed with PTSD.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the May 2, 2006 attack, Mr. Greer has experienced extreme physical and emotional pain and suffering.

1936.   The attack that injured Mr. Greer would have violated the laws of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Greer was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

1937.   Plaintiff Stephanie C. Sander is a U.S. citizen and California resident.  She is the daughter of John Dana Greer.

1938.   Plaintiff Christopher D. Greer is a U.S. citizen and Georgia resident.  He is the son of John Dana Greer.

1939.   Plaintiff Joseph L. Greer is a U.S. citizen and Arizona resident.  He is the brother of John Dana Greer.

1940.   Plaintiff Carl K. Greer is a U.S. citizen and Arizona resident.  He is the brother of John Dana Greer.

1941.   As a result of the May 2, 2006 attack, and Mr. Greer's injuries, the Greer Family has experienced extreme emotional pain and suffering.

### **Charles Gregston**

1942.   Plaintiff Specialist Charles B. Gregston served in the U.S. Army in Iraq as part of the 1-2 Stryker Calvary Regiment.  He is a U.S. citizen and California resident.

1943.   During 2007 and 2008, SPC Gregston was deployed in and/or near Sadr City for 15 months.  For the entire Battle of Sadr City, SPC Gregston was either directly in Sadr City or doing patrols on the outskirts of the area.  SPC Gregston's second and final deployment was from November 2009 to December 2010, where he was stationed on the outskirts of Baghdad, Iraq.

1944.   During both deployments in Iraq, SPC Gregston dealt predominantly with Jaysh al-Mahdi.  SPC Gregston was an immediate responder during the Jaysh al-Mahdi sniper attack that killed SGT Randell Olguin on September 30, 2007, and the Jaysh al-Mahdi EFP attack that killed CPL Joshua Molina on March 27, 2008.  SPC Gregston was engaged in fighting during the Battle of Sadr City, including supporting the construction of a wall in Sadr City to interdict the movement of supplies to Jaysh al-Mahdi members in Sadr City.  SPC Gregston was subjected to multiple roadside bomb attacks in Jaysh al-Mahdi strongholds.

1945.   As a result of the Jaysh al-Mahdi attacks and fighting, SPC Gregston suffered a number of injuries, including PTSD, Traumatic Brain Injury, and tinnitus, resulting in, among other things, permanent hearing loss.  Due to his injuries, he received a 100% disability rating

from the VA.  As a result of Jaysh al-Mahdi's attacks, SPC Gregston has experienced extreme physical and emotional pain and suffering.

1946.   The attacks that injured SPC Gregston would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Gudridge Family and Estate

1947.   Corporal James D. Gudridge served in the U.S. Army in Iraq as part of the 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.

1948.   On January 6, 2008, CPL Gudridge was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  CPL Gudridge was 20 years old.

1949.   CPL Gudridge was a U.S. citizen when he was killed in Iraq.

1950.   CPL Gudridge's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

1951.   Plaintiff Ashley G. Houppert is a U.S. citizen and North Carolina resident.  She is the sister of CPL Gudridge.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Gudridge's estate.

1952.   As a result of the January 6, 2008 attack, and CPL Gudridge's death, Ashley G. Houppert has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Gudridge's society, companionship, and counsel.

1953.   CPL Gudridge's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Haaf Family**

1954.   Plaintiff First Sergeant Robert A. Haaf served in the U.S. Army National Guard in Iraq as part of the 42nd Infantry Division.  He is a U.S. citizen and Kansas resident.

1955.   In May 2008, 1SG Haaf was injured by an EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  As a result of the attack, 1SG Haaf suffered hearing loss, a Traumatic Brain Injury, loss of taste and smell due to brain injury, PTSD, depression, and anxiety.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the May 2008 attack, 1SG Haaf has experienced extreme physical and emotional pain and suffering.

1956.   The attack that injured 1SG Haaf would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1957.   Plaintiff Monica Elizabeth Haaf is a U.S. citizen and Kansas resident.  She is the wife of 1SG Haaf.

1958.   Plaintiff J.A.H., a minor, by and through his next friend Monica Elizabeth Haaf, is a U.S. citizen and Kansas resident.  He is the minor son of 1SG Haaf.

1959.   Plaintiff Mary Agnes Haaf is a U.S. citizen and Missouri resident.  She is the mother of 1SG Haaf.

1960.   Plaintiff James Joseph Haaf is a U.S. citizen and Missouri resident.  He is the brother of 1SG Haaf.

1961.   Plaintiff Ashley Mae Sims is a U.S. citizen and Kansas resident.  She is the stepdaughter of 1SG Haaf.

1962.   As a result of the May 2008 attack, and 1SG Haaf's injuries, the Haaf Family has experienced extreme emotional pain and suffering.

### The Habsieger Family and Estate

1963.   Private First Class Andrew J. Habsieger served in the U.S. Army in Iraq as part of A Company, 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.

1964.   On March 23, 2008, during the Battle of Sadr City, PFC Habsieger was severely injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He died the next day.  PFC Habsieger was 22 years old.

1965.   PFC Habsieger was a U.S. citizen when he was killed in Iraq.

1966.   PFC Habsieger's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1967.   Plaintiff Michael Habsieger is a U.S. citizen and Missouri resident.  He is the father of PFC Habsieger.

1968.   Plaintiff Brenda Habsieger is a U.S. citizen and Missouri resident.  She is the mother of PFC Habsieger.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Habsieger's estate.

1969.   Jacob Habsieger was a U.S. citizen and Missouri resident.  He was the brother of PFC Habsieger.  Jacob Habsieger died on March 5, 2018.  Amber Habsieger, a U.S. citizen and Missouri resident, brings claims solely in her representative capacity on behalf of Jacob Habsieger's estate.

1970.   As a result of the March 23, 2008 attack, and PFC Habsieger's death the following day, the Habsieger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Habsieger's society, companionship, and counsel.

1971.   PFC Habsieger's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

1972.   Jacob Habsieger's estate is entitled to recover non-economic damages from Defendants, due to PFC Habsieger's murder by Jaysh al-Mahdi.

**The Hadfield Family**

1973.   Plaintiff Specialist Derek P. Hadfield served in the U.S. Army in Iraq as part of the 2nd Squadron, 2nd Stryker Cavalry Regiment in Iraq.  He is a U.S. citizen and Ohio resident.

1974.   On March 7, 2008, SPC Hadfield was injured by two EFPs planted and detonated by Jaysh al-Mahdi near FOB Falcon, in the Al Rashid District in Baghdad, Iraq.  As a result of the explosions, SPC Hadfield was knocked unconscious, had ringing in his ears, and sustained shrapnel injuries to his left shoulder and to his leg above the knee.  Mr. Hadfield was also diagnosed with a Traumatic Brain Injury and bilateral tinnitus.  He suffers from migraine headaches, PTSD, anxiety and depression.  Due to his injuries, he received a 90% disability rating from the VA.  As a result of the March 7, 2008 attack, SPC Hadfield has experienced extreme physical and emotional pain and suffering.

1975.   The attack that injured SPC Hadfield would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

1976.   Plaintiff Ashley N. Hadfield is a U.S. citizen and West Virginia resident.  She is the ex-wife of SPC Hadfield, and was married to him at the time of the March 7, 2008 attack.

1977.   Plaintiff Robert W. Hadfield II is a U.S. citizen and Ohio resident.  He is the father of SPC Hadfield.

1978.   Plaintiff Kristi L. Hadfield is a U.S. citizen and Ohio resident.  She is the mother of SPC Hadfield.

1979.   Plaintiff Jennifer C. Roton is a U.S. citizen and West Virginia resident.  She is the sister of SPC Hadfield.

1980.   As a result of the March 7, 2008 attack, and SPC Hadfield's injuries, the Hadfield Family has experienced extreme emotional pain and suffering.

**<u>The Hake Family and Estate</u>**

1981.   Staff Sergeant Christopher M. Hake served in the U.S. Army in Iraq as part of the 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.

1982.   On March 23, 2008, during the Battle of Sadr City, SSG Hake was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was declared dead the next day.  SSG Hake was 26 years old.

1983.   SSG Hake was a U.S. citizen when he was killed in Iraq.

1984.   SSG Hake's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1985.   Plaintiff Kelli D. Hake is a U.S. citizen and Oklahoma resident.  She is the widow of SSG Hake.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Hake's estate.

1986.   Plaintiff G.H., by and through his next friend Kelli D. Hake, is a U.S. citizen and Oklahoma resident.  He is the minor son of SSG Hake.

1987.  Plaintiff Denice L. York is a U.S. citizen and Oklahoma resident.  She is the mother of SSG Hake.

1988.  Plaintiff Russel G. York is a U.S. citizen and Oklahoma resident.  He is the stepfather of SSG Hake.

1989.  Plaintiff Jennifer York is a U.S. citizen and Oklahoma resident.  She is the stepsister of SSG Hake.

1990.  Plaintiff Jason York is a U.S. citizen and Oklahoma resident.  He is the stepbrother of SSG Hake.

1991.  Plaintiff Peter Hake is a U.S. citizen and Oklahoma resident.  He is the father of SSG Hake.

1992.  Plaintiff Jill A. Hake is a U.S. citizen and Oklahoma resident.  She is the stepmother of SSG Hake.

1993.  Plaintiff Keri Hake is a U.S. citizen and Oklahoma resident.  She is the sister of SSG Hake.

1994.  Plaintiff Zachary Hake is a U.S. citizen and Oklahoma resident.  He is the brother of SSG Hake.

1995.  Plaintiff Skylar Hake is a U.S. citizen and Oklahoma resident.  He is the brother of SSG Hake.

1996.  As a result of the March 23, 2008 attack, and SSG Hake's death, the Hake Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Hake's society, companionship, and counsel.

1997.  SSG Hake's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Hale Family and Estate**

1998.   Corporal James M. Hale served in the U.S. Army in Iraq as part of the 978th Military Police Company, 93rd Military Police Battalion.

1999.   On August 13, 2008, CPL Hale was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  CPL Hale was 23 years old.

2000.   CPL Hale was a U.S. citizen when he was killed in Iraq.

2001.   CPL Hale's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

2002.   Plaintiff Jessica Hale Williams is a U.S. citizen and Texas resident.  She is the widow of CPL Hale.  She brings claims in both her personal capacity and her representative capacity on behalf of CPL Hale's estate.

2003.   Plaintiff J.H., by and through his next friend Jessica Hale Williams, is a U.S. citizen and Texas resident.  He is the minor son of CPL Hale.

2004.   Plaintiff J.H., by and through his next friend Jessica Hale Williams, is a U.S. citizen and Texas resident.  He is the minor son of CPL Hale.

2005.   Plaintiff J.H., by and through his next friend Jessica Hale Williams, is a U.S. citizen and Texas resident.  He is the minor son of CPL Hale.

2006.   As a result of the August 13, 2008 attack, and CPL Hale's death, the Hale Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Hale's society, companionship, and counsel.

2007.   CPL Hale's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Hancock Family

2008.   Plaintiff Specialist Jerral Hancock served in the U.S. Army in Iraq as part of the 1st Cavalry Division.  He is a U.S. citizen and California resident.

2009.   On May 29, 2007, SPC Hancock was injured by an EFP planted and detonated under his vehicle by Jaysh al-Mahdi in Sadr City.  SPC Hancock's spinal cord was severed, his left arm torn off above the shoulder, and he sustained burns on 30% of his body.  As a result of the May 29, 2007 EFP attack, SPC Hancock suffers from paralysis below his chest and the lasting effects from shrapnel lodged in his spine, and he underwent amputation of his left arm. Due to his injuries, he received a 100% disability rating from the VA.  As a result of the May 29, 2007 attack, SPC Hancock has experienced extreme physical and emotional pain and suffering.

2010.   The attack that injured SPC Hancock would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2011.   Plaintiff Stacie A. Tscherny is a U.S. citizen and California resident.  She is the mother of SPC Hancock.

2012.   Plaintiff J.H., by and through his next of friend Stacie A. Tscherny, is a U.S. citizen and California resident.  He is the minor son of SPC Hancock.

2013.   Plaintiff A.H, by and through her next of friend Stacie A. Tscherny, is a U.S. citizen and California resident.  She is the minor daughter of SPC Hancock.

2014.   Plaintiff Savannah Tscherny is a U.S. citizen and California resident.  She is the sister of SPC Hancock.

2015.   As a result of the May 29, 2007 attack, and SPC Hancock's injuries, the Hancock Family has experienced extreme emotional pain and suffering.

**Jeffrey Harper**

2016.   Plaintiff Staff Sergeant Jeffrey Harper served in the U.S. Army in Iraq as part of D Company, 703rd Brigade Support Battalion, 4th Brigade, 3rd Infantry Division.  He is a U.S. citizen and Tennessee resident.

2017.   On April 29, 2008, during the Battle of Sadr City, SSG Harper was injured in a complex attack by Jaysh al-Mahdi on MSR Tampa about 5 kilometers outside of Sadr City.  SSG Harper and his unit were attacked by an IED, an EFP, RPGs, and small-arms fire.  As a result of the attack, SSG Harper sustained a Traumatic Brain Injury and suffers from tinnitus, PTSD, and headaches.  Due to his injuries, SSG Harper received a 100% disability rating from the VA.  As a result of the April 29, 2008 attack, SSG Harper has experienced extreme physical and emotional pain and suffering.

2018.   The attack that injured SSG Harper would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Sean Harrington**

2019.   Plaintiff Airman First Class Sean Harrington served in the U.S. Air Force in Iraq as part of the 877th Expeditionary Security Forces Squadron, 33rd Military Police Battalion, 16th Military Police Brigade.  He is a U.S. citizen and Pennsylvania resident.

2020.   On July 24, 2007, A1C Harrington was injured by an EFP planted and detonated near his vehicle by a cell that included members of both Jaysh al-Mahdi and Hezbollah outside of Umm Qasr, in Basra Province, Iraq.  Shrapnel from the EFP struck A1C Harrington's head

and face, and copper from the EFP's liner remains fused to his face.  The shrapnel has resulted in a partial loss of sight in his right eye and loss of most of his hearing in his right ear.  A1C Harrington has been diagnosed with a Traumatic Brain Injury and PTSD.  As a result of the July 24, 2007 attack, A1C Harrington has experienced extreme physical and emotional pain and suffering.

2021.   The attack that injured A1C Harrington would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Harris Family**

2022.   Staff Sergeant Blake M. Harris served in Iraq in the U.S. Army as part of the 1st Squadron, 8th Cavalry Regiment, 2nd Brigade Combat Team, 1st Cavalry Division.

2023.   On March 15, 2007, SSG Harris was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 27 years old.

2024.   SSG Harris was a U.S. citizen when he was killed in Iraq.

2025.   SSG Harris' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2026.   Plaintiff Paul D. Harris is a U.S. citizen and Georgia resident.  He is the father of SSG Harris.

2027.   Plaintiff Anne F. Harris is a U.S. citizen and Georgia resident.  She is the stepmother of SSG Harris.

2028.   As a result of the March 15, 2007 attack, and SSG Harris's death, the Harris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Harris's society, companionship, and counsel.

**The Hartley Family and Estate**

2029.   Staff Sergeant Jeffery Hartley served in Iraq in the U.S. Army as part of the 1st Battalion, 10th Field Artillery Regiment, 3rd Brigade Combat Team, 3rd Infantry Division.

2030.   On April 8, 2008, during the Battle of Sadr City, SSG Hartley was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Kharguliah neighborhood of the Adhamiyah District of Baghdad, Iraq.  He was 25 years old.

2031.   SSG Hartley was a U.S. citizen when he was killed in Iraq.

2032.   SSG Hartley's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2033.   Plaintiff David Wade Hartley is a U.S. citizen and Texas resident.  He is the father of SSG Hartley.  He brings claims in both his personal capacity and his representative capacity on behalf of SSG Hartley's estate.

2034.   Plaintiff David Wayne Hartley is a U.S. citizen and Texas resident.  He is the brother of SSG Hartley.

2035.   Plaintiff Kaylie N. Hartley is a U.S. citizen and Texas resident.  She is the sister of SSG Hartley.

2036.   As a result of the April 8, 2008 attack, and SSG Hartley's death, the Hartley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Hartley's society, companionship, and counsel.

2037.   SSG Hartley's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Haupt Family and Estate

2038.   Staff Sergeant Ryan Haupt served in Iraq in the U.S. Army as part of the 1st Battalion, 68th Armor Regiment, 3rd Heavy Brigade Combat Team, 4th Infantry Division.

2039.   On October 17, 2006, SSG Haupt was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi near Baqubah, in the Diyala Province of Iraq.  On information and belief, Hezbollah terrorist Daqduq personally participated in the attack that killed SSG Haupt.  He was 24 years old.

2040.   SSG Haupt was a U.S. citizen when he was killed in Iraq.

2041.   SSG Haupt's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2042.   Plaintiff Nannette Byrne-Haupt is a U.S. citizen and Colorado resident.  She is the widow of SSG Haupt.

2043.   Plaintiff Lynn Forehand is a U.S. citizen and Tennessee resident.  She is the mother of SSG Haupt.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Haupt's estate.

2044.   Plaintiff Lance Haupt is a U.S. citizen and Arizona resident.  He is the father of SSG Haupt.

2045.   Plaintiff Rhonda Haupt is a U.S. citizen and California resident.  She is the sister of SSG Haupt.

2046.   Plaintiff Tifany H. Thompson is a U.S. citizen and California resident.  She is the sister of SSG Haupt.

2047.   Plaintiff Sabrina Cumbe is a U.S. citizen and California resident.  She is the sister of SSG Haupt.

2048.   As a result of the October 17, 2006 attack, and SSG Haupt's death, the Haupt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Haupt's society, companionship, and counsel.

2049.   SSG Haupt's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

**The Heidling Family**

2050.   Plaintiff Private First Class Christopher M. Heidling served in Iraq in the U.S. Army as part of B Battery, 2nd Battalion, 17th Field Artillery Regiment.  He is a U.S. citizen and Oklahoma resident.

2051.   On December 30, 2006, PFC Heidling was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Furniture in the Karadah District in Baghdad, Iraq.  The explosion resulted in shrapnel injuries to PFC Heidling's right leg, calf, knee, and the left side of his face, a back injury, severe back pain, Traumatic Brain Injury, nerve damage, tinnitus, and PTSD.  Due to his injuries, PFC Heidling received a 90% disability rating from the VA.  As a result of the December 30, 2006 attack, PFC Heidling has experienced extreme physical and emotional pain and suffering.

2052.   The attack that injured PFC Heidling would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2053.   Plaintiff Stanley Heidling is a U.S. citizen and Texas resident.  He is the father of PFC Heidling.

2054.   Plaintiff Terra Rhoads is a U.S. citizen and Oklahoma resident.  She is the sister of PFC Heidling.

2055.   As a result of the December 30, 2006 attack, and PFC Heidling's injuries, the Heidling Family has experienced extreme emotional pain and suffering.

### The Heinlein Family and Estate

2056.   Specialist Charles T. Heinlein, Jr. served in Iraq in the U.S. Army as part of the 2nd Battalion, 3rd Infantry Regiment, 3rd Brigade, 2nd Infantry Division.

2057.   On July 31, 2007, SPC Heinlein was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq.  SPC Heinlein was 23 years old.

2058.   SPC Heinlein was a U.S. citizen when he was killed in Iraq.

2059.   SPC Heinlein's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2060.   Plaintiff Jessica Heinlein is a U.S. citizen and Washington resident.  She is the widow of SPC Heinlein.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Heinlein's estate.

2061.   Plaintiff Charles Heinlein, Sr. is a U.S. citizen and Michigan resident.  He is the father of SPC Heinlein.

2062.   As a result of the July 31, 2007 attack, and SPC Heinlein's death, the Heinlein Family has experienced severe mental anguish, emotional pain and suffering, and the loss SPC Heinlein's society, companionship, and counsel.

2063.   SPC Heinlein's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Herlem Family and Estate**

2064.   Staff Sergeant Bryant A. Herlem served in Iraq in the U.S. Army as part of the 10th Cavalry, 4th Brigade, 4th Infantry Division.

2065.   On April 28, 2006, SSG Herlem was killed by an IED planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 37 years old.

2066.   SSG Herlem was a U.S. citizen when he was killed in Iraq.

2067.   SSG Herlem's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2068.   Plaintiff LaNita Herlem is a U.S. citizen and North Carolina resident.  She is the widow of SSG Herlem.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Herlem's estate.

2069.   As a result of the April 28, 2006 attack, and SSG Herlem's death, LaNita Herlem has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Herlem's society, companionship, and counsel.

2070.   SSG Herlem's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Hernandez Family

2071. Plaintiff Major Ernesto P. Hernandez III served with the U.S. Air Force in Iraq as part of the Multinational Security Transition Command. He is a citizen U.S. citizen and Virginia resident.

2072. On March 26, 2008, Maj. Hernandez was injured in a 107mm rocket attack by Jaysh al-Mahdi at FOB Phoenix in the Al Rashid District in Baghdad, Iraq. Due to this attack, Maj. Hernandez sustained shrapnel wounds and a Traumatic Brain Injury, and now suffers from many medical conditions including PTSD, sciatic nerve damage, and femoral nerve damage. He received a 100% disability rating from the VA. As a result of the March 26, 2008 attack, Maj. Hernandez has experienced extreme physical and emotional pain and suffering.

2073. The attack that injured Maj. Hernandez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2074. Plaintiff Laura Fay Hernandez is a U.S. citizen and Virginia resident. She is the wife of Maj. Hernandez.

2075. Plaintiff Ernesto P. Hernandez IV is a U.S. citizen and Virginia resident. He is the son of Maj. Hernandez.

2076. Plaintiff N.H., by and through his next friend Laura Fay Hernandez, is a U.S. citizen and Virginia resident. He is the minor son of Maj. Hernandez.

2077. Plaintiff Ernesto Hernandez II is a U.S. citizen and Virginia resident. He is the father of Maj. Hernandez.

2078. As a result of the March 26, 2008 attack, and Maj. Hernandez's injuries, the Hernandez Family has experienced extreme emotional pain and suffering.

**Endi C. Herrera**

2079.   Plaintiff Sergeant Endi C. Herrera served in the U.S. Army in Iraq as part of Bravo Troop, 4th Squadron, 14th Cavalry Regiment.  He is a U.S. citizen and North Carolina resident.

2080.   On September 17, 2006, SGT Herrera was injured by an EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  The explosion resulted in severe injuries to SGT Herrera, including a fractured spine, herniated discs, shrapnel injuries, nerve damage, Traumatic Brain Injury, tinnitus, and PTSD.  Due to his injuries, he received a 90% disability rating from the VA.  As a result of the September 17, 2006 attack, SGT Herrera has experienced extreme physical and emotional pain and suffering.

2081.   The attack that injured SGT Herrera would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Jonathan Heslop**

2082.   Plaintiff Sergeant Jonathan Heslop served in the U.S. Army in Iraq as part of 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.  He is a U.S. citizen and Ohio resident.

2083.   On March 23, 2008, during the Battle of Sadr City, SGT Heslop was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  The explosion hit the lead vehicle in SGT Heslop's convoy, causing it to burn uncontrollably.  SGT Heslop witnessed the attack and its aftermath, including a soldier who was engulfed in flames, and, as a result, Jonathan Heslop was diagnosed with PTSD.  Due to his injuries, SGT Heslop

392

received a 30% disability rating from the VA.  As a result of the March 23, 2008 attack, SGT Heslop has experienced extreme emotional pain and suffering.

2084.   The attack that injured  SGT Heslop's convoy would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The David Hickman Family and Estate

2085.   Specialist David Emanuel Hickman served in the U.S. Army in Iraq as part of B Company, 2nd Battalion, 325th Airborne Infantry Regiment, 2nd Brigade Combat Team, 82nd Airborne Division.

2086.   On November 14, 2011, SPC Hickman was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in Baghdad, Iraq while SPC Hickman was en route from Camp Taji to JSS Muthana.  SPC Hickman was 23 years old.

2087.   SPC Hickman was a U.S. citizen when he was killed in Iraq.

2088.   SPC Hickman's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2089.   Plaintiff David Eugene Hickman is a U.S. citizen and North Carolina resident.  He is the father of SPC Hickman.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Hickman's estate.

2090.   Plaintiff Veronica Hickman is a U.S. citizen and North Carolina resident.  She is the mother of SPC Hickman.

2091.   Plaintiff Devon F. Hickman is a U.S. citizen and North Carolina resident.  He is the brother of SPC Hickman.

2092.   As a result of the November 14, 2011 attack, and SPC Hickman's death, the Hickman Family has experienced severe mental anguish, emotional pain and suffering, and the loss SPC Hickman's society, companionship, and counsel.

2093.   SPC Hickman's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Hicks Family and Estate**

2094.   Private First Class Corey L. Hicks served in Iraq in the U.S. Army as part of the 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division.

2095.   On May 2, 2008, during the Battle of Sadr City, PFC Hicks was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi on Route Predator near Sadr City. PFC Hicks was 22 years old.

2096.   PFC Hicks was a U.S. citizen when he was killed in Iraq.

2097.   PFC Hicks' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2098.   Plaintiff Russel Hicks Sr. is a U.S. citizen and Wyoming resident.  He is the father of PFC Hicks.  He brings claims in both his personal capacity and his representative capacity on behalf of PFC Hicks's estate.

2099.   Plaintiff Russel Hicks Jr. is a U.S. citizen and Arizona resident.  He is the brother of PFC Hicks.

2100.   As a result of the May 2, 2008 attack, and PFC Hicks's death, the Hicks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Hicks's society, companionship, and counsel.

2101.   PFC Hicks's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Hochstetler Family

2102.   Plaintiff Captain James D. Hochstetler served in the U.S. Army in Iraq.  He is a U.S. citizen and Tennessee resident.

2103.   On August 23, 2007, CPT Hochstetler was injured by an EFP planted and detonated by Jaysh al-Mahdi in Wasit Province on the Baghdad Kut Highway between Aziziyah and Zubidiyah, Iraq.  The explosion resulted in severe injuries to CPT Hochstetler, including the loss of his nose, trauma to the left side of his face, left eye, his right hand and forearm, and Traumatic Brain Injury that has caused chronic migraines, among other lasting effects.  As a result of the August 23, 2007 attack, CPT Hochstetler has experienced extreme physical and emotional pain and suffering.

2104.   The attack that injured CPT Hochstetler would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2105.   Plaintiff Leanne L. Hochstetler is a U.S. citizen and Tennessee resident.  She was the wife of CPT Hochstetler at the time of the attack.

2106.   Plaintiff J.H., by and through his next friend Leanne Lizabeth Hochstetler, is a U.S. citizen and Tennessee resident.  He is the minor son of CPT Hochstetler.

2107.   Plaintiff Kyle A. Marshall is a U.S. citizen and Tennessee resident.  He is the son of CPT Hochstetler.

2108.   As a result of the August 23, 2007 attack, and CPT Hochstetler's injuries, the Hochstetler Family has experienced extreme emotional pain and suffering.

**Gregory E. Hogancamp**

2109.   Plaintiff Corporal Gregory E. Hogancamp served in the U.S. Army in Iraq as part of 1st Battalion, 2nd Brigade Combat Team, 1st Cavalry Division.  He is a U.S. citizen and Florida resident.

2110.   On May 28, 2007, CPL Hogancamp was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  The explosion resulted in several injuries to CPL Hogancamp including burns, a shattered right leg, shrapnel injuries to his right leg, chest, and stomach, and a partial amputation of his left index finger.  Additionally, CPL Hogancamp suffered a concussion and Traumatic Brain Injury.  He has a VA disability rating of 80%.  As a result of the May 28, 2007 attack, CPL Hogancamp has experienced extreme physical and emotional pain and suffering.

2111.   The attack that injured CPL Hogancamp would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Holladay Family**

2112.   Plaintiff Specialist Joshua L. Holladay served in the U.S. Army Alabama National Guard in Iraq as part of the 2nd Battalion, 69th Armor Regiment.  He is a U.S. citizen and Alabama resident.

2113.   On November 20, 2009, SPC Holladay was injured by an EFP planted and detonated by Jaysh al-Mahdi south of Baghdad, Iraq, near Al-Hamza.  SPC Holladay sustained shrapnel injuries to his right arm, right leg, and right buttocks.  He also sustained a right sciatic nerve injury and a left tibial plateau fracture.  Due to his injuries, SPC Holladay has received a 60% disability rating from the VA.  As a result of the November 20, 2009 attack, SPC Holladay has experienced extreme physical and emotional pain and suffering.

2114.   The attack that injured SPC Holladay would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2115.   Plaintiff Shirley Atkinson is a U.S. citizen and Alabama resident.  She is the mother of SPC Holladay.

2116.   Plaintiff Crystal Hastings is a U.S. citizen and Alabama resident.  She is the sister of SPC Holladay.

2117.   As a result of the November 20, 2009 attack, and SPC Holladay's injuries, the Holladay Family has experienced extreme emotional pain and suffering.

**The Honeycutt Family**

2118.   Plaintiff Private First Class Robin A. Honeycutt served in Iraq as part of the 206th Military Police Company, New York Army National Guard.  He is a U.S. citizen and New York resident.

2119.   On January 22, 2010, PFC Honeycutt was injured by a 107mm rocket launched in Basra, Iraq on FOB Basra Operations Command by a joint Jaysh al-Mahdi-Hezbollah cell.  The rocket wounded him with shrapnel in his upper right leg.  PFC Honeycutt now suffers from PTSD, anxiety, and depression as a result of the rocket attack by the joint Jaysh al-Mahdi-

Hezbollah cell.  Due to his injuries, PFC Honeycutt received a 60% disability rating from the VA.  As a result of the January 22, 2010 attack, PFC Honeycutt has experienced extreme physical and emotional pain and suffering.

2120.   The attack that injured PFC Honeycutt would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who launched the rocket neither wore uniforms nor otherwise identified themselves as enemy combatants.

2120.1.   Plaintiff Janice Kwilos-Edmunds is a U.S. citizen and New York resident.  She is the mother of PFC Honeycutt.

2120.2.   As a result of the January 22, 2010 attack, and PFC Honeycutt's injuries, the Honeycutt Family has experienced extreme emotional pain and suffering.

### **The Hunt Family**

2121.   Plaintiff Chief Warrant Officer Four Robert J. Hunt served in the U.S. Army in Iraq as part of 2nd Battalion, 1st Special Forces Group (Airborne).  He is a U.S. citizen and Washington resident.

2122.   On August 23, 2007, CW4 Hunt was injured by an EFP planted and detonated by Jaysh al-Mahdi in Wasit Province, on the Baghdad Kut Highway between Aziziyah and Zubidiyah, Iraq.  The explosion resulted in a laceration to his face approximately five inches in length, a laceration to the left side of his neck proximal to the carotid artery of approximately three inches in length, and fragmentation to the left side of his head, upper torso, interior of the right arm, and right hand.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the August 23, 2007 attack, CW4 Hunt has experienced extreme physical and emotional pain and suffering.

2123. The attack that injured CW4 Hunt would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2124. Plaintiff A.H., by and through her next friend CW4 Hunt, is a U.S. citizen and Washington resident. She is the minor daughter of CW4 Hunt.

2125. Plaintiff M.H., by and through his next friend CW4 Hunt, is a U.S. citizen and Washington resident. He is the minor son of CW4 Hunt.

2126. Plaintiff Boonchob Prudhome is a U.S. citizen and Texas resident. She is the mother of CW4 Hunt.

2127. As a result of the August 23, 2007 attack, and CW4 Hunt's injuries, the Hunt Family has experienced extreme emotional pain and suffering.

**The David Hurst Family and Estate**

2128. Sergeant First Class David R. Hurst served in Iraq in the U.S. Army as part of the 2nd Battalion, 30th Infantry Regiment, 4th Brigade Combat Team, 10th Mountain Division.

2129. On June 8, 2008, during the Battle of Sadr City, SFC Hurst was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq. SFC Hurst was 31 years old.

2130. SFC Hurst was a U.S. citizen when he was killed in Iraq.

2131. SFC Hurst's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2132.   Plaintiff Max Hurst is a U.S. citizen and Louisiana resident.  He is the father of SFC Hurst.  He brings claims in both his personal capacity and his representative capacity on behalf of SFC Hurst's estate.

2133.   Plaintiff Lillian Hurst is a U.S. citizen and Louisiana resident.  She is the stepmother of SFC Hurst.

2134.   Plaintiff Christopher Hurst is a U.S. citizen and Louisiana resident.  He is the brother of SFC Hurst.

2135.   Plaintiff Mark Hurst is a U.S. citizen and Louisiana resident.  He is the brother of SFC Hurst.

2136.   As a result of the June 8, 2008 attack, and SFC Hurst's death, the David Hurst Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Hurst's society, companionship, and counsel.

2137.   SFC Hurst's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Eric Hurst Family**

2138.   Plaintiff Specialist Eric Z. Hurst served in Iraq as part of C Company, 1st Battalion, 148th Infantry Regiment, 37th Infantry Brigade Combat Team, Ohio National Guard. He is a U.S. citizen and Ohio resident.

2139.   On or about May 3, 2008, during the Battle of Sadr City, SPC Hurst was injured by an IED planted and detonated by Jaysh al-Mahdi on MSR Tampa in Baghdad, Iraq.  The explosion resulted in severe injuries including wounds to his buttocks and right hand, hearing loss in his left ear, Traumatic Brain Injury, and PTSD.  Due to his injuries, SPC Hurst received an 80% disability rating from the VA.  As a result of the attack on or about May 3, 2008, SPC Hurst has experienced extreme physical and emotional pain and suffering.

2140.   The attack that injured SPC Hurst would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2141.   Plaintiff Dwayne Hurst is a U.S. citizen and Ohio resident.  He is the father of SPC Hurst.

2142.   Plaintiff Devin T. Hurst is a U.S. citizen and Ohio resident.  He is the brother of SPC Hurst.

2143.   Plaintiff Sierra Hurst is a U.S. citizen and Ohio resident.  She is the sister of SPC Hurst.

2144.   As a result of the May 3, 2008 attack, and SPC Hurst's injuries, the Eric Hurst Family has experienced extreme emotional pain and suffering.

**The Hutchinson Family**

2145.   Plaintiff Sergeant First Class Tara K. Hutchinson served in Iraq in the U.S. Army as part of the 463rd Military Police Company.  She is a U.S. citizen and Texas resident.

2146.   On February 14, 2006, SFC Hutchinson was injured by an EFP planted and detonated near her vehicle by Jaysh al-Mahdi in the Kadamiyah District in Baghdad, Iraq.  The detonation resulted in the amputation of SFC Hutchinson's right leg above the knee, third degree burns, Traumatic Brain Injury, and PTSD.  Due to her injuries, she received a 100% disability rating from the VA.  As a result of the February 14, 2006 attack, SFC Hutchinson has experienced extreme physical and emotional pain and suffering.

2147.   The attack that injured SFC Hutchinson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s)

who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2148.   Plaintiff Linda A. Gress is a U.S. citizen and Texas resident.  She is the mother of SFC Hutchinson.  As a result of the February 14, 2006 attack, and SFC Hutchinson's injuries, Linda Gress has experienced extreme emotional pain and suffering.

**The Iwasinski Family and Estate**

2149.   Specialist Kenneth J. Iwasinski served in Iraq in the U.S. Army as part of the 2nd Battalion, 12th Infantry Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

2150.   On October 14, 2007, SPC Iwasinski was killed by an IED planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 22 years old.

2151.   SPC Iwasinski was a U.S. citizen when he was killed in Iraq.

2152.   SPC Iwasinski's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2153.   Plaintiff Dominick V. Iwasinski is a U.S. citizen and Massachusetts resident.  He is the father of SPC Iwasinski.

2154.   Plaintiff Tracy J. Taylor is a U.S. citizen and Massachusetts resident.  She is the mother of SPC Iwasinski.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Iwasinski's estate.

2155.   Plaintiff Amanda L. Taylor is a U.S. citizen and Massachusetts resident.  She is the sister of SPC Iwasinski.

2156.   As a result of the October 14, 2007 attack, and SPC Iwasinski's death, the Iwasinski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Iwasinski's society, companionship, and counsel.

2157.   SPC Iwasinski's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Jairala Family and Estate

2158.   Specialist Alfred. H. Jairala served in Iraq as part of the 2nd Battalion, 3rd Infantry Regiment, 3rd Brigade, 2nd Infantry Division (Stryker Brigade Combat Team).

2159.   On July 31, 2007, SPC Jairala was killed by an EFP planted and detonated by his vehicle by Jaysh al-Mahdi in the Adhamiyah District of Baghdad, Iraq.  SPC Jairala was 28 years old.

2160.   SPC Jairala was a U.S. citizen when he was killed in Iraq.

2161.   SPC Jairala's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2162.   Plaintiff Margarita Aristizabal is a U.S. citizen and Florida resident.  She is the widow of SPC Jairala.  Margarita Aristizabal brings claims in both her personal capacity and her representative capacity on behalf of SPC Jairala's estate.

2163.   Plaintiff J.J., by and through her next friend Margarita Aristizabal, is a U.S. citizen and Florida resident.  She is the minor daughter of SPC Jairala.

2164.   Plaintiff Sebastian Niuman is a U.S. citizen and Florida resident.  He is the stepson of SPC Jairala.

2165.   As a result of the July 31, 2007 attack, and SPC Jairala's death, the Jairala Family has experienced severe mental anguish, emotional pain and suffering, and the loss SPC Jairala's society, companionship, and counsel.

2166.   SPC Jairala's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Jerrald J. Jensen**

2167.   Plaintiff Specialist Jerrald J. Jensen served in the U.S. Army in Iraq as part of the 361st Cavalry.  He is a U.S. citizen and Colorado resident.

2168.   On August 22, 2007, during a complex attack by Jaysh al-Mahdi, SPC Jensen was injured by an EFP planted and detonated by Jaysh al-Mahdi and also sustained a gunshot wound from Jaysh al-Mahdi in the Rusafa District in Baghdad, Iraq.  The EFP explosion resulted in shrapnel injuries to SPC Jensen's face and legs, chemical burns, and a concussion, as well as a secondary gunshot wound from Jaysh al-Mahdi as SPC Jensen was exiting the vehicle after the EFP had detonated.  Additionally, SPC Jensen now suffers from Traumatic Brain Injury and hearing and visual impairments.  Due to his injuries, SPC Jensen received a 100% disability rating from the VA.  As a result of the August 22, 2007 attack, SPC Jensen has experienced extreme physical and emotional pain and suffering.

2169.   The attack that injured SPC Jensen would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who attacked SPC Jensen neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Olney E. Johnson**

2170.   Plaintiff Staff Sergeant Olney E. Johnson served in Iraq in the U.S. Army as part of the 228th Engineer Company.  He is a U.S. citizen and Pennsylvania resident.

2171.   On November 8, 2010, SSG Johnson was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Tampa, near the Dabbash neighborhood of Baghdad, Iraq. On January 17, 2011, SSG Johnson was injured by another EFP planted and detonated by Jaysh al-Mahdi in Baghdad, Iraq.  The attacks resulted in injuries to SSG Johnson's upper back, loss of hearing in his left ear, tinnitus, nerve damage in his right arm, removal of part of his skull, PTSD, and Traumatic Brain Injury.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the attacks, SSG Johnson has experienced extreme physical and emotional pain and suffering.

2172.   The attack that injured SSG Johnson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Brandon T. Josey

2173.   Plaintiff Staff Sergeant Brandon T. Josey served in Iraq in the 4th Battalion, 64th Armored Regiment, 3rd Infantry Brigade.  He is a U.S. citizen and North Carolina resident.

2174.   On April 28, 2008, during the Battle of Sadr City, SSG Josey was injured by a Jaysh al-Mahdi-modified 107mm rocket called an IRAM (integrative rocket assistive munitions) when it hit his compound, the Joint Security Station in Sadr City, Baghdad, Iraq.  The attack caused injuries to SSG Josey, including a concussion with vomiting, headache and sleeplessness, and shrapnel wounds, which still work their way out of SSG Josey's legs.

2175.   On April 29, 2008, during the Battle of Sadr City, SSG Josey was injured by Jaysh al-Mahdi members on Route Gold in Sadr City, Baghdad, Iraq, in an attack using RPGs, small arms, and mortar fire.  The attack caused injuries to SSG Josey, including loss of consciousness following an explosion and Traumatic Brain Injury.

2176.   In or about May 2008, during the Battle of Sadr City, SSG Josey was on mission in Sadr City when he fell down two flights of stairs.  SSG sustained injuries to his back from this fall, including bulging disks.

2177.   Due to his injuries, SSG Josey received a 40% disability rating from the VA.  As a result of these attacks, SSG Josey has experienced extreme physical and emotional pain and suffering.

2178.   The attacks that injured SSG Josey would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who executed these attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Joyner Family**

2179.   Plaintiff Christopher Joyner was a civilian contractor with Blackwater Security Consulting in Iraq.  He is a U.S. citizen and North Carolina resident.

2180.   On May 2, 2006, Christopher Joyner, then 37, was injured by multiple EFPs planted and detonated by Jaysh al-Mahdi near the border between the Adhamiyah and Rusafa Districts in Baghdad, Iraq.  The explosions resulted in wounds to Mr. Joyner's face, right upper extremity, and lower left extremity; the loss of his right eye, sinus fractures, and loss of teeth; cognitive deficits impairing short-term memory, abstract thinking, and remaining on topic in conversation; and acute stress disorder, for which he has received psychological treatment and counseling.  As a result of the May 2, 2006 attack, Mr. Joyner has experienced extreme physical and emotional pain and suffering.

2181.   The attack that injured Mr. Joyner would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

2182. Plaintiff Anne P. "Poppy" Joyner is a U.S. citizen and North Carolina resident. She is the wife of Christopher Joyner.

2183. Plaintiff Necole Smith is a U.S. citizen and North Carolina resident. She is the stepsister of Christopher Joyner.

2184. As a result of the May 2, 2006 attack, and Mr. Joyner's injuries, the Joyner Family has experienced extreme emotional pain and suffering.

### Cory Kenfield

2185. Plaintiff Specialist Cory Kenfield served in Iraq as part of 2nd Platoon, C Company, 2nd Battalion, 30th Infantry Regiment, 4th Brigade, 10th Mountain Division (the "2-30 Wild Boars"). He is a U.S. citizen and Arizona resident.

2186. On or about April 3, 2008, during the Battle of Sadr City, SPC Kenfield, 20 years old, was injured by an EFP planted and detonated by Jaysh al-Mahdi, near Sadr City, Baghdad, Iraq. On or about April 28, 2008, also during the Battle of Sadr City, SPC Kenfield was injured by another EFP planted and detonated by Jaysh al-Mahdi approximately 200 meters outside of Sadr City, Baghdad, Iraq. The attacks on SPC Kenfield resulted in herniated disks, Traumatic Brain Injury, balance issues, memory impairment, vision, hearing and speech issues. Due to his injuries, SPC Kenfield received a 70% disability rating from the VA. As a result of these April 2008 attacks, SPC Kenfield has experienced extreme physical and emotional pain and suffering.

2187. The attacks that injured SPC Kenfield would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Evan Kirby Family**

2188.   Plaintiff Sergeant Evan Kirby served in Iraq in the U.S. Army as part of Alpha Battery, 2nd Battalion, 377th Parachute Field Artillery Regiment.  He is a U.S. citizen and Ohio resident.

2189.   On January 20, 2007, SGT Kirby was injured in the Karbala Attack.  *See supra* ¶¶ 1515-19.   The attack, and an explosion during the attack, resulted in injuries to SGT Kirby's back and spine.  As a result of this attack and the injuries SGT Kirby suffered therein, he has experienced extreme physical and emotional pain and suffering.

2190.   The attack that injured SGT Kirby would have violated the law of war if AAH and Hezbollah were subject to it because, among other things, the terrorists who committed the Karbala Attack disguised themselves as American soldiers and executed hostages in captivity.

2191.   Plaintiff Steven Kirby is a U.S. citizen and Ohio resident.  He is the father of SGT Kirby.

2192.   Plaintiff Marcia Kirby is a U.S. citizen and Ohio resident.  She is the mother of SGT Kirby.

2193.   As a result of the Karbala Attack, the Kirby Family has experienced extreme emotional pain and suffering.

**Andrew S. Kirchoff**

2194.   Plaintiff Staff Sergeant Andrew S. Kirchoff served in Iraq as part of 2nd Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and North Carolina resident.

2195.   In early 2008, SSG Kirchoff was injured in an IED explosion detonated by Jaysh al-Mahdi in the vicinity of Sadr City, Baghdad, Iraq.  The explosion resulted in chronic back pain and hearing loss.  As a result of this early 2008 attack, SSG Kirchoff has experienced extreme physical and emotional pain and suffering.

2196. The attack that injured SSG Kirchoff would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Randall L. Klingensmith**

2197. Plaintiff Lieutenant Colonel Randall L. Klingensmith served in Iraq in the U.S. Army as part of the Multi-National Corps. He is a U.S. citizen and Georgia resident.

2198. On August 21, 2009, LTC Klingensmith was injured by an EFP planted and detonated by Jaysh al-Mahdi in Iraq along Route Irish, en route from Baghdad International Airport to the International Zone in the Mansour District in Baghdad, Iraq. After activation, the EFP was set to detonate using a passive infrared trigger system. The explosion resulted in a fractured back, severe injuries including nerve damage to his left leg, shrapnel injuries to his right knee, a right shoulder injury, broken teeth, damage to his left ear affecting his hearing, Traumatic Brain Injury, and PTSD. Due to his injuries, LTC Klingensmith received a 100% disability rating from the VA. As a result of the August 21, 2009 attack, LTC Klingensmith has experienced extreme physical and emotional pain and suffering.

2199. The attack that injured LTC Klingensmith would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who carried out the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

**The Knapp Family and Estate**

2200. Specialist David Alex Knapp served in Iraq in the U.S. Army as part of the 230th Military Police. He was a U.S. citizen and Michigan resident.

2201.   On March 14, 2008, SPC Knapp was injured by an EFP planted and detonated by Jaysh al-Mahdi south of Baghdad, Iraq.  The explosion resulted in amputation of both legs above the knee and severe vascular injuries.  As a result of the March 14, 2008 attack, SPC Knapp experienced extreme physical and emotional pain and suffering.

2202.   SPC Knapp died of a heart attack on October 2, 2010 because of the vascular injuries he sustained during the March 14, 2008 EFP attack.  SPC Knapp was 24 years old.

2203.   The attack that resulted in SPC Knapp's death would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2204.   Plaintiff Jeanette L. Knapp is a U.S. citizen and Florida resident.  She is the mother of SPC Knapp.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Knapp's estate.

2205.   As a result of the March 14, 2008 attack, and SPC Knapp's death, Jeannette L. Knapp has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Knapp's society, companionship, and counsel.

2206.   SPC Knapp's estate is entitled to recover economic and non-economic damages from Defendants, due to his injuries in and subsequent death from the March 14, 2008 Jaysh al-Mahdi attack.

### **The Kruger Family and Estate**

2207.   Lieutenant Colonel Eric Kruger served in Iraq with the U.S. Army with the 2nd Brigade Combat Team, 2nd Infantry Division.

2208.   On November 2, 2006, LTC Kruger was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 40 years old.

2209.   LTC Kruger was a U.S. citizen when he was killed in Iraq.

2210.   LTC Kruger's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2211.   Plaintiff Lawrence Kruger is a U.S. citizen and Texas resident.  He is the father of LTC Kruger.  He brings claims in both his personal capacity and his representative capacity on behalf of LTC Kruger's estate.

2212.   Plaintiff Douglas Kruger is a U.S. citizen and Texas resident.  He is the brother of LTC Kruger.

2213.   Plaintiff Kristy Kruger is a U.S. citizen and Texas resident.  She is the sister of LTC Kruger.

2214.   Plaintiff E.K., by and through her next friend Lawrence Kruger, is a U.S. citizen and Colorado resident.  She is the minor daughter of LTC Kruger.

2215.   Plaintiff C.K., by and through his next friend Lawrence Kruger, is a U.S. citizen and Colorado resident.  He is the minor son of LTC Kruger.

2216.   As a result of the November 2, 2006 attack, and LTC Kruger's death, the Kruger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Kruger's society, companionship, and counsel.

2217.   LTC Kruger's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Kube Family and Estate**

2218.   Specialist Christopher A. Kube served in Iraq in the U.S. Army as part of the 2nd Battalion, 17th Field Artillery Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

2219.   On July 14, 2007, SPC Kube was killed by an EFP planted and detonated by Jaysh al-Mahdi on the border of the Karadah and New Baghdad Districts of Baghdad, Iraq.  SPC Kube was 18 years old.

2220.   SPC Kube was a U.S. citizen when he was killed in Iraq.

2221.   SPC Kube's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2222.   Plaintiff David Kube is a U.S. citizen and Michigan resident.  He is the father of SPC Kube.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Kube's estate.

2223.   Plaintiff Jonathan Kube is a U.S. citizen and Michigan resident.  He is the brother of SPC Kube.

2224.   Plaintiff Jessica Kube is a U.S. citizen and Michigan resident.  She is the sister of SPC Kube.

2225.   Plaintiff Jennifer Kube is a U.S. citizen and Michigan resident.  She is the sister of SPC Kube.

2226.   Plaintiff Jason Kube is a U.S. citizen and Michigan resident.  He is the brother of SPC Kube.

2227.   As a result of the July 14, 2007 attack, and SPC Kube's death, the Kube Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Kube's society, companionship, and counsel.

2228.   SPC Kube's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Kuglics Family and Estate

2229.   Staff Sergeant Matthew J. Kuglics served with the U.S. Air Force in Iraq as part of the Air Force Office of Special Investigations.

2230.   On June 5, 2007, SSgt Kuglics was killed by an EFP planted and detonated by Jaysh al-Mahdi in Kirkuk, Iraq.  SSgt Kuglics was 25 years old.

2231.   SSgt Kuglics was a U.S. citizen when he was killed in Iraq.

2232.   SSgt Kuglics's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2233.   Plaintiff Donna Kuglics is a U.S. citizen and Ohio resident.  She is the mother of SSgt Matthew Kuglics.  Donna Kuglics brings claims in both her personal capacity and her representative capacity on behalf of SSgt Kuglics's estate.

2234.   Plaintiff Les Kuglics is a U.S. citizen and Ohio resident.  He is the father of SSgt Kuglics.

2235.   As a result of the June 5, 2007 attack, and SSgt Kuglics's death, the Kuglics Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Kuglics's society, companionship, and counsel.

2236.   SSgt Kuglics's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Daniel R. Kulicka**

2237.   Plaintiff Sergeant Daniel R. Kulicka served in the U.S. Army in Iraq for 1st Squadron, 2nd Cavalry Regiment.  He is a U.S. citizen and Alabama resident.

2238.   On June 19, 2008, SGT Kulicka was injured by an EFP detonated and planted by Jaysh al-Mahdi on Route Pluto in Sadr City.  The explosion resulted in severe injuries to SGT Kulicka, including Traumatic Brain Injury, traumatic cataracts, tinnitus, enlarged disks in his lower back, degenerative disks, PTSD, sleep apnea, and micro-tears on his brain.  Due to his injuries, SGT Kulicka received an 80% disability rating from the VA.  As a result of the June 19, 2008 attack, SGT Kulicka has experienced extreme physical and emotional pain and suffering.

2239.   The attack that injured SGT Kulicka would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Laird Family**

2240.   Plaintiff Dan Laird was a civilian contractor with Blackwater Security Consulting in Iraq.  He is a U.S. citizen and Florida resident.

2241.   On September 12, 2007, Mr. Laird was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Rusafa District in eastern Baghdad, Iraq.  As a result of the explosion, Mr. Laird suffered a concussion, nerve damage in his right leg, a level 5 AC separation requiring surgery on his right shoulder, PTSD, panic attacks, anxiety, and emotion injury for which he has sought counseling.  As a result of the September 12, 2007 attack, Mr. Laird has experienced extreme physical and emotional pain and suffering.

2242.   The attack that injured Mr. Laird would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

414

planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2243.   Plaintiff Angela M. Laird is a U.S. citizen and Florida resident.  She is the wife of Dan Laird.

2244.   Plaintiff Jordan M. Laird is a U.S. citizen and Florida resident.  He is the son of Dan Laird.

2245.   Plaintiff Hunter L. Laird is a U.S. citizen and Florida resident.  She is the daughter of Dan Laird.

2246.   Plaintiff C.L., by and through his next friend Angela M. Laird, is a U.S. citizen and Florida resident.  He is the minor son of Dan Laird.

2247.   As a result of the September 12, 2007 attack, and Mr. Laird's injuries, the Laird Family has experienced extreme emotional pain and suffering.

### **The Lammers Family**

2248.   Plaintiff Staff Sergeant Matthew Lammers served in the U.S. Army in Iraq as part of the 1st Battalion, 28th Infantry Regiment, 4th Brigade Combat Team, 1st Infantry Division. He is a U.S. citizen and North Carolina resident.

2249.   On June 10, 2007, SSG Lammers, then 25, was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  The explosion resulted in severe injuries to his left arm, requiring amputation, and to both legs, requiring amputation; blood loss and asphyxiation due to fluid on the lungs, suffered while conscious; multiple procedures and frequent wound cleanings including debridgement of muscle tissue; severe and ongoing phantom limb pain and pain in his back; Traumatic Brain Injury; PTSD and depression for which he has

received treatment, counseling, and medication.  As a result of the June 10, 2007 attack, SSG Lammers has experienced extreme physical and emotional pain and suffering.

2250.   The attack that injured SSG Lammers would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

2251.   Plaintiff Alicia Lammers is a U.S. citizen and North Carolina resident.  She is the wife of SSG Lammers.

2252.   Plaintiff Stacy L. Pate is a U.S. citizen and Kansas resident.  She is the sister of SSG Lammers.

2253.   Plaintiff Barbara M. Lammers is a U.S. citizen and Kansas resident.  She is the mother of SSG Lammers.

2254.   Plaintiff Gary L. Lammers is a U.S. citizen and Kansas resident.  He is the father of SSG Lammers.

2255.   As a result of the June 10, 2007 attack, and SSG Lammers's injuries, the Lammers Family has experienced extreme emotional pain and suffering.

**Christopher R. Landry**

2256.   Plaintiff Sergeant Christopher R. Landry served in Iraq as a fire team leader for B Company, 1st Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Texas resident.

2257.   During his tour from approximately September 2007 through October 2008, including during the Battle of Sadr City, SGT Landry was injured by numerous EFP, IED, RPG, and mortar attacks by Jaysh al-Mahdi in or near Sadr City, Iraq.  The Jaysh al-Mahdi attacks that injured SGT Landry resulted in Traumatic Brain Injury, back injuries, multiple stress fractures, and severe hearing loss.  Due to his injuries, SGT Landry received a disability rating of 90%

from the VA.  As a result of the Jaysh al-Mahdi attacks, SGT Landry has experienced extreme physical and emotional pain and suffering.

2258.   Those attacks that injured SGT Landry would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Roady Landtiser

2259.   Plaintiff Specialist Roady Landtiser served in the U.S. Army in Iraq as part of 1st Battalion, 18th Infantry Regiment, 2nd Heavy Brigade Combat Team, 1st Infantry Division.  He is a U.S. citizen and Oklahoma resident.

2260.   On May 17, 2009, SPC Landtiser was injured by an EFP planted and detonated by Jaysh al-Mahdi in northwest Baghdad, Iraq.  The explosion resulted in a concussion, loss of consciousness, tinnitus in his right ear, back injuries, multiple stress fractures, flashbacks and night terrors, and PTSD for which he has received treatment, medication, and counseling.  As a result of the May 17, 2009 attack, SPC Landtiser has experienced extreme physical and emotional pain and suffering.

2261.   The attack that injured SPC Landtiser would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Tyler Latham

2262.   Plaintiff Specialist Tyler Latham served in the U.S. Army in Iraq as part of the 40th Engineer Battalion.  He is a U.S. citizen and Michigan resident.

2263.   On August 26, 2008, SPC Latham was injured by an EFP planted and detonated by Jaysh al-Mahdi on the border between the Adhamiyah District and Sadr City, Baghdad, Iraq. The explosion resulted in Traumatic Brain Injury and significant injuries to SPC Latham's face, legs, arm, and left hand, which required complex surgery to reconnect tendons and ligaments and extensive physical therapy and which now lacks full mobility and produces chronic pain.  As a result of the August 26, 2008 attack, SPC Latham has experienced extreme physical and emotional pain and suffering.

2264.   The attack that injured SPC Latham would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Lawson Family and Estate

2265.   Sergeant First Class Isaac S. Lawson served in the U.S. military in Iraq, and was assigned to the 49th Military Police Brigade, California Army National Guard.

2266.   On June 5, 2006, SFC Lawson was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  SFC Lawson was 35 years old.

2267.   SFC Lawson was a U.S. citizen when he was killed in Iraq.

2268.   SFC Lawson's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

2269.   Plaintiff Suzzettee Lawson is a U.S. citizen and California resident.  She is the widow of SFC Lawson.  Suzzettee Lawson brings claims in both her personal capacity and her representative capacity on behalf of SFC Lawson's estate.

2270.   Plaintiff C.L., by and through her next friend Suzzettee Lawson, is a U.S. citizen and California resident.  She is the minor daughter of SFC Lawson.

2271.   As a result of the June 5, 2006 attack, and SFC Lawson's death, the Lawson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Lawson's society, companionship, and counsel.

2272.   SFC Lawson's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Darren Leslie**

2273.   Plaintiff Staff Sergeant Darren Leslie served in Iraq as part of 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Pennsylvania resident.

2274.   In early April 2008, during the Battle of Sadr City, SSG Leslie was injured by numerous IEDs/EFPs planted and detonated by Jaysh al-Mahdi while participating in the first patrol into Sadr City, Baghdad, Iraq.  The attacks resulted in SSG Leslie suffering multiple concussions, Traumatic Brain Injury, and PTSD.  As a result of the April 2008 attacks, SSG Leslie has experienced extreme physical and emotional pain and suffering.

2275.   The attacks that injured SSG Leslie would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who carried out attacks against him neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Christopher Levi**

2276.   Plaintiff Corporal Christopher Levi served in the U.S. Army in Iraq as part of B Company, 2nd Battalion, 30th Infantry Regiment, 4th Brigade Combat Team, 10th Mountain Division.  He is a U.S. citizen and New York resident.

2277.   On March 17, 2008, CPL Levi was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  The explosion resulted in severe injuries, including the loss of both legs and injuries to his right hand and arm.  Due to his injuries, CPL Levi received a 100% disability rating from the VA.  As a result of the March 17, 2008 attack, CPL Levi has experienced extreme physical and emotional pain and suffering.

2278.   The attack that injured CPL Levi would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The LeVine Family and Estate**

2279.   Specialist Hunter N. LeVine served in Iraq in the U.S. Army as part of the 2nd Battalion, 30th Infantry Regiment, 4th Brigade, 10th Mountain Division (the "2-30 Wild Boars").  He was a U.S. citizen and Texas resident.

2280.   On May 9, 2008, during the Battle of Sadr City, SPC LeVine was injured by an EFP planted and detonated by Jaysh al-Mahdi in Sadr City, Baghdad, Iraq.  The explosion resulted in severe injuries to his head and face, including total blindness, multiple broken bones in his face, a separated jaw, and Traumatic Brain Injury.  Due to his injuries, SPC LeVine received a 100% disability rating from the VA.  As a result of the May 9, 2008 attack, SPC LeVine experienced extreme physical and emotional pain and suffering.

2281.   SPC LeVine later died due to complications from his wounds on June 12, 2013. He was 25 years old.

2282.   The attack that resulted in SPC LeVine's death would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2283.   Plaintiff Beau LeVine is a U.S. citizen and Texas resident.  He is the father of SPC LeVine.  Beau LeVine brings claims in both his personal capacity and his representative capacity on behalf of SPC LeVine's estate.

2284.   Plaintiff Jessica LeVine is a U.S. citizen and Texas resident.  She is the stepmother of SPC LeVine.

2285.   Plaintiff Olivia LeVine is a U.S. citizen and Texas resident.  She is the sister of SPC LeVine.

2286.   As a result of the May 9, 2008 attack, and SPC LeVine's subsequent death, the LeVine Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC LeVine's society, companionship, and counsel.

2287.   SPC LeVine's estate is entitled to recover economic and non-economic damage from Defendants, due to his pain, suffering, and subsequent death on June 12, 2013 from his wounds caused by the May 9, 2008 Jaysh al-Mahdi attack.

**The Lewis Family and Estate**

2288.   Navy Special Warfare Operator 1st Class (SEAL) Jason D. Lewis served in Iraq in the U.S. Navy as part of SEAL Team 10.

2289.   On July 6, 2007, SO1 Lewis was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Karadah District in eastern Baghdad, Iraq.  SO1 Lewis was 30 years old.

2290.   SO1 Lewis was a U.S. citizen when he was killed in Iraq.

2291.   SO1 Lewis's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2292.   Plaintiff Donna Lewis is a U.S. citizen and Virginia resident.  She is the widow of SO1 Lewis.  Donna Lewis brings claims in both her personal capacity and her representative capacity on behalf of SO1 Lewis's estate.

2293.   Plaintiff G.L., by and through her next friend Donna Lewis, is a U.S. citizen and Virginia resident.  She is the minor daughter of SO1 Lewis.

2294.   Plaintiff J.L., by and through his next friend Donna Lewis, is a U.S. citizen and Virginia resident.  He is the minor son of SO1 Lewis.

2295.   Plaintiff J.L., by and through his next friend Donna Lewis, is a U.S. citizen and Virginia resident.  He is the minor son of SO1 Lewis.

2296.   Plaintiff Jean Mariano is a U.S. citizen and Virginia resident.  She is the mother of SO1 Lewis.

2297.   As a result of the July 6, 2007 attack, and SO1 Lewis's death, the Lewis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SO1 Lewis's society, companionship, and counsel.

2298.   SO1 Lewis's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Lill Family and Estate**

2299.   Sergeant Eric A. Lill served in Iraq in the U.S. Army as part of the 2nd Battalion, 17th Field Artillery Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

2300.   On July 6, 2007, SGT Lill was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Karadah District of Baghdad, Iraq.  Although SGT Lill initially survived the attack, he died from his injuries later that day in FOB Rustamiyah.  He was 28 years old.

2301.   SGT Lill was a U.S. citizen when he was killed in Iraq.

2302.   SGT Lill's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2303.   Plaintiff Anthony Lill is a U.S. citizen and Tennessee resident.  He is the father of SGT Lill.  Anthony Lill brings claims in both his personal capacity and his representative capacity on behalf of SGT Lill's estate.

2304.   Plaintiff Kortne Jones is a U.S. citizen and Tennessee resident.  She is the sister of SGT Lill.

2305.   Plaintiff Skye Otero is a U.S. citizen and Illinois resident.  She is the widow of SGT Lill.

2306.   Plaintiff M.L., by and through her next friend Skye Otero, is a U.S. citizen and Illinois resident.  She is the minor daughter of SGT Lill.

2307.   Plaintiff Cody Lill is a U.S. citizen and Illinois resident.  He is the son of SGT Lill.

2308.   As a result of the July 6, 2007 attack, and SGT Lill's death, the Lill Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Lill's society, companionship, and counsel.

2309.   SGT Lill's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Kyle Little Family and Estate

2310.   Specialist Kyle A. Little served in the U.S. Army in Iraq as part of Headquarters Company, 3rd Brigade Combat Team, 3rd Infantry Division.

2311.   On May 8, 2007, SPC Little was killed by an EFP planted and detonated by Jaysh al-Mahdi in Salman Pak, southeast of Baghdad, Iraq.  He was 20 years old.

2312.   SPC Little was U.S. citizen when he was killed.

2313.   SPC Little's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2314.   Plaintiff Shelley Ann Smith is U.S. citizen and Massachusetts resident.  She is the mother of SPC Little.  Shelley Ann Smith brings claims in both her personal capacity and her representative capacity on behalf of SPC Little's estate.

2315.   As a result of the May 8, 2007 attack, and SPC Little's death, Plaintiff Shelley Ann Smith has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Little's society, companionship, and counsel.

2316.   SPC Little's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The William Little Family**

2317.   Plaintiff William R. Little was a civilian contractor in Iraq working as a police liaison.  He is a U.S. citizen and Florida resident.

2318.   On December 20, 2006, Mr. Little was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq.  The explosion resulted in injuries to his right eye, necessitating placement of a metal plate under that eye; the right side of his face, causing nerve damage to his right cheek, sinus area, and upper lip and requiring rhinoplasty and other procedures; and his right arm and shoulder, causing him to lose muscle tissue and full range of motion in that arm.  As a result of the December 20, 2006 attack, Mr. Little has experienced extreme physical and emotional pain and suffering.

2319.   The attack that injured Mr. Little would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2320.   Plaintiff Brenda E. Little is a U.S. citizen and Florida resident.  She is the wife of Mr. Little.

2321.   Plaintiff Kira Sikes is a U.S. citizen and Florida resident.  She is the daughter of Mr. Little.

2322.   Plaintiff William R. Little, Jr. is a U.S. citizen and Florida resident.  He is the son of Mr. Little.  Plaintiff Brenda E. Little has William R. Little, Jr.'s power of attorney, and she brings this action in both her personal capacity and on his behalf.

2323.   As a result of the December 20, 206 attack, and Mr. Little's injuries, the Little Family has experienced extreme emotional pain and suffering.

**Kyle Lloyd**

2324.   Plaintiff Sergeant Kyle Lloyd served in Iraq as part of 212th Field Artillery Battalion, 4th Brigade, 2nd Infantry Division.  He is a U.S. citizen and Montana resident.

2325.   On or about July 20, 2010, SGT Lloyd was injured by an EFP planted and detonated by Jaysh al-Mahdi in north Baghdad, Iraq, near Route Tampa.  The explosion severely wounded SGT Lloyd.  His distal left femur was severed, he received shrapnel in his leg and glutes, severed an artery, damaged his sciatic nerve, lacerated his hand, was diagnosed with drop foot, and later lost more of his left leg above the knee due to amputation.  Due to his injuries, SGT Lloyd received a 100% disability rating from the VA.  As a result of the Jaysh al-Mahdi attack, SGT Lloyd has experienced extreme physical and emotional pain and suffering.

2326.   The attack that injured SGT Lloyd would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Rigoberto Lopez-Garcia**

2327.   Plaintiff Specialist Rigoberto Lopez-Garcia served in Iraq as an engineer for the 130th Engineer Battalion, Puerto Rico Army National Guard.  He is a U.S. citizen and Puerto Rico resident.

2328.   On or about January 13, 2007, SPC Lopez-Garcia was wounded by an EFP planted and detonated by Jaysh al-Mahdi in the Mansour District in Baghdad, Iraq.  The explosion resulted in severe injuries including shrapnel injuries to both legs, loss of two fingers and loss of use in a third, broken ribs, a lacerated liver, a punctured lung, a concussion, tinnitus, PTSD, migraine headaches, scarring, and chronic pain.  Due to his injuries, SPC Lopez-Garcia

received a 90% disability rating from the VA.  As a result of the attack, SPC Lopez-Garcia has experienced extreme physical and emotional pain and suffering.

2329.   The attack that injured SPC Lopez-Garcia would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Daniel S. Luckett

2330.   Plaintiff Captain Daniel S. Luckett served in the U.S. Army in Iraq as part of the 2nd Brigade Combat Team, 101st Airborne Division.  He is a U.S. citizen and Kentucky resident.

2331.   On May 11, 2008, during the Battle of Sadr City, CPT Luckett was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in Baghdad, Iraq.  The explosion resulted in severe injuries to CPT Luckett including the loss of a leg and part of a foot, among other injuries.  As a result of the May 11, 2008 attack, CPT Luckett has experienced extreme physical and emotional pain and suffering.

2332.   The attack that injured CPT Luckett would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants

### Konrad Ludwig

2333.   Plaintiff Sergeant Konrad Ludwig served in Iraq as a radio telephone operator and rifleman for B Company, 1st Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Michigan resident.

2334.   On September 29, 2007, SGT Ludwig was injured by an EFP planted and detonated by Jaysh al-Mahdi in or near Sadr City.  The explosion resulted in injuries to SGT Ludwig's spine, gave him a concussion, Traumatic Brain Injury, hearing loss, memory loss, cognitive processing dysfunction, insomnia, and a headache condition, among other injuries.  Due to his injuries, SGT Ludwig received a 100% disability rating from the VA.  As a result of the September 29, 2007 attack, SGT Ludwig has experienced extreme physical and emotional pain and suffering.

2335.   The attack that injured SGT Ludwig would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Adam Magers

2336.   Plaintiff Sergeant Adam Magers served in Iraq as a medic for the 1138th Sapper Company with the Missouri National Guard, 35th Engineer Brigade.  His company was temporarily under the operational control of both the 10th Mountain Division, and 2nd Stryker Cavalry Regiment, while running missions in northern Baghdad and Sadr City.  He is a U.S. citizen and Missouri resident.

2337.   On April 28, 2008, during the Battle of Sadr City, SGT Magers was injured when eight Jaysh al-Mahdi-modified 107mm rockets known as Improvised Rocket Assisted Munitions (IRAMs), also known as "lob bombs," hit JSS Sadr City.  The rockets were launched by a joint Jaysh al-Mahdi and Hezbollah cell operating near Sadr City.  The eight blasts resulted in a Traumatic Brain Injury, and lacerations to his arms, hands, neck, and head, among other injuries.

2338.   On May 9, 2008, SGT Magers was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Gold in Sadr City.  Three additional EFPs hit the convoy in the same ambush.  The EFP blasts resulted in a Traumatic Brain Injury, among other injuries.

2339.   Due to his injuries in these attacks, SGT Magers received a 90% disability rating from the VA.  As a result of the April 28, 2008 and May 9, 2008 attacks, SGT Magers has experienced extreme physical and emotional pain and suffering.

2340.   The attacks that injured SGT Magers would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

### John Maine

2341.   Plaintiff Specialist John Maine served in the U.S. Army in Iraq as part of the 41st Calvary Alpha Troop, 1st Infantry Division.  He is a U.S. citizen and Oregon resident.

2342.   On May 31, 2007, SPC Maine was injured by an EFP planted and detonated by Jaysh al-Mahdi in southeast Baghdad, Iraq.  The explosion resulted in severe injuries to SPC Maine, including Traumatic Brain Injury, memory loss, back injuries, pain in his knees, ringing in his ears, auditory hearing loss, and a high level of light sensitivity requiring use of special lenses.  Due to his injuries, SPC Maine received a 90% disability rating from the VA.  As a result of the May 31, 2007 attack, SPC Maine has experienced extreme physical and emotional pain and suffering.

2343.   The attack that injured SPC Maine would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**David Manganella**

2344.   Plaintiff Staff Sergeant David Manganella served in Iraq as a weapons squad leader for B Company, 1st Platoon, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Maryland resident.

2345.   Between August 2007 and November 2008, including during the Battle of Sadr City, SSG Manganella was injured by at least four IED attacks and one EFP, planted and detonated by Jaysh al-Mahdi in or near Sadr City.  These attacks resulted in injuries to SSG Manganella's spine and gave him a concussion.

2346.   On or about March 27, 2008, during the Battle of Sadr City, SSG Manganella was engaged in a firefight with Jaysh al-Mahdi in Sadr City, and at one point he was forced to jump down a building that no longer had stairs, resulting in injuries to SSG Manganella's spine.

2347.   These attacks resulted in Traumatic Brain Injury, sleep issues, spinal injuries, nerve damage, and sciatica.  Due to his injuries, SSG Manganella received a 100% disability rating from the VA.  As a result of the Jaysh al-Mahdi attacks, SSG Manganella has experienced extreme physical and emotional pain and suffering.

2348.   The attacks that injured SSG Manganella would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Marciante Family and Estate**

2349.   Corporal Luigi Marciante Jr. served in the U.S. Army in Iraq as part of the 2nd Battalion, 23rd Infantry Regiment, 4th Brigade, 2nd Infantry Division.

2350.   On September 20, 2007, CPL Marciante was killed by an EFP planted and detonated by Jaysh al-Mahdi in Miqdadiyah, Iraq.  He was 25 years old.

2351.   CPL Marciante was a U.S. citizen when he was killed in Iraq.

2352.   CPL Marciante's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2353.   Plaintiff Luigi Marciante is a U.S. citizen and New Jersey resident.  He is the father of CPL Marciante.  He brings claims in both his personal capacity and his representative capacity on behalf of CPL Marciante's estate.

2354.   Plaintiff Maria Marciante is a U.S. citizen and New Jersey resident.  She is the mother of CPL Marciante.

2355.   Plaintiff Enza Marciante Balestrieri is a U.S. citizen and New Jersey resident. She is the sister of CPL Marciante.

2356.   Plaintiff Stephanie Marciante is a U.S. citizen and New Jersey resident.  She is the widow of CPL Marciante.

2357.   Plaintiff L.M., by and through his next friend, Stephanie Marciante, is a U.S. citizen and New Jersey resident.  He is the minor son of CPL Marciante.

2358.   As a result of the September 20, 2007 attack, and CPL Marciante's death, the Marciante Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Marciante's society, companionship, and counsel.

2359.   CPL Marciante's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Marion Family and Estate**

2360.   Private First Class Adam L. Marion served in Iraq as part of the 105th Engineer Battalion, 130th Maneuver Enhancement Brigade, 171st Engineer Company, 24th Infantry Division, North Carolina Army National Guard.

2361.   On April 28, 2008, during the Battle of Sadr City, PFC Marion was killed when his unit was attacked with an IRAM launched by Jaysh al-Mahdi in or near Sadr City against FOB Loyalty.  He was 26 years old.

2362.   PFC Marion was a U.S. citizen when he was killed in Iraq.

2363.   PFC Marion's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who attacked PFC Marion's unit with rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

2364.   Plaintiff Donnie L. Marion is a U.S. citizen and North Carolina resident.  He is the father of PFC Marion.  She brings claims in both his personal capacity and his representative capacity on behalf of PFC Marion's estate.

2365.   Plaintiff Pamela J. Marion is a U.S. citizen and North Carolina resident.  She is the mother of PFC Marion.

2366.   As a result of the April 28, 2008 attack, and PFC Marion's death, the Marion Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Marion's society, companionship, and counsel.

2367.   PFC Marion's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### Edward Mariscal

2368.   Plaintiff Staff Sergeant Edward A. Mariscal served in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Oklahoma resident.

2369.   During the first week of April 2008, during the Battle of Sadr City, SSG Mariscal was injured by a command-detonated IED planted and detonated by Jaysh al-Mahdi in Sadr City. The explosion resulted in a severe concussion and acute PTSD, among other injuries.  As a result of the April 2008 attack, SSG Mariscal has experienced extreme physical and emotion pain and suffering.

2370.   The attack that injured SSG Mariscal would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Marshall Family and Estate

2371.   Sergeant Bradley W. Marshall served in Iraq in the U.S. Army as part of 377th Parachute Field Artillery Regiment, 4th Brigade Combat Team (Airborne), 25th Infantry Division.

2372.   On July 31, 2007, SGT Marshall was killed by an indirect fire attack by Jaysh al-Mahdi in FOB Kalsu near Mahaweel, Iraq.

2373.   SGT Marshall was a U.S. citizen when he was killed in Iraq.

2374.   SGT Marshall's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who coordinated and executed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2375.   Plaintiff Gina Marshall-Rickford is a U.S. citizen and Arkansas resident.  She is the widow of SGT Marshall.  Gina Marshall-Rickford brings claims in both her personal capacity and her representative capacity on behalf of SGT Marshall's estate.

2376.   Plaintiff Tanner Marshall is a U.S. citizen and Arkansas resident.  He is the son of SGT Marshall.

2377.   Plaintiff Wesley Marshall is a U.S. citizen and Arkansas resident.  He is the son of SGT Marshall.

2378.   Plaintiff Gerrald Marshall is a U.S. citizen and Arkansas resident.  He is the father of SGT Marshall.

2379.   Plaintiff Francis Marshall is a U.S. citizen and Arkansas resident.  She is the mother of SGT Marshall.

2380.   Plaintiff Kimberly Mayo is a U.S. citizen and Arkansas resident.  She is the sister of SGT Marshall.

2381.   As a result of the July 31, 2007 attack, and SGT Marshall's death, the Marshall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Marshall's society, companionship, and counsel.

2382.   SGT Marshall's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Martinez Family and Estate

2383.   Staff Sergeant Virgil C. Martinez served in Iraq as part of the 1st Battalion, 7th Field Artillery Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

2384.   On May 6, 2007, SSG Martinez was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  SSG Martinez was 33 years old.

2385.   SSG Martinez was a U.S. citizen when he was killed in Iraq.

2386.   SSG Martinez's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2387.   Plaintiff Rebecca J. Oliver is a U.S. citizen and Utah resident.  She is the mother of SSG Martinez.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Martinez's estate.

2388.   Plaintiff Daniel C. Oliver is a U.S. citizen and Utah resident.  He is the stepfather of SSG Martinez.

2389.   Plaintiff Kimberlee Austin-Oliver is a U.S. citizen and Utah resident.  She is the sister of SSG Martinez.

2390.   As a result of the May 6, 2007 attack, and SSG Martinez's death, the Martinez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Martinez's society, companionship, and counsel.

2391.   SSG Martinez's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Matheny Family and Estate**

2392.   Sergeant Charles E. Matheny, IV served in Iraq in the U.S. Army as a mechanic assigned to the 704th Support Battalion, 4th Brigade Combat Team, 4th Infantry Division.

2393.   On February 18, 2006, SGT Matheny was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 23 years old.

2394.   SGT Matheny was a U.S. citizen when he was killed in Iraq.

2395.   SGT Matheny's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2396.   Plaintiff Deborah Noble is a U.S. citizen and Texas resident.  She is the mother of SGT Matheny.  Deborah Noble brings claims in both her personal capacity and her representative capacity on behalf of SGT Matheny's estate.

2397.   Plaintiff Charles E. Matheny, III is a U.S. citizen and Washington resident.  He is the father of SGT Matheny.

2398.   Plaintiff David Noble is a U.S. citizen and Texas resident.  He is the stepfather of SGT Matheny.

2399.   As a result of the February 18, 2006 attack, and SGT Matheny's death, Plaintiffs Deborah Noble, Charles E. Matheny, III, and David Noble have experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Matheny's society, companionship, and counsel.

2400.   SGT Matheny's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Mayne Family and Estate**

2401.   Staff Sergeant Kennith W. Mayne served in Iraq in the U.S. Army as part of Company B, 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division.

2402.   On September 4, 2008, SSG Mayne was killed by EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  SSG Mayne was 29 years old.

2403.   SSG Mayne was a U.S. citizen when he was killed in Iraq.

2404.   SSG Mayne's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2405.   Plaintiff Michelle Benavidez is a U.S. citizen and Colorado resident.  She is the mother of SSG Mayne.  Michelle Benavidez brings claims in both her personal capacity and her representative capacity on behalf of SSG Mayne's estate.

2406.   Plaintiff Daniel Benavidez, Sr. is a U.S. citizen and Colorado resident.  He is the stepfather of SSG Mayne.

2407.   Plaintiff Daniel J. Benavidez, Jr. is a U.S. citizen and Colorado resident.  He is the brother of SSG Mayne.

2408.   Plaintiff Christina Biederman is a U.S. citizen and Colorado resident.  She is the sister of SSG Mayne.

2409.   Plaintiff Jennifer Morman is a U.S. citizen and Colorado resident.  She is the sister of SSG Mayne.

2410.   As a result of the September 4, 2008 attack, and SSG Mayne's death, the Mayne Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mayne's society, companionship, and counsel.

2411.   SSG Mayne's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Gregory McCoy Family and Estate**

2412.   Staff Sergeant Gregory McCoy served in Iraq in the U.S. Army with 410th Military Police Company, 720th Military Police Battalion, 89th Military Police Brigade.

2413.   On November 9, 2006, SSG McCoy was killed by an IED planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  He was 26 years old.

2414.   SSG McCoy was a U.S. citizen when he was killed in Iraq.

2415.   SSG McCoy's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2416.   Plaintiff Lori A. McCoy is a U.S. citizen and Colorado resident.  She is the widow of SSG McCoy.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG McCoy's estate.

2417.   Plaintiff Logan McCoy is a U.S. citizen and Colorado resident.  He is the son of SSG McCoy.

2418.   Plaintiff T.M., by and through his next friend Lori Anne McCoy, is a U.S. citizen and Colorado resident.  He is the minor son of SSG McCoy.

2419.   As a result of the November 9, 2006 attack, and SSG McCoy's death, the Gregory McCoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McCoy's society, companionship, and counsel.

2420.   SSG McCoy's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Steve McCoy Family and Estate

2421.   Sergeant Steve A. McCoy served in Iraq in the U.S. Army as part of 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.

2422.   On March 23, 2008, during the Battle of Sadr City, SGT McCoy was injured by an EFP planted and detonated by Jaysh al-Mahdi in Al Rashid District in Baghdad, Iraq.  The

explosion and resulting fire caused SGT McCoy to suffer severe injuries, including third degree burns over 98% of his body, the loss of some fingers, his ear, and his nose, and on June 10, 2008, SGT McCoy died as a result of the injuries he sustained in the attack.  He was 23 years old.

2423.   SGT McCoy was a U.S. citizen when he was killed in Iraq.

2424.   SGT McCoy's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2425.   Plaintiff Tabitha McCoy is a U.S. citizen and Georgia resident.  She is the widow of SGT McCoy.  Tabitha McCoy brings claims in both her personal capacity and her representative capacity on behalf of SGT McCoy's estate.

2426.   Plaintiff L.M., by and through his next friend Tabitha McCoy, is a U.S. citizen and Georgia resident.  He is the minor son of SGT McCoy.

2427.   Plaintiff R.M., by and through her next friend Tabitha McCoy, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT McCoy.

2428.   As a result of the March 23, 2008 attack, and SGT McCoy's death, the Steve McCoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT McCoy's society, companionship, and counsel.

2429.   SGT McCoy's estate is entitled to recover economic and non-economic damages from Defendants, due to his pain, suffering, and subsequent death caused by the March 23, 2008 Jaysh al-Mahdi attack.

### The McRill Family and Estate

2430.   Navy Mass Communications Specialist 1st Class Robert R. McRill served in Iraq in the U.S. Navy as part of the Naval Special Warfare Group 2.

2431.   On July 6, 2007, SP1 McRill was killed by EFP planted and detonated by Jaysh al-Mahdi in the Karadah District of Baghdad, Iraq.  He was 42 years old.

2432.   SP1 McRill was a U.S. citizen when he was killed in Iraq.

2433.   SP1 McRill's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2434.   Plaintiff Katherine McRill-Fellini is a U.S. citizen and Virginia resident.  She is the widow of SP1 McRill.  Katherine McRill-Fellini brings claims in both her personal capacity and her representative capacity on behalf of SP1 McRill's estate.

2435.   Plaintiff Brian Coke is a U.S. citizen and Virginia resident.  He is the stepson of SP1 McRill.

2436.   Plaintiff Ronald McRill is a U.S. citizen and California resident.  He is the brother of SP1 McRill.

2437.   As a result of the July 6, 2007 attack, and SP1 McRill's death, the McRill Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SP1 McRill's society, companionship, and counsel.

2438.   SP1 McRill's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi

**The Menke Family and Estate**

2439.   Specialist Jonathan D. Menke served in Iraq as part of the 95th Military Police Battalion, 18th Military Police Brigade, 38th Military Police Company, 38th Infantry Division, Indiana Army National Guard.

2440.   On August 4, 2008, SPC Menke was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Karadah District of Baghdad, Iraq.  SPC Menke was 22 years old.

2441.   SPC Menke was a U.S. citizen when he was killed in Iraq.

2442.   SPC Menke's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2443.   Plaintiff Daniel Menke is a U.S. citizen and Indiana resident.  He is the father of SPC Menke.  Daniel Menke brings claims in both his personal capacity and his representative capacity on behalf of SPC Menke's estate.

2444.   Plaintiff Paula J. Menke is a U.S. citizen and Indiana resident.  She is the stepmother of SPC Menke.

2445.   Plaintiff Nichole B. Lohrig is a U.S. citizen and Indiana resident.  She is the sister of SPC Menke.

2446.   Plaintiff Matthew W. Menke is a U.S. citizen and Indiana resident.  He is the stepbrother of SPC Menke.

2447.   As a result of the August 4, 2008 attack, and SPC Menke's death, the Menke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Menke's society, companionship, and counsel.

2448.   SPC Menke's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Merrill Family and Estate**

2449.   Sergeant Jason L. Merrill served in Iraq in the U.S. Army as part of the 1st Battalion, 26th Infantry Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

2450.   On September 3, 2006, SGT Merrill was killed by a three-array EFP strike by Jaysh al-Mahdi in the Karadah District of Baghdad, Iraq.  He was 22 years old.

2451.  SGT Merrill was a U.S. citizen when he was killed in Iraq.

2452.  SGT Merrill's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2453.  Plaintiff Tim Merrill is a U.S. citizen and Arizona resident.  He is the father of SGT Merrill.  He brings claims in both his personal capacity and his representative capacity on behalf of SGT Merrill's estate.

2454.  Plaintiff Sue Merrill is a U.S. citizen and Arizona resident.  She is the mother of SGT Merrill.

2455.  Plaintiff Alyssa Merrill is a U.S. citizen and Arizona resident.  She is the sister of SGT Merrill.

2456.  Plaintiff Amber Piraneo is a U.S. citizen and Arizona resident.  She is the sister of SGT Merrill.

2457.  Plaintiff Ashlea Lewis is a U.S. citizen and Arizona resident.  She is the sister of SGT Merrill.

2458.  As a result of the September 3, 2006 attack, and SGT Merrill's death, the Merrill Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Merrill's society, companionship, and counsel.

2459.  SGT Merrill's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Christopher Miller**

2460.   Plaintiff Private First Class Christopher Miller served in Iraq in the U.S. Army as part of 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division. He is a U.S. citizen and Ohio resident.

2461.   On September 4, 2008, PFC Miller was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  The explosion resulted in severe injuries, including the loss of his right leg, which was amputated below the knee, and the loss of part of his left leg, among other physical and emotional injuries.  Due to his injuries, PFC Miller received a 100% disability rating from the VA.  As a result of the September 4, 2008 attack, PFC Miller has experienced extreme physical and emotional pain and suffering.

2462.   The attack that injured PFC Miller would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Joseph Miller**

2463.   Plaintiff Specialist Joseph T. Miller served in Iraq in the U.S. Army as part of the 2-16 Rangers.  He is a U.S. citizen and Ohio resident.

2464.   On July 24, 2007, SPC Miller was injured by an EFP planted and detonated by Jaysh al-Mahdi in or near Baghdad, Iraq.  The attack ruptured his left ear drum, caused a Traumatic Brain Injury, and post-concussive syndrome.  Due to his injuries, SPC Miller received a 90% disability rating from the VA.  As a result of the July 24, 2007 attack, SPC Miller has experienced extreme physical and emotional pain and suffering.

2465.   The attack that injured SPC Miller would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Patrick Miller Family**

2466.   Private First Class Patrick Miller served in Iraq in the U.S. Army as part of the 2-16 Rangers.

2467.   On March 29, 2008, during the Battle of Sadr City, PFC Miller was killed by an EFP planted and detonated by Jaysh al-Mahdi between the New Baghdad District Advisory Council and COP Cajimat.  He was 23 years old.

2468.   PFC Miller was a U.S. citizen when he was killed in Iraq.

2469.   PFC Miller's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2470.   Plaintiff Kimberly Miller is a U.S. citizen and Florida resident.  She is the mother of PFC Miller.

2471.   Plaintiff Dana Svenson is a U.S. citizen and New Jersey resident.  She is the sister of PFC Miller.

2472.   As a result of the March 29, 2008 attack, and PFC Miller's death, PFC Miller's family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Miller's society, companionship, and counsel.

**The Millican Family and Estate**

2473.   Private First Class Johnathon M. Millican served in Iraq in the U.S. Army as part of the 2nd Battalion, 377th Parachute Field Artillery Regiment, 4th Brigade Combat Team, 25th Infantry Division.

2474.   On January 20, 2007, PFC Millican was killed in the Karbala Attack.  *See supra* ¶¶ 1515-19.  During the attack, he threw himself on a grenade to save his fellow soldiers and was awarded the Silver Star.  He was 20 years old.

2475.   PFC Millican was a U.S. citizen when he was killed in Iraq.

2476.   PFC Millican's murder would have violated the law of war if AAH and Hezbollah were subject to it because, among other things, the terrorists who committed the Karbala Attack disguised themselves as American soldiers and executed hostages in captivity.

2477.   Plaintiff Shannon Millican is a U.S. citizen and Alabama resident.  She is the widow of PFC Millican.  Shannon Millican brings claims in both her personal capacity and her representative capacity on behalf of PFC Millican's estate.

2478.   Plaintiff Paul M. Millican is a U.S. citizen and Alabama resident.  He is the father of PFC Millican.

2479.   As a result of the January 20, 2007 attack, and PFC Johnathon Millican's death, the Millican Family has experienced severe mental anguish, emotional pain and suffering, and the loss PFC Millican's society, companionship, and counsel.

2480.   PFC Johnathon Millican's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder in the Karbala Attack.

### The Mills Family

2481.   Plaintiff Michael R. Mills was a civilian contractor with Blackwater Security Consulting in Iraq.  He is a U.S. citizen and West Virginia resident.

2482.   On May 2, 2006, Mr. Mills, then 37, was injured by multiple EFPs planted and detonated by Jaysh al-Mahdi near the border between the Adhamiyah and Rusafa Districts in Baghdad, Iraq.  The explosions resulted in injuries to his face, shoulder, torso, and left knee,

requiring extensive medical treatment and surgeries over multiple years.  As a result of the May 2, 2006 attack, Mr. Mills has experienced extreme physical and emotional pain and suffering.

2483.   The attack that injured Mr. Mills would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

2484.   Plaintiff M.M., by and through his next friend Michael Mills, is a U.S. citizen and New Jersey resident.  He is the minor son of Mr. Mills.

2485.   Plaintiff M.M., by and through his next friend Michael Mills, is a U.S. citizen and New Jersey resident.  He is the minor son of Mr. Mills.

2486.   As a result of the May 2, 2006 attack, and Mr. Mills's injuries, the Mills Family has experienced extreme emotional pain and suffering.

**The Mock Family and Estate**

2487.   Sergeant Willsun Mock served in the U.S. Army in Iraq as part of the Blue Spaders.

2488.   On October 22, 2006, SGT Mock was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 23 years old.

2489.   SGT Mock was a U.S. citizen when he was killed in Iraq.

2490.   SGT Mock's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2491.   Plaintiff Michael Mock is a U.S. citizen and Kansas resident.  He is the father of Willsun Mock.  He brings claims in both his personal capacity and his representative capacity on behalf of SGT Mock's estate.

2492.   As a result of the October 22, 2006 attack, and SGT Mock's death, Michael Mock has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Mock's society, companionship, and counsel.

2493.   SGT Mock's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Molina Family**

2494.   Corporal Joshua A. Molina served in the U.S. Army in Iraq as part of 1st Squadron, 2nd Stryker Cavalry Regiment.

2495.   On March 27, 2008, during the Battle of Sadr City, CPL Molina was killed by an IED planted and detonated by Jaysh al-Mahdi in Sadr City.  He was 20 years old.

2496.   CPL Molina was a U.S. citizen when he was killed in Iraq.

2497.   CPL Molina's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IEP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2498.   Plaintiff Manuel Molina is a U.S. citizen and Texas resident.  He is the brother of CPL Molina.

2499.   Plaintiff Josue Molina is a U.S. citizen and Texas resident.  He is the father of CPL Molina.  He brings claims in both his personal capacity and his representative capacity on behalf of CPL Molina's estate.

2500.   Plaintiff Maria Molina is a U.S. citizen and Texas resident.  She is the mother of CPL Molina.

2501.   As a result of the March 27, 2008 attack, and CPL Molina's death, the Molina Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Molina's society, companionship, and counsel.

2502.   CPL Molina's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### Samuel Montalbano

2503.   Plaintiff Private First Class Samuel Montalbano served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Alabama resident.

2504.   On April 28, 2008, during a firefight in the Battle of Sadr City, PFC Montalbano jumped off the roof of a building carrying heavy equipment to escape direct fire from a Jaysh al-Mahdi attack.  The attack and PFC Montalbano's escape resulted in a herniated disk, hearing loss, and PTSD.  Due to his injuries, PFC Montalbano received an 80% disability rating from the VA.  As a result of the April 28, 2008 attack, PFC Montalbano has experienced extreme physical and emotional pain and suffering.

2505.   The attack that injured PFC Montalbano would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who attacked PFC Montalbano neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Andrew S. Moores

2506.   Plaintiff Sergeant Andrew S. Moores served in the U.S. Army in Iraq as part of A Company, 1st Battalion, 121st Field Artillery.  He is a U.S. citizen and Maine resident.

2507.   On June 14, 2007, SGT Moores was injured by an EFP that was planted and detonated by Jaysh al-Mahdi at Camp Scania in Nippur, Iraq.  As a result of the explosion, SGT Moores sustained shrapnel injuries to his left hand and injuries to his right shoulder and neck, causing chronic pain, limited shoulder movement, and PTSD and sleep issues for which he takes medication and has received counseling.  Due to his injuries, SGT Moores received a 100% disability rating from the VA.  As a result of the June 14, 2007 attack, SGT Moores has experienced extreme physical and emotional pain and suffering.

2508.   The attack that injured SGT Moores would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Morris Family and Estate

2509.   Staff Sergeant Daniel M. Morris served in the U.S. Army in Iraq as part of the 1st Squadron, 12th Cavalry Regiment, 3rd Brigade, 1st Cavalry Division.

2510.   On November 25, 2006, SSG Morris was injured by an EFP planted and detonated by Jaysh al-Mahdi in Aljededa al Shat in the Diyala province, in Iraq.  SSG Morris initially survived the attack but died shortly thereafter.  He was 28 years old.  On information and belief, Hezbollah terrorist Daqduq participated in the attack that killed SSG Morris.

2511.   SSG Morris was a U.S. citizen when he was killed in Iraq.

2512.   SSG Morris' murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2513.   Plaintiff Glenn Morris is a U.S. citizen and Tennessee resident.  He is the father of SSG Morris.  He brings claims in both his personal capacity and his representative capacity on behalf of SSG Morris's estate.

2514.   As a result of the November 25, 2006 attack, and SSG Morris' death, Glenn Morris has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Morris' society, companionship, and counsel.

2515.   SSG Morris' estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

### **The Murphy Family**

2516.   Plaintiff Staff Sergeant Luke Murphy served in the U.S. Army in Iraq as part of the 1st Squadron, 33rd Cavalry Regiment, 3rd Brigade Combat Team, 101st Airborne Division. He is a U.S. citizen and Florida resident.

2517.   On April 25, 2006, SSG Murphy was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District, near Sadr City.  The explosion resulted in severe injuries to SSG Murphy's legs, severing his right leg, prompting numerous surgeries including to shorten the stump of that leg, and fracturing and destroying muscle in his left leg, causing lasting problems with that leg and foot; the attack also resulted in sleep issues and prescription of anti-depressants.  Due to his injuries, he received an 80% disability rating from the VA.  As a result of the April 25, 2006 attack, SSG Murphy has experienced extreme physical and emotional pain and suffering.

2518.   The attack that injured SSG Murphy would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2519.   Plaintiff Wilette Murphy is a U.S. citizen and Florida resident.  She is the mother of SSG Murphy.  As a result of the April 25, 2006 attack, and SSG Murphy's injuries, Wilette Murphy has experienced extreme emotional pain and suffering.

### Randolph Nantz, II

2520.   Plaintiff Sergeant First Class Randolph Nantz, II served in the U.S. Army in Iraq as part of B Company, 2nd Battalion, 5th Special Forces Group.  He is a U.S. citizen and Texas resident.

2521.   On December 22, 2006, SFC Nantz was injured by EFP planted and detonated by Jaysh al-Mahdi in the Al Jadida neighborhood of Baghdad, Iraq.  The explosion caused severe injuries, including third-degree burns over more than 20% of his body, large muscle tissue loss and severe nerve damages, and the amputation of his left leg below the knee, among other injuries.  As the result of the December 22, 2006 attack, SFC Nantz has experienced extreme physical and emotional pain and suffering.

2522.   The attack that injured SFC Nantz would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Newby Family and Estate

2523.   Specialist Nicholas W. Newby served in Iraq in the Idaho National Guard as part of the 145th Brigade Support Battalion, 116th Cavalry Heavy Brigade Combat Team.

2524.   On July 7, 2011, SPC Newby was killed by EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  SPC Newby was 20 years old.

2525.   SPC Newby was a U.S. citizen when he was killed in Iraq.

2526.   SPC Newby's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2527.   Plaintiff Wayne Newby is a U.S. citizen and Idaho resident.  He is the father of SPC Nicholas Newby.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Newby's estate.

2528.   Plaintiff Theresa Hart is a U.S. citizen and Idaho resident.  She is the mother of SPC Nicholas Newby.

2529.   Plaintiff Nathan Newby is a U.S. citizen and Idaho resident.  He is the brother of SPC Nicholas Newby.

2530.   As a result of the July 7, 2011 attack, and SPC Nicholas Newby's death, the Newby Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nicholas Newby's society, companionship, and counsel.

2531.   SPC Newby's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Newsome Family and Estate**

2532.   Staff Sergeant Daniel A. Newsome served in the U.S. Army in Iraq as part of the 1st Battalion, 8th Cavalry Regiment, 2nd Brigade Combat Team, 1st Cavalry Division.

2533.   On June 27, 2007, SSG Newsome was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 27 years old.

2534.   SSG Newsome was a U.S. citizen when he was killed in Iraq.

2535.   SSG Newsome's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and

detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2536.   Plaintiff Flor Fuentes is a U.S. citizen and Massachusetts resident.  He is the father of SSG Newsome.  He brings claims in both his personal capacity and his representative capacity on behalf of SSG Newsome's estate.

2537.   As a result of the June 27, 2007 attack, and SSG Newsome's death, Flor Fuentes has experienced severe mental anguish, emotional pain and suffering, and the loss SSG Newsome's society, companionship, and counsel.

2538.   SSG Newsome's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Olguin Family and Estate

2539.   Sergeant Randell Olguin served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.

2540.   On September 30, 2007, SGT Olguin was shot and killed by sniper fire from a Jaysh al-Mahdi member in the village of Ur, near Sadr City.  He was 24 years old.

2541.   SGT Olguin was a U.S. citizen when he was killed.

2542.   SGT Olguin's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who murdered SGT Olguin neither wore a uniform nor otherwise identified himself as an enemy combatant.

2543.   Plaintiff Jose Olguin is a U.S. citizen and Texas resident.  He is the brother of SGT Olguin.  He brings claims in both his personal capacity and his representative capacity on behalf of SGT Olguin's estate.

2544.   Plaintiff Jennie Morin is a U.S. citizen and Texas resident.  She is the sister of SGT Olguin.

2545.   Plaintiff Anita Baker is a U.S. citizen and Texas resident.  She is the sister of SGT Olguin.

2546.   Plaintiff Janet L. Rios is a U.S. citizen and Texas resident.  She is the sister of SGT Olguin.

2547.   As a result of the September 30, 2007 attack, and SGT Olguin's death, the Olguin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Olguin's society, companionship, and counsel.

2548.   SGT Olguin's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Ogden Family

2549.   Plaintiff Technical Sergeant Tyler N. Ogden served in the U.S. Air Force in Iraq as part of the 477th Air Expeditionary Group.  He is a U.S. citizen and Ohio resident.

2550.   On July 8, 2011, TSgt Ogden was injured by a 107mm rocket fired by Jaysh al-Mahdi at the Victory Base Complex in the Mansour District in Baghdad, Iraq.  The rocket explosion resulted in severe injuries requiring extensive treatment, including shrapnel wounds to his right leg, knee, and ankle, muscle damage, hearing loss, and PTSD.  Due to his injuries, he received an 80% disability rating from the VA.  As a result of the July 8, 2011 attack, TSgt Ogden has experienced extreme physical and emotional pain and suffering.

2551.   The attack that injured TSgt Ogden would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the rocket neither wore uniforms nor otherwise identified themselves as enemy combatants.

2552.   Plaintiff Sheryl A. Chen is a U.S. citizen and Ohio resident.  She is the mother of TSgt Ogden.

2553.   Plaintiff Jerrin M. Ogden is a U.S. citizen and Ohio resident.  He is the brother of TSgt Ogden.

2554.   As a result of the July 8, 2011 attack, and TSgt Ogden's injuries, the Ogden Family has experienced extreme emotional pain and suffering.

### Patrick O'Neill

2555.   Plaintiff Specialist Patrick O'Neill served in the U.S. Army in Iraq as part of the 101st Airborne Division.  He is a U.S. citizen and Virginia resident.

2556.   On May 11, 2008, SPC O'Neill was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  The explosion resulted in severe injuries, including shrapnel wounds to his back and buttocks, a fractured right shoulder, a severed ear, and a collapsed lung, causing chronic pain in SPC O'Neill's chest and shoulder, PTSD, and nightmares for which he has sought counseling.  Due to his injuries, SPC O'Neill received a 30% disability rating from the VA.  As a result of the May 11, 2008 attack, SPC O'Neill has experienced extreme physical and emotional pain and suffering.

2557.   The attack that injured SPC O'Neill would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Jared Osburn

2558.   Plaintiff Specialist Jared Osburn served in Iraq as part of 1st Squadron, 2nd Cavalry Regiment.  He is a U.S. citizen and California resident.

2559.   In or about October 2007, SPC Osburn was injured by an EFP planted and detonated by Jaysh al-Mahdi near COP Callahan in Sadr City.  The EFP attack gave SPC Osburn a concussion.  In or about November or December of 2007, SPC Osburn was injured by an IED

planted and detonated by Jaysh al-Mahdi in Baghdad, Iraq.  The explosion resulted in an injury to SPC Osburn's hand.  In or about mid-April, 2008, during the Battle of Sadr City, SPC Osburn was injured in a rocket attack by Jaysh al-Mahdi on JSS Sadr City.  This attack gave SPC Osburn a concussion.  In early to mid-April of 2008, SPC Osburn was injured by a sniper round shot through his helmet by Jaysh al-Mahdi in Sadr City.  The round rendered SPC Osburn unconscious and resulted in abrasion and scarring.

2560.   Due to these attacks, SPC Osburn suffers from Traumatic Brain Injury, PTSD, migraines, headaches, vertigo, pain in his hand, and scarring due to the attacks.  He received a 90% disability rating from the VA.  As a result of the October 2007, November/December 2007, and April 2008 attacks, SPC Osburn has experienced extreme physical and emotional pain and suffering.

2561.   The attacks that injured SPC Osburn would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Timothy J. O'Sullivan

2562.   Plaintiff Major Timothy J. O'Sullivan served with the U.S. Air Force in Iraq as a senior advisor to British forces stationed in Basra, Iraq.  He is U.S. citizen and Ohio resident.

2563.   On March 2, 2008, Maj. O'Sullivan was injured near Basra by an EFP planted and detonated by a cell that included members of both Jaysh al-Mahdi and Hezbollah.  After activation, the EFP was set to detonate using a passive infrared trigger system.

2564.   During Maj. O'Sullivan's time in Basra, from approximately 2007 through 2008, a cell that included members of both Jaysh al-Mahdi and Hezbollah attacked his unit

approximately 800 to 1,100 times with 107mm rockets, including the IRAM variation of the 107mm rocket.

2565.   Additionally, during Maj. O'Sullivan's time in Basra, from approximately 2007 through 2008, Jaysh al-Mahdi attacked his unit approximately 800 – 1,100 times with IRAM rockets.

2566.   Maj. O'Sullivan sustained several injuries from these attacks, including internal bleeding, torn ligaments in his right wrist, injuries to his upper extremities, and Traumatic Brain Injury.  Due to his injuries, Maj. O'Sullivan received an 80% disability rating from the VA.  As a result of the March 2, 2008 attack and multiple rocket attacks, Maj. O'Sullivan has experienced extreme physical and emotional pain and suffering.

2567.   The attacks that injured Maj. O'Sullivan would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah members who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

### **The Owen Family**

2568.   Plaintiff Sergeant Michael L. Owen served in the U.S. Army in Iraq as a combat engineer for the 555 Brigade, 5th Engineers Battalion ("The Fightin' Fifth"), 515th Sapper Company, 1st Platoon.  He is a U.S. citizen and Arizona resident.

2569.   On November 22, 2008, SGT Owen was injured by an array consisting of six EFPs detonated by Jaysh al-Mahdi approximately 35 miles south of Baghdad, Iraq in the area near FOB Kalsu.  The explosion hit the vehicle in which SGT Owen was riding.  The attack resulted in multiple shrapnel wounds to his left thigh, a femoral artery injury, two shattered fingers and one fractured finger on his right hand, one fractured finger on his left hand, and a

Traumatic Brain Injury.  SGT Owen now suffers from migraine headaches, Traumatic Brain Injury, PTSD, anxiety, depression, social anxiety disorder, and social and occupational impairment as a result of the EFP attack by Jaysh al-Mahdi.  Due to his injuries, SGT Owen received a 90% disability rating from the VA.  As a result of the November 22, 2008 attack, SGT Owen has experienced extreme physical and emotional pain and suffering.

2570.   The attack that injured SGT Owen would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2571.   Plaintiff Laurie Miller is a U.S. citizen and Kansas resident.  She is the mother of SGT Owen.

2572.   Plaintiff R.O., by and through her next friend Michael Lee Owen, is a U.S. citizen and Kansas resident.  She is the minor daughter of SGT Owen.

2573.   As a result of the November 22, 2008 attack, and the injuries SGT Owen suffered, the Owen Family has experienced emotional pain and suffering.

### Gilbert Paul Paiz, Jr.

2574.   Plaintiff Sergeant Gilbert P. Paiz, Jr. served in Iraq with the 238th Cavalry Regiment, U.S. Army.  He is a U.S. citizen and West Virginia resident.

2575.   On March 31, 2007, SGT Paiz was injured by an RPG attack by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  The RPG hit the vehicle in which SGT Paiz was riding.  The attack resulted in serious shrapnel injuries to both legs.

2576.   SGT Paiz now suffers from scars, PTSD, and depression as a result of the RPG attack by Jaysh al-Mahdi.  Due to his injuries, he has a 40% disability rating from the VA.  As a

result of the March 31, 2007 attack, SGT Paiz has experienced extreme physical and emotional pain and suffering.

2577.   The attack that injured SGT Paiz would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Palinsky Family and Estate

2578.   Jerry A. Palinsky, Jr. served in Iraq as a civilian contractor with the Cochise Consultancy.

2579.   On May 3, 2006, Mr. Palinsky, Jr. was killed by an EFP planted and detonated by Jaysh al-Mahdi near Nasiriyah in central Iraq.  He was 42 years old.

2580.   Mr. Palinsky, Jr. was a U.S. citizen when he was killed in Iraq.

2581.   Mr. Palinsky, Jr.'s murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, he was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they targeted civilians.

2582.   Plaintiff Eddie Jo Palinsky is a U.S. citizen and Florida resident.  She is the widow of Mr. Palinsky, Jr.  She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Palinsky's estate.

2583.   Plaintiff Jerry A. Palinsky II is a U.S. citizen and Oregon resident.  He is the son of Mr. Palinsky, Jr.

2584.   Plaintiff Adina Palinsky is a U.S. citizen and Washington resident.  She is the daughter of Mr. Palinsky, Jr.

2585.   Plaintiff Jerry A. Palinsky, Sr. is a U.S. citizen and Washington resident.  He is the father of Mr. Palinsky, Jr.

2586.   Plaintiff Kathleen Hoke is a U.S. citizen and Oregon.  She is the mother of Mr. Palinsky, Jr.

2587.   Plaintiff Joel Palinsky is a U.S. citizen and Washington resident.  He is the brother of Mr. Palinsky, Jr.

2588.   Plaintiff Karaleen Herb is a U.S. citizen and Oregon resident.  She is the sister of Mr. Palinsky, Jr.

2589.   As a result of the May 3, 2006 attack, and Mr. Palinsky, Jr.'s death, the Palinsky Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Palinsky, Jr.'s society, companionship, and counsel.

2590.   Mr. Palinsky, Jr.'s estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Parker Family and Estate**

2591.   Sergeant Richard K. Parker served in Iraq as part of A Company, 1st Battalion, 152nd Field Artillery Regiment, Maine Army National Guard.

2592.   On June 14, 2007, SGT Parker was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi at Camp Scania, near the city of Nippur, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  SGT Parker was 26 years old.

2593.   SGT Parker was a U.S. citizen when he was killed in Iraq.

2594.   SGT Parker's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

2595.   Plaintiff Cheyenne Flagg is a U.S. citizen and Maine resident.  She is the sister of SGT Parker.

2596.   Plaintiff William Parker is a U.S. citizen and Maine resident.  He is the brother of SGT Parker.

2597.   Plaintiff Dixie Flagg is a U.S. citizen and Maine resident.  She is the mother of SGT Parker.  She brings claims in both her personal capacity and her representative capacity on behalf of SGT Parker's estate.

2598.   Plaintiff Meghan Parker-Crockett is a U.S. citizen and Maine resident.  She is the sister of SGT Parker.

2599.   As a result of the June 14, 2007 attack, and SGT Parker's death, the Parker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Parker's society, companionship, and counsel.

2600.   SGT Parker's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### Michael Jung Pasco

2601.   Plaintiff Specialist Michael J. Pasco served in Iraq in the U.S. Army as a motor vehicle operator for the 3rd Cavalry Regiment.  He is a U.S. citizen and Kentucky resident.

2602.   On April 15, 2011, SPC Pasco, was the driver in a Mine-Resistant Ambush Protected vehicle on patrol near Sadr City, when he was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi.  SPC Pasco suffered shrapnel wounds along his right side from his shoulder down to his leg, a broken right hand, Traumatic Brain Injury, and PTSD.  SPC Pasco received extensive medical treatment to repair his hand and remove shrapnel, and continues to receive treatment to manage his PTSD.  As a result of the April 15, 2011 attack, SPC Pasco has experienced extreme physical and emotional pain and suffering.

2603.   The attack that injured SPC Pasco would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### **The Paupore Family**

2604.   Plaintiff Sergeant Nicholas Paupore served in Iraq in the U.S. Army as part of the 2nd Battalion, 320th Field Artillery Regiment, 101st Airborne Division.  He is U.S. citizen and Virginia resident.

2605.   On July 2, 2006, SGT Paupore was injured by an EFP planted and detonated Jaysh al-Mahdi in Kirkuk, Iraq.  SGT Paupore was attacked when traveling in a Humvee in a convoy on Route Ford.  In this attack, SGT Paupore sustained injuries that resulted in the amputation of his right leg.  As a result of the July 2, 2006 attack, SGT Paupore has experienced extreme physical and emotional pain and suffering.

2606.   The attack that injured SGT Paupore would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

2607.   Plaintiff Maria Paupore is a U.S. citizen and Virginia resident.  She is the spouse of SGT Paupore.

2608.   Plaintiff Cody Paupore is a U.S. citizen and Virginia resident.  He is the son of SGT Paupore.

2609.   Plaintiff Mailey Paupore is a U.S. citizen and Virginia resident.  She is the daughter of SGT Paupore.

2610.   As a result of the July 2, 2006 attack, and SGT Paupore's injuries, the Paupore Family has experienced extreme emotional pain and suffering.

## The Pearcy Family

2611.   Plaintiff Sergeant Colin L. Pearcy served in Iraq in the U.S. Army as part of the 3rd Platoon B Company, 2nd Battalion 325th Airborne Infantry Regiment, 2nd Brigade, 82nd Airborne Division.  He is a U.S. citizen and Illinois resident.

2612.   In the early morning hours of July 17, 2007, SGT Pearcy was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq.  SGT Pearcy was knocked out initially from the blast and sustained significant injuries to his left hand and arm, as well as shrapnel wounds in his arms and legs, significant blood loss, Traumatic Brain Injury, and PTSD.  Due to his injuries, SGT Pearcy received a 90% disability rating from the VA.  As a result of the July 17, 2007 attack, SGT Pearcy has experienced extreme physical and emotional pain and suffering.

2613.   The attack that injured SGT Pearcy would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

2614.   Plaintiff Laird Pearcy is a U.S. citizen and Illinois resident. He is the father of SGT Pearcy.

2615.   Plaintiff Anne Pearcy is a U.S. citizen and Illinois resident. She is the mother of SGT Pearcy.

2616.   Plaintiff Jody Striker is a U.S. citizen and Illinois resident. She is the sister of SGT Pearcy.

2617.   Plaintiff Karyn McDonald is a U.S. citizen and Illinois resident. She is the sister of SGT Pearcy.

2618.   Plaintiff Andrew Pearcy is a U.S. citizen and Wisconsin resident. He is the brother of SGT Pearcy.

2619.   Plaintiff Patrick Pearcy is a U.S. citizen and Ohio resident. He is the brother of SGT Pearcy.

2620.   As a result of the July 17, 2007 attack, and SGT Pearcy's injuries, the Pearcy Family has experienced extreme emotional pain and suffering.

**The Pickett Family and Estate**

2621.   Staff Sergeant Emanuel Pickett served in Iraq as part of the 1132nd Military Police Company, North Carolina Army National Guard.

2622.   On April 6, 2008, during the Battle of Sadr City, SSG Pickett was killed by a 107mm rocket and mortar attack by Jaysh al-Mahdi in the Karadah District in Baghdad, Iraq.  He was 34 years old.

2623.   SSG Pickett was a U.S. citizen when he was killed in Iraq.

2624.   On information and belief, Hezbollah specifically directed Jaysh al-Mahdi agents to launch indirect-fire attacks against U.S. facilities in Baghdad – including the U.S. Embassy in the Green Zone – to terrorize American civilian leadership and intimidate America into changing its policy in Iraq.  *See supra* ¶ 738.  Less than one month before the 107mm rocket attack that killed COL Scott, a U.S. military report (as published by WikiLeaks) concluded it was "most likely" that "Hezbollah operatives [were] directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area."[391]

2625.   Hezbollah operatives participated in Jaysh al-Mahdi's 107mm rocket attacks against Americans in Baghdad, including, on information and belief, with respect to the attack that killed SSG Pickett.  *See supra* ¶ 739.

---

[391] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

464

2626.   SSG Pickett's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2627.   Plaintiff Merlese Pickett is a U.S. citizen and North Carolina resident.  She is the mother of SSG Pickett.  She brings claims in both her personal capacity and in her representative capacity on behalf of SSG Pickett's estate.

2628.   Plaintiff Harry Cromity is a U.S. citizen and North Carolina resident.  He is the brother of SSG Pickett.

2629.   Plaintiff Marlen Pickett is a U.S. citizen and North Carolina resident.  He is the brother of SSG Pickett.

2630.   Plaintiff Kemely Pickett is a U.S. citizen and North Carolina resident.  He is the brother of SSG Pickett.

2631.   Plaintiff Vivian Pickett is a U.S. citizen and North Carolina resident.  She is the sister of SSG Pickett.

2632.   Plaintiff Kyshia Sutton is a U.S. citizen and New Jersey resident.  She is the sister of SSG Pickett.

2633.   As a result of the April 6, 2008 attack, and SSG Pickett's death, the Pickett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Pickett's society, companionship, and counsel.

2634.   SSG Pickett's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

### The Plocica Family and Estate

2635.   Specialist Joshua L. Plocica served in Iraq with the U.S. Army in Iraq as part of the 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division.

2636.   On June 25, 2008, SPC Plocica was killed by an EFP planted and detonated by Jaysh al-Mahdi on Route Predators in the New Baghdad District in eastern Baghdad, Iraq.  He was 20 years old.

2637.   SPC Plocica was a U.S. citizen when he was killed in Iraq.

2638.   SPC Plocica's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2639.   Plaintiff Brenna Corbin is a U.S. citizen and Tennessee resident.  She is the sister of SPC Plocica.

2640.   Plaintiff Lowell Keith Thompson is a U.S. citizen and Tennessee resident.  He is the stepfather of SPC Plocica.

2641.   Plaintiff Lisa Thompson is a U.S. citizen and Tennessee resident.  She is the mother of SPC Plocica.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Plocica's estate.

2642.   As a result of the June 25, 2008 attack, and SPC Plocica's death, the Plocica Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plocica's society, companionship, and counsel.

2643.   SPC Plocica's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Portwine Family and Estate**

2644.   Specialist Brian L. Portwine served in the U.S. Army in Iraq as part of the 2nd Brigade, One Eight Bravo Company, 1st Platoon, 8th Mechanized Infantry Division.

2645.   On December 4, 2006, SPC Portwine was severely injured by an EFP planted and detonated by Jaysh al-Mahdi in the Mashtal neighborhood in the New Baghdad District in eastern Baghdad, Iraq.  The explosion from the EFP caused fuel to spray into the troop compartment of his vehicle, causing a fire inside.  The explosion also caused such damage to the vehicle that the occupants were unable to open the doors and escape the burning vehicle.  SPC Portwine remained trapped in the vehicle as it burned and filled with smoke.

2646.   As a result of the attack, SPC Portwine sustained significant injuries due to concussive blast forces, including shrapnel wounds and lacerations to his head and face, and a concussion.  SPC Portwine also had shrapnel and fragments of human bone embedded in his body when his interpreter's legs were shattered by the explosion.

2647.   As a result of the December 4, 2006 attack, SPC Portwine experienced extreme physical and emotional pain and suffering.  On May 27, 2011, after being diagnosed with PTSD and Traumatic Brain Injury resulting from the December 4, 2006 attack, SPC Portwine committed suicide.

2648.   The attack that resulted in SPC Portwine's death would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2649.   Plaintiff Peggy J. McNamara Portwine is a U.S. citizen and Georgia resident.  She is the mother of SPC Portwine.  She brings claims in her personal capacity and her representative capacity on behalf of SPC Portwine's estate.

2650.   As a result of the December 4, 2006 attack and the injuries suffered by, and death of, SPC Portwine, Peggy J. McNamara Portwine has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Portwine's society, companionship, and counsel.

2651.   SPC Portwine's estate is entitled to recover economic and non-economic damages from Defendants, due to the attack on him by Jaysh al-Mahdi.

**The Potter Family and Estate**

2652.   Private First Class Jerome Potter served in Iraq with the U.S. Army as part of the 1st Battalion, 8th Cavalry Regiment, 2nd Brigade Combat Team, 1st Cavalry Division.

2653.   On May 3, 2007, PFC Potter was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  He was 24 years old.

2654.   PFC Potter was a U.S. citizen when he was killed in Iraq.

2655.   PFC Potter's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2656.   Plaintiff Holly Burson is a U.S. citizen and Washington resident.  She is the mother of PFC Potter.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Potter's estate.

2657.   As a result of the May 3, 2007 attack, and PFC Potter's death, Plaintiff Holly Burson has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Potter's society, companionship, and counsel.

2658.   PFC Potter's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Preston Family and Estate**

2659.   Specialist Aaron L. Preston served in the U.S. Army in Iraq as part of the 9th Engineer Battalion, 2nd Brigade Combat Team, 1st Infantry Division.

2660.   On December 25, 2006, SPC Preston was injured by an IED planted and detonated by Jaysh al-Mahdi in the Karkh District in Baghdad, Iraq.  SPC Preston died the following day as a result of his injuries.  He was 29 years old.

2661.   SGT Preston was a U.S. citizen when he was killed in Iraq.

2662.   SGT Preston's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2663.   Plaintiff Mariah Coward is a U.S. citizen and Texas resident.  She is the sister of SPC Preston.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Preston's estate.

2664.   As a result of the December 25, 2006 attack, and SPC Preston's injuries and resulting death, Mariah Coward has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Preston's society, companionship, and counsel.

2665.   SGT Preston's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Dmitri Quist**

2666.   Plaintiff Staff Sergeant Dmitri Quist served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Washington resident.

2667.   In or about April or May 2007, SSG Quist was injured by an IED planted and detonated by Jaysh al-Mahdi at or near Route Grizzlies in or near Sadr City.  The IED attack damaged SSG Quist's hearing and gave him a concussion.

2668.   In or about June 2007, SSG Quist was injured by an EFP planted and detonated by Jaysh al-Mahdi five to ten miles north of COP Callahan near Sadr City.  The explosion struck the vehicle in which SSG Quist was driving.  The attack damaged SSG Quist's hearing and gave him a concussion.

2669.   As a result of the attacks, SSG Quist suffers from migraines, tinnitus, knee damage, vein damage, and hamstring issues.  Due to his injuries, SSG Quist has received a 70% disability rating from the VA.  As a result of the Jaysh al-Mahdi attacks, SSG Quist has experienced severe mental anguish, emotional pain, and suffering.

2670.   The attacks that injured SSG Quist would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the EFP and IED attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

### **The Ragone Family**

2671.   Plaintiff Technical Sergeant Douglas Ragone served in Iraq with the 819th Red Horse Squadron, U.S. Air Force.  He is a U.S. citizen and Michigan resident.

2672.   On February 2, 2008, TSgt Ragone was injured by an IED planted and detonated by Jaysh al-Mahdi at the intersection of Route Tampa and Route Pluto in the Al Rashid District in Baghdad, Iraq.  The explosion hit the vehicle in which TSgt Ragone was riding, disabling the vehicle and stunning him.  In this attack, TSgt Ragone sustained a concussion, a Traumatic Brain Injury, and a ruptured ear drum.  As a result of the February 2, 2008 attack, TSgt Ragone has experienced extreme physical and emotional pain and suffering.

2673.   The attack that injured TSgt Ragone would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

2674.   Plaintiff D.R., by and through his next friend Douglas Ragone, is a U.S. citizen and Michigan resident.  He is the minor son of TSgt Ragone.

2675.   Plaintiff David Ragone is a U.S. citizen and Michigan resident.  He is the father of TSgt Ragone.

2676.   Plaintiff Barbara Ragone is a U.S. citizen and Michigan resident.  She is the mother of TSgt Ragone.

2677.   Plaintiff Daniel Ragone is a U.S. citizen and Michigan resident.  He is the brother of TSgt Ragone.

2678.   Plaintiff Denise Smith is a U.S. citizen and Michigan resident.  She is the sister of TSgt Ragone.

2679.   As a result of the February 2, 2008 attack, and TSgt Ragone's injuries, the Ragone Family has experienced extreme emotional pain and suffering.

**Judas E. Recendez**

2680.   Plaintiff Sergeant Judas E. Recendez served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.  He is a U.S. citizen and California resident.

2681.   On October 22, 2006, SGT Recendez was injured by an EFP detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.

2682.   The attack severely wounded SGT Recendez and, among other things, required the amputation of both of his legs below the knee.  SGT Recendez also suffered shrapnel injuries

to the lower part of his body from the waist down, hearing and vision damage, and nerve damage in his left hand.  Due to his injuries, SGT Recendez received a 100% disability rating from the VA.  As a result of the October 22, 2006 attack, SGT Recendez has experienced extreme physical and emotional pain and suffering.

2683.   The attack that injured SGT Recendez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

### Jason Regester

2684.   Plaintiff Major Jason Regester served in Iraq in the U.S. Air Force as a logistics readiness officer for Multi-National Security Transition Command - Iraq.  He is a U.S. citizen and Nevada resident.

2685.   On June 21, 2007, Maj. Regester was injured by a 120 mm rocket attack launched Jaysh al-Mahdi at the Green Zone.  One rocket landed within 100 feet of Maj. Regester, resulting in physical injuries to him including a Traumatic Brain Injury.

2686.   On information and belief, Hezbollah participated in and directed Jaysh al-Mahdi members to launch the indirect-fire attack that injured Maj. Regester.  *See supra* ¶¶ 738-39, 2624-25.

2687.   Maj. Regester now suffers from PTSD, tinnitus, insomnia, hearing damage, and a Traumatic Brain Injury as a result of the rocket attacks by Jaysh al-Mahdi.  Due to his injuries, Maj. Regester has a 100% disability rating from the VA.  As a result of the June 21, 2007 attack, Maj. Regester has experienced extreme physical and emotional pain and suffering.

2688.   The attacks on Maj. Regester would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and

Hezbollah member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**<u>The Richard Family</u>**

2689.   Sergeant Joseph A. Richard III served in Iraq in the U.S. Army as part of the 4th Brigade Special Troops Battalion, 4th Brigade Combat Team, 10th Mountain Division.

2690.   On April 14, 2008, during the Battle of Sadr City, SGT Richard was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  Although SGT Richard initially survived the attack, he died later that night.  He was 27 years old.

2691.   SGT Richard was a U.S. citizen when he was killed in Iraq.

2692.   SGT Richard's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2693.   Plaintiff Carmen R. Billedeaux is a U.S. citizen and Louisiana resident.  She is the sister of SGT Richard.

2694.   Plaintiff Lois Richard is a U.S. citizen and Louisiana resident.  She is the mother of SGT Richard.

2695.   Plaintiff Joseph Richard Jr. is a U.S. citizen and Louisiana resident.  He is the father of SGT Richard.

2696.   As a result of the April 14, 2008 attack, and SGT Richard's death, the Richard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Richard's society, companionship, and counsel.

**The Richards Family**

2697.   Plaintiff Nathan Richards served in the U.S. Army in Iraq as part of B Company, 1st Battalion, 18th Infantry Regiment.  He is a U.S. citizen and Florida resident.

2698.   On May 17, 2009, Nathan Richards was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  He sustained a concussion and was knocked unconscious.  His eardrum was also ruptured as a result of the blast.  Mr. Richards has developed vertigo and has experienced migraines.  He has been diagnosed with a Traumatic Brain Injury and has dealt with long-term and short-term memory loss.  He also has been diagnosed with PTSD and has had nightmares and flashbacks, as well as experienced survivor's guilt.  As a result of the attack, he has experienced extreme physical and emotional pain and suffering.

2699.   Plaintiff Steven Richards is a U.S. citizen and Massachusetts resident.  He is the father of Mr. Richards.  As a result of the attack, and Nathan Richards's injuries, he has experienced extreme emotional pain and suffering.

**The Ring Family and Estate**

2700.   Corporal Michelle R. Ring served in the U.S. Army in Iraq as part of the 92nd Military Police Battalion.

2701.   On July 5, 2007, CPL Ring was killed by a mortar that was transported, stored, and launched by Jaysh al-Mahdi against Camp Liberty, which was part of Victory Base Complex in the Mansour District in Baghdad, Iraq.  She was 24 years old.

2702.   CPL Ring was a U.S. citizen when she was killed in Iraq.

2703.   The attack on CPL Ring would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2704.   Shirley Stearns was a U.S. citizen and Oregon resident.  She was the mother of CPL Ring.  She died on October 13, 2019.

2705.   Plaintiff John Stearns is a U.S. citizen and Oregon resident.  He is the father of CPL Ring.

2706.   Plaintiff Marc Stearns is a U.S. citizen and Oregon resident.  He is the son of CPL Ring.

2707.   Plaintiff John Stearns brings claims in both his personal capacity and his representative capacity on behalf of CPL Ring's estate and Shirley Stearns's estate.

2708.   As a result of the July 5, 2007 attack, and CPL Ring's death, the Ring Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Ring's society, companionship, and counsel.

2709.   SPC Ring's estate is entitled to recover economic and non-economic damages from Defendants, due to her murder by Jaysh al-Mahdi.

**The Roberts Family**

2710.   Plaintiff Staff Sergeant Erik Roberts served in Iraq in the U.S. Army as part of 1-33 Cavalry, 101st Airborne Division.  He is a U.S. citizen and Pennsylvania resident.

2711.   On April 25, 2006, SSG Roberts was injured by an EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  The attack severed his right femur and caused him to undergo more than 12 surgeries.  SSG Roberts continues to suffer from nerve damage in his right leg, impairment of coordination, cognitive disorder, and PTSD.  He received a 60% disability rating from the VA.  As a result of the April 25, 2006 attack, SSG Roberts has experienced extreme physical and emotional pain and suffering.

2712.   The attack that injured SSG Roberts would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2713.   Plaintiff E.C.R., by and through her next friend SSG Roberts, is a U.S. citizen and Pennsylvania resident.  She is the minor daughter of SSG Roberts.

2714.   Plaintiff Robin Roberts is a U.S. citizen and Tennessee resident.  She is the mother of SSG Roberts.

2715.   Plaintiff James Craig Roberts is a U.S. citizen and Ohio resident.  He is the father of SSG Roberts.

2716.   Plaintiff Cara Roberts is a U.S. citizen and Tennessee resident.  She is the sister of SSG Roberts.

2717.   Plaintiff Colin Roberts is a U.S. citizen and Tennessee resident.  He is the brother of SSG Roberts.

2718.   As a result of the attack, and SSG Roberts's injuries, the Roberts Family has experienced extreme emotional pain and suffering.

### The Roman Family

2719.   Plaintiff Specialist Manuel Roman served in the U.S. Army in Iraq as part of A Company, 130th Engineer Battalion, 1169th Engineer Group, 1st Cavalry Division.  He is a U.S. citizen and a Puerto Rico resident.

2720.   On March 29, 2007, SPC Roman was injured by an EFP planted and detonated by Jaysh al-Mahdi just outside of Camp Liberty in Baghdad, Iraq.  The explosion hit the vehicle in which SPC Roman was riding, causing him to lose consciousness.  The attack caused SPC Roman to sustain a Traumatic Brain Injury, as well as severe shrapnel injuries to his legs, buttocks, and back.

2721.   SPC Roman now suffers from shrapnel wounds, Traumatic Brain Injury, and PTSD as a result of the attack.  Due to his injuries, he received a 90% disability rating from the VA.  As a result of the March 29, 2007 attack, SPC Roman has experienced extreme physical and emotional pain and suffering.

2722.   The attack that injured SPC Roman would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2723.   Plaintiff Marco A. Roman is a U.S. citizen and Massachusetts resident.  He is the brother of SPC Roman.

2724.   Plaintiff Maria C. Murphy is a U.S. citizen and Kansas resident.  She is the sister of SPC Roman.

2725.   Plaintiff Estrella R. Villanueva is a U.S. citizen and Puerto Rico resident.  She is the mother of SPC Roman.

2726.   Plaintiff Manuel Roman, Sr. is a U.S. citizen and Puerto Rico resident.  He is the father of SPC Roman.

2727.   Plaintiff Thalia Y. Roman is a U.S. citizen and Massachusetts resident.  She is the daughter of SPC Roman.

2728.   Plaintiff Aracellys Jasmin Roman is a U.S. citizen and Connecticut resident.  She is the daughter of SPC Roman.

2729.   Plaintiff Jamilex Yali Roman is a U.S. citizen and New York resident.  She is the daughter of SPC Roman.

2730.   As a result of the March 29, 2007 attack, and SPC Roman's injuries, the Roman Family has experienced extreme emotional pain and suffering.

**The Rosenberg Family and Estate**

2731.   Major Mark E. Rosenberg served in Iraq with the U.S. Army as part of the 3rd Battalion, 29th Field Artillery Regiment, 3rd Brigade Combat Team, 4th Infantry Division.

2732.   On April 8, 2008, during the Battle of Sadr City, MAJ Rosenberg was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq. Although MAJ Rosenberg initially survived the attack, he died from his injuries later that day. MAJ Rosenberg was 32 years old.

2733.   MAJ Rosenberg was a U.S. citizen when he was killed in Iraq.

2734.   MAJ Rosenberg's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2735.   Plaintiff Julie Rosenberg is a U.S. citizen and New Mexico resident.  She is the widow of MAJ Rosenberg.  She brings claims in both her personal capacity and her representative capacity on behalf of MAJ Rosenberg's estate.

2736.   As a result of the April 8, 2008 attack, and MAJ Rosenberg's death, the Rosenberg Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Rosenberg's society, companionship, and counsel.

2737.   MAJ Rosenberg's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

## The Rzepa Family

2738.   Plaintiff Staff Sergeant Jason Rzepa served in Iraq in the U.S. Army as part of the 145th Brigade Support Battalion, 116th Cavalry Heavy Brigade Combat Team, Idaho National Guard.  He is a U.S. citizen and Idaho resident.

2739.   On July 7, 2011, SSG Rzepa was injured by an IED planted and detonated by Jaysh al-Mahdi outside the Victory Base Complex in the Mansour District of Baghdad, Iraq. SSG Rzepa lost both his legs below the knees.  As a result of the July 7, 2011 attack, SSG Rzepa has experienced extreme physical and emotional pain and suffering.

2740.   The attack that injured SSG Rzepa would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2741.   Plaintiff Cassandra Rzepa is a U.S. citizen and Idaho resident.  She is the former spouse of SSG Rzepa.

2742.   Plaintiff C.R., by and through his next friend Cassandra Rzepa, is a U.S. citizen and Idaho resident.  He is the minor son of SSG Rzepa and Cassandra Rzepa.

2743.   Plaintiff K.R., by and through his next friend Adrian Davis, is a U.S. citizen and Montana resident.  He is the minor son of SSG Rzepa.

2744.   As a result of the July 7, 2011 attack, and SSG Rzepa's injuries, the Rzepa Family has experienced extreme emotional pain and suffering.

## The Saaristo Family

2745.   Plaintiff Sergeant Brian Saaristo served in the U.S. Army in Iraq as part of the 2nd Battalion, 320th Field Artillery Regiment.  He is a U.S. citizen and Minnesota resident.

2746.   On July 2, 2006, SGT Saaristo was injured by an EFP attack by Jaysh al-Mahdi in Kirkuk, Iraq.  In this attack, SGT Saaristo sustained injuries that resulted in the amputation of both legs below the knee, loss of hearing in his left ear, and shrapnel wounds to his body and lungs.  Due to his injuries, SGT Saaristo received a 100% disability rating from the VA.  As a result of the July 2, 2006 attack, SGT Saaristo has experienced extreme physical and emotional pain and suffering.

2747.   The attack that injured SGT Saaristo would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

2748.   Plaintiff Barbara J. Liimatainen is a U.S. citizen and Minnesota resident.  She is the sister of SGT Saaristo.

2749.   Plaintiff Cheryl A. Saaristo is a U.S. citizen and Minnesota resident.  She is the spouse of SGT Saaristo.

2750.   Plaintiff Brian Saaristo, Jr. is a U.S. citizen and Minnesota resident.  He is the son of SGT Saaristo.

2751.   Plaintiff Leah M. Saaristo is a U.S. citizen and Minnesota resident.  She is the daughter of SGT Saaristo.

2752.   As a result of the July 2, 2006 attack, and SGT Saaristo's injuries, the Saaristo Family has experienced extreme emotional pain and suffering.

**The Saenz Family and Estate**

2753.   First Sergeant Carlos N. Saenz served in the U.S. Army in Iraq as part of the 490th Civil Affairs Battalion, attached to the 2nd Brigade Combat Team, 4th Infantry Division.

2754.   On May 5, 2006, 1SG Saenz was killed by an EFP planted and detonated by Jaysh al-Mahdi near Hillah, in central Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  1SG Saenz was 46 years old.

2755.   1SG Saenz was a U.S. citizen when he was killed in Iraq.

2756.   The attack on 1SG Saenz would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

2757.   Plaintiff Nanette Saenz is a U.S. citizen and Nevada resident.  She is the widow of 1SG Saenz.  She brings claims in both her personal capacity and her representative capacity on behalf of 1SG Saenz's estate.

2758.   Plaintiff Frances Catherine Castro is a U.S. citizen and Nevada resident.  She is the sister of 1SG Saenz.

2759.   As a result of the May 5, 2006 attack, and 1SG Saenz's death, the Saenz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1SG Saenz's society, companionship, and counsel.

2760.   1SG Saenz's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Brian R. Schar**

2761.   Plaintiff Staff Sergeant Brian R. Schar served in the U.S. Army in Iraq as part of the 1st Infantry Division, 2nd Brigade Combat Team, 9th Engineer Battalion.  He is a U.S. citizen and a Colorado resident.

2762.   On September 19, 2007, SSG Schar was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Senator in the Kadamiyah District in western Baghdad, Iraq.  As

SSG Schar's vehicle traversed a bridge approaching an Iraqi checkpoint, an EFP (hidden behind a light post and disguised as a rock) exploded, destroying the vehicle and knocking SSG Schar unconscious.  Upon awakening, SSG Schar realized he had no use of his hands.  While awaiting rescue, he continued to lose and regain consciousness, and he realized that both his right and left legs had been severed from his body.  SSG Schar was evacuated from the scene of the attack.

2763.   As a result of the September 19, 2007 attack, SSG Schar sustained significant injuries, including the loss of both legs and a portion of his right pinky finger.  Shrapnel and debris from the blast embedded in wounds to his colon, stomach, and upper extremities.  SSG Schar also suffered burns and permanent scarring.  Due to his injuries, he has received a 100% disability rating from the VA.  As a result of the September 19, 2007 attack, SSG Schar has experienced extreme physical and emotional pain and suffering.

2764.   The attack that injured SSG Schar would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### **The Schichtl Family**

2765.   Plaintiff Staff Sergeant Joshua Schichtl served in Iraq as part of Company A, 4th Battalion, 64th Armor Regiment, 4th Brigade Combat Team, 3rd Infantry Division.  He is a U.S. citizen and Florida resident.

2766.   On January 6, 2008, SSG Schichtl was injured by an EFP that was detonated by Jaysh al-Mahdi on Route Vernon in the Al Rashid District in Baghdad, Iraq.  The explosion hit the vehicle in which SSG Schichtl was riding.  In this attack, SSG Schichtl sustained shrapnel injuries to his left eye, face, and bicep, as well as a Traumatic Brain Injury.  The blast also

shattered SSG Schichtl's cheekbone and roof of his mouth, and he lost a number of teeth.  His lower jawbone was broken in 19 places.

2767.   SSG Schichtl now suffers from the loss of the use of his right eye, limited ability to open his mouth, difficulty chewing, scarring, Traumatic Brain Injury, and anxiety.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the January 6, 2008 attack, SSG Schichtl has experienced extreme physical and emotional pain and suffering.

2768.   The attack that injured SSG Schichtl would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2769.   Plaintiff Mark Schichtl is a U.S. citizen and Arkansas resident.  He is the father of SSG Schichtl.  As a result of the January 6, 2008 attack, and SSG Schichtl's injuries, he has experienced extreme emotional pain and suffering.

### The Schumann Family and Estate

2770.   Sergeant Jason A. Schumann served in Iraq in the U.S. Army as part of the 3rd Squadron, 89th Cavalry Regiment, 4th Brigade Combat Team, 10th Mountain Division.

2771.   On May 19, 2007, SGT Schumann was killed by injuries sustained from the detonation of an IED planted and detonated by Jaysh al-Mahdi near Diwaniyah in central Iraq.  He was traveling north on Route 1 from Tallil to Scania.  He was 23 years old.

2772.   SGT Schumann was a U.S. citizen when he was killed in Iraq.

2773.   SGT Schumann's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2774.   Plaintiff Kayla Nelson is a U.S. citizen and Minnesota resident.  She is the sister of SGT Schumann.

2775.   Plaintiff Kristie Nelson is a U.S. citizen and Minnesota resident.  She is the sister of SGT Schumann.

2776.   Plaintiff Jim Schumann is a U.S. citizen and Minnesota resident.  He is the father of SGT Schumann.  He brings claims in both his personal capacity and his representative capacity on behalf of SGT Schumann's estate.

2777.   Plaintiff Benjamin Schumann is a U.S. citizen and Minnesota resident.  He is the brother of SGT Schumann.

2778.   As a result of the May 19, 2007 attack, and SGT Schumann's death, the Schumann Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schumann's society, companionship, and counsel.

2779.   SGT Schumann's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Scott Family and Estate

2780.   Colonel Stephen K. Scott served in Iraq in the U.S. Army as part of the 356th Quartermaster Battalion, 13th Corps Support Command.

2781.   On April 6, 2008, during the Battle of Sadr City, COL Scott was killed in an explosion in the Green Zone that was caused by a 107mm rocket that was transported, stored, and launched by Jaysh al-Mahdi.  COL Scott was 54 years old.

2782.   On information and belief, Hezbollah participated in and directed Jaysh al-Mahdi to launch the indirect-fire attack that killed COL Scott.  *See supra* ¶¶ 738-39, 2624-25.

2783.   COL Scott was a U.S. citizen when he was killed in Iraq.

2784.   COL Scott's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the attack placed civilians at risk, and because the Jaysh al-Mahdi and Hezbollah member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2785.   Plaintiff Rachel M. Gillette is a U.S. citizen and Missouri resident.  She is the daughter of COL Scott.  She brings claims in both her personal capacity and her representative capacity on behalf of COL Scott's estate.

2786.   As a result of the April 6, 2008 attack, and COL Scott's death, the Scott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of COL Scott's society, companionship, and counsel.

2787.   COL Scott's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Shumate Family**

2788.   Plaintiff Shannon Shumate served as a civilian contractor in Iraq.  He is a U.S. citizen and Missouri resident.

2789.   On May 21, 2006, Shannon Shumate was injured by an EFP planted and detonated by Jaysh al-Mahdi near his vehicle in the vicinity of Mosul, Iraq.  He sustained injuries to his head and back and suffered hearing loss.  He continues to suffer from PTSD and has flashbacks when he drives at night.  As a result of the attack, he has experienced extreme physical and emotional pain and suffering.

2790.   Plaintiff Lauren Shumate is a U.S. citizen and Kansas resident.  She is the daughter of Shannon Shumate.

2791.   Plaintiff L.S., by and through her next friend Shannon Shumate, is a U.S. citizen and Missouri resident.  She is the minor daughter of Shannon Shumate.

2792.   Plaintiff L.S., by and through his next friend Shannon Shumate, is a U.S. citizen and Missouri resident.  He is the minor son of Shannon Shumate.

2793.   As a result of the attack, and Shannon Shumate's injuries, the Shumate Family has experienced extreme emotional pain and suffering.

### John P. Sklaney, III

2794.   Plaintiff Sergeant First Class John P. Sklaney, III served in Iraq in the U.S. Army as part of the 49th Military Police Brigade.  He is a U.S. citizen and Oklahoma resident.

2795.   On June 5, 2006, SFC Sklaney was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  In the aftermath of the attack, he saw his fellow soldier Isaac Lawson, whose leg had been severed.  SFC Sklaney helped to place Isaac Lawson on a stretcher.

2796.   SFC Sklaney has experienced survivor's guilt, memory loss, and PTSD.

2797.   The attack that injured SFC Sklaney would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

2798.   As a result of the attack, and the injuries he suffered, SFC Sklaney has experienced extreme emotional pain and suffering.

### The Slaven Family and Estate

2799.   Specialist Benjamin J. Slaven served in Iraq as part of the Army Reserve, 308th Transportation Company.

2800.   On June 9, 2006, SPC Slaven was killed by an EFP planted and detonated by Jaysh al-Mahdi near Diwaniyah, in central Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  SPC Slaven was 22 years old.

2801.   SPC Slaven was a U.S. citizen when he was killed in Iraq.

2802.   The attack on SPC Slaven would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

2803.   Plaintiff Judy Huenink is a U.S. citizen and Nebraska resident.  She is the mother of SPC Slaven.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Slaven's estate.

2804.   Plaintiff Sean Slaven is a U.S. citizen and Nebraska resident.  He is the brother of SPC Slaven.

2805.   Plaintiff Chastity D. Laflin is a U.S. citizen and Nebraska resident.  She is the sister of SPC Slaven.

2806.   Plaintiff Nicole Landon is a U.S. citizen and Nebraska resident.  She is the sister of SPC Slaven.

2807.   Plaintiff Misti Fisher is a U.S. citizen and North Carolina resident.  She is the sister of SPC Slaven.

2808.   As a result of the June 9, 2006 attack, and SPC Slaven's death, the Slaven Family has experienced mental anguish, emotional pain and suffering, and the loss of SPC Slaven's society, companionship, and counsel.

2809.   SPC Slaven's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Ronald E. Sloan**

2810.   Plaintiff Sergeant First Class Ronald E. Sloan served in the U.S. Army in Iraq as part of D Company, 4th Battalion, 64th Armor Regiment.  He is a U.S. citizen and Tennessee resident.

2811.   On April 17, 2008, during the Battle of Sadr City, SFC Sloan was on patrol near Sadr City when his vehicle was struck by an EFP planted and detonated by Jaysh al-Mahdi.

2812.   On April 28, 2008, during the Battle of Sadr City, SFC Sloan was attacked with variants of 107mm rockets known as IRAMs launched by Jaysh al-Mahdi in or near Sadr City.  SFC Sloan was knocked unconscious.  He has subsequently been diagnosed as suffering from a Traumatic Brain Injury and PTSD.

2813.   In the course of these attacks, SFC Sloan was also struck by shrapnel on the right side of his face and neck.  He was evacuated to the 86th combat support hospital for treatment of his wounds.  Due to his injuries, SFC Sloan received a 100% disability rating from the VA.  As a result of the attacks, and the injuries he suffered, SFC Sloan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2814.   The attacks on SFC Sloan would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Christopher G. Smith**

2815.   Plaintiff Sergeant First Class Christopher G. Smith served in Iraq in the U.S. Army as part of the 2nd Brigade Combat Team, 1st Infantry Division.  He is a U.S. citizen and New York resident.

2816.   On April 28, 2007, SFC Smith was injured by an IED planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  His face was lacerated by shrapnel, he was knocked unconscious, and he injured his back and ankle.  As a result of the April 28, 2007 attack, and the injuries he sustained therein, SFC Smith has experienced extreme physical and emotional pain and suffering.

2817.   The attack that injured SFC Smith would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

### James L. Smith

2818.   Corporal Richard A. Smith served in the U.S. Army in Iraq as part of the 25th Brigade Support Battalion, 3rd Heavy Brigade Combat Team, 1st Cavalry Division.

2819.   On December 31, 2006, CPL Smith was killed by an EFP planted and detonated by Jaysh al-Mahdi near Baqubah in Diyala Province, Iraq.  On information and belief, Hezbollah terrorist Daqduq personally participated in the attack that killed CPL Smith.  He was 20 years old.

2820.   Plaintiff James L. Smith is a U.S. citizen and Texas resident.  He is the father of CPL Smith.  As a result of the attack, and the death of CPL Smith, James L. Smith has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Smith's society, companionship, and counsel.

### The Timothy Smith Family and Estate

2821.   Sergeant Timothy M. Smith served in the U.S. Army in Iraq as part of the 4th Brigade Special Troops Battalion, 4th Brigade Combat Team, 10th Mountain Division.

2822.   On April 7, 2008, during the Battle of Sadr City, SGT Smith was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in Sadr City.  He was 25 years old.

2823.   SGT Smith was a U.S. citizen when he was killed in Iraq.

2824.   The attack on SGT Smith would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2825.   Plaintiff Patricia Smith is a U.S. citizen and California resident.  She is the mother of SGT Smith.

2826.   Plaintiff Michael W. Smith is a U.S. citizen and Florida resident.  He is the father of SGT Smith.  He brings claims in both his personal capacity and his representative capacity on behalf of SGT Smith's estate.

2827.   As a result of the April 7, 2008 attack, and SGT Smith's death, the Smith Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Smith's society, companionship, and counsel.

2828.   SGT Smith's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Sowinski Family and Estate**

2829.   Sergeant Nicholas R. Sowinski served in Iraq in the U.S. Army as part of the 4th Squadron, 14th Cavalry Regiment, 172nd Stryker Brigade Combat Team.

2830.   On October 11, 2006, SGT Sowinski was killed by injuries sustained from an IED that was planted and detonated by Jaysh al-Mahdi in the Rusafa District of Baghdad, Iraq.  He was 25 years old.

2831.   SGT Sowinski was a U.S. citizen when he was killed in Iraq.

2832.   SGT Sowinski's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2833.   Plaintiff Jared Sowinski is a U.S. citizen and Arizona resident.  He is the brother of SGT Sowinski.

2834.   Plaintiff Austin Sowinski is a U.S. citizen and Arizona resident.  He is the brother of SGT Sowinski.

2835.   Plaintiff Diane T. Sowinski is a U.S. citizen and Arizona resident.  She is the mother of SGT Sowinski.  She brings claims in both her personal capacity and her representative capacity on behalf of SGT Sowinski's estate.

2836.   As a result of the October 11, 2006 attack, and SGT Sowinski's death, the Sowinski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Sowinski's society, companionship, and counsel.

2837.   SGT Sowinski's estate is entitled to recover economic and non-economic damages from Defendants, due to his his murder by Jaysh al-Mahdi.

**The Raymond Spencer, Jr. Family and Estate**

2838.   Private First Class Raymond N. Spencer, Jr. served in Iraq as part of A Company, 2nd Battalion, 12th Cavalry Regiment, 4th Brigade Combat Team, 1st Cavalry Division.

2839.   On June 21, 2007, PFC Spencer was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi, just north of Baghdad in the Al Anbar Governorate of Iraq.  PFC Spencer was 23 years old.

2840.   PFC Spencer was a U.S. citizen when he was killed in Iraq.

2841.   The attack on PFC Spencer would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2842.   Plaintiff Raymond N. Spencer, Sr. is a U.S. citizen and Idaho resident.  He is the father of PFC Spencer.  He brings claims in both his personal capacity and his representative capacity on behalf of PFC Spencer's estate.

2843.   Plaintiff Sylvia Spencer is a U.S. citizen and Idaho resident.  She is the stepmother of PFC Spencer.

2844.   As a result of the June 21, 2007 attack, and PFC Spencer's death, the Spencer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Spencer's society, companionship, and counsel.

2845.   PFC Spencer's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Starcevich Family and Estate

2846.   Specialist Lucas V. Starcevich served in Iraq with the U.S. Army as part of the 1st Battalion, 18th Infantry Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

2847.   On April 16, 2007, SPC Starcevich was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  SPC Starcevich was 25 years old.

2848.   SPC Starcevich was a U.S. citizen when he was killed in Iraq.

2849.   The attack on SPC Starcevich would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2850.   Plaintiff Bradley Starcevich is a U.S. citizen and Illinois resident.  He is the father of SPC Starcevich.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Starcevich's estate.

2851.   Plaintiff Glenda Starcevich is a U.S. citizen and Illinois resident.  She is the stepmother of SPC Starcevich.

2852.   Plaintiff Trenton Starcevich is a U.S. citizen and California resident.  He is the brother of SPC Starcevich.

2853.   As a result of the April 16, 2007 attack, and SPC Starcevich's death, the Starcevich Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Starcevich's society, companionship, and counsel.

2854.   SPC Starcevich's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Stiggins Family and Estate**

2855.   Private First Class Antonio G. Stiggins served in the U.S. Army in Iraq as part of F Troop, 2nd Squadron, 3rd Armored Calvary Regiment.

2856.   On April 22, 2011, PFC Stiggins was killed by an EFP planted and detonated by Jaysh al-Mahdi near Kut, in the Wasit Province of Iraq.  PFC Stiggins was 25 years old.

2857.   PFC Stiggins was a U.S. citizen when he was killed in Iraq.

2858.   PFC Stiggins's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2859.   Plaintiff Angel Mayes is a U.S. citizen and New Mexico resident.  She is the mother of PFC Stiggins.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Stiggins's estate.

2860.   Plaintiff Donald Mayes is a U.S. citizen and New Mexico resident.  He is the stepfather of PFC Stiggins.

2861.   As a result of the April 22, 2011 attack, and PFC Stiggins's death, the Stiggins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Stiggins's society, companionship, and counsel.

2862.   PFC Stiggins's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Shaun C. Stiltner**

2863.   Plaintiff Shaun C. Stiltner served in Iraq as a civilian contractor with DynCorp International, supporting the U.S. Department of State.  He is a U.S. citizen and South Carolina resident.

2864.   On April 25, 2007, Mr. Stiltner was injured by an IED planted and detonated by Jaysh al-Mahdi in the Hyalamil neighborhood, in the Al Rashid District in Baghdad, Iraq.  The attack caused Mr. Stiltner to suffer second and third degree burns to his hands.  As a result of the April 25, 2007 attack, and the injuries he suffered, Mr. Stiltner has experienced extreme physical and emotional pain and suffering.

2865.   The attack that injured Mr. Stiltner would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, he was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Stout Family and Estate**

2866.   Specialist Brandon L. Stout served in Iraq as part of the Michigan Army National Guard, 46th Military Police Company.

2867.   On January 22, 2007, SPC Stout was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  SPC Stout was 23 years old.

2868.   SPC Stout was a U.S. citizen when he was killed in Iraq.

2869.   The attack on SPC Stout would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

2870.   Plaintiff William Stout is a U.S. citizen and Georgia resident.  He is the father of SPC Stout.

2871.   Plaintiff Callie McGee is a U.S. citizen and Georgia resident.  She is the sister of SPC Stout.

2872.   Plaintiff Tamara Stout is a U.S. citizen and Georgia resident.  She is the stepmother of SPC Stout.

2873.   Plaintiff Stephanie Benefield is a U.S. citizen and Georgia resident.  She is the sister of SPC Stout.

2874.   Plaintiff Audrey Barber is a U.S. citizen and Illinois resident.  She is the widow of SPC Stout.  Audrey Barber brings claims in both her personal capacity and her representative capacity on behalf of SPC Stout's estate.

2875.   Plaintiff Tracy Anderson is a U.S. citizen and Michigan resident.  She is the mother of SPC Stout.

2876.   Plaintiff Jeffrey L. Anderson is a U.S. citizen and Michigan resident.  He is the stepfather of SPC Stout.

2877.   Plaintiff Elizabeth L. Islas is a U.S. citizen and Michigan resident.  She is the sister of SPC Stout.

2878.   Plaintiff Andrew Anderson is a U.S. citizen and Michigan resident.  He is the brother of SPC Stout.

2879.   Plaintiff Adam Stout is a U.S. citizen and Michigan resident.  He is the brother of SPC Stout.

2880.   As a result of the January 22, 2007 attack, and SPC Stout's death, the Stout Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Stout's society, companionship, and counsel.

2881.   SPC Stout's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Strong Family**

2882.   Plaintiff Staff Sergeant Travis M. Strong served in the U.S. Army in Iraq as part of the 123rd Infantry Regiment.  He is a U.S. citizen and Colorado resident.

2883.   On November 27, 2006, SSG Strong was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Shuala neighborhood near the border of the Kadamiyah and Mansour Districts in Baghdad, Iraq.  The explosion hit the vehicle in which SSG Strong was riding, completely severing his right leg and nearly severing his left leg.  Due to his injuries, he received a 100% disability rating from the VA.  As a result of the November 27, 2006 attack, SSG Strong has experienced extreme physical and emotional pain and suffering.

2884.   The attack that injured SSG Strong would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2885.   Plaintiff Taylor Heston is a U.S. citizen and Arizona resident.  She is the mother of SSG Strong.

2886.   Plaintiff Anthony J. Durkacs is a U.S. citizen and Nevada resident.  He is the brother of SSG Strong.

2887.   As a result of the November 27, 2006 attack, and SSG Strong's injuries, the Strong Family has experienced extreme emotional pain and suffering.

### The Sullivan Family and Estate

2888.   Sergeant John M. Sullivan served in Iraq in the U.S. Army as part of the 2nd Battalion, 17th Field Artillery, 2nd Brigade Combat Team, 2nd Infantry Division.

2889.   On December 30, 2006, SGT Sullivan was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Karadah District in eastern Baghdad, Iraq.  He was 22 years old.

2890.   SGT Sullivan was a U.S. citizen when he was killed in Iraq.

2891.   Plaintiff Deborah Beavers is a U.S. citizen and Tennessee resident.  She is the mother of SGT Sullivan.  She brings claims in both her personal capacity and her representative capacity on behalf of SGT Sullivan's estate.

2892.   As a result of the December 30, 2006 attack, and SGT Sullivan's death, Ms. Beavers has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Sullivan's society, companionship, and counsel.

2893.   SGT Sullivan's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Suveges Family and Estate**

2894.   Nicole Suveges was a political scientist who worked for BAE Systems in the Human Terrain System (HTS) program in eastern Baghdad, Iraq in 2008.  The HTS program was designed to promote cultural understanding between U.S. military and Iraqis.

2895.   On June 24, 2008, a Jaysh al-Mahdi cell – whose members had, on information and belief, received training from Hezbollah in Iran – executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not following Sadr.  The bomb killed 11 people, including Nicole Suveges and three other Americans.

2896.   Ms. Suveges was a U.S. citizen when she was killed in Iraq.

2897.   Ms. Suveges's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, she and others killed in the attack were civilians not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

2898.   Plaintiff David C. Iverson is a U.S. citizen and Maryland resident.  He is the widower of Nicole Suveges.  He brings claims in both his personal capacity and his representative capacity on behalf of Ms. Suveges's estate.

2899.   As a result of the June 24, 2008 attack, and Nicole Suveges's death, David C. Iverson has experienced severe mental anguish, emotional pain and suffering, and the loss of Nicole Suveges's society, companionship, and counsel.

2900.   Ms. Suveges's estate is entitled to recover economic and non-economic damages from Defendants, due to her murder by Jaysh al-Mahdi.

**The Swinton Family**

2901.   Plaintiff Sergeant Allen Swinton served in Iraq in the U.S. Army as part of A Company, 703rd Brigade Support Battalion, 4th Brigade Combat Team, 3rd Infantry Division. He is a U.S. citizen and Georgia resident.

2902.   On April 12, 2008, SGT Swinton was injured by an EFP planted and detonated by Jaysh al-Mahdi near Iskandariya, Iraq.  SGT Swinton lost a great amount of blood; multiple pieces of shrapnel entered his lower extremities; and his right hand was injured.  SGT Swinton underwent surgery to tie an artery and also underwent multiple surgeries to remove shrapnel from his body.  As a result of the April 12, 2008 attack, SGT Swinton has experienced extreme physical and emotional pain and suffering.

2903.   Plaintiff Temika Swinton is a U.S. citizen and Georgia resident.  She is the wife of SGT Swinton.

2904.   Plaintiff T.R.S., by and through her next friend Temika Swinton, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT Swinton.

2905.   Plaintiff T.M.S., by and through her next friend Temika Swinton, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT Swinton.

2906.   Plaintiff Tyreasha Bryant is a U.S. citizen and Georgia resident.  She is the stepdaughter of SGT Swinton.

2907.   Plaintiff Linda Pritchett is a U.S. citizen and Michigan resident.  She is the mother of SGT Swinton.

2908.   As a result of the attack, and the injuries SGT Swinton suffered, the Swinton Family has experienced extreme emotional pain and suffering.

**The Takai Family**

2909.   Plaintiff Sergeant John Takai served in Iraq in the U.S. Army as part of B Company, 1st Battalion, 28th Infantry Regiment, 4th Brigade Combat Team, 1st Infantry Division.  He is a U.S. citizen and a Texas resident.

2910.   On June 29, 2007 SGT Takai was injured by an EFP attack by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  SGT Takai sustained a Traumatic Brain Injury, PTSD, and a lower left salvaged arm.  As a result of the June 29, 2007 attack, SGT Takai has experienced extreme physical and emotional pain and suffering.

2911.   The attack that injured SGT Takai would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

2912.   Plaintiff Mae Takai is a U.S. citizen and Texas resident.  She is the spouse of SGT Takai.

2913.   Plaintiff Jonamae Takai is a U.S. citizen and Texas resident.  She is the daughter of SGT Takai.

2914.   Plaintiff Niana Takai is a U.S. citizen and Texas resident.  She is the daughter of SGT Takai.

2915.   Plaintiff K.T., by and through her next friend SGT Takai, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Takai.

2916.   Plaintiff I.T., by and through her next friend SGT Takai, is a U.S. citizen and Texas resident.  She is the minor daughter of SGT Takai.

2917.   As a result of the June 29, 2007 attack, and the injuries SGT Takai suffered, the Takai Family has experienced extreme emotional pain and suffering.

**Brian G. Taylor**

2918.   Plaintiff Specialist Brian G. Taylor served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.  SPC Taylor is a U.S. citizen and Florida resident.

2919.   On October 22, 2006, SPC Taylor was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  The explosion resulted in injuries to his right thigh, loss of muscle, skin, and part of his femur, a dislocated knee, a damaged femoral artery, compartment syndrome, and ultimately the amputation of his right leg.  As a result of the October 22, 2006 attack, SPC Taylor has experienced extreme physical and emotional pain and suffering.

2920.   The attack that injured SPC Taylor would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

**The David G. Taylor, Jr. Family and Estate**

2921.   Major David G. Taylor, Jr. served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.

2922.   On October 22, 2006, MAJ Taylor was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  MAJ Taylor was 37 years old.

2923.   MAJ Taylor was a U.S. citizen when he was killed in Iraq.

2924.   MAJ Taylor's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and

detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

2925.   Plaintiff Michelle Taylor is a U.S. citizen and Florida resident.  She is the widow of MAJ Taylor.  She brings claims in her personal capacity and in her representative capacity on behalf of MAJ Taylor's estate.

2926.   Plaintiff J.D.J.T., by and through his next friend Michelle Taylor, is a U.S. citizen and Florida resident.  He is the minor son of MAJ Taylor.

2927.   Plaintiff Phyllis K. Taylor is a U.S. citizen and Florida resident.  She is the mother of MAJ Taylor.

2928.   Plaintiff John K. Taylor is a U.S. citizen and North Carolina resident.  He is the brother of MAJ Taylor.

2929.   As a result of the October 22, 2006 attack, and MAJ Taylor's death, the Taylor Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Taylor's society, companionship, and counsel.

2930.   MAJ Taylor's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Terry Family**

2931.   Plaintiff Sergeant First Class Edward J. Terry, Sr. served in Iraq in the U.S. Army as part of E Company, 2nd Battalion, 69th Armor Regiment, 3rd Heavy Brigade Combat Team, 2rd Infantry Division.  He is a U.S. citizen and Alabama resident.

2932.   On June 20, 2007, SFC Terry survived a mortar attack launched by Jaysh al-Mahdi on FOB Loyalty in the New Baghdad District in eastern Baghdad, Iraq.  The attack physically wounded him and caused him to sustain a traumatic brain injury as well as shrapnel

wounds.  SFC Terry received a 100% disability rating from the VA.  As a result of the attack and his injuries, he has experienced extreme physical and emotional pain and suffering.

2933.   The attack that injured SFC Terry would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2934.   Plaintiff Edward J. Terry, Jr., is a U.S. citizen and Alabama resident.  He is the son of SFC Terry.

2935.   Plaintiff Glenndon M. Terry is a U.S. citizen and Alabama resident.  He is the son of SFC Terry.

2936.   As a result of the June 20, 2007 attack, and SFC Terry's injuries, the Terry Family has experienced extreme emotional pain and suffering.

### **The Thomsen Family**

2937.   Plaintiff Sergeant Mark E. Thomsen served in Iraq in the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Arkansas resident.

2938.   From approximately March 2008 through April 2008, SGT Thomsen survived multiple attacks by Jaysh al-Mahdi, including EFP, IED, RPG, sniper, and indirect-fire attacks, in or near Sadr City, during the Battle of Sadr City.  SGT Thomsen sustained several injuries during these attacks, including at least one Traumatic Brain Injury.

2939.   On April 21, 2008, during the Battle of Sadr City, SGT Thomsen was injured by a Jaysh al-Mahdi-modified 107mm rocket attack, which used an IRAM, on JSS Sadr City.  The attack wounded SGT Thomsen with a concussion, Traumatic Brain Injury, and PTSD.  Due to his injuries, he received a VA rating of 100%.  As a result of the April 21, 2008 and other Jaysh

al-Mahdi attacks, SGT Thomsen has experienced extreme physical and emotional pain and suffering.

2940.   The attacks that injured SSG Thomsen would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants.

2941.   Plaintiff Ardell Thomsen is a U.S. citizen and Arkansas resident.  She is the mother of SGT Thomsen.

2942.   Plaintiff Ralph Thomsen is a U.S. citizen and Arkansas resident.  He is the father of SGT Thomsen.

2943.   As a result of the Jaysh al-Mahdi attacks, and SGT Thomsen's injuries, the Thomsen Family has experienced extreme emotional pain and suffering.

### The Thorne Family and Estate

2944.   Private First Class William E. Thorne served in Iraq in the U.S. Army as part of the 1st Squadron, 10th Cavalry Regiment, 2nd Brigade, 4th Infantry Division.

2945.   On August 24, 2006, PFC Thorne was killed by an IED planted and detonated by Jaysh al-Mahdi on Route Chevy, south of Baghdad, Iraq.  He was 26 years old.

2946.   PFC Thorne was a U.S. citizen when he was killed in Iraq.

2947.   PFC Thorne's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

2948.   Plaintiff Corey Schlenker is a U.S. citizen and South Dakota resident.  She is the widow of PFC Thorne.  She brings claims in both her personal capacity and her representative capacity on behalf of PFC Thorne's estate.

2949.   Plaintiff Joey Robinson is a U.S. citizen and Nebraska resident.  She is the sister of PFC Thorne.

2950.   As a result of the August 24, 2006 attack, and PFC Thorne's death, the Thorne Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Thorne's society, companionship, and counsel.

2951.   PFC Thorne's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Thornsberry Family

2952.   Plaintiff Specialist Marvin R. Thornsberry served in Iraq as part of A Battery, 2nd Battalion, 377th Parachute Field Artillery Regiment, 4th Brigade Combat Team, 25th Infantry Division.  He is a U.S. citizen and Michigan resident.

2953.   On January 20, 2007, SPC Thornsberry was in the PJCC's adjacent building during the Karbala Attack.  *See supra* ¶¶ 1515-19.  SPC Thornsberry now suffers from survivors' guilt, depression, and anxiety as a result of the Karbala Attack.  He has received an 80% disability rating from the VA.  As a result of the Karbala Attack, SPC Thornsberry has experienced extreme emotional pain and suffering.

2954.   The attack that injured SPC Thornsberry would have violated the law of war if AAH and Hezbollah were subject to it because, among other things, the terrorists who committed the Karbala Attack disguised themselves as American soldiers and executed hostages in captivity.

2955.   Plaintiff Cynthia M. Thornsberry is a U.S. citizen and Michigan resident.  She is the wife of SPC Thornsberry.

2956.   Plaintiff L.T., by and through her next friend SPC Thornsberry, is a U.S. citizen and Michigan resident.  She is the minor daughter of SPC Thornsberry.

2957.   Plaintiff M.T., by and through her next friend SPC Thornsberry, is a U.S. citizen and Michigan resident.  She is the minor daughter of SPC Thornsberry.

2958.   Plaintiff N.T., by and through his next friend SPC Thornsberry, is a U.S. citizen and Michigan resident.  He is the minor son of SPC Thornsberry.

2959.   Plaintiff A.B., by and through his next friend Cynthia Marlo Thornsberry, is a U.S. citizen and Michigan resident.  He is the minor stepson of SPC Thornsberry.

2960.   As a result of the January 20, 2007 attack, and SPC Thornsberry's survivors' guilt, depression, and anxiety, the Thornsberry Family has experienced extreme emotional pain and suffering.

**The Tiffner Family and Estate**

2961.   Captain Benjamin D. Tiffner served in the U.S. Army in Iraq as part of the 1st Battalion, 5th Special Forces Group (Airborne).

2962.   On November 7, 2007, CPT Tiffner was killed by an EFP planted and detonated by Jaysh al-Mahdi near the border of the Kadamiyah and Adhamiyah Districts in Baghdad, Iraq. He was 31 years old.

2963.   CPT Tiffner was a U.S. citizen when he was killed in Iraq.

2964.   CPT Tiffner's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

2965.   Plaintiff Timothy Tiffner is a U.S. citizen and Tennessee resident.  He is the father of CPT Tiffner.  He brings claims in both his personal capacity and his representative capacity on behalf of CPT Tiffner's estate.

2966.   Plaintiff Judith Tiffner is a U.S. citizen and Tennessee resident.  She is the mother of CPT Tiffner.

2967.   Plaintiff Joshua Tiffner is a U.S. citizen and Utah resident.  He is the brother of CPT Tiffner.

2968.   Plaintiff Seth Tiffner is a U.S. citizen and Alabama resident.  He is the brother of CPT Tiffner.

2969.   Plaintiff Sarah Crosby is a U.S. citizen and Alaska resident.  She is the sister of CPT Tiffner.

2970.   As a result of the death of the November 7, 2007 attack, and CPT Tiffner's death, the Tiffner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Tiffner's society, companionship, and counsel.

2971.   CPT Tiffner's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Trimble Family**

2972.   Plaintiff Specialist Philip R. Trimble served in Iraq in the U.S. Army as part of D Company, 1st Battalion, 181st Infantry Regiment.  He is a U.S. citizen and Iowa resident.

2973.   On March 23, 2008, during the Battle of Sadr City, SPC Trimble was injured in a Jaysh al-Mahdi attack.  SPC Trimble was at Camp Travis in the U.S. Embassy compound in Baghdad, Iraq when the alarms warned of incoming rockets and mortars.  As SPC Trimble was escaping to the bunkers, a mortar landed nearby.  The blast caused him to hit his head against a wall, and he was injured by shrapnel.

2974.   As a result of the attack, SPC Trimble suffered a puncture wound to his right shin, a Traumatic Brain Injury, and PTSD.  Due to his injuries, he received a 70% disability rating from the VA.  As a result of the March 23, 2008 attack, and the injuries he sustained therein, SPC Trimble has experienced extreme physical and emotional pain and suffering.

2975.   The attack that injured SPC Trimble would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they targeted civilians.

2976.   Plaintiff Janet M. Schoonover is a U.S. citizen and Iowa resident.  She is the mother of SPC Trimble.

2977.   Plaintiff Andrew L. Trimble is a U.S. citizen and Iowa resident.  He is the brother of SPC Trimble.

2978.   Plaintiff Richard O. Trimble is a U.S. citizen and Iowa resident.  He is the brother of SPC Trimble.

2979.   Plaintiff LaDonna R. Langstraat is a U.S. citizen and Iowa resident.  She is the sister of SPC Trimble.

2980.   Plaintiff John A. Trimble is a U.S. citizen and Iowa resident.  He is the brother of SPC Trimble.

2981.   Plaintiff Charlotte R. Teetsel is a U.S. citizen and Michigan resident.  She is the sister of SPC Trimble.

2982.   Plaintiff Kayeleen A. Luloff is a U.S. citizen and Iowa resident.  She is the sister of SPC Trimble.

2983.   As a result of the March 23, 2008 attack, and the injuries suffered by SPC Trimble, the Trimble Family has experienced extreme emotional pain and suffering.

**The Tully Family and Estate**

2984.   Sergeant First Class Michael J. Tully served in the U.S. Army as part of the 2nd Battalion, 1st Special Forces Group (Airborne).

2985.   On August 23, 2007, SFC Tully was killed by an EFP planted and detonated by Jaysh al-Mahdi in Wasit Province near Aziziyah, Iraq.  He was 33 years old.

2986.   SFC Tully was a U.S. citizen when he was killed in Iraq.

2987.   SFC Tully's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2988.   Plaintiff John R. Tully is a U.S. citizen and Pennsylvania resident.  He is the father of SFC Tully.  He brings claims in both his personal capacity and his representative capacity on behalf of SFC Tully's estate.

2989.   Plaintiff Marilyn L. Tully is a U.S. citizen and Pennsylvania resident.  She is the mother of SFC Tully.

2990.   Plaintiff Heather A. Farkas is a U.S. citizen and Pennsylvania resident.  She is the sister of SFC Tully.

2991.   Plaintiff Slade V. Tully is a U.S. citizen and Pennsylvania resident.  He is the son of SFC Tully.

2992.   Plaintiff John R. Tully, II is a U.S. citizen and Arizona resident.  He is the brother of SFC Tully.

2993.   As a result of the August 23, 2007 attack, and SFC Tully's death, the Tully Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Tully's society, companionship, and counsel.

2994.   SFC Tully's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### The Umbrell Family and Estate

2995.   First Lieutenant Colby J. Umbrell served in the U.S. Army in Iraq as part of the 1st Battalion, 501st Parachute Infantry Regiment, 4th Brigade Combat Team, 25th Infantry Division.

2996.   On May 3, 2007, 1LT Umbrell was killed by an EFP planted and detonated by Jaysh al-Mahdi near Musayyib, Iraq.  He was 26 years old.

2997.   1LT Umbrell was a U.S. citizen when he was killed in Iraq.

2998.   The attack on 1LT Umbrell would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2999.   Plaintiff Nancy Umbrell is a U.S. citizen and Pennsylvania resident.  She is the mother of 1LT Umbrell.

3000.   Plaintiff Mark Umbrell is a U.S. citizen and Pennsylvania resident.  He is the father of 1LT Umbrell.

3001.   Plaintiffs Nancy Umbrell and Mark Umbrell bring claims in both their personal capacity and their representative capacity on behalf of 1LT Umbrell's estate.

3002.   As a result of the May 3, 2007 attack, and 1LT Umbrell's death, the Umbrell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Umbrell's society, companionship, and counsel.

3003.   1LT Umbrell's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Vacho Family**

3004.   Staff Sergeant Nathan J. Vacho served in Iraq with the 489th Civil Affairs Battalion, Army Reserve, attached to the 2nd Brigade Combat Team, 4th Infantry Division.

3005.   On May 5, 2006, SSG Vacho was killed by an EFP planted and detonated by Jaysh al-Mahdi north of Hillah, in central Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system.  SSG Vacho was 29 years old.

3006.   SSG Vacho was a U.S. citizen when he was killed in Iraq.

3007.   The attack on SSG Vacho would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger placed civilians at risk.

3008.   Carol Vacho was a U.S. citizen at the time of SSG Vacho's death.  She was the mother of SSG Vacho.  She died on November 9, 2013.

3009.   Plaintiff John Vacho is a U.S. citizen and Wisconsin resident.  He is the father of SSG Vacho.  He brings claims in both his personal capacity and his representative capacity on behalf of Carol Vacho's estate.

3010.   Plaintiff Ashley M. Leslie is a U.S. citizen and Wisconsin resident.  She is the sister of SSG Vacho.

3011.   As a result of the May 5, 2006 attack, and SSG Vacho's death, the Vacho Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Vacho's society, companionship, and counsel.

3012.   Carol Vacho's estate is entitled to recover economic and non-economic damages from Defendants, due to SSG Vacho's murder by Jaysh al-Mahdi.

**The Vandegrift Family and Estate**

3013.   First Lieutenant Matthew R. Vandegrift served in Iraq with the Marine Corps as part of the 2nd Battalion, 10th Marine Regiment, 2nd Marine Division, II Marine Expeditionary Force.

3014.   On April 21, 2008, during the Battle of Sadr City and related fighting near Basra, Iraq, 1stLt Vandegrift was killed in Basra by an EFP planted and detonated by a cell that included members of both Jaysh al-Mahdi and Hezbollah.   1stLt Vandegrift was 28 years old.

3015.   The attack on 1stLt Vandegrift would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3016.   1stLt Vandegrift was a U.S. citizen when he was killed in Iraq.

3017.   Plaintiff Mary J. Vandegrift is a U.S. citizen and Colorado resident.   She is the mother of 1stLt Vandegrift.   She brings claims in both her personal capacity and her representative capacity on behalf of 1stLt Vandegrift's and John Vandegrift's estates.

3018.   Plaintiff John Vandegrift was a U.S. citizen and Colorado resident.   He is the deceased father of 1stLt Vandegrift.

3019.   As a result of the April 21, 2008 attack, and 1stLt Vandegrift's death, the Vandegrift Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1stLt Vandegrift's society, companionship, and counsel.

3020.   1stLt Vazquez's estate and John Vandegrift's estate are entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi and Hezbollah.

### The Andres Vazquez Family

3021.   Plaintiff Sergeant Andres Vazquez served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Georgia resident.

3022.   On or about May 4 or 5, 2008, during the Battle of Sadr City, SGT Vazquez was injured when two RPGs were fired by Jaysh al-Mahdi hit his vehicle in Sadr City.  SGT Vazquez was wounded in the attack and sustained a severe concussion, which left him with Traumatic Brain Injury, migraines, photosensitivity, audio sensitivity, and memory issues.  Due to his injuries, SGT Vazquez received an 80% disability rating from the VA.  As a result of the May 4-5 2008 attack, he has experienced extreme physical and emotional pain and suffering.

3023.   The attack that injured SGT Vazquez would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

3024.   Plaintiff Barbara C. Palacio-Vazquez is a U.S. citizen and Georgia resident.  She is the wife of SGT Vazquez.

3025.   Plaintiff A.V., by and through her next friend Barbara C. Palacio-Vazquez, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT Vazquez.

3026.   Plaintiff M.G.V., by and through her next friend Barbara C. Palacio-Vazquez, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT Vazquez.

3027.   Plaintiff J.B.V., by and through her next friend Barbara C. Palacio-Vazquez, is a U.S. citizen and Georgia resident.  She is the minor daughter of SGT Vazquez.

3028.   As a result of the May 4-5, 2008 attack, and SGT Vazquez's injuries, the Vazquez Family has experienced extreme emotional pain and suffering.

### **The Omar Vazquez Family and Estate**

3029.   First Lieutenant Omar J. Vazquez served in Iraq in the U.S. Army as part of the 2nd Squadron, 3rd Armored Cavalry Regiment.

3030.   On April 22, 2011, 1LT Vazquez was killed by injuries sustained from an IED planted and detonated by Jaysh al-Mahdi in Wasit Province, near Numaniyah and Kut, Iraq.  He was 25 years old.

3031.   1LT Vazquez was a U.S. citizen when he was killed in Iraq.

3032.   1LT Vazquez's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

3033.   Plaintiff Marisel Vazquez is a U.S. citizen and New Jersey resident.  She is the stepsister of 1LT Vazquez.

3034.   Plaintiff Maria Vazquez is a U.S. citizen and New Jersey resident.  She is the mother of 1LT Vazquez.  Maria Vazquez brings claims in both her personal capacity and her representative capacity on behalf of 1LT Vazquez's estate.

3035.   As a result of the April 22, 2011 attack, and 1LT Vazquez's death, the Vazquez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Vazquez's society, companionship, and counsel.

3036.   1LT Vazquez's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**The Vendela Family**

3037.   Plaintiff Staff Sergeant Travis Vendela served in Iraq in the 3rd Battalion, 8th Cavalry Regiment, 1st Cavalry Division.  He is a U.S. citizen and Utah resident.

3038.   On February 7, 2007, SSG Vendela was injured by an EFP planted and detonated by Jaysh al-Mahdi north of Diwaniyah, Iraq.  SSG Vendela sustained injuries that resulted in amputation of both of his legs above the knee, a fractured pelvis, a C4 spine fracture, a jaw fracture, and fascial release on his right arm.  As a result of the February 7, 2007 attack, SSG Vendela has experienced extreme physical and emotional pain and suffering.

3039.   The attack that injured SSG Vendela would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

3040.   Plaintiff Marianne Vendela is a U.S. citizen and Arizona resident.  She is the mother of SSG Vendela.  As a result of the February 7, 2007 attack, and SSG Vendela's injuries, Marianne Vendela has experienced extreme emotional pain and suffering.

**Jose L. Vera**

3041.   Plaintiff Sergeant First Class Jose L. Vera served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and New Jersey resident.

3042.   In July 17, 2007, SFC Vera was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  The attack severely wounded SFC Vera, causing him to lose consciousness and giving him a concussion.  He also suffered burns from shrapnel and injury to his spine.  He has since experienced nerve damage and numbness in his hands as a result of his injuries.  As a result of the July 17, 2007 attack, SFC Vera has experienced extreme physical and emotional pain and suffering.

3043.   The attack that injured SFC Vera would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### **The Veverka Family**

3044.   Staff Sergeant David M. Veverka served in Iraq with B Company, 3rd Battalion, 172nd Mountain Infantry Regiment, Army National Guard.

3045.   On May 6, 2006, SSG Veverka was killed by an EFP planted and detonated by Jaysh al-Mahdi in Diwaniyah, in Qadisiyah Province in central Iraq.  He was 25 years old.

3046.   SSG Veverka was a U.S. citizen when he was killed in Iraq.

3047.   SSG Veverka's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

3048.   Plaintiff Carol Polley is a U.S. citizen and Pennsylvania resident.  She is the mother of SSG Veverka.

3049.   Plaintiff Keith Veverka is a U.S. citizen and Pennsylvania resident.  He is the brother of SSG Veverka.

3050.   Plaintiff Douglas Veverka is a U.S. citizen and Pennsylvania resident.  He is the brother of SSG Veverka.

3051.   Plaintiff Ronald Veverka is a U.S. citizen and Pennsylvania resident.  He is the father of SSG Veverka.

3052.   Plaintiff Sandra Soliday is a U.S. citizen and Pennsylvania resident.  She is the sister of SSG Veverka.

3053.   As a result of the May 6, 2006 attack, and SSG Veverka's death, the Veverka Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Veverka's society, companionship, and counsel.

**The Vincent Family and Estate**

3054.   Steven Vincent worked in Iraq as a journalist.

3055.   On August 2, 2005, Mr. Vincent was reporting in Basra, Iraq, when he was kidnapped, taken hostage for several hours, and then shot by his kidnappers.  On information and belief, Mr. Vincent's kidnappers were from a cell that included members of both Jaysh al-Mahdi and Hezbollah.  He was 49 years old.

3056.   Mr. Vincent was a U.S. citizen when he was killed in Iraq.

3057.   Mr. Vincent's kidnapping and murder would have violated the law of war if Jaysh al-Mahdi and Hezbolah were subject to it because, among other reasons, he was a civilian not taking part in hostilities, he was executed without trial, and the Jaysh al-Mahdi and Hezbollah member(s) who conducted the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3058.   Plaintiff Lisa Ramaci is a U.S. citizen and New York resident.  She is the widow of Steven Vincent.  She brings claims in both her personal capacity and her representative capacity on behalf of Steven Vincent's estate.

3059.   Plaintiff Isabell Vincent is a U.S. citizen and California resident.  She is the mother of Steven Vincent and widow of Charles Vincent.  She brings claims in both her personal capacity and her representative capacity on behalf of Charles Vincent's estate.

3060.   Charles Vincent was a U.S. citizen and California resident.  He was the father of Steven Vincent.  He died on February 28, 2019.

3061.   As a result of the August 2, 2005 attack, and Mr. Vincent's death, the Vincent Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Vincent's society, companionship, and counsel.

3062.   Mr. Vincent's estate is entitled to recover economic and non-economic damages from Defendants, due to his kidnapping and murder by Jaysh al-Mahdi and Hezbollah.

**Christopher Violette**

3063.   Plaintiff Sergeant First Class Christopher Violette served in Iraq in the U.S. Army as part of the 1st Platoon, Charlie Company of the 2nd Stryker Calvary Regiment.  He is a U.S. citizen and Florida resident.

3064.   On April 24, 2008, during the Battle of Sadr City, SFC Violette was injured by an EFP planted and detonated by Jaysh al-Mahdi near Sadr City.  SFC Violette was awarded a Purple Heart in connection with the April 24, 2008 attack.

3065.   SFC Violette was also involved in other attacks by Jaysh al-Mahdi during the Battle of Sadr City.  In the course of two attacks by Jaysh al-Mahdi, SFC Violette rendered first aid to two U.S. service members who were badly wounded and did not survive.

3066.   The April 24, 2008 attack resulted in cervical, thoracic, and lumbar back injuries. He was prescribed heavy pain medications for these injuries, which caused him to develop a seven-year addiction to the medications.  As a result of the April 24, 2008 attack, SFC Violette has experienced extreme physical and emotional pain and suffering.

3067.   The attack that injured SFC Violette would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Michelle Wager**

3068.   Plaintiff Staff Sergeant Michelle Wager served in Iraq in the U.S. Army as part of the 46th Military Police Command, Army National Guard, Michigan.  She is a U.S. citizen and a Michigan resident.

3069.   On January 22, 2007, SSG Wager was injured by a multiple-array EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  SSG Wager was attacked while traveling as part of a six-vehicle convoy southbound on Route Pluto.  SSG Wager sustained injuries that resulted in amputation of her left leg above the knee, a rod and pin in her right hip, damage to her right ankle, nerve damage to her lower right leg, PTSD, and a Traumatic Brain Injury.  Due to her injuries, SSG Wager received a 100% disability rating from the VA.  As a result of the January 22, 2007 attack, SSG Wager has experienced extreme physical and emotional pain and suffering.

3070.   The attack that injured SSG Wager would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Bryan Wagner**

3071.   Plaintiff Specialist Bryan Wagner served in Iraq in the U.S. Army as part of the Headquarters Detachment, 95th Military Police Battalion, 18th Military Police Brigade.  He is a U.S. citizen and Florida resident.

3072.   On December 17, 2007, SPC Wagner was injured by an EFP planted and detonated by Jaysh al-Mahdi near the border between the New Baghdad and Karadah Districts in Baghdad, Iraq.  In this attack, SPC Wagner sustained injuries that resulted in the amputation of his right leg below the knee.  Due to his injuries, SPC Wagner received an 80% disability rating

from the VA. As a result of the December 17, 2007 attack, SPC Wagner has experienced extreme physical and emotional pain and suffering.

3073. The attack that injured SPC Wagner would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Wakeman Family and Estate**

3074. Sergeant Dustin S. Wakeman served in Iraq in the U.S. Army as part of the 1st Squadron, 40th Calvary Regiment, 4th Brigade Combat Team (Airborne), 25th Infantry Division.

3075. On August 4, 2007, SGT Wakeman was killed by injuries caused by an IED planted and detonated by Jaysh al-Mahdi in the Hawr Rajab neighborhood of the Al Rashid District in Baghdad, Iraq. SGT Wakeman was murdered when the explosive device detonated while he was traveling in his vehicle. SGT Wakeman was 25 years old.

3076. SGT Wakeman was a U.S. citizen when he was killed in Iraq.

3077. SGT Wakeman's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

3078. Plaintiff Margaret Wakeman is a U.S. citizen and Texas resident. She is the mother of SGT Wakeman.

3079. Plaintiff David Wakeman is a U.S. citizen and Texas resident. He is the father of SGT Wakeman. David Wakeman brings claims in both his personal capacity and his representative capacity on behalf of SGT Wakeman's estate.

3080.   Plaintiff William Z. Wakeman is a U.S. citizen and Texas resident.  He is the brother of SGT Wakeman.

3081.   As a result of the August 4, 2007 attack, and SGT Wakeman's death, the Wakeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Wakeman's society, companionship, and counsel.

3082.   SGT Wakeman's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Justin Waldeck**

3083.   Plaintiff Major Justin A. Waldeck served with the U.S. Marine Corps in Iraq as part of the 3rd Light Armored Reconnaissance Battalion, 1st Marine Division, I Marine Expeditionary Force, attached to the Army's 4th Infantry Division.  He is a U.S. citizen and Illinois resident.

3084.   On February 20, 2006, Maj. Waldeck was injured by an EFP planted and detonated by Jaysh al-Mahdi in Karbala Province, Iraq.  The attack caused Maj. Waldeck to suffer from fused metacarpal, nerve damage, and shrapnel injuries.  Due to his injuries, Maj. Waldeck received a 20% disability rating from the VA.  As a result of the February 20, 2006 attack, Maj. Waldeck has experienced extreme physical and emotional pain and suffering.

3085.   The attack that injured Maj. Waldeck would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Billy Wallace Family**

3086.   Plaintiff Sergeant First Class Billy Wallace served in Iraq in the U.S. Army as part of Alpha Battery, 2nd Battalion, 377th Parachute Field Artillery Regiment.  He is a U.S. citizen and Indiana resident.

3087.   SFC Wallace was wounded during the Karbala Attack, while helping to defend the PJCC's main building.  *See supra* ¶¶ 1515-19.  He sustained serious shrapnel injuries when a grenade exploded in the doorway of the room that he was defending.  SFC Wallace also sustained hearing loss and tinnitus and now suffers from PTSD.  As a result of the Karbala Attack, SFC Wallace has experienced extreme physical and emotional pain and suffering.

3088.   The attack that injured SFC Wallace would have violated the law of war if AAH and Hezbollah were subject to it because, among other things, the terrorists who committed the Karbala Attack disguised themselves as American soldiers and executed hostages in captivity.

3089.   Plaintiff Stefanie Wallace is a U.S. citizen and Indiana resident.  She is the wife of SFC Wallace.

3090.   Plaintiff Austin Wallace is a U.S. citizen and Florida resident.  He is the son of SFC Wallace.

3091.   Plaintiff Devon Wallace is a U.S. citizen and Indiana resident.  He is the son of SFC Wallace.

3092.   Plaintiff C.W., by and through his next friend SFC Wallace, is a U.S. citizen and Indiana resident.  He is the minor son of SFC Wallace.

3093.   As a result of the Karbala Attack, and SFC Wallace's injuries, the Wallace Family has experienced extreme emotional pain and suffering.

**Jeremy Wallace**

3094.   Plaintiff Private First Class Jeremy Wallace served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Idaho resident.

3095.   On or about March 27, 2008, during the Battle of Sadr City, PFC Wallace was injured by an EFP attack by Jaysh al-Mahdi, immediately southeast of Sadr City.  The resulted in Traumatic Brain Injury, nerve damage, and muscle atrophy.

3096.   On or about April 1, 2008, during the Battle of Sadr City, PFC Wallace was shot by a Jaysh al-Mahdi sniper, injuring his left arm.  PFC Wallace has a 100% disability rating from the VA.  As a result of the March 27, 2008 and April 1, 2008 attacks, PFC Wallace has experienced extreme physical and emotional pain and suffering.

3097.   The attacks that injured PFC Wallace would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Walton Family and Estate**

3098.   Private First Class Brett A. Walton served in Iraq in the U.S. Army as part of the 2nd Battalion, 17th Field Artillery Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

3099.   On April 9, 2007, PFC Walton was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Karadah District in Baghdad, Iraq.  PFC Walton was 37 years old.

3100.   PFC Walton was a U.S. citizen when he was killed in Iraq.

3101.   The attack on PFC Walton would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and

detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

3102.   Plaintiff Lindsay Young is a U.S. citizen and Oregon resident.  She is the widow of PFC Walton.  Lindsay Young brings claims in both her personal capacity and her representative capacity on behalf of PFC Walton's estate.

3103.   Plaintiff Sydney Walton is a U.S. citizen and Oregon resident.  She is the daughter of PFC Walton.

3104.   As a result of the April 9, 2007 attack, and PFC Walton's death, the Walton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Walton's society, companionship, and counsel.

3105.   PFC Walton's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Ward Family**

3106.   Plaintiff Sergeant First Class Patrick Ward served in Iraq as part of the 2nd Battalion, Delta Company, 505th Parachute Infantry Division, 82nd Airborne Division.  He is a U.S. citizen and Pennsylvania resident.

3107.   On January 10, 2009, SFC Ward was an occupant in the third vehicle traveling in a convoy in the New Baghdad District in eastern Baghdad, Iraq, when Jaysh al-Mahdi detonated an EFP it had planted near the lead vehicle.  SFC Ward saw the explosion.

3108.   Following the blast, SFC Ward approached the lead vehicle.  When he looked inside the vehicle, he saw the face of his friend and fellow soldier, Justin Bauer.  Then he realized that Justin Bauer had been killed.  Following the attack, SFC Ward had trouble sleeping and was diagnosed with PTSD and anxiety disorder.  He has sought counseling and received treatment to address PTSD, anxiety disorder, and the impact that the attack has had on him.  Due

to his injuries, SFC Ward received a 50% disability rating from the VA.  As a result of the Jaysh al-Mahdi attack, SFC Ward has experienced extreme emotional pain and suffering.

3109.   The attack that injured SFC Ward would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

3110.   Plaintiff Jarrett Ward is a U.S. citizen and Pennsylvania resident.  He is the son of SFC Ward.  As a result of the January 10, 2009 attack, and SFC Ward's injuries, Jarrett Ward has experienced extreme emotional pain and suffering.

**Kyle L. Welch**

3111.   Plaintiff Staff Sergeant Kyle L. Welch served in the U.S. Army in Iraq as part of the 168th Armor Battalion, 3rd Brigade, 4th Infantry Division.  He is a U.S. citizen and Colorado resident.

3112.   On April 30, 2008, during the Battle of Sadr City, SSG Welch was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Gold in Sadr City.  The explosion hit the vehicle in which SSG Welch was riding.  In this attack, SSG Welch sustained a concussion.

3113.   SSG Welch now suffers from migraines, cervical and lumbosacral strain, dizziness, weakness in his legs, tinnitus, PTSD, anxiety, and depression as a result of the EFP attack by Jaysh al-Mahdi.  Due to his injuries, he received a 90% disability rating from the VA. As a result of the April 30, 2008 attack, SSG Welch has experienced extreme physical and emotional pain and suffering.

3114.   The attack that injured SSG Welch would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

**The Wells Family**

3115.   Plaintiff Specialist Joshua Wells served in the U.S. Army in Iraq as part of the 3rd Battalion, 2nd Calvary Regiment.  He is a U.S. citizen and a Mississippi resident.

3116.   On November 2, 2007, SPC Wells was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Kadamiyah District in western Baghdad, Iraq.  In this attack, SPC Wells sustained injuries that resulted in an amputation of his legs above both knees.  Due to his injuries, SPC Wells received a 100% disability rating from the VA.  As a result of the November 2, 2007 attack, SPC Wells has experienced extreme physical and emotional pain and suffering.

3117.   The attack that injured SPC Wells would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

3118.   Plaintiff Lydia Lantrip is a U.S. citizen and Mississippi resident.  She is the mother of SPC Wells.

3119.   Plaintiff Billie Wells, Jr. is a U.S. citizen and Mississippi resident.  He is the father of SPC Wells.

3120.   Plaintiff David B. Lantrip, Jr.is a U.S. citizen and Mississippi resident.  He is the brother of SPC Wells.

3121.   Plaintiff J.W., by and through his next friend Billie Wells, Jr., is a U.S. citizen and Mississippi resident.  He is the minor brother of SPC Wells.

3122.   As a result of the November 2, 2007 attack, and SPC Wells's injuries, the Wells Family has experienced extreme emotional pain and suffering.

**The Whetzel Family**

3123.   Plaintiff Specialist Mark A. Whetzel served in the U.S. Army in Iraq as a policeman for the 65th Military Police Company.  He is a U.S. citizen and West Virginia resident.

3124.   On or about October 15, 2008, SPC Whetzel was injured by an IED planted and detonated by Jaysh al-Mahdi while traveling south from Baghdad, Iraq along Route Steelers. SPC Wetzel sustained injuries from the concussive blast of the explosion, including a dislocated shoulder and a Traumatic Brain Injury.  SPC Whetzel now suffers from headaches, memory loss, pain in both ankles, as well as PTSD, nightmares, anxiety, and depression.  Due to his injuries, SPC Whetzel received a 100% disability rating from the VA.  As a result of the October 15, 2008 attack, SPC Whetzel has experienced extreme physical and emotional pain and suffering.

3125.   The attack that injured SPC Whetzel would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

3126.   Plaintiff Jennifer D. Whetzel is a U.S. citizen and West Virginia resident.  She is the wife of SPC Whetzel.

3127.   Plaintiff Dianna E. Whetzel is a U.S. citizen and West Virginia resident.  She is the daughter of SPC Whetzel.

3128.   As a result of the October 15, 2008 attack, and SPC Whetzel's injuries, the Whetzel Family has experienced severe mental anguish, emotional pain, and suffering.

**The Lucas White Family and Estate**

3129.   Sergeant Lucas T. White served in Iraq in the U.S. Army as part of the 1st Battalion, 23rd Infantry Regiment, 3rd Brigade Combat Team, 2nd Infantry Division.

3130.   On November 6, 2006, SGT White was killed by injuries sustained from an IED planted and detonated by Jaysh al-Mahdi in the Mansour District of Baghdad, Iraq.  SGT White was 28 years old.

3131.   SGT White was a U.S. citizen when he was killed in Iraq.

3132.   SGT White's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

3133.   Plaintiff Jennifer White is a U.S. citizen and Idaho resident.  She is the widow of SGT White.  Jennifer White brings claims in both her personal capacity and her representative capacity on behalf of SGT White's estate.

3134.   As a result of the November 6, 2006 attack, and SGT White's death, the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT White's society, companionship, and counsel.

3135.   SGT White's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**Wesley Williamson**

3136.   Plaintiff Specialist Wesley Williamson served in Iraq in the U.S. Army as part of 2-30 Wild Boars.  He is a U.S. citizen and Texas resident.

3137.   On May 9, 2008, during the Battle of Sadr City, SPC Williamson was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, Iraq.  As a result of the attack, SPC Williamson's right ulna and radius were shattered, and his posterior interosseous nerve was severed.  Shrapnel also penetrated his body.  In an attempt to regain functionality of his right arm and hand, SPC Williamson underwent multiple

surgeries.  These surgeries included the installation of plates and 16 screws in his right arm and tendon transfer surgery.  The injury to his hand has resulted in a loss of dexterity to his fingers. This has forced SPC Williamson to re-learn simple everyday tasks such as typing.  Due to his injuries, he received an 80% disability rating from the VA.  As a result of the May 9, 2008 attack, SPC Williamson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3138.   The attack that injured SPC Williamson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### James T. Wilson

3139.   Plaintiff Staff Sergeant James T. Wilson served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and South Carolina resident.

3140.   On February 10, 2008, SSG Wilson was injured by an IED planted and detonated by Jaysh al-Mahdi in Sadr City.  The explosion hit the vehicle in which SSG Wilson was riding, causing him to lose consciousness.  SSG Wilson was later evaluated for a Traumatic Brain Injury and concussion.

3141.   On March 20, 2008, SSG Wilson was injured by an EFP attack by Jaysh al-Mahdi near COP Bull in Sadr City.  The explosion caused SSG Wilson to sustain another Traumatic Brain Injury.

3142.   On April 1, 2008, SSG Wilson was injured in an attack by Jaysh al-Mahdi while building a wall on Route Gold in Sadr City.  An RPG struck close to SSG Wilson while he was engaged with his unit in a small-arms attack by Jaysh al-Mahdi.  He was knocked to the ground by the explosion, causing a mild concussion.

3143.   The attacks of February 10, March 20, and April 1, 2008 resulted in multiple Traumatic Brain Injuries, multiple concussions, back injuries, chlorine lung exposure causing breathing difficulties, as well as severe sleep apnea.  Due to his injuries, SSG Wilson received a 100% disability rating from the VA.  As a result of these attacks, SSG Wilson has experienced extreme physical and emotional pain and suffering.

3144.   The attacks on SSG Wilson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

### Victor R. Wise, II

3145.   Plaintiff Senior Airman Victor R. Wise, II served with the U.S. Air Force in Iraq as part of the 732nd ESFS Detachment 2, 55th Security Forces Squadron, 55th Fighter Wing.  He is a U.S. citizen and Kentucky resident.

3146.   On September 8, 2008, SrA Wise was injured by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq.  The attack severely wounded SrA Wise, peppering his body with shrapnel and resulting in the amputation of a toe and removal of muscle in his upper thigh.  As a result of the September 8, 2008 attack, SrA Wise has experienced extreme physical and emotional pain and suffering.

3147.   The attack that injured SrA Wise would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who detonated the EFP that injured SrA Wise neither wore uniforms nor otherwise identified themselves as enemy combatants.

### The Wolfer Family and Estate

3148.   Major Stuart A. Wolfer served in the U.S. Army in Iraq as part of the 11th Battalion, 6th Brigade, 104th Infantry Division.

3149.   On April 6, 2008, during the Battle of Sadr City, MAJ Wolfer was killed in an explosion in the Green Zone that was caused by a 107mm rocket that was transported, stored, and launched by Jaysh al-Mahdi.  COL Stephen K. Scott was also killed in the attack.  MAJ Wolfer was 36 years old.

3150.   On information and belief, Hezbollah participated in and directed Jaysh al-Mahdi to launch the indirect-fire attack that killed MAJ Wolfer.  *See supra* ¶¶ 738-39, 2624-25.

3151.   MAJ Wolfer was a U.S. citizen when he was killed in Iraq.

3152.   The attack on MAJ Wolfer would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the attack placed civilians at risk, and because the Jaysh al-Mahdi and Hezbollah member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

3153.   Plaintiff Beverly Wolfer is a U.S. citizen and New York resident.  She is the sister of MAJ Wolfer.  She brings claims in both her personal capacity and her representative capacity on behalf of MAJ Wolfer's estate.

3154.   As a result of the April 6, 2008 attack, and MAJ Wolfer's death, the Wolfer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Wolfer's society, companionship, and counsel.

3155.   MAJ Wolfer's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

### **The Woodard Family**

3156.   Plaintiff Captain David Woodard served in Iraq as part of the 2-30 Wild Boars. He is a U.S. citizen and Georgia resident.

3157.   On April 28, 2008, during the Battle of Sadr City, CPT Woodard was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern

Baghdad, Iraq while he was on a patrol at a checkpoint on Route Gold and Route Arrow, approximately 200 meters outside of Sadr City.  CPT Woodard's patrol was attacked by an ambush, with a dual-array EFP on both sides of the route.  He was hit by the first one.  The EFP went through the door of his vehicle and into the transmission.  A large fragment struck his right leg and blew out four inches of his leg bone.  Two large shrapnel fragments entered his left calf, removing approximately 25% of the calf muscle.  Another fragment entered near his Achilles tendon, and the shrapnel was later surgically removed.  The second EFP was set off during the medical-evacuation operation to evacuate CPT Woodard, but it failed to detonate.  Due to his injuries, he received a 90% disability rating from the VA.  As a result of the April 28, 2008 attack, CPT Woodard has experienced significant physical and emotional pain and suffering.

3158.   The attack that injured CPT Woodard would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they attacked a medical-evacuation helicopter during a medical evacuation of a wounded soldier.

3158.1.   Plaintiff D.W., by and through his next friend CPT Woodard, is a U.S. citizen and Georgia resident.  He is the minor son of CPT Woodard.

3158.2.   As a result of the attack, and CPT Woodard's injuries, the Woodard Family has experienced severe mental anguish, emotional pain, and suffering.

**Gina Wright**

3159.   Specialist Christopher D. Young served in the U.S. Army in Iraq as part of C Company, 3rd Battalion, 160th Infantry Regiment, California Army National Guard.

3160.   On March 2, 2007, SPC Young was killed in Safwan, in Basra, Iraq, by an EFP planted and detonated by a cell that included members of both Jaysh al-Mahdi and Hezbollah. He was 20 years old.

3161.   SPC Young was a U.S. citizen when he was killed in Iraq.

3162.   SPC Young's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

3163.   Plaintiff Gina Wright is a U.S. citizen and California resident.  She is the mother of SPC Young.

3164.   As a result of the March 2, 2007 attack, and SPC Young's death, Gina Wright has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Young's society, companionship, and counsel.

**The John Roy Young Family**

3165.   John Roy Young worked in Iraq as a civilian security contractor employed by Crescent Security.

3166.   On November 16, 2006, Mr. Young was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack.  *See supra* ¶¶ 828-34.  Jaysh al-Mahdi mutilated Mr. Young's remains after executing him.  On March 24, 2008, the FBI announced that it had identified the remains of Mr. Young.  He was 44 years old.

3167.   Mr. Young was a U.S. citizen when he was kidnapped and killed in Iraq and/or Iran.

3168.   John Roy Young's kidnapping and murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, he was executed

without trial, he was tortured, the Jaysh al-Mahdi and Hezbollah member(s) who conducted the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they targeted civilians.

3169.   Plaintiff John Robert Young is a U.S. citizen and Missouri resident.  He is the son of John Roy Young.

3170.   Plaintiff Sharon DeBrabander is a U.S. citizen and Arizona resident.  She is the mother of John Roy Young.

3171.   Plaintiff Dennis DeBrabander is a U.S. citizen and Arizona resident.  He is the stepfather of John Roy Young.

3172.   Plaintiff Nicole DeBrabander is a U.S. citizen and Arizona resident.  She is the sister of John Roy Young.

3173.   Plaintiff Joella Pratt is a U.S. citizen and Missouri resident.  She is the sister of John Roy Young.

3174.   As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of John Roy Young, and the post-murder mutilation of John Roy Young's remains on or about 2008, the Young Family has experienced severe mental anguish, emotional pain and suffering, and the loss of John Roy Young's society, companionship, and counsel.

**Ricky D. Zhorne, Jr.**

3175.   Plaintiff Sergeant Ricky D. Zhorne, Jr. served in Iraq as the senior medic for Headquarters Company, 1-2 Stryker Cavalry Regiment.  He is a U.S. citizen and Tennessee resident.

3176.   On January 4, 2008, SGT Zhorne was injured by an EFP attack on or near the border between the Adhamiyah and Rusafa Districts of eastern Baghdad, Iraq, while driving

back to his unit's FOB at the old Ministry of Health building.  The weapon was an array consisting of four or five EFPs, planted and detonated by Jaysh al-Mahdi.  The explosion knocked SGT Zhorne unconscious and caused a concussion, Traumatic Brain Injury, and internal injuries from smoke inhalation.  The attack also caused SGT Zhorne to suffer seizures, cognitive dysfunction, pulmonary damage, sleep issues, and migraines.  Due to his injuries, SGT Zhorne received a 100% disability rating from the VA.  As a result of the January 4, 2008 attack, SGT Zhorne has experienced extreme physical and emotional pain and suffering.

3177.   The attack that injured SGT Zhorne would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

**Benjamin A. Zibutis**

3178.   Plaintiff Sergeant Benjamin A. Zibutis served in Iraq as in the 2nd Squad, 3rd Platoon, Comanche Company, 1st Squadron, 2nd Cavalry Regiment.  He is a U.S. citizen and Illinois resident.

3179.   On April 27, 2008, SGT Zibutis was injured by a sniper round fired by Jaysh al-Mahdi in Sadr City.  The attack severely wounded SGT Zibutis, hitting him in his right arm, causing nerve damage, PTSD, and scarring.  As a result of the April 27, 2008 attack, SGT Zibutis has experienced extreme physical and emotional pain and suffering.

3180.   The attack that injured SGT Zibutis would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

## CLAIMS FOR RELIEF

**COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) (All Plaintiffs: Aiding-and-Abetting Liability, Attack Predicate)**

3181.   Plaintiffs incorporate their allegations above.

3182.   The terrorist attacks that killed or injured Plaintiffs or members of their families were acts of international terrorism committed by Jaysh al-Mahdi.

3183.   The terrorist attacks committed by Jaysh al-Mahdi, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States or of any State, or would have violated those laws if they had been committed within the jurisdiction of the United States or of any State.  In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

3184.   Jaysh al-Mahdi's terrorist attacks appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

3185.   Jaysh al-Mahdi's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

3186.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by Jaysh al-Mahdi.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

3187.   Defendants aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi – and aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi's attacks on Plaintiffs – by engaging in corrupt transactions with MOH that were structured to finance Jaysh al-Mahdi's terrorist activities, including by providing cash, drugs, medical devices, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi.

3188.   The Jaysh al-Mahdi attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

3189.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) (All Plaintiffs:  Aiding-and-Abetting Liability, RICO predicate)

3190.   Plaintiffs incorporate their allegations above.

3191.   In approximately April 2003, terrorists from Hezbollah conspired with Muqtada al-Sadr and others to create and develop a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Iraq – an enterprise that became known as Jaysh al-Mahdi.  Since its inception, Jaysh al-Mahdi has been a group of associated individuals that functions as a continuing unit, and Jaysh al-Mahdi's express purpose has always included violence against, and the expulsion of, Americans from Iraq.  Jaysh al-Mahdi has engaged in, and its activities have affected, foreign commerce.

3192.   From April 2003 until the present, Muqtada al-Sadr and other terrorists employed by or associated with Jaysh al-Mahdi and Hezbollah (including without limitation Dr. Mutalib, Dr. Ali al-Shemari, Dr. Adel, Mr. Zamili, Dr. Ali Bustan, Dr. Jaleel, Dr. Hani, Dr. Chasib, Imad Abu Sajjad, Sa'ad Abadi, Ali Hindi, Abu Hajir, Husayn Saleem Zair, Abu Mahdi al-Muhandis, Ali Mussa Daqduq, and the other members of Jaysh al-Mahdi and Hezbollah described in this Complaint) have maintained interests in and conducted the affairs of Jaysh al-Mahdi as an enterprise by engaging in a campaign to expel Americans from Iraq through crime and anti-American violence (the "Jaysh al-Mahdi-Hezbollah Campaign").

3193.   Specifically, Muqtada al-Sadr and other terrorists employed by or associated with Jaysh al-Mahdi and Hezbollah conducted and participated in the conduct of Jaysh al-Mahdi's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Muqtada al-Sadr and other terrorists associated with Jaysh al-Mahdi and Hezbollah also maintained interests in and control of Jaysh al-Mahdi (and conspired to do so) through this pattern of racketeering activity.  Examples of these predicate crimes committed as part of the pattern of racketeering activity are set forth in the following eight paragraphs.

3194.   All of the Jaysh al-Mahdi attacks that killed or injured Plaintiffs, detailed in Part VII *supra*, constituted killing (or attempted killing) of U.S. nationals abroad and the commission of acts of terrorism transcending national boundaries, in violation of 18 U.S.C. §§ 2332 and 2332b, respectively.  If committed within the jurisdiction of the United States or any State, these attacks would also constitute murder (or attempted murder) and conspiracy to murder; and conspiracy to murder in a foreign country, in violation of state law and 18 U.S.C. § 956(a)(1), respectively.

3195.   If committed within the jurisdiction of the United States, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs employed by the United States or any agency of it, while such Plaintiffs were engaged in or on account of the performance of official duties, as detailed in Part VII *supra*, would constitute the killing or attempted killing of employees of the United States engaged in the performance of official duties, in violation of 18 U.S.C. § 1114.

3196.   The Jaysh al-Mahdi kidnappings of Michael Chand, SSG Al-Taie, Steven Vincent, and in the Crescent Security Attack and Karbala Attack, detailed in Part VII *supra*, constitute kidnapping and hostage taking, in violation of 18 U.S.C. § 1203.  If committed within the jurisdiction of the United States or any State, these kidnappings would also constitute kidnapping in violation of state law.

3197.   If committed within the jurisdiction of the United States or any State, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs through the use of EFPs, IEDs, rockets, or mortars, while such Plaintiffs were indoors or within a vehicle, as detailed in Part VII *supra*, would constitute arson, the destruction of U.S. property by fire or explosive, and damaging U.S. government property, in violation of state law, 18 U.S.C. §§ 844(f)(2)-(3), and 18 U.S.C. § 1361, respectively.

3198.   If committed within the jurisdiction of the United States, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs through the use of EFPs, IEDs, rockets, or mortars, as detailed in Part VII *supra*, would constitute use of weapons of mass destruction, in violation of 18 U.S.C. § 2332a.

3199.   If committed within the jurisdiction of the United States, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs through the use of EFPs, IEDs, rockets, or mortars, while such Plaintiffs were in or on a building, land, street, or other location accessible or open to members of the public, as detailed in Part VII *supra*, would constitute bombing places of public use, in violation of 18 U.S.C. § 2332f.

3200.   The collection of funds by Jaysh al-Mahdi and its members or agents described above constituted financing terrorism in violation of 18 U.S.C. § 2339C(a)(1).

3201.   The receipt of terrorist training from Hezbollah by agents or members of Jaysh al-Mahdi described above constituted receiving training from a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339D.

3202.   The Jaysh al-Mahdi-Hezbollah Campaign was an act of international terrorism.  It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had the Jaysh al-Mahdi-Hezbollah Campaign been conducted within the jurisdiction of the United States.  The Jaysh al-Mahdi-Hezbollah Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence

the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

3203.   The Jaysh al-Mahdi-Hezbollah Campaign occurred primarily outside the territorial jurisdiction of the United States.

3204.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Jaysh al-Mahdi-Hezbollah Campaign.  Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Muqtada al-Sadr and other terrorists associated with Jaysh al-Mahdi conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of Jaysh al-Mahdi.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Jaysh al-Mahdi-Hezbollah Campaign; are the estate, survivors, and/or heirs of U.S. nationals who suffered such injuries; or both.

3205.   Defendants aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi, its members, and the Jaysh al-Mahdi-Hezbollah Campaign.  Defendants did so by engaging in corrupt transactions with MOH that were structured to finance the terrorist activities of Jaysh al-Mahdi, its members, and the Jaysh al-Mahdi-Hezbollah Campaign, including by providing cash, drugs, medical devices, training, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi.

3206.   The Jaysh al-Mahdi-Hezbollah Campaign was committed, planned, and/or authorized by Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

3207.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)<br>(All Plaintiffs:  Primary Liability, Material-Support Predicate)

3208.   Plaintiffs incorporate their allegations above.

3209.   Defendants, by structuring their transactions with MOH to provide cash, drugs, medical devices, training, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi, provided material support to terrorists in violation of 18 U.S.C. § 2339A.

3210.   Defendants knew or recklessly disregarded that their material support would be used by Jaysh al-Mahdi in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from an FTO.  Those acts by Jaysh al-Mahdi, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Defendants also structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.

3211.   Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for Jaysh al-Mahdi appears, as an objective matter under a reasonable-

person standard, to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.  *See*, *e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material support statutes, even without any "subjective intent" to further terrorist attacks, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance' "); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

3212.   Defendants' provision of material support to Jaysh al-Mahdi occurred primarily outside the territorial jurisdiction of the United States.

3213.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

3214.   As a result of Defendants' violation of 18 U.S.C. § 2333(a) and 18 U.S.C. § 2333A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
(All Plaintiffs:  Primary Liability, Terrorist-Financing Predicate)

3215.   Plaintiffs incorporate their allegations above.

3216.   Defendants, by structuring their transactions with MOH to provide cash, drugs, and medical devices to members of Jaysh al-Mahdi, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A), knowing or recklessly disregarding that those funds were to be used in full or in part to carry out acts constituting an offense within

the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

3217.   Defendants, by structuring their transactions with MOH to provide cash, drugs, and medical devices to members of Jaysh al-Mahdi, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B), knowing or recklessly disregarding that Jaysh al-Mahdi would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the purpose of Jaysh al-Mahdi's acts was to intimidate the Iraqi and United States populations and to compel the United States and Iraqi governments to effect a withdrawal of American forces from Iraq.

3218.   Defendants' provision of funds to Jaysh al-Mahdi involved acts dangerous to human life that violated the criminal laws of the United States or would have violated those prohibitions if they were committed within the jurisdiction of the United States, including 18 U.S.C. § 2339C(a)(1)(A)-(B).  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' provision of funds to Jaysh al-Mahdi appears, as an objective matter under a reasonable-person standard, to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.  *See*, *e.g.*, *Wultz*, 755 F. Supp. 2d 1 at 48-49; *Burnett*, 274 F. Supp. 2d at 106-07.

544

3219.   Defendants' provision of funds to Jaysh al-Mahdi occurred primarily outside the territorial jurisdiction of the United States.

3220.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors or heirs of U.S. nationals who suffered such injuries; or both.

3221.   As a result of Defendants' provision of funds to Jaysh al-Mahdi in violation of 18 U.S.C. § 2333(a) and 18 U.S.C. § 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT FIVE:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Non-Estate Plaintiffs: State Law)

3222.   Plaintiffs, other than those representing the estates of decedents, incorporate their allegations above.

3223.   Defendants' corrupt transactions with MOH were a direct, actual, and proximate cause of severe emotional distress suffered by Plaintiffs.

3224.   Defendant's corrupt transactions with MOH further provided Jaysh al-Mahdi with substantial aid, assistance, and/or encouragement to conduct attacks that were a direct, actual, and proximate cause of severe emotional distress suffered by Plaintiffs.  The substantial aid, assistance, and/or encouragement Defendants provided to Jaysh al-Mahdi was a substantial factor in causing the severe emotional distress suffered by Plaintiffs as a result of those attacks.

3225.   Defendants knew or should have known that their conduct would result in severe emotional distress to Plaintiffs.  Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the severe emotional distress inflicted on Plaintiffs.

3226.   Defendants' and Jaysh al-Mahdi's conduct constituted extreme and outrageous conduct that is so extreme in degree as to go beyond all possible bounds of decency and be considered atrocious and utterly intolerable in a civilized community.

3227.   Until 2017, Plaintiffs did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused their severe emotional distress.

3228.   Defendants are liable to Plaintiffs for the intentional infliction of severe emotional distress under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

<u>COUNT SIX</u>:  ASSAULT AND BATTERY
(All Physically Wounded Plaintiffs
In The First Amended Complaint:[392]  State Law)

3229.   Plaintiffs who suffered physical injuries caused by Jaysh al-Mahdi in Iraq incorporate their allegations above.

3230.   Defendants' corrupt transactions with MOH provided Jaysh al-Mahdi with substantial aid, assistance, and encouragement to conduct terrorist attacks against the United States and Plaintiffs who were intentionally wounded in Iraq as a direct result of those attacks. Defendants' conduct was a substantial factor in causing those attacks.

3231.   As a direct, actual, and proximate result of the Defendants' conduct, Plaintiffs who were wounded in Iraq were intentionally placed in a severe apprehension of harmful, offensive bodily contact, injury, and assault, from Jaysh al-Mahdi terrorist attacks.  These Plaintiffs suffered severe, offensive, harmful bodily contact, personal injury and battery.  They

---

[392] This claim is brought on behalf of those physically wounded Plaintiffs who joined the First Amended Complaint.  *See* Dkt. 67 at ¶¶ 409-1153.  The new Plaintiffs who joined the Second Amended Complaint do not assert this claim.  *See supra* ¶¶ 1213-3180.

also suffered extreme fear, terror, anxiety, emotional and psychological distress and trauma. These Plaintiffs are entitled to recover compensation for these injuries.

3232.   Defendants knew or should have known that their conduct would result in Jaysh al-Mahdi conducting attacks against Americans in Iraq.  Defendants acted willfully, wantonly, recklessly, or with deliberate disregard to the assaults and batteries committed by Jaysh al-Mahdi against Plaintiffs who were wounded in Iraq.

3233.   Until 2017, Plaintiffs who were wounded in Iraq did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused their injuries.

3234.   Defendants are liable for assaults and batteries committed on the Plaintiffs who were wounded in Iraq under the laws of the District of Columbia and any other applicable state law, including for punitive damages

## COUNT SEVEN:  WRONGFUL DEATH
### (All Estate Plaintiffs:  State Law)

3235.   Plaintiffs who represent the estates of U.S. citizens who were killed by Jaysh al-Mahdi in Iraq ("Decedents") incorporate their allegations above.

3236.    Defendants owed a duty to Decedents and the beneficiaries of their estates to not willfully, wantonly, recklessly, with knowledge, or with deliberate disregard, engage in corrupt transactions that funded terrorists and terrorist attacks committed by Jaysh al-Mahdi targeted at the United States.  Defendants' transactions with Jaysh al-Mahdi were wrongful.

3237.   Jaysh al-Mahdi owed a duty to not conduct terrorist attacks against the United States or the Decedents.  The attacks committed by Jaysh al-Mahdi against the Decedents were wrongful.

3238.   Defendants' corrupt transactions with MOH breached Defendants' duties and were the direct, actual, and proximate cause of the deaths of Decedents.

3239.   Defendants' corrupt transactions with MOH further provided Jaysh al-Mahdi with substantial aid, assistance, and encouragement to conduct terrorist attacks that killed the Decedents.  The substantial aid, assistance, and/or encouragement Defendants provided to Jaysh al-Mahdi was a substantial factor in causing the attacks that killed the Decedents.

3240.   Defendants knew or should have known that their conduct would result in the Decedents' deaths.  Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the Decedents' deaths.

3241.   Surviving family members and heirs of the Decedents and/or the estates themselves are entitled to recover damages from Defendants for these wrongful deaths.  As a direct and proximate result of the wrongful deaths of the Decedents, their families and heirs have been deprived of future aid, income, assistance, services, comfort, companionship, affection, and financial support.  As a further direct and proximate result of the wrongful deaths of the Decedents, their heirs and families suffer and will continue to suffer permanent emotional distress, severe trauma, and psychological injuries.

3242.   As a direct and proximate result of Defendants' conduct and the Jaysh al-Mahdi attacks that Defendants aided, assisted, and encouraged, the Decedents suffered severe pain and suffering prior to their deaths.  As a further direct and proximate result of the wrongful deaths, the Decedents' estates have suffered lost earnings and a loss of accumulations and accretions.

3243.   Had the Decedents survived, Defendants would have been liable to the Decedents.

3244.   Until 2017, the personal representatives of Decedents' estates did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused the deaths of the Decedents.

3245.   Defendants are liable for the wrongful deaths of the Decedents under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

### COUNT EIGHT:  SURVIVAL ACTION
#### (All Estate Plaintiffs:  State Law)

3246.   Plaintiffs who represent Decedents' estates incorporate their allegations above, on behalf of Decedents' estates.

3247.   Defendants' corrupt transactions with MOH provided Jaysh al-Mahdi with substantial aid, assistance, and encouragement to conduct terrorist attacks against the United States and the Decedents who were killed in Iraq as a direct result of those attacks.  Defendants' conduct was a substantial factor in causing those attacks.

3248.   As a direct, actual, and proximate result of the Defendants' conduct, the Decedents were intentionally placed in a severe apprehension of harmful, offensive bodily contact, injury, and assault, from Jaysh al-Mahdi terrorist attacks.  They suffered severe, offensive, harmful, bodily contact, personal injury and battery that resulted in their deaths.  They also suffered extreme fear, pain and suffering, terror, anxiety, emotional and psychological distress and trauma prior to their deaths.

3249.   As a result of their deaths, the Decedents suffered damages including loss of life's pleasures, companionship, consortium, family, career, earning and earnings capacity, and accretion to their estates.

3250.   Defendants knew or should have known that their conduct would result in Jaysh al-Mahdi conducting attacks against Americans in Iraq.  Defendants acted willfully, wantonly,

recklessly, or with deliberate disregard to the assaults and batteries committed by Jaysh al-Mahdi against the Decedents.  Similarly, Defendants knew or should have known that their conduct would result in severe emotional distress to the Decedents.  Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the severe emotional distress inflicted on the Decedents.

3251.   Defendants' and Jaysh al-Mahdi's conduct constituted extreme and outrageous conduct that is so extreme in degree as to go beyond all possible bounds of decency and be considered atrocious and utterly intolerable in a civilized community.

3252.   Decedents would have been entitled to recover compensation for their injuries prior to their deaths.  Their estates are entitled to that compensation under the survival statute of the District of Columbia and any other applicable state law.

3253.   Until 2017, the personal representatives of the Decedents' estates could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused the Decedents' deaths.

3254.   Defendants are liable for the assaults and batteries and the intentional infliction of emotional distress committed on the Decedents under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

**JURY DEMAND**

3255.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

3256.   Plaintiffs request that the Court:

(a)     Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, and applicable state law;

(b)     Award Plaintiffs compensatory and punitive damages to the maximum extent
        permitted by law, and treble any compensatory damages awarded under the Anti-
        Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)     Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to
        18 U.S.C. § 2333(a);

(d)     Award Plaintiffs prejudgment interest; and

(e)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  January 21, 2020

Respectfully submitted,

*/s/ David C. Frederick*

Ryan R. Sparacino (D.C. Bar No. 493700)       David C. Frederick (D.C. Bar No. 431864)
Sparacino PLLC                                Joshua D. Branson (D.C. Bar No. 981623)
1920 L Street, NW, Suite 535                  Andrew E. Goldsmith (D.C. Bar No.
Washington, D.C. 20036                        1007074)
Tel:  (202) 629-3530                          Thomas G. Schultz (D.C. Bar No. 1028017)
ryan.sparacino@sparacinopllc.com              Matthew M. Duffy (D.C. Bar. No. 1031257)
                                              Kellogg, Hansen, Todd,
                                               Figel & Frederick, P.L.L.C.
                                              1615 M Street, N.W., Suite 400
                                              Washington, D.C. 20036
                                              Tel:  (202) 326-7900
                                              Fax:  (202) 326-7999
                                              dfrederick@kellogghansen.com
                                              jbranson@kellogghansen.com
                                              agoldsmith@kellogghansen.com
                                              tschultz@kellogghansen.com
                                              mduffy@kellogghansen.com

                                              *Counsel for Plaintiffs*