# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSHUA ATCHLEY *et al.*,     )
          )
          )
     Plaintiffs,     )
          )
     v.     )     Case No. 1:17-CV-02136 (RJL)
          )
ASTRAZENECA UK LIMITED *et al.*,     )
          )
          )
     Defendants.     )

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(1) AND 12(b)(6) MOTIONS TO DISMISS

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ...................................................................................4

    A.    The U.S.-Led Invasion And Strategy For Victory In Iraq .......................4

    B.    The U.S. Policy Of Rebuilding Iraq And The Ministry of Health.........5

        1.    Direct U.S. Assistance To The Ministry..................................5

        2.    U.S. Encouragement Of Private Sector Business With The Ministry...................................................................................8

    C.    Defendants' Supply Of Medical Goods To The Ministry ...................11

    D.    The Sadrists And Jaysh Al-Mahdi (JAM) ..........................................12

        1.    The Sadrists And The Ministry Of Health..............................13

        2.    Jaysh Al-Mahdi And The Armed Conflict In Iraq..................14

    E.    The Armed Attacks At Issue................................................................16

STATUTORY FRAMEWORK...............................................................................16

PLAINTIFFS' CLAIMS ........................................................................................18

LEGAL STANDARD.............................................................................................19

ARGUMENT ..........................................................................................................20

I.      THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE PLAINTIFFS' CLAIMS PRESENT NONJUSTICIABLE POLITICAL QUESTIONS (ALL COUNTS)................................................................22

II.    THE STATUTE'S ACT OF WAR EXCEPTION BARS ALL OF PLAINTIFF'S ATA CLAIMS (COUNTS 1, 2, 3, 4).....................................................28

    A.    Iraq Was In Armed Conflict During The Relevant Period ..................29

    B.    Jaysh Al-Mahdi Was A Military Force In Armed Conflict In Iraq ......32

    C.    The Attacks Here Occurred In The Course Of Armed Conflict ...........36

III.   PLAINTIFFS' ATA DIRECT-LIABILITY CLAIMS FAIL (COUNTS 3, 4).................38

    A.    Plaintiffs' Direct-Liability Claims Do Not Satisfy The ATA's Rigorous Proximate Causation Requirement .......................................................39

    B.    Defendants' Alleged Actions Were Not Acts Of International Terrorism Under The ATA ..................................................................................48

    C.    Plaintiffs Do Not Adequately Plead A Predicate Crime To Support Direct ATA Liability.....................................................................................51

        1.    Plaintiffs' Allegations Do Not Establish The Knowledge Required To Violate § 2339A Or § 2339C (Counts 3, 4)............................51

i

　　　　　2.　　　Section 2339A's Medicine Exception Bars Plaintiffs' Material-Support Claim As To The Pharmaceutical Defendants (Count 3)............53

IV.　PLAINTIFFS' ATA AIDING-AND-ABETTING CLAIMS FAIL (COUNTS 1, 2)........54

　　A.　　Plaintiffs Fail To Plead That Defendants Substantially Assisted Jaysh Al-Mahdi In Carrying Out Its Alleged Acts Of International Terrorism..................55

　　B.　　Plaintiffs Do Not Satisfy § 2333(d)'s Requirement That An FTO "Committed, Planned, Or Authorized" The Attacks That Defendants Allegedly Aided ...............................................................................................60

　　　　　1.　　　Plaintiffs Do Not Adequately Plead That An FTO Committed, Planned, Or Authorized The Vast Majority Of Attacks At Issue (Count 1) ...............................................................................................61

　　　　　2.　　　Plaintiffs Cannot Invoke RICO To Evade § 2333(d)(2)'s FTO Requirement (Count 2) ...................................................................63

　　C.　　The SAC Fails To Establish The Scienter Element Of An Aiding-And-Abetting Claim ................................................................................................66

V.　PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED (COUNTS 5-8) ...............................................................................................................................69

　　A.　　Plaintiffs' State-Law Claims Are Time-Barred ......................................69

　　B.　　Plaintiffs' State-Law Claims Would Also Fail On The Merits.............................71

　　　　　1.　　　Plaintiffs Fail To Plausibly Allege Causation And Intent On Their State-Law Claims ......................................................................71

　　　　　2.　　　Plaintiffs Fail To Plead Additional Elements Of Their IIED Claims ........73

　　　　　3.　　　Plaintiffs Fail To Plausibly Allege State Law Aiding-And-Abetting Claims ........................................................................................74

CONCLUSION....................................................................................................................74

STATUTORY APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*3M Co. v. Boulter*,
   842 F. Supp. 2d 85 (D.D.C. 2012) ................................................................74

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,
   62 F.3d 1454 (D.C. Cir. 1995) .....................................................................69

*Acosta Orellana v. CropLife Int'l*,
   711 F. Supp. 2d 81 (D.D.C. 2010) ..............................................................58

*Aetna Cas. & Surety Co. v. Leahey Constr. Co.*,
   219 F.3d 519 (6th Cir. 2000) ......................................................................56

*Al-Aulaqi v. Panetta*,
   35 F. Supp. 3d 56 (D.D.C. 2014) ..................................................................4

*Al-Tamimi v. Adelson*,
   916 F.3d 1 (D.C. Cir. 2019) ........................................................................24

*Alkasabi v. Wash. Mut. Bank, F.A.*,
   31 F. Supp. 3d 101 (D.D.C. 2014) (Leon, J.) ..............................................70

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt.*,
   435 F.3d 396 (3d Cir. 2006) ........................................................................68

*Andrus v. Glover Constr. Co.*,
   446 U.S. 608 (1980) ....................................................................................35

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ....................................................................................40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................19, 61

*Backpage.com, LLC v. Lynch*,
   216 F. Supp. 3d 96 (D.D.C. 2016) ..............................................................52

*\*Baker v. Carr*,
   369 U.S. 186 (1962) ..........................................................................22, 24, 27

\*   Authorities upon which we chiefly rely are marked with asterisks.

iii

*Bancoult v. McNamara*,
   445 F.3d 427 (D.C. Cir. 2006) ..........................................................................22

*Bank of Am. Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017) ......................................................................................40

*Beck v. Prupis*,
   529 U.S. 494 (2000) ..........................................................................................66

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................19

*Biton v. Palestinian Interim Self-Gov't Auth.*,
   412 F. Supp. 2d 1 (D.D.C. 2005) ......................................................................38

*Boim v. Quranic Literacy Inst. & Holy Land Found.*,
   291 F.3d 1000 (7th Cir. 2002) ..........................................................................59

*Brill v. Chevron Corp.*,
   No. 15-cv-04916, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017) ............................49

*Brill v. Chevron Corp.*,
   No. 15-cv-04916, 2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) ..................1, 43

*Cain v. Twitter*,
   No. 17-cv-02506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018) ....................69

*Cevenini v. Archbishop of Wash.*,
   707 A.2d 768 (D.C. 1998) ................................................................................69

*Clayborn v. Twitter*,
   Nos. 17-cv-06894, 18-cv-00543, 2018 WL 6839754 (N.D. Cal. Dec. 31, 2018)..................55

*CNE Direct, Inc. v. Blackberry Corp.*,
   821 F.3d 146 (1st Cir. 2016) ............................................................................47

*Copeland v. Twitter, Inc.*,
   352 F. Supp. 3d 965 (N.D. Cal. 2018) ..............................................................59

*Corrie v. Caterpillar, Inc.*,
   503 F.3d 974 (9th Cir. 2007) ......................................................................25, 26

*Crosby v. Twitter*,
   303 F. Supp. 3d 564 (E.D. Mich. 2018)..............................................55, 57, 59, 72

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
   941 F.2d 1220 (D.C. Cir. 1991) ........................................................................66

*El-Shifa Pharm. Indus. Co. v. United States,*
   607 F.3d 836 (D.C. Cir. 2010) (en banc) ............................................................23

*Evangelou v. District of Columbia,*
   901 F. Supp. 2d 159 (D.D.C. 2012) ....................................................................65

*United States v. Farhane,*
   634 F.3d 127 (2d Cir. 2011) ................................................................................53

*Feld Entm't, Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals,*
   873 F. Supp. 2d 288 (D.D.C. 2012) ....................................................................66

*Fields v. Twitter, Inc.,*
   881 F.3d 739 (9th Cir. 2018) ...............................................................................40

*Flores-Figueroa v. United States,*
   556 U.S. 646 (2009) .............................................................................................66

*Gill v. Arab Bank, PLC,*
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) .................................................................32

*Goldberg v. UBS AG,*
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) .................................................................59

*Halberstam v. Welch,*
   705 F.2d 472 (D.C. Cir. 1983) ........................................................56, 57, 58, 59

*United States v. Hamidullin,*
   888 F.3d 62 (4th Cir. 2018) .................................................................................35

*Hettinga v. United States,*
   677 F.3d 471 (D.C. Cir. 2012) .............................................................................54

*Hines v. Overstock.com, Inc.,*
   No. 09-cv-991, 2013 WL 4495667 (E.D.N.Y. Aug. 19, 2013) .............................71

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) .................................................................................................67

*Holmes v. Sec. Inv'r Prot. Corp.,*
   503 U.S. 258 (1992) .............................................................................................45

*Huang v. D'Albora,*
   644 A.2d 1 (D.C. 1994) ........................................................................................69

*Hull v. Eaton Corp.,*
   825 F.2d 448 (D.C. Cir. 1987) .............................................................................47

*Humanitarian Law Project v. Reno*,
  205 F.3d 1130 (9th Cir. 2000) ........................................................53

*Ihebereme v. Capital One, N.A.*,
  730 F. Supp. 2d 40 (D.D.C. 2010) ..................................................73

*Joyner v. Sibley Mem'l Hosp.*,
  826 A.2d 362 (D.C. 2003) ...............................................................73

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ..............................................4, 20, 27

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
  896 F.3d 501 (D.C. Cir. 2018) ..............................28, 29, 38, 45

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
  961 F. Supp. 2d 185 (D.D.C. 2013) .........................................34, 38

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) ................................................ *passim*

*Khairkhwa v. Obama*,
  703 F.3d 547 (D.C. Cir. 2012) .......................................................35

*King v. Burwell*,
  135 S. Ct. 2480 (2015)....................................................................66

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994).........................................................................19

*Lillard & Lillard v. Blue Cross & Blue Shield Assn.*,
  971 F. Supp. 2d 116 (D.D.C. 2013) ...........................................19, 27

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................................72, 73

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)..............................55, 57, 59, 68

*Linder v. Portocarrero*,
  963 F.2d 332 (11th Cir. 1992) .......................................................32

*Mastafa v. Australian Wheat Bd. Ltd.*,
  No. 07-cv-7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) ............69

*Mobarez v. Kerry*,
  187 F. Supp. 3d 85 (D.D.C. 2016) .................................................25

*Mullin v. Wash. Free Weekly, Inc.*,
 785 A.2d 296 (D.C. 2001) ...................................................................69

*Newborn v. Yahoo!, Inc.*,
 391 F. Supp. 2d 181 (D.D.C. 2005) ......................................................71

*O'Sullivan v. Deutsche Bank*,
 No. 17-cv-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019).................... *passim*

*Ofisi v. BNP Paribas, S.A.*,
 No. 15-cv-2010, 2018 WL 396234 (D.D.C. Jan. 11, 2018)......................56

*\*Ofisi v. BNP Paribas, S.A.*,
 278 F. Supp. 3d 84 (D.D.C. 2017)........................................................56

*Oveissi v. Islamic Republic of Iran*,
 573 F.3d 835 (D.C. Cir. 2009) .............................................................71

*\*Owens v. BNP Paribas, SA*,
 897 F.3d 266 (D.C. Cir. 2018) ......................................................... *passim*

*Owens v. Republic of Sudan*,
 826 F. Supp. 2d 128 (D.D.C. 2011) ......................................................71

*United States v. Philip Morris USA, Inc.*,
 566 F.3d 1095 (D.C. Cir. 2009) (per curiam) .......................................65

*Phoenix Consulting Inc. v. Republic of Angola*,
 216 F.3d 36 (D.C. Cir. 2000) ...............................................................19

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*,
 68 A.3d 697 (D.C. 2013) .....................................................................74

*Republic of Sudan v. Owens*,
 194 A.3d 38 (D.C. 2018) .....................................................................74

*Rothstein v. UBS AG*,
 647 F. Supp. 2d 292 (S.D.N.Y. 2009)...................................................59

*\*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013)................................................1, 42, 44, 45

*Russello v. United States*,
 464 U.S. 16 (1983)..............................................................................63

*\*Saldana v. Occidental Petroleum Corp.*,
 774 F.3d 544 (9th Cir. 2014) (per curiam)....................................24, 26

vii

*Sandza v. Barclays Bank PLC*,
    151 F. Supp. 3d 94 (D.D.C. 2015) .................................................................. 70

*Saunders v. Nemati*,
    580 A.2d 660 (D.C. 1990) ............................................................................. 69

*Schlesinger v. Reservists Comm. to Stop the War*,
    418 U.S. 208 (1974) ...................................................................................... 19

*Sentry Select Ins. Co. v. Ruiz*,
    324 F. Supp. 3d 874 (W.D. Tex. 2018) .......................................................... 36

*Shatsky v. PLO*,
    Civ. No. 02-2280, 2017 WL 2666111 (D.D.C. June 20, 2017) ..................... 40

*Siegel v. HSBC Bank USA, N.A.*,
    No. 17-cv-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018) .......... 1, 56, 60

*Smith v. Hope Village, Inc.*,
    481 F. Supp. 2d 172 (D.D.C. 2007) .............................................................. 73

*Sokolow v. PLO*,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008) .......................................................... 38

*Stewart v. Nat'l Educ. Ass'n*,
    471 F.3d 169 (D.C. Cir. 2006) ........................................................................ 4

*Strother v. District of Columbia*,
    372 A.2d 1291 (D.C. 1977) .......................................................................... 69

*Stutts v. De Dietrich Grp.*,
    No. 03-cv-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) .................... 50

*Taamneh v. Twitter*,
    343 F. Supp. 3d 904 (N.D. Cal. 2018) ................................................ 58, 59, 69

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*,
    113 F.3d 1484 (8th Cir. 1997) ............................................................... 58, 59

*In re TMJ Implants Prods. Liab. Litig.*,
    880 F. Supp. 1311 (D. Minn. 1995) .............................................................. 58

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ........................................................................................ 38

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ...................................................................................... 72

*Wash. Post v. Robinson*,
    935 F.2d 282 (D.C. Cir. 1991) ........................................................................68

*Weiss v. Nat'l Westminster Bank PLC*,
    Nos. 05-cv-4622, 07-cv-916, 2019 WL 1441118 (E.D.N.Y. Mar. 31, 2019).....................1, 68

*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009) ....................................................................71

## STATUTES, RULES & REGULATIONS

8 U.S.C. § 1189 ..................................................................................................15

18 U.S.C.
    *§ 2331 ........................................................................................... *passim*
    *§ 2333 ........................................................................................... *passim*
    *§ 2336 ...........................................................................18, 20, 28, 38
    § 2339A ......................................................................................... *passim*
    § 2339B ..................................................................................................67
    § 2339C ...........................................................................19, 39, 51, 52

28 U.S.C. § 1367 ..............................................................................................74

50 U.S.C. § 1543 ..............................................................................................30

Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L.
    No. 107-243, 116 Stat. 1498 ........................................................................29

Emergency Supplemental Appropriations Act for Defense & Reconstruction of
    Iraq & Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (Nov. 6, 2003).........................5, 23

Emergency Supplemental Appropriations Act, tit. 2, ch. 2, 117 Stat. 1209 ................................23

Justice Against Sponsors of Terrorism Act § 2(a)(5), 130 Stat. 852 ...........................................56

D.C. Code Ann.
    § 12-301 ..................................................................................................69
    § 16-2702 ................................................................................................69

Fed. R. Civ. P.
    12(b)(1) ...........................................................................4, 19, 22, 27
    12(b)(6) ...........................................................................4, 20, 40, 41

Suspending the Iraq Sanctions Act, 68 Fed. Reg. 26,459 (May 7, 2003).........................................9

Waiver of Section 1083 of the National Defense Authorization Act for Fiscal
Year 2008, 73 Fed. Reg. 6,571 (Jan. 28, 2008) ..................................................25

## OTHER AUTHORITIES

162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) (statement of Rep. Goodlatte)..........................67

H.R. Rep. No. 115-858 (2018)....................................................................................35

*Black's Law Dictionary* (10th ed. 2014)...................................................................62

*Chambers Dictionary* (13th ed. 2014) ...........................................................61, 62

*New Oxford American Dictionary* (3d ed. 2010).............................................36, 61, 62

*Oxford English Dictionary* (3d ed. 2016) ..............................................................29

*Oxford English Dictionary* (3d ed. 2002) ..............................................................33

Restatement (Second) of Torts
§ 13..........................................................................................................56, 71
§ 21..........................................................................................................71, 72
§ 46..........................................................................................71, 72, 73, 74
§ 442 (1965)....................................................................................................56
§ 876......................................................................................................55, 74
§ 925................................................................................................................71
§ 926................................................................................................................71

## OTHER PROCEEDINGS

*Bartlett v. Société Générale de Banque au Liban SAL*,
No. 1:19-cv-00007 (E.D.N.Y.) ....................................................................45

*Donaldson v. HSBC Holdings PLC*,
No. 1:18-cv-07442 (E.D.N.Y.) ....................................................................45

*Donaldson v. Islamic Republic of Iran*,
No. 1:17-cv-01206 (D.D.C.) ........................................................................45

*Freeman v. HSBC Holdings PLC*,
No. 1:14-cv-06601 (E.D.N.Y.) ....................................................................45

*Fritz v. Islamic Republic of Iran*,
No. 1:15-cv-00456 (D.D.C.) ........................................................................46

*Estate of Hartwick v. Islamic Republic of Iran,*
No. 1:18-cv-01612 (D.D.C.) ...............................................................................46

*Holladay v. Islamic Republic of Iran,*
No. 1:17-cv-00915 (D.D.C.) ...............................................................................46

*Karcher v. Islamic Republic of Iran,*
No. 1:16-cv-00232 (D.D.C.) ...............................................................................46

*Martinez v. Islamic Republic of Iran,*
No. 1:16-cv-02193 (D.D.C.) ...............................................................................46

*O'Sullivan v. Deutsche Bank AG,*
No. 1:17-cv-08709 (S.D.N.Y.)..............................................................................46

*O'Sullivan v. Deutsche Bank AG,*
No. 1:18-cv-12325 (S.D.N.Y.)..............................................................................46

*Stephens v. HSBC Holdings PLC,*
No. 1:18-cv-07439 (E.D.N.Y.) ............................................................................46

*Tavera v. HSBC Bank USA, N.A.,*
No. 1:18-cv-07312 (E.D.N.Y.) ............................................................................46

*Tollefson v. Islamic Republic of Iran,*
No. 1:17-cv-01726 (D.D.C.) ...............................................................................46

*Williams v. Islamic Republic of Iran,*
No. 1:18-cv-02425 (D.D.C.) ...............................................................................46

## INTRODUCTION

More than 4,000 U.S. service members were killed, and more than 30,000 wounded, in the Iraq War.  Defendants recognize the sacrifices and dedication of those who served, and understand the desire to hold the perpetrators of that violence responsible.  But this lawsuit attempts to do something different:  It takes hundreds of injuries and losses of life inflicted by a sectarian militia in that armed conflict and seeks to impose civil liability on pharmaceutical and medical equipment companies that had nothing to do with the attacks.

Plaintiffs stretch the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, beyond recognition with their theory that Defendants, by manufacturing and supplying life-saving medicines and equipment (such as breast cancer treatments, baby incubators, and EKG machines) to the Iraqi Ministry of Health ("Ministry"), knowingly and intentionally caused more than 300 armed attacks by a militia targeting U.S. service members during armed conflict in Iraq.  That theory is foreclosed by the plain language of the ATA and the growing body of case law interpreting it.  As recent decisions from the D.C. Circuit, Second Circuit, Seventh Circuit, and multiple district courts make clear, lawsuits like this one—which seek to use the ATA to hold private companies civilly liable for armed attacks far removed from the defendants' alleged conduct—are legally deficient and routinely dismissed at the pleadings stage.[1]

Under Plaintiffs' attenuated theory, members of Jaysh al-Mahdi ("JAM") infiltrated the Ministry, looted and diverted its resources, funneled its medicines and equipment abroad to be sold

---

[1] *E.g.*, *Owens v. BNP Paribas, SA*, 897 F.3d 266 (D.C. Cir. 2018); *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018); *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013); *Weiss v. Nat'l Westminster Bank PLC*, 2019 WL 1441118 (E.D.N.Y. Mar. 31, 2019); *O'Sullivan v. Deutsche Bank*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019); *Brill v. Chevron Corp.*, 2018 WL 3861659 (N.D. Cal. Aug. 14, 2018); *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967 (S.D.N.Y. July 27, 2018).

on black markets, and then used the resulting proceeds for an array of purposes, including paying and training militia fighters, securing logistical support, purchasing weapons, and funding attacks. The allegation that Defendants knowingly or intentionally funded attacks on U.S. forces is baseless and indeed offensive.  Plaintiffs do not, and cannot, connect any transaction between a Defendant and the Ministry to any attack by JAM.  Instead, they aggregate all 21 Defendants and their separate transactions, conflate the agency responsible for the entire Iraqi health care system with a sectarian militia that allegedly looted the agency's warehouses, and lump all of the militia's attacks together, to argue that Defendants collectively "caused" the injuries that resulted from the attacks.  Plaintiffs' far-fetched theory of liability extends the ATA far beyond its text and purpose, seeking to impose liability not on terrorists or their supporters, but on companies that responded to the U.S. Government's call to work with the Ministry to help restore vital medical services to the Iraqi people.

As a threshold matter, Plaintiffs' claims are nonjusticiable under the political question doctrine.  Plaintiffs cannot seek to hold Defendants liable for their transactions with the Ministry without calling into question the U.S. Government's national security and foreign policy decisions to directly support the Ministry, and to encourage private businesses such as Defendants to transact with it, during the period when Plaintiffs allege it was controlled by JAM insurgents.

The claims also fail under numerous express limitations that Congress placed on the imposition of ATA liability.  For instance, Congress explicitly directed that "no action shall be maintained" for injury caused by "an act of war."  But that is precisely what Plaintiffs attempt to do here, seeking civil damages for injuries caused by attacks that occurred in the course of an armed conflict between an organized militia (JAM) and U.S. and Coalition forces during the Iraq War.

2

Moreover, Congress limited both direct and aiding-and-abetting liability under the ATA to defendants who had a substantial connection to terrorism. Defendants' alleged transactions with the Ministry are far too remote from JAM's attacks to satisfy these statutory requirements. Indeed, courts regularly dismiss ATA claims because of the presence of a sovereign intermediary in the alleged chain of causation even where—unlike this case—the sovereign intermediary is a state sponsor of terrorism. Dismissal is *a fortiori* appropriate here.

Plaintiffs cannot overcome the fatal defects in their Second Amended Complaint ("SAC") by repeatedly alleging that Defendants paid "kickbacks" to obtain Ministry contracts. Defendants deny that unfounded allegation, but even assuming its truth (for purposes of Defendants' motions), it is irrelevant under the ATA. There is no private right of action for alleged violations of the Foreign Corrupt Practices Act ("FCPA"), and the ATA is not a vehicle to pursue such claims in disguise. Leaving no doubt that the corruption allegations are a distraction, Plaintiffs concede that their claims are *not* limited to "corrupt payments or other FCPA violations" and, instead, purport to trace their injuries even to goods that were "legitimately purchased" by the Ministry. SAC ¶¶ 132, 179.

In recent months, numerous federal courts have made it clear that the ATA cannot be used to impose liability on private companies for attacks, both in Iraq and elsewhere, that were similarly remote from the defendants' alleged conduct. This lawsuit is merely one in a series of cases in which plaintiffs—including most of the same Plaintiffs here—allege that many *other* defendants, ranging from financial institutions to the government of Iran, all somehow caused the same attacks at issue in this case, without any mention of the Ministry, Kimadia, medical goods, or the Defendants named here. Put simply, Plaintiffs have brought their claims against the wrong defendants and based on unfounded legal theories. This case should be dismissed.

3

## **FACTUAL BACKGROUND**

Defendants dispute many allegations in the SAC, including the implausible and offensive assertion that they knowingly supported attacks against U.S. forces.  But, for purposes of their Rule 12(b)(6) arguments, Defendants treat as true the factual allegations that are well-pleaded, non-conclusory, and not contradicted by matters subject to judicial notice, *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004), and rely on only the SAC, materials it incorporates by reference (Exs. 3-13), and documents subject to judicial notice (Exs. 14-70).  *See Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67-68 (D.D.C. 2014).  Three items (Exs. 71-73) are submitted solely in support of Defendants' Rule 12(b)(1) argument.

### A.    The U.S.-Led Invasion And Strategy For Victory In Iraq

The Iraq War began in March 2003 with the invasion of Iraq by U.S. and Coalition armed forces.  SAC ¶ 54.  Three weeks later, U.S.-led forces toppled Iraqi President Saddam Hussein's regime, *id.*, marking the beginning of a military occupation and years of armed conflict between, on one side, U.S., Coalition, and Iraqi military forces, and, on the other, an array of armed insurgent forces, including JAM.  The armed conflict in Iraq lasted for the entire period relevant to the SAC, ending no earlier than December 2011.[2]  By then, 4,496 U.S. service members had been killed, another 32,252 wounded,[3] and hundreds of civilian personnel supporting or accompanying U.S. and Coalition forces had been killed or injured.

_____

[2] *See, e.g.*, Barbara Salazar Torreon, Cong. Research Serv., RS21405, *U.S. Periods of War and Dates of Recent Conflicts* 8-9 (Dec. 14, 2018) ("On December 15, 2011, U.S. Armed Forces in Baghdad marked the official end of the war in Iraq.") (Ex. 14).

[3] U.S. Dep't of Def. ("DOD"), *Operation Iraqi Freedom (OIF) U.S. Casualty Status Fatalities & Operation New Dawn (OND) U.S. Casualty Status Fatalities* (last visited Apr. 1, 2019) (Ex. 15).

The Iraq War continued long past the fall of Saddam Hussein in 2003, and the United States and the new Iraqi government faced numerous challenges throughout the post-Saddam era.  Iraq's public infrastructure and economy were in tatters due to failed economic policies, corruption, crime, neglect, international sanctions, and prior armed conflicts, while various Sunni and Shi'a militant groups were engaged in armed conflict to try to expel U.S.-led forces from Iraq.  SAC ¶¶ 54-55, 57-62, 97, 333.  To address these challenges, the United States implemented a multi-pronged "strategy for victory in Iraq" that included defeating insurgent forces on the battlefield and restoring security, rebuilding and supporting the Iraqi economy and government, and establishing democratic governance by bringing warring factions into the political process.[4]

### B.     The U.S. Policy Of Rebuilding Iraq And The Ministry of Health

As the Iraq War raged on, the United States also implemented a foreign policy to rebuild, fund, and supply the Iraqi Government, including the Ministry and Iraq's public health care system.  With respect to the Ministry, U.S. foreign policy took two main forms: direct assistance, and encouragement of private sector business with the Ministry.

### 1.     Direct U.S. Assistance To The Ministry

In November 2003, Congress appropriated roughly $20 billion to the Iraq Relief and Reconstruction Fund, including $793 million to fund and support the Ministry over a period of several years.[5]   President George W. Bush referred to the appropriation as "the greatest

---

[4] *See* White House Off. of Press Sec'y, President Outlines Strategy for Victory in Iraq, 2005 WL 3197396 (Nov. 30, 2005).

[5] Emergency Supplemental Appropriations Act for Defense & Reconstruction of Iraq & Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (Nov. 6, 2003).  *See also* U.S. Gov't Accountability Off. ("GAO"), GAO-05-876, *Rebuilding Iraq: Status of Funding and Reconstruction Efforts* 32 (2005) (Ex. 16).

commitment of its kind since the Marshall Plan," and explained that it would serve U.S. national

security interests by "help[ing] build [a] stable democratic societ[y] in Iraq."[6]

Restoring Iraq's nearly collapsed public health care system was a critical part of this U.S.

foreign policy effort.  By the time the United States returned sovereignty to Iraq in mid-2004, more

than half of Iraq's medicine storage warehouses had been looted, and Iraq's health sector

confronted serious procurement challenges.[7]   Facing the prospect of a complete breakdown of

Iraq's public health system, the U.S.-led Coalition Provisional Authority ("CPA") increased the

Ministry's budget 60-fold.[8]  President Bush also met in person with Iraq's interim Health Minister

in December 2003 to discuss public health priorities and the U.S. delivery of more than 25,000

tons of medicines and medical supplies to Iraqi hospitals.[9]

Throughout the period relevant to the SAC (2005–2011), the United States remained

"actively engaged" with the Ministry to "meet the healthcare needs of the Iraqi people,"[10] including

---

[6] White House Off. of Press Sec'y, Remarks by the President at Signing of H.R. 3289 – The Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2003 WL 22513828 (Nov. 6, 2003); *see also* Statement by President George W. Bush upon Signing H.R. 3289, 2003 U.S.C.C.A.N. 1308, 1308 (2003).

[7] GAO, *Rebuilding Iraq*, *supra* note 5, at 31.

[8] White House Off. of the Press Sec'y, Fact Sheet: The New Iraqi Healthcare System, 2003 WL 22941262, at *1 (Dec. 15, 2003).

[9] White House Off. of the Press Sec'y, Fact Sheet: The New Iraqi Healthcare System, 2003 WL 22941262, at *1 (Dec. 15, 2003).

[10] DOD, *Report to Congress: Measuring Stability and Security in Iraq* 20 (July 23, 2009) (Ex. 17); *see also* U.S. Agency for Int'l Dev. ("USAID"), *Fact Sheet: Accomplishments in Iraq* 5, 7 (Oct. 14, 2009) (explaining that, as of 2009, "USAID [was] in the process of initiating a health program [to] build the capacity of the Ministry" and that "coordination with Iraq's Ministry of Health and other donors continue[d]") (Ex. 18); U.S. Special Inspector Gen. for Iraq Reconstr. ("SIGIR"), *Learning From Iraq: A Final Report From the Special Inspector General for Iraq Reconstruction*, at 110-11 (Mar. 2013) (Ex. 19); DOD, *Report to Congress: Measuring Stability and Security in Iraq* at 25 (Aug. 20, 2010) (stating that "the GoI and USG continue to work together as the Ministry of Health (MoH) builds its capacity and capability to meet the healthcare needs of Iraqis") (Ex. 20); USAID, *USAID and Ministry of Health Host National Primary Health Care*

by working directly with the Ministry's procurement arm, Kimadia.  Under Iraq's public, single-payer health care system, the Ministry employed "every public-sector doctor, pharmacist, nurse, and medical technician in Iraq," and Kimadia had a monopoly over all medical imports.  SAC ¶ 72.  Accordingly, the United States—and others who provided medical goods and worked to rebuild Iraq's health care system—had to work with both organizations regardless of which political party controlled them.[11]

The U.S. Government devoted enormous resources to this effort.  As reported by the U.S. Special Inspector General for Iraq Reconstruction, "[f]rom May 2003 to September 2012, the U.S. Government . . . expended $934 million for health projects" in Iraq.[12]  This included $362 million to rebuild public health clinics and hospitals, and a massive U.S.-funded effort to provide these facilities with "medical supplies and equipment."[13]  In 2005 and 2006, the U.S. Agency for International Development ("USAID") and other U.S. agencies worked closely with the Ministry by funding grants to distribute "[e]ssential health care equipment" to the Ministry,[14]  by assisting the Ministry's vaccination efforts throughout Iraq,[15] and by delivering hundreds of millions of dollars' worth of nutritional supplements, vaccines, and other medical supplies and equipment directly to the Ministry and Kimadia for distribution to Ministry hospitals and clinics.[16]  The

---

*Workshop* (Jan. 24, 2012) (joint workshop held in 2012 demonstrated the "strong partnership" between USAID and the Ministry) (Ex. 21).

[11] *See, e.g.*, Brandon Sprague & Adam Shemper, *Baghdad's Shame*, Salon (Aug. 28, 2003) (cited at Second Amended Complaint ("SAC") ¶ 48 n.5) (Ex. 3).

[12] SIGIR, *Learning From Iraq*, *supra* note 10, at 110.

[13] *Id.*

[14] USAID, *Reconstruction Weekly Update* 7 (Mar. 31, 2005) (Ex. 22).

[15] USAID, *Reconstruction Weekly Update* 1, 6 (Sept. 1, 2005) (Ex. 23); USAID, *Reconstruction Weekly Update* 10 (July 7, 2005) (Ex. 24).

[16] *See, e.g.*, U.S. Dep't of State ("DOS"), *§ 2207 Report on Iraq Relief and Reconstruction*,

Department of Defense funded and supported health care infrastructure projects for the Ministry and Kimadia,[17] and established procurement assistance centers throughout Iraq.[18]  In 2008, the Department of Defense touted those centers' "$9.6 [billion] in procurement direct assistance in key industries such as Health," and "develop[ment of] Standard Bidding Documents for Government of Iraq implementation."[19]  In the ensuing years, the United States and its agencies continued to enter into agreements or partnerships with Iraq and the Ministry to strengthen and support Iraq's health systems, including working to improve Kimadia's procurement system.[20]

### 2. U.S. Encouragement Of Private Sector Business With The Ministry

Throughout the relevant period, the United States encouraged and enabled private sector companies outside Iraq to do business with the Ministry and Kimadia.  In May 2003, the U.S. Government de-designated Iraq as a state sponsor of terrorism, suspended terrorism-related sanctions against the Iraqi government (thus allowing U.S. entities and their affiliates to do business with agencies like the Ministry), and issued a General License from the Treasury Department allowing Kimadia to use the U.S. banking system.[21]

---

App'x I, at 56 (Apr. 6, 2005) (Ex. 25); DOS, *§ 2207 Report on Iraq Relief and Reconstruction*, Exec. Summ., at 2 (Apr. 2006) (Ex. 26); USAID, *Reconstruction Weekly Update* 5 (Jan. 20, 2006) (Ex. 27); USAID, *Reconstruction Weekly Update* 6 (Sept. 8, 2005) (Ex. 28).

[17] SIGIR, *Quarterly Report to the U.S. Congress* 18, 91-93 (Apr. 30, 2009) (Ex. 29).

[18] DOD, Task Force for Business & Stability Operations, *Procurement Assistance Centers* (Ex. 30).

[19] *Id.*

[20] U.S.-Iraq Strategic Framework Agreement § VI (1), (3), (4) (Nov. 17, 2008) (Ex. 31); USAID, *Tatweer Project Quarterly Progress Report* 10 (July 31, 2008) (Ex. 32); SIGIR, *Quarterly Report to the U.S. Congress*, at 85 (Oct. 30, 2008) (Ex. 33); SIGIR, *Learning From Iraq*, *supra* note 10, at 110-11.

[21] *See* Suspending the Iraq Sanctions Act, 68 Fed. Reg. 26,459 (May 7, 2003); Off. of Foreign Assets Control, Specially Designated Nationals and Blocked Persons, and Amended Iraqi General Licenses, 2004 WL 569364, at *4 (Mar. 23, 2003); SAC ¶ 126.

8

The United States encouraged private sector companies to sell and donate medical goods to the Ministry.  In July 2003, James Haveman, an appointee of the U.S. president and the CPA's Senior Health Advisor to the Ministry, asked representatives of multinational pharmaceutical companies to commit to sell and donate medicines to Iraq on a long-term basis in order to ensure a continuous supply.[22]  Haveman and a CPA procurement advisor later met with members of the Pharmaceutical Research and Manufacturers of America ("PhRMA")—which at the time included affiliates of each Defendant's corporate family—to advise them that the Ministry would soon take control of pharmaceutical imports, and to explain Kimadia's bidding process for brand-name suppliers.[23]  Haveman explained that the head of the CPA, Ambassador L. Paul Bremer, would soon formally request that PhRMA members donate $500 million worth of medicines to the Ministry.[24]  And when the CPA thereafter promulgated tariffs for imports into Iraq, it specifically exempted "medicines and medical equipment"[25]—an exemption that remained through at least 2012.[26]

From 2004 through at least 2013, the Department of Commerce, USAID, and other U.S. agencies continued this policy of encouraging private sector companies to supply medicines and medical equipment to the Ministry—including by publishing reference materials explaining how

---

[22] U.S. Dep't of State Cable, *CPA Senior Health Advisor Haveman's Visit to Amman* (Aug. 3, 2003) (sensitive but unclassified) (Ex. 71).  The SAC relies on numerous State Department cables disclosed by WikiLeaks, including the one cited here.  Many of them (*unlike* this one) are marked as classified and appear not to have been declassified.  This brief does not cite any such classified cables, but Plaintiffs' reliance on them would complicate this case if it is not dismissed.

[23] U.S. Dep't of State Cable, *Good Vibes at Iraqi MOH Briefing for Big PhRMA* (Nov. 20, 2003) (unclassified) (Ex. 72).

[24] *Id.*

[25] Coal. Provisional Auth., Reconstr. Levy, Order No. 38 § 2 (Sept. 9, 2003) (Ex. 34).

[26] Int'l Trade Admin., *Exporting U.S. Goods to Iraq* (June 2012) (Ex. 35).

9

to participate in Kimadia's bidding process, become a recognized supplier, submit a tender, and enter the Iraqi pharmaceutical market as a foreign supplier.[27]  The Department of Commerce also ran a website that included links to Kimadia's website and its registration form for pharmaceutical companies, and on at least one occasion advertised a Kimadia solicitation for medical equipment that was exclusively manufactured by Defendant GE Healthcare.[28]  Beginning in 2006, USAID and the Department of Defense contracted directly with Defendants GE Medical Systems Information Technologies, Inc. and Johnson & Johnson to deliver medical equipment for use in Ministry facilities.[29]  In January 2009, the Department of Commerce encouraged companies with expertise in the health care sector to participate in a Health Investment Seminar in Dubai—co-sponsored by USAID and an Iraqi Ministry-led contingent—which sought to match various Ministry directorates with private suppliers to help Iraq modernize its health system.[30]  In February 2009, officials from the U.S. Embassy in Baghdad, including the Embassy's health attaché,

---

[27] *E.g.*, U.S. Commercial Serv., *Doing Business in Iraq* (2013) (cited at SAC ¶ 127 n.88) (Ex. 4) (pp. 3-7 of excerpt); U.S. Commercial Serv., *Doing Business in Iraq*, at 34 (2012) (Ex. 36) (pp. 3-7 of excerpt); U.S. Commercial Serv., *Doing Business in Iraq* (2009) (Ex. 37) (p. 6 of excerpt); U.S. Dep't of Commerce, *Business Guide for Iraq*, at 7-9 (May 20, 2005) (similar) (Ex. 38); U.S. Dep't of Commerce, *Business Guide for Iraq*, at 3-5 (June 4, 2004) (describing health care as a "[s]pecific sector[] of interest" for USAID) (Ex. 39); USAID, *Iraq Private Sector Growth and Employment Generation: Pharmaceutical and Medical Products in Iraq*, at 49-53 (Apr. 17, 2007) (cited at SAC ¶ 130 n.91) (Ex. 5); *see also* USAID, *Investor Guide of Baghdad*, at 40 (Nov. 2011) (identifying the health sector as an "investment opportunit[y]" that would improve health care in Baghdad) (Ex. 40).

[28] U.S. Dep't of Commerce, *Iraq Investment and Reconstruction Task Force: Useful Links* (last updated Sept. 11, 2006) (Ex. 41); U.S. Dep't of Commerce, *Iraq Investment and Reconstruction Task Force: Closed Tenders*, at 24 (last updated May 24, 2006) (Ex. 42).

[29] *See, e.g.*, SIGIR, *Quarterly Report to the U.S. Congress*, List of Contracting Actions and Grants (Oct. 30, 2012) (Ex. 43); SIGIR, *Quarterly Report to the U.S. Congress*, List of Contracting Actions and Grants, at D49 (Oct. 30, 2006) (Ex. 44).

[30] SIGIR, *Quarterly Report to the U.S. Congress*, at 70 (Jan. 30, 2009) (Ex. 45); U.S. Dep't of Commerce, Int'l Trade Admin., *Iraq: Events*, at 6 (last updated Aug. 25, 2015) (Ex. 46).

participated in the Ministry's "Iraq Health Investment Summit," which was designed to solicit private foreign investment in Iraq's health care sector.[31]   That October, the Department of Commerce's International Trade Administration co-sponsored the U.S.-Iraq Business and Investment Conference, which educated attendees on how to invest in the Iraqi health sector.[32]

The U.S. Government's support of the Ministry and Kimadia—and explicit encouragement of companies to transact business with them—continued despite concerns about corruption within those agencies, which often resulted in the Ministry's medicines and equipment being pilfered and sold on the black market.   A 2007 USAID report encouraging private sector investment in Iraq's health sector (*see supra* note 27) noted that "[t]he [Ministry] . . . acknowledges corruption within its own ranks" but "intends to tackle" the illegal practice of resale from clinics and pharmacies to street traders.   SAC ¶ 130 & n.92.   The report further stated that, while the United States proposed privatizing Kimadia in 2003, it ultimately chose to work with Kimadia to reform its operations.[33] "Although many challenges remain[ed]," the United States continued to "actively engage[]" with the Ministry—and urged companies to do the same—because it was essential to stabilizing Iraq and "meet[ing] the healthcare needs of the Iraqi people."[34]

### C.     Defendants' Supply Of Medical Goods To The Ministry

Defendants are leading manufacturers and suppliers of medicines and medical products, including breast cancer medications, SAC ¶¶ 197, 316, hemophilia injections, *id.* ¶ 289, MRIs and

---

[31] U.S. Dep't of State Cable, *Iraq Health Investment Summit Highlights Progress, Challenges* (Mar. 9, 2009) (sensitive but unclassified) (Ex. 73).

[32] U.S. Dep't of Commerce, Int'l Trade Admin., *U.S.-Iraq Business and Investment Conference* (last updated Aug. 25, 2015) (Ex. 47).

[33] USAID, *Iraq Private Sector Growth*, *supra* note 27, at 53, 55 (cited at SAC ¶ 130 n.91).

[34] *See* DOD, *Measuring Stability and Security* (July 23, 2009), *supra* note 10, at 20; *see also* DOD, *Measuring Stability and Security* (Aug. 20, 2010), *supra* note 10, at 25.

ultrasound machines, *id.* ¶ 226, and catheters, sutures, and arterial sheaths, *id.* ¶ 247.  Plaintiffs characterize 9 Defendants as "[S]upplier Defendants" and 11 Defendants as "[M]anufacturer Defendants."[35]  SAC ¶¶ 188, 211, 245, 281, 310.  Plaintiffs allege that the Supplier Defendants contracted to supply medicines and medical devices to the Ministry.  *See, e.g.*, *id.* ¶¶ 191-92, 213-14, 246-47, 252-54, 284-85, 312-13.  Plaintiffs additionally allege that the Supplier Defendants paid Ministry officials kickbacks in the form of "free goods," *id.* ¶¶ 190, 217, 246, 285, 312, or cash "commissions," *id.* ¶ 142, to secure contracts with Kimadia.

Plaintiffs allege that the Manufacturer Defendants manufactured the pharmaceuticals (and in some cases medical equipment) that the Supplier Defendants, in turn, sold to the Ministry and Kimadia.  *Id.* ¶¶ 188, 211, 245, 281, 310.  The Manufacturer Defendants are not alleged to have contracted or otherwise done business with the Ministry or Kimadia, nor to have engaged in any form of corrupt behavior.  *Compare, e.g.*, *id.* ¶ 192 (Suppliers), *with id.* ¶ 194 (Manufacturers).

**D.    The Sadrists And Jaysh Al-Mahdi (JAM)**

After Saddam Hussein was deposed in 2003, sectarian conflicts erupted between various Sunni and Shi'a factions.  Muqtada al-Sadr formed and led one faction (the "Sadrists"), comprised of "masses of impoverished Iraqi Shi'a" who took over "Saddam City" in eastern Baghdad and

---

[35]  The Supplier Defendants are AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Johnson & Johnson (Middle East) Inc., Cilag GmbH International, Janssen Pharmaceutica N.V., Pfizer Inc., Wyeth Pharmaceuticals Inc., Pfizer Enterprises SARL, and F. Hoffmann-La Roche Ltd.  The Manufacturer Defendants are AstraZeneca Pharmaceuticals LP, GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., Ethicon, Inc., Ethicon Endo-Surgery, LLC, Janssen Ortho LLC, Ortho Biologics LLC, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Genentech, Inc., and Hoffmann-La Roche Inc.  The SAC describes one Defendant, Johnson & Johnson, as neither a Supplier Defendant nor a Manufacturer Defendant, but alleges that it was the "parent company" of certain affiliated Manufacturer and Supplier Defendants and that it "oversaw and supervised" the alleged actions of its subsidiaries.  SAC ¶ 245.

renamed it "Sadr City."  SAC ¶¶ 57-59.  The Sadrists formed a "political wing" led by Sadr, and a military wing known as "Jaysh al-Mahdi" (Arabic for "Mahdi Army").  *Id.* ¶¶ 3, 59.

### 1.    The Sadrists And The Ministry Of Health

The Sadrists quickly became a significant political presence in Iraq, with millions of Shi'a supporters.  *See* SAC ¶ 355.  Sadr-backed candidates won 23 seats in the January 2005 parliamentary election, and 32 seats that December.  *Id.* ¶ 68.  Members of parliament from Sadr's bloc joined the Iraqi government after both elections, and when the new government "divvied up [cabinet ministries] by political party," it gave the Sadrists control of several government agencies, including the Ministry of Health, where the Sadrists appointed the Minister.  *Id*. ¶¶ 68-69.  The United States continued to support the Ministry after these elections, encouraging the Sadrists to play a constructive role in the new Iraqi government.[36]  In April 2007, the Sadrist Minister of Health resigned and was replaced with an independent, non-Sadrist minister.[37]  Today, Sadrists hold more seats in the Iraqi parliament than any other political coalition.[38]

Plaintiffs allege that JAM eventually obtained some of the goods that Defendants supplied to the Ministry because there was no "meaningful distinction between the Ministry and [JAM]."  *Id.* ¶ 166.  Yet, Plaintiffs also allege that JAM obtained these goods through "theft," "misappropriation," "diversion," and "smuggl[ing]" from the Ministry.  *Id.* ¶ 117, 132, 172; *see*

---

[36] USAID, *USAID/Iraq Weekly Update* 6 (Mar. 31, 2006) (Ex. 48); *Iraq: The Crocker-Petraeus Report: Hearing on S. 110-490 Before the S. Comm. on Foreign Relations* 109, 110th Cong. (Sept. 11, 2007) (responses of Gen. David Petraeus to Questions Submitted for the Record by Senator Joseph Biden) (Ex. 49).

[37] *See* Kenneth Katzman, Cong. Research Serv., RL31339, *Report for Congress, Iraq: Post-Saddam Governance and Security* 17 (June 4, 2008) (Ex. 50).

[38] Jane Arraf, *After Muqtada Al-Sadr's Surprise Win, Iraq's Political Leaders Try to Form Government*, Nat'l Pub. Radio (May 26, 2018), *available at* https://www.npr.org/sections/parallels/2018/05/26/614433787/after-muqtada-al-sadrs-surprise-win-iraqs-political-leaders-try-to-form-governme.

*also id.* ¶¶ 108, 177-78 & n.135.  For instance, JAM allegedly "monetized" medical equipment by stealing it from Ministry warehouses, *id.* ¶ 178, *i.e.*, "diverting [the equipment] to their own private clinics where [JAM] agents . . . could charge patients for their use outside Iraq's state-run public healthcare system."  *Id.* ¶ 221; *see also id.* ¶¶ 108-09 (alleging that JAM members stole Ministry medicines and sold them on the black market in Iran, Syria, and Jordan).  Plaintiffs further admit that although the Sadrists (not JAM) controlled the appointment of the Minister of Health from late 2004 until some point in 2008, a *different* political party then took over.  *Id.* ¶ 104.

## 2.      Jaysh Al-Mahdi And The Armed Conflict In Iraq

While the Sadrists engaged politically with Iraq's new democracy, JAM simultaneously engaged in armed conflict with both Sunni-led factions and U.S. and Coalition forces.  SAC ¶¶ 59-62, 97.  JAM's "publicly stated, primary goal" "was the expulsion of Americans from Iraq."  *Id.* ¶ 333.  As Plaintiffs acknowledge, JAM was a "militia" with "military ends."  *See, e.g.*, *id.* ¶¶ 165-66.  It was composed of "a well-armed, well-trained force of insurgents"[39]—"boast[ing] at least 60,000 fighters," *id.* ¶ 338—that used armed force to maintain control over Shi'a "stronghold[s]" in Iraq and to engage other Iraqi[40] and U.S. forces in sustained armed conflict, *see id.* ¶¶ 8, 13, 59-61, 342.  JAM fought U.S. forces using "brigades," "regional command centers," *id.* ¶¶ 61, 338, and complex infantry tactics, including assaults with heavy weapons on U.S. military personnel, tanks, convoys, helicopters, and bases, *id.* ¶¶ 337, 341, 345.  JAM conducted attacks and defended its strongholds with an array of military-grade weaponry, including machine guns and sniper rifles, *id.* ¶ 393; rocket-propelled grenades and anti-tank missiles, *id.* ¶¶ 344, 399; explosively formed

---

[39] *See also* Nimrod Raphaeli, *Understanding Muqtada al-Sadr*, Middle East Quarterly 8 (Sept. 1, 2004) (cited at SAC ¶ 60 n.19) (Ex. 6).

[40] 152 Cong. Rec. H8581 (daily ed. Nov. 13, 2006) (statement of Rep. Ted Poe) (cited at SAC ¶ 347 n.289) (Ex. 7).

penetrators "designed to penetrate tank armor," *id.* ¶¶ 341, 342; mortars, *id.* ¶ 343; and surface-to-air missiles; and other rockets, *id.* ¶¶ 345, 485.

U.S. and Coalition military forces fought for years to defeat JAM on the battlefield, including with units primarily tasked with that very mission. *E.g.*, SAC ¶¶ 409-10.[41] Meanwhile, the United States also encouraged the Sadrists to settle their disputes through participation in Iraq's new democracy.[42]  As part of those efforts, the Department of State made what Plaintiffs allege was a "strategic diplomatic decision" not to designate JAM as a Foreign Terrorist Organization ("FTO"), "reflect[ing] a concern among some U.S. policymakers about the best way to influence Sadr" to engage with U.S.-backed entities and work peacefully through Iraqi government institutions.  *Id.* ¶ 355.  That decision stands in contrast with the State Department's FTO designations of *other* groups within Iraq,[43] and coincided with the U.S. Government's other wartime decisions, including repeatedly entering into cease-fire agreements with Sadr and JAM commanders to facilitate political reconciliation.[44]

----

[41] David E. Johnson et al., *The 2008 Battle of Sadr City: Reimagining Urban Combat* xiii-xiv (RAND Corp. 2013) (cited at SAC ¶ 334 n.274) (Ex. 8).  *See also* DOD, *Report to Congress: Measuring Stability and Security in Iraq* 19 (Nov. 30, 2006) (listing JAM as a chief impediment to security in Iraq) (Ex. 51).

[42] *See Iraq: The Crocker-Petraeus Report*, *supra* note 36, at 109.

[43] Congress authorized the Secretary of State to designate any foreign organization as an FTO if the Secretary determines the organization has engaged in terrorism that "threatens the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1)(C).  The Secretary designated several groups based or active in Iraq as FTOs, including Ansar al-Islam and Al-Qa'ida in Iraq, *see* DOS, *Country Reports on Terrorism 2008*, at 288, 319-20 (Apr. 2009) (Ex. 52), and, in 2009, some Shi'a groups such as Kata'ib Hizballah, DOS, *Country Reports on Terrorism 2009*, at 260-61 (Aug. 2010) (Ex. 53).

[44] Michael R. Gordon & Gen. Bernard E. Trainor, *The Endgame: The Inside Story of the Struggle for Iraq, From George W. Bush to Barack Obama* 73 (2012) (cited at SAC ¶ 60 n.21) (Ex. 9); *id*. at 424-25 (explaining six-month cease fire Sadr declared in 2007); *id.* at 485; *id.* at 500.

### E.   The Armed Attacks At Issue

Plaintiffs' claims arise from armed attacks between 2005 and 2011 that killed or wounded 364 U.S. service members and 31 security contractors, U.S. Government employees, and others in the course of armed conflict in Iraq.  SAC ¶ 1.  Plaintiffs allege that JAM committed all but one of these attacks.  *See id.* ¶ 440 (Ansar al-Islam).[45]  Some of the attacks occurred during the "Battle of Sadr City," which pitted JAM forces against U.S. and Coalition forces in weeks of combat that claimed 925 lives and injured 2,605, with 63 Plaintiffs or their family members among the casualties.[46]  The victims in this case were deployed in combat roles, embedded with combat troops, participants in the war effort, or otherwise located in active combat zones.  *See infra* Part II.C.  Plaintiffs are these victims, their relatives, and their estates.

## STATUTORY FRAMEWORK

The ATA provides a private right of action for treble civil damages, subject to several limitations and exclusions, to U.S. nationals who are victims of a criminal "act of international terrorism."  18 U.S.C. § 2333(a).[47]  In addition to claims for direct liability, the ATA also allows claims for aiding-and-abetting liability in limited circumstances.  *Id.* § 2333(d).

Plaintiffs bring direct-liability claims under § 2333(a) and aiding-and-abetting claims under § 2333(d).  For each type of claim, each Plaintiff must plead and establish that his or her

---

[45] The SAC also alleges that certain attacks were carried out, in full or in part, specifically by Asa'ib Ahl al-Haq ("AAH"), which Plaintiffs alternatively claim was "related and allied with" or "integrated" into JAM, SAC ¶¶ 83, 334; *see also id.* ¶ 1238 n.389.

[46] SAC ¶¶ 345, 429, 596, 634, 673, 685, 705, 1085, 1195, 1338, 1420, 1456, 1537, 1543, 1583, 1608, 1686, 1728, 1759, 1771, 1792, 1869, 1891, 1964, 1982, 2017, 2030, 2083, 2095, 2129, 2139, 2174-75, 2186, 2257, 2274, 2280, 2331, 2345, 2361, 2337, 2345, 2361, 2369, 2422, 2467, 2495, 2504, 2559, 2622, 2690, 2732, 2781, 2811-12, 2822, 2938-39, 2973, 3014, 3022, 3064-65, 3095-96, 3112, 3137, 3149, 3157.

[47] The ATA provisions cited herein are included in a Statutory Appendix to this brief.

injury occurred "by reason of an act of international terrorism." *Id.* § 2333(a).  The ATA imposes four requirements for an act to constitute an act of international terrorism.  *See id.* § 2331(1).  The act must: (1) occur abroad or transcend national boundaries; (2) be "violent" or "dangerous to human life"; (3) violate federal or state criminal law (or constitute an act that would do so if committed in the United States); and (4) "appear to be intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping."  *Id.*  Together, the second and third requirements mean that a plaintiff, in addition to pleading and establishing the other elements of an ATA civil claim, must plead and establish that the conduct of the defendant (on a direct claim) or of the primary actor (on an aiding-and-abetting claim) satisfies the elements of a violent or dangerous criminal offense, including the applicable mens rea element.  *See id.* § 2331(1)(A).

Congress placed careful limitations on ATA liability.  To prevail on a direct-liability claim, a plaintiff must establish that the defendant itself committed an "act of international terrorism," *id.* § 2333(a), and so must show that the defendant's own conduct satisfies the apparent-intent, violent/dangerous, and criminal elements embedded within the ATA's definition of "international terrorism," *id.* § 2331(1).  In addition, to satisfy the statute's "by reason of" requirement, *id.* § 2333(a), the plaintiff must establish that the defendant's terrorist act proximately caused the plaintiff's injury.  To prevail on an aiding-and-abetting liability claim, a plaintiff must establish that the "act of international terrorism" that injured the Plaintiff was "committed, planned, or authorized by" a designated FTO *and* that the defendant "knowingly provid[ed] substantial assistance" to "the person who committed such an act of international terrorism."  *Id.* § 2333(d).

17

The statute further provides that "no action shall be maintained"—whether for direct or aiding-and-abetting liability—"for injury or loss by reason of an act of war," 18 U.S.C. § 2336(a), where "act of war" is defined as

> any act occurring in the course of – (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

*Id.* § 2331(4).  Thus, Congress barred ATA liability for injuries caused by any act occurring in the course of armed conflict between military forces of any origin, even if that same act also constitutes an "act of international terrorism."

## PLAINTIFFS' CLAIMS

Each of the 1,261 Plaintiffs asserts the same four ATA claims against all Defendants. Counts 1 and 2 are aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2).  Count 1 alleges that each Defendant aided and abetted each of the 300-plus attacks described in the SAC.  SAC ¶¶ 3181-89.  Count 2 alleges that each Defendant aided and abetted a RICO conspiracy "to expel Americans from Iraq through crime and anti-American violence."  *Id.* ¶¶ 3190-207.

Counts 3 and 4 are direct-liability claims brought under 18 U.S.C. § 2333(a) for "acts of international terrorism" allegedly committed by Defendants.  Count 3 alleges that Defendants caused Plaintiffs' injuries by knowingly providing material support to terrorists in violation of 18 U.S.C. § 2339A, which makes it a crime to provide "material support or resources"—except for the provision of "medicine"—"knowing or intending that they are to be used in preparation for, or in carrying out," certain federal terrorism offenses.  SAC ¶¶ 3208-14.  Count 4 alleges that Defendants violated 18 U.S.C. § 2339C, which makes it a crime to "unlawfully and willfully provide[] or collect[] funds" with the intent or knowledge that they will be used to commit certain terrorism offenses.  SAC ¶¶ 3215-21.

Plaintiffs also assert four state-law claims (Counts 5-8). Count 5 asserts intentional infliction of emotional distress claims on behalf of all non-estate Plaintiffs. SAC ¶¶ 3222-28. Count 6 asserts assault and battery claims on behalf of only those Plaintiffs named in the First Amended Complaint who were physically wounded in Iraq. *Id.* ¶¶ 3229-34. Counts 7 and 8 allege wrongful death and survival claims on behalf of all estate Plaintiffs. *Id.* ¶¶ 3235-54.

## LEGAL STANDARD

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), Plaintiffs bear the burden of establishing jurisdiction, as "[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Dismissal on the basis that Plaintiffs' claims present nonjusticiable political questions constitutes a dismissal for lack of subject matter jurisdiction. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215, 216 n.5 (1974). Where Defendants challenge the factual basis of the Court's jurisdiction, the Court "must go beyond the pleadings and resolve any disputed issues of fact." *Lillard & Lillard v. Blue Cross & Blue Shield Assn.*, 971 F. Supp. 2d 116, 118 (D.D.C. 2013) (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).[48]

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must plead facts sufficient to state a claim that is "plausible on its face," and cannot rest on mere "possibility" or on allegations that are "merely consistent with" their theory of liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although well-pleaded allegations are accepted as true, the Court need not accept "a legal conclusion couched as a factual

---

[48] Unless otherwise specified, internal citations and quotation marks are omitted.

allegation." *Id.* Nor must it credit allegations that are contradicted by documents the complaint incorporates by reference or by matters subject to judicial notice. *Kaempe*, 367 F.3d at 963.

## ARGUMENT

As a threshold matter, all of the claims (Counts 1-8) are nonjusticiable under the political question doctrine. During the same period when the Ministry was allegedly "openly controlled by terrorists," SAC ¶ 179, the Ministry had no greater benefactor than the U.S. Government, which supported and funded the Ministry and encouraged companies (including Defendants) to do business with and donate free goods to it. If the Court were to accept Plaintiffs' theory of liability, it would necessarily call into question the U.S. Government's own policy toward the Ministry, because the inescapable conclusion would be that the *U.S. Government* knowingly funded and supported a militia *attacking its own forces* in Iraq.

Plaintiffs' ATA claims (Counts 1-4) are precluded by the statute's express "act of war" exclusion, which provides that "[n]o action shall be maintained" for injuries arising from "any act occurring in the course of . . . armed conflict between military forces of any origin." 18 U.S.C. §§ 2331(4)(C), 2336(a). Throughout the relevant period, Iraq was indisputably in a state of armed conflict; JAM was a military force engaged in armed conflict with U.S., Coalition, and Iraqi forces; and Plaintiffs' injuries resulted from JAM attacks that occurred in the course of this armed conflict.

Plaintiffs' direct-liability claims under the ATA (Counts 3-4)—*i.e.*, claims that allege Defendants themselves committed "acts of international terrorism"—are facially implausible and deficient in several additional respects. The alleged connection between Defendants' alleged conduct and JAM's attacks is too attenuated to meet the ATA's rigorous proximate causation requirement, especially because the asserted chain of causation includes a sovereign intermediary (the Ministry), from which JAM allegedly stole, diverted, and looted goods. Defendants' alleged

transactions with the Ministry were also miniscule compared to the enormous support JAM received from other sources, including Iran and other Iraqi ministries, and Plaintiffs offer no allegations plausibly connecting any transaction to any particular attack. The allegations also make clear that Defendants' transactions with the Ministry were not "violent" or "dangerous to human life," and did not "appear to be intended" to "intimidate" or "coerce a civilian population or government," and thus do not constitute "international terrorism" under the ATA. And, the SAC fails sufficiently to allege the elements of any predicate crime necessary for direct liability under the ATA.

Plaintiffs' aiding-and-abetting claims under the ATA (Counts 1-2) likewise fail for a host of additional reasons. As with Plaintiffs' direct-liability claims, their allegations fail because the alleged transactions between Defendants and the Ministry were too far removed from the JAM attacks to constitute "substantial assistance" to the perpetrators of those attacks. Nor can Plaintiffs avoid the ATA's express limitation of aiding-and-abetting liability to acts of international terrorism "committed, planned, or authorized" by an entity that the Department of State has designated as an FTO. Plaintiffs concede that JAM was deliberately *not* designated as an FTO by the Executive Branch. As a result, Plaintiffs strain to link JAM to Hezbollah (a designated FTO) and resort to a convoluted and defective RICO theory to attempt to plead around the FTO requirement, which just highlights the defects in Counts 1 and 2. Plaintiffs also fail to allege the requisite knowledge that Defendants' transactions with the Ministry would aid terrorist attacks that were committed, planned, or authorized by an FTO.

Plaintiffs' state-law claims (Counts 5-8) add nothing to their case. They fail for similar reasons as the ATA counts, and they are barred by the statute of limitations.

I.   **THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE PLAINTIFFS' CLAIMS PRESENT NONJUSTICIABLE POLITICAL QUESTIONS (ALL COUNTS)**

Plaintiffs' lawsuit seeks to hold Defendants liable for conduct that mirrored and effectuated U.S. foreign policy during the Iraq War.  The Court cannot accept Plaintiffs' theories of liability without condemning the U.S. Government's policy of rebuilding, funding, and encouraging private sector business with the Ministry and Kimadia, despite the involvement of Sadrists in the Ministry. Such "political decisions . . . are by their nature committed to the political branches to the exclusion of the judiciary."  *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006).  Plaintiffs' claims thus raise nonjusticiable political questions and should be dismissed pursuant to Rule 12(b)(1).

The Supreme Court has identified six factors governing whether a lawsuit presents a "political question":

> [1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  Plaintiffs' lawsuit implicates several of these factors. Adjudication of Plaintiffs' claims would require the Court to question "the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security" with respect to the reconstruction of Iraq's health care system during wartime.  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc).  Yet the Constitution commits such decisions to the President and Congress (the first *Baker* factor).  Adjudicating Plaintiffs' claims also would risk condemning those sensitive U.S. foreign policy and national security

22

decisions made during the Iraq War and inviting the "embarrassment" of "multifarious pronouncements" by the different branches with respect to those decisions (the fourth and sixth *Baker* factors).

Throughout the time period in which Plaintiffs allege that JAM openly controlled the Ministry, rebuilding Iraq's health care system was vital to U.S. national security interests in Iraq, and a cornerstone of U.S. foreign policy.  It was U.S. policy to fund, support, and rebuild the Ministry and Kimadia through: (1) direct aid and support, including by appropriating more than $1 billion to help fund the Ministry and Kimadia[49]; and (2) promoting private sector business with those agencies, including by directly calling on pharmaceutical and medical supply firms to do business with the Ministry and instructing companies how to participate in Kimadia's bidding process, *supra* pp. 8, 10-11.  The Executive Branch and Congress repeatedly affirmed that the Ministry was a critical partner in the effort to rebuild Iraq's failing public health system, despite the Sadrists' involvement with the Ministry during part of the relevant time period.  Indeed, Plaintiffs concede that the United States made a "strategic diplomatic decision" to engage politically with the Sadrists, because it believed doing so was "the best way to influence Sadr." SAC ¶ 355.

Plaintiffs nonetheless ask this Court to disregard the strategic policy decisions of the Executive Branch and to decide instead that the Ministry, during the years the United States partnered with and funded it, was "not a genuine medical institution."  SAC ¶ 3.  Plaintiffs would have the Court supplant real-time U.S. policies in Iraq with the hindsight determination that during some of the relevant years JAM had "effectively captured" the Ministry, *id.* ¶ 166, and that it was

---

[49]   *See* SIGIR, *Learning From Iraq*, *supra* note 10, at 110; *see also* Emergency Supplemental Appropriations Act, tit. 2, ch. 2, 117 Stat. at 1225.

obvious to all that JAM stole Ministry resources to finance its "terrorist" attacks against U.S. forces, *id.* ¶ 179.  Were the Court to accept Plaintiffs' theory, it would necessarily follow that the Executive Branch and Congress knowingly provided hundreds of millions of dollars to those same "terrorists"—and thus (under Plaintiffs' theory) caused the deaths and injuries of scores of U.S. service members and government officials.  If the Court were to agree with Plaintiffs that the Ministry was "a de facto terrorist group," *id.* ¶ 3, it would necessarily follow that a U.S. agency in 2008 had pledged "strategic cooperation" with a de facto terrorist group,[50] and that the U.S. Government had knowingly supported terrorism on a massive scale when, for example, it "purchased over $117 million of medical equipment" to be "transferred to the Iraqi Ministry of Health" in 2006.[51]  Plaintiffs' own complaint proves this point, relying on materials that explicitly accuse *the United States* of "funding and training death squads" through donations to "critical ministries" in Iraq.[52]

The political question doctrine bars such a judicial indictment of U.S. foreign policy and national security decisions.  *See Baker*, 369 U.S. at 217 (first, fourth, and sixth factors).  "[P]olicy choices are to be made by the political branches," and statutory claims "can present a political question if resolving [them] requires the court to make an integral policy choice."  *Al-Tamimi v. Adelson*, 916 F.3d 1, 11-12 & n.6 (D.C. Cir. 2019).  The doctrine thus precludes adjudication of any theory of liability "that would . . . apply with equal force to the foreign policy and national security determinations made by the political branches."  *Saldana v. Occidental Petroleum Corp.*,

---

[50] USAID, *Tatweer Project Quarterly Progress Report*, *supra* note 20, at 10.

[51] DOS, *§ 2207 Report,* Exec. Summ., *supra* note 16, at 2.

[52] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Conde Nast Portfolio, 2008 WLNR 32045233 (Mar. 17, 2008) (cited at SAC ¶ 80 n.34); *see also id.* (recounting warning from State Department to DOJ that U.S. rebuilding efforts were funding Iraqi militias).

774 F.3d 544, 550 (9th Cir. 2014) (per curiam).  Put another way, adjudicating claims against a private defendant for conduct that parallels that of the United States—including its contemporaneous funding of the same foreign government agency in the interest of national security—"necessarily requires the judicial branch to question the political branches' decision." *Id.* at 552.

What is more, Plaintiffs' allegations do not merely require this Court to adjudge conduct that mirrored conduct by the U.S. Government:  The United States affirmatively encouraged Defendants and other companies to sell and donate medicines and medical equipment to the Ministry.[53]  Plaintiffs' theory that these business transactions amounted to knowing support for "terrorism," *see, e.g.*, SAC ¶¶ 105, 115, 119-20, 128, 137, attacks the U.S. Government's directive head on, requiring the Court to engage in "th[e] kind of second-guessing of the policy decisions of the political branches [that] is precisely what the political-question doctrine forbids," *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 97-98 (D.D.C. 2016).

The Ninth Circuit's decision in *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007), makes this clear.  In *Corrie*, the plaintiffs sought damages from a U.S. company that had sold bulldozers to the Israel Defense Forces ("IDF"), which allegedly used them to kill or harm the plaintiffs.  *Id.* at 977.  The court dismissed the case as nonjusticiable because the claims

---

[53] In addition, the U.S. Government decided to de-designate Iraq as a state sponsor of terrorism and to waive the FSIA's "terrorism exception" to encourage private sector business with Iraqi agencies like the Ministry.  Those decisions—which further enabled companies like Defendants to transact with the Ministry—were expressly made "in the national security interest of the United States" to "promote the reconstruction of, the consolidation of democracy in, and the relations of the United States with, Iraq."  Waiver of Section 1083 of the National Defense Authorization Act for Fiscal Year 2008, 73 Fed. Reg. 6,571 (Jan. 28, 2008).

"unavoidably" cast doubt on U.S. policy supporting private sector companies' sale of equipment to the Israeli government:

> We cannot intrude into our government's decision to grant military assistance to Israel, *even indirectly*[,] by deciding this challenge to a defense contractor's sales. Plaintiffs' claims can succeed only if a court ultimately decides that Caterpillar should not have sold its bulldozers to the IDF. . . . A court could not find in favor of the plaintiffs *without implicitly questioning, and even condemning, United States foreign policy toward Israel*.

*Id.* at 983-84 (emphases added).

As the Ninth Circuit later explained, the dispositive fact in *Corrie* was the clear indication of U.S. Government policy to support the sale of bulldozers to the IDF. *Saldana*, 774 F.3d at 552-53. In *Corrie*, the United States implemented this policy through directly financing the IDF's purchasing of bulldozers. 503 F.3d at 983-84. In *Saldana*, it did so by providing parallel funding and support. 774 F.3d at 553. The same is true here. To advance its foreign policy and national security interests, the United States provided hundreds of millions of dollars in direct funding and support for the Ministry and the Iraqi public health system and encouraged Defendants to make parallel investments over the exact time period at issue in the SAC. There is no way for the Court to adjudicate Plaintiffs' claims without challenging these decisions.

It is no answer to allege that some of Defendants' conduct was part of a "corrupt" scheme. Even if Plaintiffs' allegations were true, the ATA is not an anti-corruption statute (nor is there a private right of action under the FCPA generally), and it draws no distinction between "corrupt" and "non-corrupt" support; rather, it focuses on whether the support was "material" or "substantial," and provided with the requisite knowledge or terroristic intent. *See, e.g.*, 18 U.S.C. § 2339A(a); *id.* § 2333(d)(2). Indeed, Plaintiffs admit their theory is "not limited to . . . corrupt payments or other FCPA violations," SAC ¶ 179, because "contract goods" that the Ministry "legitimately purchased" were also being looted by JAM to support its attacks, *id.* ¶ 132. Thus,

according to Plaintiffs, Defendants are liable "[w]hether or not" they engaged in corruption, because *any* "transactions with a counterparty that was openly controlled by terrorists"—which is what Plaintiffs ask the Court to conclude about the Ministry—had a "causal nexus" to JAM attacks. *Id.* ¶ 179.[54]  Accordingly, the political questions presented here are "inextricable" from Plaintiffs' claims, *Baker*, 369 U.S. at 217, because the Court could not rule in Plaintiffs' favor on *any* claim without impugning U.S. Government policies to encourage transactions with the Ministry and to fund and supply the Ministry directly.

Nor can Plaintiffs avoid dismissal pursuant to Rule 12(b)(1), under which Plaintiffs' allegations need not be taken as true, by asserting conclusions that are flatly contradicted by the facts.  *See Kaempe*, 367 F.3d at 963; *Lillard & Lillard*, 971 F. Supp. 2d at 118.  For example, Plaintiffs contend that "[t]he U.S. Government did not support the Jaysh al-Mahdi-controlled Ministry of Health," SAC ¶ 76, but official U.S. Government documents show that it plainly did so, *supra* p. 5-8.  Likewise, Plaintiffs assert that the United States did not "encourage companies to transact with [the Ministry] between 2005 and 2008 in a way that would benefit the terrorists running it."  *Id.*  But again, official U.S. Government documents show that it did encourage business with the Ministry during this time period—creating a direct conflict with Plaintiffs' allegations that any "transactions with a [ministry] that was openly controlled by terrorists," including contracts for "legitimately purchased" goods, would benefit those terrorists.  *Id.* ¶¶ 132, 179.  And Plaintiffs' own sources condemn the U.S. Government for its support of the Ministry because that support might redound to JAM's benefit.  *Supra* note 52.  While those critics are free

---

[54] Plaintiffs have consistently included this allegation in all three of their complaints, even after Defendants pointed out that it necessarily impugns the U.S. Government's policy toward the Ministry.  Compl. ¶ 172; AC ¶ 179; SAC ¶ 179; Mem. of Law ISO Defs' Rule 12(b)(6) and 12(b)(1) Mot. to Dismiss [Dkt. 72-1] at 31-32.

to condemn these U.S. foreign policy decisions, judicial adjudication of such matters is barred by the political question doctrine.

## II.     THE STATUTE'S ACT OF WAR EXCEPTION BARS ALL OF PLAINTIFFS' ATA CLAIMS (COUNTS 1, 2, 3, 4)

The ATA provides that "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war."  18 U.S.C. § 2336(a).  The phrase "'[a]ct of war' is a term of art under the statute."  *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018).  The ATA broadly defines "act of war" as:

*any* act occurring in the course of –

(A) declared war;

(B) armed conflict, whether or not war has been declared, between two or more nations; or

(C) *armed conflict between military forces of any origin*[.]

*Id.* § 2331(4) (emphases added).  The statutory text is unambiguous.  Acts excluded from ATA liability need not occur during "declared war" or armed conflict between "nations."  Rather, the exclusion extends to "armed conflict between military forces *of any origin*"—a phrase that necessarily includes non-state military forces such as Jaysh al-Mahdi, *i.e.*, the "Mahdi Army."  *Id.* § 2331(4)(C) (emphasis added).  And it covers "*any* act" occurring "in the course of" such armed conflict.  *Id.* § 2331(4) (emphasis added); *see also Kaplan*, 896 F.3d at 512.  As Plaintiffs' allegations confirm, the JAM attacks that injured them were "act[s] occurring in the course of . . . armed conflict between military forces of any origin."  *Id.*  Plaintiffs' ATA claims are accordingly barred under the statute.

28

A. **Iraq Was In Armed Conflict During The Relevant Period**

There can be no serious question that there was armed conflict in Iraq—known almost universally as the "Iraq War"—during the relevant period.  18 U.S.C. § 2331(4)(C).  The term "armed conflict" encompasses protracted hostilities between armed groups.[55]  That ordinary meaning is consistent with standard usage.[56]  The positions of both political branches of the U.S. Government, as well as Plaintiffs' own allegations, make clear that U.S. forces in Iraq remained in armed conflict with various militias, including JAM, from 2005 through at least 2011—the period in which all of the victims in this case were injured or killed.

Congress passed, and President Bush signed into law, a statute that expressly authorized U.S. troops to engage in armed hostilities in Iraq.  *See* Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498.  That statute continued to be the domestic legal basis for U.S. engagement in armed conflict in Iraq throughout the relevant period.[57]

Presidents Bush and Obama each consistently characterized the armed conflict in Iraq as a "war" during the relevant period.[58]  As late as December 2011, President Obama reported that

---

[55] *See Oxford English Dictionary* (3d ed. 2016) (defining "armed" as "[e]quipped with or carrying a weapon or weapons" and "conflict" as "[a] prolonged struggle"; *see also id.* (defining "war" as "[h]ostile contention by means of armed forces, carried on between nations, states, or rulers, or between parties in the same nation or state").

[56] *See, e.g.*, Op. of Off. of Legal Counsel, U.S. Dep't of Justice, *Memorandum for Att'y Gen. Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi*, at 25 (July 16, 2010) (defining armed conflict as "protracted armed violence between governmental authorities and armed groups" (citation omitted)) (Ex. 54)

[57] *See, e.g.*, *Declaration and Principles: Future U.S. Commitments to Iraq, Joint Hearing Before the Subcomm. on the Middle East and South Asia & the Subcomm. on Int'l Orgs., Human Rights, and Oversight of the H. Comm. on Foreign Affairs*, 110th Cong., 2d Sess. 22-23, 38 (2008) (testimony of David Satterfield, Senior Advisor, Coordinator for Iraq, U.S. State Dep't) (Ex. 55).

[58] *See, e.g.*, White House Off. of Press Sec'y, *President Bush Delivers State of the Union*

29

"[f]or nearly nine years, our nation has been at war in Iraq."[59]  President Bush specifically addressed the need to "defeat[]" the "militia fighters" in the course of that war.[60]  And pursuant to the War Powers Resolution, both Presidents regularly reported to Congress, through at least 2010, that U.S. "armed forces continue to be engaged in . . . hostilities" in Iraq.  50 U.S.C. § 1543(c).[61]  The Department of Defense repeatedly confirmed that Coalition forces were in armed conflict with armed groups in Iraq, including JAM.[62]  And U.S. Secretaries of State explained that Coalition forces operating in Iraq were bound by "the law of armed conflict."[63]

Likewise, the U.S. Department of Justice has represented in court that "when the United States passed control to an interim Iraqi government in 2004, the ongoing hostilities became a non-international *armed conflict*."[64]  The phrase "non-international armed conflict" is the well-accepted

---

*Address*, 2007 WL 159710, at *7 (Jan. 23, 2007); White House Off. of Press Sec'y, *Remarks of President Barack Obama - Address to Joint Session of Congress*, 2009 WL 459901, at *9 (Feb. 24, 2009).

[59] White House Off. of Press Sec'y, *Remarks by the President and First Lady on the End of the War in Iraq*, 2011 WL 6256727 at *2 (Dec. 14, 2011).

[60] White House Off. of Press Sec'y, *President Bush Delivers State of the Union Address*, 2008 WL 218919, at *7 (Jan. 28, 2008).

[61] *See, e.g.*, H. R. Doc. No. 109-30, at 2 (2005) (Ex. 56); No. 109-73, at 2 (2005) (Ex. 57); No. 109-114, at 2 (2006) (Ex. 58); No. 110-5, at 2 (2007) (Ex. 59); No. 110-38, at 2 (2007) (Ex. 60); No. 110-81, at 2 (2007) (Ex. 61); No. 110-122, at 2 (2008) (Ex. 62); No. 111-61, at 2 (2009) (Ex. 63); No. 111-79, at 2 (2009) (Ex. 64); No. 111-122, at 2 (2010) (Ex. 65).

[62] *See, e.g.*, DOD, *Report to Congress: Measuring Stability and Security in Iraq* 14 (Mar. 2, 2007) (noting that the "conflict" in Iraq involved numerous armed groups targeting Coalition forces) (Ex. 66).

[63] *See, e.g.*, S.C. Res. 1790, Annex II, Letter dated Dec. 10, 2007 from U.S. Secretary of State to President of Security Council, U.N. Doc. S/RES/1790, at 8 (Dec. 18, 2007) (Ex. 67).

[64] Suppl. Br. of United States, *United States v. Hamidullin*, No. 15-4788, 2017 WL 4163478, at *7 (4th Cir. Sept. 11, 2017) (emphasis added); *see also* Br. for United States as Amicus Curiae Supporting Resp., *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel Carter*, 135 S. Ct. 1970 (No. 12-1497), 2014 WL 5395798, at *3 (2015) ("an armed conflict in Iraq" existed in 2005); *accord* Int'l Comm. of the Red Cross ("ICRC"), Opinion Paper, *How is the Term "Armed Conflict" Defined in International Humanitarian Law?* 3 (Mar. 2008) (non-international armed

30

classification of armed conflict that involves non-state armed forces—precisely what the ATA calls "armed conflict between military forces of any origin," 18 U.S.C. § 2331(4)(C), as opposed to "armed conflict . . . between two or more nations," *id.* § 2331(4)(B).  U.S. coalition allies and military experts agree that armed conflict continued in Iraq long after 2004.[65]

Plaintiffs' own allegations confirm that U.S. forces and JAM were in armed conflict.  Their complaint acknowledges the armed "insurgency against U.S. forces," SAC ¶ 183; intense hostilities including "thousands of bombings" and other attacks on military targets using military weapons, *id.* ¶¶ 59, 61-62, 86, 89, 102-03, 2550; prolonged military battles, *id.* ¶¶ 337, 345; and hundreds of soldiers killed or wounded "in action," *id.* ¶ 341.  Plaintiffs allege that JAM targeted U.S. forces serving in Iraq, and that its members engaged in combat with U.S. forces, resulting in massive casualties.  *Id.* ¶¶ 61, 337-38.  And Plaintiffs describe large-scale, sophisticated combat between U.S. forces and JAM, including during the weeks-long *Battle* of Sadr City—in the course of which many of the Plaintiffs suffered their injuries.  *See id.* ¶¶ 339-41, 343-46, 429, 596, 634.  Plaintiffs cannot credibly deny the existence of armed conflict in Iraq during the relevant time

---

conflict exists when "one or more non-governmental armed groups" with the "capacity to sustain military operations" are involved in "hostilities . . . of a collective character or when the government is obliged to use military force against the insurgents, instead of mere police forces") (Ex. 68).

[65] *See, e.g.*, ICRC, *Iraq Post 28 June 2004: Protecting Persons Deprived of Freedom Remains a Priority* (Aug. 5, 2004) (Ex. 69) ("hostilities in Iraq between armed fighters on one hand opposing the Multinational Force (MNF-I) and/or the newly established authorities on the other, amount[ed] to a non-international armed conflict"); Michael N. Schmitt (Stockton Professor, U.S. Naval War College; former JAG Corps, U.S. Army), *Iraq (2003 Onwards)*, in *International Law and the Classification of Conflicts* 357 (2012) ("Since 2003, the conflict in Iraq . . . has evolved linearly from international armed conflict, through a period of belligerent occupation, to non-international armed conflict.") (Ex. 74); KH (Article 15(c) Qualification Directive) Iraq CG [2008] UKAIT 00023, ¶ 17 (Jan. 28–Feb. 1, 2008) (stating U.K. Government's view that as of 2008 "Iraq was in a situation of internal armed conflict") (Ex. 75).

period—a period during which more than 4,000 U.S. service members were killed and more than 31,000 U.S. service members were wounded.[66]

## B. Jaysh Al-Mahdi Was A Military Force In Armed Conflict In Iraq

Congress excluded from ATA liability any act that occurs in the course of "armed conflict between" not only "two or more nations" but also "military forces of any origin."   18 U.S.C. § 2331(4)(B), (C).  The reference in subsection (C) to military forces "of any origin" necessarily includes military forces that are not national forces.  *See, e.g.*, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 511-12 (E.D.N.Y. 2012).  Congress adopted this broad language against a long history of non-state military forces participating in armed conflict, such as the Vietnamese guerilla forces known as the Viet Cong or the "Nicaraguan anti-government military forces (contras)," *Linder v. Portocarrero*, 963 F.2d 332, 333 (11th Cir. 1992).  And that limitation on ATA liability continues to align with reality in the post-9/11 world, in which the U.S. military has fought against, and sometimes alongside, various non-state military forces that do not wear uniforms or consistently comply with the law of war, including the Kurdish Peshmerga (a U.S.-allied militia) and Afghan Taliban (an insurgent militia not designated as an FTO).  Taken on its plain terms, the phrase "military forces of any origin" includes such non-state military forces, whereas a contrary reading would leave § 2331(4)(C) a virtual nullity.

Despite conclusory statements to the contrary, *see* SAC ¶ 347, Plaintiffs' allegations squarely establish that JAM was a "military force[] of any origin," 18 U.S.C. § 2331(4)(C).  The SAC repeatedly describes JAM as a "militia," *e.g.*, *id.* ¶¶ 8, 11, 13, 60, 67, 87, 165, 171, 183, which by definition is a "military force."  *See, e.g.*, *Oxford English Dictionary* (3d ed. 2002) (defining "militia" as "[a] *military force* that engages in rebel or terrorist activities in opposition to a regular

---

[66] *See* DOD, *OIF U.S. Casualty Status Fatalities, supra* note 3.

army" (emphasis added)).  Plaintiffs allege that JAM was formed to "fight the so-called American and British occupiers," "waged an insurgency against U.S. forces in Iraq," and regularly launched "attacks against Coalition forces throughout Iraq."  *Id.* ¶¶ 61, 183, 333.  Throughout the relevant period, JAM displayed all the hallmarks of a "military force."

*First*, JAM employed the command structure of a traditional army, including "Company-, Battalion-, and Brigade-level commanders."  *Id.* ¶ 102.  By 2007, JAM had amassed more than "60,000 fighters" "operat[ing] throughout Iraq, with regional command centers," *id.* ¶ 338, and multiple "brigades," *id.* ¶ 61.  Its "military headquarters" directed "combat operations," including those against U.S. forces.[67]

*Second*, JAM forces engaged in organized, armed combat operations against U.S. forces. The SAC describes JAM's use of complex infantry tactics and military weapons such as mortars, surface-to-air missiles, rocket-propelled grenades, and explosives designed to penetrate tank armor.  SAC ¶¶ 339-46.  JAM used these infantry tactics and sophisticated weapons to attack military targets such as tanks, convoys, helicopters, and bases, *see, e.g.*, *id.* ¶¶ 89, 340-45, 403, and to mount "complex attacks," with JAM members distracting U.S. forces with small-arms fire while others detonated explosives, *id.* ¶¶ 346, 1085, 2017.  Many such armed attacks occurred during the "Battle of Sadr City," in which JAM fighters engaged U.S. troops in firefights, *id.* ¶ 1338; attacked them with sniper fire, *id.* ¶¶ 2938, 3096; fired rocket-propelled grenades at them, *id.* ¶ 1456; and fired rockets at U.S. military bases, *e.g.*, *id.* ¶¶ 1537, 2174, 2337, 2361, 2939, 2973.

*Third*, JAM fought to expand, conquer, and defend territory as a military force.  Plaintiffs allege that JAM successfully "seized control of large swaths of Iraq, including but not limited to

---

[67] *See, e.g.*, Gordon & Trainor, *Endgame*, *supra* note 44, at 101 (cited at SAC ¶ 60 nn.21, 23, 38, 42, 114, 115).

Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah, and the entire eastern half of Baghdad."  SAC ¶ 61. Plaintiffs even acknowledged, in their original complaint, that such activities are a key attribute of a "conventional military force."  Compl. ¶ 341.

*Fourth*, JAM was never designated by the Executive Branch as an FTO or Specially Designated Global Terrorist ("SDGT").  SAC ¶ 355.  Just last year, Congress amended the ATA to state that "the term 'military force' does not include" a person designated by the Executive Branch as an FTO or SDGT.  18 U.S.C. § 2331(6)(A).  In drawing this bright line, the Anti-Terrorism Clarification Act reinforced the applicability of subsection (C) to all other non-state military forces.

JAM meets all the attributes of what would ordinarily be considered a "military force of any origin."  Although Plaintiffs have tried to walk back their earlier recognition that Jaysh al-Mahdi—in English, the "Mahdi Army," SAC ¶ 3—was an "army," Compl. ¶ 331, they still concede, as they must, that JAM engaged in "military activities," Dkt. 82 at 4.  An organized militia that engages in military activities, including traditional combat operations against opposing military targets, with a goal of claiming and defending territory, and not designated as an FTO or SDGT, is plainly a "military force[] of any origin."  18 U.S.C. § 2331(4)(C).

Trying to evade that inevitable conclusion, Plaintiffs allege that JAM members violated the law of war by, for example, fighting without uniforms, shooting from mosques, or using infrared triggers on bombs.  *See, e.g.*, SAC ¶¶ 413, 427, 515, 531, 811.  But nothing in the statutory language suggests that such conduct has any bearing on whether an armed group is a military force. An armed force that "engage[s] in sustained combat with a national military" is, "in the context of . . . th[at] particular conflict," a "military" force for purposes of the ATA's act of war exclusion. *Kaplan v. Cent. Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185, 204 (D.D.C. 2013), *vacated*

*on other grounds*, 896 F.3d 501 (D.C. Cir. 2018).  National militaries do not always adhere to the law of war, yet they undeniably remain "military forces."  A military force that does not wear uniforms (or fails to comply with the law of war in other ways) may forfeit certain legal protections and expose its members to prosecution for war crimes, but it does not cease to be a "military force" engaged in armed conflict.  The "Taliban *military forces*," as the D.C. Circuit has described them, illustrate the point.  *Khairkhwa v. Obama*, 703 F.3d 547, 549 (D.C. Cir. 2012) (emphasis added); *see United States v. Hamidullin*, 888 F.3d 62, 69, 74 (4th Cir. 2018) (holding that the United States engaged in a "non-international armed conflict against unlawful Taliban insurgents," a group that did not "ha[ve] a fixed, distinctive sign recognizable at a distance, carr[y] arms openly, or conduct[] operations in accordance with the laws and customs of war").

Indeed, if the ATA required "military forces of any origin" to comply with the laws of war, it would not have been necessary for Congress to amend the statute to exclude FTOs and SDGTs from the definition of "military force[s]."  18 U.S.C. § 2331(6)(A).  By definition, FTOs and SDGTs do not comply with the law of war, and thus under Plaintiffs' reading would not have been included within "military forces" to begin with.  Moreover, Congress specifically carved out *only* these two groups while leaving the exclusion untouched with respect to all other non-national armed groups by "*preserv[ing]* the courts' ability" to determine whether any other person or entity constitutes a "military force of any origin."  H.R. Rep. No. 115-858, at 4 n.11 (2018) (emphasis added).  Where, as here, Congress has "explicitly enumerate[d] certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent."  *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980).

### C.    The Attacks Here Occurred In The Course Of Armed Conflict

The act of war exclusion applies to "any" act occurring "in the course of" armed conflict between military forces.  18 U.S.C. § 2331(4).  "The dictionary meaning of 'in the course of' is 'during and as a part of the specified activity.'"  *Sentry Select Ins. Co. v. Ruiz*, 324 F. Supp. 3d 874, 886 (W.D. Tex. 2018) (citing *New Oxford American Dictionary* 398 (3rd ed. 2010)).  The paradigmatic act that occurs "in the course of" armed conflict between military forces is an attack, during that conflict, by one military force against another military force.  That is precisely what this case is about:  Plaintiffs allege that JAM engaged in armed attacks, using military weapons and tactics, against U.S. military forces and related personnel, during armed conflict between those forces in Iraq.

The victims named by Plaintiffs were U.S. service members, military contractors, or government officials or others accompanying or supporting U.S. or Coalition forces as part of the war effort.  SAC ¶¶ 409-3180.  The overwhelming majority were members of the U.S. Army, Navy, Marine Corps, or Air Force deployed to Iraq in combat roles (and/or embedded with combat battalions), many serving in units whose combat missions were to fight "insurgents" like JAM, and who were attacked during the course of carrying out those missions.  Dozens of the victims were members of the Army's "2-16 Rangers," who Plaintiffs allege were specifically "tasked with fighting . . . Jaysh al-Mahdi." *Id.* ¶ 410; *see also id.* ¶ 486 (the mission of Spc. Connolly's company likewise was to "fight Jaysh al-Mahdi").  Others were members of units that were often drawn into armed combat in majority-Shiite areas of Iraq, such as the Army's 1-2 Stryker Cavalry Regiment, *id.* ¶¶ 1333-35, 1341-47, 1455-62, 1542-49, 1652-54, 1682-84, 1790-94, 1890-94, 1942-46, 2194-96, 2256-58, 2273-75, 2333-35, 2344-48, 2368-70, 2503-05, 2539-48, 2666-70, 2937-43, 3021-28, 3094-97, 3139-44; the 1st Battalion, 26th Infantry Regiment, 2nd Brigade Combat Team, 101st

Airborne Division ("Blue Spaders"), *id.* ¶¶ 1155-57, 1158-62, 1172-76, 1177-82; the 2nd Battalion, 30th Infantry Regiment, 4th Brigade, 10th Mountain Division (the "2-30 Wild Boars"), *id.* ¶¶ 1183-90, 1191-93, 1194-96, 1798-800, 1868-72, 2185-87, 2279-87, 3136-38, 3156-58; or the Third Armored Cavalry Regiment, *see id.* ¶¶ 2601-02, 2855-56, 3029-30.  The contractor and government personnel victims were embedded with Coalition military forces, stationed in armed combat zones, and/or participated in war efforts.  Most provided armed security for areas used by U.S. military forces and for those engaged in the disposal of captured military weapons, *e.g.*, *id.* ¶¶ 462, 490, 523, 650, and operated in zones of active fighting, *e.g.*, *id*. ¶¶ 544-45, 547-48, 564-65, 827-28, 842-43, 852-53, 862-63, 899-900, 949-50, 1325-26, 1447-48, 2179-80, 2240-41, 2481-82; *see also id.* ¶¶ 338, 403.

Every attack in this case is also alleged to have occurred in or near areas that Plaintiffs describe as zones of active armed hostilities.  *See generally* SAC ¶¶ 338, 403, 409-3180.  Indeed, Plaintiffs allege that many victims were killed or wounded in *battles* between U.S. forces and JAM, for example, the Battle of Sadr City.[68]  Many of the other JAM attacks at issue targeted U.S. military installations.  *E.g.*, *id*. ¶ 2119 (rocket launched at Forward Operating Base Basra Operations Command); *id*. ¶ 2337 (rocket attack on Joint Security Station Sadr City).

Attacks carried out by one military force against another military force (and against those accompanying and supporting that force) during armed conflict between those forces, undoubtedly occur in the course of (*i.e.*, during and as part of) armed conflict.  In contrast, when courts construing the ATA have found that violent acts did not occur "in the course of" armed conflict,

---

[68] SAC ¶¶ 345, 429, 596, 634, 673, 685, 705, 1085, 1195, 1338, 1420, 1456, 1537, 1543, 1583, 1608, 1686, 1728, 1759, 1771, 1792, 1869, 1891, 1964, 1982, 2017, 2030, 2083, 2095, 2129, 2139, 2174-75, 2186, 2257, 2274, 2280, 2331, 2345, 2361, 2369, 2422, 2467, 2495, 2504, 2559, 2622, 2690, 2732, 2781, 2811-12, 2822, 2938-39, 2973, 3022, 3064-65, 3095-96, 3112, 3137, 3149, 3157.

the acts at issue both clearly targeted civilians—for example, bombing a university cafeteria occupied by students—rather than "military or governmental personnel or interests," and occurred far from a "combat or militarized zone." *See Sokolow v. PLO*, 583 F. Supp. 2d 451, 459 (S.D.N.Y. 2008); *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 10-11 (D.D.C. 2005) (bombing a school bus transporting children); *see also Kaplan*, 961 F. Supp. 2d at 203.  Nothing like that is alleged here.

Nor can Plaintiffs avoid the act of war exclusion by alleging that JAM's attacks "violate[d] the law of war." *See, e.g.*, SAC ¶ 351.  "No action shall be maintained" under the ATA based on "*any*" act "occurring in the course of" armed conflict—not just lawful acts.  18 U.S.C. §§ 2331(4), 2336(a) (emphasis added).  Indeed, controlling authority from the D.C. Circuit refutes Plaintiffs' effort to inject a lawful/unlawful distinction into the clear statutory text.  As that court recently recognized, the exclusion has meaning *only* if it bars lawsuits based upon acts that could otherwise "qualif[y] as 'an act of international terrorism' in the first place." *Kaplan*, 896 F.3d at 513.  All acts of international terrorism, when committed in the course of armed conflict, violate the law of war.  Reading the ATA exclusion as Plaintiffs urge, so as not to exclude acts in the course of armed conflict that violate the law of war, not only would defy the plain terms of the statute, but also would render the provision meaningless. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

## III.    PLAINTIFFS' ATA DIRECT-LIABILITY CLAIMS FAIL (COUNTS 3, 4)

Counts 3 and 4 allege that Defendants are directly liable under the ATA, 18 U.S.C. § 2333(a), on the theory that Defendants' *own* conduct—*i.e.*, manufacturing medical goods or supplying such goods to the Ministry of Health—constituted "acts of international terrorism" that injured Plaintiffs. *See* SAC ¶¶ 3208-21.  Those claims fail for several reasons beyond the political question doctrine and the statute's prohibition of liability for "acts of war."

Subject to the limitations already discussed, § 2333(a) creates a civil cause of action for a U.S. national "injured . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). To satisfy the "by reason of" requirement, Plaintiffs must establish that Defendants proximately caused their injuries. *Owens v. BNP Paribas, SA*, 897 F.3d 266, 273 (D.C. Cir. 2018). And to establish that Defendants committed an act of international terrorism, Plaintiffs must show (among other things) that Defendants' *own* conduct: (1) was violent or dangerous to human life; (2) appears to have been intended to achieve certain terroristic objectives, such as intimidating or coercing a civilian population or influencing government policy by intimidation or coercion; and (3) violated a federal or state criminal law. 18 U.S.C. § 2331(1)(A), (B).

Plaintiffs' allegations fail to satisfy any of these requirements, much less all of them. *First*, Plaintiffs cannot establish that Defendants' sales or donations were the proximate (*i.e.*, direct and substantial) cause of their injuries because there were numerous intervening acts and actors between Defendants' transactions with the Ministry and JAM's attacks on Plaintiffs—including the Ministry's causation-breaking role. *Second*, Defendants' alleged actions were plainly neither violent nor dangerous to human life, and to suggest that those actions appear to have been intended to achieve terroristic ends would be preposterous. *Third*, Plaintiffs do not adequately plead the elements of the two predicate crimes they invoke (18 U.S.C. §§ 2339A, 2339C).

## A.     Plaintiffs' Direct-Liability Claims Do Not Satisfy The ATA's Rigorous Proximate Causation Requirement

Defendants supplied medicine and medical equipment to the Ministry of Health, a government agency responsible for the health care of all Iraqis. *See* SAC ¶ 2, 72. Only after those transactions were complete did JAM agents allegedly steal or "misappropriat[e]" some of the goods, sell them on the black market, and use the proceeds to fund attacks like those that injured Plaintiffs. *See id.* ¶¶ 108, 117, 128, 172. Taking Plaintiffs' well-pleaded allegations as true, they

present a purported chain of causation far too indirect and attenuated to satisfy the ATA's "traditionally rigorous proximate cause requirement." *Shatsky v. PLO*, 2017 WL 2666111, at *7 (D.D.C. June 20, 2017) (Leon, J.). The D.C. Circuit and numerous other courts have affirmed the dismissal of ATA claims on the ground that similar causation theories were too indirect to state a claim.

To plead injury "by reason of" a defendant's conduct, 18 U.S.C. § 2333(a), an ATA plaintiff must plausibly allege *both* that the defendant's conduct was a "substantial factor" in causing the plaintiff's injuries, *and* that those injuries were "reasonably foreseeable." *Owens*, 897 F.3d at 273; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) ("foreseeability alone is not sufficient to establish proximate cause"). To meet the substantial-factor requirement, the plaintiff "must" establish "some direct relation between the injury asserted and the injurious conduct alleged." *Owens*, 897 F.3d at 273 n.8 (quoting *Fields v. Twitter, Inc.*, 881 F.3d 739, 745 (9th Cir. 2018)). Whether the defendant's allegedly wrongful conduct "led directly" to the plaintiff's injury is the "central question" in proximate causation. *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

The D.C. Circuit recently rejected an indirect causation theory similar to Plaintiffs' in *Owens*—a decision that controls the outcome here—affirming a Rule 12(b)(6) dismissal based on the plaintiffs' failure to plead proximate causation under the ATA. *Owens*, 897 F.3d at 269. The plaintiffs in *Owens* sought to hold a multinational bank liable for al Qaeda's 1998 bombings of the U.S. embassies in Kenya and Tanzania, based on the bank's illegal provision of financial services to the government of Sudan, a designated state sponsor of terrorism. *Id.* at 268-71. The bank illegally processed more than $6 billion for sanctioned Sudanese banks. *Id.* at 269-70. And the

plaintiffs alleged that "Sudan provided safe harbor for al Qaeda's operational and logistical supply network, as well as critical financial, military, and intelligence services." *Id.* at 269.

The bank pleaded guilty to criminal charges, *id.* at 269-70, but despite the bank's extensive criminal support for a designated state sponsor of terrorism, the D.C. Circuit emphasized that the bank was "more than one step removed from a terrorist act or organization," *id.* at 275. In such cases, the court explained, plaintiffs cannot satisfy the ATA's proximate-causation requirement unless they "allege some facts demonstrating a substantial connection between *the defendant* and terrorism." *Id.* (emphasis added). Moreover, because an "intermediary" in the plaintiffs' causation theory (the Sudanese government) was "a sovereign state with many legitimate agencies, operations, and programs to fund, the need for additional allegations supporting substantiality [was] all the more acute." *Id.* at 276.

To "satisfy proximate causation under the ATA," the D.C. Circuit explained, the *Owens* plaintiffs were required to plead facts showing that the funds the bank provided to Sudan "actually . . . aided in the embassy bombings." *Id.*. Although the plaintiffs claimed that the funds were transferred to al Qaeda and were "necessary" for al Qaeda to carry out the embassy bombings, the court of appeals recognized that such "conclusory allegations . . . do not meet *Twombly*'s plausibility standard." *Id.* Finding no non-conclusory allegations establishing that "Sudan would have been unable to fund the attacks by al Qaeda without the cash provided by [the bank]," or even that the cash was "in fact sent to al Qaeda," the D.C. Circuit held that the plaintiffs had failed "to adequately plead facts alleging that [the bank] *substantially* contributed to the Plaintiffs' injuries." *Id.* (alteration and quotation omitted). The court therefore affirmed the district court's dismissal of the plaintiffs' ATA claims under Rule 12(b)(6). *Id.*

The D.C. Circuit's decision in *Owens* is consistent with the decisions of other circuits and district courts, which regularly dismiss ATA claims because of the presence of a sovereign intermediary in an alleged causation chain.  For example, the Seventh Circuit, in *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018), rejected an ATA suit alleging that Deutsche Bank caused attacks on U.S. soldiers in Iraq by illegally processing transactions for Iranian banks in a way that evaded U.S. sanctions.  *Id.* at 386-88.  The plaintiff had alleged that Iran, a designated state sponsor of terrorism, used the proceeds of Deutsche Bank's transactions to fund militias fighting U.S. forces in Iraq.  *Id.*  But the Seventh Circuit recognized that "a sovereign's affirmative choice to engage in a wrongful act will usually supersede [for causation purposes] a third party's choice to do business with that sovereign."  *Id.* at 393.  The court acknowledged "[t]he desire to hold someone responsible for [plaintiff's] grievous loss," but held that "Deutsche Bank [was] the wrong defendant."  *Id.* at 396.  "Its actions [were] too attenuated from the terrorist attack that killed [the U.S. soldier]."  *Id.*

Similarly, in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), the Second Circuit held that plaintiffs had not plausibly alleged that a bank proximately caused terrorist attacks by "provid[ing] Iran with hundreds of millions of dollars," *id.* at 93, despite the bank allegedly knowing "full well that the cash dollars it was providing . . . would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations," *id.* at 97 (emphasis omitted).  Iran's status as a designated state sponsor of terrorism "made it more likely" that these funds "would be used for terrorism," but, the court explained, "the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund."  *Id.*  Given Iran's intervening role in the alleged causation chain, the plaintiffs' ATA claims failed because they could not demonstrate

42

"a proximate causal relationship between the cash transferred by [the bank] to Iran and the terrorist attacks . . . that injured plaintiffs."  *Id.*

Another court recently echoed this holding, again dismissing ATA claims based on the alleged provision of illegal financial services to a foreign sovereign (Iran) by defendant banks.  *See O'Sullivan v. Deutsche Bank*, 2019 WL 1409446, at *1 (S.D.N.Y. Mar. 28, 2019).  The Plaintiffs there (including 37 of the same Plaintiffs who brought this action, *see infra* note 69) claimed that Iran, using money provided by the banks, funded and equipped JAM, which in turn carried out the attacks that injured the plaintiffs.  *Id.* at *2, 5.  In light of this "attenuated causal chain" involving a sovereign intermediary, the court held that the banks' alleged conduct, although a "wrongful . . . evasion of U.S. sanctions," did not plausibly "play[] a substantial role in bringing about the attacks that injured Plaintiffs," *id.* at *6 & n.11; *see also Brill v. Chevron Corp.*, 2018 WL 3861659, at *1-2 (N.D. Cal. Aug. 14, 2018) (dismissing ATA claims based on illegal "kickbacks" to officials of pre-war Iraq, even though the kickbacks allegedly helped Saddam Hussein fund terrorist attacks, because imposing ATA liability on the defendant "only for doing business, albeit illegally, with a rogue state would extend the scope of the [ATA] far beyond Congress's mandate").

As in each of those cases, Plaintiffs here allege that companies transacted business only with a foreign government entity, but that the government entity was in league with terrorists and that such business with the government eventually benefitted the terrorists.  By Plaintiffs' own account, Defendants transacted with only the Ministry and its import entity, Kimadia—not with JAM.  *See, e.g.*, SAC ¶¶ 189, 246, 283, 311.  Although Plaintiffs allege that members of JAM "infiltrate[d]" and "effectively captured" the Ministry, *id.* ¶¶ 166, 168, they concede that the Ministry operated "a government-run healthcare system" and employed "every public-sector

doctor, pharmacist, nurse, and medical technician in Iraq," *id.* ¶¶ 2, 72.  In other words, the Ministry remained an important "government [agency], and as such it ha[d] many legitimate . . . operations[] and programs."  *Owens*, 897 F.3d at 275 (quoting *Rothstein*, 708 F.3d at 97); *see also O'Sullivan*, 2019 WL 1409446, at *6.  The fact that Defendants sold medical goods to the Ministry, and that other actors inside the Ministry thereafter looted or diverted some of those products to support JAM, *see* SAC ¶¶ 5, 104, 128-29, cannot make Defendants liable under the ATA for JAM's independent criminal acts.

As every court of appeals to have considered the question has held, a company does not proximately cause terrorist attacks by doing business with a sovereign government—even when the transactions are allegedly unlawful and the sovereign allegedly works hand-in-glove with terrorists.  *See, e.g.*, *Owens*, 897 F.3d at 269-70, 273-76.  And because designated state sponsors of terrorism like Iran and Sudan were causation-defeating intermediaries in *Owens*, *Kemper*, and *Rothstein*, the intervening role of the *U.S.-supported* Ministry necessarily defeats causation here.  Were that not so, it would mean that any entity that provided medical supplies or other support to the Ministry—including the U.S. Government, the United Nations, and the World Health Organization—also proximately caused Plaintiffs' injuries, because Plaintiffs allege that anyone who transacted with the Ministry (legitimately or otherwise) caused JAM's armed attacks.  *See* SAC ¶¶ 132, 179.

Although the Ministry's intervening role is sufficient to defeat Plaintiffs' theory of causation, it is far from the only step separating Defendants' alleged conduct from the attacks that injured Plaintiffs.  Plaintiffs' theory is that: (1) the Manufacturer Defendants sold pharmaceuticals and medical equipment to the Supplier Defendants; (2) the Supplier Defendants sold pharmaceuticals and medical equipment to Kimadia, allegedly providing some goods free of

charge, *e.g.*, SAC ¶¶ 189-90, 217; (3) agents within the Ministry "looted," "stole[]," "divert[ed]," or "funneled" those goods to JAM members, *id.* ¶¶ 5, 130, 171; (4) JAM members resold Defendants' products in black markets, *id.* ¶ 8; (5) JAM leaders used the proceeds from the black market sales to pay combatants, purchase weapons, and secure "logistical support," *id.*; (6) JAM fighters received training, arms, and other support from Iran and its "proxy" Hezbollah, *id.* ¶¶ 56, 366; and (7) JAM fighters then carried out armed attacks, *id.* ¶ 408.  With such a complex and attenuated theory of causation, Plaintiffs' allegations cannot establish the "direct relation between the injury asserted and the injurious conduct alleged" that proximate cause requires.  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *accord Kemper*, 911 F.3d at 393 (plaintiff could not plead proximate causation given the "numerous criminal intervening acts separating Deutsche Bank from the terrorist attack").

Plaintiffs' theory of causation suffers from another critical defect:  Defendants' actions were not "necessary for [the Ministry] to fund [the attacks]" at issue.  *Owens*, 897 F.3d at 276; *see also, e.g.*, *Rothstein*, 708 F.3d at 97.  Indeed, Plaintiffs allege that Defendants' contributions paled in comparison to the Ministry's massive procurement budget.  *Compare, e.g.*, SAC ¶ 116, *with id.* ¶ 318.  And they allege that JAM "fully commandeered" and diverted the resources of three other ministries.  *Id.* ¶¶ 65, 80, 168, 173.  On top of all that, Iran and its proxy Hezbollah allegedly purchased and "supplied many of the weapons" used by JAM.  *Id.* ¶¶ 404-06.  In fact, more than 900 of the 1,263 Plaintiffs are currently advancing a fundamentally different causation narrative in *other* lawsuits: that *Iran*, aided by various banks, funded and equipped JAM to carry out the same attacks at issue here—without any mention of the Ministry, Kimadia, or medical goods.[69]

---

[69]  *See Bartlett v. Société Générale de Banque au Liban SAL*, No. 1:19-cv-00007 (E.D.N.Y.); *Donaldson v. HSBC Holdings PLC*, No. 1:18-cv-07442 (E.D.N.Y.); *Donaldson v. Islamic Republic of Iran*, No. 1:17-cv-01206 (D.D.C.); *Freeman v. HSBC Holdings PLC*, No. 1:14-

45

Against this backdrop, there is no plausible claim that Defendants "*substantially* contributed to Plaintiffs' injuries" by providing assistance that "actually . . . aided in [the attacks]" that injured Plaintiffs. *Owens*, 897 F.3d at 276.

Plaintiffs' inability to plausibly allege that Defendants "substantially contributed" to their injuries alone defeats their direct-liability claims. *Id.* at 275 n.11, 276. But the SAC also fails to satisfy the independent requirement to show that the JAM attacks here were a "reasonably foreseeable" consequence of Defendants' transactions with, not JAM, but the Ministry. *Id.* at 273. Militia attacks were not the natural consequence of supplying medical goods to a government ministry responsible for operating a country's public health care system—particularly when the United States was openly supporting that ministry and encouraging private companies to do business with it. *See supra* pp. 5-11. And that is especially so given that JAM was able to access those goods only by looting, stealing, and diverting them from the Ministry. SAC ¶¶ 5, 107, 170-171. Under these circumstances, Plaintiffs "ha[ve] not alleged facts plausibly suggesting that it was foreseeable that [Defendants'] actions would fund terrorism." *Kemper*, 911 F.3d at 393-94 (reaching same conclusion even where defendant bank allegedly provided sanctions-avoidance services to Iran, a designated state sponsor of terrorism).

---

cv-06601 (E.D.N.Y.); *Fritz v. Islamic Republic of Iran*, No. 1:15-cv-00456 (D.D.C.); *Estate of Hartwick v. Islamic Republic of Iran*, No. 1:18-cv-01612 (D.D.C.); *Holladay v. Islamic Republic of Iran*, No. 1:17-cv-00915 (D.D.C.); *Karcher v. Islamic Republic of Iran*, No. 1:16-cv-00232 (D.D.C.); *Martinez v. Islamic Republic of Iran*, No. 1:16-cv-02193 (D.D.C.); *O'Sullivan v. Deutsche Bank AG*, No. 1:17-cv-08709 (S.D.N.Y.); *O'Sullivan v. Deutsche Bank AG*, No. 1:18-cv-12325 (S.D.N.Y.); *Stephens v. HSBC Holdings PLC*, No. 1:18-cv-07439 (E.D.N.Y.); *Tavera v. HSBC Bank USA, N.A.*, No. 1:18-cv-07312 (E.D.N.Y.); *Tollefson v. Islamic Republic of Iran*, No. 1:17-cv-01726 (D.D.C.); *Williams v. Islamic Republic of Iran*, No. 1:18-cv-02425 (D.D.C.). One of these cases, involving 37 of the Plaintiffs here, *O'Sullivan* (No. 1:17-cv-08709), was recently dismissed for failure to plausibly allege either direct or secondary liability under the ATA. *See O'Sullivan*, 2019 WL 1409446, at *5-10. Other cases involve hundreds of the same Plaintiffs. *See, e.g.*, *Bartlett*, No. 1:19-cv-00007 (E.D.N.Y.) (involving nearly 500 of the Plaintiffs here). And many of the Plaintiffs are party to multiple similar lawsuits.

Significantly, all of the arguments above apply with particular force to the Manufacturer Defendants, who are even further removed from Plaintiffs' injuries than the Supplier Defendants. Aside from "registering to do business as [] manufacturer[s]" and "submitting paperwork" confirming that the Suppliers could sell their products, *e.g.* SAC ¶¶ 156, 194, the Manufacturers are not alleged to have had any direct connection to the Ministry, to say nothing of JAM. Plaintiffs seek to hold the Manufacturers liable because they manufactured medical devices or medicines (or just pharmaceutical ingredients) that others sold to the Ministry (and allegedly "used to bribe" its officials). *Id.* ¶¶ 188, 211, 245, 281, 310. But such commercial activity, many steps removed from any alleged wrongdoing, even more clearly fails the ATA's proximate-causation test. *See Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 118, 124 (2d Cir. 2013) (providing "routine banking services to organizations and individuals said to be affiliated with al Qaeda" did not "proximately cause[]" plaintiffs' injuries).[70]

Across the board and with respect to every Defendant, Plaintiffs' allegations come nowhere near pleading the necessary direct relationship between Defendants' transactions with the Ministry and the alleged JAM attacks that injured Plaintiffs. As in *Owens* and similar cases, Plaintiffs' direct-liability ATA claims (Counts 3, 4) should be dismissed.

---

[70] Plaintiffs cannot bridge this gap with conclusory allegations that the Suppliers acted as "agents" of the Manufacturers. SAC ¶¶ 157, 193, 219, 249, 255, 287, 314. Nowhere do Plaintiffs allege that the Manufacturers had the sort of "day-to-day control" over the Suppliers' operations that would be required to establish agency. *Hull v. Eaton Corp.*, 825 F.2d 448, 458 (D.C. Cir. 1987); *see also CNE Direct, Inc. v. Blackberry Corp.*, 821 F.3d 146, 151 (1st Cir. 2016) (manufacturer's ability to refuse to sell its products to the putative agent "d[id] not approach the kind of close control a principal would be expected to assert over an agent's operations").

### B.   Defendants' Alleged Actions Were Not Acts Of International Terrorism Under The ATA

Plaintiffs also fail to plead that Defendants themselves committed an "act of international terrorism," as required to state a claim for direct liability under 18 U.S.C. § 2333(a). To constitute an act of international terrorism, a defendant's own actions must "appear to be intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B). The defendant's actions must *also* be "violent" or "dangerous to human life." *Id.* § 2331(1)(A). The Seventh Circuit's decision in *Kemper*, 911 F.3d 383, confirms that Plaintiffs do not plausibly allege either ATA element.

To satisfy the apparent-intent element of the ATA, 18 U.S.C. § 2331(1)(B), Plaintiffs needed to allege facts that would lead an "objective observer" to conclude that Defendants, in doing business with the Ministry, "desire[d] to 'intimidate or coerce'" a "civilian population or government," or to use mass destruction, assassination, or kidnapping to shape government conduct. *Kemper*, 911 F.3d at 390. That notion is absurd on its face. An objective observer would perceive Defendants' actions as driven by commercial motives. In fact, that is Plaintiffs' own perception: Plaintiffs allege that Defendants transacted with the Ministry "[i]n an effort to grow their market share in Iraq," SAC ¶¶ 114-15; that increasing the "market for Defendants' products" was a "motive for Defendants to engage in corrupt transactions" with the Ministry, *id.* ¶ 116; and that any corrupt payments allegedly made by Defendants were part of a "business strategy," *id.* ¶¶ 212-13. An objective observer would not interpret sales of medical goods by respected pharmaceutical and medical-device companies as intended to coerce a civilian population, or change government policy through violence, let alone by killing U.S. service members.

*Kemper* underscores this conclusion.  In *Kemper*, the plaintiff sued Deutsche Bank under the ATA for "wrongful[ly]" helping Iranian state-owned banks "evade" U.S. sanctions, which allegedly helped Iran fund militias in Iraq.  911 F.3d at 390, 393.  As the Seventh Circuit explained, however, "[t]o the objective observer, [the bank's] interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'"  *Id.* at 390.  That conclusion was reinforced by a consent decree cited in the SAC, which stated that "Deutsche Bank built its sanctions-evading business because it was 'lucrative.'"  *Id.*; *see also id.* at 394 (noting that the only plausible "implication" from plaintiff's allegations is that "Deutsche Bank's sanctions-avoiding actions, while wrongful, were designed to increase its profits," not to fund terrorism).  Here, too, an objective observer would conclude that Defendants' alleged "interactions with [the Ministry] were motivated by economics, not by a desire to 'intimidate or coerce,'" *id.*—and Plaintiffs' *own allegations* confirm that common-sense conclusion.  *See also Brill v. Chevron Corp.*, 2017 WL 76894, at *1, *4 (N.D. Cal. Jan. 9, 2017) (determining that a company's participation in corrupt oil-for-food deals did not appear to be intended to intimidate or coerce).

This conclusion is made even clearer by Plaintiffs' allegations that Defendants (or their affiliates) entered into similar transactions with officials in other countries with no nexus to JAM or terrorism.  *See, e.g.*, SAC ¶¶ 199, 202 & n.173, 273 & n.230, 292-93.  Even in Iraq, Plaintiffs allege that Defendants paid "kickbacks" to the Ministry long *before* JAM existed, *id.* ¶¶ 4, 7, 44-53, 116, 200, 222-28, 262-70, 319-20, and provided "free" goods for years *after* the Sadrists lost control of the Ministry, *id.* ¶¶ 104, 202, 271, 295, 321.  Given these allegations, an objective observer would not believe that Defendants' sales were intended to assist JAM's attacks or to achieve the terroristic objectives enumerated in § 2331(1)(B).

Plaintiffs' allegations also fail to establish that Defendants' actions were "violent" or "dangerous to human life."  18 U.S.C. § 2331(1)(A).  Although courts outside this circuit have suggested that "giving fungible dollars to a terrorist organization may be 'dangerous to human life,'" they have specified that "doing business with companies and countries that have significant legitimate operations" does not generally constitute an act dangerous to human life.  *Kemper*, 911 F.3d at 390.[71]  Thus, *Kemper* held that providing "sanctions-avoidance services" to Iran was not "dangerous to human life," because Iran, although a designated state sponsor of terrorism, was still a sovereign with "legitimate operations" to fund.  *Id.* at 387, 390; *see also O'Sullivan*, 2019 WL 1409446, at *8 (stating that "the provision of banking services" to Iran cannot be "considered as acts dangerous to human life, particularly [where the alleged causal chain is] so attenuated.").  *Kemper*'s holding applies with even greater force here, where Defendants' alleged wrongdoing took the form of selling and giving life-saving medical supplies to the U.S.-backed Ministry, at a time when the United States was committed to rebuilding Iraq's public health system.

Plaintiffs' failure to adequately plead these two statutory requirements is even more glaring as to the Manufacturer Defendants.  Manufacturing medicines or medical devices is neither "violent" nor "dangerous to human life" under any reasonable reading of those terms.  And of course an objective observer would not conclude that manufacturing such products, to be repackaged by distributors and resold to customers around the world, was intended to achieve any terroristic purpose enumerated in the ATA.  *See Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *1-2 (E.D.N.Y. June 30, 2006) (explaining that "engaging in commercial banking activity" with

---

[71] It is unclear whether the D.C. Circuit would go even that far.  It has yet to determine whether a violation of the material-support provisions can "qualif[y] as an act of 'international terrorism' under the ATA."  *Owens*, 897 F.3d at 271 n.5.

companies that supplied chemicals to Saddam Hussein's regime in Iraq did not appear to be "designed to coerce civilians or government entities as required under § 2331").

### C.     Plaintiffs Do Not Adequately Plead A Predicate Crime To Support Direct ATA Liability

The ATA's definition of "international terrorism" can be satisfied only if the defendant's conduct also violated a federal or state criminal law.  18 U.S.C. § 2331(1)(A).  Plaintiffs attempt to invoke two criminal provisions—18 U.S.C. § 2339A (Count 3) and § 2339C (Count 4)—which prohibit providing material support for, and financing of, terrorism.  SAC ¶¶ 3209, 3216.  But Plaintiffs fail to plead that Defendants possessed the knowledge required to violate either statute.  And Plaintiffs' material-support claim (Count 3) fails with regard to all Defendants who manufactured or sold pharmaceuticals, for the additional reason that § 2339A expressly excludes "medicine" from its definition of "material support."

#### 1.     Plaintiffs' Allegations Do Not Establish The Knowledge Required To Violate § 2339A Or § 2339C (Counts 3, 4)

To violate § 2339A or § 2339C, a defendant must "intend" or "know[]" that its material support or financing will be used for terrorist attacks.  18 U.S.C. §§ 2339A, 2339C.  Plaintiffs fail to plead either form of mens rea.  Plaintiffs concede that Defendants' actions were commercially motivated, not intended to support terrorism.  *See* SAC ¶¶ 114-16, 212-13.  And Plaintiffs' "knowledge" theory is no more than unsubstantiated speculation based on spotty news reports.

Plaintiffs' conclusory allegation that Defendants actually "knew" their sales of medical goods to the Ministry would indirectly aid terrorism, SAC ¶ 180, is not supported by any more detailed allegations.  For good reason:  Plaintiffs' allegations demonstrate that the relationship between the Ministry and JAM (let alone the Ministry and JAM's attacks) was far from clear during the relevant period.  Plaintiffs acknowledge that Iraq's Parliament appointed members of

51

the Sadrist political party, not JAM, to run the Ministry.  *Id.* ¶¶ 59, 63-73.  And consistent with Iraqi political norms, *see id.* ¶¶ 65, 68, Sadr "capitalized" on his control of the Ministry to create "patronage" networks and "provide services to the poor and jobs to his followers," *id.* ¶ 183 (10th bullet).   Meanwhile, JAM agents had to resort to "looting," "theft or misappropriation," "smuggl[ing]," "siphoning," and "embezzl[ement]" to obtain Ministry resources.  *Id.* ¶¶ 108, 117, 130, 138 & n.98, 172, 177-78 & n.135, 183 (12th bullet).  JAM members then funneled these goods through serpentine networks into black markets that, by definition, operated in the shadows. *See id.* ¶¶ 108-09 (alleging stolen goods made their way to Iran, Syria, and Jordan for resale).  All of these alleged facts, plain on the face of the SAC, undercut Plaintiffs' speculative theory that Defendants must have known not only that JAM had "effectively captured [the Ministry]," but also that JAM agents would divert Defendants' goods to aid in terrorism.  *Id.* ¶¶ 166, 180.

Plaintiffs therefore resort to selectively highlighting news reports that they argue put Defendants on constructive notice of a link between the Ministry and JAM's attacks—but that effort also fails.  Relying on snippets of reports in the public domain at that time, Plaintiffs allege that Defendants *should have been aware* that any transactions with the Ministry would indirectly supply JAM, and that the militia would use the resulting funds to attack U.S. troops.  SAC ¶¶ 11, 183-87.  But "should have known" is not the standard under the plain statutory language.  *See* 18 U.S.C. §§ 2339A, 2339C (requiring *knowledge*); *see also Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016) (determining that "reckless disregard" does not meet a "knowing" mens rea requirement in a federal crime).  And even if it were, it was widely known at the time that the United States and reputable international organizations were vigorously supporting the Ministry—and that fact cannot be squared with Plaintiffs' contention that Defendants should have

known that the Ministry was a "de facto terrorist group."  *See* SAC ¶ 3; *see also supra* pp. 5-8, 23-24.

### 2.  Section 2339A's Medicine Exception Bars Plaintiffs' Material-Support Claim As To The Pharmaceutical Defendants (Count 3)

Count 3 requires that Plaintiffs also establish that Defendants provided "material support" for terrorism.  18 U.S.C. § 2339A.  But that criminal statute expressly excludes "medicine" from its definition of "material support."  *Id.* § 2339A(b)(1).  The Pharmaceutical Defendants—those who manufactured or supplied medicines—are not plausibly alleged to have provided anything but medicine to the Ministry, so Count 3 fails as to those Defendants for this additional reason.[72]

Section 2339A's medicine exception categorically permits the provision of "medical substances and preparations."  *United States v. Farhane*, 634 F.3d 127, 143 (2d Cir. 2011).  In enacting this exception, Congress "decide[d] that the humanitarian value of providing medicine to [terrorist] organizations outweighs the risk that the medicine would be sold to finance terrorist activities."  *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 n.4 (9th Cir. 2000).  Thus, even if medicines "functioned" in Iraq as "commodities" that were "convertible into cash," SAC ¶ 117, Defendants' pharmaceutical sales and donations could not have violated § 2339A.

To try to circumvent this pleading failure, Plaintiffs claim that "[each Defendant] paid cash 'commissions' to Jaysh al-Mahdi in connection with [its Ministry] contracts."  *See* SAC ¶¶ 192, 217, 248, 254, 285, 313.  But Plaintiffs' cut-and-paste allegations are altogether conclusory and generic.  Moreover, notwithstanding vague allegations that Kimadia demanded commissions "as a general matter," SAC ¶ 142, *see also id.* ¶¶ 145, 192, 217, 248, 254, 285, 313, the few specifics

---

[72] These Defendants include the AstraZeneca Defendants, the Pfizer Defendants, the Roche U.S. Defendants, and Roche Ltd, as well as several of the J&J Defendants (Cilag GmbH International, Janssen Pharmaceutica NV, Janssen Ortho LLC, and Ortho Biologics LLC).

Plaintiffs offer on "commissions" indicate that some companies "refused to pay" them, *id.* ¶¶ 52, 222. The Court need not "accept [the] inferences drawn by [Plaintiffs]" when they "are not supported by the facts set out in the complaint." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

Once again, these deficiencies are particularly stark as to the Manufacturer Defendants. Aside from a single, bare allegation purporting to encompass *all* Defendants, SAC ¶ 145, the Manufacturers are not alleged to have made *any* payments to the Ministry, corrupt or otherwise, *see id.* ¶¶ 188, 245, 281, 310 (alleging that only the Suppliers "negotiated with Kimadia and made corrupt payments"). Plaintiffs thus have not pleaded (and cannot plead) that the Pharmaceutical Manufacturer Defendants provided Ministry officials with anything other than medicine, and thus cannot establish the predicate criminal violation to support direct ATA liability under Count 3.[73]

## IV.    PLAINTIFFS' ATA AIDING-AND-ABETTING CLAIMS FAIL (COUNTS 1, 2)

Plaintiffs allege in Counts 1 and 2 that Defendants aided and abetted the persons who committed the acts of international terrorism that injured Plaintiffs. *See* 18 U.S.C. § 2333(d)(2); SAC ¶¶ 3181-207. These aiding-and-abetting claims are unmoored from the ATA's text and purpose. When Congress amended the ATA in 2016, it confined aiding-and-abetting liability to instances where (1) the defendant provided "substantial assistance" to "the person who committed" the "act of international terrorism"; (2) that act of international terrorism was "committed, planned, or authorized" by an entity designated by the Secretary of State as an FTO; and (3) the defendant *knew* both that it was substantially assisting that act and that a designated FTO had the requisite

---

[73] The Pharmaceutical Manufacturer Defendants are AstraZeneca Pharmaceuticals, LP, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Genentech, Inc., Hoffmann-La Roche Inc., Janssen Ortho LLC and Ortho Biologics LLC.

involvement in that act.  18 U.S.C. § 2333(d)(2).  Plaintiffs fail to plausibly allege any of these elements; thus, Counts 1 and 2 must be dismissed.

### A.    Plaintiffs Fail To Plead That Defendants Substantially Assisted Jaysh Al-Mahdi In Carrying Out Its Alleged Acts Of International Terrorism

Congress set a high bar for secondary liability under the ATA:  "[A]iding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization" (something Defendants are not even alleged to have done); rather, the defendant must "itself assum[e] a 'role' in [the] terrorist activities" that injure the plaintiff.  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018).  Plaintiffs' claims do not clear this high bar.  In particular, their allegations do not establish that Defendants provided *any* assistance to the "person who committed" "the act[s] of international terrorism" that injured each Plaintiff, much less that any such assistance was "substantial."  18 U.S.C. § 2333(d)(2).

*First*, Plaintiffs' theory of aiding-and-abetting liability suffers from the same fundamental defect that dooms their theory of proximate causation.  Too many intervening acts and actors, including a governmental intermediary, stand between the medical goods provided by the Supplier Defendants to the Ministry and the attacks committed by JAM.  *See supra* Part III.A.  The presence of these intervening acts and actors precludes secondary liability.

The ATA's text makes this clear:  Congress required not only that a defendant's assistance be "substantial," but also that it be provided to "the person who committed" the attack, 18 U.S.C. § 2333(d), so as to "assist the principal violation," *Linde*, 882 F.3d at 329 (quotation omitted).  *See also Crosby v. Twitter*, 303 F. Supp. 3d 564, 574-75 (E.D. Mich. 2018); *Clayborn v. Twitter*, 2018 WL 6839754 at *9 (N.D. Cal. Dec. 31, 2018).  The plain text of § 2333(d) thus tracks the common-law rule, under which "the factors" for "determining [aiding-and-abetting] liability" "are the same as those used in determining the existence of legal causation," Restatement (Second) of Torts § 876

cmt. d (1979); *accord Aetna Cas. & Surety Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000). And, as the Restatement explains, one important factor in this analysis is the intervention of a "third person." Restatement (Second) of Torts § 442 (1965).

Courts have repeatedly held that the interposition of an intermediary—in particular, a governmental entity—between the defendant's conduct and the principal perpetrator precludes aiding-and-abetting claims. The court in *Ofisi v. BNP Paribas, S.A.*, for example, dismissed aiding-and-abetting claims because a foreign sovereign—one formally designated as a state sponsor of terrorism no less (Sudan)—stood between the defendants' provision of banking services and the terrorist actors. 278 F. Supp. 3d 84, 109 (D.D.C. 2017) (holding that presence of intermediary rendered alleged connection "too tenuous"); *see also Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *5 (D.D.C. Jan. 11, 2018) (concluding that aiding-and-abetting claim failed given absence of plausible allegations that defendant had "directly funded any terrorist group"). And, in *Siegel v. HSBC Bank USA, N.A.*, the court dismissed a claim that was based on allegations that the defendant banks had provided financial services to a financial institution, which in turn provided banking services to terrorist organizations. 2018 WL 3611967, at *4-5 (S.D.N.Y. July 27, 2018) (no allegation defendants had "direct relationship" with terrorist organizations). By contrast, there was a vastly closer relationship between the defendant and the principal tortfeasor in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the case that provides the "framework" for aiding-and-abetting liability under the ATA, *see* JASTA § 2(a)(5), 130 Stat. 852. For five years, the defendant in *Halberstam* not only was the tortfeasor's live-in girlfriend, but she also served as the "banker, bookkeeper, recordkeeper, and secretary" to his criminal enterprise. 705 F.2d at 474-76, 487.

As explained in detail above, the Supplier Defendants are alleged to have transacted only with the Ministry, not with JAM (and the Manufacturer Defendants are not alleged to have

transacted with either). *See* Part III.A. The sovereign intermediary standing between Defendants' medical goods and JAM's attacks is an insurmountable barrier to Plaintiffs' aiding-and-abetting claims, because providing assistance to a Ministry responsible for health care in Iraq is not providing assistance to "the person who committed" acts of international terrorism, 18 U.S.C. § 2333(d)(2), to "assist the principal violation," *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487).

*Second*, Plaintiffs' aiding-and-abetting claims face another insurmountable barrier: If Defendants can be said to have aided JAM at all, Plaintiffs' allegations do not establish that such aid was "substantial." 18 U.S.C. § 2333(d)(2). *Halberstam* sets forth the factors for determining whether assistance is substantial enough to give rise to ATA liability.[74] Here, those factors compel dismissal.

The first and second *Halberstam* factors—the nature of the act allegedly encouraged, and the amount and kind of assistance given—"dictate[ ] what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. Far from supplying JAM with bombs or bullets, *see Crosby*, 303 F. Supp. 3d at 574, Defendants provided medical supplies such as intravenous breast cancer medications, SAC ¶¶ 191, 312, ultrasound machines, *id.* ¶ 226, and catheters, *id.* ¶ 247. And, again, they provided these supplies not to JAM, but to the government agency responsible for delivering health care to the Iraqi people. Defendants' alleged transactions with the Ministry were thus many steps removed from the attacks committed by JAM. In fact, Plaintiffs fail to connect *any* of the Defendants' alleged transactions to any of the specific attacks that injured them. This

---

[74] The factors are: (1) nature of the act encouraged; (2) the amount and kind of assistance given; (3) whether the defendant is absent or present at the time of the tort; (4) the defendant's relation to the tortious actor; (5) the defendant's state of mind; and (6) the duration of the assistance provided. *Halberstam*, 705 F.2d 472, 483-84.

is a fatal defect because, under the ATA, indirectly assisting a terrorist organization's "general course of conduct" does not amount to "substantial assistance" to a particular terrorist act. *Taamneh v. Twitter*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018); *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109-10 (D.D.C. 2010) (explaining that allegations that defendant "generally provided aid to a third party, who in turn purportedly engaged in tortious activity," did not establish substantial assistance).

As discussed in Part III.A, moreover, any value JAM could have extracted from Defendants' products pales in comparison to the budgets of the other ministries JAM commandeered, and the vast support that Iran allegedly provided to JAM.  Where, as here, the principal tortfeasor was not "heavily dependent" on the assistance at issue, that assistance was not "substantial." *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. 1311, 1319 (D. Minn. 1995), *aff'd*, 113 F.3d 1484 (8th Cir. 1997); *see also Taamneh*, 343 F. Supp. 3d at 917-18.

The third and fourth *Halberstam* factors—whether the defendant was present at the time of the principal violation, and the defendant's relationship to the principal wrongdoer, 705 F.2d at 478, 484—further demonstrate Plaintiffs' failure to adequately allege "substantial assistance." Plaintiffs do not (and of course could not) allege that any Defendant was present at any JAM attack, or that any Defendant had a special relationship, such as a "position of authority," vis-à-vis JAM or any JAM fighter.  *See id.* at 484; *Taamneh*, 343 F. Supp. 3d at 917-18.  Plaintiffs' attempts to plead *any* connection between Defendants and JAM are belied by their concession that the Supplier Defendants at most "transact[ed] with [the Ministry]"—not with JAM or any of the fighters who actually injured Plaintiffs.  SAC ¶ 9; *see also supra* pp. 11-12.

*Halberstam*'s fifth factor, state of mind, requires a showing that the defendant "was one in spirit with the [principal wrongdoer]."  705 F.2d at 484; *see In re Temporomandibular Joint (TMJ)*

*Implants Prods. Liab. Litig. ("TMJ Implants")*, 113 F.3d 1484, 1496 (8th Cir. 1997).  Unlike the general scienter element of aiding and abetting (which arises from § 2333(d)(2)'s use of the word "knowingly), *see infra* pp. 51-52, this "substantial assistance" factor turns on whether the defendant *shared* the principal wrongdoer's objective *and intended* to assist the principal tort.  *See Linde*, 882 F.3d at 329 n.10.  Courts have emphasized that this factor requires not merely that the alleged aider-and-abettor knew of the principal wrongdoer's illegal activities, but also that he *desired* to help those activities succeed.  *See Crosby*, 303 F. Supp. 3d at 574-75; *Taamneh*, 343 F. Supp. 3d at 917-18; *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 975-76 (N.D. Cal. 2018); *Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1023 (7th Cir. 2002), *overruled on other grounds by Boim*, 549 F.3d 685 (7th Cir. 2008); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425 (E.D.N.Y. 2009); *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 295 (S.D.N.Y. 2009), *aff'd*, 708 F.3d 82 (2d Cir. 2013).  It would be preposterous to contend that Defendants were "one in spirit" with JAM, or that they shared JAM's intent to kill American soldiers in Iraq.  As Plaintiffs seemingly recognize, Defendants plainly had no intent to aid JAM's attacks.  The *only* motivation Plaintiffs ascribe to Defendants is a commercial one—to "win sales contracts" and expand their market share by doing business with a U.S.-backed Ministry.  SAC ¶¶ 4, 115; *see also supra* pp. 11-12, 48.[75]

Any assistance allegedly provided by the Manufacturer Defendants was even further removed and, thus, even more clearly insubstantial.  Apart from the bureaucratic minutiae of "registering to do business as [] manufacturer[s]" and "submit[ting] paperwork" confirming that the Supplier Defendants could sell their products, the Manufacturers are not alleged to have done

---

[75] The sixth *Halberstam* factor, the duration of the aid provided, does not play a significant role here in light of the other factors.  *TMJ Implants*, 113 F.3d at 1496 (despite contacts "extending over four decades," this factor did not alter analysis where aid was otherwise not substantial).

anything besides manufacture medical goods (or, in some instances, only pharmaceutical ingredients) that other companies repackaged and sold to the Ministry. SAC ¶¶ 150, 157, 194, 220, 250, 256, 288, 315; *see supra* pp. 11-12. Such routine commercial activity—remote in every way from JAM's attacks—falls especially far short of the "substantial assistance" § 2333(d)(2) requires. *See Siegel*, 2018 WL 3611967 at *5 (rejecting aiding-and-abetting theory based on "common commercial banking practices with a foreign financial institution").

### B. Plaintiffs Do Not Satisfy § 2333(d)'s Requirement That An FTO "Committed, Planned, Or Authorized" The Attacks That Defendants Allegedly Aided

To further narrow the scope of aiding-and-abetting liability under the ATA, Congress required plaintiffs to establish that their injuries arose from acts of international terrorism "committed, planned, or authorized" by a designated FTO. 18 U.S.C. § 2333(d)(2). Here, Plaintiffs allege that their injuries arose from attacks by JAM, which the Secretary of State never designated as an FTO. SAC ¶ 355.[76] Apparently recognizing this flaw in their argument, Plaintiffs attempt to tie JAM to Hezbollah, a distinct group that is an FTO, and plaintiffs do so by straining to claim that Hezbollah generally "planned" or "authorized" the attacks that JAM "committed." *Id.* ¶¶ 15, 408.

That effort fails. Plaintiffs do not plausibly allege that Hezbollah "planned" or "authorized" the overwhelming majority of attacks at issue, and Count 1 therefore must be dismissed as to the vast majority of the Plaintiffs. In Count 2, Plaintiffs try to plead around that defect through a convoluted theory that Hezbollah "planned" or "authorized" a years-long "Jaysh

---

[76] One Plaintiff family alleges injury in an attack committed by a separate Sunni insurgent group: Ansar al-Islam ("AAI"). SAC ¶¶ 439-61. Although that attack is plausibly alleged to have been "committed" by an FTO, *id.* ¶ 440, the claims arising from it nonetheless fail because Plaintiffs do not allege that Defendants knowingly and substantially assisted AAI, "the person who committed" the act. 18 U.S.C. § 2333(d)(2).

al-Mahdi-Hezbollah Campaign," which they claim violated RICO, and in turn constituted a distinct "act of international terrorism" that caused their injuries. But Plaintiffs' convoluted theory ignores the plain language of the ATA and is not adequately alleged in any event.

### 1.   Plaintiffs Do Not Adequately Plead That An FTO Committed, Planned, Or Authorized The Vast Majority Of Attacks At Issue (Count 1)

JAM is not, and has never been, an FTO. Plaintiffs therefore have no choice but to try to allege that Hezbollah "planned" or "authorized, or committed" alongside JAM, the attacks that injured Plaintiffs. Even after two amendments, Plaintiffs allege that Hezbollah operatives were involved in only 22 of the 300-plus attacks at issue—covering only 35 of the 395 primary victims.[77]

For the remaining (and vast majority of) attacks, Plaintiffs make no concrete factual allegations demonstrating that Hezbollah "planned" or "authorized" those attacks, let alone "committed" them alongside JAM. Instead, they merely include a "[t]hreadbare recital[]," *Iqbal*, 556 U.S. at 678, that each of the hundreds of attacks "committed or proximately caused by Jaysh al-Mahdi . . . was planned, authorized, and/or carried out . . . by Hezbollah," SAC ¶ 408. This bare restatement of the statutory standard "will not do." *Iqbal*, 556 U.S. at 678.

To "plan" something is to "design" it or "decide on and arrange [it] in advance." *New Oxford American Dictionary* (3d ed. 2010).[78] And to "authorize" means to "give official

---

[77] *See* SAC ¶¶ 463, 735-39, 828-31, 843, 853, 863-65, 1507, 1515, 1519, 1622, 1668, 1721, 1743, 1819, 1829, 1834, 1907, 2020, 2039, 2119, 2189, 2337, 2474, 2510, 2563-64, 2624-25, 2686, 2782, 2819, 2953, 3014, 3055, 3087, 3150, 3160, 3166. Defendants do not dispute the adequacy of Plaintiffs' allegations that a designated FTO committed, planned, or authorized these 22 attacks, but Defendants maintain that Plaintiffs do not satisfy other elements of their aiding-and-abetting claims as to these attacks. *See supra* pp. 55-60 (substantial assistance), 66-69 (scienter).

[78] *See also, e.g.*, *The Chambers Dictionary* (13th ed. 2014) ("to design" or "devise" "a scheme drawn up beforehand").

61

permission" or "approval," in the context of a relationship of control or authority.  *Id.*[79]  For the

vast majority of the attacks (at least all but the 22 referenced above), Plaintiffs provide no non-

conclusory allegations that plausibly show either the required planning or authorization by

Hezbollah.  In particular, they fail to allege any facts demonstrating that Hezbollah decided on and

arranged in advance, or gave official permission or approval for, the attacks.  Instead, they allege

that Hezbollah provided general support to JAM by inspiring its members and assisting JAM with

recruiting, training, and propaganda efforts.  *See* SAC ¶¶ 15, 366-67, 369, 374-88, 389-407.  But

neither inspiration nor general assistance constitutes "planning" or "authorizing."  Apparently

recognizing as much, Plaintiffs attempt without basis to redefine the statute's plain terms.  *See,*

*e.g.*, *id.* ¶ 396 ("Hezbollah *planned* the Jaysh al-Mahdi EFP terrorist attack campaign (as with the

other [JAM] attacks outlined in [the SAC]) in Iraq *through the extensive training and coordination*

set forth above." (emphases added)).

At most, the SAC suggests that Hezbollah provided "material support or resources" to

JAM, but that is a distinct concept under the ATA.  *See* 18 U.S.C. § 2339A(a), (b)(1) (defining

"material support or resources" to include providing "training," "weapons," "expert advice,"

"personnel," and any "service").  Had Congress intended for plaintiffs to be able to bring an aiding-

and-abetting claim whenever a group receives "material support or resources" from an FTO before

committing an attack, Congress could have used the language of the material-support statute,

§ 2339A.  Instead, when Congress enacted § 2333(d)(2), it required more significant FTO

involvement:  The FTO must be the actor that "committed, planned, or authorized" the act of

---

[79] *See also, e.g.*, *The Chambers Dictionary* (13th ed. 2014) ("to give authority to"); *Black's Law Dictionary* (10th ed. 2014) ("authorize" defined as 1) "to give legal authority; to empower;" and 2) "to formally approve, to sanction").

international terrorism that injured the plaintiff.  *See Russello v. United States*, 464 U.S. 16, 23 (1983).

The SAC attempts to cure Plaintiffs' prior pleading failures, not with new facts, but with cosmetic word changes that parrot the statutory elements.  In place of allegations in the original complaint that described Hezbollah's alleged inspiration and support as "assist[ing]" or "aid[ing]" the JAM campaign, the SAC includes conclusory allegations that Hezbollah "plann[ed]" or "direct[ed]" it.  *Compare, e.g.*, Compl. ¶ 356 ("Hezbollah agents had been sent to Iraq *to assist* [JAM]" (emphasis added)), *with* SAC ¶ 368 ("Hezbollah agents had been sent to Iraq, where they were deployed *to direct* [JAM]'s terrorist campaign" (emphasis added)).  Yet the only *fact* Plaintiffs allege as support for this new assertion does not actually support it.  *See* Defendants' Notice (Sealed) [Dkt. 107] (addressing Plaintiffs' claim that Hezbollah directed JAM's attacks).  Although the labels have changed, Plaintiffs' factual allegations and legal theory have not; by "planning" and "directing," Plaintiffs still mean that Hezbollah "trained" and "supported."  *See* SAC ¶¶ 390, 395, 401-02.  Semantic edits aside, Plaintiffs do not allege facts showing the level of Hezbollah control or authority over JAM necessary to plausibly infer that Hezbollah committed, planned, or authorized the attacks that injured more than 90% of the 395 victims named in the SAC.

## 2.    Plaintiffs Cannot Invoke RICO To Evade § 2333(d)(2)'s FTO Requirement (Count 2)

Unable to allege that a designated FTO "committed, planned, or authorized" the vast majority of attacks at issue, plaintiffs try to advance an even more convoluted RICO-based theory.  According to the theory behind Count 2, each Plaintiff was injured by a long series of racketeering acts spanning many years (labeled the "Jaysh al-Mahdi-Hezbollah Campaign," SAC ¶ 3192), which they assert both violated RICO and somehow constituted a single "act of international

terrorism."  Conflating 16 years of attacks into a single "act," Plaintiffs attempt to allege that Hezbollah planned or authorized that "act."  This pleading artifice fails for several reasons.

*First*, this theory is flatly contrary to the plain language of the ATA.  As explained, the ATA imposes aiding-and-abetting liability for injuries only if they were proximately caused by "*an act*" of international terrorism that was committed, planned, or authorized by an FTO.  18 U.S.C. § 2333(d)(2) (emphasis added).  Plaintiffs' RICO theory identifies the required "act" as a 16-year-long "Campaign."  SAC ¶¶ 3192, 3202, 3206.  Plainly, a years-long "Campaign" of countless armed militia attacks is not a single "*act* of international terrorism."

*Second*, even if the purported "Jaysh al-Mahdi-Hezbollah Campaign" could constitute "an act of international terrorism," Plaintiffs do not plead facts to support the claim that *Hezbollah* "committed, planned, or authorized" that Campaign.  The laundry list of alleged RICO predicate crimes in the SAC conspicuously omits any allegation that Hezbollah or its members committed a "pattern" of predicate crimes.  SAC ¶¶ 3193-201 (referring to "Jaysh al-Mahdi attacks" or crimes committed by JAM members).  And any theory that Hezbollah "planned" or "authorized" the supposed "Jaysh al-Mahdi-Hezbollah Campaign" is contradicted by Plaintiffs' own sources. Plaintiffs assert that Hezbollah helped found JAM, *see* SAC ¶¶ 56, 333, 357, but materials they cite state that Hezbollah did not "establish contacts" with JAM until after JAM was founded.[80] Plaintiffs' sources make clear that Sadr established JAM, appointed top military commanders, and

---

[80] *Compare* SAC ¶ 333 (Sadr founded JAM in April 2003), *with* Edward T. Pound, *The Iran Connection*, U.S. News & World Report 46 (Nov. 22, 2004) (cited at SAC ¶ 56 n.18) (Hezbollah established contacts with JAM in late August 2003) (Ex. 10).

took control of Sadr City without Hezbollah.[81]  Hezbollah could not have "committed, planned, or authorized" a "Campaign" that was underway before it had any involvement.[82]

*Third*, Count 2 fails because Plaintiffs have not sufficiently alleged the requisite substantial assistance by Defendants to the person(s) who allegedly committed the predicate RICO offenses that injured Plaintiffs.  Plaintiffs identify the "Jaysh al-Mahdi-Hezbollah Campaign" as a RICO enterprise, *see* SAC ¶ 3192, but RICO requires a perpetrator "distinct from the RICO enterprise," *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1113 (D.C. Cir. 2009) (per curiam). Thus, if the act of international terrorism alleged in Count 2 is a RICO violation, SAC ¶ 3202, then Plaintiffs must establish that each Defendant provided substantial assistance not to the "Campaign" generally, but to the specific perpetrators who committed the predicate RICO offenses.

Plaintiffs' allegations fall far short of this requirement.  Plaintiffs list a series of alleged perpetrators, SAC ¶ 3192, and a series of alleged predicate offenses, *id.* ¶ 3193.  But they do not attempt to connect particular perpetrators to particular offenses, nor do they allege that Defendants "substantially assisted" those individual perpetrators.  Plaintiffs lump all Defendants (and all alleged perpetrators) together and allege generally that Defendants collectively assisted "Jaysh al-Mahdi, its members, and the Jaysh al-Mahdi-Hezbollah Campaign."  SAC ¶ 3205.  That

---

[81] *See* Mahan Abedin, *Dossier: The Sadrist Movement*, Middle East Intell. Bull. (July 2003) (cited at SAC ¶ 333 n.272) (stating that these acts were done by July 2003) (Ex. 11).

[82] Despite incorporating sources that contradict their theory, Plaintiffs allege "on information and belief" that Hezbollah contacted JAM earlier, an allegation they vaguely purport to base on "information that has become available." SAC ¶ 56 n.18.  Pleading on information and belief is permissible only "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference . . . plausible." *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012).  The timing of Hezbollah's first contact with JAM is not peculiarly within Defendants' knowledge, and Plaintiffs' sources contradict the inference that Hezbollah contacted JAM before August 2003.

conclusory group pleading is inadequate.  *See, e.g.*, *Feld Entm't, Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 317 (D.D.C. 2012).[83]

### C.      The SAC Fails To Establish The Scienter Element Of An Aiding-And-Abetting Claim

Plaintiffs' aiding-and-abetting claims independently fail because Plaintiffs' allegations do not satisfy the express scienter requirement of § 2333(d)(2).  Congress confined ATA aiding-and-abetting liability to any person "who aids and abets, by *knowingly* providing substantial assistance, . . . the person who committed *such* an act of international terrorism."  18 U.S.C. § 2333(d)(2) (emphases added).  The final clause, "such an act of international terrorism," identifies the type of conduct the defendant must assist: not "terrorism" generally, but the act of international terrorism described earlier in § 2333(d)(2)—one committed, planned, or authorized by an FTO.  *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (explaining that "such" refers to something that has "just been mentioned").[84]  And, as the Supreme Court has explained, when the word "knowingly" is used in a statute as an element of an offense, it is most naturally read "as applying to all the subsequently listed elements."  *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009).  Thus, to impose aiding-and-abetting liability under § 2333(d)(2), a person must "*knowingly* provid[e]

---

[83] Nor do Plaintiffs adequately allege that each of their injuries occurred "by reason of" the alleged RICO violations.  *See Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991) (a plaintiff is injured by reason of a § 1962(b) violation only if his injuries "ar[ose] from the acquisition or maintenance of an interest in or control of an enterprise"); *Beck v. Prupis*, 529 U.S. 494, 505 (2000) (a plaintiff is injured by reason of a § 1962(d) violation only if his injury arose from a substantive RICO violation done in furtherance of the conspiracy).

[84] *See* 18 U.S.C. § 2333(d)(2) ("In an action under subsection (a) for an injury arising *from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization* . . . liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, . . . *such* an act of international terrorism." (emphases added)).

substantial assistance" to "such" an act of international terrorism, *i.e.*, one committed, planned, or authorized by a designated FTO.

Congress thus limited aiding-and-abetting liability, and its expansive treble damages, *see* 18 U.S.C. § 2333(a), to persons who substantially assisted an act of international terrorism while knowing that that assisted act was committed, planned, or authorized by a designated FTO. *See* 162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) (statement of Rep. Goodlatte) ("Secondary liability should only attach to persons who have *actual knowledge* that they are directly providing substantial assistance to a designated foreign terrorist organization" (emphasis added)). This legislative demarcation is sensible, because it is the Secretary of State's official designation of an FTO that provides notice that a group is "so tainted by [its] criminal conduct that any contribution to [the] organization facilitates that conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (quoting note following 18 U.S.C. § 2339B); *see O'Sullivan*, 2019 WL 1409446, at *10 (concluding that aiding-and-abetting liability attaches only if defendants "knew that the financial services they provided to the various Iranian entities were destined *to aid the FTOs* responsible for the attacks that injured Plaintiffs" (emphasis added)).

Plaintiffs fail to plead the requisite knowledge. JAM is not an FTO, and the SAC is devoid of any factual allegation that Defendants knew they were aiding Hezbollah attacks. Plaintiffs cite a small selection of news reports regarding purported generic "links" between Hezbollah and JAM, SAC ¶ 374, but the cited reports actually stated that any relationship between the groups was "very, very hard to pin down," even for the head of the U.S. Central Command.[85]  And according to other

---

[85] Michael R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006) (cited at SAC ¶ 374 & n.331) (explaining the difficulty of understanding "links" between Hezbollah and Iraqi Shi'a groups like JAM) (Ex. 12); *see also, e.g.*, Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources: Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008) (cited at SAC ¶ 366 n.316) (Ex. 13) (describing Hezbollah's "possible role" in

public records that Plaintiffs cited in their initial complaint and tellingly omitted from their amended complaints (but that remain judicially noticeable), there was "little . . . evidence" that Hezbollah had "*any direct involvement*" with JAM, or provided it any "military support."[86] Plaintiffs' cherry-picked and contradicted news snippets thus do not come close to plausibly showing that any Defendant *was aware*, at the time of its alleged provision of substantial assistance, of Hezbollah's alleged role in committing, planning, or authorizing any of the supposedly assisted attacks.

Nor do Plaintiffs plausibly allege that Defendants were aware that their sales to the Ministry would substantially assist terrorism of any kind. To be liable for aiding and abetting an act of international terrorism under the ATA, a defendant must at least have known that "by assisting the principal, it was itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329; *accord O'Sullivan*, 2019 WL 1409446 at *10. In fact, even "knowingly provid[ing] [routine commercial] services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement." *Weiss v. Nat'l Westminster Bank PLC*, 2019 WL 1441118, at *11 (E.D.N.Y. Mar. 31, 2019). And, as explained above, *see supra* Part III.C, Plaintiffs have not even plausibly alleged that Defendants knew either that any transactions with the Ministry would indirectly supply JAM, or that JAM would use the resulting funds to attack U.S. troops. *See*

---

strikes against Coalition forces as "murk[y]" and stating that only "splinter factions of . . . al-Sadr's Mahdi Army militia" trained with "Hezbollah instructors").

[86] Rola el-Husseini, *Hizbullah and Regional Non-State Actors*, in Islamist Politics in the Middle East 176 (Samer S. Shehata ed., 2012) (emphasis added) (cited at Compl. ¶ 366 n.331) (Ex. 70); *see also id.* at 178 (although Hezbollah was "vocally supportive" of Iraqi Shi'a groups, any "material support . . . remain[ed], at most, limited and furtive"). The Court may take judicial notice of "what was in the public realm at the time." *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); *see also Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (a "court may take judicial notice of the existence of newspaper articles . . . that publicized" certain facts).

*Taamneh*, 343 F. Supp. 3d at 917; *Cain v. Twitter*, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018); *Mastafa v. Australian Wheat Bd. Ltd.*, 2008 WL 4378443, at *5 (S.D.N.Y. Sept. 25, 2008).

## V.   PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED (COUNTS 5-8)

### A.   Plaintiffs' State-Law Claims Are Time-Barred

The limitations periods for Plaintiffs' state-law claims generally range from one to three years. *See* D.C. Code Ann. § 12-301(4) (one year for assault and battery); *id.* § 16-2702 (two years for wrongful death); *Saunders v. Nemati*, 580 A.2d 660, 665 (D.C. 1990) (three years for intentional infliction of emotional distress (IIED)); *Strother v. District of Columbia*, 372 A.2d 1291, 1296 (D.C. 1977) (three years for survival).[87]  Plaintiffs first asserted their state-law claims between seven and thirteen years after the attacks from which those claims arose. *See* SAC ¶¶ 409-3180.  The state-law claims (Counts 5-8) are therefore untimely.

Nor does the "discovery rule" aid Plaintiffs, because that rule applies only where "the relationship between the fact of injury and the alleged tortious conduct [is] obscure." *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298-99 (D.C. 2001).  In such cases, the limitations period begins to run upon "inquiry notice" of the cause of action, *i.e.*, "that notice which a plaintiff would have possessed after due investigation." *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 771 (D.C. 1998).  Plaintiffs summarily allege that they "could not have known with the exercise of reasonable diligence of Defendants' wrongdoing" "[u]ntil 2017." SAC ¶¶ 3227, 3233, 3244, 3253.

---

[87] D.C. choice-of-law rules generally "treat statutes of limitations as procedural," *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995), unless incorporated within a cause of action itself, *Huang v. D'Albora*, 644 A.2d 1, 4 (D.C. 1994).  For this reason, the D.C. statutes of limitations govern (and bar) all of the IIED, assault, and battery claims.  Although several states' wrongful death and survival statutes incorporate limitations periods within the cause of action, the SAC fails to plead where the majority of relevant estates are in probate.  Even if Plaintiffs contend that the claims of estates for which no location is alleged are not governed (and therefore time-barred) by D.C. law, those claims should nevertheless be dismissed as too vague for Defendants to prepare a response. *See infra* note 88.

But they fail to support this bare assertion, point to any investigative steps they took in due diligence, or explain what changed in 2017 to put them on inquiry notice.  *See Alkasabi v. Wash. Mut. Bank, F.A.*, 31 F. Supp. 3d 101, 110 (D.D.C. 2014) (Leon, J.) ("[P]laintiffs do not allege any facts, let alone sufficient ones, indicating that they exercised due diligence in ascertaining the alleged injury underlying their legal claim[.]").

These failures are even more glaring given Plaintiffs' allegation that by 2008 at the latest, it was "widely understood" and reported by "Western media sources" that JAM exerted control over the Ministry, and financed its armed conflict with U.S. forces through purported kickbacks and diverted products.  *E.g.*, SAC ¶¶ 11, 182-83.  "[C]ourts have found inquiry notice where the information available to plaintiff was far more meager or inaccessible" than the reports Plaintiffs themselves cite.  *See Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 114 (D.D.C. 2015). Defendants disagree that these reports suffice to establish their knowledge of JAM's activities, *see supra* pp. 52-53, but Plaintiffs cannot advance such a theory and simultaneously argue that their claims were not discoverable until nearly a decade later.

Nor can Plaintiffs claim that Defendants' business with the Ministry was unknowable, even with reasonable inquiry, until a later date.  Plaintiffs allege that certain Defendants' transactions had been public for years, SAC ¶ 49 n.7, 222, that Kimadia made its contracts publicly available starting in 2010, *id.* ¶ 190, and that those contracts are representative of earlier contracts, *see, e.g.*, *id.* ¶¶ 285, 295.  Under Plaintiffs' theory, even non-corrupt business with the Ministry caused their injuries, *see id.* ¶ 179, so as soon as they knew (or could have known) that Defendants did business with the Ministry, they had notice of their claims.  And even if any alleged corruption were relevant to their claims, Plaintiffs allege that the Ministry's corruption was widely reported in the mid-2000s, *e.g.*, *id.* ¶ 171, and that Defendants' allegedly corrupt practices were disclosed as early as

2010, *see, e.g.*, *id.* ¶¶ 116, 222, 262-71 (alleging that Defendants used the same "practice[s]" at the Ministry before, during, and after the Sadrist era, and that these "practice[s]" were publicly disclosed in government settlements). That was more than enough to prompt a reasonably diligent person to investigate. Even applying the discovery rule, therefore, Plaintiffs' claims are untimely.

## B.  Plaintiffs' State-Law Claims Would Also Fail On The Merits

All of the state-law claims—IIED (Count 5), Assault and Battery (Count 6), Wrongful Death (Count 7), and Survival (Count 8)—share common elements, such as causation and intent. Because the SAC fails to allege facts supporting these elements, the Court should dismiss all of the state-law claims for the same reasons that doom their ATA claims.[88]

### 1.  Plaintiffs Fail To Plausibly Allege Causation And Intent On Their State-Law Claims

*Causation*. Plaintiffs do not adequately allege that Defendants' actions caused their injuries, as is required for all of Plaintiffs' state-law tort theories. *See* Restatement (Second) of Torts §§ 13 (battery), 21 (assault), 46 (IIED), 925 (wrongful death), 926 (survival). Just as Plaintiffs' causal theory is too indirect and attenuated to establish proximate causation under the ATA, *see supra* Part III.A, it similarly fails under state law. The SAC fails to plead that Defendants

---

[88] Plaintiffs nowhere allege what jurisdiction's law they believe governs any of their state law claims. *See* SAC ¶¶ 3228, 3234, 3245, 3254. Courts in D.C. blend a "governmental interests analysis" and "most significant relationship" test to determine what jurisdiction's substantive law applies to common law tort claims. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009). These tests point to three possible choices: the law of the forum (D.C.), the place of the alleged tort (Iraq), and Plaintiffs' domiciles at the time of the alleged tort. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011). Plaintiffs assert their claims only "under the laws of the District of Columbia and any other applicable state law." SAC ¶¶ 3228, 3234, 3245, 3254. Plaintiffs' failure to plead their domiciles at the time of each alleged tort means either that D.C. law governs or that dismissal is required. *See, e.g.*, *Hines v. Overstock.com, Inc.*, 2013 WL 4495667, at *12 (E.D.N.Y. Aug. 19, 2013); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 167 (E.D. Pa. 2009); *accord Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 190 n.9 (D.D.C. 2005).

proximately caused any victim's battlefield injury or death, or any family's emotional distress. *See Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 590-91 (E.D.N.Y. 2005) (bank's alleged facilitation of monetary benefit to families of terrorists was insufficient under New York law to plead causation of emotional distress); *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 580 (E.D. Mich. 2018) (dismissing wrongful death claims under Michigan law for lack of proximate causation).

Plaintiffs also must plead actual (*i.e.*, "but for") causation as part of their claims for common-law tort liability, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013), but the SAC fails to adequately allege that the attacks on Plaintiffs would not have occurred but for Defendants' transactions with the Ministry.  As noted (*supra* at 45-46), the public record makes clear that JAM had ample resources independent of Defendants' sales to the Ministry.  Indeed, in other lawsuits, many of the same Plaintiffs here have alleged that the Government of Iran and various financial entities caused their injuries, never suggesting that Defendants played any role in the causal chain.  *See supra* pp. 45-46 & n.69.

*Intent*.  Plaintiffs also fail to allege the necessary intent for each of the state-law claims. Intent under IIED claims requires a plaintiff, at a minimum, to plead that each defendant "desire[d] to inflict severe emotional distress," "kn[e]w[] that such distress [was] certain, or substantially certain, to result from his conduct," or acted "in deliberate disregard of a high degree of probability that the emotional distress [would] follow."  Restatement (Second) of Torts § 46 cmt. i (1965). Similarly, to plead assault or battery, a plaintiff must allege that each defendant acted "intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact."  Restatement (Second) of Torts §§ 13(a), 21(a)

(1965).[89]  Plaintiffs here fail to plausibly allege that Defendants intended, knew, or deliberately disregarded that their transactions would result in attacks against U.S. forces and in turn cause injuries to service members and their families.  *See supra* pp. 51-53.  That failure dooms not only their IIED and assault and battery claims (Counts 5-6), but also their wrongful death[90] and survival claims (Counts 7-8), which purport to be based on predicate intentional torts.  *See* SAC ¶¶ 3235-45, 3246-54; Pls.' Opp'n to Mot. to Dismiss FAC at 90 [Dkt. 76].[91]

## 2.    Plaintiffs Fail To Plead Additional Elements Of Their IIED Claims

To state an IIED claim, a plaintiff must plausibly allege that a defendant engaged in conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965).  *Defendants*' alleged manufacturing or supplying of medical goods to a government agency—even pursuant to allegedly corrupt contracts—does not satisfy this standard.  *See Linde*, 384 F. Supp. 2d at 590-91; *Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 54-55 (D.D.C. 2010); *see also Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 373 (D.C. 2003).  The Manufacturer Defendants are not even alleged to have

---

[89] Plaintiffs also do not allege that Defendants themselves physically harmed or threatened Plaintiffs, further dooming any direct claims against Defendants for assault or battery.  Rather, Plaintiffs allege that their apprehension and harmful and offensive contacts were the result of attacks by JAM (or other militant groups') fighters.  SAC ¶¶ 3230-31.

[90] To the extent Plaintiffs concede that D.C. law governs their wrongful death claims, *see* SAC ¶ 3245, those claims are barred because the D.C. statute does not apply extraterritorially, *see Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 206 (D.D.C. 2007).  Absent such a concession, the wrongful death claims on behalf of estates for which the SAC fails to identify a state of probate should be dismissed as too vague.  *See supra* note 88.

[91] Plaintiffs cannot bring wrongful death or survival claims based on negligence, because they fail to plead that Defendants owed a duty to the decedents.  Apart from the conclusory allegation that "Defendants owed a duty . . . to not . . . engage in corrupt transactions," SAC ¶ 3236, the SAC pleads no facts establishing that Defendants owed a duty to protect any U.S. soldier or military contractor in Iraq from torts committed by JAM.

transacted with or provided goods to the Ministry.  *Supra* p. 11-12.  Moreover, in many states a plaintiff may recover for IIED only if she was "present at the time" of a defendant's "extreme and outrageous conduct."  Restatement (Second) of Torts § 46(1); *see also Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018).  Here, Plaintiffs do not allege they were present for Defendants' conduct (*i.e.*, manufacturing goods or transacting with the Ministry).

### 3. Plaintiffs Fail To Plausibly Allege State Law Aiding-And-Abetting Claims

Plaintiffs allege that Defendants provided "substantial aid, assistance and/or encouragement to [the JAM] attacks," SAC ¶¶ 3224, 3230, 3239, 3247, though they do not expressly advance any state-law "aiding-and-abetting" claims, and the District of Columbia has not expressly recognized aiding-and-abetting causes of action.  *See, e.g.*, *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 711 (D.C. 2013); *see also 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 119 (D.D.C. 2012) (dismissing aiding-and-abetting claim).  Even assuming Plaintiffs have asserted aiding-and-abetting claims, those claims would fail because, as explained above, *supra* pp. 55-60, 66-68, Plaintiffs have not plausibly alleged facts sufficient to sustain any aiding-and-abetting theory.  *See* Restatement (Second) of Torts § 876(b).  Thus, Plaintiffs' state-law claims, like their federal claims, fail at the threshold and should be dismissed.[92]

### CONCLUSION

For the foregoing reasons, all of Plaintiffs' claims should be dismissed with prejudice.

---

[92] If, notwithstanding the foregoing, the Court were to dismiss the ATA claims but retain supplemental jurisdiction over any of the state law claims, *see* 28 U.S.C. § 1367, Defendants reserve their right to assert other applicable defenses, including *forum non conveniens*.

Dated: April 4, 2019

Respectfully submitted,

/s/ Neil H. MacBride
Neil H. MacBride (D.C. Bar No. 439137)
Kenneth J. Wainstein (D.C. Bar No. 451058)
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
Tel: (202) 962-7030; Fax: (202) 962-7118
neil.macbride@davispolk.com

Paul S. Mishkin (*admitted pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4292; Fax: (212) 701-5292
paul.mishkin@davispolk.com

*Counsel for Defendants AstraZeneca
Pharmaceuticals, LP and AstraZeneca UK
Limited*

/s/ John B. Bellinger
John B. Bellinger III (D.C. Bar No. 405059)
David J. Weiner (D.C. Bar No. 499806)
Robert A. DeRise (D.C. Bar No. 1005355)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson (D.C. Bar No.
994989)
ARNOLD & PORTER KAYE SCHOLER
LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-2325
Reeves.Anderson@arnoldporter.com

*Counsel for Defendants GE Healthcare USA
Holding LLC, GE Medical Systems
Information Technologies, Inc., and GE
Medical Systems Information Technologies
GmbH*

(signatures continue on next page)

/s/ Kannon K. Shanmugam
Kannon K. Shanmugam (D.C. Bar No. 474304)
Jeh C. Johnson (D.C. Bar No. 461627)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com

John F. Baughman (D.C. Bar No. NY0254)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
jbaughman@paulweiss.com

*Counsel for Defendants Johnson & Johnson, Cilag GmbH International, Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Janssen Pharmaceutica NV, Johnson & Johnson (Middle East) Inc., and Ortho Biologics LLC*

/s/ Joseph G. Petrosinelli
Joseph G. Petrosinelli (D.C. Bar No. 434280)
Christopher N. Manning (D.C. Bar No. 464069)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
jpetrosinelli@wc.com

*Counsel for Defendants Pfizer Inc., Pfizer Pharmaceuticals LLC, Pfizer Enterprises SARL, Pharmacia & Upjohn Company LLC, and Wyeth Pharmaceuticals Inc.*

/s/ John E. Hall
John E. Hall (D.C. Bar No. 415364)
Beth S. Brinkmann (D.C. Bar No. 477771)
David M. Zionts (D.C. Bar No. 995170)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Telephone: (202) 662-5987
Facsimile: (202) 778-5987
jhall@cov.com

*Counsel for Defendant F. Hoffmann-La Roche Ltd*

/s/ Patrick J. Carome
Patrick J. Carome (D.C. Bar No. 385676)
David W. Bowker (D.C. Bar No. 989309)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
patrick.carome@wilmerhale.com

*Counsel for Defendants Genentech, Inc. and Hoffmann-La Roche Inc.*

# STATUTORY APPENDIX

## STATUTORY APPENDIX
## TABLE OF CONTENTS

Page

18 U.S.C. § 2331 .................................................................................................1a

18 U.S.C. § 2333 .................................................................................................2a

18 U.S.C. § 2336 .................................................................................................3a

18 U.S.C. § 2339A ...............................................................................................3a

18 U.S.C. § 2339C ...............................................................................................4a

**18 U.S.C. § 2331.  Definitions**

As used in this chapter–

    (1) the term "international terrorism" means activities that –

        (A)    involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

        (B)    appear to be intended–

            (i)    to intimidate or coerce a civilian population;

            (ii)    to influence the policy of a government by intimidation or coercion; or

            (iii)    to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

        (C)    occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

    (2)    the term "national of the United States" has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act;

    (3)    the term "person" means any individual or entity capable of holding a legal or beneficial interest in property;

    (4)    the term "act of war" means any act occurring in the course of–

        (A)    declared war;

        (B)    armed conflict, whether or not war has been declared, between two or more nations; or

        (C)    armed conflict between military forces of any origin;

    (5)    the term "domestic terrorism" means activities that–

        (A)    involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

        (B)    appear to be intended–

            (i)    to intimidate or coerce a civilian population;

            (ii)    to influence the policy of a government by intimidation or coercion; or

            (iii)    to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

        (C)      occur primarily within the territorial jurisdiction of the United States; and

    (6)     the term "military force" does not include any person that–

        (A)      has been designated as a–

            (i)      foreign terrorist organization by the Secretary of State under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189); or

            (ii)     specially designated global terrorist (as such term is defined in section 594.310 of title 31, Code of Federal Regulations) by the Secretary of State or the Secretary of the Treasury; or

        (B)      has been determined by the court to not be a "military force".

## 18 U.S.C. § 2333.  Civil remedies

    (a)     **Action and jurisdiction**.–Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

    (b)     **Estoppel under United States law**.–A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

    (c)     **Estoppel under foreign law**.–A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

    (d)     **Liability**.–

        (1)     **Definition**.–In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

        (2)     **Liability**.–In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

(e)  **Use of blocked assets to satisfy judgments of U.S. nationals**.–For purposes of section 201 of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note), in any action in which a national of the United States has obtained a judgment against a terrorist party pursuant to this section, the term "blocked asset" shall include any asset of that terrorist party (including the blocked assets of any agency or instrumentality of that party) seized or frozen by the United States under section 805(b) of the Foreign Narcotics Kingpin Designation Act (21 U.S.C. 1904(b)).

## 18 U.S.C. § 2336.  Other limitations

(a)  **Acts of war**.–No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war.

(b)  **Limitation on discovery**.–If a party to an action under section 2333 seeks to discover the investigative files of the Department of Justice, the Assistant Attorney General, Deputy Attorney General, or Attorney General may object on the ground that compliance will interfere with a criminal investigation or prosecution of the incident, or a national security operation related to the incident, which is the subject of the civil litigation. The court shall evaluate any such objections in camera and shall stay the discovery if the court finds that granting the discovery request will substantially interfere with a criminal investigation or prosecution of the incident or a national security operation related to the incident. The court shall consider the likelihood of criminal prosecution by the Government and other factors it deems to be appropriate. A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. If the court grants a stay of discovery under this subsection, it may stay the action in the interests of justice.

(c)  **Stay of action for civil remedies**.—

(1)  The Attorney General may intervene in any civil action brought under section 2333 for the purpose of seeking a stay of the civil action. A stay shall be granted if the court finds that the continuation of the civil action will substantially interfere with a criminal prosecution which involves the same subject matter and in which an indictment has been returned, or interfere with national security operations related to the terrorist incident that is the subject of the civil action. A stay may be granted for up to 6 months. The Attorney General may petition the court for an extension of the stay for additional 6-month periods until the criminal prosecution is completed or dismissed.

(2)  In a proceeding under this subsection, the Attorney General may request that any order issued by the court for release to the parties and the public omit any reference to the basis on which the stay was sought.

## 18 U.S.C. § 2339A.  Providing material support to terrorists

(a)  **Offense**.–Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing

or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

(b)     **Definitions**.–As used in this section–

(1)     the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2)     the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3)     the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.


## 18 U.S.C. § 2339C.  Prohibitions against the financing of terrorism

(a)     **Offenses**.–

(1)     **In general**.–Whoever, in a circumstance described in subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such     funds are to be used, in full or in part, in order to carry out–

(A)     an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or

(B)     any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to

4a

abstain from doing any act, shall be punished as prescribed in subsection (d)(1).

(2)   **Attempts and conspiracies**.–Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (d)(1).

(3)   **Relationship to predicate act**.–For an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act.

(b)   **Jurisdiction**.–There is jurisdiction over the offenses in subsection (a) in the following circumstances–

(1)   the offense takes place in the United States and–

(A)   a perpetrator was a national of another state or a stateless person;

(B)   on board a vessel flying the flag of another state or an aircraft which is registered under the laws of another state at the time the offense is committed;

(C)   on board an aircraft which is operated by the government of another state;

(D)   a perpetrator is found outside the United States;

(E)   was directed toward or resulted in the carrying out of a predicate act against–

(i)   a national of another state; or

(ii)   another state or a government facility of such state, including its embassy or other diplomatic or consular premises of that state;

(F)   was directed toward or resulted in the carrying out of a predicate act committed in an attempt to compel another state or international organization to do or abstain from doing any act; or

(G)   was directed toward or resulted in the carrying out of a predicate act–

(i)   outside the United States; or

(ii)   within the United States, and either the offense or the predicate act was conducted in, or the results thereof affected, interstate or foreign commerce;

(2)   the offense takes place outside the United States and–

5a

(A)      a perpetrator is a national of the United States or is a stateless person whose habitual residence is in the United States;

(B)      a perpetrator is found in the United States; or

(C)      was directed toward or resulted in the carrying out of a predicate act against–

         (i)      any property that is owned, leased, or used by the United States or by any department or agency of the United States, including an embassy or other diplomatic or consular premises of the United States;

         (ii)      any person or property within the United States;

         (iii)      any national of the United States or the property of such national; or

         (iv)      any property of any legal entity organized under the laws of the United States, including any of its States, districts, commonwealths, territories, or possessions;

(3)      the offense is committed on board a vessel flying the flag of the United States or an aircraft which is registered under the laws of the United States at the time the offense is committed;

(4)      the offense is committed on board an aircraft which is operated by the United States; or

(5)      the offense was directed toward or resulted in the carrying out of a predicate act committed in an attempt to compel the United States to do or abstain from doing any act.

(c)      **Concealment**.–Whoever–

(1)(A)      is in the United States; or

         (B)      is outside the United States and is a national of the United States or a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possessions); and

(2)      knowingly conceals or disguises the nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds–

         (A)      knowing or intending that the support or resources are to be provided, or knowing that the support or resources were provided, in violation of section 2339B of this title; or

6a

(B)    knowing or intending that any such funds are to be provided or collected, or knowing that the funds were provided or collected, in violation of subsection (a), shall be punished as prescribed in subsection (d)(2).

(d)    **Penalties**.–

    (1)    **Subsection (a)**–Whoever violates subsection (a) shall be fined under this title, imprisoned for not more than 20 years, or both.

    (2)    **Subsection (c)**–Whoever violates subsection (c) shall be fined under this title, imprisoned for not more than 10 years, or both.

(e)    **Definitions**.–In this section–

    (1)    the term "funds" means assets of every kind, whether tangible or intangible, movable or immovable, however acquired, and legal documents or instruments in any form, including electronic or digital, evidencing title to, or interest in, such assets, including coin, currency, bank credits, travelers checks, bank checks, money orders, shares, securities, bonds, drafts, and letters of credit;

    (2)    the term "government facility" means any permanent or temporary facility or conveyance that is used or occupied by representatives of a state, members of a government, the legislature, or the judiciary, or by officials or employees of a state or any other public authority or entity or by employees or officials of an intergovernmental organization in connection with their official duties;

    (3)    the term "proceeds" means any funds derived from or obtained, directly or indirectly, through the commission of an offense set forth in subsection (a);

    (4)    the term "provides" includes giving, donating, and transmitting;

    (5)    the term "collects" includes raising and receiving;

    (6)    the term "predicate act" means any act referred to in subparagraph (A) or (B) of subsection (a)(1);

    (7)    the term "treaty" means–

        (A)    the Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on December 16, 1970;

        (B)    the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on September 23, 1971;

        (C)    the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents,

adopted by the General Assembly of the United Nations on December 14, 1973;

(D)    the International Convention against the Taking of Hostages, adopted by the General Assembly of the United Nations on December 17, 1979;

(E)    the Convention on the Physical Protection of Nuclear Material, adopted at Vienna on March 3, 1980;

(F)    the Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on February 24, 1988;

(G)    the Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome on March 10, 1988;

(H)    the Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms located on the Continental Shelf, done at Rome on March 10, 1988; or

(I)    the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations on December 15, 1997;

(8)    the term "intergovernmental organization" includes international organizations;

(9)    the term "international organization" has the same meaning as in section 1116(b)(5) of this title;

(10)    the term "armed conflict" does not include internal disturbances and tensions, such as riots, isolated and sporadic acts of violence, and other acts of a similar nature;

(11)    the term "serious bodily injury" has the same meaning as in section 1365(g)(3) of this title;

(12)    the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(13)    the term "material support or resources" has the same meaning given that term in section 2339B(g)(4) of this title; and

(14)    the term "state" has the same meaning as that term has under international law, and includes all political subdivisions thereof.

(f)      **Civil penalty**.–In addition to any other criminal, civil, or administrative liability or penalty, any legal entity located within the United States or organized under the laws of the United States, including any of the laws of its States, districts, commonwealths, territories, or possessions, shall be liable to the United States for the sum of at least $10,000, if a person responsible for the management or control of that legal entity has, in that capacity, committed an offense set forth in subsection (a).