# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSHUA ATCHLEY *et al.*,      )
          )
          )
       Plaintiffs,    )
          )
       v.          )     Case No. 1:17-CV-02136 (RJL)
          )
ASTRAZENECA UK LIMITED *et al.*,   )
          )
          )
       Defendants.   )

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## RULE 12(b)(1) AND 12(b)(6) MOTIONS TO DISMISS

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

I.  THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE
    PLAINTIFFS' CLAIMS PRESENT NONJUSTICIABLE POLITICAL
    QUESTIONS (ALL COUNTS)........................................................................................2

    A.  ATA Claims Are Not Exempt From The Political Question Doctrine ..................3

    B.  Plaintiffs' Claims Cannot Be Adjudicated Without Second-Guessing The
        U.S. Government's Policies Of Supporting And Funding The Ministry................4

    C.  Plaintiffs Cannot Avoid A Political Question By Alleging Corruption .................7

II. THE STATUTE'S ACT OF WAR EXCLUSION BARS ALL OF PLAINTIFFS'
    ATA CLAIMS (COUNTS 1, 2, 3, 4)................................................................................9

    A.  There Was "Armed Conflict" In Iraq During The Entire Relevant Period............10

    B.  Jaysh Al-Mahdi Was A "Military Force Of Any Origin" In The Iraq War...........11

    C.  Plaintiffs' Injuries Are Each By Reason Of An Act That Occurred "In The
        Course Of" Armed Conflict ................................................................................17

III. PLAINTIFFS' ATA DIRECT LIABILITY CLAIMS FAIL (COUNTS 3, 4)................20

    A.  Plaintiffs' Direct Liability Claims Do Not Satisfy The ATA's Proximate
        Causation Requirement ......................................................................................20

    B.  Defendants' Alleged Conduct Is Not "International Terrorism"..........................24

    C.  Plaintiffs Do Not Adequately Plead The Knowledge Required For The
        Predicate Crimes On Which Their Direct Liability Claims Are Based................26

    D.  Section 2339A's Medicine Exception Bars Plaintiffs' Material-Support
        Claim Against The Pharmaceutical Defendants (Count 3)..................................28

IV. PLAINTIFFS' ATA AIDING-AND-ABETTING CLAIMS FAIL (COUNTS 1, 2)........29

    A.  Plaintiffs Fail To Plead That Defendants Substantially Assisted Jaysh Al-
        Mahdi In Committing Acts Of International Terrorism .......................................29

        1.  Plaintiffs Fail To Allege That Defendants Aided The "Person Who
            Committed" The Acts Of International Terrorism That Injured
            Them .....................................................................................................29

        2.  Plaintiffs Fail To Allege That Defendants Provided "Substantial
            Assistance" To Jaysh Al-Mahdi..............................................................31

    B.  Plaintiffs Fail To Plead That A Designated FTO "Committed, Planned, Or
        Authorized" The Acts Of International Terrorism Alleged In The
        Complaint...........................................................................................................33

        1.  Plaintiffs Do Not Adequately Plead That A Designated FTO
            Committed, Planned, Or Authorized The Vast Majority Of Attacks
            At Issue (Count 1)..................................................................................34

       2.      Plaintiffs Cannot Invoke RICO To Evade Section 2333(d)(2)'s
Designated-FTO Requirement (Count 2)...................................................36

C.     The SAC Fails To Establish The Scienter Element Of An Aiding-And-
Abetting Claim..............................................................................................38

V.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED
(COUNTS 5-8)......................................................................................................40

A.    Plaintiffs' State-Law Claims Are Time-Barred ....................................................40

B.    Plaintiffs' State-Law Allegations Would Also Fail On The Merits .....................42

VI.   PLAINTIFFS' CLAIMS AGAINST THE MANUFACTURER DEFENDANTS
ARE ESPECIALLY DEFICIENT (ALL COUNTS) ........................................43

CONCLUSION..................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abecassis v. Wyatt*,
785 F. Supp. 2d 614 (S.D. Tex. 2011) ..................................................................23, 24, 30, 32

*Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) ..................................................................................32, 45

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) .................................................................................................3, 6

*Alkasabi v. Wash. Mut. Bank F.A.*,
31 F. Supp. 3d 101 (D.D.C. 2014) (Leon, J.)........................................................................40

*Andrus v. Glover Constr. Co.*,
446 U.S. 608 (1980).............................................................................................................13

*Avco Corp. v. U.S. Dep't of Justice*,
884 F.2d 621 (D.C. Cir. 1989).............................................................................................36

*Awad v. Obama*,
608 F.3d 1 (D.C. Cir. 2010)..................................................................................................15

*Backpage.com, LLC v. Lynch*,
216 F. Supp. 3d 96 (D.D.C. 2016)........................................................................................27

*\*Baker v. Carr*,
369 U.S. 186 (1962) ..............................................................................................................4

*Baker v. Great Socialist People's Libyan Arab Jamahiriya*,
Civ. A. 03-749 (GK), 2006 WL 3208662 (D.D.C. Nov. 7, 2006).........................................43

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................6

*bin Ali Jaber v. United States*,
861 F.3d 241 (D.C. Cir. 2017)................................................................................................3

*Biton v. Palestinian Interim Self-Gov't Auth.*,
412 F. Supp. 2d 1 (D.D.C. 2005)..........................................................................................18

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ...................................................................................25, 27, 32

\*   Authorities upon which we chiefly rely are marked with asterisks.

iii

*Boland v. Elite Terazzo Flooring, Inc.,*
    763 F. Supp. 2d 64 (D.D.C. 2011) ........................................................42

*Bopp v. Wells Fargo Bank, N.A.,*
    740 F. Supp. 2d 12 (D.D.C. 2010) (Leon, J.) .........................................38

*Capitol Servs. Mgmt v. VESTA Corp.,*
    318 F. Supp. 3d 265 (D.D.C. 2018) .......................................................41

*Carswell v. Air Line Pilots Ass'n Int'l,*
    540 F. Supp. 2d 107 (D.D.C. 2008) .......................................................45

*Cevenini v. Archbishop of Wash.,*
    707 A.2d 768 (D.C. 1998) ......................................................................41

*In re Chiquita Brands Int'l, Inc.,*
    190 F. Supp. 3d 1100 (S.D. Fla. 2016) ..................................................32

*In re Chiquita Brands Int'l, Inc.,*
    284 F. Supp. 3d 1284 (S.D. Fla. 2018) ..................................................27

*Citizens for Responsibility & Ethics in Wash. v. Trump,*
    No. 18-5150, 2019 WL 2261089 (D.C. Cir. May 28, 2019) ....................5

*Clayborn v. Twitter, Inc.,*
    No. 18-cv-00543-LB, 2018 WL 6839754 (N.D. Cal. Dec. 31, 2018) ....................36

*\*Corrie v. Caterpillar, Inc.,*
    503 F.3d 974 (9th Cir. 2007) ...................................................................9

*Crosby v. Twitter, Inc.,*
    303 F. Supp. 3d 564 (E.D. Mich. 2018)..................................................31

*\*Crosby v. Twitter, Inc.,*
    921 F.3d 617 (6th Cir. 2019) .............................................1, 29, 32, 35, 42

*Doe v. Exxon Mobil Corp.,*
    654 F.3d 11 (D.C. Cir. 2011) .................................................................33

*Edwards v. D.C.,*
    821 F.2d 651 (D.C. Cir. 1987) ...............................................................40

*\*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) (en banc) .............................................3, 4

*Elite Int'l Enter., Inc. v. Patton Wallcoverings, Inc.,*
    No. 12-14620, 2014 WL 1652197 (E.D. Mich. Apr. 24, 2014) ..............44

iv

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) ................................................24

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996) ..............................................41

*Flores-Figueroa v. United States*,
   556 U.S. 646 (2009)..........................................................39

*Freeman v. HSBC Holdings PLC*,
   No. 14 CV 6601 (DLI) (CLP), 2018 WL 3616845 (E.D.N.Y. July 27, 2018) .......16

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...............................12, 16, 27

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ........................................ *passim*

*Herbert v. Nat'l Acad. of Scis.*,
   974 F.2d 192 (D.C. Cir. 1992)................................................5

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012)..............................................22

*Hines v. Overstock.com, Inc.*,
   No. 09 CV 991 (SJ), 2013 WL 4495667 (E.D.N.Y. Aug. 19, 2013).................43

*Hull v. Eaton Corp.*,
   825 F.2d 448 (D.C. Cir. 1987)..............................................44

*Humanitarian Law Project v. Reno*,
   205 F.3d 1130 (9th Cir. 2000) ..............................................28

*Kaplan v. Cent. Bank of Islamic Rep. of Iran*,
   961 F. Supp. 2d 185 (D.D.C. 2013) *("Kaplan I")*................12, 13, 14, 16

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
   896 F.3d 501 (D.C. Cir. 2018) *("Kaplan II")* .....................9, 12, 16, 17

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ......................................... *passim*

*Khadr v. Gates*,
   No. 07-1156, 2008 WL 2828507 (D.C. Cir. July 17, 2008) ....................15

*Khairkhwa v. Obama*,
   703 F.3d 547 (D.C. Cir. 2012)..............................................15

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ........................................................................39

*Estate of Klieman v. Palestinian Authority*,
   424 F. Supp. 2d 153 (D.D.C. 2006) ............................................17, 18

*Lee v. Wolfson*,
   265 F. Supp. 2d 14 (D.D.C. 2003) ......................................................41

*Linde v. Arab Bank, PLC*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................32

*\*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)..........................................................25, 33

*Linder v. Portocarrero*,
   963 F.2d 332 (11th Cir. 1992) ............................................................15

*Lopez v. Council on American-Islamic Relations Action Network, Inc.*,
   826 F.3d 492 (D.C. Cir. 2016) ............................................................45

*Miller v. Arab Bank PLC*,
   Nos. 18-cv-2192 (BMC), 18-cv-4670 (BMC), 2019 WL 1115027 (E.D.N.Y.
   Mar. 11, 2019)............................................................................30, 32

*Mohamed v. Select Portfolio Servicing, Inc.*,
   215 F. Supp. 3d 85 (D.D.C. 2016) ......................................................43

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D. Utah 2006) .................................................16

*Nader v. Democratic Nat'l Comm.*,
   567 F.3d 692 (D.C. Cir. 2009)............................................................41

*O'Sullivan v. Deutsche Bank AG*,
   No. 17 CV 8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ........................30

*Ofisi v. BNP Paribas, S.A.*,
   No. 15-2010 (JDB), 2018 WL 396234 (D.D.C. Jan. 11, 2018)..............................33

*\*Ofisi v. BNP Paribas, S.A.*,
   278 F. Supp. 3d 84 (D.D.C. 2017) ..........................................30, 32, 39

*\*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) (*"Owens IV"*) ................................. *passim*

*Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017) (*"Owens III"*) .......................................22

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*,
 651 F.3d 857 (8th Cir. 2011) ........................................................40

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
 182 F.3d 17 (D.C. Cir. 1999) ..........................................................3

*Pontrelli v. MonaVie, Inc.*,
 No. 13-cv-4649-WJM-MF, 2014 WL 4105417 (D.N.J. Aug. 19, 2014)...............44

*Ray v. Queen*,
 747 A.2d 1137 (D.C. 2000) ...........................................................41

*\*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013)........................................................1, 20, 22, 24

*\*Saldana v. Occidental Petroleum Corp.*,
 774 F.3d 544 (9th Cir. 2014) ................................................. *passim*

*Sentry Select Ins. Co. v. Ruiz*,
 324 F. Supp. 3d 874 (W.D. Tex. 2018)................................................17

*Siegel v. HSBC Bank USA, N.A.*,
 No. 17cv6593 (DLC), 2018 WL 3611967 (S.D.N.Y. July 27, 2018)....................30

*Sokolow v. PLO*,
 583 F. Supp. 2d 451 (S.D.N.Y. 2008)................................................18

*Taamneh v. Twitter, Inc.*,
 343 F. Supp. 3d 904 (N.D. Cal. 2018) ........................................29, 31, 36

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
 200 F.3d 843 (D.C. Cir. 2000) ......................................................45

*UL LLC v. Space Chariot Inc.*,
 250 F. Supp. 3d 596 (C.D. Cal. 2017) .................................................5

*Ungar v. Islamic Republic of Iran*,
 211 F. Supp. 2d 91 (D.D.C. 2002)...................................................32

*United States v. Bestfoods*,
 524 U.S. 51 (1998)...................................................................45

*United States v. Farhane*,
 634 F.3d 127 (2d Cir. 2011)..........................................................28

*United States v. Lindh*,
 212 F. Supp. 2d 541 (E.D. Va. 2002) .................................................15

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
   842 F.3d 430 (6th Cir. 2016) ...................................................................39

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978).................................................................................26

*United States v. Yunis*,
   924 F.2d 1086 (D.C. Cir. 1991) ...............................................................15

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013).................................................................................42

*Weiss v. Arab Bank, PLC*,
   No. 06 CV 1623 (NG) (VVP), 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007).......................16

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) .............................................................32

### STATUTES, RULES & REGULATIONS

18 U.S.C. § 1111 .............................................................................................17

18 U.S.C. § 2331(1) .........................................................................................24

18 U.S.C. § 2331(1)(A) ....................................................................................26

18 U.S.C. § 2331(1)(B)..............................................................................24, 25, 26

18 U.S.C. § 2331(4) .....................................................................................9, 12

18 U.S.C. §§ 2331(4)(A).................................................................................9, 14

18 U.S.C. §§ 2331(4)(B).................................................................................14

18 U.S.C. § 2331(4)(C) ........................................................................... *passim*

18 U.S.C. § 2331(6) .........................................................................................14

18 U.S.C. § 2331(6)(A)...............................................................................10, 13

18 U.S.C. § 2333(a) .....................................................................................27, 36

18 U.S.C. § 2333(d)(2) ........................................................................... *passim*

18 U.S.C. § 2336(a) ................................................................................9, 10, 17

18 U.S.C. § 2339A.....................................................................26, 27, 28, 35

18 U.S.C. § 2339A(b)(1)..................................................................................28

18 U.S.C. § 2339C ......................................................................................26, 27

21 U.S.C. § 829(a) ............................................................................................18

28 U.S.C. § 1350 (Alien Tort Statute) ...............................................................3

Controlled Substances Act (CSA),
    Pub. L. No. 91-513, 85 Stat. 1236 (1970)................................................18

Justice Against Sponsors of Terrorism Act (JASTA),
    Pub. L. No. 114-222, 130 Stat. 852 (2016)..............................................35

National Defense Authorization Act for Fiscal Year 2012 (NDAA),
    Pub. L. No. 112-81, 125 Stat. 1298 (2011)..............................................16

Racketeer Influenced and Corrupt Organizations Act (RICO),
    18 U.S.C. § 1964(c) .................................................................34, 36, 37, 38

Torture Victim Protection Act (TVPA),
    Pub.L. 102-256, H.R. 2092, 106 Stat. 73 (1992) .......................................3

Fed. R. Civ. P.
    8.................................................................................................................28
    12(b)(1) ......................................................................................................5
    12(b)(6) ....................................................................................................10

### OTHER AUTHORITIES

*American Military History, Volume II: The United States Army in a Global Era,*
    *1917-2008*, https://history.army.mil/html/books/030/30-22/CMH_Pub_30-
    22.pdf ......................................................................................................15

Appellants' Reply Br., *Owens v. BNP Paribas, S.A.*,
    No. 17-7037, 2017 WL 3189016 (D.C. Cir. July 25, 2017) ....................22

*U.S. Military Casualties – Operation Iraqi Freedom (OIF) Casualty Summary by*
    *Month and Service*, https://tinyurl.com/oifcasualties (last visited June 1, 2019) ...................10

*U.S. Military Casualties – Operation New Dawn (OND) Casualty Summary by*
    *Month and Service*, https://tinyurl.com/ondcasualties (last visited June 1,
    2019) ........................................................................................................10

Christopher S. Stewart, *The Betrayal of Judge Radhi*,
    Upstart Bus. J., 2008 WLNR 32045233 (Mar. 17, 2008).........................6

H.R. Rep. No. 115-858 (2018).........................................................................13

*Military*, *Macmillan Dictionary*, https://tinyurl.com/MacMilitary ................12

*Military*, *Oxford English Dictionary*, https://tinyurl.com/OEDMilitary ........................................ 12

O. Uhler, et al., ICRC, *IV Commentary on Geneva Convention* 35-36 (Jean S. Pictet, ed. 1958), https://www.loc.gov/rr/frd/Military_Law/pdf/GC_1949-IV.pdf ......................................................................................................................... 15

*Prosecutor v. Milosevic*, ICTY Case No. IT-02-54-T, 2004 WL 3249535 (June 16, 2004), *available at* https://tinyurl.com/MilosevicDecision ................................ 15

Restatement (Second) of Torts § 876 cmt. d (1979) .................................................... 30

S. Rep. No. 102-342 (1992) ......................................................................................... 14

Statement of Arthur Brennan, *Waste Fraud & Corruption in Iraq*, S. Democratic Policy Comm. (May 12, 2008), 2008 WL 2010885 .................................................... 6

## **INTRODUCTION**

Despite two amendments, Plaintiffs still have not come close to stating a cognizable claim under any of their pleaded causes of action.  Binding precedent and common sense dictate that business transactions with the sovereign, U.S.-supported Iraqi Ministry of Health did not cause attacks by a militia group that allegedly looted and diverted goods from the Ministry.  Having alleged the involvement of a causation-defeating sovereign intermediary, Plaintiffs now argue that the Ministry was really a "front organization" for terrorists.  Opp. 70.  But in so doing, they run headlong into the political question doctrine.  The Court cannot adjudicate Plaintiffs' claims without condemning U.S. foreign policy that funded and supported the Ministry and encouraged companies, including Defendants, to do business with the Ministry.

Even on the merits, all of Plaintiffs' Anti-Terrorism Act claims fail at the threshold because they arise from "act[s] occurring in the course of . . . armed conflict between military forces of any origin."  18 U.S.C. § 2331(4)(C).  While Plaintiffs seek to rewrite that language—limiting it to "*lawful* act[s] occurring in the course of . . . armed conflict between military forces *that are government-affiliated and comply with the law of war*"—they cannot expand the scope of ATA liability by adding words not in the statute.

Plaintiffs also fail to meaningfully address the wave of recent decisions, including the D.C. Circuit's controlling decision in *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018), and decisions of the Second, Sixth, and Seventh Circuits, dismissing ATA claims at the pleading stage for lack of causation.  *E.g.*, *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019); *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018); *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013).  Under these decisions, Defendants did not proximately cause attacks committed by JAM merely by doing business with a ministry responsible for providing healthcare to millions of Iraqis.

Those flaws are dispositive legal defects, not "arguments for a jury" based on a "jumble"

1

of "Internet research." Opp. 3, 15-16. The Court can readily recognize—from the SAC, documents that it incorporates, and judicially noticeable materials—uncontroversial facts that no amount of discovery could change: throughout the period at issue, the U.S. Government endorsed the Ministry; JAM was a military force engaged in armed conflict with U.S. military forces as part of the Iraq War; and the Ministry was a sovereign agency with legitimate operations.

Similarly, Plaintiffs' allegation that Defendants' transactions were tainted by corruption (an allegation that Defendants deny) does not cure any of the defects in the SAC because it is immaterial even if accepted as true. In particular, Plaintiffs repeatedly refer to and mischaracterize an inquiry by the Fraud Section of DOJ as somehow relevant to this litigation. Plaintiffs' unsupported speculation concerning that inquiry should not distract the Court from its task here to evaluate whether Plaintiffs' civil complaint states a claim as a matter of law. Plaintiffs got it right when they conceded in the SAC that the core of their claims is that *any* business with the Ministry violated the ATA because all such transactions, corrupt or otherwise, were allegedly being used to support JAM.

Companies that supplied a government health ministry with badly needed pharmaceuticals and medical supplies are not, and should not be, liable for casualties caused by a militia in the course of the Iraq War. The ATA does not open the courthouse doors to such claims, and Plaintiffs' unsupported use of the ATA and state tort law should be rejected.

## I.   THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE PLAINTIFFS' CLAIMS PRESENT NONJUSTICIABLE POLITICAL QUESTIONS (ALL COUNTS)

The political question doctrine bars claims that, like Plaintiffs' claims, would require a court to second-guess foreign-policy and national-security decisions of the political branches. Mem. 22-28. Plaintiffs concede that, to prevail on their claims, they would have to prove that the Ministry was not a legitimate government agency in charge of Iraq's entire healthcare system, but

rather a known "front organization" for "terrorists" attacking U.S. troops. *See* Opp. 70. But to accept that theory would necessarily mean that U.S. foreign policy to support and fund the Ministry aided attacks on U.S. service members—as Plaintiffs' own sources have argued (*see infra* p.6). Resolving the case in Plaintiffs' favor would thus "necessarily require [the Court] to look beyond the [Defendants] in this case and toward the foreign policy interests and judgments of the United States government itself." *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 552 (9th Cir. 2014).

### A.   ATA Claims Are Not Exempt From The Political Question Doctrine

Plaintiffs first argue that no ATA claim can ever present a political question because Congress authorized civil suits under the ATA. Opp. 18-20. That is plainly incorrect. No federal statute, including one that "expressly authoriz[es]" private lawsuits, Opp. 18, can "override Article III's requirement that federal courts refrain from deciding political questions," *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) (en banc). The D.C. Circuit has specifically recognized that a statutory claim can present a political question where, as here, resolving it "requires the court to make an integral policy choice." *Al-Tamimi v. Adelson*, 916 F.3d 1, 12 n.6 (D.C. Cir. 2019). Consistent with those principles, courts routinely apply the doctrine to claims grounded in a federal statutory cause of action. *E.g.*, *bin Ali Jaber v. United States*, 861 F.3d 241, 246 (D.C. Cir. 2017) (Alien Tort Statute and Torture Victim Protection Act); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22-24 (D.C. Cir. 1999) (AEDPA).

Plaintiffs' argument concerning the second *Baker* factor—that the ATA provides "judicially discoverable and manageable standards," Opp. 18-20—is a straw man. It is true that statutes generally provide judicially manageable standards, which is why a statutory claim may be "less likely" to present a political question. *Al-Tamimi*, 916 F.3d at 12 n.6. But Defendants do not assert a political question based on a lack of such standards; rather, the political question in this

case implicates the first, fourth, and sixth *Baker* factors.  Mem. 22-23.  This political question arises from the *logical conclusion* that would follow from the application of Plaintiffs' legal theory, *see Baker v. Carr*, 369 U.S. 186, 219 (1962), and impermissibly "require[s] the court to reassess policy choices and value determinations the Constitution entrusts to the political branches alone," *El-Shifa*, 607 F.3d at 843.

In that respect, this case is unusual.  ATA cases typically do not put at issue the policy decisions of the U.S. political branches.  All but one of Plaintiffs' cases holding ATA claims justiciable, Opp. 18-20 & n.13, involved isolated attacks on civilians in Israel, and none involved alleged support of a government entity that was also supported by the U.S. Government.  Thus, a finding of liability in those cases could not have called into question any policy decisions of the U.S. political branches.

### B.   Plaintiffs' Claims Cannot Be Adjudicated Without Second-Guessing The U.S. Government's Policies Of Supporting And Funding The Ministry

U.S. Government documents, including documents on which Plaintiffs rely, demonstrate that it was U.S. foreign policy throughout the relevant period to support and fund the Ministry, and to promote private business with it.  Mem. 5-11.  These government records contradict Plaintiffs' assertion that U.S. support for the Ministry ended by "early 2004."  Opp. 27.  They demonstrate instead that the United States continued to support, partner with, and supply the Ministry through at least 2011.  Mem. 6-8.  Those documents also show that it was U.S. foreign policy to encourage private companies to supply medicines and medical equipment to the Ministry.  *Id.* at 8-11.  Plaintiffs suggest there was no such policy, Opp. 25, but they cite nothing to rebut the specific instances, set forth in Defendants' opening brief, in which the U.S. Government not only encouraged private companies to supply medical goods to the Ministry, but actually contracted with particular Defendants to do so, *see, e.g.*, Mem. 10.  Plaintiffs instead rely on an illusory

distinction: that U.S. support for the Iraqi health sector was somehow distinct from support for the Ministry, Opp. 27.  But the SAC expressly alleges that the Ministry was solely responsible for Iraq's centralized public healthcare system, so support for one was support for the other.  SAC ¶¶ 2, 72.

Application of the political question doctrine here is grounded in indisputably authoritative, official government records, such as reports submitted to Congress by the State Department (Mem. Ex. 25-26), Defense Department (Mem. Ex. 17, 20), and the U.S. Special Inspector General for Iraq Reconstruction (Mem. Ex. 19, 29, 33).  Plaintiffs urge the Court not to consider those materials, but in so doing, they misconstrue both the standard for judicial notice and what the Court can consider under Rule 12(b)(1).  Of course, on a Rule 12(b)(1) motion the Court may "consider the complaint supplemented by undisputed facts evidenced in the record . . . plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). It is also well settled that the Court may take judicial notice of records like these that reflect the U.S. Government's "official position." *Citizens for Responsibility & Ethics in Wash. v. Trump*, 2019 WL 2261089, at *4 (D.C. Cir. May 28, 2019); *see also UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017).[1]

Plaintiffs assert that the United States would not have encouraged Defendants' sales, because doing so would have "funnel[ed] resources to the terrorists who ran the Ministry."  Opp. 26.  But that is precisely the problem.  Official records show that the United States *did* partner and promote business with the Ministry—even when Plaintiffs assert it was "Sadrist-run" and integral to JAM's "national terrorist apparatus," Opp. 6, 25.  *See* Mem. Ex. 25 at 30; *see also* Mem. Ex. 32

---

[1] Nor is a sponsoring witness required.  *See United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 187 & n.12 (D.D.C. 2018).

at 10 (USAID); Mem. Ex. 17 at 20 (Defense Department); Mem. Ex. 42 at 23 (Commerce Department). Yet Plaintiffs' claims depend on equating the U.S.-backed Ministry with a militia engaged in alleged terrorism against U.S. forces. *See, e.g.*, Opp. 43, 45. The Court could not adopt Plaintiffs' legal theory without similarly concluding that by supporting the Ministry, the United States supported a known terrorist "front organization," made cash donations to terrorists, and pledged to strengthen cooperation with an entity "obvious[ly]" controlled by terrorists. *Id.* at 7, 70. Indeed, *Plaintiffs' own sources* illustrate how adjudicating their claims necessarily would impugn the United States' foreign policy in Iraq. *See* Statement of Arthur Brennan, *Waste, Fraud & Corruption in Iraq*, S. Democratic Policy Comm. (May 12, 2008), 2008 WL 2010885 (cited at SAC ¶ 108 n.79) (former U.S. official's statement blaming "the Department of State's . . . policies" of supporting Iraqi ministries, which "contributed to the killing and maiming of U.S. soldiers," and "finance[ed] outlaws and insurgents such as the Mehdi Army"); Christopher S. Stewart, *The Betrayal of Judge Radhi*, Upstart Bus. J., 2008 WLNR 32045233 (Mar. 17, 2008) (quoted at SAC ¶¶ 80 n.34, 173 & n.128) (former U.S. official's assertion that "U.S. reconstruction cash is funding militias" and "funding and training death squads").[2]

Plaintiffs cannot avoid the consequences of their theory by arguing they are "extricable" because only Defendants raise these "implications." Opp. 21-22. Political questions are not limited to issues raised explicitly by a plaintiff. *See, e.g.*, *Saldana*, 774 F.3d at 555. Moreover, unlike the plaintiffs in *Al-Tamimi*, who waived any theory of liability that relied on the conduct of the U.S.-assisted Israeli military, 916 F.3d at 9 n.5, Plaintiffs' claims turn entirely on the character and conduct of the U.S.-supported Ministry. Their claims are thus "inextricably bound to an

---

[2] While Plaintiffs omit these portions from the SAC, they cannot rely on excerpts of materials they incorporated into their pleading without accepting the portions that undercut their narrative. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007).

inherently political question—the propriety of the United States' decision" to support the Ministry. *Saldana*, 774 F.3d at 552.

### C.    Plaintiffs Cannot Avoid A Political Question By Alleging Corruption

Plaintiffs cannot avoid the application of the political question doctrine by recasting their allegations as concerning only those portions of Defendants' transactions with the Ministry that allegedly were corrupt.  The political question analysis does not turn on whether a defendant's conduct was lawful or blameless.  *See Saldana*, 774 F.3d at 550-52 (finding political question where defendant was alleged to have knowingly aided war crimes to further its bottom line). Moreover, Plaintiffs effectively concede that their corruption allegations are immaterial to their theory of liability, which posits that JAM benefitted from *all* "transactions with a counterparty that was openly controlled by terrorists."  SAC ¶ 179.  Plaintiffs thus impugn *any* dealings with the Ministry, corrupt or not, necessarily including the United States' much more substantial support.

Plaintiffs now try to disavow this "single paragraph" of their SAC, Opp. 23, but that paragraph simply makes explicit what is implicit throughout the SAC: namely, that Plaintiffs' claims rest not on allegations of corruption, but rather on a wholesale condemnation of U.S. foreign policy.  Specifically, Plaintiffs assert that the U.S.-supported Ministry was a known "front organization" that was "openly controlled by terrorists," Opp. 70; SAC ¶ 179, and that there could be no legitimate support for a Ministry so "obvious[ly]" controlled by JAM, Opp. 7.  Under Plaintiffs' theory, the United States also knowingly aided alleged acts of terrorism by JAM, given its own substantial support of the Ministry during the relevant period.  The point is not that "the U.S. government wanted [anyone] to violate federal law," Opp. 1-2, but rather that it supported, and urged Defendants and others to transact with, a Ministry that Plaintiffs now argue was a known terror "front organization."  Corruption or no corruption, the Court cannot accept Plaintiffs' claims

without second guessing the political branches' judgment in this regard.

Plaintiffs try to distinguish the U.S. Government's support of the Ministry by contending that Defendants' purportedly corrupt "off-book" transactions "enhance[d] Jaysh al-Mahdi's ability to monetize their goods on the black market."  Opp. 1, 27-28.  But the SAC alleges that free goods were most commonly provided *on* the "books," as obligations set out in Kimadia contracts.  *See, e.g.*, SAC ¶ 134.  Nor does the SAC allege that JAM "monetized" only (or even mostly) "off-book" free goods.  Rather, Plaintiffs allege that JAM thoroughly "loot[ed] [the Ministry's] inventory for profit," and that "diver[sion]" of even "legitimately purchased" goods plagued Kimadia.  *Id.* ¶¶ 3, 132; *see also id.* ¶¶ 107, 130, 174.  It is clear, moreover, that the United States did not merely provide support for public infrastructure projects such as hospitals and clinics, *see* Opp. 27-28; SAC ¶ 113; the United States transferred large quantities of goods directly into this same alleged climate of looting and diversion, *see supra* p. 5-6.[3]  Accepting those allegations as true, those donations by the U.S. Government would have been "monetized" as readily as any supposedly corrupt transactions.

In that respect, this case is indistinguishable from *Saldana*.  There, the defendants allegedly made payments to a foreign government entity responsible for murdering civilians.  774 F.3d at 546, 549.  The Ninth Circuit held those claims were nonjusticiable because the United States "provided much greater funding" to the same entity at the same time.  *Id.* at 552.  Reaching the merits would thus have "require[d] the judicial branch to question the political branches' decision to provide extensive [aid] to [a foreign government]," because if the *Saldana* defendants

---

[3] The United States also *equipped* these facilities—including through contracts with Defendants—and *delivered goods* directly to the Ministry.  *E.g.*, Mem. 6, 8, 10.  And Plaintiffs allege that the hospitals and clinics that the United States helped to build served as bases from which JAM launched attacks.  *E.g.*, Opp. 7, 67; SAC ¶¶ 87, 131.  Plaintiffs even argue that support for the Ministry's legitimate programs redounded to JAM's benefit.  Opp. 70.

knowingly funded war criminals, "the same would have to be said of the State Department." *Id.* at 552, 555. The same reasoning applies here. If Plaintiffs were correct that Defendants should have known that the Ministry was a front for JAM, and that their dealings with the Ministry make them responsible for attacks on U.S. troops, then "the same would have to be said" of the U.S. Government. *Id.*[4]

## II.   THE STATUTE'S ACT OF WAR EXCLUSION BARS ALL OF PLAINTIFFS' ATA CLAIMS (COUNTS 1, 2, 3, 4)

The ATA mandates that "[n]o action shall be maintained" for injury or loss by reason of "an act of war," and defines "act of war" to mean "*any* act occurring in the course of" (A) "declared war," (B) "armed conflict . . . between two or more nations," or (C) "armed conflict between military forces of *any* origin." 18 U.S.C. §§ 2331(4)(A)-(C), 2336(a) (emphases added). This limitation on the scope of the ATA "becomes salient only if the act in question qualifies as 'an act of international terrorism' in the first place." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 513 (D.C. Cir. 2018) ("*Kaplan II*"). It thus reflects Congress's judgment that armed conflicts between military forces may not give rise to an action for civil damages under the ATA, even if the elements of an ATA claim could otherwise be met.

Plaintiffs would nullify § 2331(4)—which covers "any act occurring in the course of . . . armed conflict between military forces of any origin"—by reading into the statute words that are not there. As Plaintiffs would have it, "any act occurring in the course of . . . armed conflict" would mean only *lawful* acts occurring in the course of armed conflict. Opp. 37. "[M]ilitary forces

---

[4] Plaintiffs attempt to distinguish *Saldana* on the ground that it did not involve corruption, Opp. 24, but the defendant in *Saldana* was also alleged to have violated the law (by knowingly aiding war crimes), and the court nevertheless found a political question. 774 F.3d at 550. Plaintiffs also try to distinguish *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007), as limited to sales in which the United States paid for a defendant's goods directly. Opp. 22. But the United States' payment for the bulldozers was decisive in *Corrie* only "because it evidenced the United States' policy decision to support the IDF's use of the bulldozers." *Saldana*, 774 F.3d at 552-53.

of any origin" would mean only *government-affiliated* military forces that *comply with the law of war*.  Opp. 29-36.  And Congress's precise instruction that "'military force' does not include . . . [a] designated . . . foreign terrorist organization," 18 U.S.C. § 2331(6)(A), would exclude not only designated FTOs, but also *any non-designated group* that acts "*like an FTO,*" Opp. 32.

Put simply, Plaintiffs know the act of war limitation precludes their claims, so they try to rewrite and narrow it.  That effort should be rejected, and Plaintiffs' ATA claims dismissed.[5]

## A.    There Was "Armed Conflict" In Iraq During The Entire Relevant Period

Plaintiffs' own allegations are fatal to their absurd claim that there was no armed conflict in Iraq after April 2003.  Plaintiffs cite examples of JAM's post-2003 military engagement with U.S. forces, *see* SAC ¶¶ 339-46, and claim that JAM's battlefield conduct violated the law of war, which logically and by their terms apply only *in war*, Dkt. 76 at 40.  And statutes passed by Congress and signed by the President, as well as the vast public record of judicially noticeable U.S. Government documents, confirm that armed conflict continued in Iraq throughout the period at issue.  *See* Mem. 29-32.  The undisputed facts speak for themselves:  roughly 90% of the more than 4,400 U.S. service members killed in the Iraq War were killed *after* the fall of Saddam in April 2003, including more than 900 during the 2007 military "surge" alone.  *See* Mem. 4 & n.3, 32 & n.66.[6]  The notion that U.S. service members who risked or sacrificed their lives in the hostilities of the Iraq War were not engaged in armed conflict cannot be taken seriously.

---

[5] Plaintiffs want to postpone reckoning with this case-ending defect until summary judgment or trial, *see* Opp. 29, but they fail to identify any reason to do so, particularly where— as here—Plaintiffs themselves have pleaded all the facts necessary to decide the issue.  It would be especially odd to hold that Rule 12(b)(6) dismissal is unavailable for a statutory limitation that by its terms provides that "[n]o action shall be maintained" at all.  18 U.S.C. § 2336(a).

[6] *See U.S. Military Casualties – Operation Iraqi Freedom (OIF) Casualty Summary by Month and Service*, https://tinyurl.com/oifcasualties (last visited June 1, 2019); *U.S. Military Casualties – Operation New Dawn (OND) Casualty Summary by Month and Service*, https://tinyurl.com/ondcasualties (last visited June 1, 2019).

**B.**     **Jaysh Al-Mahdi Was A "Military Force Of Any Origin" In The Iraq War**

Plaintiffs' own allegations also demonstrate that JAM was a "military force":  it was an organized, well-armed militia that engaged in armed combat against the U.S. military and others. *See, e.g.*, SAC ¶¶ 61-62, 338-46.  JAM amassed 60,000-plus fighters, organized into companies, battalions, and brigades directed by a "hierarchical command structure" with a "headquarters from which to launch attacks" and "regional command centers."  *Id.* ¶¶ 61, 102, 335, 338, 351.  Those fighters used military weapons and complex infantry tactics to engage in sustained, organized combat with U.S. forces, *id.* ¶¶ 339-46, 1085, 2017, including attacks on U.S. military bases, *e.g.*, *id.* ¶¶ 1537, 2174, 2337, 2361, 2939, 2973.  They fought to capture and hold strategic territories, *id.* ¶¶ 59, 61, 338, and their "primary goal" was the quintessential military objective of "expel[ling]" U.S. forces from Iraq, *id.* ¶ 13; *see also id.* ¶¶ 58-59.  The U.S. military treated JAM as an enemy force and deployed combat units for the specific purpose of engaging it in battle.  *E.g.*, *id.* ¶¶ 409-10, 486.  Far from mere "jargon and tactics," Opp. 34, these allegations confirm that JAM was a "military force of any origin," *see* Mem. 32-35.

Plaintiffs contend otherwise, for two reasons: first, because JAM acted in "total disregard of the laws of war," Opp. 29-32, and second, because JAM was not the army of a national government, *id.* at 32-34.  But both rationales are squarely foreclosed by the plain language of the ATA, which provides that no suit can be maintained for injury by reason of "*any* act" (not just lawful acts) in the course of armed conflict between "military forces of *any* origin" (not just military forces that are affiliated with a government and comply with the law of war).  18 U.S.C. § 2331(4)(C) (emphases added).  In fact, Plaintiffs all but admit that their atextual carve-outs would nullify § 2331(4)(C), rendering that provision "belt-and-suspenders" surplusage.  Opp. 33.

*First*, Plaintiffs try to remove JAM from the scope of "military forces of any origin" by

using what they term "[a] law-of-war interpretation" of the ATA, under which, Plaintiffs claim, only forces that abide by the law of war can fall within the act of war exclusion.  Opp. 30.  But the phrase "law-of-war interpretation" appears nowhere in the ATA.  As courts have observed, "Congress has explicitly referenced the laws of war in other statutes," so "[t]he fact that it did not in the ATA would thus seem to suggest that it did not plan for the laws of war to be the touchstone in interpreting 18 U.S.C. § 2331(4)."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 514 (E.D.N.Y. 2012); *accord Kaplan v. Cent. Bank of Islamic Rep. of Iran*, 961 F. Supp. 2d 185, 200-01 (D.D.C. 2013) ("*Kaplan I*"), *vacated in part on other grounds*, 896 F.3d 501 (D.C. Cir. 2018).

Unable to ground their novel interpretation in the statutory text, Plaintiffs cite a cherry-picked definition of "military" to support their narrow reading of "military forces" as necessarily abiding by the law of war.  Opp. 30, 33 n.31.  But even that definition also recognizes that "military" can refer generally to "the methods of . . . organized fighting men," and includes the broader and more common definition of "relating to soldiers, arms, or war," which says nothing about adherence to the law of war and unquestionably covers JAM.  Webster's Third New Int'l Dict. Unabridged 1433 (P. Grove ed., 3d ed. 2002).[7]  Plaintiffs concede that JAM "engaged in military activities" and "employ[ed] military-style attacks" using "military tactics."   Dkt. 82 at 4; Opp. 35-36; *see also* SAC ¶¶ 166, 183.  It defies logic to insist that an organized force engaged in military activities and pursuing military objectives is not a "military force."

Congress's recent amendment of the ATA to specify that "military force" does not include designated FTOs reaffirms that "military force" does include other non-state military forces, like

---

[7] *See also Military*, *Macmillan Dictionary*, https://tinyurl.com/MacMilitary ("relating to armies or armed forces and the way in which they are organized"); *Military*, *Oxford English Dictionary*, https://tinyurl.com/OEDMilitary ("relating to or characteristic of soldiers or armed forces").

JAM, regardless of whether they violate the law of war.  *See* Mem. 34.  The amendment makes the State Department's FTO designation determinative, and otherwise "*preserve[s]* the courts' ability" to determine whether a non-designated group is a "military force of any origin."  H.R. Rep. No. 115-858, at 4 n.11 (2018) (emphasis added).  Congress's amendment thereby abrogated *Kaplan I*'s holding that designated FTOs (such as Hezbollah) can constitute military forces under § 2331(4)(C), *see* H.R. Rep. No. 115-858, at 4-5 (2018), but it did not disturb Judge Lamberth's reasoning that an organized armed group that employs a military command structure, attacks military targets, pursues military objectives, provokes a military response, and enters cease-fires surely constitutes a "military force[] of any origin"—regardless of whether it obeys the law of war, *see* 961 F. Supp. 2d at 200-01.

If Congress had wanted to nullify *Kaplan I*'s reasoning, it would have written the amendment more broadly.  Congress could have enacted any of Plaintiffs' preferred carve-outs, defining "military force" to exclude non-designated groups that "ignore[] the laws of war just like an FTO" or that receive support from a designated FTO.  Opp. 32.  But Congress did not do so, and instead drew a bright line at designated FTOs.  Plaintiffs' interpretation would render that line meaningless, in contravention of a fundamental canon of statutory interpretation.  *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied[.]").[8]

*Second*, Plaintiffs' contention that "military forces" must be associated with "recognized governments," or at least with "not-fully-sovereign governments" or "supra-national entities,"

---

[8] Plaintiffs note that Defendants' prior briefing—filed before the 2018 amendment—referenced al Qaeda and ISIS as "military forces."  *See* Opp. 36.  It is precisely because those groups otherwise qualified as "military forces of any origin" that the amendment explicitly excluded designated FTOs from the definition of "military force[s]," 18 U.S.C. § 2331(6)(A), underscoring that non-designated groups, like JAM, continue to fit within the definition.

Opp. 32-34, likewise has no basis in the ATA. Indeed, it is directly counter to the broad language Congress used: "military forces *of any origin*." 18 U.S.C. § 2331(4)(C) (emphasis added). Plaintiffs argue that assigning "of any origin" its ordinary meaning would render superfluous the act of war exclusion's first two prongs—for declared wars and armed conflicts "between two or more nations." Opp. 34 (citing 18 U.S.C. § 2331(4)(A)-(B)). But that gets things backwards. It is Plaintiffs' reading that would render subsection (C) a nullity by limiting it to "conflicts that closely resemble traditional wars between nations," Opp. 33, which already are included in subsections (A) and (B), *see Kaplan I*, 961 F. Supp. 2d at 201. The more natural reading of the phrase "of any origin" is that it extends to military forces not already covered in subsections (A) and (B), including non-national military forces—*i.e.*, those "of any origin." Indeed, Congress intended the act of war exclusion to cover "civil war," S. Rep. No. 102-342, at 46 (1992), which necessarily includes non-state actors whose goal is to *defeat* government forces. And the 2018 amendment to the ATA reemphasizes Congress's view that "military forces of any origin" retains its ordinary meaning. If that phrase referred only to government-affiliated groups, there would have been no need to specify that "military forces" do not include designated FTOs, most of which are non-government entities like al Qaeda, Hezbollah, or Boko Haram. 18 U.S.C. § 2331(6).[9]

Common usage confirms that "military force" does not refer only to groups that comply with the law of war or affiliate with a national government. History is replete with examples of

---

[9] Plaintiffs misleadingly quote the Army's Law of War Manual to suggest that it defines the phrase "*a* 'military force'" as an entity that narrowly aims to "'vindicate [a government's] rights (principally, its inherent right of self-defense) under international law." Opp. 31 (quoting Dep't of Def., Law of War Manual §§ 1.5, 1.5.1 (updated Dec. 2016)) (emphasis added). But the entry Plaintiffs cite does not even use, much less define, that phrase or any similar phrase. Rather, it discusses an entirely different concept: defining "war" as, among other things, referring to a state's "prosecuti[on] [of] its rights *by* military force." Law of War Manual § 1.5 (emphasis added). That entry also acknowledges the existence of "non-State armed group[s]." *Id.* §§ 1.5, 1.5.1.

military forces—both national and non-state—that systematically violated the law of war.[10]   The

North Vietnamese Army, the Viet Cong, the Sandinistas, the Contras, the Serbian Army, the

Croatian Army, the Kosovo Liberation Army, and the Syrian Army, for instance, all routinely

flouted the law of war, but undoubtedly were "military forces."[11]   And in the post-9/11 world, the

United States has fought in armed conflicts with non-state military forces that routinely violate the

law of war, such as the "Taliban *military forces*."   *Khairkhwa v. Obama*, 703 F.3d 547, 549 (D.C.

Cir. 2012) (emphasis added).

Plaintiffs respond that "Congress did not intend for the act of war defense to shelter groups

like the Taliban."  Opp. 36.  But the issue is not "sheltering" the Taliban or other non-state military

forces that violate the law of war.  Rather, the issue is that Congress chose not to allow civil suits

for injury from acts that occur in the course of armed conflicts between military forces.  And if

non-state military forces like JAM and the Taliban—a group against which the United States

"initiated a military campaign," *Awad v. Obama*, 608 F.3d 1, 3 (D.C. Cir. 2010), and whose

---

[10] *See, e.g.*, O. Uhler, et al., ICRC, *IV Commentary on Geneva Convention* 35-36 (1958), https://www.loc.gov/rr/frd/Military_Law/pdf/GC_1949-IV.pdf (treating existence of a non-state "organized military force" as distinct from whether that force is "prepared to observe the ordinary laws of war"); Br. of United States, *Khadr v. Gates*, 2008 WL 2828507, at *13, *42 (D.C. Cir. July 17, 2008) (treating unlawful enemy combatant as "serv[ing] in an enemy military force").

  *United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) (Opp. 30), is inapposite.  It upheld a jury instruction that a criminal defendant, charged with aircraft hijacking, could not rely on the "obedience to military orders" defense unless his military organization adhered to the laws and customs of war.  *Id.* at 1098.  That holding is consistent with the rule that belligerents are not immune from prosecution unless the "armed force" for which they fought complied with the Geneva Convention.  *See United States v. Lindh*, 212 F. Supp. 2d 541, 557 n.35 (E.D. Va. 2002).

[11] *See, e.g.*, *Linder v. Portocarrero*, 963 F.2d 332, 333 (11th Cir. 1992) (discussing the "Nicaraguan anti-government military forces (contras)"); *Prosecutor v. Milosevic*, ICTY Case No. IT-02-54-T, ¶ 23 (June 16, 2004), *available at* https://tinyurl.com/MilosevicDecision ("the KLA [is] an organised military force"); Center of Military History, U.S. Army, *American Military History, Volume II: The United States Army in a Global Era, 1917–2008* 294-334, https://history.army.mil/html/books/030/30-22/CMH_Pub_30-22.pdf (discussing the "military forces" of the Viet Cong).

"enemy forces" have "engaged in hostilities against the United States" during its eighteen-year war in Afghanistan, Pub. L. No. 112-81, 125 Stat. 1298, 1562 (2011)—were not "military forces of any origin," the act of war exclusion would not apply to two of the longest wars in U.S. history.[12]

Plaintiffs' argument disregards the considerations that Congress balanced when it created civil liability under the ATA in only certain circumstances.  Congress's directive that "no action shall be maintained" for injuries that arise during armed conflicts between military forces reflects understandable caution not to allow private tort suits to govern the conduct of such conflicts.  And interpreting that directive according to its plain meaning will not "protect" JAM or other military forces that violate the law of war, Opp. 31; to the contrary, as U.S. and Coalition forces showed in the Iraq War, opposing military forces like JAM can be targeted and killed on the battlefield, captured and detained for the duration of hostilities, and tried and punished for their crimes.  Given the U.S. Government's ample legal authority to defeat and punish opposing military forces, Congress opted to broadly define such forces as a means of limiting the wartime reach of the ATA.  The Court should respect that choice and give effect to the statutory language Congress actually used, rather than the atextual interpretation Plaintiffs have advanced.

---

[12] The cases Plaintiffs cite for their position that "of any origin" refers to only government-like groups or those that adhere to the law of war, all from out-of-circuit district courts, are inapposite or contrary to this Circuit's precedents.  *Weiss v. Arab Bank, PLC* addressed only "designated" FTOs, to which Congress has now spoken.  *See* 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007).  And the magistrate judge's view in *Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, at *59 (E.D.N.Y. July 27, 2018), that "an act of international terrorism" cannot be an "act of war," *id.*, conflicts with *Kaplan II*'s key holding that "the exception becomes salient only if the act in question qualifies as 'an act of international terrorism' in the first place." 896 F.3d at 513.  *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006), is also an outlier: it involved an uncontested default judgment based on only a prima facie finding, and other courts have rejected it as atextual.  *Kaplan I*, 961 F. Supp. 2d at 201; *Gill*, 893 F. Supp. 2d at 512, 515.

**C.**   **Plaintiffs' Injuries Are Each By Reason Of An Act That Occurred "In The Course Of" Armed Conflict**

The ATA's plain text provides that no ATA action may be maintained for injury by reason of "*any* act occurring *in the course of* . . . armed conflict between military forces of any origin." 18 U.S.C § 2331(4)(C) (emphases added); *see also* 18 U.S.C. § 2336(a).  The "dictionary"—and most natural—"meaning of 'in the course of' is during and as a part of the specified activity." *Sentry Select Ins. Co. v. Ruiz*, 324 F. Supp. 3d 874, 886 (W.D. Tex. 2018) (citing New Oxford Am. Dictionary 398 (3rd ed. 2010)).  Attacks by one military force against another military force during armed conflict between those military forces plainly occur during and as part of armed conflict.

Foreclosed by its plain text, Plaintiffs once again attempt to redraft the ATA, insisting that "in the course of" limits the act of war exclusion to only lawful acts.  Opp. 36-39.  But that purported requirement has no footing in the statutory text.  And it cannot be right:  if only acts that comply with the law of war fell within the act of war exclusion, the exclusion would have no application whatsoever—because the "acts of international terrorism" for which ATA suits can be brought are by definition unlawful acts contrary to the law of war.  *See* Mem. 38; *Kaplan II*, 896 F.3d at 513.  The Court should reject Plaintiffs' effort to limit the act of war exclusion to the non-existent category of warfare that abides by the law of war but somehow constitutes international terrorism.[13]

Ignoring the D.C. Circuit's reasoning in *Kaplan II*, Plaintiffs instead rely, Opp. 37-38, on inapt analogies to unrelated statutes that were drawn in *Estate of Klieman v. Palestinian Authority*,

---

[13] Seemingly recognizing that glaring problem with their interpretation, Plaintiffs suggest that conventional warfare that complies with the law of war can sometimes constitute "international terrorism," Opp. 39, but identify no such scenario.  For instance, contrary to Plaintiffs' argument, "a soldier's battlefield attack[] on enemy troops" that complies with the law of war, *id.*, could not be subject to ATA liability, because the federal murder statute—like state murder statutes—criminalizes only "the *unlawful* killing of a human being with malice aforethought," 18 U.S.C. § 1111 (emphasis added).

424 F. Supp. 2d 153, 164-65 (D.D.C. 2006).[14]  But *Klieman* was based on very different facts—a shooting of a public bus full of "non-combatant civilian[]" passengers, which the court unremarkably held did not occur "in the course of" armed conflict, *id.* at 155-56, 167.  As *Klieman* illustrates, the typical ATA action seeks to impose civil liability for terrorist attacks on civilians far from any battlefield, and so is not precluded by the act of war limitation.  *See also Sokolow v. PLO*, 583 F. Supp. 2d 451, 459 (S.D.N.Y. 2008) (bombing of university cafeteria); *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 10-11 (D.D.C. 2005) (bombing of "a civilian bus" transporting children).

This case is very different.  All of the 395 attack casualties identified in the SAC are alleged to have been killed or injured by JAM in zones of active hostilities during the height of U.S. combat operations in Iraq.  Mem. 37.  Of those 395 victims, 393 were U.S. service members, contractors, or government officials supporting the U.S. war effort in Iraq, and 364 were serving in the military, when they were injured or killed.  Many were members of U.S. Army units specifically "tasked with fighting" JAM.  SAC ¶ 410.  Plaintiffs cannot walk back their allegations by, for example, re-characterizing the military roles of Plaintiff Specialists Jimmy Connolly, whose "company's mission at FOB Hammer was to fight Jaysh al-Mahdi," *id.* ¶ 486, and Robert Winegar, a member of the 2-16 Rangers whose mission included battling JAM, *id.* ¶¶ 410, 704, as merely "supporting their unit's mission to rebuild Iraq's sewer system and electric grid," Opp. 38.

Plaintiffs try to deflect attention from the vast majority of the attacks described in the SAC and toward two attacks that are obvious outliers, and that were not even alleged until their most

---

[14]  For example, the Controlled Substances Act exempts from liability a doctor's distribution of controlled substances "in the course of professional practice."  21 U.S.C. § 829(a); *id.* § 802(21).  That language has been construed to mean a doctor's lawful distribution of drugs, but that is because of the qualifier "professional," not the phrase "in the course of."  *See Klieman*, 424 F. Supp. 2d at 164-65.

recent amended complaint.  Asserting that "[m]any Plaintiffs were civilians"—but ignoring that nearly all of the civilian victims were military contractors, civilian contractors who provided security or otherwise assisted the U.S. war effort, or U.S. Government officials supporting the U.S. war effort, *e.g.*, SAC ¶¶ 490, 523, 544, 650—Plaintiffs now focus on two (of 395) victims.  *See* Opp. 38.  In so doing, Plaintiffs only highlight how clearly the "act of war" exclusion applies to the remaining 393 victims and the 1,255 Plaintiffs associated with them.

And even as to the two outlier attacks, Plaintiffs cannot escape the statutory limitation by omitting key alleged facts from their brief:  while they now refer to Dr. Stephen Everhart simply as a "college professor" attacked "while he was returning from a seminar," Opp. 38, they omit key allegations in the SAC that he was "riding in a convoy headed to the U.S. Embassy," SAC ¶ 1736, on a road that was a "focal point[]" of JAM attacks on U.S. forces, *id.* ¶¶ 403, 1736, at the same location where dozens of service member Plaintiffs were similarly attacked, *id.* ¶¶ 990, 1238, 1247, 1272, 1279, 1551, 1845, 1910, 2051, 2219, 2289, 2300, 2431, 2440, 2450, 2622, 2889, 3072, 3099. And journalist Steven Vincent was attacked while "reporting in Basra," *id.* ¶ 3055, a "Jaysh al-Mahdi stronghold[]" that Sadr had seized a year earlier, *id.* ¶¶ 61, 403, and the location of numerous allied military operations, command centers, and "approximately 800 to 1,100" JAM attacks on one military unit alone, *e.g., id.* ¶¶ 177, 336 n.278, 338, 356, 386, 962, 2564-65, 3160.

Plaintiffs would have the Court believe that the two outlier civilian victims are representative, and that all victims in this case were far from combat zones and uninvolved in the U.S. war effort.  That suggestion—which Plaintiffs extend even to U.S. soldiers who fought the six-week *Battle* of Sadr City, Opp. 38—is deeply misleading.  Plaintiffs must rely on their own allegations, which they have already twice amended to try to evade this statutory bar, and yet still establish that their injuries arose from acts that occurred in the course of armed conflict.

By barring ATA civil liability for injuries caused by "act[s] of war," *i.e.*, acts in the course of armed conflict between military forces, Congress chose not to import the complexities of civil litigation onto the battlefield.  Faithful adherence to that judgment, as reflected in the statute's unambiguous text, requires dismissal.

## III.   PLAINTIFFS' ATA DIRECT LIABILITY CLAIMS FAIL (COUNTS 3, 4)

Beyond failing at the threshold under the political question doctrine and act of war exclusion, Plaintiffs' ATA claims also fail on their own terms.  As to Plaintiffs' claims that Defendants are directly liable for their injuries under the ATA, Plaintiffs have not (and cannot) meet the statute's proximate causation requirement or definition of "international terrorism," nor establish the elements of the predicate crimes on which they base their direct liability claims.

### A.   Plaintiffs' Direct Liability Claims Do Not Satisfy The ATA's Proximate Causation Requirement

Plaintiffs concede that a defendant does not proximately cause terrorist acts by transacting with a sovereign entity that has legitimate operations, even if that entity also supports terrorism, like the Sudanese or Iranian Governments.  *See* Opp. 69; *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) ("*Owens IV*"); *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013); *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018).  Seeking to avoid the application of that rule here, however, Plaintiffs contend that the Iraqi Ministry of Health was not a "truly independent intermediary" capable of interrupting any purported chain of causation in this case.  Opp. 69.  But if Sudan and Iran—designated state sponsors of terrorism with deep connections to terrorist organizations—are causation-defeating intervening entities, the same conclusion must be true of the Ministry, which was a sovereign arm of a U.S. ally, *not* a sponsor of terrorism.

It is no response to *Owens IV* and similar cases for Plaintiffs to claim that the Ministry was really a terrorist "front organization" with no legitimate operations.  Opp. 70.  Plaintiffs' own

allegations belie that claim. In the SAC, Plaintiffs acknowledge that the Ministry, even under Sadrist management, was a sprawling bureaucracy that administered Iraq's "government-run healthcare system," provided "free medical care to all Iraqis," and employed "every public-sector doctor, pharmacist, nurse, and medical technician in Iraq." SAC ¶¶ 2, 72. Plaintiffs further allege that JAM agents had to "infiltrate[]" the Ministry and resort to "looting," "theft or misappropriation," "smuggl[ing]," "siphon[ing]," and "embezzl[ement]" in order to obtain Ministry resources. *Id.* ¶¶ 3, 11, 70, 108, 117, 130, 138 & n.98, 168, 172, 177-78 & n.135, 183 (11th-14th bullets). In short, the SAC itself establishes that the Ministry did not "exist solely to perform terrorist acts." *Kemper*, 911 F.3d at 392. Plaintiffs cannot evade the rule of *Owens IV* by walking back from the SAC and depicting the Ministry as a JAM front with no legitimate operations.

Perhaps recognizing this difficulty, Plaintiffs now contend that Defendants "bypass[ed] the Ministry" when providing free goods, and "pa[id] direct cash bribes to terrorists" that "never flowed through the Ministry at all." Opp. 71-72. But again, that is not what Plaintiffs alleged in the SAC. Instead, Plaintiffs alleged that the "free goods" were accounted for in the parties' contracts and delivered directly to Kimadia warehouses, from which they were later stolen. SAC ¶¶ 7, 107, 120-21, 123, 128. And as to "cash bribes," Plaintiffs alleged that the Supplier Defendants made "corrupt payments *to MOH officials*" and paid bribes when "dealing *with MOH*." *Id.* ¶ 142 (emphasis added). The closest Plaintiffs came to alleging direct payments to JAM is a conclusory assertion, based on unspecified "information and belief," that Defendants paid bribes to unidentified "MOH officials" who were also "members of Jaysh al-Mahdi." *Id.* ¶ 145; *see also* ¶¶ 189, 192, 218, 248, 252, 283, 311. Even there, however, Plaintiffs did not allege any Defendant-specific factual basis for their assertion, instead asserting only that "as a general matter, companies

doing business with Kimadia"—not JAM—"[had] to pay [such] bribes." *Id.* ¶ 142. However much Plaintiffs now insist that Defendants "directly financ[ed] [a] terrorist group," Opp. 65, Plaintiffs are bound by their complaint, *see Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012), which alleges only that the support for JAM flowed through, and was looted from, the Ministry and Ministry officials.

By trying to conflate a sovereign entity with terrorists, Plaintiffs follow the same path trodden by other ATA plaintiffs attempting to establish proximate causation. Courts, however, have consistently blocked those attempts. In *Owens IV*, the plaintiffs argued that Sudan "was functioning primarily as a terrorist haven, rather than a normal nation-state." Appellants' Reply Br., *Owens v. BNP Paribas, S.A.*, No. 17-7037, 2017 WL 3189016, at *2 (D.C. Cir. July 25, 2017). But the D.C. Circuit held that Sudan's intervening role defeated causation—even though the defendant bank had pleaded guilty to *illegally* doing business with Sudan, *and* even though the bank's business allegedly helped Sudan provide al Qaeda with "security," "intelligence-gathering services," and "economic aid." *Owens IV*, 897 F.3d at 269. Likewise, in *Rothstein*, the plaintiffs argued that Iran and Hezbollah were effectively one and the same, alleging that Iran "controlled, funded, and operated" Hezbollah, and "used that organization" to carry out the attacks at issue. 708 F.3d at 85. But the Second Circuit rejected that attempt to collapse the sovereign entity and terrorist group into one, and held that Iran's intervening role defeated causation because Iran had "legitimate . . . operations[] and programs" to run. *Id.* at 97.[15]

In other respects as well, Plaintiffs fail to show that Defendants were a substantial factor in causing their injuries. Plaintiffs assert that the Ministry and Iran were JAM's "two biggest

---

[15] Plaintiffs' attempt, at Opp. 65-66, to analogize their case to *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) (*Owens III*), is without merit because in that case, *Sudan*, the foreign nation, was sued for *directly supporting* al Qaeda.

sources of support." Opp. 73. But that assertion conspicuously lacks any citation to the SAC. Plaintiffs also concede that *Iran* provided JAM with the funding it needed; indeed, Plaintiffs view Iran's role as so central that most of them, in separate lawsuits, allege that it was Iran that caused the exact same attacks at issue here. Mem. 45-46. Put simply, the Ministry's resources were not "necessary for [JAM] to carry out the [attacks]." *Owens IV*, 897 F.3d at 276; *see* Mem. 45-46.

Moreover, even if the *Ministry* were a substantial factor in causing Plaintiffs' injuries, Plaintiffs still must "adequately plead facts alleging that [*Defendants*] substantially contributed to [their] injuries." *Owens IV*, 897 F.3d at 276 (emphasis omitted). In other words, Plaintiffs would still need to explain how each Defendant's alleged actions were necessary to the attacks at issue. Plaintiffs come nowhere near doing so. *See, e.g.*, Opp. 67 (asserting, without any factual support or citation, that JAM's attacks depended on Defendants' transactions with the Ministry).

Nor is it enough for Plaintiffs to now claim that it was "foreseeable" that alleged kickbacks to the Ministry would strengthen JAM's "broader organization." Opp. 65-68. Plaintiffs base this argument on *Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) ("*Abecassis I*"), which held that a plaintiff had alleged "proximate cause," despite "only an attenuated connection between the plaintiffs' injuries and each of the defendants," because the complaint "support[ed] an inference that it was foreseeable that Hussein would use the kickbacks to support Palestinian terror attacks." *Id.* at 649. *Abecassis I*, however, pre-dates and is inconsistent with the recent court of appeals decisions on proximate causation, including recent opinions in the D.C. Circuit. *Abecassis I* also bears no resemblance to the present case. The defendants there allegedly went outside legal procurement channels and funneled kickbacks through a complex set of front companies directly into a secret account that a state sponsor of terrorism (Saddam Hussein's Iraq) used exclusively for "improper uses," including funding terrorists. *Id.* at 617-19, 647. The court expressly

distinguished the facts alleged from a case in which a defendant "pay[s] money to a state sponsor of terrorism" with legitimate operations to fund (as in *Rothstein*).  *Id.* at 649.

Indeed, in *Owens IV*, the D.C. Circuit explicitly rejected such an "attenuated chain of causation," holding that "directness" was required to establish proximate causation under the ATA, and that foreseeability is not enough.  897 F.3d at 273 & n.8, 275.  Meanwhile, other circuits have confirmed that allegations that a defendant generally "facilitated [a terrorist group's] growth" cannot satisfy the ATA's proximate-cause requirement.  *E.g., Fields v. Twitter, Inc.*, 881 F.3d 739, 750 (9th Cir. 2018).  Under *Owens IV* and comparable decisions from courts of appeals around the country, Plaintiffs' direct liability ATA claims (Counts 3 and 4) must be dismissed.

### B.    Defendants' Alleged Conduct Is Not "International Terrorism"

Defendants' alleged conduct does not constitute "international terrorism" as defined in the ATA.  18 U.S.C. § 2331(1).  To constitute an act of international terrorism, Defendants' conduct must, *inter alia*, "appear to be intended" to intimidate or coerce civilians, influence government policy through intimidation or coercion, or affect government conduct by mass destruction, assassination, or kidnapping.  *Id.* § 2331(1)(B).  For Plaintiffs now to argue that Defendants appeared to have such a terroristic intent when supplying medical goods to the Ministry is absurd and (once again) belied by their own allegations.  Plaintiffs conceded in the SAC that Defendants' motives were commercial, alleging that Defendants aimed to expand their market share in the Middle East by securing contracts in a booming market.  SAC ¶¶ 114-16; Mem. 48-49.

Plaintiffs now assert that Defendants' focus on this concession "misses the point," Opp. 75, but a recent Seventh Circuit decision shows otherwise.  In *Kemper*, the Seventh Circuit held that the conduct of a bank, although alleged to have aided terrorism, would appear to an objective observer to have been "motivated by economics," not a desire to intimidate or coerce, particularly because a consent decree cited in the complaint stated that the bank engaged in the conduct because

it was "lucrative."  911 F.3d at 390.  Tellingly, Plaintiffs bury their response to *Kemper* in a footnote, attempting to distinguish it as "involv[ing] money funneled through an independent sovereign intermediary."  Opp. 75 n.69.  But Plaintiffs allege that Defendants, too, transacted with an independent sovereign intermediary.  And *Kemper*'s holding applies here regardless:  no objective observer would perceive a terroristic intent from medical supply companies transacting (even unlawfully) with a sovereign health ministry with legitimate operations, particularly when Plaintiffs have conceded that the companies acted with an economic motive.

All but admitting that they cannot meet the ATA's requirement of apparent intent to intimidate, coerce, or affect government policy through mass destruction, Plaintiffs (once again) invent a different statutory standard.  Relying on a snippet of dicta from a Seventh Circuit decision, they argue that a defendant appears to act with the requisite terroristic intent whenever "the 'foreseeable consequences' of [the] defendant's conduct promote one of the three statutory aims" in § 2331(1)(B).  Opp. 74 (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008)).  But that decision predates *Kemper*, which made it clear that the Seventh Circuit does not follow an atextual "foreseeability only" standard.  And contrary to Plaintiffs' suggestion, Opp. 75, the use of the word "appear" in § 2331(1)(B) does not dilute the ATA's terroristic-intent requirement.  Rather, it indicates that intent in this instance is evaluated, not subjectively, but from the perspective of an "objective observer."  *Kemper*, 911 F.3d at 390.  The question remains whether, from that perspective, the defendant appeared to have intended to achieve the requisite terrorist objectives—a question not answered by "foreseeability."  *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 327-28 (2d Cir. 2018).

Alternatively, Plaintiffs try to justify their "foreseeability" standard by arguing that "the law presumes that [Defendants] *intended* the natural consequences of their actions."  Opp. 75

(emphasis added).  But Plaintiffs rely on *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978), which read a *general* intent requirement into a statute that made no "mention of intent or state of mind." *Id.* at 438, 444.  As even *Gypsum* recognizes, other statutes require *specific* intent—*i.e.*, that an actor "consciously desire[d]" an outcome.  *Id.* at 445.  Section 2331(1)(B), which expressly requires terroristic intent (judged from the perspective of an objective observer), is just such a statute.

In answering whether a Defendant appeared to have that intent, context matters.  And here, context would lead an objective observer to conclude that payments made as part of an alleged "business strategy" to grow market share, SAC ¶¶ 114-15, 212-13, did not reflect "a desire to 'intimidate or coerce,'" *Kemper*, 911 F.3d at 390.

Plaintiffs also fail to allege a separate element of "international terrorism": that Defendants' transactions were "violent acts" or "acts dangerous to human life."  18 U.S.C. § 2331(1)(A).  Plaintiffs cite cases observing that giving money directly to a terrorist group may be "dangerous to human life."  Opp. 76.  But the D.C. Circuit has not gone that far.  *See* Mem. 50 n.71.  In any event, that is not what the SAC alleges Defendants did.  Rather, it alleges that Defendants transacted with the ministry responsible for Iraq's healthcare system.  SAC ¶¶ 2, 72.  And "doing business with companies and countries that have significant legitimate operations" is not inherently "dangerous to human life" under any circuit's law.  *See Kemper*, 911 F.3d at 390.

### C.   Plaintiffs Do Not Adequately Plead The Knowledge Required For The Predicate Crimes On Which Their Direct Liability Claims Are Based

Plaintiffs also fail to plead the mens rea required by the predicate crimes on which their ATA direct liability claims depend, *i.e.*, that Defendants intended or knew their alleged material support (18 U.S.C. § 2339A) or financing (18 U.S.C. § 2339C) would be used for terrorist attacks.  Plaintiffs argue that to meet the mens rea elements of those two crimes, it is enough to allege that

Defendants "knew or *recklessly disregarded*" that their transactions with the Ministry would benefit JAM. Opp. 76 (emphasis added). That is wrong, as the ordinary meaning of "knowing" makes clear. *See Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016). While Plaintiffs cite two cases that held recklessness is a sufficient mental state for other elements required by § 2333(a) (such as the victim's nationality), both of those cases recognized that the predicate crimes underlying Plaintiffs' ATA claims (§ 2339A and § 2339C) have their "own requirements regarding the requisite mental state." *Gill*, 893 F. Supp. 2d at 503-04; *accord Boim*, 549 F.3d at 692. And "an ATA plaintiff proceeding on a 2339A predicate must show evidence of the defendant's *specific knowledge of*, or intent to further, the specified underlying crime." *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1309 (S.D. Fla. 2018) (emphasis added).

Plaintiffs do not plead that Defendants actually knew their dealings with the Ministry would aid terrorist attacks. They now argue that such knowledge can somehow be inferred from Defendants' alleged "sidestepping" of FCPA restrictions, Opp. 46, but Plaintiffs' own allegations foreclose that inference: according to Plaintiffs, Defendants engaged in similar conduct in other countries with no nexus to terrorism, as well as in Iraq itself both before and after the period in question. *See* Mem. 49. Next, Plaintiffs seek an inference that Defendants knew their sales would aid terrorism because of contemporaneous "[p]ress coverage" of JAM's ties to the Ministry. Opp. 47. But that approach effectively converts the actual-knowledge requirements of § 2339A and § 2339C into a "should have known" standard. Moreover, even the reports cited by Plaintiffs do not portray the Ministry as a mere "terrorist" front for JAM—and any such inference would be implausible in any event given the United States' open support for the Ministry. Mem. 51-52.[16]

---

[16] Plaintiffs also attempt to establish knowledge based on the theory that "Defendants negotiated" at "in-person meetings at the Ministry headquarters" where they must have seen JAM "trappings" and weapons. Opp. 46-47. In the SAC, however, Plaintiffs allege only that other

### D.   Section 2339A's Medicine Exception Bars Plaintiffs' Material-Support Claim Against The Pharmaceutical Defendants (Count 3)

Conceding that the sale or donation of "medicine" does not violate § 2339A (*see* 18 U.S.C. § 2339A(b)(1)), Plaintiffs argue that the medicines the Pharmaceutical Defendants supplied to the Ministry were instead "currency," Opp. 79.  But Congress foreclosed that theory when it specified that the provision of medicine cannot be "material support" for terrorism even if the medicine is later "sold to finance terrorist activities." *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 n.4 (9th Cir. 2000).  Nor can Plaintiffs avoid the medicine exception by claiming that some Defendants supplied the Ministry with "devices" (*e.g.*, pre-filled syringes) for the delivery of their medicines.  Such basic applicators are essential to the "appropriate use or application" of the medicine and thus fall within the exception. *United States v. Farhane*, 634 F.3d 127, 142 & n.12 (2d Cir. 2011).

In a similar vein, Plaintiffs seek to avoid the medicine exception by asserting that Defendants paid cash bribes.  But they again point only to generic allegations about how Kimadia "typically" did business and to boilerplate allegations that all of the Defendants paid commissions. *See* Opp. 78, Mem. 53.  These allegations are insufficient under Rule 8.  *See supra* pp. 21-22.[17]

---

entities, not Defendants, visited the Ministry.  SAC ¶ 180.  Moreover, sightings of weapons and Sadrist propaganda—at an agency headed by the Sadrist party and targeted by Sunni fighters—would not plausibly establish that any visitor would have *actual knowledge* that transactions with the Ministry would result in diversion of goods to support militia attacks on U.S. service members.

[17] Nor can Plaintiffs sustain their bribery theory by speculating that "performance-bond clauses" in some Ministry contracts must have been vehicles for kickbacks to Ministry officials because they served no "legitimate business function given the presence of letters of credit."  *See* Opp. 78; SAC ¶¶ 161-62.  Plaintiffs' own allegations again contradict that claim:  whereas letters of credit protected Defendants by having a credit-worthy bank guarantee payment to Defendants upon fulfillment of their contractual obligations, *id.* ¶ 127, the performance bonds "protect[ed] Kimadia from default by the supplier[s]," *id.* ¶ 161.

## IV.     PLAINTIFFS' ATA AIDING-AND-ABETTING CLAIMS FAIL (COUNTS 1, 2)

### A.     Plaintiffs Fail To Plead That Defendants Substantially Assisted Jaysh Al-Mahdi In Committing Acts Of International Terrorism

Plaintiffs' aiding-and-abetting claims fail in two fundamental ways to satisfy § 2333(d)(2)'s requirement that Defendants "provid[ed] substantial assistance" to the "person who committed" the acts of international terrorism that injured Plaintiffs.  *First*, the SAC alleges that the "assistance" at issue flowed to a sovereign government entity, rather than to the "person who committed" the alleged acts of international terrorism.  Mem. 55-57.  *Second*, any assistance Defendants allegedly provided was not "substantial."  *Id.* at 57-60.

### 1.     *Plaintiffs Fail To Allege That Defendants Aided The "Person Who Committed" The Acts Of International Terrorism That Injured Them*

"Courts now routinely dismiss ATA [aiding-and-abetting] claims when the plaintiffs fail to allege a direct link between the defendants and the individual perpetrator."  *Crosby v. Twitter, Inc.*, 921 F.3d 617, 627 n.6 (6th Cir. 2019).  In this case, the Ministry's intervening role between Defendants' alleged transactions and the alleged acts committed by JAM means that Plaintiffs cannot sufficiently allege that each Defendant aided the "person who committed" the acts of terrorism that injured Plaintiffs.  18 U.S.C. § 2333(d)(2).  Plaintiffs fail to cure this core defect.

Even if JAM could qualify as a "person" for aiding-and-abetting purposes, *see* Opp. 44, Plaintiffs fail to allege that Defendants provided aid directly *to* JAM to assist in its commission of each attack.  Mem. 55-57.  Plaintiffs allege that the Supplier Defendants transacted with the Ministry, not JAM.  *Id.* at 39; *see supra* pp. 21-22.  They also allege nothing to link those transactions to the "specific crimes" that injured Plaintiffs, instead claiming (at most) that those transactions "assist[ed] [JAM] generally."  *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018).  And the SAC forecloses Plaintiffs' late-breaking argument that some unspecified aid from Defendants "never touched the Ministry at all" and instead went "directly"

to JAM.  Opp. 45; *see supra* pp. 21-22.  Plaintiffs cannot now walk away from their allegations

that Defendants' support flowed only through the Ministry—and thus plainly was not given to the

"person who committed" the attacks that injured them.  Opp. 43.

Plaintiffs also cannot circumvent the Ministry's intervening role by arguing that aiding-

and-abetting liability does not require Defendants to have proximately caused JAM's attacks.  Opp.

44-45.  The substantial-assistance inquiry may not be coterminous with the proximate causation

inquiry for direct liability, but it too requires a determination of whether the intervention of a third-

party legally severed any relationship between the defendant and the ultimate acts that caused the

plaintiff's injury.  *See* Restatement (Second) of Torts § 876 cmt. d (1979) (cross-referencing § 442,

which catalogs when "an intervening force"—including the "act[s] of a third person"—"is a

superseding cause of harm to another"); *accord Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84,

109 (D.D.C. 2017), *vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018); *Siegel

v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *4-*5 (S.D.N.Y. July 27, 2018); *see also

O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019).   In

particular, the Restatement makes clear that an intervening third party has the "same" liability-

defeating impact for both aiding-and-abetting and direct liability claims.  Restatement (Second) of

Torts § 876 cmt. d.

None of the cases Plaintiffs cite, Opp. 35, is to the contrary.  *Miller v. Arab Bank PLC*,

2019 WL 1115027 (E.D.N.Y. Mar. 11, 2019), involved the provision of financial services to a

designated FTO, not transactions with a sovereign government.  *Id.* at *1, *9.  And although

*Abecassis I* involved the government of Iraq, that government (under Saddam Hussein) was then

a designated state sponsor of terrorism, 785 F. Supp. 2d at 628, and more recent D.C. Circuit and

other case law has clarified that even a state sponsor of terrorism can be an intervening force that

cuts off liability, *supra* pp. 20-22.  As for *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the close and direct relationship in that case between the principal tortfeasor and the defendant—his live-in girlfriend and the "banker, bookkeeper, recordkeeper, and secretary" for his criminal enterprise, *id.* at 474-76, 487—illustrates precisely the kind of direct connection that is missing here.

      2.    *Plaintiffs Fail To Allege That Defendants Provided "Substantial Assistance" To Jaysh Al-Mahdi*

      Plaintiffs' allegations are also insufficient to establish that Defendants provided "substantial assistance" under the *Halberstam* factors for aiding-and-abetting liability.

      ***Factors 1 and 2: The nature of the act assisted and amount of aid.***  Plaintiffs have not alleged either that JAM's attacks were "heavily dependent" on any Defendant's manufacture or supply of medical products, or that Defendants' alleged aid was "indisputably important" to the attacks.  *Halberstam*, 705 F.2d at 488.  While Plaintiffs make unsubstantiated claims about *the Ministry*'s importance to JAM, Opp. 73, they do not adequately allege that any individual Defendant provided "substantial assistance" to JAM—not least because JAM had far larger and more direct sources of funding that dwarfed the value of the medical supplies that each Defendant provided to the Ministry and that JAM allegedly later stole from Ministry warehouses.  *See, e.g.*, SAC ¶¶ 65, 173, 367, 374, 376, 389, 404-06; *see also* Mem. 45.  And again, while Plaintiffs now argue in their brief that "each [Defendant] gave Jaysh al-Mahdi at least several million dollars per year in cash and medical goods," Opp. 41, that argument is contradicted by allegations in the SAC that Defendants transacted with the Ministry, not with JAM.  *See supra* pp. 21-22.[18]

---

[18] Plaintiffs assert that *Halberstam* would support liability even if Defendants played only a "relatively trivial role" in assisting JAM's attacks, because terrorism is particularly "blameworth[y]."  Opp. 42.  The same could be said for every aiding-and-abetting case under the ATA, yet courts routinely dismiss such claims after applying the *Halberstam* factors.  *See, e.g.*, *Taamneh*, 343 F. Supp. 3d at 917-18; *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 573-75 (E.D.

The ATA cases Plaintiffs cite, Opp. 41, confirm the insufficiency of Plaintiffs' claims. Each involved aid directly to known terrorist groups, or (in one case) directly to a secret account used by a designated state sponsor of terrorism to make payments to terrorists. *See Boim*, 549 F.3d at 698; *Miller*, 2019 WL 1115027 at *1; *In re Chiquita Brands Int'l, Inc.*, 190 F. Supp. 3d 1100, 1104 (S.D. Fla. 2016); *Abecassis I*, 785 F. Supp. 2d at 628; *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 18 (D.D.C. 2010); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 578 (E.D.N.Y. 2005). That is obviously not the case here, where Plaintiffs claim that Defendants provided medical supplies to a U.S.-backed ministry, which were then stolen or diverted and sold on the black market so that the proceeds could be used to attack opposing military forces. *See* SAC ¶¶ 168-69, 172.

Nor can Plaintiffs establish substantial assistance by simply asserting that Defendants' transactions provided "financial assistance" generally to JAM. Opp. 41. Allegations that a defendant "generally provided aid to a third party, who in turn purportedly engaged in tortious activity," are insufficient to establish substantial assistance. *Ofisi*, 278 F. Supp. 3d at 111. Rather, plaintiffs must "plead a link between the aid rendered and the *principal violation* (or violations) alleged." *Id.* (emphasis added); *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002); *accord Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109-10 (D.D.C. 2010).

***Factors 3 and 4: Presence and relationship.*** Plaintiffs concede that Defendants were not present at any of the attacks (the third *Halberstam* factor) and had no "special relationship" with JAM (the fourth factor). Opp. 58. Those factors therefore favor Defendants. *See* Mem. 58.

***Factor 5: State of mind.*** The fifth *Halberstam* factor—state of mind—also strongly favors Defendants. Plaintiffs do not even attempt to argue that Defendants were "one in spirit" with JAM

---

Mich. 2018), *aff'd*, 921 F.3d 617.

or desired to help JAM's attacks succeed, Opp. 48-49, and the SAC concedes that Defendants' motives in transacting with the Ministry were economic, SAC ¶¶ 114-16.

Instead, Plaintiffs seek to conflate the *Halberstam* state-of-mind factor with § 2333(d)(2)'s separate requirement that a defendant's substantial assistance must be "knowingly provid[ed]." Opp. 46-49, 54.[19]   But *Halberstam* shows those are distinct inquiries.   The D.C. Circuit first analyzed whether the defendant "knowingly" assisted the principal *before* considering "whether [the defendant's] assistance was substantial."  705 F.2d at 488.  And in determining whether the defendant's assistance was "substantial," the court asked whether the defendant "*inten[ded] and desire[d]* to make the [principal tort] succeed."  *Id.* (emphasis added).  Consistent with *Halberstam*, the Second Circuit recently held that evidence of the defendant's specific intent to advance the principal tort is part of the substantial assistance inquiry.  *See Linde*, 882 F.3d at 329 n.10.  And courts around the country have dismissed aiding-and-abetting claims under the ATA where plaintiffs failed to allege such an intent.  *See* Mem. 59 (collecting cases).  This Court should do the same here.

### B.   Plaintiffs Fail To Plead That A Designated FTO "Committed, Planned, Or Authorized" The Acts Of International Terrorism Alleged In The Complaint

The ATA limits aiding-and-abetting liability to attacks "committed, planned, or authorized" by a designated FTO.   18 U.S.C. § 2333(d)(2).   JAM allegedly "committed" the attacks at issue, but JAM is not a designated FTO.  Mem. 60.  Plaintiffs try to get around this statutory limitation in two ways.  *First*, Plaintiffs seek to redefine the verbs "plan" and "authorize," such that training or equipping JAM fighters would amount to "planning" every attack JAM later

---

[19] Plaintiffs cite two cases for the proposition that an aider and abettor need not "share the same purpose as the principal," Opp. 48-49, but both cases focused on the "knowingly" element. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-39 (D.C. Cir. 2011), *vacated by* 527 F. App'x 7 (D.C. Cir. 2013); *Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *4 (D.D.C. Jan. 11, 2018).

committed, and inspiring JAM fighters would count as "authorizing" those attacks.  Opp. 53-58.
*Second*, Plaintiffs advance a convoluted fallback theory, based on RICO, that attempts to shoehorn over 300 attacks committed over 16 years into a collective single "act" of international terrorism that a designated FTO purportedly helped devise.  Opp. 58-61.  Both workarounds fail.

### 1.     Plaintiffs Do Not Adequately Plead That A Designated FTO Committed, Planned, Or Authorized The Vast Majority Of Attacks At Issue (Count 1)

The flaw in Plaintiffs' first argument is readily apparent.  The most Plaintiffs can do to support their claim that Hezbollah, a designated FTO, "planned" each attack that injured a Plaintiff is to allege that Hezbollah "co-found[ed]" JAM; "recruit[ed], train[ed], and equipp[ed]" JAM fighters; and helped "devis[e] the tactics" generally used by JAM.  Opp. 53-54.  But the ATA requires more:  Plaintiffs must plead that a designated FTO actually "planned"—*i.e.*, "decide[d] on and arrange[d] in advance," Mem. 61 (quoting *New Oxford Am. Dictionary* (3d ed. 2010))—each specific "act of international terrorism" that caused their injuries. 18 U.S.C. § 2333(d)(2).

General assistance from a designated FTO to the perpetrator of the acts of international terrorism is insufficient.  That JAM allegedly received training and weapons from Hezbollah, Opp. 53-54, for example, does not plausibly suggest that Hezbollah "planned" the attacks that JAM fighters *themselves* later planned and committed—just as the United States does not "plan" any future attack of a Syrian militia simply by providing it weapons and training.

Plaintiffs respond that a designated FTO "plans" the individual acts of terrorism committed by a non-FTO so long as it helps devise an overarching "general plan" for that group, even though the FTO does not control or direct specific attacks.  Opp. 55.  But even if such abstract "schem[ing]" were sufficient—and it is not—Plaintiffs fail to allege even that much.  *Id.* at 50. They allege only that Hezbollah *recruited*, *trained*, *and equipped* JAM.  Mem. 62-63.  Such *assistance* to a group is not the same as *planning* an attack at any level of generality.  *See* Mem.

61-63.[20]

Plaintiffs do not dispute that under their approach, a plaintiff could bring an ATA aiding-and-abetting claim for any attack committed by a non-FTO merely because it had in the past received "material support or resources" from a designated FTO. Nor do they contest that, if Congress meant to achieve that result in the aiding-and-abetting provision of the ATA, it could have borrowed that terminology from the related material-support statute (18 U.S.C. § 2339A). *See* Mem. 62-63; Opp. 55-56. Plaintiffs' only response is that it would not have occurred to Congress to use the phrase "material support" in § 2333(d)(2) because Congress enacted that provision two decades after the material-support statute. Opp. 56. But Congress repeatedly used "material support" elsewhere in the very same law that created § 2333(d)(2). *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, §§ 2(a)(6)-(7), (b), 130 Stat. 852, 852-53 (2016). Congress's use of different and narrower words—"planned" or "authorized"—when providing for aiding-and-abetting liability in § 2333(d)(2) must be given effect.

Having sought (unsuccessfully) to redefine "plan," Plaintiffs next seek to change what it means for a designated FTO to "authorize" an act of international terrorism. According to Plaintiffs, Hezbollah "authorized" every JAM attack by "recruiting, training, and indoctrinating" JAM fighters, and by inspiring or "incit[ing]" JAM. Opp. 56-58. But as the Sixth Circuit recently held, to "authorize" an attack means to "give official permission for . . . [it]." *Crosby*, 921 F.3d at 626 (rejecting theory that ISIS "authorized" attack by "virtually recruit[ing]" and inspiring attacker). Whether Hezbollah recruited, trained, or inspired JAM fighters says nothing about

---

[20] Contrary to Plaintiffs' claims (at 52-53), the fact that Defendants did not contest (with respect to Count 1) the sufficiency of allegations that Hezbollah planned or committed 22 of the attacks described in the SAC, *see* Mem. 61 & n.77, does not imply that the SAC sufficiently alleges Hezbollah's role in the more than 275 other attacks, which occurred at other times or locations.

whether it had the authority and control necessary to give official permission for JAM's general military operations—let alone each and every attack that injured Plaintiffs. *See* Mem. 61-63. And allegations that a designated FTO "sought to generally radicalize individuals and promote[] attacks" do not constitute "authorization" of a particular attack as required by § 2333(d)(2). *Clayborn v. Twitter, Inc.*, 2018 WL 6839754, at *8 (N.D. Cal. Dec. 31, 2018).

### 2. Plaintiffs Cannot Invoke RICO To Evade Section 2333(d)(2)'s Designated-FTO Requirement (Count 2)

Plaintiffs advance their RICO theory knowing that that they cannot establish that a designated FTO "committed, planned, or authorized" each of "the individual attacks that injured Plaintiffs." Opp. 52, 59 (conceding Count 2 is a backup). But that theory rests on an absurd assumption: that JAM fighters engaged in a 16-year terrorist "campaign," encompassing hundreds of separate attacks, that can be characterized as a single "act" of international terrorism "planned" or "authorized" by Hezbollah. *See* SAC ¶¶ 3191-92, 3202, 3206. This Court should reject Plaintiffs' transparent attempt to evade § 2333(d)(2)'s designated-FTO requirement.

The ATA creates a civil cause of action only for plaintiffs "injured . . . by reason of *an act* of international terrorism," and it imposes aiding-and-abetting liability only for "an injury arising from *an act* of international terrorism committed, planned, or authorized by [a designated FTO]." 18 U.S.C. § 2333(a), (d)(2) (emphases added). Plaintiffs cite no ATA case to support their RICO theory, and that is because there is none. It is far from the "most natural reading" of the statute, *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 627 (D.C. Cir. 1989), to say that the "act" that caused each Plaintiff's injury was not the attack in which he or she was injured, but rather a collection of hundreds of attacks on others over more than a decade, *see Taamneh*, 343 F. Supp. 3d at 916 (emphasizing that use of the singular "act" in § 2333(d)(2) requires a "connect[ion] with a specific crime," not a terrorist group's "general course of conduct"). Nor is it a natural reading

to say that, by allegedly helping to co-found JAM, Hezbollah "planned" or "authorized" every attack JAM committed over the next 16 years.  *See* Opp. 60.  Plaintiffs respond by pointing to language in *Halberstam* that describes a multi-year burglary campaign as the "act assisted" in that case.  *Id*.  But neither *Halberstam* nor the other cases Plaintiffs cite analyzed the ATA's use of the phrase "act of international terrorism."

Moreover, Count Two would fail even if the purported JAM "campaign" could constitute a singular "*act* of international terrorism."  To be liable for aiding-and-abetting under the ATA, a defendant must "knowingly provid[e] substantial assistance" to "the person who committed" the "act of international terrorism," 18 U.S.C. § 2333(d)(2), which in Count Two is predicated on an alleged RICO violation.  Here, Plaintiffs appear to allege that JAM was the RICO enterprise, *see* SAC ¶¶ 3191-92; Opp. 59, though at times even they seem confused about whether the enterprise was JAM or the "campaign," *compare* Opp. 60.  But a RICO enterprise cannot itself be the perpetrator of a RICO violation.  Mem. 65.  So if JAM is the "enterprise," it cannot be the "person" that violated RICO and thus committed the purported "act of international terrorism."  Instead, Plaintiffs would have to plead that each Defendant knowingly provided substantial assistance not to JAM generally, but to individual "RICO perpetrator[s]."  Opp. 61.

They have not done so.  Mem. 65-66.  Plaintiffs cite paragraph 3192 of the SAC, claiming it "allege[s] that Defendants aided [certain] RICO perpetrators in particular."  Opp. 61.  But that paragraph merely lists JAM members, without even mentioning Defendants.  SAC ¶ 3192.  Plaintiffs' further response—that "Defendants need not have known (and Plaintiffs need not plead) the identities of the specific principals," Opp. 61—misstates the law and is a red herring.  The question is not whether Defendants knew the identities of the JAM members they allegedly aided, but whether Plaintiffs have adequately alleged that individual Defendants provided substantial

assistance to the RICO principals, *i.e.*, the particular JAM members who allegedly committed the purported RICO violations that injured each Plaintiff.  Again, Plaintiffs have not done so.

Plaintiffs' RICO theory also fails because the SAC is devoid of allegations that Hezbollah actually "committed, planned, or authorized" the purported JAM campaign.  Although Plaintiffs allege in conclusory fashion that Hezbollah "planned" or "directed" the campaign, they allege more specifically only that Hezbollah "trained," "supported," or "inspir[ed]" JAM.  Mem. 63 (citing SAC ¶¶ 390, 395, 401-02).  But again, to train, support, or inspire a group is not to "plan" or "authorize" an entire "campaign," let alone specific attacks.  *Id.* at 61-63; *see supra* pp. 34-36.[21]

### C.    The SAC Fails To Establish The Scienter Element Of An Aiding-And-Abetting Claim

Consistent with *Halberstam*, § 2333(d)(2) requires proof that an alleged aider and abettor "knowingly gave 'substantial assistance' to someone who performed wrongful conduct."  Opp. 62. But § 2333(d)(2) specifically defines the wrongful conduct the defendant must "knowingly" assist as "such an act of international terrorism"—meaning one "committed, planned, or authorized" by a designated FTO.  Thus, in order to state an ATA aiding-and-abetting claim for any given attack, Plaintiffs must allege that each Defendant knowingly provided substantial assistance to that attack, with "knowingly" encompassing knowledge that *an FTO had the requisite involvement* in the attack.  Plaintiffs fail to do so.  *See* Mem. 66-67.[22]

---

[21] Nor can Plaintiffs now claim that Hezbollah "planned" or "authorized" the entire 16-year JAM "campaign" merely by co-founding JAM.  Opp. 60.  As shown by *Plaintiffs' own sources*—which state, for example, that JAM was already operating when Hezbollah first made contact with it—Plaintiffs have not plausibly alleged even that Hezbollah co-founded JAM.  Mem. 64-65 & nn.80-82.  Allegations contradicted by documents incorporated into the SAC need not be accepted as true.  *See Bopp v. Wells Fargo Bank, N.A.*, 740 F. Supp. 2d 12, 15 (D.D.C. 2010) (Leon, J.).

[22] Plaintiffs misread *Halberstam*.  The court there did not hold that the defendant had the requisite scienter even though she was "unaware" of her companion's crimes.  Opp. 69.  Rather, the defendant "knew" the principal "was involved in some type of personal property crime."  705

Plaintiffs contend that they do not have to allege that Defendants knew of Hezbollah's alleged role in JAM's attacks because § 2333(d)(2)'s scienter requirement ("knowingly") "modifies only the verb it precedes (and perhaps the verb's immediate modifiers)," *i.e.*, "providing substantial assistance." Opp. 66. But Plaintiffs concede that § 2333(d)(2) *also* requires proof that "defendants knew that [the alleged aid] would be used to support *terrorist* activity." Opp. 46 (emphasis added). The statute, however, does not refer to supporting "terrorist activity" generally, but to aiding and abetting "such an act of international terrorism." 18 U.S.C. § 2333(d)(2). The proper reading of § 2333(d)(2) thus does not require "knowingly" to modify an adjectival phrase "at the beginning of the section." Opp. 63. It simply recognizes that "knowingly" reaches the *later* phrase "such an act of international terrorism," which refers back to the "act of international terrorism committed, planned, or authorized by [a designated FTO]." *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (noting that "such" refers to something that has "just been mentioned").

Contrary to Plaintiffs' contention, *see* Opp. 62 n.56, this reading comports with the standard rule—in both the criminal *and civil* contexts—that the word "knowingly" applies to each element of the statutory language that follows it, *see, e.g.*, *Flores-Figueroa v. United States*, 556 U.S. 646, 647, 652-53, 657 (2009) (applying that rule in a criminal case); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436-37, 439 (6th Cir. 2016) (explaining in a civil case that the "ordinary rules of grammar" support application of that rule). It is also consistent with the statement of the chairman of the House Judiciary Committee that aiding-and-abetting liability attaches under the ATA only if the defendant had "actual knowledge"

---

F.2d at 488; *see also Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 111 n.23 (D.D.C. 2017) (distinguishing *Halberstam* and dismissing aiding-and-abetting claims for failure to plead knowledge), *vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018).

of the designated FTO's role in the relevant attack.  *See* Mem. 67.[23]

Plaintiffs fare no better with their alternative argument that Defendants knew that they were assisting attacks "committed, planned, or authorized" by Hezbollah.  Opp. 63.  Plaintiffs' only "support" for that claim are snippets from a few news articles, which they implausibly insist put the world on notice of some (vague) relationship between JAM and Hezbollah.  *Id.* at 64.  But the relevant question is whether Defendants *knowingly* provided substantial assistance to a terrorist act committed, planned, or authorized by a designated FTO—not whether they *should have known* that transactions with the Ministry would aid such an act.  And Plaintiffs fail plausibly to allege that Defendants knew their transactions with the Ministry would support terrorist attacks at all, *see supra* p. 27—let alone attacks committed, planned, or authorized by Hezbollah, *see* Mem. 51-53, 67-69.  As Plaintiffs' own sources acknowledge, there was in fact "little . . . evidence" that Hezbollah had "*any direct involvement*" with JAM.  Mem. 68 (quoting Mem. Ex. 70).

## V.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED (COUNTS 5-8)

### A.   Plaintiffs' State-Law Claims Are Time-Barred

Plaintiffs do not dispute they were injured many years before filing this action.  Thus, the relevant statutes of limitations bar their state-law claims.  Mem. 69 & n.87.

Plaintiffs invoke the discovery rule, Opp. 80, but they fail to allege any facts to support its application.  Plaintiffs no longer contend that they had "no duty" to plead a factual basis for invoking the rule, *compare* Opp. 80, *with* Dkt. 76 at 87 n.85, and for good reason.  *See, e.g.*, *Alkasabi v. Wash. Mut. Bank F.A.*, 31 F. Supp. 3d 101, 109-10 (D.D.C. 2014) (Leon, J.) (dismissing

---

[23] Plaintiffs mistakenly contend that the chairman's statement "deserves no weight."  Opp. 63.  Courts regularly rely on the floor statements of committee chairs to discern congressional intent in similar circumstances—particularly where, as here, the statement was made "just before [the law's] passage."  *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 864-65 (8th Cir. 2011); *see also Edwards v. D.C.*, 821 F.2d 651, 660 n.12 (D.C. Cir. 1987).

claims where plaintiffs did not allege facts showing due diligence).  Instead, Plaintiffs insist that reasonable diligence presents "[a]t most . . . a fact question," Opp. 80, while failing to plead any facts sufficient to raise such a question, *see id.*; *Capitol Servs. Mgmt. v. VESTA Corp.*, 318 F. Supp. 3d 265, 270 (D.D.C. 2018).  They do not allege having conducted any investigation before *2017*, and they offer nothing to suggest that an investigation *years earlier* would have had a different result, failing to explain what (if anything) changed in the interim.  Opp. 80-81.  Plaintiffs cite no case applying the discovery rule based on such bare-bones pleadings.[24]

Plaintiffs need not have had all relevant facts, known the full extent of the alleged wrongdoing, or known the identity of every alleged wrongdoer in order to be placed on notice for purposes of the discovery rule.  *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 700-02 (D.C. Cir. 2009).  As soon as a plaintiff knew of "some evidence of wrongdoing" or would have possessed such knowledge "after due investigation," the limitations period began to run.  *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 771 (D.C. 1998).  Here, Plaintiffs claim the link between the Ministry and JAM's attacks was "major, international news" that no one "could . . . have overlooked" at the time of the attacks.  SAC ¶ 11.  That put Plaintiffs on notice to investigate who had done business—even legitimate business, *id.* ¶ 179—with the Ministry.  Had they done so, they would have soon discovered Defendants' transactions with the Ministry.  Indeed, they allege that Defendants' sales to Kimadia had been public for years, *see, e.g.*, *id.* ¶¶ 49 n.7, 222, that Kimadia made its contracts publicly available starting in 2010, *id.* ¶ 190, and that those transactions were indicative of Kimadia's contracts from 2005 to 2009, *e.g.*, *id.* ¶¶ 285, 295.  And even if

---

[24] Plaintiffs' cases all involved allegations of misrepresentations, changed circumstances, or fiduciary duties—none of which is alleged here.  *See Firestone v. Firestone*, 76 F.3d 1205, 1210 (D.C. Cir. 1996); *Lee v. Wolfson*, 265 F. Supp. 2d 14, 18-19 (D.D.C. 2003); *Ray v. Queen*, 747 A.2d 1137, 1144 (D.C. 2000).

corruption were relevant to the analysis (it is not), Plaintiffs allege that corruption in the Ministry and Kimadia's procurement process was widely reported by the mid-2000s.  *E.g.*, *id.* ¶¶ 171, 222, 265.  Yet they failed to conduct any investigation into their potential claims until years later in 2017.  Plaintiffs' attempt to rely on the discovery rule is thus foreclosed by their own pleadings.

**B.**     **Plaintiffs' State-Law Allegations Would Also Fail On The Merits**

All of Plaintiffs' state-law claims share common elements, such as intent and proximate causation.  Plaintiffs do not contend that these elements either differ by state or demand a lesser showing than their ATA counterparts.  Opp. 81-83.  Thus, the Court should dismiss Plaintiffs' state-law claims based on the same fundamental flaws as their ATA claims.  *See* Mem. 71-74; *Crosby*, 921 F.3d at 627 (affirming dismissal of state law claims on proximate-causation grounds). The Court should also dismiss those claims based on additional, common defects.   For instance, although Plaintiffs argue that they need not plead actual, but-for causation, Opp. 81-82, invoking an exception for cases involving "multiple, independently sufficient factual causes," they fail to note that such cases are "rare," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013), nor do they plausibly allege that Defendants' conduct (transacting with the Ministry) would be independently sufficient to result in Plaintiffs' injuries.[25]

Only if Plaintiffs' claims could survive those common defects would the Court need to resolve any state-specific issues, such as whether the law of a state recognizes aiding-and-abetting liability or imposes a "presence" requirement on IIED claims.  *See* Mem. 74.  Plaintiffs argue their state-law claims are insulated from dismissal because the SAC is too vaguely pleaded to allow a

---

[25] Apart from incorporating their flawed ATA arguments, Plaintiffs' chief support for their IIED claims is citation of several default judgment cases, brought under a different statute, against designated state sponsors of terrorism. Opp. 81-82 (citing district court cases).  Those cases have no persuasive value, as the plaintiffs' allegations were never put to the test.  *See Boland v. Elite Terazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67-68 (D.D.C. 2011).

choice-of-law analysis.  Opp. 82 n.70.  But Plaintiffs have not merely failed to plead specific legal *theories*, as in some of the cases they cite;[26] instead, they have also repeatedly failed to plead necessary *facts* concerning their domiciles—facts solely within their possession.  Nor can Plaintiffs avoid dismissal by playing hide-the-ball and asserting that their claims may be viable under some state's laws, Opp. 82, without specifying which one, *see Hines v. Overstock.com, Inc.*, 2013 WL 4495667, at *12 (E.D.N.Y. Aug. 19, 2013).

In any event, for the reasons discussed above (including lack of proximate causation), *every* state-law claim is deficient under *any* state's law and should therefore be dismissed.

## VI.    PLAINTIFFS' CLAIMS AGAINST THE MANUFACTURER DEFENDANTS ARE ESPECIALLY DEFICIENT (ALL COUNTS)

The Manufacturer Defendants are not alleged to have interacted with the Ministry beyond registering to do business in Iraq, nor are they alleged to have interacted with JAM.  *See* Mem. 12, 47, 50-51, 54, 59-60.  They are not alleged to have negotiated with or sold goods to Kimadia or the Ministry or to have made any corrupt payments.  *Id.*  Rather, they are alleged only to have manufactured medicines or equipment, or in some cases just pharmaceutical ingredients, that other companies independently packaged and sold to the Ministry.  *Id.*  Plaintiffs now argue that the Manufacturers "directly participated in the aiding and abetting by paying bribes to register with the Ministry," Opp. 52, but the allegations they cite, SAC ¶¶ 194, 220, 250, 256, 288, 315, say only that the Manufacturers registered—*not* that they paid bribes.  Because the Manufacturer Defendants are a step further removed from even sales to the Ministry, and because manufacturing medical goods for other companies to distribute is routine commercial activity that does not satisfy any of the requirements for direct or aiding-and-abetting liability under the ATA or state law, there

---

[26] *Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 99 (D.D.C. 2016); *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, 2006 WL 3208662, at *5 (D.D.C. Nov. 7, 2006).

are even more reasons why, for the Manufacturer Defendants, Plaintiffs' claims fail as a matter of law.  Mem. 47, 59-60, 73-74.

Evidently recognizing that the Manufacturers' own conduct cannot serve as a basis for liability, Plaintiffs strain to argue that the Manufacturers are "vicariously liable," on an agency theory, for the Suppliers' alleged "assistance."  Opp. 50-52.  But this agency gambit also fails.

*First*, Plaintiffs' assertion that the Manufacturers had some "right to control" the Suppliers lacks any merit.  A vague and unsubstantiated allegation that some unnamed "Iraqi law" or regulation gave rise to an agency relationship, Opp. 50-51; SAC ¶¶ 156-57, at most states a legal conclusion that need not be accepted as true.  And it is well established that a manufacturer-supplier relationship does not by itself create a principal-agent relationship.  *See* Mem. 47 n.70; *Hull v. Eaton Corp.*, 825 F.2d 448, 457-58 (D.C. Cir. 1987).  Plaintiffs' comparisons, Opp. 51, to cases in which a supplier "facilitate[d] [a] purchase" for a selling manufacturer, rather than taking goods into its own inventory, *Elite Int'l Enter., Inc. v. Patton Wallcoverings, Inc.*, 2014 WL 1652197, at *5 (E.D. Mich. Apr. 24, 2014), or in which a manufacturer "provide[d] clear policies and procedures for the [d]istributors to follow" and "direct[ed] [their] acts," *Pontrelli v. MonaVie, Inc.*, 2014 WL 4105417, at *4 (D.N.J. Aug. 19, 2014), are inapt.  Here, Plaintiffs allege that an agency relationship was created because the Suppliers sometimes submitted letters with their bids confirming that they "had authority" to sell products that had been manufactured by others.  SAC ¶ 156; *see also id.* ¶¶ 193, 219, 249, 255, 287, 314.  But that is obviously insufficient to establish agency, because anytime a manufacturer provides products to a supplier (absent some agreement to the contrary), it implicitly "authorizes" their sale.

*Second*, Plaintiffs do not allege that the Manufacturer Defendants *actually exercised* control over the Supplier Defendants, which is another prerequisite of an agency relationship.  *E.g.*,

*Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000); *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C. 2008); *Acosta Orellana*, 711 F. Supp. 2d at 112.   Plaintiffs erroneously claim, Opp. 51, that "[a]ctual control" is not required, citing *Lopez v. Council on American-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 499 (D.C. Cir. 2016).   But *Lopez* involved the classic agency scenario of an employee operating at the direction of his employer-supervisor, and the court explicitly held that a principal-agent relationship existed because the employer had the "ability to control" the employee and "*in fact exerted that control*"—a fact that Plaintiffs fail to plead.   *Id.* at 499 (emphasis added).

*Finally*, Plaintiffs' agency theory is not saved by their assertion that each set of Manufacturers and Suppliers acted "as an integrated business unit."  Opp. 51-52.  Well-established principles of corporate separateness dictate that the Manufacturers are not liable for the Suppliers' conduct based solely on their corporate relationship.  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998).   And the cases Plaintiffs cite for this theory involved parent corporations as the principals and their "distribution subsidiar[ies]" as the agents.  Opp. 52 n.50.  This case, however, involves the inverse.  The Manufacturer Defendants—the supposed "principals"—are allegedly the wholly or partly-owned subsidiaries, or in some cases corporate siblings, of their alleged "agents."   SAC  ¶¶ 17-21, 23-29, 31-34, 36-37, 188, 211, 245, 281, 310.   Such corporate relationships cannot be squared with Plaintiffs' theory of purported agency.

In sum, Plaintiffs' claims against the Manufacturer Defendants are especially defective and plainly should be dismissed.

## CONCLUSION

For the foregoing reasons, all of Plaintiffs' claims should be dismissed with prejudice.

Dated: June 5, 2019

Respectfully submitted,

/s/ Neil H. MacBride
Neil H. MacBride (D.C. Bar No. 439137)
Kenneth J. Wainstein (D.C. Bar No. 451058)
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
Tel: (202) 962-7030; Fax: (202) 962-7118
neil.macbride@davispolk.com

Paul S. Mishkin (*admitted pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4292; Fax: (212) 701-5292
paul.mishkin@davispolk.com

*Counsel for Defendants AstraZeneca
Pharmaceuticals, LP and AstraZeneca UK
Limited*

/s/ John B. Bellinger
John B. Bellinger III (D.C. Bar No. 405059)
David J. Weiner (D.C. Bar No. 499806)
Robert A. DeRise (D.C. Bar No. 1005355)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson (D.C. Bar No.
994989)
ARNOLD & PORTER KAYE SCHOLER
LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-2325
Reeves.Anderson@arnoldporter.com

*Counsel for Defendants GE Healthcare USA
Holding LLC, GE Medical Systems
Information Technologies, Inc., and GE
Medical Systems Information Technologies
GmbH*

(signatures continue on next page)

/s/ Kannon K. Shanmugam
Kannon K. Shanmugam (D.C. Bar No.
474304)
Jeh C. Johnson (D.C. Bar No. 461627)
PAUL, WEISS, RIFKIND,
 WHARTON &
GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com

John F. Baughman (D.C. Bar No. NY0254)
PAUL, WEISS, RIFKIND,
 WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
jbaughman@paulweiss.com

*Counsel for Defendants Johnson & Johnson,
Cilag GmbH International, Ethicon Endo-
Surgery, LLC, Ethicon, Inc., Janssen Ortho
LLC, Janssen Pharmaceutica NV, Johnson &
Johnson (Middle East) Inc., and Ortho
Biologics LLC*

/s/ John E. Hall
John E. Hall (D.C. Bar No. 415364)
Beth S. Brinkmann (D.C. Bar No. 477771)
David M. Zionts (D.C. Bar No. 995170)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Telephone: (202) 662-5987
Facsimile: (202) 778-5987
jhall@cov.com

*Counsel for Defendant F. Hoffmann-La
Roche Ltd*

/s/ Joseph G. Petrosinelli
Joseph G. Petrosinelli (D.C. Bar No. 434280)
Christopher N. Manning (D.C. Bar No.
464069)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
jpetrosinelli@wc.com

*Counsel for Defendants Pfizer Inc.,
Pfizer Pharmaceuticals LLC, Pfizer
Enterprises SARL, Pharmacia
& Upjohn Company LLC, and Wyeth
Pharmaceuticals Inc.*

/s/ Patrick J. Carome
Patrick J. Carome (D.C. Bar. No. 385676)
David W. Bowker (D.C. Bar. No. 989309)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
patrick.carome@wilmerhale.com

*Counsel for Defendants Genentech, Inc. and
Hoffmann-La Roche Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this fifth day of June 2019, I electronically transmitted a copy of the foregoing DEFENDANTS' REPLY IN SUPPORT OF THEIR RULE 12(b)(1) AND 12(b)(6) MOTIONS TO DISMISS to the Clerk's Office using the CM/ECF system, and service was effected electronically to all counsel of record.

/s/ Patrick J. Carome
PATRICK J. CAROME

48