**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSHUA ATCHLEY *et al.*, | |
| Plaintiffs, | |
| | Case No. 17-cv-02136-RJL |
| v. | |
| ASTRAZENECA UK LIMITED *et al.*, | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
RULE 12(b)(1) AND 12(b)(6) MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 4

    A.    Legal Background ............................................................................................ 4

    B.    Factual Background ......................................................................................... 5

        1.    Jaysh al-Mahdi and Corruption at the Iraqi Ministry of Health............................ 5

        2.    Defendants' Payments to Jaysh al-Mahdi .......................................................... 11

        3.    Jaysh al-Mahdi's Hezbollah-Sponsored Campaign of Terrorism......................... 13

    C.    Plaintiffs' Claims ............................................................................................ 14

ARGUMENT .................................................................................................................... 15

    I.    DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE IT DEPENDS ON EXTRA-PLEADING MATERIALS THE COURT SHOULD DISREGARD.......... 15

    II.    THE POLITICAL QUESTION DOCTRINE DOES NOT SUPPORT DISMISSAL 18

        A.    The Second Amended Complaint Raises Justiciable Legal Questions About A Federal Statute And Traditional Tort Law ............................................................. 18

        B.    Plaintiffs' Claims Do Not Require This Court To Pass Judgment On U.S. Policy Toward The Ministry ......................................................................................... 21

        C.    Plaintiffs' Claims Are Consistent With U.S. Foreign Policy................................. 22

    III.    THE ACT-OF-WAR DEFENSE DOES NOT BAR PLAINTIFFS' CLAIMS.......... 29

        A.    Jaysh al-Mahdi Was Not A "Military Force" ....................................................... 29

            1.    Jaysh al-Mahdi consistently violated the laws of war....................................... 29

            2.    The phrase "of any origin" does not help Defendants ...................................... 32

            3.    Defendants rely on improper criteria in classifying Jaysh al-Mahdi as a "military force" ................................................................................................ 34

        B.    Jaysh al-Mahdi's Attacks On Plaintiffs Did Not Occur "In The Course Of" Any "Armed Conflict" .............................................................................................. 36

i

IV.     PLAINTIFFS PROPERLY PLEAD AIDING-AND-ABETTING CLAIMS
        (COUNTS ONE AND TWO) ....................................................................................... 39

    A.     Plaintiffs Adequately Allege That Defendants Knowingly And Substantially
           Assisted Jaysh al-Mahdi's Acts Of International Terrorism ................................... 40

        1.     Factors 1 and 2:  nature of the act assisted and amount of the aid ................... 40

            a.     Defendants' assistance was substantial in kind and amount .................... 40

            b.     Defendants' arguments lack merit ............................................................ 43

        2.     Factor 5:  Defendants' state of mind .................................................................. 46

        3.     Factors 3, 4, and 6:  presence, relationship, and duration ................................. 49

        4.     The Manufacturers are also liable ..................................................................... 50

    B.     Plaintiffs Adequately Allege That Hezbollah "Committed, Planned, Or
           Authorized" The Relevant Acts Of International Terrorism ................................... 52

        1.     Hezbollah "planned" the terrorist attacks that injured Plaintiffs ...................... 53

        2.     Hezbollah "authorized" the terrorist attacks that injured Plaintiffs ................. 56

        3.     Hezbollah "planned and authorized" Jaysh al-Mahdi's  illegal terrorist
               enterprise .......................................................................................................... 58

        4.     Defendants' knowledge argument regarding Hezbollah lacks merit ............... 61

V.      PLAINTIFFS PROPERLY PLEAD PRIMARY-LIABILITY CLAIMS (COUNTS
        THREE AND FOUR) ................................................................................................. 64

    A.     Plaintiffs Properly Plead Proximate Cause .......................................................... 65

        1.     Defendants proximately caused Plaintiffs' injuries by directly financing the
               terrorist group responsible for the attacks at issue ........................................... 65

        2.     The Ministry was not a causation-defeating intermediary ................................ 69

        3.     Defendants' other causation arguments lack merit ........................................... 72

    B.     Defendants' Conduct Was "International Terrorism" .......................................... 74

    C.     Plaintiffs Adequately Plead Two Predicate Crimes ............................................. 76

        1.     Plaintiffs plead the necessary scienter ............................................................. 76

        2.     The "medicine" exemption does not support dismissal of Count Three ........... 77

VI.    PLAINTIFFS PROPERLY PLEAD VIOLATIONS OF STATE LAW (COUNTS
       FIVE THROUGH EIGHT) ........................................................................ 80

       A.    Fact Issues Preclude Defendants' Statute-Of-Limitations Argument ................... 80

       B.    Defendants' Tort-Law Arguments Lack Merit ...................................... 81

             1.    Intentional infliction of emotional distress (Count Five) ................................ 81

             2.    Assault and battery (Count Six) .................................................. 83

             3.    Wrongful death and survival (Counts Seven and Eight) ................................ 83

CONCLUSION ........................................................................................ 83

# TABLE OF AUTHORITIES*

**Page(s)**

## Cases

*Abecassis v. Wyatt,*
  785 F. Supp. 2d 614 (S.D. Tex. 2011).............................................................................*passim*

Abecassis v. Wyatt
  7 F. Supp. 3d 668 (S.D. Tex. 2014)..............................................................................3, 71, 74

ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,
  957 F. Supp. 1308 (S.D.N.Y. 1997) ......................................................................................41

ACA Int'l v. FCC,
  885 F.3d 687 (D.C. Cir. 2018)...............................................................................................64

Advocate Health Care Network v. Stapleton,
  137 S. Ct. 1652 (2017) ..........................................................................................................63

Aetna Cas. & Sur. Co. v. Leahey Constr. Co.,
  219 F.3d 519 (6th Cir. 2000)...........................................................................................46, 62

Aktieselskabet AF 21. November 21 v. Fame Jeans Inc.,
  525 F.3d 8 (D.C. Cir. 2008)...................................................................................................71

Ali v. Obama,
  736 F.3d 542 (D.C. Cir. 2013)...............................................................................................36

Almog v. Arab Bank, PLC,
  471 F. Supp. 2d 257 (E.D.N.Y. 2007) ..................................................................................19

Alsabri v. Obama,
  764 F. Supp. 2d 60 (D.D.C. 2011).........................................................................................36

*Al-Tamimi v. Adelson,*
  916 F.3d 1 (D.C. Cir. 2019)..............................................................................................*passim*

Bancroft Glob. Dev. v. United States,
  330 F. Supp. 3d 82 (D.D.C. 2018).........................................................................................60

Banneker Ventures, LLC v. Graham,
  798 F.3d 1119 (D.C. Cir. 2015)..........................................................................15, 17, 60, 77

---

* Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Baker v. Carr,*
  369 U.S. 186 (1962) ........................................................................... 18, 19, 20

*Baker v. Farrand,*
  26 A.3d 806 (Me. 2011) ............................................................................... 59

*Baker v. Gurfein,*
  744 F. Supp. 2d 311 (D.D.C. 2010) ............................................................. 83

*Bennett v. Islamic Rep. of Iran,*
  507 F. Supp. 2d 117 (D.D.C. 2007) ............................................................. 81

*Biton v. Palestinian Interim Self-Gov't Auth.,*
  412 F. Supp. 2d 1 (D.D.C. 2005) ..................................................... 18, 19, 20, 37

*Bodoff v. Islamic Rep. of Iran,*
  424 F. Supp. 2d 74 (D.D.C. 2006) ............................................................... 83

*\*Boim v. Holy Land Found. for Relief & Dev.,*
  549 F.3d 685 (7th Cir. 2008) ............................................................... *passim*

*Brill v. Chevron Corp.,*
  2017 WL 76894 (N.D. Cal. Jan. 9, 2017) ................................................... 75

*Bryant v. Yosemite Falls Café, Inc.,*
  2018 WL 372704 (E.D. Cal. Jan. 11, 2018) ............................................... 26

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
  274 F. Supp. 2d 86 (D.D.C. 2003) ................................................. 4, 67, 80, 81

*Camp v. Dema,*
  948 F.2d 455 (8th Cir. 1991) ................................................................ 46, 49

*Cause of Action Inst. v. Tillerson,*
  285 F. Supp. 3d 201 (D.D.C. 2018) ........................................................... 25

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., In re,*
  190 F. Supp. 3d 1100 (S.D. Fla. 2016) .................................................... 40-41

*\*Chiquita Brands Int'l, Inc., In re,*
  284 F. Supp. 3d 1284 (S.D. Fla. 2018) ............................................ 47, 66, 73, 74

*City of Chicago v. Purdue Pharma L.P.,*
  211 F. Supp. 3d 1058 (N.D. Ill. 2016) ....................................................... 52

v

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002) ........................................................................... 56

*CNE Direct, Inc. v. Blackberry Corp.*,
  821 F.3d 146 (1st Cir. 2016) ............................................................. 51

*C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*,
  508 F.2d 1354 (7th Cir. 1975) ........................................................... 79

*Cooper v. Tokyo Elec. Power Co.*,
  166 F. Supp. 3d 1103 (S.D. Cal. 2015), *aff'd*, 860 F.3d 1193 (9th Cir. 2017) .................. 22, 23

*Corrie v. Caterpillar, Inc.*,
  503 F.3d 974 (9th Cir. 2007) ............................................................. 22

*Doe v. Exxon Mobil Corp.*,
  473 F.3d 345 (D.C. Cir. 2007) ................................................ 19, 21, 28

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) .... 49

*Doe v. Mattis*,
  889 F.3d 745 (D.C. Cir. 2018) ........................................................... 35

*Domestic Airline Travel Antitrust Litig., In re*,
  221 F. Supp. 3d 46 (D.D.C. 2016) ..................................................... 17

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
  246 F. Supp. 3d 52 (D.D.C. 2017) ..................................................... 83

*Elahi v. Islamic Rep. of Iran*,
  124 F. Supp. 2d 97 (D.D.C. 2000) ..................................................... 58

*Elite Int'l. Enter., Inc. v. Patton Wallcoverings, Inc.*,
  2014 WL 1652197 (E.D. Mich. Apr. 24, 2014) ................................... 51

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ........................................................... 20

*Estate of Klieman v. Palestinian Auth.*,
  424 F. Supp. 2d 153 (D.D.C. 2006) ........................................ 19, 37, 38

*Feldman v. FDIC*,
  879 F.3d 347 (D.C. Cir. 2018) ........................................................... 15

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996)..................................................................... 80

*Flores-Figueroa v. United States*,
   556 U.S. 646 (2009) ..................................................................................... 62

*Freeman v. HSBC Holdings PLC*,
   2018 WL 3616845, slip op. (E.D.N.Y. July 27, 2018)........................... 30, 36, 44, 69

*FTC v. Wash. Data Res.*,
   856 F. Supp. 2d 1247 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013)...................... 16

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) .........................................................*passim*

*Gill v. Islamic Rep. of Iran*,
   249 F. Supp. 3d 88 (D.D.C. 2017)............................................................... 83

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
   422 F. Supp. 2d 96 (D.D.C. 2006)............................................................ 19, 76

*Goldberg v. UBS AG*,
   660 F. Supp. 2d 410 (E.D.N.Y. 2009).........................................................*passim*

*Gourdine v. Karl Storz Endoscopy-America, Inc.*,
   223 F. Supp. 3d 475 (D.S.C. 2016) ............................................................ 52

*Graham v. SEC*,
   222 F.3d 994 (D.C. Cir. 2000)................................................................... 49

*Gross v. German Found. Indus. Initiative*,
   456 F.3d 363 (3d Cir. 2006) ..................................................................... 28

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ................................................................................. 37

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983).................................................................*passim*

*Hale v. United States*,
   2015 WL 7760161 (D.D.C. Dec. 2, 2015) ................................................. 17

*Herbert v. Nat'l Acad. of Scis.*,
   974 F.2d 192 (D.C. Cir. 1992).................................................................. 17

*Hourani v. Mirtchev*,
  796 F.3d 1 (D.C. Cir. 2015) ................................................................. 18, 21

*Hull v. Eaton Corp.*,
  825 F.2d 448 (D.C. Cir. 1987) ...................................................................... 51

*Hurd v. District of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) ............................................................... 16, 17

*Hunt v. Rodriguez*,
  2009 WL 173070 (E.D. Cal. Jan. 26, 2009) ................................................. 17

*Ibrahim v. Titan Corp.*,
  391 F. Supp. 2d 10 (D.D.C. 2005) ............................................................... 21

*Jakobovits v. PHL Variable Ins. Co.*,
  2018 WL 2291311 (E.D.N.Y. May 18, 2018) ............................................... 82

*Japan Whaling Ass'n. v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) ............................................................................... 18, 19

*Jerome Stevens Pharm., Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) ................................................................... 15

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ................................................................................ 24

*Jones v. Lattimer*,
  29 F. Supp. 3d 5 (D.D.C. 2014) ................................................................... 82

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995) .......................................................................... 24

*Kaplan v. Cent. Bank of Islamic Rep. of Iran*,
  961 F. Supp. 2d 185 (D.D.C. 2013) ....................................................... 31, 33

*Kaplan v. Cent. Bank of Islamic Rep. of Iran*,
  896 F.3d 501 (D.C. Cir. 2018) ............................................................... 29, 38

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) ............................................................. *passim*

*Khairkhwa v. Obama*,
  703 F. 3d 547 (D.C. Cir. 2012) ................................................................... 36

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................. 16, 17

*Knox v. Palestine Liberation Org.*,
  306 F. Supp. 2d 424 (S.D.N.Y. 2004) ........................................................... 19

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ....................................................................... 19

*Lee v. Wolfson*,
  265 F. Supp. 2d 14 (D.D.C. 2003) .......................................................... 80, 81

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..................................................................................... 66

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) .................................................... 4, 16, 41, 74

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ................................................................... *passim*

*Lipman v. Lehman*,
  1996 WL 420869 (D.D.C. July 19, 1996) ...................................................... 75

*Lopez v. Council on American-Islamic Relations Action Network, Inc.*,
  826 F.3d 492 (D.C. Cir. 2016) ..................................................................... 51

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992) ........................................................................ 61

*McMahon v. Presidential Airways, Inc.*,
  460 F. Supp. 2d 1315 (M.D. Fla. 2006), *aff'd* 502 F.3d 1331 (11th Cir. 2007) ...................... 21

*Meyer v. Holley*,
  537 U.S. 280 (2003) ..................................................................................... 50

*Miller v. Arab Bank, PLC*,
  --- F. Supp. 3d ---, 2019 WL 1115027 (E.D.N.Y. Mar. 11, 2019) .................................. *passim*

*Mohamed v. Select Portfolio Servicing, Inc.*,
  215 F. Supp. 3d 85 (D.D.C. 2016) ................................................................. 82

*Molins PLC v. Textron, Inc.*,
  48 F.3d 1172 (Fed. Cir. 1995) ..................................................................... 75

*Morris v. Khadr*,
　415 F. Supp. 2d 1323 (D. Utah 2006) ............................................................. 34, 35

*Morris v. McCarthy*,
　825 F.3d 658 (D.C. Cir. 2016)............................................................................... 72

*Murray v. Amalgamated Transit Union*,
　206 F. Supp. 3d 202 (D.D.C. 2016)...................................................................... 28

*Nixon v. United States*,
　506 U.S. 224 (1993) ............................................................................................... 18

*O'Sullivan v. Deutsche Bank AG*,
　2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)................................................. 69, 75

*Ofisi v. BNP Paribas, S.A.*,
　278 F. Supp. 3d 84 (D.D.C. 2017).....................................................................44-45

*Ofisi v. BNP Paribas, S.A.*,
　2018 WL 396234 (D.D.C. Jan. 11, 2018)........................................................ 45, 49

*Owens v. BNP Paribas S.A.*,
　235 F. Supp. 3d 85 (D.D.C. 2017)................................................................... 69, 70

*\*Owens v. BNP Paribas S.A.*,
　897 F.3d 266 (D.C. Cir. 2018)....................................................................*passim*

*Owens v. Rep. of Sudan*,
　531 F.3d 884 (D.C. Cir. 2008)......................................................................... 66, 72

*\*Owens v. Rep. of Sudan*,
　864 F.3d 751 (D.C. Cir. 2017)......................................................................... 65, 66

*Paroline v. United States*,
　572 U.S. 434 (2014) ........................................................................................ 65, 67

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
　652 F. Supp. 2d 495 (S.D.N.Y. 2009) ................................................................... 52

*People v. Corpening*,
　386 P.3d 379 (Cal. 2016)....................................................................................... 60

*Peterson v. Islamic Rep. of Iran*,
　515 F. Supp. 2d 25 (D.D.C. 2007), *abrogated on other grounds*,
　*Mohammadi v. Islamic Rep. of Iran*, 782 F.3d 9 (D.C. Cir. 2015)....................... 82, 83

*Pontrelli v. MonaVie, Inc.*,
  2014 WL 4105417 (D.N.J. Aug. 19, 2014) ........................................................ 51

*Rael v. Cadena*,
  604 P.2d 822 (N.M. 1979) ............................................................................... 48

*Ray v. Queen*,
  747 A.2d 1137 (D.C. 2000) ............................................................................. 80

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997) ........................................................................................ 75

*Rep. of Sudan v. Owens*,
  194 A.3d 38 (D.C. 2018) ................................................................................. 82

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ................................................................. 69, 70, 71

*Russello v. United States*,
  464 U.S. 16 (1983) .......................................................................................... 56

*Saldana v. Occidental Petroleum Corp.*,
  774 F.3d 544 (9th Cir. 2014) ........................................................................... 24

*Shatsky v. Palestine Liberation Org.*,
  2017 WL 2666111 (D.D.C. June 20, 2017) ..................................................... 65

*Siegel v. HSBC Bank USA, N.A.*,
  2018 WL 3611967 (S.D.N.Y. July 27, 2018)................................................... 45

*Smith v. District of Columbia*,
  413 F.3d 86 (D.C. Cir. 2005).................................................................... 65, 72

*Stansell v. Rep. of Cuba*,
  217 F. Supp. 3d 320 (D.D.C. 2016)................................................................. 81

*Stansell v. Revolutionary Armed Forces of Colombia*,
  771 F.3d 713 (11th Cir. 2014) ........................................................................ 56

*Strauss v. Credit Lyonnais, S.A.*,
  2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) .............................................. 47, 73

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013) ............................................................ 70

*Taamneh v. Twitter, Inc.*,
  343 F. Supp. 3d 904 (N.D. Cal. 2018)................................................. 44

*Techniarts Eng. v. United States*,
  51 F.3d 301 (D.C. Cir. 1995)............................................................ 58

*Terrorist Bombings of U.S. Embassies in E. Africa, In re*,
  552 F.3d 93 (2d Cir. 2008) ............................................................. 35

*Tex. Mun. Power Agency v. EPA*,
  89 F.3d 858 (D.C. Cir. 1996)........................................................... 63

*Twenty First Century L.P.I. v. LaBianca*,
  19 F. Supp. 2d 35 (E.D.N.Y. 1998) ................................................. 41

*Ungar v. Palestine Liberation Org.*,
  402 F.3d 274 (1st Cir. 2005) .......................................................... 19

*United States v. Akinyoyenu*,
  199 F. Supp. 3d 106 (D.D.C. 2016)................................................56-57

*United States v. Assi*,
  586 F. Supp. 2d 841 (E.D. Mich. 2008) ........................................... 36

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018)............................................ 15, 17

*United States v. Chang Ru Meng Backman*,
  817 F.3d 662 (9th Cir. 2016) .......................................................... 63

*United States v. Dewalt*,
  92 F.3d 1209 (D.C. Cir. 1996)......................................................... 62

*United States v. Farhane*,
  634 F.3d 127 (2d Cir. 2011) ........................................................... 79

*United States v. Fiorillo*,
  186 F.3d 1136 (9th Cir. 1999) ........................................................ 63

*United States v. Haipe*,
  769 F.3d 1189 (D.C. Cir. 2014)....................................................... 76

*United States v. Jennings*,
  496 F.3d 344 (4th Cir. 2007) .......................................................... 63

*United States v. Johnson*,
    970 F.2d 907 (D.C. Cir. 1992) ........................................................................ 55

*United States v. Jones*,
    471 F.3d 535 (4th Cir. 2006) ......................................................................... 62

*United States v. Parnell*,
    581 F.2d 1374 (10th Cir. 1978) ...................................................................... 55

*United States v. Pregler*,
    925 F.2d 268 (8th Cir. 1991) ......................................................................... 59

*United States v. Prosperi*,
    573 F. Supp. 2d 436 (D. Mass. 2008) ............................................................ 37

*United States v. Right to Use & Occupy 3.38 Acres of Land, More or Less, in Alexandria*,
    484 F.2d 1140 (4th Cir. 1973) ....................................................................... 58

*United States v. Shah*,
    474 F. Supp. 2d 492 (S.D.N.Y. 2007) ........................................................... 36

*United States v. Staten*,
    581 F.2d 878 (D.C. Cir. 1978) ....................................................................... 61

*United States v. TDC Mgmt. Corp.*,
    24 F.3d 292 (D.C. Cir. 1994) ......................................................................... 49

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ...................................................................................... 75

*United States v. Yunis*,
    924 F.2d 1086 (D.C. Cir. 1991) ..................................................................... 30

*United States ex rel. Head v. Kane Co.*,
    798 F. Supp. 2d 186 (D.D.C. 2011) ........................................................... 78-79

*United States ex rel. Heath v. AT&T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015) ....................................................................... 78

*Universal Cable Prods. LLC v. Atl. Specialty Ins. Co.*,
    278 F. Supp. 3d 1165 (C.D. Cal. 2017) .......................................................... 36

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ...................................................................................... 81

*Weiss v. Arab Bank, PLC*,
  2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)........................................ 31, 34, 35

*Weiss v. Nat'l Westminster Bank PLC*,
  453 F. Supp. 2d 609 (E.D.N.Y. 2006).............................................. 4, 66, 74

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014) ...................................................... 74

*Weiss v. Nat'l Westminster Bank PLC*,
  278 F. Supp. 3d 636 (E.D.N.Y. 2017) ........................................ 52, 67, 70

*Wilderness Soc'y v. Griles*,
  824 F.2d 4 (D.C. Cir. 1987)....................................................... 17

*Wultz v. Islamic Rep. of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ............................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ........................................................ 18, 19, 20

## Statutes, Rules, Codes, and Regulations

1 U.S.C. § 1 ............................................................................ 44

8 U.S.C. § 1189........................................................................ 13, 61

Foreign Corrupt Practices Act of 1977 ("FCPA"),
  15 U.S.C. § 78dd-1, *et seq.*

    § 78dd-1(a)....................................................................... 5

    § 78m(b)(2)(A)................................................................... 5

18 U.S.C. § 1111 ...................................................................... 39

18 U.S.C. § 1114 ...................................................................... 39

18 U.S.C. § 1962

    § 1962 (b)................................................................... 59, 60

    § 1962(c)................................................................... 59, 60

    § 1962(d)...................................................................... 59

18 U.S.C. § 2331(1) ................................................................................ 39, 59, 74

§ 2331(1)(A) ........................................................................... 39, 59, 60, 76

§ 2331(1)(B) ..................................................................................... 31, 74

§ 2331(1)(B)(ii) ....................................................................................... 39

§ 2331(3) .................................................................................................. 44

§ 2331(4) ...................................................................................... 29, 36, 37

§ 2331(4)(A) ..................................................................................... 29, 34

§ 2331(4)(B) ................................................................... 29, 32, 33, 34

§ 2331(4)(C) ...................................................................................... passim

§ 2331(6)(A) ............................................................................................ 32

§ 2331(6)(A)(i) ....................................................................................... 31

§ 2331(6)(B) ............................................................................................ 32

18 U.S.C. § 2333 ............................................................................................ 18

§ 2333(a) ........................................................................................... passim

§ 2333(d) ........................................................................................... 44, 50

§ 2333(d)(1) .............................................................................................. 44

§ 2333(d)(2) ...................................................................................... passim

18 U.S.C. § 2336

§ 2336(a) ............................................................................................... 2, 29

18 U.S.C. § 2337 ............................................................................................ 20

18 U.S.C. § 2339A ........................................................................... 56, 65, 76, 77

§ 2339A(a) ............................................................................................... 77

§ 2339A(b)(1) ..................................................................................... 77, 79

18 U.S.C. § 2339B(a)(1) ...................................................................................... 63

18 U.S.C. § 2339C ............................................................................... 65, 76, 77

18 U.S.C. § 2339D ............................................................................................ 35

Anti-Terrorism Clarification Act of 2018,
    Pub. L. No. 115-253, 132 Stat. 3183 (2018) ............................................ 31

Emergency Suppl. Appropriations Act for Defense & for the Reconstruction of Iraq
    & Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (2003) ................... 27

Justice Against Sponsors of Terrorism Act ("JASTA"),
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................................. 4

        § 2(a)(3) ................................................................................................ 56

        § 2(a)(4) ........................................................................................... 5, 49

        § 2(a)(5) .................................................................................. 39, 60, 62

        § 2(a)(6) ......................................................................... 5, 45, 49, 66

        § 2(a)(7) .......................................................................................... 49, 64

        § 2(b) ...................................................................................... 5, 49, 55, 64

Violent Crime and Enforcement Act of 1994,
    Pub. L. No. 103-322, 108 Stat. 1796 ....................................................... 56

Fed. R. Civ. P. 8 .................................................................................................. 78

Fed. R. Civ. P. 9(b) ............................................................................................ 78

Fed. R. Civ. P. 12(b)(1) ............................................................................. *passim*

Fed. R. Civ. P. 15(a) .......................................................................................... 83

Fed. R. Evid. 201(b) ........................................................................................... 16

Fed. R. Evid. 404(b) ........................................................................................... 55

## Other Authorities, Legislative, and Agency Materials

H.R. Rep. No. 115-858 (2018) ............................................................. 31, 32, 33

H.R. Conf. Rep. No. 104-518 (1996) ........................................................................ 79

S. Rep. No. 102-342 (1992) ............................................................................. *passim*

2 Wigmore on Evidence § 304 .................................................................................. 55

Judgement, *Prosecutor v. Kordic & Cerkez*, ICTY Case No. IT-95-14/2-A
   (Dec. 17, 2004) ..................................................................................................... 55

*Oxford English Dictionary* (3d ed. 2002) .............................................................. 35

Restatement (Second) of Torts § 46 (1964) ............................................................. 82

Restatement (Second) of Torts § 46 cmt. l (1964) .................................................. 82

Restatement (Second) of Torts § 876 cmt. d (1979) ............................................... 45

Restatement (Second) of Torts § 876(b) (1979) ..................................................... 83

Restatement (Third) of Agency § 1.01 (2006) ........................................................ 50

Restatement (Third) of Agency § 1.01 cmt. c (2006) ............................................. 51

Dep't of Def., *Law of War Manual* (updated Dec. 2016) ................................ 31, 33

Sen. Patrick Leahy, *Questions for the Record, Rod J. Rosenstein* (2017),
   https://goo.gl/nbeAqA .............................................................................................. 5

Tr. of Status Conf., *SEC v. Int'l Bus. Machs. Corp.*, No. 11-cv-563
   (D.D.C. Dec. 20, 2012), Dkt. 10 ............................................................................ 5

U.S. Dep't of Justice & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*
   (Nov. 14, 2012), https://www.justice.gov/criminal-fraud/fcpa-guidance ................ 5

Internet Archive Wayback Machine,
   http://web.archive.org/ .......................................................................................... 28

*Webster's Third New Int'l Dictionary Unabridged* (3d ed. 2002) ................. *passim*

*Webster's New World College Dictionary* (4th ed. 2010) ..................................... 34

## INTRODUCTION

Plaintiffs are American service members and civilians, and their families, who were attacked in Iraq between 2005 and 2011 by a Hezbollah-sponsored terrorist group called "Jaysh al-Mahdi."  Defendants are large medical-supply companies that knowingly financed those attacks.  The reason was straightforward:  Jaysh al-Mahdi openly controlled the Iraqi Ministry of Health ("Ministry"), and Defendants obtained lucrative contracts from the Ministry by making corrupt payments to the terrorists who ran it.  Those payments, in turn, supplied Jaysh al-Mahdi with funding for things like buying weapons and paying recruits.  By 2006, due in no small part to its control of the Ministry, Jaysh al-Mahdi became the deadliest terrorist group in Iraq.  It murdered and wounded thousands of Americans, including Plaintiffs and their family members.

Defendants financed Jaysh al-Mahdi both in cash and in "free goods."  With the latter, Defendants structured their transactions to deliver batches of extra, off-book medical goods they knew Jaysh al-Mahdi would use for terrorist ends.  Those goods functioned in Iraq as cash equivalents – easily monetized on the black market or used as currency to pay terrorist salaries – and Defendants knew they helped fund Jaysh al-Mahdi's terrorist operations.  Indeed, Defendants finalized their corrupt transactions at in-person meetings surrounded by fighters, weapons, and jihadist propaganda making clear that they were helping terrorists.  Public news reports repeatedly documented the same connection.  Yet Defendants wanted to make money off the Ministry, so they proceeded with their corrupt transactions anyway.  For that, they are liable to Plaintiffs under the federal Anti-Terrorism Act ("ATA") and various state laws.

Defendants' motion to dismiss reads like a jury argument.  Nearly 30 pages are devoted not to Plaintiffs' allegations, but to an elaborate factual narrative – cobbled together from 753 pages of Internet research – about U.S. foreign policy in Iraq.  In Defendants' telling, the U.S. government *wanted* them to violate federal law and funnel corrupt payments to the reprehensible

terrorists who ran the Ministry.  Of course, they have no real evidence for that claim.  Nor do they acknowledge that DOJ is criminally investigating them for the matters Plaintiffs allege. Dkt. 86 at 1-2.  Instead, they cite a hodgepodge of unsubstantiated materials suggesting that the U.S. government broadly wanted to rebuild Iraq's health infrastructure after the U.S. invasion. Such materials, in the absence of a sponsoring witness, would be worth little at summary judgment.  Using them to dismiss a case like this on the pleadings would be unprecedented.

That flaw (among others) sinks Defendants' lead argument under the political question doctrine.  Plaintiffs' claims do not require the resolution of any political question; they apply a private cause of action to private companies.  This Court can apply the statute Congress drafted without so much as mentioning the separate policy questions Defendants strain to raise.  But if the Court reaches those questions, the answer is simple:  Defendants undermined U.S. policy by financing terrorists through a corrupt scheme that is now the subject of a criminal inquiry.

Defendants' "act of war" defense is even weaker.  18 U.S.C. § 2336(a).  That defense covers wartime attacks by "military forces," *id.* § 2331(4)(C), not criminal groups like Jaysh al-Mahdi that ignore the laws of war.  Jaysh al-Mahdi bore no resemblance to a traditional military: its fighters dressed like non-combatants; it slaughtered thousands of innocent civilians; it used ambulances, hospitals, and children to launch attacks; and it tortured and executed the Americans it captured.  Defendants' act-of-war argument sanitizes those shameful acts.  It also seeks to transform Jaysh al-Mahdi into a "military force" based on characteristics that are typical of virtually every terrorist group in the world, including al-Qaeda and Hezbollah.  That argument defies the ATA's text and purpose, and the Court should reject it out of hand.

Defendants' arguments about the elements of Plaintiffs' claims, which begin more than halfway through their 74-page brief, are also unfounded.  Congress enacted the ATA to stanch

the flow of resources to terrorist groups, and Defendants here knowingly (or recklessly) did what the ATA was designed to curtail.  They not only provided Jaysh al-Mahdi members with corrupt payments that helped fund attacks; they did so to win contracts from an institution that was central to Jaysh al-Mahdi's terrorist operations.  Such payments offer a textbook case for ATA liability.  Indeed, two federal judges have upheld strikingly similar claims based on kickbacks companies paid to secure commercial contracts from Saddam Hussein's regime, which Saddam used to fund terrorism abroad.  *See Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) ("*Abecassis I*"); *Abecassis v. Wyatt*, 7 F. Supp. 3d 668 (S.D. Tex. 2014) ("*Abecassis II*").  Given the direct nexus between the Ministry and Jaysh al-Mahdi, Plaintiffs' claims are even stronger.

With no answer for *Abecassis* or cases like it, Defendants pin their hopes on a different line of cases under which companies that process financial transactions for an independent sovereign country (like Sudan or Iran) are not, without more, liable for attacks committed by some *other* terrorist group separately funded by that country.  But the Ministry here was not the "independent intermediary" those cases demand;[1] it was controlled by Jaysh al-Mahdi and part and parcel of the group's terrorist architecture.  Defendants also made frequent extra-contractual cash payments *directly* to Jaysh al-Mahdi members, without routing them through the Ministry at all.  And they did all this while Jaysh al-Mahdi openly used the Ministry's assets – including its headquarters, ambulances, and security personnel – to conduct terrorist attacks in Iraq.

Defendants can cite no case dismissing ATA claims like the ones Plaintiffs bring here.  Instead, they try to portray the Ministry as an independent, causation-defeating intermediary based on a disputed (and badly mistaken) factual narrative about the Iraqi healthcare system.  Defendants should save those arguments for a jury.  The motion to dismiss should be denied.

---

[1] *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018) ("*Owens IV*").

## BACKGROUND

### A.    Legal Background

Congress enacted the ATA in 1992 to "open[] the courthouse door to victims of international terrorism."  S. Rep. No. 102-342, at 45 (1992).  The ATA reflected Congress's dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists.  *Id.* at 22.  Congress thus originally designed the statute's civil remedy to impose "liability at any point along the causal chain of terrorism."  *Id.*; *see* 18 U.S.C. § 2333(a).

In the ensuing years, courts applied the ATA to further Congress's purpose of "cut[ting] the terrorists' lifeline" by separating terrorists from "their financial angels."  *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc).  Courts thus held frequently that the ATA imposed liability for providing general funding to terrorist groups, without requiring plaintiffs to trace the specific attacks that injured them to any one monetary contribution.[2]  Courts divided on the legal theory for imposing such liability:  some held that terrorist funders were directly liable for themselves committing an "act of international terrorism," 18 U.S.C. § 2333(a); *see*, *e.g.*, *Boim*, 549 F.3d at 689-90, whereas others held them secondarily liable as aiders-and-abettors, *see*, *e.g.*, *Abecassis I*, 785 F. Supp. 2d at 645-49.

Congress resolved that disagreement in the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which preserves primary liability under the ATA while also codifying "causes of action for aiding and abetting and conspiracy liability."

---

[2] *See*, *e.g.*, *Abecassis I*, 785 F. Supp. 2d at 647; *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 503-08, 521 (E.D.N.Y. 2012); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 41-57 (D.D.C. 2010); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 580-88 (E.D.N.Y. 2005) ("*Linde I*"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106 (D.D.C. 2003).  Unless otherwise specified, all internal quotations, brackets, and emphases are omitted from all citations herein.

*Id.* § 2(a)(4). In recognizing secondary liability, Congress found that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities." *Id.* § 2(a)(6). Congress thus explained that its "purpose" was to "provide civil litigants with the broadest possible basis . . . to seek relief against" entities that contribute resources "directly or indirectly" to foreign terrorists. *Id.* § 2(b).

The Foreign Corrupt Practices Act ("FCPA"), though lacking a separate private cause of action, provides additional context for Defendants' ATA violations. The FCPA bars companies from corruptly paying "foreign official[s]" to obtain business, 15 U.S.C. § 78dd-1(a), or violating the statute's accounting provisions, *id.* § 78m(b)(2)(A). FCPA violations, particularly by repeat offenders like Defendants, have a "corrosive effect" on "our corporate culture." Tr. of Status Conf. at 9:24-10:1, *SEC v. Int'l Bus. Machs. Corp.*, No. 11-cv-563 (D.D.C. Dec. 20, 2012), Dkt. 10 (Leon, J.). Such violations often "impede[ ] [U.S.] efforts to . . . combat international crime and terrorism."[3] Indeed, the FCPA "play[s] a key role in counterterrorism policy, as it helps stop the flow of money to terrorist organizations and those who would fund them."[4]

## B.   Factual Background

### 1.   Jaysh al-Mahdi and Corruption at the Iraqi Ministry of Health

**a.**   For nearly two decades, the Iraqi Ministry of Health has been one of the most corrupt institutions in the world. Dkt. 106, ¶¶ 48-51, 105-11, 138 ("SAC").[5] The Ministry first

---

[3] U.S. Dep't of Justice & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 104 n.5 (Nov. 14, 2012), https://www.justice.gov/criminal-fraud/fcpa-guidance.

[4] Sen. Patrick Leahy, *Questions for the Record, Rod J. Rosenstein* at 24 (2017), https://goo.gl/nbeAqA.

[5] "SAC" refers to the Second Amended Complaint. "Def. Ex. __" refers to Defendants' exhibits. *See* Dkt. 111-2. "Pl. Ex. __" refers to Plaintiffs' exhibits, most of which are full versions of Defendants' excerpted exhibits and put Defendants' citations in context.

gained notoriety under the U.N. Oil-For-Food Program, which authorized Western companies to sell humanitarian goods to Saddam Hussein's regime, subject to strict financial controls. *Id.* ¶¶ 44-53. The Saddam-era Ministry, and its import subsidiary Kimadia, devised several schemes to circumvent the Oil-For-Food Program and extract kickbacks from foreign medical-goods suppliers doing business with the Ministry. *Id.* Those corrupt payments – which virtually every Defendant or an affiliate made – supplied Saddam's regime with funding it used to finance international terrorism. *Id.* ¶ 53. Saddam's exploitation of the Oil-For-Food Program spawned numerous FCPA enforcement actions, including against several Defendants. *Id.* ¶ 49.

In April 2003, the United States invaded Iraq and removed Saddam from power. *Id.* ¶ 54. Roughly 18 months later, the Ministry began to fall under the control of the Shiite terrorist group Jaysh al-Mahdi (Arabic for the "Mahdi Army," sometimes spelled in English as the "Mehdi Army"). *Id.* ¶¶ 63-76. Jaysh al-Mahdi was headed by notorious anti-American cleric Muqtada al-Sadr and modeled on Hezbollah, the Lebanese terrorist group that helped him found it. *Id.* ¶¶ 56-59. Jaysh al-Mahdi acted as the terrorist wing of Sadr's political party, the "Sadrist Trend," and Sadr's followers were called "Sadrists." *Id.* ¶ 59. Jaysh al-Mahdi's founding purpose was to exterminate the American presence in Iraq. *Id.* ¶ 333. To that end, Sadr regularly presided over "Death to America" chants, praised the September 11 attacks, and called for a "jihad" against the "occupiers." *Id.* ¶¶ 58-60. Jaysh al-Mahdi eventually became the deadliest terrorist group in Iraq, responsible for more casualties than even al-Qaeda. *Id.* ¶ 62.

From 2005 to 2008, the Ministry was integral to Jaysh al-Mahdi's national terrorist apparatus. *Id.* ¶¶ 63-104. Beginning in late 2004, Jaysh al-Mahdi engaged in an "occupational cleansing" in which it purged the Ministry of Sunnis and secular technocrats while staffing the key positions (from the Minister on down) with Jaysh al-Mahdi members. *Id.* ¶¶ 63-70. With

operatives in place throughout the ranks, Jaysh al-Mahdi transformed the Ministry into an instrument of terrorism.  *Id*. ¶¶ 78-103.  It used the Ministry headquarters building as a base from which to launch attacks.  *Id*.  It converted hospitals into command-and-control centers.  *Id*.  It relied on ambulances to transport death squads around Baghdad.  *Id*. ¶ 86.  And it used the Ministry security staff to house thousands of fighters commanded by the Deputy Health Minister.  *Id*. ¶ 85.  As the U.S. Embassy in Baghdad summarized in 2006, the Ministry and its infrastructure were "openly under the control of the Mehdi Army."  *Id*. ¶ 79.

Jaysh al-Mahdi's control of the Ministry was no secret.  Beginning in late 2004, Jaysh al-Mahdi's terrorist propaganda festooned Ministry facilities throughout Iraq, including its Baghdad headquarters.  *Id*. ¶ 73.  Large pictures of Muqtada al-Sadr adorned the walls; jihadist slogans like "Death to America" were ubiquitous; and Jaysh al-Mahdi's all-black flag decorated the entrances.  *Id*.  Armed Jaysh al-Mahdi fighters walked the halls.  *Id*. ¶ 180.  The Deputy Health Minister (a Jaysh al-Mahdi commander) stocked his Ministry office with weaponry like rocket-propelled grenades ("RPGs"), and he regularly led Jaysh al-Mahdi fighters up to the roof to launch attacks.  *Id*. ¶¶ 89-90.  According to one witness, the Ministry headquarters building looked more like a "Mahdi Army camp" than a medical building.  *Id*. ¶ 90.  Jaysh al-Mahdi's control of the Ministry was so obvious – and the armed fighters so prevalent – that it became one of the few buildings in Baghdad that U.S. officials could not safely enter.  *Id*. ¶ 180.

Major Western newspapers at the time also reported on Jaysh al-Mahdi's takeover of the Ministry.  They described (among other things) how the Ministry had fallen "under the control of the Shia cleric Moqtada al-Sadr" and was providing "millions of dollars" to Sadr's "Shiite Muslim militia."  *Id*. ¶ 183.  A *CBS News* report detailed how the "Mahdi Army" had turned Ministry hospitals into "command and control centers."  *Id*. ¶ 87.  And one *USA Today* reporter,

after witnessing the Jaysh al-Mahdi propaganda and jihadist messages all over the Ministry

headquarters, left with no "doubt[] about who runs the place." *Id*. ¶ 180.

      **b.**      Jaysh al-Mahdi also used the Ministry (as Saddam had) for terrorist finance.  SAC

¶¶ 105-12, 165-79.  Jaysh al-Mahdi prioritized control of the Ministry – which the Sadrists

officially took over in the April 2005 elections, *id*. ¶ 68 – because Kimadia offered it a proven

stream of corrupt revenue, and because Hezbollah had long controlled the Lebanese health

system to great effect, *id*. ¶¶ 64, 173.  Thus, in late 2004, Jaysh al-Mahdi revived the corrupt

schemes that Saddam had used under Oil-For-Food.  *Id*. ¶¶ 112, 116-64.  As one U.S.

investigator observed in a contemporaneous memorandum, "official corruption [was] tolerated at

the [Ministry] because it ha[d] become the ministry occupied by the Mahdi Army."  *Id*. ¶ 81.

      Jaysh al-Mahdi extracted corrupt payments in two primary ways.  First, medical-goods

suppliers structured their transactions with Kimadia to provide Jaysh al-Mahdi members with

extra batches of in-kind drugs and medical devices, free of charge, on top of the quantities for

which Kimadia had paid.  *Id*. ¶¶ 116-41.  Suppliers included those "free goods" in the same

shipments as the "purchased goods" and packaged them in a manner conducive to street resale,

which ensured that Jaysh al-Mahdi could monetize them on the black market.  *Id*. ¶¶ 5, 50-51,

119-20.  Because of the way the contracts were structured, Ministry officials did not have to

account for the extra goods in inventory.  *Id*. ¶¶ 117-20.  For that reason, as one Ministry insider

stated, the "free goods" were "very easy to disappear" for illicit purposes.  *Id*. ¶ 132.

      Defendants liked using "free goods" payments (which they also used to finance terrorism

under Oil-For-Food) because it allowed them to pay in-kind bribes using medical goods that cost

them little to manufacture.  *Id*. ¶ 117.  It also allowed Defendants to claim, if caught, that they

were donating "life-saving medicines and [medical] equipment" to the Iraqi people.  *Compare*

8

Dkt. 111-1 at 1 ("Mem."), *with* SAC ¶ 118.  But as Defendants knew, their medical goods in Iraq functioned as cash equivalents – regularly sold and bartered (like gold, or diamonds) on black markets – and Kimadia's procurement process ensured that "free goods" donations did not go to any legitimate public health facility.  SAC ¶¶ 119-20, 137-39.  Defendants knew that their "free goods" deliveries only worsened the deterioration of Iraq's public-health system.  *Id*. ¶ 138.

Second, medical-goods suppliers also paid Jaysh al-Mahdi cash bribes (known as "commissions" in Iraq) to obtain contracts from Kimadia.  *Id*. ¶¶ 142-64.  As they had done under Oil-For-Food, Defendants paid commissions through several mechanisms – including so-called "performance bonds" (*id*. ¶¶ 161-62) and other unreasonable "services" clauses (*id*. ¶ 158) – and funneled the money to Jaysh al-Mahdi through their corrupt local sales agents (*id*. ¶¶ 148-49).  According to several witnesses, it was essentially impossible to obtain a commercial contract from Kimadia between 2005 and 2008 without paying "commissions" to Jaysh al-Mahdi members at several stages of the transaction.  *Id*. ¶¶ 142-45; *see*, *e.g.*, *id*. ¶¶ 197, 213, 258.

**c.**  Jaysh al-Mahdi used Defendants' corrupt payments to finance terrorist attacks on Americans.  SAC ¶¶ 165-79.  As documented by U.S. anti-corruption personnel, Ministry employees, and other Iraqi government officials, Jaysh al-Mahdi was notorious for using its control over the Ministry to fund terrorist operations.  *Id*. ¶¶ 108-12, 165-75.  Corrupt payments – which provided off-book, fungible resources for which Ministry employees did not need to officially account – were especially easy to appropriate for terrorist ends.  *Id*. ¶ 179.  That was true of not only Defendants' "commissions," but also their "free goods" deliveries.  Jaysh al-Mahdi "finance[d] operations from diverted medicines" that it sold on the black market, and it regularly paid its rank-and-file terrorist fighters directly in pharmaceuticals rather than cash.  *Id*.

¶¶ 169, 176.  Jaysh al-Mahdi was so dependent on its supply of cash-equivalent pharmaceuticals from the Ministry that it was often known in Iraq as "The Pill Army."  *Id.* ¶¶ 9, 176.

In February 2007, those facts led the U.S. government to coordinate the prosecution of Deputy Health Minister Hakim al-Zamili for helping Jaysh al-Mahdi "effectively hijack[] the Ministry of Health."  *Id.* ¶ 94.  The prosecution was based on evidence that Zamili had "orchestrated kickback schemes related to inflated contracts for equipment and services, with millions of dollars allegedly funneled to Mr. Sadr's Mahdi Army."  *Id.* ¶ 171.  An Iraqi court eventually acquitted Zamili after Jaysh al-Mahdi coerced the witnesses into recanting.  *Id.* ¶ 96.

**d.**      The United States did not encourage companies to transact with the Jaysh al-Mahdi-controlled Ministry, and it especially opposed use of the corrupt Kimadia contracting process.  *Id.* ¶¶ 76, 113.  The U.S. government warned of the Ministry's "atrocious reputation" for "corruption" while "under the control of the Mehdi Army"; helped prosecute the Deputy Health Minister as a terrorist; and supported efforts to combat corruption at the Ministry.  *Id.* ¶¶ 76, 80-81, 94, 108, 169.  The United States viewed Kimadia in particular as a "serious problem," Dkt. 72-14 at 5, and sought to abolish it altogether for being "totally and utterly corrupt," SAC ¶ 48.  But Iraqi intransigence derailed those efforts, and as the Iraq Study Group concluded, the Sadrist-run Ministry refused to "work with Americans" at all.  *Id.* ¶ 76.

The U.S. government thus looked for other constructive ways to support the Iraqi health sector without enabling the Jaysh al-Mahdi terrorists who ran the Ministry.  *Id.* ¶ 113.  For example, it focused on rebuilding Iraq's infrastructure by supporting the construction and supply of new hospitals.  *Id.*  On occasion, it also procured medical goods by contracting directly with suppliers to avoid dealing with corrupt Kimadia officials and to minimize the risk that products would be diverted.  *See*, *e.g.*, Def. Ex. 44 (Table D-1); SAC ¶ 113.  At the same time, it warned

companies about the importance of complying with the FCPA.[6]  Indeed, U.S. officials called corruption "the second insurgency" and warned that corrupt payments to Iraqi officials were "provid[ing] the money, the people and the motivation to fight Americans in Iraq."  SAC ¶ 172.

That phenomenon was nowhere more evident than at the Ministry.  The situation there became so bad that, in June 2007, General Odierno ordered a battalion-level operation to attempt to cleanse the Ministry of the worst "Jaysh al Mahdi (JAM) fighters" who worked there.[7]  As the order authorizing the operation stated, the Ministry was thoroughly "infiltrated by criminal elements," "pose[d] a significant threat to [Coalition forces]," and functioned as "an enabler for corruption, [extra-judicial killing], use of ambulances to bypass checkpoints, and insurgent logistics flow."  *MNC-I Order* at 1.  The order made the U.S. government's position clear:  it vehemently opposed the "endemic corruption" that enabled "internal JAM affiliated leadership and external JAM to continue their illicit operations utilizing [Ministry] resources."  *Id*. at 2.

### 2.    Defendants' Payments to Jaysh al-Mahdi

At least from 2004 until 2013, Defendants made corrupt payments to obtain lucrative medical-goods contracts from the Ministry.  SAC ¶ 7.  For each Defendant, Plaintiffs allege an array of drugs or devices that it sold (or manufactured for sale) to the Ministry; identify a minimum number of tainted contracts it obtained; specify particular contract numbers and "free goods" percentages it paid; and describe the corrupt third-party agents (often called "Scientific Bureaus") it used to funnel payments to Jaysh al-Mahdi.  *Id*. ¶¶ 188-209 (AstraZeneca), 210-44 (GE), 245-80 (J&J), 281-309 (Pfizer), 310-32 (Roche).  Each Defendant (or a predecessor or

---

[6] *See*, *e.g.*, U.S. Com. Serv., *Doing Business in Iraq* 72-78 (2012) (Pl. Ex. 2; full version of Def. Ex. 36) (citing FCPA and warning companies about extensive "corruption" in Iraq).

[7] Multinational-Corps – Iraq, *Operation Black Crescent* at 2, FRAGO_020 to OPORD 07-01 (June 6, 2007) (Pl. Ex. 3) ("*MNC-I Order*").  Plaintiffs offer this evidence not for judicial notice, but to illustrate why the Court should await a full evidentiary record before finding facts.

affiliate) has violated the FCPA in comparable ways before, *id.*, and virtually all of them made similar corrupt payments – using the very same crooked local agents – to obtain contracts from Saddam's regime under Oil-For-Food, *id.* ¶¶ 199-201, 222-23, 262-63, 319-20.

At least two corporate entities, both of which generally appeared in the sales contracts, were involved in each corrupt transaction. *Id.* ¶¶ 121-22.  First, a Supplier acted as the contracting entity that executed the corrupt transaction with Kimadia.  *Id.* ¶ 122.  Second, a Manufacturer (affiliated with the Supplier) made the goods being sold.  *Id.*  Each Supplier acted as its Manufacturers' agent:  Ministry regulations required the Suppliers to confirm they were acting on the Manufacturers' behalf subject to the Manufacturers' control, and the Manufacturers had to authorize their sales.  *Id.* ¶¶ 156-57.  The Manufacturers also participated directly in the corrupt transactions, *id.* ¶¶ 194, 220, 250, 256, 315, and worked in concert with their Suppliers to grow their sales to the Ministry, *id.* ¶¶ 12, 114, 203-07, 233-41, 272-78, 296-306, 322-30.[8]

Defendants knew (or recklessly disregarded) that their corrupt payments funded Jaysh al-Mahdi terrorist attacks.  *Id.* ¶¶ 10-11, 180-87.  Defendants finalized their contracts at in-person meetings inside the Ministry headquarters, surrounded by Jaysh al-Mahdi propaganda and fighters.  *Id.* ¶¶ 121, 180-81.  They each used a local Scientific Bureau that was fluent in Iraqi politics and aware that Jaysh al-Mahdi raised money through the Ministry.  *Id.* ¶ 182.  And each had a corporate-security department that exposed it to public and non-public reporting of Jaysh al-Mahdi's terrorist financing schemes at the Ministry.  *Id.* ¶¶ 183-86.

---

[8] There are 21 Defendants from five corporate families:  AstraZeneca, GE, J&J, Pfizer, and Roche.  SAC ¶¶ 17-37.  Each includes at least one Supplier and one Manufacturer Defendant.  *Id.*  ¶¶ 188, 211, 245, 281, 310.  Plaintiffs assert claims against nine total Suppliers and 11 Manufacturers, *see* Mem. at 12 n.35, while the remaining Defendant, Johnson & Johnson, is a parent company that supervised its subsidiaries' corrupt conduct, SAC ¶¶ 245, 273-74.

### 3.      Jaysh al-Mahdi's Hezbollah-Sponsored Campaign of Terrorism

Defendants' transactions funded a terrorist campaign that killed and injured large numbers of Americans in Iraq.  Due to Hezbollah's close operational involvement, Jaysh al-Mahdi was able to master an array of terrorist tactics.  SAC ¶¶ 338-46.  Most lethal were explosively formed penetrators ("EFPs"), an advanced explosive device designed to penetrate American tank armor.  *Id*. ¶¶ 341-42.  Jaysh al-Mahdi used EFPs and other weaponry – including mortars, rockets, and RPGs – to kill or wound thousands of Americans.  *Id*. ¶¶ 14, 339-46.  The U.S. military thus considered Jaysh al-Mahdi to be a "terrorist organization" that represented a graver threat than al-Qaeda in Iraq.  *Id*. ¶¶ 347-48.  Although the United States declined for diplomatic reasons to designate Jaysh al-Mahdi officially as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189, Plaintiffs' claims are unaffected by that decision (to which they disclaim any challenge).  SAC ¶¶ 355-56.

Jaysh al-Mahdi engaged in despicable, illegal attacks on Americans (including Plaintiffs) working to rebuild Iraq's civic institutions.  *Id.* ¶¶ 349-52.  Jaysh al-Mahdi fighters launched attacks out of mosques, schools, ambulances, and hospitals; coopted children and Iraqi police officers for attacks; and wore civilian clothes (rather than uniforms) to prevent the U.S. military from engaging them.  *Id*. ¶¶ 351-54.  They tortured, murdered, and mutilated the bodies of the Americans they captured, including Plaintiffs' civilian family members.  *Id*. ¶¶ 461, 796, 808.  They intentionally slaughtered thousands of innocent Iraqi civilians.  *Id*. ¶ 351.  They stole from, raped, and murdered people who crossed them.  *Id*. ¶ 353.  And they funded it all through a mafia-like criminal enterprise in which the Ministry played a key role.  *Id*. ¶¶ 143-44, 166, 168.

Hezbollah, which has been a designated FTO since 1997, was instrumental to Jaysh al-Mahdi's terrorist campaign.  *Id*. ¶¶ 364-407.  Hezbollah co-founded Jaysh al-Mahdi as its terrorist proxy in Iraq; recruited Iraqi Shiites to join Jaysh al-Mahdi; came up with Jaysh

al-Mahdi's heinous tactics; and instructed Jaysh al-Mahdi on how to employ them.  *Id.* ¶¶ 364-76, 389-407.  Its involvement focused on the particular types of attacks that injured Plaintiffs – which were too sophisticated for Jaysh al-Mahdi to execute on its own – and the particular Iraqi geographies where those attacks took place.  *Id.* ¶¶ 389-403.  At all times, Hezbollah stationed senior operatives in Iraq to supervise Jaysh al-Mahdi's "jihad" against America.  *Id.* ¶¶ 366-70.

Hezbollah also used its religious power over Iraqi Shi'a to authorize the Jaysh al-Mahdi terrorist campaign.  *Id.* ¶¶ 377-88.  Senior Hezbollah spiritual leaders called publicly for terrorist violence against Americans in Iraq and went to great lengths to justify it religiously.  *Id.* ¶¶ 378-85.  Hezbollah exerted similar influence over Sadr personally, with whom it was in close contact.  *Id.* ¶ 387.  Hezbollah's messages had their intended effect.  *Id.* ¶¶ 377-88.  Jaysh al-Mahdi's members (from its top leaders down to rank-and-file fighters) publicly swore fealty to Hezbollah, marched under Hezbollah's banners and flags, and regularly participated in rallies where they chanted "we are Hezbollah."  *Id.* ¶¶ 371-73.  As one prominent journalist put it, Jaysh al-Mahdi was essentially the "Iraqi branch of Hezbollah."  *Id.* ¶ 364.

## C.     Plaintiffs' Claims

Plaintiffs are U.S. citizens who were killed or injured between 2005 and 2011 by Jaysh al-Mahdi in Iraq.  SAC ¶¶ 1, 16.  They are American service members who deployed to Iraq to stabilize the country, American civilians working on reconstruction projects, and the estates and family members of both.  *Id.* ¶¶ 408-3180.  Every Plaintiff brings two aiding-and-abetting (*id.* ¶¶ 3181-3207) and two primary-liability (*id.* ¶¶ 3208-21) claims under the ATA.  They also assert various state-law claims arising out of the same conduct.  *Id.* ¶¶ 3222-54.  Plaintiffs' allegations are sourced from (among other things) more than 12 Confidential Witnesses; an array of public and non-public reports, contracts, and emails; English- and Arabic-language press reports; and U.S. diplomatic and military cables as published by *WikiLeaks*.  *Id.* ¶¶ 41-43.

14

**ARGUMENT**

I.   **DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE IT DEPENDS ON EXTRA-PLEADING MATERIALS THE COURT SHOULD DISREGARD**

In deciding Defendants' motion to dismiss, the Court should "take[] the allegations of the complaint as true" and "draw all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).  That applies to both the merits and jurisdictional arguments:  although Rule 12(b)(1) permits consideration of "materials outside the pleadings" in assessing subject-matter jurisdiction, the Court "must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Similarly, in addressing factual arguments under Rule 12(b)(1) "at [the] threshold stage, prior to any discovery," the Court should "accord [Plaintiffs] the benefit of all reasonable inferences." *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018).  To survive the motion to dismiss, Plaintiffs need only allege facts that, favorably construed, state a "plausible claim for relief." *Banneker*, 798 F.3d at 1129.

As explained below, the SAC satisfies that test.  But rather than engage with Plaintiffs' allegations as pleaded, Defendants devote large parts of their brief to their own competing factual narrative divorced from (and often at odds with) Plaintiffs' allegations. *See*, *e.g.*, Mem. at 4-15, 22-28, 29-38.  Moreover, Defendants support that narrative not with affidavits or other admissible evidence, but with 753 pages of Internet research (and a few book chapters) excerpted from a patchwork of 73 secondary sources. *See id.* at 4.  Defendants offer no "sponsoring witness[]" for any of their excerpts. *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 186-87 (D.D.C. 2018) (Leon, J.).  Rather, they ask the Court (at 4, 20) to accept on faith that everything in their excerpts is true, so that it can draw contested factual inferences in their favor.

15

That is not a proper exercise on a motion to dismiss.  A "bulky 'document dump'" is generally a "disfavored (and risky) practice that almost always results in grief for the lawyers or the judge or for anyone else left to swim in a great reservoir of undifferentiated and unfamiliar paper."  *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1253 n.3 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013).  That is especially true here, where neither side has taken discovery.  Defendants' need to rely on a jumble of research excerpts is a virtual admission that Plaintiffs' claims, as pleaded, should proceed.  *See Hurd v. District of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017) (rejecting extra-pleading "documents supportive of [defendant's] view of potentially disputed issues"); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (criticizing "temptation to pile on numerous documents to . . . undermine the complaint," which "risks premature dismissals of plausible claims that may turn out to be valid after discovery").[9]

Neither of Defendants' justifications (at 4) for submitting their extra-pleading materials is persuasive.  *First*, those materials are not properly subject to judicial notice.  A "federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Hurd*, 864 F.3d at 686 (quoting Fed. R. Evid. 201(b)).  Many of Defendants' sources – such as undated, now-obsolete webpages (Def. Exs. 30, 41-42, 46-47), anonymous USAID newsletters archived on a third-party website (Def. Exs. 22-24, 27-28, 48), or a book chapter by a Hezbollah-sympathizing academic (Def. Ex. 70) – self-evidently fail that test.  *See Khoja*, 899 F.3d at 999-1002.  And in most cases, Defendants seek judicial notice merely because some unnamed

---

[9] *See also Wultz*, 755 F. Supp. 2d at 40 (excluding "matters outside the pleadings" on an ATA motion to dismiss raising political question doctrine and other grounds); *Gill*, 893 F. Supp. 2d at 509 ("At the Rule 12 stage the court has virtually no factual record, and the exercise of judicial notice in a case like [this ATA] one is not acceptable."); *Linde I*, 384 F. Supp. 2d at 575 n.2 (declining to "consider [ ] factual submissions" on an ATA motion to dismiss).

employee of some government agency supposedly authored the document.  That is not a proper

basis for assuming the truth of contested facts, especially without a "sponsoring witness" to

contextualize the document and vouch for its conclusions.  *AT&T*, 310 F. Supp. 3d at 186-87.[10]

     *Second*, Defendants misuse (at 4) the incorporation-by-reference doctrine.  When a

plaintiff cites only part of a document to support a discrete allegation, courts should not "treat the

entire document as incorporated into the complaint."  *Banneker*, 798 F.3d at 1133.  By

submitting Exhibits 3-13 – mostly for points unrelated to Plaintiffs' citations – Defendants

wrongly ask the Court to "adopt every word" of those sources "as true."  *Id.*  The Court should

reject that attempt to smuggle contested facts into a motion to dismiss.  *See id.*[11]

     Those principles apply to Defendants' Rule 12(b)(1) arguments as well.  When a fact-

heavy jurisdictional argument implicates the merits, courts should not "rul[e] on a Rule 12(b)(1)

motion . . . before the plaintiff has had a chance to discover the facts necessary to establish

jurisdiction."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992); *see Wilderness

Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987) (similar).  Here, Defendants seek to defeat

jurisdiction before any discovery, based on a complicated factual argument about U.S. foreign

policy they drum up from untested secondary sources.  Using such materials to find jurisdictional

facts at this stage would "short-circuit the factual development and adjudicative process to which

[Plaintiffs are] entitled."  *Hale v. United States*, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).

---

[10] *See Khoja*, 899 F.3d at 1001 (declining to judicially notice contents of an "agency report" on a motion to dismiss); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) (declining to use "government" records to "counter the factual allegations underlying Plaintiffs' claim"); *Hunt v. Rodriguez*, 2009 WL 173070, at *3 (E.D. Cal. Jan. 26, 2009) ("[J]udicial notice is not a vehicle" for accepting "the facts in every governmental record."); *see also Hurd*, 864 F.3d at 686-87 (similar).

[11] *See also Khoja*, 899 F.3d at 1003 ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts."); *Domestic Airline*, 221 F. Supp. 3d at 70 (refusing to incorporate documents "merely cited as the source of certain factual allegations").

## II.     THE POLITICAL QUESTION DOCTRINE DOES NOT SUPPORT DISMISSAL

### A.     The Second Amended Complaint Raises Justiciable Legal Questions About A Federal Statute And Traditional Tort Law

The federal judiciary "has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012).  The political question doctrine represents a "narrow exception to that rule," *id.* at 195, under which there are six factors that identify a nonjusticiable political question, *see Baker v. Carr*, 369 U.S. 186, 217 (1962).  In applying those six factors (listed in Mem. at 22), courts typically dismiss for lack of "jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it.'" *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  Unless such an issue is "inextricable from the case at bar, there should be no dismissal." *Baker*, 369 U.S. at 217.

Defendants cite no case (nor are Plaintiffs aware of one) dismissing any ATA lawsuit under the political question doctrine.  This case should not be the first, because Plaintiffs' ATA claims simply ask the Court to interpret and apply a federal statute to Defendants' private conduct.  *See* SAC ¶¶ 3181-3221 (citing 18 U.S.C. § 2333).  Interpreting a statute is a "recurring and accepted task for the federal courts," even when it has "significant political overtones." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Here, the existence of a federal statute expressly authorizing Plaintiffs' claims is decisive.  Whatever the merits of Defendants' efforts (at 22-28) to tie the facts of this case to U.S. foreign policy, "Congress explicitly committed these issues to the federal courts under the ATA." *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6 (D.D.C. 2005).  The Court can thus apply the

statutory criteria Congress established in the ATA "without 'expressing lack of the respect due coordinate branches of government.' " *Id.* (quoting *Baker*, 369 U.S. at 217).[12]

Courts routinely hold that similar lawsuits under the ATA are justiciable.[13]  They do so because ATA lawsuits are "tort suit[s] brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism." *Ungar*, 402 F.3d at 280.  For that reason, courts have sustained claims against the Palestine Liberation Organization for supporting attacks in the Gaza Strip, *see Biton*, 412 F. Supp. 2d at 5-6; a Chinese state-owned bank for funding a bombing in Tel Aviv, *see Wultz*, 755 F. Supp. 2d at 19, 25-27; and a Jordanian bank for maintaining accounts for Hamas, *Almog*, 471 F. Supp. 2d at 295 n.45.  Those cases all had "political overtones," and some even touched on issues as sensitive as the "Israeli-Palestinian conflict." *Ungar*, 402 F.3d at 281.  But the ATA's statutory scheme made all of them justiciable, and it has the same effect here.

Congress's judgment that federal courts should entertain ATA lawsuits confirms that no *Baker* factor (*see* 369 U.S. at 217) is present in this case.  As for the first factor, Plaintiffs' claims merely ask the Court to interpret a statute – a traditional role constitutionally committed to the judiciary.  *See Zivotofsky*, 566 U.S. at 195-96; *Japan Whaling*, 478 U.S. at 230.  As for the second, the ATA itself arms courts with "judicially discoverable and manageable standards" in

---

[12] The same holds true for Plaintiffs' state-law claims.  *See* SAC ¶¶ 3222-54.  Those claims turn on traditional tort-law principles this Court is well-equipped to apply.  *See Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 354 (D.C. Cir. 2007) ("tort suit[s]" are "constitutionally committed to the judiciary"); *Lane v. Halliburton*, 529 F.3d 548, 560 (5th Cir. 2008) (in an "ordinary tort suit, the textual commitment factor actually weighs in favor of resolution by the judiciary").

[13] *See Gill*, 893 F. Supp. 2d at 520; *Wultz*, 755 F. Supp. 2d at 25-27; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 295 n.45 (E.D.N.Y. 2007); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96, 99-100 (D.D.C. 2006); *Biton*, 412 F. Supp. 2d at 5-6; *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 280-82 (1st Cir. 2005); *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 448 (S.D.N.Y. 2004).

the form of explicit statutory criteria. *Baker*, 369 U.S. at 217.  This Court need only apply those criteria to determine whether Defendants' support for Jaysh al-Mahdi was "international terrorism," 18 U.S.C. § 2333(a), or whether they "aid[ed] and abet[ted]" terrorism, *id*. § 2333(d)(2).  That is a quintessentially proper role for a court.  *See Zivotofsky*, 566 U.S. at 196 ("enforc[ing] a specific statutory right" is a "familiar judicial exercise").[14]

As for the final four *Baker* factors, the "initial policy determination involved here has already been made by the U.S. Congress":  that Americans "injured by terrorist acts" should be able to sue under the ATA.  *Biton*, 412 F. Supp. 2d at 6.  Allowing this case to proceed therefore would neither disrespect nor embarrass the political branches, *see Baker*, 369 U.S. at 217; it would effectuate the judgment they expressed in a federal statute.  In fact, the ATA contains several *statutory* protections to prevent intrusions into foreign policy, including one immunizing government officials from suit.  *See* 18 U.S.C. § 2337.  But Defendants urge (at 22-23) the Court to ignore the statute and instead conduct its own free-floating inquiry into whether "Plaintiffs' theories of liability" might contradict "U.S. policy" decisions supposedly reflected in documents they found on the Internet.  That argument – asking a court to decide for itself that U.S. foreign policy bars a claim expressly authorized by Congress – would flout the very separation-of-powers principles Defendants claim to promote.  A far better way to respect the political branches is to follow and apply the statute Congress wrote.

---

[14] True, the D.C. Circuit has declined to say that a "statutory claim can never present a political question," but it has observed that "a statutory claim is less likely to present a political question."  *Al-Tamimi v. Adelson*, 916 F.3d 1, 12 n.6 (D.C. Cir. 2019).  A private statutory right of action weighs heavily in favor of judicial resolution, *see id*., and the D.C. Circuit has never applied the doctrine to dismiss a statutory claim against *private* companies like Defendants, *cf. El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 851 (D.C. Cir. 2010) (en banc) (non-justiciable claim asserted against the United States by the "target of a military strike"); *see also id*. at 856 (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations.  Never.").

**B.     Plaintiffs' Claims Do Not Require This Court To Pass Judgment On U.S. Policy Toward The Ministry**

Plaintiffs' claims also do not require the Court to opine on U.S. policy.  To resolve those claims, the Court need only determine whether Defendants' private conduct violated the ATA. That requires the Court to pass judgment on Defendants, not the U.S. government.  This case is thus like most lawsuits against "private defendants":  it is justiciable because it does not require the Court to evaluate any actual U.S. government decisions.  *McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1319-20 (M.D. Fla. 2006) (dismissal warranted in "exceedingly small" number of "cases against private defendants"), *aff'd*, 502 F.3d 1331 (11th Cir. 2007).[15]

Defendants nonetheless try (at 24) to inject political questions into this case by arguing that, if they funded terrorists through the Ministry, it "necessarily follow[s]" that the United States did too.  Even if that were true, the resulting "political question" would be "extricable." *Al-Tamimi*, 916 F.3d at 13.  Plaintiffs' claims hinge on *Defendants*' conduct:  whether they engaged in corrupt transactions; whether Jaysh al-Mahdi controlled the Ministry; and whether Defendants' sales benefited terrorists.  Answering them does not require the Court to discuss U.S. policy at all.  *See id*. at 9 ("Although the factual allegations of the complaint undoubtedly bear on [political] questions, our duty is to analyze the specific claims to determine whether they *require* us to answer them.").  At best, Defendants have shown (at 22) that Plaintiffs' theory "implicates" U.S. policy in the sense that some other plaintiff in some other case might allege similar things about the U.S. government.  But any such purported implications – which appear

---

[15] *See Hourani*, 796 F.3d at 8-9 (rejecting political question argument by "private parties" facing "private civil liability"); *Exxon*, 473 F.3d at 355 (district court did not clearly err in holding justiciable "claims by a private party against a private United States corporation"); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 16 (D.D.C. 2005) (no political question raised by claims against "private parties" for conduct in Iraq where the "government is not a party").

nowhere in the SAC[16] and which only Defendants insist on bringing up – are "extricable from the resolution of plaintiffs' claims." *Wultz*, 755 F. Supp. 2d at 26.

*Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007), which Defendants cite heavily (at 25-26), provides a useful contrast. There, the plaintiffs sued Caterpillar for selling bulldozers to Israel in violation of "international law." *Id.* at 977-79. But the U.S. "government paid for every bulldozer that Caterpillar transferred," and it specifically had "approved and financed all contracts between Israel and Caterpillar." *Id.* at 978. "The decisive factor" was "that Caterpillar's sales to Israel were paid for by the United States" as military aid to Israel. *Id.* at 982. Because "the United States [was] a direct actor" in the challenged transactions themselves, the Ninth Circuit held that Caterpillar's conduct was inseparable from "our government's decision to grant military assistance to Israel." *Id.* at 983 & n.8. This case is different: Defendants made corrupt deals (which DOJ is now investigating) that no U.S. official ever approved, let alone directly paid for. *See Cooper v. Tokyo Elec. Power Co.*, 166 F. Supp. 3d 1103, 1123 (S.D. Cal. 2015) (distinguishing *Corrie* as involving sales the U.S. "approved and paid for"), *aff'd*, 860 F.3d 1193 (9th Cir. 2017). Unlike in *Corrie*, therefore, the Court here can evaluate Defendants' conduct without commenting on separate U.S. government actions.

### C. Plaintiffs' Claims Are Consistent With U.S. Foreign Policy

**1.** The points above are dispositive, because the Court need not opine about U.S. policy to resolve Plaintiffs' claims. But Defendants' argument also fails on its own terms because Plaintiffs' claims promote U.S. foreign-policy objectives. Plaintiffs allege that Defendants violated the ATA by making corrupt payments that empowered bad actors at the

---

[16] Defendants argue (at 24 & n.52) that one article Plaintiffs cite criticizes the U.S. government, but Plaintiffs do not rely on that part of the article, SAC ¶¶ 80, 173, which thus poses no "inextricable" political question, *Al-Tamimi*, 916 F.3d at 13.

Ministry and impaired U.S. efforts to improve the Iraqi health system.  SAC ¶¶ 112-20, 129-39,

142-45.  Moreover, after Plaintiffs filed this action, DOJ opened a criminal investigation into the

same matters.  *See* Dkt. 86 at 1-2.  Any suggestion that the U.S. government endorsed

Defendants' illegal practices is absurd on its face.  Indeed, Defendants' own sources state that

the United States publicly called Iraqi corruption a "second insurgency" that created a

"compelling need for . . . reforms."[17]  Holding Defendants liable for corrupt conduct that is

currently the subject of a DOJ criminal inquiry comports with U.S. foreign policy.

Recognizing that problem, Defendants do not contend (nor do they cite any source

contending) that the U.S. government supported corrupt transactions with the Ministry.  Rather,

they try to divert attention (at 26-27) from their corruption by zeroing in on a single paragraph

where Plaintiffs allege that the "causal nexus" to terrorism was "not limited" to "FCPA

violations."  SAC ¶ 179.  Even if Defendants' criticisms of that paragraph were correct, *but see*

*infra* Part II.C.2, the solution would be to disregard that one allegation rather than to dismiss

Plaintiffs' claims wholesale.[18]  After all, the same paragraph alleges that "Defendants' corrupt

payments to Jaysh al-Mahdi members inside [the Ministry] provided especially valuable

assistance for Jaysh al-Mahdi," SAC ¶ 179, and the SAC focuses overwhelmingly on the unique

nexus between corrupt payments and terrorism, *id*. ¶¶ 188-332.  All else aside, Defendants' off-

---

[17] SIGIR, *Quarterly Report to the United States Congress* 8 (Oct. 30, 2008) (Pl. Ex. 4; full version of Def. Ex. 33); *see also*, *e.g.*, USAID, *Iraq Private Sector Growth and Employment Generation:  Pharmaceutical and Medical Products in Iraq*, §§ 6.5.1.1, 7.5 (Apr. 17, 2007) ("*2007 USAID Report*") (Pl. Ex. 5; full version of Def. Ex. 5) (observing that "the system of control of the pharmaceutical distribution chain has collapsed"; also identifying "bribery, corruption, [and] protection rackets" as key "[t]hreats" to Iraqi healthcare).

[18] *See Al-Tamimi*, 916 F.3d at 9 n.5 (plaintiffs cured political question issue by "waiving any theory of liability" based on government actions); *Wultz*, 755 F. Supp. 2d at 26 ("[b]ecause the Court will not consider them, there is no concern that [two allegations] will raise a political question"); *Cooper*, 166 F. Supp. 3d at 1124 (remedy for "Court's justiciability concerns" was to "omit[ ] [the offending] allegations" and to narrow the "theory of the case").

book, corrupt payments were far more potent sources of assistance to Jaysh al-Mahdi than ordinary commercial transactions. *Id.* ¶¶ 132, 142-45, 179; *see Abecassis I*, 785 F. Supp. 2d at 649 (explaining this concept under Oil-For-Food). At the very least, the Court can condemn *those* types of payments under the ATA without contradicting any U.S. policy judgment.

Defendants' reliance (at 24-26) on *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 550 (9th Cir. 2014) (per curiam), is misplaced. There, the plaintiffs asserted tort claims under the Alien Tort Statute ("ATS") against a company that funded (without corruption) a Colombian Army Brigade. *See id.* at 545. The court held those claims nonjusticiable because the "United States provided much greater funding to the [same] Brigade at the same time and for the same purpose." *Id.* at 552. Given that the challenged conduct mirrored U.S. government aid in virtually every respect, the court found "no principled way to sever [defendant's] funding from that of the United States." *Id.* Here, Defendants' conduct is easy to "sever": whereas the United States avoided contracting with Kimadia and tried to stamp out corruption at the Ministry, Defendants exacerbated it by bribing the Jaysh al-Mahdi members who controlled their contracts, SAC ¶¶ 105-64. Defendants' payments, as alleged, were thus not made "at the same time and for the same purpose as [those of] the United States." *Saldana*, 774 F.3d at 554-55.

Defendants cannot point to any court extending *Saldana* to bar such allegations. Doing so here – when there is a more-than-plausible way to distinguish Defendants' conduct from that of the U.S. government – would conflict with the D.C. Circuit's reminder that political questions compel dismissal only if the claims "*require* us to answer them." *Al-Tamimi*, 916 F.3d at 9.[19]

---

[19] *Saldana* also gave no weight to the judgment Congress expressed in the ATS. *See* 774 F.3d at 545. That was error, *see supra* Part II.A, and conflicts with the D.C. Circuit's recent treatment of the ATS, *see Al-Tamimi*, 916 F.3d at 11-12. At any rate, the ATA provides a far more comprehensive statutory framework than the ATS and supports jurisdiction more strongly here. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1404-05 (2018) (contrasting the two).

**2.**     Nor do any of Plaintiffs' claims (corruption-based or otherwise) "seriously interfere with important governmental interests."  *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (*Baker* factors require such interference).  The U.S. government opposed Jaysh al-Mahdi's takeover of the Ministry:  a 2006 U.S. Embassy report warned that the Ministry was "openly under the control of the Mehdi Army," SAC ¶ 79; terrorists inside the Ministry made death threats against U.S. officials, *id*. ¶¶ 76, 89; and Coalition forces arrested the Deputy Health Minister (a Jaysh al-Mahdi commander) in February 2007 because he had, as General Petraeus put it, "effectively hijacked the Ministry of Health," *id*. ¶¶ 93-94.  Defendants do not even try to reconcile their narrative with the U.S. government's *arrest and prosecution* of the Ministry's most powerful official; instead, they ignore the allegation.  Nor can they square their position with the government's recognition that Jaysh al-Mahdi had turned the Ministry into an "enabler for corruption, [extra-judicial killing], use of ambulances to bypass checkpoints, and insurgent logistics flow."  *MNC-I Order* at 1.  The U.S. military even ordered an operation to remove nearly 15,000 Jaysh al-Mahdi terrorists from the Ministry by force.  *Id*. at 1-3.  To suggest it simultaneously blessed the very sales practices empowering those terrorists is implausible.

Defendants nonetheless insist (at 25) that the "United States affirmatively encouraged . . . companies to sell and donate medicines and medical equipment" to the Sadrist-run Ministry. That is factually untrue, *see* SAC ¶¶ 76, 113, and Defendants offer no evidence to back up their assertion.  Their two main sources (at 9-10 & nn.22-24) are unauthenticated cables that offer only unverified double hearsay about 15-year-old meetings.  *See* Def. Exs. 71-72; *infra* note 28. Such materials provide no basis for finding jurisdictional facts in Defendants' favor.[20]  Both

---

[20] *See Cause of Action Inst. v. Tillerson*, 285 F. Supp. 3d 201, 208 n.6 (D.D.C. 2018) (noting that "admissibility – and a focus on reliability – should guide [courts] in assessing whether to rely on evidence outside of the pleadings" on a Rule 12(b)(1) motion; *Bryant v. Yosemite Falls*

cables also were written roughly a year before Jaysh al-Mahdi effected its takeover of the Ministry and so shed no light on whether the U.S. government supported the transactions at issue here.  SAC ¶ 104.  As for the rest of Defendants' sources, they concern infrastructure or public-health projects that had little to do with Defendants' commercial sales to Kimadia;[21] describe direct U.S. government (or U.N.-funded) contracts that bypassed the terrorist-run procurement process Defendants used;[22] or merely contain general information about basic Iraqi procedures, *see* Def. Exs. 4, 36-37, 39, 41-42.  None shows that the U.S. government encouraged Defendants to funnel resources to the terrorists who ran the Ministry.

The *2007 USAID Report* that Defendants cite (at 10-11) reinforces the point.  Defendants attach a 13-page excerpt (Def. Ex. 5) of that 61-page report (Pl. Ex. 5) and assert (Mem. at 11) that it shows the U.S. government's "explicit encouragement of companies to transact business" with "the Ministry and Kimadia."  That characterization illustrates the folly of using Defendants' excerpts to find facts on a motion to dismiss.  In reality, the full report stated that the Ministry's "pharmaceutical distribution chain has collapsed"; that the "process through which non-domestic suppliers bid for tender . . . is open to abuse"; and that the Ministry, "and in particular, its[] operating subsidiary known as *Kimadia should be thoroughly restructured*, . . . *[and] its functions [should] be restricted*."  *2007 USAID Report* §§ 6.5.1.1, 7.2, 8.2.6 (emphasis added).

---

*Café, Inc.*, 2018 WL 372704, at *3 (E.D. Cal. Jan. 11, 2018) (refusing to consider a defendant's "inadmissible hearsay" on a Rule 12(b)(1) motion).

[21] *See* Def. Ex. 16 at 33 (U.S. "largely focused on improving the physical infrastructure"); Def. Ex. 18 at 5-7; Def. Ex. 19 at 110-11; Def. Ex. 23 at 6; Def. Ex. 25 at 29-30; Def. Ex. 26 at 2; Def. Ex. 27 at 5; Def. Ex. 29 at 91-94; Def. Ex. 30; Def. Ex. 31 § VI; Def. Ex. 32 at 9-12.

[22] *See* SIGIR, *The Year of Transition Enters the Fourth Quarter* 77 (Oct. 30, 2006) (Pl. Ex. 6; full version of Def. Ex. 44) (noting Army's "direct role in management oversight"); Def. Ex. 26 at 3 ("direct contracts"); Dkt. 72-30 at 98 (noting use of "U.S. government-controlled warehouse" in light of Kimadia "corruption"); *see also* Def. Ex. 22 at 7; Def. Ex. 24 at 10; Def. Ex. 39 at 2; Def. Ex. 43 at 12; Def. Ex. 44 at D-49.

Nowhere did USAID encourage foreign suppliers to sell into that broken procurement system. On the contrary: the report concluded that a "pre-requisite" for investment in the Ministry was new "privatisation and restructuring mechanisms" to curtail corruption. *Id.* §§ 1.8, 8.1.

Defendants' assertions (at 23) about the U.S. government's "direct aid and support" to the Ministry are similarly flawed. Many of their sources describe U.S. efforts to supply the Ministry in 2003 or early 2004 – in the aftermath of the invasion – when the United States or its handpicked Iraqi successors still ran the Ministry. SAC ¶ 54.[23] Such efforts say nothing about U.S. foreign policy toward the Ministry after Jaysh al-Mahdi later captured it. SAC ¶¶ 63-104. Moreover, Defendants repeatedly conflate U.S. spending on the *Iraqi health sector* with funding for the *Ministry* itself.[24] The United States undoubtedly spent money on the former. But it is one thing for the U.S. government to directly fund infrastructure projects subject to oversight and anti-corruption safeguards;[25] it is quite another for Defendants to structure their sales contracts to

---

[23] *See* Mem. at 5-6 & nn.4-9; Def. Exs. 3, 34, 71-72. Defendants also attach tangential exhibits discussing the Ministry in 2009 or later – when Jaysh al-Mahdi's control had begun to wane, SAC ¶ 104, but Defendants' sources admit that "reforms in MOH procurement and contracting were still needed," Def. Ex. 73 at 3. *See also* Def. Ex. 4 (2013 document); Def. Ex. 20 at 25 (2010 project); Def. Ex. 21 (2012 workshop); Def. Ex. 32 at 10 (describing mid-2008 plan for an "overall restructuring of the Ministry" to eventually "improve procurement systems"); Def. Ex. 33 at 85 (2009-2013 Strategic Plan); Def. Exs. 17, 45-47 (2009 documents).

[24] *Compare*, *e.g.*, Emergency Suppl. Appropriations Act for Defense & for the Reconstruction of Iraq & Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (2003) (allocating "$793,000,000 for health care"), *with* Mem. at 5 & n.5 (mischaracterizing that appropriation as going entirely to "fund and support the Ministry").

[25] Almost none of Defendants' sources suggests that the United States used the Kimadia process for distribution. *See* Dkt. 72-14 at 5 (noting that "Kimadia is a serious problem"). The one exception (Def. Ex. 25) – whose author is unknown and which merits no assumption of truth – does not suggest U.S.-funded goods were diverted. *Compare* Def. Ex. 25 at 30 (noting "installation and training of specified equipment with the vendors, Kimadia and the designated hospitals"), *with* Def. Ex. 16 at 34 (noting "revised distribution plan" given Ministry's "limited capacity" to "distribute large shipments") *and* Dkt. 72-30 at 98 (noting use of "U.S. government-controlled warehouse"). Although Kimadia monopolized "public medical-goods imports," SAC ¶ 47, it did not control non-profit, private, or U.S. government imports, *id.* ¶ 113.

enhance Jaysh al-Mahdi's ability to monetize their goods on the black market.  SAC ¶¶ 113, 117, 132.  Defendants cannot credibly claim that the latter served U.S. foreign-policy interests.

Finally, Defendants' materials (even if read in their favor) do not support dismissal because none expresses the government's "unqualified opinion that this suit must be dismissed." *Exxon*, 473 F.3d at 354.  Many are weekly USAID "update" newsletters (author and reliability unknown) that Defendants downloaded from a third-party website;[26] several are now-defunct webpages that Defendants dredged up through the "Internet Archive Wayback Machine";[27] and a few are cables (as published by *WikiLeaks*) reciting several layers of hearsay.[28]  Three others say on their face that they "do not necessarily reflect the views of [USAID] or the United States Government,"[29] while two more contain disclaimers denying any "endorsement . . . by the U.S. Department of Commerce" of the information Defendants cite, Def. Ex. 41 at 4; Def. Ex. 42 at 30.  Such materials – none of which has the benefit of a sponsoring witness – are far from the type of "authoritative expression[s]" of U.S. policy that can deprive the Court of jurisdiction. *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 384 (3d Cir. 2006).

---

[26] Def. Exs. 22-24, 27-28, 48; *see also* Def. Ex. 18 (anonymous USAID "fact sheet"); Def. Ex. 21 (anonymous USAID press release).

[27] Def. Exs. 30, 41-42.  The Internet Archive Wayback Machine is a free tool for retrieving archived versions of webpages that no longer exist.  *See* http://web.archive.org/.

[28] Def. Exs. 71-73.  Hearsay is not a reliable basis for finding jurisdictional facts in Defendants' favor.  *See supra* note 20.  By contrast, because Plaintiffs seek merely to proceed to discovery (rather than asking the Court to find facts), they are permitted to rely on hearsay to support their allegations at this stage.  *See*, *e.g.*, *Murray v. Amalgamated Transit Union*, 206 F. Supp. 3d 202, 207 (D.D.C. 2016) (plaintiffs are "not limited to evidence that meets the standards of admissibility" in opposing a jurisdictional motion to dismiss).

[29] Def. Ex. 5 at 3; Def. Ex. 32 at 3; *see also* USAID, *The USAID-TIJARA Provincial Economic Growth Program* at 3 of PDF (Nov. 2011) (Pl. Ex. 7; full version of Def. Ex. 40) (disclaimer cover page).  Even the more official-looking reports discuss the health sector only briefly as part of a broader, high-level survey of U.S. reconstruction.  *See*, *e.g.*, Pl. Exs. 4, 6 (examples); *see also* Def. Exs. 17, 19-20, 25-26, 29, 33, 44-45, 50.  Such generalized surveys offer no specific judgment about whether Defendants should have sold to the Ministry.

## III.     THE ACT-OF-WAR DEFENSE DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants next argue (at 28-38) that the ATA bars Plaintiffs' claims because Jaysh al-Mahdi was a "military force[ ]" engaged in "act[s] of war" against the United States. 18 U.S.C. §§ 2331(4)(C), 2336(a). At the outset, the "act of war exception" raises questions "best addressed on a motion for summary judgment or at trial." *Gill*, 893 F. Supp. 2d at 510. The SAC alleges several facts raising a plausible inference that Jaysh al-Mahdi was a terrorist group rather than a military force committing acts of war. SAC ¶¶ 55, 347-56, 409-10. Defendants' attempt (at 29-38) to rebut those allegations – through a mishmash of factual assertions, inferences from public statements, and international-law principles, *see* Def. Exs. 52-69, 74-75 – is premature. *See Kaplan v. Cent. Bank of Islamic Rep. of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018) ("*Kaplan II*") (act-of-war bar "presents a merits issue, not a jurisdictional one").

But if this Court is inclined to resolve Defendants' arguments now, it should reject them. An "act of war" is an act occurring "in the course of" (1) a "declared war," (2) an "armed conflict, whether or not war has been declared, between two or more nations," or (3) an "armed conflict between military forces of any origin." 18 U.S.C. § 2331(4). Defendants do not argue that this case implicates the first two prongs, and their attempt to squeeze Jaysh al-Mahdi's conduct into the third prong conflicts with the ATA's text and purpose.

### A.     Jaysh al-Mahdi Was Not A "Military Force"

#### 1.     Jaysh al-Mahdi consistently violated the laws of war

The ATA's act-of-war defense does not extend to non-state actors like Jaysh al-Mahdi that act in total disregard of the laws of war. The defense, as its first two prongs show, is focused on national armies. *See* 18 U.S.C. § 2331(4)(A)-(B). In cases that do not involve such armies, Congress used the term "military forces," *id*. § 2331(4)(C), to cabin the act-of-war defense to other legitimate armed groups that "act in substantial conformity with the laws of

war," *Gill*, 893 F. Supp. 2d at 517.  A law-of-war interpretation accords with the provision's plain text:  the adjective "military" ordinarily pertains "to the methods and customs of war or of organized fighting men," as in military "discipline."  *Webster's Third New Int'l Dict. Unabridged* 1433 (3d ed. 2002) ("*Webster's Third*").  Consistent with that plain meaning, the D.C. Circuit has upheld a jury instruction (for an "obedience to military orders" defense) that groups "must conduct their operations in accordance with the laws and customs of war to qualify as military organizations."  *United States v. Yunis*, 924 F.2d 1086, 1098 (D.C. Cir. 1991).  The same definition, which "track[s] language found in . . . the Geneva Convention and . . . the Hague Convention," *id.*, applies to the ATA.  *See Gill*, 893 F. Supp. 2d at 511-17.

That principle alone demonstrates that Jaysh al-Mahdi was not a "military force."  Jaysh al-Mahdi systematically disregarded the laws of war:  it slaughtered civilians on purpose; hid from U.S. troops in mosques, schools, ambulances, and hospitals; used children to perpetrate attacks; and engaged in mass sectarian cleansing.  SAC ¶¶ 13, 350-53.  It worked closely with Hezbollah, an FTO that has orchestrated terrorist attacks against Americans around the globe. *Id.* ¶¶ 357-76.  Jaysh al-Mahdi also kidnapped the relatives of several Plaintiffs and then tortured them, executed them in captivity, and mutilated the bodies.  *Id.* ¶¶ 827-73.  All the while, its fighters ignored the Geneva Conventions by refusing to carry arms openly or to distinguish themselves from civilians.  *Id.* ¶ 352.  Those are the criminal acts of a terrorist group, not the acts of a "military force."  *See* R. & R., *Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, slip op. at *3, *58-60 (E.D.N.Y. July 27, 2018) (Pollak, Mag. J.) (holding that Jaysh al-Mahdi was not a "military force[ ]" in Iraq because it "did not conduct [its] operations in accordance with the customs and laws of war"); *Gill*, 893 F. Supp. 2d at 517 (group that "violate[s] the laws of war to any substantial degree" is not "a 'military' force" under the ATA).

Jaysh al-Mahdi also bore additional hallmarks of a non-military terrorist group.  Acts of "terrorism" under the ATA are violations of U.S. criminal law designed to "coerce a civilian population" or influence "the policy of a government."  18 U.S.C. § 2331(1)(B).  The goal of a "military force" in a "war," by contrast, is to "vindicate [a government's] rights (principally, its inherent right of self-defense) under international law."  Dep't of Def., *Law of War Manual* §§ 1.5, 1.5.1 (updated Dec. 2016) ("*Law of War Manual*").  Jaysh al-Mahdi fits only the former category.  Sadr did not seek to vindicate Iraq's rights under international law; he instead called for "jihad" *against* Iraq's Coalition government.  SAC ¶¶ 144, 333, 353.  For those reasons, the U.S. military called Jaysh al-Mahdi a "terrorist organization," and one commander described it as a "mob with a lot of weapons."  *Id.* ¶ 347.  Congress did not intend the act-of-war bar to protect such groups.  *See Weiss v. Arab Bank, PLC*, 2007 WL 4565060, at *5-6 (E.D.N.Y. Dec. 21, 2007) (treating "terrorist organization" like Jaysh al-Mahdi as a "military force" would "pervert the very purpose of the ATA, which was enacted to deter terrorist activity").

Defendants assert (at 35) that a group can violate the laws of war while remaining a "'military force' engaged in armed conflict."  But the only ATA case they cite for that proposition was vacated by the D.C. Circuit and then repudiated by Congress.  *Compare Kaplan v. Cent. Bank of Islamic Rep. of Iran*, 961 F. Supp. 2d 185, 204 (D.D.C. 2013) ("*Kaplan I*"), *with* Dkt. 92 at 2-3 (detailing *Kaplan I*'s history).  Defendants' need to rely on *Kaplan I* is telling: that decision's flawed view of the ATA (which no other court has ever adopted) led it to conclude that *Hezbollah* was a protected "military force."  961 F. Supp. 2d at 203-04.  Congress since has specifically rejected *Kaplan I*'s holding and clarified that FTOs like Hezbollah can never be a "military force."  Pub. L. No. 115-253 § 2(a), 132 Stat. 3183 (2018), *codified at* 18 U.S.C. § 2331(6)(A)(i); *see* H.R. Rep. No. 115-858, at 4-5 (2018) (criticizing *Kaplan I* by name).

Defendants misconstrue (at 34-35) Congress's clarification and invite the Court to make the same errors that led Congress to abrogate *Kaplan I*. Defendants are correct (at 35) that FTOs "do not comply with the law of war," and so it never should "have been necessary for Congress to amend the statute to exclude" them. But the clarification became necessary because *Kaplan I* – following Defendants' logic – errantly concluded that Hezbollah was a "military force." *See* H.R. Rep. No. 115-858, at 4-5. Congress amended the statute to correct that error and restore "Congress' original intent," not to substantively alter the ATA. *Id*. at 5. Congress's clarification is decisive here. Jaysh al-Mahdi was modeled on Hezbollah, worked closely with Hezbollah's leadership, and functioned as "the Iraqi branch of Hezbollah." SAC ¶ 364; *see id*. ¶¶ 59, 365-407. If attacks against American troops by Hezbollah itself are categorically not attacks by a "military force," 18 U.S.C. § 2331(6)(A), the same must hold true of attacks committed by a Hezbollah-sponsored proxy group with Hezbollah's training, weapons, tactics, and participation.

It is no answer that the United States declined to designate Jaysh al-Mahdi itself as an FTO. *See* 18 U.S.C. § 2331(6)(B) (expressly preserving courts' ability to "determine[ ]" that a non-FTO like Jaysh al-Mahdi is "not [ ] a 'military force'"); SAC ¶¶ 355-56. As the House Judiciary Committee explained, the ATA "make[s] clear a person in addition to an FTO . . . may be found not to be a military force." H.R. Rep. No. 115-858, at 4 n.11. Jaysh al-Mahdi – which ignored the laws of war just like an FTO – exemplifies why Congress made that choice.

### 2.      The phrase "of any origin" does not help Defendants

Defendants criticize Plaintiffs' interpretation by noting (at 28, 32-35) that the act-of-war bar extends beyond conflicts "between two or more nations" to those "between military forces *of any origin*." 18 U.S.C. § 2331(4)(B), (C) (emphasis added). But "of any origin" modifies "military force," which Jaysh al-Mahdi was not. Indeed, Congress designed the act-of-war bar to "contrast the traditional actions of national militaries with those of terrorist groups." *Gill*, 893 F.

Supp. 2d at 515.  When it used the phrase "of any origin," it thus meant to encompass armies

that, though not belonging to an official "nation[]," 18 U.S.C. § 2331(4)(B), still "behave[] as

traditional military forces do," *Gill*, 893 F. Supp. 2d at 516.  That might include militaries

associated with not-fully-sovereign governments (like Taiwan), supra-national entities (like

NATO), or perhaps subnational autonomous governments (like the Kurdish Peshmerga) – if they

act in "substantial conformance with the laws of war."  *Id*. at 516.  But the phrase "of any origin"

cannot sweep in non-militaries like Jaysh al-Mahdi, which ignored the laws of war and

sabotaged the very democracy the Sadrists nominally supported.  SAC ¶¶ 80, 144, 347-50.[30]

Defendants' contrary reading is far too broad.  Given the ATA's structure, the act-of-war

exception's "military forces" prong is a narrow, belt-and-suspenders clause designed to capture

conflicts that closely resemble traditional wars between nations.  *See Gill*, 893 F. Supp. 2d at 516

(explaining this conclusion in light of "*ejusdem generis* rule").  After all, the plain meaning of

"military" connotes an association with a government,[31] and the Department of Defense

describes "the resort to military force" as the "prerogative of the State," *Law of War Manual*

§ 1.11.1.1.  The ATA reflects the same understanding:  Congress intended to limit the act-of-war

defense to "injuries that result from military action by recognized governments as opposed to

terrorists."  S. Rep. No. 102-342, at 46; *see* H.R. Rep. No. 115-858, at 5.  Defendants, however,

read (at 32) "of any origin" to flip that principle on its head and make the defense mainly about

---

[30] Those facts also distinguish this case from *Kaplan I*.  There, Hezbollah's attacks on Israel occurred during a "military conflict that was temporally limited, discrete, waged between Israel and Lebanon over the course of 34 days during the summer of 2006, and provoked by a discrete event."  961 F. Supp. 2d at 203.  For purposes of that discrete conflict – commonly called the "Israel-Lebanon war" – Hezbollah acted as "part of the Lebanese government."  *Id*. at 204.  This case is dissimilar in every respect.  *See* SAC ¶ 348 (distinguishing the Israel-Lebanon war).

[31] *See*, *e.g.*, *Webster's Third* at 1433 ("military" as an adjective describes things "performed or made by armed forces"); *id*. at 119 (defining "armed forces" as "the combined military, naval, and air forces of a nation or a group of nations").

"non-state" actors.  That interpretation has no support in the statute.  *See Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006) (refusing to extend act-of-war bar to non-state actors).

Defendants' observation (at 35) that "[n]ational militaries do not always adhere to the law of war" misses the point.  National militaries "traditionally," even if not "universally," act "in substantial conformance with the laws of war."  *Gill*, 893 F. Supp. 2d at 515.  Congress modeled the ATA's "military forces" prong on the traditional case.  *See id.* at 513-17.  If a true national military nonetheless violates the law of war, it might still point to a "declared war" or an "armed conflict . . . between two or more nations" to come within the act-of-war bar's first two prongs. 18 U.S.C. § 2331(4)(A)-(B).  But if Defendants were correct, both of those prongs would be superfluous because the "military forces" clause would already encompass virtually every armed group in the world.  The Court should reject that reading in favor of one that gives effect to all three prongs of the act-of-war defense and implements Congress's intent to shield only conduct that resembles "military action by recognized governments."  S. Rep. No. 102-342 at 46.

### 3.    Defendants rely on improper criteria in classifying Jaysh al-Mahdi as a "military force"

Defendants characterize (at 33-34) Jaysh al-Mahdi as a "military force" by invoking its use of military-style jargon and tactics.  But such characteristics have no bearing on whether it was a "military force" under the ATA.  *See Weiss*, 2007 WL 4565060, at *6 ("[t]o describe, in common parlance . . . that the terrorists engage in military or paramilitary-type activities does not mean [they are] a 'military force' ").[32]  Terrorists do not morph into a "military" by calling

---

[32] Jaysh al-Mahdi was not a lawful "militia" under Iraqi law, SAC ¶ 347, and colloquially describing it as one, *cf.* Mem. at 32-34, does not make it a "military force."  A "militia" in everyday parlance can refer to virtually any "group[ ] of citizens that are organized as to resemble an army."  *Webster's New World College Dictionary* 914 (4th ed. 2010).  Had Congress wanted to exclude all "militias" from the ATA, it would have used that term in the statute.  Defendants' own definition confirms the problem:  exempting all so-called "militia[s]"

themselves one, or by using military-grade weapons.  *See* 18 U.S.C. § 2339D (criminalizing

"knowingly receiv[ing] military-type training from" FTOs); *Morris*, 415 F. Supp. 2d at 1333

("'military' training" can be "employ[ed] . . . in a terroristic fashion to achieve terroristic ends").

Nor do they become a "military" by conquering territory.  *Compare* Mem. at 33-34, *with Doe v.*

*Mattis*, 889 F.3d 745, 747 (D.C. Cir. 2018) ("territory controlled by the Islamic State of Iraq and

the Levant").  Were it otherwise, the more sophisticated a terrorist group's operations – and the

more Americans it were able to kill as a result – the more likely its supporters would qualify for

act-of-war immunity.  Defendants cite no case endorsing such a perverse result.

Defendants' arguments betray their lack of any limiting principle.  As their own materials

confirm, U.S. and allied troops play a vital role in the global fight against terrorism.  *See*, *e.g.*,

Def. Ex. 54 at 27-28; Def. Ex. 57 at 1-2.  It is thus no surprise that terrorists like Jaysh al-Mahdi

often employ military-style attacks on Western military targets.  *See Morris*, 415 F. Supp. 2d at

1331; *Weiss*, 2007 WL 4565060, at *2, *5 (attacks on soldiers not acts of war under the ATA).

Treating such attacks as coming from a "military force" just because Jaysh al-Mahdi was well-

organized and versed in military tactics – something also true of Hezbollah, al-Qaeda, and other

FTOs[33] – would gut the ATA as a counterterrorism tool.  Simply put, a reading of "military

force" that would envelop all of the world's worst terrorist groups cannot be the correct one.  *See*

---

from the ATA would risk swallowing the statute.  Mem. at 32-33 ("'militia' . . . engages in rebel
or *terrorist activities*") (emphasis added) (quoting *Oxford English Dictionary* (3d ed. 2002)).

[33] *See* U.S. State Dep't, *Country Reports on Terrorism 2008* at 198 (Apr. 2009) (Pl. Ex. 8;
full version of Def. Ex. 52) (Hezbollah holds "military-style bases"); *id.* at 293 (CPP/NPA has a
"military wing" and conducts "guerilla warfare" against "U.S. military interests"), 296 ("Hamas
includes military and political wings" and executed a "military-style coup"), 306 (PKK uses a
"military wing" to attack "military and paramilitary targets"), 309 (Tamil Tigers wage
"battlefield insurgen[cy]" through an "amphibious force, the Sea Tigers," and an "air wing, the
Air Tigers"), 324-25 (Colombian FARC "organized along military lines" and takes
"conventional military action"); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552
F.3d 93, 138 (2d Cir. 2008) (al-Qaeda's "military committee" and "military commander").

*Freeman*, 2018 WL 3616845, at *59 (treating Jaysh al-Mahdi as a "military force" on the ground that it "engaged in military activities" would "effectively eliminate liability . . . under the ATA").

Defendants' comparison (at 35) of Jaysh al-Mahdi to the Taliban confirms the point. The Taliban is a quintessential "terrorist organization[ ]" whose fighters are "[u]nlike enemy soldiers in traditional wars." *Ali v. Obama*, 736 F.3d 542, 546 (D.C. Cir. 2013). Congress did not intend for the act-of-war defense to shelter groups like the Taliban, and Defendants' insistence (at 32, 35) that it did just reveals the absurdity of their position.[34] Indeed, Defendants earlier laid bare their view that, in the so-called "post-9/11 reality," not only the Taliban but also "al Qaeda and ISIS" are "military forces" waging "armed conflicts." Dkt. 72-01 at 36. They now try to paper over that concession by excising the al-Qaeda reference from their latest brief, but the logic remains the same. Much as the "al-Qaeda/Taliban structure" resembles a "military apparatus," *Alsabri v. Obama*, 764 F. Supp. 2d 60, 75 (D.D.C. 2011), so too did Jaysh al-Mahdi organize itself like a terrorist army. But none of those heinous groups is plausibly a "military force."

### B.  Jaysh al-Mahdi's Attacks On Plaintiffs Did Not Occur "In The Course Of" Any "Armed Conflict"

Even if Jaysh al-Mahdi were a "military force," the attacks that injured Plaintiffs did not occur "in the course" of any "armed conflict." 18 U.S.C. § 2331(4), (4)(C). To begin, Plaintiffs allege that the fight against Jaysh al-Mahdi was a law enforcement matter against terrorists rather than a traditional "armed conflict." SAC ¶¶ 55, 93-94, 349-50, 404-08. Indeed, "[f]ormal armed hostilities" in Iraq "ended on May 1, 2003," *id*. ¶ 55, when the U.S. military mission shifted to

---

[34] Although one decision used the words "Taliban military forces" in unrelated *dicta*, *Khairkhwa v. Obama*, 703 F. 3d 547, 549 (D.C. Cir. 2012), similar examples abound for many terrorist groups and prove nothing, *see*, *e.g.*, *United States v. Shah*, 474 F. Supp. 2d 492, 498-99 (S.D.N.Y. 2007) ("al Qaeda military"); *United States v. Assi*, 586 F. Supp. 2d 841, 846 (E.D. Mich. 2008) ("Hizballah military operation[s]"); *Universal Cable Prods. LLC v. Atl. Specialty Ins. Co.*, 278 F. Supp. 3d 1165, 1179 (C.D. Cal. 2017) (Hamas "action using military force").

civil reconstruction and nation-building, *id.* ¶¶ 349-50.  Defendants' attempt (at 29-32) to refute

those allegations with extra-pleading materials raises improper fact disputes.  *See United States*

*v. Prosperi*, 573 F. Supp. 2d 436, 545-55 (D. Mass. 2008) (noting that "Iraq conflict" ended in

May 2003 when President Bush declared that "[m]ajor combat operations in Iraq have ended").

    But even assuming that post-Saddam Iraq remained in "armed conflict," Plaintiffs were

not injured "in the course of" it.  18 U.S.C. § 2331(4).  "In the course of" is a "gatekeeper phrase

that is intended to exclude as a matter of law a subset of conduct" otherwise within the "general

. . . provision in question."  *Klieman*, 424 F. Supp. 2d at 164.  That phrase here thus operates to

exclude acts connected to an "armed conflict" that remain outside the category Congress

intended to protect.  *See id.* at 164-66.  "As a matter of law, an act that violates established norms

of warfare and armed conflict under international law is not an act occurring in the course of

armed conflict."  *Id.* at 166; *see Biton*, 412 F. Supp. 2d at 7-9 (adopting same legal rule).[35]

    That principle provides an alternative basis for rejecting Defendants' act-of-war defense.

The SAC describes, for every Plaintiff or family member attacked in Iraq, how Jaysh al-Mahdi

violated the laws of war in committing the attack.  SAC ¶¶ 408-3180.  For example, Jaysh al-

Mahdi kidnapped, tortured, and executed Michael Chand, as well as the civilians targeted in the

Crescent Security Kidnapping.  *Id.* ¶¶ 462-66, 828-36, 843, 853, 863-68.  Several other attacks

involved ambulances or mosques.  *Id.* ¶¶ 514, 560, 622, 1076, 1135.  Jaysh al-Mahdi regularly

attacked Plaintiffs without wearing uniforms, with weapons that indiscriminately placed civilians

at risk, or both.  *E.g.*, *id.* ¶¶ 531, 735, 737-38, 811, 822, 824, 919, 921, 1312.  It targeted William

---

[35] Defendants point (at 28, 38) to "any act," 18 U.S.C. § 2331(4), but that term is limited by both "in the course of" *and* "military forces," *id.* § 2331(4)(C).  It comes into play only if the act in question is "in the course of" an "armed conflict between military forces."  *Id.*; *cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (" 'any note' should not be interpreted to mean literally 'any note,' but must be understood against . . . what Congress was attempting to accomplish").

Kelso for being a medic.  *Id.* ¶¶ 556-58.  And it killed Master Sergeant Thomas and Colonel Scott in rocket attacks directed at civilians in the Green Zone.  *Id.* ¶¶ 735-38, 2781.

Many Plaintiffs were civilians not lawfully subject to attack at all.  *E.g.*, *id.* ¶¶ 462, 490, 523, 544, 547, 564, 650, 784, 862, 899, 949, 1325-26, 1447, 1529, 1735, 1926, 1934, 2179, 2240, 2317, 2481, 2578.  Dr. Stephen Everhart, for example, was a college professor whom Jaysh al-Mahdi ambushed and killed while he was returning from a seminar at an Iraqi business school.  *Id.* ¶¶ 1735-36.  Another civilian, Steven Vincent, was a journalist who was working on a reporting assignment when Jaysh al-Mahdi kidnapped and executed him.  *Id.* ¶¶ 3054-55.  And Michael Chand was a civilian providing security for road-construction projects.  *Id.* ¶¶ 462-63.

As for Plaintiffs in uniform, Jaysh al-Mahdi killed Specialist Tucker while he was returning "from helping to build a soccer field for Iraqi children."  *Id.* ¶ 673.  It wounded Specialists Connolly and Winegar while they were supporting their unit's mission to rebuild Iraq's sewer system and electric grid.  *Id.* ¶¶ 409, 486, 705.  It murdered Corporal O'Brien while he secured weapons in a "civilian location."  *Id.* ¶ 804.  Others were patrolling a gas station to "prevent Jaysh al-Mahdi from extorting the local population."  *Id.* ¶¶ 530, 808, 1063.  Even the "battles" were precipitated by terrorist acts:  in the Battle of Sadr City, for example, U.S. forces entered Sadr City to prevent Jaysh al-Mahdi (and Hezbollah) from terrorizing civilians in the Green Zone.  *Id.* ¶¶ 345, 397.  Such attacks – which served no legitimate combat purpose – did not occur "in the course of" any armed conflict.  *See Klieman*, 424 F. Supp. 2d at 166.

Contrary to Defendants' assertion (at 38), that conclusion does not limit the act-of-war defense to conduct that would never "qualif[y] as an 'act of international terrorism' in the first place."  *Kaplan II*, 896 F.3d at 513.  The legislative history makes that clear:  Congress saw a need to bar claims for "injuries that result from military action by recognized governments," S.

Rep. No. 102-342, at 46, because conventional warfare (even if law-of-war compliant) might meet the ATA's definition of "international terrorism," 18 U.S.C. § 2331(1).  Indeed, if jurisdictional requirements were met, a soldier's battlefield attacks on enemy troops could arguably "be a criminal violation," *id*. § 2331(1)(A), under any number of U.S. or state murder statutes – which generally contain no law-of-war defense, *see*, *e.g.*, *id*. §§ 1111, 1114.  And traditional combat activities could arguably appear "intended . . . to influence the policy of a government by intimidation or coercion." *Id*. § 2331(1)(B)(ii).  Defendants are thus incorrect (at 38) in asserting that "[a]ll acts of international terrorism, when committed in the course of armed conflict, violate the law of war."  In fact, military soldiers who engage in traditional combat are exactly who Congress had in mind when enacting the act-of-war defense.  *See* S. Rep. No. 102-342, at 45-46.  Jaysh al-Mahdi terrorists who use ambulances to murder Americans are not.

## IV.   PLAINTIFFS PROPERLY PLEAD AIDING-AND-ABETTING CLAIMS (COUNTS ONE AND TWO)

Counts One and Two allege that Defendants aided and abetted Jaysh al-Mahdi's terrorist acts in Iraq.  SAC ¶¶ 3181-3207.  Congress has instructed courts to apply *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "the proper legal framework for how [aiding-and-abetting] liability should function" under the ATA.  JASTA § 2(a)(5).  *Halberstam* identifies three elements of aiding-and-abetting liability:  (1) the principal violator must "perform a wrongful act," (2) "the defendant must be generally aware of his role" in the "overall illegal or tortious activity," and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 487-88.  Jaysh al-Mahdi's acts undisputedly satisfied the first element, and Plaintiffs properly allege the other two.  *See infra* Part IV.A.  Hezbollah also "committed, planned, or authorized" Jaysh al-Mahdi's terrorist acts.  *See* 18 U.S.C. § 2333(d)(2); *infra* Part IV.B.

A.    **Plaintiffs Adequately Allege That Defendants Knowingly And Substantially Assisted Jaysh al-Mahdi's Acts Of International Terrorism**

Defendants aided and abetted Jaysh al-Mahdi by providing resources it used to fund terrorist attacks on Americans in Iraq.  SAC ¶¶ 105-79.  *Halberstam* itself demonstrates that Defendants' assistance was "substantial."  There, the principal tort was a "long-running burglary enterprise" in which a man stole valuables from homes and, on one occasion, murdered a resident.  705 F.2d at 488.  The D.C. Circuit affirmed that the burglar's live-in companion was liable for aiding and abetting both the enterprise as a whole and the murder committed in the course of it.  *See id*. at 475-76.  Her assistance was limited to clerical tasks, like keeping the books and processing payments from buyers, that helped convert "stolen goods into 'legitimate' wealth."  *Id*. at 488; *see id*. at 474-76 (describing her role).  She neither assisted in nor knew about the murder.  *See id*. at 475-76, 488.  But her financial acts were substantial assistance "in the context of the enterprise [she] aided."  *Id*. at 488.  And because "violence and killing" was a "foreseeable risk" of the broader enterprise, she was liable for the murder even though she did not even "kn[ow] specifically that [her companion] was committing burglaries."  *Id*.

The D.C. Circuit determined that the woman's assistance to the burglary enterprise was "substantial" using six factors:  (1) the nature of the act assisted; (2) the amount and kind of assistance; (3) presence at the time of the tort; (4) relation to the tortfeasor; (5) her state of mind; and (6) the duration of the assistance.  *See id.* at 483-84.  Those factors support liability here.

1.    **Factors 1 and 2:  nature of the act assisted and amount of the aid**

a.    **Defendants' assistance was substantial in kind and amount**

*Halberstam*'s first factor explains that "the *nature of the act* involved dictates what aid might matter, *i.e.*, be substantial."  705 F.2d at 484.  The acts here are Jaysh al-Mahdi's terrorist attacks on Plaintiffs (as to Count One) and its terrorist enterprise as a whole (Count Two).

Financing of the type Defendants provided matters greatly to such activities.  *See Boim*, 549 F.3d at 690-91 (explaining importance of "cut[ting] the terrorists' lifeline" by separating them from "their financial angels").  That is why courts regularly hold that providing general funding to a terrorist group aids and abets the group's attacks.[36]  And courts more broadly hold that financial assistance – especially when involving unlawful kickbacks – aids and abets the enterprise being funded.[37]  Plaintiffs' allegations warrant the same conclusion.  Just as the burglary enterprise (and a related murder) in *Halberstam* benefited from laundering "stolen goods into 'legitimate' wealth," 705 F.2d at 488, so did Jaysh al-Mahdi's terrorist enterprise (and its attacks) benefit from corrupt financing extracted through Kimadia, SAC ¶¶ 165-79.

     *Halberstam*'s second factor concerns the "*amount [and kind] of assistance given* the wrongdoer."  705 F.2d at 484 (brackets in original).  Here, Defendants each gave Jaysh al-Mahdi at least several million dollars per year in cash and medical goods.  SAC ¶¶ 198, 221, 251, 261, 291, 318.  That assistance was greater than in *Halberstam*, where the assistance was not "overwhelming as to any given burglary."  705 F.2d at 488.  It also far exceeds the collective $1.7 million over nine years another court held sufficient for aiding and abetting Colombian terrorism.  *See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,

---

[36] *See Miller v. Arab Bank, PLC*, --- F. Supp. 3d ---, 2019 WL 1115027, at *9 (E.D.N.Y. Mar. 11, 2019) (bank's "financial support for terrorist organization" aided and abetted suicide bombings); *Abecassis I*, 785 F. Supp. 2d at 645-49 (Oil-For-Food "kickbacks" aided and abetted terrorist attacks in Israel because Saddam "diverted" them "to make reward payments to families of suicide bombers"); *Wultz*, 755 F. Supp. 2d at 57 (bank's processing of transactions for terror group aided and abetted Tel Aviv bombing); *Linde I*, 384 F. Supp. 2d at 584 (similar).

[37] *See, e.g.*, *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997) ("Participation in the financing of a[n] [unlawful] scheme, particularly where . . . the financing was not routine, constitutes substantial assistance."); *Twenty First Century L.P.I. v. LaBianca*, 19 F. Supp. 2d 35, 42 (E.D.N.Y. 1998) (finding defendant liable for aiding and abetting breach of fiduciary duty by "pa[ying] kickbacks to [plaintiff's] employees").

190 F. Supp. 3d 1100, 1104 (S.D. Fla. 2016) ("*Chiquita I*").  Much as in that case, Defendants' funding here helped Jaysh al-Mahdi "continue and intensify its terror campaign."  *Id*. at 1119.

*Abecassis I* is especially instructive.  There, the court held that plaintiffs had stated an ATA aiding-and-abetting claim based on the defendants' corrupt payments to Saddam's regime under Oil-For-Food, which supplied Saddam with fungible resources he could use to "support terrorist activity in Israel."  785 F. Supp. 2d at 646-49.[38]  One company allegedly made $5.5 million in corrupt payments, which formed part of a $6 billion slush fund Saddam had created by "manipulating the Oil for Food program."  *Id*. at 622-23.  Although the company's payments were less than 0.1% of that broader fund, the "kickbacks" gave Saddam at least some "unrestricted money" he could make "available for terrorist activities" against Israel.  *Id*. at 647.  The court held that liability in such circumstances accorded with "Congress's clear intent to resist terrorism by cutting off the sources of funding to terrorist groups."  *Id*. at 645.

The same is true here.  Although Defendants were not Jaysh al-Mahdi's sole source of funds, their corrupt payments supplied Jaysh al-Mahdi with an important stream of revenue.  SAC ¶¶ 165-79.  That is more than enough for liability.  *See Abecassis I*, 785 F. Supp. 2d at 647-49.  In fact, given the reprehensible nature of Jaysh al-Mahdi's conduct, *Halberstam* would support liability even if Defendants played only a "relatively trivial role" in financing it.  705 F.2d at 484 n.13 ("[A] defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act.").  Because Defendants played a more-than-trivial role in funding one of the most "blameworth[y] . . . act[s]" imaginable, *id*. – heinous terrorist attacks on Americans rebuilding Iraq – Plaintiffs' aiding-and-abetting claims should proceed.

---

[38] *Abecassis I* was decided before JASTA codified secondary liability, but it viewed 18 U.S.C. § 2333(a) as permitting both primary and aiding-and-abetting liability, the latter of which it evaluated using principles similar to those in *Halberstam*.  *See* 785 F. Supp. 2d at 637, 645.

b.        **Defendants' arguments lack merit**

Defendants' effort (at 55-60) to downplay their assistance is unpersuasive.  Defendants

may not have "suppl[ied]" Jaysh al-Mahdi "with bombs or bullets," Mem. at 57, but they did

supply the resources with which to acquire such weapons, SAC ¶¶ 8, 165-79.  That included cash

"commissions," *id*. ¶¶ 142-64, which is one type of aid the ATA is plainly intended to curtail, *see*

*Abecassis I*, 785 F. Supp. 2d at 645 (aiding and abetting should be applied to "cut[] off the

sources of funding to terrorist groups").  Defendants' corrupt payments also took the form of free

pharmaceuticals and medical devices, which they knew Jaysh al-Mahdi would convert into cash

or use to pay rank-and-file terrorist fighters.  SAC ¶¶ 167-73, 175-79.  In context, those "free

goods" functioned as cash equivalents (to be used as terrorist finance) rather than legitimate

medical goods (to be used in public health facilities).  *Id*. ¶¶ 117-20, 129-33, 137-40, 176.

Defendants' contrary arguments merely confirm the potency of their scheme.  One reason

Defendants relied so heavily on "free goods" payments was that they could cloak those payments

in specious humanitarian justifications, *id*. ¶ 118 – the same ones Defendants repeatedly invoke

here. *E.g.*, Mem. at 1 ("life-saving medicines and equipment").  But Defendants did not intend

their "free goods" to serve any humanitarian function; that is why they structured them as off-

book donations and packaged them to facilitate black-market diversion.  SAC ¶¶ 120, 137-38.

Given Jaysh al-Mahdi's control of the Ministry, such in-kind payments were functionally the

same as cash donations to terrorists.  *Id*. ¶¶ 117, 169-72.  Defendants' attempt to disguise those

payments as legitimate commercial activity only adds to their culpability.  *See Halberstam*, 705

F.2d at 488 ("laundering" burglary proceeds was "important" part of substantial assistance).

Defendants are also mistaken (at 55) in asserting that they provided no "assistance to the

person who committed" the terrorist acts at issue.  The relevant "person" under 18 U.S.C.

§ 2333(d)(2) is Jaysh al-Mahdi,[39] not individual terrorists, and Plaintiffs amply allege assistance to that group.  JASTA's "broad[]" definition of the term "person" confirms that a "defendant may be liable under the ATA for aiding the organization behind the attacks, not only the individual 'triggerman.'"  *Miller*, 2019 WL 1115027, at *9.  That result makes sense:  limiting liability to cases where the defendant aids the individual terrorist who plants the bomb – or where plaintiffs can somehow "show that a particular dollar was used in furtherance of a particular attack" – would make ATA cases all-but-impossible to bring and frustrate the statute's purpose of deterring terrorist finance.  *Id*. at *7; *see Goldberg*, 660 F. Supp. 2d at 429.[40]

Defendants fare no better in trying to diminish (at 55-56) the causal link between their assistance and terrorism.  Plaintiffs' aiding-and-abetting claims do not require Defendants themselves (as opposed to the terrorists they funded) to have proximately caused the attacks at issue.[41]  *Halberstam* itself rules out proximate cause as an important factor, *see* 705 F.2d at 481 (no requirement that "the injury had directly resulted from the encouragement"), and one of Defendants' own cases (at 56) held it "unnecessary to show a cause-effect relationship between the assistance and the primary violation," *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 108

---

[39] *See* 18 U.S.C. § 2333(d)(1); 1 U.S.C. § 1; *Freeman*, 2018 WL 3616845, at *17 ("Congress intended a broader definition of 'person' beyond just the specific individual [terrorist] . . . who, for instance, actually planted the EFP").  "Person" has an even broader meaning in 18 U.S.C. § 2333(d) than it does in the ATA generally.  *See* 18 U.S.C. § 2331(3).

[40] Defendants' cases (at 57-58) are inapposite.  The conduct in *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904 (N.D. Cal. 2018), was failing to exclude ISIS from a social-media platform – a "routine service[] generally available to members of the public."  *Id*. at 918.  Defendants' corrupt payments – neither routine nor generally available, but calibrated to facilitate Jaysh al-Mahdi's illegal activities – distinguish this case from *Tammneh* and all the other social-media cases Defendants cite (at 55, 57-59, 69).  *See* Dkt. 91 at 2-3 (explaining distinction).

[41] *See Owens IV*, 897 F.3d at 276-77 (defendant itself "would not need to satisfy any of the ATA's elements," including proximate causation, "to be held liable" as an aider-and-abettor); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018) ("*Linde II*") (defendant's own conduct need not be "a proximate cause of plaintiffs' injuries" for secondary liability).

(D.D.C. 2017).  JASTA further reinforces the point:  Congress intended to reach companies that provide "resources, *directly or indirectly*, to persons or organizations that pose a significant risk of committing acts of terrorism."  JASTA § 2(a)(6) (emphasis added).  Criticisms of Plaintiffs' causal theory thus provide no reason to dismiss the aiding-and-abetting claims.[42]

In any event, Plaintiffs adequately plead proximate cause for the reasons explained below.  *See infra* Part V.A.  Here, as with Plaintiffs' primary-liability claims, Defendants' arguments (at 56-57) fail because the Ministry was not the "intermediary" they say it was.  *See infra* Part V.A.2.  The Ministry was controlled by Jaysh al-Mahdi and served as the group's nerve center:  terrorists used it to raise money, employ fighters, smuggle weapons, and even conduct attacks.  SAC ¶¶ 63-112.  In fact, Sadr obtained control of Kimadia precisely so that Jaysh al-Mahdi could reap the benefit of corrupt transactions like the ones Defendants executed.  *Id*. ¶ 167; *see Miller*, 2019 WL 1115027, at *1-2, *9 (financing through "front organizations" supported secondary liability); *Abecassis I*, 785 F. Supp. 2d at 647-49 (similar for kickbacks funneled through Saddam).  None of Defendants' secondary-liability cases (at 56) involved "intermediaries" even remotely similar.[43]  Moreover, many of Defendants' corrupt payments (including cash "commissions") were *extra-contractual* payments that never touched the Ministry at all.  SAC ¶¶ 142-64.  Such payments are more than enough for aiding and abetting.

---

[42] Defendants' reliance (at 55-56) on the Restatement is misplaced.  Its discussion of "legal causation" does not address the factors for determining substantial assistance; rather, it addresses the scope of liability when an aider-and-abettor "encourages another to commit a tortious act" but the tortfeasor then goes on to commit separate "not foreseeable" acts.  Restatement (Second) of Torts § 876 cmt. d (1979).  That has no bearing on Defendants' liability here.

[43] *Cf. Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *3 (D.D.C. Jan. 11, 2018) (no allegation that "any transaction [defendant] processed for Sudan or Sudanese banks was transferred to al Qaeda"); *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018) (no allegation that defendants "were even generally aware that the financial services they provided [to a separate bank] were directly assisting [any] terrorist organizations").

2.      **Factor 5:  Defendants' state of mind**

**a.**      *Halberstam*'s fifth factor instructs that "the *state of mind* of the defendant may
also be relevant."  705 F.2d at 484.  The only requirement is that the defendant "be generally
aware of his role as part of an overall illegal or tortious activity."  *Id*. at 477.  An aider-and-
abettor need not "have a full understanding" nor "know all of the details" of the tort.  *Aetna Cas.
& Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535-36 (6th Cir. 2000).  On the contrary:  only
"some degree of knowledge" is necessary.  *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991).

The SAC sufficiently pleads Defendants' knowledge.  That is true in part due to the
corrupt structure of their transactions:  they made unlawful payments (in either cash or in-kind
product) structurally designed to funnel off-book resources to Jaysh al-Mahdi.  SAC ¶¶ 117-20,
132-39, 142-45, 165.  The "very object of sidestepping" ordinary FCPA restrictions on those
transactions "was to provide money for [Jaysh al-Mahdi members] to achieve ends other than
providing for the welfare of Iraqi civilians."  *Abecassis I*, 785 F. Supp. 2d at 647.  Such
allegations alone "support an inference that the defendants knew that money paid in kickbacks
would be used to support terrorist activity."  *Id*; *see Halberstam*, 705 F.2d at 487 (inferring
knowledge from services performed "in an unusual way under unusual circumstances"); *Camp*,
948 F.2d at 459 (similar).  The financing here may have occurred "in the shadows," Mem. at 52,
but they were shadows that Defendants knew about and exploited:  raising money using black-
market medical goods was a well-known practice in Iraq and had a long, public pedigree dating
back to Oil-For-Food.  SAC ¶¶ 50-53, 117-20, 130-32, 137-38, 182-85.

Additional allegations aver that Defendants knew Jaysh al-Mahdi would use their corrupt
payments to support terrorist attacks on Americans in Iraq.  *Id.* ¶¶ 180-87.  Defendants
negotiated those payments at in-person meetings at the Ministry headquarters surrounded by the
trappings of Jaysh al-Mahdi's terrorist agenda, *id*. ¶¶ 10, 121, 180:  propaganda posters paying

homage to known terrorist Muqtada al-Sadr, Jaysh al-Mahdi's unmistakable black flag, terrorist

fighters and weapons, and "Death to America" slogans, *id*. ¶¶ 10, 73-74, 89-90, 180-81.

Defendants could not have entered that building without being at least "generally aware" they

were "playing a 'role' in [Jaysh al-Mahdi's] violent or life-endangering activities." *Linde II*, 882

F.3d at 329-30 (quoting *Halberstam*, 705 F.2d at 477).  Indeed, *USA Today* reported that Jaysh

al-Mahdi's overt control of the Ministry left no "doubt[ ] about who runs the place."  SAC ¶ 180.

Press coverage documenting Jaysh al-Mahdi's control of the Ministry further shows

Defendants' knowledge.  *Id.* ¶¶ 11, 183-85.  Publicly available articles reported (among other

things) that the Ministry was "under the control of the Shia cleric Moqtada al-Sadr" and "his

militia, the Mahdi Army"; that Ministry officials effected "the diversion of millions of dollars to

[their] Shiite Muslim militia"; and that the Ministry's procurement system was "in the 'grip' of

the Mahdi Army."  *Id*. ¶¶ 11, 183.  A publicly disclosed report from the U.S. Embassy likewise

warned that the Ministry was "openly under the control of the Mehdi Army" and was allowing it

to "finance[ ] operations from diverted medicines."  *Id*. ¶ 184.  Courts regularly sustain

allegations of knowledge under the ATA based on public reporting much less compelling.[44]

Defendants respond (at 51-53) with jury arguments, claiming they thought the Ministry

was run by the "Sadrist political party" rather than Jaysh al-Mahdi.  But there was no meaningful

distinction between the two, SAC ¶ 59, and even if there were, Defendants overlook the many

public sources attributing control of the Ministry to Jaysh al-Mahdi specifically.[45]  As for the

---

[44] *See Abecassis I*, 785 F. Supp. 2d at 647 (sustaining knowledge allegations based on "news stories"); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1318-20 (S.D. Fla. 2018) ("*Chiquita II*") (finding triable issue on knowledge given "widely reported news" about terror group); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *15 (E.D.N.Y. Oct. 5, 2006) ("press discussions"); *Goldberg*, 660 F. Supp. 2d at 433 ("public sources of information").

[45] *See*, *e.g.*, SAC ¶ 183 (second bullet:  linking Minister to "Mehdi Army"); *id*. (fourth bullet:  "[m]ost of the security guards in the morgue and the ministry are affiliated to [Sadr's]

argument (at 52) that the Sadrists only used the Ministry for "patronage," it conflicts with reports that Jaysh al-Mahdi used the Ministry to transport death squads, launch attacks, and raise money for terrorism.  SAC ¶¶ 86-92, 183-84.  Defendants ignore those allegations and – based on one sentence fragment in one of the more-than-20 articles Plaintiffs cite – contend (at 52) that Sadr really just wanted to "provide services to the poor."  They should save such assertions for trial.

Defendants' reliance (at 52-53) on purported U.S. policy toward the Ministry is likewise misplaced for the reasons stated above.  *See supra* Parts I, II.C.  During the relevant period, the three most high-profile indications of U.S. policy toward the Ministry were:  (1) the Deputy Health Minister's criminal arrest and prosecution, SAC ¶¶ 93-96; (2) the U.S. Embassy's conclusion that the Ministry "has an atrocious reputation" and was "openly under the control of the Mehdi Army," *id*. ¶ 169; and (3) the Iraq Study Group's conclusion that the Sadr-controlled Ministry "will not work with Americans," *id*. ¶ 76.  Defendants cannot credibly claim they thought their kickbacks to the criminals running the Ministry were consistent with U.S. policy.

**b.**      Defendants have no good answer for Plaintiffs' knowledge allegations, so they move the goalposts and argue (at 58-59) they did not "share[ ] JAM's intent to kill American soldiers."  But no such specific-intent standard appears in the statute.  Under that standard, *Halberstam* would have reversed, because the defendant did not know about (much less intend) the murder for which she was held liable.  *See* 705 F.2d at 475-76, 488.[46]  But *Halberstam* affirmed, and the D.C. Circuit later confirmed that an "aider and abettor" need not "share the

---

militia, the Mahdi army"); *id* (fifth bullet:  "controlled by the Mahdi Army"); *id*. (eleventh bullet: "diversion of millions of dollars to a Shiite Muslim militia").

[46] Although Defendants quote (at 58) another part of *Halberstam* discussing a defendant who was "one in spirit" with the principal violator, that was merely one example of a state-court case that found liability – not a suggestion that being "one in spirit" is necessary in all cases. *Halberstam*, 705 F.2d at 484 (citing *Rael v. Cadena*, 604 P.2d 822 (N.M. 1979)).

same purpose as the principal." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-36 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *see Ofisi*, 2018 WL 396234, at *4 n.8 (similar).  Whatever the merits of Defendants' out-of-circuit cases (at 58-59), they cannot override those holdings.  *See also Linde II*, 882 F.3d at 329 (no "specific intent" requirement).[47]

Defendants' argument also conflicts with congressional intent.  Defendants previously conceded (Dkt. 72-1 at 58-59) that primary liability under the ATA requires only knowledge or recklessness.  *See also infra* Part V.C.  JASTA incorporates a standard at least as lenient. Congress intended JASTA to *expand* liability under the ATA, *see* JASTA § 2(a)(4), (b), and Defendants offer no plausible reason Congress would have included in JASTA a specific-intent requirement more defendant-friendly than the one required for primary liability under the ATA. In fact, JASTA does not even require actual knowledge; its scienter standard demands only recklessness.[48]  Defendants cannot use the substantial-assistance inquiry to smuggle in a state-of-mind requirement more demanding than the scienter standard Congress actually imposed.

### 3.   Factors 3, 4, and 6:  presence, relationship, and duration

The remaining *Halberstam* factors either are neutral or cut in Plaintiffs' favor.  The third factor asks whether a defendant was "*present at the time* of" the principal tort.  705 F.2d at 488. Defendants, as in most ATA cases, assisted Jaysh al-Mahdi by supplying financing – not by

---

[47] Defendants seek to distinguish (at 59) JASTA's "general scienter element" from the state-of-mind substantial-assistance factor, but their argument conflicts with *Halberstam* itself.  When the court there analyzed the defendant's state of mind, it inferred her "long-term intention" from the fact that her "assistance was knowing."  705 F.2d at 488.  A separate specific-intent showing is thus unnecessary for either scienter or "substantial assistance."  *See also*, *e.g.*, *Camp*, 948 F.2d at 460 (substantial-assistance prong of inquiry requires only "some degree of knowledge").

[48] *See* JASTA § 2(a)(6)-(7) (explaining Congress's intent to cover defendants that "recklessly" provide resources to terrorist groups); *see also Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000) (recklessness supports aiding-and-abetting liability under the securities laws); *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 296-97 (D.C. Cir. 1994) (interpreting the word "knowingly" in another civil statute to impose liability for recklessness).

showing up at the scene of the terrorist attacks.  As in *Halberstam* itself, Defendants' physical absence during the attacks is no bar to liability.  *See id.* at 482 ("the aiding-abetting action may also be more distant in time and location and still be substantial enough ").

As for the fourth factor, Defendants' "*relation to the tortious actor*," *id.* at 488, Defendants cooperated with Jaysh al-Mahdi in structuring their transactions to finance terrorism, SAC ¶¶ 105-87.  The lack of some "special relationship" to any "[Jaysh al-Mahdi] fighter," Mem. at 58, is irrelevant because the relevant "person" that Defendants aided under 18 U.S.C. § 2333(d) was the group Jaysh al-Mahdi.  *See supra* pp. 43-44; *see also Halberstam*, 705 F.2d at 488 ("we accord [the relationship factor] a low priority in our calculus").

Finally, the sixth factor – "the *duration of the assistance*" – confirms that Defendants' assistance was substantial.  *Id.*  Defendants supplied Jaysh al-Mahdi with corrupt sources of financing throughout (at least) the nine-year period from 2004 to 2013.  SAC ¶ 7.  Much of that conduct has continued in recent years, *id.* ¶¶ 202, 271, 295, 321, and most Defendants engaged in similar misconduct from 2000-2003 under Oil-For-Food, *id.* ¶¶ 2, 44-53.  The longevity of Defendants' scheme well exceeds the "five years" at issue in *Halberstam*.  705 F.2d at 474.  This factor thus supports liability even more "strongly" here than it did there.  *Id.* at 488.

### 4.    The Manufacturers are also liable

Plaintiffs' substantial-assistance allegations apply equally to the Manufacturers.  SAC ¶¶ 193-94, 219-20, 249-50, 255-56, 287-88, 314-15.  To begin, the Manufacturers are "vicariously liable" for the misconduct of their agent Suppliers.  *See Meyer v. Holley*, 537 U.S. 280, 285 (2003).  Agency requires that an agent act "on the principal's behalf and subject to the principal's control."  Restatement (Third) of Agency § 1.01 (2006).  Here, Iraqi law required the Manufacturers to provide written authorizations designating the Suppliers as their "sole and exclusive . . . represent[atives]" in Iraq, SAC ¶¶ 156-57, and the Manufacturers had the right to

control the transactions the Suppliers negotiated on their behalf, *id*. ¶¶ 156-57, 193, 219, 249, 255, 287, 314.  That alone raises a plausible inference of agency.  *See Pontrelli v. MonaVie, Inc.*, 2014 WL 4105417, at *4 (D.N.J. Aug. 19, 2014) ("Distributors" were agents of manufacturer that manifested "consent and authorization to have the Distributors to act on their behalf").

Defendants argue (at 47 n.70) that Plaintiffs' allegations of control are deficient, but they ignore that a principal need not have the "right to control the full range of the agent's activities." Restatement (Third) of Agency § 1.01 cmt. c.  Here, the Manufacturers had the right to control what mattered:  they had authority to decide whether to sell to the Jaysh al-Mahdi-controlled Ministry and whether (and in what way) to use their products as in-kind bribes.  SAC ¶¶ 156-57. The Manufacturers cannot escape liability for their agents' misconduct by failing to exercise their authority to stop it.  *See* Restatement (Third) of Agency § 1.01 cmt. c ("[a] principal's failure to exercise the right of control does not eliminate it"); *Lopez v. Council on American-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 499 (D.C. Cir. 2016) ("Actual control . . . is not the test; it is the right to control which is determinative.").

Further, unlike in the cases Defendants cite (at 47 n.40),[49] the Suppliers here were not independent wholesalers buying from manufacturers and re-selling at a mark-up while bearing the inventory risks.  Rather, they were "sales agents" acting as a "middleman" between the Ministry and their affiliated Manufacturers to "facilitate[] the purchase."  *Elite Int'l Enter., Inc. v. Patton Wallcoverings, Inc.*, 2014 WL 1652197, at *5 (E.D. Mich. Apr. 24, 2014).  Those types of distributors are agents.  *See id.*; *Pontrelli*, 2014 WL 4105417, at *4-5.  That is particularly true because each Supplier acted in concert with its affiliated Manufacturer(s) as an integrated

---

[49] *See CNE Direct, Inc. v. Blackberry Corp.*, 821 F.3d 146, 151-52 (1st Cir. 2016); *Hull v. Eaton Corp.*, 825 F.2d 448, 457-58 (D.C. Cir. 1987).

business unit.  *See* SAC ¶¶ 203-04, 207-08 (AstraZeneca), 233-34, 237-38, 240 (GE), 273-77

(J&J), 296-301, 304 (Pfizer), 322-24 (Roche).  Such close affiliates are nothing like the third-

party wholesalers to which the Manufacturer Defendants analogize themselves.[50]

        In any event, the Manufacturers directly participated in the aiding and abetting by paying

bribes to register with the Ministry, confirming the Suppliers' authority to execute the corrupt

transactions, and manufacturing goods they knew would be used to fund terrorism.  SAC ¶¶ 194,

220, 250, 256, 288, 315.  That is enough for liability, with or without an agency relationship.

*See*, *e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F.

Supp. 2d 495, 510-11 (S.D.N.Y. 2009) (even "clerical and ministerial" conduct can support

aiding-and-abetting liability when it "substantially contribute[s]" to principal tort).  By enabling

their business units' corrupt payments, the Manufacturers did not engage in "routine commercial

activity," Mem. at 60; they knowingly contributed to terrorist finance.[51]

> **B.     Plaintiffs Adequately Allege That Hezbollah "Committed, Planned, Or
>          Authorized" The Relevant Acts Of International Terrorism**

        JASTA imposes aiding-and-abetting liability for injuries arising from an "act of

international terrorism committed, planned, or authorized" by an FTO.  18 U.S.C. § 2333(d)(2).

Plaintiffs allege that Hezbollah, an FTO since 1997, "planned," "authorized," and sometimes

helped "commit[ ]" the attacks that injured Plaintiffs.  SAC ¶¶ 357-408.  Defendants concede (at

---

[50] *See also City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1070 (N.D. Ill. 2016) (plausible inference that J&J distribution subsidiary had "agency relationship" with "Johnson & Johnson"); *Gourdine v. Karl Storz Endoscopy-America, Inc.*, 223 F. Supp. 3d 475, 496-97 (D.S.C. 2016) (medical-goods distributor was agent of affiliated manufacturer where they "work[ed] together" as part of "one business enterprise" that was "divided into numerous parts").

[51] *See Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 641 (E.D.N.Y. 2017) (companies "cannot 'routinely' provide [commercial] services, if they provide those services with knowledge of their assistance in funding terrorist activities"); *Miller*, 2019 WL 1115027, at *6 ("Whether financial services are 'routine . . . raises questions of fact for a jury to decide.' ") (quoting *Linde II*, 882 F.3d at 327).

61 n.77) that Plaintiffs allege Hezbollah helped "commit[]" 22 attacks against 35 families, including a joint 2007 Jaysh al-Mahdi-Hezbollah rocket attack on the Green Zone. *See* SAC ¶¶ 735-39. The same logic applies to the nearly identical 2008 Hezbollah-directed rocket attacks on the Green Zone, which precipitated the Battle of Sadr City. *Id.* ¶¶ 397, 738-39. Including those Battle of Sadr City injuries,[52] which the Hezbollah rocket attacks caused, *id.* ¶¶ 345, 397, Defendants' view of JASTA would allow 288 Plaintiffs' claims (out of 1258 total) to proceed.

But Defendants' interpretation would nullify the words "planned" and "authorized" in the statute, and the Court should reject it. Under the proper standard, Hezbollah "planned" and "authorized" *all* of the Jaysh al-Mahdi attacks that killed and injured Plaintiffs.

### 1.    Hezbollah "planned" the terrorist attacks that injured Plaintiffs

Hezbollah "planned" the Jaysh al-Mahdi attacks that injured Plaintiffs. To "plan" something means to "arrange the parts of:  [to] design." *Webster's Third* at 1730. Here, Hezbollah arranged and designed the Jaysh al-Mahdi terrorist attacks at issue. It did so by co-founding Jaysh al-Mahdi as its terrorist proxy to undermine U.S. interests in Iraq, SAC ¶¶ 56, 364; recruiting, training, and equipping Jaysh al-Mahdi fighters, *id.* ¶¶ 366-68, 390-92, 404-07; instructing those fighters how to execute attacks specifically designed to kill Americans, *id.* ¶¶ 389-401; dispatching senior operatives to Iraq to oversee and support those attacks, *id.* ¶¶ 367-

---

[52] SAC ¶¶ 428-35, 595-601, 633-35, 672-83, 684-92, 704-11, 1084-90, 1194-96, 1336-40, 1419-26, 1455-62, 1536-41, 1542-49, 1582-89, 1607-14, 1685-91, 1727-34, 1758-61, 1770-74, 1790-94, 1868-72, 1890-94, 1942-46, 1963-72, 1981-97, 2016-18, 2029-37, 2082-84, 2094-2101, 2128-37, 2138-44, 2173-78, 2185-87, 2256-58, 2273-75, 2279-87, 2330-32, 2336-40, 2344-48, 2360-67, 2368-70, 2421-29, 2466-72, 2494-2502, 2503-05, 2558-61, 2689-96, 2731-37, 2810-14, 2821-28, 2937-43, 2972-83, 3013-20, 3021-28, 3063-67, 3094-97, 3111-14, 3136-38, 3148-55, 3156-58. As for the Capra Family, *id.* ¶¶ 439-61, Plaintiffs allege that Tech. Sgt. Capra died in an attack committed by Ansar al-Sunna ("AAI"), an FTO, *id.* ¶ 440. Defendants say (at 60 n.76) they did not aid that group, but they ignore the allegations that the Capra Family was injured "by reason of" Jaysh al-Mahdi's terrorist campaign, 18 U.S.C. § 2333(a), because Jaysh al-Mahdi supported and proximately caused the AAI attack, SAC ¶ 441.

70; and devising the tactics – such as EFPs and 107mm rockets – that Jaysh al-Mahdi used to kill Americans in Iraq, *id*. ¶¶ 393-402.  Hezbollah even memorialized its scheme to sponsor such attacks in a document that five U.S. Senators later called a "planning guide."  *Id*. ¶¶ 399, 402.

Further, each Plaintiff (or a family member) was attacked using particular tactics – and in a particular geography – specifically attributable to Hezbollah.  *Id*. ¶¶ 393-401 (describing Hezbollah's role in planning small-arms, IED, EFP, rocket, mortar, and RPG attacks, as well as complex attacks and kidnapping operations); *id*. ¶ 403 (describing Hezbollah's role in the particular geographies where Plaintiffs were injured).  Without Hezbollah's training and sponsorship, Jaysh al-Mahdi would have been unable to perpetrate those types of attacks in those geographies.  *Id*. ¶¶ 389-407.  Hezbollah's role in purposefully designing and making arrangements for those attacks constitutes "planning."  *See Webster's Third* at 1730.

Plaintiff Billy Johnson, whose claims Defendants previously singled out (Dkt. 72-01 at 67-68) for criticism, well illustrates that point.  SAC ¶¶ 544-46.  On December 9, 2007, Jaysh al-Mahdi detonated an EFP in Wasit Province that injured Mr. Johnson.  *Id*. ¶ 545.  EFPs were "expressly designed to penetrate" armor like Mr. Johnson's, and they were "exclusively associated with Hizballah."  *Id*. ¶ 395.  They were also virtually unheard of in Iraq until Hezbollah, which was the "world's foremost expert on EFPs," "introduced" them to Iraq in 2004 by teaching Jaysh al-Mahdi how to use them against American convoys like Mr. Johnson's.  *Id*. Hezbollah instructed Jaysh al-Mahdi to use EFPs – through a multipronged plan to foster EFP attacks against Americans in Iraq, *id*. ¶ 396 – because of their unique ability to pierce American armor.  *Id*. ¶¶ 364, 370-71, 395-96.  And Hezbollah's sponsorship of EFP attacks extended specifically to the Wasit Province cell that attacked Mr. Johnson.  *Id*. ¶¶ 402, 545.

Despite all those allegations, Defendants insist (at 61) there are "no concrete factual allegations" tying Hezbollah to attacks like the one on Mr. Johnson.  It is unclear what Defendants think is missing, but if they are demanding allegations that Hezbollah specifically decided that Jaysh al-Mahdi should attack *Mr. Johnson on December 9*, their argument fails.

*First*, Defendants' argument conflicts with JASTA's text.  A person can "plan" an act by helping devise the scheme of which the act is a part; control over the act's individual details is not required.  *Cf. United States v. Parnell*, 581 F.2d 1374, 1382 (10th Cir. 1978) ("a series of similar transactions" can form "part of one basic and overriding plan").  Consistent with that principle, evidence of prior acts can be admissible to prove a "plan" under Fed. R. Evid. 404(b) when those acts are "caused by a general plan of which they are the individual manifestations." *United States v. Johnson*, 970 F.2d 907, 913-14 (D.C. Cir. 1992) (quoting 2 Wigmore on Evidence § 304, at 249).  Similarly, the International Criminal Tribunal for Yugoslavia has held that a defendant "planned" a series of individual war crimes by helping to devise a "general plan" to "kill military aged men" throughout "the Lasva Valley" – even though he did not decide the details of any single crime.  Judgement ¶¶ 975-76, *Prosecutor v. Kordic & Cerkez*, ICTY Case No. IT-95-14/2-A (Dec. 17, 2004).  Here, Hezbollah likewise "planned" Jaysh al-Mahdi's attacks on Americans in Iraq without always dictating their individual times and locations.

*Second*, Defendants' argument conflicts with JASTA's purpose of "provid[ing] civil litigants with the broadest possible basis" to sue entities that "provide[] material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities."  JASTA § 2(b).  Defendants' interpretation of "planned" would gut JASTA by immunizing a wide array of FTO-sponsored attacks.  Modern terrorism often involves FTOs farming out operations to remote, semi-autonomous non-FTO proxies with discretion to choose the targets, locations, and

times of individual attacks,[53] and Hezbollah has relied on such proxies to plan some of the most heinous attacks in history.  SAC ¶¶ 358-61.  Congress intended to deter funding for such attacks, but Defendants would immunize all of them because none is "planned" in the cramped, FTO-must-select-each-individual-target sense in which they use the term.  The inconsistency between Defendants' position and "the realities of terrorism" is reason enough to reject it.  *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 732 (11th Cir. 2014).

   *Third*, Defendants' comparison (at 62-63) to the criminal material-support statute (18 U.S.C. § 2339A) is inapt.  "Language in one statute usually sheds little light upon the meaning of different language in another statute."  *Russello v. United States*, 464 U.S. 16, 25 (1983); *see City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002) (comparison between provisions "grows weaker with each difference").  Congress enacted the "material support" law as part of the Violent Crime and Enforcement Act of 1994, *see* Pub. L. No. 103-322, 108 Stat. 1796, whereas it enacted JASTA more than two decades later as an amendment to a separate civil statute.  The two are textually dissimilar, and there is no indication Congress meant to contrast the FTO's role in the latter with the former.  Thus, although Hezbollah's training and other activities undoubtedly provided "material support" to Jaysh al-Mahdi under U.S. criminal law, they *also* amounted to "planning" under JASTA.

   ## 2.    Hezbollah "authorized" the terrorist attacks that injured Plaintiffs

   Hezbollah also "authorized" the Jaysh al-Mahdi terrorist attacks that injured Plaintiffs.  18 U.S.C. § 2333(d)(2).  "[C]ourts have recognized that the term 'authorized' is broad."  *United*

---

   [53] *See* JASTA § 2(a)(3) (finding that FTOs can "act[ ] through affiliated groups or individuals"); *see also* U.S. State Dep't, *Country Reports on Terrorism 2007* at 8 (Apr. 2008) (Dkt. 76-9) (noting a "transition from expeditionary to guerrilla terrorism," where FTOs operate through "intermediaries" and the "subversion of [local] populations" to cause attacks by proxies that have "communications, training, and financial" links to the FTO).

*States v. Akinyoyenu*, 199 F. Supp. 3d 106, 115 (D.D.C. 2016).  To "authorize" something means "to endorse, empower, justify, or permit" it through "some recognized or proper authority ([such] as custom, evidence, personal right, or regulating power)."  *Webster's Third* at 146.  Hezbollah's activities satisfy both elements of that definition.  SAC ¶¶ 377-88.

Hezbollah exerted authority over Jaysh al-Mahdi in several ways.  It exerted *religious* authority by virtue of its exalted status among Iraqi Shi'a, particularly through its Secretary-General Hassan Nasrallah and Grand Ayatollah Hussein Fadlallah, whom the U.S. government found was Hezbollah's "Spiritual Leader" and "Leading Ideological Figure."  *Id*. ¶¶ 377-80.  It exerted *personal* authority through its influence over Sadr himself, who was close with Hezbollah's leadership.  *Id*. ¶ 387.  And it exerted *operational* authority through its role in recruiting, training, and indoctrinating Jaysh al-Mahdi's fighters.  *Id*. ¶¶ 364-76, 389-403.

Jaysh al-Mahdi itself ratified Hezbollah's authority.  At public rallies, Jaysh al-Mahdi members declared themselves "an extension of Hizbullah," professed their "willingness to die for Hezbollah," carried banners featuring Hezbollah leadership side-by-side with Sadr, and chanted "We are Hezbollah."  *Id*. ¶¶ 372-73, 378.  Sadr himself swore fealty to Hezbollah by describing Jaysh al-Mahdi as Hezbollah's "striking arm in Iraq," pledging support for what he called "our victorious party, Hezbollah," and noting Jaysh al-Mahdi's "formal links with Hizbollah."  *Id*. ¶¶ 333, 371-73.  At the operational level, Jaysh al-Mahdi fighters relied on Hezbollah's training to learn how to murder Americans in Iraq.  *Id*. ¶¶ 375-76, 389-403.  Even organizationally, Jaysh al-Mahdi's very structure – including its terrorist apparatus and control over public-health services in Iraq – was modeled on Hezbollah.  *Id*. ¶ 59.

Hezbollah used that authority over Jaysh al-Mahdi to incite the attacks that injured Plaintiffs.  *Id*. ¶¶ 377-88.  Hezbollah exhorted Jaysh al-Mahdi to resist the so-called "occupiers";

implemented a propaganda campaign to rally additional recruits to Jaysh al-Mahdi's terrorist cause; and publicly called on Iraqi Shiites to wage a "jihad" against Americans. *Id*. ¶¶ 377-83. Moreover, Grand Ayatollah Fadlallah issued a 2004 *fatwa* instructing Iraqi Shi'a that they had a *religious duty* to attack Americans in Iraq. *Id*. ¶¶ 384-85. Such religious instructions were "authorization" under any definition.[54] They also were far more potent than legal authorization: in the context of an Islamic jihad against a perceived occupier, Hezbollah's imprimatur offered vital, necessary permission for Jaysh al-Mahdi's abhorrent acts of violence. SAC ¶ 380.

Defendants' only answer (at 61-63) is to suggest again that Hezbollah had to exert authority over the details of each individual attack. But a person can "authorize" an act categorically, without approving all the details. *See Techniarts Eng'g v. United States*, 51 F.3d 301, 305 (D.C. Cir. 1995) (contract was "specifically authorized by statute" because it fell within the category Congress had authorized, not because Congress had approved its individual terms); *United States v. Right to Use & Occupy 3.38 Acres of Land, More or Less, in Alexandria*, 484 F.2d 1140, 1142 (4th Cir. 1973) ("statutory authorization" to acquire land "need not refer to the specific transaction"). Defendants' contrary view is not only atextual; it would (as with the word "planned") vitiate JASTA as a tool for combatting terrorist finance. *See supra* pp. 55-56.

### 3. Hezbollah "planned and authorized" Jaysh al-Mahdi's illegal terrorist enterprise

a. Count Two alleges that Defendants also aided and abetted a different "act of international terrorism," 18 U.S.C. § 2333(a): the "Jaysh al-Mahdi-Hezbollah Campaign," which

---

[54] *See Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000) ("[a] Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder"). Defendants are wrong (at 62) to downplay such activities as "inspiration." Unlike an FTO that passively inspires a lone wolf across the world, Hezbollah had direct, institutional links to Jaysh al-Mahdi. SAC ¶¶ 364-76, 389-92. Also unlike an FTO "inspiring" faraway strangers, Hezbollah tailored its messages of authorization to Jaysh al-Mahdi and Iraqi Shi'a in particular. *Id*. ¶¶ 371-73.

was Jaysh al-Mahdi's terrorist campaign to coerce the United States into withdrawing from Iraq. SAC ¶¶ 3190-3207.  Sadr and his associates waged that Campaign through an illegal enterprise (Jaysh al-Mahdi) that engaged in a pattern of racketeering activity, including the attacks on Plaintiffs.  *Id.* ¶¶ 3191-93.  The Jaysh al-Mahdi-Hezbollah Campaign was an "act of international terrorism" under the ATA, *id.* ¶ 3202:  it was undisputedly "violent [and] dangerous to human life"; it sought to "influence the policy of a government by intimidation or coercion"; and it "occur[red] primarily outside" the United States' "territorial jurisdiction."  18 U.S.C. § 2331(1).  It also violated the "criminal laws of the United States," *id.* § 2331(1)(A), because Sadr and his associates conducted Jaysh al-Mahdi's affairs in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") statute.  *Id.* § 1962(b)-(d); *see* SAC ¶¶ 3193, 3202.

The Court should sustain Count Two even if it concludes that Hezbollah did not "plan" or "authorize" the individual attacks that injured Plaintiffs.  No matter how the Court views the individual attacks, Hezbollah "planned" and "authorized" Jaysh al-Mahdi's broader enterprise by co-founding Jaysh al-Mahdi, exercising its religious and moral authority to build up Jaysh al-Mahdi's organization and to incite attacks, and developing the tactics and training that Jaysh al-Mahdi deployed in its campaign against Americans.  *Id.* ¶¶ 364-407.  Defendants aided and abetted that Campaign for the reasons stated above, *supra* Part IV.A, and Plaintiffs undeniably were injured "by reason of" Jaysh al-Mahdi's operation of that Campaign, 18 U.S.C. § 2333(a).

**b.**      Defendants' challenges to Count Two fail.  *First*, Defendants assert (at 64) that violating the RICO statute is not "a single *act* of international terrorism," but they offer no support for that assertion.[55]  Ordinarily, a "statutory reference to an 'act or omission' may

---

[55] *See United States v. Pregler*, 925 F.2d 268, 269 (8th Cir. 1991) ("[a] [three-year] conspiracy is an ongoing act"); *Baker v. Farrand*, 26 A.3d 806, 816 (Me. 2011) ("act" can refer to "a series of related acts or omissions that proximately cause a harm").

include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." *People v. Corpening*, 386 P.3d 379, 382 (Cal. 2016). That is nowhere more evident than in *Halberstam* itself, where the "act assisted" was not the individual murder but the "long-running burglary enterprise." 705 F.2d at 488. Just as the woman in *Halberstam* was liable for assisting the "act" of a "five-year-long burglary campaign against private homes," *id.*, so are Defendants liable for assisting Jaysh al-Mahdi's multiyear campaign against the United States in Iraq, SAC ¶¶ 3202-05. Defendants cannot explain why Congress would have wanted to bar liability for assisting a multiyear "campaign" or "enterprise" like the one in *Halberstam* itself. 705 F.2d at 488; *see* JASTA § 2(a)(5) (citing *Halberstam*). Nor do they offer any basis to exclude the RICO statute from the "criminal laws of the United States" whose violation is "international terrorism" under the ATA. 18 U.S.C. § 2331(1)(A).

*Second*, Defendants assert (at 64-65) that Hezbollah did not plan or authorize the Campaign, but Plaintiffs allege that Hezbollah co-founded Jaysh al-Mahdi in April 2003 (thus "planning" and "authorizing" the enterprise), which should be accepted as true. SAC ¶¶ 56 & n.18, 364; *see Bancroft Glob. Dev. v. United States*, 330 F. Supp. 3d 82, 102 (D.D.C. 2018) (information-and-belief pleading sufficient "where the belief is based on factual information that makes the inference of culpability plausible"). Defendants' effort (at 64-65) to debate the timing of Hezbollah's involvement – based on a disputed interpretation of a single article – is premature. *See Banneker*, 798 F.3d at 1129. At any rate, the precise timing of Hezbollah's involvement matters little because RICO also proscribes "conduct[ing the] affairs" and "maintain[ing] . . . control" of a racketeering enterprise, not just creating one. 18 U.S.C. § 1962(b), (c). Thus, even if Hezbollah did not contact Jaysh al-Mahdi until after its formation, Hezbollah still "planned" and "authorized" the RICO violation as it continued. SAC ¶¶ 364-407.

*Third*, Defendants err in asserting (at 65-66) that Plaintiffs fail to plead a RICO violation.  Plaintiffs identify Sadr and many Jaysh al-Mahdi associates at the Ministry by name, SAC ¶¶ 78-102, and allege that Defendants aided those RICO perpetrators in particular, *id.* ¶¶ 3192-93.  Nothing more is required at this stage.  *See McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (RICO claims that do not sound in fraud are "evaluated . . . against the more lenient pleading standards of Federal Rule of Civil Procedure 8(a)").  To be liable for aiding and abetting the Jaysh al-Mahdi-Hezbollah Campaign, Defendants need not have known (and Plaintiffs need not plead) the identities of the specific principals they aided so long as they were "generally aware of [their] role [in] an overall illegal or tortious activity."  *Halberstam*, 705 F.2d at 487-88; *see United States v. Staten*, 581 F.2d 878, 887 (D.C. Cir. 1978) (affirming aiding-and-abetting conviction even though the "principal in the operation" being assisted was not specifically "identified").  Accordingly, the assertion that Plaintiffs must allege with particularity each individual RICO perpetrator – or the individual crimes each one committed – lacks merit.

### 4.   Defendants' knowledge argument regarding Hezbollah lacks merit

In a last-ditch attempt to escape aiding-and-abetting liability, Defendants argue (at 66-68) that the SAC fails to allege that they *knew* of Hezbollah's role in Jaysh al-Mahdi's terrorist attacks.  But the statute requires no such allegation.  The pertinent section reads:

> In an action under subsection (a) for an injury arising from an act of international terrorism *committed, planned, or authorized by an organization that had been designated as [an FTO]* under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by *knowingly providing substantial assistance*, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2) (emphases added).  Defendants maintain (at 66) that the word "knowingly" applies to every element in that lengthy paragraph, including the FTO's role embedded in the prefatory clause.  That argument misreads the statute for several reasons.

*First*, Congress used the word "knowingly" before "providing substantial assistance" not to describe the FTO element, but to incorporate *Halberstam*'s scienter requirement that an aider-and-abettor "knowingly gave 'substantial assistance' to someone who performed wrongful conduct." 705 F.2d at 478; *see* JASTA § 2(a)(5) (*Halberstam* "provides the proper legal framework"). It is black-letter law that an aider-and-abetter can knowingly give such assistance without "hav[ing] a full understanding" of the principal tort or "know[ing] all of the details of the primary party's scheme." *Aetna*, 219 F.3d at 536. In *Halberstam* itself, the woman was unaware that her companion was even "committing burglaries," let alone murder. 705 F.2d at 488. But she remained liable for the murder because she knew that "something illegal was afoot" and "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 486, 488. That is all Congress intended to require here. Just as the woman in *Halberstam* was liable despite not knowing the details of the ultimate tort, here Defendants are liable for "knowingly" aiding Jaysh al-Mahdi's criminal enterprise – even if they were unaware of Hezbollah's involvement. *See Linde II*, 882 F.3d at 329 (no requirement that defendant "knew of the specific attacks at issue").

*Second*, Defendants' argument is ungrammatical. An adverb like "knowingly" most naturally modifies only the verb it precedes (and perhaps the verb's immediate modifiers), not the entire sentence in which it appears. *See United States v. Dewalt*, 92 F.3d 1209, 1214 (D.C. Cir. 1996) ("the more obvious reading is that the adverb 'knowingly' modifies only the verbs, not the adjectival phrase"); *United States v. Jones*, 471 F.3d 535, 539 (4th Cir. 2006) (extending "knowingly" to the "infinite hereafters of statutory sentences would cause grammarians to recoil").[56] That principle further supports the *Halberstam* standard. Defendants, by contrast,

---

[56] Defendants cite (at 66) *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), but that case involved a differently worded *criminal* statute and relied heavily on the "manner in which the courts ordinarily interpret criminal statutes." *Id.* at 652. JASTA's grammatical structure

extend "knowingly" not just beyond the verb it modifies ("providing"), but also through the direct object ("substantial assistance") and the indirect object ("the person who committed such an act") all the way up to an adjectival phrase ("committed, planned, or authorized by") modifying "act" in an introductory clause at the beginning of the section.  The word "such" is far too thin a reed on which to assume that Congress intended a meaning so unnatural.[57]

*Third*, had Congress intended Defendants' reading, it would have said so clearly.  It could have limited liability, for example, to injuries "arising from an act of international terrorism *that the defendant knew was* committed, planned, or authorized" by an FTO.  Or it could have borrowed the scienter standard from the criminal material-support statute requiring a defendant to "have knowledge that the organization is a designated terrorist organization."  18 U.S.C. § 2339B(a)(1).  The absence of such language cuts against Defendants' interpretation.

Rather than proffer textual evidence to the contrary, Defendants base their position (at 67) on a single floor statement that deserves no weight.  "[F]loor statements by individual lawmakers" are "among the least illuminating forms of legislative history," especially when (as here) they conflict with the statutory text and come from someone who did not even sponsor the bill.  *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1661 (2017).[58]  Contrary to Defendants' floor statement, JASTA's text gives no indication that Congress was concerned

---

distinguishes it from the statute in *Flores-Figueroa* and counsels a different interpretation of "knowingly."  *See United States v. Chang Ru Meng Backman*, 817 F.3d 662, 667 (9th Cir. 2016) (*Flores-Figueroa* "not a useful model" for textually different statutes).

[57] *See United States v. Jennings*, 496 F.3d 344, 354 (4th Cir. 2007) ("it is doubly implausible here to extend the adverb's reach . . . through prepositional, relative, and conjunctive phrases and clauses"); *United States v. Fiorillo*, 186 F.3d 1136, 1156 & n.32 (9th Cir. 1999) (even if "knowingly" modifies words "far *beyond* it," it cannot modify "words that *precede[ ]* it").

[58] *See Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 875 (D.C. Cir. 1996) (per curiam) (calling for "extreme caution" in using "floor" statements, which are often merely one member's "attempt[ ] to reassure his own constituency or even to create legislative history").

about terrorist financiers having "notice" of an FTO's involvement.  Instead, Congress's concern

was for *victims* of terrorism and with affording them "full access to the court system."  JASTA

§ 2(a)(7), (b).  Those "findings" codified in the statute shed "substantial light" on JASTA's

purpose and refute Defendants' position.  *ACA Int'l v. FCC*, 885 F.3d 687, 698 (D.C. Cir. 2018).

       *Finally*, even if Defendants were correct about the statute, the SAC adequately alleges

that they knew of Hezbollah's role in Jaysh al-Mahdi's terrorist acts.  SAC ¶ 374.  Not only did

Sadr and Jaysh al-Mahdi repeatedly proclaim their allegiance to Hezbollah at public events, *id*.

¶¶ 364-73 – of which Defendants' local agents were surely aware, *id*. ¶ 182 – but "widespread

[media] coverage" of Hezbollah's role in Jaysh al-Mahdi's terrorist campaign placed Defendants

directly on notice of those facts, *id*. ¶ 374.  Those news reports stated that Jaysh al-Mahdi was

"being aided directly . . . by Hezbollah," that "Hezbollah was recruiting and training members of

Sadr's militia," and that Hezbollah made a "strategic decision" to ratchet up "support to Sadr to

increase pressure on the U.S."  *Id*.  Defendants' request (at 67-68) that the Court construe those

articles in their favor raises fact questions and provides no basis for dismissal at this stage.[59]

## V.    PLAINTIFFS PROPERLY PLEAD PRIMARY-LIABILITY CLAIMS (COUNTS THREE AND FOUR)

       A defendant that funds terrorism also violates the ATA when its own conduct constitutes

an "act of international terrorism."  18 U.S.C. § 2333(a).  Primary liability works through a

"chain of explicit statutory incorporations," under which a defendant that violates a predicate

criminal statute can also commit an act of "international terrorism" under the ATA.  *Boim*, 549

---

[59] For example, the lead article Defendants cite (at 67 & n.85), though noting General Abizaid's belief that Hezbollah-Jaysh al-Mahdi "linkages" are "hard to pin down with precision," also noted his conclusion that "[t]hese linkages exist" and corroborated them based on a "Mahdi commander."  Def. Ex. 12 at 5-6; *see* Ex. 70 at 176 (describing "widespread assumption" and "proliferation of accusations" that "Hizballah was active" with Jaysh al-Mahdi; then opining that those accusations were wrong based on Hezbollah's own self-serving denials).

F.3d at 690.  Counts Three and Four state primary-liability claims based on predicate violations of 18 U.S.C. §§ 2339A and 2339C, respectively.  SAC ¶¶ 3208-21.

### A.     Plaintiffs Properly Plead Proximate Cause

#### 1.     Defendants proximately caused Plaintiffs' injuries by directly financing the terrorist group responsible for the attacks at issue

Plaintiffs' primary-liability claims (unlike the aiding-and-abetting claims) require that Defendants proximately caused Plaintiffs' injuries.  To plead "proximate cause," Plaintiffs must allege "some reasonable connection" between their injuries and Defendants' conduct.  *Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) ("*Owens III*").  Such a connection requires a plausible inference that (1) Defendants' conduct was a "'substantial factor in the sequence of events'" that led to Plaintiffs' injuries, and (2) the injuries were "'reasonably foreseeable or anticipated as a natural consequence'" of that conduct.  *Owens IV*, 897 F.3d at 273 (quoting *Owens III*, 864 F.3d at 794).  Those elements foreclose liability only when the "causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Owens III*, 864 F.3d at 794 (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).  Whether the requisite link exists in any given case "is ordinarily a question for the jury."  *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005).[60]

Plaintiffs' causation allegations are legally sufficient.  The D.C. Circuit recently explained that providing material support to a terrorist group proximately causes the group's foreseeable attacks when the support "foster[s] the[] growth" of that group.  *Owens III*, 864 F.3d at 794.  Thus, in *Owens III*, the court upheld a finding that Sudan proximately caused al-Qaeda's

---

[60] *Shatsky v. Palestine Liberation Org.*, 2017 WL 2666111 (D.D.C. June 20, 2017) (Leon, J.), confirms that Plaintiffs need only show "proximate cause, as that term is typically defined." *Id.* at *7.  Although *Shatsky* found no causation under that standard, it did so at summary judgment based on evidentiary requirements that are inapplicable at this stage.

U.S. Embassy bombings by providing al-Qaeda with general "tax exceptions and customs privileges" and by facilitating its "access to the formal banking system." *Id*. at 794-95.  The plaintiffs were not required to "chart a direct and unbroken factual line between [the defendant's] actions and the terrorist act[s]" that injured them.  *Owens v. Rep. of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008) ("*Owens I*"); *see also Owens III*, 864 F.3d at 799 (affirming causation despite no evidence that Sudan "directly advanced" the specific "bombings" in question).  Rather, they needed only to show that the defendant's "financial support" strengthened the capacity of al-Qaeda's "broader organization" to commit the type of attacks that injured them.  *Id*. at 794-95.

The D.C. Circuit's proximate-cause standard accords with the ATA's purpose.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("Proximate-cause analysis is controlled by the nature of the statutory cause of action.").  The ATA's founding goal was to "interrupt, or at least imperil, the flow of money" "at any point along the causal chain of terrorism," S. Rep. No. 102-342, at 22, and Congress recently reaffirmed its intent to curtail the flow of "resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism," JASTA § 2(a)(6).  By making "financiers of terrorism" liable for attacks foreseeably committed by the groups they fund, the *Owens* standard fulfills that objective of "cut[ting] the terrorists' lifeline."  *Boim*, 549 F.3d at 691; *see id*. at 697-98.  Courts thus routinely sustain proximate-cause allegations when a defendant gives general financing to the terrorist group responsible for the attacks at issue.[61]

---

[61] *See*, *e.g.*, *Miller*, 2019 WL 1115027, at *7-8 (sustaining proximate-cause allegations because "rout[ing] payments to terrorist organizations . . . enhanced their ability to fund and commit acts of terrorism"); *Chiquita II*, 284 F. Supp. 3d at 1317-18 (triable issue on proximate cause where defendant's "financial contributions" materially "enhance[d] the [terrorists'] terror capabilities"); *Wultz*, 755 F. Supp. 2d at 48 (bank's alleged "provision of financial services, including receipt and transfer of funds, proximately caused plaintiffs' alleged injuries"); *Weiss*, 453 F. Supp. 2d at 631 (sustaining proximate-cause allegations that "defendant provided material

The SAC satisfies that standard by alleging a "substantial connection between [Defendants] and terrorism." *Owens IV*, 897 F.3d at 275. Defendants sold to the Ministry during a period when terrorists controlled everything from its headquarters (which they used as a base), to its ambulances (which they weaponized), to its hospitals (which they used as command-and-control centers), to its procurement process (which they used to raise money). *Id.* ¶¶ 63-112. Jaysh al-Mahdi was so dependent on the Ministry that it became known in Iraq as "the Pill Army." *Id.* ¶¶ 9, 176. Yet despite the obvious nexus between the Ministry and terrorism, Defendants structured their transactions to funnel illegal payments – in both cash and in-kind cash-equivalents – to the Jaysh al-Mahdi members who ran the Ministry. *Id.* ¶¶ 105-64. Those payments supplied Jaysh al-Mahdi with the means to pay its rank-and-file fighters and with the funding to support the rest of its terrorist infrastructure. *Id.* ¶¶ 165-79. Indeed, Sadr and Jaysh al-Mahdi sought control of the Ministry precisely because corrupt payments from foreign suppliers like Defendants offered them a potent source of terrorist finance. *Id.* ¶ 167. The connection between such payments and Jaysh al-Mahdi terrorism was not some "mere fortuity," *Paroline*, 572 U.S. at 445; it was the entire point of the arrangement.[62]

*Abecassis I* confirms that those allegations are sufficient. *See* 785 F. Supp. 2d at 649. There, the court held that the plaintiffs had adequately pleaded a causal link between "Palestinian terrorist attacks" in Israel and the defendants' "kickbacks" to Saddam's regime under Oil-For-

---

assistance or funding to the terrorist organization responsible for perpetrating the attacks"); *Burnett*, 274 F. Supp. 2d at 106 (same because "[a]ny terrorist attack . . . might have been the natural and probable consequence of . . . providing financial support to" a terrorist group).

[62] This conclusion applies to the Manufacturers for the reasons stated above. *See supra* Part IV.A.4. The Manufacturers' conduct – which they knew (or disregarded) supported Jaysh al-Mahdi, SAC ¶¶ 183-87 – formed an integral part of the unlawful scheme and so was not "routine commercial activity." *Compare* Mem. at 54, *with Weiss*, 278 F. Supp. 3d at 641-42 (activity not "routine" if company "knows that the groups" benefiting "are engaged in terrorist activities").

Food.  *Id*.  Although the court perceived "only an attenuated connection between the plaintiffs'

injuries and each of the defendants," it sustained the allegations of "proximate cause" under the

ATA because it was "foreseeable that [Saddam] would use the kickbacks" to finance terrorism.

*Id*.  The key, for the court, was the corrupt structure of the transactions.  Although companies

"were permitted and even encouraged to do business with Iraq" under Saddam, they were

"restricted to doing so within the bounds of the [Oil-For-Food Program]" that limited their sales

to specified "humanitarian uses."  *Id*.  By paying unlawful "kickbacks," the defendants

"bypassed" those restrictions and funneled "money to [Saddam] for unlimited discretionary use."

*Id*.  A natural and proximate consequence of providing such "off-book money" was that Saddam

"would use at least some of it to support terrorist attacks" in Israel.  *Id*.

      Plaintiffs' causation allegations are even stronger.  Here, as in *Abecassis I*, Defendants

structured their transactions with an Iraqi ministry to "bypass[] the strict rules" (there, the Oil-

For-Food Program; here, the FCPA) designed to ensure their integrity.  *Id*.  Here, as in *Abecassis

I*, the "purpose of [the] kickbacks" was to funnel money to a corrupt counterparty (there,

Saddam's regime; here, Jaysh al-Mahdi) "for unlimited discretionary use."  *Id*.  And in both

cases "it was foreseeable" that such "off-book money" would flow to "support terrorist attacks."

*Id*.; *see* SAC ¶¶ 165-87.  The only difference is that, whereas the *Abecassis I* kickbacks were

transmitted by Saddam to separate terrorist groups abroad, *see* 785 F. Supp. 2d at 619-23, here

Defendants' counterparty was effectively an arm of the very group that injured Plaintiffs, SAC

¶¶ 63-104.  If the former is enough for proximate cause, the latter is an easy case.[63]

---

     [63] Jaysh al-Mahdi's control of the Ministry distinguishes this case from *Brill v. Chevron
Corp.*, 2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) (cited in Mem. at 43), which held that
certain kickbacks to Saddam did not support proximate cause because the link to terrorism ran
through a "financial labyrinth" of "many intermediaries."  *Id*. at *2.  No such flaws are present
here.  SAC ¶¶ 165-79.  Regardless, *Brill* applied a "higher standard" for proximate cause, *id*. at

## 2.    The Ministry was not a causation-defeating intermediary

Most of Defendants' causation arguments (at 40-45) rest on the premise that the Ministry was a "sovereign intermediary" that broke the direct link between their transactions and Jaysh al-Mahdi's terrorist operations.  That premise is flawed, for three reasons.

*First*, the Ministry was not the intermediary Defendants need it to be.  The cases they cite (at 40-44) each involved a "truly independent intermediary" – such as Sudan or Iran – separating the alleged transactions from the terrorist group at issue.  *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 97 (D.D.C. 2017) ("*Owens II*").[64]  In those circumstances, a bank that does no more than transfer currency (even illegally) into the treasury of an "intermediating country" does not proximately cause attacks committed by some *other* terrorist group the country then decides to fund downstream.  *Owens IV*, 897 F.3d at 275.  The core premise is that the intermediary (like Sudan) remains separate from the terrorist group (like al-Qaeda) responsible for the attack.  *See id*. at 274-75.  If and only if such a separation exists, the "sovereign's affirmative choice to engage in a wrongful act" – by giving some of its own resources to terrorists – "will usually supersede a third party's choice to do business with that sovereign."  *Kemper*, 911 F.3d at 393.

This case is different.  The Ministry was not some autonomous sovereign making an independent decision to aid terrorists; it was run by Jaysh al-Mahdi commanders who built their entire terrorist architecture around it.  SAC ¶¶ 3, 63-104, 137-38.  In fact, Iraq's legitimate

---

*1, which it realized was "arguably . . . at odds" with the D.C. Circuit's standard in *Owens IV*, *id*. at *3 n.1.  *Owens III* and *Owens IV* – not *Brill* – are controlling here.

[64] *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392-93 (7th Cir. 2018) (bank "provid[ed] services to Iran" rather than "servic[ing] a terrorist group directly"); *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (no "proximate causal relationship between the cash transferred . . . to Iran and the terrorist attacks by Hizbollah and Hamas"); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *5 (S.D.N.Y. Mar. 28, 2019) (similar).  Plaintiffs do not endorse these cases but distinguish them as framed by the courts that decided them.  *See Freeman*, 2018 WL 3616845, at *20-49 (correctly applying proximate-cause principles).

sovereign government helped *prosecute* two senior Sadrists for illegally converting the Ministry

into an instrument of Jaysh al-Mahdi terrorism.  *Id*. ¶¶ 84, 93-96.  An entity dominated by a

terrorist group that its own government forbids is not an "independent intermediary."  *Owens IV*,

897 F.3d at 275.  Instead, the Ministry was a Jaysh al-Mahdi "front organization," akin to the

terrorist-run charities that often form part of the causal chain in ATA cases.  *Strauss v. Credit*

*Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013).[65]  Treating such a terrorist front as a

causation-defeating intermediary would leave the ATA "a dead letter," by allowing companies to

evade liability simply by "launder[ing]" their terrorist donations through nominally separate

"intermediate organizations."  *Boim*, 549 F.3d at 702.  Defendants cite no case endorsing a result

so at odds with Congress's intent.  *See* S. Rep. No. 102-342, at 22.

Nor was the Ministry like a sovereign government "with 'many legitimate agencies,

operations, and programs to fund.' "  *Owens IV*, 897 F.3d at 276 (quoting *Rothstein*, 708 F.3d at

97); *cf.* Mem. at 44.  Perhaps the Ministry was *supposed* to fund such programs, but Jaysh al-

Mahdi actually spent most of its money (and deployed its assets) in service of the Sadrist terrorist

agenda.  SAC ¶¶ 78-112.  Even the few programs Defendants say (at 43-44) were legitimate –

like running clinics and employing doctors – functioned to perpetuate Jaysh al-Mahdi's social

standing and so played an integral role in its Hezbollah-pioneered "welfare as warfare" strategy.

SAC ¶¶ 59, 64-65, 167, 358.  If anything, such programs just made the Ministry a more valuable

asset to the Jaysh al-Mahdi terrorists who ran it.  *See Boim*, 549 F.3d at 698 ("welfare activities

reinforce" terrorism by building terrorists' "popularity").  They therefore cannot sever the causal

---

[65] *See Strauss*, 925 F. Supp. 2d at 432 (money funneled to Hamas through third-party
"organizations controlled by Hamas"); *Weiss*, 278 F. Supp. 3d at 643 ("Defendant provided
funds to Hamas front-groups"); *Owens II*, 235 F. Supp. 3d at 97 (noting that ATA proximate-
cause allegations typically succeed when a company provides financing "for a terrorist
organization or a terrorist front").

chain, just as Hezbollah-led health programs in Lebanon would not protect a defendant that financed Hezbollah through the nominally sovereign health ministry there.  SAC ¶¶ 64, 358.

*Second*, even if the Ministry had retained some semblance of sovereign independence from Jaysh al-Mahdi, Defendants' corrupt payments benefited only the latter.  The whole point of "free goods" was to supply off-book product and thus *bypass* the Ministry's so-called "legitimate agencies, operations, and programs."  *Rothstein*, 708 F.3d at 97; *see* SAC ¶¶ 117-20, 132-33, 137-40.  Such in-kind bribes – calibrated to deliver value to Jaysh al-Mahdi rather than the Iraqi health system – are a far cry from merely transferring currency to a sovereign country like Sudan.  *See Abecassis II*, 7 F. Supp. 3d at 675 (similarly explaining why Oil-For-Food kickback allegations passed muster under *Rothstein*).[66]  That alone distinguishes this case from *Owens IV*, which lacked allegations that "any currency processed by [the defendant] for Sudan was . . . in fact sent to al Qaeda."  897 F.3d at 276.  The SAC supplies that missing link by alleging in detail how Defendants' transactions actually flowed to Jaysh al-Mahdi.  SAC ¶¶ 106-12, 119-20, 165-79.  Intermediary or not, that is sufficient.  *See Owens IV*, 897 F.3d at 275 (even a defendant "more than one step removed from a terrorist act or organization" remains liable if "facts demonstrat[e] a substantial connection between the defendant and terrorism").

*Third*, many of Defendants' corrupt payments never flowed through the Ministry at all.  Plaintiffs allege that Defendants obtained contracts from Kimadia not only by agreeing to deliver "free goods," but also by paying cash bribes (and other benefits) to Jaysh al-Mahdi members.

---

[66] Defendants' suggestion (at 44-45) that the verbs "looted" and "diverted" connote a causal separation between the Ministry and Jaysh al-Mahdi lacks merit.  Those words do not imply the Ministry's independence from Jaysh al-Mahdi's activities; they reflect that Jaysh al-Mahdi was directing Defendants' goods away from the Iraqi public-health system.  SAC ¶¶ 5, 130, 138, 171.  Any ambiguity in the SAC's wording on that front should be resolved in Plaintiffs' favor.  *See Aktieselskabet AF 21. November 21 v. Fame Jeans Inc.*, 525 F.3d 8, 20 n.8 (D.C. Cir. 2008).

SAC ¶¶ 110-12, 142-64; *see infra* pp. 77-79.  These were *extra-contractual* payments made

*directly* to Jaysh al-Mahdi members, and by their nature they did not even touch official Ministry

accounts.  SAC ¶¶ 142-45.  Defendants may want to pretend that all they did was transact

"business with a sovereign government," Mem. at 44, but the SAC alleges that they won that

business in part by paying direct cash bribes to terrorists, SAC ¶¶ 189, 192, 218, 248, 252, 283,

311.  No matter how the Court views the Ministry's role in the causal chain, none of Defendants'

causation cases supports the dismissal of such allegations.  *See*, *e.g.*, *Owens IV*, 897 F.3d at 275

("provid[ing] funds directly to a terrorist organization" would be sufficient); *Kemper*, 911 F.3d at

394 ("direct provision of services to terrorists" would be sufficient).

### 3.   Defendants' other causation arguments lack merit

Defendants' remaining causation arguments are even less persuasive.  They carve up

Plaintiffs' theory into seven artificial "steps," Mem. at 44-45, but those steps form a single causal

sequence and so only illustrate the link between Defendants' transactions and terrorism, *see*

*Owens I*, 531 F.3d at 895 ("direct and unbroken factual line" not required).  Indeed, the "steps"

Defendants identify – such as Jaysh al-Mahdi's monetization of their goods and use of the

proceeds for terrorism – were the natural consequences of their conduct and so do not "break the

causal chain."  *Morris v. McCarthy*, 825 F.3d 658, 672 (D.C. Cir. 2016) ("superseding cause"

defeats causation only when "of independent origin" and "not foreseeable").  In fact, the "free

goods" functioned as cash equivalents, and monetizing them was no more a causation-defeating

"step" than would be a terrorist's conversion of U.S.-dollar donations into local currency.  At

best, Defendants' list-making exercise raises questions "for the jury."  *Smith*, 413 F.3d at 102.

Defendants fare no better (at 45-46) in pointing to Jaysh al-Mahdi's other sources of

revenue.  Plaintiffs allege that corrupt payments by medical-goods suppliers provided an

important (if not exclusive) stream of revenue for Jaysh al-Mahdi, SAC ¶¶ 167, 175-76, and they

did so in connection with an institution that was integral to Jaysh al-Mahdi's power in Iraq, *id*. ¶¶ 63-104. The ATA requires nothing more. *See Kemper*, 911 F.3d at 391 ("causation inquiry was not meant to prevent liability" where terrorist donor is "lucky enough that other people were committing similarly wrongful acts"); *Chiquita II*, 284 F. Supp. 3d at 1317 (triable proximate-cause issue existed where defendant's contributions to terrorist group were "but a small fraction of [the terrorist group's] overall revenues"). In fact, Defendants' own cases reject the sort of "strict but-for causation" that they now propose. *Kemper*, 911 F.3d at 390.

Certain Plaintiffs' participation in other lawsuits against Iran (or banks that aided it) is irrelevant for the same reason. *Cf.* Mem. at 45 n.69. There is nothing inconsistent about the cases: Jaysh al-Mahdi's two biggest sources of support were (1) the Ministry, and (2) Iran and its proxies. Companies that aided Jaysh al-Mahdi through either channel are liable under the ATA, and so it is only natural that many Plaintiffs brought multiple suits. *See Strauss*, 2006 WL 2862704, at *18 n.16 (there "may be more than one proximate cause of an injury"). That Iran also supported the same terrorists Defendants funded makes their conduct worse, not better.

Finally, the Court can dispose with these and the rest of Defendants' arguments for a simple reason: they would also exonerate a terrorist financier who (for example) intentionally wired cash directly into ISIS's general bank account. In that case too, the causal chain could be said to involve many "step[s]," Mem. at 44;[67] the financier's single donation (even if worth millions) would "pale[] in comparison" to ISIS's overall budget, *id*. at 45; no ISIS victim would be able to trace the financier's fungible dollars to any single attack without "lump[ing] all of

---

[67] For example, the financier could argue that the "steps" involved (1) agreeing with ISIS on terms, (2) instructing a bank to effect the wire transfer, (3) ISIS's bank processing the transfer, (4) ISIS withdrawing cash from the bank, (5) ISIS converting the dollars donated into local currency, (6) ISIS using the local currency to buy weapons, (7) ISIS devising a new attack using those weapons, and (8) ISIS instructing a specific terrorist cell to carry out the attack.

[ISIS's] attacks together," *id.* at 2; and an ISIS victim might decide to sue "*other* defendants" as well, *id.* at 3. Just as using those arguments to shield the ISIS financier would be absurd, so too accepting them here would make a mockery of Congress's intent to interrupt "the flow of money" "at any point along the causal chain of terrorism." S. Rep. No. 102-342, at 22.

### B. Defendants' Conduct Was "International Terrorism"

Defendants' corrupt payments to Jaysh al-Mahdi were "act[s] of international terrorism" under the ATA because they involved dangerous acts, violated U.S. criminal law, occurred primarily outside U.S. territory, and "appear[ed] to be intended" to achieve the three terrorist aims set out in the statute. 18 U.S.C. § 2331(1) (laying out definition); *see* SAC ¶¶ 3211, 3218.

The requirement that Defendants' conduct "appear to be intended" to achieve a terrorist aim, 18 U.S.C. § 2331(1)(B), "is not a state-of-mind requirement; it is a matter of external appearance," *Boim*, 549 F.3d at 694; *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (liability hinges on "an objective standard" pegged to "the apparent intentions of actions"); *Wultz*, 755 F. Supp. 2d at 49 ("actual subjective intent" unnecessary). The requirement is met when the "foreseeable consequences" of a defendant's conduct promote one of the statutory aims. *Boim*, 549 F.3d at 694. Here, Defendants made corrupt payments to obtain contracts from a terrorist-controlled Ministry that they knew (or recklessly disregarded) used violence to achieve political ends. *See supra* Part V.A. Courts routinely hold that comparable allegations of material support raise a plausible inference of apparent intent.[68]

This is not a novel concept in the law. The Supreme Court recognized 40 years ago that "a person who acts (or omits to act) intends a result of his act (or omission) . . . when he knows

---

[68] *See Abecassis II*, 7 F. Supp. 3d at 675-76 (reaching that conclusion for Oil-For-Food kickbacks); *Boim*, 549 F.3d at 694; *Miller*, 2019 WL 1115027, at *6-7; *Chiquita II*, 284 F. Supp. 3d at 1319; *Wultz*, 755 F. Supp. 2d at 48-49; *Linde I*, 384 F. Supp. 2d at 580-81; *Goldberg*, 660 F. Supp. 2d at 426-27; *Weiss*, 453 F. Supp. 2d at 613; *Burnett*, 274 F. Supp. 2d at 106-07.

that the result is practically certain to follow from his conduct, whatever his desire may be as to

that result." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978); *see Reno v. Bossier

Parish Sch. Bd.*, 520 U.S. 471, 486 (1997) ("people usually intend the natural consequences of

their actions"). The ATA's focus on the appearance of a defendant's intent is similar; whatever

Defendants subjectively desired, the law presumes that they intended the natural consequences of

their actions. *See Boim*, 549 F.3d at 693-94. Here, those consequences included Jaysh al-Mahdi

attacks that sought to (and did) achieve the terrorist aims set out in the ATA. A jury would be

within its rights to find that Defendants appeared to have intended those aims as well. *See

Lipman v. Lehman*, 1996 WL 420869, at *6 (D.D.C. July 19, 1996) ("[I]ntent is most often

shown by acts, the natural consequences of which are presumably intended by the actor.")

(quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995)).[69]

Defendants' response (at 48) that they were "driven by commercial motives" misses the

point. The Bank of China, the defendant in *Wultz* and "an internationally respected financial

institution with branches in this country," 755 F. Supp. 2d at 48, similarly argued that it wanted

to make money rather than further terrorism. But the court denied its motion to dismiss because

"the law requires only that a defendant's acts '*appear* to be intended' to achieve one of the three

enumerated items." *Id.* at 49. Here, too, even if Defendants *also* had apparent financial motives,

*see* Mem. at 48-49, that does not negate their apparent intent to support Jaysh al-Mahdi's

---

[69] Defendants' cases (at 48-51) are not to the contrary. *Kemper*, as noted above, involved money funneled through an independent sovereign intermediary rather than a terrorist-controlled Ministry. 911 F.3d at 390, 392-93. An objective observer would not perceive the two in the same way. *See* SAC ¶¶ 3, 75-103, 137-38; *supra* pp. 69-70. *O'Sullivan* involved facts nearly identical to *Kemper* and is distinguishable for the same reason. 2019 WL 1409446, at *8. As for *Brill v. Chevron Corp.*, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017), the plaintiffs there made "no allegations whatsoever" to satisfy the "appear to be intended" requirement but instead said it "should not be treated as an independent element." *Id.* at *4.

terrorist aims, *see Wultz*, 755 F. Supp. 2d at 48-49; *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) ("money-raising goals obviously do not preclude a finding of intent to influence government policy").   At most, Defendants' argument that they appeared to be motivated solely by greed, rather than terrorism, just raises fact questions "for the jury."  *Gilmore*, 422 F. Supp. 2d at 102; *see Linde II*, 882 F.3d at 327 (apparent intent raises "questions of fact for a jury").

Defendants' conduct was also "dangerous to human life."  18 U.S.C. § 2331(1)(A). Financing terrorists is "like giving a loaded gun to a child," because it runs an inherent risk of enabling violence.  *Boim*, 549 F.3d at 690.  And the predicate criminal statutes Defendants violated reflect Congress's judgment that financing terrorist groups is dangerous.  *See id*. at 689-91.  Even Defendants' lead case (at 50) agrees that "giving fungible dollars to a terrorist organization may be 'dangerous to human life.' "  *Kemper*, 911 F.3d at 390.  That is what Plaintiffs allege here; Defendants' response (at 50) merely reprises the flawed causation arguments Plaintiffs have refuted above.  *See supra* Part V.A.

### C.   Plaintiffs Adequately Plead Two Predicate Crimes

#### 1.   Plaintiffs plead the necessary scienter

Plaintiffs plead violations of two predicate criminal statutes to support their primary-liability claims:  18 U.S.C. § 2339A (material support; Count Three) and 18 U.S.C. § 2339C (terrorist finance; Count Four).  *See* SAC ¶¶ 3209-10, 3216-17.  Plaintiffs adequately allege the state of mind required by both statutes.  Both offenses require only that Defendants knew or recklessly disregarded that their support of Jaysh al-Mahdi would be used for terrorist purposes. *See Boim*, 549 F.3d at 693 ("To give a small child a loaded gun would be a case of *criminal* recklessness and therefore satisfy the state of mind requirement for liability under section 2333 and the statutes that it incorporates by reference."); *Gill*, 893 F. Supp. 2d at 506 (mental state for

§§ 2339A and 2339C is satisfied if "the defendant was reckless with regard to the substantial probability of injuries that would likely be suffered by Americans").

Plaintiffs' allegations meet that standard for the reasons explained above.  *See supra* Part IV.A.2.  Defendants knew (or recklessly disregarded) that their corrupt payments to Jaysh al-Mahdi supported terrorist attacks – both through direct knowledge, SAC ¶¶ 180-82, and media reports, *id*. ¶¶ 183-87.  That is sufficient.  *See Goldberg*, 660 F. Supp. 2d at 433 (sustaining ATA claim under § 2339C alleging knowledge based on "public sources").  Defendants' request (at 51-53) – that the Court review all of Plaintiffs' sources and determine for itself what Defendants knew – is premature.  *See Banneker*, 798 F.3d at 1129 (dismissal improper when "there are two alternative explanations . . . both of which are plausible").

### 2.      The "medicine" exemption does not support dismissal of Count Three

Defendants raise one other argument against Count Three, which alleges that Defendants violated § 2339A by providing "material support or resources" to Jaysh al-Mahdi. 18 U.S.C. § 2339A(a).  Some of the Defendants argue (at 53-54) that Count Three does not apply to them because Congress excluded "medicine" from the definition of "material support."  18 U.S.C. § 2339A(b)(1).  Even if correct, Defendants' argument has no effect on Count Four (brought under 18 U.S.C. § 2339C), which contains no such exception and against which Defendants raise no other challenge.  But the criticism of Count Three also fails.

**a.      *Cash bribes, free trips, and other benefits*.**  The "medicine" exception, no matter how this Court construes it, does not exculpate Defendants because each supported Jaysh al-Mahdi members through cash bribes, vacations, and other unreasonable contract benefits.  SAC ¶¶ 142-64; *see id*. ¶¶ 189, 192 (AstraZeneca), 217-18 (GE), 248, 252, 254 (J&J), 283, 285 (Pfizer), 311, 313 (Roche).  The SAC alleges that most Defendants made similar cash payments under Oil-For-Food and identifies specific corrupt contracts executed by the others.  *Id*. ¶¶ 49 &

n.7, 161-62.  It further details the seven transaction stages at which Defendants had to pay "commissions," *id.* ¶¶ 146-64, and explains that Jaysh al-Mahdi typically required such "commissions" to account for at least 20% of the contract value, *id*. ¶¶ 142-45, 195, 258.  It also identifies Defendants' corrupt local agents and describes in detail how Defendants used them to deliver those benefits to Jaysh al-Mahdi.  *Id*. ¶¶ 49, 200-01, 223-32, 262-70, 319-20.

Such allegations are more than sufficient.  Defendants call (at 53) the cash allegations "conclusory and generic," but Plaintiffs allege they paid "commissions" on the same specific transactions in which they delivered "free goods" (whose specificity Defendants do not challenge).  SAC ¶¶ 191-92, 216-17, 246-48, 253-54, 284-85, 312-13.  The SAC also describes the mechanics of those cash payments in depth, *id*. ¶¶ 146-64, and it identifies specific contract numbers and percentages in which Defendants paid cash bribes through "performance bonds," *id*. ¶¶ 161-62.  The alleged bribes are especially plausible because nearly every Defendant (or a predecessor or affiliate) made similar payments under Oil-For-Food.  *Id.* ¶¶ 44-53.  The only things arguably missing are the exact dates and amounts of every payment, but such detail is far more than the "short and plain statement" Rule 8 requires.  *Wultz*, 755 F. Supp. 2d at 38-39.

Plaintiffs' allegations would pass muster even under Rule 9(b)'s heightened standard, which does not apply here.  *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015).  In *Heath*, which addressed the False Claims Act, the D.C. Circuit held that Rule 9(b) does not require " 'representative samples' of the [alleged false] claims that specify the time, place, and content of the bills."  *Id*. at 125.  Instead, it requires only "sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."  *Id*.  Plaintiffs' extensive description of the cash-bribe scheme achieves both ends.  *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 202-04 (D.D.C.

2011) (sustaining allegations about a "complex fraud scheme" without details of "specific invoices, statements or records" or "where and when the . . . submission occurred").

        **b.**     ***Medical devices***.  Defendants sometimes supplied Jaysh al-Mahdi with medical devices along with pharmaceuticals.  *See* SAC ¶¶ 259 (Janssen-Cilag's Eprex), 290 & n.237 (Pfizer's BeneFix), 317 (Roche's Pegasys).  Such devices are "property" within the definition of material support, rather than "medicine" excluded from it.  18 U.S.C. § 2339A(b)(1); *see* H.R. Conf. Rep. No. 104-518, at 114 (1996) ("limit[ing]" the exclusion "to the medicine itself" rather than "the vast array of medical supplies"); *United States v. Farhane*, 634 F.3d 127, 143 (2d Cir. 2011) ("[T]he medicine exception identified in § 2339A(b)(1) shields only those who provide *substances* qualifying as medicine to terrorist organizations.").  Defendants' inclusion of medical devices alongside their drugs thus renders the "medicine" exemption inapplicable.

        **c.**     ***"Free goods" were currency, not medicine***.  The free drugs Defendants delivered to Kimadia functioned as cash equivalents rather than medical donations.  SAC ¶¶ 117, 119-20, 137-39.  Because Defendants provided those goods knowing they would be bartered on the black market, they did not function as "medicine" in the context of Defendants' transactions.  *See Webster's Third* at 1402 ("medicine" means "a substance or preparation used in treating disease").  Rather, the cash-equivalent drugs were a type of "currency," which is a type of material support.  18 U.S.C. § 2339A(b)(1); *cf. C.N.S. Enters., Inc. v. G. & G. Enters., Inc.*, 508 F.2d 1354, 1363 (7th Cir. 1975) ("currency" in Securities Exchange Act encompasses "cash substitute[s]").  Terrorist groups (including Hezbollah) often raise funds through black-market drug smuggling, SAC ¶¶ 169-71, 361-62, and Congress did not plausibly intend to allow companies to support those efforts by providing terrorists with cash-equivalent pharmaceuticals.

## VI.    PLAINTIFFS PROPERLY PLEAD VIOLATIONS OF STATE LAW (COUNTS FIVE THROUGH EIGHT)

Based on the same conduct described above, Plaintiffs also bring claims (SAC ¶¶ 3222-54) for intentional infliction of emotional distress, assault and battery, wrongful death, and survival.  *See Burnett*, 274 F. Supp. 2d at 107 ("Given the adequacy of plaintiffs' [ATA allegations], plaintiffs have also stated common law claims for wrongful death, survival, and intentional infliction of emotional distress.").  Defendants' arguments (at 69-74) fail.

### A.    Fact Issues Preclude Defendants' Statute-Of-Limitations Argument

Plaintiffs' state-law claims are timely as pleaded.  Under the "discovery rule," the limitations clock did not start until Plaintiffs knew or reasonably should have known that Defendants' wrongdoing caused their injuries.  *See, e.g.*, *Lee v. Wolfson*, 265 F. Supp. 2d 14, 17-18 (D.D.C. 2003).  The key question is whether "the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him."  *Ray v. Queen*, 747 A.2d 1137, 1141-42 (D.C. 2000).  Here, given the obscurity of Defendants' corrupt contracting practices, Plaintiffs could not reasonably have discovered their claims until 2017, when counsel's investigation unearthed them.  SAC ¶¶ 3227, 3233, 3244, 3253.  At most, that date poses a fact question for the jury.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208-09 (D.C. Cir. 1996) ("As [the D.C. Circuit has] repeatedly held, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.").  Defendants themselves argue (at 51) that even the basic fact of the "relationship between the Ministry and JAM . . . was far from clear during the relevant period."  They cannot simultaneously argue that Plaintiffs were aware of that fact as a matter of law.

Defendants are incorrect (at 70) to suggest an inconsistency in the allegations that *Defendants* knew of Jaysh al-Mahdi's activities while *Plaintiffs* reasonably lacked knowledge of

Defendants' wrongdoing.  Whatever the public record about the Ministry, Defendants' own contracting practices – which are the centerpiece of this case – were not publicly known.  SAC ¶¶ 188-332.  Moreover, Defendants are sophisticated companies with corporate security departments and savvy local agents in Iraq.  *See*, *e.g.*, *id.* ¶¶ 182, 185.  Plaintiffs are not similarly situated and should not be expected to have learned everything Defendants knew – particularly because this case required an exhaustive investigation with non-public witnesses and documents. *Id.* ¶¶ 1, 41-43; *see Lee*, 265 F. Supp. 2d at 19 (court "cannot decide as a matter of law that plaintiff did not exercise due diligence in discovering defendants' alleged wrongdoing").

### B.     Defendants' Tort-Law Arguments Lack Merit

#### 1.     Intentional infliction of emotional distress (Count Five)

Plaintiffs allege all the elements of intentional infliction of emotional distress.  SAC ¶¶ 3222-28; *see Burnett*, 274 F. Supp. 2d at 107-08 (sustaining similar claim based on material support to terrorists).  Defendants' arguments to the contrary (at 71-74) are unpersuasive.

**a.     *Extreme and outrageous conduct*.**  Defendants knowingly funded terrorists who used their resources to attack Americans.  SAC ¶¶ 105-87.  As courts have repeatedly recognized, that constitutes extreme and outrageous conduct.  *See*, *e.g.*, *Stansell v. Rep. of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016); *Burnett*, 274 F. Supp. 2d at 107-08.

**b.     *Causation*.**  Causation exists in support-of-terrorism cases when the attack is "precipitated by the defendants' financial support and sponsorship."  *Bennett v. Islamic Rep. of Iran*, 507 F. Supp. 2d 117, 129 (D.D.C. 2007).  Plaintiffs allege that Defendants' corrupt transactions were critical to Jaysh al-Mahdi's terrorist operations, SAC ¶¶ 165-79, which raises a plausible inference of factual and legal causation at this stage, *see supra* Part V.A.  Defendants are incorrect (at 72) that but-for causation is required.  *Compare Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (noting but-for-causation "exception for cases" with "multiple,

independently sufficient factual causes"), *with Boim*, 549 F.3d at 695-98 (explaining why that

common-law exception applies to terrorist finance); *see also Owens v. Rep. of Sudan*, 71

F. Supp. 3d 252, 256 n.2 (D.D.C. 2014) (same exception for IIED claims in "terrorism cases").

      **c.**    *Intent*.  To satisfy this element, Plaintiffs need only allege that Defendants

supported terrorism with at least "reckless disregard of the probability of causing" emotional

distress.  *Peterson v. Islamic Rep. of Iran*, 515 F. Supp. 2d 25, 42 (D.D.C. 2007), *abrogated on

other grounds by Mohammadi v. Islamic Rep. of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015).  The SAC

does so for the reasons stated above.  *See supra* Parts IV.A.2, V.C.1.

      **d.**    *Presence*.  Defendants assert (at 74) that "many states" require plaintiffs to be

"present" at the scene of the tort.  But many states impose no such requirement, *see Peterson*,

515 F. Supp. 2d at 42-44 (surveying case law), and deciding which states' laws apply to which

Plaintiffs is premature at this stage.[70]  Moreover, the Restatement contains no "presence"

requirement for *direct* victims (like the physically wounded Plaintiffs here), *see* Restatement

(Second) of Torts § 46 (1964), and terrorism-related torts based on conduct that violates the ATA

fall within the Restatement's exception to that requirement for indirect victims, *see id*. § 46 cmt.

l; *Rep. of Sudan v. Owens*, 194 A.3d 38, 42-45 (D.C. 2018) (reaching same conclusion for

terrorism claims under the FSIA).  A presence requirement therefore cannot justify dismissal.

---

[70] Defendants assert (at 71 n.88) that "dismissal is required" because Plaintiffs do not plead facts (like domicile at the time of the attacks) sufficient to perform a choice-of-law analysis on the pleadings.  But Plaintiffs are under no obligation to plead such facts; "a complaint need not pin plaintiff's claim for relief to a precise legal theory."  *Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 99 (D.D.C. 2016); *see also, e.g., Baker v. Great Socialist People's Libyan Arab Jamahirya*, 2006 WL 3208662, at *5 (D.D.C. Nov. 7, 2006) (rejecting argument that "Plaintiffs must identify which states' laws apply"); *Jakobovits v. PHL Variable Ins. Co.*, 2018 WL 2291311, at *8 (E.D.N.Y. May 18, 2018) (denying motion to dismiss for lack of "facts necessary to determine which state's substantive law applies").  Indeed, courts often decline to conduct a choice-of-law analysis on the pleadings.  *See, e.g., Jones v. Lattimer*, 29 F. Supp. 3d 5, 10 n.3 (D.D.C. 2014) (citing cases).  This Court should follow a similar course.

### 2.    Assault and battery (Count Six)

Most Plaintiffs who were physically wounded allege that Defendants gave "substantial assistance or encouragement" to Jaysh al-Mahdi's assault and battery of Plaintiffs.  Restatement (Second) of Torts § 876(b) (1979); *see* SAC ¶¶ 3229-34.  As explained above, Defendants aided and abetted Jaysh al-Mahdi's terrorist attacks, which harmed Plaintiffs.  *See supra* Part IV.A. That is sufficient to impose secondary aiding-and-abetting liability on Defendants.  *See Gill v. Islamic Rep. of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017) (defendant "vicariously liable for assault and battery" for supporting "terrorist activities" by another).  Defendants' only answer (at 74) is to suggest incorrectly that there is no aiding-and-abetting liability under D.C. law.[71]

### 3.    Wrongful death and survival (Counts Seven and Eight)

The wrongful-death and survival claims are brought by the deceased Plaintiffs and their estates, and they incorporate the intentional torts discussed above.  SAC ¶¶ 3235-54.  Plaintiffs adequately plead these claims for reasons already stated, and Defendants make no independent arguments against them.  *See*, *e.g.*, *Bodoff v. Islamic Rep. of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006); *Peterson*, 515 F. Supp. 2d at 39-40 (sustaining similar wrongful-death claims).

### CONCLUSION

The Court should deny the motion to dismiss.  In the alternative, it should grant Plaintiffs an opportunity to seek leave to amend.  *See* Fed. R. Civ. P. 15(a).  Plaintiffs have substantively amended their Complaint only once – well over a year ago, before seeing the last two versions of Defendants' motions to dismiss (Dkts. 70, 72, 111, 112) – and would respectfully request the opportunity to cure any deficiencies the Court might discern.  *See* Dkt. 100 at 3 n.3.

---

[71] "[T]his court is bound to recognize an actionable tort of aiding and abetting under the D.C. Circuit's decision in *Halberstam*."  *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 87-88 (D.D.C. 2017) (citing *Halberstam*, 705 F.2d at 479); *see also Baker v. Gurfein*, 744 F. Supp. 2d 311, 317 n.3 (D.D.C. 2010).

Dated:  May 6, 2019[*]

Respectfully submitted,

/s/ *David C. Frederick*

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

David C. Frederick (D.C. Bar No. 431864)
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Thomas G. Schultz (D.C. Bar No. 1028017)
Matthew M. Duffy (D.C. Bar No. 1031257)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
tschultz@kellogghansen.com
mduffy@kellogghansen.com

*Counsel for Plaintiffs*

---

[*] Plaintiffs originally filed this Opposition on May 6, 2019.  *See* Dkt. 114.  In accordance with the Court's January 30, 2020 Order, Dkt. 126 ("Order"), Plaintiffs are refiling this Opposition on February 5, 2020.  The Opposition on its face addresses Defendants' motion to dismiss the Second Amended Complaint, but under the Order should be construed to apply to Defendants' renewed motion to dismiss the Third Amended Complaint.  *See* Dkt. 128.