**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSHUA ATCHLEY *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 17-cv-02136-RJL |
| ASTRAZENECA UK LIMITED *et al.*, | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 2

    A.    Defendants' Corrupt Payments To Terrorists ........................................................ 2

    B.    Plaintiffs' Claims ................................................................................................ 7

ARGUMENT ................................................................................................................................... 8

I.    THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS BECAUSE THEY FINANCED A TERRORIST GROUP THAT THEY KNEW WAS ATTACKING THE UNITED STATES .................................................... 9

II.    THE COURT HAS SPECIFIC JURISDICTION BECAUSE THE FOREIGN DEFENDANTS' TRANSACTIONS RELIED ON U.S. CONTACTS .......................... 12

    A.    The Foreign Defendants Purposefully Availed Themselves Of The United States' Benefits And Protections ..................................................................................... 12

    B.    Plaintiffs' Claims Are Connected To The Foreign Defendants' U.S. Contacts ... 19

    C.    Jurisdiction Is Reasonable Because It Serves Vital Federal Interests................... 22

III.    PENDENT JURISDICTION EXISTS OVER THE STATE-LAW CLAIMS ................ 23

IV.    AT A MININUM, JURISDICTIONAL DISCOVERY IS WARRANTED .................... 23

CONCLUSION.............................................................................................................................. 25

# TABLE OF AUTHORITIES

Page

**Cases**

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) ............................................................... 10

*Adelson v. Hananel*,
  652 F.3d 75 (1st Cir. 2011) ................................................................... 23

*Adidas Am., Inc. v. Cougar Sport, Inc.*,
  169 F. Supp. 3d 1079 (D. Or. 2016) ...................................................... 20

*Air Prods. & Controls Inc. v. Safetech Int'l Inc.*,
  503 F.3d 544 (6th Cir. 2007) .................................................. 13, 19-20, 21

*Al Rushaid v. Pictet & Cie*,
  68 N.E.3d 1 (N.Y. 2016) ........................................................................ 18

*Asahi Metal Indus. Co. v. Superior Court*,
  480 U.S. 102 (1987) ............................................................................... 22

*Associated Producers, LTD v. Vanderbilt Univ.*,
  76 F. Supp. 3d 154 (D.D.C. 2014) ........................................................... 8

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*,
  591 F.3d 1 (1st Cir. 2009) ..................................................................... 19

*Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig., In re*,
  299 F. Supp. 3d 324 (D.N.H. 2017) ....................................................... 24

*Bristol-Myers Squibb Co. v. Superior Court*,
  137 S. Ct. 1773 (2017) ........................................................................... 16

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ............................................................... 18

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ......................................................................*passim*

*C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*,
  771 F.3d 59 (1st Cir. 2014) ................................................................... 23

---

 * Authorities on which counsel chiefly relies are denoted with an asterisk per Local Civil Rule 7(a).

*Calder v. Jones*,
    465 U.S. 783 (1984) .................................................................................. 9, 12

*Diamond Chem. Co. v. Atofina Chems. Inc.*,
    268 F. Supp. 2d 1 (D.D.C. 2003) ..............................................................23-24

*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*,
    618 F.3d 1153 (10th Cir. 2010) ................................................................... 20

*Ferreyra v. Fraternal Order of Police Legal Plan, Inc.*,
    53 F. Supp. 3d 69 (D.D.C. 2014) ................................................................. 23

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009)......................................................... 7, 22

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) ................................................................. 8, 24

*Hale v. United States*,
    2015 WL 7760161 (D.D.C. Dec. 2, 2015) .................................................... 25

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ..................................................................................... 19

*Helmer v. Doletskaya*,
    393 F.3d 201 (D.C. Cir. 2004) ..................................................................... 12

*Hoffa Eng'g, LLC v. Craney*,
    2007 WL 831820 (S.D. Ind. Mar. 12, 2007)................................................. 25

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .................................................................................10, 22-23

*IMAPizza LLC v. AT Pizza Ltd.*,
    334 F. Supp. 3d 95 (D.D.C. 2018)............................................................... 21

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ..................................................................................... 17

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ....................................................................... 20

*Knox v. MetalForming, Inc.*,
    914 F.3d 685 (1st Cir. 2019) ...................................................................15-16

*Lans v. Adduci Mastriani & Schaumberg L.L.P.*,
   786 F. Supp. 2d 240 (D.D.C. 2011) ................................................................. 8, 18

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) .......................................................................... 18, 22

*Licci v. Lebanese Canadian Bank, SAL*,
   984 N.E.2d 893 (N.Y. 2012) ......................................................................... 18, 22

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) .......................................................................... 8, 12

*Manifold v. Wolf Coach, Inc.*,
   231 F. Supp. 2d 58 (D.D.C. 2002) ........................................................... 19, 20, 21

*McGee v. Int'l Life Ins. Co.*,
   355 U.S. 220 (1957) ........................................................................................... 12

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D. Utah 2006) ....................................................... 9, 10, 12

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) .......................................................................... 8, 9, 11

*Myers v. Casino Queen, Inc.*,
   689 F.3d 904 (8th Cir. 2012) .............................................................................. 20

*National Women's Political Caucus, Inc. v. Metro. Louisville Women's Political Caucus*,
   359 F. Supp. 3d 13 (D.D.C. 2019) ...................................................................... 21

*O'Connor v. Sandy Lane Hotel Co.*,
   496 F.3d 312 (3d Cir. 2007) .......................................................................... 20, 21

*Paques, Inc., In re*,
   277 B.R. 615 (Bankr. E.D. Pa. 2000) ................................................................. 15

*Pro Axess, Inc. v. Orlux Distrib., Inc.*,
   428 F.3d 1270 (10th Cir. 2005) ..................................................................... 13, 23

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ............................................................................................. 10

*Shoppers Food Warehouse v. Moreno*,
   746 A.2d 320 (D.C. 2000) .................................................................................. 19

iv

*Sisso v. Islamic Rep. of Iran*,
  448 F. Supp. 2d 76 (D.D.C. 2006) ................................................................. 9, 23

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................ 10

*\*St. Jude Med., Inc. v. Lifecare Int'l, Inc.*,
  250 F.3d 587 (8th Cir. 2001) ...................................................................... 13, 14, 15

*\*Strauss v. Credit Lyonnais, S.A.*,
  175 F. Supp. 3d 3 (E.D.N.Y. 2016) ............................................................... 17, 19, 20

*Terrorist Attacks on September 11, 2001, In re*,
  714 F.3d 659 (2d Cir. 2013) ......................................................................... 10, 11, 25

*\*uBid, Inc. v. GoDaddy Grp., Inc.*,
  623 F.3d 421 (7th Cir. 2010) .............................................................................. 20, 21

*Unite Here Local 25 v. Madison Ownership, LLC*,
  850 F. Supp. 2d 219 (D.D.C. 2012) ........................................................................... 25

*Vencedor Mfg. Co. v. Gougler Indus., Inc.*,
  557 F.2d 886 (1st Cir. 2017) ................................................................................. 15-16

*Walden v. Fiore*,
  571 U.S. 277 (2014) .............................................................................. 9, 10, 11, 12

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ......................................................................... 11, 21, 22

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) ................................................................. 17, 20

*Wultz v. Islamic Rep. of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) .................................................................... 10, 23

**Statutes**

18 U.S.C. § 2331(1)(C) .......................................................................................... 11, 21

18 U.S.C. § 2333 *et seq.* .......................................................................................... 7, 12

18 U.S.C. § 2333(d)(2) ............................................................................................... 12

18 U.S.C. § 2334(d) ....................................................................................................... 7

v

Justice Against Sponsors of Terrorism Act ("JASTA"),
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ........................................................................ *passim*

**Other Authorities**

Amicus Br. of U.S. Senators Charles E. Grassley *et al.*,
    *Sokolow v. Palestine Liberation Org.*, 2017 WL 1291691 ............................................... 7, 8, 10

Deferred Prosecution Agmt., *United States v. DePuy, Inc.*,
    No. 11-cr-0099 (D.D.C. Apr. 8, 2011), Dkt. 1-1 ........................................................... 5

Order, *Bishop v. Hoffman-La Roche, Inc.*,
    No. 02-cv-1533 (M.D. Fla. Mar. 30, 2004), Dkt. 186 ............................................... 15

S. Rep. No. 102-342 (1992) ............................................................................................ 7

## INTRODUCTION

This case concerns claims by American citizens against companies that used American products and the American banking system to finance corrupt payments to an anti-American terrorist group.  Some of those companies are located abroad.  But all are part of globally integrated medical-supply conglomerates with a significant presence in the United States, and each foreign company worked closely with its domestic affiliates to obtain and fulfill corrupt sales contracts with the terrorist-run Iraqi Ministry of Health ("Ministry").  Those transactions with the Ministry directly funded terrorist attacks targeting Americans in Iraq, which killed and injured Plaintiffs and their family members.  *See* Dkt. 106 ("SAC"), ¶¶ 165-79, 333-56.  The attacks were perpetrated by Jaysh al-Mahdi, a group that Defendants knew was intent on using terrorist attacks to expel the United States from Iraq.  *Id*. ¶¶ 333, 354.

The Due Process Clause permits U.S. jurisdiction over any entity that knowingly finances such attacks.  That is true in part because Congress has determined that civil anti-terrorism lawsuits by U.S. citizens in U.S. courts serve vital national-security interests.  Of course, many entities that fund foreign terrorists do so through non-U.S. subsidiaries and transactions that culminate in payments to non-U.S. persons.  Defendants fit the same pattern:  they often used their foreign affiliates to route their payments to Jaysh al-Mahdi, and a lot of their conduct occurred in Iraq – where the terrorists they bribed were located.  But that does not render them beyond the jurisdiction of U.S. courts.  Where, as here, the transactions that funded terrorism have multiple, essential touchpoints with the United States, subjecting the terrorist funders to U.S. jurisdiction promotes compelling government interests and comports fully with due process.

Personal jurisdiction is therefore proper for two independent reasons.  First, under the Supreme Court's "effects test," Defendants are subject to jurisdiction in this forum because they financed a group that they knew was targeting the United States through terrorist attacks on U.S.

citizens.  Congress has found that such financing is inherently directed at the United States and creates a strong connection to this forum.  Congress's judgment, as in any due-process analysis touching on national security, merits substantial weight.  It also brings Defendants within the traditional rule that a tortfeasor is subject to jurisdiction in any forum that its conduct targets.

Second, Defendants "purposefully availed" themselves of the United States by executing corrupt transactions that relied on U.S. contacts.  Defendants' transactions may have ended in Iraq, but they began in the United States and relied on U.S. supply chains, FDA approvals, and U.S. banks.  Those U.S. contacts were neither coincidental nor tangential to Plaintiffs' claims; they were important components of the unlawful transactions and materially enhanced the value of the corrupt payments made to Jaysh al-Mahdi.  A company that uses U.S. manufacturing, banking, and regulatory approvals to magnify the value of its corrupt payments to terrorists should be subject to suit here.  Defendants' response (at 15-19) – that only their final delivery of goods and cash to terrorists in Iraq counts as "suit-related" conduct – takes an artificially narrow view of their transactions and would all but eliminate U.S. jurisdiction over terrorist funders.

Alternatively, the Court should order jurisdictional discovery.  Such discovery (though unnecessary) would likely reveal additional evidence of U.S. contacts and refute Defendants' factual arguments.  And because merits discovery should proceed against the 15 U.S. Defendants in all events, ordering jurisdictional discovery at the same time would promote judicial economy.

## BACKGROUND

### A.    Defendants' Corrupt Payments To Terrorists

1.    From at least late 2004 to 2008, Jaysh al-Mahdi controlled the Ministry and used it to extract corrupt payments from medical companies like Defendants.  SAC ¶¶ 63-113.  The corrupt payments generally included "free goods" – extra drugs and devices Defendants knew Jaysh al-Mahdi would monetize for terrorist purposes – and cash bribes.  *Id*. ¶¶ 114-64.  Such

payments, which Defendants made directly to Jaysh al-Mahdi operatives inside the Ministry, provided an important source of financing for terrorist attacks on Americans. *Id.* ¶¶ 165-79.

Plaintiffs elsewhere describe the facts of those payments in great detail. *See* Pls.' Opp'n to Defs.' 12(b)(1) and 12(b)(6) Mot. ("Merits Opp'n") at 5-14; SAC ¶¶ 180-332. Most relevant here, Defendants' transactions generally involved two corporate entities: (1) a *supplier* that negotiated and executed the sales contract with Kimadia (the Ministry's import arm); and (2) an affiliated *manufacturer* that made the goods being sold. *Id.* ¶ 147. The Foreign Defendants that challenge personal jurisdiction are six non-U.S. suppliers that made corrupt payments to secure Kimadia sales contracts for products made by their domestic manufacturing affiliates.[1]

The Foreign Defendants tied their corrupt contracts to the United States in several ways. Most significantly, each sold to Kimadia at least some products made predominantly or exclusively in the United States. *Id.* ¶¶ 189, 239-42, 252, 283, 311. Due to the unique strengths of U.S. high-tech manufacturing, Defendants chose to make many of their most expensive, complex drugs and devices here. *See*, *e.g.*, *id.* ¶¶ 12, 239, 305. That was particularly true for their "active pharmaceutical ingredients" ("API"), which produce a drug's intended pharmacological effect. *Id.* ¶¶ 122, 189 n.164. Defendants made the API in the United States for many of the blockbuster drugs that the Foreign Defendants sold to Kimadia. *Id.* ¶¶ 189, 252, 283, 311. Although sometimes such drugs would be "formulated" elsewhere – referring to the process in which American-made API was combined with other substances to create a final

---

[1] The "Foreign Defendants" are AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International ("Cilag"), Janssen Pharmaceutica N.V. ("Janssen"), Pfizer Enterprises SARL, and F. Hoffmann-La Roche Ltd. SAC ¶¶ 17, 21, 23, 27, 31, 35. Each is part of a broader corporate family that includes other Defendants as well. *Id.* ¶¶ 17-18 (AstraZeneca), 19-21 (GE Healthcare), 22-29 (J&J), 30-34 (Pfizer), 35-37 (Roche). The term "Janssen-Cilag" refers collectively to Janssen and Cilag. *Id.* ¶ 253 n.208. Unless otherwise specified, all internal quotations, citations, and ellipses are omitted.

product – the American-made API represented the most important, hard-to-replicate part of the process that gave the drugs virtually all their value. *Id.* ¶¶ 122, 189 n.164, 276.

The Jaysh al-Mahdi members who controlled the Ministry coveted Defendants' American-made goods in particular. *Id.* ¶ 12. The provision of U.S.-sourced drugs and devices not only complied with Kimadia policy prioritizing the acquisition of such goods, but also supplied Jaysh al-Mahdi with cash equivalents that were especially valuable on the black market. *Id.* ¶¶ 152-53. To that end, Kimadia's sales contracts with the Foreign Defendants often contained "origin" terms obligating them to source from the United States. *Id.* ¶¶ 122, 152, 307. In such circumstances, the Foreign Defendants were required to affix a "U.S." label on the drugs and devices they delivered. *Id.* ¶ 152. On other occasions, the Foreign Defendants listed a foreign place of *formulation* as the "origin" but still sourced the most important part of the drug – the API – from the United States. *Id.* ¶¶ 205-06, 276, 326. And in all cases, the Foreign Defendants procured certificates of FDA approval from the United States, which further enhanced the value of drugs and devices provided. *Id.* ¶¶ 152-53, 208, 243, 279, 308, 331.

The Foreign Defendants were able to source drugs and devices from the United States because each was part of a globally integrated company with a significant U.S. presence. SAC ¶ 12. Pfizer, for example, adhered to a "One Pfizer strategy" that "abolish[ed] . . . the wall between domestic and international operations," *id.* ¶ 296, and it centralized control over its global supply network in New York, *id.* ¶¶ 298, 302. GE Healthcare likewise used its Wisconsin headquarters to run "global cross-functional teams" with responsibilities "throughout the breadth of the supply chain." *Id.* ¶ 237. And as J&J admitted in an agreement with the Department of Justice filed in this District, its U.S. parent company was "responsible for the acts of its . . . operating companies" in paying kickbacks to secure contracts from the Saddam-era Ministry. *Id.*

¶ 273.  Such cross-affiliate collaboration remained essential to the corrupt transactions Plaintiffs allege.  *Id.* ¶¶ 203-07, 237, 277, 298, 301, 323-27.  Indeed, the Ministry required suppliers and manufacturers to work in tandem at several stages of each transaction.  *Id.* ¶¶ 122, 147, 156-57.

The Foreign Defendants' transactions also used the New York banking system.  That is because they chose to secure those transactions – all of which involved U.S. dollars – with letters of credit.  *Id.* ¶¶ 124-27, 209, 244, 280, 309, 332.  A letter of credit alleviates a seller's risk by having a reputable financial institution guarantee payment in the event of default by the buyer.  *Id.* ¶ 127.  Kimadia issued letters of credit through the Trade Bank of Iraq ("TBI") and required the Foreign Defendants to fund the associated banking charges by kicking back a portion of the sales price into TBI's correspondent account in New York.  *Id.* ¶¶ 124-26.  Those payments, which relied on New York's status as a credit hub, were material to the Foreign Defendants' ability to finance their corrupt sales to the Ministry.  *Id.* ¶¶ 125-27.

**2.**      The Foreign Defendants account for six of the 21 Defendants – two from J&J, one from each of the other four Defendant corporate families.  *See supra* note 1.  Each made corrupt payments to Jaysh al-Mahdi in connection with the sale of several products.  *Id.* ¶¶ 188-98, 210-21, 252-61, 281-91, 310-18.  Each sourced high-value drugs or devices from the United States; sometimes certified to Kimadia that it was doing so; and used the U.S. banking system to procure letters of credit.  *Id.* ¶¶ 203-09, 233-44, 272-80, 296-309, 322-32.  Each also procured U.S. export certificates and FDA approval documentation in connection with its Kimadia contracts.  *Id.*  Further, in admitting criminal bribery concerning the Saddam-era Ministry, Janssen-Cilag (the two J&J Foreign Defendants) consented to U.S. jurisdiction and acknowledged that their U.S. parent was "responsible" for their conduct in Iraq.  *Id.* ¶¶ 272-73; *see* Deferred Prosecution Agmt. §§ 2(b), 5, *United States v. DePuy, Inc.*, No. 11-cr-0099 (D.D.C. Apr. 8, 2011), Dkt. 1-1.

The Foreign Defendants make no effort to refute most of those allegations.  They do not, for example, submit affidavits disclaiming reliance on U.S. manufacturing or denying that they worked with their U.S. affiliates to fulfill the alleged contracts.  Nor does any Defendant adduce evidence disputing Plaintiffs' letter-of-credit allegations.  The GE Healthcare Foreign Defendant has produced no evidence at all.  As for the other Foreign Defendants, their outside counsel submit declarations purporting to attach some (but not all) of their Kimadia contracts:

- AstraZeneca UK Limited.  Plaintiffs allege at least 19 contracts from 2004-2008, including for at least three high-value drugs with American API.  SAC ¶ 189.  Plaintiffs allege seven illustrative contract numbers associated with those drugs.  *Id*. ¶¶ 162, 191, 196.  AstraZeneca UK Limited does not deny that it sourced the API for those drugs from the United States.  It produces six of the seven identified contracts, *see* Dkt. 112-5, ¶ 3, and its Arimidex contract expressly identifies the United States as the "Origin of goods" (with "UK" having been crossed out), *id*. Ex. 8 at 1; *see also* SAC ¶ 204.

- GE Medical Systems Information Technologies GmbH.  Plaintiffs allege a 100% market share for nuclear-medicine products in Iraq from 2004-2008, and at least 12 medical-device contracts GE Medical Systems Information Technologies GmbH executed.  *Id.* ¶¶ 210-13.  Plaintiffs identify one illustrative contract number, *id*. ¶ 216, and allege that GE Medical Systems Information Technologies GmbH fulfilled its contracts by sourcing devices from its U.S. affiliates and certifying the U.S. origin to Kimadia, *id*. ¶¶ 240-43.  GE Healthcare refutes none of those allegations and submits no responsive evidence.

- Janssen-Cilag.  Plaintiffs allege at least 13 contracts from 2004-2008, including for at least 2 high-value drugs with American API.  *Id*. ¶ 252.  Plaintiffs allege three illustrative contract numbers associated with those drugs.  *Id*. ¶ 253.  Janssen-Cilag does not deny it sourced the API for those drugs from the United States.  Although it purports to produce three contracts with the numbers Plaintiffs identify, one such "contract" consists of (1) an unsigned, undated draft and (2) two preliminary documents Cilag did not countersign and that reference "conditions" in an "e-mail" Cilag does not provide.  Dkt. 112-2, Ex. 1.  Janssen-Cilag does not produce evidence from any witness competent to authenticate those documents.  Nor does it deny that it began selling another drug (Remicade) to Kimadia in 2010 for which it identified the United States as the origin.  SAC ¶¶ 252-53.

- Pfizer Enterprises SARL.  Plaintiffs allege at least 17 contracts negotiated by Pfizer suppliers from 2004-2008, including for at least six high-value drugs with American API.  *Id.* ¶ 283.  Plaintiffs allege three illustrative contract numbers executed by Pfizer Enterprises SARL, *id*. ¶ 284, and allege that it certified the U.S. "origin" in at least some of those contracts, *id*. ¶¶ 304, 307.  Pfizer Enterprises SARL produces only one of the three contracts.  Dkt. 112-4, ¶¶ 3-4.  It does not deny that it sourced the API from the United States for all of the American-made drugs Plaintiffs allege.

- F. Hoffmann-La Roche Ltd.  Plaintiffs allege at least 18 contracts from 2004-2008, including for at least five high-value drugs with American API.  SAC ¶ 311.  Plaintiffs identify four illustrative contract numbers, *id*. ¶ 312, and allege that F. Hoffmann-La Roche Ltd. certified to Kimadia the U.S. "origin" for those drugs, *id*. ¶¶ 122, 156, 328.  F. Hoffmann-La Roche Ltd. produces only two contracts and offers no evidence about the others. Dkt. 112-3, ¶¶ 2-4.  Nor does it deny that it sourced the API from the United States for the two contracts that it does produce.

All told, no Foreign Defendant submits evidence refuting the allegation that it used the United States to source the critical API for its drugs.  Nor does any Foreign Defendant deny that it executed at least *some* corrupt contracts with Kimadia containing an express U.S. "origin" term.

**B.     Plaintiffs' Claims**

Plaintiffs' claims arise under the federal Anti-Terrorism Act ("ATA"), *see* 18 U.S.C. § 2333 *et seq.*, which Congress enacted to stop "the flow of money" to terrorist groups, S. Rep. No. 102-342, at 22 (1992).  In Congress's view, the ATA was needed to "provid[e] victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories."  *Id.*  Congress thus crafted the ATA to "extend[ ] the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines."  *Id.* at 45.  Similarly, Congress included in the ATA a statutory bar to *forum non conveniens* arguments, 18 U.S.C. § 2334(d), which further ensured that Americans harmed by terrorism could pursue "broad remedies in a procedurally privileged U.S. forum," *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 422 (E.D.N.Y. 2009).  As the ATA's original author and co-sponsor put it, the statutory scheme manifests Congress's view that "vital interests in protecting U.S. nationals and combating terrorism are linked directly to the assertion of jurisdiction over ATA civil claims." Amicus Br. of U.S. Senators Charles E. Grassley *et al.* at 7, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Apr. 6, 2017), 2017 WL 1291691 ("Grassley Br.").

Congress recently reaffirmed that view in the Justice Against Sponsors of Terrorism Act ("JASTA"), which expanded ATA civil liability.  *See* Pub. L. No. 114-222, 130 Stat. 852 (2016).

In JASTA, Congress found that entities that "knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism . . . necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States." *Id*. § 2(a)(6).  JASTA's "purpose" was therefore "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against" companies like the Foreign Defendants that funnel "support, directly or indirectly, to foreign [terrorists]."  *Id*. § 2(b).  Those findings reflect "Congress's considered judgment" that "federal court jurisdiction over ATA claims is appropriate and consistent with the Due Process Clause."  Grassley Br. at 4.

## ARGUMENT

At this stage of the case, Plaintiffs need only make "a prima facie showing of jurisdiction."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  In determining whether Plaintiffs have met that standard, their factual allegations "are presumed to be true unless directly contradicted by affidavit or other evidence."  *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 264 (D.D.C. 2011).  The Court should "consider all allegations of jurisdictional facts in a light most favorable to the assertion of personal jurisdiction."  *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 161 (D.D.C. 2014).

A corporation is subject to specific personal jurisdiction when it establishes "minimum contacts" with the forum such that it "should reasonably anticipate being haled into court there."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  Because the Foreign Defendants challenge personal jurisdiction over the federal-law ATA claims under "the Due Process Clause of the Fifth Amendment," Dkt. 112-1 ("PJ Br.") at 8, the relevant forum is the "United States as a whole," *Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 (D.C. Cir. 2017).

I.    **THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS BECAUSE THEY FINANCED A TERRORIST GROUP THAT THEY KNEW WAS ATTACKING THE UNITED STATES**

A defendant can establish "minimum contacts" with a forum by engaging in conduct that is "aimed at or has an effect in the forum." *Mwani*, 417 F.3d at 12-13; *see Calder v. Jones*, 465 U.S. 783, 789 (1984) ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."). Under that principle, a defendant's tortious conduct creates jurisdiction when its activities are "expressly aimed" at a forum such that it should "reasonably anticipate being haled into court there to answer" for the effects of its conduct. *Id*. at 789-90. Causing an "injury to a forum resident" is not sufficient. *Walden v. Fiore*, 571 U.S. 277, 290 (2014). Rather, "the effects of [a defendant's] conduct" must be "connected to the forum . . . in a way that makes those effects a proper basis for jurisdiction." *Id*.

The Foreign Defendants are subject to jurisdiction under that standard because they knowingly financed terrorist attacks that targeted the United States. SAC ¶¶ 3-14. "'Terrorism cases provide textbook examples of unabashedly malignant actions aimed at the United States whose effects'" confer personal jurisdiction in this forum. *Sisso v. Islamic Rep. of Iran*, 448 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (quoting *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006)). That is because terrorist attacks targeting Americans, by their nature, are designed to "cause pain and sow terror in the [victim's] home country, the United States." *Mwani*, 417 F.3d at 13. Here, Jaysh al-Mahdi attacked Plaintiffs in an effort to terrorize the United States into leaving Iraq. SAC ¶¶ 13, 58, 333, 345. By financing that campaign, Defendants aligned themselves with conduct that was "purposefully direct[ed] . . . at the United States" and so should have caused them "to reasonably anticipate being haled into an American court." *Mwani*, 417 F.3d at 14. Those "effects" alone are enough to confer personal jurisdiction over the Foreign Defendants, with or without any other U.S. contacts. *See Calder*, 465 U.S. at 789.

9

Upholding jurisdiction on that basis accords with Congress's findings.  In amending the
ATA, Congress found that entities that "directly or indirectly" finance terrorism "necessarily
direct their conduct at the United States, and should reasonably anticipate being brought to court
in the United States."  JASTA § 2(a)(6).  Congress's considered judgment on that point merits
substantial weight.  *See ACA Int'l v. FCC*, 885 F.3d 687, 698 (D.C. Cir. 2018) ("predicate
congressional findings can shed substantial light on the intended reach of a statute"); Grassley
Br. at 4-10 (further explaining Congress's intent).  Courts afford the political branches wide
latitude to make "national security and foreign policy" judgments in a variety of constitutional
contexts,[2] and Congress here has determined that the threat to U.S. national interests posed by
companies that finance terrorism "connects [their conduct] to the forum in a meaningful way,"
*Walden*, 571 U.S. at 290.  Consistent with that finding, the Foreign Defendants' knowing
provision of financing to Jaysh al-Mahdi is enough to create personal jurisdiction in this forum.[3]

Defendants cite Second Circuit cases to argue (at 13-14) that "indirect funding to [a
terrorist] organization" does not create jurisdiction.  But even in the Second Circuit, jurisdiction
exists over entities that provide "financial . . . support *directly* to [a terrorist group] when [the
group] allegedly was known to be targeting the United States."  *In re Terrorist Attacks on
September 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013).  That is what Plaintiffs allege here.

---

[2] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("*HLP*") (relying on
congressional findings to reject First Amendment challenge to material-support statute); *see*, *e.g.*,
*Rostker v. Goldberg*, 453 U.S. 57, 64-65 (1981) (rejecting due-process challenge to military draft
based on "great[ ] deference" to Congress regarding "national defense").  Indeed, for Article III
subject-matter jurisdiction, "Congress has the power to . . . articulate chains of causation that will
give rise to a case or controversy where none existed before."  *Spokeo, Inc. v. Robins*, 136 S. Ct.
1540, 1549 (2016).  That same principle should apply with equal force to personal jurisdiction.

[3] *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 35 (D.D.C. 2010) (upholding
jurisdiction over bank that provided "financial services" to group that "purposefully directed
terrorist activities toward the United States"); *Morris*, 415 F. Supp. 2d at 1336 (holding that
"effects doctrine" provides jurisdiction over defendants that provide terrorist "financing").

Defendants structured their transactions with the Ministry to send resources *directly* to Jaysh al-Mahdi, SAC ¶¶ 3-7, 165-79, and they did so while knowing that Jaysh al-Mahdi was targeting Americans in particular, *id.* ¶¶ 180-87, 333-54.  The nexus is thus "more direct and one step closer" than in the cases that find no jurisdiction.  *Terrorist Attacks*, 714 F.3d at 678.

In any event, the Second Circuit cases predate JASTA and conflict with the national-security judgments it embodies.  In Congress's view, companies "necessarily direct their conduct at the United States" whenever they provide anti-American terrorists with "resources, directly *or indirectly*."  JASTA § 2(a)(6) (emphasis added).  That determination reflects the sort of "foreign policy [and] national security" judgments that Defendants themselves say are constitutionally committed to "the President and Congress."  Dkt. 111-1 at 22.  Indeed, Defendants elsewhere argue that this Court should afford the political branches such absolute deference on foreign-policy issues that it should refuse to decide this case altogether.  *See id.* at 22-28.  Having argued for deference so total, they cannot then ask the Court to rebuke Congress's express finding that "indirect[ ]" terrorist financing is necessarily directed at the United States.  JASTA § 2(a)(6).[4]

Further, the contacts Defendants created were "with the forum . . . itself" rather than just with "persons who reside there."  *Walden*, 571 U.S. at 285.  The attacks Defendants funded were not "indiscriminate" attacks that injured Americans by chance; they "were specifically targeted against [U.S.] citizens" and designed to influence U.S. policy.  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 338-39 (2d Cir. 2016); *see* SAC ¶¶ 58-62, 333.  Defendants' support for those attacks – which targeted Plaintiffs *because of* their nationality – was thus directed at "U.S.

---

[4] Nor can Defendants avoid that conclusion by asserting (at 11-13) that their conduct "occurred in Iraq."  Most terrorist financing takes place abroad, and "international terrorism" under the ATA by definition "occur[s] primarily outside the territorial jurisdiction of the United States."  18 U.S.C. § 2331(1)(C); *see* JASTA § 2(a)(3) (finding terrorists "raise significant funds outside of the United States"); *Mwani*, 717 F.3d at 12-13 ("physical" location not decisive).

interests." *Morris*, 415 F. Supp. 2d at 1336.  As Congress has found, *see supra* pp. 7-8, "'the relationship among the defendant, the forum, and the litigation'" in such cases is overwhelming. *Walden*, 571 U.S. at 291 (quoting *Calder*, 465 U.S. at 788).

Defendants err (at 15-16) in passing those contacts off on Jaysh al-Mahdi.  The ATA's core premise is that those who knowingly fund terrorism assume responsibility for – and the contacts created by – the terrorist acts they fund.  *See* 18 U.S.C. § 2333(d)(2); JASTA §§ 2(a)(6), 2(b).  A proper due-process analysis must account for that central feature of Plaintiffs' cause of action.  *See Walden*, 571 U.S. at 287 ("The strength of [the] connection [in *Calder*] was largely a function of the nature of the libel tort.").  Given the statutory context, Jaysh al-Mahdi's attacks on U.S. interests were not "random, fortuitous, or attenuated" contacts; they are "necessary element[s]" of Plaintiffs' claims and bind Defendants to this forum.  *Id*. at 286-88.  But Defendants ask (at 11-15) the Court to ignore the statute and allow them to disclaim all jurisdictional responsibility for the attacks they knowingly financed.  Nothing in *Walden* – a diversity case in which the forum State had no significance whatsoever to the cause of action, *see id*. at 289-91 – justifies upending the statutory scheme and denying Plaintiffs the U.S. forum that Congress deliberately afforded them.  *See Livnat*, 851 F.3d at 56 ("congressional interests may be relevant to whether personal jurisdiction comports with due-process standards").

## II.    THE COURT HAS SPECIFIC JURISDICTION BECAUSE THE FOREIGN DEFENDANTS' TRANSACTIONS RELIED ON U.S. CONTACTS

### A.    The Foreign Defendants Purposefully Availed Themselves Of The United States' Benefits And Protections

Effects aside, a defendant can also create "minimum contacts" by "purposefully avail[ing] himself of the benefits and protections of [the forum's] laws."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985).  The Foreign Defendants engaged in "purposeful availment" of the U.S. forum in at least two ways – either of which is sufficient.

**1.a.**   A corporation "has minimum contacts with a forum if [it] enters into a contract that has a 'substantial connection' with the forum." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).  Such a connection depends on the "negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479.

Those considerations support personal jurisdiction here because the Foreign Defendants' corrupt contracts created a connection with the United States.  In dealing with Kimadia, each Foreign Defendant:  (1) affiliated with at least one U.S. manufacturer so it could sell U.S.-made drugs or devices to Kimadia, SAC ¶¶ 122, 156-57; (2) worked closely with U.S.-based personnel to fulfill Kimadia's orders, *id*.; (3) procured critical paperwork from the United States, including export certificates and FDA approvals, *id*. ¶¶ 152-56; and (4) expressly certified on at least one occasion that it was sourcing its goods from the United States, *id*. ¶ 122.  *See supra* pp. 3-7; SAC ¶¶ 203-09 (AstraZeneca), 233-44 (GE Healthcare), 272-80 (J&J), 296-309 (Pfizer), 322-32 (Roche).  By deliberately sourcing and distributing medical goods from their U.S. affiliates, the Foreign Defendants purposefully availed themselves of the United States.[5]

That reliance on the United States was no mere coincidence; it was a material part of the Foreign Defendants' corrupt conduct.  Many of their most expensive and valuable products had to be made in the United States due to the unique advantages offered by U.S. manufacturing

---

[5] *See St. Jude Med., Inc. v. Lifecare Int'l, Inc*., 250 F.3d 587, 591-93 (8th Cir. 2001) (medical-goods distributor availed itself of Minnesota by contracting to distribute goods "manufactured in Minnesota"); *Pro Axess, Inc. v. Orlux Distrib., Inc.,* 428 F.3d 1270, 1277 (10th Cir. 2005) (sunglasses distributor availed itself of Utah by seeking Utah company's "assistance in procuring sunglasses frames" and contemplating "services necessary" for distribution chain "were to be performed in Utah"); *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (life-safety-products reseller availed itself of Michigan by "conduct[ing] business with a [manufacturer] whose principal place of business it knew to be in Michigan").

facilities.  *Id.* ¶¶ 203-06, 233-39, 276-79, 300-07, 322-30.  Those expensive American-made products made for an especially potent form of terrorist finance by enabling Jaysh al-Mahdi to fetch higher black-market prices.  *Id.* ¶¶ 122, 153.  Moreover, because FDA approval was important to Kimadia, the Foreign Defendants' reliance on FDA-approved medical goods allowed them to extract additional profits on their corrupt sales.  *Id.* ¶ 153.  And for the goods whose contractual "origin" was the United States, the Foreign Defendants promised to procure the goods from the United States and stamped "U.S." or "USA" on the inner and outer packaging.  *Id.* ¶¶ 152, 204-05, 242, 275, 307, 328.  In other words, the Foreign Defendants increased the black-market value of their corrupt "free goods" payments by emblazoning the U.S. connection on the very face of the goods themselves.

*St. Jude* demonstrates the sufficiency of those contacts.  There, an out-of-forum medical-goods distributor agreed to supply a Minnesota manufacturer's "medical products" to the "Saudi Ministry of Health."  250 F.3d at 590.  The Eighth Circuit held that the distributor was subject to personal jurisdiction in Minnesota because the "distribution contract" concerned "medical devices which were manufactured and shipped from Minnesota," and because the distributor worked with the manufacturer's "personnel in Minnesota [to] prepare bids to submit to the Gulf Cooperative Consortium" in the Middle East.  *Id.* at 592.  Although the distributor was based in California and performed work that occurred mostly overseas, its supply chain required it to maintain an "ongoing relationship" and "regular communications" with the Minnesota-based manufacturer.  *Id.*  Those contacts gave rise to a "purposeful connection" that put the distributor "on notice" it "could be haled into court in Minnesota."  *Id.*

Here, too, the Foreign Defendants entered "distribution contract[s]" for "medical [goods] which were manufactured and shipped from [the forum]," while working with U.S. sales and

manufacturing "personnel" to "prepare bids to submit to" a Mideast purchaser.  *Id*.  The only difference is that, in *St. Jude*, the in-forum manufacturer itself became the plaintiff and sued the out-of-forum distributor for conversion.  *Id*. at 592-93.  But that distinction is immaterial because, as with the plaintiff-manufacturer in *St. Jude*, here the Foreign Defendants' forum-connected tortious conduct "necessarily injured" forum residents.  *Id*.  And whereas the *St. Jude* distributor's in-forum contacts arose from a mere "business relationship" with a third-party manufacturer, *id*., the Foreign Defendants here used globally integrated supply chains that relied on their own affiliates' U.S. facilities, SAC ¶¶ 203-07, 233-41, 272-78, 296-301, 322-30.  Those inter-affiliate relationships create a stronger connection to the forum than the arm's-length "distributorship" the Eighth Circuit held sufficient.  *St. Jude*, 250 F.3d at 592-93.

**b.**     None of this requires the Court to disregard "corporate formalities."  PJ Br. at 20. Jurisdiction here does not depend on imputing jurisdictional contacts across corporate entities; it instead recognizes that the Foreign Defendants used their own contacts with their U.S. affiliates to obtain and fulfill the corrupt sales contracts at issue.  SAC ¶ 12.  Indeed, the Foreign Defendants worked hand-in-hand with their American counterparts in cross-entity business units to negotiate and fulfill the Kimadia sales contracts.  *Id.* ¶¶ 201-07 (AstraZeneca), 233-41 (GE), 272-77 (J&J), 296-306 (Pfizer), 322-30 (Roche);[6] *see id*. ¶¶ 122, 147, 156-57 (describing supplier-manufacturer cooperation).  The Foreign Defendants' own conduct thus subjects them to jurisdiction, without any need for the Court to find an alter ego or agency relationship.[7]

---

[6] *Cf.* Order at 10, *Bishop v. Hoffman-La Roche, Inc.*, No. 02-cv-1533 (M.D. Fla. Mar. 30, 2004), Dkt. 186 (noting the "Roche Group" works in "global teams" that "exist sometimes across entity boundaries" involving both U.S. companies and F. Hoffmann-La Roche Ltd.).

[7] *See In re Paques, Inc.*, 277 B.R. 615, 635-36 (Bankr. E.D. Pa. 2000) (upholding jurisdiction over foreign company based on its "extensive inter-company dealings" with a separate U.S. "subsidiary" that was not its "alter ego"); *see also Knox v. MetalForming, Inc.*, 914 F.3d 685, 694 (1st Cir. 2019) ("international business" cannot "shield itself from suit by a careful

*Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), which the Foreign Defendants invoke (at 18-19), is not to the contrary.  There, non-California plaintiffs sued a non-California manufacturer in California state court concerning a drug it "manufacture[d], label[ed], [and] package[d]" outside of California.  *Id*. at 1778.  The plaintiffs tried to create jurisdiction from the "bare fact" that the out-of-state manufacturer "contracted with a California distributor." *Id*. at 1783.  That gambit failed not because of any inherent flaw with basing jurisdiction on in-forum supply chains, but because the specific California distributor there had nothing to do with the case:  the out-of-state plaintiffs failed to connect it in any way to the "pharmacies that dispensed [the drug] to them."  *Id*.  Here, by contrast, the Foreign Defendants worked closely with their U.S. affiliates in fulfilling many of the very corrupt transactions at issue.  *See supra* pp. 3-7.  Moreover, the United States here (unlike California in *Bristol-Myers*) undeniably has a vital "interest in the claims" brought by American victims of terrorism.  137 S. Ct. at 1780. Plaintiffs are thus more like the *California* consumers in *Bristol-Myers* who sued in their "home State[ ]," as to which everyone agreed there was personal jurisdiction.  *Id*. at 1783-84.

The Foreign Defendants' other attempts (at 18-19) to downplay their U.S. contacts are unpersuasive.  The value proposition they offered Jaysh al-Mahdi depended on their unique ability to supply drugs and devices that could *only* be made in America.  SAC ¶¶ 122, 153, 189, 203-06, 233-39, 252, 276-78, 283, 304-07, 311, 322-30.  The sales contracts often identified the United States as the "origin of goods" for that reason.  *Id*.  And even the contracts identifying a different "origin" for U.S.-manufactured goods used the term to refer to drug formulation rather than API manufacturing.  *Id*. ¶¶ 122, 189 n.164, 205, 276-78, 307, 326-27.  API manufacturing

---

but formalistic structuring of its business dealings") (quoting *Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886, 891 (1st Cir. 2017)).

was the essential, hard-to-replicate process that made the drugs work as advertised; it reflected Defendants' intellectual property and accounted for virtually all their drugs' value. *Id.* ¶¶ 122, 189 n.164.  Drug formulation, by contrast, was a comparatively simple process that could happen virtually anywhere.  *Id.*  Whatever the place of formulation, the Foreign Defendants' agreement to supply drugs whose API they sourced from the United States created "future consequences" and an "actual course of dealing" tethered to this forum.  *Burger King*, 471 U.S. at 479.

Those contacts do not disappear just because the Foreign Defendants may *also* have sold goods sourced from other countries.  *Cf.* PJ Br. at 19.  Personal jurisdiction demands minimum – not exclusive – contacts with this forum.  *See, e.g.*, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (upholding jurisdiction over "multistate lawsuit in New Hampshire . . . even though only a small portion of [defamatory content was] distributed in New Hampshire").  In a similar ATA case, jurisdiction existed over a foreign bank for routing just five wire transfers through the United States as compared to "at least 280 other transfers" routed "elsewhere in the world."  *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20-21 (E.D.N.Y. 2016).  Although the U.S.-connected transactions accounted for only "1.8% of the total," they remained "an integral facet of the conduct" that financed terrorism.  *Id.*  Jurisdiction here is even clearer: although the Foreign Defendants may not have relied solely on the United States in their corrupt transactions, their heavy use of U.S.-based supply chains "evidence[s] a broader operation fundamentally intertwined with [the United States]."  *Id.* at 22; *see Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 285-88 (E.D.N.Y. 2016) (explaining similar holding).

**2.**     The Foreign Defendants also financed their corrupt U.S.-dollar-denominated transactions through the U.S. banking system.  SAC ¶¶ 12, 125-27, 209, 244, 280, 309, 332.  A defendant's "use of a New York correspondent bank account" can demonstrate "'purposeful

availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168, 171 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012)).  For that reason, routing money through a "correspondent bank account in New York" can give rise to personal jurisdiction.  *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 8 (N.Y. 2016).

The Foreign Defendants' corrupt transactions with Kimadia depended on New York's predictable banking system.  They secured those transactions by paying Kimadia for letters of credit, which played a vital role in facilitating their sales by alleviating their risk of non-payment.  SAC ¶¶ 124-27.[8]  And they purchased the letters of credit by wiring money into correspondent banking accounts in New York.  *Id.* ¶ 126; *see id.* ¶¶ 209, 244, 280, 309, 332.  New York's role was no accident; it served as the hub of the global credit system for U.S.-dollar-denominated transactions like Kimadia's.  *Id.* ¶ 126.  In fact, New York-based correspondent accounts underpinned the entire trade-finance system in Iraq, with U.S. banks playing a leading role in propping up Iraqi public imports.  *Id.*  By using TBI's New York-based correspondent accounts to buy vital credit protections for their corrupt sales, the Foreign Defendants availed themselves "of New York's dependable and transparent banking system."  *Licci*, 732 F.3d at 171.

Those contacts are far from "irrelevant to Plaintiffs' claims."  PJ Br. at 16.  Although the New York fees themselves may not have gone to Jaysh al-Mahdi, they were instrumental in

---

[8] The Foreign Defendants' criticism (at 16-18 & n.12) of Plaintiffs' letter-of-credit allegations lacks merit.  The SAC individually alleges that each Foreign Defendant used the New York banking system, SAC ¶¶ 209, 244, 280, 309, 332, and it explains the basis for those allegations in detail, *id.* ¶¶ 124-27.  Because the Foreign Defendants offer no evidence to refute those allegations, they are "presumed to be true."  *Lans*, 786 F. Supp. 2d at 264; *see Browning v. Clinton*, 292 F.3d 235, 243 (D.C. Cir. 2002) (sustaining allegations "on information and belief").

facilitating the corrupt payments that did.  SAC ¶¶ 124-27.  For sophisticated multinational corporations like the Foreign Defendants, the financing terms that facilitated the underlying transactions form an integral part of the "course of dealing" that "must be evaluated."  *Burger King*, 471 U.S. at 479.  Indeed, the New York fees were memorialized in the same letters of credit that established the other deal terms, often including the "free goods" kickbacks.  SAC ¶¶ 124-27.  Those fees tethered the corrupt transactions to the U.S. "banking system" and so subjected the Foreign Defendants "to jurisdiction in the United States with respect to the overall course of conduct of which those [transactions] were a part."  *Strauss*, 175 F. Supp. 3d at 30.

### B.     Plaintiffs' Claims Are Connected To The Foreign Defendants' U.S. Contacts

Plaintiffs' claims "relate[] to or arise[] out of" the Foreign Defendants' U.S. contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  That "lenient standard" does not require a claim to "formally arise from defendant's contacts."  *Air Prods.*, 503 F.3d at 553; *see Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009) ("The relatedness test is a flexible, relaxed standard.").  Rather, as this Court put it, the standard requires only a " 'discernible relationship' between the business transacted in the [forum] and the claims."  *Manifold v. Wolf Coach, Inc.*, 231 F. Supp. 2d 58, 63 (D.D.C. 2002) (Leon, J.) (quoting *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 333 (D.C. 2000) (en banc)).

The Foreign Defendants' U.S. contacts bear a close connection to Plaintiffs' claims here. Plaintiffs allege that the Foreign Defendants financed Jaysh al-Mahdi through their "corrupt sales practices," SAC ¶ 1, and those sales depended on the United States in key ways.  For many of the relevant transactions, there would have been no sale at all – and thus no corrupt payment to Jaysh al-Mahdi – without the ability to access U.S. manufacturing and secure credit protections through the U.S. banking system.  *See supra* Part II.A; *Air Prods.*, 503 F.3d at 553 (nexus existed where tort "would not have [occurred]" without "Defendants' business relationship" with in-

forum manufacturer). Those contacts therefore have a "discernible relationship" to the ATA

violations, *Manifold*, 231 F. Supp. 2d at 63, and also supply their but-for jurisdictional cause.[9]

Further, the Foreign Defendants' U.S. contacts affirmatively strengthened the causal link

to terrorism by enhancing the value of their corrupt payments, which is sufficient even under

their preferred (at 22-23) proximate-cause standard. *See supra* pp. 13-14, 18-19; Merits Opp'n

Part V.A (explaining that Defendants proximately caused Plaintiffs' injuries). But the Court

should reject that standard because it would "exclude too many claims . . . where the defendant's

contacts with [the forum] prove[ ] little" about the merits but still give "the defendant fair

warning" of personal jurisdiction. *uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 430 (7th Cir.

2010).[10] The "precise causal relationship between contacts and claim [is] not important; what

[is] required [is] that the relationship be 'intimate enough to keep . . . personal jurisdiction

reasonably foreseeable.'" *Id.* (quoting *O'Connor*, 496 F.3d at 323). That standard is met here.

Causality aside, it is "balanced and reasonable" to assert jurisdiction over the Foreign Defendants

based on their knowing use of American products and American banks to execute transactions

---

[9] Defendants' attempt (at 24-25) to defeat jurisdiction by reprising their ATA causation arguments lacks merit. Plaintiffs' allegations are sufficient under the "but-for" jurisdictional standard even if no one payment was a *necessary* cause of any one injury. *See Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1161 (10th Cir. 2010) ("But-for causation is less restrictive and supports the exercise of personal jurisdiction based on any event in the causal chain leading to the plaintiff's injury."); *Adidas Am., Inc. v. Cougar Sport, Inc.*, 169 F. Supp. 3d 1079, 1092 (D. Or. 2016) ("The 'but for' test should not be narrowly applied; rather, the requirement is merely designed to confirm that there is some nexus between the cause of action and defendant's contact with the forum."). A defendant's forum contacts need not be strictly necessary to the ATA violation to support personal jurisdiction. *See Strauss*, 175 F. Supp. 3d at 30-31 (U.S.-based transactions were small fraction of overall terrorist finance); *Weiss*, 176 F. Supp. 3d at 285-88 (similar). After all, substantive liability under the ATA does not require "strict but-for causation." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018); *see* Merits Opp'n Part V.A. The jurisdictional standard should not demand more.

[10] *See Myers v. Casino Queen, Inc.*, 689 F.3d 904, 912 (8th Cir. 2012) (rejecting "proximate cause standard"); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007) ("Our relatedness analysis, however, requires neither proximate causation nor substantive relevance.").

that financed attacks on Americans.  *Id.* at 431.  Jaysh al-Mahdi's ability to obtain additional

funding from non-U.S. sources does not alter that conclusion, *cf.* PJ Br. at 24-25, just as it does

not defeat causation under the ATA as a matter of substantive law, *see* Merits Opp'n at 72-74.

The Foreign Defendants also place great weight (at 10-11, 13, 15-16, 18) on the Second

Circuit's statement in one case that the "relevant 'suit-related conduct' by the defendants was the

conduct that could have subjected them to liability under the ATA."  *Waldman*, 835 F.3d at 335.

Seizing on that language, the Foreign Defendants argue (at 18) that their U.S. contacts are not

"suit-related" because the narrow act of sourcing U.S. goods or paying U.S. banking fees did not

all-by-itself violate the ATA.  But although that U.S.-centered conduct may not have been

wrongful *in isolation*, it formed an integral part of broader transactions that did violate the ATA.

That is enough to satisfy the "relatedness" test for specific jurisdiction.  *See Air Prods.*, 503 F.3d

at 553 (focusing not on final step of tortious conduct in isolation but on "business relationship"

that enabled it); *Manifold*, 231 F. Supp. 2d at 63 (refusing to limit jurisdictional contacts to final

"delivery" of the product at issue and instead considering the "business transaction" as a whole).

In no other context do courts require a defendant's contacts with the forum to be the thing

that makes its conduct unlawful.[11]  The ATA should not be the first.  Because ATA cases turn on

a defendant's provision of support to *foreign* terrorists, *see* 18 U.S.C. § 2331(1)(C), it is unlikely

that U.S. contacts specifically will ever be what makes such conduct illegal.  But that cannot

---

[11] *See, e.g.*, *O'Connor*, 496 F.3d at 323-24 (forum contact was mailing promotional brochures; unlawful conduct was out-of-forum negligence causing out-of-forum injury); *Air Prods.*, 503 F.3d at 551-53 (forum contact was negotiation of contract with local manufacturer; unlawful conduct was fraudulent "transfer of assets that occurred wholly outside the state"); *National Women's Political Caucus, Inc. v. Metro. Louisville Women's Political Caucus*, 359 F. Supp. 3d 13, 24 (D.D.C. 2019) (forum contact was payment of dues to D.C. organization; unlawful conduct was "unfair competition that occurred in Kentucky"); *IMAPizza, LLC v. AT Pizza Ltd.*, 334 F. Supp. 3d 95, 115 (D.D.C. 2018) (forum contact was business trip to scout in-forum restaurants; unlawful conduct was trademark infringement that "occurred abroad").

mean that specific jurisdiction fails in all ATA cases.  Instead, the Court should take a "highly realistic approach" tailored to terrorist-financing cases like this one, *Burger King*, 471 U.S. at 479, in which the corrupt transactions ended in Iraq but touched the United States at several points along the way.  Those U.S. contacts, in their real-world context, formed a key part of the "conduct that . . . [created] liability under the ATA."  *Waldman*, 835 F.3d at 335.[12]

## C.   Jurisdiction Is Reasonable Because It Serves Vital Federal Interests

Exercising jurisdiction over the Foreign Defendants also "comport[s] with fair play and substantial justice."  *Burger King*, 471 U.S. at 476.  In performing that inquiry, courts typically consider the "reasonableness" of jurisdiction in light of the "burdens on an alien defendant," the potential "interests" of "other nations" in the dispute, and the "Federal interest" in where the lawsuit is adjudicated.  *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 115 (1987).  Here, the last consideration is especially important.  The U.S. "interest in adjudicating th[is] dispute" is so overwhelming that it would warrant "jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."  *Burger King*, 471 U.S. at 477.

Congress has determined that civil antiterrorism lawsuits in U.S. courts serve important national-security objectives.  *See supra* pp. 7-8.  That is why it made statutory findings designed to facilitate personal jurisdiction, *see* JASTA § 2(a)-(b), and enacted protections "designed to give American nationals broad remedies in a procedurally privileged U.S. forum," *Goldberg*, 660 F. Supp. 2d at 422.  Those legislative decisions, which serve "the Government's interest in

---

[12] The banking cases Defendants cite (at 16-17) would have come out the other way under their test, because the wrongful act in those cases was a *foreign* bank's decision to wire money to *foreign* terrorists abroad – not the bank's choice (lawful standing alone) to open a "correspondent account" within the "forum's banking system."  *Licci*, 732 F.3d at 171.  Indeed, jurisdiction there existed even though "[n]ot all elements" were "related to [defendant's] use of the correspondent account," and even though the "harms suffered by plaintiffs flowed not from [the banking services] but rather from rockets" launched at Israel.  *Licci*, 984 N.E.2d at 901.

combating terrorism," reflect an "urgent objective of the highest order."  *HLP*, 561 U.S. at 28.

Given federal counter-terrorism interests so compelling, jurisdiction would be warranted even on

a "borderline showing of [minimum contacts]."  *Pro Axess*, 428 F.3d at 1280; *see Adelson v.*

*Hananel*, 652 F.3d 75, 84 (1st Cir. 2011) ("an especially strong showing of reasonableness may

serve to fortify a borderline showing of relatedness and purposefulness").  And because the

contacts here are hardly "borderline," the overriding national interest in affording Plaintiffs a

remedy in U.S. courts amply justifies this Court's exercise of personal jurisdiction.[13]

## III.   PENDENT JURISDICTION EXISTS OVER THE STATE-LAW CLAIMS

This Court has jurisdiction over the state-law claims as well.  The " 'D.C. Circuit has

adopted the doctrine of pendent personal jurisdiction,' " which permits a court to exercise

jurisdiction over a state-law claim that " 'arises out of a common nucleus of operative facts with

a [federal] claim in the same suit over which the court does have personal jurisdiction.' "  *Wultz*,

755 F. Supp. 2d at 36 (quoting *Sisso*, 448 F. Supp. 2d at 90-91).  Because all of Plaintiffs' state-

law claims undisputedly arise out of the same common nucleus of operative facts as the ATA

claims, this Court should exercise pendent jurisdiction over the state-law claims.  *See id.*

## IV.   AT A MININUM, JURISDICTIONAL DISCOVERY IS WARRANTED

Although the Court should deny the motion to dismiss outright, in the alternative it

should allow jurisdictional discovery to proceed simultaneously with merits discovery.  In this

District, the "standard for permitting jurisdictional discovery is quite liberal."  *Diamond Chem.*

---

[13] The American "interest in adjudicating the dispute" is "particularly weighty" because the Foreign Defendants cannot identify any "burdens, interests, or inefficiencies" that cut "against jurisdiction."  *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 70 (1st Cir. 2014).  The Foreign Defendants do not even contend that such factors make jurisdiction unreasonable and so have forfeited the point.  *See Ferreyra v. Fraternal Order of Police Legal Plan, Inc.*, 53 F. Supp. 3d 69, 76 n.6 (D.D.C. 2014) (Leon, J.) (no new arguments on reply).

*Co. v. Atofina Chems. Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003).  Jurisdictional discovery is typically warranted when "a party demonstrates that it can supplement its jurisdictional allegations through discovery."  *GTE*, 199 F.3d at 1351.

That test is met here for several reasons.  *First*, discovery would allow Plaintiffs to supplement their allegations regarding the Foreign Defendants' contacts with their U.S. affiliates. Plaintiffs allege that Defendants used globally integrated supply chains that required the Foreign Defendants to work hand-in-hand with their U.S. affiliates on sales to Kimadia.  *See supra* pp. 4-5.  Although the Foreign Defendants resist those allegations based on (at 20) abstract appeals to "corporate formalities," that at most raises fact-intensive questions for discovery.  *See*, *e.g.*, *In re Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.*, 299 F. Supp. 3d 324, 335-36 (D.N.H. 2017) (ordering "jurisdictional discovery" as to foreign defendant's "relationship" with in-forum "subsidiaries").  Such discovery is especially warranted because the sales contracts suggest that the Foreign Defendants did not observe corporate formalities in practice.[14]

*Second*, discovery could supply some of the evidence that Defendants say is missing from Plaintiffs' jurisdictional allegations.  For example, Janssen-Cilag argues (at 5 n.6) that three contracts identified in the SAC did not contain U.S. "origin" terms.  But given its reliance on U.S. manufacturing – and the U.S. sourcing apparent in other Defendants' contracts – Janssen-

---

[14] For example, one AstraZeneca contract identifies the "manufacturing company" as "AstraZeneca" (not a corporate entity) and is signed by the President of "AstraZeneca FZ-LLC" – a non-signatory affiliate of the executing party.  Dkt. 112-5, Ex. 2 at 1.  Another lists the "Contracting Party" as non-entity "ASTRAZENCA."  *Id*. Ex. 6 at 1.  One J&J document identifies "Cilag AG" as the "Manufacturing company" in one place but "Cilag GmbH International" in another.  *Compare* Dkt. 112-2, Ex. 1 at 1 *with id*. at 5.  Another is executed by "Cilag GmbH International" but elsewhere lists "Cilag A.G. International" as the "seller."  *Id*. Ex. 3 at 1.  And one Roche contract similarly identifies "Roche" (not a corporate entity) as the "Manufacturing company" and is signed by a third-party agent who stamped the trade name "Roche" rather the corporate name of the supplying entity.  Dkt. 112-3, Ex. 2 at 1.

Cilag likely executed *other* contracts with such terms.  SAC ¶¶ 190-91, 274-79.  The Court should thus allow discovery into the Foreign Defendants' broader set of contracts with Kimadia. *See id.* ¶ 190 (explaining why contract examples pleaded in the SAC are not exhaustive). Similarly, the Foreign Defendants nitpick (at 17-18) Plaintiffs' letter-of-credit allegations as "speculative" but offer no evidence refuting them.  Requiring the Foreign Defendants to produce their letters of credit would thus confirm whether Plaintiffs correctly allege that " 'each defendant' actually paid processing fees to a New York account."  PJ Br. at 18.

    *Third*, discovery would confirm Plaintiffs' allegations that Defendants "sent financial and other material support *directly* to [Jaysh al-Mahdi]," which would be sufficient for effects-based jurisdiction even under their own Second Circuit cases.  *Terrorist Attacks*, 714 F.3d at 678.  Such discovery would cover topics relating to Jaysh al-Mahdi's control of the Ministry, SAC ¶¶ 63-104, as well as the nature of Defendants' corrupt payments and their connection to the Jaysh al-Mahdi members inside the Ministry, *id.* ¶¶ 105-64.  Because that "jurisdictional question is closely intertwined with the merits," this Court should "allow discovery to proceed" more broadly and return to Foreign Defendants' personal-jurisdiction defense at "summary judgment thereafter."  *Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219, 230 (D.D.C. 2012); *see Hale v. United States*, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015) (similar).

    In all events, full discovery should proceed against the 15 U.S. Defendants that do not challenge personal jurisdiction.  The most efficient course – if the Court does not deny the Foreign Defendants' motion outright – is for the Court to fold any jurisdictional discovery into that process and defer the "determination of personal jurisdiction . . . until discovery has been completed."  *Hoffa Eng'g, LLC v. Craney*, 2007 WL 831820, at *6 (S.D. Ind. Mar. 12, 2007).

## CONCLUSION

    The Court should deny the motion, or alternatively order jurisdictional discovery.

Dated:  May 6, 2019[*]

Respectfully submitted,

/s/ David C. Frederick

| | |
|---|---|
| Ryan R. Sparacino (D.C. Bar No. 493700) | David C. Frederick (D.C. Bar No. 431864) |
| Sparacino PLLC | Joshua D. Branson (D.C. Bar No. 981623) |
| 1920 L Street, NW, Suite 535 | Andrew E. Goldsmith (D.C. Bar No. 1007074) |
| Washington, D.C. 20036 | Thomas G. Schultz (D.C. Bar No. 1028017) |
| Tel:  (202) 629-3530 | Matthew M. Duffy (D.C. Bar No. 1031257) |
| ryan.sparacino@sparacinopllc.com | Kellogg, Hansen, Todd, |
| |  Figel & Frederick, P.L.L.C. |
| | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | Tel:  (202) 326-7900 |
| | Fax:  (202) 326-7999 |
| | dfrederick@kellogghansen.com |
| | jbranson@kellogghansen.com |
| | agoldsmith@kellogghansen.com |
| | tschultz@kellogghansen.com |
| | mduffy@kellogghansen.com |

*Counsel for Plaintiffs*

---

[*] Plaintiffs originally filed this Opposition on May 6, 2019.  *See* Dkt. 113.  In accordance with the Court's January 30, 2020 Order, Dkt. 126 ("Order"), Plaintiffs are refiling this Opposition on February 5, 2020.  The Opposition on its face addresses Defendants' motion to dismiss the Second Amended Complaint, but under the Order should be construed to apply to Defendants' renewed motion to dismiss the Third Amended Complaint.  *See* Dkt. 130.