# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOSHUA ATCHLEY *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 17-2136 (RJL) |
| | ) | |
| ASTRAZENECA UK | ) | |
| LIMITED, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

July 17, 2020 [Dkt. ## 128, 130]

Plaintiffs in this suit are American service members, civilians, and their families who were murdered or wounded by terrorist attacks in Iraq between 2005 and 2011. They bring this suit against numerous pharmaceutical and medical equipment companies, some foreign and some domestic (collectively, "defendants"), alleging those companies knowingly financed the terrorist attacks that harmed them and are therefore liable under the Anti-Terrorism Act ("ATA") and various state laws. All defendants move to dismiss, arguing that plaintiffs' complaint fails to state a claim under the ATA.[1] *See* Defs.' Mot. to Dismiss ("Defs.' Mot.") [Dkt. # 128]. The foreign defendants move to dismiss for lack of

---

[1] Defendants are: AstraZeneca UK Limited, AstraZeneca Pharmaceuticals LP, GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., GE Medical Systems Information Technologies GmbH, Johnson & Johnson, Cilag GmbH International, Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Janssen Pharmaceutica N.V., Johnson & Johnson (Middle East) Inc., Ortho Biologics LLC, Pfizer Inc., Pfizer Enterprises SARL, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Wyeth Pharmaceuticals Inc., F. Hoffman-La Roche Ltd., Genentech, Inc., and Hoffman-La Roche Inc.

personal jurisdiction.[2]  *See* Foreign Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction ("Defs.' Juris. Mot.") [Dkt. # 130].

While I deeply sympathize with plaintiffs for the losses they have endured, losses for which this country will be forever indebted, I cannot conclude that the law provides the relief plaintiffs seek in this case.  Accordingly, and after due consideration of the briefing, oral argument, the relevant law, the entire record, and for the reasons stated below, foreign defendants' Motion to Dismiss for lack of personal jurisdiction and defendants' Motion to Dismiss for lack of subject-matter jurisdiction are **GRANTED**.

## BACKGROUND

In March 2003, the United States and Coalition armed forces invaded Iraq and removed Saddam Hussein from power.  *See* Third Am. Compl. ("TAC") ¶ 54 [Dkt. # 124]. Following his removal, U.S., Coalition, and Iraqi military forces worked to rebuild Iraq while also engaged in years of armed conflict against various armed insurgent forces, including a group named Jaysh al-Mahdi ("JAM").  *See id.* ¶¶ 54, 55, 59-61, 333; Defs.' Mot. at 4.  JAM functioned as the terrorist arm of the Iraqi Sadrists, a political group that was hostile to the United States.  *Id.* ¶¶ 56, 58-59.  JAM was also supported by the terrorist group Hezbollah, which sought to undermine the United States' efforts in Iraq and provided JAM with training, supplies, and recruits.  *Id.* ¶¶ 56, 62, 357.

---

[2]  Foreign defendants are: AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Phamaceutica NV, Pfizer Enterprises SARL, and F. Hoffman-La Roche Ltd (collectively, "foreign defendants").  All defendants join the foreign defendants' motion to dismiss for lack of jurisdiction as to plaintiffs' state law claims.

Throughout Saddam's regime and after, Iraq maintained a government-run healthcare system operated by the Iraqi Ministry of Health ("the Ministry" or "MOH") and the Ministry's state-owned import subsidiary, Kimadia. *Id.* ¶¶ 2, 72. The Ministry was a "sprawling bureaucracy" that employed "every public-sector doctor, pharmacist, nurse, and medical technician in Iraq." *Id.* ¶ 72. Kimadia was responsible for "importing and distributing" medical goods and had a monopoly over all medical imports in Iraq. *Id.* ¶¶ 72, 119.

Both the Ministry and Kimadia were openly plagued by corruption and profiteering. *Id.* ¶¶ 48, 129-30, 173. By late 2004, the Sadrists controlled the Ministry and Kimadia. *Id.* ¶¶ 10, 63, 66, 68, 69, 70, 71, 73, 104. The Sadrists were linked to JAM, and some Ministry officials and employees were members of JAM. *Id.* ¶¶ 67, 69, 102, 165. According to plaintiffs, JAM used the Ministry to finance its terrorist activities and had "de facto control over the [Ministry's] contracting process." *Id.* ¶¶ 104-05. JAM capitalized on the Ministry's "lack of any modern logistics system" and inability to "track[] the movement of goods and devices," *id.* ¶ 107, by "commandeering MOH facilities" and "looting MOH's inventory for profits." *Id.* ¶ 3.

Beginning in 2004, defendants entered into supply agreements with the Ministry for the shipment of medical goods and equipment into Iraq. *Id.* ¶¶ 4–6, 128. Those contracts went through the Ministry's procurement process, and they were negotiated and executed at "in-person meetings inside the Ministry's headquarters building in Baghdad." *Id.* ¶¶ 10, 119, 121. Among other things, the contracts' terms generally reflected the country of origin of the goods being sold. *Id.* ¶ 122. According to plaintiffs, suppliers would also

"typically . . . make the sale pursuant to an irrevocable letter of credit" in order to guarantee suppliers were paid for the goods. *Id.* ¶¶ 124, 127.

In addition to the medical goods contemplated by the contracts, defendants provided Ministry officials with in-kind drugs and equipment free of charge. *Id.* ¶¶ 5, 116, 117. In fact, Kimadia's standard bid instructions directed companies to provide extra goods for free as part of their agreements. *Id.* ¶ 120. Those goods "functioned as cash equivalents in Iraq" because they "possessed high street value" and "could be effectively monetized on regional black markets." *Id.* ¶ 117. After the contracts were executed, defendants would ship both the contract goods and the free goods to a Kimadia warehouse in Iraq. *Id.* ¶ 128. After Kimadia transferred the inventory to Ministry warehouses, the goods were "often diverted" by Ministry employees to the black market. *Id.* On top of the free goods, defendants also made cash payments to Ministry officials through "corrupt local agents." *Id.* ¶¶ 6, 142, 145.

According to plaintiffs, defendants' provision of free goods and cash payments to the Ministry financed JAM throughout the period between 2004 and 2013. *See id.* ¶¶ 7, 13, 167. The Sadrists controlled both the Ministry and Kimadia, which they used to supply JAM with "resources critical to its terrorist operations." *Id.* ¶ 167. During that time, JAM carried out numerous terrorist attacks, capturing, torturing, and murdering Americans. *See, e.g.*, *id.* ¶¶ 14, 333-46, 463, 787, 808. Some of those attacks killed or injured plaintiffs or their relatives. *Id.* ¶¶ 16, 62, 408-3180.

4

**LEGAL STANDARD**

To survive a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), plaintiffs must "establish[] a factual basis for the exercise of personal jurisdiction over the defendant[s]." *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990). Although "factual discrepancies appearing in the record must be resolved in favor of the plaintiff," *id.*, the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts," *Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017) (internal quotation marks omitted). "Mere conclusions or 'bare allegation[s]' do not constitute the *prima facie* case for jurisdiction that this standard requires." *Fawzi v. Al Jazeera Media Network*, 273 F. Supp. 3d 182, 186 (D.D.C. 2017) (quoting *Livnat*, 851 F.3d at 57).

On a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), plaintiffs again bear the burden of establishing jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). If a plaintiff's claims present nonjusticiable political questions, the case must be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1). *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *Al-Tamimi v. Adelson*, 916 F.3d 1, 7-8 (D.C. Cir. 2019). In making that assessment, a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   Again, I must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs, but I need not "accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." *See City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

## ANALYSIS

I.   **Personal Jurisdiction Over the Foreign Defendants and State Law Claims**

A.   *The Foreign Defendants*

The foreign defendants move to dismiss all of plaintiffs' claims for lack of specific personal jurisdiction under the Due Process Clause of the Fifth Amendment.[3]   Defs.' Juris. Mot. at 1.   A foreign defendant is subject to specific personal jurisdiction when it has certain "minimum contacts" with the forum such that it "should reasonably anticipate being haled into court there."   *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (requiring

---

[3] Plaintiffs do not argue that this Court has *general* personal jurisdiction over any of the foreign defendants.   Nor could they.   Their allegations do not suggest, let alone establish, that the foreign defendants—all of which are incorporated abroad—are "essentially at home in the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014); *see* TAC ¶¶ 17, 21, 23, 27, 31, 35.

"certain minimum contacts"). That "'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (citations omitted). A defendant may also create the requisite minimum contacts by "purposefully avail[ing] himself of the benefits and protections of [the forum's] laws." *Id.* at 482.

The "minimum contacts" inquiry "focuses 'on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). For specific jurisdiction to exist, "the defendant's suit-related conduct must create a substantial connection with the forum." *Id.* That "necessary relationship" must "arise out of contacts that the 'defendant himself' creates with the forum," and the defendant's contacts must be with the forum itself, not persons who reside there. *Id.* at 284-85. When personal jurisdiction is challenged under the Due Process Clause of the Fifth Amendment, the relevant forum is the "United States as a whole." *Livnat*, 851 F.3d at 55.

Plaintiffs advance two theories as to why this Court has specific personal jurisdiction over the foreign defendants. First, plaintiffs contend that the foreign defendants' conduct was "aimed at or has an effect in the forum" such that specific jurisdiction exists. Pls.' Opp. to Defs.' Juris. Mot. ("Pls.' Juris. Opp'n") at 9 [Dkt. # 133]. In plaintiffs' view, the foreign defendants "knowingly financed terrorist attacks that targeted" Americans and thereby "aligned themselves" with conduct that was "purposefully directed at the United States." *Id.* (internal quotation marks omitted).

Second, plaintiffs assert that the foreign defendants "purposefully availed themselves" of the United States' "benefits and protections." *Id.* at 12. Neither theory has merit.

With respect to the first theory, plaintiffs have not established that the foreign defendants' suit-related conduct—namely, transactions for medical goods with the Ministry—was "substantially connected" to, or "purposefully directed" at, the United States. To the contrary, all the relevant conduct that plaintiffs contend gives rise to liability under the ATA occurred *in Iraq*, not the United States. Perhaps most importantly, the alleged terrorist funding occurred in Iraq. *See, e.g.*, TAC ¶¶ 165, 168-69, 173, 179. As did the terrorist attacks that killed or wounded plaintiffs. *Id.* ¶¶ 333-46, 408-3180. So too foreign defendants' allegedly corrupt payments and in-kind donations to Iraqi officials. *Id.* ¶¶ 128, 133-37, 142. And with respect to the allegedly corrupt contracts, the terms were set in Iraq, the bids were submitted in Iraq, and the contracts were hand delivered in Iraq. *Id.* ¶¶ 120, 121. None of that conduct has any substantial connection to the United States.

Plaintiffs nonetheless insist that jurisdiction exists because the medical goods provided to the Ministry were used by JAM to perpetrate terrorist attacks against U.S. citizens. But defendants were not "primary participants" in the attacks, and indirect funding to a terrorist organization does not *itself* confer jurisdiction because that conduct is not "expressly aimed" at the United States. *See In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94, 95 (2d Cir. 2008), *abrogated on other grounds*, (holding that plaintiffs' allegations that defendants "intended to fund al Qaeda through their donations to Muslim charities" was insufficient); *cf. Calder v. Jones*, 465 U.S. 783, 790 (1984) (concluding that court had personal jurisdiction over "primary participants in an alleged wrongdoing

intentionally directed at a California resident"); *Mwani v. bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005) (holding exercise of personal jurisdiction over bin Laden and al Qaeda—the primary participants—was proper).

On this point, the Second Circuit's decision in *In re Terrorist Attacks* is instructive. There, the court concluded jurisdiction was lacking, despite plaintiffs' allegations that defendants "intended to fund al Qaeda through their donations to Muslim charities." *In re Terrorist Attacks*, 538 F.3d at 95. Plaintiffs did *not* allege, however, that defendants "directed" the attacks or "commanded" or "authorized" al Qaeda to commit them. *Id.* at 94. Thus, "[e]ven if the [defendants] were reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction." *Id.* at 94-95.

This same principle applies with full force here. Plaintiffs do not allege that the foreign defendants were primary participants in JAM's attacks on U.S. citizens. Thus, even if they were somehow aware of JAM's upcoming attacks or planned attacks on U.S. citizens in Iraq, "their contacts with the United States would remain far too attenuated to establish personal jurisdiction in American courts." *Id.* at 95. Indeed, even assuming "that acts of violence committed against residents of the United States were a foreseeable consequence of the [foreign defendants'] alleged indirect funding of [JAM], . . . foreseeability is not the standard for recognizing personal jurisdiction." *Id.* Plaintiffs must instead show the foreign defendants "expressly aimed" intentional tortious

acts at U.S. citizens. *Calder*, 465 U.S. at 789. Like the plaintiffs in *In re Terrorist Attacks*, they have not done so here.

Plaintiffs counter that the foreign defendants provided financial "support *directly* to a [terrorist group] when [the group] allegedly was known to be targeting the United States." Pls.' Juris. Opp'n at 10 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013)). Thus, in plaintiffs' view, the "effects" of the foreign defendants' conduct are sufficiently connected to the United States to confer specific jurisdiction. *Id.* at 10-11. That theory, however, is belied by plaintiffs' own allegations. In their complaint, plaintiffs allege that "[d]efendants knew or recklessly disregarded that their corrupt transactions with *MOH* financed Jaysh al-Mahdi terrorist attacks." TAC ¶ 180 (emphasis added). By those terms, defendants' transactions with the Ministry were—at best— *indirectly* connected to JAM's terrorist attacks, and they were therefore not "expressly aimed" at the United States such that specific jurisdiction is proper. *See In re Terrorist Attacks*, 538 F.3d at 95; *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 21-23 (D.D.C. 2003) (concluding the court lacked personal jurisdiction over Saudi prince that donated to Islamic charities "knowing that those foundations funded terrorist organizations including Al Qaeda").[4]

---

[4] Plaintiffs' briefing only confirms that this theory of specific jurisdiction is meritless. According to plaintiffs, the foreign defendants "structured their transactions *with the Ministry* to send resources *directly* to Jaysh al-Mahdi, and they did so while knowing that Jaysh al-Mahdi was targeting Americans in particular." Pls.' Juris. Opp'n at 11 (first emphasis added) (citations omitted). Although plaintiffs insist that the foreign defendants sent resources "directly" to JAM, the reality is that any resources went through the Ministry.

Plaintiffs' second theory of personal jurisdiction is similarly unpersuasive. Plaintiffs contend that the foreign defendants "purposefully availed themselves" of the United States' "benefits and protections" by (1) "sourcing and distributing medical goods from their U.S. affiliates" and (2) by paying certain banking fees through the New York banking system. Pls.' Juris. Opp'n at 12-13, 17-18.  With respect to the sourcing of medical goods, plaintiffs argue that the foreign defendants created the requisite "minimum contacts" because they "enter[ed] into . . . contract[s] that ha[d] a 'substantial connection with" the United States. *Id.* at 13 (quoting *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004)).  Specifically, they argue that the foreign defendants' "corrupt contracts" with Kimadia involved (1) "affiliat[ing] with at least one U.S. manufacturer so it could sell U.S.-made drugs or devices to Kimadia;" (2) "work[ing] closely with U.S.-based personnel to fulfill Kimadia's orders;" (3) "procur[ing] critical paperwork from the United States, including export certificates and FDA approvals;" and (4) "expressly certif[ying] on at least one occasion that it was sourcing its goods from the United States." *Id.*

None of those alleged contacts, however, amounts to relevant suit-related conduct sufficient to confer specific jurisdiction.  Plaintiffs do *not* allege that the foreign defendants' manufacturing or sourcing practices were themselves unlawful or could otherwise subject the foreign defendants to liability under the ATA. Pls.' Juris. Opp'n at 21.  Nor do those practices constitute the suit-related conduct underlying plaintiffs' ATA claims.  Rather, those practices are at best tangential to plaintiffs' claims that the foreign defendants entered into corrupt contracts in Iraq with the Iraqi Ministry.  Accordingly, they cannot form the basis for specific jurisdiction. *Walden*, 571 U.S. at 284 (noting that

defendant's "*suit-related conduct* must create a substantial connection with the forum" (emphasis added)); *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (noting suit-related conduct is that which "could have subjected [defendants] to liability under the ATA"); *Sharp Corp. v. Hisense USA Corp.*, 292 F. Supp. 3d 157, 171 (D.D.C. 2017) (evaluating what plaintiffs' claims are "really about").

Plaintiffs' arguments to the contrary are not compelling. Plaintiffs contend that the foreign defendants' "most expensive and valuable products *had* to be made in the United States due to the unique advantages offered by U.S. manufacturing facilities" and that their sales to the Ministry "depended on" drugs and devices "that could *only* be made in America." Pls.' Juris. Opp'n at 13-14, 16 (first emphasis added). In plaintiffs' view, that "reliance on the United States" was "a material part of the [f]oreign [d]efendants' corrupt conduct" because it allowed them to "increase[] the black-market value of their corrupt 'free goods' payments." *Id.* at 13, 14. I disagree. For one thing, many of the goods sold by the foreign defendants were sourced from countries *other* than the United States. Defs.' Juris. Mot. at 5-6. And, to the extent the Ministry insisted that the foreign defendants identify country of origin, that requirement appears to have been because the Ministry was "suspicious of counterfeit drugs," not because U.S.-sourcing increased the value of the goods. TAC ¶ 122. Indeed, plaintiffs offer no non-conclusory allegations that plausibly suggest that sourcing from the United States *specifically* was material to the Ministry contracts. Their allegations certainly do not establish that these purported U.S. contacts were substantial to their claims such that the exercise of specific jurisdiction would be appropriate. As the foreign defendants point out, were the Court to adopt plaintiffs' theory

that personal jurisdiction "rest[s] on the mere fact that the 'value' of a foreign transaction is 'magnif[ied]' because the goods sold were originally manufactured in the United States[,] . . . personal jurisdiction would extend to countless transactions between foreign entities that involve a U.S.-made product." Defs.' Reply in Support of Juris. Mot. ("Defs.' Juris. Reply") at 6 [Dkt. # 131].[5]

The foreign defendants purported contacts with the New York banking system are likewise peripheral to this suit. Plaintiffs contend that the foreign defendants "secured" their "corrupt transactions with Kimadia" by "paying Kimadia for letters of credit," which guaranteed that Kimadia paid the foreign defendants under the parties' contracts and therefore "played a vital role in facilitating their sales by alleviating [the] risk of non-payment." Pls.' Juris. Opp'n at 18. Those letters of credit instructed defendants' banks to reimburse Kimadia's bank, the Trade Bank of Iraq, for the banking fees associated with the letters of credit. TAC ¶¶ 124-25; *see* Pls.' Juris. Opp'n at 18. Plaintiffs argue that those fees were "instrumental to facilitating the corrupt payments" to the Ministry that ultimately assisted JAM in its terrorist attacks and, because foreign defendants paid those fees into the Trade Bank of Iraq's correspondent New York bank account, they provide the requisite jurisdictional hook. Pls.' Juris. Opp'n at 18-19. Please! None of the payments for letters

---

[5] Plaintiffs also make the related argument that personal jurisdiction is proper because the foreign defendants "work[ed] with U.S. sales and manufacturing personnel to prepare bids to submit to" the Ministry. Pls.' Juris. Opp'n at 14-15 (internal quotation marks omitted). In plaintiffs' view, the foreign defendants' "use[ of] globally integrated supply chains that relied on their own affiliates' U.S. facilities" establishes jurisdiction. *Id.* at 15. Again, I see no substantial connection between those purported contacts—which at best reflect a "typical manufacturer-distributor relationship among corporate affiliates"—and the conduct giving rise to plaintiffs' claims. Defs.' Juris. Reply at 8.

of credit are connected to any allegedly unlawful payments. Nor were they connected to the allegedly corrupt contracts with the Ministry. Indeed, plaintiffs make *no* allegations that those payments were redirected to JAM or used to fund any terrorist attacks. They are utterly divorced from the suit-related conduct underlying plaintiffs' claims.

Plaintiffs primarily rely on *Licci ex rel. Licci v. Lebanese Canadian Bank*, but that case is readily distinguishable. 732 F.3d 161 (2d Cir. 2013). In *Licci*, the Second Circuit concluded there was personal jurisdiction because the defendant "repeated[ly] use[d] . . . New York's banking system" as "an instrument to achieve the very wrong alleged"—the transfer of funds to Hezbollah knowing those funds would assist terrorist attacks. *Id.* at 171-72. Plaintiffs' claims here involve the provision of medicines and medical equipment, not banking services, and the close connection between the U.S. banking system and the "wrong alleged"—necessary to a finding or jurisdiction in *Licci*—is wholly lacking here.

**B.   *State Law Claims***

All defendants move to dismiss plaintiffs' state-law claims for lack of personal jurisdiction under the Due Process Clause of the Fourteenth Amendment. *See* Defs.' Juris. Mot. at 25. Plaintiffs, in turn, appear to concede that I lack independent jurisdiction over their state law claims, instead arguing that I should nevertheless exercise pendent jurisdiction over them because I possess personal jurisdiction over their ATA claims. Pls.' Juris. Opp'n at 23. Because I lack jurisdiction over plaintiffs' ATA claims, however, I decline to adopt pendent jurisdiction over plaintiffs' state law claims.

## II.     Political Question

Defendants next argue that plaintiffs' complaint should be dismissed in its entirety because their claims present non-justiciable political questions. Defs.' Mot. at 22.  The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).  Courts evaluate six factors in deciding whether a lawsuit presents a "political question":

> [1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  The doctrine remains, however, a "narrow exception" to the Judiciary's general "responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012).  "Indeed, the political question doctrine mandates dismissal *only if* a political question is 'inextricable from the case.'" *Al-Tamimi*, 916 F.3d at 8 (emphasis added) (quoting *Baker*, 369 U.S. at 217).

Defendants argue that during the relevant time, "[i]t was U.S. policy to fund, support, and rebuild the Ministry and Kimadia through . . . direct aid and support . . . and [by] promoting private sector business with those agencies." Defs.' Mot. at 23.  Thus, in their view, plaintiffs seek to hold defendants liable "for conduct that

15

mirrored and effectuated U.S. foreign policy during the Iraq War" such that this Court "cannot accept [p]laintiffs' theories of liability without condemning the U.S. Government's policy of rebuilding, funding, and encouraging private sector business with the Ministry." *Id.* at 22. Put differently, "[a]djudicat[ing] [p]laintiffs' claims would require the Court to question the wisdom of discretionary decisions made by the political branches in the realm of foreign policy," "risk condemning those sensitive U.S. foreign policy and national security decisions made during the Iraq War[,] and invit[e] the 'embarrassment' of 'multifarious pronouncements' by the different branches with respect to those decisions." *Id.* at 22-23 (internal quotation marks and citations omitted).

Not so fast! As an initial matter, as far as I am aware, no other court has dismissed ATA claims under the political question doctrine. *See* Pls.' Opp. to Defs.' Mot. ("Pls.' Opp'n") at 18 [Dkt. # 132]. And with good reason: ATA claims generally—and plaintiffs' claims in this suit—ask a court to interpret and apply a federal statute to a defendant's private conduct. *Id.* Such statutory interpretation is a "familiar judicial exercise" decidedly in this Court's wheelhouse. *Zivotofsky*, 566 U.S. at 196. And, to the extent this case touches on political questions, those issues are peripheral to, not "inextricable from[,] the case." *Al-Tamimi v. Adelson*, 916 F.3d at 8.

Nor do plaintiffs' claims require this Court to opine on U.S. foreign policy. Although it may be true, as defendants emphasize, that the United States provided support to the Ministry and encouraged defendants to transact with the Ministry, that alone does not transform plaintiffs' claims into political questions. Plaintiffs do not allege that defendants violated the ATA simply by providing support to the Ministry. Rather, they

contend that JAM "captured" the Ministry at some time after the invasion, and defendants subsequently engaged in corrupt transactions with that compromised entity.  TAC ¶ 166. According to plaintiffs, those corrupt transactions "impaired U.S. efforts to improve the Iraqi health system." Pls.' Opp'n at 23 (citing TAC ¶¶ 112-20, 129-39, 142-45).  Accepting plaintiffs' theory condemns defendants' conduct, not the United States Government's general policy supporting the Iraqi healthcare system.  It thus does not present a political question "inextricable from the case." *Tamimi*, 916 F.3d at 8.

## III.    ATA Act-of-War Defense

Defendants next contend that this Court should dismiss all of plaintiffs' ATA claims under the statute's act-of-war defense, which provides that "[n]o action shall be maintained" for injuries arising from "any act occurring in the course of . . . armed conflict between military forces of any origin." 18 U.S.C. §§ 2331(4)(C), 2336(a); *see* Defs.' Mot. at 28.  As at least one court has recognized, that affirmative defense raises legal and factual issues regarding what constitutes a "military force" or "armed conflict" that are "best addressed on a motion for summary judgment or at trial." *Gill v. Arab Bank PLC*, 893 F. Supp. 2d 474, 510 (E.D.N.Y. 2012).  Those considerations warrant restraint here.  Indeed, plaintiffs' complaint is replete with allegations that JAM was not a military force, was not engaged in an "armed conflict," and did not injure plaintiffs "in the course of" that conflict. Pls.' Opp'n at 29 (citing TAC ¶¶ 55, 347-56, 409-10); *see id.* at 37-38 (describing injuries to civilian-plaintiffs).  Defendants, unsurprisingly, disagree. *See* Defs.' Mot. at 29-38.  In

light of those disputes, I decline to wade into that particular factual thicket at the motion-to-dismiss stage.

## IV.   Plaintiffs' ATA Claims

Plaintiffs contend that defendants are both directly and secondarily liable under the ATA.  The ATA creates a private cause of action for those harmed by international terrorism, providing that "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism . . . may sue therefor . . . and shall recover threefold . . . damages." 18 U.S.C. § 2333(a). Thus, to prevail on an ATA claim, a plaintiff must show that (1) a U.S. national suffered an injury; (2) an act of international terrorism occurred; and (3) the U.S. national's injury occurred "by reason of" the act of international terrorism.

In 2016, Congress amended the ATA to permit aiding-and-abetting liability claims. *See* 18 U.S.C. § 2333(d). Aiding-and-abetting liability requires that "an act of international terrorism" was "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized." *Id.*  Such secondary liability extends to "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *Id.*

### A.   *Direct Liability*

Plaintiffs allege that defendants are directly liable under the ATA for supplying medicine and medical equipment to the Ministry, after which JAM agents misappropriated

those goods, sold them on the black market, and used the proceeds to fund the attacks that injured plaintiffs.  TAC ¶¶ 3208-21; *see* 18 U.S.C. 2333(a).  Those claims fail, however, because plaintiffs do not plausibly allege that defendants caused their injuries.

"[T]he ATA's 'by reason of' language demands a showing of proximate causation." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018); *see also* 18 U.S.C. § 2333(a).  "[P]roximate cause prevents liability where there is not a sufficient link between the defendant's conduct and the plaintiff's injuries." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019) ("[A] butterfly in China is not the proximate cause of New York storms.").  "To survive a motion to dismiss for failure to state a claim, [p]laintiffs must therefore plausibly allege (1) that [defendants'] acts were 'a "substantial factor" in the sequence of events' that led to their injuries and (2) that those injuries 'must have been "reasonably foreseeable or anticipated as a natural consequence" of' [defendants'] conduct." *Owens*, 897 F.3d at 273 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)).

Plaintiffs cannot satisfy this first requirement.  To establish that defendants' conduct was a "substantial factor," plaintiffs must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 273 n.8.  In other words, defendants' alleged wrongful conduct must have "led directly" to the plaintiffs' injuries. *Id.*  And, as our Circuit Court and others have recognized, because "the presence of an independent intermediary" makes a defendant "more than one step removed from a terrorist act or organization," it "create[s] a more attenuated chain of causation . . . than one in which a supporter of terrorism provides funds directly to a terrorist organization." *Id.* at 275; *see*

*Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013). That is especially so when the intermediary is a sovereign entity with "many legitimate agencies, operations, and programs to fund." *Rothstein*, 708 F.3d at 97; *see also Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018) ("[A] sovereign's affirmative choice to engage in a wrongful act will usually supersede a third party's choice to do business with that sovereign."). In those circumstances, plaintiffs must provide "additional allegations supporting substantiality." *Owens*, 897 F.3d at 276. They must "adequately plead facts" that defendants' conduct "actually . . . aided in" the act of terrorism. *Id.*

The Ministry's involvement here defeats plaintiffs' causation theory. Plaintiffs allege defendants contracted with the Ministry and Kimadia. TAC ¶¶ 121, 189, 213, 246, 283, 311. And, although plaintiffs allege the Ministry was "effectively captured" by JAM, *id.* ¶ 166, the Ministry remained a government agency responsible for Iraq's healthcare system, *id.* ¶¶ 2, 72. Indeed, according to plaintiffs' allegations, *after* defendants shipped their goods and equipment to Kimadia warehouses, Ministry officials diverted the material to JAM or JAM looted the inventory. *Id.* ¶¶ 3, 128. Those allegations, however, do not establish the substantial connection between defendants and JAM necessary for proximate causation. *Owens*, 897 F.3d at 276.

Plaintiffs' arguments to the contrary are, to say the least, not persuasive. They first contend that to break the causal chain, the sovereign must "remain[] separate from the terrorist group." Pls.' Opp'n at 69. In their view, the Ministry was "run by" JAM and was therefore not an "autonomous sovereign" intermediary. *Id.* Even accepting plaintiffs' allegations that JAM co-opted the Ministry, the law does *not* require independence from

terrorist groups.   In *Owens* and *Rothstein*, the sovereigns at issue—Sudan and Iran, respectively—were *designated state sponsors of terrorism*.  *See Owens*, 897 F.3d at 269 (acknowledging Sudan provided al Qaeda with "critical financial, military, and intelligence services."); *Rothstein*, 708 F.3d at 85, 97 (rejecting plaintiffs' causation theory despite their allegations that Iran "controlled, funded, and operated" Hezbollah).   And yet, those sovereigns' intervening role defeated causation.  So too here.

Plaintiffs' contention that the Ministry was merely a terrorist "front" without "legitimate agencies, operations, and programs to fund" fails on plaintiffs' own terms.  *See* Pls.' Opp'n at 70.  In their complaint, plaintiffs alleged that the Ministry administered Iraq's "government-run healthcare system," provided "free medical care to all Iraqis," and employed "every public-sector doctor, pharmacist, nurse, and medical technician in Iraq." TAC ¶¶ 2, 72.  Even now, plaintiffs do not seriously contest, nor could they, that the Ministry ran legitimate programs.  Instead, they argue that those programs—"like running clinics and employing doctors"—functioned to perpetuate [JAM's] social standing" in Iraq. Pls.' Opp'n at 70.  While that may be so, plaintiffs cannot escape the reality that the Ministry did not "exist solely to perform terrorist acts." *Kemper*, 911 F.3d at 392.

Plaintiffs counter that defendants "bypass[ed] the Ministry" when they provided free goods and "pa[id] direct cash bribes to terrorists." Pls.' Opp'n at 71, 72.  Again, that argument is belied by plaintiffs' own allegations.  Plaintiffs alleged the "free goods" were expressly contemplated by defendants' contracts with the Ministry, were provided to Ministry officials, and were delivered directly to Kimadia warehouses, *after* which they were stolen. *See* TAC ¶ 107 (explaining that medicine was stolen from warehouses), ¶ 120

("Kimadia's standard bid instructions regularly instructed companies to specify the quantity of extra goods that they would provide for free"; "This demand for 'free goods' still appears *on the face* of Kimadia's standard instructions"), ¶ 123 ("[T]he standard sales contract typically contained . . . the obligation to provide 'free goods'"), ¶128 (free goods "arrived at a Kimadia warehouse" and "had to be signed for by a Kimadia warehouse manager"); *see also id.* ¶ 136 ("Defendants used medical goods as cash equivalents to *buy off MOH officials*"), ¶ 137 ("Defendants did not intend for the 'free goods' *provided to Kimadia* to serve any legitimate charitable or medicinal purpose"), ¶ 139 ("*Kimadia* had an obvious reason for demanding 'free goods'") (emphases added).  Nothing in plaintiffs' allegations suggests defendants engaged directly with JAM to "bypass" the Ministry.  Indeed, no alchemist could transmute those allegations now to survive dismissal.

With respect to cash bribes, plaintiffs alleged that defendants "made other corrupt payments to *MOH officials*." *Id.* ¶ 142 (emphasis added); *see also id.* ("From 2004-2013, it was standard practice for companies *dealing with MOH* to pay 'commissions.'") (emphasis added).  Again, plaintiffs do not allege those direct payments were made to JAM.  At most, plaintiffs allege that "[o]n information and belief, each [d]efendant paid significant 'commissions' to MOH officials who were members of [JAM]." *Id.* ¶ 145; *see also id.* ¶ 8 ("Cash bribes provided to [JAM] agents within MOH flowed directly into [JAM's] coffers.").  Those conclusory assertions lacking in any specific factual basis, however, cannot save plaintiffs' direct-liability claims.  *See Owens*, 897 F.3d at 276 ("[T]hese are conclusory allegations that do not meet *Twombly*'s plausibility standard with

respect to the need for a proximate causal relationship . . . ." (quoting *Rothstein*, 708 F.3d at 97)).

### B.  *Aiding-and-Abetting Liability*

Plaintiffs also claim that defendants aided and abetted JAM's acts of terrorism. TAC ¶¶ 3181-207; *see* 18 U.S.C. § 2333(d)(2). Under the 2016 amendments to the ATA, a defendant is indirectly liable for "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" if the defendant "knowingly provid[ed] substantial assistance, or . . . conspire[d] with the person who committed such an act of international terrorism." § 2333(d)(2).

Plaintiffs fail to satisfy the statutory requirements for aiding-and-abetting liability. Most obviously, plaintiffs do not allege that an FTO "committed, planned, or authorized" the attacks at issue. *Id.* Rather, plaintiffs contend they were injured by attacks carried out by JAM, which the Secretary of State has *never* designated as an FTO. TAC ¶ 355. That fact is fatal to plaintiffs' aiding-and-abetting claims. Undaunted, plaintiffs seek to remedy this defect by contending JAM's attacks were "planned" or "authorized" by Hezbollah, a designated FTO, but that effort falls short in three ways. *See* Pls.' Opp'n at 53-61.

First, plaintiffs' complaint does not allege that Hezbollah planned or authorized all of the attacks at issue. The best plaintiffs can muster is that Hezbollah-affiliated individuals were involved in 22 out of the 300-plus attacks at issue, injuring 35 of 395 individuals. *See* Defs.' Mot. at 61 & n.77. For the remaining attacks—which constitute the vast majority— plaintiffs offer no concrete factual allegations that Hezbollah "planned" or "authorized"

them.  *See* TAC ¶ 408 (alleging that each of the hundreds of attacks "committed or proximately caused by [JAM] . . . was planned, authorized, and/or carried out . . . by Hezbollah"). That "[t]hreadbare recital[]" is not enough. *Iqbal*, 556 U.S. at 678.[6]

Second, to the extent plaintiffs allege that Hezbollah provided general support to JAM by recruiting and training its members, Pls.' Opp'n at 53-54, those allegations do not establish that Hezbollah "planned" or "authorized" the attacks at issue, 18 U.S.C. § 2333(d)(2). To "plan" means to "decide on and arrange [it] in advance;" to "authorize" is to "give official permission" or "approval." Defs.' Mot. at 61-62 (quoting *New Oxford American Dictionary* (3d ed. 2010)); *see also* Pls.' Opp'n at 53, 57 (conceding to "plan" is to "design," and to "authorize" is to "endorse" through some "proper authority"). General support or encouragement is not enough. *See Crosby*, 921 F.3d at 626 (concluding plaintiffs' allegations that ISIS "virtually recruited" the perpetrator were insufficient to establish that it "authorized" the attack at issue).

Stymied by the plain text, plaintiffs resort to rewriting the statute. In their view, Hezbollah "planned" JAM's attacks by "co-founding" JAM "as its terrorist proxy," recruiting JAM fighters, and "instructing those fighters how to execute attacks." Pls.' Opp'n at 53. And Hezbollah "authorized" the attacks by exerting "religious authority" over JAM "by virtue of its exalted status among Iraqi Shi'a" and "operational authority through its role in recruiting, training, and indoctrinating" JAM fighters. Pls.' Opp'n at 57.

---

[6] Defendants "do not dispute the adequacy of [p]laintiffs' allegations that a designated FTO committed, planned, or authorized" those 22 attacks. Defs.' Mot. at 61 n.77. As explained *infra*, even if plaintiffs satisfied this particular statutory requirement as to those 22 attacks, they fail to establish other statutory elements.

That dog won't hunt!  Under plaintiffs' logic, "a plaintiff could bring an ATA aiding-and-abetting claim for any attack committed by a non-FTO merely because it had in the past received 'material support and resources' from a designated FTO." Defs.' Reply in Supp. Mot. ("Defs.' Reply") at 35 [Dkt. # 129].  Unfortunately for plaintiffs, Congress opted for a more limited statute, circumscribing aiding-and-abetting liability to situations where an FTO *itself* had a significant role in a particular attack.  *See* 18 U.S.C. § 2333(d)(2). Plaintiffs would erase that limitation entirely and extend liability to circumstances not expressly contemplated by the statutory text.

Third, Plaintiffs' RICO theory is similarly out of step with the statutory text. Plaintiffs argue that they were injured by a 16-year racketeering scheme by JAM and Hezbollah to expel Americans from Iraq, which plaintiffs refer to as the "Jaysh al-Mahdi-Hezbollah Campaign." TAC ¶¶ 3190-3207; Pls.' Opp'n at 58-61.  According to plaintiffs, that Campaign, which covers hundreds of separate attacks, constitutes an "act of terrorism" under § 2333(d)(2) that was "planned" or "authorized" by Hezbollah.  *See* TAC ¶¶ 3191-92, 3202, 3206.  I am not persuaded.  The ATA imposes aiding-and-abetting liability for "an injury arising from *an act* of international terrorism committed, planned, or authorized" by an FTO.  § 2333(d)(2).  To say the least, it would be quite unnatural to read that statutory language, as plaintiffs do, to mean that the "act" causing injury was not the particular attack in which a plaintiff was injured, but instead a collection of hundreds of attacks spanning 16 years.  *Cf. Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 915-16 (N.D. Cal. 2018) (rejecting plaintiffs' argument that "act of international terrorism" encompassed all of ISIS's terrorist operations, rather than a specific attack).  Plaintiffs cannot collapse

numerous attacks into one overarching campaign purportedly orchestrated by Hezbollah. Indeed, that argument appears to be yet another attempt to skirt the requirement that an FTO "plan" or "authorize" the particular "act of international terrorism," and it fails for the same reasons noted above.

Even if plaintiffs established that an FTO committed, planned, or authorized some of the attacks, they failed to plead that defendants substantially assisted *JAM* in carrying out the alleged acts of terrorism. To impose aiding-and-abetting liability, the ATA requires that a defendant "knowingly provid[ed] substantial assistance . . . [to] the person who committed" the act of international terrorism. 18 U.S.C. § 2333(d)(2). But plaintiffs allege that defendants provided medical goods and devices to the Ministry, not JAM. *See, e.g.* TAC ¶ 128. As numerous courts have held, plaintiffs "fail[ure] to allege a direct link between the defendants and the individual perpetrator" warrants dismissal of their aiding-and-abetting liability claims. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 627 n.6 (6th Cir. 2019) (collecting cases and noting that courts "routinely dismiss" aiding-and-abetting ATA claims on that basis).

Even assuming defendants were sufficiently connected to JAM, plaintiffs' allegations fail to establish that any assistance was "substantial." For the assistance to be "substantial," the ATA "requires more than the provision of material support to a designated terrorist organization." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018). Rather, "the secondary actor [must] be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Id.* (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *accord Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 574 (E.D.

Mich. 2018), *aff'd*, 921 F.3d 617 (6th Cir. 2019).  And, in enacting JASTA, Congress noted that the six factors identified in our Circuit Court's decision in *Halberstam v. Welch* were useful in determining "how much encouragement or assistance is substantial enough." 705 F.2d at 478; 18 U.S.C. § 2333 Statutory Note (Findings and Purpose (a)(5)).  Those factors are: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the duration of defendant's assistance. 705 F.2d at 483-84.  When applied to plaintiffs' allegations, however, the *Halberstam* factors demonstrate defendants' purported aid was *not* substantial.

In evaluating the first and second factors, *Halberstam* asks whether the act was "heavily dependent" on the assistance provided, or whether the assistance was "indisputably important" to, or an "essential part of" the act. 705 F.2d at 488.  Plaintiffs allege that defendants provided the Ministry with medical supplies and equipment, and that JAM subsequently obtained and used those goods for financial gain, which in turn helped them perpetrate terrorist attacks that harmed plaintiffs. *See* TAC ¶¶ 3, 128.  They do not allege that defendants directly assisted JAM itself, or even that defendants indirectly provided goods that would plainly assist JAM in its terrorist enterprise, like "instructions on how to build a bomb or obtain an assault rifle." *Crosby*, 303 F. Supp. 3d at 574.  Instead, plaintiffs seek to impose liability for defendants' provision of medical supplies like ultrasound machines and catheters.  Those allegations do not plausibly suggest that JAM's attacks were "heavily dependent" on defendants' purported assistance, or that defendants' provision of medical goods was "indisputably important" to the terrorist attacks.

*Halberstam*, 705 F.2d at 488.  At most, they suggest defendants provided general support to JAM through their contracts with the Ministry.  But absent a link between that support and the principal violation, defendants' purported assistance is not substantial.  With respect to the third and fourth factors, plaintiffs concede defendants were not present at any of the attacks, nor did they have a special relationship with JAM.  Pls.' Opp'n at 49-50.

The fifth factor—state of mind—also weighs against finding that defendants' alleged assistance was substantial.  In *Halberstam*, our Circuit Court considered whether the defendant was "one in spirit" with the tortfeasor or "desire[d] to make the venture succeed."  705 F.2d at 484, 488.  Here, plaintiffs allege defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by JAM to support terrorist attacks.  TAC ¶¶ 4, 115; Pls.' Opp'n at 46-47.  Those allegations do not even suggest defendants were "one in spirit" with JAM's desire to kill American citizens in Iraq or that defendants intended to help JAM succeed in doing so. *Crosby*, 303 F. Supp. 3d at 574 (noting defendants were not "of a mind to see [the act of terrorism] take place" and concluding aiding and abetting liability "cannot be premised merely on a finding that the defendant knowingly provided support to a designated terrorist organization"); *Taamneh*, 343 F. Supp. 3d at 917 (concluding defendants not "one in spirit" with ISIS where plaintiffs did not allege defendants had "any intent to further ISIS's terrorism").

Finally, defendants contend the sixth factor—duration of the aid provided—"does not play a significant role here in light of the other factors."  Defs.' Mot. at 59 n.75.  I agree.  Although it is true, as plaintiffs point out, that defendants alleged aid spanned over

a decade, that *alone* is not enough to establish that aid was substantial, given the other factors.

Thus, having evaluated all of the factors identified in *Halberstam*, I cannot possibly conclude that defendants "assum[ed] a role" in JAM's terrorist activities such that any assistance was "substantial." *Linde*, 882 F.3d at 329. As such, plaintiffs have failed to state a claim for aiding-and-abetting liability under the ATA. Those claims, accordingly, must be dismissed.

## CONCLUSION

For all of the foregoing reasons, defendants' motions to dismiss are **GRANTED**. A separate order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge