**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSHUA ATCHLEY *et al.*,

               Plaintiffs,

    v.

ASTRAZENECA UK LIMITED *et al.*,

               Defendants.

Case No. 17-cv-02136-RJL

JURY TRIAL DEMANDED

**PLAINTIFFS' SURREPLY IN OPPOSITION TO
<u>ASTRAZENECA'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

I.    ASTRAZENECA'S NEW PROCEDURAL ARGUMENTS LACK MERIT ................... 2

II.   ASTRAZENECA'S NEW JUDICIAL-ESTOPPEL ARGUMENTS LACK MERIT ....... 9

III.  ASTRAZENECA'S NEW EVIDENCE DOES NOT WARRANT DISMISSAL ........... 12

IV.  ASTRAZENECA'S NEW U.S.-BANKING ARGUMENTS ARE UNPERSUASIVE .. 16

CONCLUSION ............................................................................................................................. 17

# TABLE OF AUTHORITIES[*]

**Page(s)**

## CASES

*Agbara v. Okoji*, 2021 WL 4940927 (D.D.C. Oct. 22, 2021)..........................................................9

*Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F. Supp. 2d 27 (D.D.C. 2004) ..................8

*\*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C Cir. 2022) .........................10, 11, 13, 14, 15

*Bennett v. City of Holyoke*, 362 F.3d 1 (1st Cir. 2004).................................................................4

*Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379 (S.D.N.Y. 2021)................................................17

*Chase v. Pan-Pac. Broad., Inc.*, 750 F.2d 131 (D.C. Cir. 1984) ...................................................8

*Cheese Depot, Inc. v. Sirob Imports, Inc.*, 2016 WL 6082352 (N.D. Ill. Oct. 18, 2016) ...............7

*Collins v. N.Y. Cent. Sys.*, 327 F.2d 880 (D.C. Cir. 1963)......................................................14, 16

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
    265 F. Supp. 3d 1196 (D. Or. 2017) ...................................................................................5

*Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151 (2d Cir. 1999) ...............................3

*Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735 (D.C. Cir. 1995) .........................................16-17

*Dem. Rep. Congo v. FG Hemisphere Assocs. LLC*, 508 F.3d 1062 (D.C. Cir. 2007) ....................5

*Denari v. U.S. Dry Cleaning Servs. Corp.*, 2017 WL 2779051
    (E.D. Cal. June 27, 2017)....................................................................................................8

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)....................................................................6, 7

*\*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021)................14

*Gasoline Spot Litig., In re*, 2020 WL 7431843 (N.D. Cal. Dec. 18, 2020) ..................................14

*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958 (D.C. Cir. 2016).....................4, 5

*Globe Metallurgical, Inc. v. Rima Indus. S.A.*, 177 F. Supp. 3d 317 (D.D.C. 2016)......................8

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Grayson v. Anderson*, 816 F.3d 262 (4th Cir. 2016) ........................................................8

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*,
    757 F. Supp. 2d 904 (W.D. Mo. 2010) ..........................................................8

*Horton v. Sunpath, Ltd.*, 2023 WL 2653386 (N.D. Tex. Mar. 27, 2023) ........................................8

*Houston v. Pavilion USA 2020, Inc.*, 2023 WL 1860961 (D.D.C. Feb. 9, 2023) ..........................16

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018) ....................................... 7-8

*Leyse v. Bank of Am. N.A.*, 804 F.3d 316 (3d Cir. 2015) .........................................................5

*Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ........................................17

*Miller v. Holzmann*, 2006 WL 3422421 (D.D.C. Nov. 28, 2006) ..............................................8

*Mold-A-Rama Inc. v. Collector-Concierge-Int'l*, 451 F. Supp. 3d 881 (N.D. Ill. 2020) ...............8

*Mussat v. Enclarity, Inc.*, 362 F. Supp. 3d 468 (N.D. Ill. 2019) ..............................................9

*Mwani v. Osama Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ........................................................8

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ....................................................................12

*Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36 (D.C. Cir. 2000)................................3

*Posner v. Essex Ins. Co.*, 178 F.3d 1209 (11th Cir. 1999)............................................... 13-14

*Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607 (1992) .......................................................17

*Sierra v. Hayden*, 2019 WL 3802937 (D.D.C. Aug. 13, 2019) ...................................................9

*Spireas v. Commissioner of Internal Revenue*, 886 F.3d 315 (3d Cir. 2018) ............................ 3-4

*St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587 (8th Cir. 2001) ....................................14

*Terrorist Attacks on September 11, 2001, In re*, 2023 WL 2430381
    (S.D.N.Y. Mar. 9, 2023) ........................................................8

*United States v. Hewlett*, 395 F.3d 458 (D.C Cir. 2005) .........................................................5

*United States v. Pole*, 2021 WL 5796518 (D.D.C. Dec. 7, 2021) ..............................................16

*Wesberry v. United States*, 205 F. Supp. 3d 120 (D.D.C. 2016) ...............................................17

# RULES

Fed. R. Civ. P. 12(b) ...............................................................................................5

Fed. R. Civ. P. 12(b)(2)................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)........................................................................................5, 9

Fed. R. Civ. P. 12(c) ...............................................................................................9

Fed. R. Civ. P. 12(f) ................................................................................................9

Fed. R. Civ. P. 12(f)(2).............................................................................................9

Fed. R. Civ. P. 12(g)(2)................................................................................ *passim*

Fed. R. Civ. P. 12(h)(1)..............................................................................1, 4, 5, 6

Fed. R. Civ. P. 12(h)(1)(A) ...............................................................................5-6, 8

Fed. R. Civ. P. 12(h)(1)(B)(ii) ...............................................................................8

Fed. R. Civ. P. 12(h)(2)............................................................................................9

Fed. R. Crim. P. 12(b)(3) ........................................................................................5

# OTHER MATERIALS

*Black's Law Dictionary* (11th ed. 2019).............................................................4

Mem. ISO MTD, *In re Derivium Capital, LLC*, No. 07-cv-02992-DCN, Dkt. 94-1
     (D.S.C. Feb. 27, 2008) ....................................................................................8

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
     § 1391 (3d ed. 2022) ......................................................................................7

## INTRODUCTION

AstraZeneca's incendiary reply brief (Dkt. 161, "Reply") misstates the facts and the law. AstraZeneca has waived its latest personal-jurisdiction defense, so it tries to shift the focus to a spate of inflammatory accusations about Plaintiffs' litigation conduct.  Those accusations are unfounded.  The complaint's jurisdictional allegations were reasonable and never changed.  The details rested within AstraZeneca's sole control, as Plaintiffs noted from the outset.  Yet AstraZeneca spent five-plus years resisting discovery into those details while saying nothing to suggest that any of the API allegations were "false" or "misleading."  Reply at 6.  The reason is now clear.  AstraZeneca stayed silent so it could shield its files from discovery – files that reveal abundant U.S. contacts – while advancing its preferred legal challenge to Plaintiffs' jurisdictional theory instead.  Only after losing its first motion did AstraZeneca decide to litigate the jurisdictional facts.  So now AstraZeneca takes its records – which it spent years blocking Plaintiffs from seeing – and uses them to attack Plaintiffs' integrity.  All this so it can justify filing a successive motion that the Federal Rules of Civil Procedure prohibit on their face.

The Court should reject that gambit.  AstraZeneca does not deny that its API-based factual challenge was "available" years ago.  Fed. R. Civ. P. 12(g)(2).  Quite the opposite:  it attributes its delay to a purposeful choice to start "investigating" only "after the D.C. Circuit's reversal."  Reply at 8 n.11.  That explanation just confirms the waiver.  AstraZeneca could have "investigated" jurisdiction from the beginning; all it apparently needed was its own supply-chain records.  But it waited so it could try a different tack first.  That is just what the Federal Rules are designed to prevent.  No amount of misguided invective can justify overriding those rules.

AstraZeneca's new legal arguments are also unpersuasive.  Its view of Rules 12(g)(2) and 12(h)(1) misreads their text, flouts their purpose, and defies Circuit precedent.  Indeed,

AstraZeneca cites no case ever allowing a successive motion to dismiss like this one.  Similarly, AstraZeneca's judicial-estoppel argument mischaracterizes Plaintiffs' position and the D.C. Circuit's opinion.  AstraZeneca's proffered reading of both – which it now pretends hinged on API alone – conflicts with what AstraZeneca itself said on appeal.  AstraZeneca's new evidence likewise fails to disprove the many U.S. contacts the D.C. Circuit recognized in upholding jurisdiction.  And AstraZeneca's excessive factual accusations to the contrary are mistaken.  At best, AstraZeneca's charge (Reply at 1) of "*false or highly misleading statements*" rests on disputed inferences drawn from ambiguous documents, which the Court must construe in Plaintiffs' favor at this stage.  If anything, such attacks just show why discovery is warranted.

AstraZeneca urges the Court to discard all these principles in the name of freeing it from "stigmatizing accusations of supporting terrorism."  Reply at 2.  But AstraZeneca's successive motion has nothing to do with such stigma.  Its overblown factual criticisms concern not whether AstraZeneca bribed terrorists, but whether Plaintiffs were right (before discovery) about exactly which parts of AstraZeneca's convoluted supply chain touched the United States when it did so.  AstraZeneca seeks to litigate the latter question forever, through an endless parade of motions, so it can stave off ever having to defend itself on the merits.  Its reply highlights the infirmities with that approach.  This motion should not have been filed.  The Court should deny it.

# I.    ASTRAZENECA'S NEW PROCEDURAL ARGUMENTS LACK MERIT

A.    AstraZeneca waived its latest personal-jurisdiction defense by omitting it from the earlier Rule 12(b)(2) motions.  AstraZeneca's opening brief confirmed the point:  AstraZeneca distinguished (Mot. at 3)[1] its earlier "facial challenge" to the "***legal*** sufficiency of Plaintiffs' jurisdictional theory" from its new arguments litigating "case-specific ***facts***," the latter of which

---

[1] "Mot." means AstraZeneca's opening brief.  Dkt. 149-1.  "Opp." means Plaintiffs' opposition.  Dkt. 157.  Unless noted, all internal quotations, citations, and brackets are omitted.

it deliberately "reserv[ed]."  Under AstraZeneca's own framing, the latter are distinct from the former and are waived.  Opp. at 19-21.  So AstraZeneca now tries to reverse course, reframing its newest motion on reply (at 11) as merely "present[ing] additional evidence in support of the same previously articulated theory."  That reframing is unpersuasive.

AstraZeneca's prior motion did not argue its latest theory that it never sourced U.S.-made API for Iraq.  It did the opposite:  it accepted the U.S.-manufacturing allegations *as true* and merely argued that "manufacturing or sourcing goods from the United States" is "irrelevant" to jurisdiction.  Dkt. 130-1 at 18.  AstraZeneca said that criticism was "equally or more true" for API, contending that the "manufacture of a drug's active pharmaceutical ingredient is not 'suit-related' conduct and is highly tangential to Plaintiffs' claims."  *Id*. at 19 n.13.  It even suggested that API sourcing was *less* suit-related than manufacturing "the final drugs themselves" – that is, formulation.  *Id*.; *see also id.* at 6 (similar).  AstraZeneca's belated motion is hardly (Reply at 11) "additional evidence" for that theory.  Rather, it presents a new theory – one that factually denies the existence of jurisdictional contacts that AstraZeneca last time said were irrelevant.

Challenging a legal theory of jurisdiction is different from challenging the jurisdictional facts.  Defendants may do either, or both, on a Rule 12(b)(2) motion:  they may "challenge[] not only the theory but also the facts on which jurisdiction [is] predicated."  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999).  But doing one does not preserve the other.  Indeed, core distinctions separate these two types of jurisdictional challenges.  *See Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36, 40 (D.C. Cir. 2000) (distinguishing challenge to "legal sufficiency" from challenge to "factual underpinning").  And under ordinary waiver principles, challenging a fact's relevance does not preserve a later dispute to that fact's existence.  *See Spireas v. Commissioner of Internal Revenue*, 886 F.3d 315, 322 (3d Cir. 2018)

(as amended June 1, 2018) (for waiver purposes, "two arguments can be the same" only if they "depend on the same facts"); *Bennett v. City of Holyoke*, 362 F.3d 1, 6 (1st Cir. 2004) ("a party cannot preserve a claim by raising a related but factually distinct claim").  Because AstraZeneca now changes the factual premise of its jurisdictional argument, its new argument is waived.

      **B.**     AstraZeneca glosses over those distinctions by misinterpreting Rule 12(h)(1), under which a defendant "waives" any personal-jurisdiction "defense" by "omitting it from a motion in the circumstances described in Rule 12(g)(2)."  AstraZeneca now frames (Reply at 9) the relevant "defense" as simply "lack of personal jurisdiction" writ large – such that raising *any* personal-jurisdiction argument preserves *all* such arguments.  But Circuit precedent forecloses that position.  The relevant "defense" cannot merely be personal jurisdiction in the abstract, as the D.C. Circuit has held that some challenges to "personal jurisdiction are different" under Rule 12(h)(1).  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016).[2] Thus, the question is whether AstraZeneca's new argument is different enough to be a "separate" defense for waiver purposes.  *Id*.  The answer is yes, for three reasons.

     *First*, AstraZeneca's position conflicts with the Rules' text.  A "defense," in legal parlance, is a "defendant's stated reason why the plaintiff or prosecutor has no valid case," such as "that she was 25 miles from the building at the time of the robbery."  *Black's Law Dictionary* 528 (11th ed. 2019).  In common usage, arguments that depend on materially different facts are different "defenses."  For example, a criminal defendant might challenge a murder charge by presenting an alibi, or instead by arguing that the charged conduct did not amount to murder.  Both seek acquittal on the same ultimate ground – the defendant did not commit murder – but

---

[2] AstraZeneca portrays (Reply at 9-10) *Gilmore* as turning on the "narrow" distinction between "statutory and constitutional" personal jurisdiction.  But the practical distinction between AstraZeneca's shifting factual arguments here is even more stark than in *Gilmore*.

nobody would say they are the same "defense."  So too here.  Denying API's *existence* challenges jurisdiction for a different "stated reason," *id.*, than does attacking API's *relevance*.  The Rule's text "would be meaningless if a party could preserve *all* objections to [personal jurisdiction] by raising *any* [such] defense."  *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 265 F. Supp. 3d 1196, 1202 (D. Or. 2017) (emphasis added).[3]

It is no answer that "Rule 12(b)(2) explicitly denominates 'lack of personal jurisdiction' as a 'defense.'"  Reply at 9.  Not every defense within each Rule 12(b) category is the same.  For example, constitutional and statutory personal-jurisdiction challenges belong to the same category of "defense" under Rule 12(b)(2), yet the D.C. Circuit has held they are different for waiver purposes.  *See Gilmore*, 843 F.3d at 964.  Similarly, Rule 12 denominates "failure to state a claim" as a single category of "defense[]," Fed. R. Civ. P. 12(b)(6), even though that category encompasses many different defenses for waiver purposes.  *See, e.g.*, *Leyse v. Bank of Am. N.A.*, 804 F.3d 316, 320 (3d Cir. 2015) ("collateral estoppel" versus "statutory standing").  Given that structure, the word "defense" in Rules 12(g)(2) and 12(h)(1) cannot refer merely to the *category* of defense under Rule 12(b).  Rather, the text tracks ordinary waiver principles, under which one personal-jurisdiction argument does not preserve a new argument based on new facts.

*Second*, AstraZeneca's position undermines Rule 12(h)(1)'s purpose.  Forcing defendants to promptly surface all their personal-jurisdiction defenses allows courts to resolve "such preliminary matters" at the threshold "before the court's and parties' time is consumed in struggle over the substance of the suit."  *Dem. Rep. Congo v. FG Hemisphere Assocs. LLC*, 508 F.3d 1062, 1065 (D.C. Cir. 2007).  And Rule 12(h)(1)'s consolidation mandate is vital so "the

---

[3] *See also United States v. Hewlett*, 395 F.3d 458, 460 (D.C. Cir. 2005) (interpreting similarly worded waiver rule under Federal Rule of Criminal Procedure 12(b)(3) as requiring the specific "facts and arguments that make clear the basis of defendant's objections").

court [can] do a reasonably complete job" in one threshold ruling.  Fed. R. Civ. P. 12(h)(1)(A), advisory committee's note to 1966 amendment.  AstraZeneca's piecemeal-litigation approach thwarts those goals.  Under its theory, defendants could serially litigate jurisdiction point-by-point in every case, arguing that each sequential motion goes to the same broad "defense" of "personal jurisdiction."  That theory has no limiting principle.  Indeed, if the Court denies this motion, AstraZeneca's reading of Rule 12(h)(1) would let it try a third (and fourth, and fifth) time, each time with "additional evidence" and new facts.  Reply at 11.  That cannot be right.

*Third*, AstraZeneca's impermissible tactics highlight the waiver.  Waiver and forfeiture principles generally "ensure that parties can determine when an issue is out of the case, and that litigation remains, to the extent possible, an orderly progression."  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008).  AstraZeneca's reply flips those principles on their head.  AstraZeneca alone has had the "incontrovertible evidence" (Reply at 4) about its own API since the outset of the case.  Yet it remained silent for five-plus years, accepting the jurisdictional allegations as true and blocking Plaintiffs' efforts to see any evidence about them.  Opp. at 20.  At the same time, AstraZeneca wasted judicial resources by litigating the relevance of those facts while baiting Plaintiffs into drawing inferences that AstraZeneca now, long afterward, assails (Reply at 1) as "false."  Rule 12(h)(1) protects plaintiffs from just such a bait-and-switch.

AstraZeneca says it did not "withhold" evidence, because it waited to start "investigating" the jurisdictional facts until "after the D.C. Circuit's reversal."  Reply at 8 n.11.  That explanation, if true,[4] merely admits the waiver.  A defense is waived when it was "available to the party" during the initial motion.  Fed. R. Civ. P. 12(g)(2); *see* Fed. R. Civ. P. 12(h)(1)(A)

---

[4] AstraZeneca's declaration (Dkt. 161-1, ¶ 2) says its "extensive investigation" "began after the D.C. Circuit" decision, but does not deny that AstraZeneca earlier knew of or suspected its "clear-cut evidence" (Reply at 7) of API sourcing – even if it waited to formally investigate.

(incorporating Rule 12(g)(2)).  AstraZeneca's admission that it waited for years to start checking

its own files for "basic, objectively verifiable facts," Mot. at 1, makes waiver all the more

appropriate.  *See* 5C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1391

(3d ed. 2022) ("[T]he message conveyed by the present version of Rule 12(h)(1) seems quite

clear.  It advises a litigant to exercise great diligence in challenging personal jurisdiction[.]").

Nor can AstraZeneca blame (Reply at 6) its "multiple 12(b)(2) motions" on this

litigation's size.  The "complexity of a case does not eliminate the value of waiver and forfeiture

rules." *Exxon*, 554 U.S. at 487 n.6.  Precisely because of this case's size, AstraZeneca should

have raised any factual challenge to jurisdiction in its first motions (which it spent years

preparing), while still efficiently litigating the common issues.  AstraZeneca could have located

its jurisdictional evidence with less effort, and fewer pages, than it spent on the 1,100 pages of

internet research for its political-question-doctrine defense instead.  *See* Dkts. 72-3 to 72-95.

**C.**　　AstraZeneca's cases (Reply at 8-13) do not support its position.  It cites no case

allowing a defendant to litigate a forum contact's jurisdictional relevance for years and then,

after losing, try again by denying that the contact even exists.  Almost nobody appears to have

even tried such a gambit.  The closest is *Cheese Depot, Inc. v. Sirob Imports, Inc.*, 2016 WL

6082352 (N.D. Ill. Oct. 18, 2016), where the court denied a similarly successive venue motion.

*Id.* at *2 (waiver when defendant "did not submit evidence challenging [venue] allegations").

Most of AstraZeneca's cases involve defendants whose first Rule 12(b)(2) motion raises

a factual defense, typically by adducing evidence on the disputed factual points.  *See*, *e.g.*,

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115 (D.D.C. 2018) (noting defendants'

"version of the facts," citing declarations).  A defendant that does so preserves a defense based

on those factual averments, even if the court denies the initial motion to permit discovery.  *See*

*id.*[5]  A plaintiff's jurisdictional theory also sometimes mirrors its merits theory and so requires

full "merits discovery."[6]  In those specific scenarios, and only after full discovery, a plaintiff

must "[u]ltimately" show "facts supporting jurisdiction over the defendant by a preponderance of

the evidence."  *Grayson*, 816 F.3d at 268.  But this case is different.  Here, AstraZeneca's

successive motion rests on discrete jurisdictional facts – the location of its own API

manufacturing – that it alone controls but strategically omitted from its first motion.

AstraZeneca's (and Roche's, *see* Dkt. 163) other cases are even more off-point.  Most

merely describe a court's "procedural leeway" in addressing an *initial* Rule 12(b)(2) motion and

say nothing about successive motions with new arguments.[7]  The others involved defendants that

initially preserved a personal-jurisdiction defense under a different rule by "includ[ing] it in [the

answer]," Fed. R. Civ. P. 12(h)(1)(B)(ii), and then promptly filing a single motion afterward.[8]

Such cases do not involve successive motions and so shed no light on Rule 12(h)(1)(A).

---

[5] *Compare Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (affirming after "full discovery process") *with* Mem. in support of MTD at 2-4, *In re Derivium Capital, LLC*, No. 07-cv-02992-DCN (D.S.C. Feb. 27, 2008), Dkt. 94-1 (original motion challenging facts through affidavits); *see also*, *e.g.*, *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 757 F. Supp. 2d 904, 911-12 (W.D. Mo. 2010) (first motion challenged facts via "affidavits"; court allowed later motion given "Amended Complaint" that provided new "information" and added new "defendants"); *Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F. Supp. 2d 27, 29-30 (D.D.C. 2004) (original motion denied all forum contacts; court ordered discovery).

[6] *In re Terrorist Attacks on September 11, 2001*, 2023 WL 2430381, at *1 (S.D.N.Y. Mar. 9, 2023); *see id.* at *7 (allowing summary-judgment motion after "years of discovery" on merits).

[7] *Globe Metallurgical, Inc. v. Rima Indus. S.A.*, 177 F. Supp. 3d 317, 323 (D.D.C. 2016); *see*, *e.g.*, *Mwani v. Osama Bin Laden*, 417 F.3d 1, 6-7 (D.C. Cir. 2005); *Miller v. Holzmann*, 2006 WL 3422421, at *1-2 (D.D.C. Nov. 28, 2006).

[8] *See*, *e.g.*, *Denari v. U.S. Dry Cleaning Servs. Corp.*, 2017 WL 2779051, at *3 (E.D. Cal. June 27, 2017) (allowing "post-answer Rule 12(b) motion as long as no prior Rule 12(b) motion was filed"); *Chase v. Pan-Pac. Broad., Inc.*, 750 F.2d 131, 133-34 (D.C. Cir. 1984); *Mold-A-Rama Inc. v. Collector-Concierge-Int'l*, 451 F. Supp. 3d 881, 886-87 (N.D. Ill. 2020); *Horton v. Sunpath, Ltd.*, 2023 WL 2653386, at *1 (N.D. Tex. Mar. 27, 2023).

**D.**      Even if AstraZeneca did preserve its latest personal-jurisdiction challenge, the

Court should still prohibit this successive motion to dismiss.  Because Rule 12(g)(2) bars

sequential Rule 12 motions, AstraZeneca at most should be permitted to re-assert these personal-

jurisdiction arguments at summary judgment, after full discovery.  Opp. at 17-19, 22.

AstraZeneca invokes (Reply at 13) the Court's supposed "discretion" to override Rule

12(g)(2), but Rule 12(g)(2)'s "must not" command is mandatory.  Opp. at 22 & n.29.

Regardless, AstraZeneca's cases (Reply at 13-14 & n.16) involve Rule 12(b)(6) defenses, which

are preserved even if omitted initially.  *See* Fed. R. Civ. P. 12(h)(2).  For such arguments, a

sequential motion to dismiss can sometimes appear more efficient because otherwise a defendant

could just raise the same arguments by "fil[ing] a new motion for judgment on the pleadings

under Rule 12(c)."  *Sierra v. Hayden*, 2019 WL 3802937, at *7 (D.D.C. Aug. 13, 2019).

Unlike failure to state a claim, personal jurisdiction is not one of the three defenses that

Rule 12(h)(2) preserves even if omitted initially.  Accordingly, the Court lacks "authority to

allow [AstraZeneca] to resurrect a waived personal jurisdiction defense."  *Agbara v. Okoji*, 2021

WL 4940927, at *3 (D.D.C. Oct. 22, 2021).  And AstraZeneca cannot re-file this motion under

Rules 12(c) or 12(f) either.  *Compare* Reply at 13-14 *with Mussat v. Enclarity, Inc.*, 362 F. Supp.

3d 468, 472 (N.D. Ill. 2019) ("asserting a personal jurisdiction defense in a Rule 12(c) motion is

improper"); *see also* Fed. R. Civ. P. 12(f)(2) (motion to strike would be untimely).  In fact, Rule

12(g)(2) would continue to bar both of those successive "motion[s] under this rule" too.

## II.      ASTRAZENECA'S NEW JUDICIAL-ESTOPPEL ARGUMENTS LACK MERIT

AstraZeneca's new arguments (Reply at 15-20) for judicial estoppel are similarly

unpersuasive.  Plaintiffs are not "disavow[ing] their API-based theory" of jurisdiction.  Reply at

15.  As Plaintiffs stressed (Opp. at 38), U.S.-made API remains a key forum contact that would

suffice for personal jurisdiction.  To be clear, U.S.-made API would be "critical" and would

satisfy the D.C. Circuit's "four overlapping" factors. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th

204, 234, 238 (D.C Cir. 2022).  The Circuit thus held that Defendants cannot use non-U.S.

formulation to overcome U.S.-API-related contacts.  *See id.* at 238.  But AstraZeneca inverts this

point in a way Plaintiffs never did, pretending that Plaintiffs argued (and the Circuit held) that

the *presence* of U.S. formulation would be *insufficient* for jurisdiction.  This proposition appears

nowhere in Plaintiffs' briefs or the Circuit's opinion, so AstraZeneca recasts (Reply at 16-19) a

handful of other comments and portrays them as the linchpin of the D.C. Circuit opinion.

That argument fails because the D.C. Circuit never relied on the particular comments

AstraZeneca cites.  For estoppel to apply, it is not enough for the D.C. Circuit to have accepted

that API manufacturing is more "commercially important" than formulation.  Third Am. Compl.,

Dkt. 124 ("TAC") ¶ 189 n.164; *see Atchley*, 22 F.4th at 235 n.11, 238; *see also* Opp. at 32-35

(explaining why that principle does not undercut jurisdiction).  Rather, estoppel would require

the D.C. Circuit to have gone further and adopted AstraZeneca's latest notion that U.S.

formulation is so "unimportant" (Reply at 16) that it can never support U.S. jurisdiction.  The

Circuit did nothing of the sort.  Indeed, AstraZeneca's repeated quote (Reply at 1, 14, 16, 17, 18,

21, 23, 29) about formulation being "unimportant" – which it extracts from a single sentence in

one brief – appears nowhere in the D.C. Circuit's opinion.  To the contrary, the Circuit

highlighted Arimidex's "drug formulation occur[ing] in Delaware" as favoring jurisdiction.

*Atchley*, 22 F.4th at 235.  And right after noting that API drives "much of the drugs' value to

Jaysh al-Mahdi," the Circuit observed that "the U.S. provenance of *the drugs or* their active

ingredients mattered to Jaysh al-Mahdi."  *Id*. at 238 (emphasis added).

Until its current motion, AstraZeneca never framed Plaintiffs' theory as hinging on API.

Instead, in seeking en banc review of the panel opinion, it told the full Circuit that the opinion

turned on allegations that Defendants "purchased some of the medical supplies they sold to the

Ministry (*or*, in some cases, just active ingredients) from [U.S.] affiliates."[9]  Thus, in challenging

the very holding at issue, AstraZeneca denigrated API as an afterthought – "just active

ingredients," *id.* – without ever suggesting that "the ***key*** was API."  Reply at 17.

AstraZeneca's accusation (Reply at 19) of "unfair behavior" also lacks merit.  Plaintiffs'

jurisdictional theory at all times reflected good-faith arguments based on the facts then available.

Opp. at 35-39 & nn.35-36.  The complaint's API allegations had a reasonable basis and never

changed.[10]  Plaintiffs also made all the arguments AstraZeneca now impugns in their very first

brief five years ago (*see* Dkt. 75 at 3-4, 16-17) – eliciting not even a hint from AstraZeneca that

anything was "false" or "misleading."  Reply at 6.  Nor did Plaintiffs "pivot[] further on appeal."

*Id.*  Plaintiffs appealed by repeating the same arguments, which AstraZeneca itself told the D.C.

Circuit were the same.  *See* Supp. Ex. 22 at 62 (asserting that "the district court correctly"

rejected Plaintiffs' appellate theory about U.S.-sourced "goods (or their ingredients)").

AstraZeneca's unfounded accusations all stem from its own delay.  Had AstraZeneca

come forward with these facts the first time, the parties could have avoided this dispute.

Plaintiffs could have amended their complaint to conform to the evidence, and this Court could

have resolved all the jurisdictional issues on the current record.  But AstraZeneca chose instead

---

[9] Supp. Ex. 21 (Foreign Def.'s Pet. for Rehearing En Banc at 2) (emphasis added); *see also* Supp. Ex. 22 (Def.'s-Appellees Br. at 62) (similar).

[10] Plaintiffs did not "mislead[] the Court."  Reply at 6.  Plaintiffs' API allegations reflected a good-faith reading of the available sources, including Kimadia documents and other sources referencing U.S. manufacturing (*e.g.*, Dkt. 149-3, Ex. H; Dkt. 157-4) and Plaintiffs' research into typical practices for pharmaceutical companies like AstraZeneca.  Given industry practice, including the other Defendants' supply chains, *e.g.*, TAC ¶¶ 300, 327, Plaintiffs read the U.S. manufacturing references as referring to API.  Plaintiffs expected that if AstraZeneca structured its supply chain differently – by following the unusual procedure of making API abroad but formulating it in the United States – it would have said something much earlier.

to litigate this issue serially.  Rather than present the basic jurisdictional facts it controls, it held

them in (Mot. at 3) "reserv[e]" so it could tell the D.C. Circuit (Supp. Ex. 22 at 69-70) that

jurisdictional discovery "would not change the court's analysis."  Once that gambit failed,

AstraZeneca finally started "investigating" (Reply at 8 n.11); collected "basic" evidence from its

own files (Mot. at 1); came forward with the very documents it had sat on for years; and now

uses those documents to attack Plaintiffs' integrity.  If anyone has reaped an "unfair advantage"

from these events, it is AstraZeneca.  *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).

## III.    ASTRAZENECA'S NEW EVIDENCE DOES NOT WARRANT DISMISSAL

AstraZeneca's new evidentiary arguments are also unavailing.  At most, they reveal

additional U.S. contacts and show why the Court cannot grant this motion without discovery.

**A.**    AstraZeneca's new factual materials do not refute the many U.S. contacts

Plaintiffs previously identified.  Opp. at 25-32.  For example, none disputes that AstraZeneca

expressly wrote the U.S. sourcing into its Arimidex contract and then certified to Kimadia that

Arimidex was of U.S. "origin."  Dkt. 149-3 (Mishkin Decl.) Ex. H at 1, 3.  Those contacts alone

support jurisdiction under the D.C. Circuit's opinion.  Opp. at 30-32.[11]  AstraZeneca's new

exhibits also fail to answer most of the questions its prior submission left open.  Opp. at 40 &

App'x 1; *see also* Supp. App'x 1.  Again, the declarants do not testify that AstraZeneca never

provided the Ministry with any U.S.-made API.[12]

---

[11] AstraZeneca's reply downplays Arimidex's U.S. sourcing by arguing (at 21 n.21) that the dollar value of the one attached Arimidex contract is a small percentage of the total dollar value of the six attached contracts.  But that calculation uses the wrong comparator.  AstraZeneca registered Arimidex for sale with the Ministry four separate times over a thirteen-year period (1999 through 2012).  Schultz Decl. Ex. 15.  It thus likely sold Arimidex in other transactions and other contracts beyond the one it attaches.  In any event, even relatively small forum contacts can support personal jurisdiction.  Opp. at 29-30 (citing authority).

[12] AstraZeneca's reply newly asserts (at 2) that "no AstraZeneca entity made or supplied AZ UK with U.S.-manufactured API for any product sold to the Ministry during the Alleged

Plaintiff's opposition also adduced evidence of three other U.S.-manufactured drugs that AstraZeneca UK registered for sale with the Ministry:  Crestor (manufactured by U.S.-based AstraZeneca affiliate IPR Pharmaceuticals, Inc.), Cubicin (U.S.-manufactured by Hospira, Inc.), and Onglyza (U.S.-manufactured by Bristol-Myers Squibb).  Opp. at 12 & n.27 & Schultz Decl. Ex. 15.  AstraZeneca's reply now admits it registered these additional U.S.-formulated drugs with the Ministry, and it dribbles out a few more highly excerpted drug-registration forms for them.  Dkt. 161-4 (Clarkson Supp. Decl.) ¶¶ 15-22 & Exs. N-P.  Even with the many gaps in this new evidence about these other drugs, it shows that AstraZeneca UK was "collaborat[ing] with U.S. manufacturers to market their American products in Iraq."  *Atchley*, 22 F.4th at 234-35.

AstraZeneca attempts to downplay these newly disclosed U.S. contacts by asserting that it "did not enter into any contract with MOH" for the sale of these drugs "during the Alleged Period."  Dkt. 161-2 ¶ 5.  But the AstraZeneca declarant who makes this assertion (Mohamed Amin Ben Lakhal) did not join AstraZeneca until after the "Alleged Period" and bases his statements on his secondhand "understand[ing]" after "speaking with knowledgeable people," "reviewing the contracts," and examining other unidentified "sources of information" – none of which AstraZeneca has produced.  *Id.* ¶¶ 1, 4.  These statements are hearsay – based on undisclosed sources – and cannot defeat personal jurisdiction without discovery.  *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214-15 (11th Cir. 1999) (on a Rule 12(b)(2) motion, "we consider only those portions of [a defendant's] [a]ffidavit that set forth specific factual

---

Period," but none of the declarants make similar statements (individually or collectively).  *See* Supp. App'x 1, No. 35.  And even the statement in AstraZeneca's brief allows that AstraZeneca may have sourced U.S. API from *non-affiliated* U.S. manufacturers, just as AstraZeneca used non-affiliated U.S. manufacturers to formulate drugs it registered for sale with the Ministry.  *See infra* p. 13.  Affiliated or not, such contacts would show AstraZeneca's "collaboration with U.S. manufacturers" to supply "U.S. goods" to the Ministry.  *Atchley*, 22 F.4th at 234.

declarations within the affiant's personal knowledge"); *Collins v. New York Cent. Sys.*, 327 F.2d 880, 882 (D.C. Cir. 1963) (declining to credit similar conclusory statements); *In re Gasoline Spot Litig.*, 2020 WL 7431843, at *8 (N.D. Cal. Dec. 18, 2020) (same).

But even if the Court accepts Mr. Lakhal's hearsay, AstraZeneca UK's registration of the three additional U.S.-made drugs still supports jurisdiction:  it shows AstraZeneca UK worked to "capture a business opportunity" for U.S. companies and that "'the products to be distributed by [defendants] were being manufactured' in the forum."  *Atchley*, 22 F.4th at 235 (quoting *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 591 (8th Cir. 2001)).  Moreover, even if AstraZeneca never entered into formal sales contracts for these drugs, the TAC alleges (and AstraZeneca offers no evidence refuting) that the earlier registration stages also involved cash bribes.  TAC ¶¶ 142-64.  These U.S.-tied drug registrations alone are thus substantial "suit-related" conduct supporting jurisdiction under *Atchley* and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).  *See* Opp. at 29-30 (describing both cases).

That remains true even if AstraZeneca UK never distributed these three U.S. drugs in Iraq.  In *St. Jude*, a distributor agreed to sell an in-forum manufacturer's products in Saudi Arabia, but decided to source the products elsewhere before signing the contract at issue.  The Eighth Circuit upheld jurisdiction because the defendant still "pursued a business relationship" in which "the products to be distributed . . . were being manufactured in [the forum]," even though the defendant never distributed the products under the contract.  250 F.3d at 591-92; *see Atchley*, 22 F.4th at 235 (citing *St. Jude*).  So too here.  Even if AstraZeneca UK did not sell Crestor, Cubicin, or Onglyza until later, it "pursued . . . business relationship[s]" with U.S. manufacturers for the purpose of selling their drugs to the Ministry.  *St. Jude*, 250 F.3d at 591-92.

14

**B.**       Rather than address these facts and inferences head on, AstraZeneca resorts to ad

hominem attacks, incorrectly asserting (Reply at 1) that Plaintiffs have "fabricat[ed] new facts"

and attaching an appendix purporting to list Plaintiffs' "false or highly misleading statements."

These offensive attacks have no merit.  As set forth in Plaintiffs' attached appendix, the

statements AstraZeneca characterizes as "false" or "misleading" are nothing of the sort.

In reality, the "false and misleading statements" in AstraZeneca's appendix represent

mere factual and inferential disputes, which the Court must resolve in Plaintiffs' favor at this

stage.  *See Atchley*, 22 F.4th at 214.  In many cases, AstraZeneca's own position is tenuous.  For

example, AstraZeneca calls "false" Plaintiffs' point that AstraZeneca "manufactured" Arimidex

in the United States, arguing that its Newark facility "only formulated Arimidex and never made

API."  AstraZeneca App'x A at 3.  But Plaintiffs' statements quote AstraZeneca's own

documents, which repeatedly characterize the Newark facility's formulation of Arimidex as

"manufacturing."[13]  When AstraZeneca attacks Plaintiffs' use of the word "manufactured," it is

merely disputing its own documents.  Similarly, AstraZeneca attacks as "false" Plaintiffs'

allegation that its contracts with the Ministry required it to procure proof of FDA approval,

because AstraZeneca says such proof was needed only "if available."  AstraZeneca App'x A at

1-2.  But AstraZeneca's drugs *were* FDA-approved, so proof of FDA approval *was* "available" in

each case.  AstraZeneca's contracts therefore *did* require it to provide such proof.

The rest of AstraZeneca's appendix is similar.  *See* Supp. App'x 1 (responding to each

attack).  For example, as Plaintiffs noted (Opp. at 10), the Newark "site master files" show that

Seroquel was "produced at Newark or contractors" and "licensed for export," Dkt. 149-4 (Whyte

---

[13] *See, e.g.*, Dkt. 149-5 (Clarkson Decl.) Ex. B at 1 ("Arimidex tablets" sold to the Ministry
were "manufactured by AstraZeneca Pharmaceutical[s] LP, Newark, Delaware"); Dkt. 149-4
(Whyte Decl.) Ex. A § C.1.5 (listing Arimidex as a "product manufactured" in Newark).

Decl.) Ex. A § C.1.5, and supply chain maps for Seroquel similarly suggest that AstraZeneca

US's Newark facility formulated Seroquel for foreign markets, Dkt. 149-6 (O'Leary Decl.) Exs.

J, L, and O.  AstraZeneca does not dispute that Plaintiffs accurately describe these documents; it

simply cites *other* documents for the contrary proposition that "Seroquel formulated by AZP LP

was for the U.S. market only."  AstraZeneca App'x A at 4-8.  Plaintiffs are at least entitled to

jurisdictional discovery so the Court can adjudicate these disputes on a full record.

AstraZeneca chides (Reply at 2-5) Plaintiffs for not simply accepting its self-serving

declarations to "contextualize the documents."  But Plaintiffs need not accept at face value the

inferences drawn by AstraZeneca's belated declarations.  AstraZeneca cannot short-circuit

jurisdictional discovery by cherry-picking the evidence it wants Plaintiffs to see and then

insisting that its own assertions are beyond dispute.  *See, e.g.*, *Collins*, 327 F.2d at 882 (ordering

discovery despite affidavit); *Houston v. Pavilion USA 2020, Inc.*, 2023 WL 1860961, at *5

(D.D.C. Feb. 9, 2023) (applying *Collins* to order discovery).

## IV.    ASTRAZENECA'S NEW U.S.-BANKING ARGUMENTS ARE UNPERSUASIVE

As Plaintiffs explained (Opp. at 41-44), AstraZeneca UK's contacts with U.S. banks

provide additional grounds for jurisdictional discovery.  AstraZeneca argues (Reply at 24) that

Plaintiffs failed to preserve these arguments on appeal.  But on Plaintiffs' second argument – that

AstraZeneca UK used U.S. banks to route cash bribes – Plaintiffs had no need to appeal on this

issue because they had not raised it with this Court.  *See, e.g.*, *United States v. Pole*, 2021 WL

5796518, at *5 (D.D.C. Dec. 7, 2021) (allowing new claims on remand when consistent with

appellate mandate).  AstraZeneca has filed a new motion to dismiss, so Plaintiffs may oppose it

on any basis, old or new.  Nor does forfeiture bar Plaintiffs' letters-of-credit theory, because the

law has changed since the Court's last ruling.  Opp. at 41-42; *see Crocker v. Piedmont Aviation,*

16

*Inc.*, 49 F.3d 735, 740 (D.C. Cir. 1995) ("an intervening change in the law . . . *will* support a departure from the previously established law of the case") (emphasis in original).

In any event, all Plaintiffs are seeking is the chance to conduct U.S.-banking discovery, not an immediate merits ruling.  AstraZeneca resists discovery – even though courts "quite liberal[ly]" grant it, *Wesberry v. United States*, 205 F. Supp. 3d 120, 135 (D.D.C. 2016) – by arguing that *Licci*'s holding does not apply, *see* Reply at 25-26.  But *Licci*'s logic applies to non-bank customers whose banks, acting as their customers' agents, use U.S. correspondent accounts. Purposeful availment of the U.S. banking system, not formal account ownership, is the key.  *See Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("[T]he *use* of a New York correspondent bank account, *standing alone*" may be sufficient.) (emphasis added); *cf. Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 619-20 (1992) ("By issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city, Argentina purposefully avail[ed] itself of the privilege of conducting activities within the [United States].").[14]  And Plaintiffs have made allegations supporting a plausible inference that AstraZeneca UK relied on the U.S. dollar and that U.S. banks were vital to that reliance.  TAC ¶¶ 6-8, 12, 122-27, 142-45, 149, 209.  If the Court disagrees on this record, it should allow jurisdictional discovery, or at least give Plaintiffs a chance to amend their Complaint to flesh out this theory to a fuller extent.  *See* Opp. at 44.

## CONCLUSION

The Court should deny the motion, or order jurisdictional discovery.

---

[14] AstraZeneca cites (Reply at 25) *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379 (S.D.N.Y. 2021), but that case noted the possibility of "unusual circumstances" in which "an individual bank customer would have [a] reason to direct its foreign bank to use a [U.S.] correspondent account."  *Id.* at 403 n.25.  Plaintiffs are entitled to discovery into that question or to amend their complaint to address it.  *See* TAC ¶ 126(d) (U.S. banks were "essential").

Dated:  May 16, 2023

Respectfully submitted,

/s/ Joshua D. Branson

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

David C. Frederick (D.C. Bar No. 431864)
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Thomas G. Schultz (D.C. Bar No. 1028017)
Matthew M. Duffy (D.C. Bar No. 1031257)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
tschultz@kellogghansen.com
mduffy@kellogghansen.com

*Counsel for Plaintiffs*

# Supplemental Appendix 1

# Response to AstraZeneca Chart Alleging "False and Misleading Statements."

**Supplemental Appendix 1 – Response to AstraZeneca Chart Alleging "False and Misleading Statements."[1]**

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| | **Contracts and Registration Forms** | | | |
| 1 | "AstraZeneca's submission 'show[s] . . . that it told the Ministry its drugs were "manufactured" by AstraZeneca US in Newark, Delaware.'" (Opp. at 2.) | The submission shows that AZ UK told MOH that one drug, Arimidex, was formulated in the U.S., but that other drugs supplied to MOH did not rely on U.S. sourcing. | Whyte Decl. ¶ 3 (AZP LP never manufactured API). <br><br> Clarkson Decl. ¶¶ 9-12 (AZP LP did not manufacture the API for any of the Relevant Products); *id.* Ex. A at 4 § L-2, Ex. B (identifying that AZP LP formulated only Arimidex for Iraq). <br><br> O'Leary Decl. ¶¶ 7-8 (API for the Relevant Products sold in Iraq was never manufactured in the United States). <br><br> Clarkson Supp. Decl. ¶¶ 6-14 (confirming AZ UK made the API for Arimidex and AZP LP did not manufacture other drugs for Iraq). | Plaintiffs' statement accurately quotes AstraZeneca's April 29, 2009 letter to the Ministry, which states that the "Arimidex tablets" that AstraZeneca UK sold to the Ministry were "manufactured by AstraZeneca Pharmaceutical LP, Newark, Delaware 19702, USA." Clarkson Decl. Ex. B at pdf p. 16. <br><br> AstraZeneca's rebuttal does not contradict Plaintiffs' statement. It acknowledges that "AZ UK told MOH" that the Arimidex AstraZeneca UK was selling to the Ministry "was formulated in the US." To the extent AstraZeneca disputes the characterization of "formulation" as "manufacturing," it is disputing a characterization made by its own documents. <br><br> (Note that AstraZeneca misquotes Plaintiffs' opposition, but this misquotation does not materially affect the meaning of Plaintiffs' statement.) |

---

[1] This Supplemental Appendix responds point by point to the chart set forth in Appendix A to AstraZeneca's Reply, which purports to catalogue 38 "False and Misleading Statements" made by Plaintiffs. The first four columns of the chart above reproduce AstraZeneca's chart verbatim. (Plaintiffs do not adopt any of the characterizations in this portion of the chart.) The last column includes Plaintiffs' responses to AstraZeneca's accusations. In many cases, AstraZeneca cites the same materials to support more than one assertion (for example, AstraZeneca cites Clarkson Declaration Exhibit A, § L-2 to support 18 separate assertions), many of which are not meaningfully related to the cited documents. For the sake of efficiency, Plaintiffs generally respond to these cited documents only where most relevant and do not address every duplicative AstraZeneca citation in each response.

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 2 | "AstraZeneca UK was required to certify in each of its contracts with Kimadia that the drugs it sold were FDA approved." (Opp. at 7-8 (emphasis added).) | Kimadia's contracts with AZ UK did not require AZ UK to procure FDA approval. The contracts required "FDA, CE, HPB, MOH" certificates to be submitted "if available." | Mishkin Decl. Ex. A (requesting the submission of certificates from the FDA, CE, HPB, or MOH, if available); *id.* Exs. A-L (reflecting the same requirement in all of the contracts identified in the TAC). | Plaintiffs' statement accurately characterizes AstraZeneca's contracts with Kimadia, which required AstraZeneca UK "[t]o submit the following certificates in case of its availability for the awarded materials:  FDA, CE, HPB, MOH."  *See*, *e.g.*, Mishkin Decl. Ex. A at pdf p. 8.  AstraZeneca asserts the contracts required it to submit FDA approvals only if such approvals were "available."  But AstraZeneca does not dispute that each of the drugs at issue was FDA approved.  Accordingly, FDA approvals for these drugs were "available," and AstraZeneca was required to submit them. |
| 3 | "Each of [AZ UK's] contracts – including the ones for drugs it claims were manufactured elsewhere – required proof of FDA approval, which AstraZeneca UK used AstraZeneca US to procure from the United States." (Opp. at 37.) | Kimadia's contracts with AZ UK did not require AZ UK to procure FDA approval. The contracts required "FDA, CE, HPB, MOH" certificates to be submitted "if available." | Mishkin Decl. Ex. A (requesting the submission of certificates from the FDA, CE, HPB, or MOH, if available); *id.* Exs. A-L (reflecting the same requirement in all of the contracts identified in the TAC). | Plaintiffs' statement accurately characterizes AstraZeneca's contracts with Kimadia, which required AstraZeneca UK "[t]o submit the following certificates in case of its availability for the awarded materials:  FDA, CE, HPB, MOH."  *See*, *e.g.*, Mishkin Decl. Ex. A at pdf p. 8.  AstraZeneca's rebuttal is identical to its rebuttal to Statement 2, *supra*.  Plaintiffs incorporate their response regarding that Statement. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 4 | "[A]ll of AstraZeneca UK's contracts with Kimadia required it to procure FDA approval documentation." (Opp. at 13.) | Kimadia's contracts with AZ UK did not require AZ UK to procure FDA approval. The contracts required "FDA, CE, HPB, MOH" certificates to be submitted "if available." | Mishkin Decl. Ex. A (requesting the submission of certificates from the FDA, CE, HPB, or MOH, if available); *id.* Exs. A-L (reflecting the same requirement in all of the contracts identified in the TAC). | Plaintiffs' statement accurately characterizes AstraZeneca's contracts with Kimadia, which required AstraZeneca UK "[t]o submit the following certificates in case of its availability for the awarded materials:  FDA, CE, HPB, MOH."  *See*, *e.g.,* Mishkin Decl. Ex. A at pdf p. 8.<br><br>AstraZeneca's rebuttal is identical to its rebuttal to Statement 2, *supra*.  Plaintiffs incorporate their response regarding that Statement. |
| 5 | "The same letter listed Seroquel and Meronem as 'Drug Products for Iraqi market' for which 'AstraZeneca Pharmaceutical[s] LP, Newark, Delaware 19702, USA' was the 'manufacture[r].'" (Opp. at 39.) | The letter states that the Meronem and Seroquel processed in the U.S. is "for the US market only." | Clarkson Decl. ¶¶ 9-12 (AZP LP did not manufacture the API for any of the Relevant Products); *id.* Ex. A at 4 § L-2, Ex. B (identifying that AZP LP formulated only Arimidex for Iraq).<br><br>Clarkson Supp. Decl. ¶¶ 7-13 (confirming AZ UK made the API for Arimidex, and AZP LP did not manufacture either Seroquel or Meronem for Iraq). | Plaintiffs' statement accurately quotes an April 29, 2009 letter that AstraZeneca UK sent to the Ministry.  Clarkson Decl. Ex. B at pdf p. 17.<br><br>AstraZeneca's rebuttal quotes a different letter (included in the same exhibit) stating that the "Meronem and Seroquel that is processed at AstraZeneca Pharmaceutical[s] LP, Newark, Delaware 19702, USA, is for the US market only and is not for export to Iraq."  *Id.* at pdf p. 16.  However, this statement is contradicted both by the April 29, 2009 letter cited above and by other AstraZeneca documents, including site master files indicating that Meronem and Seroquel were among the products "export[ed]" by the Newark facility, and supply chain maps indicating that Meronem and Seroquel were exported to foreign markets.  Plaintiffs address these documents more fully in their responses concerning Statements 11-14, 16-17, 21, and 24-29.<br><br>The relevant paragraphs of Ms. Clarkson's declarations cited by AstraZeneca rely on same the letter cited by AstraZeneca and are contradicted by the same evidence described above.  Clarkson Decl. ¶¶ 9-12; Clarkson Supp. Decl. ¶ 7-13. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 6 | "[D]iscovery is warranted to explore the gaps, inconsistencies, and ambiguities that pervade AstraZeneca's documents. See App'x 1 (detailing these issues)." (Opp. at 40.) *See* App'x 1 at 2-3, 5 (asserting that certain regulatory documents are "not [for] the formulation or dosage" of the Relevant Product covered by contracts identified in the TAC). | Sourcing locations pertain to all dosages of the Relevant Products during the Alleged Period. | Clarkson Decl. ¶ 9 (indicating that attached regulatory documents confirm API manufacturing and formulation sites for each of the Relevant Products during the Alleged Period).<br><br>Clarkson Supp. Decl. ¶ 5 (confirming regulatory documents provided identify sourcing locations applicable to all dosages of Relevant Products).<br><br>O'Leary Decl. ¶ 7 (summarizing source locations for Relevant Products sold in Iraq during the Alleged Period).<br><br>O'Leary Supp. Decl. ¶ 4 (confirming information provided about sourcing locations pertains to all dosages of Relevant Products). | Plaintiffs' statements (and the referenced appendix) accurately describe the gaps, inconsistencies, and ambiguities in the exhibits AstraZeneca submitted with its original motion.<br><br>AstraZeneca's rebuttal pertains to only one category of these gaps: the "dosages of the Relevant Products during the Alleged Period." Plaintiffs' opposition and appendix catalogues numerous other gaps, inconsistencies, and ambiguities beyond issues related to dosage. *See* Opp. at 40 and App'x. 1.<br><br>For example, AstraZeneca did not attach a drug registration form for Arimidex, despite attaching such forms for the other three drugs. Opp. at 40. AstraZeneca declarant Nicola Clarkson asserts in her supplemental declaration that she was "unable to locate a copy of [the] original registration" for Arimidex, which was supposedly submitted "before the Alleged Period." Clarkson Supp. Decl. ¶ 6. However, a table obtained from the Iraqi pharmacists' trade association indicates that AstraZeneca UK registered Arimidex with the Ministry on four separate occasions between 1999 and 2012. *See* Schultz Decl. Ex. 15. Ms. Clarkson's supplemental declaration does not address why AstraZeneca did not attach any of these subsequent registration forms for Arimidex. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| **Arimidex** | | | | |
| 7 | "Consistent with [the] allegation" that AstraZeneca manufactured Arimidex in the United States, "each of the 'site master files' for AstraZeneca US's Newark facility listed Arimidex as among the facility's 'products manufactured,' which were 'produced at Newark or contractors' and 'licensed for export.'" (Opp. at 8.) | AZP LP only formulated Arimidex and never made API. | Whyte Decl. ¶ 3, Exs. J-N (AZP LP never manufactured API).<br><br>O'Leary Decl. ¶¶ 7-9, Exs. A, B (Arimidex's API was manufactured exclusively outside the United States; AZP LP merely formulated Arimidex).<br><br>Clarkson Decl. Ex. A at 5 § A, Ex. B (Arimidex formulated at AZP LP used API from the U.K.).<br><br>Clarkson Supp. Decl. ¶ 6 (confirming AZ UK made the API for Arimidex). | Plaintiffs' statement accurately describes and quotes the site master files for AstraZeneca US's Newark facility, which indicate that AstraZeneca US "manufactured" Arimidex. *See, e.g.*, Whyte Decl. Ex. A § C.1.5 at pdf p. 10.<br><br>AstraZeneca's assertion that AstraZeneca US "only formulated Arimidex and never made API" does not contradict Plaintiffs' statement, because AstraZeneca's own documents describe AstraZeneca US's formulation of Arimidex as "manufacturing." |
| 8 | "[A]n April 2009 letter from AstraZeneca UK told the Ministry that 'Arimidex tablets' were 'manufactured by AstraZeneca Pharmaceutical[s] LP, Newark Delaware." (Opp. at 9.) | "Tablet manufacture" refers to formulation. | Whyte Decl. ¶ 6 (tablet manufacture is a formulation process and different from API manufacturing). | Plaintiffs' statement accurately quotes an April 29, 2009 letter from AstraZeneca UK to the Ministry, which states that the "Arimidex tablets" that AstraZeneca UK was selling to the Ministry were "manufactured by AstraZeneca Pharmaceutical[s] LP, Newark Delaware." Clarkson Decl. Ex. B at pdf p. 16.<br><br>AstraZeneca's rebuttal does not contradict Plaintiffs' statement. At most, AstraZeneca's assertion that "tablet manufacture" refers to "formulation" raises a semantic dispute about whether formulation constitutes manufacturing. As noted above in Plaintiffs' Response concerning Statement 7, AstraZeneca's own documents characterize formulation as "manufacturing." |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| **Seroquel** | | | | |
| 9 | "The TAC alleges that AstraZeneca US manufactured Seroquel in the United States . . . . The documents attached to AstraZeneca's motion appear to confirm that allegation." (Opp. at 9.) | The Seroquel formulated by AZP LP was for the U.S. market only and was not sold in Iraq. | Clarkson Decl. ¶¶ 9, 11-12 (Seroquel sold to MOH was not formulated in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Seroquel formulated by AZP LP for U.S. supply only); *id.* Ex. G at 2-3, Ex. I (identifying non-U.S. manufacturers and API sources for Seroquel).<br><br>Clarkson Supp. Decl. ¶¶ 7-12 (confirming AZP LP was not registered to formulate Seroquel for the Iraq market).<br><br>O'Leary Decl. ¶¶ 7-9 (the Relevant Products were not sourced from the United States, with the sole exception of the formulation of Arimidex); *id.* Exs. H-K, M (Seroquel supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 5-6 (AZP LP was not a primary manufacturing site for the Seroquel supplied to Iraq and did not provide a backup supply for Seroquel supplied to Iraq during the relevant time period). | The first sentence quoted by AstraZeneca accurately describes the allegations in the Third Amended Complaint.  *See* TAC ¶ 189.  The second sentence is a topic sentence that accurately describes the AstraZeneca documents described in the sentences following this topic sentence, which are addressed below with respect to Statements 11, 12, and 13. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 10 | "Additional evidence confirms AstraZeneca US's role in manufacturing Seroquel sold to Kimadia." (Opp. at 10.) | The Seroquel formulated by AZP LP was for the U.S. market only and was not sold in Iraq. | Clarkson Decl. ¶¶ 9, 11-12 (Seroquel sold to MOH was not formulated in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Seroquel formulated by AZP LP for U.S. supply only); *id.* Ex. G at 2-3, Ex. I (identifying non-U.S. manufacturers and API sources for Seroquel).<br><br>Clarkson Supp. Decl. ¶¶ 7-12 (confirming AZP LP was not registered to formulate Seroquel for the Iraq market).<br><br>O'Leary Decl. ¶¶ 7-9 (the Relevant Products were not sourced from the United States, with the sole exception of the formulation of Arimidex); *id.* Exs. H-K, M (Seroquel supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 5-6 (AZP LP was not a primary manufacturing site for the Seroquel supplied to Iraq and did not provide a backup supply for Seroquel supplied to Iraq during the relevant time period). | Plaintiffs' statement is a topic sentence that accurately describes the evidence described in the sentences following this topic sentence, which are addressed below with respect to Statements 16 and 17. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 11 | "The site master files for the Newark facility list Seroquel as among the 'medicinal products (produced at Newark or contractors) currently licensed for export.'" (Opp. at 9-10.) | The site master files do not indicate that any drug produced at AZP LP was licensed for export to Iraq. The Seroquel formulated by AZP LP was for the U.S. market only and was not exported to or sold in Iraq. | Whyte Decl. Ex. A-G at § C 1.5 (identifying drugs produced at Newark or contractors generally licensed for export); *id.* Exs. H-I §§ 1.2, 6.1.1 (referring to drugs manufactured at Newark generally licensed for domestic distribution and export). Clarkson Decl. ¶¶ 9, 11-12 (Seroquel sold to MOH was not formulated in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Seroquel formulated by AZP LP for U.S. supply only); *id.* Ex. G at 2-3, Ex. I (identifying non-U.S. manufacturers and API sources for Seroquel). Clarkson Supp. Decl. ¶¶ 7-12 (confirming AZP LP was not registered to formulate Seroquel for the Iraq market). O'Leary Decl. ¶¶ 7-9 (the Relevant Products were not sourced from the United States, with the sole exception of the formulation of Arimidex); *id.* Exs. H-K, M (Seroquel supply chains for Rest of World markets did not include AZP LP). O'Leary Supp. Decl. ¶¶ 5-6 (AZP LP was not a primary manufacturing site for the Seroquel supplied to Iraq and did not provide a backup supply for Seroquel supplied to Iraq during the relevant time period). | Plaintiffs' statement accurately quotes the site master files for AstraZeneca US's Newark facility, which list Seroquel as a "medicinal products (produced at Newark or contractors) currently licensed for export." *See, e.g.*, Whyte Decl. Ex. A-G § C 1.5.<br><br>AstraZeneca rebuttal does not meaningfully contradict Plaintiffs' statement. AstraZeneca asserts that these site master files "do not indicate that [Seroquel] was licensed for export to Iraq." But most of the site master files do not list any specific countries to which these drugs are exported, and none specifically exclude Iraq from their general statements that Seroquel is "licensed for export." *See, e.g., id.*<br><br>AstraZeneca also cites §§ 1.2 and 6.1.1 of the site master files from 2012 and 2013 (Whyte Decl. Exs. H-I), but these sections state that the drugs currently licensed for export are set forth in "Appendix 2" to the site master file. AstraZeneca has omitted this appendix from the excerpts it submits. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 12 | "Seroquel supply chain maps from 2007 and 2009 also suggest that AstraZeneca US's Newark facility formulated Seroquel for shipment to Iraq." (Opp. at 10.) | The Seroquel formulated by AZP LP was for the U.S. market only and was not sold in Iraq. | Clarkson Decl. ¶¶ 9, 11-12 (Seroquel sold to MOH was not formulated in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Seroquel formulated by AZP LP for U.S. supply only); *id.* Ex. G at 2-3, Ex. I (identifying non-U.S. manufacturers and API sources for Seroquel).<br><br>Clarkson Supp. Decl. ¶¶ 7-12 (confirming AZP LP was not registered to formulate Seroquel for the Iraq market).<br><br>O'Leary Decl. ¶¶ 7-9 (the Relevant Products were not sourced from the United States, with the sole exception of the formulation of Arimidex); *id.* Exs. H-K, M (Seroquel supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 5-6 (AZP LP was not a primary manufacturing site for the Seroquel supplied to Iraq and did not provide a backup supply for Seroquel supplied to Iraq during the relevant time period). | Plaintiffs' statement accurately states that the supply chain maps include links between AstraZeneca US's Newark facility and the "Rest of World" markets. O'Leary Decl. Exs. O, J. AstraZeneca admits that "Iraq generally would be considered a 'Rest of World' market." Marchany Decl. ¶ 4 & n.1.<br><br>AstraZeneca cites other supply chain maps to argue that the "Rest of World markets did not include AZP LP." But many of these maps contradict this statement or are ambiguous. The documents that AstraZeneca characterizes as "Seroquel supply chain map[s] as of 2006" are dated "12 November 2004" and indicate that the "Newark" facility exported Seroquel to Europe, contradicting AstraZeneca's assertion that "the Seroquel formulated by AZP LP was for the U.S. market only." O'Leary Decl. Exs. H, I; *see also id.* Ex. M (2008 supply chain map with same indication). A 2007 Seroquel supply chain map includes only a portion of the supply chain. *Id.* Ex. K.<br><br>Paragraph 6 of Mr. O'Leary's supplemental declaration also does not meaningfully address the 2007 or 2009 Seroquel supply chain maps. Mr. O'Leary asserts that the "dotted line between [AZP LP] and arrows to [ROW] . . . . refer to backup supply for markets that would not have included Iraq." O'Leary Supp. Decl. ¶ 6. But Mr. O'Leary provides no specific basis for this statement other than his "knowledge and experience." *Id.* ¶ 3.<br><br>The letters that AstraZeneca UK wrote to the Ministry in 2011 and 2012 post-date the 2007 and 2009 supply chains by years. *See* Clarkson Decl. Exs. G and I. Ms. Clarkson states she was "unable to locate earlier registration forms" showing the sourcing of Seroquel at the time of the 2007 and 2009 supply chain maps. Clarkson Supp. Decl. ¶ 11. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 13 | "And a 2008 supply chain map indicates that AstraZeneca US's Newark facility was 'established as an alternative source of [Seroquel] tablets for most markets' and does not appear to exclude Iraq from those markets." (Opp. at 10.) | The Seroquel formulated by AZP LP was for the U.S. market only and was not sold in Iraq. | Clarkson Decl. ¶¶ 9, 11-12 (Seroquel sold to MOH was not formulated in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Seroquel formulated by AZP LP for U.S. supply only); *id.* Ex. G at 2-3, Ex. I (identifying non-U.S. manufacturers and API sources for Seroquel).<br><br>Clarkson Supp. Decl. ¶¶ 7-12 (confirming AZP LP was not registered to formulate Seroquel for the Iraq market).<br><br>O'Leary Decl. ¶¶ 7-9 (the Relevant Products were not sourced from the United States, with the sole exception of the formulation of Arimidex); *id.* Exs. H-K, M (Seroquel supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 5-6 (AZP LP was not a primary manufacturing site for the Seroquel supplied to Iraq and did not provide a backup supply for Seroquel supplied to Iraq during the relevant time period). | Plaintiffs' statement accurately quotes a 2008 supply chain map for Seroquel, which states that "Newark is established as an alternative source of tablets for most markets." O'Leary Decl. Ex. L at pdf p. 32.<br><br>AstraZeneca's rebuttal does not contradict Plaintiffs' statement. Paragraphs 7-9 of the O'Leary Declaration do not address the 2008 Seroquel supply chain map.<br><br>Paragraph 5 of Mr. O'Leary's supplemental declaration also does not meaningfully address the quoted statement from the 2008 Seroquel supply chain map. Mr. O'Leary asserts that "consistent with my understanding and experience . . . AZP LP's Newark facility did not serve as a backup supply function for Seroquel supplied to Iraq during the relevant timeframe." O'Leary Supp. Decl. ¶ 5. But Mr. O'Leary provides no specific basis for this statement beyond his "knowledge and experience." *Id.* ¶ 3. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 14 | "Another 2007 supply chain map similarly shows that AstraZeneca US sourced Seroquel ingredients from 'Texas, USA' and a '2nd plant in US.'" (Opp. at 10.) | These sourced ingredients are not API, but instead are widely available chemicals that are unimportant from a supply chain perspective. | O'Leary Supp. Decl. ¶ 7, Ex. K. | Plaintiffs' statement accurately describes a 2007 Seroquel supply chain map, which shows that AstraZeneca US sourced Seroquel ingredients from 'Texas, USA' and a '2nd plant in US.'"  O'Leary Decl. Ex. K at pdf p. 29.<br><br>AstraZeneca's rebuttal does not contradict Plaintiffs' statement. Paragraph 7 of Mr. O'Leary's supplemental declaration states that the ingredients sourced from these locations are "common, widely available chemicals" that "are not considered significant from a supply chain perspective."  O'Leary Supp. Decl. ¶ 7. Mr. O'Leary provides no specific bases for this statement besides his own "experience." *Id.* ¶ 1. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 15 | "In 2011, moreover, AstraZeneca UK wrote to Kimadia registering AstraZeneca US's Newark facility as a 'site for manufacturing and testing of Seroquel' prolonged release tablets." (Opp. at 10.) | The letter is for Seroquel XR. AZ UK was not approved as an alternative site for Seroquel XR until 2015.<br><br>AZ UK never sold Seroquel XR to MOH during the Alleged Period. | Clarkson Decl. ¶ 12 (transfer of Seroquel XR formulation to AZP LP was not approved until 2015); *id.* Ex. H (2011 letter requesting approval to transfer Seroquel XR formulation); *id.* Ex. L (reflecting 2015 decision date approving transfer).<br><br>Clarkson Supp. Decl. ¶ 14 (AZ UK was not permitted to supply Iraq with Seroquel XR formulated by AZP LP until 2015 approval).<br><br>Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Seroquel XR during the Alleged Period). | Plaintiffs' statement accurately quotes a September 21, 2011 letter from AstraZeneca UK to the Ministry "propos[ing] to register AstraZeneca Pharmaceutical[s] LP, 587 Old Baltimore Pike, Newark 19702, USA, as the new site for manufacturing and testing of Seroquel 50mg, 200mg, 300mg and 400mg Prolonged release tablets."  Clarkson Decl. Ex. H at pdf p. 35.<br><br>AstraZeneca's rebuttal does not contradict Plaintiffs' statement. AstraZeneca asserts that "AZ UK [sic] was not approved as an alternative site for Seroquel XR until 2015."  Plaintiffs' opposition explains (at 27) that the registration cited by AstraZeneca is a re-registration certificate that references only one of the dosages described in AstraZeneca UK's 2011 letter. Plaintiffs' opposition also explains (at 27-28) that even assuming that AstraZeneca US was not approved as a source of Seroquel XR until 2015, AstraZeneca UK's 2011 letter establishing AstraZeneca US's Newark facility as the global "site for manufacturing and testing of Seroquel" is independently jurisdictionally significant.<br><br>Plaintiffs address Mr. Ben Lakhal's declaration in their responses concerning Statements 30 and 33. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 16 | "The Registration Form . . . which AstraZeneca UK submitted to Kimadia on AstraZeneca US's behalf, identified AstraZeneca US's 'Product List' as including 'Seroquel.'" (Opp. at 10.) | The site registration form Plaintiffs cited specified that AZP LP manufactured "Seroquel for US supply only." The Seroquel formulated by AZP LP was not sold in Iraq. | Clarkson Decl. ¶ 9, 11-12 (Seroquel sold to MOH was not formulated in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Seroquel formulated by AZP LP for US supply only); *id.* Ex. G at 2-3, Ex. I (identifying non-U.S. manufacturers and API sources for Seroquel).<br><br>Clarkson Supp. Decl. ¶ 8 (AZP LP "product list" is not limited to products supplied to Iraq; AZP LP did not manufacture the Seroquel that was supplied to Iraq).<br><br>O'Leary Decl. ¶¶ 7-9 (the Relevant Products were not sourced from the United States, with the sole exception of the formulation of Arimidex); *id.* Exs. H-K, M (Seroquel supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 5-6 (AZP LP was not a primary manufacturing site for the Seroquel supplied to Iraq and did not provide a backup supply for Seroquel supplied to Iraq during the relevant time period). | Plaintiffs' statement accurately quotes the March 13, 2009 Registration Form that AstraZeneca UK submitted to the Ministry on AstraZeneca US's behalf, which contains a "Product List" that includes "Seroquel." Clarkson Decl. Ex. A at pdf p. 11.<br><br>AstraZeneca's rebuttal cites a different, ambiguous section of the Registration Form, which raises a fact dispute regarding the proper inference to draw from this section. *Id.* The portion of the Registration Form quoted by AstraZeneca responds to the following queries: "Are these preparations totally or partially manufactured by the firm itself? If partially manufactured, what are these products, where manufactured, and why?" AstraZeneca's response to this query states in relevant part: "Seroquel for US supply only." *Id.* A fair reading of this statement is that "Seroquel for US supply only" is "partially manufactured" by AstraZeneca US – *i.e.*, that the Seroquel that AstraZeneca US distributes within the United States is "partially manufactured" by AstraZeneca US, while the Seroquel exported *outside* the United States is "totally" manufactured by AstraZeneca US. This reading coheres with other documents indicating that AstraZeneca US exported Seroquel. *See* Plaintiffs' Responses concerning Statements 11-13.<br><br>Paragraph 8 of Ms. Clarkson's supplemental declaration asserts that the inclusion of Seroquel in the "Product List" for AstraZeneca US "reflects that Seroquel was one of the products manufactured by AZP LP, not that the Seroquel manufactured by AZP LP was supplied to Iraq." But this statement contradicts Paragraph 5 of Ms. Clarkson's original declaration, which states that these registrations contain "[i]nformation about manufacturing locations for drugs *sold to MOH*." (emphasis added). |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 17 | "Consistent with that registration, a subsequent FDA export certificate for Seroquel – again provided by AstraZeneca UK to Kimadia – described AstraZeneca US as Seroquel's 'license holder' and 'Manufacturer.'" (Opp. at 10.) | The FDA export certificate is for Seroquel XR and from after the Alleged Period.\n\nAZ UK never sold Seroquel XR to MOH during the Alleged Period. | Schultz Decl. Ex. 2 (Plaintiffs' proffered FDA certificate for Seroquel XR, issued May 25, 2016).\n\nClarkson Decl. ¶ 12 (transfer of Seroquel XR formulation to AZP LP was not approved until 2015); *id.* Ex. H (2011 letter requesting approval to transfer Seroquel XR formulation); *id.* Ex. L (reflecting 2015 decision date approving transfer).\n\nClarkson Supp. Decl. ¶ 14 (AZP LP was not registered to formulate Seroquel XR for supply to Iraq until 2015).\n\nBen Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Seroquel XR during the Alleged Period). | Plaintiffs' statement accurately describes and quotes a May 24, 2018 FDA certificate for the export of Seroquel XR to Iraq by AstraZeneca Pharmaceuticals LP.  *See* Schultz Decl. Ex. 2.  Although Plaintiffs have been unable to obtain FDA export certificates from during the "Alleged Period," it is a fair inference that AstraZeneca obtained similar export certificates during the alleged period.  AstraZeneca does not deny that it obtained such certificates.\n\nAstraZeneca asserts that the export certificate is for "Seroquel XR."  But AstraZeneca itself attached documents concerning Seroquel XR to its motion to dismiss and discussed Seroquel XR in its brief.  *See, e.g.*, Clarkson Decl. Exs. F, H, L. Plaintiffs' evidence regarding Seroquel XR responds to AstraZeneca's evidence concerning the same drug.\n\nAstraZeneca's assertion that it "never sold Seroquel XR to MOH during the Alleged Period" is based solely on the declaration of Mohamed Amin Ben Lakhal.  Mr. Ben Lakhal states that he joined AstraZeneca in February 2014 (after the "Alleged Period") and that his statements about Seroquel XR are not based on his "understand[ing]" from "speaking with knowledgeable people," "reviewing the contracts between AZ UK and MOH," and reviewing other "available sources of information."  Ben Lakhal Decl. ¶¶ 1, 4, 5.  Mr. Ben Lakhal does not identify or attach any of these sources of information. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 18 | "A similar export certificate for Seroquel identified AstraZeneca US as the 'Product license holder' and 'Manufacturer,' and the Newark facility as the manufacturing cite." (Opp. at 32-33.) | The FDA export certificate is for Seroquel XR and from after the Alleged Period.<br><br>AZ UK never sold Seroquel XR to MOH during the Alleged Period. | Schultz Decl. Ex. 2 (Plaintiffs' proffered FDA certificate for Seroquel XR, issued May 25, 2016).<br><br>Clarkson Decl. ¶ 12 (transfer of Seroquel XR formulation to AZP LP was not approved until 2015); *id.* Ex. H (2011 letter requesting approval to transfer Seroquel XR formulation); *id.* Ex. L (reflecting 2015 decision date approving transfer).<br><br>Clarkson Supp. Decl. ¶ 14 (AZP LP was not registered to formulate Seroquel XR for supply to Iraq until 2015).<br><br>Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Seroquel XR during the Alleged Period). | Plaintiffs' statement accurately describes and quotes a May 24, 2018 FDA certificate for the export of Seroquel XR to Iraq by AstraZeneca Pharmaceuticals LP.  Schultz Decl. Ex. 2.<br><br>AstraZeneca's rebuttal is identical to its rebuttal to Statement No. 17, *supra*.  Plaintiffs incorporate their response regarding that Statement. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 19 | "AstraZeneca UK elsewhere again described the United States as Seroquel's 'site for manufacturing.'" (Opp. at 39.) | The letter is for Seroquel XR. AZ UK was not approved as an alternative site for Seroquel XR until 2015.<br><br>AZ UK never sold Seroquel XR to MOH during the Alleged Period. | Clarkson Decl. ¶ 12 (transfer of Seroquel XR formulation to AZP LP was not approved until 2015); *id.* Ex. H (2011 letter requesting approval to transfer Seroquel XR formulation); *id.* Ex. L (reflecting 2015 decision date approving transfer).<br><br>Clarkson Supp. Decl. ¶ 14 (AZ UK was not permitted to supply Iraq with Seroquel XR formulated by AZP LP until 2015 approval).<br><br>Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Seroquel XR during the Alleged Period). | Plaintiffs' statement accurately describes and quotes a September 21, 2011 letter from AstraZeneca UK to the Ministry "propos[ing] to register AstraZeneca Pharmaceutical[s] LP, 587 Old Baltimore Pike, Newark 19702, USA, as the new site for manufacturing and testing of Seroquel 50mg, 200mg, 300mg and 400mg Prolonged release tablets." Clarkson Decl. Ex. H at pdf p. 35.<br><br>AstraZeneca's rebuttal is materially identical to its rebuttal to Statement No. 15, *supra.* Plaintiffs' incorporate their response regarding that statement. (Note that AstraZeneca's rebuttal cites to the incorrect page number. The statement quoted by AstraZeneca appears in Plaintiffs' opposition at 33.) |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| **Meronem** | | | | |
| 20 | "Plaintiffs allege that AstraZeneca US manufactured Meronem in the United States." (Opp. at 11.) | The registration form and other related documents show that Meronem for Iraq was not manufactured in the U.S. | Clarkson Decl. ¶ 12 (Meronem sold to MOH was not manufactured in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (AZP LP did not manufacture the Meronem that was supplied to Iraq).<br><br>O'Leary Decl. ¶¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem); *id.* Exs. C-G (Meronem supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 8-9 (confirming Meronem sent to Iraq did not have a secondary supply source because it was not a market of high enough commercial value). | Plaintiffs' statement accurately describes the TAC's allegations that AstraZeneca US manufactured Meronem in the United States. *See* TAC ¶ 189. AstraZeneca does not dispute that AstraZeneca US's Newark facility formulated Meronem. This allegation is supported by evidence described in subsequent sentences in Plaintiffs' opposition, which are addressed below in connection with Statements 21-32.<br><br>AstraZeneca's rebuttal does not contradict Plaintiffs' statement. The documents cited by AstraZeneca do not bear on what allegations Plaintiffs make in their complaint. Plaintiffs address these documents in their responses concerning Statements 21-32, which address facts supporting this allegation. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 21 | "AstraZeneca admits that 'the Meronem vials filled by [AstraZeneca US] . . . could potentially supply certain large foreign markets if there were shortages.'" (Opp. at 11.) | The registration form and other related documents show that Meronem for Iraq was not manufactured in the U.S.<br><br>Iraq is not a "large foreign market[]" that would have a backup supply source. | Clarkson Decl. ¶ 12 (Meronem sold to MOH was not manufactured in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (AZP LP did not manufacture the Meronem that was supplied to Iraq).<br><br>O'Leary Decl. ¶¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem); *id.* Exs. C-G (Meronem supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 8-9 (Iraq was not a large foreign market and did not have a secondary supply source because it was not a market of high enough commercial value). | Plaintiffs' statement accurately quotes the declaration of AstraZeneca employee James O'Leary, who states that "The Meronem vials filled by AZP LP were primarily for use in U.S. and Canadian markets, but some could potentially supply certain large foreign markets if there were shortages and if AZP LP was registered in that market as an alternative manufacturing site for Meronem." O'Leary Decl. ¶ 9 n.1.<br><br>AstraZeneca cites Mr. O'Leary's statement in his original declaration that he "understand[s] that AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem." O'Leary Decl. ¶ 9 n.1. As Plaintiffs' opposition explains (at 11 n.25), this statement is not based on Mr. O'Leary's personal knowledge. Moreover, the March 13, 2009 Registration Form for AstraZeneca US listed Meronem in AstraZeneca US's "Product List." Clarkson Decl. Ex. A § 1.K.<br><br>AstraZeneca also cites Mr. O'Leary's statement in his supplemental declaration that Iraq was not a "large foreign market" because it was "not a market of high enough commercial value to warrant the designation and registration of a secondary supply source." O'Leary Supp. Decl. ¶ 8. However, Mr. O'Leary does not provide a specific basis for this statement other than his own "knowledge and experience." Moreover, the TAC alleges (and AstraZeneca does not dispute at this stage) that the Iraqi pharmaceutical market was the "fastest-growing market in Eastern Europe, the Middle East, and Africa" from 2006-2011. TAC ¶ 114. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 22 | "No declarant excludes Iraq from such potential markets." (Opp. at 11.) | The declarants all confirm that the Meronem for Iraq was not manufactured in the U.S. | Clarkson Decl. ¶ 12 (Meronem sold to MOH was not manufactured in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (AZP LP did not manufacture the Meronem that was supplied to Iraq).<br><br>O'Leary Decl. ¶¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem); *id.* Exs. C-G (Meronem supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 8-9 (confirming Meronem sent to Iraq did not have a secondary supply source because it was not a market of high enough commercial value). | Plaintiffs' statement accurately describes the content of the declarations attached to AstraZeneca's opening brief. The preceding sentence in Plaintiffs' opposition quotes Mr. O'Leary's statement that "[t]he Meronem vials filled by AZP LP . . . could potentially supply certain large foreign markets if there were shortages and if AZP LP was registered in that market as an alternative manufacturing site for Meronem." O'Leary Decl. ¶ 9 n.1. Plaintiffs' statement correctly notes that no AstraZeneca declarant, including Mr. O'Leary, clearly excluded Iraq from the "large foreign markets" referenced in Paragraph 9 (footnote 1) of Mr. O'Leary's declaration. Plaintiffs also incorporate their Response concerning Statement 21, which addresses Mr. O'Leary's statements on this issue.<br><br>Paragraph 13 of Ms. Clarkson's supplemental declaration asserts that "AZP LP was not registered as a manufacturer for the Meronem supplied to Iraq." However, this assertion is based on the Registration Form and other ambiguous correspondence, which are addressed in Plaintiffs' responses concerning Statements 28-29. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 23 | "AstraZeneca's cited exhibits [] confirm that AstraZeneca US helped supply Meronem globally." (Opp. at 11.) | The Meronem for Iraq was not manufactured in the U.S. | Clarkson Decl. ¶ 12 (Meronem sold to MOH was not manufactured in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (AZP LP did not manufacture the Meronem that was supplied to Iraq).<br><br>O'Leary Decl. ¶¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem); *id.* Exs. C-G (Meronem supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 8-9 (confirming Meronem sent to Iraq did not have a secondary supply source because it was not a market of high enough commercial value). | Plaintiffs' statement is a topic sentence that accurately describes the evidence described in the sentences following this topic sentence, which are addressed below with respect to Statements 24, 25, and 26. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 24 | "The 2006 and 2007 Supply Chain Maps for Meronem also show that AstraZeneca US's 'Newark' facility performed 'vial filling' and 'secondary packing' functions for all markets." (Opp. at 11.) | Vial filling for the Meronem supplied to Iraq did not occur in the U.S. | O'Leary Decl. ¶¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem); *id.* Exs. C-G (Meronem supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 9, 10 (confirming Meronem sold to MOH was formulated and manufactured in Japan or Italy).<br><br>Clarkson Decl. ¶ 12 (Meronem sold to MOH was not manufactured in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (confirming AZP LP did not manufacture the Meronem that was supplied to Iraq). | Plaintiffs' statement accurately describes the 2006 and 2007 supply chain maps for Meronem, which show that AstraZeneca US's Newark facility performed "vial filling" and "secondary packing" functions for Meronem without regard to specific markets.  O'Leary Decl. Exs. E, F.<br><br>The supply chain maps cited by AstraZeneca do not support its assertion that "Meronem supply chains for Rest of World markets did not include AZP LP."  A 2005 supply chain map for Meronem indicates that AstraZeneca US's "Newark" facility was involved in the formulation of Meronem for "ROW" (Rest of World).  *Id.* Ex. C.  And a 2009 supply chain map for Meronem indicates that AstraZeneca US's Newark facility contributed to the "Fill/Formulation" process for Meronem without regard to specific markets.  *Id.* Ex. G.<br><br>Paragraphs 9 and 10 of Mr. O'Leary's supplemental declaration also do not meaningfully address these supply chain maps.  Paragraph 9 states that "vial filling" and "secondary packaging" "would have been performed by AZP LP on a backup basis for certain large markets, but not for a small market such as Iraq."  But Mr. O'Leary does not provide a specific basis for this statement beyond his own "knowledge and experience."  Paragraph 10 does not address Plaintiffs' statement. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 25 | "A 2009 Supply Chain Map similarly indicates that AstraZeneca US's Newark facility contributed to the 'Fill/Formulation' process for Meronem for all markets." (Opp. at 11.) | AZP LP only provided vial filling for Meronem for certain markets, but not for Iraq. | O'Leary Decl. ¶¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem); *id.* Exs. C-G (Meronem supply chains for Rest of World markets did not include AZP LP).<br><br>O'Leary Supp. Decl. ¶¶ 9, 10 (confirming Meronem sold to MOH was formulated and manufactured in Japan or Italy).<br><br>Clarkson Decl. ¶ 12 (Meronem sold to MOH was not processed in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (confirming AZP LP did not manufacture the Meronem that was supplied to Iraq). | Plaintiffs' statement accurately describes a 2009 supply chain map for Meronem, which shows that AstraZeneca US's Newark facility contributed to the "Fill/Formulation" process for Meronem without regard to specific markets.  O'Leary Decl. Ex. G.<br><br>AstraZeneca's rebuttal is substantially identical to its rebuttal to Statement 24 and relies on the same documents as its rebuttal to Statement 24.  Plaintiff incorporates its response regarding that statement. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 26 | "The site master files for the Newark facility list Meronem as among the 'medicinal products (produced at Newark or contractors) currently licensed for export.'" (Opp. at 11.) | The site master files do not indicate that any drug produced at AZP LP was licensed for export to Iraq. The Meronem formulated by AZP LP was for the U.S. market only and was not sold in Iraq. | Whyte Decl. Ex. A-G at § C 1.5 (identifying drugs produced at Newark or contractors generally licensed for export); *id.* Exs. H-I §§ 1.2, 6.1.1 (referring to drugs manufactured at Newark generally licensed for domestic distribution and export).<br><br>Clarkson Decl. ¶ 12 (Meronem sold to MOH was not manufactured in the United States); *id.* Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (confirming AZP LP did not manufacture the Meronem that was supplied to Iraq).<br><br>O'Leary Decl. ¶ 7, 9 n.1 (AZP LP was never registered in Iraq as an alternative manufacturing site for Meronem).<br><br>O'Leary Supp. Decl. ¶¶ 9, 10 (confirming Meronem sold to MOH was formulated and manufactured in Japan or Italy). | Plaintiffs' statement accurately quotes the site master files for AstraZeneca US's Newark facility.  *See, e.g.*, Whyte Decl. Ex. A-G § C 1.5.<br><br>AstraZeneca asserts that these site master files "do not indicate that any drug produced at AZP LP was licensed for export to Iraq."  But most of the site master files do not list any specific countries to which these drugs are exported, and none specifically exclude Iraq from their general statements that Meronem is "licensed for export."  *See id.*<br><br>AstraZeneca also cites §§ 1.2 and 6.1.1 of the site master files from 2012 and 2013 (Whyte Decl. Exs. H-I), but these sections state that the drugs currently licensed for export are set forth in "Appendix 2" to the site master file.  AstraZeneca has omitted this appendix from the excerpts of the site master files that it submitted with its motion. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 27 | "But the Registration Form attached to another declaration registered 'Meronem' in AstraZeneca US's 'Product List.'" (Opp. at 11.) | The Registration Form indicates that Meronem supplied to Iraq was not formulated in the U.S. | Clarkson Decl. ¶ 9 (listing Meronem's API manufacturing sites and formulation sites); *id.* ¶¶ 5, 6 (noting that site registration includes all information about the site—not just information about the drugs that AZ intends to export to MOH); *id.* Ex. A at 4 § L-2, B (Meronem manufactured by AZP LP for U.S. supply only); *id.* Exs. D, E (identifying non-U.S. manufacturers and API source for Meronem).<br><br>Clarkson Supp. Decl. ¶ 8 (AZP LP "product list" is not limited to products supplied to Iraq); *id.* ¶ 13 (confirming AZP LP was not registered as a manufacturer for the Meronem supplied to Iraq and could not supply Iraq with any Meronem vials that may have been filled by AZP LP). | Plaintiffs' statement accurately describes and quotes the Registration Form that AstraZeneca UK submitted to the Ministry on AstraZeneca US's behalf, which contains a "Product List" that includes "Meronem." Clarkson Decl. Ex. A § K.<br><br>AstraZeneca's rebuttal cites a different, ambiguous section of the Registration Form and raises a fact dispute regarding that section. The portion of the Registration Form quoted by AstraZeneca responds to the following query: "If partially manufactured, what are these products, where manufactured, and why?" In response to this query, AstraZeneca's Registration Form states: "Meronem - AstraZeneca Pharmaceuticals LP, labelling, packing, final testing and release for the US. Manufactured by Dainippon Sumitomo Pharma Co., Ltd., Japan or ACS Dobfar." Clarkson Decl. Ex. A § L-2. A fair reading of this statement is that AstraZeneca Pharmaceuticals LP labels, packs, and performs final testing on Meronem "releas[ed] for the US," while other companies manufacture Meronem released in the U.S. This statement does not clearly say that Meronem released *outside* the U.S. is manufactured by non-U.S. entities. AstraZeneca's proffered interpretation that this statement – that the "Meronem manufactured by AZP LP [is] for U.S. supply only" – contradicts other documents indicating that AstraZeneca US exported Seroquel. *See* Plaintiffs' Responses concerning Statements 11-13. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 28 | "Indeed, an earlier 2009 letter signed by the declarant described both Meronem and Seroquel as 'Drug Products for Iraqi market' for which 'AstraZeneca Pharmaceutical[s] LP, Newark, Delaware 19702 USA' was the 'manufacture[r].'" (Opp. at 27.) | The cited letters make clear that AZP LP was not the manufacturer of the Seroquel and Meronem sold in Iraq. | Clarkson Decl. Ex. A at 4 § L-2, Ex. B (Meronem manufactured by AZP LP for U.S. supply only).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (confirming AZP LP did not manufacture Seroquel and Meronem sold in Iraq). | Plaintiffs' statement accurately quotes an April 29, 2009 letter that AstraZeneca UK sent to the Ministry, which identifies Seroquel and Meronem as "Drug Products for the Iraqi market" for which "AstraZeneca Pharmaceutical[s] LP" was the "manufacture[r]." Clarkson Decl. Ex. B at pdf p. 17.<br><br>AstraZeneca's rebuttal quotes a different letter (included in the same exhibit) stating that the "Meronem and Seroquel that is processed at AstraZeneca Pharmaceuticals[s] LP, Newark, Delaware 19702, USA is for the US market only and is not for export to Iraq." *Id.* at pdf p. 16.  However, this statement is contradicted both by the letter cited above and by other AstraZeneca documents, including site master files indicating that Meronem and Seroquel were among the products "export[ed]" by the Newark facility, and supply chain maps indicating that Meronem and Seroquel were exported to foreign markets.  These documents are addressed in Plaintiffs' responses concerning Statements 11-14, 16-17, 21, and 24-26.  Plaintiffs also incorporate their response concerning Statement No. 29. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 29 | "This letter also contradicts AstraZeneca's interpretation of its other letter stating that the 'Meronem and Seroquel that is processed' at Newark "is for the US market only.' In that context, 'processed' appears to mean packing and distribution, not formulation." (Opp. at 27 n.30.) | The cited letters make clear that AZP LP was not the manufacturer of the Seroquel and Meronem sold in Iraq. | Clarkson Decl. Ex. A at 4 § L-2, Ex. B (identifying that AZP LP formulated only Arimidex for Iraq).<br><br>Clarkson Supp. Decl. ¶¶ 9-10, 12 (confirming AZP LP did not manufacture Seroquel and Meronem sold in Iraq). | Plaintiffs' statement draws a reasonable inference based on a contradiction between two documents, one of which lists Meronem and Seroquel as "Drug Products for Iraqi market" for which AstraZeneca US was the "manufacture[r]," and the second of which states that the "Meronem and Seroquel that is processed" at Newark "is for the US market only." Clarkson Decl. Ex. B at pdf pp. 16, 17.<br><br>Plaintiffs' statement offers a reasonable reconciliation of these two contradictory statements:  the second statement's reference to "processing" could refer to packing and distribution, rather than formulation.  As Plaintiffs explained (Opp. at 27 n.30), this inference also coheres with other AstraZeneca exhibits.  *See* O'Leary Decl. Exs. G, O.<br><br>Ms. Clarkson's supplemental declaration states that she used "processed" as "a broad term referring to any manufacturing activities generally." Clarkson Supp. Decl. ¶¶ 9-10, 12. However, Ms. Clarkson does not offer another reasonable way to reconcile her contradictory statements on this point:  she asserts (*id.* ¶ 10) that her letter identified only Arimidex as a drug that was "manufacture[d]" by AstraZeneca US.  But the subject of Ms. Clarkson's letter is: "AstraZeneca Pharmaceuticals LP, Newark, Delaware for AstraZeneca UK Limited.  Drug Substances' sourcing," indicating that the entire letter pertained to drugs manufactured by AstraZeneca US.<br><br>Ms. Clarkson's declaration also does not meaningfully address the numerous other documents (such as site master files and supply chain maps) showing that Meronem manufactured at AstraZeneca US was exported globally, which contradict her statement that this Meronem was "for the US market only."  *See* Plaintiffs' Responses concerning Statements 20-28. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| **Crestor** | | | | |
| 30 | "Plaintiffs also have evidence about at least one other drug AstraZeneca UK sold the Ministry: the cholesterol medication Crestor." (Opp. at 11.) | AZ UK did not sell Crestor to MOH during the Alleged Period. | Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Crestor during the Alleged Period).<br><br>Marchany Decl. ¶ 4 (IPR never manufactured API for Crestor). | Plaintiffs' statement accurately describes a table obtained from the Iraqi pharmacists' trade association, which indicates that AstraZeneca registered Crestor for sale with the Ministry. *See* Schultz Decl. Ex. 15.<br><br>AstraZeneca's assertion that it "did not sell Crestor to MOH during the Alleged Period" relies solely on the declaration of Mr. Ben Lakhal, who states that "I understand that AZ UK did not enter into any contract with MOH for the sale of . . . . Crestor. . . during the Alleged Period." Ben Lakhal Decl. ¶ 5. However, Mr. Ben Lakhal joined AstraZeneca in 2014 (after the "Alleged Period"), and his statement is not based on his personal knowledge, but is instead his "understanding" from "speaking with knowledgeable people," "reviewing the contracts between AZ UK and MOH," and reviewing other "available sources of information," which Mr. Ben Lakhal does not describe. *Id.* ¶¶ 1, 4, 5.<br><br>Paragraph 4 of the Ms. Marchany's declaration does not contradict Plaintiffs' statement or support AstraZeneca's rebuttal. Ms. Marchany states that "IPR never manufactured the API for Crestor," which does not negate Plaintiffs' evidence showing that AstraZeneca registered Crestor for sale with the Ministry, or support AstraZeneca's statement that it "did not sell Crestor to MOH during the Alleged Period." |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 31 | "A drug registry table obtained from the Iraqi pharmacists' trade association shows that AstraZeneca UK sold Kimadia at least three formulations of Crestor (5mg, 10mg, and 20mg tablets), and each formulation was manufactured by AstraZeneca's U.S. affiliate IPR Pharmaceuticals, Inc." (Opp. at 12.) | AZ UK did not sell Crestor to MOH during the Alleged Period. | Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Crestor during the Alleged Period).<br><br>Marchany Decl. ¶ 4 (IPR did not manufacture API for Crestor for any markets).<br><br>Clarkson Supp. Decl. ¶ 15, Ex. N (Crestor's registration identified a non-U.S. source for the drug's API). | Plaintiffs' statement accurately describes a table obtained from the Iraqi pharmacists' trade association, which indicates that AstraZeneca registered Crestor for sale with the Ministry. *See* Schultz Decl. Ex. 15.<br><br>AstraZeneca's rebuttal is identical to its rebuttal to Statement 30, and the first two documents it cites are the same as those it cites in its rebuttal to Statement No. 30. Plaintiffs' incorporate their response concerning Statement No. 30.<br><br>Paragraph 15 and Exhibit N to Ms. Clarkson's supplemental declaration lend further support to Plaintiffs' statement. Ms. Clarkson states that AstraZeneca UK "appl[ied] to register Crestor with MOH [in] 2007," and that the drug registration (Clarkson Supp. Decl. Ex. N) states that IPR Pharmaceuticals "undert[ook] the formulation and tableting of the finished product." Ms. Clarkson's assertion that IPR Pharmaceuticals did not manufacture the API for Crestor does not negate these facts. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 32 | "AstraZeneca's FDA registrations also show that at least one U.S. subsidiary – IPR Pharmaceuticals, Inc. – performed 'API Manufacturing.' . . . At least one, Crestor, appears to have entailed U.S. API manufacturing." (Opp. at 39-40.) | IPR did not manufacture API for Crestor or any drug sold to MOH during the Alleged Period. | Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Crestor or Zomig).<br><br>Marchany Decl. ¶ 4 (IPR only manufactured API for one drug exported to the "Rest of World" markets, Zomig, which was not approved in Iraq).<br><br>Clarkson Supp. Decl. ¶ 15, Ex. N (Crestor's registration identified a non-U.S. source for the drug's API); *id.* ¶ 17 (Zomig was not approved to be sold to MOH during the Alleged Period). | Plaintiffs' statements draw reasonable inferences from a table obtained from the Iraqi pharmacists' trade association and from AstraZeneca's FDA registrations.  The table obtained from the Iraqi pharmacists' trade association indicates that Crestor was manufactured by "IPRpharmaceuticals Inc [sic]."  Schultz Decl. Ex. 15.  AstraZeneca's FDA establishment registrations list "IPR Pharmaceuticals, Inc." as an affiliate of AstraZeneca that is engaged in "API manufacture."  *See*, *e.g.*, Whyte Decl. Ex. J at pdf p. 63.<br><br>Paragraph 4 of the Marchany Declaration states that "IPR never manufactured the API for Crestor."  However, Ms. Marchany does not deny that IPR was involved in other aspects of manufacturing for Crestor.  Moreover, the drug registration form for Crestor attached to Ms. Clarkson's supplemental declaration lists IPR Pharmaceuticals as the "manufacturer" of Crestor and indicates that IPR Pharmaceuticals "undertakes the formulation and tableting of the finished product" for Crestor. Clarkson Supp. Decl. Ex. N at pdf pp. 11, 12.<br><br>Plaintiffs address Mr. Ben Lakhal's Declaration in their response regarding Statement 30. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| | **Onglyza and Cubicin** | | | |
| 33 | "This same table indicates that AstraZeneca UK sold Kimadia two other U.S.-manufactured drugs that AstraZeneca's motion fails to address: Onglyza and Cubicin. *Id.*" (Opp. at 12 n.27.) | AZ UK did not sell Onglyza or Cubicin to MOH during the Alleged Period. | Ben Lakhal Decl. ¶ 5 (AZ UK did not enter into any contract with MOH for the sale of Onglyza or Cubicin during the Alleged Period).<br><br>Clarkson Supp. Decl. ¶¶ 18, 20, Exs. O-P (Onglyza's and Cubicin's registrations both identified non-AZ manufacturers and non-U.S. sources for the drugs' API). | Plaintiffs' statement accurately describes a table obtained from the Iraqi pharmacists' trade association, which indicates that AstraZeneca registered Onglyza and Cubicin for sale with the Ministry.  *See* Schultz Decl. Ex. 15.<br><br>AstraZeneca's assertion that it "did not sell Onglyza or Cubicin to MOH during the Alleged Period" relies solely on the declaration of Mr. Ben Lakhal, who states that "I understand that AZ UK did not enter into any contract with MOH for the sale of [these drugs] during the Alleged Period."  Ben Lakhal Decl. ¶ 5.  However, Mr. Ben Lakhal joined AstraZeneca in 2014 (after the "Alleged Period"), and his statement is not based on his personal knowledge, but is instead his "understand[ing]" from "speaking with knowledgeable people," "reviewing the contracts between AZ UK and MOH," and reviewing other "available sources of information," which Mr. Ben Lakhal does not describe.  *Id.* ¶¶ 1, 4, 5.<br><br>Paragraphs 18 and 20 and Exhibits O and P to Ms. Clarkson's supplemental declaration lend further support to Plaintiffs' statement.  Exhibits O and P confirm that AstraZeneca UK registered Cubicin and Onglyza for sale with the Ministry during the "Alleged Period."  Both of these registration forms also indicate that the "manufacturers" of these drugs were U.S. companies (Hospira, Inc. and Bristol-Myers Squibb, respectively).  Ms. Clarkson's assertion that IPR Pharmaceuticals did not manufacture the API for these drugs does not negate these facts. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| **API** | | | | |
| 34 | "As for Plaintiffs' stray comments about drug formulation that AstraZeneca now cites, none of those comments conflicts with a finding of jurisdiction here." (Opp. at 3.) | Plaintiffs repeatedly told the D.C. Circuit that the API manufacturing was the jurisdictionally significant sourcing and formulation was unimportant. | App. B (listing Plaintiffs' statements about API). | Plaintiffs' statement is a legal argument supported by the facts set forth in Plaintiffs' briefing.  *See* Opp. at 35-39; Surreply at 9-12. <br><br> AstraZeneca's rebuttal is incorrect.  Plaintiffs never characterized API as "the" jurisdictionally significant factor related to drug sourcing.  Plaintiffs' used the word "unimportant" to describe formulation only a single time (in their reply brief before the D.C. Circuit), and only in relation to API.  Plaintiffs continue to believe that API is more important than formulation, but do not (and have never) taken the position that formulation is irrelevant or cannot support personal jurisdiction. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 35 | "AstraZeneca does not (and presumably cannot) deny that it ever used U.S.-sourced API for any of the drugs it provided to the Ministry." (Opp. at 3 (emphasis in original).) | No AstraZeneca entity made or supplied AZ UK with U.S.-manufactured API for any product with U.S.-sourced API that AZ UK sold to MOH during the Alleged Period. | Whyte Decl. ¶¶ 3, 8, Exs. J-N (AZP LP never made API and IPR Pharmaceuticals was the only U.S. AstraZeneca facility that made API during the Alleged Period).<br><br>O'Leary Decl. ¶¶ 7-8 (API for the Relevant Products sold in Iraq was never manufactured in the United States).<br><br>Marchany Decl. ¶ 4 (IPR did not manufacture API for any drugs exported to Iraq).<br><br>Clarkson Supp. Decl. ¶ 6 (confirming AZ UK's Macclesfield facility was the sole manufacturer of the API for Arimidex); *id.* ¶¶ 15, 17, Ex. N (Crestor's registration identified a non-U.S. source for Crestor's API). | Plaintiffs' statement accurately describes AstraZeneca's opening brief and the declarations and exhibits attached to that brief, none of which denied that AstraZeneca ever used U.S.-sourced API for any of the drugs it provided to the Ministry.<br><br>Although AstraZeneca's reply brief asserts, for the first time, that "[n]o AstraZeneca entity made or supplied AZ UK with U.S.-manufactured API for any product with U.S.-sourced API that AZ UK sold to MOH during the Alleged Period," none of the declarations or exhibits attached to AstraZeneca's opening brief or reply brief make that statement. Instead, these declarants all address specific drugs or manufacturing sites.<br><br>The statement in AstraZeneca's reply brief also does not state definitively that AstraZeneca UK never used U.S.-sourced API for any of the drugs it provided to the Ministry. Instead, it states that "no *AstraZeneca entity* made or supplied AZ UK with U.S. manufactured API for any product with U.S.-sourced API that AZ UK sold to MOH during the Alleged Period." This statement does not rule out that AstraZeneca manufactured drugs for the Ministry using U.S. API from non-AstraZeneca affiliated companies.<br><br>The declarations and exhibits cited by AstraZeneca also do not support its parenthetical characterizations of those documents. For example, the FDA registrations attached to Mr. Whyte's declaration do not support AstraZeneca's assertion that "IPR Pharmaceuticals was the only U.S. AstraZeneca facility that made API during the Alleged Period." The earliest FDA registration attached to Mr. Whyte's declaration is from 2010, so these registrations do not cover the entire "Alleged Period." |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| **Procedural History** | | | | |
| 36 | "AstraZeneca does not dispute these allegations [that U.S. sourcing increased black market price]." (Opp. at 37.) | AstraZeneca vigorously disputed these allegations. | Memorandum in Support of Motion to Dismiss for Lack of Personal Jurisdiction at 2 n.2, 19 n.14 (Feb. 5, 2020), Dkt. No. 130-1.<br><br>Defendants' Reply Memorandum of Law in Support of Motion to Dismiss for Lack of Personal Jurisdiction at 11 (Feb. 5, 2020), Dkt. No. 131.<br>Brief for Defendants-Appellees at 64-65 (D.C. Cir. Mar. 12, 2021), Dkt. No. 1889719. | Plaintiffs' statement fairly describes AstraZeneca's position on this motion to dismiss.  For purposes of this motion, AstraZeneca has not contested that the U.S. sourcing of drugs increased their black market prices.<br><br>None of the statements cited by AstraZeneca specifically dispute the factual allegation that the U.S. sourcing of drugs increased their black market prices.  Instead, with one exception, each of these statements disputes the relevance of this fact.  *See, e.g.*, Dkt. 130-1 at 19-20 n.14 (asserting that this fact is "jurisdictionally irrelevant.").<br><br>The one exception is a boilerplate footnote at the beginning of the Foreign Defendants' brief asserting that "Defendants deny all alleged wrongdoing."  *Id.* at 2 n.2.  This statement does not meaningfully contest, for purposes of Defendants' motion, the allegation that U.S. sourcing increased the black-market prices of drugs. |
| 37 | "AstraZeneca withheld evidence so it could object to jurisdictional discovery, insisting that more facts 'would not change the court's jurisdictional analysis.'" (Opp. at 1.) | AstraZeneca did not withhold any evidence. | Mishkin Supp. Decl. ¶¶ 2-3 (explaining AZ undertook an extensive investigation, commenced after the D.C. Circuit's reversal). | Plaintiffs' statement is a reasonable inference from AstraZeneca's failure to provide any of the evidence it now cites over a more than five-year period of briefing.  AstraZeneca's assertion that it began an investigation after the D.C. Circuit's reversal does not refute that it possessed all of the evidence earlier. |

| # | Plaintiffs' Assertion | AstraZeneca Rebuttal | AstraZeneca Citations | Plaintiffs' Response |
|---|---|---|---|---|
| 38 | "AstraZeneca . . . refused to produce any evidence." (Opp. at 1.) | AstraZeneca produced the contracts cited in the Complaint. | Mishkin Declaration in Support of Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Exs. 1-8 (Feb. 5, 2020), Dkt. No. 130-5 (contracts identified in Plaintiffs' Second Amended Complaint). | Plaintiffs' statement accurately describes AstraZeneca's failure to produce evidence regarding its manufacturing practices in connection with its original motion.  AstraZeneca's original motion "challenged 'personal jurisdiction on the pleadings,' based solely on 'documents incorporated by reference in the complaint'" – i.e., the specific contracts cited in the TAC.  Opp. at 20 (quoting Dkt. 130-1 at 7.)  AstraZeneca thus did not offer any witness testimony authenticating or explaining those contracts. |