**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JOSHUA ATCHLEY *et al.*, |
| Plaintiffs, |
| v. |
| ASTRAZENECA UK LIMITED *et al.*, |
| Defendants. |

Case No. 1:17-CV-02136 (RJL)

## JOINT SUBMISSION REGARDING CASE MANAGEMENT

Pursuant to the Court's Minute Order dated March 1, 2023, the parties to this action respectfully set forth their positions below regarding case management planning for this litigation.

## I.   JOINT STATEMENT

On March 1, 2023, this Court stayed further proceedings in this action pending the ruling in *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S.), which the Supreme Court decided on May 18, 2023, *see* 143 S. Ct. 1206 (2023).  *See* Minute Order (Mar. 1, 2023).  Since the Court's March 1, 2023 Minute Order, the parties have met and conferred on multiple occasions regarding case management.  The parties have reached agreement on certain aspects of a case management plan but disagree about other aspects, including whether discovery should continue to be stayed while Defendants seek certiorari.  This joint submission presents both the issues on which the parties agree and the parties' respective positions on the disputed issues.

## II.   AREAS OF AGREEMENT

The parties agree that any discovery should occur in phases, with the initial phase ("Phase 1") focusing on certain issues, but they disagree as to what all of the Phase 1 issues should be.  Apart from their dispute over the Phase 1 issues, the parties agree that supplemental legal briefing should take place simultaneously with other Phase 1 proceedings on the Anti-Terrorism

Act's ("ATA's") "act of international terrorism" element of Plaintiffs' direct-liability claims, which the D.C. Circuit left for the Court to decide in the first instance on remand. *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 238 (2022).[1]

The parties agree that once they receive guidance from the Court on the disputed issues discussed below, in particular whether the discovery stay should continue and what issues should be included in Phase 1, they will meet and confer again in order to provide the Court with an updated Joint Meet and Confer Statement relating to items that were left open in their prior submission (ECF No. 73) and any other information requested by the Court.  Depending on the Court's ruling on the first disputed issue below, the parties will also meet and confer to propose a case schedule as appropriate.

## III.   PARTIES' POSITIONS ON DISPUTED ISSUES

The principal issues on which the parties have been unable to agree as of this submission include (1) whether the discovery stay should continue; (2) what issues should be addressed in Phase 1 and post-Phase 1 discovery; and (3) whether bellwethers should be required for certain discovery.  The parties' respective positions on these issues are set forth below.  Should the Court wish to discuss the issues directly with the parties, the parties are happy to provide their respective availability for a status conference.

---

[1] The AstraZeneca Defendants state that their general agreement with Defendants' positions in this submission is without prejudice to their arguments in their Motion to Dismiss (*see* ECF Nos. 149, 161, 169), including that they should be dismissed without any discovery.  To the extent discovery proceeds as to them, the Foreign Defendants (AstraZeneca UK Limited, F. Hoffmann-La Roche Ltd, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Pharmaceutica NV, and Pfizer Enterprises SARL) state that they consent only to jurisdictional discovery in Phase 1.  *See, e.g.*, ECF No. 147-1, at 2 n.1; ECF Nos. 149, 163, 177.

A.    **Disputed Issue No. 1:  Whether the Discovery Stay Should Continue**

   1.    **Defendants' Position**

Defendants submit that the current stay of discovery should remain in place until the ongoing appellate proceedings have concluded. This week, Defendants are filing their petition for *certiorari*, which will request that the Supreme Court vacate the D.C. Circuit's opinion in this action and remand for reconsideration in light of the Supreme Court's recent decision in *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), or, alternatively, that the Supreme Court grant *certiorari* on the merits.  As this Court anticipated in its March 1, 2023 Minute Order, the Supreme Court's guidance in *Taamneh* regarding the proper interpretation of the ATA and its aiding-and-abetting provision fundamentally reshapes this case.

*First*, the Supreme Court held that the ATA's aiding-and-abetting analysis must focus "on assistance to the tort for which plaintiffs seek to impose liability," *i.e.*, the specific "act of international terrorism that injured the plaintiffs." *Taamneh*, 143 S. Ct. at 1225, 1230.  The Ninth Circuit in *Taamneh* therefore had erred by looking for alleged "assistance to ISIS' activities in general" instead of "focus[ing]" on aid to the specific ISIS terrorist attack at issue.  *Id.* at 1229. The D.C. Circuit in this case similarly erred by asking whether Defendants allegedly provided "substantial assistance to Jaysh al-Mahdi" generally, without focusing on aid to the specific attacks that injured Plaintiffs.  *Atchley*, 22 F.4th at 225; *see* 22 F.4th at 224.

*Second*, *Taamneh* cautioned against a "rigid[] focus[] on" the "facts" or "exact phraseology" of *Halberstam*, 705 F.2d 472, the D.C. Circuit case that the ATA's statutory findings identify as "providing the proper legal framework for civil aiding and abetting . . . liability."  143 S. Ct. at 1218, 1223 (cleaned up).  Instead, *Taamneh* instructed courts to follow the common law of aiding and abetting and ask whether "the defendant consciously and culpably participated in a wrongful act so as to help make it succeed."  *Id.* at 1223 (cleaned up).  The Supreme Court held

that the Ninth Circuit in *Taamneh* had erred by treating *Halberstam*'s six factors as "a sequence of disparate, unrelated considerations without a common conceptual core," instead of zooming out and asking whether the defendant's "participation" in the tort was "significant and culpable enough to justify attributing the principal wrongdoing to" them.  *Id.* at 1229.  Here too, the D.C. Circuit ticked through *Halberstam*'s six factors without asking that big-picture question.  The court concluded that four factors favored Plaintiffs, one favored Defendants, and one was neutral, and thus deemed the alleged assistance to be substantial.  *Atchley*, 22 F.4th at 222–24.  On every factor, the court compared Defendants' alleged transactions with the Iraqi Health Ministry to Linda Hamilton's assistance to Bernard Welch's burglary enterprise in *Halberstam*.  *Id.*  The decision below thus sidestepped the fundamental inquiry:  whether global medical companies "consciously and culpably participated" in each specific attack that injured Plaintiffs, *i.e.*, whether each defendant "culpably associated themselves with the . . . attack, participated in it as something they wished to bring about, or sought by their action to made it succeed."  *Taamneh*, 143 S. Ct. at 1223, 1226 (cleaned up).  In opposing a continuation of the stay, Plaintiffs similarly avoid this fundamental inquiry, instead noting immaterial factual distinctions to *Taamneh* that miss the bigger picture.

*Third*, *Taamneh* held that the ATA's requirement that a defendant "knowingly provide substantial assistance" does not create distinct knowledge and substantiality requirements.  *Id.* at 1229.  Instead, the statute directs "a single inquiry" considering knowledge and substantiality "in tandem" to "capture conscious and culpable conduct."  *Id.* at 1225, 1229.  The Ninth Circuit in *Taamneh* thus had erred by "separat[ing] the 'knowing' and 'substantial' subelements," instead of considering them together.  *Id.* at 1229.  The D.C. Circuit did the same, treating knowledge and substantiality as separate, distinct inquiries.  *Atchley*, 22 F.4th at 221–24.  The panel's decision thus missed what *Taamneh* makes clear is "the essence" of aiding-and-abetting liability:  whether

4

defendants so culpably "participat[ed]" in the tort as "to justify attributing the principal wrongdoing to" them.  143 S. Ct. at 1229.

*Fourth*, *Taamneh* clarified the ATA's knowledge requirement, instructing courts to examine whether the defendant "conscious[ly] participat[ed] in the underlying tort."  *Id.* at 1222. The Supreme Court approvingly cited common-law cases asking if the defendant "calculated and intended to produce" the tort or acted "with the intent of facilitating" its commission.  *Id.* at 1221– 22 (citations omitted).  The Ninth Circuit thus had erred by asking only "whether the defendants were 'generally aware' of their role in ISIS' overall scheme," instead of considering defendants' "state of mind" both as "to their actions and the tortious conduct."  *Id.* at 1229.  The D.C. Circuit did much the same in this case, asking only whether petitioners allegedly acted "with a general awareness" of supporting "terrorist acts."  *Atchley*, 22 F.4th at 223.  As in *Taamneh*, the court "should have given much greater weight to defendants' . . . undisputed lack of intent to support" terrorism.  143 S. Ct. at 1229–30.

*Fifth*, while *Taamneh* involved only an aiding-and-abetting claim, the Supreme Court's decision also warrants reconsideration of the D.C. Circuit's proximate-causation holding on direct liability.  Aiding-and-abetting principles and proximate causation play similar roles, limiting liability for acts "too remote," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (citation omitted), or "tangential" to the harm, *Taamneh*, 143 S. Ct. at 1220.  A conclusion that Plaintiffs' injuries were too distant from Defendants' alleged conduct to support aiding-and-abetting liability should cast serious doubt on the idea that Defendants can be directly liable for that same injury.  Indeed, the D.C. Circuit found Plaintiffs' direct-liability claims "more challenging."  *Atchley*, 22 F.4th at 225.

Accordingly, given the Supreme Court's clarification of the governing standards and the D.C. Circuit's departures from those standards, Defendants believe it is likely that the Supreme

Court will grant *certiorari* in order to vacate and remand for reconsideration consistent with *Taamneh* or, alternatively, grant *certiorari* on the merits.  The Supreme Court routinely grants, vacates, and remands where, as here, "intervening developments . . . reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration."  *Lawrence v. Chater*, 516 U.S. 163, 167 (1996).  The paradigmatic example is when the Supreme Court issues an opinion "after the decision under review" that "change[s] or clarifie[s] the governing legal principles in a way that could possibly alter the decision" below.  *See Flowers v. Mississippi*, 579 U.S. 913, 913 (2016) (Alito, J., dissenting).  Indeed, in *Taamneh*'s companion case, *Gonzalez v. Google LLC*, the Supreme Court vacated and remanded so that the Ninth Circuit could reexamine, in light of *Taamneh*, an ATA complaint containing both direct and aiding-and-abetting claims.  143 S. Ct. 1191, 1191–92 (2023).  The same result is likely here: after the D.C. Circuit issued its opinion, *Taamneh* clarified the ATA's legal requirements in ways that undoubtedly bear on the D.C. Circuit's decision.[2]

The same reasons that counseled in favor of the stay of discovery that the Court ordered three months ago thus apply with even greater force now.  The Supreme Court's interpretation of the ATA makes clear that Plaintiffs have not yet demonstrated that their claims can survive a motion to dismiss under the proper legal framework.  Defendants submit that reconsideration of the allegations under the correct legal standard announced in *Taamneh* should lead the D.C. Circuit, or the Supreme Court, to affirm this Court's dismissal or, at a minimum, to substantially narrow the claims.  This would render discovery entirely unnecessary or, alternatively, reshape the contours of the case and clarify what discovery, if any, may be required.

---

[2] Contrary to Plaintiffs' suggestion that two district courts have determined that the D.C. Circuit's decision in *Atchley* remains "good law" after *Taamneh*, *infra* at 10–11, neither court was presented with, or decided, that issue; each focused on the allegations in its own case, not whether Plaintiffs' allegations state a claim.

6

Plaintiffs complain of delay, but as they acknowledge, the Supreme Court will decide the petition when it returns from summer recess in only a few months.  Plaintiffs thus cannot show any prejudice resulting from awaiting that decision, nor from any further proceedings that the Supreme Court believes are warranted.  As the Court is aware, the passage of time since Plaintiffs' injuries is largely due to Plaintiffs waiting years to file their claims, their multiple amendments to the complaint, and the time it understandably took both this Court and the D.C. Circuit to consider the motions to dismiss.  Plaintiffs' counsel's concern regarding possible "loss of evidence" in the next few months is similarly unfounded and belied by their Phase 1 proposal, which would excuse their clients from any discovery in Phase 1.  *See infra* at 11–12.

As the Court held in its March 1, 2023 Minute Order, it was prudent to stay proceedings because of the possibility that *Taamneh* would change the legal landscape on issues material to this case.  Now that *Taamneh* has done so, and clarified the "appropriate framework" for aiding-and-abetting liability in a manner that validates this Court's prior dismissal of this action, 143 U.S. at 1225, it remains prudent to maintain that stay pending the outcome of appellate proceedings in the next few months.  Given that the contours of this litigation remain in flux, and are likely to be clarified shortly by the Supreme Court and the D.C. Circuit, there is no reason to begin discovery and impose corresponding burdens on the parties and non-parties.

### 2.      Plaintiffs' Position

The Supreme Court's decision in *Twitter* confirms that the D.C. Circuit's decision was correct and that discovery should start promptly.  It also confirms that this Court should not enter another stay while Defendants seek certiorari on issues the Supreme Court just decided.

Courts rarely grant stays pending a certiorari petition.  *See In re A.F. Moore & Assocs.*, 974 F.3d 836, 841 (7th Cir. 2020) (calling such stays "a rare exception"); *Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007) (such stays appropriate only "[i]n exceptional cases").  To obtain a stay,

Defendants must show: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm; (3) a stay will not substantially injure other parties; and (4) the public interest supports a stay. *See de Csepel v. Hungary*, 2022 WL 3026998, at *2 (D.D.C. Aug. 1, 2022). Defendants "must establish a pressing need" for a stay pending certiorari. *Naegele v. Albers*, 2014 WL 12683359, at *2 (D.D.C. Dec. 2, 2014) (cleaned up). Defendants cannot make these showings.

### a. Defendants Are Unlikely To Succeed On The Merits Of Their Certiorari Petition

The Court should deny a stay at the outset because Defendants are unlikely to obtain Supreme Court review and even less likely to obtain reversal. Certiorari grants are rare, *see Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venez.*, 185 F. Supp. 3d 233, 250 (D.D.C. 2016) (grant rate is 0.9%), and stays based on that slim chance are rarely appropriate, *see Kurd v. Republic of Turk.*, 2022 WL 4379032, at *2 (D.D.C. Sept. 21, 2022) (denying stay pending certiorari when D.C. Circuit's opinion was "comprehensive," "there was no dissenting opinion," and "request for *en banc* consideration was denied").

Defendants' stated intention to seek a grant, vacate, and remand ("GVR") does not change that analysis. The GVR procedure would apply only if there were a "reasonable probability" the D.C. Circuit would reach a different result in light of *Twitter*. *Lawrence*, 516 U.S. at 167. Even then, a GVR would be only "potentially appropriate," and would remain unwarranted if "the delay and further cost entailed in a remand are not justified by the potential benefits of further reconsideration." *Id.* at 167-68. Here, the D.C. Circuit's thorough and fact-bound decision in *Atchley* accords with *Twitter*. Any minor differences between the two make no difference to the outcome and would not justify more delay in this nearly six-year-old case.

Defendants' attempt (at 3-5) to manufacture inconsistency between *Atchley* and *Twitter* fails. Both courts held there must be some – but not a "strict" – nexus between a defendant's aid and the relevant terrorist act. *Compare Twitter*, 143 S. Ct. at 1224-25 (recognizing even "remote

support can still constitute aiding and abetting"), *with Atchley*, 22 F.4th at 225 ("Substantial assistance to the ultimate deed – whether provided directly or indirectly – is enough."). Both explained that the factors from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), guide the analysis but "should 'not be accepted as immutable components.'" *Compare Twitter*, 143 S. Ct. at 1220 (quoting *Halberstam*, 705 F.2d at 489), *with Atchley*, 22 F.4th at 221 ("No [*Halberstam*] factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim."). Both courts also "recognized the need to cabin aiding-and-abetting liability to cases of truly culpable conduct." *Twitter*, 143 S. Ct. at 1221; *accord Atchley*, 22 F.4th at 221 ("What is required is that, on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism."). And both courts focused on whether a defendant's "participation" in the principal tort was "significant and culpable enough" to constitute aiding and abetting. *Twitter*, 143 S. Ct. at 1229; *see also Atchley*, 22 F.4th at 224 (requiring that Defendants' aid be "substantial" with "general awareness" of their own "role in Jaysh al-Mahdi's terrorist activities").

The only difference between *Twitter* and *Atchley* is that the factual allegations fell on opposite sides of the common legal rules applied by both courts. In *Twitter*, the social-media companies passively "failed to stop ISIS" from misusing their "generally available virtual platforms." *Twitter*, 143 S. Ct. at 1230. The companies committed no "affirmative misconduct" – they just failed to adequately police their platforms – and the allegations of "mere passive nonfeasance" did not state a claim. *Id*. at 1226-27. Defendants' alleged conduct here was not comparable. Indeed, bribing terrorists is nothing like running a generally available social-media platform. As the D.C. Circuit explained, Defendants affirmatively engaged in the "corrupt provision of free goods and cash bribes to do business with a Ministry completely overrun by Jaysh al-Mahdi." *Atchley*, 22 F.4th at 209-10. Those transactions – knowingly providing terrorists with

"cash kickbacks" and "off-the-books batches of valuable medical goods" – showed the requisite culpability. *Id.* at 209. Such active malfeasance is more than enough under *Twitter*.

*Twitter* itself contemplated liability in a case like this. As the Supreme Court explained, "some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all the group's actions or perhaps some definable subset of terrorist acts." 143 S. Ct. at 1228. A prime example is "where [a] provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting." *Id.*[3] The D.C. Circuit relied on just such allegations: "in dealing with the notoriously corrupt Ministry under the control of a terrorist group, defendants facilitated their transactions with bribes and structured them to include free goods of great value in funding terrorist acts." 22 F.4th at 221. The United States highlighted that point in its amicus brief in *Twitter*, opposing liability for Twitter but endorsing *Atchley* because Defendants here "engaged in transactions outside the regular course of business" through "the corrupt provision of free goods and cash bribes to an entity defendants knew was engaged in anti-American acts of terrorism." Br. at 22, *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. Dec. 6, 2022) (quoting *Atchley*, 22 F.4th at 221); *cf. Kurd*, 2022 WL 4379032, at *3 (denying stay where United States supported respondent).

Two district courts have had the opportunity to consider whether *Atchley* remains good law in light of *Twitter*, and both declined to stay discovery. *See Sotloff v. Qatar Charity*, 2023 WL 3721683, at *30-31 (S.D. Fla. May 30, 2023) (citing both cases and distinguishing *Twitter* as turning on the "lack of Twitter's *affirmative* actions and global scale of its platform"); Minute

---

[3] Notably, the Supreme Court treated allegations more akin to active malfeasance – Google's alleged sharing of advertising revenue with terrorists – separately from the allegations of passive nonfeasance. *See Twitter*, 143 S. Ct. at 1230. The Supreme Court held those allegations were insufficient because the magnitude of any such revenue had not been pleaded. *See id.* (noting amount might have been as low as $50). Here, by contrast, the assistance was "at least several million dollars per year in cash or goods over a period of years." *Atchley*, 22 F.4th at 222.

Entry, *Bonacasa v. Standard Chartered PLC*, No. 22-3320, (S.D.N.Y. June 2, 2023) (denying defendant's request for a discovery stay in light of *Twitter* when earlier ruling relied on *Atchley*, *see Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718 at *9-15 (S.D.N.Y. Mar. 7, 2023)). Because *Atchley*'s analysis is consistent with *Twitter* and the outcome will not be different because of *Twitter*, no further stay is appropriate.

### b. The Other Stay Factors Confirm No Additional Stay Is Warranted

Defendants will suffer no irreparable harm without a stay. Discovery costs "do[] not constitute irreparable injury," even when they are "substantial and unrecoupable," *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974); *see Doe I v. Exxon Mobil Corp.*, 2007 WL 9865914, at *2 (D.D.C. Dec. 19, 2007). Nor does mere discovery show the "pressing need" necessary for a stay pending certiorari. *Naegele*, 2014 WL 12683359, at *2 (cleaned up). As this Court has stated, "the discovery process" in this case should begin "efficiently and expeditiously," 2/4/19 Hr'g Tr. 10:1-2, because it will disserve both the parties and the Court to allow "this case to languish," *id.* at 10:4-6; *see also* Dkt. 152 at 10-13.

Plaintiffs' interests are, by contrast, exceptionally weighty. Nearly six years have passed since Plaintiffs filed this action. A stay would delay progress *at least* three more months, because the Supreme Court will not rule on Defendants' petition until after the Court's summer recess. That would result in at least nine months of total delay – perhaps longer – since the D.C. Circuit issued its mandate reinstating Plaintiffs' claims. This added delay is reason enough to deny another stay. *See, e.g.*, *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 36 (D.D.C. 2004) (denying stay "after five years of litigation"); *Rudder v. District of Columbia*, 1994 WL 495767, at *2 (D.D.C. Sept. 6, 1994) (denying stay because litigation had "been pending for several years").

Continued delay also prejudices Plaintiffs' case. This action centers on misconduct and injuries that are now more than a decade old. *See Atchley*, 22 F.4th at 209. Further "delaying" the

case "increase[s] the danger of prejudice resulting from the loss of evidence." *Clinton v. Jones*, 520 U.S. 681, 707-08 (1997). Moreover, 19 Plaintiffs have died since they filed suit. *See* Dkt. 152 at 7. Discovery should proceed before any more Plaintiffs die. *See Doe I*, 2007 WL 9865914, at *2 (denying stay given "the injuries and deaths of kin allegedly suffered by Plaintiffs").

Last, the public interest weighs against a stay. Congress enacted the Justice Against Sponsors of Terrorism Act "to provide civil litigants with the broadest possible basis . . . to seek relief against [entities] . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b), 130 Stat. 852. Here, more than in almost any other context, "further delay weighs against the public interest in allowing [Plaintiffs] to proceed to prosecute their claims." *Usoyan v. Republic of Turk.*, 2022 WL 4379058, at *5 (D.D.C. Sept. 21, 2022) (case involving "assault against U.S. citizens and residents on American soil by armed foreign agents").

## B.   Disputed Issue No. 2:  Phase 1 Issues and Post-Phase 1 Discovery

### 1.   Plaintiffs' Position

#### a.   Phase 1 Should Address Common Issues; Phase 2 Should Address Attack-Specific Issues

Plaintiffs' proposal matches the approach taken by courts around the country in virtually every other mass-tort case, including other ATA cases. As in those cases, the parties here should start by litigating the common, non-Plaintiff-specific issues on a full discovery record. Those issues would include Defendants' transactions and scienter, as well as the relationship between Jaysh al-Mahdi and the Ministry.[4]  This approach focuses first on the alleged misconduct – what

---

[4] Plaintiffs understand Defendants seek to re-raise their personal jurisdiction and political-question defenses. Plaintiffs believe no new discovery is necessary or appropriate to reject these defenses because (1) Defendants have waived their fact-based personal jurisdiction defenses, *see* Dkt. 157 at 17-22, and (2) this Court has rejected the political question defense on legal grounds, *see Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 207 (D.D.C. 2020) ("[N]o other court has dismissed ATA claims under the political question doctrine" because Plaintiffs' claims ask this Court "to

one court called the "upstream" issues – before proceeding to "downstream" issues specific to individual Plaintiffs.  Dkt. 3386 at 1, *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR MDL*"), MDL No. 11-2262 (S.D.N.Y. Apr. 4, 2022).

Here, the core issue is whether Defendants, "aware of Jaysh al-Mahdi's command of the Ministry, secured lucrative medical-supply contracts with the Ministry by giving corrupt payments and valuable gifts" to the terrorists who ran it.  *Atchley*, 22 F.4th at 209.  Discovery thus should focus on Defendants' contracts with the Ministry; the alleged corrupt payments, including free goods and cash bribes; Defendants' state of mind; and Jaysh al-Mahdi's control of the Ministry and use of Ministry-related revenue to fund attacks.  The parties could also conduct discovery of third parties (like the U.S. government) that may have relevant evidence on these issues, such as the Ministry's relationship to terrorism.  Addressing these common issues first, before litigating the details of 250+ attacks and 1,200+ Plaintiffs, will "best ensure the most efficient resolution of these actions and use of the parties' and the Court's resources."  Dkt. 179 at 1, *In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prods. Liab. Litig.* ("*Diabetes Drugs MDL*"), MDL No. 18-2809 (E.D.K.Y. Oct. 24, 2018).[5]

This proposal to start discovery with Defendants' conduct tracks the approach taken in other ATA cases.  In *Bartlett*, for example, "1,279 American nationals" killed or injured by Hezbollah brought ATA claims against 13 banks.  Dkt. 320 at 1, 14, *Bartlett v. Societe Generale*

---

interpret and apply a federal statute to [Defendants'] private conduct.").  But because discovery into these issues overlaps substantially with the merits and is common to all Plaintiffs, such discovery should occur in Phase 1 if it is allowed.

[5] Defendants' incorrectly suggest (at 23) that merits discovery from Defendants is not "common" because there are multiple defendants.  Each defendant has evidence that is common to each plaintiff.  It is typical for the first phase of complex litigation to involve discovery from multiple defendants, such as in the recent (and ongoing) *LIBOR*, *Opioids*, and *JUUL* MDLs where there are multiple defendants.

*de Banque au Liban SAL*, No. 19-0007 (E.D.N.Y. Mar. 31, 2023).  The *Bartlett* court compelled the defendant banks to produce the plaintiffs' requested discovery at the outset – including nearly a decade of bank records about transactions with hundreds of individuals allegedly linked to Hezbollah – before any discovery started on the individual plaintiffs' attacks or injuries.  *See id.*, Dkt. 328 at 3-20 (June 8, 2023).  Other ATA cases that have survived threshold dismissal are similar.  In those cases, courts have advanced the litigation quickly from the motion-to-dismiss ruling to merits discovery of the defendants.[6]  This Court should take the same approach.

Plaintiffs' proposal to put "common" issues in Phase 1 also matches other complex cases across subject matters.  For example, the *LIBOR MDL* concerns antitrust and other claims about whether certain banks conspired to fix interest-rate benchmarks.  The court ordered that discovery start with common issues like the defendants' conspiracy and deferred plaintiff-specific matters like injury, notice, and reliance.  *See* Dkt. 3380 at 1, *LIBOR MDL* (Mar. 16, 2022).  Similarly, in the *Diabetes Drugs MDL*, which involves allegations that AstraZeneca's drugs Onglyza and Kombiglyze XR increase the risks of deadly health conditions, the court adopted a case management plan with "two phases with the first phase addressing 'general causation,' . . . a critical issue in th[at] case, common to all actions," before proceeding to plaintiff-specific issues.  Dkt. 179 at 1, *Diabetes Drugs MDL* (Oct. 24, 2018).  There are many other similar examples.[7]

---

[6] *See, e.g.*, Dkt. 68 at 1, *King v. Habib Bank Ltd.*, No. 20-4322 (S.D.N.Y. Nov. 3, 2022) (ordering full merits discovery a month after denying Defendant's motion to dismiss); Dkt. 136 at 1, *Shatsky v. Syrian Arab Republic*, No. 02-2280 (D.D.C. Sept. 19, 2011) (Leon, J.) (ordering party discovery to begin shortly after vacating entry of default); Dkt. 13 at 2, 6, *Smedinghoff v. Standard Chartered Bank*, No. 23-2865 (S.D.N.Y. May 8, 2023) (ordering party discovery shortly after denying motion to dismiss); Dkt. 171, *Licci v. Am. Express Bank Ltd.*, No. 08-7253 (S.D.N.Y. June 30, 2022) (ordering party discovery, including ESI, after order granting motion to dismiss was vacated and remanded).

[7] *See, e.g.*, Dkt. 89 at 4, *In re Nexium (Esomeprazole) Prods. Liab. Litig.*, No. MDL No. 12-2404 (C.D. Cal. Mar. 11, 2013) ("Phase One of this litigation will determine certain potentially

Even in the *3M Earplugs MDL*, the largest multidistrict litigation in U.S. history, the court frontloaded discovery from the defendants and resolved common-to-all-Plaintiffs questions early. The first stage involved discovery into the design, testing, performance, marketing, sales, and distribution of the allegedly faulty earplugs – the analogue to Defendants' corrupt payments here. *See* Dkt. 688-1, *In re 3M Combat Arms Earplug Prods. Liab. Litig.* ("*3M Earplugs MDL*"), MDL No. 19-2885 (N.D. Fla. Sept. 12, 2019). By August 2019, four months after the MDL began, the court reported that "[t]he parties ha[d] made considerable progress on document discovery." *Id.*, Dkt. 651 at 1. The court then ordered the parties to brief the common issue of the federal government contractor defense (which closely overlapped with the merits) in April 2020, *see id.*, Dkt. 987 at 1, held oral argument in June, *see id.*, Dkt. 1186, and granted summary judgment to the plaintiffs on that issue in July, *see id.*, Dkt. 1280. After resolving that threshold issue, the case moved to a second stage focused on resolving individual plaintiffs' claims through a bellwether approach. *See*, *e.g.*, *id.*, Dkt. 1333.

At the close of Phase 1 here, the parties can meet-and-confer over Phase 2, which should cover the remaining attack- and Plaintiff-specific issues. Such issues might include (1) whether individual Plaintiffs were killed or injured in attacks committed by Jaysh al-Mahdi; (2) whether Hezbollah "committed, planned, or authorized" those attacks, 18 U.S.C. §2333(d)(2); (3) whether the act-of-war defense applies; and (4) Plaintiffs' injuries and damages.

Many courts have deferred such plaintiff-specific discovery until the common, defendant-focused issues are resolved. For example, in the *Diabetes Drugs MDL*, the courts held that deferring "plaintiff-specific issues" until after the threshold causation issues could save the parties "the time and expense of further discovery and litigation." Dkt. 179 at 1 (Oct. 24, 2018). Courts

_____

dispositive legal issues. Because such legal issues will define the scope of this litigation, those issues will be addressed first . . . .").

applying the same logic often begin bellwether selection and discovery only after resolving dispositive common issues in an initial phase.[8]  Plaintiffs propose the same approach here.  To ensure the bellwether selection process can begin promptly at the conclusion of Phase 1 – and to address Defendants' desire for some discovery of individual plaintiffs (at 28) – Plaintiffs are willing to work with Defendants to develop fact sheets for Plaintiffs to fill out during Phase 1, and to meet-and-confer over obtaining appropriate releases to the extent practicable.  *See, e.g.*, Dkt. 111 at 2, *Strauss v. Credit Lyonnais, S.A.*, No. 07-914 (E.D.N.Y. Mar. 4, 2009) (requiring "Plaintiff Profile Forms").

### b.    Defendants' Proposal Is Unworkable And Inefficient

The Court should not adopt Defendants' proposal.  They can cite no example of any court adopting a structure even remotely similar.  Rather than frontload the common merits questions that typically go first in mass-tort cases, Defendants cherry-pick their three preferred defenses and propose dispositive motions – but not full discovery – on those defenses in Phase 1.  None of Defendants' three proposed Phase 1 issues (personal jurisdiction, the political question doctrine, and their "act of war" defense) is a common issue of the type that courts typically address first.  It would unworkable and inefficient to devote Phase 1 to these issues in isolation.

*First*, Defendants' proposal is unworkable because, at the end of Phase 1, Defendants would have this Court resolve dispositive motions on two defenses (personal jurisdiction and the

---

[8] *See, e.g.*, Dkt. 13317, *In re Johnson & Johnson Talcum Powder Prods. Marketing, Sales Pracs. and Prods. Liab. Litig.* ("*J&J Talc MDL*"), MDL No. 16-2738 (D.N.J. May 15, 2020), (beginning the "process for identifying and selecting bellwether cases for trial" three weeks after resolving *Daubert* challenges on general causation issues); Dkt. 1682, *In re Roundup Prods. Liab. Litig.*, MDL No. 16-2741 (N.D. Cal. Aug. 28, 2018) (ordering parties to propose bellwether plans a month after resolving general causation and *Daubert* issues); *see also* Dkt. 109 ¶ 1, *Wultz v. Bank of China Ltd.*, No. 11-1266 (S.D.N.Y. Apr. 6, 2011) (bifurcating liability and damages discovery in ATA case, "with liability discovery proceeding first"); Dkt. 191, *Weiss v. National Westminster Bank, PLC*, No. 05-4622 (E.D.N.Y. Dec. 24, 2008) (similar).

16

political question doctrine) without allowing Plaintiffs adequate discovery.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1381 (D.C. Cir. 1988) (reversible error to grant summary judgment "without first permitting discovery on the merits").  Defendants would limit discovery of their files to "readily-accessible contract and organizational documents" and would prohibit discovery into their electronically-stored information ("ESI").  Plaintiffs need full discovery of Defendants – including ESI – to adequately respond to a dispositive motion on either of these issues.

If the Court even permits Defendants' to re-raise their political-question-doctrine defense, Plaintiffs must have adequate discovery into "defendants' conduct."  *Atchley*, 474 F. Supp. 3d at 208 (rejecting defense because "plaintiffs' theory condemns defendants' conduct, not the United States Government's general policy").  Defendants' core argument is that they engaged only in conduct condoned by the government.  That question, on its face, cannot be resolved without discovery into Defendants' conduct.  As for personal jurisdiction, "[t]he nub of the dispute" will concern whether Plaintiffs' claims "arise out of" or are "related in some other way" to the Foreign Defendants' contacts with the United States.  *Atchley*, 22 F.4th at 234 (cleaned up).  The Court cannot adequately assess whether Plaintiffs' claims relate to foreign defendants' domestic contacts without a full evidentiary record on the former.[9]  For that reason, jurisdictional discovery is intertwined with, and cannot be severed from, merits discovery.  *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992) (If "jurisdictional facts . . . are inextricably intertwined with the merits of the case," court "should usually defer its jurisdictional decision until the merits are heard."); *see also*, *e.g.*, Dkt. 68 at 1, *King v. Habib Bank Ltd.*, No. 20-4322 (S.D.N.Y. Nov. 3,

---

[9] *See*, *e.g.*, Dkt. 163 at 4-5 (Roche arguing that jurisdictional issues will turn on factual questions concerning "the value of the goods to Jaysh al-Mahdi on an alleged black market").

2022) (declining to bifurcate jurisdictional and merits discovery in ATA case where "jurisdiction theories" were "intertwined with the merits").[10]

It would be reversible error to grant Defendants summary judgment on either issue on the scant evidentiary record – lacking crucial ESI discovery – Defendants propose. *See Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 861, 867 (7th Cir. 2019) (error to grant summary judgment and deny a Rule 56(d) motion when there were "unresolved issues surrounding production of electronically stored information"); *In re PHC, Inc., S'holder Litig.*, 762 F.3d 138, 141, 144 (1st Cir. 2014) (similar); *Cruz v. McAleenan*, 931 F.3d 1186, 1193 (D.C. Cir. 2019) (abuse of discretion in denying a Rule 56(d) motion for additional discovery); *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1998) (as amended) (reversing grant of summary judgment issued "without first giving [the plaintiff] a chance to conduct discovery" into a key issue).  Restricting Phase 1 to two issues that cannot even be resolved at the end of Phase 1 (as proposed by Defendants) would accomplish nothing but delay.  That is why, if the Court does adopt a staging approach, it should allow discovery on all common issues together and resolve them on a full record.

The foreign defendants' statement (at 2 n.1, 22 n.11) that they "consent only to jurisdictional discovery in Phase 1" does not change the analysis.  If the foreign defendants wanted a standalone "jurisdictional discovery" period, they should have raised a factual challenge to personal jurisdiction in their first motion to dismiss.  But they did the opposite:  they spent years *objecting* to jurisdictional discovery while raising legal challenges instead.  *See* Dkt. 157 at 20;

---

[10] Defendants effectively concede (at 26) that the political question defense cannot be resolved without discovery from Defendants.  They seek a limited ruling that "ordinary-course dealings with the Ministry" would be barred by the political question doctrine, but that just begs the merits question whether Defendants' transactions involved bribery and kickbacks or were "ordinary-course dealings" supposedly condoned by the U.S. government.

Dkt. 176 at 2-9. The Court should hold them to that choice. Awarding them a standalone jurisdictional-discovery phase would effectively give them a second motion to dismiss in violation of Rule 12(g)(2). Defendants cite no case – nor are Plaintiffs aware of one – granting a defendant's request for limited jurisdictional discovery after losing a first motion to dismiss on that issue.

*Second*, Defendants' proposal is also inefficient because it would litigate overlapping issues in different phases. As noted above, discovery for both personal jurisdiction and the political question doctrine will overlap with the merits discovery on the common issues that Defendants seek to defer until Phase 2. These overlapping issues should be litigated together. For example, it makes no sense to litigate the political question doctrine – which will hinge on the exact nature of Defendants' dealings with the Ministry – while deferring litigation over the merits of those dealings. The same is also true for the "act of war" defense. As the D.C. Circuit explained, the ATA "would appear to foreclose treating an attack planned or authorized by a Foreign Terrorist Organization such as Hezbollah as an 'armed conflict between military forces of any origin' because Congress specifically excluded so-designated organizations from the definition of 'military force.'" *Atchley*, 22 F.4th at 238 (quoting 18 U.S.C. §2331(4), (6)). The act-of-war defense will overlap substantially with whether Hezbollah "committed, planned, or authorized" the relevant terrorist acts, 18 U.S.C. §2333(d)(2), which Defendants propose deferring to Phase 2. *See infra* p. 27-28. Plaintiffs propose instead litigating both attack-specific issues together. Defendants' request to break them apart creates needless duplication and inefficiency.

That inefficiency is especially acute given the nature of the discovery the act-of-war defense will entail. That defense could require discovery of hundreds of attacks to assess whether each attach occurred "in the course of" an "armed conflict" between "military force[s]." 18 U.S.C. §§ 2331(4)(C), 2336(a). And that defense will not plausibly apply to certain plaintiffs. *See*, *e.g.*, Dkt. 124 ¶¶ 1735-36 (civilian academic murdered when returning from an academic seminar).

Wading into that "factual thicket," *Atchley*, 474 F. Supp. 3d at 208, at the threshold is the opposite of efficient case management that favors resolving common issues first. It would create years of needless delay before the parties even reach the core merits issues in this case.

*Third*, Defendants' proposal is also inefficient because resolution of the three issues that Defendants propose for Phase 1 will not materially advance the litigation. Defendants' personal jurisdiction defense, at best, would result in the dismissal of the six foreign defendants but would leave the remaining 15 U.S. Defendants in the case. And this Court has already rejected Defendants' political-question defense on *legal* grounds. *See Atchley*, 474 F. Supp. 3d at 207 ("[N]o other court has dismissed ATA claims under the political question doctrine" because of Defendants' "private conduct."). No amount of discovery will alter that ruling. Finally, the D.C. Circuit strongly indicated that Defendants' "act of war" defense lacks merit. *See Atchley*, 22 F.4th at 238 (noting that the defense "appear[s] foreclose[d]" by the statute's plain language). Given the serious facial flaws with these so-called "threshold" defenses, none supports delaying merits discovery into Defendants' conduct for several years.

Finally, Defendants propose "to begin" discovery from governmental third parties on two other issues: Jaysh al-Mahdi's control of the Ministry and Hezbollah's involvement with Jaysh al-Mahdi. Plaintiffs agree that such discovery should begin as soon as possible, and they would not oppose a request to start taking government discovery now. But Defendants will also be critical sources of evidence on those issues. They dealt directly with the Ministry and will likely have evidence of the link between Jaysh al-Mahdi and the Ministry. *See Atchley*, 22 F.4th at 213 (Plaintiffs allege Defendants "finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control"). Thus, as to Jaysh al-Mahdi's control of the Ministry, Plaintiffs agree that the parties should take discovery on the question and litigate it in Phase 1. But, as with the other issues, such discovery must be sufficient to produce a

full evidentiary record – including from Defendants – and the parties should litigate it alongside the other merits issues with which it substantially overlaps.

### 2. Defendants' Position

If and when discovery does proceed in this case, Defendants submit that Phase 1 discovery should be directed at threshold jurisdictional and quasi-jurisdictional issues that could eliminate or substantially narrow the litigation without imposing substantial discovery burdens on the parties. Phase 1 would then conclude with dispositive motions on some or all of these issues.  Phase 1 would also include some limited party discovery to reduce delays in the event that the Court later determines that some portion of the litigation should survive Phase 1.  Accordingly, Defendants propose that Phase 1 discovery consist of three principal categories:

(1)     jurisdictional discovery relevant to the Foreign Defendants' personal jurisdiction defense;[11]

(2)     discovery from government sources and other non-parties related to two other jurisdictional and quasi-jurisdictional issues: the political question doctrine, which implicates the Court's subject matter jurisdiction; and the ATA's armed conflict (or "act of war") limitation, which is a statutory "limitation[]" on the ability of a civil action to be "maintained."  18 U.S.C. § 2336(a), 2331(4).  Defendants also propose to begin discovery related to Plaintiffs' allegations of Jaysh al-Mahdi's alleged control of the Iraqi Ministry of Health during the relevant period, and Hezbollah's alleged involvement with Jaysh al-Mahdi, since those issues also have a substantial government discovery component;

_____

[11] As noted above, the Foreign Defendants consent only to jurisdictional discovery in Phase 1, and AstraZeneca UK Limited preserves its arguments in its Motion to Dismiss that Plaintiffs are not entitled to any jurisdictional discovery as to AstraZeneca UK Limited. *See* note **Error! Bookmark not defined.**. References to other proposed Phase 1 discovery involving "Defendants" refer to the U.S.-based defendants.

(3)      limited party discovery consisting of (a) each plaintiff providing a fact sheet and releases of service, employment and medical records; (b) Plaintiffs' counsel providing readily accessible documents in their possession relating to the alleged attacks; and (c) Defendants providing readily accessible contract and organizational documents or information. This limited party discovery could be completed without undue burden, in part because it would not require either side to engage in burdensome searches of electronically stored information ("ESI") in Phase 1. Defendants have also offered to discuss with Plaintiffs the provision of other categories of threshold documents or information stored in centrally located repositories that might be similarly limited and would not require searches of ESI.[12]

This proposed approach gives the parties and the Court the best opportunity to eliminate or substantially narrow the claims and issues in dispute from the outset, while providing each side with background information and releases that may be relevant to threshold issues and reduce delays in the event that the litigation survives the threshold Phase 1. Moreover, the requirement that each plaintiff provide a fact sheet and appropriate releases (common in mass tort cases) will allow ample time for each plaintiff to comply before any plaintiff-specific discovery might occur.[13] If some plaintiffs fail to timely comply, the Court would then have authority to dismiss those plaintiffs, which would further narrow the claims should the litigation proceed past Phase 1.

Defendants also propose that the case management schedule address only Phase 1 at this time, and that the parties confer on a new case management schedule for any subsequent phases after any Phase 1 dispositive motions are resolved – also a routine approach in complex litigation.

---

[12] As each defendant is differently situated with respect to which documents are readily accessible, the specific categories of documents would be subject to negotiation with each Defendant.

[13] Plaintiffs appear to be willing to provide these items in Phase 1, although the parties will need to agree on the details. *See supra* at 16.

Plaintiffs' complaints about Defendants' Phase 1 proposal fall flat.  Indeed, while Plaintiffs claim that their proposal frontloads "common" issues and Defendants' proposal does not, it is Plaintiffs who propose to take full merits discovery from 21 Defendants during Phase 1 on unique issues such as each defendant's individual "conduct and scienter," whereas Defendants focus on threshold issues common to all or virtually all of Plaintiffs' claims that would likely eliminate or narrow claims.  In addition to personal jurisdiction, which both parties include in their Phase 1 proposals,[14] Defendants propose frontloading discovery and, as to certain issues, dispositive motions on: (1) whether Plaintiffs' claims are subject to the ATA's bar on "maintain[ing]" actions for injuries incurred during an "armed conflict"; (2) whether Plaintiffs' claims raise a political question; (3) whether Jaysh al-Mahdi controlled the Ministry of Health; (4) Hezbollah's alleged involvement with Jaysh al-Mahdi; (5) whether each plaintiff is willing and able to participate in discovery based solely on providing answers to a simple fact sheet and signing waivers; and (6) any claims that can be resolved based on the proposed limited party discovery.  Plaintiffs complain that Defendants' proposed issues are "defenses," *supra* at 16–17, but courts routinely prioritize discovery of jurisdictional or similarly threshold matters that are likely to dispose of the entire litigation or, at a minimum, the vast majority of the claims[15]:

---

[14] Plaintiffs contend that discovery regarding whether the Court has personal jurisdiction over the Foreign Defendants cannot be separated from merits discovery of all Defendants, that the Foreign Defendants have waived any fact-based personal jurisdiction challenge, and that allowing focused jurisdictional discovery would somehow contravene Rule 12(g)(2).  *See supra* at 12–13 n.4, 19. They are wrong on every count.  Plaintiffs' asserted bases for contending the Court has personal jurisdiction raise particular factual questions – such as Foreign Defendants' sourcing and the Ministry's focus on that sourcing – that do not implicate the full-blown merits discovery of 21 different Defendants that Plaintiffs propose.  And Plaintiffs' purported procedural roadblocks fail, for at least the reasons stated in the Reply Brief in Further Support of AstraZeneca's Motion to Dismiss [Dkt. 161].  It is common practice for defendants to challenge complaints on legal grounds, as Foreign Defendants did here, and if those challenges do not succeed, proceed to engage in discovery to establish the factual bases for their positions.

[15] *See* 9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2008.3 (3d ed. 2013) ("Given the frequent difference between jurisdictional issues and merits issues, a court

1.      <u>Armed conflict ("act of war") limitation</u>.  The ATA's armed conflict limitation is of course a threshold issue.  Congress expressly provided that "no action <u>shall be maintained</u> . . . for injury or loss by reason of an act of war," defined as "any act occurring in the course of armed conflict between military forces of any origin."  18 U.S.C. §§ 2331(4), 2336(a).  By its plain text, the entire point of this provision is to prevent such an action from being "maintained" at all.  *Id.* at § 2336(a).  It would defy the statutory text for courts to back-load this until the end of discovery, by which time the action will obviously have been "maintained" and substantial discovery burdens incurred for a significant period of time.  For that reason, Defendants have proposed that the parties take discovery on this issue from government sources and other non-parties, and that Plaintiffs' counsel provide the readily accessible documents in their possession relating to the alleged attacks (such as those used to prepare the complaint), so that the Court may decide this issue at the earliest opportunity.[16]

Plaintiffs try to frame the armed conflict limitation as an inherently "attack-specific" issue.  That is incorrect.  The key factual issues to be decided are global:  was Jaysh al-Mahdi a "military force of any origin," and was it participating in an "armed conflict" in Iraq at the relevant time.  The answer to that question depends on the attributes of Jaysh al-Mahdi generally, its overall activities, and the overall situation in Iraq.  If the Court concludes that Jaysh al-Mahdi was a military force participating in an armed conflict, nearly the entire case will be readily resolved.

---

may also decide to defer discovery on the merits until the jurisdictional issues are resolved."); *Cap. Eng'g & Mfg. Co. v. Weinberger*, 1988 WL 13272, at *1–2 (D.D.C. Feb. 5, 1988) ("We would be inclined, at this point, to permit discovery limited to the threshold issues raised by defendants," which "raised at least a colorable challenge to the court's jurisdiction over plaintiffs' claims.").

[16] Plaintiffs incorrectly suggest above that the D.C. Circuit already resolved the armed conflict/act-of-war issue against Defendants.  To the contrary, the panel concluded that it was "content with the district court's inclination to leave that question for resolution on a developed evidentiary record."  *Atchley*, 22 F.4d at 239.  This evidentiary record is exactly what Defendants propose be developed in Phase 1.

For example, Plaintiffs alleged that the majority of the attacks committed by Jaysh al-Mahdi were against U.S. servicemembers and associated civilian personnel in Iraq – such as the sizeable number of plaintiffs who claim injury from the "Battle of Sadr City."  If the Court determines that Jaysh al-Mahdi was a military force participating in an armed conflict, it is hard to imagine how Plaintiffs could argue that service members injured by Jaysh al-Mahdi in the "Battle of Sadr City" were not injured in the course of that armed conflict.

To argue otherwise, Plaintiffs cherry-pick an example – an attack killing a professor – that is not representative of the overwhelming majority of the attacks alleged.[17]  And even if attack-specific issues remained to be litigated as to a few potential outlier claims, a global and early resolution of the question of whether Jaysh al-Mahdi was a military force participating in an armed conflict would at a minimum substantially narrow and simplify the issues remaining for Phase 2. Speculation that some attacks might require further factual development at the end of Phase 1 should not impede the Court from resolving the attacks that do not.

2.  <u>Political question doctrine.</u>  The political question doctrine presents a jurisdictional bar against ordinary-course transactions with the Iraq Ministry of Health.  No discovery of Defendants is necessary to establish that the U.S. Government supported this sovereign foreign agency during the period in which Plaintiffs allege that the Ministry was one and the same with Jaysh al-Mahdi.  In arguing that Defendant-facing discovery is necessary on political question,

---

[17] Even in Plaintiffs' example, the complaint pleads that the underlying attack was targeting a convoy "headed to the U.S. Embassy."  Third Am. Compl. [Dkt. 124] ("TAC") ¶ 1736.  Here as well, if the Court determines that Jaysh al-Mahdi was a military force participating in an armed conflict, it is difficult to see how an attack on a government convoy headed to the U.S. Embassy during a period of armed conflict did not occur in the course of that armed conflict.

Similarly, Plaintiffs note Hezbollah's alleged role in a small number of attacks, but what matters for purposes of the statutory analysis is that *Jaysh al-Mahdi* (the group Defendants are alleged to have supported) committed all of the attacks and is not a designated FTO; thus, Jaysh al-Mahdi can be a "military force of any origin" under the statute.

Plaintiffs assert that the "core" issue in the case is whether Defendants secured Ministry contracts through corrupt means.  *See supra* at 13 (citing *Atchley*, 22 F.4th at 209).  But elsewhere, Plaintiffs alternatively insist that their claims are not so limited, and that *any* transactions with the Ministry could form the basis for liability – a position that necessarily implicates the U.S. Government's support of the Ministry during this same period.  TAC ¶ 179.  An early ruling that the Court lacks subject matter jurisdiction over claims based solely on ordinary-course dealings with the Ministry would substantially narrow the litigation if any portion were to survive Phase 1 and sharpen the focus of future discovery.

3.    Jaysh al-Mahdi control of the Ministry of Health.  The extent of Jaysh al-Mahdi's purported control of the Ministry of Health is unquestionably an issue common to all Plaintiffs' claims, and it should be resolved at the earliest possible juncture.  It is well-established that an independent and legitimate governmental intermediary can break the causal chain between Defendants' actions and Plaintiffs' injuries.  *See Atchley*, 22 F.4th at 227.  The D.C. Circuit concluded that Plaintiffs' claims overcame this bar at the pleading stage because Plaintiffs alleged the Ministry "was thoroughly dominated by Jaysh al-Mahdi and 'functioned more as a terrorist apparatus than a health organization.'"  *Id.* at 228.  Plaintiffs contend that this issue cannot be resolved in Phase 1 because, they speculate, Defendants might also have evidence regarding Jaysh al-Mahdi's control over the Ministry.  But it is far more likely that discovery from governmental and non-party sources alone will demonstrate that there is no genuine dispute of *material* fact regarding the extent of Jaysh al-Mahdi's purported control over the Ministry and whether it was functioning as an independent intermediary.  Certainly, there is no reason to preclude such discovery in Phase 1.

4.    Hezbollah involvement with Jaysh al-Mahdi.  The extent of Hezbollah's alleged involvement with Jaysh al-Mahdi may also be an appropriate issue for early resolution.  Plaintiffs

do not contend that Defendants supported Hezbollah, nor that Defendants or Plaintiffs would have any evidence regarding the extent of Hezbollah's involvement.  If Phase 1 discovery demonstrates that there is no genuine dispute of material fact regarding Hezbollah's involvement, there is no reason to delay resolving that dispositive issue.  And to the extent Plaintiffs contend that an understanding of Hezbollah's involvement is necessary to resolve the question of whether Plaintiffs' claims cannot be maintained because the injuries were inflicted by a military force in the course of an armed conflict, *see supra* at 19, Defendants' Phase 1 proposal would allow those issues to be addressed together if appropriate.

5.   <u>Fact sheets and waivers</u>.  If each of the 1,250+ individual Plaintiffs intends to prosecute his or her own claim, then he or she should be able to provide at least a basic fact sheet and waivers during the initial phase of discovery.  If any Plaintiffs are unable or unwilling to do so, their claims should be dismissed.

6.   <u>Other Defendant-specific relief</u>.  Defendants should be permitted to move for any other relief that might be available to them at the end of Phase 1.  For example, the proposed limited party discovery may establish the timing of a defendant's first sale of pharmaceutical products or medical devices to the Ministry, enabling that defendant to seek dismissal of claims based on attacks that occurred before that time.

*          *          *

These potential issues and dispositive motions could eliminate, or at a minimum drastically narrow, the number of claims requiring further discovery in Phase 2.  Of course, allowing Defendants to seek dispositive relief at the end of Phase 1 does not necessarily mean they will be able to do so as to each issue, and any such motions will necessarily be limited to those issues on which Defendants believe in good faith that there is no genuine dispute of material fact.  Moreover, if Plaintiffs believe that they still require additional discovery to respond to any Phase 1 dispositive

27

motions that Defendants do file, *see supra* at 17–18, Federal Rule of Civil Procedure 56(d) provides them with a procedure to argue that such additional discovery may reveal a genuine dispute of *material* fact. But the mere possibility that additional discovery on a particular issue might be necessary after Phase 1 is not a sufficient reason to force Defendants to wait until after full merits discovery, as Plaintiffs' propose, before seeking dispositive relief as soon as the record supports it.

### C. Disputed Issue No. 3:  Bellwethers

#### 1. Plaintiffs' Position

Plaintiffs believe that the Court should employ a bellwether process to conduct discovery of plaintiff-specific issues. To be clear, Plaintiffs do not believe the Court needs to decide now what a bellwether process should look like. The parties should submit their proposals for a bellwether process after they have substantially completed the Phase 1 discovery on common issues. That discovery may inform what the bellwether process should be. But Defendants' proposal – which frontloads their attack-specific act-of-war defense – would require this Court to decide now whether to use a bellwether process and what it should be. If the Court does frontload individual-attack-specific issues, therefore, Plaintiffs request that it order a bellwether process to resolve them.

Bellwether trials are standard in mass tort actions like this one. They "assist in the maturation of disputes by providing an opportunity for coordinating counsel to *organize* the products of pretrial common discovery, *evaluate* the strengths and weaknesses of their arguments and evidence, and *understand* the risks and costs associated with the litigation." Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tulane L. Rev. 2323, 2325 (2008) (emphases added). Courts "regularly engage in bellwethers" because the information they efficiently produce is "so valuable."  4 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 11:11, at

42 (6th ed. 2022).  This is true in "multi-plaintiff cases stemming from terrorist-related events." *Mwani v. Al Qaeda*, 2014 WL 4749182, at *1 n.1 (D.D.C. Sept. 25, 2014).

A bellwether approach will make this case manageable.  By prioritizing a subset of the 1,200 Plaintiffs, and thus a subset of the 200+ attacks, bellwethers will "streamline" "merits discovery and promote judicial efficiency."  Dkt. 68 at 3, *King*, No. 20-4322 (S.D.N.Y.) (language from party request granted by court).  That is why the *King* court adopted a bellwether approach for similar ATA claims.  *See id.*  And that is why courts in other terrorism cases routinely adopt bellwether approaches to litigate individual issues after resolving common ones.[18]

Defendants object to any organized process of bellwether discovery and trials for individual issues.  Instead, they propose that this Court try each case individually, with no effort by the parties to consolidate or streamline the issues.  But this Court already rejected the prospect of trying "800 to 1,000 individual cases" at an early status conference by stating, "You can't possibly have that in mind."  12/19/18 Hr'g Tr. at 6:9-13.

Defendants' more specific objections also lack merit.  *First*, courts routinely use bellwethers when there are multiple defendants with differing involvement in the alleged wrongdoing.  For example, the court overseeing the *JUUL MDL* set an "aggressive trial schedule" involving bellwethers even though that case involved multiple categories of defendants: JUUL; Altria, a JUUL investor; JUUL's founders and directors; retailers; distributors; and manufacturers. Dkt. 938 at 1, *In re JUUL Labs, Inc., Marketing, Sales Prac. & Prods. Liab. Litig.* ("*JUUL MDL*"), MDL No. 19-2913 (N.D. Cal. Sept. 9, 2020).  Similarly, the court overseeing the *Opioids MDL* scheduled nearly a dozen bellwether trials against "various types of participants in the opioid drug

---

[18] *See, e.g.*, Dkt. 1361 at 4, *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and S'holder Deriv. Litig.*, No. 08-1916 (S.D. Fla. Apr. 11, 2017), (setting schedule for the 12 cases selected for two consolidated ATS bellwether trials); Dkt. 1389 at 1-2, *Linde v. Arab Bank, PLC*, No. 04-2799 (E.D.N.Y. May 24, 2016) (damages trial for 17 bellwether plaintiffs).

industry," including manufacturers, distributors, and pharmacies.  Dkt. 4611 at 1, *In re Nat'l Prescription Opiate Litig.* ("*Opioids MDL*"), MDL No. 17-2804 (N.D. Ohio Aug. 17, 2022).

*Second*, courts use bellwethers even when the alleged wrongdoing stretches over a long timeframe.  The period of alleged wrongdoing was five years in the *JUUL MDL*; fifteen years in the *3M Earplugs MDL*; and decades in the *J&J Talc MDL*.  All involved bellwethers.  *See* Dkt. 388, *JUUL MDL* (Mar. 11, 2020); Dkt. 704, *3M Earplugs MDL* (Sept. 20, 2019); Dkt. 13186 at 4, *J&J Talc MDL* (Apr. 27, 2020).

*Third*, Defendants argue that bellwethers will not be useful because this case involves different types of attacks in different geographies and contested attribution to Jaysh al-Mahdi.  But bellwethers are useful *because* of these multiple variables, not despite them.  In the *3M Earplugs MDL*, the court ordered a bellwether process because that case involves hundreds of thousands of plaintiffs who hearing was damaged in many types of combat across the globe and over nearly two decades.  Managing a litigation that complex would be impossible without a bellwether approach, which "allow[s] the court to separate the entire litigation into meaningful divisions and focus[] the attorneys on the most predominant and important issues, ensuring that the cases ultimately tried [a]re representative of the entire census."  *Bellwether Trials*, 82 Tulane L. Rev. at 2345.  "By identifying the major variables, the . . . court and the attorneys can create sensible and easily ascertainable groupings by which to categorize the entire" case, simplifying the complex litigation to all parties' benefit.  *Id.*  Plaintiffs believe that the major variables here will be attack geography, date, and weapon type.  Other courts addressing a wide array of terrorist attacks have employed a bellwether approach focused on these variables.  *See*, *e.g.*, *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *13 (D.D.C. July 19, 2022) (conducting bellwether trial and observing, "[a]ttributing a specific attack to a particular terrorist group – a central issue in this litigation – requires considering two key factors:  geography and the time period in which the attack took

place").  And the *King* case – an ongoing ATA case with similarly large numbers of Plaintiffs attacked in varied geographies with varied weapons – is successfully employing a bellwether approach now.  *See supra* p. 29.

    *Fourth*, Defendants argue that bellwethers are not useful here because this case lacks a common thread like a single drug.  But there are multiple common threads, including Jaysh al-Mahdi's relationship to the Ministry of Health and whether Defendants paid bribes or kickbacks related to their Ministry contracts.  This argument again reinforces the need for a bellwether approach, which is meant to turn even a "conglomeration of loosely analogous cases" into something manageable.  *Bellwether Trials*, 82 Tulane L. Rev. at 2345.

    *Finally*, Defendants err in criticizing "Plaintiffs' strategic decision to join more than 1,250 plaintiffs with distinct claims in a single action."  As shown by the many bellwether cases cited above, such joinder is common in mass-tort cases because of the impracticality of litigating each case individually.  This Court has already recognized the logic of that approach here.  As the Court stated at a status conference, "it certainly doesn't make a heck of a lot of sense to have 6- or 800 people filing individual suits in other jurisdictions all around the country," and, "from a judicial efficiency point of view, it probably makes the most sense to consolidate the case."  12/19/18 Hr'g Tr. 16:25-17:6.  Consistent with that guidance, Plaintiffs informed this Court of their work to identify "Bellwether samples" to "efficiently handle[]" discovery – to which the Court responded: "Well, I think that sounds productive."  2/4/19 Hr'g Tr. 8:7-16.

        **2.**      **Defendants' Position**

    Defendants strongly oppose Plaintiffs' attempt to use a bellwether process, whereby the parties would identify a handful of attacks and limit the plaintiff-facing discovery to only those attacks, as a means of curing Plaintiffs' strategic decision to join more than 1,250 plaintiffs with distinct claims in a single action.  Rather than a supposed "bellwether" process that would not work

in the context of this litigation and ultimately would fail to get the parties materially closer to resolution, Defendants instead propose that the most efficient way for the Court to manage the litigation is by deciding the threshold issues and either dismissing or substantially narrowing the claims in Phase 1, as described above.

As an initial matter, Plaintiffs effectively concede that it is premature to consider the issue, noting that Phase 1 "may inform what the bellwether process should be."  Plaintiffs suggest that the Court might need to commit to bellwethers now because of Defendants' proposal to include discovery relating to the ATA's armed conflict limitation in Phase 1.  But as discussed above, the armed conflict limitation is not an attack-specific issue, and there is every reason to believe that Defendants' proposed Phase 1 discovery will enable the Court to address this defense on a litigation-wide basis.  *See supra* at 24–25.

More importantly, while it is impossible to predict the precise contours of any future phase of discovery at this stage, what is clear is that bellwethers are not appropriate for this litigation. This is not a products liability litigation in which the plaintiffs consist of similarly situated consumers who used the same product and claim similar injuries, such that a series of bellwether trials would be representative of other consumers' claims.[19]  Instead, this litigation is, in effect, more than 1,250 individual ATA lawsuits, stemming from more than 270 different attacks, that were filed as a single omnibus action.  Even assuming that the proper way to organize Plaintiffs' claims is by attack, and acknowledging that the overwhelming majority of the attacks were on U.S. military forces and support personnel in Iraq, the Third Amended Complaint alleges that each of the 277+ attacks occurred at different times, in different ways, in different places, and with different

---

[19] Even in the product liability context, claims cannot be joined under Rule 20 unless the plaintiffs were harmed "in the same accident."  *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 343 F.R.D. 347, 351 (S.D. Fla. 2023).

injuries over a multi-year period. Even as to attacks involving a similar weapon or type of attack, the complaint alleges that different plaintiffs were injured in different ways.

The timing of each attack is particularly important, because the 21 Defendants are not a monolithic bloc and, indeed, are alleged to have done different things, at different times, and in different ways from one another. Yet, as *Taamneh* now makes clear, the ATA requires proof of each defendant's "conscious, voluntary, and culpable participation" in a specific terrorist attack. 143 S. Ct. at 1223, 1225, 1230. Thus, if Plaintiffs wish to prove that a particular defendant is liable as to a specific attack, they will be required to establish each element of liability as to that individual defendant as to that specific attack. In this regard, the cases that Plaintiffs cite above are simply inapposite. Only two alleged ATA violations, but both were single-defendant cases, *King v. Habib Bank Lim.*, 2022 WL 4537849, at *1 (S.D.N.Y. Sept. 28, 2022); *Linde v. Arab Bank, PLC*, 2016 WL 6095850, at *1 (E.D.N.Y. May 24, 2016), and one did not employ bellwethers until the damages phase, *Linde*, 2016 WL 6095850, at *1.[20]

In contrast, Plaintiffs' allegations here cannot be established against each defendant on a bellwether basis. Plaintiffs do not allege the types of conduct that might allow for a handful of bellwether attacks to be representative of other attacks, for example, that Defendants all conspired with one another, or that they were all part of the same stream of commerce for a particular product, as in a products liability action. To the contrary, the complaint alleges that the supplier Defendants

---

[20] Plaintiffs' remaining cases involved claims under "the terrorism exception to the Foreign Sovereign Immunities Act," *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *1 (D.D.C. July 19, 2022); claims under "the Alien Tort Statute[,] the Torture Victim Protection Act of 1991[,] state tort law and Colombian tort law," *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig.*, 190 F. Supp. 3d 1100, 1104 (S.D. Fla. 2016); and decisions in consumer class actions and tort cases, which are even further afield, *see In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 576 (N.D. Cal. 2020); *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 617 (N.D. Ohio 2020); *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2019 WL 5065194, at *1 (N.D. Fla. Oct. 9, 2019); *In re Johnson & Johnson Talcum Powder Prods. Mktng., Sales Pracs., & Prods. Liab. Litig.*, 903 F.3d 278, 281–82 (3d Cir. 2018).

each contracted, separately from one another, with the Iraqi Ministry of Health at different times in different amounts for different products from different sourcing locations over a multi-year period. And the complaint does not allege that the manufacturer Defendants contracted with the Ministry at all.

Moreover, even if Plaintiffs were able to establish in one "bellwether" that Jaysh al-Mahdi committed one particular attack, and that it was "planned" or "authorized" by Hezbollah, it would not follow that Jaysh al-Mahdi committed, or that Hezbollah planned or authorized, any of the others. Those and other elements would need to be established attack by attack, which makes the bellwether process particularly unworkable, and unhelpful, here.

Given all of the elements, as reinforced in *Taamneh*, that each of the 1,250+ Plaintiffs will have to prove as to each of the 21 Defendants and as to each of the 270+ different attacks, no single attack or handful of attacks could possibly be representative of the others. Plaintiffs cannot isolate specific attacks or treat Defendants as a single bloc to prove their claims but, rather, must prove each individual element of their ATA claims as to each defendant and as to each attack.[21] That is why Defendants propose addressing threshold jurisdictional and quasi-jurisdictional issues that would narrow or eliminate claims and parties rather than attempt to wade into the individual-plaintiff thicket at the outset. It would make no sense for the Court and the parties to waste years litigating what Plaintiffs contend are "bellwether cases" simply to confirm that they have no representative value, leaving the parties and the Court right back where they started, with an unmanageable number of individual claims and common, threshold issues unresolved. This is particularly true when there is good reason to believe that this case will not survive the ongoing appellate proceedings, let alone reach a second phase of discovery. Even if the litigation were to

---

[21] For that reason, Defendants reserve the right to seek severance of claims that survive after resolution of the only common threshold issues in Phase 1.

survive the appellate proceedings, if it were narrowed to a manageable number of claims by the conclusion of Phase 1, then bellwethers would make even less sense.  For that reason, Defendants propose that the case management schedule address only Phase 1 at this time, and that the parties confer on a new case management schedule for any subsequent phases after any Phase 1 dispositive motions are resolved.  There is no reason to waste the parties' and judicial resources litigating the question of bellwethers now when there is a high likelihood that the question may never need to be addressed at all.

Dated:  June 28, 2023                          Respectfully submitted,

                                               /s/ Joshua D. Branson
                                               David C. Frederick (D.C. Bar No. 431864)
                                               Joshua D. Branson (D.C. Bar No. 981623)
                                               Andrew E. Goldsmith (D.C. Bar No. 1007074)
                                               Thomas G. Schultz (D.C. Bar No. 1028017)
                                               KELLOGG, HANSEN, TODD, FIGEL &
                                               FREDERICK, P.L.L.C.
                                               1615 M Street, N.W., Suite 400
                                               Washington, D.C. 20036
                                               Tel: (202) 326-7900
                                               Fax: (202) 326-7999
                                               dfrederick@kellogghansen.com
                                               jbranson@kellogghansen.com
                                               agoldsmith@kellogghansen.com
                                               tschultz@kellogghansen.com

                                               Ryan R. Sparacino (D.C. Bar No. 493700)
                                               Sparacino PLLC
                                               1920 L Street, NW, Suite 835
                                               Washington, D.C. 20036
                                               Tel: (202) 629-3530
                                               ryan.sparacino@sparacinopllc.com

                                               *Counsel for Plaintiffs*

/s/ John B. Bellinger
John B. Bellinger III (D.C. Bar No. 405059)
David J. Weiner (D.C. Bar No. 499806)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson (D.C. Bar No. 994989)
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-2848
(303) 863-2325
Reeves.Anderson@arnoldporter.com

*Counsel for Defendants GE Healthcare USA
Holding LLC, GE Medical Systems Information
Technologies, Inc., and GE Medical Systems
Information Technologies GmbH*

/s/ Maureen F. Browne
Beth S. Brinkmann (D.C. Bar No. 477771)
Maureen F. Browne (D.C. Bar No. 441440)
David M. Zionts (D.C. Bar No. 995170)
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
One City Center
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5104
bbrinkmann@cov.com

*Counsel for Defendant F. Hoffmann-La Roche Ltd*

36

/s/ Paul S. Mishkin

Paul S. Mishkin (*admitted pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4292
Fax: (212) 701-5292
paul.mishkin@davispolk.com

Jesse Solomon (D.C. Bar No. 998972)
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W. Washington, DC 20005
Tel: (202) 962-7030
Fax: (202) 962-7118
jesse.solomon@davispolk.com

*Counsel for Defendants AstraZeneca*
*Pharmaceuticals, LP and AstraZeneca UK Limited*

/s/ Jeh C. Johnson

Jeh C. Johnson (D.C. Bar No. 461627)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
jjohnson@paulweiss.com

*Counsel for Defendants Johnson & Johnson, Cilag*
*GmbH International, Ethicon Endo-Surgery, LLC,*
*Ethicon, Inc., Janssen Ortho LLC, Janssen*
*Pharmaceutica NV, Johnson & Johnson (Middle*
*East) Inc., and Ortho Biologics LLC*

37

/s/ Christopher N. Manning
Joseph G. Petrosinelli (D.C. Bar No. 434280)
Christopher N. Manning (D.C. Bar No. 464069)
Melissa B. Collins (D.C. Bar No. 1012929)
Brian T. Gilmore (D.C. Bar No. 1030601)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000
cmanning@wc.com

*Counsel for Defendants Pfizer Inc., Pfizer
Pharmaceuticals LLC, Pfizer Enterprises SARL,
Pharmacia & Upjohn Company LLC, and Wyeth
Pharmaceuticals Inc.*


/s/ David W. Bowker
David W. Bowker (D.C. Bar. No. 989309)
Catherine M.A. Carroll (D.C. Bar. No. 497890)
Leon T. Kenworthy (D.C. Bar. No. 1045105)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
david.bowker@wilmerhale.com

*Counsel for Defendants Genentech, Inc. and
Hoffmann-La Roche Inc.*