**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSHUA ATCHLEY *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ASTRAZENECA UK LIMITED *et al.*,<br><br>Defendants. | Case No. 17-cv-02136-RJL<br><br>**PUBLIC-REDACTED VERSION** |

**OPPOSITION TO DEFENDANT F. HOFFMANN-LA ROCHE LTD'S RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. Factual Background .......... 3

1. Jaysh al-Mahdi's Anti-American Mission .......... 3

2. Roche's Global Business .......... 4

a. FHLR's Collaborative Relationship with Genentech .......... 5

b. FHLR's Collaborative Relationship with Roche Nutley .......... 9

3. FHLR's Transactions with Kimadia .......... 10

B. Procedural History .......... 15

1. FHLR's Previous Motions To Dismiss .......... 15

2. The Supreme Court's Vacatur and the D.C. Circuit's Second Opinion .......... 16

3. FHLR's Renewed Motion To Dismiss .......... 17

LEGAL STANDARD .......... 18

ARGUMENT .......... 18

I. FHLR'S MOTION IS PROCEDURALLY BARRED .......... 18

A. Rules 12(g)(2) and 12(h)(1) Bar FHLR's Successive Motion To Dismiss .......... 18

B. FHLR's Arguments Against Application of Rules 12(g) and 12(h) Fail .......... 20

II. FHLR'S FACT-BASED MOTION IS IMPROPER WITHOUT DISCOVERY .......... 24

III. UNDER *FULD*, WHICH CONTROLS, DUE PROCESS IS SATISFIED .......... 26

A. *Fuld* Authorizes Personal Jurisdiction Over FHLR .......... 26

B. FHLR's Arguments Against *Fuld*'s "More Flexible Inquiry" Fail .......... 30

1. *Fuld's* Holding Is Not Limited to the PSJVTA or Federal Statutes Authorizing Personal Jurisdiction .......... 30

2. FHLR's Attempts to Revive the Minimum Contacts Test Fail. .................. 32

3. FHLR did not lack fair notice. ........................................................ 33

IV. EVEN IF THE FOURTEENTH AMENDMENT'S MINIMUM CONTACTS TEST APPLIED, DUE PROCESS WOULD BE SATISFIED.................................................. 35

CONCLUSION........................................................................................................ 42

## TABLE OF AUTHORITIES*

Page(s)

**Cases**

*About U.S. Real Estate, Inc. v. Burnley*,
2015 WL 3397025 (N.D. Ill. May 26, 2015) ........ 21

*Albany Ins. Co. v. Almacenadora Somex, S.A.*,
5 F.3d 907 (5th Cir. 1993) ........ 22

*Aljabri v. bin Salman*,
106 F.4th 1157 (D.C. Cir. 2024) ........ 24

*Allen ex rel. Allen v. Devine*,
726 F. Supp. 2d 240 (E.D.N.Y. 2010) ........ 20

*Arista Recs., Inc. v. Sakfield Holding Co. S.L.*,
314 F. Supp. 2d 27 (D.D.C. 2004) ........ 23

*AstraZeneca UK Ltd. v. Atchley*,
144 S. Ct. 2675 (2024) ........ 16

**Atchley v. AstraZeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022) ..... 3, 4, 14, 15, 18, 19, 21, 26, 30, 35, 36, 37, 38, 39, 40, 42

**Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026) ........ 1, 16, 17, 26, 30

*Atchley v. AstraZeneca UK Ltd.*,
2023 WL 1479424 (D.C. Cir. Feb. 2, 2023) ........ 16

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
11 F.4th 972 (9th Cir. 2021) ........ 38

*Benko v. Quality Loan Serv. Corp.*,
789 F.3d 1111 (9th Cir. 2015) ........ 38

*Brooks v. Warden*,
706 F. App'x 965 (11th Cir. 2017) ........ 22

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ........ 36

* Authorities on which counsel chiefly rely are denoted with an asterisk, per Local Civil Rule 7(a).

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014)........................................ 25

*Cent. Am. Bank for Econ. Integration v. Mossi*,
2025 WL 2732731 (D.D.C. Sept. 25, 2025) ........................................................ 33

*Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000) ........................................................................... 33

*Cheese Depot, Inc. v. Sirob Imports, Inc.*,
2016 WL 6082352 (N.D. Ill. Oct. 18, 2016)........................................................ 21

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
265 F. Supp. 3d 1196 (D. Or. 2017) ................................................................. 20

*Crane v. New York Zoological Soc'y*,
894 F.2d 454 (D.C. Cir. 1990)..................................................................... 18, 23

*Davis v. Cross*,
774 F. Supp. 2d 62 (D.D.C. 2011) ............................................................... 19, 20

*Devas Multimedia Priv. Ltd. v. Antrix Corp. Ltd.*,
2026 WL 2330570 (9th Cir. Aug. 12, 2026)........................................................ 31

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) ........................................................................... 32

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
2017 WL 2651618 (E.D. Tex. June 20, 2017)...................................................... 20

*El-Fadl v. Central Bank of Jordan*,
75 F.3d 668 (D.C. Cir. 1996)........................................................................... 24

*Ennenga v. Starns*,
677 F.3d 766 (7th Cir. 2012) ........................................................................... 22

*Farouki v. Petra Int'l Banking, Corp.*,
683 F. Supp. 2d 23 (D.D.C. 2010) ................................................................... 25

*Federal Deposit Ins. Corp. v. U.S. Titles, Inc.*,
939 F. Supp. 2d 30 (D.D.C. 2013) ................................................................. 22-23

*Finan v. Lafarge S.A.*,
2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025)................................................. 28, 31

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990).................................................... 19, 20, 21, 22

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025)..................................... 1, 2, 3, 16, 17, 26, 27, 29, 30, 31, 32, 33, 34, 35

*Gamble v. United States*,
587 U.S. 678 (2019)........................................................................................ 27, 28

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
843 F.3d 958 (D.C. Cir. 2016)....................................................................19-20, 21

*Gligorov v. Nation of Brunei*,
185 F.4th 1169 (D.C. Cir. 2026)................................................................. 31, 34, 35

*IMAPizza, LLC v. At Pizza Ltd.*,
334 F. Supp. 3d 95 (D.D.C. 2018)........................................................................ 22

*King v. Bon Charge*,
823 F. Supp. 3d 508 (D. Del. 2025)................................................................ 30, 31

*Koyo Seiko Co., Ltd. v. U.S.*,
92 F.3d 1162 (Fed. Cir. 1996)............................................................................... 38

*Lans v. Adduci Mastriani & Schaumberg L.L.P.*,
786 F. Supp. 2d 240 (D.D.C. 2011)....................................................................... 18

*Livnat v. Palestinian Auth.*,
851 F.3d 45 (D.C. Cir. 2017)................................................................................. 33

*Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,
826 F.3d 492 (D.C. Cir. 2016)............................................................................... 37

*Metcalfe v. Renaissance Marine, Inc.*,
566 F.3d 324 (3d Cir. 2009).................................................................................. 24

*Michigan Nat'l Bank v. Quality Dinette, Inc.*,
888 F.2d 462 (6th Cir. 1989)................................................................................. 38

*Miller v. Holzmann*,
2006 WL 568722 (D.D.C. Mar. 9, 2006)................................................................ 24

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005)............................................................................. 18, 29

*Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*,
573 F. Supp. 2d 70 (D.D.C. 2008)......................................................................... 24

*Noble v. Sombrotto,*
84 F. Supp. 3d 11 (D.D.C. 2015)........................................................................... 41

*Orient Plus Int'l Ltd. v. Baosheng Media Group Holdings Ltd.*,
799 F. Supp. 3d 310 (S.D.N.Y. 2025) ..... 31

*Pro Axess, Inc. v. Orlux Distrib., Inc.*,
428 F.3d 1270 (10th Cir. 2005) ..... 30

*Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*,
819 F.2d 434 (3d Cir. 1987) ..... 38

*Rodriguez v. Imperial Brands, PLC*,
182 F.4th 1333 (11th Cir. 2026) ..... 31, 34, 35

*Second Amend. Found. v. U.S. Conf. of Mayors*,
274 F.3d 521 (D.C. Cir. 2001) ..... 2, 24

*Stralia Maritime, S.A. v. Praxis Energy Agents DMCC*,
431 F. Supp. 3d 366 (S.D.N.Y. 2019) ..... 23

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ..... 16

*United States v. Dish Network L.L.C.*,
954 F.3d 970 (7th Cir. 2020) ..... 37

*United States v. Zaia*,
751 F. Supp. 2d 132 (D.D.C. 2011) ..... 23

*Urquhart-Bradley v. Mobley*,
964 F.3d 36 (D.C. Cir. 2020) ..... 2, 24

*U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*,
880 F. Supp. 2d 36, 41 (D.D.C. 2012) ..... 25

*Williams v. Romarm, SA*,
756 F.3d 777 (D.C. Cir. 2014) ..... 24

*Winston & Strawn, LLP v. McLean*,
843 F.3d 503 (D.C. Cir. 2016) ..... 23

*X Corp. v. World Fed'n of Advertisers*,
826 F. Supp. 3d 772 (N.D. Tex. 2026) ..... 31

**Statutes**


18 U.S.C. § 2333(a) .......... 27

18 U.S.C. § 2334(a) .......... 32

18 U.S.C. § 2334(e) .......... 26

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016) .......... 28, 32

§ 2(a)(1) .......... 28

§ 2(a)(6) .......... 28, 32

§ 2(a)(7) .......... 28

Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1),
134 Stat. 1182, 3291 (2020) .......... 28-29


**Rules**


Fed. R. Civ. P.

Rule 4(f)(3) .......... 32

Rule 4(k)(2) .......... 26, 31, 32, 33, 38

Rule 12 .......... 18, 19, 22

Rule 12(b) .......... 20

Rule 12(b)(2) .......... 18, 21

Rule 12(g) .......... 19, 22, 23

Rule 12(g)(2) .......... 18, 19, 20, 23

Rule 12(h) .......... 22

Rule 12(h)(1) .......... 23

Rule 12(h)(1)(A) .......... 19

Rule 56(d) .......... 25

**Other Authorities**

4A Charles Alan Wright et al., *Federal Practice and Procedure* § 1075 (4th ed. 2026) ............ 26

5C *Wright & Miller's Fed. Prac. & Proc. Civ.* § 1384 (3d ed. 2026) ........................................ 19

Amicus Br. of U.S. Senators Charles E. Grassley et al., S*okolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Apr. 6, 2017), 2017 WL 1291691 ............................................................ 34

*Restatement (Third) of Agency* § 1.02 (2006) ................................................................... 37

S. Rep. No. 102-342 (1992) ......................................................................................... 33-34

## INTRODUCTION

Nine years into this litigation, FHLR[1] returns to this Court with a new theory for why it lacks personal jurisdiction. FHLR already litigated and lost its better jurisdictional motion. This successive motion is procedurally barred and substantively flawed. The Court should deny it.

Plaintiffs are terror victims who sued FHLR for making corrupt payments to Jaysh al-Mahdi, a terrorist organization that controlled Iraq's Ministry of Health ("Ministry"). Eight years ago, FHLR and the other foreign Defendants moved to dismiss for lack of personal jurisdiction. They challenged the legal sufficiency of Plaintiffs' jurisdictional theory – that FHLR worked with its U.S. affiliates to source U.S.-made drugs for the Ministry to facilitate FHLR's corrupt payments to terrorists. This Court granted the motion but the D.C. Circuit reversed, holding that Plaintiffs had alleged minimum contacts between FHLR and the United States. On remand after Supreme Court review, the D.C. Circuit reversed again. On personal jurisdiction, the D.C. Circuit noted that the Supreme Court's decision in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025) had "reshaped the relevant jurisdictional inquiry" by replacing the minimum-contacts test with a "more flexible" standard. *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 614 (D.C. Cir. 2026) ("*Atchley II*"). And although Defendants "did not seek certiorari" on personal jurisdiction, the D.C. Circuit noted that it would be "unlikely [to] reach a different conclusion" if it applied the "more flexible" *Fuld* standard. *Id.*

Notwithstanding the court of appeals' statement, FHLR now tries again. Nine years into this case, FHLR (following another foreign defendant, AstraZeneca, *see* Dkt. 149) has moved again to dismiss for lack of personal jurisdiction. This time, it attaches five declarations and 66 exhibits from its own files to launch a factual attack on Plaintiffs' jurisdictional allegations. It

[1] "FHLR" refers to Defendant F. Hoffmann-La Roche Ltd.

could have, but chose not to, submit those materials years ago when it first moved to dismiss. Its attempt to do so now conflicts with the Federal Rules and fails on the merits.

*First*, Federal Rules of Civil Procedure 12(g)(2) and 12(h)(1) bar FHLR's successive motion. Those rules required FHLR to raise all its personal-jurisdiction challenges in its first motion, or else waive them. That requirement promotes judicial economy and prevents piecemeal litigation by requiring defendants to consolidate their jurisdictional arguments in one threshold motion at the pleading stage. This case illustrates the wisdom of those principles. FHLR here concedes that it held back its full fact-based challenge years ago, reserving it for a later motion after its first attempts had failed. The Rules foreclose that approach. Having moved to dismiss on personal-jurisdiction grounds and lost, FHLR "must not" file another such motion advancing new arguments. Fed. R. Civ. P. 12(g)(2).

*Second*, a "plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (quoting *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001)).[2] Discovery in this case has just commenced. Plaintiffs have not yet had the opportunity to obtain evidence relevant to FHLR's personal-jurisdiction arguments. It would be improper to grant FHLR's motion without affording Plaintiffs jurisdictional discovery.

*Third*, if the Court reaches the merits, the record supports personal jurisdiction under *Fuld*'s controlling standard. FHLR's conduct – bribing an Iraqi terrorist group that used those funds to kill or injure hundreds of U.S. citizens – is "closely related to the United States" and "implicates important foreign policy concerns." *Fuld*, 606 U.S. at 18-19. Personal jurisdiction also remains proper under the "minimum contacts" test the D.C. Circuit originally applied before

[2] Unless otherwise noted, all internal quotations, brackets, citations, and emphases are omitted.

*Fuld* abrogated that test. The evidence FHLR attached to its motion corroborates the allegations that the D.C. Circuit held were sufficient. It shows that FHLR reached into the United States to contract with its U.S. affiliates to sell their drugs in Iraq. It sold the Ministry more than $110 million in pharmaceuticals, 42% of which were sourced from the United States. And its contracts listed U.S. companies as manufacturers and specified the drugs' U.S. provenance. Those are the very facts that the D.C. Circuit held sufficient to establish jurisdiction.

## BACKGROUND

### A. Factual Background

#### 1. Jaysh al-Mahdi's Anti-American Mission

In the wake of the U.S.-Iraq war, American forces remained in Iraq on a peacekeeping mission to rebuild the country. *See* Dkt. 124, Third Am. Compl. ("TAC") ¶ 55. The Hezbollah-sponsored terrorist group Jaysh al-Mahdi sought to undermine those reconstruction efforts. It terrorized the population and commandeered instruments of local government, including the Ministry. *Id.* ¶¶ 63, 350. "The U.S. military thus had to fight Jaysh al-Mahdi in an effort to prevent it from derailing the United States' broader project of civilian reconstruction in Iraq." *Id.* Jaysh al-Mahdi's terrorist attacks killed more than 500 Americans in Iraq and wounded thousands more – making it responsible for "more American casualties in Iraq than any other terrorist group." *Id.* ¶ 14. Plaintiffs and their families were the victims. *Id.* ¶ 16.

Jaysh al-Mahdi openly controlled Iraq's Ministry of Health "and used it as a vehicle for terrorist activity." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 209 (D.C. Cir. 2022) ("*Atchley I*"). Following a playbook used by Saddam Hussein, Jaysh al-Mahdi used its control of the Ministry and the Ministry's import subsidiary Kimadia to extract corrupt payments from medical companies seeking to do business in Iraq. TAC ¶¶ 63-113. American military leaders

referred to this corruption as "the second insurgency" because it funded and supplied Jaysh al-Mahdi's campaign of terror. *Id.* ¶ 172.

Defendants are large pharmaceutical conglomerates who were aware of Jaysh al-Mahdi's violent anti-American agenda and yet "secured lucrative medical-supply contracts with the Ministry by giving corrupt payments and valuable gifts to Jaysh al-Mahdi." *Atchley I*, 22 F.4th at 209. Those bribes and gifts funded Jaysh al-Mahdi's attacks on Plaintiffs. *Id.* at 212-13.

### 2. Roche's Global Business

Roche Holding Ltd. ("Roche") is a global pharmaceutical conglomerate and "the world's largest biotech company."[3] During the relevant period, Roche owned more than 170 corporate subsidiaries employing more than 80,000 employees across 70 countries.[4] Roche functioned as a globally integrated conglomerate and "employed a globally integrated distribution model that relied heavily on its U.S. manufacturing capabilities to source and distribute product worldwide." TAC ¶ 322. As Roche's Code of Conduct explains: "We are many, working as one across functions, across companies, and across the world."[5] Roche's centralized corporate governance structure reflects this philosophy, with a single Corporate Executive Committee that manages "operational matters that affect all divisions and functions – i.e., the company as a whole."[6]

Roche maintains a significant U.S. presence. It had more than 20,000 employees in North America during the relevant period,[7] maintains much of its corporate management and global compliance function in the U.S.,[8] and owns more than two dozen U.S. subsidiaries across

[3] Roche, *Our history*, https://bit.ly/3TxkViC.
[4] Roche 2011 Finance Report at 132-136, 143, https://bit.ly/3VdgdqZ.
[5] Roche, *Roche Group Code of Conduct*, at 10 (Jan. 2015), https://bit.ly/3Taux2Z.
[6] Roche, *Governance*, https://bit.ly/47oRVgm.
[7] Roche 2011 Annual Report at 92, https://bit.ly/4AyRltM.
[8] LifeScienceHistory.com, *Hoffman-La Roche Established U.S. Plant In Nutley, NJ*, https://bit.ly/4AAyEGj; *see also* TAC ¶ 324.

32 sites.[9] Roche "relied heavily on its U.S. manufacturing capabilities to source and distribute product worldwide." TAC ¶ 322. From 2005-2009, Roche's top three selling drugs worldwide – Herceptin, Avastin, and Rituxan (branded in Iraq as MabThera) – were all developed and manufactured by Roche subsidiary Genentech in the United States. *Id.* ¶ 325. Roche's U.S. facilities manufacture drugs that "are shipped to Roche hubs for distribution to customers worldwide."[10] In 2025, as part of its "110 year legacy in the United States," Roche announced a $50 billion U.S. investment to "underscore [its] long-standing commitment to research, development, and manufacturing in the US."[11]

Like other Defendants, Roche's transactions with the Ministry involved two types of affiliated corporate entities: (1) manufacturers that made the drugs, and (2) a supplier that contracted with Kimadia. TAC ¶ 147. Two of Roche's U.S. manufacturers, Genentech and Roche Nutley, manufactured drugs that its Swiss supplier, FHLR, sold to the Ministry. *Id.* ¶ 310.

**a. FHLR's Collaborative Relationship with Genentech**

Genentech, Inc. ("Genentech") is a wholly owned Roche subsidiary incorporated in Delaware and headquartered in California. Dkt. 212-2 (Kazenwadel Decl.) ¶ 8. Roche began partnering with Genentech in the 1970s and acquired a controlling stake in 1990.[12] This partnership gave Genentech "access to Roche's extensive marketing and distribution channels, especially outside the U.S.," while "giv[ing] Roche access to many important products from

---

[9] Roche, *Locations,* https://bit.ly/4iSVKS3.
[10] Roche, *Behind the Scenes: Tucson Global Operations*, https://bit.ly/3VgnxlJ.
[11] Roche, Media & Investor Release, *Roche to invest USD 50 billion in pharmaceuticals and diagnostics in the United States over the next five years*, at 1 (Apr. 22, 2025), https://bit.ly/4rw528I.
[12] Roche, *Our history*, https://bit.ly/3TxkViC; Genentech, Inc., Form S-4 (June 5, 1995), https://bit.ly/3VSXjWw; Dkt. 212-2 (Kazenwadel Decl.) ¶ 8.

Genentech's innovative R&D efforts."[13] As Roche's head of M&A described the relationship: "In Europe we say it's good to have a rich uncle in America. Genentech had a rich uncle in Switzerland."[14]

Since then, Genentech has played a "pivotal role" in Roche's global distribution capabilities. TAC ¶ 322. Genentech manufactured Roche's top three selling drugs – Herceptin, Avastin, and MabThera – at its California facilities. *Id.* ¶ 325. By 2008, "[p]roducts originating from Genentech represented 46% of total sales of Roche's 20 top-selling drugs" worldwide.[15] In 2009, Roche fully acquired Genentech and "combined" Genentech's "Manufacturing operations . . . with the global operations of Roche."[16] Roche's chairman remarked that the merger would "create new opportunities" for the two companies to "collaborate on a worldwide scale."[17]

Even before Roche fully acquired Genentech in 2009, FHLR and Genentech closely collaborated to develop, market, and sell U.S.-manufactured drugs across the world, including in Iraq. TAC ¶¶ 322-32. FHLR's motion attaches agreements that illustrate this collaboration:

**1998 Commercialization and Licensing Agreement.** In 1998, FHLR and Genentech signed an agreement that [redacted]. *See* Dkt. 213-1 (JK-1) at 1 (the "1998 Agreement"). The 1998 Agreement explained that Genentech "[redacted]

[13] Harvard Bus. Rev., *Roche's Acquisition of Genentech* at 4, 6, 9-210-040 (Sept. 28, 2011), available at https://bit.ly/4iTYyON.
[14] *Id.* at 4.
[15] *Id.* at 5.
[16] Roche and Genentech, Ex. 99.1 – Joint Press Release (Mar. 12, 2009), https://bit.ly/4jrU95O.
[17] Harvard Bus. Rev., *Roche's Acquisition of Genentech* at 6, 9-210-040 (Sept. 28, 2011), available at https://bit.ly/4iTYyON.

[redacted]" and that FHLR "[redacted]" *Id.* It gave FHLR [redacted]

The 1998 Agreement also [redacted]

**1999 Commercialization and Licensing Agreement.** In 1999, Genentech and FHLR signed [redacted][18] [redacted]

---

[18] FHLR's motion does not attach the original 1999 Agreement. It also does not attach at least eight additional agreements between Genentech and Roche/FHLR that are referenced in the recitals to the 1999 Agreement. *See* Dkt. 213-2 (JK-2) at pp. 2-3

[redacted]

The 1999 Agreement [redacted][19] [redacted] The 1999 Agreement therefore [redacted]

Like the 1998 Agreement, the 1999 Agreement [redacted]

[19] *See* Roche 2005 Annual Report at 25, https://bit.ly/4heNeM2.

[redacted] The 1999 Agreement also [redacted]

**2006 Umbrella Manufacturing Supply Agreement.** In July 2006, FHLR and Genentech signed [redacted]

**b. FHLR's Collaborative Relationship with Roche Nutley**

Hoffmann-La Roche Inc. ("Roche Nutley") is a wholly owned Roche subsidiary incorporated in New Jersey and headquartered in Nutley, New Jersey. Dkt. 212-8 (Resnick Decl.) ¶ 8; TAC ¶ 37. Roche Nutley "served as the company's American headquarters from

1929 until 2009," when Roche acquired Genentech.[20] Roche shuttered the Nutley facilities after acquiring Genentech and moved its U.S. headquarters to Genentech's California offices. TAC ¶ 323. While it was in operation, Roche Nutley manufactured Xeloda, a lucrative chemotherapy drug, and Zenapax, a drug used in organ transplantation, both of which FHLR sold to the Ministry. *Id.* ¶ 323; Dkt. 212-41 (SD-1) (entry 76). Roche located key global compliance personnel at Roche Nutley's New Jersey offices. TAC ¶ 324.[21]

FHLR signed several intercompany agreements with its affiliate Roche Nutley in which the two affiliates agreed to collaborate on researching, developing, and marketing drugs across the globe. [redacted]

**3. FHLR's Transactions with Kimadia**

**1.** The TAC alleges that FHLR obtained at least 44 contracts from Kimadia after 2004. TAC ¶ 311. Without any discovery, Plaintiffs supplied details for six of those 44 contracts, covering five drugs: Herceptin, Xeloda, MabThera, Pegasys, and Avastin. *Id.* ¶ 312. The TAC alleges that Genentech and Roche Nutley played key roles in manufacturing those drugs and in facilitating FHLR's corrupt payments relating to them. *Id.* ¶¶ 310-32.

[20] Andrew Pollack, *Roche to Shut Former U.S. Headquarters*, N.Y. Times (June 26, 2012), https://bit.ly/4xJjN9L.
[21] FDA, *Zenapax drug label*, https://bit.ly/46OMt6h.

The documents attached to FHLR's motion – though incomplete in significant respects – largely confirm these allegations and reveal that FHLR sold additional U.S.-sourced drugs to Kimadia. FHLR's motion attaches a table showing 165 shipments of drugs that FHLR sent to Kimadia between 2003 and 2011. *See* Dkt. 212-41 (SD-1). These shipments correspond to 149 invoices and 98 contracts between FHLR and Kimadia. *Id.* FHLR's motion attaches the invoices and some of the contracts as exhibits. *See* Dkt. 212-41 (invoices); Dkts. 212-42 to 212-53 (contracts).

These invoices and contracts show that, from 2003 through 2011, FHLR sold Kimadia $109.7 million of drugs. Of that amount, $45.9 million – or 42% – is attributable to drugs manufactured in the United States. *See* App'x A (identifying transactions for U.S.-sourced drugs). That is, for 42% of the drugs that FHLR sold Kimadia, either FHLR's internal records show that the drug's active pharmaceutical ingredients (API) were made in the United States, or FHLR represented to Kimadia (in the relevant contract or invoice or on the drug's packaging) that the drug was made in the United States, or both. *Id.*[22]

This 42% figure likely understates the total amount of U.S.-sourced drugs that FHLR sold Kimadia from 2003 through 2011, because FHLR's documentation of its Kimadia transactions is incomplete by FHLR's own admission. For example, FHLR acknowledges that "due to the passage of time and changes in FHLR's . . . system[s]," FHLR could not identify the origin of the drug's API for 17% of FHLR's transactions with Kimadia (28 out of 165). Dkt. 212-11 (Waelchli Decl.) ¶ 34 n.7. FHLR also did not attach (or produce) the contracts associated

[22] More specifically, FHLR's records show that the active pharmaceutical ingredients for at least $30 million (27%) of these drugs were manufactured in the United States, *see* Dkt. 212-39 (HW-28). The contracts, invoices, or packaging for roughly $35 million of these drugs (32%) listed the United States as their origin. *See* App'x A.

with certain shipments, making it impossible to determine what those contracts represented about the origin of the drugs being sold. *See* Schultz Decl. ¶¶ 6, 8.

The documentation that FHLR did produce confirms that FHLR sold at least six U.S.-sourced drugs to the Ministry between 2004-11: Herceptin, MabThera, Xeloda, Zenapax, Neupogen, and Cymevene. *See* App'x A. FHLR also acknowledges selling Genentech-manufactured Avastin to the Ministry beginning in 2012. Dkt. 212-40 (Daouk Decl.) at 6 n.5.[23]

**2.** FHLR sold each of these drugs to Kimadia by collaborating with its U.S. affiliates Genentech and Roche Nutley. They signed several agreements memorializing that collaboration. *Supra* pp. 6-10. Similar cooperation extended to multiple steps in the Kimadia contracting process. As the TAC explains (and Roche does not dispute), during the tender process, FHLR was "required to demonstrate 'sole and exclusive rights to represent th[e] manufacturer in the territory of Iraq for all of its products,'" and had to provide a "letter from the manufacturing company authori[z]ing [the supplier] to represent them." TAC ¶ 157 (quoting USAID, Pharmaceutical & Medical Products in Iraq § 6.5.1.1, Contract No. 267-C-00-04-00435-00 (Apr. 17, 2007)). FHLR registered Genentech and Roche Nutley as approved manufacturers, as required by the Ministry, *id.* ¶¶ 147, 315. FHLR used its manufacturer counterparts to certify the origin of its U.S. goods, *id.* ¶ 122. And FHLR certified that it was selling drugs on behalf of its U.S. manufacturers, *id.* ¶¶ 156-57, 314-15.[24] FHLR also relied on its U.S. manufacturer

[23] FHLR also acknowledges that it sold Tamiflu to the Ministry "outside the tender bidding process" in 2009. Dkt. 212-40 (Daouk Decl.) ¶ 20 n.4; Roche does not state where it manufactured Tamiflu, but public evidence indicates that Roche manufactured Tamiflu in the United States. *See* Center for Infectious Disease Research and Policy, *Roche to Build Tamiflu Plant in US* (Oct. 18, 2005), https://bit.ly/4ACYfhG.

[24] Other Defendants have provided examples of these applications and certifications. *See*, *e.g.*, Dkt. 149-5 (Clarkson Decl.) (attaching company registration forms and drug registration forms submitted by AstraZeneca to Kimadia). FHLR's motion does not attach any of these forms, which Plaintiffs have requested in discovery.

affiliates to obtain export certificates for each of the drugs it sold to Kimadia. For example, Roche Nutley obtained export certificates from the U.S. FDA authorizing the shipment of Herceptin into Iraq. *See*, *e.g.*, Ex. 4.

**3.** The exhibits attached to FHLR's motion also support the TAC's allegations that U.S. sourcing was material to FHLR's corrupt payments. The TAC alleges that under Kimadia regulations, "suppliers seeking to register U.S.-manufactured goods had to provide a certificate confirming that the U.S. Food and Drug Administration ('FDA') had approved the drug or device for sale in the United States, and such suppliers had to certify that they were sourcing the drug or device from the United States," and "had to write the country of origin . . . on the inner and outer packages of the drugs or devices shipped to Kimadia." TAC ¶ 152. FHLR further "agreed to procure letters from the U.S. Department of Commerce confirming that the drugs were manufactured in the United States." *Id.* ¶ 331.

FHLR's documents now confirm those allegations. Its contracts with Kimadia included express representations that the "Origin of the Goods" was the "USA," and that "all raw materials . . . will be of (USA) origin." *See*, *e.g.*, Dkts. 212-46 (SD-6), 212-51 (SD-11). They required FHLR to provide "certificate of origin," as well as a certification from the U.S. that the goods are consumed locally. *Id.* They contained "Special Conditions" requiring FDA certification and required the seller to "write the manufacturer name & country of origin on each inner & outer packing." *See* Dkt. 212-51 (SD-11); TAC ¶ 331; *see also* Dkt. 212-46 (SD-6) (similar). Though FHLR's motion does not attach those certifications, FHLR does not dispute that it provided them. And other documents attached to FHLR's motion confirm that it complied with Kimadia's instructions. *See generally* Dkt. 212-40 (Daouk Decl.). For example, FHLR wrote on the invoices for Herceptin: "We certify that the goods are of USA origin." Dkt. 212-31

(HW-20); *see* Dkt. 212-41 (SD-1) at 449, 521 (invoices for sale of Herceptin with USA origin). And Herceptin's outer packaging stated that it was "made for [FHLR] by Genentech, Inc, South San Francisco, California, USA." Dkt. 212-17 (HW-6).

**4.** In addition to selling U.S.-made drugs to Kimadia, FHLR "gave the Ministry extra batches of [U.S.-sourced] drugs . . . for free on top of the quantities Kimadia paid for." *Atchley I*, 22 F.4th at 212. These "[f]ree goods packaged alongside the paid goods, but which nobody expected to appear in the Ministry's inventory, were readily available to Jaysh al-Mahdi to sell on the black market." *Id.* This "provision of U.S.-manufactured drugs was, along with the provision of cash bribes, the very instrumentality the foreign defendants allegedly used to violate the ATA." *Id.* at 236.

Again, the contracts attached to FHLR's motion confirm these allegations. Each of the contracts contains a "free of charge" clause specifying that FHLR would provide free drugs to Kimadia on top of the drugs for which Kimadia had paid. *See* App'x A. In a 2011 Herceptin contract, for example, FHLR sold more than $11.2 million of Herceptin and provided an in-kind rebate worth $351,500. *Id.* Other examples include Neupogen (10.4% free goods relative to the total contract value, worth $103,386.68); Cymevene (11.4%, worth $11,265.75); and Zenapax (7.4%, worth $6,586.95). *Id.* Jaysh al-Mahdi monetized those "free goods" on the black market and used the funds to finance its attacks. TAC ¶¶ 313-15, 318.

The total wholesale value of the free drugs FHLR provided Kimadia was roughly $780,000. *See* App'x A. Their black-market value was likely much higher; the TAC explains (and FHLR does not dispute) that free drugs were sold on the black market "at 100-1000 percent above the sale price within the Iraqi health system." TAC ¶ 51. For example, FHLR's records

show that it charged Kimadia $650 for a 150mg vial of Herceptin, but the annual cost of Herceptin treatment for a single patient in 2012 was $54,000 per year. *Id.* ¶ 316.

### B. Procedural History

#### 1. FHLR's Previous Motions To Dismiss

Plaintiffs filed this action on October 17, 2017. Dkt. 1. Plaintiffs amended their complaint three times, but the last two simply added or swapped Plaintiffs and made no substantive changes. Dkts. 67, 106, 124. Plaintiffs have substantively amended only once: on March 12, 2018. Dkt. 67. Ever since, the allegations against FHLR have remained the same.

FHLR and other foreign Defendants jointly moved to dismiss each of Plaintiffs' four complaints for lack of personal jurisdiction. Dkts. 63, 70, 112, 130. FHLR also joined the other Defendants in moving to dismiss under Rule 12(b)(6), *see* Dkts. 72, 128, attaching more than 1,000 pages of factual materials excerpted from 93 sources, Dkt. 72-2. FHLR's personal-jurisdiction motion accepted the bulk of the jurisdictional allegations as true but argued that manufacturing or sourcing goods in the United States was legally insufficient to create specific personal jurisdiction. Dkt. 130-1 at 10-11, 16-19. It supported these arguments with declarations and exhibits, including two contracts with Kimadia. *See* Dkt. 130-1; Dkt. 130-3 (Zionts Decl. and Exs.). FHLR claimed the contracts showed that its sales to Kimadia "were for the sale of goods that . . . originated from *outside* the United States." Dkt. 30-1 at 5.

The Court granted FHLR's motions to dismiss and held that Plaintiffs had not satisfied the "minimum contacts" test then required for specific personal jurisdiction. Dkt. 138. The D.C. Circuit reversed, holding that Plaintiffs had sufficiently pleaded personal jurisdiction under the "minimum contacts" test. *Atchley I*, 22 F.4th at 231, 233. It noted that FHLR "dispute[d] only whether plaintiffs' claims 'arise out of or relate to' [its U.S.] contacts," and held that Plaintiffs

had satisfied this element in "four overlapping ways," though the Court emphasized that it did "not decide whether all four are necessary, nor whether one alone would suffice." *Id.* at 234.

The D.C. Circuit's four factors were: (1) the Foreign Defendants "worked with in-forum manufacturers," like Genentech and Roche Nutley, by "acting as those manufacturers' representatives in Iraq when they solicited Iraqi bids and fulfilled orders for the manufacturers' goods to be shipped there"; (2) "the goods the foreign defendants supplied from their U.S. affiliate manufacturers were, at least in significant part, U.S. goods"; (3) "the primary way in which plaintiffs allege that the foreign defendants actually violated the ATA was giving Jaysh al-Mahdi cash bribes and U.S.-manufactured free goods"; and (4) the "U.S. provenance of the medical goods mattered to" Jaysh al-Mahdi. *Id.* at 235-36.

**2. The Supreme Court's Vacatur and the D.C. Circuit's Second Opinion**

Shortly after the D.C. Circuit issued its decision, the Supreme Court decided *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which "clarified the scope of secondary liability under the ATA." *Atchley II*, 165 F.4th at 600. Citing *Taamneh*, Defendants sought Supreme Court review of whether Plaintiffs had stated a claim. Defendants did not seek certiorari on the D.C. Circuit's holding on personal jurisdiction, though they had petitioned for rehearing en banc on personal jurisdiction, which the full D.C. Circuit unanimously denied. *Atchley v. AstraZeneca UK Ltd.*, 2023 WL 1479424 (D.C. Cir. Feb. 2, 2023). The Supreme Court granted, vacated, and remanded for further consideration in light of *Taamneh*. *See AstraZeneca UK Ltd. v. Atchley*, 144 S. Ct. 2675, 2675-76 (2024) (Mem.).

On remand, the D.C. Circuit again reversed the dismissal of Plaintiffs' claims and remanded to this Court. *See Atchley II*, 165 F.4th at 615. On personal jurisdiction, the D.C. Circuit observed that after it announced its original opinion, the Supreme Court issued *Fuld*, which "reshaped the relevant jurisdictional inquiry" into a "more flexible" standard. *Atchley II*,

165 F.4th at 614. While noting that "Defendants did not seek certiorari on that issue," the D.C. Circuit stated that it would be "unlikely [to] reach a different conclusion" on personal jurisdiction "were we to apply the 'more flexible jurisdictional inquiry' that *Fuld* prescribes." *Id.* The D.C. Circuit "therefore reaffirm[ed] [its] holding that the district court may exercise personal jurisdiction over defendants." *Id.*

**3. FHLR's Renewed Motion To Dismiss**

After the D.C. Circuit's mandate, FHLR again moved to dismiss for lack of personal jurisdiction. FHLR now attaches 2,633 pages in support of its motion: the two contracts it attached to its original motions, plus five additional declarations and 64 additional exhibits, including (1) ten additional contracts between FHLR and Kimadia, *see* Dkts. 212-42 to 212-53 (SD-2 – SD-13); (2) a compilation of 165 invoices from 2003-11, *see* Dkt. 212-41 (SD-1); (3) sixteen drug package templates, Dkts. 212-12 to 212-27 (HW-1 – HW-16); (4) seventeen drug labels, Dkts. 212-56 to 212-72) (LJ-1 – LJ-17); and (5) seven contracts between FHLR and its domestic affiliates, *see* Dkts. 213-1 to 213-7 (JK-1 – JK-5, BR-1 – BR-2). All of these materials are dated 2012 or earlier; FHLR does not argue that any of them were unavailable when it filed its previous four motions to dismiss.

FHLR's motion omits important documents concerning its dealings with Kimadia and its collaboration with U.S. manufacturers. These include (1) documents related to the contract tendering process (such as registration forms and correspondence with Kimadia) akin to those that other Defendants have produced, *see* Dkt. 149-5; (2) correspondence between FHLR and its domestic affiliates; (3) correspondence or other documents generated by [redacted]; (4) internal FHLR records that are referenced in FHLR's declarations but not attached to its motion, *see, e.g.,* Dkt. 212-11 (Waelchli Decl.) ¶ 34; and (5) dozens of other inter-affiliate contracts that are referenced in the

seven inter-affiliate contracts that FHLR produced. Plaintiffs requested these documents from FHLR, but FHLR has not produced them. *See* Ex. 3; Schultz Decl. ¶¶ 23-36.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(2), the Court must "assume the truth of plaintiffs' factual allegations and draw all reasonable inferences in plaintiffs' favor." *Atchley I*, 22 F.4th at 214. Where a defendant submits extra-pleading materials, Plaintiffs' allegations are "presumed to be true unless directly contradicted by affidavit . . . or other evidence." *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 264 (D.D.C. 2011). Any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). To make a prima facie jurisdictional showing, Plaintiffs need not adduce "evidence that meets the standards of admissibility" that apply at summary judgment or trial. *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). Rather, Plaintiffs "may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

## ARGUMENT

### I. FHLR'S MOTION IS PROCEDURALLY BARRED

#### A. Rules 12(g)(2) and 12(h)(1) Bar FHLR's Successive Motion To Dismiss

Rule 12(g)(2) bars FHLR from "mak[ing] another motion under [Rule 12] raising a defense or objection that was available to [FHLR] but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). FHLR filed an "earlier motion," *see* Dkts. 111-112, 130, challenging the "legal sufficiency" of Plaintiffs' factual allegations, Mot. 41. FHLR's earlier motions argued that its transactions with Kimadia were not purposely directed at the United States, and that its manufacturing of drugs in the United States was insufficiently suit-related to subject it to

personal jurisdiction. Dkt. 130-1 at 10-19. The D.C. Circuit rejected its arguments. *See Atchley I*, 22 F.4th at 231-38.

FHLR now "raise[s] fact-based challenges" to personal jurisdiction, Mot. 41, based on documents that were available when FHLR filed its earlier motions. Its new motion argues that it did not sell enough U.S.-made drugs to support the constitutional exercise of jurisdiction. Mot. 17-21. Because FHLR's new arguments, and the facts supporting them, were "available" during the prior briefing, Rule 12(g)(2) provides that FHLR "must not make another motion" now seeking dismissal on personal-jurisdiction grounds. This rule protects against "dilatory motion practice" by preventing parties from stringing together dismissal motions "in sequence"—the very tactic FHLR attempts here. 5C *Wright & Miller's Fed. Prac. & Proc. Civ.* § 1384 at 2 (3d ed. 2026) (Rule 12(g)).

Rule 12(h)(1)(A) confirms that FHLR has waived the personal-jurisdiction challenge it presses now. That rule provides that a party waives a personal jurisdiction defense by "omitting it from a motion in the circumstances described in Rule 12(g)(2)," Fed. R. Civ. P. 12(h)(1)(A) – in other words, when the newly raised defense was available earlier. "Claims regarding defects in personal jurisdiction are waived if not raised." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 453 (D.C. Cir. 1990) (citing Rules 12(g)-(h)); *Davis v. Cross*, 774 F. Supp. 2d 62, 63 n.2 (D.D.C. 2011) (Leon, J.) ("[A] defendant can always waive his personal jurisdiction defenses by failing to raise [them] in a responsive motion filed under Rule 12."). Because FHLR's fact-based jurisdictional arguments and supporting documents were available when FHLR filed its initial motion, FHLR waived these objections by failing to raise them.

That FHLR's initial motion challenged the legal sufficiency of Plaintiffs' jurisdictional allegations is not enough to preserve the challenge it raises now. Raising one personal

jurisdiction argument in an initial motion "does not preserve" other such arguments. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016) (party that raised one "defense resting on personal jurisdiction" nonetheless "waived" a personal jurisdiction defense based on a "separate" ground); *see Foremost-McKesson*, 905 F.2d at 453 (invoking one personal jurisdiction defense does not preserve a different "ground for a claim of lack of *in personam* jurisdiction") (citing Rules 12(g), (h)); *see also Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 258 (E.D.N.Y. 2010) (denying subsequent Rule 12(b)(2) motion to dismiss).

The Rule's text reinforces this reading. It requires an initial motion to include any "defense or objection that was available." Fed. R. Civ. P. 12(g)(2). "If a party can preserve any objection [based on a Rule 12(b) defense] by simply raising [the] defense – regardless of the objection underlying that defense – then the word 'objection' in Rule 12(g)(2) would be superfluous." *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 265 F. Supp. 3d 1196, 1201-02 (D. Or. 2017) (collecting cases that "defendants waived" venue objections, "despite having raised [different] venue defenses" in earlier motions). Raising one of the listed defenses "is not sufficient to preserve every objection" based on that defense. *Id.* (citing *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 2017 WL 2651618, at *21 (E.D. Tex. June 20, 2017)).

**B. FHLR's Arguments Against Application of Rules 12(g) and 12(h) Fail**

**1.** FHLR cites (at 40-41) a January 30, 2020 stipulated order that it claims "authoriz[ed]" this motion. *See* Dkt. 126. That order merely allowed defendants to move to dismiss the TAC by re-filing the briefing they had directed at a previous complaint. The point was to streamline the docket and allow the existing briefing to efficiently "apply to the new motions." *Id.* That order did not authorize Defendants to raise new arguments they had already waived.

In the sentence FHLR selectively quotes, the order provided that "[s]hould Defendants at a later date wish to assert grounds for dismissing or severing the TAC's *amended or newly-added claims or Plaintiffs* for reasons in addition to those asserted in Defendants' Existing Briefs, nothing in this Order prevents them from doing so." *Id.* at 2 (emphasis added). That sentence preserved Defendants' right to seek dismissal of *newly added* claims or Plaintiffs – which, by definition, were not "available" to Defendants when they filed their original motion. But the order did not permit Defendants to circumvent Rules 12(g) and 12(h) by raising new arguments they had previously forfeited. Indeed, the TAC did not change any substantive allegations against Defendants. *See* Dkt. 125-1 (redline of TAC). FHLR's belated attempt to dismiss claims that "appeared in [the] complaints since the case was filed" is "waived." *Cheese Depot, Inc. v. Sirob Imports, Inc.*, 2016 WL 6082352, at *2 (N.D. Ill. Oct. 18, 2016) (quoting *About U.S. Real Estate, Inc. v. Burnley*, 2015 WL 3397025 (N.D. Ill. May 26, 2015)).[25]

**2.** FHLR's other arguments largely repeat the unpersuasive arguments that AstraZeneca raised to justify its own successive Rule 12(b)(2) motion, which Plaintiffs' prior briefs address comprehensively. *See* Dkts. 157 at 17-24, 168-01 at 2-12. Like AstraZeneca, FHLR argues (at 43) that it raised the broader "defense" of personal jurisdiction in its first motion and now "simply seeks to support that defense with facts rather than with legal challenges to Plaintiffs' pleadings." The D.C. Circuit's decisions in *Gilmore* and *Foremost-McKesson* foreclose that argument. *Gilmore* held that a party waives a personal jurisdiction defense not brought in its first motion, even if the first motion raised a personal jurisdiction

[25] The D.C. Circuit's statement in its first decision in this case that the case remains at the motion-to-dismiss stage also does not help Roche. *See* Mot. at 42 n.32. The decision is left "to the district court to decide in the first instance whether plaintiffs have alleged an act of international terrorism as required to plead direct liability" – i.e., whether Plaintiffs have stated a claim on which relief can be granted. *Atchley I*, 22 F.4th at 238.

defense resting on a "separate" ground. *See* 843 F.3d at 964. And *Foremost-McKesson* held that invoking one personal jurisdiction defense does not preserve a different "ground for a claim of lack of *in personam* jurisdiction." 905 F.2d at 453. FHLR has no answer for either case.

FHLR still seeks (at 40) an exception to the Federal Rules based on the "circumstances" of the case. It argues that departing from the clear language of Rules 12(g)(2) and Rule 12(h) is "sensible" because following the rules would have required FHLR to "incur significant time and costs" gathering facts earlier in the case. *Id.* at 40, 41. But FHLR's policy argument just confirms the waiver by making clear that FHLR's failure to raise these arguments in its earlier motions was a conscious choice. Forcing defendants to raise threshold defenses early promotes judicial economy and minimizes delays at the pleading stage. The advisory committee's note to the 1966 amendment to Rule 12 explains that "[a] party who by motion invites the court to pass upon a threshold defense should bring forward all the specified defenses he then has and thus allow the court to do a reasonably complete job." FHLR's latest motion flouts that principle.

Courts have recognized that "[t]he policy behind Rule 12(g) is to prevent piecemeal litigation in which a defendant moves to dismiss on one ground, loses, then files a second motion on another ground." *Brooks v. Warden*, 706 F. App'x 965, 969 (11th Cir. 2017) (quoting *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012)); *see also Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 (5th Cir. 1993) (citing Rule 12(g)'s "salutary" "consolidation requirement" and holding the rule barred a motion to dismiss where defendant "waited until its second motion to raise" new "grounds for dismissal"). FHLR attempts that maneuver here, and the Court should reject it for the same reasons.[26]

---

[26] The cases FHLR cites – *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 108 (D.D.C. 2018), and *Federal Deposit Ins. Corp. v. U.S. Titles, Inc.*, 939 F. Supp. 2d 30, 33-34 (D.D.C.

In any event, Rule 12(g)(2) is mandatory: a defendant "must not" file a successive motion to dismiss based on arguments that were "available" earlier. *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) ("The Federal Rules are as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the . . . mandate [of a Federal Rule] than they do to disregard constitutional or statutory provisions."); *United States v. Zaia*, 751 F. Supp. 2d 132, 144 (D.D.C. 2011) (when the Federal Rules use "must," the "language is mandatory" and courts lack discretion).

FHLR's related argument that courts allow "phased resolution" of personal jurisdiction, *e.g.* Mot. at 43, is a red herring. The cases FHLR cites (at 44) are distinguishable. In *Crane v. New York Zoological Society*, 894 F.2d 454, 456 (D.C. Cir. 1990), a second motion was made *after* the plaintiff had the opportunity to "obtain discovery of jurisdictional facts." If anything, this case supports the conclusion that granting defendant's motion without affording Plaintiffs jurisdictional discovery would be error. *See also infra* Part II (explaining that the cases FHLR cites support the need for jurisdictional discovery).

FHLR's argument (at 43-44) that courts allow *renewal* of a motion to dismiss is likewise inapposite. In *Stralia Maritime, S.A. v. Praxis Energy Agents DMCC*, 431 F. Supp. 3d 366, 368 (S.D.N.Y. 2019), the court denied the initial motion without prejudice to renew it at a later time, which the defendant did. *See also Arista Recs., Inc. v. Sakfield Holding Co. S.L.*, 314 F. Supp. 2d 27, 28-29 (D.D.C. 2004) (court granted jurisdictional discovery before allowing defendant to renew motion to dismiss). By contrast, FHLR does not seek merely to renew its prior motion or support it with additional facts, but to raise new arguments. *See supra* pp. 18-21. FHLR points

2013) – do not support its policy arguments. Neither case concerned successive motions or waiver under Rule 12(g) and Rule 12(h)(1).

to no case allowing a defendant to reserve available arguments in a first motion to dismiss for lack of personal jurisdiction and raise them in a successive motion to dismiss.

## II. FHLR'S FACT-BASED MOTION IS IMPROPER WITHOUT DISCOVERY

The D.C. Circuit has "held many times" that "discovery is justified" when it will allow a plaintiff to "supplement its jurisdictional allegations." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020); *see also Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001) (a "plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery"). The "standard for permitting jurisdictional discovery is quite liberal." *Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 74 (D.D.C. 2008). The "only requir[ement]" is "that a plaintiff 'have at least a good faith belief that such [jurisdictional] discovery will enable it to show that the court has personal jurisdiction over the defendant.'" *Aljabri v. bin Salman*, 106 F.4th 1157, 1165 (D.C. Cir. 2024) (quoting *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014)). Plaintiffs have met that liberal standard here by identifying numerous categories of discovery that would allow them to supplement their jurisdictional allegations. *See* Schultz Decl. ¶¶ 27-36.

District courts abuse their discretion when they fail to allow such discovery, even if a plaintiff's "allegations are insufficient" on their own to make a "prima facie case" of jurisdiction. *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996). The cases FHLR cites (at 44) are in accord. *See Miller v. Holzmann*, 2006 WL 568722, at *21 (D.D.C. Mar. 9, 2006) ("abuse of discretion" to deny jurisdictional discovery if the nonmovant establishes that discovery could establish jurisdiction), *report & recommendation adopted in part and overruled in part*, 2007 WL 710134 (D.D.C. Mar. 6, 2007); *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009) (court "should ordinarily allow discovery on jurisdiction").

FHLR's alternative framing of this motion, which seeks summary judgment, is likewise premature. Rule 56(d) provides that where the nonmovant shows that "it cannot present facts essential to justify its opposition," the Court may "defer considering the motion or deny it" or may "allow time . . . to take discovery." Fed. R. Civ. P. 56(d). That rule exists to prevent summary judgment motions like this one. *See U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 880 F. Supp. 2d 36, 41 (D.D.C. 2012) ("Rule 56(d) is provided to ensure that the non-moving party isn't 'railroaded' by a premature motion for summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014).

To satisfy Rule 56(d), Plaintiffs need only attach a declaration specifying the reasons discovery is needed. Fed. R. Civ. P. 56(d). Here, Plaintiffs attach such a declaration. *See* Decl. of T. Schultz. As set forth in that declaration, FHLR has (for nearly a decade) objected to discovery at every turn. Plaintiffs served FHLR with discovery requests on June 5, 2026, nearly two months before it filed this motion. Yet, FHLR still largely refused to produce responsive documents. *Id.* ¶¶ 18-28.

For Plaintiffs to adequately respond to FHLR's factual claims, jurisdictional discovery is required. Plaintiffs have identified numerous categories of evidence that would be relevant to such discovery. *See* Schultz Decl. ¶¶ 27-36. FHLR objects only (at 42, 45 n.34) to "full discovery on the merits," but makes no argument as to why Plaintiffs should be denied jurisdictional discovery. *Accord Farouki v. Petra Int'l Banking, Corp.*, 683 F. Supp. 2d 23, 28 (D.D.C. 2010). Indeed, FHLR itself previously argued – in a brief it filed supporting AstraZeneca's 2023 motion to dismiss – that it would be entitled to raise a factual challenge to personal jurisdiction "following relevant discovery." Dkt. 163, at 1-2. That discovery has not yet occurred.

## III. UNDER *FULD*, WHICH CONTROLS, DUE PROCESS IS SATISFIED

"The traditional personal jurisdiction analysis asks first whether an applicable long-arm statute authorizes the court to hear the case, and second whether doing so comports with due process." *Atchley I*, 22 F.4th at 231. Here, the "applicable long-arm statute" is Federal Rule of Civil Procedure 4(k)(2). *Id.* The D.C. Circuit already has decided that the "statutory" elements of Rule 4(k)(2) are "readily satisfied" in this case. *Id.* The only remaining question is the constitutional one: whether the exercise of personal jurisdiction over FHLR is consistent with the Fifth Amendment's Due Process Clause. *See* 4A Charles Alan Wright et al., *Federal Practice and Procedure* § 1075 (4th ed. 2026). It is.

### A. *Fuld* Authorizes Personal Jurisdiction Over FHLR

*Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), "reshaped the relevant jurisdictional inquiry" under the Fifth Amendment. *Atchley II*, 165 F.4th at 614. Abrogating the D.C. Circuit's prior precedent, the Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment." *Fuld,* 606 U.S. at 16. The Court held that "the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* Although *Fuld* did not "delineate the outer bounds" of that test, it identified one set of facts that satisfies it: personal jurisdiction is proper when the defendant engages in "conduct closely related to the United States that implicates important foreign policy concerns." *Id.* at 18-19.

*Fuld* addressed the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), which authorized personal jurisdiction over the Palestine Liberation Organization (PLO) for ATA claims if it committed certain predicate acts. Those included "mak[ing] any payment" to individuals (or families of individuals) who "commit[ed] any act of terrorism that injured or killed a national of the United States." 18 U.S.C. § 2334(e). *Fuld* held that the

PSJVTA's jurisdiction-triggering predicate – paying money to terrorists – was "closely related to the United States" because it "further[ed] the Federal Government's longstanding policy of deterring these sorts of payments, which the United States has determined promote acts of terror that may injure or kill Americans." 606 U.S. at 21. The Court also concluded that the "foreign policy concerns" were obvious. *Id.* at 18. The "Federal Government has an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable." *Id.* at 24. Finally, *Fuld* did not decide whether the Fifth Amendment requires courts to conduct a separate "reasonableness" inquiry before exercising personal jurisdiction – balancing "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief" – but noted that jurisdiction over the PLO would "easily" satisfy any such inquiry. *Id.* at 23-24.

*Fuld* authorizes personal jurisdiction over FHLR. At the threshold, all ATA cases satisfy *Fuld*. ATA claims involve conduct "closely related to the United States," *id.* at 18: terrorist attacks on U.S. nationals. *See* 18 U.S.C. § 2333(a). The Supreme Court repeatedly has "recognized the National Government's interest in holding accountable those who perpetrate an 'act of violence' against U.S. nationals – who, even when physically outside our borders, remain 'under the particular protection' of American law." *Fuld*, 606 U.S. at 15 (quoting *Gamble v. United States*, 587 U.S. 678, 687 (2019)). ATA cases also "implicate[] important foreign policy concerns." *Id.* at 18-19. The Act "ensures, as part of a broader foreign policy agenda, that Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation." *Id.* at 21. In particular, the Federal Government "has a strong interest in permitting American victims of international terror to pursue justice in domestic courts." *Id.* at 20. U.S. lawsuits are "vital to 'furthering the safety of Americans abroad,

facilitating compensation for injuries or death, and deterring international terrorism.' " *Id.* Because this is an ATA case, this Court may exercise personal jurisdiction over FHLR.

One court already held that the Fifth Amendment broadly authorizes personal jurisdiction in ATA cases. In *Finan v. Lafarge S.A.*, the court addressed ATA claims against a French cement company that funded ISIS's attacks against Americans in Syria. The court stressed "the unique interest that the United States has in allowing cases like Plaintiffs' to be heard in federal courts." 2025 WL 2504317, at *16 (E.D.N.Y. Aug. 29, 2025) (citing JASTA § 2(a)(7)). It likewise observed that the plaintiffs' ATA claims "implicate[d] important foreign policy and national security concerns." *Id.* at *17. For those reasons, the court held that exercising jurisdiction complied with the Fifth Amendment. *See id.* at *16-17. This Court should reach the same conclusion: the Fifth Amendment authorizes personal jurisdiction in ATA cases.

Congress's legislative findings confirm the point. In 2016, Congress passed the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), adding aiding-and-abetting liability for companies like FHLR that paid off terrorists who were actively attacking U.S. forces. JASTA's legislative findings detailed how "terrorism is a serious and deadly problem that threatens the vital interests of the United States." JASTA § 2(a)(1). So Congress concluded that entities that "contribute material support or resources" to terrorists that attack Americans "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court" here. JASTA § 2(a)(6). Those jurisdictional findings are vital to the statute's design. As Congress has emphasized, it is "long-standing policy" that "civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States." Sudan Claims Resolution

Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 1182, 3291, 3294-95 (2020). That is true of every ATA case, including this one.

But even if all ATA cases did not categorically satisfy *Fuld*, FHLR's conduct here was "closely related to the United States" and "implicate[d] important foreign policy concerns." *Fuld*, 606 U.S. at 18-19. The TAC alleges – and FHLR does not dispute for purposes of this motion – that FHLR's corrupt payments to Jaysh al-Mahdi caused the deaths of hundreds of American servicemembers and civilian contractors in Iraq. TAC ¶¶ 169, 3187, 3210, 3217; *see Mwani*, 417 F.3d at 13 (finding personal jurisdiction over foreign defendants whose actions abroad were "directed at [and] felt in" the United States). FHLR provided these corrupt payments in the form of U.S.-manufactured goods, pursuant to collaborative sales efforts with U.S. manufacturers under contracts governed by U.S. law and with U.S. arbitration clauses. *Supra* pp. 7-9. There is little difference between FHLR's illicit payments to terrorists in Iraq and the PLO's bounties paid to terrorists operating in the West Bank.

FHLR's terrorist payments also raise serious foreign policy concerns. As the Court held in *Fuld*, American lawsuits against terrorist funders "further[] the Federal Government's longstanding policy of deterring these sorts of payments, which the United States has determined promote acts of terror that may injure or kill Americans." 606 U.S. at 21. Likewise here, FHLR's wrongful conduct funded terrorist attacks against Americans, TAC ¶ 356, thereby implicating the foreign policy concerns underpinning the ATA. Indeed, FHLR's corrupt payments presented a considerable threat to U.S. operations in Iraq. FHLR fueled corruption at the Ministry, which U.S. authorities called "the second insurgency" in Iraq, by "providing the money, the people and the motivation [for Jaysh al-Mahdi] to fight Americans." TAC ¶ 172. Stopping these kinds of terrorist payments is fundamentally important to U.S. national security.

Finally, exercising personal jurisdiction over FHLR is reasonable: any burden on FHLR is minimal and vastly outweighed by the interests of the United States and Plaintiffs in obtaining relief. Again, "the Federal Government has an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable." *Fuld*, 606 U.S. at 24. That interest extends to holding accountable entities like FHLR that aid and abet terrorists. *Atchley I*, 22 F.4th at 234-35. And FHLR can claim no meaningful burden from litigating in this Court. It is the self-described "world's largest biotech company," *supra* pp. 4-5, and as a sophisticated corporation with sophisticated U.S. counsel, it "would not be burdened that much" by litigating here. *King v. Bon Charge*, 823 F. Supp. 3d 508, 519 (D. Del. 2025) (applying *Fuld*). FHLR has "hired local counsel, documents can all be exchanged and served electronically, and counsel can communicate by video or phone." *Id.*; *see Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005) (no undue burden to French defendant litigating in Utah). Under any balancing test, exercising personal jurisdiction in this case is fundamentally fair.

### B. FHLR's Arguments Against *Fuld*'s "More Flexible Inquiry" Fail

FHLR offers (at 32-39) a battery of arguments against applying *Fuld*'s "more flexible jurisdictional inquiry," 606 U.S. at 16, instead arguing that the old "minimum contacts" standard still applies. FHLR's arguments conflict with *Fuld* itself and ignore the D.C. Circuit's holding *in this case* that *Fuld* "reshaped the relevant jurisdictional inquiry" into a "more flexible" test. *Atchley II*, 165 F.4th at 614. That binding precedent forecloses FHLR's arguments.

#### 1. *Fuld's* Holding Is Not Limited to the PSJVTA or Federal Statutes Authorizing Personal Jurisdiction

FHLR asserts (at 32-33, 37) that *Fuld* "applie[s] to the limited 'subset of federal cases' in which 'personal jurisdiction is authorized by a federal statute,'" like the PSJVTA (quoting *Fuld*,

606 U.S. at 11-12). But *Fuld* did not limit its holding only to cases where federal law expressly authorizes jurisdiction. Instead, it held that that "difference[s] between the Fifth and Fourteenth Amendments" are "implicated in only a subset of federal cases, *such as those* in which personal jurisdiction is . . . authorized by a federal statute." 606 U.S. at 11 (emphasis added).

*Fuld* itself was a case under Rule 4(k)(1)(C). But "Rule 4(k)(2) cases also fall within that subset." *Rodriguez v. Imperial Brands, PLC*, 182 F.4th 1333, 1346 (11th Cir. 2026). The D.C. Circuit agreed that "[w]hile *Fuld* dealt only with Congress's ability to extend personal jurisdiction by statute, the Supreme Court broadly 'decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment.'" *Gligorov v. Nation of Brunei*, 185 F.4th 1169, 1180 (D.C. Cir. 2026) (quoting *Fuld*, 606 U.S. at 16). For that reason, many courts have applied *Fuld*'s flexible jurisdictional inquiry to cases where "Rule 4(k)(2) provides a proper basis for [the] court's exercise of personal jurisdiction." *Lafarge*, 2025 WL 2504317, at *16; *see X Corp. v. World Fed'n of Advertisers*, 826 F. Supp. 3d 772, 792-93 (N.D. Tex. 2026) (applying *Fuld* to antitrust claims); *Orient Plus Int'l Ltd. v. Baosheng Media Group Holdings Ltd.*, 799 F. Supp. 3d 310, 334-35 (S.D.N.Y. 2025) (securities law); *King*, 823 F. Supp. 3d at 516-17 (Telephone Consumer Protection Act); *Devas Multimedia Priv. Ltd. v. Antrix Corp. Ltd.*, 2026 WL 2330570, at *7-8 (9th Cir. Aug. 12, 2026) (FSIA).

FHLR is also incorrect to suggest (at 32-33) that *Fuld* turned on "Congress's judgment" limited to the PSJVTA. The Court's holding was much broader. It "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment" not because of some legislative intent but because, as a constitutional matter, "the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld*, 606 U.S. at 16. At any rate, congressional intent also favors

jurisdiction here. Through JASTA, Congress condemned any entities that "knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States." JASTA § 2(a)(6). Such entities "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States," without regard to any "minimum contacts" test. *Id.*

**2. FHLR's Attempts to Revive the Minimum Contacts Test Fail.**

FHLR attempts to reinstate the pre-*Fuld* minimum contacts test by arguing that even if the Fifth Amendment does not require it, "the ATA itself and the Federal Rules" require minimum contacts "as a statutory matter." These arguments fail.

FHLR first attempts (at 34) to resurrect a minimum-contacts test from the ATA's nationwide service provision, 18 U.S.C. § 2334(a), which authorizes service "in any district where the defendant . . . is found." But Plaintiffs did not rely on the ATA's nationwide service provision to serve FHLR, so it is irrelevant to personal jurisdiction over FHLR. Instead, Plaintiffs served FHLR by "means not prohibited by international agreement" (electronically and through FHLR's agents) under Rule 4(f)(3). Fed. R. Civ. P. 4(f)(3); *see* Minute Order (Nov. 28, 2017); Dkt. 56; *see*, *e.g.*, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 234 (5th Cir. 2022) (under Rule 4(k)(2), a party may employ any proper method of service). FHLR does not argue that Rule 4(f)(3) requires "minimum contacts" with the United States.

FHLR next argues (at 34-35) that Rule 4(k)(2) itself requires "minimum contacts" with the United States. Many post-*Fuld* courts have rejected that argument, applying *Fuld's* "more flexible" inquiry to Rule 4(k)(2) cases. *See supra* p. 31. FHLR's contrary argument is unpersuasive. It asserts (at 35) that Rule 4(k)(2)'s reference to "the United States Constitution *and laws*," implicitly incorporates the ATA's nationwide service provision and thus requires

minimum contacts. But Rule 4(k)(2) only requires that exercise of jurisdiction be "consistent with the United States constitution and laws." A nationwide service provision does not make the exercise of jurisdiction worldwide "inconsistent"—especially where, as here, Plaintiffs have not even relied on the nationwide service provision to serve FHLR. The Seventh Circuit addressed this issue in *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934 (7th Cir. 2000) and held that nationwide service provisions still allow jurisdiction under Rule 4(k)(2) because "use of the word 'consistent' in Fed. R. Civ. P. 4(k)(2) does not require that a statute explicitly permit worldwide service of process." *Id.* at 941.

FHLR cites (at 34-35) pre-*Fuld* cases requiring minimum contacts analysis under Rule 4(k)(2), relying on a now-overruled conflation of the Fifth and Fourteenth Amendments. But the same issues apply: the D.C. Circuit has already established *in this case* that *Fuld* supplanted the Fourteenth Amendment test with a more "flexible inquiry," and this District has observed that "*Fuld* lowers the constitutional floor" in Rule 4(k)(2) cases, "even though *Fuld* did not squarely involve an application of that rule." *Cent. Am. Bank for Econ. Integration v. Mossi*, 2025 WL 2732731, at *8 (D.D.C. Sept. 25, 2025). Indeed, when *Fuld* rejected the minimum-contacts test, it directly abrogated the D.C. Circuit precedent that had adopted it. *Compare Livnat v. Palestinian Auth.*, 851 F.3d 45, 54 (D.C. Cir. 2017) ("No court has ever held that the Fifth Amendment permits personal jurisdiction without the same 'minimum contacts' with the United States as the Fourteenth Amendment requires with respect to States."), *with Fuld*, 606 U.S. at 7-8 (abrogating *Livnat*); *see* Dkt. 116 (FHLR citing *Livnat* in support of motion to dismiss for lack of personal jurisdiction).

**3. FHLR did not lack fair notice.**

FHLR also argues (at 37-39) that it did not have fair notice of being haled into a U.S. court. But Congress's legislative judgment demonstrates why FHLR had fair notice. Since

1992, Congress has intended the ATA to "provid[e] victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories." S. Rep. No. 102-342, at 22 (1992). Congress reaffirmed that view in 2016 when enacting JASTA, which reflected "Congress's considered judgment" that "federal court jurisdiction over ATA claims is appropriate and consistent with the Due Process Clause." Amicus Br. of U.S. Senators Charles E. Grassley et al. at 5, S*okolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Apr. 6, 2017), 2017 WL 1291691. By funding terrorists who attacked Americans, FHLR received more than adequate notice that it might be haled into U.S. courts to answer for the harm its actions caused.

The evidence reinforces that FHLR had notice of its exposure to liability in U.S. courts. FHLR sourced the critical API for many of its drugs sold to terrorists from the United States. FHLR sold millions of dollars' worth of U.S.-origin drugs to the Ministry. And FHLR provided these drugs to the Ministry under multiple licensing agreements with its domestic affiliates where FHLR consented to arbitration in the United States. *Supra* pp. 7-9.

The cases that have found no jurisdiction under *Fuld* provide a useful contrast. In those cases, the controversy had no material connection to the United States. In *Gligorov*, for instance, a Slovenian national sued the government of Brunei and others for an alleged conspiracy to, among other things, "destroy his reputation and business." 185 F.4th at 1175. The Court held there was no personal jurisdiction because the plaintiff was "not a U.S. national or resident," he lacked "any significant business ties to the United States," and "virtually all of" defendants' alleged misconduct "occurred overseas and affected the overseas business of a foreign businessman." *Id.* at 1181. Similarly, in *Rodriguez*, the defendants' alleged conduct – violations of the Helms-Burton Act – "had no meaningful relationship to the United States." 182 F.4th at 1348; *see id.* at 1349-50 (similar). One defendant was the parent company of two U.S.

subsidiaries that provided marketing services to a state-owned, Cuban tobacco company; the other defendant was a passive owner in that same state-owned enterprise. *Id.* at 1338-39, 1348-50. *Gligorov* and *Rodriguez* thus bear no resemblance to this case: FHLR financed the Jaysh al-Mahdi's attacks on American soldiers by giving it free drugs from the United States. As in *Fuld*, the United States has an overwhelming interest in adjudicating such claims.

## IV. EVEN IF THE FOURTEENTH AMENDMENT'S MINIMUM CONTACTS TEST APPLIED, DUE PROCESS WOULD BE SATISFIED

Even if the D.C. Circuit's four-factor test for personal jurisdiction under the "minimum contacts" standard survived *Fuld*, Plaintiffs satisfy those factors. The unrebutted allegations and evidence show that (1) FHLR "worked with in-forum manufacturers" to sell drugs to Kimadia; (2) the drugs FHLR sold Kimadia "were, at least in significant part, U.S. goods"; (3) FHLR gave Jaysh al-Mahdi "U.S.-manufactured free goods" as "bribes"; and (4) the "U.S. provenance of the medical goods mattered to" Jaysh al-Mahdi. *Atchley I*, 22 F.4th at 234-36.

**1.** The D.C. Circuit's first factor supports jurisdiction because FHLR "worked with in-forum manufacturers" Genentech and Roche Nutley by "acting as those manufacturers' representative[] in Iraq when [it] solicited Iraqi bids and fulfilled orders for the manufacturers' goods to be shipped there," participating in a "cooperative business model [that] benefitted from the protections of U.S. law." *Atchley I*, 22 F.4th at 234-35. The contracts attached to FHLR's motion prove that collaboration and reveal collaborative efforts more extensive than previously known. For example, the contracts [redacted]" Dkt. 213-1 (JK-1) at 20; *see also* Dkt. 213-2 (JK-2) at 17-18 (similar); Dkt. 213-5 (JK-5) at 9-10 (similar).

The "cooperative business model" between FHLR and its U.S. counterparts "benefit[t]ed from the protections of U.S. food and drug law, customs and export law, and intellectual property regime." *Atchley I*, 22 F.4th at 235. Not only do the contracts [redacted], but they also contemplate an ongoing relationship centered around the United States. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) ("with respect to . . . contractual obligations," "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities"). All contracts contain [redacted]. *See*, *e.g.*, Dkt. 213-1 (JK-1) at 36; Dkt. 213-2 (JK-2) at 47; Dkt. 213-3 (JK-3) at 21; Dkt. 213-4 (JK-4) at 6; Dkt. 213-5 (JK-5) at 37; *see also* Dkt. 213-6 (BR-1) at 10 (selecting "[redacted]"); Dkt. 213-7 (BR-2) at 9 (same). All contracts [redacted]. *See e.g.*, Dkt. 213-1 (JK-1) at 34; Dkt. 213-2 (JK-2) at 45; Dkt. 213-3 (JK-3) at 19. At least two of the agreements [redacted]." Dkt. 213-3 (JK-3) at 5; *see* Dkt. 213-5 (JK-5) at 6 (similar). While another [redacted] Dkt. 213-1 (JK-1), Appendix B at 12.

FHLR also collaborated with its U.S. affiliates during the Kimadia tendering process. *Supra* pp. 12-13. FHLR does not dispute the allegations that FHLR demonstrated to Kimadia "sole and exclusive rights to represent th[e] manufacturer in the territory of Iraq for all of its products," provided a "letter from the manufacturing company authori[z]ing [the supplier] to represent them," and registered Genentech and Roche Nutley as approved manufacturers. TAC

¶ 157; *see id.* ¶¶ 147, 315. FHLR used its manufacturer counterparts to certify the origin of its U.S. goods, *id.* ¶ 122, certified that it was selling drugs on behalf of its U.S. manufacturers, *id.* ¶¶ 156-57, 314-15, and relied on its domestic manufacturer affiliates to obtain export certificates for each of the drugs it sold to Kimadia. *Supra* p. 13. Those unrebutted allegations further demonstrate the collaboration between FHLR and its U.S. affiliates to sell drugs to the Ministry.

FHLR contends (at 15) that the D.C. Circuit's first factor cuts against jurisdiction because FHLR was not the legal "agent" of Genentech or Roche Nutley. But that is not the standard that the D.C. Circuit articulated. While the court informally referred to suppliers as "agents" of manufacturers, it never required suppliers to be *legal* agents for manufacturers or applied formal agency principles. Instead, it evaluated whether the entities engaged in (1) "collaboration"; (2) "a business opportunity beneficial to both the foreign supplier . . . and their U.S. manufacturer affiliates"; and (3) the sale of U.S. products in Iraq, including where U.S. "contract law would have . . . governed interactions between the foreign suppliers and their U.S. manufacturers, and their businesses benefited from the protections of U.S. [law]." *Atchley I*, 22 F.4th at 234-35. The facts here satisfy these inquiries.

In any event, even if a formal agency relationship were required, the evidence of close collaboration between FHLR and its domestic affiliates suffices to show such a relationship – or at the very least presents a factual question. *See Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 497 (D.C. Cir. 2016) (existence of agency relationship is a "factual determination"). FHLR argues that its contracts with its domestic affiliates disclaim an agency relationship, but "parties cannot by ukase negate agency if the relation the contract creates is *substantively* one of agency." *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020) (citing *Restatement (Third) of Agency* § 1.02 (2006)).

**2.** The D.C. Circuit's second factor supports jurisdiction because "[t]he goods [FHLR] supplied from [its] U.S. affiliate manufacturers were, at least in significant part, U.S. goods." *Atchley I*, 22 F.4th at 235. Of the drugs sold to the Ministry in the relevant period, ***42%*** (by value) had U.S.-made API or listed the U.S. as the country of origin – totaling nearly $46 million in sales to the Ministry. *See* App'x A. FHLR, for its part, calculates (at 18-19) that 27% of the drugs it sold Kimadia "had U.S.-made API," and that 16% "specified the drugs as being of U.S. origin." *See* Dkt. 212-40 (Daouk Decl.) ¶ 24. But whichever percentage one uses, courts have routinely found that far lower sales amounts are "substantial" or "significant" in conducting personal jurisdiction analyses.[27]

FHLR contends (at 17-19) that the D.C. Circuit's second factor cuts against jurisdiction because "[w]hat FHLR actually sold 'in significant part' to the Ministry . . . were drugs made in *foreign* countries with *foreign*-made API" – in other words, that the majority of the drugs FHLR sold to the Ministry were not made in the United States. But the second factor does not require a *majority* of FHLR's drugs to be U.S.-sourced – only that they be sourced from the U.S. "in significant part." 22 F.4th at 235. And as noted above, courts have upheld jurisdiction based on far smaller percentages of U.S.-based sales.

[27] *See*, *e.g.*, *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021) (finding the claims arise out of and relate to forum-related activities for Rule 4(k)(2) purposes where "about 10% of its total sales are to the United States"); *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436-38 (3d Cir. 1987) (finding minimum contacts with Pennsylvania where 0.066% of depositors resided in Pennsylvania and they contributed only 0.071% of the deposits); *Michigan Nat'l Bank v. Quality Dinette, Inc.*, 888 F.2d 462, 466 (6th Cir. 1989) (determining that 3% of total sales was "sufficiently 'continuous and systematic,' thereby warranting general personal jurisdiction"); *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1118-19 (9th Cir. 2015) (claims against individual defendant met statutory definition of "significant" because they affected 15-20% of defendants' overall activities and generated an estimated $5-8 million in damages); *Koyo Seiko Co., Ltd. v. U.S.*, 92 F.3d 1162, 1166 (Fed. Cir. 1996) (upholding "a one percent threshold for determining significance" under import law).

**3.** The D.C. Circuit's third factor supports jurisdiction because U.S.-made drugs (as well as other methods of providing bribes, like "Off-the-Books Payoff[s]") were "the very instrumentality" FHLR "used to violate the ATA." *Id.* at 236. *Every single contract* between FHLR and the Ministry provided for free drugs. *See supra* pp. 14-15. This evidence shows that the U.S.-sourced free drugs FHLR used to bribe the Ministry had a wholesale value of more than $780,000 – with a retail value many times that. *Supra* p. 14.

FHLR argues (at 19-21) that the third factor cuts against jurisdiction because the free drugs it used to bribe Jaysh al-Mahdi were a small proportion of the drugs it sold to Jaysh al-Mahdi. Again, this is not the standard the D.C. Circuit articulated; it said nothing about the size of Defendants' bribes relative to their sales. Instead it simply reasoned that these bribes were "part of how the foreign suppliers secured a market for U.S.-manufactured products." *Atchley I*, 22 F.4th at 235. The facts here confirm that part of the D.C. Circuit's analysis. And the facts show that these bribes were significant: more than $780,000 in wholesale value, and likely millions of dollars in black-market resale value. *See supra* p. 14.

FHLR also argues that this factor cuts against jurisdiction because its contracts for non-U.S.-sourced drugs also contained corrupt free-of-charge clauses. But the fact that FHLR may have bribed Kimadia with non-U.S.-sourced drugs does not diminish the U.S. contacts created by FHLR's bribes consisting of U.S.-manufactured drugs. Again, this argument finds no support in the D.C. Circuit's analysis.

Finally, FHLR argues (at 25-26) that the drugs at issue were "ill-suited for black market diversion" because they had no "conceivable recreational use" and required specific storage conditions. That mischaracterizes Plaintiffs' allegations, which do not depend on the premise that Jaysh al-Mahdi soldiers used free drugs "recreational[ly]." For example, the TAC explains

that the "rare, expensive drugs of the sort sold by Defendants" could be "effectively monetized on regional black markets or by Jaysh al-Mahdi doctors and pharmacists through their private clinics" and had a "high street value throughout the Middle East, given the chronic shortages at state-run clinics across the region." TAC ¶ 117. FHLR's unsupported speculation about the suitability of its drugs to black market diversion does not warrant dismissal, particularly in the face of unrebutted allegations that Jaysh al-Mahdi found a way to divert and sell *MRI machines* and other "large medical devices" on the black market. TAC ¶ 178.

**4.** The D.C. Circuit's fourth factor supports jurisdiction because the unrebutted allegations and evidence show that "the U.S. provenance of the medical goods mattered" to Jaysh al-Mahdi. *Atchley I*, 22 F.4th at 236. The TAC alleges that Jaysh al-Mahdi "placed a premium on importing medical goods manufactured in the United States and Europe – as goods sourced from other countries were considered less valuable; worth less on the black market; and more likely to be counterfeit." TAC ¶ 153. FHLR presents no evidence regarding the subjective mental states of Jaysh al-Mahdi terrorists or Ministry representatives. If anything, the evidence attached to FHLR's motion supports Plaintiffs' allegation. Each of FHLR's contracts with Kimadia required it to certify the origin of its goods, provide FDA approvals where applicable, and stamp the country of origin on the drugs' packaging. *See supra* pp. 13-14. FHLR's data also suggests that Jaysh al-Mahdi placed a premium on U.S. drugs in particular: Among drugs either listing the United States as the country of origin or containing U.S. API, the average unit price was $578.23 in the relevant period. *See* App'x A. The average unit price for all other drugs sold to the Ministry in the same period was $132.10. *See id.*

FHLR offers (at 22) a single, untested declaration from an FHLR "Logistics Manager" who claims that, to his knowledge, the Ministry did not express a preference for versions of

drugs that were sold in the United States. *See* Dkt. 212-40 (Daouk Decl.) ¶¶ 2, 25. But that employee did not assume his role at FHLR until 2009 – five years after Jaysh al-Mahdi assumed control of the Ministry. His declaration does not explain the basis for his personal knowledge of Jaysh al-Mahdi's preferences and contradicts the documentary evidence making clear that the U.S. sourcing was material to Jaysh al-Mahdi. *See supra* pp. 13-14; *Noble v. Sombrotto*, 84 F. Supp. 3d 11, 17 n.3 (D.D.C. 2015) (must be "a sufficient foundation for a finding that the matters discussed were within the declarants' personal knowledge").

FHLR also raises a series of factual arguments that improperly draw inferences in FHLR's favor. *First*, FHLR argues (at 22-23) that if the Ministry preferred U.S. drugs, it would have demanded the U.S.-branded version of MabThera, called Rituxan. But regardless of how this drug was branded, FHLR's contracts with Kimadia for MabThera expressly represent that "all raw materials" for MabThera are "of (USA) origin," Dkt. 212-47 (SD-7), and the packaging FHLR used for MabThera represents that it is "[m]ade for [FHLR] by Genentech Inc., South San Francisco, California, USA." Dkt. 212-19 (HW-8). These express indications of MabThera's U.S. sourcing make its brand name (MabThera or Rituxan) unimportant.

*Second,* FHLR argues (at 23-24) that the Ministry never paid a "premium" for U.S. goods because, in a single Herceptin contract sourced from Switzerland, the per milligram price of the drug was approximately the same as when sourced from the United States. This is consistent with the TAC's allegations that Jaysh al-Mahdi "placed a premium on importing medical goods manufactured in the United States and Europe" – i.e., in Western countries. TAC ¶ 153. The fact that Jaysh al-Mahdi may have assigned similar premiums to drugs manufactured in other Western countries does not mean that U.S. sourcing did not confer such a premium.

*Third,* FHLR argues (at 24-25) that "[i]f Jaysh al-Mahdi were truly fixated on U.S.-made drugs or U.S. API, one would expect that Jaysh al-Mahdi's control of the Ministry would correspond with a spike in Ministry demand for U.S.-made drugs from FHLR," but that this did not happen. This factual argument ignores other easy explanations for this trend, such as fluctuations in global supply or black-market demand.

*Finally*, FHLR argues (at 26-27) that the labelling and packaging of the drugs could not have mattered to Jaysh al-Mahdi or the Ministry because the labels on the drugs did not indicate that they were FDA-approved. That ignores the D.C. Circuit's opinion, which states in relevant part that "the supplier defendants . . . certified to Kimadia which drugs were American in origin, and wrote 'USA' on the packaging of the U.S.-origin goods." *Atchley I*, 22 F.4th at 236. That is precisely what FHLR did. *Supra* p. 13.

**CONCLUSION**

The Court should deny the motion or alternatively order jurisdictional discovery.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Joshua D. Branson*

David C. Frederick (D.C. Bar No. 431864)
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Thomas G. Schultz (D.C. Bar No. 1028017)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
tschultz@kellogghansen.com

Ryan R. Sparacino (D.C. Bar No. 493700)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*