**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOSHUA ATCHLEY *et al.*,

Plaintiffs,

v.

ASTRAZENECA UK LIMITED *et al.*,

Defendants.

Case No. 17-cv-02136-RJL

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................... iii

INTRODUCTION .................... 1

BACKGROUND .................... 3

A. Legal Background .................... 3

B. Factual Allegations .................... 4

C. Procedural History .................... 9

ARGUMENT .................... 12

I. COUNTS THREE AND FOUR STATE DIRECT-LIABILITY CLAIMS UNDER THE ATA .................... 12

A. The Complaint Alleges Defendants Committed Acts Dangerous To Human Life .................... 13

B. The Complaint Alleges Defendants' Acts Appear To Be Intended To Coerce, Intimidate, Or Influence .................... 18

C. The Complaint Alleges Defendants Committed A Predicate Offense Under 18 U.S.C. § 2339A .................... 24

II. COUNT TWO PLAUSIBLY ALLEGES AN AIDING-AND-ABETTING CLAIM .................... 28

A. Count Two Alleges An Act of International Terrorism .................... 29

B. Count Two Alleges That Hezbollah Planned or Authorized Sadr's Violation of the RICO Statute .................... 34

C. Count Two Alleges That Defendants Aided and Abetted Sadr's Violation of the RICO Statute .................... 35

D. The "Law of the Case" Doctrine Does Not Apply .................... 36

III. COUNTS FIVE THROUGH EIGHT PLAUSIBLY ALLEGE TIMELY STATE-LAW CLAIMS .................... 37

A. Plaintiffs Plausibly Allege All Elements of Their State-law Claims .................... 37

1. Intentional Infliction of Emotional Distress (Count Five) .................... 37

2. Assault and Battery (Count Six) .................... 40

3. Wrongful Death and Survival (Counts Seven and Eight) ..... 41

B. Fact Issues Preclude Defendants' Statute-of-Limitations Arguments ..... 42

CONCLUSION ..... 45

## TABLE OF AUTHORITIES*

Page(s)

**Cases**


*Abecassis v. Wyatt*,
785 F. Supp. 2d 614 (S.D. Tex. 2011) ........ 3, 4

*Abecassis v. Wyatt*,
7 F. Supp. 3d 668 (S.D. Tex. 2014) ........ 3, 19

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ........ 33

*Atchley v. AstraZeneca UK Ltd.*,
474 F. Supp. 3d 194 (D.D.C. 2020) ........ 11, 36

**Atchley v. AstraZeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022) ........ 2, 5, 11, 13, 15, 16, 21, 23, 26, 28, 36, 38

**Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592
(D.C. Cir. 2026) ........ 1, 4, 5, 9-10, 12, 13, 15, 16, 21, 22, 26, 28, 29, 33, 35, 36, 38-39, 40

*Baker v. Farrand*,
26 A.3d 806 (Me. 2011) ........ 31

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) ........ 12, 35

*Beach TV Props., Inc. v. Solomon*,
324 F. Supp. 3d 115 (D.D.C. 2018) ........ 36

*Blais v. Islamic Republic of Iran*,
459 F. Supp. 2d 40 (D.D.C. 2006) ........ 38

*Bodoff v. Islamic Republic of Iran*,
424 F. Supp. 2d 74 (D.D.C. 2006) ........ 41

*Boim v. Quranic Literacy Inst.*,
291 F.3d 1000 (7th Cir. 2002) ........ 32

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ........ 1-2, 3, 4, 13, 14, 15, 16, 18, 19, 20


---

*Authorities on which counsel chiefly rely are denoted with an asterisk, per Local Civil Rule 7(a).

*Borochov v. Islamic Republic of Iran*,
94 F.4th 1053 (D.C. Cir. 2024) ........................................................................ 30

*Branch v. Smith*,
538 U.S. 254 (2003) ........................................................................ 16

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
274 F. Supp. 2d 86 (D.D.C. 2003) ........................................................................ 19, 37

*Bussineau v. President & Dirs. of Georgetown Coll.*,
518 A.2d 423 (D.C. 1986) ........................................................................ 43

*In re Chiquita Brands Int'l, Inc.*,
284 F. Supp. 3d 1284 (S.D. Fla. 2018) .............................. 3, 14, 19, 20, 21, 24, 30, 31, 32

*C.N.S. Enters., Inc. v. G. & G. Enters., Inc.*,
508 F.2d 1354 (7th Cir. 1975) ........................................................................ 27

*Cohen v. Islamic Republic of Iran*,
238 F. Supp. 3d 71 (D.D.C. 2017) ........................................................................ 39

*Diamond v. Davis*,
680 A.2d 364 (D.C. 1996) ........................................................................ 44

*District of Columbia v. Beretta, U.S.A., Corp.*,
872 A.2d 633 (D.C. 2005) ........................................................................ 39

*District of Columbia v. Carlson*,
793 A.2d 1285 (D.C. 2002) ........................................................................ 43

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
246 F. Supp. 3d 52 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018) .................. 40, 41

*Est. of Parsons v. Palestinian Auth.*,
651 F.3d 118 (D.C. Cir. 2011) ........................................................................ 30

*Filebark v. U.S. Dep't of Transp.*,
542 F. Supp. 2d 1 (D.D.C. 2008) ........................................................................ 36

*Fitzgerald v. Seamans*,
553 F.2d 220 (D.C. Cir. 1977) ........................................................................ 42

*Gardel v. SK & A Structural Eng'rs PLLC*,
286 F. Supp. 3d 120 (D.D.C. 2017) ........................................................................ 43, 44

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ........................................................................ 3

*Gill v. Islamic Republic of Iran*,
249 F. Supp. 3d 88 (D.D.C. 2017) .......... 40

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
53 F. Supp. 3d 191 (D.D.C. 2014) .......... 30

*Goldberg v. UBS AG*,
660 F. Supp. 2d 410 (E.D.N.Y. 2009) .......... 3, 19

*Goldman v. Lafarge*,
821 F. Supp. 3d 329 (E.D.N.Y. 2026) .......... 16, 17, 23

*Gonzalez v. Google*,
2 F.4th 871 (9th Cir. 2021), *vacated on other grounds*, 598 U.S. 617 (2023) .......... 22

*Hakimyar v. Habib Bank Ltd.*,
2025 WL 605575 (S.D.N.Y. Feb. 25, 2025) .......... 17-18

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .......... 31, 35-36, 41

*Honickman v. BLOM Bank, SAL*,
6 F.4th 487 (2d Cir. 2021) .......... 16

*Humanitarian L. Project v. Reno*,
205 F.3d 1130 (9th Cir. 2000) .......... 26

*Hurd v. District of Columbia*,
864 F.3d 671 (D.C. Cir. 2017) .......... 5

*Jones v. Lattimer*,
29 F. Supp. 3d 5 (D.D.C. 2014) .......... 42

*Joyner v. Sibley Mem'l Hosp.*,
826 A.2d 362 (D.C. 2003) .......... 38

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) .......... 13, 14, 15, 17, 22

*Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle East*,
66 F.4th 1007 (D.C. Cir. 2023) .......... 13, 29

*King v. Habib Bank Ltd.*,
2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) .......... 17

*Kubicki ex rel. Kubicki v. Medtronic, Inc.*,
293 F. Supp. 3d 129 (D.D.C. 2018) .......... 42

*Kurd v. Republic of Turkey*,
374 F. Supp. 3d 37 (D.D.C. 2019) .................................................................... 40, 41

*Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*,
890 F.2d 456 (D.C. Cir. 1989), *on reh'g* (Jan. 10, 1990) ............................................... 45

*Lacy v. District of Columbia*,
424 A.2d 317 (D.C. 1980) ..................................................................................... 38

*Laro, Inc. v. Chase Manhattan Bank (Nat'l Ass'n)*,
866 F. Supp. 132 (S.D.N.Y. 1994)........................................................................... 31

*Lelchook v. Islamic Republic of Iran*,
393 F. Supp. 3d 261 (E.D.N.Y. 2019) ..................................................................... 14, 16

*Linde v. Arab Bank, PLC*,
384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................19, 30, 31-32, 38

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018)........................................................................................ 17, 18

*Magliore v. Brooks*,
844 F. Supp. 2d 38 (D.D.C. 2012) ............................................................................... 40

*McLaughlin v. Anderson*,
962 F.2d 187 (2d Cir. 1992)........................................................................................ 35

*Miller v. Arab Bank, PLC*,
372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................................................ 18, 19

*Momenian v. Davidson*,
878 F.3d 381 (D.C. Cir. 2017) .................................................................................... 44

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
30 F.3d 1510 (D.C. Cir. 1994) .................................................................................... 37

*People v. Corpening*,
386 P.3d 379 (Colo. 2016) .......................................................................................... 31

*Peterson v. Islamic Republic of Iran*,
515 F. Supp. 2d 25 (D.D.C. 2007) ............................................................................ 38, 41

*Reno v. Bossier Parish Sch. Bd.*,
520 U.S. 471 (1997)..................................................................................................... 19

*RJR Nabisco, Inc. v. Eur. Cmty.*,
579 U.S. 325 (2016)..................................................................................................... 30

*Rosemond v. United States*,
572 U.S. 65 (2014) ........ 19

*Schansman v. Sberbank of Russ., PJSC*,
565 F. Supp. 3d 405 (S.D.N.Y. 2021) ........ 13-14, 16, 19, 22, 24

*In re Search of One Apple iPhone Smartphone*,
628 F. Supp. 3d 155 (D.D.C. 2022) ........ 32

*Selig v. Taliban*,
774 F. Supp. 3d 129 (D.D.C. 2025) ........ 39-40

*Smith v. Hope Vill., Inc.*,
2006 WL 8448528 (D.D.C. July 26, 2006) ........ 43

*Smith v. United States*,
518 F. Supp. 2d 139 (D.D.C. 2007) ........ 43

*Spetner v. Palestine Inv. Bank*,
2026 WL 2350124 (E.D.N.Y. Aug. 13, 2026) ........ 19

*Stansell v. Republic of Cuba*,
217 F. Supp. 3d 320 (D.D.C. 2016) ........ 37, 38

*Sundberg v. TTR Realty, LLC*,
109 A.3d 1123 (D.C. 2015) ........ 40, 41

*In re Terrorist Attacks on September 11, 2001*,
2026 WL 873284 (S.D.N.Y. Mar. 12, 2026), *report and recommendation adopted*,
2026 WL 850591 (S.D.N.Y. Mar. 26, 2026) ........ 42

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ........ 12, 30, 31, 32, 41

*Ungar v. Islamic Republic of Iran*,
211 F. Supp. 2d 91 (D.D.C. 2002) ........ 41

*Ungar v. Palestine Liberation Org.*,
402 F.3d 274 (1st Cir. 2005) ........ 39

*United States v. All Petroleum-Product Cargo Onboard the M/T Arina*,
173 F.4th 342 (D.C. Cir. 2026) ........ 20, 21, 23

*United States v. Crosby*,
20 F.3d 480 (D.C. Cir. 1994) ........ 31

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011) ........ 27

*United States v. Haipe*,
769 F.3d 1189 (D.C. Cir. 2014) .......... 21

*United States v. Jama*,
217 F. Supp. 3d 882 (E.D. Va. 2016) .......... 27

*United States v. Marzook*,
426 F. Supp. 2d 820 (N.D. Ill. 2006) .......... 32

*United States v. Pregler*,
925 F.2d 268 (8th Cir. 1991) .......... 31

*United States v. Shabban*,
612 F.3d 693 (D.C. Cir. 2010) .......... 21

*United States v. Staten*,
581 F.2d 878 (D.C. Cir. 1978) .......... 36

*United States v. Wyatt*,
807 F.2d 1480 (9th Cir. 1987) .......... 31

*In re U.S. OPM Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019) .......... 23

*Wash. Metro. Area Transit Auth. v. Davis*,
606 A.2d 165 (D.C. 1992) .......... 39

*Weiss v. Nat'l Westminster Bank PLC*,
453 F. Supp. 2d 609 (E.D.N.Y. 2006) .......... 4, 19

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014) .......... 18

*Weiss v. Nat'l Westminster Bank PLC*,
993 F.3d 144 (2d Cir. 2021) .......... 19

*W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
235 F.3d 629 (D.C. Cir. 2001) .......... 32

*Witherspoon v. Philip Morris Inc.*,
964 F. Supp. 455 (D.D.C. 1997) .......... 37

*Wultz v. Islamic Republic of Iran*,
755 F. Supp. 2d 1 (D.D.C. 2010) .......... 3, 13, 19, 21, 22, 25

*Zapata v. HSBC Holdings PLC*,
414 F. Supp. 3d 342 (E.D.N.Y. 2019) .......... 23

**Statutes**

18 U.S.C. § 2 .......... 31
18 U.S.C. § 844(f) .......... 34
18 U.S.C. § 956(a)(1) .......... 34
18 U.S.C. § 1114 .......... 34
18 U.S.C. § 1203 .......... 34
18 U.S.C. § 1361 .......... 34
18 U.S.C. § 1962
§ 1962(b) .......... 2, 29, 35
§ 1962(c) .......... 2, 29, 30, 35
§ 1962(d) .......... 2, 29
18 U.S.C. § 2331(1) .......... 13, 17, 32
18 U.S.C. § 2331(1)(A) .......... 13, 29
18 U.S.C. § 2331(1)(B) .......... 18, 19
18 U.S.C. § 2332 .......... 34
§ 2332a .......... 12, 34
§ 2332b .......... 20, 34
§ 2332f .......... 34
18 U.S.C. § 2333
§ 2333(a) .......... 3, 4, 10
§ 2333(d) .......... 10, 28
18 U.S.C. § 2339A .......... 10, 24, 25, 26, 27, 31
18 U.S.C. § 2339B .......... 31
18 U.S.C. § 2339C .......... 10, 25, 34
18 U.S.C. § 2339D .......... 34

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016)............ 4, 10

§ 2(a)(1) ............ 4

§ 2(a)(4) ............ 4

§ 2(a)(5) ............ 31, 41

§ 2(a)(6) ............ 4

§ 2(b)............ 4, 16

**Legislative Materials**

H.R. Conf. Rep. No. 104-518 (1996)............ 26

H.R. Rep. No. 102-1040 (1992)............ 3

H.R. Rep. No. 115-858 (2018)............ 4

S. Rep. No. 102-342 (1992) ............ 3

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024)............ 30

Brief for Defendants-Appellees, *Atchley v. AstraZeneca UK Ltd.*,
2021 WL 1599309 (D.C. Cir. filed Mar. 12, 2021)............ 26

*Webster's Third New International Dictionary of the English Language* (1993)............ 27

## INTRODUCTION

Plaintiffs are American service members and civilians, and their families, who were attacked in Iraq by the Hezbollah-sponsored terrorist group Jaysh al-Mahdi. Defendants are large medical-supply companies that knowingly financed those attacks. Jaysh al-Mahdi openly controlled the Iraqi Ministry of Health ("Ministry"), and Defendants obtained lucrative contracts from the Ministry by making corrupt payments to the terrorists who ran it. Those payments, in turn, funded Jaysh al-Mahdi's terror attacks. By 2006, due in no small part to its control of the Ministry, Jaysh al-Mahdi became the deadliest terrorist group in Iraq. It murdered and wounded thousands of Americans, including Plaintiffs and their family members.

Plaintiffs brought this case in 2017, alleging that Defendants' funding of Jaysh al-Mahdi violated the Anti-Terrorism Act (ATA) and state law. In February, the D.C. Circuit upheld Count One of the complaint as sufficiently alleging Defendants' liability for aiding and abetting the terrorist attacks that injured them and their families. *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 599 (D.C. Cir. 2026) ("*Atchley II*"). It credited allegations that Defendants' "stream of bribes and free goods helped finance Jaysh al-Mahdi's terrorist attacks on U.S. nationals" and that Defendants "knew that their bribe payments and free good shipments were being used to fund Jaysh al-Mahdi and its numerous attacks." *Id.* It then remanded for this Court to assess Plaintiffs' other claims in light of its reasoning. Those claims should proceed too.

*First*, Counts Three and Four plausibly allege that Defendants are directly liable for committing acts of international terrorism that injured Plaintiffs. Defendants' conduct – directly and knowingly funding terrorist attacks on Plaintiffs – meets the ATA's definition of "international terrorism." Many courts have so held. *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) ("Giving money to [terrorists], like

giving a loaded gun to a child . . . is an 'act dangerous to human life' " that "violates a federal criminal statute" and "appear[s] to be intended" to achieve terroristic aims).[1] Defendants respond with factual disputes that euphemize their conduct as merely "supplying medicine." The D.C. Circuit rejected similar arguments as "rest[ing] on an untenably skeptical reading of the complaint that impermissibly draws inferences against plaintiffs." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 228 (D.C. Cir. 2022) ("*Atchley I*"). This Court should do the same.

*Second*, Count Two should proceed alongside Count One, which the D.C. Circuit already sustained. The D.C. Circuit upheld the latter as alleging that Defendants aided Jaysh al-Mahdi's terrorist attacks on Plaintiffs. Count Two is similar: it alleges that Defendants aided Jaysh al-Mahdi's terrorist campaign against Americans in Iraq. That campaign was an "act" of international terrorism: it was dangerous to human life; appeared to be intended to influence a government through intimidation or coercion; and violated the criminal laws of the United States – namely, the RICO statute. 18 U.S.C. § 1962(b)–(d). Defendants do not dispute these elements. They argue instead that they can be liable under the ATA only for aiding and abetting a discrete, physical "act" of international terrorism. But the ATA makes clear that "acts of international terrorism" refer to criminal infractions – such as a violation of the RICO statute – even if those infractions include multiple physical acts. Defendants' contrary view defies the ATA's text, the common law of aiding and abetting, and common sense.

*Third*, Counts Five through Eight plausibly allege state-law claims for intentional infliction of emotional distress, assault and battery, wrongful death, and survival. The complaint alleges each element of these state-law claims. And these claims are timely under the discovery rule. Defendants' arguments are again fact-bound and supply no basis for dismissal now.

---

[1] Unless otherwise noted, all internal quotations, brackets, citations, and emphases are omitted.

In the end, Defendants' latest brief mostly rehashes the factual arguments they have made and lost before. They repackage their terrorist payoffs as ordinary commerce; they portray Plaintiffs' allegations as conclusory; and they downplay the causal links between their bribes and the terrorist attacks that harmed Plaintiffs. The D.C. Circuit rejected those very arguments. Just as Defendants' premature factual assertions were no basis to dismiss Count One before discovery, they are no basis to dismiss the other claims either. The motion should be denied.

## BACKGROUND

### A. Legal Background

**1.** Congress enacted the ATA in 1992 to "open[ ] the courthouse door to victims of international terrorism." S. Rep. No. 102-342, at 45 (1992). The ATA reflected Congress's dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists. *Id.* at 22. Congress thus originally designed the statute's civil remedy to impose "liability at any point along the causal chain of terrorism." *Id.*; *see* 18 U.S.C. § 2333(a).

The ATA achieved that objective by providing a "cause of action for American victims of terrorism." H.R. Rep. No. 102-1040, at 5 (1992); *see* 18 U.S.C. § 2333(a). In the ensuing years, courts applied the ATA to further Congress's purpose of "cut[ting] the terrorists' lifeline" by separating terrorists from "their financial angels." *Boim*, 549 F.3d at 690-91. Courts held frequently that the ATA imposed liability for providing broad-based funding to terrorist groups, without requiring plaintiffs to trace the specific attacks that injured them to any one monetary contribution.[2] Courts divided on the legal theory for imposing such liability: some held that

[2] *See*, *e.g.*, *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1318-20 (S.D. Fla. 2018) ("*Chiquita III*"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 503-08, 521 (E.D.N.Y. 2012); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 647-49 (S.D. Tex. 2011) ("*Abecassis I* "), *amended in part on other grounds*, 7 F. Supp. 3d 668 (S.D. Tex. 2014) ("*Abecassis II*"); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 41-57 (D.D.C. 2010); *Goldberg v. UBS AG*, 660 F. Supp. 2d

terrorist funders were directly liable for themselves committing "an act of international terrorism," 18 U.S.C. § 2333(a); *see*, *e.g.*, *Boim*, 549 F.3d at 689-90, while others held them secondarily liable as aiders-and-abettors, *see*, *e.g.*, *Abecassis I*, 785 F. Supp. 2d at 645-49.

**2.** In 2016, Congress expanded the ATA in the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which preserved direct liability while also codifying "causes of action for aiding and abetting and conspiracy liability." *Id.* § 2(a)(4). Congress acted because it viewed "[i]nternational terrorism" as "a serious and deadly problem that threatens the vital interests of the United States." *Id.* § 2(a)(1).

By authorizing civil litigation to "cut[ ] terrorists' financial life-lines," the amended ATA promoted "longstanding efforts to reduce global terrorism and thus protect Americans here and abroad." H.R. Rep. No. 115-858, at 3-4 (2018). Congress reaffirmed its view that entities that "contribute material support or resources" to terrorists who attack Americans "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court" here. JASTA § 2(a)(6). In short, JASTA's "purpose" was "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against" companies that give "support, directly or indirectly, to foreign [terrorists]." *Id.* § 2(b).

**B. Factual Allegations**[3]

**a.** "In 2003, the United States invaded Iraq." *Atchley II*, 165 F.4th at 598. "Even before the invasion, Hezbollah – a Lebanese group designated as a Foreign Terrorist

---

410, 429 (E.D.N.Y. 2009); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) ("*Weiss I*").

[3] Repeating their tactics from previous motions to dismiss, *see* Dkt. 132 at 15-17, Defendants' latest motion includes a "background" section divorced from the complaint's allegations. Defendants present a competing factual narrative supported by 337 pages of Internet research excerpted from a patchwork of 21 exhibits, most of which appear nowhere in the complaint. The D.C. Circuit rejected this tactic, "declin[ing] defendants' invitation to take judicial notice of

Organization under U.S. law since 1997 – made plans to undermine the expected U.S. presence." *Id.* In "April 2003, Hezbollah's 'chief terrorist mastermind, Imad Mugniyeh,' collaborated with the powerful Shiite cleric Muqtada al-Sadr to establish a fighting force in Iraq to violently expel the Americans." *Id.* (quoting TAC[4] ¶ 56). "Hezbollah's goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict 'mass casualties' on Americans." TAC ¶ 364. Sadr and Hezbollah called this terrorist network Jaysh al-Mahdi.

In the months that followed, "Hezbollah recruited, trained, and armed [Jaysh al-Mahdi's] fighters and helped it plan and carry out operations in Iraq." *Atchley II*, 165 F.4th at 598. "By July 2007, General David Petraeus concluded that Jaysh al-Mahdi was 'more of a hindrance to long-term security in Iraq' than was al-Qaeda in Iraq." *Id.* (quoting TAC ¶ 62). Jaysh al-Mahdi's "attacks likely killed over five hundred Americans and injured many more." *Id.*

Sadr modeled Jaysh al-Mahdi's structure, operations, and finances on its sponsor Hezbollah. TAC ¶ 59. Jaysh al-Mahdi followed Hezbollah's "welfare as warfare" strategy by seizing control of corrupt government institutions and using those institutions to finance its terror attacks. *Id.* ¶¶ 61, 358. In 2004, Jaysh al-Mahdi "executed a plan to take control of" the Ministry and then use its "control over [the Ministry] to finance terrorist activities." *Id.* ¶¶ 63-64. As a report by the U.S. Special Inspector General for Iraqi Reconstruction later observed: "Employing the model . . . embraced by Hezbollah . . . [Jaysh al-Mahdi] openly deployed ministry resources to build support" for its terrorist activities. *Id.* ¶ 65.

---

documents reciting complex facts that appear subject to dispute," *Atchley I*, 22 F.4th at 229 (citing *Hurd v. District of Columbia*, 864 F.3d 671, 686-87 (D.C. Cir. 2017)), and this Court should do the same.

[4] "TAC" refers to the Third Amended Complaint. Dkt. 124.

The Ministry made an appealing target for Jaysh al-Mahdi. It was a famously corrupt institution that first gained notoriety under the U.N. Oil-For-Food Program, which imposed strict controls on Western companies selling goods to Saddam Hussein's regime. *Id.* ¶¶ 44-53. The Saddam-era Ministry, and its import subsidiary "Kimadia," devised several schemes to circumvent the Oil-For-Food Program and extract kickbacks from medical-goods suppliers selling in Iraq. *Id.* Those kickbacks – which virtually every Defendant or an affiliate paid – supplied Saddam's regime with funding for terrorism. *Id.* ¶¶ 49, 53. After Saddam's ouster, Jaysh al-Mahdi reinstituted the corrupt schemes that Saddam had used to fund terrorism.

The Ministry quickly became integral to Jaysh al-Mahdi's terrorist enterprise. Starting in 2004, Jaysh al-Mahdi executed an "occupational cleansing" to purge the Ministry of officials disloyal to its terrorist cause. *Id.* ¶¶ 63-70. By early 2005, Sadr cemented the takeover by replacing the Ministry's leadership with his own operatives. *Id.* ¶¶ 68-71. The Ministry soon became an instrument of terrorist violence. *Id.* ¶¶ 78-104. Jaysh al-Mahdi transformed the Ministry's Baghdad headquarters into a terrorist base. *Id.* ¶¶ 89-90. It converted the hospitals into command-and-control centers. *Id.* ¶¶ 86-87. It used the ambulances to transport death squads. *Id.* ¶ 86. And it placed thousands of terrorist fighters on the Ministry's payroll. *Id.* ¶ 85. As the U.S. Embassy in Baghdad concluded in a 2006 report, the Ministry and its infrastructure were "openly under the control of the Mehdi Army." *Id.* ¶ 79.

Jaysh al-Mahdi's control of the Ministry was no secret. By late 2004, terrorist propaganda festooned Ministry facilities throughout Iraq. *Id.* ¶ 73. Pictures of Muqtada al-Sadr adorned the walls; terrorist slogans like "Death to America" were ubiquitous; and Jaysh al-Mahdi's all-black flag decorated the entrances. *Id.* Armed Jaysh al-Mahdi fighters walked the halls. *Id.* ¶ 180. The Deputy Health Minister stocked his office with terrorist weaponry, and he

led terrorist attacks from the roof of the Ministry's headquarters. *Id.* ¶¶ 89-90. As a result, one witness recounted, the headquarters resembled a "Mahdi Army camp." *Id.* ¶ 90. The terrorist presence was so pervasive that U.S. officials could not even enter the building. *Id.* ¶ 180.

Major Western newspapers at the time reported on Jaysh al-Mahdi's takeover of the Ministry. They described (for example) how the Ministry had fallen "under the control of the Shia cleric Moqtada al-Sadr" and was providing "millions of dollars" to Sadr's "Shiite Muslim militia." *Id.* ¶ 183. A *CBS News* report detailed how the "Mahdi Army" had turned Ministry hospitals into "command and control centers." *Id.* ¶ 87. And one *USA Today* reporter, after witnessing the Jaysh al-Mahdi propaganda throughout the Ministry's headquarters, reported there was no "doubt[ ] about who runs the place." *Id.* ¶ 180.

**b.** Jaysh al-Mahdi also used the Ministry to raise funds for terrorism. *Id.* ¶¶ 105-12. Mimicking Hezbollah's conduct in Lebanon, Sadr seized the Ministry so that Jaysh al-Mahdi could capture the corrupt revenue that Kimadia had long extracted from foreign contractors. *Id.* ¶¶ 64, 173. Like Hezbollah, Jaysh al-Mahdi used its political wing (called the "Sadrist Trend") to formalize its control of the country's health apparatus; like Hezbollah, Jaysh al-Mahdi then pursued a "welfare as warfare" agenda that weaponized the health infrastructure against its enemies. *Id.* ¶¶ 59, 64-76, 84-88, 358. Jaysh al-Mahdi followed Hezbollah's playbook with great success. As one U.S. investigator documented, "official corruption [was] tolerated at the [Ministry] because it ha[d] become the ministry occupied by the Mahdi Army." *Id.* ¶ 81.

Defendants made corrupt payments to Jaysh al-Mahdi in two ways, both of which followed Oil-For-Food precedents. First, Defendants structured their transactions to provide Jaysh al-Mahdi with extra batches of in-kind drugs and medical devices, free of charge, on top of the quantities for which Kimadia paid. *Id.* ¶¶ 116-41. Defendants included those "free goods" in

the same shipments as the "purchased goods" and packaged them in a manner conducive to street resale, which allowed Jaysh al-Mahdi to monetize them on the black market. *Id.* ¶¶ 5, 50-51, 119-20. Because of the contracts' structure, Ministry officials did not have to account for the extra goods in inventory. *Id.* ¶¶ 117-20. For that reason, one Ministry insider stated, the "free goods" were "very easy to disappear" for terrorist aims. *Id.* ¶ 132.

Defendants made "free goods" payments because it allowed them to pay in-kind bribes using medical products that were cheap to manufacture and easy to disguise as legitimate shipments. *Id.* ¶¶ 50-52, 117-18. As Defendants knew, their "free" goods functioned as cash equivalents – regularly sold and bartered (like gold or diamonds) on black markets – and they never reached any public-health facility. *Id.* ¶¶ 119-20, 137-39.

Second, Defendants also paid Jaysh al-Mahdi cash bribes, called "commissions," to obtain contracts from Kimadia. *Id.* ¶¶ 142-64. Much as they had done under Oil-For-Food, Defendants bribed the Jaysh al-Mahdi operatives who ran the Ministry by funneling "commission" money through their corrupt local agents. *Id.* ¶¶ 49, 148-49, 191-92, 213-18, 246-48, 253-54, 284-85, 312-13. Defendants even paid for "free vacations" to "luxurious resorts" for Ministry officials, under the guise of providing "training courses." *Id.* ¶ 159.

**c.** Defendants' corrupt sales and payments to the Ministry financed Jaysh al-Mahdi terrorist attacks on Americans. *Id.* ¶¶ 165-79. As documented by U.S. anti-corruption personnel, Ministry employees, and other Iraqi officials, Jaysh al-Mahdi openly used the Ministry and Kimadia to fund terrorist operations. *Id.* ¶¶ 108-12, 165-75. Corrupt payments – which provided off-book, fungible resources for which Jaysh al-Mahdi operatives inside the Ministry need not account – were especially easy to appropriate for terrorist ends. *Id.* ¶ 179. That was true of both Defendants' cash bribes and their "free goods" deliveries. Jaysh al-Mahdi

"finance[d] operations from diverted medicines," and it often paid rank-and-file terrorist fighters in pharmaceuticals rather than cash. *Id.* ¶¶ 169, 176. Jaysh al-Mahdi was so dependent on the Ministry's resources that it became known as "The Pill Army." *Id.* ¶¶ 9, 176.

In February 2007, those facts led the U.S. government to coordinate the prosecution of Deputy Health Minister Hakim al-Zamili for "effectively hijack[ing] the Ministry of Health" on Jaysh al-Mahdi's behalf. *Id.* ¶ 94. The prosecution rested on evidence that Zamili had "orchestrated kickback schemes related to inflated contracts for equipment and services, with millions of dollars allegedly funneled to Mr. Sadr's Mahdi Army." *Id.* ¶ 171.

The resulting nexus to terrorism was strong. U.S. officials called corruption in Iraq "the second insurgency" that "provid[ed] the money, the people and the motivation to fight Americans." *Id.* ¶ 172. That phenomenon was nowhere more evident than at the Ministry. The Ministry's corruption became so pronounced by 2007 that General Odierno ordered an operation against the "Jaysh al Mahdi (JAM) fighters" who had captured it. Dkt. 132-3 at 1-2 (Multi-National Corps – Iraq, *Operation Black Crescent*, FRAGO_020 to OPORD 07-01 (June 6, 2007)). As his order stated, the Ministry was "infiltrated by criminal elements," "pose[d] a significant threat to [Coalition forces]," and functioned as "an enabler for corruption, [extra-judicial killing], use of ambulances to bypass checkpoints, and insurgent logistics flow." *Id.* at 1. Such "endemic corruption" at the Ministry enabled "internal JAM affiliated leadership and external JAM to continue their illicit operations utilizing [Ministry] resources." *Id.* at 2.

### C. Procedural History

Plaintiffs are "victims of Jaysh al-Mahdi's attacks" who brought suit against Defendants – "pharmaceutical and medical equipment manufacturers and suppliers" – for knowingly paying "illegal cash bribes directly to the group and suppl[ying] extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations against

Americans." *Atchley II*, 165 F.4th at 596. For many years, these Plaintiffs knew that they (or their loved ones) had been attacked. *E.g.*, TAC ¶¶ 1, 16. Some even discovered that Jaysh al-Mahdi was responsible. What they did not know – and could not reasonably have known – was that some of the Western world's largest pharmaceutical and medical-device companies had financed those attacks. *Id.* ¶¶ 1, 3210, 3227, 3233, 3244, 3253. Defendants' illicit practices were, by their nature, obscure and covert. *E.g.*, *id.* ¶¶ 117-19, 134-64. Given that, Plaintiffs could not reasonably have uncovered their claims until 2017, when counsel's investigation unearthed them. *Id.* ¶¶ 3227, 3233, 3244, 3253.

The complaint alleges eight Counts. Counts One and Two assert aiding-and-abetting claims under JASTA, 18 U.S.C. § 2333(d). *See* TAC ¶¶ 3181-89 (Count One); ¶¶ 3190-3207 (Count Two). Both Counts allege that Defendants aided and abetted acts of international terrorism that were committed, planned, or authorized by Hezbollah, a designated Foreign Terrorist Organization. Count One alleges that Defendants aided and abetted the terrorist attacks that Jaysh al-Mahdi carried out against Plaintiffs. Count Two alleges that Defendants aided and abetted the larger terror campaign that Jaysh al-Mahdi and Hezbollah pursued to harm Americans in Iraq.

Counts Three and Four assert direct liability claims under 18 U.S.C. § 2333(a). *See* TAC ¶¶ 3208-14 (Count Three); ¶¶ 3215-21 (Count Four). These Counts allege that Defendants themselves committed acts of international terrorism that injured Plaintiffs or their family members. The Counts differ only in the predicate criminal violations used to show that Defendants' conduct meets the definition of "international terrorism": Count Three alleges that Defendants' conduct violates the material-support statute, 18 U.S.C. § 2339A, while Count Four alleges that Defendants' conduct violates the terrorist financing statute, 18 U.S.C. § 2339C.

Counts Five through Eight allege state-law claims. Count Five alleges a claim for intentional infliction of emotional distress on behalf of all non-estate plaintiffs; Count Six alleges that Defendants aided and abetted Jaysh al-Mahdi's assault and battery of Plaintiffs who were physically wounded; Count Seven alleges wrongful death on behalf of estates of U.S. citizens killed in Iraq; and Count Eight brings survival claims on behalf of these same Plaintiffs.

Seven years ago, Defendants moved to dismiss Plaintiffs' complaint for failure to state a claim. *See* Dkts. 72, 128. This Court granted the motion. *Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194 (D.D.C. 2020). It dismissed Plaintiffs' direct-liability ATA claims "because plaintiffs do not plausibly allege that defendants caused their injuries." *Id.* at 209. It dismissed Plaintiffs' aiding-and-abetting ATA claims because Plaintiffs "failed to plead that defendants substantially assisted [Jaysh al-Mahdi] in carrying out the alleged acts of terrorism" or that Hezbollah "planned" or "authorized" them. *Id.* at 211-21. The Court then "decline[d] to adopt pendent jurisdiction over plaintiffs' state law claims." *Id.* at 207.

The D.C. Circuit reversed. *Atchley I*, 22 F.4th at 210. First, it held that "with respect to the direct liability claim, plaintiffs have adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries." *Id.* at 210. Second, it held that "plaintiffs plead facts that suffice to support their aiding-and-abetting claim at the motion-to-dismiss stage." *Id.* In particular, "the complaint plausibly alleges that Hezbollah, a designated Foreign Terrorist Organization, planned or authorized the relevant attacks," and that "defendants knowingly provided substantial assistance to Jaysh al-Mahdi – most clearly through their corrupt provision of free goods and cash bribes to do business with a Ministry completely overrun by Jaysh al-Mahdi." *Id.* at 209-10. The D.C. Circuit did not decide "issues the district court itself did not reach," instead "remand[ing] for further proceedings consistent with this opinion." *Id.* at 238-39.

Defendants petitioned for certiorari. The Supreme Court granted, vacated, and remanded for further consideration in light of its decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).

On remand, the D.C. Circuit reached the same conclusions. First, it "reverse[d] the district court's dismissal of plaintiffs' secondary liability claims." *Atchley II*, 165 F.4th at 597. It held that Plaintiffs adequately alleged the "conscious, voluntary, and culpable participation in" tortious activity and the "nexus between defendants' assistance and the acts of international terrorism that injure plaintiffs" that *Twitter* demands. *Id.* It based this holding on well-pleaded allegations that "Defendants knew their assistance would be used to launch attacks on plaintiffs, and they repeatedly structured their transactions in an unusual and unlawful manner that served to facilitate Jaysh al-Mahdi's operations." *Id.*

Second, it reaffirmed its "holding on the direct liability claims that plaintiffs adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries," and reaffirmed its holdings that "manufacturer defendants were not too remote from the conduct alleged to be held liable." *Atchley II*, 165 F.4th at 597. It then again "remand[ed] for further proceedings consistent with this opinion." *Id.* at 615.

## ARGUMENT

On a motion to dismiss, the Court accepts Plaintiffs' allegations and affords them all reasonable inferences. *Atchley II*, 165 F.4th at 600. Plaintiffs need not proffer "detailed factual allegations," but need allege enough "factual matter" to state a "claim to relief that is plausible on its face." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

### I. COUNTS THREE AND FOUR STATE DIRECT-LIABILITY CLAIMS UNDER THE ATA

The ATA provides a right of action to "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). To state a

direct-liability claim, a plaintiff must allege that (1) the defendant committed "an act of international terrorism"; (2) a U.S. national suffered an injury; and (3) the U.S. national's injury occurred "by reason of" the defendant's act of international terrorism. *Atchley I*, 22 F.4th at 226.

The second and third elements are not at issue here. Defendants do not dispute that Plaintiffs adequately plead injuries, and the D.C. Circuit upheld the proximate-cause allegations. *Id.* at 210. The only remaining question is whether Defendants' terrorist funding was an "'act[ ] of international terrorism' within the meaning of the ATA." *Atchley II*, 165 F.4th at 614.

It was. The ATA defines "international terrorism" as "activities" that (1) "involve violent acts or acts dangerous to human life"; (2) "appear to be intended" "to intimidate or coerce a civilian population" or "influence or affect a government by intimidation, coercion, or violence"; and (3) violate a predicate criminal statute. *Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle East*, 66 F.4th 1007, 1014 (D.C. Cir. 2023); *see* 18 U.S.C. § 2331(1). Defendants' alleged conduct meets each of these elements.

### A. The Complaint Alleges Defendants Committed Acts Dangerous To Human Life

**1.** The complaint plausibly alleges that Defendants' payments to terrorists were "dangerous to human life." 18 U.S.C. § 2331(1)(A). As the en banc Seventh Circuit explained, "[g]iving money to" a terrorist organization (like Jaysh al-Mahdi) is "like giving a loaded gun to a child" and "is an 'act dangerous to human life.'" *Boim*, 549 F.3d at 690; *see Wultz*, 755 F. Supp. 2d at 43-44 (providing "extensive banking services" to terrorist group, enabling it to carry out terrorist attacks, was "dangerous to human life"); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (noting that "giving fungible dollars to a terrorist organization may be 'dangerous to human life'"). Even less-direct allegations that a defendant "provided financial services to fundraisers and individuals who supported" a terrorist organization, "and these

fundraisers and individuals then provided the funds to the" organization which "enhance[d] their ability to commit terrorist attacks," satisfy the dangerousness requirement. *Schansman v. Sberbank of Russ., PJSC*, 565 F. Supp. 3d 405, 416 (S.D.N.Y. 2021). Similarly, when banks "route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing 'acts dangerous to human life.'" *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 266 (E.D.N.Y. 2019).

Here, Plaintiffs plausibly allege that each Defendant gave "fungible dollars," as well as fungible free goods, "to a terrorist organization." *Kemper*, 911 F.3d at 390; *see* TAC ¶¶ 5-8, 165-66. Defendants knew their money was financing Jaysh al-Mahdi's terrorist attacks on Americans. TAC ¶¶ 10-11. They also knew their free goods were "cash equivalents" for the terrorists. *Id.* ¶¶ 117, 136-39. These actions involve conduct dangerous to human life under *Boim* and *Wultz*. *Accord Schansman*, 565 F. Supp. 3d at 417-18 ("Defendants were on notice of" the terrorist organization's "widely reported" "activities" including that it "openly, publicly, and repeatedly carried out terrorist attacks on civilians").

This conclusion recognizes that funding terrorism is itself a dangerous act, as Congress intended. Congress provided that "a donation to a terrorist group that targets Americans outside the United States may violate section 2333," *Boim*, 549 F.3d at 690, because "[d]amages are a less effective remedy against terrorists and their organizations than against their financial angels." *Id.; accord Chiquita III*, 284 F. Supp. 3d at 1316 (holding Chiquita's alleged payments to a terrorist organization "qualif[y] as an 'act of international terrorism' within the meaning of Section 2333(1) for which Chiquita may be held primarily liable under Section 2333(a)").

**2.** Defendants' primary response is to downplay the allegations that they knowingly funded terror attacks on Americans. They argue (at 17-19) that merely "manufacturing and

selling medicines and medical devices" is not "violent" or "dangerous to human life." But the complaint alleges that Defendants did far more than "manufacture and sell medicines." As the D.C. Circuit recognized, it alleges they "made illegal payments in both cash and goods to Jaysh al-Mahdi, following methods already familiar from defendants' corrupt dealings with Kimadia under the earlier Oil-for-Food program," and that Defendants "knew that their bribe payments and free good shipments were being used to fund Jaysh al-Mahdi and its numerous attacks on the victims in this case." *Atchley II*, 165 F.4th at 599. "Selling medicines" may not be violent or dangerous, but knowingly financing terrorism is.

Defendants' analogy (at 17-18) illustrates the difference. Defendants argue that, "in ordinary parlance," a bank robbery "involves" acts dangerous to human life, but that "selling a car" does not, "even if the buyer later uses it as a getaway vehicle." But if the seller *knows* the buyer intends to use the car to rob a bank, that sale "[involves] acts dangerous to human life" – much like giving a loaded gun to a child. *Boim*, 549 F.3d at 690.

Defendants dispute the well-pleaded allegations about Jaysh al-Mahdi's control of the Ministry. Defendants (at 21) assert – despite the allegations – that the Ministry had "significant legitimate operations" and attempt to analogize to cases involving transactions with sovereign states, like *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018). The D.C. Circuit has already rejected that analogy and distinguished *Kemper* and similar cases. It explained that "sovereign states" have "many legitimate agencies, operations, and programs to fund" such that "we cannot presume that aid to such a state finds its way into terrorist hands." *Atchley I*, 22 F.4th at 227-28. But "plaintiffs do not allege that defendants aided an autonomous nation with many functions and priorities." *Id.* at 228. "Rather, they allege that defendants gave to a single agency" that was so "thoroughly dominated by Jaysh al-Mahdi" that it "functioned more as a

terrorist apparatus than a health organization." *Id.* Knowingly providing corrupt payments to obtain contracts from such an organization is "dangerous to human life."

**3.** Defendants' structural arguments fare no better. They assert (at 18) that, in amending the statute in 2016 to add aiding-and-abetting liability, Congress indicated that paying known terrorists is not actionable under § 2331. But expanding liability by adding a new category does not diminish or repeal the direct liability provisions of the statute. "[A]bsent a clearly expressed congressional intention, repeals by implication are not favored." *Branch v. Smith*, 538 U.S. 254, 273 (2003). As the D.C. Circuit recognized in this litigation, Congress's objective in enacting JASTA was to "provide civil litigants with the broadest possible basis" against entities that support terrorists, "directly or indirectly," not to limit it. *Atchley II*, 165 F.4th at 601 (quoting JASTA § 2(b) (Amendment)). While Congress expanded liability to other forms of aid, courts – including after Congress enacted JASTA – recognize that "providing financial assistance to known terrorist organizations" is within the ambit of the ATA's direct liability provisions. *Lelchook*, 393 F. Supp. 3d at 266; *see Schansman*, 565 F. Supp. 3d at 416.

**4.** Defendants' cases (at 19-20) do not cast doubt on *Boim*'s application of the ATA's direct liability provisions. In *Kemper*, the Seventh Circuit "clarif[ied]" *Boim*'s proximate-cause standard. 911 F.3d at 391. As to the statutory definition of international terrorism, however, the court reaffirmed that "giving fungible dollars to a terrorist organization may be 'dangerous to human life.'" *Id.* at 390. It distinguished the facts in *Kemper* – "doing business with companies and countries that have significant legitimate operations" – from the facts in *Boim*, "which dealt with direct donations to a known terrorist organization." *Id.*[5]

---

[5] Similarly, *Goldman v. Lafarge*, 821 F. Supp. 3d 329, 335 (E.D.N.Y. 2026) (discussed Mot. 20), cited *Honickman v. BLOM Bank, SAL*, 6 F.4th 487 (2d Cir. 2021), which called *Boim*'s discussion of "*the causation element*" under the ATA's primary liability provisions "inapposite"

This case is like *Boim*, not *Kemper*. Defendants made direct "payments to Jaysh al-Mahdi." TAC ¶ 5; *see id.* ¶ 165 ("Defendants knowingly structured their transactions to facilitate Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from MOH – which Jaysh al-Mahdi used to support terrorist operations against Americans in Iraq"). They did much more than engage in business dealings that "may violate U.S. sanctions," which, alone, "does not convert them into terrorist acts." *Kemper*, 911 F.3d at 390.

Defendants also rely (at 19-20) on *King v. Habib Bank Ltd.*, an unreported, out-of-circuit district court case. *King* cites *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018), for the proposition that Congress's addition of a provision for secondary liability supersedes or otherwise diminishes primary liability for directly paying known terrorists. 2022 WL 4537849, at *4 (S.D.N.Y. Sept. 28, 2022). But *Linde* declined to reach the question whether "a jury could find that direct monetary donations to a known terrorist organization satisfy § 2331(1)'s definitional requirements." 882 F.3d at 327. Rather, *Linde* considered whether "providing *routine financial services* to members and associates of terrorist organizations" amounted to life-endangering acts; it did not discuss whether direct payments of money, goods, bribes, and other corrupt payments to such organizations are dangerous. *Id.* (emphasis added). Even as to the closer question of providing "financial services," *King* recognized that *Linde* and its progeny indicate that primary liability "may still lie where banking services are directed at a specifically identifiable violent or dangerous act." 2022 WL 4537849, at *5 (collecting cases).

These cases and the other non-binding cases Defendants cite do not support their position here. Mot. 20 (citing *Goldman*, 821 F. Supp. 3d 329, and *Hakimyar v. Habib Bank Ltd.*, 2025

---

after Congress addressed the causation framework for aiding and abetting claims in JASTA. 6 F.4th at 499 n.14 (emphasis added). Here, the D.C. Circuit found causation satisfied.

WL 605575, at *1, *5 (S.D.N.Y. Feb. 25, 2025)). Defendants did not provide mere "financial services," routine or otherwise. Rather, they paid "direct monetary donations" as well as donations of fungible, cash-equivalent goods, "to a known terrorist organization." *Linde*, 882 F.3d at 327. *E.g.*, TAC ¶¶ 165-66 (alleging "Defendants' corrupt transactions" "delivered resources directly to Jaysh al-Mahdi"). While providing routine services may be actionable under the secondary liability provisions of JASTA under some circumstances after *Twitter*, paying terrorists directly remains actionable under the primary liability provisions. *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (plaintiffs adequately alleged acts of international terrorism where bank administered an insurance scheme "rewarding acts of terrorism" and "routing payments").

### B. The Complaint Alleges Defendants' Acts Appear To Be Intended To Coerce, Intimidate, Or Influence

**1.** The complaint plausibly alleges that Defendants' ongoing payments to a known terrorist organization were acts that "appear to be intended" to achieve a terrorist aim. 18 U.S.C. § 2331(1)(B). The statute does not articulate "a state-of-mind requirement; it is a matter of external appearance." *Boim*, 549 F.3d at 694; *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (the "appear to be intended" requirement is "an objective standard to recognize the apparent intentions of actions"). The requirement is met when the conduct's "foreseeable consequences" promote any of the terrorist aims the ATA enumerates: intimidating or coercing civilians, influencing government policy by intimidation or coercion, or affecting government conduct by mass destruction, assassination or kidnapping. 18 U.S.C. § 2331(1)(B)(i)–(iii); *Boim*, 549 F.3d at 694.

The law presumes actors intend their actions' natural consequences; their acts thus also "appear to be intended" to achieve those foreseeable results. *Boim*, 549 F.3d at 693-94; *see also*

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[P]eople usually intend the natural consequences of their actions."). Determining what "appear[s] to be intended" is therefore closely related to the proximate-cause determination, because it "depends on whether the consequences of the defendant's activities were reasonably foreseeable, and reasonable foreseeability depends largely on what the defendant knew." *Schansman*, 565 F. Supp. 3d at 418 (quoting *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 161 (2d Cir. 2021)). "What matters for purposes of gauging intent . . . is that the defendant has chosen, with full knowledge, to participate in the illegal scheme." *Rosemond v. United States*, 572 U.S. 65, 79 (2014).

Conduct "meets the requirements of 18 U.S.C. § 2331(1)(B)" where a defendant "knew it was doing business with terrorists who were going to use violence to attack civilians." *Miller*, 372 F. Supp. 3d at 45 (holding a defendant "cannot ignore blatant red flags"). "Donations appear to be intended to" further the statute's list of terrorist aims "when a donor knows the terroristic aims and activities of its recipient and when it is foreseeable that the donations will advance such terroristic aims." *Abecassis II*, 7 F. Supp. 3d at 676. Accordingly, courts hold that comparable allegations of material support for terrorist groups raise a plausible inference of apparent intent. *Id.* (reaching that conclusion for Oil-For-Food kickbacks); *Spetner v. Palestine Inv. Bank*, 2026 WL 2350124, at *7 (E.D.N.Y. Aug. 13, 2026) (suicide bombings "foreseeably and 'objectively would appear intended to intimidate a population or government'"); *Boim*, 549 F.3d at 694 (summary judgment); *Miller*, 372 F. Supp. 3d at 44-45; *Chiquita III*, 284 F. Supp. 3d at 1319; *Wultz*, 755 F. Supp. 2d at 48-49; *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 580-81 (E.D.N.Y. 2005); *Goldberg*, 660 F. Supp. 2d at 426-27; *Weiss I*, 453 F. Supp. 2d at 613; *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003).

Plaintiffs satisfy this standard. In *Chiquita III*, the plaintiffs alleged direct liability by pleading that Chiquita "continuously paid substantial sums of money to the FARC over a nine-year time span, knowing before and during that time of" the FARC's terrorist goals. 284 F. Supp. 3d at 1315. Here, Defendants similarly paid Jaysh al-Mahdi, both in cash and in free goods that Jaysh al-Mahdi could exchange for cash. TAC ¶¶ 114-64. The complaint details Defendants' knowledge of the Ministry and Jaysh al-Mahdi's terrorist activities. *Id.* ¶¶ 182-87, 188-98 (AZ), 220-29 (GE), 250 (Ethicon), 256 (J&J), 288 (Pfizer), 315 (Roche), 354. "If a defendant gives money to a terror organization, knowing of the aims and activities of that organization," "this conduct creates a jury question as to whether it may objectively be viewed as that which 'appears to be intended' to [intimidate] or coerce a civilian population or government." *Chiquita III*, 284 F. Supp. 3d at 1319; *accord Boim*, 549 F.3d at 693-94 (finding intent satisfied because "[a] knowing donor to Hamas" would know its "donations would appear to be intended" for terrorist aims in light of their "foreseeable consequences").

The D.C. Circuit's recent decision in *United States v. All Petroleum-Product Cargo Onboard the M/T Arina*, 173 F.4th 342 (D.C. Cir. 2026), a forfeiture case, is instructive. Interpreting an analogous intent requirement in 18 U.S.C. § 2332b(g)(5), the court held the complaint adequately alleged that the "material-support offense was calculated to affect the U.S. government" where the United States alleged the owner of the defendant property "play[ed] a major role in funding the Iranian government in general and" the Iranian Revolutionary Guards, which were "responsible for terrorist activities" including attacks on Americans. *Id.* at 344, 349. As here, the complaint detailed how the terrorist arm – there, the Revolutionary Guards – used "terrorism as a tool of statecraft" focused on the United States. *Id.* at 349. As here, the claim was not merely that the owner of the defendant property supported the "sovereign state" of Iran,

but that it supported the Guards specifically. *Id.* at 350.[6] And as in *M/T Arina*, Defendants were not merely "indirect supporter[s]" of the terrorist group "through some independent intermediary," but were "direct source[s] of funding for" Jaysh al-Mahdi. 173 F.4th at 350.

**2.** Defendants' claim (at 15-17) that they had commercial, not terrorist, motives does not warrant dismissal. As Judge Lamberth observed, apparent terroristic intent can exist even when a defendant also wants to make money. *See Wultz*, 755 F. Supp. 2d at 44, 48-49 ("a reasonable person could easily infer" terroristic intent when a defendant provides commercial services – in that case, "banking services" to terrorists); *cf. M/T Arina*, 173 F.4th at 349 (statute's intent requirement "can be met through reasonable inferences based on objective 'circumstantial evidence' " including "evidence of a defendant's 'knowledge' that his activities could 'influence government conduct,' " and "his particular *motivation*" is not the statute's focus) (emphasis in opinion). It is black-letter law that "money-raising goals obviously do not preclude a finding of [terroristic] intent" under § 2331. *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see United States v. Shabban*, 612 F.3d 693, 696 (D.C. Cir. 2010) ("evidence that a defendant had multiple intentions does not mean there [is] insufficient evidence of the requisite statutory intent"). That payments "may have had multiple motivational triggers, some salutary, are factors for the trier of fact to consider." *Chiquita III*, 284 F. Supp. 3d at 1319.

None of Defendants' cases dismissed a direct-liability ATA claim where, as here, a court found proximate causation satisfied. *See Atchley I*, 22 F.4th at 210; *Atchley II*, 165 F.4th at 597. And the only ATA decision in this District to address Defendants' argument rejected it. In

---

[6] That the owner of the defendant property in *M/T Arina* was also an arm of the Iranian government, and thus "closely intertwined" with the terrorist agency, 173 F.4th at 350, does not defeat the analogy, because Defendants here supported not merely the Iraqi government – "an autonomous nation with many functions and priorities" – but the Ministry in particular, knowing it was "a single agency that had been overtaken by terrorists," *Atchley I*, 22 F.4th at 228.

*Wultz*, the district court denied the Bank of China's motion, reasoning that "a reasonable person could easily infer [terroristic] intent" from the commercial services the bank provided to terrorists. 755 F. Supp. 2d at 48-49. The same logic applies here.

Defendants' out-of-circuit authorities are distinguishable, in large part because none involved a finding of proximate causation. This is fatal to Defendants' argument, because "what an observer could reasonably find '*appear[ed] to be intended*' depends on whether the consequences of the defendant's activities were reasonably foreseeable." *Schansman*, 565 F. Supp. 3d at 418 (quoting *Weiss*, 993 F.3d at 161). The line from *Kemper* Defendants cite – that "interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce,'" 911 F.3d at 390 – does not apply. The interactions in *Kemper* had no causal tie to terrorism, and there was no allegation that the defendant "serviced a terrorist group directly." *Id.* at 392-95. By contrast, Defendants "made corrupt payments that directly financ[ed] Jaysh al-Mahdi's sustained campaign of terrorist attacks." *Atchley II*, 165 F.4th at 605. *Kemper* and cases like it say nothing about whether a jury could infer apparent terroristic intent where Defendants "persistently pursued opportunities" to make such deliberate payments to terrorists. *Id.*

Defendants' other cases are similarly off-point. In *Gonzalez v. Google*, 2 F.4th 871 (9th Cir. 2021), *vacated on other grounds*, 598 U.S. 617 (2023), the court reasoned that the en banc Seventh Circuit found intent in *Boim* because that case "involved voluntary donations specifically and purposefully directed to a foreign terrorist organization." *Id.* at 900. By contrast, *Gonzalez* concerned Google sharing ad revenue with ISIS as part of its generally available AdSense program, allegations the court found "easily distinguished from those involving donations to a known terrorist organization." *Id.* The facts here resemble those in

*Boim*, because Defendants made payments directly to Jaysh al-Mahdi and to the Ministry, knowing its terrorist activities. *See also Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 357-59 (E.D.N.Y. 2019) (no causal link between bank's alleged money laundering and the cartels' injurious acts).

Defendants also misplace reliance on *Goldman*. The court there recognized that "both profit and terroristic aims can simultaneously motivate an ATA defendant," and ruled against the plaintiffs because they *admitted* that the defendants did not support ISIS's aims. *Goldman*, 821 F. Supp. 3d at 337. No such admission defeats intent here; Plaintiffs allege that Defendants knew that the consequences of their material support for Jaysh al-Mahdi and the Ministry included attacks that sought to (and did) achieve the aims the ATA enumerates. *See supra* pp. 14-15. Defendants knew they were funding Jaysh al-Mahdi's attacks that served terroristic purposes. TAC ¶¶ 182-87, 188-98 (AZ), 220-29 (GE), 250 (Ethicon), 256 (J&J), 288 (Pfizer), 315 (Roche), 354; *see also Atchley I*, 22 F.4th at 221.

A jury could find from such knowledge that Defendants appeared to share that purpose. *M/T Arina*, 173 F.4th at 349-50 (reasonable evidence supporting objective intent requirement includes evidence of "a defendant's 'knowledge' that his activities could 'influence government conduct,' " such as being a "source of funding" for a group known to engage in "terrorist activities aimed at influencing the United States"). Indeed, weighing Defendants' apparent intent is better saved for a jury after discovery. *See In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.").

Finally, Defendants' argument (at 16-17) that "commercial sales" cannot satisfy the intent requirement also fails because Plaintiffs allege not standard commercial sales, or even

legitimate charitable donations, but corrupt payments of cash and goods destined for the black market. *See* TAC ¶¶ 137-38. "Defendants did not intend for the 'free goods' provided to Kimadia to serve any legitimate charitable or medicinal purpose." *Id.* ¶ 137. It was "widely reported" "that medical goods nominally intended for the Iraqi people were routinely diverted," and Defendants knew (or recklessly disregarded that) the "free goods" they provided "were not serving any legitimate public-health objective; they were destined for the black market." *Id.* ¶ 138. Illegitimate donations of cash and goods that Defendants knew would be diverted cannot be likened to routine commercial sales; in that context, where it is foreseeable that the donations will advance the recipient's terroristic aims, intent is satisfied. *See Chiquita III*, 284 F. Supp. 3d at 1307, 1319. At a minimum, "[w]hether financial services are 'routine . . . raises questions of fact for a jury to decide.'" *Schansman*, 565 F. Supp. 3d at 415.

### C. The Complaint Alleges Defendants Committed A Predicate Offense Under 18 U.S.C. § 2339A

**1.** The complaint plausibly alleges that Defendants violated Section 2339A(a), which makes it a federal crime to provide "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out," federal terrorism offenses. 18 U.S.C. § 2339A(a). The statute defines material support or resources to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." *Id.* § 2339A(b)(1). Plaintiffs allege that Defendants violated this statute "by structuring their transactions with [the Ministry] to provide

cash, drugs, medical devices, training, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi." *See* TAC ¶¶ 3208-14 (Count Three).[7]

Those allegations surpass the "short and plain statement" Federal Rule of Civil Procedure 8 requires. *Wultz*, 755 F. Supp. 2d at 38-39. The complaint details how each Defendant provided support to Jaysh al-Mahdi members through cash bribes, "performance bonds" that allowed Jaysh al-Mahdi to collect cash, "administrative fees," vacations, trainings, and other unreasonable contract benefits, in addition to free goods. *See* TAC ¶¶ 142-64; *see id.* ¶¶ 188-98 (AstraZeneca paid commissions, administrative fees, and other cash); 213-21 (GE made corrupt payments, bribes, commissions, equipment); 245-52, 254, 259, 262-70 (J&J made corrupt payments, commissions, medical devices, cash bribes, and kickbacks); 283, 290-91 (Pfizer paid commissions, devices); 311-13, 317-18 (Roche paid commissions, devices).

**2.** Defendants argue (at 23-24) that § 2339A excludes medicine from its definition of material support. Even if this argument were persuasive, it would not help Defendants, because Defendants gave Jaysh al-Mahdi other forms of material support, like money. TAC ¶¶ 142-64, 3209. Defendants also provided property and equipment, including medical devices, training, and vacations, including lodging. *Id.* ¶¶ 158-60. The complaint details multiple transaction stages at which Defendants paid "commissions," *id.* ¶¶ 142-64, and explains that Jaysh al-Mahdi typically required such "commissions" to account for at least 20% of the contract value, *id.* ¶¶ 142-45, 189, 195, 258. The complaint identifies Defendants' corrupt local agents and explains how Defendants used them to deliver those benefits to Jaysh al-Mahdi. *Id.* ¶¶ 49, 200-01, 223-32, 262-70, 281-91, 319-20.

---

[7] Count Four asserts a direct liability cause of action predicated on a violation of 18 U.S.C. § 2339C(a)(1)(A), financial support to terrorists. Defendants do not challenge this predicate.

Defendants respond (at 24) with arguments the D.C. Circuit rejected. Indeed, Defendants call the cash-payment allegations "conclusory," but that was the same thing they said to the D.C. Circuit[8] – which upheld the allegations. *See Atchley II*, 165 F.4th at 596 (complaint alleges that "defendants paid illegal cash bribes directly to the group" and "knew that the funds and goods they were gratuitously providing to Jaysh al-Mahdi financed its attacks against Americans"); *Atchley I*, 22 F.4th at 227 ("Plaintiffs' nonconclusory, detailed allegations describe the free goods scheme" and "the cash bribes"). Defendants accuse Plaintiffs (at 24) of providing "few specifics," but the D.C. Circuit detailed the allegations: "defendants paid cash bribes (called 'commissions') to Jaysh al-Mahdi in order to obtain lucrative Kimadia contracts. These 'commissions' were typically 20 per cent of any contract price. 'The Sadrists extracted their 'commissions' from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle.'" *Atchley II*, 165 F.4th at 599. The Court should reject Defendants' recycled arguments, as the D.C. Circuit did.

In invoking the "medicine exception" to the definition of material support, Defendants rely (at 25) on *Humanitarian Law Project v. Reno*, but that case did not construe the scope of the definition or the exception. 205 F.3d 1130 (9th Cir. 2000) (upholding similar provision).

Certain Defendants argue (at 25) that they provided "medical devices," which, they argue, fall under the "medicine" exception to § 2339A. First, Defendants cite no case sweeping "devices" into that exception. In any event, such devices are "property" within the definition of material support, rather than "medicine" excluded from it. 18 U.S.C. § 2339A(b)(1); *see* H.R. Conf. Rep. No. 104-518, at 114 (1996) ("limit[ing]" the exclusion "to the medicine itself" rather

[8] Brief for Defendants-Appellees, *Atchley v. AstraZeneca UK Ltd.*, 2021 WL 1599309, at *33 (D.C. Cir. filed Mar. 12, 2021).

than "the vast array of medical supplies"); *United States v. Farhane*, 634 F.3d 127, 143 (2d Cir. 2011) ("[T]he medicine exception identified in § 2339A(b)(1) shields only those who provide *substances* qualifying as medicine to terrorist organizations."); *United States v. Jama*, 217 F. Supp. 3d 882, 893 n.12 (E.D. Va. 2016) (citing *Farhane* in distinguishing "medicinal substances, as opposed to medical-related services or equipment"). The Court should decline Defendants' invitation to be the first court to expand the exception to include "devices."

In any case, the free drugs Defendants paid Kimadia and Jaysh al-Mahdi functioned as cash equivalents, not medicine. TAC ¶¶ 117, 136, 141, 258, 260. Because Defendants provided those goods knowing they would be bartered on the black market, *id.* ¶¶ 50-51, 108, 117-18, they did not function as "medicine" in the context of Defendants' transactions. *See Webster's Third New International Dictionary of the English Language* (1993) at 1402 ("medicine" means "a substance or preparation used in treating disease"). Rather, the cash-equivalent drugs were a type of "currency," which is a species of material support. 18 U.S.C. § 2339A(b)(1); *cf. C.N.S. Enters., Inc. v. G. & G. Enters., Inc.*, 508 F.2d 1354, 1363 (7th Cir. 1975) ("currency" in Securities Exchange Act encompasses "cash substitute[s]"). Terrorist groups (including Hezbollah) often raise funds through black-market drug smuggling, TAC ¶¶ 169-71, 361-62, and Congress did not plausibly intend to allow companies to support those efforts by providing terrorists with cash-equivalent pharmaceuticals.

Defendants call the possibility that the free drugs they provided functioned as commodities "remote" (at 23), but the complaint provides extensive detail on how Jaysh al-Mahdi turned them into cash on the black market. TAC ¶¶ 50-51, 108, 117-18. Defendants also assert without support (at 25) that medical devices are "almost impossible" to convert to terrorism support on the black market, but the complaint details the opposite: Jaysh al-Mahdi

monetized both small devices and large medical equipment and machines. TAC ¶¶ 178, 211, 227, 242 (GE); 246-48, 259, 268 (J&J); 290 (Pfizer). The allegations describe the particular devices, machines, and equipment, along with the agents in Iraq and their manner of selling the goods. *E.g.*, *id.* ¶ 268. As the D.C. Circuit recognized, the "[f]ree goods packaged alongside the paid goods, but which nobody expected to appear in the Ministry's inventory, were readily available to Jaysh al-Mahdi to sell on the black market." *Atchley I*, 22 F.4th at 212-13.

Finally, the Manufacturer Defendants are incorrect to assert (at 24) that they cannot be liable for providing material support to terrorists because they did not directly "negotiate[] with Kimadia." The D.C. Circuit again rejected this argument, holding that "the manufacturer defendants could be held liable both directly and secondarily despite not dealing immediately with Jaysh al-Mahdi," based on the complaint's well-pleaded allegations that "reports demonstrating the connection between the Ministry and Jaysh al-Mahdi were available to all parties and because the complaint contained sufficient allegations that suppliers acted as manufacturers' agents." *Atchley II*, 165 F.4th at 614. That holding is controlling.[9]

## II. COUNT TWO PLAUSIBLY ALLEGES AN AIDING-AND-ABETTING CLAIM

JASTA imposes aiding-and-abetting liability for injuries arising from "an act of international terrorism committed, planned, or authorized" by a Foreign Terrorist Organization. 18 U.S.C. § 2333(d)(2). Count One alleges that Defendants aided and abetted the terror attacks that Hezbollah planned and authorized and that Jaysh al-Mahdi carried out against Plaintiffs. The D.C. Circuit has already held that Count One adequately alleges all the elements of an aiding-and-abetting claim under the ATA: "(1) an injury arising from an act of international terrorism; (2) which act was committed, planned, or authorized by a designated Foreign Terrorist

---

[9] Defendants' arguments (at 22) that these Defendants cannot have engaged in dangerous acts fail for the same reason.

Organization; and (3) that defendants aided or abetted the act of international terrorism by knowingly providing substantial assistance." *Atchley II*, 165 F.4th at 601-02.

Count Two's aiding-and-abetting allegations are nearly identical to the allegations in Count One that the D.C. Circuit already upheld. The only difference is that Count Two alleges an alternative predicate "act of international terrorism": the violation of racketeering laws by terrorists associated with Jaysh al-Mahdi and Hezbollah. *See* TAC ¶¶ 3193, 3202. Count Two, like Count One, pleads all the elements of an aiding-and-abetting claim under the ATA.

### A. Count Two Alleges An Act of International Terrorism

**1.** The complaint alleges that Muqtada al-Sadr and other terrorists associated with Jaysh al-Mahdi and Hezbollah "engag[ed] in a campaign to expel Americans from Iraq through crime and anti-American violence," thereby violating federal racketeering laws. TAC ¶ 3192. This criminal violation was an "act of international terrorism": (1) it was "violent" or "dangerous to human life"; (2) it "appear[ed] to be intended" "to intimidate or coerce a civilian population" or "influence or affect a government by intimidation, coercion, or violence"; and (3) it violated U.S. criminal law, *see Keren Kayemeth LeIsrael*, 66 F.4th at 1014 – namely, the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(b)–(d).

Defendants do not contest any of these elements. They argue instead (at 42) that (1) the ATA imposes aiding-and-abetting liability only for assisting a singular, discrete "act" of international terrorism, and (2) the RICO violation they assisted does not constitute such a discrete "act," because it encompassed multiple attacks. That argument contravenes the ATA's text, black-letter principles of aiding-and-abetting liability, and common sense.

Start with the statutory text. The ATA defines "international terrorism" to include specified "acts" that "violat[e] the criminal laws of the United States." 18 U.S.C. § 2331(1)(A). An "act of international terrorism" under the ATA is therefore an act that violates criminal law.

As the Supreme Court put it in *Twitter*, an "act of international terrorism" is an "actionable wrong." *Twitter*, 598 U.S. at 495. The D.C. Circuit has likewise explained that an "act of international terrorism" means the "violat[ion] [of] any one of a series of predicate criminal laws." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 122 (D.C. Cir. 2011). And courts have recognized that "a broad range of state and federal crimes . . . may qualify as 'act(s) of international terrorism,' actionable under the ATA." *Chiquita III*, 284 F. Supp. 3d at 1304; *see also Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 200 (D.D.C. 2014) (an act of international terrorism means a "violat[ion] [of] any one of a series of predicate criminal laws"); *Linde*, 384 F. Supp. 2d at 581 (acts of international terrorism are "predicate crimes giving rise to civil liability under the ATA"); *cf. Black's Law Dictionary* (12th ed. 2024) (defining "unlawful act" as "conduct that is not authorized by law; a violation of a civil or criminal law").

The common law of aiding and abetting confirms that principle. The common law imposes secondary liability on a defendant who "helps another to complete [the] commission" of "a crime." *Twitter*, 598 U.S. at 488, 495. Indeed, "a completed crime is necessary for aiding-and-abetting liability to attach," and the defendant must aid and abet the "act constituting the offense." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1063-64 (D.C. Cir. 2024). Under the common law, as under the ATA, the relevant "act" in an aiding-and-abetting case is the "actionable wrong"— meaning a violation of criminal law.

The violation of the RICO statute is an "actionable wrong." The statute's "specific prohibitions" make it "unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 330–31 (2016); *see* 18 U.S.C. § 1962(c). And as with other federal crimes, aiding and abetting a criminal violation of the RICO statute is itself subject to criminal

penalties. *See* 18 U.S.C. § 2; *United States v. Wyatt*, 807 F.2d 1480, 1482 (9th Cir. 1987); *Laro, Inc. v. Chase Manhattan Bank (Nat'l Ass'n)*, 866 F. Supp. 132, 138 (S.D.N.Y. 1994).

This is true even though a RICO violation, like many other crimes, involves multiple discrete physical acts. A "statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." *People v. Corpening*, 386 P.3d 379, 382 (Colo. 2016); *United States v. Pregler*, 925 F.2d 268, 269 (8th Cir. 1991) ("[a] [three-year] conspiracy is an ongoing act"); *Baker v. Farrand*, 26 A.3d 806, 816 (Me. 2011) ("act" can refer to "a series of related acts or omissions that proximately cause a harm"). Indeed, the "act assisted" in *Halberstam v. Welch* – the D.C. Circuit decision that provides the "proper legal framework for how [aiding-and-abetting] liability should function" under the ATA, JASTA § 2(a)(5) – was a "five-year-long burglary campaign against private homes." 705 F.2d 472, 488 (D.C. Cir. 1983).

The same is true of RICO. Although a violation of RICO requires proof of a "pattern" of predicate criminal acts, "Congress intended that a RICO violation be a discrete offense that can be prosecuted separately from its underlying predicate offenses." *United States v. Crosby*, 20 F.3d 480, 484 (D.C. Cir. 1994). At bottom, therefore, RICO is no different than any crime involving multiple discrete steps. As with all other crimes, a defendant is liable for aiding and abetting a RICO violation if the defendant "helps another to complete [the] commission" of a RICO offense. *Twitter*, 598 U.S. at 488, 495.

These same principles apply under the ATA, under which "a broad range of state and federal crimes . . . may qualify as 'act(s) of international terrorism,'" *Chiquita III*, 284 F. Supp. 3d at 1304. For example, "violations of 18 U.S.C. §§ 2339A and 2339B, which make it a crime to provide material support to terrorists and to designated foreign terrorist organizations,

respectively, are included in Section 2331(1)'s broad definition of 'international terrorism.'" *Linde*, 384 F. Supp. 2d at 581. This is true even though such crimes often involve multiple steps. *See id.* at 577 (administering terrorist "benefit plan" was act of international terrorism); *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1004 (7th Cir. 2002) (act of international terrorism involved "series of complicated transactions"); *Chiquita III*, 284 F. Supp. 3d at 1315 (defendant committed "act of international terrorism" by "continuously pa[ying] substantial sums of money to the FARC over a nine-year time span").

There is no reason to treat a RICO violation differently than any other multi-step act of international terrorism. Indeed, the ATA and the RICO statute "share similar goals," and "many of RICO's predicate activities are also crimes of terrorism." *In re Search of One Apple iPhone Smartphone*, 628 F. Supp. 3d 155, 162 (D.D.C. 2022); *United States v. Marzook*, 426 F. Supp. 2d 820, 826-27 (N.D. Ill. 2006) (sustaining RICO claim based on campaign of terror attacks). A RICO violation thus makes a natural predicate act of international terrorism.

**2.** Defendants' arguments are unpersuasive. They selectively quote *Twitter*'s rejection of aiding-and-abetting liability based on assistance to a "transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 598 U.S. at 495. But Count Two does not allege merely that Defendants assisted an "enterprise" – nor would such an allegation suffice to establish a violation of RICO. *See W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (RICO violation requires proof of "conduct," not just enterprise). The complaint instead alleges an "actionable wrong" in the form of a criminal violation of the RICO statute. TAC ¶¶ 3190-3207. *Twitter* makes clear that such "actionable wrongs" constitute "acts of international terrorism." *Twitter*, 598 U.S. at 495.

The out-of-circuit decisions Defendants invoke (at 42-43) provide no better support. Their principal authority, *Ashley v. Deutsche Bank Aktiengesellschaft*, rejected an aiding-and-abetting theory based on general assistance to a terrorist enterprise because "the scope of Plaintiffs' racketeering theory would sweep as broad as covering every terrorist attack of all time carried out against Americans by the Taliban-al-Qaeda Campaign." 144 F.4th 420, 448 (2d Cir. 2025). But as the D.C. Circuit explained on remand after *Twitter*, that concern is not present here, because "the complaint tells a localized story that ties defendants' alleged knowing provision of substantial aid to a defined subset of Jaysh al-Mahdi's tortious attacks – conduct that was circumscribed temporally and geographically." *Atchley II*, 165 F.4th at 607 (noting that "plaintiffs' claims are limited to . . . attacks in Iraq, even though Jaysh al-Mahdi carried out attacks elsewhere in the Middle East"). "Because plaintiffs' allegations are limited . . . to a temporally and geographically discrete set of Jaysh al-Mahdi's terrorist acts," *id.*, there is no danger – as there was in *Ashley* – that Count Two will "sweep as broad as covering every terrorist attack of all time carried out against Americans" in Iraq, 144 F.4th at 448.

Finally, even if the Court determines that a RICO violation is not an "act" of international terrorism, it should not dismiss Count Two of the complaint. At the very least, the predicate criminal acts underlying the RICO violation – which Count Two identifies and describes – are themselves "acts of international terrorism." For example, the complaint alleges that Jaysh al-Mahdi committed the predicate criminal offenses of "murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction,

commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively." TAC ¶ 3193; *see also id.* ¶¶ 3194-99. Each of these predicate criminal offenses constitutes an act of international terrorism.

### B. Count Two Alleges That Hezbollah Planned or Authorized Sadr's Violation of the RICO Statute

The complaint plausibly alleges that Hezbollah "committed, planned, or authorized" Sadr's RICO violations. *See*, *e.g.*, TAC ¶¶ 3188, 3206. The D.C. Circuit already held that "Plaintiffs plausibly allege that Hezbollah both planned and authorized the attacks against them." *Atchley I*, 22 F.4th at 218. It observed that "[t]he complaint describes in detail how Hezbollah acted through Jaysh al-Mahdi with the specific goal of harming Americans in Iraq" – for example, how Hezbollah "worked with Sadr to found Jaysh al-Mahdi with the shared goal of killing Americans and driving U.S. forces out of Iraq," and how "Hezbollah sent nearly 800 agents to Iraq to direct Jaysh al-Mahdi's terrorist campaign." *Id.* The D.C. Circuit was addressing Count One's allegation that Hezbollah planned and authorized the terrorist attacks against Plaintiffs, but its reasoning applies with equal force to Count Two's allegation that Hezbollah planned and authorized the larger terror campaign that injured Plaintiffs.

Defendants respond (at 42-43) by disputing the well-pleaded allegations that the D.C. Circuit already credited. They cite (at 43 n.32) a single document for the proposition that Hezbollah did not "establish contacts" with Jaysh al-Mahdi until several months after it was formed and therefore could not have "planned" its campaign. But the complaint alleges that Hezbollah co-founded Jaysh al-Mahdi in April 2003, which should be accepted as true. TAC ¶¶ 56 & n.18, 364. Defendants' effort (at 43 & n.33) to debate the timing of Hezbollah's

involvement – based on a disputed interpretation of a single article – is premature. *See Banneker*, 798 F.3d at 1129. At any rate, the precise timing of Hezbollah's involvement matters little because RICO proscribes "conduct[ing] [the] affairs" and "maintain[ing] . . . control" of a racketeering enterprise, not just creating one. 18 U.S.C. § 1962(b), (c). Thus, even if Hezbollah did not contact Jaysh al-Mahdi until after its formation, Hezbollah still "planned" and "authorized" the RICO violation as it continued. TAC ¶¶ 364-407.

### C. Count Two Alleges That Defendants Aided and Abetted Sadr's Violation of the RICO Statute

The complaint plausibly alleges that Defendants aided and abetted the violation of RICO by Jaysh al-Mahdi and Hezbollah terrorists. Again, the D.C. Circuit has already held that the complaint "state[s] an ATA aiding-and-abetting claim based on defendants' 'conscious, voluntary, and culpable participation in [Jaysh al-Mahdi's] wrongdoing.'" *Atchley II*, 165 F.4th at 613. While that holding addressed Plaintiffs' claim that Defendants aided and abetted the terrorist attacks against them, it follows that Defendants also aided and abetted the larger terror campaign that injured Plaintiffs.

Defendants err in asserting (at 43) that the complaint fails to identify the specific "'person' within the RICO 'enterprise' that conducted the predicate RICO offenses." Plaintiffs identify Sadr and many Jaysh al-Mahdi associates at the Ministry by name, TAC ¶¶ 78-102, and allege that Defendants aided those RICO perpetrators in particular, *id*. ¶¶ 3192-93. Nothing more is required at this stage. *See McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (RICO claims that do not sound in fraud are "evaluated . . . against the more lenient pleading standards of Federal Rule of Civil Procedure 8(a)"). Defendants need not have known (and Plaintiffs need not plead) the identities of the specific principals they aided so long as they were "generally aware of [their] role [in] an overall illegal or tortious activity." *Halberstam*, 705 F.2d

at 487-88; *see United States v. Staten*, 581 F.2d 878, 887 (D.C. Cir. 1978) (affirming aiding-and-abetting conviction even though the "principal in the operation" being assisted was not specifically "identified"). Accordingly, the assertion that Plaintiffs must allege with particularity each individual RICO perpetrator – or the individual crimes each one committed – lacks merit.

### D. The "Law of the Case" Doctrine Does Not Apply

Finally, Defendants are incorrect that the law of the case requires dismissal of Count Two because this Court originally dismissed it before the D.C. Circuit reversed that dismissal. The law-of-the-case doctrine "is prudential, not jurisdictional," *Filebark v. U.S. Dep't of Transp.*, 542 F. Supp. 2d 1, 5 n.10 (D.D.C. 2008) (Leon, J.), and "'adherence to the doctrine is not mandatory,' but rather left to the district court's sound discretion." *Beach TV Props., Inc. v. Solomon*, 324 F. Supp. 3d 115, 123 (D.D.C. 2018). There is no basis to apply the doctrine here.

This Court previously dismissed Count Two "for the same reasons" that it dismissed Count One – namely, that Plaintiffs had failed to plausibly allege that Hezbollah "planned or authorized" the relevant acts of international terrorism or that Defendants provided "substantial assistance" to those acts. *Atchley*, 474 F. Supp. 3d at 212. The D.C. Circuit reversed the dismissal of Count One, and "remand[ed] for further proceedings consistent with this opinion." *Atchley II*, 165 F.4th at 615. The D.C. Circuit "d[id] not directly address plaintiffs' RICO theory . . . in view of our remand," leaving it for this Court to reassess Count Two in light of the D.C. Circuit's reasoning. *Atchley I*, 22 F.4th at 217. Thus, the "further proceedings consistent with [the D.C. Circuit's] opinion" should include the fresh consideration of Count Two. *Id.* at 239.

True, this Court previously observed in dicta that it would be "unnatural" to read the term "act" in the ATA to encompass a "racketeering scheme by JAM and Hezbollah to expel Americans from Iraq." *Atchley*, 474 F. Supp. 3d at 212. But "dicta is not part of the law of the case." *Beach TV Props.*, 324 F. Supp. 3d at 123. And in any event, the law-of-the-case doctrine

does not apply "when an intervening interpretation of the law has been issued by a controlling authority." *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 30 F.3d 1510, 1516 (D.C. Cir. 1994). Since this Court's order dismissing Count Two six years ago, the D.C. Circuit has issued two lengthy decisions reversing that dismissal and the Supreme Court has issued *Twitter*, which clarified the meaning of "act of international terrorism" under the ATA. These "intervening interpretations of the law" preclude application of the law-of-the-case doctrine here.

## III. COUNTS FIVE THROUGH EIGHT PLAUSIBLY ALLEGE TIMELY STATE-LAW CLAIMS

Based on the same conduct described above, Plaintiffs also bring claims (TAC ¶¶ 3222-54) for intentional infliction of emotional distress, assault and battery, wrongful death, and survival. *See Burnett*, 274 F. Supp. 2d at 107 ("Given the adequacy of plaintiffs' [ATA] allegations . . . , plaintiffs have also stated common law claims for wrongful death, survival, and intentional infliction of emotional distress."). Plaintiffs adequately allege each of them.

### A. Plaintiffs Plausibly Allege All Elements of Their State-law Claims

#### 1. Intentional Infliction of Emotional Distress (Count Five)

The complaint alleges each of the elements of intentional infliction of emotional distress: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 462 (D.D.C. 1997). Indeed, where an organization aids and abets terrorists in conducting attacks on Americans, "[t]here can be little question that plaintiffs have stated . . . the elements of intentional infliction of emotional distress." *Burnett*, 274 F. Supp. 2d at 107.

**a.** The complaint allegations satisfy the first element, "extreme and outrageous conduct," by alleging that Defendants knowingly funded terrorists who used their resources to attack Americans. *Id.*; *see also Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C.

2016) ("the act of engaging in terrorism by means of material support . . . is extreme, outrageous, and goes beyond all possible bounds of decency").

Defendants cite (at 33) *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 590 (E.D.N.Y. 2005), for the proposition that intentional infliction of emotional distress claims do not reach those who merely "support" terrorists. But unlike the bank in *Linde* that merely processed payments by others to terrorists, Defendants here directly *funded* Jaysh al-Mahdi's attacks. Defendants' reliance on *Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362 (D.C. 2003), is similarly misplaced: funding terrorist attacks can hardly compare to "intentionally closing the office door" on someone's hand. *Id.* at 373.

**b.** The complaint satisfies the second element— intent— by alleging that Defendants acted with "reckless disregard of the probability of causing" emotional distress. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 42 (D.D.C. 2007). Defendants do not contest this.

**c.** The complaint also satisfies the third element, causation. The D.C. Circuit has already held "plaintiffs have adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries." *Atchley I*, 22 F.4th at 210. That holding is dispositive.

Defendants are incorrect to claim (at 37) that D.C. courts apply a "stricter" proximate cause standard in cases involving "intervening criminal act[s]." D.C. courts assess whether an outcome was "foreseeable" even considering any intervening acts. *See Lacy v. District of Columbia*, 424 A.2d 317, 323-24 (D.C. 1980); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 57 (D.D.C. 2006) ("defendants' actions in facilitating and supporting the Khobar Towers bombing proximately caused Mr. Blais' emotional distress because the material support and direction given to Saudi Hezbollah ensured the event would occur"). Here, the D.C. Circuit has already credited the complaint's allegations that "Defendants knew their assistance . . .

would be used to launch attacks on plaintiffs." *Atchley II*, 165 F.4th at 597. The resulting emotional distress was certainly "foreseeable." At the very least, Defendants cannot overcome the presumption that "[p]roximate cause is generally a factual issue to be resolved by the jury." *Wash. Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 170 (D.C. 1992).

Defendants misplace reliance (at 37-38) on *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633 (D.C. 2005). That case involved claims that gun manufacturers and distributors were negligent in how they sold their product to the public, resulting in an illegal flow of firearms into the District. *Id.* There, the court focused on ensuring that the law created reasonable duties of care in the community and balanced concerns about "limitless notions of duty and foreseeability" owed to every resident of D.C. *Id.* at 643. Here, holding Defendants liable for knowingly funding terrorist attacks does not risk similarly limitless liability.

**d.** Defendants assert (at 39) that family members cannot recover because they were not physically present for the attacks. But "because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence [ ] that they suffered mental anguish and trauma as a result of it." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017). While Defendants try to limit that exception to the FSIA context, they offer no principled reason why a terrorism exception would exist for an intentional infliction of emotional distress claim under the FSIA and not under the ATA, and they cite no authority drawing that distinction. Nor can they. *See*, *e.g.*, *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 279 (1st Cir. 2005) ("the FSIA and . . . the ATA were two sides of the same coin"); *Selig v. Taliban*, 774 F. Supp. 3d 129, 140 (D.D.C. 2025) ("The

limited case law addressing ATA damages in this circuit has relied heavily on FSIA proceedings for both evidence and damages calculations.”).

**2. Assault and Battery (Count Six)**

The complaint plausibly alleges that Defendants aided and abetted Jaysh al-Mahdi’s acts of assault and battery on Plaintiffs. “An assault is ‘an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim,’ ” while “[a] battery is ‘an intentional act that causes a harmful or offensive bodily contact.’ ” *Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012). Defendants do not contest that Jaysh al-Mahdi’s attacks on Plaintiffs meet the legal elements of assault and battery. And courts in this District are “bound by the law of this Circuit to recognize aiding and abetting liability for common law torts under District of Columbia law.” *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 49 (D.D.C. 2019) (collecting cases). The D.C. Circuit held that the complaint plausibly alleges that Defendants aided and abetted Jaysh al-Mahdi’s attacks on Plaintiffs. *See Atchley II*, 165 F.4th at 613. Defendants are therefore liable for aiding and abetting Jaysh al-Mahdi’s assault and battery too. *See Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017) (defendant “vicariously liable for assault and battery” for supporting “terrorist activities” by another).

Defendants’ only response is to suggest incorrectly that aiding-and-abetting liability does not exist under D.C. law, relying (at 34) on a mischaracterization of a single case, *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123 (D.C. 2015). “*Sundberg* does not, however, bear the weight that [Defendants] ascribe[] to it.” *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D.D.C. 2017), *aff’d*, 894 F.3d 339 (D.C. Cir. 2018). In *Petroleo*, Judge Mehta explained that the quote that Defendants highlight from *Sundberg* – “we have not recognized the tort of aiding and abetting” – “was not an affirmative statement about the current state of District of Columbia tort law, but rather a mere acknowledgment that none of the court’s prior cases had

recognized the tort." *Id.* at 87. And after *Sundberg*, courts in this District have recognized that they are "bound by the law of this Circuit to recognize aiding and abetting liability for common law torts under District of Columbia law." *Kurd*, 374 F. Supp. 3d at 49.

Defendants next claim (at 34-35) that even if aiding-and-abetting liability does exist under state law, its liability threshold is more demanding than the ATA's. But *Halberstam* — the basis for common law aiding-and-abetting liability under D.C. law — also serves as the "legal framework" for JASTA, § 2(a)(5); *see Twitter*, 598 U.S. at 488. Both common law and ATA aiding-and-abetting derive from *Halberstam*. There is no reason for the same framework to generate different outcomes.[10]

Finally, Defendants claim (at 38-39) that Plaintiffs fail to allege intent for the assault and battery claims. But *Halberstam* teaches that the test for aiding-and-abetting requires only that the defendant be "generally aware of his role as part of an overall illegal or tortious activity at the time" and "knowingly and substantially assist the principal violation." 705 F.2d at 477-78. To import a different intent requirement would eviscerate aiding-and-abetting liability.

### 3. Wrongful Death and Survival (Counts Seven and Eight)

The deceased Plaintiffs and their estates bring wrongful death and survival claims, which incorporate the intentional torts described above. TAC ¶¶ 3235-54. Those claims are adequately pled. *See, e.g.*, *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006) (finding wrongful death liability for terrorist act); *Peterson*, 515 F. Supp. 2d at 39-40 (similar).

---

[10] Defendants cite (at 34-35) *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002), for the principle that merely providing aid to a third party who commits tortious acts is not enough; Plaintiffs must plead a link between the aid rendered and the principal violation. To the extent that that departs from *Halberstam*— binding authority overriding *Ungar*— it overstates the test.

Defendants respond (at 39-40) that Plaintiffs cannot bring a claim for wrongful death under D.C. law because the statute applies only to injuries occurring within the District. To begin, D.C. law does not automatically apply to all of Plaintiffs' wrongful death claims. Defendants concede (at 28) that "the wrongful death claims might warrant a closer analysis to determine what jurisdiction's law applies to each." Courts that have performed a choice-of-law analysis for wrongful death actions in the terrorism context have concluded that different states' laws should apply to different plaintiffs. *See In re Terrorist Attacks on September 11, 2001*, 2026 WL 873284, at *2, *6-7 (S.D.N.Y. Mar. 12, 2026), *report and recommendation adopted*, 2026 WL 850591 (S.D.N.Y. Mar. 26, 2026). Summarily dismissing Plaintiffs' wrongful death claims without such an analysis would be premature at best.

**B. Fact Issues Preclude Defendants' Statute-of-Limitations Arguments**

**1.** Plaintiffs' state-law claims are timely as pleaded. The "discovery rule" tolls the limitations period until a "plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C. Cir. 1977); *see also Kubicki ex. rel. Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 158 (D.D.C. 2018) (discovery rule makes timely an action based on "when the plaintiff knew or should have known of the potential claim").[11] Under the discovery rule, a claim does not accrue until the plaintiff "has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Id.*; *see also*

---

[11] Defendants argue (at 27-28) that D.C. law applies to the state-law claims because it is the law of the forum and D.C. law generally treats statutes of limitations as procedural unless incorporated into the cause of action itself. But the Court need not engage in a choice-of-law analysis at this stage. *See*, *e.g.*, *Jones v. Lattimer*, 29 F. Supp. 3d 5, 10 n.3 (D.D.C. 2014) (citing cases). Such an inquiry is more properly reserved for summary judgment – "after an opportunity for discovery." *Id.*

*District of Columbia v. Carlson*, 793 A.2d 1285, 1288 (D.C. 2002) (conduct constitutes a "cause-in-fact" of an injury where it is "a substantial factor in bringing about the harm"). The discovery rule exists for circumstances (like these) where "the relationship between the fact of injury and the alleged tortious conduct is obscure." *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).[12]

**2.** In the face of this evidence, Defendants urge the Court to misapply the discovery rule. They argue (at 29-30) that Plaintiffs' state-law claims accrued at the time of each Plaintiff's injuries, because Plaintiffs "knew of their injuries and their immediate cause— the attacks— when the attacks occurred." That theory rests on the premise that knowledge of physical injury stemming from a terrorist attack is akin to knowledge of wrongdoing by these Defendants. The law does not agree. The discovery rule protects against a strict application of the limitations period "where the injury and cause-in-fact do not themselves provide evidence of" the wrongdoing. *Bussineau*, 518 A.2d at 426. "[K]nowledge by a plaintiff of '*who* has inflicted the injury' is one of the 'critical facts' that a plaintiff must know (or should know through the exercise of due diligence) before the plaintiff's claim can accrue." *Smith v. United States*, 518 F. Supp. 2d 139, 151 (D.D.C. 2007) (emphasis added). Nor does common sense: for Plaintiffs to know whom they can sue, they must be able to identify who wronged them.

*Gardel v. SK & A Structural Engineers PLLC*, 286 F. Supp. 3d 120 (D.D.C. 2017) is not to the contrary. Although Defendants invoke it (at 29) for the proposition that accrual is not

[12] Defendants claim (at 28-29) that the discovery rule does not apply to wrongful death claims brought under D.C. law. But D.C. law does not automatically apply to all of Plaintiffs' wrongful death claims – a fact Defendants concede – and a choice-of-law analysis is premature at this stage of litigation. *See supra* p. 42. Even if it did, D.C. law permits tolling for the fraudulent concealment of a wrongful death claim, *e.g.*, *Smith v. Hope Vill., Inc.*, 2006 WL 8448528, at *3 (D.D.C. July 26, 2006), and the complaint alleges indications of Defendants' fraudulent concealment, TAC ¶¶ 118-19, 132-64.

delayed because a plaintiff has not discovered the right party to sue, that misstates the case: the plaintiff there had broken his leg on the sidewalk because he leaned on a chain that, quite clearly, "someone had failed to secure[.]" *Gardel*, 286 F. Supp. 3d at 127. The ability to investigate *who* might be the proper defendant in a lawsuit, the court concluded, "satisfies the quantum of knowledge required to put a plaintiff on inquiry notice." *Id.* Here, by contrast, the complaint makes clear that there was no reason to suspect that anyone – much less Western medical-supply companies – might be funding the terrorist attacks that injured Plaintiffs. *E.g.*, TAC ¶¶ 3227, 3233, 3244, 3253. And even if they had, it is unlikely that service members and their families could approximate the same detailed investigatory work that resulted in this litigation.

Defendants fall back on an argument (at 30) that Plaintiffs' claims accrued at the time of attack because Plaintiffs knew *Jaysh al-Mahdi* was responsible for the attacks and thus should have sought out counsel immediately after the attacks. But a soldier wounded by a roadside attack in Iraq, for example, might know that he had been injured. He might even know the immediate instrument of his injury. He could not know – much less *suspect* – that prominent pharmaceutical and medical-device companies might be funneling cash and free goods to a militia through the Ministry to make those attacks possible. *See Diamond v. Davis*, 680 A.2d 364, 380 (D.C. 1996) ("the plaintiff's knowledge of wrongdoing on the part of one defendant did not cause accrual of his action against another, unknown defendant responsible for the same harm, unless the two defendants were closely connected, such as in a superior-subordinate relationship").

**3.** If there is any question, the accrual date of Plaintiffs' claims is a fact question that should be reserved for a jury. The discovery rule implicates a "highly fact-bound" inquiry. *Diamond*, 680 A.2d at 372; *see Momenian v. Davidson*, 878 F.3d 381, 387-89 (D.C. Cir. 2017)

(reversible error where court granted motion to dismiss plaintiff's claims as time-barred and not subject to discovery rule). Courts may reject discovery rule arguments on the face of the complaint only "if no reasonable person could disagree on the date" of accrual. *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 463 n.11 (D.C. Cir. 1989), *on reh'g* (Jan. 10, 1990). Defendants cannot clear that high bar.

**CONCLUSION**

The Court should deny the motion.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Joshua D. Branson*
David C. Frederick (D.C. Bar No. 431864)
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Thomas G. Schultz (D.C. Bar No. 1028017)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
tschultz@kellogghansen.com

Ryan R. Sparacino (D.C. Bar No. 493700)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*